# Exhibit C

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

WILLIAM DUKES,                )
                              )
        Plaintiff,            )
                              )
        -vs-                  ) No. 17 cv-7095
                              )
COOK COUNTY SHERIFF'S, et al, )
                              )
        Defendants.          )

THE VIDEOCONFERENCE DISCOVERY DEPOSITION OF
ASHLEY BLOODWORTH, RN, taken in the above-entitled
case, before SHARON A. DORENCZ, Certified Shorthand
Reporter within and for the County of Cook and State
of Illinois, on the 4th day of February, A.D., 2022,
at the hour of 9:00 o'clock a.m. pursuant to notice.

---

**Page 2**

1
2               A P P E A R A N C E S
3       MAUCK & BAKER, LLC, by
        MS. KIRSTIN M. ERICKSON
4       MR. WHITMAN BRISKY
        1 North LaSalle Street  Suite 600
5       Chicago, Illinois 60602
        kerickson@mauckbaker.com
6
                on behalf of the plaintiff;
7
8       DeVORE RADUNSKY, by
        MR. TROY S. RADUNSKY
9       20 North Clark Street  Suite 525
        Chicago, Illinois 60602
10      tradunsky@devoreradunsky.com
                on behalf of Defendant
11              Ashley Bloodworth.
12
        MIA BUNTIC, Assistant State's Attorney
13      50 West Washington Street Suite 2760
        Chicago, Illinois 60602
14      mia.buntic@cookcountyil.gov
                on behalf of Defendant
15              Willie Partee;
16
        LAW OFFICES OF JOHN C. COYNE, by
17      MR. JOHN C. COYNE
        53 W. Jackson Boulevard  Suite 1750
18      Chicago, Illinois 60604
        jjc@johnccoynelaw.com
19
                on behalf of Defendants
20              Altman and Smith.
21
22
23
24

---

**Page 3**

1                   I N D E X
2       WITNESS                     EXAMINATION
3       ASHLEY BLOODWORTH
4       By Ms. Erickson                 4
5
6               E X H I B I T S
7       Bloodworth Deposition       Marked for ID
        Exhibit
8
        Exhibit A  Answers to Pl. Interrogatories   16
9       Exhibit B  Interagency Directive            56
        Exhibit C  Dukes Medical Records            85
10      Exhibit D  Housing Records                  99
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**Page 4**

1       COURT REPORTER:  Before we proceed, I will
2       ask counsel to agree on the record that under the
3       current National Emergency, pursuant to Section 319 of
4       the Public Health Service Act, there is no objection
5       to this deposition officer administering a binding
6       oath to the witness by Zoom videoconference.
7               Please state your agreement on the
8       record.
9               MS. ERICKSON:  Kirstin Erickson for the
10      plaintiff.  No objection.
11              MR. RADUNSKY:  Troy Radunsky for the
12      defendant and the witness.  No objections.
13              MS. BUNTIC:  Mia Buntic on behalf of
14      Defendant Partee.  No objection.
15              MR. COYNE:  John Coyne on behalf of
16      Defendants Altman and Smith.  No objection.
17              (Witness duly sworn.)
18      WHEREUPON:
19              ASHLEY BLOODWORTH,
20      called as a witness herein, having been first duly
21      sworn, was examined upon oral interrogatories and
22      testified as follows:
23              E X A M I N A T I O N
24      BY MS. ERICKSON:

---

1  (Pages 1 to 4)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 5

1    Q.  Could you please state your name for the
2    record and spell your last name?
3        A.  Ashley Bloodworth, and last name,
4    B-l-o-o-d-w-o-r-t-h.
5        Q.  Thank you.  Let the record reflect this is
6    the deposition of Ashley Bloodworth taken pursuant to
7    notice and set by agreement of the parties.  The
8    deposition will be taken pursuant to Federal Rules of
9    Civil Procedure 30 and all other applicable rules.
10            My name is Kirstin Erickson.  I
11   represent Mr. William Dukes in this matter.  I'm gonna
12   ask you some questions today regarding your
13   background, education, employment history and then
14   specifically about your time at Cook County Department
15   of Corrections as a nurse for Cermak.  Does that sound
16   good?
17       A.  Okay.
18       Q.  Is it okay if I call you Ashley?
19       A.  Yes, it is.
20       Q.  All right.  And have you ever given a
21   deposition before?  She's frozen here.  (video
22   distortion)
23       A.  Hello?
24           MR. RADUNSKY:  Ashley, you know what, we

Page 6

1    didn't -- can you hear us?
2            THE WITNESS:  I can hear you now.
3            MR. RADUNSKY:  Okay.  Listen, if we, like,
4    Ms. Kirstin just pointed out, if we get frozen or
5    something happens or you don't understand this
6    question, like we -- attorney/client privilege, but
7    what we talked about yesterday.  Do not answer a
8    question if you don't understand it or the screen
9    freezes.  Okay?  You know, Kirstin will be happy to
10   restate it.  And I think that might have just
11   happened.  With technology, there can be things like
12   that, so let's just make sure if that happens, that
13   you speak up, okay, or we'll try to -- we'll try to be
14   aware of it, too.  Okay?
15       A.  Okay.
16           MR. RADUNSKY:  Okay.
17           MS. ERICKSON:  Thanks, Troy.
18   BY MS. ERICKSON:
19       Q.  Okay.  So have you ever given a deposition
20   before, Ashley?
21       A.  I believe I did once before.
22       Q.  Okay.  So we're gonna go over some of those
23   ground rules that you went over before likely.  Please
24   make sure all your answers are verbal, as the court

Page 7

1    reporter can't take down nods and uh-huhs.  Okay?
2        A.  Okay.
3        Q.  And then make sure I finish my question
4    before you start to answer because the court reporter
5    can't take down both voices at the same time.  Is that
6    fair?
7        A.  Yes.
8        Q.  Okay.  If I ask you a question you don't
9    understand, please just let me know, and I'll either
10   repeat it or rephrase it.  But if you answer the
11   question, I'm going to assume you understood it.  Does
12   that sound fair?
13       A.  Yes.
14       Q.  I'm gonna ask you questions that go back
15   several years, and if you don't remember something,
16   you don't have the answer to my question, just let me
17   know, and I'll move on.  Does that sound good?
18       A.  Okay.  That sounds good.
19       Q.  All right.  Is anyone else in the room with
20   you?
21       A.  No.
22       Q.  Okay.  So you should not communicate with
23   anyone else during the deposition other than myself
24   and the court reporter unless we go on break, in which

Page 8

1    case you can speak with, obviously, your attorney or
2    someone else.  You should also not consult with any
3    written, printed or electronic information during the
4    deposition other than information provided to you by
5    me via zoom.  Okay?
6        A.  Okay.
7        Q.  Okay.  And computer and phone usage during
8    the deposition is limited to access to the zoom
9    deposition, interface and/or exhibits being used, and
10   cannot be used at any time for research on breaks.
11   Okay?
12       A.  Okay.  I do have a question.  If my school
13   calls regarding my kids or anything, can I pickup the
14   phone or say I need to take a break to --
15       Q.  Yeah.
16       A.  -- answer the phone for them?
17       Q.  Yeah.
18       A.  Not assuming that, but just in case I need
19   to know.
20           MR. RADUNSKY:  Yes.
21   BY MS. ERICKSON:
22       Q.  For sure.  If there's a question pending, I
23   would just ask you answer that question, and then we
24   could take a break right then.  Okay?

2 (Pages 5 to 8)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

| Page 9 | Page 10 |
|---|---|

**Page 9**

1      A. Okay. Sounds good. Thank you.
2      Q. Yeah, sure. Okay. So, Ashley, what's your
3 date of birth?
4      A. June 21, 1985.
5      Q. And then, if we can go off the record for
6 one minute?
7          (Off the record.)
8 BY MS. ERICKSON:
9      Q. We'll go back on the record. Ashley, what
10 is your current address?
11      A. 15147 Wabash Avenue, South Holland, Illinois
12 60473.
13      Q. How long have you lived there?
14      A. A little over about three years or so.
15      Q. Who currently lives with you?
16      A. Myself and my two kids.
17      Q. How old are your kids?
18      A. My son, he is 17, and my daughter is 16.
19      Q. Are you married?
20      A. No.
21      Q. Have you ever been married?
22      A. Yes, I have.
23      Q. What is your ex-husband's name?
24      A. Michael Hatchet, Jr.

**Page 10**

1      Q. Let's go to your educational background. So
2 you graduated from Rich East High School in 2003?
3      A. Correct.
4      Q. Where is that located?
5      A. That is lo -- well, they closed that school
6 down, but it was --
7          MR. RADUNSKY: Go ahead.
8          THE WITNESS: -- located in Park Forest,
9 Illinois.
10 BY MS. ERICKSON:
11      Q. In Illinois?
12      A. Yes.
13      Q. And then you graduated from Chicago State
14 University in 2014?
15      A. Yes.
16      Q. You received your RN from Chicago State?
17      A. My bachelor's, yes.
18      Q. Did you receive any other degrees when you
19 were at Chicago State?
20      A. No.
21      Q. When did you pass the NCLEX exam?
22      A. I believe it was around 2014.
23      Q. You took it right after you graduated?
24      A. I believe so.

| Page 11 | Page 12 |
|---|---|

**Page 11**

1      Q. Have you ever been convicted of a felony or
2 a crime involving dishonesty?
3      A. No.
4      Q. In preparation for your deposition, did you
5 review anything?
6      A. Yes.
7      Q. What did you review?
8      A. It has been such a long time. We reviewed
9 what I and -- (audio distortion)
10      Q. I think you're freezing up. Hang on one
11 second, Ashley.
12          MR. RADUNSKY: Ashley, say it again, what
13 you reviewed. You got cutoff. You froze.
14          THE WITNESS: It says my Internet connection
15 is unstable. Can you hear me?
16          MR. RADUNSKY: Yeah, we can hear you now.
17 So you just started to say what documents you
18 reviewed, and then you froze. So can you just start
19 again and answer Kirstin's question about what
20 documents you reviewed?
21          THE WITNESS: Okay. I -- we reviewed the
22 MAR. We went over some directives, I'm trying to
23 think, what the lawsuit was about, and we went over
24 what I responded to, the documents that I responded

**Page 12**

1 to.
2 BY MS. ERICKSON:
3      Q. Okay. What do you mean by directives?
4      A. The directives with I guess we were supposed
5 to do or follow.
6      Q. So the policies in place?
7      A. Well, that's not what they're called but --
8      Q. Okay.
9      A. What I knew them as, I don't know what
10 they're, you know, what they are now, but we knew them
11 as directives so --
12      Q. Okay.
13          MR. RADUNSKY: Kirstin?
14          MS. ERICKSON: Yes.
15          MR. RADUNSKY: Can we go off the record? I
16 mean, can I explain, I mean, just what she said right
17 there maybe so you can understand? I just want to
18 explain really fast. So the officers of the jail --
19          COURT REPORTER: I'm sorry. Did you say --
20          MR. RADUNSKY: We're off the record. We're
21 off the record.
22          MS. ERICKSON: No, no. Why? Let's just
23 stay on the record.
24          MR. RADUNSKY: Okay. Go ahead. I wanted to

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 13

1  explain why she said that they're called bulletins and
2  directives. It's because Cermak has things, as you've
3  seen in this case, and they put up bulletins and
4  directives. The officers of the jail have policies,
5  so that there's a distinction there, or interagency
6  things that we have, which are for both Cermak and the
7  offices.
8       So that's why she doesn't know them as
9  policies, because those are for the officers at the
10 jail. She knows them as directives and bulletins. So
11 that's what she's saying. Okay. Thanks. Go ahead.
12 Sorry. I didn't mean to interrupt.
13 BY MS. ERICKSON:
14      Q. Did you talk to anyone other than your
15 attorney in preparation for your deposition today?
16      A. No.
17      Q. Now, are you currently working, Ashley?
18      A. Yes.
19      Q. Where do you work?
20      A. At Chicago Public Schools.
21      Q. How long have you been there?
22      A. I started April, 2021, last year.
23      Q. What is your role there?
24      A. I'm a health service nurse.

Page 14

1      Q. Are you stationed at one specific school?
2      A. No.
3      Q. How many schools do you work at?
4      A. I work at three.
5      Q. And where were you working prior to CPS?
6      A. I was at Cook County Stroger Hospital.
7      Q. What time frame were you at Cook County
8  Stroger?
9      A. I believe in 2018 to 2021. To that April,
10 2021.
11      Q. So did you go straight to Stroger after you
12 worked at Cook County Department of Corrections?
13      A. Yes.
14      Q. And I believe the record shows that you
15 worked at Cook County Department of Corrections for
16 Cermak from October, 2016, through August, 2018. Does
17 that sound right?
18      A. That sounds about right.
19      Q. Okay. What was -- what was your shift when
20 you started working at Cook County?
21      A. When I started working, I was on the night
22 shift.
23      Q. What shift -- what are the hours for that
24 shift for nurses?

Page 15

1      A. I believe it was 3 to 11.
2      Q. Okay. And then did that change at some
3  point in your couple of years at Cook County?
4      A. Yes.
5      Q. What did it change --
6      MR. RADUNSKY: Is that 3 p.m. to -- I mean,
7  I'm sorry, 3 p.m. to 11 p.m., or are you saying 3 a.m.
8  to 11 a.m.? I just wanted to be clear. I'm sorry.
9      THE WITNESS: Yeah. 3 p.m. to 11 p.m.
10     MR. RADUNSKY: Okay.
11     THE WITNESS: Or 11:30 but --
12 BY MS. ERICKSON:
13      Q. How long were you on that shift from 3 p.m.
14 to 11 p.m.?
15      A. I really don't know the exact time, but I do
16 know that I did go into different shifts cause I
17 worked the daytime. I remember working the daytime
18 shift was like 7 to 3, so yeah. It varied though.
19      Q. Did you decide to switch shifts, or did
20 someone tell you you need to work this shift now?
21      A. I didn't -- I had to. I think at that time
22 I needed the day shift, and so they let me come into
23 the day shift.
24      Q. Okay. And were you full time when you were

Page 16

1  working at Cook County?
2      A. Yes.
3      Q. So how many shifts per week did you work
4  when you were full time?
5      A. I know you get -- I got, like, two days off,
6  so what's that, five days a week, I guess.
7      Q. Did you work weekends?
8      A. Yes. I believe we worked weekends, every
9  other weekend or something to that effect.
10      Q. Did you have a preferred shift?
11      A. No. I mean, I enjoyed the 7 to 3 in
12 order -- it just worked out for my schedule for my
13 kids and that main stuff.
14      Q. The 7 a.m. to 3 p.m.?
15      A. Yes.
16      Q. Okay. I'm going to post or share my screen
17 and put up your Answers to Interrogatories in a moment
18 here. All right. So I'm marking this as Exhibit A.
19 Do you recognize this as your Answers to Plaintiff's
20 Interrogatories?
21      A. Yes.
22               (Bloodworth Deposition
23               Exhibit A marked for
24               identification.)

4  (Pages 13 to 16)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

| Page 17 |
| --- |

1      MR. RADUNSKY: Can you see that okay,
2  Ashley?
3      THE WITNESS: Yes, I can see that.
4      MR. RADUNSKY: Obviously, if you can't, just
5  tell her, and she'll make it better, you know, I'm
6  sure.
7      THE WITNESS: Okay.
8  BY MS. ERICKSON:
9      Q.  And then the very last page, which I
10  combined, because the page was separate, is this your
11  signature, Ashley?
12      A.  Yes.
13      Q.  Okay.  And you marked this on 11/18/2021?
14      A.  Yes.
15      Q.  Okay.  And so did you review your Answers to
16  Interrogatories?
17      A.  Yes.
18      Q.  When you answered them, you answered them
19  truthfully and as honestly as you could?
20      A.  Yes.
21      Q.  Okay.  I was -- down here on No. 3, it could
22  just be a typo, but it states that you worked at Cook
23  County from October, 2016, through August, 2018, but
24  then later on it says October, 2015, to 2018.

| Page 18 |
| --- |

1  I just want to clarify.  You started
2  working in October of 2016, right?
3      A.  Oh man.  Okay.  Yes.
4      MR. RADUNSKY: Yeah.
5      THE WITNESS: I'm sorry for that typo.
6      MR. RADUNSKY: Yeah, that's my fault, too.
7  BY MS. ERICKSON:
8      Q.  And then looking at No. 6.  It's a question
9  saying -- regarding policies.  And in your response,
10  it states, "None.  We do not have "policies."  Our
11  medical license tells us when to refer a patient to a
12  higher level provider."
13          Did the word "policies" throw you off
14  in this question?
15      A.  Yes, it did.
16      MR. RADUNSKY: Uh-huh.
17  BY MS. ERICKSON:
18      Q.  Okay.  So then -- go ahead.
19      A.  Okay.  No, go ahead.  It did.
20      Q.  It's because you would call them
21  directives?
22      A.  Yes.
23      Q.  Okay.  And so there were directives in place
24  when you worked there from 2016 to 2018, right?

| Page 19 |
| --- |

1      A.  Yes.
2      Q.  And how did you learn about those
3  directives?
4      A.  We were --
5      MR. RADUNSKY: Go ahead.  I'm sorry.  Go
6  ahead.
7      THE WITNESS: We had training when you're
8  first hired.  I do recall being trained.
9  BY MS. ERICKSON:
10      Q.  What did the trainings entail?
11      A.  Oh, that was long ago.  Let's see.  I know
12  they gave us some paperwork.  Oh, I had to shadow a
13  nurse.  That's all I can remember.
14      Q.  How long did you have to shadow before you
15  started working, if you remember?
16      A.  No.  I don't remember that.  But it was -- I
17  believe it was long enough.  I don't know.  To be
18  honest, I don't know.
19      Q.  That's okay.  Don't worry about it.
20          The paperwork that you received,
21  within the paperwork, were the directives in that
22  paperwork?
23      A.  I believe the directives were in that
24  paperwork.  I don't have it now, so I don't know.

| Page 20 |
| --- |

1      MR. RADUNSKY: She also called them
2  bulletins.  Either -- they're different titles, but
3  the same thing, you know.
4      MS. ERICKSON: Okay.
5  BY MS. ERICKSON:
6      Q.  So within the paperwork you received, it
7  sounds like you received the directives and bulletins;
8  is that correct?
9      A.  Yes.
10      Q.  Okay.  And you would have reviewed those
11  before you started working at Cook County?
12      A.  Yes.
13      Q.  Were you required to sign a document saying
14  "I agree to follow these directives and bulletins"?
15      A.  I believe there might have -- I might have
16  signed something.  Again, I don't know.  I don't
17  remember.  That was a while ago.
18      Q.  Okay.  And what do you remember about
19  learning in those directives?
20      A.  Once again, that was a long time ago.  I
21  really cannot remember, but it was like more so like
22  medical standards, medication, how to administer
23  medication.
24      Q.  Did it explain --

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 21

1    A.  Treatment issue.  Okay.  Go ahead.  I'm
2   sorry.
3    Q.  No.  I cut you off.  What did you say?
4    A.  Like any treatment issue.
5    Q.  Did you have any in-person training with
6   supervisors going through the directives with you?
7    MR. RADUNSKY:  You mean different than the
8   shadowing?
9    MS. ERICKSON:  Yes.
10   MR. RADUNSKY:  Okay.  Go ahead, Ashley.
11   THE WITNESS:  I don't recall that.  I don't
12  recall that.  I just remember shadowing with a nurse
13  or nurses.
14  BY MS. ERICKSON:
15   Q.  And the paperwork that you received at the
16  beginning in August, 2016, did you receive directives
17  about Med Pass?
18   A.  I believe so.
19   Q.  What about intake?
20   A.  No.  I don't recall intake.  I don't
21  believe --
22   MR. RADUNSKY:  I mean, I guess objection to
23  form.  Can you just define what you mean by intake.
24   You can answer Ashley.  You can answer

Page 22

1   if you understand.
2    THE WITNESS:  Can you, like, repeat the
3   question like what kind of -- like, what do you mean
4   when you say "intake"?
5   BY MS. ERICKSON:
6    Q.  Did you receive any information in the
7   directives about what happens when an inmate arrives
8   to Cook County and they go through a sort of intake
9   process medically?
10   A.  They -- they could have, yes, but again, I'm
11  just kind of foggy on that.
12   Q.  Would you have received information in those
13  directives when you started about how to handle
14  emergencies in the tiers?
15   A.  Yes.  They may have given me that
16  information as well.
17   Q.  Did you receive information in those
18  directives about how to service request forms?
19   A.  Yes.
20   Q.  So after you reviewed the directives and did
21  your shadowing and you started working, did you feel
22  like you knew what you were supposed to do as a nurse
23  working at Cook County?
24   A.  I believe I did, uh-huh.

Page 23

1    Q.  Okay.  No. 13 in your answers, I just want
2   to understand what you mean.  This, the question
3   basically asks whether you were authorized by a
4   supervisor or individual while working at the medical
5   staff at CCDOC to decide whether an inmate required
6   medical care and treatment and prescription
7   medications between November, 2015, and 2017.  And if
8   you were authorized, just to state the name and job
9   title of the individual who authorized you to make the
10  decision.
11   And in your response, it states, "I
12  can administer non-narcotic medication, and over the
13  counter medications such as an Advil or Tylenol to
14  inmates."
15   So the last part I understand.  But
16  the first part of "I can also administer non-narcotic
17  medication," what do you mean by that?
18   A.  I believe from -- I believe there was like
19  some kind -- Okay.  Wait.
20   Q.  Sure.  Take a minute if you need to.
21   A.  We were able to, depending on the complaint,
22  I can remember that we were able to administer pain
23  medications, but it was -- how can I put it -- the
24  medical director, they had a medical director, and it

Page 24

1   was okay as long as they have these symptoms, by the
2   symptoms, we could give them basic over-the-counter
3   medication, like Tylenol or Advil.
4    Q.  Okay.  So this first part is also just
5   referring to the ability to give over-the-counter
6   medications, like Advil, Tylenol?
7    A.  Yes.
8    MR. RADUNSKY:  When you say "the first
9   part," Kristin, could you be more specific?
10  BY MS. ERICKSON:
11   Q.  Sure.  So the first part of this statement,
12  "I can also administer non-narcotic medication,"
13  refers to administering over-the-counter medications,
14  like Advil and Tylenol?
15   MR. RADUNSKY:  Yeah.  That's been asked and
16  answered.  Go ahead.  You can answer it again,
17  Ashley.
18   THE WITNESS:  Yes.
19   MR. RADUNSKY:  Okay.  Thanks for clarifying,
20  Kristin.  I appreciate it.
21   MS. ERICKSON:  Sure.  Stopping sharing.  All
22  right.
23  BY MS. ERICKSON:
24   Q.  And Cook County Department of Corrections

6  (Pages 21 to 24)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

| Page 25 | Page 26 |
|---|---|

**Page 25**

1 was the name on your paycheck, right?
2     A. Yes, I believe so, yes.
3     Q. Do you remember working with correctional
4 officer Roy Foster in 2017 in division 10, tier 2C?
5     A. No, I do not.
6     Q. Do you remember working with Nakia Buchanan
7 Smith, also a correctional officer in that same
8 tier?
9     A. No, I do not.
10     Q. Do did you work with Correctional Officer
11 Eleanor Altman at that same time?
12     A. No, I do not remember.
13     Q. And do you remember working with Amir
14 Qureshi in 2017 in Division 10, tier 2C?
15     A. No, I do not.
16     Q. So you left Cook County Department of
17 Correction in 2018. Why did you leave?
18     A. Well, I was able to get the day shift
19 because I was given, like, accommodations, but there
20 wasn't a day shift at the jail at that time, and so
21 what I did get was offered was a daytime position at
22 Stroger, so that's where I went.
23     Q. So because they couldn't give you day shift
24 at Cook County, you left?

**Page 26**

1     A. For at the jail?
2     Q. Yes.
3     A. Yes, uh-huh, yes.
4     MR. RADUNSKY: Is that a yes?
5     THE WITNESS: Yes.
6     MR. RADUNSKY: No uh-huhs or uh-uhs.
7     THE WITNESS: I'm sorry.
8     MR. RADUNSKY: That's okay. You're doing
9 fine.
10 BY MS. ERICKSON:
11     Q. Okay. So let's talk about your
12 responsibilities and duties as a nurse, a registered
13 nurse while working at Cook County Department of
14 Corrections. And when I say "Cook County" in this
15 context, I'm only talking about Cook County Department
16 of Corrections, not Stroger. Okay?
17     A. Okay.
18     Q. Because I know you were at --
19     A. At the jail?
20     Q. Yes. Yes. So you were a registered working
21 nurse while working at Cook County, right?
22     A. Yes.
23     Q. Okay. And what were you responsible for
24 while working at Cook County as a registered nurse?

| Page 27 | Page 28 |
|---|---|

**Page 27**

1     A. The treatment of the detainees, medical
2 treatment of the detainees.
3     Q. So what about the treatment were you
4 responsible for?
5     A. Administering medication.
6     Q. Were you responsible for taking part in the
7 intake process when inmates would arrive to Cook
8 County?
9     A. No.
10     Q. Who did that?
11     A. I don't remember, but I believe it was
12 intake.
13     MR. RADUNSKY: You don't have to guess. If
14 you don't -- I think she's looking for the names of
15 anybody that you might recall. And if you don't
16 remember, she doesn't want you guessing, you know.
17 BY MS. ERICKSON:
18     Q. Oh, no, no. Not specific names. But I just
19 wondered what was the role or the title of the person
20 who performed intake?
21     A. I don't know. I can't recall anything about
22 that process.
23     Q. And you had said that one of your main roles
24 was administering medication, right?

**Page 28**

1     A. Yes.
2     Q. Every time that you administered a
3 medication to an inmate, were you required to put that
4 medication in the EMAR or the electronic medical
5 records?
6     A. Yes.
7     Q. When did you do that during your shift?
8     A. As soon as I gave the medication.
9     Q. So you would go and give the medication and
10 then right in that moment put it in the system?
11     A. Yes. As soon as they took the medication,
12 yes.
13     Q. So then you're familiar with the EMAR system
14 at Cook County then, right?
15     A. Yes. Somewhat. It's been a while, but I am
16 familiar with EMAR as a nurse, yes.
17     Q. If an inmate receives a medication, are
18 there times that the medication does not go into the
19 EMAR for that particular inmate?
20     A. No. I don't believe so.
21     Q. Who did you report to when you were working
22 at Cook County?
23     A. I don't know his name, but I had managers,
24 but I don't remember their name.

7 (Pages 25 to 28)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 29

1    Q. What were their titles?
2    A. Manager or supervisor.
3    Q. Would they be called like a nursing
4  supervisor?
5    A. I don't recall that, but I did look to
6  doctors as well. But immediate supervisors, that's
7  all I know. I can remember manager supervisors.
8    Q. Did you report directly to the medical
9  director?
10    A. I don't recall reporting to the medical
11  director, but I did report to doctors, whoever was --
12  I don't recall.
13    Q. Whoever was what?
14    A. Whoever was on call or whatever doctor was
15  available, yes.
16    Q. So when you say you reported to doctors when
17  they were on call, what do you mean by that?
18    A. Well, whoever was -- there was always a
19  medical provider there, so if we had to, it was an
20  issue, we would go report to them any issues, medical
21  issues with any detainee.
22    Q. Okay. And that particular medical provider
23  you're saying was always a physician?
24    A. Or a nurse practitioner.

Page 30

1    Q. So you -- it sounds like if there was a
2  specific issue and you needed to ask questions about,
3  you would go to either a physician that was there or a
4  nurse practitioner?
5    A. Yes.
6    Q. And you said that a physician was always
7  there?
8    A. Well, they're always -- they were always
9  available, so you could call them. You can reach them
10  basically.
11    Q. So even if they weren't physically present,
12  you could, you know, page or call a physician to get
13  answers to your questions?
14    A. Yes.
15    Q. Okay. And were there physicians on site at
16  Cermak?
17    A. There were physicians there, yes.
18    Q. When were they there?
19    A. There was always a physician available, but
20  primarily in the morning, like during the daytime,
21  they were more so present, but there was always a
22  doctor available somewhere, even if it was, like,
23  Urgent Care or Cermak.
24    Q. Okay. Where was Urgent Care located in Cook

Page 31

1  County?
2    A. Okay. So I was in Division 10. And so
3  Cermak was, like, the hospital portion of the jail.
4  So if there was ever an issue, they, you know, you
5  could send them to Urgent Care. And there they have
6  doc -- you know, they can be treated urgently for
7  things that we didn't have or accessible to us in our,
8  you know, division.
9    Q. Was there one Urgent Care for each
10  division?
11    A. No. I don't think so. I think it was an
12  Urgent Care for all inmates, detainees.
13    Q. And who was working in Urgent Care?
14    A. It was doctors, nurses and other staff that
15  I'm not -- I'm not -- I can't remember anymore.
16    Q. Was it open 24/7?
17    A. Yes.
18    Q. What types of medical needs would an inmate
19  have that would cause them to go to Urgent Care?
20    A. Any trauma, bleeding, unconsciousness.
21  Those are some things I can think of off the top of my
22  head.
23    Q. What if an inmate had specific prescribed
24  medications and they weren't getting them in the Med

Page 32

1  Pass, could they request to go to Urgent Care to see a
2  physician and ask for those medications?
3    MR. RADUNSKY: Objection. Is that a
4  hypothetical? It's a hypothetical, I'm assuming? Is
5  that a hypothetical, Kirstin?
6    MS. ERICKSON: I'm asking based on her
7  experience what would happen.
8    MR. RADUNSKY: Well, I'm asking you if
9  that's a hypothetical, or are you trying to say that
10  that's specifically a question related to your client?
11  I'm assuming it's a hypothetical. I mean, can you
12  just tell me if it is?
13    MS. ERICKSON: Well, let's have the question
14  read back. Court reporter, can you read it back, and
15  we'll just -- we'll analyze whether it's -- it doesn't
16  matter either way. If she can answer the question,
17  she can answer the question.
18        (Question read back.)
19  BY MS. ERICKSON:
20    Q. It sounds speculation. I want to know in
21  your experience, what would you do in that
22  situation?
23    MR. RADUNSKY: Okay. Go ahead. You can
24  answer.

8  (Pages 29 to 32)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 33

1    THE WITNESS: Okay. Well, they can have the
2  officer bring them and give the medication. Any
3  medication that they missed, we were willing -- well,
4  the nurses were willing to give them their medication
5  if they were missed, so, yeah.
6  BY MS. ERICKSON:
7    Q. So are you saying that they wouldn't need to
8  go to Urgent Care because the nurses could help them
9  get the medications that they didn't have?
10    A. Yes.
11    Q. Were your superiors employed by Cermak or
12  Cook County Department of Corrections?
13    MR. RADUNSKY: Object to the form of that
14  question. It's also speculation because she said she
15  doesn't remember the name of any of her superiors, but
16  you can answer, Ashley. Go ahead.
17    THE WITNESS: I believe it was all in the
18  same agency. Cermak was housing the CCDOC so --
19  BY MS. ERICKSON:
20    Q. So is it -- I mean, did you work collab --
21  strike that.
22    Did you work collaboratively with the
23  Cook County Department of Correction officers and
24  staff such that you weren't distinguishing who was

Page 34

1  working for who?
2    A. We would -- we worked collaboratively,
3  yes.
4    Q. Did you have a medication escort officer
5  when you went to administer medication?
6    A. Yes.
7    Q. What was that person's role?
8    A. For safety.
9    Q. Can you be more descriptive? So for safety
10  what?
11    A. Safety of the nurses.
12    Q. What would happen -- so what I want to know
13  is what would happen if you walked around with
14  medication and you didn't have a medication escort
15  officer? Like what was the fear or risk, do you
16  know?
17    MR. RADUNSKY: Objection. Foundation. I
18  mean, she never said that there wasn't an escort
19  officer there, so I think that that's not a fair
20  question based on her prior responses.
21    You can answer, Ashley.
22    THE WITNESS: Can you repeat the question,
23  ma'am?
24    MS. ERICKSON: Yeah. I forgot, too. Court

Page 35

1  reporter, can you repeat the question?
2    (Question read back.)
3    THE WITNESS: No. We never did not have an
4  escort with us.
5  BY MS. ERICKSON:
6    Q. Okay. Was that med -- was the medication
7  escort officer also a correction officer?
8    A. Yes.
9    Q. Can you explain the process of performing
10  Med Pass on your shift?
11    A. Let me see. It was a while ago. But I
12  remember we went into, like, a room, each I believe it
13  was called a tier, would have a room, and we would
14  administer the medication. And then the detainee
15  would come one by one to receive their medication, and
16  the officers would be present. It was officers, if I
17  can recall, two that were present as well.
18    Q. So that room was separate from the general
19  tier unit?
20    A. Yes.
21    Q. And so how did the inmates know that it was
22  time to receive medication?
23    A. I believe the officers would let them
24  know.

Page 36

1    Q. Okay. So it -- it was more like you -- the
2  officers would come in and say it's time to receive
3  medication, and anyone who knew they received
4  medication would come up?
5    A. Yes.
6    Q. Okay. And how was that organized? Who got
7  the medication first, second, third, et cetera?
8    A. I -- if I can recall, I believe they -- I
9  guess they -- they were -- they would come in one by
10  one. I don't know exactly what order that was, but
11  they would come in to us one by one. I can't remember
12  the order.
13    Q. So you weren't in charge of figuring out who
14  came in. You just gave the medicine when they came in
15  to see you, is that --
16    A. Yes. After -- yes. After we identified,
17  you know, were given, you know, their name and
18  identifiers, yes.
19    Q. What did you have with you to know who
20  received what medication and dosages?
21    A. We had, if I can recall correctly, it was a
22  medication cart with computers so we can chart
23  realtime. And I believe they were locked in the
24  medication cart, the medication.

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 37

1     Q.  So how -- okay.  So if an inmate walks up to
2  you and says, my name is Jimmy John, do you look up
3  their name at that moment to see what medications they
4  receive?
5     A.  Yes.  And, also they have to identify
6  another identifier to make sure that that can be Jimmy
7  John, as you said.
8     MR. RADUNSKY:  That I know is a
9  hypothetical.
10     MS. ERICKSON:  My favorite -- my favorite
11  sandwich shop.  Sorry.
12  BY MS. ERICKSON:
13     Q.  So if a person walks up to you and they say,
14  this is my name, and you look up in the system their
15  particular name, right?
16     A.  Yes.
17     Q.  Do you have to look at their ID?
18     A.  Yes.
19     Q.  And how does the inmate receive the ID, if
20  you know?
21     A.  Well, I believe it's -- I don't know, but I
22  believe the officer made sure that they had their ID.
23  I really can't remember the exact process, you know,
24  but I do remember the ID with the picture and the name

Page 38

1  and then them having to identify who they were, some
2  identifiers that they had to say to make sure that
3  they were indeed the person who was supposed to
4  receive the medication.
5     Q.  Would the identifiers be, like, their date
6  of birth --
7     A.  Yes.
8     Q.  -- or would it also have possibly been
9  their -- their inmate number?
10     A.  Those, yes, are identifiers.
11     Q.  What if an inmate comes into you and says
12  they need medication, but their name isn't in the
13  chart stating that they need medication, what do you
14  do then?
15     MR. RADUNSKY:  Objection.  Foundation.  It
16  assumes facts that are not in evidence.  It's a
17  hypothetical.  You can answer Ashley, go ahead.
18     THE WITNESS:  Okay.  Can you repeat that
19  again?  I'm sorry.  I didn't --
20     MR. RADUNSKY:  I'm sorry.  The court
21  reporter can read it back.
22     (Question read back.)
23     THE WITNESS:  We would look up their name in
24  the MAR and see if they have their medication.  But

Page 39

1  that generally, I don't recall that happening so --
2  BY MS. ERICKSON:
3     Q.  Oh, so you don't recall ever typing in the
4  name and then not finding their name with the
5  medication in the chart?
6     A.  I don't recall it happening --
7     Q.  Okay.
8     A.  -- no.
9     Q.  But if it happened, what would the
10  directives say that you should do in that -- in that
11  moment?
12     A.  Again, it's been a while, but I would look
13  them up, just verify that that is indeed that person
14  with the correctional officer, and I would look up
15  their medication or and their orders in the
16  computer.
17     Q.  But if they didn't have an order in the
18  computer, what would be the next step for you as the
19  nurse?
20     A.  Well, they had -- I believe they had access
21  to yellow slips.  That's how I remember them.  And
22  they can -- they could write any complaints, or they
23  could tell us what's going on.  And based upon
24  whatever symptoms they were having, and if it's within

Page 40

1  our scope of practice that we were given, we could
2  give them, like, how I said, the non -- the Advil or
3  Tylenol, like I said, they were having pain, we could
4  administer that.  But they would have to fill out a
5  health service request form as well.
6     Q.  And the yellow slip is the health service
7  request form, right?
8     A.  Yes.
9     Q.  So the inmate in that moment could fill out
10  the health service request form for anything from over
11  the counter to potentially narcotics and other
12  medications, right?
13     A.  Well, the doctor would have to -- they would
14  have to see a doctor, and the doctor would have to
15  prescribe based upon his assessment from that.
16     Q.  So would it be if you don't see an order in
17  the system for this particular inmate, you might give
18  them over-the-counter medications, or you might say
19  you need to talk to a doctor, right?
20     A.  Yeah.  But most of the time we referred them
21  to the -- to the doctor, yes.
22     Q.  And how soon after that conversation would
23  the inmate see a doctor?
24     MR. RADUNSKY:  Objection to the form of the

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

| Page 41 |
| --- |

1  question. I think that that's gonna vary. You can
2  answer it. You can answer it.
3      THE WITNESS: I believe it was -- they would
4  see them, but it -- I don't know. It depend on the
5  part like what is going on with them --
6  BY MR. ERICKSON:
7      Q. Uh-huh.
8      A. -- as far as the time frame.
9      Q. What if -- what if it was a night Med Pass
10  and the physicians weren't on site, how -- how would
11  the inmate see a physician if the physician is not on
12  site?
13      MR. RADUNSKY: Objection. Speculation and
14  foundation. I mean, you're asking her to, like, I
15  mean, you can answer it. You can answer it.
16      THE WITNESS: Can you repeat that question
17  again?
18      MS. ERICKSON: Court reporter, can you
19  please read it back? Thanks.
20      (Question read back.)
21      THE WITNESS: Well, generally, I don't
22  recall that happening a lot. But during the day, they
23  were given -- well, every day they're given the access
24  to the yellow form slip. So they can ask. But if

| Page 42 |
| --- |

1  it's an emergent situation, they can be -- I think
2  they were taken to Cermak, or they can go to Urgent
3  Care or upstairs to the infirmary. Once again, it was
4  a long time ago, so everything is foggy.
5  BY MS. ERICKSON:
6      Q. Yeah, I understand that.
7      Who would take the inmate to Urgent
8  Care if it was a more emergent situation at that time?
9      A. It would be the nurses and officers.
10      Q. And as a registered nurse, what sorts of
11  medical situations would you consider to be
12  emergent?
13      A. Unconsciousness, blood trauma, someone not
14  breathing. That's a few I can think of the top of my
15  head right now.
16      Q. Would you consider chest pains to be an
17  emergent and serious medical need?
18      A. Chest pains are, yes. Chest pains are
19  important, but it's other -- it could be other
20  symptoms depending on what my assessment entails.
21      Q. I don't understand. What do you mean?
22      A. Okay. So chest pain is important, but it's
23  other assessment findings. So when I say assessment,
24  I mean other symptoms that go along with that to make

| Page 43 |
| --- |

1  it life-threatening.
2      Q. Okay. What are those symptoms?
3      A. Someone has -- is sweating, can't breathe,
4  nausea or vomiting, chest tightness, fatigue,
5  light-headedness, abnormal vital signs.
6      Q. Did you take vital signs when an inmate
7  would come see you to receive medication?
8      A. No, not on the tier. But if they complained
9  of it, I would have the officer bring them to the --
10  to the infirmary. I believe that's what we called it.
11  And there we had -- we would take their vital signs.
12      Q. And how would an inmate know if their vital
13  signs were off?
14      A. Well, they -- they can know if they don't
15  feel well, so that's how I would assume.
16      Q. Because is it possible that an inmate has
17  chest pain and had abnormal vitals, but they don't
18  know what their vitals are when they're speaking to
19  you?
20      A. No. There's predominantly always something,
21  like their heart is beating irregular, like, you will
22  know that something is wrong with you. You will feel
23  something different in you. You'll say, okay. This
24  is not right. They'll feel their heart beating fast.

| Page 44 |
| --- |

1  Like I said, it may be light-headedness or there will
2  be some form of abnormality that they will know
3  something is wrong.
4      Q. So as a registered nurse, do you take it at
5  their word if they say, I have chest pains and other
6  symptoms, whatever it may be, and I need medication
7  now?
8      A. Yes, I would -- that would be important, but
9  I would have to do my assessment. So they would have
10  to have all these, you know, chest pain is important,
11  but they would have to have other symptoms, and I
12  would have to do -- perform my assessment to just make
13  sure that they are indeed okay or not okay.
14      Q. Is the assessment something you do in that
15  EMAR where you check off boxes?
16      A. No.
17      Q. Okay.
18      A. You have to do blood pressure, pulse,
19  respiration, 02 saturation.
20      Q. So I might have misunderstood you. I
21  thought that you said if they had abnormal vitals, you
22  sent them to the infirmary. But you -- you did take
23  some of the vitals there in front of you?
24      MR. RADUNSKY: Objection. I think that

11 (Pages 41 to 44)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

| Page 45 | Page 46 |
|---|---|

**Page 45**

1  mischaracterizes her testimony.  You can explain it
2  again, Ashley.
3  BY MS. ERICKSON:
4      Q.  Yeah, please.
5      A.  Okay.  What I was saying was that I -- if
6  someone complains of something to me, I would have to
7  do an assessment.  And with that assessment, I would
8  ask questions and also get vital signs.
9      Q.  So you would take the blood pressure?
10     A.  Blood pressure.
11     Q.  Pulse?
12     A.  Pulse.  Oxygen saturation.  Temp is always
13  part of it as well.
14     Q.  Okay.
15        MR. RADUNSKY:  Kristin, mind if we take a
16  break in like two minutes?
17        MS. ERICKSON:  Not at all.
18        MR. RADUNSKY:  Okay.  In like two minutes
19  Ashley.  Okay?
20        THE WITNESS:  Okay.
21  BY MS. ERICKSON:
22     Q.  Were there any other vitals that you would
23  obtain in that moment from the inmates?
24     A.  Res -- did I say respirations?

**Page 46**

1      Q.  Yes.
2      A.  Okay.  They can -- there was -- you could do
3  an EKG, but you need a doctor's order.
4      Q.  But would it be something, if you felt like
5  that particular inmate needed an EKG, would you send
6  them emergently to Urgent Care?
7      A.  Yes.
8        MS. ERICKSON:  Okay.  We can take a break
9  right now.  What do you want, five minutes, ten
10  minutes?
11        MR. RADUNSKY:  Why don't we do ten minutes.
12  And, Ashley, just make sure that you turn off your
13  camera and your sound.
14            (Whereupon a short recess was
15            had.)
16  BY MS. ERICKSON:
17     Q.  Ashley, were social workers employed by
18  Cermak?
19     A.  I believe we had social workers, they had
20  social workers.
21     Q.  Were they -- go ahead.
22     A.  I believe they had social workers.
23     Q.  And they were in the Cermak structure or in
24  the Cook County Department of Corrections structure,

| Page 47 | Page 48 |
|---|---|

**Page 47**

1  do you know?
2      A.  No, I do not know.  I can't -- I don't
3  remember that.
4      Q.  Do you know if a social worker was also
5  called a correctional rehabilitative worker or a
6  CRW?
7      A.  They might have been.
8        MR. RADUNSKY:  Don't guess.  If you don't
9  know, you don't know.
10        THE WITNESS:  Yeah, I don't know.
11  BY MS. ERICKSON:
12     Q.  Let's go back to the Med Pass for a few
13  minutes.  Who was responsible for putting the
14  medication on a cart?
15     A.  When you say putting it on a cart, what are
16  you saying, like stocking it or --
17     Q.  Yes.
18     A.  I can't remember the exact method.  I
19  believe the nurses.
20        MR. RADUNSKY:  Don't guess.
21        THE WITNESS:  To be honest, I really can't
22  remember.
23  BY MS. ERICKSON:
24     Q.  Did you ever in your time at Cook County

**Page 48**

1  experience Cermak being out of a specific
2  medication?
3      A.  No.  I don't recall that either.
4      Q.  When you went -- strike that.
5            When you gave medication at Med Pass,
6  did you have occasion to look at the medical chart of
7  that patient ever?
8      A.  Well, I know we always looked at their
9  medical chart, yes.  We did look at medical history
10  and medical charts, yes.
11     Q.  Every time you gave medication, you would
12  look at the medical chart of that inmate?
13     A.  Yes.
14     Q.  And what were you looking at specifically in
15  the chart?
16     A.  Well, you always want to look at their
17  medical history, what orders they have, when
18  medication was given.  That's all I can think of
19  at this time.
20     Q.  If you went into the med -- I don't know.
21  Has it ever happened to you where you go into the
22  medical chart, and the order wouldn't pertain to the
23  date on which you give a medication?
24     A.  No.  I don't recall that happening.

12  (Pages 45 to 48)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 49

1    Q.  Okay.  Every time an inmate is received at
2   Cook County, do they need to go through the intake
3   medical process again?
4       MR. RADUNSKY:  Just object.  I think she
5   explained her involvement in intake, but you can
6   answer again, Ashley.  Go ahead.
7       THE WITNESS:  Yeah.  I don't recall what
8   intake, but I don't recall what they did.  But they
9   did -- I believe they did take medical history
10  though.
11  BY MS. ERICKSON:
12      Q.  Did you have an email address when you were
13  working at Cook County?
14      A.  Yes.
15      Q.  What was your email address?  I think you
16  froze.  (video distortion)
17      MR. RADUNSKY:  Hold on.
18      MS. ERICKSON:  Okay.  You're back.
19      MR. RADUNSKY:  Are you back?
20      THE WITNESS:  Can you guys hear me?
21      MR. RADUNSKY:  Yeah.  We're okay.
22      THE WITNESS:  Okay.  Can you repeat whatever
23  you said?
24      MR. RADUNSKY:  She wanted to know if you

Page 50

1   remembered your email address at Cook County.
2       THE WITNESS:  No.  I just remember my -- it
3   was associated with my name.  That's what I
4   remember.
5   BY MS. ERICKSON:
6       Q.  What sorts of information did you send or
7   receive on that email?
8       MR. RADUNSKY:  Object to form of the
9   question.  That's a very broad question.  I mean, you
10  can answer, Ashley, if you understand.
11      THE WITNESS:  Like, what do you mean what
12  sort of information?  I don't understand the
13  question.
14  BY MS. ERICKSON:
15      Q.  Well, who did you email when you would email
16  someone when you were working at Cook County?
17      MR. RADUNSKY:  Oh my goodness.  Object form
18  of the question.  At what time?  I mean, that's just,
19  again, that's a really broad question.
20      Ashley, you can answer it if you
21  understand.
22      THE WITNESS:  I guess other -- I would
23  assume other staff.
24  BY MS. ERICKSON:

Page 51

1       Q.  Was email a method that you used to
2   communicate with your colleagues about specific
3   patients?
4       A.  If I -- if I were to, yes.  I mean, email is
5   a form of communication that we did utilize.  I do
6   remember email, yes.
7       Q.  How did you communicate with the
8   correctional officers?
9       A.  We would talk.  We have -- we had access to
10  telephone, and it was -- they were generally always
11  around, so it was -- we really didn't have to use the
12  telephone to get an officer because they were always
13  present somewhere near us.
14      Q.  Did you use radios to communicate with the
15  correctional officers?
16      A.  I don't recall radios.  We could have had
17  them.  I'm not saying we -- they didn't.  But I -- I
18  don't remember having radios.  I don't know.
19      Q.  Regarding training, after your initial
20  training at Cook County, did you receive any other
21  sort of training at Cook County afterwards?
22      A.  Yeah.  I believe we had, like, follow-up,
23  you know, training, if I remember correctly.  Yeah,
24  we had, like, follow-up trainings that they did

Page 52

1   provide us.
2       Q.  How regularly would those trainings be?
3       A.  There were some that were more frequent than
4   others.
5       Q.  So you don't remember how frequent they
6   were?
7       A.  No.  But they were maybe every year or, like
8   I said, some were more than others but, yeah, we
9   did -- yes, we did have training.
10      Q.  Which trainings were more regular than
11  others?
12      A.  I really can't remember which ones.  That
13  was a long time ago.  I can't remember which ones
14  were.  But I do remember meeting, you know, CPR.  That
15  was yearly.  But if you needed additional support, it
16  would vary.  That's what I do remember.  Like, if you
17  needed help with something, you can -- there was
18  resources there.
19      Q.  Who would be your main point of contact for
20  training?
21      MR. RADUNSKY:  Object to the form of the
22  question.
23      You can answer it, Ashley, if you
24  understand.

13  (Pages 49 to 52)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 53

1    THE WITNESS: So when you say who would be
2  the contact for training, you -- you're saying like --
3  BY MS. ERICKSON:
4    Q. I'll rephrase it. Who would contact you or
5  notify you that a training was going to take place?
6    A. I believe the manager. Manager or emails or
7  something like that.
8    Q. And who actually did the training for you?
9    A. For me? Like, I did my own training, but I
10 don't understand what you're asking.
11   Q. Were the trainings online?
12   A. Some were online, and like -- like I was
13 saying, CPR, that was in person.
14   Q. Uh-huh.
15   A. Uh-huh.
16   Q. But then other trainings, would they have
17 been in person at all?
18   A. Yes. There would probably be some other
19 in-person training but, like I said, I don't -- I
20 don't remember exactly everything.
21   Q. And then some of the trainings were
22 individual online?
23   MR. RADUNSKY: Asked and answered. You can
24 answer it again, Ashley.

Page 54

1    THE WITNESS: Yes. Some of them, the
2  trainings were online.
3  BY MS. ERICKSON:
4    Q. Those yellow slips, were you responsible for
5  picking the yellow slips up in the tiers?
6    A. I remember that the medical professionals
7  were, yes.
8    Q. Wait. You're a medical professional,
9  right?
10   A. Yes. And that's why I say yes.
11   Q. Oh, okay.
12   A. Uh-huh.
13   Q. Were there other people besides the nurses
14 that were responsible for picking up the yellow
15 slips?
16   A. It was, but they were medical personnel.
17   Q. Always a medical personnel would be
18 responsible for picking up the yellow slip?
19   A. Yes.
20   Q. Where would the medical personnel find the
21 yellow slips to pick up?
22   A. They were usually locked up in a lock box or
23 something to that nature.
24 BY MS. ERICKSON:

Page 55

1    Q. How often were the med -- were the yellow
2  slips supposed to be picked up from a tier?
3    A. I can't remember the exact, but I believe it
4  was frequently. I can't remember the exact, but I
5  remember it being done frequently.
6    Q. Can you explain frequently? Does that mean
7  like five times a day? What do you mean?
8    A. No, I don't think that frequent, but like
9  daily maybe.
10   Q. Was there a certain time in the day when the
11 yellow slips would be picked up in the tiers?
12   A. I don't believe it was a certain time of the
13 day. It might have been.
14   MR. RADUNSKY: Okay. You don't have to
15 guess. She doesn't want you to guess.
16 BY MS. ERICKSON:
17   Q. No. You don't have to guess.
18   A. Okay. Well, I don't remember.
19   Q. Okay. I'm going to show you a directive
20 here. Give me one moment. I'll share my screen. I'm
21 pulling up -- I'll mark it as Exhibit B for Ashley's
22 deposition. It is interagency directive 64.5.45.0.
23 It's entitled Medication Administration and
24 Distribution. Can you see this, Ashley?

Page 56

1    (Bloodworth Exhibit B marked
2         for identification.)
3    THE WITNESS: Yes, I can see that.
4    MR. RADUNSKY: You said Exhibit A?
5    MS. ERICKSON: B, B.
6    MR. RADUNSKY: B. Can you give -- Kirstin,
7  can you give the Bates stamp?
8    MS. ERICKSON: Oh, yeah, sure. Of course.
9  Bates stamp 000007.
10   MR. RADUNSKY: Thank you. Ashley, I mean,
11 do you understand what she just referred to?
12   THE WITNESS: Can you explain?
13   MR. RADUNSKY: Uh-huh. I thought so.
14 Kirstin, can you explain what you just did so she
15 knows when you're talking about the page numbers?
16   MS. ERICKSON: Sure. Your counsel has
17 marked this with a Bates stamp so that we can identify
18 it later on, and that's what I just told him about.
19   MR. RADUNSKY: Do you understand that? And
20 I'm not -- I mean, I can see it up in the corner.
21 It's a ten-page document, Ashley, so it's going to go
22 from page 7 to 17 in the Bates stamping. Okay?
23   THE WITNESS: Okay.
24   MR. RADUNSKY: Okay. Just so you

14  (Pages 53 to 56)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 57

1  understand. Go ahead.
2      MS. ERICKSON: Yeah, thank you. 7 to 16.
3      MR. RADUNSKY: To 16.
4  BY MS. ERICKSON:
5      Q. Okay. So at the top here, it says
6  "Effective Date." Do you understand 17 May 13 to mean
7  May 17, 2013?
8      A. Okay. Yeah.
9      Q. Okay. So would this pol -- would this
10 directive have been in place when you were employed
11 with Cermak in 2016 to 2018?
12     A. Yes. If the document says that, yes.
13     Q. Okay. And we won't go through all of it.
14 Don't worry. I'm not gonna spend an hour on this, but
15 at the top here, it says the purpose of it. Do you
16 see that?
17     A. Uh-huh, yes.
18     Q. Okay. And it says, "This directive
19 establishes the procedures to be followed by all Cook
20 County Department of Corrections (CCDOC) and Cermak
21 Health Services of Cook County (Cermak) employees with
22 regard to the administration and distribution of
23 medication."
24     Do you see that?

Page 58

1      A. Yes.
2      Q. Okay.
3      MR. RADUNSKY: Counsel, did she -- Ashley,
4  she read that correctly, right?
5      THE WITNESS: Yes.
6      MR. RADUNSKY: Okay. Go ahead.
7  BY MS. ERICKSON:
8      Q. And in the policy section underneath that, I
9  just want to get kind of a foundation here. It
10 states, "Prescribed medication is a medically
11 necessary form of treatment."
12     Do you see that?
13     A. Yes.
14     Q. Okay. Do you agree that it's important for
15 inmates to receive their medication on time?
16     A. Yes.
17     Q. Okay. And then within part A there, it
18 states, "The goals of this interagency collaboration
19 are to: 1. Administer or Distribute medication
20 efficiently; 2. Prevent drug hoarding, misuse and
21 diversion; 3. Avoid medication errors; and 4. Maintain
22 staff safety."
23     Did I read that accurately?
24     A. Yes.

Page 59

1      Q. Okay. And did you do this when you were
2  performing your role as a registered nurse at Cook
3  County?
4      A. Yes.
5      Q. Under Applicability going down a little bit
6  further here, under 3, roman numeral 3, Applicability,
7  it states, "This order is applicable to all Cook
8  County Department of Corrections and Cermak Health
9  Services of Cook County employees and is for strict
10 compliance."
11     Did I read that correctly?
12     A. Yes.
13     Q. What do you understand strict compliance to
14 mean?
15     A. To comply with the directive.
16     Q. Are you finished? I just want -- I don't
17 want to interrupt you.
18     A. Yes.
19     Q. Okay. Going onto page 2. There are
20 specific definitions, and I'm sure you're familiar
21 with these. I won't go through them all. But A
22 states, "Dose-by-dose (DXD)." And it states,
23 "Medication that's administered to a patient one dose
24 at a time by a nurse. This medication is distributed

Page 60

1  daily."
2      Did you experience in your time as a
3  nurse at Cook County giving medication dose by dose?
4      A. Yes.
5      Q. How did you know if an inmate received a
6  medication DXD or dose by dose?
7      A. When you say, how are they given, are you
8  saying --
9      MR. RADUNSKY: You don't have to figure out
10 what she's saying. Just tell her you don't understand
11 it. She'll re-ask it in a different way.
12     THE WITNESS: Okay.
13     MR. RADUNSKY: All right? Go ahead,
14 Kirsten. Sorry.
15 BY MS. ERICKSON:
16     Q. So going -- just go on to part B and then go
17 back. So B states, "Keep-on-person (KOP) and this is
18 quote, "Medication that is distributed to a patient in
19 a specified quantity by a nurse or medical technician
20 for later self-administration by the inmate. KOP
21 refill medication is distributed weekly on a pre-set
22 days for each division. New KOP medication is
23 distributed daily for each division."
24     Did you administer medications to

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 61

1  patients who had KOP administration?
2      A.  No.  I don't recall giving out KOP.  I don't
3  recall that.  Not saying that it didn't happen, but I
4  don't recall it.
5      Q.  So you don't remember ever knowing any
6  inmate that had a KOP medication?
7      MR. RADUNSKY:  Objection.  That misstates
8  her testimony.  You can say it again.  It's not what
9  she said.  Explain it.  Go ahead, Ashley.  You can
10  answer it again.
11      THE WITNESS:  I was saying that I don't
12  recall me personally giving KOP, but I don't know.
13  That was a while ago.  I can't recall if I did or not,
14  but I don't believe so.
15  BY MS. ERICKSON:
16      Q.  Okay.  How would KOP be notated in the
17  chart?  And by "chart," I mean the medical chart?
18      A.  I believe it would be -- it will say it in
19  the medical chart maybe.  I can't remember.  That was
20  a long time ago.  I can't remember that, but it was --
21  I believe it would say "KOP" or in the chart.
22      Q.  Are you finished?
23      A.  Yes.
24      Q.  Okay.  So based on the fact that within this

Page 62

1  directive it states A, that there's dose-by-dose
2  medication or keep-on-person medication, would you
3  understand this to mean that the inmate has a choice
4  to either receive medication dose-by-dose or to have
5  it on their person?
6      A.  I believe the doctor ordered the order for
7  it, so it depended on the doctor and what they ordered
8  but, yeah, but no.  They didn't decide.  I believe the
9  doctor decided.
10      Q.  Decided what?
11      A.  Whether -- what -- the doctor decided the
12  order, what orders to be administered to them.
13      MR. RADUNSKY:  You answered the question.
14  BY MS. ERICKSON:
15      Q.  And so are you familiar with the five
16  rights?
17      A.  Yes.  I'm familiar with that.
18      Q.  We'll go to E.  As far as the medication
19  administration time, was there a specific time that
20  you passed out meds when you did it in the morning
21  shift from 7 a.m. to 3 p.m.?
22      A.  I cannot remember the exact timing anymore.
23  I can't.  I don't remember.
24      MR. RADUNSKY:  That's okay.

Page 63

1  BY MS. ERICKSON:
2      Q.  And if you go down to G, it states,
3  "Medication pass - a the term used by Cermak to
4  indicate the process by which medication is
5  administered or distributed to inmates."
6      Is that correctly read?
7      A.  Yes.
8      Q.  Would the correctional officers also call it
9  Med Pass?
10      MR. RADUNSKY:  Objection.  Speculation.  I
11  mean, if you know.
12  BY MS. ERICKSON:
13      Q.  In your experience, would you hear -- did
14  you hear correctional officers call it medication pass
15  or Med Pass?
16      MR. RADUNSKY:  You can answer if you know.
17      THE WITNESS:  Yes.  I remember a Med Pass,
18  medication pass, yes.
19  BY MS. ERICKSON:
20      Q.  And then you said before the team for the
21  medication would have been Cermak staff member and a
22  CCDOC medication escort officer, right?
23      A.  Yes.
24      Q.  And we were talking about this before.  The

Page 64

1  EMAR is the electronic medication administration
2  record.  One moment here.
3      MR. RADUNSKY:  Is there a question?
4      MS. ERICKSON:  No.  No.
5      MR. RADUNSKY:  Oh, I'm sorry.  I thought you
6  were waiting for me.
7  BY MS. ERICKSON:
8      Q.  Okay.  So then under "Procedures," we're
9  still on page two of this or Bates stamped 000008.  It
10  states that under Preparation, "Cermak staff shall:"
11  and then it lists a few things that should be done,
12  the first one being "Deliver medication rosters to the
13  CCDOC watch commander before roll call and at least
14  two hours prior to a medication pass" with specific
15  hours.
16      Can you explain how this was carried
17  out?
18      A.  That was some time ago, but I believe we
19  followed whatever this directive is, yeah.  So I can't
20  really remember the exact process, but if it's the
21  same, if this directive says that, then that's most
22  likely what happened.
23      Q.  Okay.  And do you know who is the CCDOC
24  watch commander?

16  (Pages 61 to 64)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 65

1    MR. RADUNSKY: Just object to the form. At
2  what time, any timeframe or just in --
3    MS. ERICKSON: No. In general. I just want
4  to know if you understand what that means.
5    MR. RADUNSKY: Those are two different
6  questions. Do you understand who the watch commander
7  is, or do you know who it is? Go ahead. If you know
8  the answers, go ahead, Ashley.
9    THE WITNESS: I do not know who the watch
10  commander -- I can't remember who the watch commander
11  is or was at that time.
12  BY MS. ERICKSON:
13    Q.  Do you know what their role is of a CCDOC
14  watch commander?
15    A.  No. I can't recall under a watch
16  commander.
17    Q.  I just want to know what's -- if you
18  understand. Does this directive talk about a
19  correctional officer, or is it some other person based
20  on your knowledge and understanding of what
21  happened?
22    A.  I -- I really don't -- do not know who the
23  watch commander is. I believe it says CCDOC, so
24  whoever they appointed, I'm not sure.

Page 66

1    Q.  Okay. So as you said, if this says that
2  medication rosters were delivered to the CCDOC watch
3  commanders before roll call and at least two hours
4  prior to medication pass, you believe that this
5  actually took place when you worked there as Cook
6  County, right?
7    A.  Yes.
8    Q.  Okay. And then it says, "Cermak staff
9  shall" also under No. 2 "setup the medication
10  equipment."
11    Does that mean to put the medication
12  on the med cart do you know?
13    A.  No. It's probably, but I just know the
14  medications were there, but I'm not too sure about
15  that.
16    Q.  Okay. So you don't remember setting up the
17  medication equipment?
18    A.  No. But I do believe that Cermak did it.
19    Q.  Okay. So someone from Cermak you're saying
20  did it, but you don't remember doing it?
21    A.  No. I don't remember the process, but I
22  remember -- I remember giving the medication, like,
23  but I don't remember the exact.
24    Q.  And then going on to -- it separates the DXD

Page 67

1  or the dose-by-dose medication in B. And then C is
2  the KOP medical -- medication distribution.
3    Did you ever review this particular
4  directive?
5    MR. RADUNSKY: Yesterday we looked at this,
6  she said. Oh, I'm sorry, yeah. We went -- this is
7  one of the directives.
8    (Cross talking)
9    MR. RADUNSKY: I thought you asked her that
10  -- I thought you asked her that 45 minutes ago when
11  you first showed this. I'm sorry.
12    MS. ERICKSON: All right. Yeah.
13    MR. RADUNSKY: She saw it yesterday.
14    MS. ERICKSON: All right. Thank you.
15  BY MS. ERICKSON:
16    Q.  Ashley, when you were working at Cook
17  County, did you review this particular directive about
18  Cermak dose-by-dose medication administration?
19    A.  It looks familiar, yes. It does look
20  familiar.
21    Q.  Okay. Would you have reviewed on the next
22  page, page 4, the KOP medication distribution steps as
23  well?
24    A.  Yeah. Whatever is in the back of it.

Page 68

1    Q.  What's the difference between a dose-by-dose
2  method 1 and a dose-by-dose method 2 do you know?
3    A.  No.
4    MR. RADUNSKY: You want to read the policy,
5  Ashley?
6    THE WITNESS: Yeah. Let me read and see.
7    MR. RADUNSKY: Wait a minute. Let her know
8  when you're done, Ashley, and she'll scroll down for
9  you.
10    THE WITNESS: Okay.
11  BY MS. ERICKSON:
12    Q.  You want me to scroll?
13    A.  Yes.
14    Q.  Okay. That's actually the end of dose-by-
15  dose method 1. So this up at the top on page 5, it
16  states, "dose method 1, General Population."
17    Is this the method you would have used
18  for most inmates?
19    A.  For a medication pass, yes.
20    Q.  Okay. And then what inmates would be --
21  would not be considered to be general population
22  inmates?
23    A.  I'm not too sure. I just remember, like,
24  this being -- I'm not too sure what makes them not

17 (Pages 65 to 68)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 69

1  general population, but this looks like something that
2  I was -- that we were doing.
3      Q.  Okay.  And it looks like on the next page,
4  page 7 under G, "Dose-by-dose Method 2 (Special
5  Management Lockdowns) this was a different method; is
6  that correct?
7      A.  Well, it says it was a different method.
8      MR. RADUNSKY:  You want to read, Ashley?
9  You want to read it again?
10     THE WITNESS:  Yes.  Okay.  Let me see.
11  Yeah.  That's another method, but I don't remember
12  that one too much.
13  BY MS. ERICKSON:
14     Q.  Okay.  So you didn't use the method 2?
15     A.  I don't recall this one, no.
16     Q.  That's okay.  And you testified earlier that
17  you don't remember administering KOP, right?
18     A.  No, I don't recall that.
19     Q.  And when -- under I On page 8 and Bates
20  000014, under I, it states, "Inmate Patient Refusal."
21     Why don't you take a second and just
22  read this part?
23     A.  Okay.
24     Q.  Thanks.

Page 70

1      A.  Okay.  I remember this.  I remember this.
2      Q.  So when would you -- strike that.  What
3  would you consider an inmate refusing medication to
4  be?  That's a horrible question.  Strike that.
5          When would you have a patient sign a
6  patient refusal form?
7      A.  They had to verbally say they're refusing
8  medication.
9      Q.  What if -- if the inmate didn't come to Med
10  Pass, would they also be required to fill out the
11  patient refuses medication form?
12     A.  Yes.  The officer would have to go get that
13  inmate or detainee to sign.  And if they refuse, yes,
14  I remember me and the officer had the nurse and the
15  officer had to sign saying that they refused.
16     Q.  Let's go to the next page, page 9 or 00015.
17  Under J, it states, "Unable to Administer."
18         Why don't you talk a minute to review
19  this part, please?
20     A.  Okay.
21     Q.  So and what would a situation look like
22  where you -- three consecutive doses of medication
23  have not been administered to an inmate?
24     MR. RADUNSKY:  Object to the form of the

Page 71

1  question.  What do you mean what would it look like?
2  You can answer if you understand.
3      THE WITNESS:  I really -- don't recall that.
4  But can you repeat the question?
5  BY MS. ERICKSON:
6      Q.  Yeah.  In what sorts of circumstances would
7  an inmate not receive one, two or three consecutive
8  doses of medication?
9      MR. RADUNSKY:  Objection.  Hold on.  Hold
10  on.  Just objection again to the form of the question.
11  It's very broad.
12         Ashley, you can answer it if you
13  understand.
14     THE WITNESS:  I don't recall that happening,
15  so I'm not even sure.
16  BY MS. ERICKSON:
17     Q.  So just to be clear.  You never encountered
18  a situation where an inmate came to you and they
19  didn't receive their medication at that moment or --
20     A.  I'm not saying that couldn't have happened,
21  but I don't -- I'm not sure.  I don't know.  That was
22  a long time ago.
23     Q.  Was there ever a situation where like No. 2?
24  Medications unable to be administered to the entire

Page 72

1  living unit in a medical division?
2      A.  I don't recall that happening either.
3      Q.  The living unit just means the tier,
4  right?
5      A.  Yeah.  I remember tiers, but I don't recall
6  that.  I don't recall that happening.
7      Q.  No. 3 states, "For an inmate living unit,
8  early for court appearance or for transfer to another
9  jurisdiction, medication may be administered before
10  the scheduled time."
11         Did I read that accurately?
12     A.  Yes.
13     Q.  And did you ever administer medication early
14  because an inmate was going to court?
15     A.  I think they had a med -- a court nurse for
16  that who comes in.  I believe that court meds or court
17  med, I think.
18     Q.  Okay.  And then No. 4, it states, "The nurse
19  shall report missing doses to the pharmacy promptly
20  after medication rounds and make arrangements to
21  administer a late dose.  If inmate is not present on
22  the living unit, the nurse shall note, "Not Present"
23  (or NP) on the MAR."
24         What do you understand missing doses

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 73

1     to mean in this part of the directive?
2         A.   That the dose was not there.
3         Q.   So what you understand it to mean is that
4     that particular dose of that medication was not on
5     your cart at that moment?
6         A.   It could have -- yes.  It could have been
7     not on the cart or, uh-huh.
8         MR. RADUNSKY:  Okay.  You've answered it.
9     BY MR. ERICKSON:
10        Q.   Are you finished?
11        A.   Yes.
12        Q.   I didn't want to interrupt you.  Yeah, yeah.
13    Okay.  And that's the end of that.  So I will close
14    that out.
15            So I want to go to specifics about
16    medication in Mr. Duke's -- Mr. William Duke's medical
17    chart in the E-M-A-R, EMAR.  And you state -- you
18    talked about that you don't know how long intake took
19    or any of the details about that, right?
20        A.   Correct.
21        MR. RADUNSKY:  Asked and answered.  That's
22    okay.  You can answer again.
23    BY MS. ERICKSON:
24        Q.   So do you know how an inmate would get a

Page 74

1     prescription when they came from another correctional
2     facility to Cook County?
3         A.   I believe I think I stated this before, but
4     I think in intake, they are -- their medical history
5     is taken into account.  It's always a doctor there, so
6     I would say a doctor was somewhere present for an
7     intake.
8         Q.   Do you know, in your experience, did you
9     ever pass meds to an inmate that were brought from an
10    outside correctional facility?
11        MR. RADUNSKY:  What do you mean, Kirsten,
12    when you say "brought from an outside medical
13    facility"?  Can you clarify that?  So objection to
14    form.
15            You can answer it, Ashley.  I'm sorry.
16    You can answer if you understand.
17        THE WITNESS:  Can you repeat that question
18    again?
19        MS. ERICKSON:  Sure.  Court reporter, can
20    you read back the question, please?
21            (Question read back.)
22        MR. RADUNSKY:  Again, Ashley, I just had
23    that objection to form.  If you understand the
24    question, you can answer it.

Page 75

1         THE WITNESS:  From an outside correctional
2     facility?  So are you saying they --
3         MR. RADUNSKY:  No.  You don't have to do
4     that.  She'll re-ask the question.  You don't have to
5     figure out what Kirsten is saying.  I mean, she can
6     rephrase it if you can't answer it as it's asked.
7     Just ask her to rephrase it.
8     BY MS. ERICKSON:
9         Q.   You want me to rephrase it?
10        A.   Please.
11        Q.   Sure.  And so if an inmate -- if an
12    inmate -- I think she's frozen.
13        MR. RADUNSKY:  Are you -- wow.  I've missed
14    every one of these.  Are you there, Ashley?  Good.
15    Hello, Ash, you good?
16        THE WITNESS:  Okay.
17        MR. RADUNSKY:  We're good.
18    BY MS. ERICKSON:
19        Q.   So if an inmate had medication at an outside
20    correctional facility, for example, Livingston
21    Correctional Facility, did you ever encounter where
22    they could -- they would bring that medication into
23    Cook County?
24        A.   I'm not sure about that because I don't know

Page 76

1     the process exact -- I can't remember the process
2     exactly in intake, so I'm not -- I don't know.
3         Q.   Do you know if any of the medication on your
4     cart would have been medication that came from another
5     correctional facility?
6         A.   I don't believe so.
7         Q.   Let's talk about medication specifically.
8     What is aspirin taken for?
9         MR. RADUNSKY:  Objection.  Form of the
10    question.  That's pretty broad.
11            Ashley, you can answer if you
12    understand.  You can answer.
13        THE WITNESS:  When you say "aspirin" --
14        MR. RADUNSKY:  No, no.  You don't have to do
15    that.  Listen.
16        THE WITNESS:  Okay.
17        MR. RADUNSKY:  Ashley, let's talk about
18    this.  Kirstin doesn't want you to try to figure out
19    her question.  If you do not understand a question,
20    just tell her, like she said at the beginning of the
21    deposition.  Just say, look, I don't understand what
22    you're saying.  All right?  That's all you have to do.
23    She'll be happy to restate it.  She just did that and
24    actually restated it in a way that you could answer

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

---

Page 77

1  the question. So just do that. Okay?
2       THE WITNESS: Okay.
3       MR. RADUNSKY: Kirsten, could you re-ask it?
4  BY MS. ERICKSON:
5       Q. Yeah. What signs and symptoms would an
6  inmate be experiencing in which you would -- well, an
7  inmate would be taking aspirin?
8       MR. RADUNSKY: Okay. Then I have an
9  objection that was just to the form of the question.
10  I said it's very broad.
11       And, Ashley, you can answer the
12  question if you understand it.
13       THE WITNESS: That is very broad because it
14  depends on what else is going on.
15  BY MS. ERICKSON:
16       Q. Okay. Would a patient be taking aspirin for
17  a headache?
18       MR. RADUNSKY: Objection to the foundation,
19  form. Lots of factors there.
20       You can answer, Ashley, if you
21  understand the question.
22       THE WITNESS: It's a lot of things that go
23  into that.
24  BY MS. ERICKSON:

---

Page 78

1       Q. Yeah. No, I'm not saying it's totally,
2  like, inclusive. I'm saying in your experience as a
3  registered nurse, okay, could a patient be taking
4  aspirin because they have a headache?
5       MR. RADUNSKY: Okay. That's -- yeah. You
6  can answer that, Ashley. Go ahead, of course. Answer
7  it.
8       THE WITNESS: It might, but normally they
9  take Ibuprofen or Tylenol.
10  BY MS. ERICKSON:
11       Q. Okay. So in your experience as a registered
12  nurse, have you encountered patients who take aspirin
13  as a blood thinner?
14       A. Yes.
15       Q. Nitroglycerine sublingual. Have you ever
16  given that medication to an inmate?
17       A. No. Not to my knowledge, no.
18       Q. Do you know what signs and symptoms
19  nitroglycerine treats?
20       A. Yes.
21       Q. And what are those?
22       A. Those -- that would be something for like a
23  heart attack. Signs and symptoms of that are
24  light-headedness, sweating, chest pain, chest

---

Page 79

1  tightness, fatigue. Let's see. The vital signs would
2  be elevated. Those are some of the things I could
3  think of off the top of my head.
4       Q. Okay. And do you know how nitroglycerine
5  sublingual is administered?
6       MR. RADUNSKY: We can just agree to call it
7  nitroglycerine.
8       THE WITNESS: Yes.
9  BY MS. ERICKSON:
10       Q. Okay. How is it administered?
11       A. You said sublingual, so that's under --
12  under the tongue.
13       Q. Uh-huh. And how many -- how many tablets
14  are usually given in a dose?
15       A. It depends on the order.
16       Q. Okay.
17       A. So we have to follow whatever the doctor's
18  orders is.
19       Q. Uh-huh. Uh-huh. Could nitroglycerin be
20  given by just giving one tablet?
21       MR. RADUNSKY: Objection. Yeah, go ahead.
22  You can answer it. Go ahead.
23       THE WITNESS: Again, it depends on the
24  order. Whatever, you know, whatever the doctor

---

Page 80

1  ordered, that's what we follow, the nurse will
2  follow.
3  BY MS. ERICKSON:
4       Q. And if the doctor's order does not say "KOP"
5  on it, would you understand that to be a dose-by-dose
6  medication?
7       A. Yes. To my understanding.
8       Q. Okay. Is Levalbuterol a type of an inhaler?
9  Have you heard of that? Lev -- I might be saying it
10  wrong. L-e-v-a-l buterol?
11       A. Albuterol? I don't -- I'm not familiar with
12  that.
13       MR. RADUNSKY: Hold on. Hold on. Let her
14  spell it again, Ashley. Go ahead, Kirsten.
15  BY MS. ERICKSON:
16       Q. It's l-e-v-a-l-b-u-t-e-r-o-l.
17       Are you familiar with that medication?
18       A. No. I'm not really -- I'm not familiar with
19  that.
20       Q. But you're familiar with Albuterol?
21       A. Yes.
22       Q. What is that prescribed for?
23       A. Albuterol is prescribed for asthmatic
24  patients.

---

20  (Pages 77 to 80)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 81

1    Q.  Is that the type of medication that would be
2  kept on a person while they're housed at Cook County
3  in your experience?
4    A.  To be honest, I can't remember exactly --
5    Q.  Uh-huh.
6    A.  -- if they had it on them or we gave it to
7  them.  I don't -- I don't remember that.  But it's up
8  to the -- I'm sorry -- but it's up to the doctor to
9  prescribe that order.
10    Q.  Are you familiar with a medication
11  Terazosin, T-e-r-a-z-o-s-i-n?
12    A.  I'm not too familiar with that.
13    Q.  Are you familiar with Lipator?
14    A.  Yes, I'm familiar with Lipator.
15    Q.  Why -- strike that.
16        What signs and symptoms does Lipator
17  treat?
18    A.  Lipator, if I'm not mistaken, is for
19  cholesterol.  So that would help to control someone's
20  cholesterol.
21    Q.  Okay.  If someone is prescribed Lipator by a
22  physician, would it note in the prescription if it's
23  supposed to be given once a day, twice a day?
24    A.  The order will say that, yes.

Page 82

1    Q.  Is Lipator generally given more than once a
2  day, or does it depend on the inmate or patient?
3    A.  Once again, it depends on the order --
4    Q.  Okay.
5    A.  -- you know, of what the doctor ordered.
6    Q.  All right.  And then Amoxicillin, and that's
7  an antibiotic, right?
8    A.  Yes.
9    Q.  Motrin, what signs and symptoms would you
10  prescribe -- strike that.
11        What signs and symptoms would you use
12  Motrin to treat?
13    A.  Motrin is for pain, so for pain.  But again,
14  it depends on what the doctor ordered.
15    Q.  Would that be one of those over-the-counter
16  medications that you could give out if an inmate had a
17  specific sign or symptom that Motrin could treat?
18    MR. RADUNSKY:  You mean without a doctor's
19  authorization?
20    MS. ERICKSON:  Right.  Exactly.
21    MR. RADUNSKY:  You can answer, Ashley.
22    THE WITNESS:  Motrin.  Yes, that was,
23  uh-huh.
24  BY MS. ERICKSON:

Page 83

1    Q.  Are you familiar with Metoprolol,
2  M-e-t-o-p-r-o-l-o-l?
3    A.  Metoprolol, yes.
4    Q.  Metoprolol.  Thank you.
5    A.  Metoprolol.
6    Q.  What signs and symptoms does Metoprolol
7  treat?
8    A.  That's for hypertension, so that's a
9  beta-blocker.  So that's to control high blood
10  pressure in hypertensive patients, uh-huh.
11    Q.  Does that specific medication treat chest
12  pain?
13    MR. RADUNSKY:  It's for hypertension, so, I
14  mean, I just object to the form of the -- you can
15  answer, Ashley.  Go ahead.
16    THE WITNESS:  So it's not to be -- to
17  particularly treat that.  It's to prevent it.
18  BY MS. ERICKSON:
19    Q.  So does that mean that if a patient is
20  prescribed Metoprolol, they should be taking that as
21  prescribed to avoid chest pain, right?
22    A.  Well, to avoid a heart attack or a stroke.
23    Q.  Well, what about chest pain though?
24    MR. RADUNSKY:  I think she's already

Page 84

1  answered that.  That's the first thing that she said,
2  Kirstin, is to prevent chest pain.
3        You can answer, Ashley.  It's been
4  asked and answered.  You can answer.
5    THE WITNESS:  Okay.  So, yes, it would
6  prevent stroke, signs and symptoms of stroke or heart
7  attack.
8    MS. ERICKSON:  She didn't say chest pains.
9  She said heart attack.  That's not exactly the same
10  thing, so I'm just trying to understand what you
11  meant.
12    MR. RADUNSKY:  Well, I understand it.  I
13  wrote it down differently, and the record will speak
14  for itself.  That's fine.
15    MS. ERICKSON:  Yeah.  I'm sure.
16  BY MS. ERICKSON:
17    Q.  So I'm going to post -- give me one second.
18    MR. RADUNSKY:  Ashley, how you doing?  We've
19  been going about an hour.  We can go a little longer,
20  take another break in say like 10, 15 minutes?
21    THE WITNESS:  It doesn't really --
22    MR. RADUNSKY:  All right.  That's good.
23  You're hanging in there?
24    MS. ERICKSON:  So I'm marking as Exhibit

21  (Pages 81 to 84)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 85

1  C --
2          MR. RADUNSKY:  You're marking this?  Okay.
3  BY MS. ERICKSON:
4      Q.  These are CCSAO Dukes 000001, and it's 962
5  pages, and this is William Dukes' medical records at
6  Cook County Health and Hospital Systems.
7          Can you see this?
8          (Bloodworth Exhibit C
9          identified for the record.)
10  THE WITNESS:  Yes, I can see this.
11  BY MS. ERICKSON:
12      Q.  Are you familiar with a medical record
13  looking like this in the printed form?
14      A.  No.  I'm not familiar with this first page.
15  No, I don't recall that.
16      Q.  Okay.  I'm going to page 575.  CCSAO Dukes
17  000575.  Can you see this, Ashley?
18      A.  Yes, I can.
19      Q.  Okay.  When you would go into a patient's
20  medical chart, is this the way that you would see the
21  orders for a particular inmate's prescriptions?
22      A.  Yeah.  That looks familiar, uh-huh.
23      Q.  Okay.  And then on the left at the top, for
24  example, on this table, it says the start date and the

Page 86

1  end date of the medication, right?
2      A.  Yes.
3      Q.  Okay.  So, for example, on this line, it
4  states 11/25/15, 9 a.m. through February 17, 2016, at
5  8:59 a.m.?
6      A.  Yes.
7          MR. RADUNSKY:  Kristin, are those Bates
8  stamps?  I think they are, aren't they.
9          MS. ERICKSON:  Yes.  I just said this is the
10  page for you.
11          MR. RADUNSKY:  So, I mean, just so we're
12  clear for the record, the exhibit is 962 pages,
13  correct?
14          MS. ERICKSON:  Yep, yes.
15          MR. RADUNSKY:  Okay.  And I think you said
16  what the first page it started on, so that's fine.  I
17  just wanted to make sure.  Go ahead.
18  BY MS. ERICKSON:
19      Q.  All right.  So then under on that first row,
20  in that first row there, the medication description is
21  fluoxetine 20 mg capsule UD, right?  What do you
22  understand UD to mean, if you understand it?
23      A.  I'm not familiar with the UD.
24      Q.  That's okay.  And then underneath it, it

Page 87

1  says "2 cap oral daily."
2          Does that mean two capsules orally
3  daily?
4      A.  Yes.
5      Q.  Okay.  So that would mean they received two
6  capsules either in the morning or in the evening,
7  right?
8      A.  Yes.
9      Q.  Okay.  And then here over to the right, the
10  next column, first shift 7 a.m. to 2:59 p.m..  Who is
11  supposed to sign this part?  Like there's a scribble
12  there, but who generally would be the person to
13  scribble in that box?
14      A.  Um --
15      Q.  If you know, just yes or --
16      A.  I -- I don't know.
17          MR. RADUNSKY:  Then don't guess.  Go
18  ahead.
19  BY MS. ERICKSON:
20      Q.  I realize you didn't -- I realize you didn't
21  make this chart.  I'm just asking based on your
22  knowledge of looking at it and being familiar with it,
23  what is your experience here?
24          So looking at this chart on, for

Page 88

1  example, on November 25, 2015, you would see the
2  patient needs fluoxetine.  You would also see on that
3  same date prescribed the day before they would need --
4  I don't know how to say it -- Atorvastatin.  How do
5  you say that, Ashley?
6      A.  Atorvastatin.
7      Q.  Thank you.  Atorvastatin.  What is that
8  medication used to treat?
9      A.  Atorvastatin?  I believe that's for
10  cholesterol.
11      Q.  And then the next one under that third
12  column or third row of medication, Albuterol, right?
13      A.  Yes.
14      Q.  And it says, 2 PUFF inhalation every six
15  hours as needed," right?
16      A.  Yes.
17      Q.  And then it states, "MAP note: to nurse."
18  What does that mean, if you know?  Oh, you know what,
19  I think it says MAR.  Is it MAR note?
20          MR. RADUNSKY:  Yeah.  It does.  It's an R.
21  You're right.
22          MS. ERICKSON:  I have a bad copy.
23          MR. RADUNSKY:  Objection to the form.  Yeah.
24  Improper.  I'm just kidding.  Go ahead.

22  (Pages 85 to 88)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 89

1    BY MS. ERICKSON:
2        Q.   What does it mean when it says "MAR note to
3    nurse"?
4        A.   I don't know.  I don't remember that.
5        Q.   Okay.  Would the -- in this particular
6    situation for Albuterol, could the patient take the
7    Albuterol every six hours if he or he, she, they did
8    not have the inhaler on them throughout the day?
9            MR. RADUNSKY:  Objection.  Speculation.  If
10   you know, you can answer.
11           THE WITNESS:  As needed.  Whatever the order
12   reads.  The nurse will follow whatever, the order.
13   BY MS. ERICKSON:
14       Q.   So I know that from what I understand that
15   the Med Pass happens twice daily, is that right, in
16   Cook County?
17           MR. RADUNSKY:  It's been answered.  You can
18   answer again.
19           THE WITNESS:  Yes.  Yeah, yes.
20   BY MS. ERICKSON:
21       Q.   All right.  So just to understand --
22       A.   But it could -- I'm sorry to cut you off,
23   but it could happen more than twice.  It just all
24   depends on the order.

Page 90

1        Q.   Okay.  So for an inmate who needs Albuterol
2    as needed, how do they get two puffs of the Albuterol
3    when they need it if it's not during Med Pass?
4        A.   They can let the officer know, and they can
5    either come -- they could have come up to the
6    dispensary or the nurse can go down with an officer.
7        Q.   Okay.
8        A.   But more than likely, they came up to the
9    dispensary.
10       Q.   How far is the dispensary from Division 10
11   to 2C?
12       A.   It's all in the same building that I can
13   remember.
14       Q.   And then also -- so these one, two, three,
15   the first three medications were ordered on November
16   25, 2015, right?
17       A.   Yes.
18       Q.   Okay.  And then going on, it looks like
19   specific medications were added.  On December 9, 2015,
20   for example, bacitracin ointment was added, correct?
21       A.   Yes.
22       Q.   And then also, for whatever reason, this one
23   is added on December 8, 2015, nitroglycerine 0.4 mg
24   tab, 25 -- what does the 25 stand for?

Page 91

1        A.   Looks like the number of tablets maybe.
2        Q.   So does that mean there would be 25 tablets
3    in a container given to an inmate?
4        A.   I'm not sure about that.  To be honest, I
5    don't know why they put that 25 in.
6        Q.   Okay.
7        A.   It says bottle, though, so I don't --
8        Q.   Okay.  So, all right.  That's fine.
9            And SL is for sublingual, under the
10   tongue, right?
11       A.   Yes.
12       Q.   All right.  And that states, "1 TAB
13   Sublingual EVERY 5 MINUTES As Needed."
14           How would a patient get this
15   nitroglycerin as needed when they need it if it's not
16   during Med Pass?
17       A.   Like I said, the officer can be notified,
18   and then a nurse can give this per order.
19       Q.   Okay.  Would there be any reason
20   specifically for nitroglycerin that an inmate wouldn't
21   receive nitroglycerin under that same system of
22   calling the correctional officer, calling the nurse
23   and then bringing or going to get the medication?
24       A.   Not to my knowledge.

Page 92

1        Q.   Okay.  Is nitroglycerin a risk for a patient
2    to have on their person?
3        A.   It can be if they don't understand how to
4    take it.
5        Q.   What are the risks associated with having it
6    on their person?
7        A.   They can overdose on it.  They cannot take
8    it as needed can pose a risk.  It's a lot of risks if
9    it's not administered correctly per the order.
10       Q.   And what are the specific risks of -- if
11   they overdose, do they die on nitroglycerin?
12       A.   It can if it -- if it's not taken properly.
13   And there are some fatal risks associated with it.
14       Q.   And I assume you don't know whose signature
15   this is, right?
16       A.   No, I do not.
17       Q.   When you looked at orders, would you ever
18   see a doctor's actual name typed out, or was it only
19   ever a signature?
20       A.   That was a long time ago.  But I believe --
21   all I remember was on the computer, so I -- I don't
22   know.
23       Q.   So on the computer for this, it would state
24   what physician ordered it?

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 93

1    MR. RADUNSKY: Objection. I think she said
2  she didn't know, but you can answer, Ashley. Go
3  ahead.
4    THE WITNESS: Yeah, but I'm not too familiar
5  with this signature here.
6  BY MS. ERICKSON:
7    Q. No, of course. This is scribbles. I
8  understand. And then going to the next page, we are
9  on CCSAO Dukes 00576. Some additional medications
10  were added on December 9, 2015, and December 8, 2015.
11    Do you see those here?
12    A. Yes.
13    Q. Okay. Was aspirin added on December 9th?
14    A. It looks like, yes.
15    Q. Was metoprolol added on December 8, 2015?
16    MR. RADUNSKY: And I would just object
17  because it's not her document, and she said she didn't
18  generate it. She doesn't even know who the signature
19  is, so when you're sort of asking her to speculate
20  about these things, subject to that, Ashley, you can
21  answer. I mean, we'd stipulate the document says what
22  it says.
23    THE WITNESS: Yes. According to the
24  document, it does.

Page 94

1  BY MS. ERICKSON:
2    Q. All right. So then do you have any
3  understanding of why three of Mr. Duke's medications
4  would have been ordered on the date he was reentering
5  or actually entered for the first time Cook County,
6  and then certain medications were ordered about two
7  weeks later?
8    MR. RADUNSKY: Objection. Speculation. She
9  had nothing to do with it again. You can ask again.
10  I mean, you can answer, Ashley, go ahead.
11    THE WITNESS: I'm not sure. It's a lot of
12  things could happen. I don't know. I'm not sure
13  about that.
14  BY MS. ERICKSON:
15    Q. Again, you don't know why certain ones have
16  scribbles next to them and certain medications don't
17  have scribbles, right?
18    A. No, I do not know.
19    MR. RADUNSKY: Let's go for like another
20  minute or two?
21    MS. ERICKSON: Yeah.
22  BY MS. ERICKSON:
23    Q. So some of the medications it looks like
24  they ended in March of 2016. And then we'll go down

Page 95

1  to CCSAO Dukes 000577, and I'll give you -- it's hard
2  to read.
3    A. Yeah. This is hard to read.
4    Q. But it looks like some more medication was
5  prescribed on June 25, 2016. Do you -- can you see
6  that?
7    A. Yes, I can see that.
8    Q. Okay. So if this particular inmate was in
9  Cook County between March 1, 2016 -- or strike that.
10    If this particular inmate was in Cook
11  County from March 2, 2016, through June 24, 2016, and
12  needed medication, it would -- it should be in this
13  particular order, right?
14    MR. RADUNSKY: Object to the form of the
15  question. You can answer, Ashley, if you
16  understand.
17    THE WITNESS: Okay. I don't understand the
18  question. Can you --
19  BY MS. ERICKSON:
20    Q. Sure. All the -- so what I'm trying to
21  understand is, so starting with the orders starting on
22  page 575 --
23    A. Okay.
24    Q. -- would they go consecutively by date as

Page 96

1  to -- as you scroll down, you would find the more
2  recent orders?
3    A. I'm not too sure about the order.
4    Q. Okay.
5    A. But if the document states it.
6    Q. Okay. So if there's no document in this
7  particular chart that gives orders for medication
8  between March 2, 2016, and June 24, 2016, that means
9  this particular inmate wasn't receiving medication
10  during that time, right?
11    MR. RADUNSKY: Hold on. Objection. We'll
12  stipulate whatever's in the record, the records say.
13  You know, again, you're asking Ashley to speculate
14  about his entire chart and his entire history.
15    Subject to that, Ashley, you can answer
16  the question if you know.
17    THE WITNESS: No cause there's a lot of
18  things that can go along with that, so I'm not too
19  sure about that.
20  BY MS. ERICKSON:
21    Q. What do you mean there's a lot of things
22  that can go along with that?
23    A. You said -- so when the question you asked
24  me, you said that from March 1st from that time

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 97

1   period, they wouldn't be given medication. Is that
2   what you were saying?
3       Q.  Yeah. If it -- we'll stipulate to the
4   records, what's in the records, but I just want to be
5   clear on the record. If there's no particular order
6   for this inmate to receive any medications after March
7   2, 2016, until June 24th -- through June 24, 2016,
8   does that mean this patient would not receive any
9   medications because there's no order for it?
10      MR. RADUNSKY:  Again, objection. I think it
11  mischaracterizes the evidence. The records speak for
12  themselves, and you're asking her to speculate.
13          So, Ashley, you can answer the
14  question if you can.
15      THE WITNESS:  If there's no order, I know a
16  nurse wouldn't administer, so only if it's ordered.
17      MS. ERICKSON:  Okay. All right. We can
18  take a break now. Do you want to do ten minutes?
19      MR. RADUNSKY:  Yeah. It's 11:22. I mean,
20  why don't we just come back at, you know, let's say in
21  ten minutes, about 11:32?
22      MS. ERICKSON:  Sounds great. Thanks.
23          (Whereupon a short
24              recess was had.)

Page 98

1       MS. ERICKSON:  I'm going to share what I'm
2   marking as Exhibit E. I'm marking it as Exhibit E for
3   this deposition, but it was previously marked as CCSAO
4   Dukes 000963.
5       MR. RADUNSKY:  Okay.
6       MS. ERICKSON:  And CCSA0 000964.
7       MR. RADUNSKY:  Could I just ask you really
8   fast? I mean, like, okay, so what was Exhibit A
9   today? I mean, I thought I wrote them all down. My
10  first one comes up as like an Exhibit B, which was the
11  medical distribution admin policy. I mean, can you
12  give me like a quick rundown just so I have all these?
13      MS. ERICKSON:  You want to do it at the end?
14  I'll do it at the end.
15      MR. RADUNSKY:  We've been going in order.
16  There was an Exhibit D?
17      MS. ERICKSON:  That was -- that was the
18  medical records.
19      MR. RADUNSKY:  Exhibit D was the Dukes
20  records. Exhibit C, that's what I thought. That was
21  Dukes records. So what's Exhibit D?  Is this now
22  Exhibit D, Kirsten?
23      MS. ERICKSON:  B was the medical
24  administration directive. Oh, C is the medical

Page 99

1   records. You're right. D. Thank you.
2       MR. RADUNSKY:  I'm sorry.
3       MS. ERICKSON:  No problem. So I'm marking
4   this as Exhibit D as in dog. The same pages as
5   stated, CCSAO Dukes 000963 and 000964.
6          (Whereupon Exhibit D was
7              entered into the record.)
8   BY MS. ERICKSON:
9       Q.  And, Ashley, have you ever seen a document
10  like this before?
11      A.  No. It doesn't look too familiar to me.
12      Q.  But if it was one that was created for
13  inmates at Cook County, would you be able to
14  understand and explain what the Bed, this particular
15  column means, like, in the first column "DIV 15-LV-
16  Livingston co-general."
17          What does that mean to you?
18      A.  To me I believe --
19      MR. RADUNSKY:  Don't guess if you don't
20  know. If you don't know, don't guess.
21      THE WITNESS:  So it looks -- I don't -- I
22  don't know.
23  BY MS. ERICKSON:
24      Q.  So Mr. Dukes was at Cook County when you

Page 100

1   administered medication in 2017. So looking here, for
2   example, bed, looking at the dates, May 20, 2017,
3   through May 29, 2017, what do you understand "DIV10-
4   2C-2303-2" to mean?
5       A.  It looks like Division 10.
6       Q.  And 2C, what does that mean? Is that the
7   tier, tier 2C?
8       A.  Okay, yes. That could be that.
9       MR. RADUNSKY:  You don't have to guess,
10  Ashley. If you don't know, again, I mean, just tell
11  her. You didn't create this document. You don't know
12  what it is. She doesn't want you to guess. Okay?
13      THE WITNESS:  Okay.
14  BY MS. ERICKSON:
15      Q.  And then is 2303, would that be the number
16  of the cell of the inmate, or do you know?
17      A.  I do not know that.
18      Q.  Okay.
19      MR. RADUNSKY:  You are correct, though,
20  Kirsten.
21      MS. ERICKSON:  That's what I thought.
22      MR. RADUNSKY:  These are housing records.
23      MS. ERICKSON:  Okay. Thank you.
24      MR. RADUNSKY:  Sure.

25 (Pages 97 to 100)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 101

1   BY MS. ERICKSON:
2       Q.   So then in that particular entry, it looks
3   like Mr. Dukes would have been in bed 2. Is that the
4   way -- Do you know if there are more than one person
5   in each cell in Division 10 2C?
6       A.   I can't remember exactly.
7       Q.   All right. So on some of the entries, it
8   says "Livingston Co-General. And you probably
9   don't know Mr. Dukes or remember him at all, but I'll
10  just represent to you that Mr. Dukes was housed at
11  Livingston Correctional Center for a period of time
12  and would come back to Cook County. Okay? Does that
13  make sense?
14      A.   Okay. Yes.
15      Q.   And so then the oldest date in this document
16  for Mr. William Dukes is November 25, 2015. And that
17  would be the first time that he was housed at Cook
18  County from my understanding.
19           Is that -- is that the way you would
20  understand a document like this to be?
21      MR. RADUNSKY:   Again, she would be
22  speculating, but we'll stipulate --
23      THE WITNESS:   No. I'm not familiar with
24  this document.

Page 102

1       MR. RADUNSKY:   We'll stipulate that you're
2   correct, though.
3       MS. ERICKSON:   Thank you. All right.
4   Thanks.
5   BY MS. ERICKSON:
6       Q.   So for periods of time where there's a
7   DIV10-2C DIV8-3E, DIV9, it's my understanding, and
8   maybe, Troy, you want to stipulate to this, that that
9   means that Mr. Dukes was housed at Cook County; is
10  that right?
11      MR. RADUNSKY:   That's right. I mean, that
12  shows the start and the end date and every time he got
13  moved to another cell, and now you correctly
14  characterized it earlier what it all means and the
15  locations and cell numbers.
16  BY MS. ERICKSON:
17      Q.   Thank you. If this particular inmate had
18  medications that he was supposed to take at his
19  Livingston Correctional facility, and I know you're
20  not involved in the intake, would that particular
21  inmate need to see a doctor upon entry here at Cook
22  County to receive those same medications?
23      A.   They would need a doctor. They would see a
24  doctor. I believe they would, yes.

Page 103

1       Q.   And then, again, I know you weren't involved
2   until maybe May of 2017. It could have been a little
3   bit earlier, but in 2017, but I just wanted to show
4   this as far as and gather an understanding of the
5   medication and the way that would work.
6            I'm going to go back to Exhibit C. So
7   Exhibit C -- I'm going to give you exactly the page
8   here in a moment. And they're Mr. Dukes Cook County
9   medical records. We're on page CCSAO Dukes 000174,
10  and the date is 11/24/2015. The time on here states
11  14:20 CST.
12           Would this mean that Mr. Dukes had an
13  intake screening at 2:20 in the afternoon on this
14  particular date?
15      MR. RADUNSKY:   Objection. She didn't create
16  the document, so foundation.
17           And you can answer if you know,
18  Ashley.
19      THE WITNESS:   If that's what the document
20  says. Whatever the document says.
21  BY MS. ERICKSON:
22      Q.   Okay. It looks like on this particular case
23  an RN administered the intake, right?
24      A.   Once again, if that's what the document

Page 104

1   states. Whatever it states.
2       Q.   Okay. I'm scrolling down to page CCSAO
3   Dukes 000177. Under the initial medical screening,
4   there's yes and no next to specific diseases, and do
5   you see it says "high blood pressure: yes"?
6       A.   I do see that.
7       Q.   And then "high cholesterol: yes"?
8       A.   I see that as well.
9       Q.   Okay. "Diabetes: no." Do you see that?
10      A.   Yes.
11      Q.   And then "heart problems," it says "yes."
12  Correct?
13      A.   Yes. I see that.
14      Q.   It looks like RN Howard -- RN Stewart also
15  put in comments, "stent in heart at that same time."
16           Can you see that?
17      MR. RADUNSKY:   We'll stipulate that the
18  record says what it says. So you don't have to go
19  through it. Whatever it says, it says. No problem.
20  BY MS. ERICKSON:
21      Q.   So, Ashley, if you were to start
22  administering medications the next day, would you have
23  access in your chart the way you see it electronically
24  to this comment, "stent in heart"?

26 (Pages 101 to 104)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 105

1    A.  If it's in the documentation, then I would
2  have access to that issue at that time.
3    Q.  And then going down to page CCSAO Dukes
4  000179, it states at the top, "Intake Home
5  Medications" and gives a specific list.  It says,
6  "current medication list: ASA."
7         Is that aspirin?
8    A.  Yes, I believe so, that is.
9    Q.  "NTG SL."  Is that nitroglycerin sublingual?
10    A.  I believe that could be, yes.
11         MR. RADUNSKY:  I'm sorry.  Can I just get a
12  page number again on that, 179?  Thanks.  Go ahead.
13  BY MS. ERICKSON:
14    Q.  And then it lists several other medications.
15  Do you see that?
16    A.  Yes.
17    Q.  How do you understand intake home
18  medications to be, like what does the home mean?
19    A.  I'm not too familiar with that.  It's been a
20  while, so I'm not sure but --
21         MR. RADUNSKY:  Okay.  You're done.
22         THE WITNESS:  Yeah.  I'm not sure about
23  that.
24         MR. RADUNSKY:  And we would just have an

Page 106

1  ongoing objection.  Obviously, she didn't draft this
2  record.
3         MS. ERICKSON:  Yeah, understood.  So, yeah,
4  so just let her finish and just don't coach her when
5  to stop, you know.  If she has more to say, I'll let
6  her say it.  If she's done, I'll move on.  Okay?
7  Thank you.
8  BY MS. ERICKSON:
9    Q.  So it says, "pharmacy where gets meds IDOC."
10  Do you know what IDOC stands for?
11    A.  No.
12    Q.  Is that Illinois Department of
13  Corrections?
14         MR. RADUNSKY:  Objection.  Asked and
15  answered.  She just said she didn't know.  You can
16  answer again.
17         THE WITNESS:  No.  At first I wasn't
18  familiar with IDOC, but that that could be that,
19  yes.
20         MR. RADUNSKY:  I don't want you to guess.
21  Ashley, don't guess.
22  BY MS. ERICKSON:
23    Q.  So do you know what it means?
24    A.  Well, no, not initially, no.

Page 107

1    Q.  Okay.  So these are specific medications.
2  We don't know because we weren't there.  I'm not RN
3  Stewart.  You're not either.  But these medications
4  are listed in the chart, and they could be medications
5  he brought from home or medications that are given
6  that particular day, right?
7         MR. RADUNSKY:  Objection.  It's speculation.
8  I mean, hold on, Ashley.  Objection.  Speculation and
9  form of that question.  I mean, you can answer.
10         THE WITNESS:  I don't know.
11  BY MS. ERICKSON:
12    Q.  Okay.  So at the bottom here on the next
13  page, 180, 000180, at the top, it states, "Medical
14  Nurse Recommendation: Referral for Medical
15  Assessment."  And then it also a couple lines down
16  says, "Mental Health Nurse Recommendation: Referral
17  for a mental health or MH assessment," which I
18  understand to be a mental health.
19         Do you under that to be a mental
20  health assessment?
21    A.  It says, "Mental Health Nurse
22  Recommendation: Referral for MH assessment."
23         Yes.  This document says that, yes.
24    Q.  Okay.  And then under the Medical Comments,

Page 108

1  he lists "dx htn, heaet disease," probably heart
2  disease, "high cholesterol," status post, "s/p neck
3  surgery 2 weeks ago, asthma, neck pain."
4         Do you see all that?
5    A.  Yes.
6    Q.  So based on your understanding of the
7  document, I know you didn't create it, what would a
8  referral to a medical assessment be for these
9  particular diagnoses in the way the patient presents
10  that day?
11         MR. RADUNSKY:  Objection.  Utter
12  speculation.  You can answer, Ashley.
13         THE WITNESS:  I don't know, but I would say
14  they would need to --
15         MR. RADUNSKY:  Don't guess.  I mean, Ashley,
16  if you don't know, I mean, you know, you don't have to
17  guess.
18         THE WITNESS:  Okay.  So I don't know.
19  BY MS. ERICKSON:
20    Q.  But if a patient needed a medical assessment
21  when they saw you in the Med Pass line, what would
22  that mean?
23    A.  They would have to be referred to a
24  doctor.

27  (Pages 105 to 108)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

|  | Page 109 |
|---|---|

1       Q.  All right.  And so we'll go on to the intake
2   that was right before you saw Mr. Dukes, and that is
3   on page 205.
4           MR. RADUNSKY:  I mean, can I just ask,
5   Kirstin.  She wasn't involved in this process.  We'll
6   stipulate to whatever the records say.  And Ashley
7   said that she was aware of this history.  So I
8   don't -- I don't know why we have to go through this
9   process.
10          We're willing to stipulate that
11  whatever the histories are, whatever the records say,
12  the defense admits it.  She didn't create these
13  documents.  I don't know what you expect to ask out of
14  her but, you know, I don't know if we can sort of
15  speed this on.  Whatever the records say, I mean, they
16  say.
17          MS. ERICKSON:  Uh-huh, yeah.  Noted.
18  BY MS. ERICKSON:
19      Q.  In this particular date, we're on CCSAO
20  Dukes 000205, on March 11, 2017, it was for a
21  particular date.  Do you see it there at the top of
22  the page?
23      A.  Yes.
24      Q.  It looks like Wayne Kinzie took the intake,

|  | Page 110 |
|---|---|

1   right?
2       A.  If the document, their name is on the intake
3   form.
4       Q.  Okay.  And then going to the following page
5   on page 206 under the Initial Medical Screen, it
6   states, "high blood pressure: no."  Right?  Do you see
7   that?
8       A.  I do see that.
9       Q.  "High cholesterol: no," right?  Do you see
10  that?
11      A.  I do see that.
12      Q.  "Diabetes: No,"  Is that correct?
13          MR. RADUNSKY:  We'll stipulate, like I
14  said --
15          MS. ERICKSON:  All right, Troy.
16          MR. RADUNSKY:  The records say what they
17  say.  I mean, this is not fair to the witness.  I
18  mean, they say what they say.  She's told you that
19  five times.  So I don't know, I mean, how this is not
20  harassing the witness.  I mean, I'll let it go on a
21  little more, but I'm gonna shut it down if you're just
22  gonna say, this is what the records say.  This is what
23  the records say.  One, she didn't create the record.
24          MS. ERICKSON:  I hear you.  I understand.

|  | Page 111 |
|---|---|

1           MR. RADUNSKY:  Well, I mean, come on.  Then
2   let's be fair to the witness here.
3   BY MS. ERICKSON:
4       Q.  All right.  So it states, also, that this
5   patient did not have heart problems, right?
6       A.  It says "Heart Problems: No."
7       Q.  Does that mean that they didn't have heart
8   problems?
9           MR. RADUNSKY:  I would just object.  It's
10  the same objection.  The record says what it says.  I
11  mean, I'm gonna let this go on for another minute, but
12  if you don't actually ask her questions, then --
13          MS. ERICKSON:  I'm building a foundation.
14  Just, please.  I won't go on very long.  Just let
15  me -- just let me ask the questions.  Okay.  Thank
16  you, Troy.
17          MR. RADUNSKY:  Sure.
18  BY MS. ERICKSON:
19      Q.  Ashley, so this was the -- in his records,
20  this is the last intake before he comes into your care
21  in May of 2017.  Would you have reviewed the most
22  recent intake before you saw this particular
23  patient?
24          MR. RADUNSKY:  That's been asked and

|  | Page 112 |
|---|---|

1   answered.  You can answer it again, Ashley.
2           THE WITNESS:  Like I said, I'm not sure all
3   what was presented at that time.  That was a long time
4   ago.  But if the records were there, it was
5   reviewed.
6   MS. ERICKSON:
7       Q.  Because part of the problem is that this is
8   a printed record versus an electronic record in the
9   way that you saw it, right?
10      A.  Yes.
11          MR. RADUNSKY:  Objection to the form of the
12  question.
13  BY MS. ERICKSON:
14      Q.  So what I'm trying to gather and understand
15  is what you would have seen, if you know at this time
16  in March to May of 2017, and that's what the basis of
17  these questions is.
18          MR. RADUNSKY:  I mean, I don't -- form of
19  the question.  I don't understand what you're even
20  asking.
21          Ashley, if you can understand the
22  question, you can answer if you understand.
23          THE WITNESS:  Okay.  Can you repeat it
24  and -- (cross talking) -- what you're asking me

28  (Pages 109 to 112)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

|   | Page 113 |   | Page 114 |
|---|---|---|---|

**Page 113**

1    because I don't understand it.
2    BY MS. ERICKSON:
3        Q.  So you had access to an electronic medical
4    record for this patient when you saw him in 2017,
5    right?
6        A.  Yes.
7        Q.  Did you have a printed paper version of the
8    records?
9        A.  I don't recall a paper record.
10        Q.  So I'm trying to understand based on what I
11    have because I don't have access to the EMAR.  I'm
12    trying to understand what you would have seen, if you
13    know, before you saw Mr. Dukes in May of 2017?
14        A.  Like I said, I would have reviewed the
15    medical history and all orders.  Whatever his chart
16    said, that's what I would have reviewed.
17        Q.  Okay.  So then just to understand the
18    process.  If his intake, for example, medical screen
19    was different than the previous intake, it would have
20    been updated in the electronic medical chart that you
21    saw, right?
22        A.  I suppose it should -- it should be updated,
23    yes.
24        Q.  Okay.  So then when you saw Mr. Dukes, it

**Page 114**

1    seems like you would have seen that he has no high
2    blood pressure, no high cholesterol, no diabetes and
3    no heart problem, right?
4        A.  I'm not sure.  But if I saw this document,
5    if it said that, I would have seen that.  Or if it
6    said the other thing, I would have seen whatever the
7    document stated.
8        Q.  I'll go onto page 403.  And these are
9    just -- this is the first time that he came into your
10    care that I can tell.  Again marked page CCSAO Dukes
11    000403.  And the date here states May 21, 2017.  20:45
12    CDT, which I understand to be 8:45 p.m.
13            Is that what you understand it to be?
14        A.  Yes.
15        Q.  Okay.  So you would have been working the --
16    which shift at that point?
17        A.  P.M. shift, the 3 to 11.
18        Q.  Okay.
19        A.  Is that -- yeah, that's nighttime, right?
20    Yeah, that's nighttime.
21        Q.  On this one?  What's the question?  It's
22    8:45 on May 21st.
23        A.  8:45 p.m.?
24        Q.  Yeah.

**Page 115**

1        A.  Yes.
2        Q.  Okay.  And then just verifying that this
3    would have been the first time if the records state, I
4    know the records state what the records state, but
5    this is your name, right?
6        A.  Yes.
7        Q.  Ashley Bloodworth, RN?
8        A.  I'm sorry to cut you off, yes.
9        Q.  Okay.  So does that mean that you would have
10    given this medication, the atorvastatin?
11        A.  Yes.  If that's what the records says that I
12    did, that's what I did.
13        Q.  Okay.  And then going on, it looks like you
14    also gave two more medications to Mr. Dukes, doxazosin
15    and metoprolol, right?  Do you see that?
16        A.  You're freezing.  The whole thing froze.
17        Q.  Okay.  I'll restate the question then.  So
18    looking on page 404.  It looks like on that same Med
19    Pass on May 21st, you gave doxazosin
20    D-o-x-a-z-o-s-i-n, so metoprolol.  Is that accurate?
21        A.  Yes.  That's what the record reads, that's
22    what happened, yes.
23        Q.  Okay.  And then just assuming just to
24    understand how it went, he must have only had those

**Page 116**

1    three medications in his order, or you would have
2    given additional medications, right?
3        A.  Correct.
4        Q.  Okay.  All right.  Stopping sharing here.
5            Did you get any sort of update on
6    patients when their medications changed?
7        A.  I believe so.
8        Q.  How were you notified?
9        A.  I can't really recall the exactly.  Yeah, I
10    can't really recall how we did -- yeah.  I can't
11    really recall that.
12        MS. ERICKSON:  I don't have many more
13    questions.  Can we take like a five-minute break?
14        MR. RADUNSKY:  Of course.  Yes.  We're going
15    on another break.
16            (Whereupon a short recess
17                was had.)
18    BY MS. ERICKSON:
19        Q.  Okay.  We can go back on the record then.
20    I'm posting Exhibit C, which is the medical records.
21    Going to page 230 CCSAO Dukes 000230.
22            Have you seen this type of form
23    before, Ashley?
24        MR. RADUNSKY:  We can't see it on your

29  (Pages 113 to 116)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 117

1    screen.
2         THE WITNESS: I don't see anything.
3         MS. ERICKSON: Oh my gosh. I'm sorry.
4         MR. RADUNSKY: So the answer is no.
5    BY MS. ERICKSON:
6         Q. All right. Sharing my screen. Thank you.
7    On page 230 of Exhibit C, do you recognize this form,
8    Ashley?
9         A. Yeah. That looks like a health service
10   request form. It states that, yes.
11        Q. Okay. And then the date on this form it
12   says, a little sloppily, 5/15/16, right?
13        A. That's what the document states, yes.
14        Q. Okay. So then the inmate would fill out the
15   form, right?
16        A. Yes.
17        Q. So Mr. William Dukes wrote on this
18   particular date with no time noted, "I have the
19   following medical problem. I am having problems with
20   my BPH and need to see a doctor. Hard start; weak/"
21   I don't know what the rest of that says. It's hard to
22   understand.
23             But just this particular first part.
24   Can you see that?

Page 118

1         A. Yes, I do see that, the first part of it.
2         Q. Okay. And BPH, what does that mean?
3         MR. RADUNSKY: What that says is actually
4    "split stream." It says "hard start; weak/split
5    stream; can't empty bladder, etc."
6         MS. ERICKSON: I agree. Thank you.
7         MR. RADUNSKY: Yeah.
8    BY MS. ERICKSON:
9         Q. So going up to that first line of Mr. Dukes
10   note here, BPH, what does that mean do you
11   understand?
12        A. BPH. I believe that's a prostate
13   disorder.
14        Q. And so and it looks like at the bottom it
15   states, "HS are collected by," and then there's a
16   signature. Do you see that?
17        A. I do see that.
18        Q. Okay. And then the date would have been May
19   15, 2016, right?
20        A. Yes, I do see that.
21        Q. So that means that this particular form was
22   picked up on May 15, 2016?
23        A. The document says that, yes.
24        Q. Yeah. Okay. And then the next line says

Page 119

1    "paper triaged by a nurse," and a particular nurse.
2    It looks like a nurse's signature is there with a date
3    next to it. Do you see that?
4         A. Yes, I do see that.
5         Q. What does it mean "paper triaged by a
6    nurse"?
7         A. The nurse saw the health service request
8    form.
9         Q. Okay. So at that time collected on that
10   date and then reviewed on that date by this particular
11   nurse?
12        A. I believe so.
13        Q. Okay. And then the referrals to medical,
14   there's an empty box for now, today or routine,
15   right?
16        MR. RADUNSKY: I just have an ongoing
17   objection to the document. She didn't draft it. She
18   didn't author it. We're even having trouble
19   deciphering the words. But you can answer, Ashley.
20        THE WITNESS: Can you repeat that question,
21   ma'am?
22        MS. ERICKSON: Court reporter, could you
23   repeat the question, please?
24        COURT REPORTER: Actually, the way you were

Page 120

1    saying the --
2         MS. ERICKSON: That's okay.
3    BY MS. ERICKSON:
4         Q. Based on your experience, Ashley, in
5    reviewing and looking at these forms, would "refer
6    medical" mean that this particular inmate was referred
7    to for a medical assessment?
8         MR. RADUNSKY: Objection. Speculation. I
9    mean, you're asking her to get in the mind of what the
10   other nurse said, I mean, in a document she didn't
11   draft. So you can answer, Ashley.
12        THE WITNESS: I'm not sure, ma'am.
13   BY MS. ERICKSON:
14        Q. Would you typically have seen something else
15   written on this line besides "medical," like would
16   it --
17        A. It's been so long ago. I don't really
18   recall. I don't recall that.
19        Q. If a patient was referred to psych, would
20   that be noted here, referral to psych?
21        MR. RADUNSKY: Objection. Again, it's
22   speculation. You're asking her to testify about a
23   document she's not drafted. Ashley, you can answer.
24        THE WITNESS: I don't know, ma'am.

30 (Pages 117 to 120)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 121

1        MR. RADUNSKY:  And we will stipulate again
2    that the record says what it says.
3        MS. ERICKSON:  I'm trying to understand the
4    way this witness interprets these.
5    BY MS. ERICKSON:
6        Q.  You've seen many of these documents, right,
7    through your time at Cook County?
8        A.  I have seen these documents before, yes.
9    Not this exact, but health service, blank health
10   service request forms and others, yes.
11       Q.  Okay.  So did you see these forms filled
12   out?
13       A.  Yes.  I did see filled out.
14       Q.  We'll go down to the next page.  Page 231
15   CCSAO Dukes 000231.  The date on the form is
16   12/1/2015, which do you understand that to be December
17   1, 2015?
18       A.  Yes.
19       Q.  Okay.  And I understand you didn't write
20   this.  This isn't your document.  But it being that
21   you're familiar with the form, I want to just ask you
22   a few questions about it.
23           On this particular date, Mr. Dukes
24   wrote at the top under Meds, "I'm not getting my

Page 122

1    prescribed medication," and he put a check next to
2    that box.  Do you see that?
3        A.  Yes.
4        Q.  Okay.  And he wrote the name of the
5    medication, "nitroglycerin 0.4 mg, "KOP"?"
6            Would this have been a keep-on-person
7    medication that he was requesting?
8        MR. RADUNSKY:  Objection.  Speculation.  I
9    mean, you're asking -- (cross talking) Hold on.
10   You're asking her again to get inside the head of what
11   your client wanted.  She said she didn't draft the
12   documents.  It's not a fair question, and it's
13   speculation.
14           You can answer, Ashley.
15       THE WITNESS:  Whatever the document says.
16   That's all I could say.
17   BY MS. ERICKSON:
18       Q.  What's that?
19       MR. RADUNSKY:  She said that's all she can
20   say.
21       THE WITNESS:  That's all I can say.
22   Whatever the document says.
23   BY MS. ERICKSON:
24       Q.  Okay.  The document says "nitroglycerin 0.4

Page 123

1    mg KOP."  That we established earlier meant keep on
2    person, right?
3        A.  Yes.
4        Q.  And then underneath it, there's some -- at
5    the beginning where it says, "ordered PRN stop."
6            Does PRN mean as needed?
7        A.  Yes.  As needed is PRN.
8        Q.  Okay.  So it seems like this particular
9    inmate is requesting for an as-needed medication,
10   correct?
11       MR. RADUNSKY:  Again, it's speculation, and
12   you're asking her to answer questions about a document
13   that she didn't draft.  I mean, I don't know why you
14   keep doing this, but you insist on doing this.  This
15   isn't fair to the witness.  She's telling you she
16   didn't draft this.  She doesn't know what -- what he
17   was saying.  She didn't do the triage.
18       MS. ERICKSON:  She knows.  She --
19       MR. RADUNSKY:  He was triaged by somebody
20   else.  Show her a document that she paper triaged
21   actually and saw his health services request form
22   where she doesn't have to guess what another nurse
23   did, that would be fair and fine.  But you're asking
24   her to get inside your client's head.  What did he

Page 124

1    mean by "KOP?"  What did he mean when he said that he
2    had these medical issues.
3            She didn't do the paper triage.  I
4    mean, she's being completely honest with you, but yet
5    you keep --
6        MS. ERICKSON:  She understands.  I mean,
7    these are doc -- these are things we went over and
8    something that she would have as a registered nurse.
9    I'm asking about her knowledge as a registered
10   nurse.
11       MR. RADUNSKY:  And she told you everything
12   she knows about KOP, but again, everything that I
13   think is on the record.  So your questions are
14   specific to this document right here, which she did
15   not author.  And you're asking her, if you look back
16   at the record, Kirstin, like why did my client say
17   this.  What does this mean?  You know, and that's not
18   fair to her.  You know, she doesn't know.  She's being
19   asked to speculate, and so that's my objection.  But,
20   you know, I'm still letting her answer the
21   questions.
22       MS. ERICKSON:  Yep.  Got it.
23       MS. BUNTIC:  And we're looking for expert
24   testimony.  I don't believe that she was disclosed as

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 125

1    an expert witness.
2    BY MS. ERICKSON:
3        Q.  Are all of your opinions today based on to a
4    reasonable degree of medical certainty for a nurse?
5        MR. RADUNSKY:  Well, first of all, that's
6    not the standard in federal court, and so I would
7    object to that.  I mean, the expert disclosures are
8    not, I mean, have not yet been formally disclosed.  So
9    she's giving you her opinions today based on her
10   background, training and expertise.  But she's not,
11   you know, I mean, being produced necessarily as you
12   would consider an expert like you would retain or a
13   controlled expert.
14       MS. ERICKSON:  Yeah.  I didn't say she was a
15   controlled expert.
16       MR. RADUNSKY:  Yeah.  But first, she's a
17   nurse.  I mean, she's told you about her background.
18       MS. ERICKSON:  Uh-huh, yeah.  And I'm asking
19   her based on her experience as a nurse.
20       MR. RADUNSKY:  Sure.  That's fair.
21   BY MS. ERICKSON:
22       Q.  Then we'll go onto page 233.  CCSAO Dukes
23   000233.  This looks like it was filled out on
24   11/28/15.  Can you see that?

Page 126

1        A.  Yes.
2        Q.  Okay.  And it has very similar notation at
3    the top with an X next to "I am NOT getting my
4    prescribed medication."  Is that accurate?
5        A.  Yes.
6        Q.  Okay.  And then name medication,
7    nitroglycerin 0.4 mg.  "Keep on person."  "see below."
8            Is that what the document states?
9        A.  That's what that says, yes.
10       Q.  Okay.  If you reviewed a health service
11   request form that had that notation at the top, what
12   would you do with it?
13       A.  If I saw a document with this notation on
14   it?  Is that what you're asking?
15       Q.  Yes.
16       A.  Well, I would have to research and find out
17   what's going on.  Look at the medical history, look at
18   his orders, look at his chart.
19       Q.  Okay.  And then if nitroglycerin 0.4 mg is
20   in his chart and doesn't say DXD next to it --
21   or strike that.  And doesn't -- sorry.  Strike the
22   whole question.
23            And if nitroglycerin 0.4 mg is in his
24   medical chart, what would you do then?

Page 127

1        A.  If nitroglycerin is in his medical chart?
2        Q.  Uh-huh.
3        A.  If it's ordered --
4        MR. RADUNSKY:  I just object to the form of
5    the question.  I don't know what that means either.
6    But you can answer, Ashley.
7        THE WITNESS:  If it's ordered, I would give
8    it as ordered.
9    BY MS. ERICKSON:
10       Q.  And so how is nitroglycerin 0.4 mg given as
11   needed to a patient?
12       MR. RADUNSKY:  Object, I mean, to the
13   form -- to the question.  What do you mean?  It's
14   given as needed.  That's exactly what it says.  That's
15   what it means.
16       MS. ERICKSON:  Okay, Troy.  Just let her
17   answer, yes or no, I don't know, I don't understand,
18   please.
19       MR. RADUNSKY:  Your question answered the
20   question.  You can answer, Ashley.
21       THE WITNESS:  Whatever the order stated,
22   that's what I would follow.
23   BY MS. ERICKSON:
24       Q.  So as a registered nurse, when a patient

Page 128

1    comes up to you and has nitroglycerin 0.4 mg. in their
2    chart, and when do you actually administer it if the
3    order says "as needed"?
4        A.  The order will also indicate when it should
5    be administered and how much the dosage should be.
6        Q.  So the order will say exactly what "as
7    needed" means?
8        A.  The order will say the type of medication,
9    the dosage and directions on its usage.
10       Q.  Okay.  But specifically the as needed, how
11   do you as a registered nurse know that it's needed
12   right then?
13       A.  Well, if -- okay.  If it's ordered and a
14   patient displays signs of it could be a heart attack,
15   then it can be administered based on whatever the
16   order is.
17       Q.  So would you agree that a heart attack is a
18   serious medical need?
19       A.  Yes.
20       Q.  And that signs and symptoms leading up to a
21   heart attack are also serious medical needs?
22       A.  Yes.
23       MR. RADUNSKY:  Objection.  That misstates
24   her testimony.

32 (Pages 125 to 128)

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 129

1    MS. ERICKSON: It's a question. Just a
2  question.
3    MR. RADUNSKY: You can -- you can answer
4  it.
5    THE WITNESS: Yes. But we will look, like,
6  as a nurse, I would look at many different things:
7  signs and symptoms, medical history, in my assessment.
8  I would go off my assessment so --
9  BY MS. ERICKSON:
10   Q.  So are chest pains a serious medical need?
11   MR. RADUNSKY: Objection. Now she's already
12  answered that question. You can answer again.
13   THE WITNESS: Chest pain is one of the signs
14  and symptoms of a heart attack, but it's other -- it's
15  also other signs and symptoms of them.
16  BY MS. ERICKSON:
17   Q.  Well, it's just a yes or no. Is a symptom
18  of a chest pain, is that a serious medical need?
19   MR. RADUNSKY: Objection. It's been asked
20  and answered. You don't have to answer it again,
21  Ashley.
22   MS. ERICKSON: She's not answering it
23  directly because you're interjecting.
24   MR. RADUNSKY: No. She's answered it three

Page 130

1  times. I'm instructing her not to answer. If you
2  have a problem with it, you can bring it up with the
3  court. You're not answering it, Ashley. You've
4  answered it three times.
5  BY MS. ERICKSON:
6    Q.  Ashley, are you not going to answer the
7  question?
8    MR. RADUNSKY: Ashley, you're not gonna
9  answer the question, right?
10   THE WITNESS: I've already stated.
11   MR. RADUNSKY: Okay. She's not answering
12  the question.
13  BY MS. ERICKSON:
14   Q.  So you're not answering the question?
15   MR. RADUNSKY: That's correct. You can
16  certify it.
17   MS. ERICKSON: Give me one second here.
18  Almost done. I promise. I think that's all I have
19  right now. Thank you very much.
20   MR. RADUNSKY: You guys have any questions?
21  Mia?
22   MS. BUNTIC: No questions.
23   MR. RADUNSKY: Give me a second. I'm not
24  sure if I'm gonna any questions or not. Let's take a

Page 131

1  five-minute break.
2    (Whereupon a short
3    recess was had.)
4    MR. RADUNSKY: I have no questions. So we
5  will reserve signature. Ashley, you can go.
6    THE WITNESS: Okay. Bye, everyone. Have a
7  good evening.
8    COURT REPORTER: I'm assuming, Kirstin, that
9  you're gonna order?
10   MS. ERICKSON: Yes. We're going to order.
11   MR. RADUNSKY: I'll take a copy, please.
12   AND FURTHER DEPONENT SAITH NOT . . . .
13   (The deposition concluded at
14    12:35 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 132

1    IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
2
3
4  WILLIAM DUKES,              )
                               )
5    Plaintiff,                )
                               )
6  -vs-              ) No. 17 cv-7095
                               )
7  COOK COUNTY SHERIFF'S, et al,   )
                               )
8    Defendants.          )
9
10   I, ASHLEY BLOODWORTH, being first duly
11  sworn, on oath, say that I am the deponent in the
12  aforesaid deposition, that I have read the foregoing
13  transcript of my deposition, consisting of Pages 1
14  through 133 inclusive, taken at the aforesaid time and
15  place and that the foregoing is a true and correct
16  transcript of my testimony so given.
17   _____
        ASHLEY BLOODWORTH, Deponent
18
19  _____ I have not submitted errata sheet(s)
20  _____ I have submitted _____ errata sheet(s)
21
22
23  SUBSCRIBED AND SWORN TO
    before me this _____ day of
24  _____ A.D. 2022.

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 133

1   STATE OF ILLINOIS  )
              ) SS:
2   COUNTY OF C O O K  )
3
4      I, SHARON A. DORENCZ, a Certified Shorthand
   Reporter within and for the State of Illinois do
5   hereby certify:
6      That previous to the commencement of the
   examination of the witness, the witness was duly sworn
7   via videoconference to testify the whole truth
   concerning the matters herein,
8
      That the foregoing deposition was reported
9   stenographically by me via videoconference, was
   thereafter reduced to a printed transcript by me, and
10  constituted a true record of the testimony given and
   the proceedings had;
11
      That the said deposition was taken before me
12  via videoconference at the time and place specified;
13     That the reading and signing by the witness
   of the deposition transcript was agreed upon as stated
14  herein;
15     That I am not a relative or employee or
   attorney or counsel, nor a relative or employee of
16  such attorney or counsel for any of the parties
   hereto, nor interested directly or indirectly in the
17  outcome of this action.
18     IN WITNESS WHEREOF, I do hereunto set my
   hand this 2nd day of March, 2022.
19
20
21     SHARON A. DORENCZ, CSR
22
23
24

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

**A**

**A.D** 1:15 132:24
**a.m** 1:16 15:7,8
  16:14 62:21
  86:4,5 87:10
**ability** 24:5
**able** 23:21,22
  25:18 99:13
**abnormal** 43:5
  43:17 44:21
**abnormality**
  44:2
**above-entitled**
  1:12
**access** 8:8 39:20
  41:23 51:9
  104:23 105:2
  113:3,11
**accessible** 31:7
**accommodatio...**
  25:19
**account** 74:5
**accurate** 115:20
  126:4
**accurately** 58:23
  72:11
**Act** 4:4
**action** 133:17
**actual** 92:18
**added** 90:19,20
  90:23 93:10,13
  93:15
**additional** 52:15
  93:9 116:2
**address** 9:10
  49:12,15 50:1
**admin** 98:11
**administer**
  20:22 23:12,16
  23:22 24:12
  34:5 35:14
  40:4 58:19
  60:24 70:17
  72:13,21 97:16
  128:2

**administered**
  28:2 59:23
  62:12 63:5
  70:23 71:24
  72:9 79:5,10
  92:9 100:1
  103:23 128:5
  128:15
**administering**
  4:5 24:13 27:5
  27:24 69:17
  104:22
**administration**
  55:23 57:22
  61:1 62:19
  64:1 67:18
  98:24
**admits** 109:12
**Advil** 23:13 24:3
  24:6,14 40:2
**aforesaid** 132:12
  132:14
**afternoon**
  103:13
**agency** 33:18
**ago** 19:11 20:17
  20:20 35:11
  42:4 52:13
  61:13,20 64:18
  67:10 71:22
  92:20 108:3
  112:4 120:17
**agree** 4:2 20:14
  58:14 79:6
  118:6 128:17
**agreed** 133:13
**agreement** 4:7
  5:7
**ahead** 10:7
  12:24 13:11
  18:18,19 19:5
  19:6 21:1,10
  24:16 32:23
  33:16 38:17
  46:21 49:6

57:1 58:6
60:13 61:9
65:7,8 78:6
79:21,22 80:14
83:15 86:17
87:18 88:24
93:3 94:10
105:12
**al** 1:7 132:7
**Albuterol** 80:11
  80:20,23 88:12
  89:6,7 90:1,2
**Altman** 2:20
  4:16 25:11
**Amir** 25:13
**Amoxicillin** 82:6
**analyze** 32:15
**and/or** 8:9
**answer** 6:7 7:4
  7:10,16 8:16
  8:23 11:19
  21:24,24 24:16
  32:16,17,24
  33:16 34:21
  38:17 41:2,2
  41:15,15 49:6
  50:10,20 52:23
  53:24 61:10
  63:16 71:2,12
  73:22 74:15,16
  74:24 75:6
  76:11,12,24
  77:11,20 78:6
  78:6 79:22
  82:21 83:15
  84:3,4 89:10
  89:18 93:2,21
  94:10 95:15
  96:15 97:13
  103:17 106:16
  107:9 108:12
  112:1,22 117:4
  119:19 120:11
  120:23 122:14
  123:12 124:20

127:6,17,20
129:3,12,20
130:1,6,9
**answered** 17:18
  17:18 24:16
  53:23 62:13
  73:8,21 84:1,4
  89:17 106:15
  112:1 127:19
  129:12,20,24
  130:4
**answering**
  129:22 130:3
  130:11,14
**answers** 3:8 6:24
  16:17,19 17:15
  23:1 30:13
  65:8
**antibiotic** 82:7
**anybody** 27:15
**anymore** 31:15
  62:22
**appearance** 72:8
**Applicability**
  59:5,6
**applicable** 5:9
  59:7
**appointed** 65:24
**appreciate** 24:20
**April** 13:22 14:9
**arrangements**
  72:20
**arrive** 27:7
**arrives** 22:7
**as-needed** 123:9
**ASA** 105:6
**Ash** 75:15
**Ashley** 1:12 2:11
  3:3 4:19 5:3,6
  5:18,24 6:20
  9:2,9 11:11,12
  13:17 17:2,11
  21:10,24 24:17
  33:16 34:21
  38:17 45:2,19

46:12,17 49:6
50:10,20 52:23
53:24 55:24
56:10,21 58:3
61:9 65:8
67:16 68:5,8
69:8 71:12
74:15,22 75:14
76:11,17 77:11
77:20 78:6
80:14 82:21
83:15 84:3,18
85:17 88:5
93:2,20 94:10
95:15 96:13,15
97:13 99:9
100:10 103:18
104:21 106:21
107:8 108:12
108:15 109:6
111:19 112:1
112:21 115:7
116:23 117:8
119:19 120:4
120:11,23
122:14 127:6
127:20 129:21
130:3,6,8
131:5 132:10
132:17
**Ashley's** 55:21
**asked** 24:15
  53:23 67:9,10
  73:21 75:6
  84:4 96:23
  106:14 111:24
  124:19 129:19
**asking** 32:6,8
  41:14 53:10
  87:21 93:19
  96:13 97:12
  112:20,24
  120:9,22 122:9
  122:10 123:12
  123:23 124:9

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

124:15 125:18
126:14
**asks** 23:3
**aspirin** 76:8,13
77:7,16 78:4
78:12 93:13
105:7
**assessment**
40:15 42:20,23
42:23 44:9,12
44:14 45:7,7
107:15,17,20
107:22 108:8
108:20 120:7
129:7,8
**Assistant** 2:12
**associated** 50:3
92:5,13
**assume** 7:11
43:15 50:23
92:14
**assumes** 38:16
**assuming** 8:18
32:4,11 115:23
131:8
**asthma** 108:3
**asthmatic** 80:23
**atorvastatin**
88:4,6,7,9
115:10
**attack** 78:23
83:22 84:7,9
128:14,17,21
129:14
**attorney** 2:12
8:1 13:15
133:15,16
**attorney/client**
6:6
**audio** 11:9
**August** 14:16
17:23 21:16
**author** 119:18
124:15
**authorization**

82:19
**authorized** 23:3
23:8,9
**available** 29:15
30:9,19,22
**Avenue** 9:11
**avoid** 58:21
83:21,22
**aware** 6:14
109:7

___ **B** ___

**B** 3:6,9 55:21
56:1,5,5,6
60:16,17 67:1
98:10,23
**B-l-o-o-d-w-o-...**
5:4
**bachelor's** 10:17
**bacitracin** 90:20
**back** 7:14 9:9
32:14,14,18
35:2 38:21,22
41:19,20 47:12
49:18,19 60:17
67:24 74:20,21
97:20 101:12
103:6 116:19
124:15
**background**
5:13 10:1
125:10,17
**bad** 88:22
**BAKER** 2:3
**based** 32:6 34:20
39:23 40:15
61:24 65:19
87:21 108:6
113:10 120:4
125:3,9,19
128:15
**basic** 24:2
**basically** 23:3
30:10
**basis** 112:16

**Bates** 56:7,9,17
56:22 64:9
69:19 86:7
**beating** 43:21,24
**bed** 99:14 100:2
101:3
**beginning** 21:16
76:20 123:5
**behalf** 2:6,11,15
2:19 4:13,15
**believe** 6:21
10:22,24 14:9
14:14 15:1
16:8 19:17,23
20:15 21:18,21
22:24 23:18,18
25:2 27:11
28:20 33:17
35:12,23 36:8
36:23 37:21,22
39:20 41:3
43:10 46:19,22
47:19 49:9
51:22 53:6
55:3,12 61:14
61:18,21 62:6
62:8 64:18
65:23 66:4,18
72:16 74:3
76:6 88:9
92:20 99:18
102:24 105:8
105:10 116:7
118:12 119:12
124:24
**beta-blocker**
83:9
**better** 17:5
**binding** 4:5
**birth** 9:3 38:6
**bit** 59:5 103:3
**bladder** 118:5
**blank** 121:9
**bleeding** 31:20
**blood** 42:13

44:18 45:9,10
78:13 83:9
104:5 110:6
114:2
**Bloodworth**
1:12 2:11 3:3,7
4:19 5:3,6
16:22 56:1
85:8 115:7
132:10,17
**bottle** 91:7
**bottom** 107:12
118:14
**Boulevard** 2:17
**box** 54:22 87:13
119:14 122:2
**boxes** 44:15
**BPH** 117:20
118:2,10,12
**break** 7:24 8:14
8:24 45:16
46:8 84:20
97:18 116:13
116:15 131:1
**breaks** 8:10
**breathe** 43:3
**breathing** 42:14
**bring** 33:2 43:9
75:22 130:2
**bringing** 91:23
**BRISKY** 2:4
**broad** 50:9,19
71:11 76:10
77:10,13
**brought** 74:9,12
107:5
**Buchanan** 25:6
**building** 90:12
111:13
**bulletins** 13:1,3
13:10 20:2,7
20:14
**Buntic** 2:12 4:13
4:13 124:23
130:22

**buterol** 80:10
**Bye** 131:6

___ **C** ___

**C** 2:1,16,17 3:9
67:1 85:1,8
98:20,24 103:6
103:7 116:20
117:7 133:2
**call** 5:18 18:20
29:14,17 30:9
30:12 63:8,14
64:13 66:3
79:6
**called** 4:20 12:7
13:1 20:1 29:3
35:13 43:10
47:5
**calling** 91:22,22
**calls** 8:13
**camera** 46:13
**cap** 87:1
**capsule** 86:21
**capsules** 87:2,6
**care** 23:6 30:23
30:24 31:5,9
31:12,13,19
32:1 33:8 42:3
42:8 46:6
111:20 114:10
**carried** 64:16
**cart** 36:22,24
47:14,15 66:12
73:5,7 76:4
**case** 1:13 8:1,18
13:3 103:22
**cause** 15:16
31:19 96:17
**CCDOC** 23:5
33:18 57:20
63:22 64:13,23
65:13,23 66:2
**CCSA0** 98:6
**CCSAO** 85:4,16
93:9 95:1 98:3

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

99:5 103:9
104:2 105:3
109:19 114:10
116:21 121:15
125:22
**CDT** 114:12
**cell** 100:16 101:5
102:13,15
**Center** 101:11
**Cermak** 5:15
13:2,6 14:16
30:16,23 31:3
33:11,18 42:2
46:18,23 48:1
57:11,20,21
59:8 63:3,21
64:10 66:8,18
66:19 67:18
**certain** 55:10,12
94:6,15,16
**certainty** 125:4
**Certified** 1:13
133:4
**certify** 130:16
133:5
**cetera** 36:7
**change** 15:2,5
**changed** 116:6
**characterized**
102:14
**charge** 36:13
**chart** 36:22
38:13 39:5
48:6,9,12,15
48:22 61:17,17
61:17,19,21
73:17 85:20
87:21,24 96:7
96:14 104:23
107:4 113:15
113:20 126:18
126:20,24
127:1 128:2
**charts** 48:10
**check** 44:15

122:1
**chest** 42:16,18
42:18,22 43:4
43:17 44:5,10
78:24,24 83:11
83:21,23 84:2
84:8 129:10,13
129:18
**Chicago** 2:5,9,13
2:18 10:13,16
10:19 13:20
**choice** 62:3
**cholesterol**
81:19,20 88:10
104:7 108:2
110:9 114:2
**circumstances**
71:6
**Civil** 5:9
**clarify** 18:1
74:13
**clarifying** 24:19
**Clark** 2:9
**clear** 15:8 71:17
86:12 97:5
**client** 32:10
122:11 124:16
**client's** 123:24
**close** 73:13
**closed** 10:5
**co-general** 99:16
101:8
**coach** 106:4
**collab** 33:20
**collaboration**
58:18
**collaboratively**
33:22 34:2
**colleagues** 51:2
**collected** 118:15
119:9
**column** 87:10
88:12 99:15,15
**combined** 17:10
**come** 15:22

35:15 36:2,4,9
36:11 43:7
70:9 90:5,5
97:20 101:12
111:1
**comes** 38:11
72:16 98:10
111:20 128:1
**commander**
64:13,24 65:6
65:10,10,14,16
65:23
**commanders**
66:3
**commencement**
133:6
**comment** 104:24
**comments**
104:15 107:24
**communicate**
7:22 51:2,7,14
**communication**
51:5
**complained** 43:8
**complains** 45:6
**complaint** 23:21
**complaints**
39:22
**completely**
124:4
**compliance**
59:10,13
**comply** 59:15
**computer** 8:7
39:16,18 92:21
92:23
**computers** 36:22
**concerning**
133:7
**concluded**
131:13
**connection**
11:14
**consecutive**
70:22 71:7

**consecutively**
95:24
**consider** 42:11
42:16 70:3
125:12
**considered**
68:21
**consisting**
132:13
**constituted**
133:10
**consult** 8:2
**contact** 52:19
53:2,4
**container** 91:3
**context** 26:15
**control** 81:19
83:9
**controlled**
125:13,15
**conversation**
40:22
**convicted** 11:1
**Cook** 1:7,14
5:14 14:6,7,12
14:15,20 15:3
16:1 17:22
20:11 22:8,23
24:24 25:16,24
26:13,14,15,21
26:24 27:7
28:14,22 30:24
33:12,23 46:24
47:24 49:2,13
50:1,16 51:20
51:21 57:19,21
59:2,7,9 60:3
66:5 67:16
74:2 75:23
81:2 85:6
89:16 94:5
95:9,10 99:13
99:24 101:12
101:17 102:9
102:21 103:8

121:7 132:7
**copy** 88:22
131:11
**corner** 56:20
**correct** 10:3
20:8 69:6
73:20 86:13
90:20 100:19
102:2 104:12
110:12 116:3
123:10 130:15
132:15
**correction** 25:17
33:23 35:7
**correctional**
25:3,7,10
39:14 47:5
51:8,15 63:8
63:14 65:19
74:1,10 75:1
75:20,21 76:5
91:22 101:11
102:19
**Corrections**
5:15 14:12,15
24:24 26:14,16
33:12 46:24
57:20 59:8
106:13
**correctly** 36:21
51:23 58:4
59:11 63:6
92:9 102:13
**counsel** 4:2
56:16 58:3
133:15,16
**counter** 23:13
40:11
**County** 1:7,14
5:14 14:6,7,12
14:15,20 15:3
16:1 17:23
20:11 22:8,23
24:24 25:16,24
26:13,14,15,21

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 4

26:24 27:8
28:14,22 31:1
33:12,23 46:24
47:24 49:2,13
50:1,16 51:20
51:21 57:20,21
59:3,8,9 60:3
66:6 67:17
74:2 75:23
81:2 85:6
89:16 94:5
95:9,11 99:13
99:24 101:12
101:18 102:9
102:22 103:8
121:7 132:7
133:2
couple 15:3
107:15
course 56:8 78:6
93:7 116:14
court 1:1 4:1
6:24 7:4,24
12:19 32:14
34:24 38:20
41:18 72:8,14
72:15,16,16
74:19 119:22
119:24 125:6
130:3 131:8
132:1
Coyne 2:16,17
4:15,15
CPR 52:14
53:13
CPS 14:5
create 100:11
103:15 108:7
109:12 110:23
created 99:12
crime 11:2
cross 67:8
112:24 122:9
CRW 47:6
CSR 133:21

CST 103:11
current 4:3 9:10
105:6
currently 9:15
13:17
cut 21:3 89:22
115:8
cutoff 11:13
cv-7095 1:6
132:6

D

D 3:1,10 98:16
98:19,21,22
99:1,4,6
D-o-x-a-z-o-s-i...
115:20
daily 55:9 60:1
60:23 87:1,3
89:15
date 9:3 38:5
48:23 57:6
85:24 86:1
88:3 94:4
95:24 101:15
102:12 103:10
103:14 109:19
109:21 114:11
117:11,18
118:18 119:2
119:10,10
121:15,23
dates 100:2
daughter 9:18
day 1:15 15:22
15:23 25:18,20
25:23 41:22,23
55:7,10,13
81:23,23 82:2
88:3 89:8
104:22 107:6
108:10 132:23
133:18
days 16:5,6
60:22

daytime 15:17
15:17 25:21
30:20
December 90:19
90:23 93:10,10
93:13,15
121:16
decide 15:19
23:5 62:8
decided 62:9,10
62:11
deciphering
119:19
decision 23:10
defendant 2:11
2:15 4:12,14
Defendants 1:8
2:19 4:16
132:8
defense 109:12
define 21:23
definitions
59:20
degree 125:4
degrees 10:18
Deliver 64:12
delivered 66:2
Department
5:14 14:12,15
24:24 25:16
26:13,15 33:12
33:23 46:24
57:20 59:8
106:12
depend 41:4
82:2
depended 62:7
depending 23:21
42:20
depends 77:14
79:15,23 82:3
82:14 89:24
deponent 131:12
132:11,17
deposition 1:11

3:7 4:5 5:6,8
5:21 6:19 7:23
8:4,8,9 11:4
13:15 16:22
55:22 76:21
98:3 131:13
132:12,13
133:8,11,13
description
86:20
descriptive 34:9
details 73:19
detainee 29:21
35:14 70:13
detainees 27:1,2
31:12
DeVORE 2:8
diabetes 104:9
110:12 114:2
diagnoses 108:9
die 92:11
difference 68:1
different 15:16
20:2 21:7
43:23 60:11
65:5 69:5,7
113:19 129:6
differently
84:13
directions 128:9
directive 3:9
55:19,22 57:10
57:18 59:15
62:1 64:19,21
65:18 67:4,17
73:1 98:24
directives 11:22
12:3,4,11 13:2
13:4,10 18:21
18:23 19:3,21
19:23 20:7,14
20:19 21:6,16
22:7,13,18,20
39:10 67:7
directly 29:8

129:23 133:16
director 23:24
23:24 29:9,11
disclosed 124:24
125:8
disclosures
125:7
DISCOVERY
1:11
disease 108:1,2
diseases 104:4
dishonesty 11:2
disorder 118:13
dispensary 90:6
90:9,10
displays 128:14
distinction 13:5
distinguishing
33:24
distortion 5:22
11:9 49:16
Distribute 58:19
distributed
59:24 60:18,21
60:23 63:5
distribution
55:24 57:22
67:2,22 98:11
DISTRICT 1:1
1:1 132:1,1
DIV 99:15
DIV10- 100:3
DIV10-2C 102:7
DIV8-3E 102:7
DIV9 102:7
diversion 58:21
division 25:4,14
31:2,8,10
60:22,23 72:1
90:10 100:5
101:5
doc 31:6 124:7
doctor 29:14
30:22 40:13,14
40:14,19,21,23

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

62:6,7,9,11
74:5,6 79:24
81:8 82:5,14
102:21,23,24
108:24 117:20
**doctor's** 46:3
79:17 80:4
82:18 92:18
**doctors** 29:6,11
29:16 31:14
**document** 20:13
56:21 57:12
93:17,21,24
96:5,6 99:9
100:11 101:15
101:20,24
103:16,19,20
103:24 107:23
108:7 110:2
114:4,7 117:13
118:23 119:17
120:10,23
121:20 122:15
122:22,24
123:12,20
124:14 126:8
126:13
**documentation**
105:1
**documents**
11:17,20,24
109:13 121:6,8
122:12
**dog** 99:4
**doing** 26:8 66:20
69:2 84:18
123:14,14
**DORENCZ** 1:13
133:4,21
**dosage** 128:5,9
**dosages** 36:20
**dose** 59:23 60:3
60:3,6,6 68:15
68:16 72:21
73:2,4 79:14

**dose-by-** 68:14
**dose-by-dose**
59:22 62:1,4
67:1,18 68:1,2
69:4 80:5
**doses** 70:22 71:8
72:19,24
**doxazosin**
115:14,19
**draft** 106:1
119:17 120:11
122:11 123:13
123:16
**drafted** 120:23
**drug** 58:20
**Duke's** 73:16,16
94:3
**Dukes** 1:4 3:9
5:11 85:4,16
93:9 95:1 98:4
98:19,21 99:5
99:24 101:3,9
101:10,16
102:9 103:8,9
103:12 104:3
105:3 109:2,20
113:13,24
114:10 115:14
116:21 117:17
118:9 121:15
121:23 125:22
132:4
**Dukes'** 85:5
**duly** 4:17,20
132:10 133:6
**duties** 26:12
**dx** 108:1
**DXD** 59:22 60:6
66:24 126:20

─────── E ───────
**E** 2:1,1 3:1,6
4:23 62:18
98:2,2
**E-M-A-R** 73:17

**earlier** 69:16
102:14 103:3
123:1
**early** 72:8,13
**East** 10:2
**education** 5:13
**educational** 10:1
**effect** 16:9
**Effective** 57:6
**efficiently** 58:20
**either** 7:9 20:2
30:3 32:16
48:3 62:4 72:2
87:6 90:5
107:3 127:5
**EKG** 46:3,5
**Eleanor** 25:11
**electronic** 8:3
28:4 64:1
112:8 113:3,20
**electronically**
104:23
**elevated** 79:2
**email** 49:12,15
50:1,7,15,15
51:1,4,6
**emails** 53:6
**EMAR** 28:4,13
28:16,19 44:15
64:1 73:17
113:11
**emergencies**
22:14
**Emergency** 4:3
**emergent** 42:1,8
42:12,17
**emergently** 46:6
**employed** 33:11
46:17 57:10
**employee** 133:15
133:15
**employees** 57:21
59:9
**employment**
5:13

**empty** 118:5
119:14
**encounter** 75:21
**encountered**
71:17 78:12
**ended** 94:24
**enjoyed** 16:11
**entail** 19:10
**entails** 42:20
**entered** 94:5
99:7
**entire** 71:24
96:14,14
**entitled** 55:23
**entries** 101:7
**entry** 101:2
102:21
**equipment**
66:10,17
**Erickson** 2:3 3:4
4:9,9,24 5:10
6:17,18 8:21
9:8 10:10 12:2
12:14,22 13:13
15:12 17:8
18:7,17 19:9
20:4,5 21:9,14
22:5 24:10,21
24:23 26:10
27:17 32:6,13
32:19 33:6,19
34:24 35:5
37:10,12 39:2
41:6,18 42:5
45:3,17,21
46:8,16 47:11
47:23 49:11,18
50:5,14,24
53:3 54:3,24
55:16 56:5,8
56:16 57:2,4
58:7 60:15
61:15 62:14
63:1,12,19
64:4,7 65:3,12

67:12,14,15
68:11 69:13
71:5,16 73:9
73:23 74:19
75:8,18 77:4
77:15,24 78:10
79:9 80:3,15
82:20,24 83:18
84:8,15,16,24
85:3,11 86:9
86:14,18 87:19
88:22 89:1,13
89:20 93:6
94:1,14,21,22
95:19 96:20
97:17,22 98:1
98:6,13,17,23
99:3,8,23
100:14,21,23
101:1 102:3,5
102:16 103:21
104:20 105:13
106:3,8,22
107:11 108:19
109:17,18
110:15,24
111:3,13,18
112:6,13 113:2
116:12,18
117:3,5 118:6
118:8 119:22
120:2,3,13
121:3,5 122:17
122:23 123:18
124:6,22 125:2
125:14,18,21
127:9,16,23
129:1,9,16,22
130:5,13,17
131:10
**errata** 132:19,20
**errors** 58:21
**escort** 34:4,14
34:18 35:4,7
63:22

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 6

established 123:1
establishes 57:19
et 1:7 36:7 132:7
evening 87:6 131:7
evidence 38:16 97:11
ex-husband's 9:23
exact 15:15 37:23 47:18 55:3,4 62:22 64:20 66:23 76:1 121:9
exactly 36:10 53:20 76:2 81:4 82:20 84:9 101:6 103:7 116:9 127:14 128:6
exam 10:21
examination 3:2 133:6
examined 4:21
example 75:20 85:24 86:3 88:1 90:20 100:2 113:18
exhibit 3:7,8,9,9 3:10 16:18,23 55:21 56:1,4 84:24 85:8 86:12 98:2,2,8 98:10,16,19,20 98:21,22 99:4 99:6 103:6,7 116:20 117:7
exhibits 8:9
expect 109:13
experience 32:7 32:21 48:1 60:2 63:13 74:8 78:2,11

81:3 87:23 120:4 125:19
experiencing 77:6
expert 124:23 125:1,7,12,13 125:15
expertise 125:10
explain 12:16,18 13:1 20:24 35:9 45:1 55:6 56:12,14 61:9 64:16 99:14
explained 49:5

**F**
facility 74:2,10 74:13 75:2,20 75:21 76:5 102:19
fact 61:24
factors 77:19
facts 38:16
fair 7:6,12 34:19 110:17 111:2 122:12 123:15 123:23 124:18 125:20
familiar 28:13 28:16 59:20 62:15,17 67:19 67:20 80:11,17 80:18,20 81:10 81:12,13,14 83:1 85:12,14 85:22 86:23 87:22 93:4 99:11 101:23 105:19 106:18 121:21
far 41:8 62:18 90:10 103:4
fast 12:18 43:24 98:8
fatal 92:13

fatigue 43:4 79:1
fault 18:6
favorite 37:10 37:10
fear 34:15
February 1:15 86:4
federal 5:8 125:6
feel 22:21 43:15 43:22,24
felony 11:1
felt 46:4
figure 60:9 75:5 76:18
figuring 36:13
fill 40:4,9 70:10 117:14
filled 121:11,13 125:23
find 54:20 96:1 126:16
finding 39:4
findings 42:23
fine 26:9 84:14 86:16 91:8 123:23
finish 7:3 106:4
finished 59:16 61:22 73:10
first 4:20 19:8 23:16 24:4,8 24:11 36:7 64:12 67:11 84:1 85:14 86:16,19,20 87:10 90:15 94:5 98:10 99:15 101:17 106:17 114:9 115:3 117:23 118:1,9 125:5 125:16 132:10
five 16:6 46:9 55:7 62:15

110:19
five-minute 116:13 131:1
fluoxetine 86:21 88:2
foggy 22:11 42:4
follow 12:5 20:14 79:17 80:1,2 89:12 127:22
follow-up 51:22 51:24
followed 57:19 64:19
following 110:4 117:19
follows 4:22
foregoing 132:12,15 133:8
Forest 10:8
forgot 34:24
form 21:23 33:13 40:5,7 40:10,24 41:24 44:2 50:8,17 51:5 52:21 58:11 65:1 70:6,11,24 71:10 74:14,23 76:9 77:9,19 83:14 85:13 88:23 95:14 107:9 110:3 112:11,18 116:22 117:7 117:10,11,15 118:21 119:8 121:15,21 123:21 126:11 127:4,13
formally 125:8
forms 22:18 120:5 121:10 121:11

Foster 25:4
foundation 34:17 38:15 41:14 58:9 77:18 103:16 111:13
frame 14:7 41:8
freezes 6:9
freezing 11:10 115:16
frequent 52:3,5 55:8
frequently 55:4 55:5,6
front 44:23
froze 11:13,18 49:16 115:16
frozen 5:21 6:4 75:12
full 15:24 16:4
further 59:6 131:12

**G**
G 63:2 69:4
gather 103:4 112:14
general 35:18 65:3 68:16,21 69:1
generally 39:1 41:21 51:10 82:1 87:12
generate 93:18
getting 31:24 121:24 126:3
give 24:2,5 25:23 28:9 33:2,4 40:2,17 48:23 55:20 56:6,7 82:16 84:17 91:18 95:1 98:12 103:7 127:7 130:17 130:23

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

given 5:20 6:19
22:15 25:19
36:17 40:1
41:23,23 48:18
60:7 78:16
79:14,20 81:23
82:1 91:3 97:1
107:5 115:10
116:2 127:10
127:14 132:16
133:10
gives 96:7 105:5
giving 60:3 61:2
61:12 66:22
79:20 125:9
go 6:22 7:14,24
9:5,9 10:1,7
12:15,24 13:11
14:11 15:16
18:18,19 19:5
19:5 21:1,10
22:8 24:16
28:9,18 29:20
30:3 31:19
32:1,23 33:8
33:16 38:17
42:2,24 46:21
47:12 48:21
49:2,6 56:21
57:1,13 58:6
59:21 60:13,16
60:16 61:9
62:18 63:2
65:7,8 70:12
70:16 73:15
77:22 78:6
79:21,22 80:14
83:15 84:19
85:19 86:17
87:17 88:24
90:6 93:2
94:10,19,24
95:24 96:18,22
103:6 104:18
105:12 109:1,8

110:20 111:11
111:14 114:8
116:19 121:14
125:22 129:8
131:5
goals 58:18
going 7:11 16:16
21:6 39:23
41:5 53:5
55:19 56:21
59:5,19 60:16
66:24 72:14
77:14 84:17,19
85:16 90:18
91:23 93:8
98:1,15 103:6
103:7 105:3
110:4 115:13
116:14,21
118:9 126:17
130:6 131:10
gonna 5:11 6:22
7:14 41:1
57:14 110:21
110:22 111:11
130:8,24 131:9
good 5:16 7:17
7:18 9:1 75:14
75:15,17 84:22
131:7
goodness 50:17
gosh 117:3
graduated 10:2
10:13,23
great 97:22
ground 6:23
guess 12:4 16:6
21:22 27:13
36:9 47:8,20
50:22 55:15,15
55:17 87:17
99:19,20 100:9
100:12 106:20
106:21 108:15
108:17 123:22

guessing 27:16
guys 49:22
130:20

———————

**H**

H 3:6
hand 133:18
handle 22:13
Hang 11:10
hanging 84:23
happen 32:7
34:12,13 61:3
89:23 94:12
happened 6:11
39:9 48:21
64:22 65:21
71:20 115:22
happening 39:1
39:6 41:22
48:24 71:14
72:2,6
happens 6:5,12
22:7 89:15
happy 6:9 76:23
harassing
110:20
hard 95:1,3
117:20,21
118:4
Hatchet 9:24
head 31:22
42:15 79:3
122:10 123:24
headache 77:17
78:4
heaet 108:1
health 4:4 13:24
40:5,6,10
57:21 59:8
85:6 107:16,17
107:18,20,21
117:9 119:7
121:9,9 123:21
126:10
hear 6:1,2 11:15

11:16 49:20
63:13,14
110:24
heard 80:9
heart 43:21,24
78:23 83:22
84:6,9 104:11
104:15,24
108:1 111:5,6
111:7 114:3
128:14,17,21
129:14
Hello 5:23 75:15
help 33:8 52:17
81:19
hereto 133:16
hereunto 133:18
high 10:2 83:9
104:5,7 108:2
110:6,9 114:1
114:2
higher 18:12
hired 19:8
histories 109:11
history 5:13
48:9,17 49:9
74:4 96:14
109:7 113:15
126:17 129:7
hoarding 58:20
hold 49:17 71:9
71:9 80:13,13
96:11 107:8
122:9
Holland 9:11
home 105:4,17
105:18 107:5
honest 19:18
47:21 81:4
91:4 124:4
honestly 17:19
horrible 70:4
hospital 14:6
31:3 85:6
hour 1:16 57:14

84:19
hours 14:23
64:14,15 66:3
88:15 89:7
housed 81:2
101:10,17
102:9
housing 3:10
33:18 100:22
Howard 104:14
HS 118:15
htn 108:1
hypertension
83:8,13
hypertensive
83:10
hypothetical
32:4,4,5,9,11
37:9 38:17

———————

**I**

Ibuprofen 78:9
ID 3:7 37:17,19
37:22,24
identification
16:24 56:2
identified 36:16
85:9
identifier 37:6
identifiers 36:18
38:2,5,10
identify 37:5
38:1 56:17
IDOC 106:9,10
106:18
Illinois 1:1,15
2:5,9,13,18
9:11 10:9,11
106:12 132:1
133:1,4
immediate 29:6
important 42:19
42:22 44:8,10
58:14
Improper 88:24

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

**in-person** 21:5
  53:19
**inclusive** 78:2
  132:14
**indicate** 63:4
  128:4
**indirectly**
  133:16
**individual** 23:4
  23:9 53:22
**infirmary** 42:3
  43:10 44:22
**information** 8:3
  8:4 22:6,12,16
  22:17 50:6,12
**inhalation** 88:14
**inhaler** 80:8
  89:8
**initial** 51:19
  104:3 110:5
**initially** 106:24
**inmate** 22:7 23:5
  28:3,17,19
  31:18,23 37:11
  37:19 38:9,11
  40:9,17,23
  41:11 42:7
  43:6,12,16
  46:5 48:12
  49:1 60:5,20
  61:6 62:3
  69:20 70:3,9
  70:13,23 71:7
  71:18 72:7,14
  72:21 73:24
  74:9 75:11,12
  75:19 77:6,7
  78:16 82:2,16
  90:1 91:3,20
  95:8,10 96:9
  97:6 100:16
  102:17,21
  117:14 120:6
  123:9
**inmate's** 85:21

**inmates** 23:14
  27:7 31:12
  35:21 45:23
  58:15 63:5
  68:18,20,22
  99:13
**inside** 122:10
  123:24
**insist** 123:14
**instructing**
  130:1
**intake** 21:19,20
  21:23 22:4,8
  27:7,12,20
  49:2,5,8 73:18
  74:4,7 76:2
  102:20 103:13
  103:23 105:4
  105:17 109:1
  109:24 110:2
  111:20,22
  113:18,19
**interagency** 3:9
  13:5 55:22
  58:18
**interested**
  133:16
**interface** 8:9
**interjecting**
  129:23
**Internet** 11:14
**interprets** 121:4
**interrogatories**
  3:8 4:21 16:17
  16:20 17:16
**interrupt** 13:12
  59:17 73:12
**involved** 102:20
  103:1 109:5
**involvement**
  49:5
**involving** 11:2
**irregular** 43:21
**issue** 21:1,4
  29:20 30:2

  31:4 105:2
**issues** 29:20,21
  124:2

---

**J**

**J** 70:17
**Jackson** 2:17
**jail** 12:18 13:4
  13:10 25:20
  26:1,19 31:3
**Jimmy** 37:2,6
**jjc@johnccoy...**
  2:18
**job** 23:8
**John** 2:16,17
  4:15 37:2,7
**Jr** 9:24
**June** 9:4 95:5,11
  96:8 97:7,7
**jurisdiction** 72:9

---

**K**

**K** 133:2
**keep** 123:1,14
  124:5 126:7
**keep-on-person**
  60:17 62:2
  122:6
**kept** 81:2
**kerickson@m...**
  2:5
**kidding** 88:24
**kids** 8:13 9:16
  9:17 16:13
**kind** 22:3,11
  23:19 58:9
**Kinzie** 109:24
**Kirsten** 60:14
  74:11 75:5
  77:3 80:14
  98:22 100:20
**Kirstin** 2:3 4:9
  5:10 6:4,9
  12:13 32:5
  56:6,14 76:18
  84:2 109:5

  124:16 131:8
**Kirstin's** 11:19
**knew** 12:9,10
  22:22 36:3
**know** 5:24 6:9
  7:9,17 8:19
  12:9,10 13:8
  15:15,16 16:5
  17:5 19:11,17
  19:18,24 20:3
  20:16 26:18
  27:16,21 28:23
  29:7 30:12
  31:4,6,8 32:20
  34:12,16 35:21
  35:24 36:10,17
  36:17,19 37:8
  37:20,21,23
  41:4 43:12,14
  43:18,22 44:2
  44:10 47:1,2,4
  47:9,9,10 48:8
  48:20 49:24
  51:18,23 52:14
  60:5 61:12
  63:11,16 64:23
  65:4,7,7,9,13
  65:17,22 66:12
  66:13 68:2,7
  71:21 73:18,24
  74:8 75:24
  76:2,3 78:18
  79:4,24 82:5
  87:15,16 88:4
  88:18,18 89:4
  89:10,14 90:4
  91:5 92:14,22
  93:2,18 94:12
  94:15,18 96:13
  96:16 97:15,20
  99:20,20,22
  100:10,11,16
  100:17 101:4,9
  102:19 103:1
  103:17 106:5

  106:10,15,23
  107:2,10 108:7
  108:13,16,16
  108:18 109:8
  109:13,14,14
  110:19 112:15
  113:13 115:4
  117:21 120:24
  123:13,16
  124:8,17,18,18
  124:20 125:11
  127:5,17
  128:11
**knowing** 61:5
**knowledge**
  65:20 78:17
  87:22 91:24
  124:9
**knows** 13:10
  56:15 123:18
  124:12
**KOP** 60:17,20
  60:22 61:1,2,6
  61:12,16,21
  67:2,22 69:17
  80:4 122:5
  123:1 124:1,12
**Kristin** 24:9,20
  45:15 86:7

---

**L**

**L-e-v-a-l** 80:10
**l-e-v-a-l-b-u-t-...**
  80:16
**LaSalle** 2:4
**late** 72:21
**LAW** 2:16
**lawsuit** 11:23
**leading** 128:20
**learn** 19:2
**learning** 20:19
**leave** 25:17
**left** 25:16,24
  85:23
**let's** 6:12 10:1

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

12:22 19:11
26:11 32:13
47:12 70:16
76:7,17 79:1
94:19 97:20
111:2 130:24
**letting** 124:20
**Lev** 80:9
**Levalbuterol**
   80:8
**level** 18:12
**license** 18:11
**life-threatening**
   43:1
**light-headedn...**
   43:5 44:1
   78:24
**limited** 8:8
**line** 86:3 108:21
   118:9,24
   120:15
**lines** 107:15
**Lipator** 81:13
   81:14,16,18,21
   82:1
**list** 105:5,6
**listed** 107:4
**Listen** 6:3 76:15
**lists** 64:11
   105:14 108:1
**little** 9:14 59:5
   84:19 103:2
   110:21 117:12
**lived** 9:13
**lives** 9:15
**living** 72:1,3,7
   72:22
**Livingston**
   75:20 99:16
   101:8,11
   102:19
**LLC** 2:3
**lo** 10:5
**located** 10:4,8
   30:24

**locations** 102:15
**lock** 54:22
**Lockdowns** 69:5
**locked** 36:23
   54:22
**long** 9:13 11:8
   13:21 15:13
   19:11,14,17
   20:20 24:1
   42:4 52:13
   61:20 71:22
   73:18 92:20
   111:14 112:3
   120:17
**longer** 84:19
**look** 29:5 37:2
   37:14,17 38:23
   39:12,14 48:6
   48:9,12,16
   67:19 70:21
   71:1 76:21
   99:11 124:15
   126:17,17,18
   129:5,6
**looked** 48:8 67:5
   92:17
**looking** 18:8
   27:14 48:14
   85:13 87:22,24
   100:1,2 115:18
   120:5 124:23
**looks** 67:19 69:1
   69:3 85:22
   90:18 91:1
   93:14 94:23
   95:4 99:21
   100:5 101:2
   103:22 104:14
   109:24 115:13
   115:18 117:9
   118:14 119:2
   125:23
**lot** 41:22 77:22
   92:8 94:11
   96:17,21

**Lots** 77:19
_____
### M
**M** 2:3 4:23
**M-e-t-o-p-r-o-...**
   83:2
**ma'am** 34:23
   119:21 120:12
   120:24
**main** 16:13
   27:23 52:19
**Maintain** 58:21
**man** 18:3
**Management**
   69:5
**manager** 29:2,7
   53:6,6
**managers** 28:23
**MAP** 88:17
**MAR** 11:22
   38:24 72:23
   88:19,19 89:2
**March** 94:24
   95:9,11 96:8
   96:24 97:6
   109:20 112:16
   133:18
**mark** 55:21
**marked** 3:7
   16:23 17:13
   56:1,17 98:3
   114:10
**marking** 16:18
   84:24 85:2
   98:2,2 99:3
**married** 9:19,21
**matter** 5:11
   32:16
**matters** 133:7
**MAUCK** 2:3
**mean** 12:3,16,16
   13:12 15:6
   16:11 21:7,22
   21:23 22:3
   23:2,17 29:17

32:11 33:20
34:18 41:14,15
42:21,24 50:9
50:11,18 51:4
55:6,7 56:10
56:20 57:6
59:14 61:17
62:3 63:11
66:11 71:1
73:1,3 74:11
75:5 82:18
83:14,19 86:11
86:22 87:2,5
88:18 89:2
91:2 93:21
94:10 96:21
97:8,19 98:8,9
98:11 99:17
100:4,6,10
102:11 103:12
105:18 107:8,9
108:15,16,22
109:4,15
110:17,18,19
110:20 111:1,7
111:11 112:18
115:9 118:2,10
119:5 120:6,9
120:10 122:9
123:6,13 124:1
124:1,4,6,17
125:7,8,11,17
127:12,13
**means** 65:4 72:3
   96:8 99:15
   102:9,14
   106:23 118:21
   127:5,15 128:7
**meant** 84:11
   123:1
**med** 21:17 31:24
   35:6,10 41:9
   47:12 48:5,20
   55:1 63:9,15
   63:17 66:12

70:9 72:15,17
89:15 90:3
91:16 108:21
115:18
**medical** 3:9
   18:11 20:22
   23:4,6,24,24
   27:1 28:4 29:8
   29:10,19,20,22
   31:18 42:11,17
   48:6,9,9,10,12
   48:17,22 49:3
   49:9 54:6,8,16
   54:17,20 60:19
   61:17,19 67:2
   72:1 73:16
   74:4,12 85:5
   85:12,20 98:11
   98:18,23,24
   103:9 104:3
   107:13,14,24
   108:8,20 110:5
   113:3,15,18,20
   116:20 117:19
   119:13 120:6,7
   120:15 124:2
   125:4 126:17
   126:24 127:1
   128:18,21
   129:7,10,18
**medically** 22:9
   58:10
**medication**
   20:22,23 23:12
   23:17 24:3,12
   27:5,24 28:3,4
   28:8,9,11,17
   28:18 33:2,3,4
   34:4,5,14,14
   35:6,14,15,22
   36:3,4,7,20,22
   36:24,24 38:4
   38:12,13,24
   39:5,15 43:7
   44:6 47:14

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

48:2,5,11,18
48:23 55:23
57:23 58:10,15
58:19,21 59:23
59:24 60:3,6
60:18,21,22
61:6 62:2,2,4
62:18 63:3,4
63:14,18,21,22
64:1,12,14
66:2,4,9,11,17
66:22 67:1,2
67:18,22 68:19
70:3,8,11,22
71:8,19 72:9
72:13,20 73:4
73:16 75:19,22
76:3,4,7 78:16
80:6,17 81:1
81:10 83:11
86:1,20 88:8
88:12 91:23
95:4,12 96:7,9
97:1 100:1
103:5 105:6
115:10 122:1,5
122:7 123:9
126:4,6 128:8
**medications**
23:7,13,23
24:6,13 31:24
32:2 33:9 37:3
40:12,18 60:24
66:14 71:24
82:16 90:15,19
93:9 94:3,6,16
94:23 97:6,9
102:18,22
104:22 105:5
105:14,18
107:1,3,4,5
115:14 116:1,2
116:6
**medicine** 36:14
**meds** 62:20

72:16 74:9
106:9 121:24
**meeting** 52:14
**member** 63:21
**mental** 107:16
107:17,18,19
107:21
**method** 47:18
51:1 68:2,2,15
68:16,17 69:4
69:5,7,11,14
**metoprolol** 83:1
83:3,4,5,6,20
93:15 115:15
115:20
**mg** 86:21 90:23
122:5 123:1
126:7,19,23
127:10 128:1
**MH** 107:17,22
**Mia** 2:12 4:13
130:21
**mia.buntic@c...**
2:14
**Michael** 9:24
**mind** 45:15
120:9
**minute** 9:6
23:20 68:7
70:18 94:20
111:11
**minutes** 45:16
45:18 46:9,10
46:11 47:13
67:10 84:20
91:13 97:18,21
**mischaracteri...**
45:1 97:11
**missed** 33:3,5
75:13
**missing** 72:19,24
**misstates** 61:7
128:23
**mistaken** 81:18
**misunderstood**

44:20
**misuse** 58:20
**moment** 16:17
28:10 37:3
39:11 40:9
45:23 55:20
64:2 71:19
73:5 103:8
**morning** 30:20
62:20 87:6
**Motrin** 82:9,12
82:13,17,22
**move** 7:17 106:6
**moved** 102:13

-------

## N

**N** 2:1 3:1 4:23
4:23
**Nakia** 25:6
**name** 5:1,2,3,10
9:23 23:8 25:1
28:23,24 33:15
36:17 37:2,3
37:14,15,24
38:12,23 39:4
39:4 50:3
92:18 110:2
115:5 122:4
126:6
**names** 27:14,18
**narcotics** 40:11
**National** 4:3
**nature** 54:23
**nausea** 43:4
**NCLEX** 10:21
**near** 51:13
**necessarily**
125:11
**necessary** 58:11
**neck** 108:2,3
**need** 8:14,18
15:20 23:20
33:7 38:12,13
40:19 42:17
44:6 46:3 49:2

88:3 90:3
91:15 102:21
102:23 108:14
117:20 128:18
129:10,18
**needed** 15:22
30:2 46:5
52:15,17 88:15
89:11 90:2
91:13,15 92:8
95:12 108:20
123:6,7 127:11
127:14 128:3,7
128:10,11
**needs** 31:18 88:2
90:1 128:21
**never** 34:18 35:3
71:17
**New** 60:22
**night** 14:21 41:9
**nighttime**
114:19,20
**nitroglycerin**
79:19 91:15,20
91:21 92:1,11
105:9 122:5,24
126:7,19,23
127:1,10 128:1
**nitroglycerine**
78:15,19 79:4
79:7 90:23
**nods** 7:1
**non** 40:2
**non-narcotic**
23:12,16 24:12
**normally** 78:8
**North** 2:4,9
**NORTHERN**
1:1 132:1
**notated** 61:16
**notation** 126:2
126:11,13
**note** 72:22 81:22
88:17,19 89:2
118:10

**noted** 109:17
117:18 120:20
**notice** 1:16 5:7
**notified** 91:17
116:8
**notify** 53:5
**November** 23:7
88:1 90:15
101:16
**NP** 72:23
**NTG** 105:9
**number** 38:9
91:1 100:15
105:12
**numbers** 56:15
102:15
**numeral** 59:6
**nurse** 5:15 13:24
19:13 21:12
22:22 26:12,13
26:21,24 28:16
29:24 30:4
39:19 42:10
44:4 59:2,24
60:3,19 70:14
72:15,18,22
78:3,12 80:1
88:17 89:3,12
90:6 91:18,22
97:16 107:14
107:16,21
119:1,1,6,7,11
120:10 123:22
124:8,10 125:4
125:17,19
127:24 128:11
129:6
**nurse's** 119:2
**nurses** 14:24
21:13 31:14
33:4,8 34:11
42:9 47:19
54:13
**nursing** 29:3

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

**O**

**O** 4:23 133:2,2
**o'clock** 1:16
**oath** 4:6 132:11
**object** 33:13
  49:4 50:8,17
  52:21 65:1
  70:24 83:14
  93:16 95:14
  111:9 125:7
  127:4,12
**objection** 4:4,10
  4:14,16 21:22
  32:3 34:17
  38:15 40:24
  41:13 44:24
  61:7 63:10
  71:9,10 74:13
  74:23 76:9
  77:9,18 79:21
  88:23 89:9
  93:1 94:8
  96:11 97:10
  103:15 106:1
  106:14 107:7,8
  108:11 111:10
  112:11 119:17
  120:8,21 122:8
  124:19 128:23
  129:11,19
**objections** 4:12
**obtain** 45:23
**obviously** 8:1
  17:4 106:1
**occasion** 48:6
**October** 14:16
  17:23,24 18:2
**offered** 25:21
**officer** 4:5 25:4
  25:7,10 33:2
  34:4,15,19
  35:7,7 37:22
  39:14 43:9
  51:12 63:22
  65:19 70:12,14

70:15 90:4,6
  91:17,22
**officers** 12:18
  13:4,9 33:23
  35:16,16,23
  36:2 42:9 51:8
  51:15 63:8,14
**offices** 2:16 13:7
**Oh** 18:3 19:11
  19:12 27:18
  39:3 50:17
  54:11 56:8
  64:5 67:6
  88:18 98:24
  117:3
**ointment** 90:20
**okay** 5:17,18 6:3
  6:9,13,14,15
  6:16,19,22 7:1
  7:2,8,18,22 8:5
  8:6,7,11,12,24
  9:1,2 11:21
  12:3,8,12,24
  13:11 14:19
  15:2,10,24
  16:16 17:1,7
  17:13,15,21
  18:3,18,19,23
  19:19 20:4,10
  20:18 21:1,10
  23:1,19 24:1,4
  24:19 26:8,11
  26:16,17,23
  29:22 30:15,24
  31:2 32:23
  33:1 35:6 36:1
  36:6 37:1
  38:18 39:7
  42:22 43:2,23
  44:13,13,17
  45:5,14,18,19
  45:20 46:2,8
  49:1,18,21,22
  54:11 55:14,18
  55:19 56:22,23

56:24 57:5,8,9
  57:13,18 58:2
  58:6,14,17
  59:1,19 60:12
  61:16,24 62:24
  64:8,23 66:1,8
  66:16,19 67:21
  68:10,14,20
  69:3,10,14,16
  69:23 70:1,20
  72:18 73:8,13
  73:22 75:16
  76:16 77:1,2,8
  77:16 78:3,5
  78:11 79:4,10
  79:16 80:8
  81:21 82:4
  84:5 85:2,16
  85:19,23 86:3
  86:15,24 87:5
  87:9 89:5 90:1
  90:7,18 91:6,8
  91:19 92:1
  93:13 95:8,17
  95:23 96:4,6
  97:17 98:5,8
  100:8,12,13,18
  100:23 101:12
  101:14 103:22
  104:2,9 105:21
  106:6 107:1,12
  107:24 108:18
  110:4 111:15
  112:23 113:17
  113:24 114:15
  114:18 115:2,9
  115:13,17,23
  116:4,19
  117:11,14
  118:2,18,24
  119:9,13 120:2
  121:11,19
  122:4,24 123:8
  126:2,6,10,19
  127:16 128:10

128:13 130:11
  131:6
**old** 9:17
**oldest** 101:15
**once** 6:21 20:20
  42:3 81:23
  82:1,3 103:24
**ones** 52:12,13
  94:15
**ongoing** 106:1
  119:16
**online** 53:11,12
  53:22 54:2
**open** 31:16
**opinions** 125:3,9
**oral** 4:21 87:1
**orally** 87:2
**order** 16:12
  36:10,12 39:17
  40:16 46:3
  48:22 59:7
  62:6,12 79:15
  79:24 80:4
  81:9,24 82:3
  89:11,12,24
  91:18 92:9
  95:13 96:3
  97:5,9,15
  98:15 116:1
  127:21 128:3,4
  128:6,8,16
  131:9,10
**ordered** 62:6,7
  80:1 82:5,14
  90:15 92:24
  94:4,6 97:16
  123:5 127:3,7
  127:8 128:13
**orders** 39:15
  48:17 62:12
  79:18 85:21
  92:17 95:21
  96:2,7 113:15
  126:18
**organized** 36:6

**outcome** 133:17
**outside** 74:10,12
  75:1,19
**over-the-coun...**
  24:2,5,13
  40:18 82:15
**overdose** 92:7
  92:11
**Oxygen** 45:12

**P**

**P** 2:1,1
**p.m** 15:6,7,7,9,9
  15:13,14 16:14
  62:21 87:10
  114:12,17,23
  131:14
**page** 17:9,10
  30:12 56:15,22
  59:19 64:9
  67:22,22 68:15
  69:3,4,19
  70:16,16 85:14
  85:16 86:10,16
  93:8 95:22
  103:7,9 104:2
  105:3,12
  107:13 109:3
  109:22 110:4,5
  114:8,10
  115:18 116:21
  117:7 121:14
  121:14 125:22
**pages** 85:5 86:12
  99:4 132:13
**pain** 23:22 40:3
  42:22 43:17
  44:10 78:24
  82:13,13 83:12
  83:21,23 84:2
  108:3 129:13
  129:18
**pains** 42:16,18
  42:18 44:5
  84:8 129:10

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 12

| | | | | |
|---|---|---|---|---|
| **paper** 113:7,9 | 90:3 91:16 | **phone** 8:7,14,16 | **post** 16:16 84:17 | 85:13 112:8 |
| 119:1,5 123:20 | 108:21 115:19 | **physically** 30:11 | 108:2 | 113:7 133:9 |
| 124:3 | **passed** 62:20 | **physician** 29:23 | **posting** 116:20 | **prior** 14:5 34:20 |
| **paperwork** | **patient** 18:11 | 30:3,6,12,19 | **potentially** | 64:14 66:4 |
| 19:12,20,21,22 | 48:7 59:23 | 32:2 41:11,11 | 40:11 | **privilege** 6:6 |
| 19:24 20:6 | 60:18 69:20 | 81:22 92:24 | **practice** 40:1 | **PRN** 123:5,6,7 |
| 21:15 | 70:5,6,11 | **physicians** 30:15 | **practitioner** | **probably** 53:18 |
| **Park** 10:8 | 77:16 78:3 | 30:17 41:10 | 29:24 30:4 | 66:13 101:8 |
| **part** 23:15,16 | 82:2 83:19 | **pick** 54:21 | **pre-set** 60:21 | 108:1 |
| 24:4,9,11 27:6 | 88:2 89:6 | **picked** 55:2,11 | **predominantly** | **problem** 99:3 |
| 41:5 45:13 | 91:14 92:1 | 118:22 | 43:20 | 104:19 112:7 |
| 58:17 60:16 | 97:8 108:9,20 | **picking** 54:5,14 | **preferred** 16:10 | 114:3 117:19 |
| 69:22 70:19 | 111:5,23 113:4 | 54:18 | **preparation** | 130:2 |
| 73:1 87:11 | 120:19 127:11 | **pickup** 8:13 | 11:4 13:15 | **problems** 104:11 |
| 112:7 117:23 | 127:24 128:14 | **picture** 37:24 | 64:10 | 111:5,6,8 |
| 118:1 | **patient's** 85:19 | **Pl** 3:8 | **prescribe** 40:15 | 117:19 |
| **Partee** 2:15 4:14 | **patients** 51:3 | **place** 12:6 18:23 | 81:9 82:10 | **Procedure** 5:9 |
| **particular** 28:19 | 61:1 78:12 | 53:5 57:10 | **prescribed** | **procedures** |
| 29:22 37:15 | 80:24 83:10 | 66:5 132:15 | 31:23 58:10 | 57:19 64:8 |
| 40:17 46:5 | 116:6 | 133:12 | 80:22,23 81:21 | **proceed** 4:1 |
| 67:3,17 73:4 | **paycheck** 25:1 | **plaintiff** 1:5 2:6 | 83:20,21 88:3 | **proceedings** |
| 85:21 89:5 | **pending** 8:22 | 4:10 132:5 | 95:5 122:1 | 133:10 |
| 95:8,10,13 | **people** 54:13 | **Plaintiff's** 16:19 | 126:4 | **process** 22:9 |
| 96:7,9 97:5 | **perform** 44:12 | **please** 4:7 5:1 | **prescription** | 27:7,22 35:9 |
| 99:14 101:2 | **performed** | 6:23 7:9 41:19 | 23:6 74:1 | 37:23 49:3 |
| 102:17,20 | 27:20 | 45:4 70:19 | 81:22 | 63:4 64:20 |
| 103:14,22 | **performing** 35:9 | 74:20 75:10 | **prescriptions** | 66:21 76:1,1 |
| 107:6 108:9 | 59:2 | 111:14 119:23 | 85:21 | 109:5,9 113:18 |
| 109:19,21 | **period** 97:1 | 127:18 131:11 | **present** 30:11,21 | **produced** |
| 111:22 117:18 | 101:11 | **point** 15:3 52:19 | 35:16,17 51:13 | 125:11 |
| 117:23 118:21 | **periods** 102:6 | 114:16 | 72:21,22 74:6 | **professional** |
| 119:1,10 120:6 | **person** 27:19 | **pointed** 6:4 | **presented** 112:3 | 54:8 |
| 121:23 123:8 | 37:13 38:3 | **pol** 57:9 | **presents** 108:9 | **professionals** |
| **particularly** | 39:13 53:13,17 | **policies** 12:6 | **pressure** 44:18 | 54:6 |
| 83:17 | 62:5 65:19 | 13:4,9 18:9,10 | 45:9,10 83:10 | **promise** 130:18 |
| **parties** 5:7 | 81:2 87:12 | 18:13 | 104:5 110:6 | **promptly** 72:19 |
| 133:16 | 92:2,6 101:4 | **policy** 58:8 68:4 | 114:2 | **properly** 92:12 |
| **pass** 10:21 21:17 | 123:2 126:7 | 98:11 | **pretty** 76:10 | **prostate** 118:12 |
| 32:1 35:10 | **person's** 34:7 | **population** | **prevent** 58:20 | **provide** 52:1 |
| 41:9 47:12 | **personally** 61:12 | 68:16,21 69:1 | 83:17 84:2,6 | **provided** 8:4 |
| 48:5 63:3,9,14 | **personnel** 54:16 | **portion** 31:3 | **previous** 113:19 | **provider** 18:12 |
| 63:15,17,18 | 54:17,20 | **pose** 92:8 | 133:6 | 29:19,22 |
| 64:14 66:4 | **pertain** 48:22 | **position** 25:21 | **previously** 98:3 | **psych** 120:19,20 |
| 68:19 70:10 | **pharmacy** 72:19 | **possible** 43:16 | **primarily** 30:20 | **Public** 4:4 13:20 |
| 74:9 89:15 | 106:9 | **possibly** 38:8 | **printed** 8:3 | **PUFF** 88:14 |

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

**puffs** 90:2
**pulling** 55:21
**pulse** 44:18
  45:11,12
**purpose** 57:15
**pursuant** 1:16
  4:3 5:6,8
**put** 13:3 16:17
  23:23 28:3,10
  66:11 91:5
  104:15 122:1
**putting** 47:13,15

**Q**

**quantity** 60:19
**question** 6:6,8
  7:3,8,11,16
  8:12,22,23
  11:19 18:8,14
  22:3 23:2
  32:10,13,16,17
  32:18 33:14
  34:20,22 35:1
  35:2 38:22
  41:1,16,20
  50:9,9,13,18
  50:19 52:22
  62:13 64:3
  70:4 71:1,4,10
  74:17,20,21,24
  75:4 76:10,19
  76:19 77:1,9
  77:12,21 95:15
  95:18 96:16,23
  97:14 107:9
  112:12,19,22
  114:21 115:17
  119:20,23
  122:12 126:22
  127:5,13,19,20
  129:1,2,12
  130:7,9,12,14
**questions** 5:12
  7:14 30:2,13
  45:8 65:6

111:12,15
112:17 116:13
121:22 123:12
124:13,21
130:20,22,24
131:4
**quick** 98:12
**quote** 60:18
**Qureshi** 25:14

**R**

**R** 2:1 88:20
**radios** 51:14,16
  51:18
**Radunsky** 2:8,8
  4:11,11 5:24
  6:3,16 8:20
  10:7 11:12,16
  12:13,15,20,24
  15:6,10 17:1,4
  18:4,6,16 19:5
  20:1 21:7,10
  21:22 24:8,15
  24:19 26:4,6,8
  27:13 32:3,8
  32:23 33:13
  34:17 37:8
  38:15,20 40:24
  41:13 44:24
  45:15,18 46:11
  47:8,20 49:4
  49:17,19,21,24
  50:8,17 52:21
  53:23 55:14
  56:4,6,10,13
  56:19,24 57:3
  58:3,6 60:9,13
  61:7 62:13,24
  63:10,16 64:3
  64:5 65:1,5
  67:5,9,13 68:4
  68:7 69:8
  70:24 71:9
  73:8,21 74:11
  74:22 75:3,13

75:17 76:9,14
76:17 77:3,8
77:18 78:5
79:6,21 80:13
82:18,21 83:13
83:24 84:12,18
84:22 85:2
86:7,11,15
87:17 88:20,23
89:9,17 93:1
93:16 94:8,19
95:14 96:11
97:10,19 98:5
98:7,15,19
99:2,19 100:9
100:19,22,24
101:21 102:1
102:11 103:15
104:17 105:11
105:21,24
106:14,20
107:7 108:11
108:15 109:4
110:13,16
111:1,9,17,24
112:11,18
116:14,24
117:4 118:3,7
119:16 120:8
120:21 121:1
122:8,19
123:11,19
124:11 125:5
125:16,20
127:4,12,19
128:23 129:3
129:11,19,24
130:8,11,15,20
130:23 131:4
131:11
**re-ask** 60:11
  75:4 77:3
**reach** 30:9
**read** 32:14,14,18
  35:2 38:21,22

41:19,20 58:4
58:23 59:11
63:6 68:4,6
69:8,9,22
72:11 74:20,21
95:2,3 132:12
**reading** 133:13
**reads** 89:12
  115:21
**realize** 87:20,20
**really** 12:18
  15:15 20:21
  37:23 47:21
  50:19 51:11
  52:12 64:20
  65:22 71:3
  80:18 84:21
  98:7 116:9,10
  116:11 120:17
**realtime** 36:23
**reason** 90:22
  91:19
**reasonable**
  125:4
**recall** 19:8 21:11
  21:12,20 27:15
  27:21 29:5,10
  29:12 35:17
  36:8,21 39:1,3
  39:6 41:22
  48:3,24 49:7,8
  51:16 61:2,3,4
  61:12,13 65:15
  69:15,18 71:3
  71:14 72:2,5,6
  85:15 113:9
  116:9,10,11
  120:18,18
**receive** 10:18
  21:16 22:6,17
  35:15,22 36:2
  37:4,19 38:4
  43:7 50:7
  51:20 58:15
  62:4 71:7,19

91:21 97:6,8
102:22
**received** 10:16
  19:20 20:6,7
  21:15 22:12
  36:3,20 49:1
  60:5 87:5
**receives** 28:17
**receiving** 96:9
**recess** 46:14
  97:24 116:16
  131:3
**recognize** 16:19
  117:7
**Recommendat...**
  107:14,16,22
**record** 4:2,8 5:2
  5:5 9:5,7,9
  12:15,20,21,23
  14:14 64:2
  84:13 85:9,12
  86:12 96:12
  97:5 99:7
  104:18 106:2
  110:23 111:10
  112:8,8 113:4
  113:9 115:21
  116:19 121:2
  124:13,16
  133:10
**records** 3:9,10
  28:5 85:5
  96:12 97:4,4
  97:11 98:18,20
  98:21 99:1
  100:22 103:9
  109:6,11,15
  110:16,22,23
  111:19 112:4
  113:8 115:3,4
  115:4,11
  116:20
**reduced** 133:9
**reentering** 94:4
**refer** 18:11

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

120:5
**referral** 107:14
107:16,22
108:8 120:20
**referrals** 119:13
**referred** 40:20
56:11 108:23
120:6,19
**referring** 24:5
**refers** 24:13
**refill** 60:21
**reflect** 5:5
**refusal** 69:20
70:6
**refuse** 70:13
**refused** 70:15
**refuses** 70:11
**refusing** 70:3,7
**regard** 57:22
**regarding** 5:12
8:13 18:9
51:19
**registered** 26:12
26:20,24 42:10
44:4 59:2 78:3
78:11 124:8,9
127:24 128:11
**regular** 52:10
**regularly** 52:2
**rehabilitative**
47:5
**related** 32:10
**relative** 133:15
133:15
**remember** 7:15
15:17 19:13,15
19:16 20:17,18
20:21 21:12
23:22 25:3,6
25:12,13 27:11
27:16 28:24
29:7 31:15
33:15 35:12
36:11 37:23,24
39:21 47:3,18

47:22 50:2,4
51:6,18,23
52:5,12,13,14
52:16 53:20
54:6 55:3,4,5
55:18 61:5,19
61:20 62:22,23
63:17 64:20
65:10 66:16,20
66:21,22,22,23
68:23 69:11,17
70:1,1,14 72:5
76:1 81:4,7
89:4 90:13
92:21 101:6,9
**remembered**
50:1
**repeat** 7:10 22:2
34:22 35:1
38:18 41:16
49:22 71:4
74:17 112:23
119:20,23
**rephrase** 7:10
53:4 75:6,7,9
**report** 28:21
29:8,11,20
72:19
**reported** 29:16
133:8
**reporter** 1:14
4:1 7:1,4,24
12:19 32:14
35:1 38:21
41:18 74:19
119:22,24
131:8 133:4
**reporting** 29:10
**represent** 5:11
101:10
**request** 22:18
32:1 40:5,7,10
117:10 119:7
121:10 123:21
126:11

**requesting** 122:7
123:9
**required** 20:13
23:5 28:3
70:10
**Res** 45:24
**research** 8:10
126:16
**reserve** 131:5
**resources** 52:18
**respiration**
44:19
**respirations**
45:24
**responded** 11:24
11:24
**response** 18:9
23:11
**responses** 34:20
**responsibilities**
26:12
**responsible**
26:23 27:4,6
47:13 54:4,14
54:18
**rest** 117:21
**restate** 6:10
76:23 115:17
**restated** 76:24
**retain** 125:12
**review** 11:5,7
17:15 67:3,17
70:18
**reviewed** 11:8
11:13,18,20,21
20:10 22:20
67:21 111:21
112:5 113:14
113:16 119:10
126:10
**reviewing** 120:5
**Rich** 10:2
**right** 5:20 7:19
8:24 10:23
12:16 14:17,18

16:18 18:2,24
24:22 25:1
26:21 27:24
28:10,14 37:15
40:7,12,19
42:15 43:24
46:9 54:9 58:4
60:13 63:22
66:6 67:12,14
69:17 72:4
73:19 76:22
82:6,7,20
83:21 84:22
86:1,19,21
87:7,9 88:12
88:15,21 89:15
89:21 90:16
91:8,10,12
92:15 94:2,17
95:13 96:10
97:17 99:1
101:7 102:3,10
102:11 103:23
107:6 109:1,2
110:1,6,9,15
111:4,5 112:9
113:5,21 114:3
114:19 115:5
115:15 116:2,4
117:6,12,15
118:19 119:15
121:6 123:2
124:14 128:12
130:9,19
**rights** 62:16
**risk** 34:15 92:1,8
**risks** 92:5,8,10
92:13
**RN** 1:12 10:16
103:23 104:14
104:14 107:2
115:7
**role** 13:23 27:19
34:7 59:2
65:13

**roles** 27:23
**roll** 64:13 66:3
**roman** 59:6
**room** 7:19 35:12
35:13,18
**rosters** 64:12
66:2
**rounds** 72:20
**routine** 119:14
**row** 86:19,20
88:12
**Roy** 25:4
**rules** 5:8,9 6:23
**rundown** 98:12

___

| **S** |
|---|

**S** 2:1,8 3:6
**s/p** 108:2
**safety** 34:8,9,11
58:22
**SAITH** 131:12
**sandwich** 37:11
**saturation** 44:19
45:12
**saw** 67:13
108:21 109:2
111:22 112:9
113:4,13,21,24
114:4 119:7
123:21 126:13
**saying** 13:11
15:7 18:9
20:13 29:23
33:7 45:5
47:16 51:17
53:2,13 60:8
60:10 61:3,11
66:19 70:15
71:20 75:2,5
76:22 78:1,2
80:9 97:2
120:1 123:17
**says** 11:14 17:24
37:2 38:11
57:5,12,15,18

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

64:21 65:23
66:1,8 69:7
85:24 87:1
88:14,19 89:2
91:7 93:21,22
101:8 103:20
103:20 104:5
104:11,18,18
104:19,19
105:5 106:9
107:16,21,23
111:6,10,10
115:11 117:12
117:21 118:3,4
118:23,24
121:2,2 122:15
122:22,24
123:5 126:9
127:14 128:3
**schedule** 16:12
**scheduled** 72:10
**school** 8:12 10:2
10:5 14:1
**schools** 13:20
14:3
**scope** 40:1
**screen** 6:8 16:16
55:20 110:5
113:18 117:1,6
**screening**
103:13 104:3
**scribble** 87:11
87:13
**scribbles** 93:7
94:16,17
**scroll** 68:8,12
96:1
**scrolling** 104:2
**second** 11:11
36:7 69:21
84:17 130:17
130:23
**section** 4:3 58:8
**see** 17:1,3 19:11
32:1 35:11

36:15 37:3
38:24 40:14,16
40:23 41:4,11
43:7 55:24
56:3,20 57:16
57:24 58:12
68:6 69:10
79:1 85:7,10
85:17,20 88:1
88:2 92:18
93:11 95:5,7
102:21,23
104:5,6,8,9,13
104:16,23
105:15 108:4
109:21 110:6,8
110:9,11
115:15 116:24
117:2,20,24
118:1,16,17,20
119:3,4 121:11
121:13 122:2
125:24 126:7
**seen** 13:3 99:9
112:15 113:12
114:1,5,6
116:22 120:14
121:6,8
**self-administr...**
60:20
**send** 31:5 46:5
50:6
**sense** 101:13
**sent** 44:22
**separate** 17:10
35:18
**separates** 66:24
**serious** 42:17
128:18,21
129:10,18
**service** 4:4 13:24
22:18 40:5,6
40:10 117:9
119:7 121:9,10
126:10

**services** 57:21
59:9 123:21
**set** 5:7 133:18
**setting** 66:16
**setup** 66:9
**shadow** 19:12,14
**shadowing** 21:8
21:12 22:21
**share** 16:16
55:20 98:1
**sharing** 24:21
116:4 117:6
**SHARON** 1:13
133:4,21
**she'll** 17:5 60:11
68:8 75:4
76:23
**sheet(s)** 132:19
132:20
**SHERIFF'S** 1:7
132:7
**shift** 14:19,22,23
14:24 15:13,18
15:20,22,23
16:10 25:18,20
25:23 28:7
35:10 62:21
87:10 114:16
114:17
**shifts** 15:16,19
16:3
**shop** 37:11
**short** 46:14
97:23 116:16
131:2
**Shorthand** 1:13
133:4
**show** 55:19
103:3 123:20
**showed** 67:11
**shows** 14:14
102:12
**shut** 110:21
**sign** 20:13 70:5
70:13,15 82:17

87:11
**signature** 17:11
92:14,19 93:5
93:18 118:16
119:2 131:5
**signed** 20:16
**signing** 133:13
**signs** 43:5,6,11
43:13 45:8
77:5 78:18,23
79:1 81:16
82:9,11 83:6
84:6 128:14,20
129:7,13,15
**similar** 126:2
**site** 30:15 41:10
41:12
**situation** 32:22
42:1,8 70:21
71:18,23 89:6
**situations** 42:11
**six** 88:14 89:7
**SL** 91:9 105:9
**slip** 40:6 41:24
54:18
**slips** 39:21 54:4
54:5,15,21
55:2,11
**sloppily** 117:12
**Smith** 2:20 4:16
25:7
**social** 46:17,19
46:20,22 47:4
**somebody**
123:19
**someone's** 81:19
**Somewhat** 28:15
**son** 9:18
**soon** 28:8,11
40:22
**sorry** 12:19
13:12 15:7,8
18:5 19:5 21:2
26:7 37:11
38:19,20 60:14

64:5 67:6,11
74:15 81:8
89:22 99:2
105:11 115:8
117:3 126:21
**sort** 22:8 50:12
51:21 93:19
109:14 116:5
**sorts** 42:10 50:6
71:6
**sound** 5:15 7:12
7:17 14:17
46:13
**sounds** 7:18 9:1
14:18 20:7
30:1 32:20
97:22
**South** 9:11
**speak** 6:13 8:1
84:13 97:11
**speaking** 43:18
**Special** 69:4
**specific** 14:1
24:9 27:18
30:2 31:23
48:1 51:2
59:20 62:19
64:14 82:17
83:11 90:19
92:10 104:4
105:5 107:1
124:14
**specifically** 5:14
32:10 48:14
76:7 91:20
128:10
**specifics** 73:15
**specified** 60:19
133:12
**speculate** 93:19
96:13 97:12
124:19
**speculating**
101:22
**speculation**

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 16

32:20 33:14
41:13 63:10
89:9 94:8
107:7,8 108:12
120:8,22 122:8
122:13 123:11
**speed** 109:15
**spell** 5:2 80:14
**spend** 57:14
**split** 118:4
**SS** 133:1
**staff** 23:5 31:14
33:24 50:23
58:22 63:21
64:10 66:8
**stamp** 56:7,9,17
**stamped** 64:9
**stamping** 56:22
**stamps** 86:8
**stand** 90:24
**standard** 125:6
**standards** 20:22
**stands** 106:10
**start** 7:4 11:18
85:24 102:12
104:21 117:20
118:4
**started** 11:17
13:22 14:20,21
18:1 19:15
20:11 22:13,21
86:16
**starting** 95:21
95:21
**state** 1:14 4:7
5:1 10:13,16
10:19 23:8
73:17 92:23
115:3,4,4
133:1,4
**State's** 2:12
**stated** 74:3 99:5
114:7 127:21
130:10 133:13
**statement** 24:11

**states** 1:1 17:22
18:10 23:11
58:10,18 59:7
59:22,22 60:17
62:1 63:2
64:10 68:16
69:20 70:17
72:7,18 86:4
88:17 91:12
96:5 103:10
104:1,1 105:4
107:13 110:6
111:4 114:11
117:10,13
118:15 126:8
132:1
**stating** 38:13
**stationed** 14:1
**status** 108:2
**stay** 12:23
**stenographica...**
133:9
**stent** 104:15,24
**step** 39:18
**steps** 67:22
**Stewart** 104:14
107:3
**stipulate** 93:21
96:12 97:3
101:22 102:1,8
104:17 109:6
109:10 110:13
121:1
**stocking** 47:16
**stop** 106:5 123:5
**Stopping** 24:21
116:4
**straight** 14:11
**stream** 118:4,5
**Street** 2:4,9,13
**strict** 59:9,13
**strike** 33:21 48:4
70:2,4 81:15
82:10 95:9
126:21,21

**Stroger** 14:6,8
14:11 25:22
26:16
**stroke** 83:22
84:6,6
**structure** 46:23
46:24
**stuff** 16:13
**subject** 93:20
96:15
**sublingual** 78:15
79:5,11 91:9
91:13 105:9
**submitted**
132:19,20
**SUBSCRIBED**
132:23
**Suite** 2:4,9,13,17
**superiors** 33:11
33:15
**supervisor** 23:4
29:2,4
**supervisors** 21:6
29:6,7
**support** 52:15
**suppose** 113:22
**supposed** 12:4
22:22 38:3
55:2 81:23
87:11 102:18
**sure** 6:12,24 7:3
8:22 9:2 17:6
23:20 24:11,21
37:6,22 38:2
44:13 46:12
56:8,16 59:20
65:24 66:14
68:23,24 71:15
71:21 74:19
75:11,24 84:15
86:17 91:4
94:11,12 95:20
96:3,19 100:24
105:20,22
111:17 112:2

114:4 120:12
125:20 130:24
**surgery** 108:3
**sweating** 43:3
78:24
**switch** 15:19
**sworn** 4:17,21
132:11,23
133:6
**symptom** 82:17
129:17
**symptoms** 24:1
24:2 39:24
42:20,24 43:2
44:6,11 77:5
78:18,23 81:16
82:9,11 83:6
84:6 128:20
129:7,14,15
**system** 28:10,13
37:14 40:17
91:21
**Systems** 85:6

**T**

**T** 3:6 4:23
**T-e-r-a-z-o-s-i-n**
81:11
**tab** 90:24 91:12
**table** 85:24
**tablet** 79:20
**tablets** 79:13
91:1,2
**take** 7:1,5 8:14
8:24 23:20
42:7 43:6,11
44:4,22 45:9
45:15 46:8
49:9 53:5
69:21 78:9,12
84:20 89:6
92:4,7 97:18
102:18 116:13
130:24 131:11
**taken** 1:12 5:6,8

42:2 74:5 76:8
92:12 132:14
133:11
**talk** 13:14 26:11
40:19 51:9
65:18 70:18
76:7,17
**talked** 6:7 73:18
**talking** 26:15
56:15 63:24
67:8 112:24
122:9
**team** 63:20
**technician** 60:19
**technology** 6:11
**telephone** 51:10
51:12
**tell** 15:20 17:5
32:12 39:23
60:10 76:20
100:10 114:10
**telling** 123:15
**tells** 18:11
**Temp** 45:12
**ten** 46:9,11
97:18,23
**ten-page** 56:21
**Terazosin** 81:11
**term** 63:3
**testified** 4:22
69:16
**testify** 120:22
133:7
**testimony** 45:1
61:8 124:24
128:24 132:16
133:10
**thank** 5:5 9:1
56:10 57:2
67:14 83:4
88:7 99:1
100:23 102:3
102:17 106:7
111:15 117:6
118:6 130:19

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

**Thanks** 6:17
13:11 24:19
41:19 69:24
97:22 102:4
105:12
**thing** 20:3 84:1
84:10 114:6
115:16
**things** 6:11 13:2
13:6 31:7,21
64:11 77:22
79:2 93:20
94:12 96:18,21
124:7 129:6
**think** 6:10 11:10
11:23 15:21
27:14 31:11,11
31:21 34:19
41:1 42:1,14
44:24 48:18
49:4,15 55:8
72:15,17 74:3
74:4 75:12
79:3 83:24
86:8,15 88:19
93:1 97:10
124:13 130:18
**thinner** 78:13
**third** 36:7 88:11
88:12
**thought** 44:21
56:13 64:5
67:9,10 98:9
98:20 100:21
**three** 9:14 14:4
70:22 71:7
90:14,15 94:3
116:1 129:24
130:4
**throw** 18:13
**tier** 25:4,8,14
35:13,19 43:8
55:2 72:3
100:7,7
**tiers** 22:14 54:5

55:11 72:5
**tightness** 43:4
79:1
**time** 5:14 7:5
8:10 11:8 14:7
15:15,21,24
16:4 20:20
25:11,20 28:2
35:22 36:2
40:20 41:8
42:4,8 47:24
48:11,19 49:1
50:18 52:13
55:10,12 58:15
59:24 60:2
61:20 62:19,19
64:18 65:2,11
71:22 72:10
92:20 94:5
96:10,24
101:11,17
102:6,12
103:10 104:15
105:2 112:3,3
112:15 114:9
115:3 117:18
119:9 121:7
132:14 133:12
**timeframe** 65:2
**times** 28:18 55:7
110:19 130:1,4
**timing** 62:22
**title** 23:9 27:19
**titles** 20:2 29:1
**today** 5:12 13:15
98:9 119:14
125:3,9
**told** 56:18
110:18 124:11
125:17
**tongue** 79:12
91:10
**top** 31:21 42:14
57:5,15 68:15
79:3 85:23

105:4 107:13
109:21 121:24
126:3,11
**totally** 78:1
**tradunsky@d...**
2:10
**trained** 19:8
**training** 19:7
21:5 51:19,20
51:21,23 52:9
52:20 53:2,5,8
53:9,19 125:10
**trainings** 19:10
51:24 52:2,10
53:11,16,21
54:2
**transcript**
132:13,16
133:9,13
**transfer** 72:8
**trauma** 31:20
42:13
**treat** 81:17
82:12,17 83:7
83:11,17 88:8
**treated** 31:6
**treatment** 21:1,4
23:6 27:1,2,3
58:11
**treats** 78:19
**triage** 123:17
124:3
**triaged** 119:1,5
123:19,20
**trouble** 119:18
**Troy** 2:8 4:11
6:17 102:8
110:15 111:16
127:16
**true** 132:15
133:10
**truth** 133:7
**truthfully** 17:19
**try** 6:13,13
76:18

**trying** 11:22
32:9 84:10
95:20 112:14
113:10,12
121:3
**turn** 46:12
**twice** 81:23
89:15,23
**two** 9:16 16:5
35:17 45:16,18
64:9,14 65:5
66:3 71:7 87:2
87:5 90:2,14
94:6,20 115:14
**Tylenol** 23:13
24:3,6,14 40:3
78:9
**type** 80:8 81:1
116:22 128:8
**typed** 92:18
**types** 31:18
**typically** 120:14
**typing** 39:3
**typo** 17:22 18:5

_____
**U**

**UD** 86:21,22,23
**uh-huh** 18:16
22:24 26:3
41:7 53:14,15
54:12 56:13
57:17 73:7
79:13,19,19
81:5 82:23
83:10 85:22
109:17 125:18
127:2
**uh-huhs** 7:1
26:6
**uh-uhs** 26:6
**Um** 87:14
**unable** 70:17
71:24
**unconsciousness**
31:20 42:13

**underneath** 58:8
86:24 123:4
**understand** 6:5
6:8 7:9 12:17
22:1 23:2,15
42:6,21 50:10
50:12,21 52:24
53:10 56:11,19
57:1,6 59:13
60:10 62:3
65:4,6,18 71:2
71:13 72:24
73:3 74:16,23
76:12,19,21
77:12,21 80:5
84:10,12 86:22
86:22 89:14,21
92:3 93:8
95:16,17,21
99:14 100:3
101:20 105:17
107:18 110:24
112:14,19,21
112:22 113:1
113:10,12,17
114:12,13
115:24 117:22
118:11 121:3
121:16,19
127:17
**understanding**
65:20 80:7
94:3 101:18
102:7 103:4
108:6
**understands**
124:6
**understood** 7:11
106:3
**unit** 35:19 72:1
72:3,7,22
**UNITED** 1:1
132:1
**University** 10:14
**unstable** 11:15

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

update 116:5
updated 113:20
  113:22
upstairs 42:3
Urgent 30:23,24
  31:5,9,12,13
  31:19 32:1
  33:8 42:2,7
  46:6
urgently 31:6
usage 8:7 128:9
use 51:11,14
  69:14 82:11
usually 54:22
  79:14
utilize 51:5
Utter 108:11

_____

**V**

varied 15:18
vary 41:1 52:16
verbal 6:24
verbally 70:7
verify 39:13
verifying 115:2
version 113:7
versus 112:8
video 5:21 49:16
videoconference
  1:11 4:6 133:7
  133:9,12
vital 43:5,6,11
  43:12 45:8
  79:1
vitals 43:17,18
  44:21,23 45:22
voices 7:5
vomiting 43:4
vs- 1:6 132:6

_____

**W**

W 2:17
Wabash 9:11
Wait 23:19 54:8
  68:7
waiting 64:6

walked 34:13
walks 37:1,13
want 12:17 18:1
  23:1 27:16
  32:20 34:12
  46:9 48:16
  55:15 58:9
  59:16,17 65:3
  65:17 68:4,12
  69:8,9 73:12
  73:15 75:9
  76:18 97:4,18
  98:13 100:12
  102:8 106:20
  121:21
wanted 12:24
  15:8 49:24
  86:17 103:3
  122:11
Washington
  2:13
wasn't 25:20
  34:18 96:9
  106:17 109:5
watch 64:13,24
  65:6,9,10,14
  65:15,23 66:2
way 32:16 60:11
  76:24 85:20
  101:4,19 103:5
  104:23 108:9
  112:9 119:24
  121:4
Wayne 109:24
we'll 6:13,13 9:9
  32:15,15 62:18
  94:24 96:11
  97:3 101:22
  102:1 104:17
  109:1,5 110:13
  121:14 125:22
we're 6:22 12:20
  12:20 49:21
  64:8 75:17
  86:11 103:9

109:10,19
  116:14 119:18
  124:23 131:10
We've 84:18
  98:15
weak/ 117:20
weak/split 118:4
week 16:3,6
weekend 16:9
weekends 16:7,8
weekly 60:21
weeks 94:7
  108:3
went 6:23 11:22
  11:23 25:22
  34:5 35:12
  48:4,20 67:6
  115:24 124:7
weren't 30:11
  31:24 33:24
  36:13 41:10
  103:1 107:2
West 2:13
whatever's
  96:12
WHEREOF
  133:18
WHITMAN 2:4
William 1:4 5:11
  73:16 85:5
  101:16 117:17
  132:4
Willie 2:15
willing 33:3,4
  109:10
witness 3:2 4:6
  4:12,17,20 6:2
  10:8 11:14,21
  15:9,11 17:3,7
  18:5 19:7
  21:11 22:2
  24:18 26:5,7
  33:1,17 34:22
  35:3 38:18,23
  41:3,16,21

45:20 47:10,21
  49:7,20,22
  50:2,11,22
  53:1 54:1 56:3
  56:12,23 58:5
  60:12 61:11
  63:17 65:9
  68:6,10 69:10
  71:3,14 74:17
  75:1,16 76:13
  76:16 77:2,13
  77:22 78:8
  79:8,23 82:22
  83:16 84:5,21
  85:10 89:11,19
  93:4,23 94:11
  95:17 96:17
  97:15 99:21
  100:13 101:23
  103:19 105:22
  106:17 107:10
  108:13,18
  110:17,20
  111:2 112:2,23
  117:2 119:20
  120:12,24
  121:4 122:15
  122:21 123:15
  125:1 127:7,21
  129:5,13
  130:10 131:6
  133:6,6,13,18
wondered 27:19
word 18:13 44:5
words 119:19
work 13:19 14:3
  14:4 15:20
  16:3,7 25:10
  33:20,22 103:5
worked 14:12,15
  15:17 16:8,12
  17:22 18:24
  34:2 66:5
worker 47:4,5
workers 46:17

46:19,20,22
working 13:17
  14:5,20,21
  15:17 16:1
  18:2 19:15
  20:11 22:21,23
  23:4 25:3,6,13
  26:13,20,21,24
  28:21 31:13
  34:1 49:13
  50:16 67:16
  114:15
worry 19:19
  57:14
wouldn't 33:7
  48:22 91:20
  97:1,16
wow 75:13
write 39:22
  121:19
written 8:3
  120:15
wrong 43:22
  44:3 80:10
wrote 84:13 98:9
  117:17 121:24
  122:4

_____

**X**

X 3:1,6 4:23
  126:3

_____

**Y**

yeah 8:15,17 9:2
  11:16 15:9,18
  18:4,6 24:15
  33:5 34:24
  40:20 42:6
  45:4 47:10
  49:7,21 51:22
  51:23 52:8
  56:8 57:2,8
  62:8 64:19
  67:6,12,24
  68:6 69:11
  71:6 72:5

Ashley Bloodworth, RN
William Dukes v. Cook County Sheriff's, et al.

Page 19

| | | | | |
|---|---|---|---|---|
| 73:12,12 77:5 | **000403** 114:11 | **179** 105:12 | **205** 109:3 | **525** 2:9 |
| 78:1,5 79:21 | **000575** 85:17 | **180** 107:13 | **206** 110:5 | **53** 2:17 |
| 84:15 85:22 | **000577** 95:1 | **1985** 9:4 | **21** 9:4 114:11 | **56** 3:9 |
| 88:20,23 89:19 | **000963** 98:4 | **1st** 96:24 | **21st** 114:22 | **575** 85:16 95:22 |
| 93:4 94:21 | 99:5 | | 115:19 | |
| 95:3 97:3,19 | **000964** 98:6 | **2** | **230** 116:21 | **6** |
| 105:22 106:3,3 | 99:5 | **2** 58:20 59:19 | 117:7 | **6** 18:8 |
| 109:17 114:19 | **00576** 93:9 | 66:9 69:4,14 | **2303** 100:15 | **600** 2:4 |
| 114:20,24 | **02** 44:19 | 71:23 87:1 | **231** 121:14 | **60473** 9:12 |
| 116:9,10 117:9 | | 88:14 95:11 | **233** 125:22 | **60602** 2:5,9,13 |
| 118:7,24 | **1** | 96:8 97:7 | **24** 95:11 96:8 | **60604** 2:18 |
| 125:14,16,18 | **1** 2:4 58:19 68:2 | 101:3 108:3 | 97:7 | **64.5.45.0** 55:22 |
| **year** 13:22 52:7 | 68:15,16 91:12 | **2:20** 103:13 | **24/7** 31:16 | |
| **yearly** 52:15 | 95:9 121:17 | **2:59** 87:10 | **24th** 97:7 | **7** |
| **years** 7:15 9:14 | 132:13 | **20** 2:9 86:21 | **25** 88:1 90:16,24 | **7** 15:18 16:11,14 |
| 15:3 | **10** 25:4,14 31:2 | 100:2 | 90:24 91:2,5 | 56:22 57:2 |
| **yellow** 39:21 | 84:20 90:10 | **20:45** 114:11 | 95:5 101:16 | 62:21 69:4 |
| 40:6 41:24 | 100:5 101:5 | **2003** 10:2 | **2760** 2:13 | 87:10 |
| 54:4,5,14,18 | **11** 15:1,7,8,9,14 | **2013** 57:7 | **29** 100:3 | |
| 54:21 55:1,11 | 109:20 114:17 | **2014** 10:14,22 | **2C** 25:4,14 90:11 | **8** |
| **Yep** 86:14 | **11/18/2021** | **2015** 17:24 23:7 | 100:6,7 101:5 | **8** 69:19 90:23 |
| 124:22 | 17:13 | 88:1 90:16,19 | **2C-2303-2** 100:4 | 93:10,15 |
| **yesterday** 6:7 | **11/24/2015** | 90:23 93:10,10 | **2do** 68:2 | **8:45** 114:12,22 |
| 67:5,13 | 103:10 | 93:15 101:16 | **2nd** 133:18 | 114:23 |
| | **11/25/15** 86:4 | 121:17 | | **8:59** 86:5 |
| **Z** | **11/28/15** 125:24 | **2016** 14:16 | **3** | **85** 3:9 |
| **zoom** 4:6 8:5,8 | **11:22** 97:19 | 17:23 18:2,24 | **3** 15:1,6,7,7,9,13 | |
| | **11:30** 15:11 | 21:16 57:11 | 15:18 16:11,14 | **9** |
| **0** | **11:32** 97:21 | 86:4 94:24 | 17:21 58:21 | **9** 70:16 86:4 |
| **0.4** 90:23 122:5 | **12/1/2015** | 95:5,9,11,11 | 59:6,6 62:21 | 90:19 93:10 |
| 122:24 126:7 | 121:16 | 96:8,8 97:7,7 | 72:7 114:17 | **9:00** 1:16 |
| 126:19,23 | **12:35** 131:14 | 118:19,22 | **30** 5:9 | **962** 85:4 86:12 |
| 127:10 128:1 | **13** 23:1 57:6 | **2017** 23:7 25:4 | **319** 4:3 | **99** 3:10 |
| **000001** 85:4 | **133** 132:14 | 25:14 100:1,2 | | **9th** 93:13 |
| **000007** 56:9 | **14:20** 103:11 | 100:3 103:2,3 | **4** | |
| **000008** 64:9 | **15** 84:20 118:19 | 109:20 111:21 | **4** 3:4 58:21 | |
| **000014** 69:20 | 118:22 | 112:16 113:4 | 67:22 72:18 | |
| **00015** 70:16 | **15-LV-** 99:15 | 113:13 114:11 | **403** 114:8 | |
| **000174** 103:9 | **15147** 9:11 | **2018** 14:9,16 | **404** 115:18 | |
| **000177** 104:3 | **16** 3:8 9:18 57:2 | 17:23,24 18:24 | **45** 67:10 | |
| **000179** 105:4 | 57:3 | 25:17 57:11 | **4th** 1:15 | |
| **000180** 107:13 | **17** 1:6 9:18 | **2021** 13:22 14:9 | | |
| **000205** 109:20 | 56:22 57:6,7 | 14:10 | **5** | |
| **000230** 116:21 | 86:4 132:6 | **2022** 1:15 | **5** 68:15 91:13 | |
| **000231** 121:15 | **1750** 2:17 | 132:24 133:18 | **5/15/16** 117:12 | |
| **000233** 125:23 | | | **50** 2:13 | |