# Exhibit 1

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION
3
    WILLIAM DUKES,                    )
4                                     )
                   Plaintiff,         )
5                                     )
        v.                            )   2019 L 008948
6                                     )
    COOK COUNTY SHERIFF'S OFFICE;     )
7   THOMAS J. DART, in his            )
    official capacity as Sheriff      )
8   of Cook County, Illinois;         )
    COOK COUNTY, ILLINOIS;            )
9   MEDICAL DIRECTOR OF CERMAK        )
    HEALTH SERVICES OF COOK           )
10  COUNTY in his or her official     )
    capacity; DIRECTOR OF             )
11  NURSING OF CERMAK HEALTH          )
    SERVICES OF COOK COUNTY, in       )
12  his or her official capacity;     )
    M. ADDISON; E. ALTMAN;            )
13  J. ARIAS; M. BOZYK;               )
    N. BUCHANAN-SMITH; R. FOSTER;     )
14  C. GALINDO; J. MERAZ;             )
    W. PARTEE; Z. PERRY;              )
15  A. QURESHI; W. RIVERA;            )
    J. RODRIGUEZ; D. SALMON;          )
16  S. TAYLOR; J. TORRES;             )
    L. TORRES; C. ANDREWS;            )
17  A. BLOODWORTH; Q. DUNMARS;        )
    P. GREEN; S. JAMES; L. LOCKE;     )
18  S. PRATT; and D. TRIPLETT;        )
                                      )
19             Defendants.            )
    _____)
20
21
                   DEPOSITION OF
22
                   SUSAN SHEBEL
23
                   May 11, 2022
24
25
```

Page 2

1       The deposition of SUSAN SHEBEL, taken on
2   behalf of the plaintiff in the above-entitled case
3   before Debra L. Kleszyk, a Certified Shorthand
4   Reporter within and for the State of Illinois,
5   taken remotely via videoconference on May 11,
6   2022, commencing at 9:05 a.m., pursuant to the
7   Federal Rules of Civil Procedure.  The witness
8   appeared at 2700 California Avenue, Chicago,
9   Illinois.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            I N D E X
2
3   WITNESS:  SUSAN SHEBEL
4   EXAMINATION                    PAGE
5    By Ms. Erickson                5
6
7
8
9
10       INDEX OF EXHIBITS
11  EXHIBIT     DESCRIPTION        MARKED
12  Exhibit A    Interagency Directive        149
                 Medication Administration
13               and Distribution
14  Exhibit B    General Order              159
                 Inmate Grievance Procedure
15
    Exhibit C    grievances            192
16               (CCSAO Dukes 000963 - 1207)
17  Exhibit D    medical records           200
                 (CCSAO Dukes 000001 - 962)
18
19
20
21
22       STIPULATION
23  The parties stipulated to waive any objections to
24  the validity of the oath administered remotely.
25

Page 3

1        A P P E A R A N C E S
2
3   MAUCK & BAKER, LLC
    BY:  MS. KIRSTIN M. ERICKSON
4   One North LaSalle Street, Suite 600
    Chicago, Illinois 60602
5   (312) 332-2400
    kerickson@mauckbaker.com
6
        Appeared via videoconference on behalf
7    of Plaintiff
8
9
    DeVORE RADUNSKY, LLC
10  BY:  MR. JASON DeVORE
        MS. KIMBERLY MUSICK
11  20 North Clark Street, Suite 525
    Chicago, Illinois 60602
12  (312) 300-4479
    jdevore@devoreradunsky.com
13  kmusick@devoreradunsky.com
14      Appeared via videoconference on behalf
        of Defendants
15
16
17  LAW OFFICES OF JOHN C. COYNE
    BY:  MR. JOHN C. COYNE
18  53 West Jackson Boulevard, Suite 1750
    Chicago, Illinois 60604
19  (312) 929-4308
    jcc@johncoynelaw.com
20
        Appeared via videoconference on behalf
21   of Defendants N. Buchanan-Smith and
        E. Altman
22
23
24
25

Page 5

1            (The witness was duly
2            sworn.)
3            SUSAN SHEBEL,
4   called as a witness herein, having been
5   first duly sworn, was examined and
6   testified as follows:
7            EXAMINATION
8            BY MS. ERICKSON
9       Q.   Please state your name for the record
10  and spell your last name.
11      A.   Susan Shebel.  S-h-e-b-e-l.
12           MS. ERICKSON:  Let the record reflect
13  this is the deposition of Susan Shebel taken
14  pursuant to notice and set by agreement of the
15  parties.  The deposition will be taken pursuant to
16  Federal Rule of Civil Procedure 30 and all other
17  applicable rules.
18  BY MS. ERICKSON:
19      Q.   My name is Kirstin Erickson, and I
20  represent William Dukes in this lawsuit.  I'm
21  going to ask you some questions today regarding
22  your background, education, employment history,
23  and then questions specific to Mr. Dukes and
24  documents that you signed of his.
25           Have you ever given a deposition

2 (Pages 2 - 5)

Page 6

1 before?
2     A.  Yes.
3     Q.  In what circumstances?
4     A.  For Cermak.
5     Q.  How many depositions?
6     A.  I don't have a count.
7     Q.  Okay.  How many -- have you been a
8 party to lawsuits?
9     A.  What do you mean?
10     Q.  As a defendant --
11     A.  I was named in a lawsuit, yes.
12     Q.  Okay.  While working at Cermak?
13     A.  Yes.
14     Q.  Is that case resolved?
15     A.  As far as I'm aware.
16     Q.  Okay.  All right.  Well, then you know
17 the ground rules, but I'll just go over them.
18          Can you hear me okay?
19     A.  I can.
20     Q.  All right.  Let me know if you can't
21 at some point and we can -- because Zoom causes
22 some issues sometimes.
23          Please make sure all your answers
24 are verbal.  The court reporter can't take down
25 nods or uh-huhs.  Okay?

Page 7

1     A.  Yes.
2     Q.  Make sure I finish my question before
3 you begin to answer as it's difficult for the
4 court reporter to take down two voices at the same
5 time.  Is that fair?
6     A.  Yes.
7     Q.  If I ask a question that you don't
8 understand, please let me know, and I'll either
9 repeat it or rephrase it.  But if you answer the
10 question, I'm going to assume that you understood
11 the question.  Is that fair?
12     A.  Yes.
13     Q.  I'm going to go back a few years.  If
14 you don't remember something or you don't know the
15 answer, just let me know, and I'll move on.  Okay?
16     A.  Okay.  Let me turn my fan off real
17 quick.
18     Q.  Okay.
19     A.  Okay.  That's better.
20     Q.  Can you hear me better?
21     A.  Yeah.
22     Q.  I'll try and be loud, but.
23          And then computer and phone usage
24 during the deposition is limited to access to the
25 Zoom.  Is that fair?

Page 8

1     A.  Yes.
2     Q.  And then we can take breaks, but just
3 if you could please answer the question that's
4 pending before we go on break, that would be
5 appreciated.  Okay?
6     A.  Yes.
7     Q.  Okay.  Susan -- can I call you Susan?
8     A.  Sure.  Yes.
9     Q.  What is your date of birth?
10     A.  July 1, 1957.
11     Q.  What is your current address?
12     A.  My home address?
13     Q.  Yeah.
14     A.  Do I have to give my home address?
15 Can I give you my work address?
16         MR. DeVORE:  That's fine.
17         I mean, she can be contacted
18 through counsel as well.
19         THE WITNESS:  2700 California Avenue.
20 BY MS. ERICKSON:
21     Q.  Your current address where you live,
22 how long have you lived there?
23     A.  It will be 35 years.
24     Q.  Who do you live with?
25     A.  I live with myself, my daughter.

Page 9

1     Q.  How old is your daughter?
2     A.  My daughter, how old is my daughter?
3     Q.  Yeah.
4     A.  She was born in '87.
5     Q.  Where did you attend high school?
6     A.  New Buffalo, Michigan.
7     Q.  What -- did you graduate?
8     A.  Yes.
9     Q.  What year --
10     A.  What year?
11     Q.  Yeah.
12     A.  1975.
13     Q.  And where did you attend college?
14     A.  Lake Michigan College, Benton Harbor,
15 Michigan.
16     Q.  What year did you receive your degree?
17     A.  1984.
18     Q.  And what was your undergrad degree in?
19     A.  Nursing.  Associate degree, nursing.
20     Q.  What was the first part?  I couldn't
21 hear.
22     A.  Associate degree, nursing.
23     Q.  After attending Lake Michigan College
24 and graduating in 1984, did you attend any other
25 colleges?

3 (Pages 6 - 9)

Page 10

1   A.  No.
2   Q.  Have you received any other
3   certificates after graduating from Lake Michigan
4   College?
5   A.  CEUs.  I was federal certified for
6   medical surveyor, nursing surveyor, for long-term
7   care.  Wound care.  Some of them have been a
8   while.  I don't recall them all.
9   Q.  Okay.
10  A.  And then the CEUs that you take,
11  varied.
12  Q.  Are the CEUs what you take to keep up
13  your nursing license?
14  A.  Correct.
15  Q.  Did you take the NCLEX exam?
16  A.  Yes.
17  Q.  What year did you take that?
18  A.  1984.
19  Q.  So did you pass the exam in 1984?
20  A.  Yes.
21  Q.  Okay.  Do you have to take that exam
22  again after the first time you pass it?
23  A.  No.
24  Q.  Okay.  Where did you take the
25  trainings to receive the long-term care and the

Page 11

1   wound care certificates?
2   A.  I -- oh, it's been a -- I don't recall
3   the name of the town for the wound care.  It's
4   been so long.
5          Long-term care was down in
6   Indianapolis, and then the testing was down in
7   Orlando.
8   Q.  Do you remember about what years you
9   received those certificates?
10  A.  I would like to say 2013.
11  Q.  Okay.
12  A.  But, no, I'm guessing on that.  So I
13  don't recall the exact year.
14  Q.  That's okay.  Thank you.
15         Have you ever been convicted of a
16  felony or a crime involving dishonesty?
17  A.  No.
18  Q.  In preparation for your deposition,
19  did you review anything?
20  A.  Grievances.
21  Q.  Which -- Mr. Dukes' grievances?
22  A.  Correct.
23  Q.  Did you discuss those grievances with
24  Mr. Radunsky or any attorney from his office?
25  A.  Yes.

Page 12

1   Q.  So after you passed the NCLEX in 1984,
2   where did you begin working?
3   A.  Okay.  I worked at -- it's called
4   Red Oaks Nursing Home.
5   Q.  Where is that located?
6   A.  It was located in Michigan City.
7   Q.  And you worked there as a nurse?
8   A.  Started out as graduate nurse and then
9   nurse, yes.
10  Q.  What years did you work there?
11  A.  I believe I left in -- because I've
12  worked agency, too.  So 19 -- boy, you're making
13  me go back a few years.
14  Q.  Okay.
15  Q.  Okay.
16  Q.  So it was after you got your NCLEX in
17  1984, you worked at this nursing home for was it
18  like two to five years?
19  A.  Yeah.  Yes.  Correct.
20  Q.  And then where did you work after you
21  were at Red Oaks Nursing?
22  A.  I went to Michigan City.  It was a
23  doctor's facility.  The urgent care.
24  Q.  And what did you --
25  A.  Urgency care nurse.

Page 13

1   Q.  How long were you there?
2   A.  Close to six years.
3   Q.  And what was your role while you were
4   working at Michigan City urgent care?
5   A.  I was the urgent care nurse.  I did
6   triage and whatever was required.
7   Q.  Then after you were at the urgent
8   care, where did you work?
9   A.  I worked for Life Care Nursing
10  facility.
11  Q.  How long were you at that facility?
12  A.  A couple years.  A few years.
13  Q.  When you worked at the -- when you
14  worked at Life Care Nursing facility, what were
15  your main duties as a nurse?
16  A.  Assessments, patient assessments.
17  Passing meds.  I also worked as an assistant DON
18  and DON for a short time.
19         In between there, I did work for
20  the State as a medical surveyor.  But I'm -- it's
21  been so many years that I can't recall what year
22  was -- that I did what.
23  Q.  That's okay.  So before you were at
24  Life Care Nursing facility you were a medical
25  surveyor for the State?

4 (Pages 10 - 13)

Page 14

1    A.    I worked at Life Care, yes.
2    Q.    Which state?
3    A.    Indiana.
4    Q.    What does one do as a medical
5  surveyor?
6    A.    You go into nursing facilities and
7  make sure that they're following the State
8  guidelines, State and Federal guidelines, for
9  Medicare, Medicaid.
10    Q.    Do you know how long you were a
11  medical surveyor for Indiana?
12    A.    It was a year.
13    Q.    Okay. Let's go back to Life Care
14  Nursing. So you were at Life Care Nursing, and
15  you said that you were the assistant director of
16  nursing and the director of nursing at one point?
17    A.    Yeah. The director left, and I took
18  her spot for a short time.
19    Q.    Do you know about what year you left
20  Life Care Nursing facility?
21    A.    I would be guessing. It was 2003
22  perhaps, around in there.
23    Q.    Okay. And where did you go work after
24  Life Care Nursing facility?
25    A.    I went to Fountainview Terrace in

Page 15

1  La Porte. That's also long-term care.
2    Q.    And what was your role at that
3  facility?
4    A.    Patient -- patient care, treatments,
5  meds, patient assessments.
6    Q.    So you were working directly
7  clinically for patients?
8    A.    Correct.
9    Q.    Okay. Did you use your wound care
10  license or certification --
11    A.    It wasn't a license. It was just
12  classes, certification. No, I was not a wound
13  care nurse.
14    Q.    Okay. How long were you at
15  Fountainview Terrace?
16    A.    About two years.
17    Q.    And then where did you go to after
18  that?
19    A.    I went to Westville Correctional
20  Center.
21          I've got to put this idle timer
22  thing off.
23          Westville Correctional Center.
24    Q.    Where is that located?
25    A.    Westville, Indiana.

Page 16

1    Q.    What was your role at Westville
2  Correctional Center?
3    A.    I worked in the urgent care. I did
4  the CQI, the audits. I've worked in the -- in the
5  infirmary. Sometimes I used to go start the IVs
6  and things like that. But mainly it was the CQI.
7    Q.    So you mainly did quality control?
8    A.    Correct.
9    Q.    What does the I stand for in CQI?
10    A.    Improvement.
11    Q.    Ah. Okay.
12    A.    Continuous quality improvement.
13    Q.    So as having a focus in continuous
14  quality improvement, what types of -- what types
15  of things were you doing day to day at Westville?
16    A.    Audits. I would audit the different
17  disciplines, make sure they were following the
18  policies.
19    Q.    So while you were at Westville
20  Correctional Center, you reviewed the policies
21  first and then were able to audit?
22    A.    I was provided with audits from the
23  CQI director. I believe she was down in -- I
24  think she was in Indianapolis. So they provided
25  the audits. And then I would audit the charts.

Page 17

1  They provided the templates, if that makes sense.
2  The templates were provided by Corizon. They had
3  another name before that, and I don't -- I don't
4  recall what it is. They merged.
5    Q.    So, just to understand better, Corizon
6  gave you templates of what?
7    A.    Audits.
8    Q.    Audits of what?
9    A.    Different disciplines. Different
10  quality measures.
11    Q.    And you said that you were reviewing
12  charts. What charts were you reviewing?
13    A.    The detainees' charts or inmates'
14  charts.
15    Q.    So you reviewed the medical charts of
16  the detainees?
17    A.    Correct.
18    Q.    When you say you reviewed the medical
19  charts, does that mean that you went into their
20  electronic file and looked at all of the care
21  through the whole time they were there or was it
22  after each visit? How did that work?
23    A.    According to the audit, I would audit
24  that particular aspect of what was being audited.
25  There was like a rotation of different things that

5 (Pages 14 - 17)

Page 18

1  you would audit, and that's the part of the chart
2  that I would look at.
3      Some of the records were paper,
4  paper chart, and I would have to go into medical
5  records and get their paper chart. They were
6  integrated between paper and electronic.
7      Q.  Okay.
8      A.  So some were paper.
9      Q.  And then when you identified an issue
10 or a problem, what did you do in that role?
11     A.  That would have been brought to the --
12 we had like a CQI -- different disciplines.
13 Everybody represented their discipline, and it
14 would be brought forth and we would discuss what
15 would be a good plan of action. And then that --
16 that would be reaudited and we'd decide when and
17 how frequently that particular aspect needed to be
18 reaudited to bring it up to a certain mark.
19     Q.  So it sounds like, and correct me if
20 I'm wrong, whenever -- correct me if I'm wrong.
21 Whenever you would identify an issue, the team
22 would get together and discuss how to resolve that
23 issue?
24     A.  No.  We did -- it's partially correct.
25 I would bring all of the audits, and we would

Page 19

1  review all of them.  Whether there was an issue or
2  not, they were reviewed.  It was brought forth
3  between -- to all the disciplines that worked at
4  the -- their -- I guess the director of each
5  discipline.  We would have a meeting.
6      Q.  When you say disciplines, what do you
7  mean?
8      A.  Like the mental health director,
9  social work director, psychiatrist, the
10 administrator, director of nursing, pharmacy.
11 Everybody that had a role.
12     Q.  Okay.
13     A.  And would have input.
14     Q.  Was Corizon the medical company at
15 Westville Correctional Center?
16     A.  That's correct.  There was another
17 one, but I don't remember their name.  They sold
18 or merged, and I don't recall.
19     Q.  Okay.  Do you remember about how many
20 detainees there were at Westville?
21     A.  It varied.  I could give you a
22 guesstimate number, if that would be appropriate.
23     Q.  Sure.  Like even if it's a range
24 between --
25     A.  Approximately 3500.

Page 20

1      Q.  Okay.  And did you work at Westville
2  Correctional Center full time?
3      A.  Yes.
4      Q.  Was it a Monday-through-Friday job or
5  did you work weekends as well?
6      A.  Occasionally.  But mainly it was
7  Monday through Friday.
8      Q.  Okay.  How long were you at Westville
9  Correctional Center?
10     A.  About five and a half years.
11     Q.  Five and a half years?
12     A.  About five and a half years.
13     Q.  Thank you.  I couldn't hear you.
14     A.  I'm sorry.
15     Q.  No, it's okay.
16     And then after Westville where did
17 you go to work?
18     A.  Then I came here.
19     Q.  And "here" meaning?
20     A.  Cermak.
21     Q.  What year did you start working at
22 Cermak?
23     A.  2012.
24     Q.  Is your paycheck from Cook County or
25 from Cermak?

Page 21

1      A.  Cook County.
2      Q.  Are you a salary or hourly employee?
3      A.  Hourly.
4      Q.  And how much do you get paid per hour?
5      A.  59.80 something.  I don't recall the
6  cents.
7      Q.  When you started working at -- for
8  Cermak in 2012, what was your position?
9      A.  Clinical performance improvement
10 analyst.
11     Q.  Clinical performance improvement
12 analyst?
13     A.  Correct.
14     Q.  Thank you.  And what did you do in
15 that role?
16     A.  Audits.
17     Q.  Can you explain more what that role
18 entailed?
19     A.  I just made audits that would coincide
20 with the policies and then either go out to the
21 division and check what needed to be checked or go
22 through the medical record, whatever applied.
23     Q.  Did you have a role -- strike that.
24     Have you had a role at Cermak where
25 you have helped change policies at all?

6 (Pages 18 - 21)

Page 22

1    A.   No.  I don't change policies, no.
2    Q.   So what did -- what were you auditing
3  in 2012 when you began?
4    A.   Med room operations.  Boy, it's taking
5  me back.  What else did I audit?  'Cuz I had to
6  design the --
7    Q.   Let's just start with that one.  You
8  said med room operations?
9    A.   Yeah.
10   Q.   What does that mean?
11   A.   Make sure that things were counted
12 that needed to be counted.  Expiration dates were
13 managed properly of medical supplies.
14         Let me click that out.  I'm sorry.
15 What?
16   Q.   That's okay.
17         Were you responsible for disposing
18 of medication if it was too old?
19   A.   No.
20   Q.   So you checked the expiration dates of
21 what?
22   A.   Of medical supplies.  Catheters, you
23 know, syringes -- well, no, not really -- yeah,
24 syringes, just bandages, anything that was a
25 medical supply that would have an expiration date

Page 23

1  on it and make sure that it's -- it's not expired.
2  Just check that.  I'm checking the checker.
3  Checking the checker.
4    Q.   What does that mean?
5    A.   I didn't go around every week and
6  check all the medical supplies.  I would just do
7  an audit to make sure that it was being -- that
8  service was being provided.
9    Q.   So by service, you mean make sure
10 someone else was going to count?
11   A.   Make sure that it was being done.  I
12 would actually check it.
13   Q.   And when you say med room, what does
14 that mean?
15   A.   That's the room where medications are
16 kept.  Med cart.
17   Q.   Where is that located?
18   A.   Usually in the dispensaries.
19   Q.   So is there more than one med room at
20 Cook County?
21   A.   Yes.  You mean Cermak?  Yes.  Yes.
22   Q.   Just to be clear, so when I'm -- so
23 we're talking right now about the Cook County
24 Department of Corrections facility --
25   A.   Yes.

Page 24

1    Q.   -- overall.  Right?
2    A.   Okay.  Yes.
3    Q.   And then within that whole facility
4  Cermak has specific roles.  Right?
5    A.   Correct.
6    Q.   To provide medical care.  Right?
7    A.   Correct.
8    Q.   Okay.  So the med rooms are located
9  within the Cook County facility.  Right?
10   A.   Correct.
11   Q.   Okay.  And then how many med rooms are
12 there at Cook County Department of Corrections?
13   A.   There's a med room in every building.
14 I don't know if that's the right word to use.  And
15 then Cermak -- I have to count because there's
16 more med rooms in the infirmary because there's
17 one in each unit, like south, southeast, west.
18 Yeah, there's one in each unit.  And then in RTU
19 there's one on each floor.  And then each
20 division, there's one in each division.
21   Q.   So is each building at Cook County a
22 division?
23   A.   Correct.  Except for RTU is a division
24 but it has more than one med room.  There's one
25 for each floor.

Page 25

1    Q.   Okay.  And that's because it's a
2  medical, more --
3    A.   Yes.
4    Q.   -- for people with medical needs.
5  Right?
6    A.   Correct.
7    Q.   So let's just talk about Division 10
8  for a second so I understand.  So in Division 10
9  is there one med room for the whole building?
10   A.   That would be my understanding.  I
11 have not been out there for a while.  But my
12 understanding is one -- one dispensary, one med
13 room.
14   Q.   When you say dispensary and med room
15 or med room dispensary, are you saying --
16   A.   That's where I usually -- the meds
17 are -- the med room is usually in the dispensary.
18   Q.   Okay.  Everyone uses different terms,
19 so I'm trying to understand what you're meaning so
20 we don't cross paths.
21   A.   Okay.
22   Q.   So the med room, when you say med room
23 you mean the dispensary as well or is it the med
24 room --
25   A.   It's a room with -- it would be --

7 (Pages 22 - 25)

Page 26

1 normally it would be a room. Always -- see,
2 there's so many exceptions, so I don't want to say
3 that there's always a med room in a dispensary
4 because that's not the case. And then I probably
5 have --
6     Q. That's okay.
7     A. The med room is where the med carts
8 are kept and anything that you would need for
9 passing your meds.
10         And then the dispensary would be
11 where the nurses would see patients or doctors
12 would see patients. It's more like the clinic
13 area. Some areas have the med room. There's a
14 room in the dispensary where the med room is, and
15 in some it is -- it was not.
16     Q. I understand.
17     A. Okay.
18     Q. So the med rooms that are located
19 throughout the facility all have medication carts?
20     A. I'm thinking that they use medication
21 carts, yes.
22     Q. And that's where Cermak staff go to
23 fill the carts with the medications for the
24 patients -- or the inmates in that division?
25     A. The nurses -- the pharmacy -- the

Page 27

1 nurses don't fill the med carts with meds.
2     Q. Who does?
3     A. That's the pharmacy.
4     Q. So then the med carts are in the med
5 room, and that's where the pharmacist would fill
6 the med carts with medications for the inmates in
7 the division?
8     A. I can't answer that question. I don't
9 know how -- what procedure the pharmacy uses with
10 the med cart, if they do an exchange of carts or
11 what they do. I can't answer that question. It
12 would be more the pharmacy could answer that. I
13 don't think --
14     Q. So but --
15     A. The pharmacy brings meds up to the med
16 room to fill the carts.
17     Q. So but you're saying someone from
18 pharmacy is the one who puts the medication on the
19 carts for the inmates?
20     A. Puts the meds on the cart? They
21 would -- they would -- they don't set meds on the
22 cart because it's a locked cart.
23     Q. In the cart? I don't know. What does
24 the cart look like?
25     A. It has drawers and they lock and they

Page 28

1 have little compartments in the -- little
2 compartments for the meds. And the pharmacy fills
3 those.
4         Now, I don't know if they bring
5 cassettes up to fill the carts or if they bring
6 the cart to pharmacy. I really don't know their
7 procedure for them filling the carts or even if
8 it's different in each division. I can't answer
9 that question.
10     Q. Yeah, I didn't ask you that many
11 questions yet. I'm just trying to understand the
12 cart.
13         So the cart has the medication on
14 it. You said it has particular drawers that can
15 be locked?
16     A. Yes.
17     Q. Okay. And who determines -- well,
18 strike that.
19         Do the nurses give out medication
20 like pill by pill to the inmates or are the
21 medications that an inmate needs prepackaged for
22 the inmate?
23     A. They're labeled for the inmate, unit
24 dose if it's a dose-by-dose medication. They're
25 wrapped, each pill.

Page 29

1     Q. If a particular inmate, for example
2 Mr. William Dukes, has five medications he's
3 supposed to take, would they be -- each medication
4 would be prewrapped separately or is it one
5 particular package all the meds are in there
6 together?
7     A. They would be separate.
8     Q. Okay. And then how does the nurse
9 know, who's passing the meds, which particular
10 ones are for Mr. Dukes?
11     A. His name would be on it. His name
12 would be on it.
13     Q. Oh okay. In the drawers how are they
14 set up? Is one inmate's five medications put next
15 to each other or is it aspirins in this area, I
16 don't know, metoprolols in this area? How does
17 it -- how does it work functionally on the cart?
18         MR. DeVORE: Objection. Form. I was
19 objecting as to form. It's confusing as phrased.
20 It calls for a narrative.
21         If you understand the question, you
22 can answer it.
23         THE WITNESS: I didn't.
24 BY MS. ERICKSON:
25     Q. Okay. So I'll ask again a different

8 (Pages 26 - 29)

Page 30

1 way.
2         You said that the medications for
3 inmates are packaged and the medication pill is
4 put into a package enclosed. Correct?
5     A. Yes.
6     Q. And is there more than one medication
7 in one particular package for an inmate?
8     A. They're individually packaged.
9     Q. Okay. And then as far as how they're
10 put on --
11     A. I don't pass the meds, so I don't know
12 if -- I just know that they come in strips
13 individually with their name on it. But what
14 drawer they go in and how they -- I don't think
15 they separate them by type of pill.
16     Q. What does that mean?
17     A. You were asking if aspirin goes in one
18 drawer and something goes in another. I don't
19 understand that, so.
20     Q. Well, okay. So was the -- was the way
21 that medication was passed in 2012 essentially the
22 same way it was passed in 2017 through '19? Or
23 strike that. Sorry.
24         Was medication passed in the same
25 or similar fashion in 2012 as it was in 2015

Page 31

1 through '17?
2     A. I don't know the answer to that
3 question. I wasn't passing the meds.
4     Q. But you --
5     A. I don't pass the meds.
6     Q. Right. But do you audit the people
7 that do pass meds at all?
8     A. I did in 2012.
9     Q. Okay.
10     A. But not 2017.
11     Q. Okay. So let's just talk about 2012.
12 So it was your responsibility to oversee the way
13 in which medications were passed to inmates?
14     A. No.
15     Q. Okay.
16     A. It was --
17     Q. Can you describe your role as an
18 auditor?
19     A. I would report -- I would see how they
20 were doing it and report it on an audit. And then
21 the audit would be reported to the director of
22 nursing.
23     Q. So in 2012 you said you see how they
24 were doing it. What does that mean? See how
25 they -- who was doing what?

Page 32

1     A. Audit. Audit how the nurses were
2 passing the medications.
3     Q. Okay.
4     A. And then I would -- I would report
5 what was within the guidelines according to the
6 policy, how they were doing it, and then take that
7 audit to the director of nursing.
8     Q. Okay. So you did watch nurses pass
9 out meds in 2012. Right?
10     A. Yes.
11     Q. Okay. And so if one inmate had more
12 than one medication, would a nurse go in different
13 drawers to take out the medication to give to the
14 inmate, or was there a different manner in which
15 they did that?
16     A. They had -- they had a Pyxis. It was
17 in the process of a changeover of the system. So
18 they were -- they were unit dose wrapped, some
19 from -- directly from the drug company as in unit
20 dose and then some were from the pharmacy. And
21 it was in a transition. So how they do it now
22 would be different than 2012. There's been -- I
23 don't --
24     Q. I'm not sure you answered my question.
25     A. I'm not sure I did either. I'm not

Page 33

1 sure I understood.
2     Q. That's okay. I'll ask again.
3         So if an inmate in 2012 had more
4 than one medication -- and you said that they're
5 individually wrapped either by the pharmacy or by
6 an outside source. Right? You've already said
7 that. Right?
8     A. Yes.
9     Q. But then if there's more than one
10 medication, are they located in the same spot in
11 the drawers for that one individual or are they in
12 separate drawers for the one inmate?
13         MR. DeVORE: Objection. Asked and
14 answered.
15         MS. ERICKSON: She didn't answer it.
16         MR. DeVORE: Well, I believe she did
17 before when you asked her if they were by drug and
18 she said they weren't, they were by detainee.
19         But go ahead if there's something
20 different asked.
21         THE WITNESS: So each detainee had
22 their area where their meds were kept, unit dose.
23 BY MS. ERICKSON:
24     Q. Okay. All together in one spot?
25     A. Yes.

9 (Pages 30 - 33)

1  Q.  Okay.  And then you said at some point
2  there was a -- did you say Pyxis?
3  A.  I did.
4  Q.  What does that mean?
5  A.  That's just a medication cart.  It's a
6  medication cart, just a medication system.  I
7  don't pass meds out of the Pyxis, so I couldn't
8  give you the ramifications of it all.  But it's
9  the newer medication pass cart.
10  Q.  Is Pyxis just a name of the type of
11  cart?
12  A.  Yes.  Or the medication process.
13  Q.  Oh okay.  And when did the Pyxis
14  process and cart begin?
15  A.  I don't know the exact date.  I would
16  be guessing.  I don't know.  I don't pass the meds
17  after that point.
18  Q.  But you didn't pass the meds --
19  A.  Or I never passed the meds actually.
20  Q.  Yeah.  So how long were you in a role
21  where you were auditing nurses passing meds?  From
22  2012 until when?
23  A.  Approximately two years.  No.  Maybe
24  it's three.  Maybe it's three years.  Sounds about
25  right.

1  Q.  So from 2012 until 2015 you were
2  auditing --
3  A.  Yes.
4  Q.  -- the ways in which nurses were
5  passing meds?
6  A.  No, that isn't all that -- it wasn't
7  the only audit that I did.  I had other
8  responsibilities.
9  Q.  But is that what -- is that part of
10  what you did --
11  A.  Correct.
12  Q.  -- from 2012 to 2015 --
13  A.  Correct.  Correct.
14  Q.  Please wait until I finish.
15  From 2012 until 2015, you audited
16  the way in which nurses passed meds at Cook
17  County?
18  A.  Correct.
19  Q.  From 2012 until 2015, was there an
20  electronic medical record?
21  A.  Yes.  It was beginning, yes.
22  Q.  Do you know about what year that
23  began?
24  A.  No, I do not.
25  Q.  Did you have any role in --

1  A.  I don't recall.
2  Q.  -- how -- oh sorry.
3  A.  I don't recall.  I don't recall the
4  year.
5  Q.  Okay.  Did you have any role in
6  beginning to roll out the electronic medical
7  system at Cook County?
8  A.  I don't understand your question.
9  Q.  Oh okay.  I'll rephrase.
10  Did you have any part in the
11  implementation of using electronic medical records
12  at Cook County?
13  MR. DeVORE:  Objection to form as to
14  what implementation entails and what the question
15  really means.
16  If you understand what --
17  THE WITNESS:  I don't.
18  BY MS. ERICKSON:
19  Q.  Who decided that Cook County was going
20  to use electronic medical records?
21  A.  I don't have a knowledge of that.
22  Q.  Okay.  And when Cook County began
23  using electronic records, did it continue to
24  maintain paper medical records?
25  A.  I don't under -- you mean double?  I

1  don't understand your question.
2  Q.  So when a nurse passes medication to
3  an inmate, is the nurse required to write down
4  that the medication was passed to the inmate?
5  MR. DeVORE:  When?  What time period?
6  MS. ERICKSON:  Any time period.  The
7  question is just generally.
8  THE WITNESS:  Was she ever required to
9  write it down?
10  BY MS. ERICKSON:
11  Q.  No.  I'll --
12  A.  I don't understand.
13  Q.  Yeah, yeah, I'll rephrase.  It's okay.
14  When a nurse passes meds to an
15  inmate, under Cook County policy from any time
16  from 2012 until the present, is the nurse supposed
17  to write down that the inmate received the
18  medication in the medical records?
19  MR. DeVORE:  Objection as to form.
20  Unclear what the time period is.
21  But you can answer for whatever
22  time period that you have knowledge about, if you
23  understand the question.
24  THE WITNESS:  I don't know when they
25  stopped writing exactly and when they started the

10 (Pages 34 - 37)

1  electronic record. I don't know. I don't know
2  when -- exactly when one started and one ended.
3  BY MS. ERICKSON:
4    Q.  Okay. So are you saying that when
5  electronic medical records started being used at
6  Cook County there were no paper records used for
7  inmates?
8    A.  No, I did not say that.
9    Q.  I'm just trying to understand the
10  system.
11    A.  I know. I know.
12    Q.  I'm not trying to give you a hard
13  time. I just want to understand. So you've been
14  there since 2012 working for Cermak. You've been
15  in audit. You've watched med pass. And I'm
16  trying to understand. When electronic medical
17  records began being used at Cermak and Cook
18  County, was there a policy that said we don't need
19  to do paper records anymore?
20    A.  No. There is no policy that says that
21  because there can be, as everybody knows, a
22  computer shutdown or whatever and then you use a
23  paper.
24    Q.  Okay.
25    A.  Paper MAR. But now it's all

1  electronic unless there is a computer, whatever
2  you want to call it, shutdown.
3    Q.  Okay.
4    A.  Then they would use a paper MAR.
5    Q.  That makes sense. So maybe there was
6  no specific policy, but when Cermak started using
7  electronic medical records was it the custom and
8  practice to use electronic medical records and not
9  paper records?
10    A.  Correct.
11    Q.  Okay. And then if there was some kind
12  of computer glitch, it sounds like at that point
13  people would write down on paper when they passed
14  meds. Is that right?
15    A.  A paper MAR. Correct.
16    Q.  Okay. And that's still used to this
17  day. Right?
18    A.  Correct.
19    Q.  Do you know where the paper records
20  for inmates -- strike that.
21      Do you know where the paper medical
22  records are stored at Cook County?
23    A.  No. I don't know what they are.
24    Q.  If you had to audit or review medical
25  records of an inmate that were not electronic, how

1  would you find those medical records?
2    A.  They could be scanned.
3    Q.  Is it the custom and practice nowadays
4  that if a medical record was paper before it
5  should be on the system electronically?
6      MR. DeVORE: Objection. Form as to
7  time period. And that's my main objection as to
8  what "before" means.
9      THE WITNESS: Okay. Yeah, you would
10  have to ask medical records all those intricacies.
11  I don't --
12  BY MS. ERICKSON:
13    Q.  Okay. Who's the person I should speak
14  with in medical records?
15    A.  Linda Kampe.
16    Q.  What's her role?
17    A.  She's a -- I don't know her title.
18  Medical records and assistant COO.
19    Q.  What's that?
20    A.  Assistant COO.
21    Q.  What does that mean?
22    A.  Operations.
23    Q.  She's the assistant chief operating
24  officer of medical records?
25    A.  Correct.

1    Q.  Okay.
2    A.  No. Not of records. She's over
3  records and the assistant COO.
4    Q.  The assistant COO of what?
5    A.  Operations here at Cook County.
6    Q.  Of Cermak or Cook County?
7    A.  Yes. Cermak.
8    Q.  So I should speak with Linda Kampe,
9  who's assistant COO of Cermak. Right?
10      MR. DeVORE: Objection. That
11  mischaracterizes her testimony.
12  BY MS. ERICKSON:
13    Q.  I'm just trying to understand. Is
14  Linda Kampe the COO of Cermak?
15      MR. DeVORE: I think she just
16  testified she wasn't sure of her exact title.
17  BY MS. ERICKSON:
18    Q.  I just -- she worked for Cermak or for
19  Cook County? That's the question.
20    A.  She works for the medical part.
21    Q.  Cermak?
22    A.  Because Cermak is this building. And
23  I had said that before. So I don't -- Cook County
24  Health at 2700 California.
25    Q.  Okay. Are you able --

11 (Pages 38 - 41)

Page 42

1    A.   I need to take a break. I'm sorry.
2    Q.   Are you in your office right now?
3    A.   I am.
4    Q.   Is your office at Stroger Hospital?
5    A.   No. I'm at Cermak.
6        MR. DeVORE: The witness just said
7   before your last two questions that she needed to
8   take a break.
9        MS. ERICKSON: Oh, okay. Yeah. Sure.
10  We can take a break. Do you want ten minutes? Is
11  that good?
12       THE WITNESS: Yes, please.
13       MS. ERICKSON: Okay. All right.
14  We'll come back at 10:05.
15          (A break was taken from
16                9:55 a.m. until
17                10:07 a.m.)
18       MS. ERICKSON: We can go back on then.
19  BY MS. ERICKSON:
20   Q.   So I want to go back to your role as
21  the clinical performance improvement coordinator.
22  Was it coordinator?
23   A.   Analyst.
24   Q.   Analyst. Thank you. The clinical
25  performance improvement analyst since 2012.

Page 43

1   Besides auditing med pass and auditing the med
2   room operations, did you have any other specific
3   roles?
4    A.   Oh. I assisted with the nursing
5   guidelines. They were writing nursing guidelines.
6   I assisted with that book.
7    Q.   It's a specific book you said?
8    A.   Nursing guidelines.
9    Q.   Is it --
10   A.   Nursing guidelines. Nursing guide-
11  lines.
12          I assisted with the bed control.
13   Q.   Anything else?
14   A.   Not that I can recall at the moment.
15   Q.   Okay. And then the nursing guide-
16  lines, is that what they were called? Nursing
17  guidelines?
18   A.   Yes.
19   Q.   Are those nursing guidelines the same
20  as they were in 2012 today?
21       MR. DeVORE: Objection. Calls for
22  speculation.
23  BY MS. ERICKSON:
24   Q.   To your knowledge.
25   A.   I don't believe so.

Page 44

1    Q.   Do you know when they changed?
2    A.   No. The date, I don't know. I'm not
3   a part of that, developing the guidelines or --
4   writing the guidelines or developing them. I'm
5   not a part of that.
6    Q.   Do you know how often the nursing
7   guidelines changed?
8    A.   No.
9    Q.   Who is in charge of modifying the
10  nursing guidelines?
11   A.   I don't know the answer to that
12  question.
13   Q.   Is Linda Kampe involved in that?
14   A.   I don't know.
15   Q.   And what does bed control mean?
16   A.   Bed control is when you -- it's hard
17  to explain. When a -- saying where a patient
18  needs to go according to their level of care,
19  according to what the provider assigned to them,
20  the level of care. Each division has different
21  levels.
22   Q.   Okay. So what is the range of care
23  per division?
24   A.   I don't -- I can't tell you what
25  division sees what.

Page 45

1    Q.   So you're saying is it the doctor that
2   decides which division an inmate will go to?
3    A.   A provider, mental health or medical.
4    Q.   Do you know what level of care
5   Division 10 is for an inmate?
6    A.   As in when? I wouldn't know because
7   they change.
8    Q.   Oh, it changes regularly --
9    A.   I don't know when. And I wouldn't
10  know if you gave me a date what it would have been
11  at that time. They change.
12   Q.   Oh, it changes regularly, the level of
13  care --
14   A.   That I don't know. That's DOC and
15  medical that determines all that. I'm not a part
16  of that.
17   Q.   So then --
18   A.   Who decides that, I don't know.
19   Q.   So what was your role in bed control
20  in 2012?
21   A.   So there would be a list of patients
22  that would be in -- say they were medical and they
23  had just been assigned to medical but maybe they
24  were in GP --
25   Q.   Which means?

12 (Pages 42 - 45)

1    A.  -- and I would say that -- general
2  population.
3    Q.  Okay.
4    A.  -- that they need to be moved to this
5  level of care.  Then DOC would determine where
6  according to where they had that level of care.
7    Q.  So DOC being, like you said, the
8  provider would decide where they should go?
9    A.  The provider assigns the level of
10  care.
11    Q.  Okay.
12    A.  And their bed is determined by the
13  level of care, the recommendation of level of
14  care.  And then DOC is in control of movement.
15    Q.  Okay.  So it sounds like Cook County
16  is in charge of deciding which bed but the
17  provider says which division that particular
18  inmate should go to given their need?
19    A.  Not division necessarily but level of
20  care.  Because each division can be different
21  things.
22    Q.  Okay.  I understand.  And then going
23  back to the Pyxis, why -- why was the Pyxis cart
24  and process needed?
25    A.  Just monitor.  More control.

1    Q.  How does the Pyxis med cart work?
2    A.  I don't pass meds out of the Pyxis, so
3  I couldn't give you all the dynamics of it.
4    Q.  Have you seen it?
5    A.  I don't pass meds.  I don't know the
6  answer to that.
7    Q.  Have you seen the Pyxis?
8    A.  I've seen it.  I've seen the cart.
9    Q.  Is it -- is it a machine where pills
10  are put in from the top and like somehow combined
11  quicker in a package?
12    A.  No.  That's pharmacy.  Pharmacy has --
13  that would be just -- no.  The Pyxis doesn't
14  package the medications.  The pharmacy packages
15  the medications.  And how they put them in the
16  Pyxis or whatever, I'm not involved in that
17  process whatsoever.
18    Q.  Okay.
19    A.  So I don't know the answer to that
20  question.
21    Q.  Okay.  And where is the pharmacy
22  located at Cook County?
23    A.  Cermak.  Cermak building.  I don't
24  know their exact location.
25    Q.  Is there just one pharmacy?

1    A.  I believe so, yes.
2    Q.  And there's a specific building for
3  Cermak?
4    A.  Yes.
5    Q.  Are any inmates housed in that
6  building?
7    A.  Yes.
8    Q.  Which building is it?
9    A.  Cermak.  Cermak Hospital.  It isn't
10  really hospital.  It's the -- it's the infirmary.
11    Q.  Which patients are housed in the
12  Cermak building?
13    A.  Infirmary patients.
14    Q.  What does that mean?
15    A.  Higher level of care.
16    Q.  So which patients need to be in the
17  infirmary?
18    A.  Higher level of care for medical and
19  higher level of care for mental health.
20    Q.  Are these patients that need dialysis
21  every day?
22    A.  Dialysis every day?  I don't --
23    Q.  That's okay.
24    A.  I don't know the answer to that.
25    Q.  It's okay.  I'm not trying to trick

1  you.  I'm just trying to understand the way Cermak
2  is set up.
3        And how many patients are there
4  housed at the Cermak building?
5    A.  I don't have the count.
6    Q.  Greater than 100?
7    A.  I would say greater than a hundred.
8  But that's all that I could tell you.  I couldn't
9  go up to two or three.  Just I would say greater
10  than a hundred.
11    Q.  Are there Cermak nurses that are only
12  working in that building?
13    A.  I don't know the answer to that
14  question.  I don't do scheduling.
15    Q.  Did you have any other roles in 2012
16  besides audit med pass, audit med room operations,
17  and nursing guidelines and bed control?
18    A.  Not to my knowledge.  Not that I
19  recall.
20    Q.  Okay.  And how long were you in that
21  role as the --
22    A.  That's still my title.  But I do
23  grievances since 2015.
24    Q.  You have the same title but you've
25  just changed jobs or duties since 2015?

13 (Pages 46 - 49)

1    A.    Correct.
2    Q.    Okay.
3    A.    Correct.
4    Q.    Had has your job essentially -- strike
5  that.
6          Have you had the same duties in
7  your job since 2015 until today?
8    A.    Correct.
9    Q.    Okay.  And can you explain your
10  responsibilities since 2015 in your role?
11    A.    I answer the grievances.
12          It's vague.  I don't understand the
13  question.  It seems vague to me.
14    Q.    What do you do day to day in your role
15  working at Cermak since 2015?
16    A.    Day to day?  Okay.  So you want my
17  day-to-day?
18    Q.    Mm-hmm.
19    A.    I would take out the grievances that
20  are assigned for me to do that day or that I
21  determine need to be done that day, and then I
22  would get into their chart and review.  And if
23  there's somebody that I need to review it with or
24  talk to about an issue, I would do that.  Answer
25  the grievance.  And then --

1          This thing keeps popping up.
2          And then we would send it back to
3  DOC when they come pick them up the next day.
4    Q.    And when you said you get into the
5  chart, does that mean that you go and look at that
6  inmate's medical chart?
7    A.    Yes.
8    Q.    Okay.  Since 2015 have you looked at
9  paper medical records for inmates?
10    A.    I may have, but not that I recall.
11    Q.    What's the name of the system that
12  Cermak uses for electronic e-medical records?
13    A.    Cerner.
14    Q.    What's that?
15    A.    Cerner.
16    Q.    Cerner?
17    A.    PowerChart.
18    Q.    Has Cermak used Cerner PowerChart
19  since 2015?
20    A.    To the best of my knowledge, yes.
21    Q.    And you have access to the medical
22  chart through Cerner PowerChart on your computer?
23    A.    Yes.
24    Q.    Is there a policy that you know of
25  that states that a nurse needs to enter the

1  medication that a patient takes at that time?
2  Strike that.  That was a bad question.
3          Do the nurses through Cermak need
4  to put medication that they pass to inmates into
5  Cerner PowerChart right after it's administered?
6    A.    They put it in Pyxis.
7    Q.    How do -- do you know how that works?
8    A.    I don't pass medications, so I
9  couldn't give you the dynamics of it.
10    Q.    So it sounds like you're saying that
11  on the med cart there's a computer?
12    A.    Yes.
13    Q.    And then after a nurse gives the
14  medication to an inmate, the nurse would put in
15  the system that they gave a specific medication to
16  that inmate?
17    A.    Yes.
18    Q.    Okay.  And then if a medication --
19  strike that.
20          If there's no -- like, for example,
21  if today no one gave an inmate medication, it
22  wouldn't be in the medical chart electronically.
23  Right?
24    A.    Could you say that again?
25    Q.    Yeah.  Sure.  It's a hard question.

1          So you -- do you audit the medical
2  records at all?
3    A.    I don't do audits now.
4    Q.    Okay.  Does anyone review the
5  electronic medical records?
6    A.    I couldn't answer that question who
7  that would be.
8    Q.    Is there a person, though?
9    A.    I don't -- not to my knowledge that I
10  know of.  I'm not in that audits.
11          MR. DeVORE:  And, Kirstin, by review
12  you meant audit in that context?
13          MS. ERICKSON:  Yes.  Yep.
14  BY MS. ERICKSON:
15    Q.    So, just to clarify, no one audits the
16  electronic medical records after they're entered?
17          MR. DeVORE:  I don't think that's what
18  she said.
19          THE WITNESS:  That wouldn't be my
20  department, so I wouldn't.
21  BY MS. ERICKSON:
22    Q.    So do you know is there someone who
23  audits the electronic medical records?
24    A.    That I don't know who that would be.
25    Q.    Does someone do it that you know of?

14 (Pages 50 - 53)

Page 54

1    A.   Not that I know of.
2    Q.   Okay.  So how does -- how does Cermak
3  determine if the medical -- strike that.
4        How does Cermak determine if
5  inmates are getting the medication when they're
6  supposed to?
7    A.   That's not what -- that's not within
8  my scope of what I do, so I can't answer that.  I
9  can't speak to that question.
10   Q.   What about in your prior role from
11  2012 to 2015, how -- at that point you were the --
12   A.   We have --
13   Q.   -- how did anyone or did anyone --
14  strike that.
15       Did anyone at Cermak review the
16  medical records from 2012 to 2015?
17       MR. DeVORE:  Objection as to form as
18  to what medical records and for what
19  purpose.
20       You can answer, if you can.
21       THE WITNESS:  I don't -- I don't know
22  the answer to that question.
23  BY MS. ERICKSON:
24   Q.   Is there any oversight to your
25  knowledge about -- strike that.

Page 55

1        Is there any oversight of med pass
2  from 2015 to the present of nurses giving
3  medication to inmates?
4    A.   That would be the nursing department.
5  And I don't -- or IT.  I don't -- I don't know
6  their process right now as to how they do their
7  audits.  I don't do the audits now, so that's not
8  in my -- I don't know the answer to that question.
9    Q.   But when you were doing audits from
10  2012 to 2015, was anyone seeing -- from Cermak was
11  anyone overseeing if medications were given at the
12  right time, within the time window, within the --
13   A.   There's nurse managers.  There's IT.
14  There's computer.  The COO.  The director of
15  nursing.
16   Q.   What about them?  Was there oversight?
17   A.   I don't know who was doing it.  I
18  don't know who was doing it --
19   Q.   Do you know if it was done?
20   A.   -- and to what -- who's doing what in
21  what record in what capacity.  I don't know the
22  answer to that question.  There's so many parts of
23  a medical record, and I don't know what every-
24  body's role is into looking at those different
25  components.  I don't know the answer to that

Page 56

1  question, I really do not.
2    Q.   I understand.  I understand.
3        From 2012 to 2015, what time were
4  meds supposed to be passed in the morning?
5    A.   There's a -- there's a leeway, and I
6  don't -- I don't recall exactly what the leeway
7  is.  I believe it's two hours before and two hours
8  after.  But I don't -- I can't attest to that.
9  That is just my recollection.
10   Q.   Mm-hmm.  And, what, two hours before
11  and after what time?
12   A.   Whatever time the provider -- like if
13  it was BID.  It depends on what the provider
14  ordered.  Did they order at a time?  Then you'd
15  have two hours before or after.  There's so many
16  different times to pass meds.  9:00 a.m.,
17  9:00 p.m.  9:00, 1:00, and 5:00.  9:00, 1:00,
18  5:00, and 9:00.  Every 12 hours.  There's so many
19  different times that they can be ordered.  Because
20  everybody is not going to get their meds at
21  1:00 p.m. because it just can't happen, so there's
22  a window --
23   Q.   Mm-hmm.
24   A.   -- that is acceptable to pass the
25  medications as to -- according to when they're

Page 57

1  assigned -- or ordered I should say is a better
2  word.
3    Q.   Understood.  So it sounds like there's
4  a 9:00 a.m., 1:00 p.m., 5:00 p.m., and 9:00 p.m.
5  med pass.
6    A.   I don't know what the med passes --
7  what times med passes are right now.
8    Q.   What times -- strike that.
9    A.   Usually --
10   Q.   Hang on.  What times were the med
11  passes from 2012 to 2015?
12   A.   Oh, my goodness.  Well, there could be
13  9:00, 1:00, 5:00 and 9:00.  6:00 A, 6:00 P,
14  9:00 A, 9:00 P.  It depends on the medications.
15  And then if they had IVs --
16   Q.   Mm-hmm.
17   A.   -- I mean, it could just be all
18  different -- all different times.
19   Q.   Okay.  So if an inmate has, for
20  example, during 2012 to 2015 an a.m. and a p.m.
21  med, how is the nurse supposed to know when to
22  administer the med?
23   A.   Well, it could be depending upon what
24  the medication is, if it's something that needs to
25  be taken with meals.  Usually if there was --

1 9:00 and 9:00. Am I committed to 9:00 and 9:00?
2 No. Because there's just so many variables with
3 medications.
4     Q.   No. Understood. But if a patient
5 needed meds at specific times like 9:00 a.m.,
6 1:00 p.m., 5:00 p.m., would that be in the order
7 for the inmate?
8     A.   Not necessarily. It could be BID,
9 TID, QID.
10     Q.   Can you take us through those? What
11 does BID mean again?
12     A.   Twice a day.
13     Q.   And TID?
14     A.   Three times a day.
15     Q.   And what was the third one you said?
16     A.   QID. Four times a day.
17     Q.   Okay. So if an order says QID for a
18 certain medication, is it known throughout Cermak
19 then whatever the four times are throughout the
20 day, that the inmate will get them at those four
21 times, whether it's 9:00 a.m., 1:00 p.m.,
22 5:00 p.m., 9:00 p.m., or 8:00 a.m., noon,
23 5:00 p.m., 9:00 p.m.?
24     MR. DeVORE: Are you taking into
25 account the window she was just talking about?

1     MS. ERICKSON: No.
2 BY MS. ERICKSON:
3     Q.   I'm just saying if the order says --
4 will the order for the medication just say QID or
5 will it say the specific times the medication
6 should be passed?
7     A.   It depends on the medication. It
8 depends on what the doctor writes. It can -- it
9 depends on what the doctor writes.
10     Q.   What if the doctor doesn't --
11     A.   Or provider, I should say.
12     Q.   What if the doctor doesn't write
13 times?
14     A.   Then it could be up to -- it would be
15 9:00, 1:00, 5:00 and 9:00. It could be every six
16 hours. It would just depend.
17     Q.   But if it's not in the order --
18     A.   It could be both 9:00, 1:00, 5:00 and
19 9:00, as an example. It could be 12:00, 6:00,
20 12:00, 6:00.
21     Q.   Okay.
22     A.   There's just -- there's so many
23 variables, it's just a very hard question to
24 answer.
25     Q.   Mm-hmm. No. Thank you.

1     So as far as who decides what times
2 to give the medications, if it doesn't say in the
3 order who is that person?
4     A.   It would be the medication --
5     MR. DeVORE: Objection. Calls for
6 speculation.
7     THE WITNESS: I don't work on the
8 unit, so I don't know who that person would be.
9 BY MS. ERICKSON:
10     Q.   Okay. And I believe you said there
11 was -- there would be a 6:00 a.m. and a 6:00 p.m.
12 med pass. What -- are those --
13     A.   No. There could be a 6:00 a.m. and
14 6:00 p.m. medication order. It doesn't mean
15 that's a specific general med pass. 'Cuz there's
16 a window. There's a window, two and two before
17 and after.
18     Q.   Mm-hmm. But what do you mean that --
19 what do you mean that the med order would be
20 6:00 a.m., 6:00 p.m.?
21     A.   I said it could be. I don't under-
22 stand.
23     Q.   I don't either. Let me try again.
24     So the meds can be passed, you
25 know, four times a day at 9:00, 1:00, 5:00, 9:00

1 or a variation of those. But what did you mean
2 when you said 6:00 A, 6:00 P, 9:00 A, 9:00 P
3 earlier?
4     A.   I was giving you examples of different
5 times that medications are -- can be ordered or --
6 'cuz there's so many -- I was giving you examples
7 that there's so many variables of med times and
8 that they can fall into the range of that window,
9 two hours before and two hours after.
10     Q.   Okay. What about when patients are
11 leaving to go to court early in the morning but
12 they need to receive a morning medication?
13     A.   I'm not involved in the medication
14 pass and the court meds. I'm not involved in that
15 medication pass.
16     Q.   But do you -- in looking at the
17 grievances, is part of your responsibility to
18 determine how to resolve the issue?
19     A.   What's your question?
20     Q.   That was my question.
21     A.   How was it -- could you repeat it
22 then?
23     MS. ERICKSON: Debbie, can you repeat
24 the question, please.
25     ///

16 (Pages 58 - 61)

Page 62

1    (The following question
2    was read back:
3    "Q. In looking at the
4    grievances, is part of
5    your responsibility to
6    determine how to resolve
7    the issue?")
8  BY MS. ERICKSON:
9    Q.  You review. You review grievance
10  forms. Right?
11    MR. COYNE: I'm sorry, was there an
12  answer to that question? I don't think I heard
13  it. Did she answer, Kirstin, or no?
14    MS. ERICKSON: No.
15    MR. COYNE: Okay.
16    THE WITNESS: Okay. So you asked me
17  if I am involved in -- could you -- I'm sorry --
18  BY MS. ERICKSON:
19    Q.  Yeah. Do you --
20    A.  My thing was off. Okay. There we go.
21    Q.  Are you with us?
22    A.  I am.
23    Q.  Okay. As part of your role since
24  2015, you review the grievance forms from inmates.
25  Right?

Page 63

1    A.  Correct.
2    Q.  And is it your job to decide how to
3  resolve the issue?
4    A.  It is not my job to resolve all the
5  issues. I could go to a person that could assist
6  me. But I can't resolve all the issues.
7    Did I understand your question
8  correctly?
9    Q.  Yeah. So did you -- so do you decide
10  what next steps need to be taken after reading a
11  grievance form?
12    A.  As in resolving the issue or finding
13  -- helping to find their answer? I still don't
14  understand the question. I'm sorry. In a plan
15  of correction for the facility? Or I just don't
16  understand your question.
17    Q.  Yeah, it seems like it's a hard
18  question.
19    So have you ever reviewed a
20  grievance form where an inmate needed medication
21  to go to court but they didn't receive the
22  medication?
23    A.  I may have.
24    Q.  And what did you do in that situation?
25    A.  I would give it to -- I would have the

Page 64

1  nurse manager of that division do a review.
2    Q.  What does it mean for them to do a
3  review?
4    A.  To do like an investigation and find
5  out what happened. It's their division, and they
6  would know more as to if there needed to be a
7  corrective action for the nurse. It would be more
8  like a personnel issue.
9    Q.  And then would you write that
10  corrective action on the grievance form?
11    A.  No. It would be a personnel issue.
12  So, no, I don't. I just said it was referred to
13  the nursing manager for review, something to that.
14    Q.  And then how do you know if the nurse
15  manager does her job?
16    A.  I don't review the nurses. I don't
17  audit the nurses. I'm not in charge of the
18  nurses. That would be -- that's not my role.
19    Q.  Does anyone audit the nurses?
20    A.  That I don't -- that's not my role.
21  So I don't -- I can't answer that question. I
22  don't know.
23    Q.  How does an inmate notify -- strike
24  that.
25    What's the process for an inmate to

Page 65

1  notify Cook County or Cermak that he or she needs
2  medication early in the morning prior to going to
3  court?
4    MR. DeVORE: Detainee. Not inmate.
5  BY MS. ERICKSON:
6    Q.  Is there an answer to the question?
7    A.  Yes, I don't know the process for that
8  now. At one time there was a -- DOC gave them a
9  list. But I don't know their process really.
10    Q.  So you didn't have to oversee that at
11  all in 2012 to 2015?
12    A.  Correct.
13    Q.  And then how many hours do you work
14  per week currently?
15    A.  Forty.
16    Q.  Do you work overtime ever?
17    A.  No.
18    Q.  Do you know how much nurses get paid
19  at Cermak?
20    A.  No.
21    Q.  Did you ever get a promotion since you
22  began working at Cook County?
23    A.  Same job. Same title.
24    Q.  So is that a no?
25    A.  No.

17 (Pages 62 - 65)

1    Q.   Have you ever been disciplined since
2 you began working at Cook County?
3    A.   No.
4    Q.   Have you ever been put on
5 administrative leave?
6    A.   No.
7    Q.   In the lawsuit where you're a
8 defendant, what are the allegations -- what were
9 the allegations against you?
10    A.   This I don't recall.
11    Q.   Did it have to do with your role from
12 2012 to 2015 or 2015 to the present?
13    A.   I don't -- I don't recall.
14    Q.   Was there a judgment against you?
15    A.   No.
16    Q.   Is retention of nurses a current issue
17 for Cermak?
18       MR. DeVORE:  Objection. Foundation,
19 form, and calls for speculation.
20       THE WITNESS:  I don't know the answer
21 to that question. I'm not involved in the hiring
22 process.
23 BY MS. ERICKSON:
24    Q.   How many medical staff are there
25 usually staffed in the Cermak dispensary?

1    A.   I don't know the answer to that
2 question.
3    Q.   Are there --
4    A.   I don't have any idea. Sorry.
5    Q.   Sorry to interrupt. What did you say?
6    A.   I don't have any knowledge of that,
7 how many there are. I don't know.
8    Q.   In your current role, do you ever
9 leave your office to go through -- to go visit
10 places throughout the building?
11    A.   You mean like in the different
12 divisions? No.
13    Q.   In your current role since 2015, do
14 you communicate with anyone outside of the office
15 that you're in?
16    A.   As in staff members? Yes.
17    Q.   How do you communicate with them?
18    A.   Talk.
19    Q.   On the phone? E-mail? In person?
20    A.   Usually in person.
21    Q.   And where --
22    A.   Sometimes by --
23    Q.   Oh, sorry.
24    A.   Usually in person.
25    Q.   Where do you all communicate?

1    A.   Where do we communicate? I'll track
2 them down, go to their office. I could call them
3 on the phone. Sometimes I'll leave them a
4 message, you know, "Give me a call when you get a
5 chance. I have a question."
6    Q.   Okay. But do you visit the
7 dispensaries in other buildings --
8    A.   No.
9    Q.   -- ever?
10    A.   No.
11    Q.   Why not?
12    A.   I don't do audits. I would -- because
13 I have grievances to answer.
14    Q.   But --
15    A.   I don't understand. There would be no
16 purpose for me to go visit a dispensary.
17    Q.   How do you find the people that you
18 need to talk to who work at Cermak?
19    A.   I speak with the nursing -- nursing
20 managers. And they speak with their nurses, if
21 need be, to do a review or investigation.
22    Q.   So you don't ever speak to the nurses
23 personally about grievances?
24    A.   I may call a nurse up on the phone for
25 a brief question. But it maybe would be like a

1 supply, so-and-so has an order for something, an
2 ace wrap, could you make sure he gets that.
3 That's not -- that's not very often. Usually
4 anything that would have to do with the nurses
5 would be the nurse manager would handle it.
6    Q.   Okay. So you're not involved with
7 disciplining nurses?
8    A.   No.
9    Q.   And you don't go speak to nurses
10 directly in person. Right?
11    A.   Correct. Managers occasionally. But
12 not nurses. Not -- the manager would speak with
13 them.
14    Q.   And when you review the grievance, if
15 there seems to be an issue with a correctional
16 officer that entails some kind of medical issue,
17 what do you do?
18    A.   I don't manage DOC. So anything that
19 has to do with an officer would be something that
20 the DOC would answer separately. And I would
21 answer the medical part of that question.
22    Q.   So you don't -- you don't respond to
23 the correctional officer issue at all if it's in
24 the grievance?
25    A.   That's correct. I don't manage the

18 (Pages 66 - 69)

Page 70

1 officers, so I can't speak to anything -- their
2 job duties. That's DOC. And we're Cermak. So I
3 would speak to the medical part of it. And
4 anything that has to do with the DOC part of the
5 grievance would be answered by them.
6     Q.   Does the DOC and Cermak work together
7 in order to make sure that patients get their
8 medications on time and appropriately?
9     A.   I know there's an officer that is with
10 the nurse when she passes the meds. Does that
11 answer your question?
12     Q.   No. It was --
13     A.   There's an officer with the nurse when
14 the nurse is passing her medications.
15     Q.   No. That wasn't the answer. It's a
16 yes-or-no question.
17         MR. DeVORE:  She did. She just
18 answered it.
19         THE WITNESS:  Does it -- then I --
20 does the officer have anything to do with med
21 pass? Is that your question? I guess I don't
22 understand your question.
23 BY MS. ERICKSON:
24     Q.   Does the Department of Corrections and
25 Cermak work together to make sure that inmates

Page 71

1 have their medication on time --
2         MR. DeVORE:  Objection.
3 BY MS. ERICKSON:
4     Q.   -- on time and accurately?
5         MR. DeVORE:  Objection. Asked and
6 answered.
7         To the extent it's not answered or
8 you understand it, you can answer again.
9         THE WITNESS:  DOC doesn't have
10 anything to do with the accuracy of medications or
11 anything. That's DOC. And then Cermak is
12 medical. So DOC has nothing to do -- I can't
13 answer your question. I'm sorry.
14 BY MS. ERICKSON:
15     Q.   The DOC has nothing to do with
16 medication?
17     A.   No. They can't -- how do they know if
18 it's accurate? They don't -- they're not --
19 they're not in medicine. They're in the
20 Department of Corrections.
21     Q.   But what happens when an inmate has an
22 as-needed medication and they need that medication
23 and there's no nurse present? Then what -- then
24 what is the inmate supposed to do?
25     A.   That would be DOC that could answer

Page 72

1 that question for you 'cuz they would be the ones
2 that would contact medical. I mean, the -- if
3 there's no medical there, then it's DOC because
4 DOC is over custody.
5     Q.   But so then at that point Cermak
6 doesn't care if the patient gets the medication or
7 not?
8         MR. DeVORE:  Objection. Mischarac-
9 terizes testimony. Foundation.
10         THE WITNESS:  They care; they're just
11 not there. They care, but they're not there. So
12 DOC has to assure either movement to move the
13 patient to wherever they need to go or to contact
14 nursing. That would be DOC's policies as to how
15 they would handle that situation.
16 BY MS. ERICKSON:
17     Q.   So who from DOC would talk to Cermak
18 to make sure that inmates are getting their
19 medications when they need them?
20         MR. DeVORE:  Objection. Seeks
21 information --
22         THE WITNESS:  That --
23         MR. DeVORE:  It calls for speculation.
24 BY MS. ERICKSON:
25     Q.   You were answering the question. Go

Page 73

1 ahead. What did you say?
2     A.   I don't know. That would be DOC that
3 would answer that. DOC would know.
4     Q.   What do you mean no one from Cermak
5 would know what happens when an inmate needs
6 medication and it's not around?
7     A.   You asked me who in DOC, and I don't
8 know.
9     Q.   So who from Cermak -- I mean, strike
10 that.
11         Would someone from Cermak talk to
12 someone from DOC to figure out how to resolve an
13 issue like this?
14     A.   If DOC notified them.
15     Q.   Would a correctional officer be in
16 charge of contacting someone from Cermak?
17     A.   I don't know what DOC person would be
18 in charge of it.
19     Q.   So basically no one is in charge, and
20 an inmate could be at various places in the
21 building and not get medication --
22     A.   That's not what I said.
23     Q.   And who's responsible?
24     A.   I said that I don't know. I didn't
25 say no one. I said I don't know 'cuz it's DOC.

19 (Pages 70 - 73)

Page 74

1    Q.   Have you ever reviewed -- have you
2  ever reviewed a grievance where an inmate was in
3  receiving and they were requesting as-needed
4  medication and no one gave them the medication?
5         MR. DeVORE:  Objection.  Incomplete
6  hypothetical.  Calls for speculation.
7         You can answer, if you can.
8         THE WITNESS:  In receiving?  No, not
9  to my -- not that I recall.
10 BY MS. ERICKSON:
11   Q.   Have you ever been to receiving?
12   A.   Yes.  It's been a while, but yes.
13   Q.   Can you describe the process of an
14 inmate coming through receiving?
15         MR. DeVORE:  Objection.  Unclear as to
16 what time period.  Form of the question.
17         You can answer, if you can.
18         THE WITNESS:  Okay.  So the process as
19 in, like, for intake receiving them from -- they
20 would do a -- the nurse would do a medical
21 screening, dental, medical, mental health
22 screening, refer them to -- if they needed to see
23 medical.  If they needed to see dental, they would
24 do a dental, the nursing would do a dental visual.
25 And then mental health, if they needed to see

Page 75

1  mental health, they would refer them to -- they're
2  right there at intake.
3  BY MS. ERICKSON:
4    Q.   Is there a doctor or PA right there at
5  intake when an inmate needs to see medical?
6    A.   It depends on the time.  If it's after
7  a certain time, and I don't know what time that
8  is -- they usually come in the afternoons -- if
9  they need to see medical and the provider at
10 intake is -- then they would refer them to urgent
11 care.
12   Q.   So if after a certain hour -- do you
13 know what hour that is when --
14   A.   No.
15   Q.   -- there's no physicians or PAs at the
16 intake?
17   A.   No.  No, I don't.
18   Q.   Okay.  But then after that time, that
19 cutoff time, the inmate would be sent to urgent
20 care to see a doctor or PA?
21   A.   Correct.
22   Q.   Was that always the way it works to
23 your knowledge?
24   A.   That's the way that it's supposed to
25 work pretty much, yeah.

Page 76

1    Q.   Okay.  And is it policy that every
2  time an inmate goes through intake that if they
3  need medications they will see a doctor or a PA to
4  get those orders?
5    A.   It depends.  They would get -- they
6  would go to urgent care intake.  From intake, if
7  they need to see a provider they would go to
8  urgent care.
9    Q.   But the question was about orders.  So
10 is it every time that a -- if an inmate comes
11 through intake and they need medications and the
12 nurse determines, oh, they need this specific
13 medication, will they always go see a PA or a
14 physician?
15   A.   If they -- do a screening.  And
16 if they need to see the provider, they would refer
17 them to urgent care.  And that's how they do it.
18 And then the provider would order what they needed
19 to order.
20   Q.   Okay.  So they would always -- every
21 time the inmate comes through intake, they would
22 see a provider if they need medication, and that
23 provider would enter an order for the medications.
24 Right?
25   A.   It depends on why they have left.  And

Page 77

1  I don't -- it would depend on why they would have
2  leave.  If they've left for a doctor's appointment
3  and they're coming back, they're not going to
4  see -- they're not going to see a provider,
5  they're going to go to their division.
6    Q.   Okay.
7    A.   Does that make sense?
8    Q.   Yeah.  It makes sense, yeah.
9         Is there a certain time frame after
10 which the inmate needs to see medical again for an
11 order?
12   A.   For what?
13   Q.   Like if -- like if an inmate leaves
14 for five days to go to another facility and they
15 come back, do they need to go through a medical
16 intake again?
17   A.   I don't know the answer to that
18 question.  I would have to -- I'd have to
19 reference the policy.  I don't know the answer to
20 that question.
21   Q.   Okay.  If an inmate leaves to go to
22 court and come back, do they have to go through
23 the medical intake process again?
24   A.   Not to my knowledge.
25   Q.   Okay.  So I believe what you described

20 (Pages 74 - 77)

Page 78

1  just a minute or two minutes ago was the process
2  when an inmate is coming from outside the facility
3  and they have to go through the medical intake
4  process. Right?
5      A.  If they've come from the jail, they've
6  been arrested, they're coming from the outside --
7      Q.  Mm-hmm.
8      A.  -- they're doing a full intake, then
9  they would -- and it was determined that they need
10 to see the provider, they would see the provider.
11 If the provider wasn't at intake, then they would
12 refer them to urgent care and a provider would see
13 them in urgent care.
14     Q.  And where is -- where does medical
15 intake take place?
16     A.  Downstairs in the intake receiving.
17     Q.  At which building are we in?
18     A.  You know, it's moved.  It's in -- I
19 believe it's in RDC.
20     Q.  What's that?
21     A.  RDC.
22     Q.  RDC?
23     A.  Not RDC.  RTU.  I'm getting --
24     Q.  Oh.
25     A.  RTU.  Sorry.  It's RTU.  The lower

Page 79

1  level of RTU.
2      Q.  So is that the Division 8 building?
3      A.  Yes.
4      Q.  Okay.
5      A.  RTU.  But Cermak is also 8 also.
6      Q.  So medical intake takes place in
7  Division 8 in the --
8      A.  RTU.
9      Q.  -- RTU?  Okay.  And that's the only --
10     A.  And then also urgent care.  You know,
11 if it's after time, then they would refer them to
12 urgent care.
13     Q.  Is that -- that's not in that same
14 building.  Right?
15     A.  No.  No.
16     Q.  How far away is it from the regular
17 medical intake location and RTU?
18     A.  Not too far.
19     Q.  Okay.  A building away?
20     A.  I don't know how many steps.  And then
21 you're talking, you know, if it's nighttime or the
22 weather is bad, the tunnels.  And I get lost in
23 the tunnels, so I can't answer that question.
24     Q.  Is the urgent care at -- it's at the
25 Cermak Hospital?

Page 80

1      A.  Cermak here, yes.
2      Q.  Is that --
3      A.  Cermak here.
4      Q.  What does that mean, Cermak here?
5      A.  This building here, Cermak, at the
6  jail.  Cermak.
7      Q.  Okay.
8      A.  It's not Stroger.  It's Cermak.
9      Q.  Yeah, I understand.
10     A.  Okay.
11     Q.  So the urgent care at Cermak, is that
12 about a mile away from the RTU?
13     A.  A mile?  I don't think it's a mile.
14     Q.  Is it about a ten-minute walk?
15     A.  I don't know.  I've never timed it.
16 I haven't been down there for so long that I
17 couldn't tell you.  But it's not a mile.
18     Q.  Okay.  So after an inmate goes through
19 the medical intake process, do they have to go
20 through the receiving line or go to like a
21 bullpen-type area?
22     A.  Oh.  That's DOC.  That's holding and
23 movement.  Yeah, Cermak -- that's DOC.  That's
24 DOC's policies.  And, yeah, that's not Cermak.
25 That's not Cermak's --

Page 81

1      Q.  I'm just trying to understand the
2  process.  I'm not calling -- I'm not saying anyone
3  is responsible.  I'm just saying so after the
4  patient -- the inmate goes through the medical
5  intake, do they have to -- it sounds like they
6  have to go to a holding area?
7      A.  I don't know the answer to that
8  question if they have to go there or they can take
9  them right to the division or what DOC does with
10 them, what they decide what they need to do with
11 them.  I imagine there's different things that
12 depend on why they're putting them where or taking
13 them where, and I don't know those examples or
14 reasons.
15     Q.  In your ten years of working there,
16 you've never known what happens to inmates after
17 they go through medical intake?
18     A.  Not every time.  Everything is
19 different.  You said do they always go to the pen.
20 I don't know the answer.  I can't say that they
21 always go to the pen.  They could take them
22 directly to the division, sometimes put them in
23 the -- like a bullpen.
24     Q.  So what's the -- okay.  So let's not
25 say always.  Where do inmates generally go after

21 (Pages 78 - 81)

Page 82

1 they go through the medical intake process?
2    MR. DeVORE: Objection. Calls for
3 speculation. Asked and answered.
4    THE WITNESS: Sometimes they take them
5 directly to the division. It depends on where
6 they're at and what detainee, what number of
7 detainees, how many they've seen, is this the last
8 one, we'll take the group right now, or do they
9 need to sit in the bullpen until we bring others.
10 Does one of them need to go to urgent care? You
11 know, it depends on their -- what they need and
12 DOC's determination of how to manage the movement.
13 BY MS. ERICKSON:
14    Q. Does DOC decide if someone needs to go
15 to urgent care?
16    A. The nurses -- that would be medical's
17 decision that they need to go to urgent care, like
18 they need to see the provider for intake. And
19 then DOC would -- they manage the movement.
20    Q. When do inmates need to go to the
21 bullpen after their medical intake?
22    A. When do they?
23    Q. Mm-hmm. In what situation?
24    A. Nothing -- nothing that has to do with
25 a medical reason. There's no medical reason why

Page 83

1 we would -- we would order them to go to a
2 bullpen. That's -- that's strictly movement.
3 That's DOC. That's how they manage it.
4    Q. I understand. But my --
5    A. I'm supposing.
6    Q. What's the point of going to a bullpen
7 for an inmate?
8    MR. DeVORE: Objection. Asked and
9 answered. Calls for speculation. She's already
10 testified she has nothing to do with that.
11 BY MS. ERICKSON:
12    Q. You can answer.
13    A. Oh. What would be a reason?
14    Q. Yeah. Why do they go there?
15    A. That's how DOC manages.
16    Q. Manages what?
17    A. A group of people. I'm -- you're
18 asking me to suppose. I don't -- that's DOC's
19 movement. That's how they manage movement.
20 That's not anything that has to --
21    Q. They send to bullpen? That's how they
22 manage movement?
23    A. I don't manage --
24    MR. DeVORE: Object. It mischarac-
25 terizes the testimony.

Page 84

1 BY MS. ERICKSON:
2    Q. What did you say?
3    A. I don't manage movement. Cermak
4 doesn't manage movement. That's DOC that manages,
5 so they could better answer your question than I
6 could.
7    Q. What do you mean by manage movement?
8    A. Manage. They're in control of where
9 the detainee goes.
10    Q. But you -- but it sounds like Cermak
11 does manage the movement when there's a medical
12 issue involved. Right?
13    A. No.
14    MR. DeVORE: Objection.
15 BY MS. ERICKSON:
16    Q. No?
17    MR. DeVORE: Asked and answered.
18    THE WITNESS: No. They don't manage
19 movement. They say where they need to go. But
20 they don't move them. They don't take them there.
21 It's DOC that takes them. So that's movement.
22 BY MS. ERICKSON:
23    Q. So when you say manage -- sorry. Go
24 ahead. So when you're saying manage movement,
25 you're saying the person that's actually moving

Page 85

1 them, that's the manage movement?
2    A. Yeah.
3    Q. Okay. But someone --
4    A. They would be -- they would be in
5 charge of the detainee. We're not in charge of
6 the custody of the detainee.
7    Q. But someone from Cermak could decide
8 how DOC needs to manage the movement of that
9 inmate. Right?
10    A. They would decide where the --
11    MR. DeVORE: Objection. Mischarac-
12 terizes testimony.
13 BY MS. ERICKSON:
14    Q. I can't hear --
15    A. -- where the detainee needs to go.
16 And then from there it goes to DOC. Then they
17 manage the rest of it.
18    Q. I couldn't hear the beginning of it.
19    A. We don't --
20    Q. Sorry, can you just start over?
21    A. Okay. So we would say that they need
22 to go to urgent care.
23    Q. Mm-hmm.
24    A. Maybe even write the order they go to
25 urgent care. But then after that, that's up to

22 (Pages 82 - 85)

Page 86

1 the DOC to take them to urgent care and manage
2 their custody to take them to urgent care.
3      Q.   Okay.
4      A.   So they manage it.  They manage the
5 movement of it.
6      Q.   It sounds like if the inmate is in a
7 place where they're being managed by DOC and they
8 have a medical issue it's on DOC to do something
9 to get the detainee the medical care they need?
10          MR. DeVORE:  Objection.
11          THE WITNESS:  That's correct.
12          MR. DeVORE:  Objection.  That
13 mischaracterizes her testimony.
14 BY MS. ERICKSON:
15      Q.   What was the answer?
16      A.   You asked -- could you repeat your
17 question?
18          MS. ERICKSON:  Sure.  Let's have it
19 read back because -- Debbie, could you read back
20 the question, please.
21              (The following question
22              was read back:
23              "Q.  It sounds like if the
24              inmate is in a place where
25              they're being managed by

Page 87

1              DOC and they have a
2              medical issue it's on DOC
3              to do something to get the
4              detainee the medical care
5              they need?")
6          THE WITNESS:  DOC would manage the
7 movement.
8          MS. ERICKSON:  That wasn't the
9 question.
10          Debbie, can you read the question
11 again.
12              (The following question
13              was read back:
14              "Q.  It sounds like if the
15              inmate is in a place where
16              they're being managed by
17              DOC and they have a
18              medical issue it's on DOC
19              to do something to get the
20              detainee the medical care
21              they need?")
22          THE WITNESS:  Hmm.
23          MR. DeVORE:  And my objection was --
24 my objection was misrepresents her direct
25 testimony and asked and answered.  Go ahead.

Page 88

1 BY MS. ERICKSON:
2      Q.   It's just a yes-or-no question.
3 That's it.
4      A.   It's hard to answer yes or no.
5      Q.   Why?
6      A.   Are they totally in charge of -- is
7 there -- because it depends on different variables
8 as to is it just DOC there, is there any medical
9 there, is there a telephone they can call someone.
10 I don't know.
11      Q.   So then, you tell me, is there someone
12 from medical from Cermak at the bullpen?
13      A.   Someone at the -- DOC manages the
14 bullpen.
15      Q.   Okay.  So is there someone stationed
16 at the bullpen from Cermak?
17      A.   Not to my knowledge.
18      Q.   All right.  So that's -- so then when
19 an inmate goes to receiving or the bullpen,
20 they're under the care and management of the
21 Department of Corrections.  Right?
22      A.   Yes.
23      Q.   And Cermak is not involved in what
24 happens to the inmates while they're in receiving.
25 Right?

Page 89

1      A.   I wouldn't say that they're not
2 involved in anything in receiving.
3      Q.   So they are -- I'm confused.  Are
4 people from Cermak at receiving to help inmates,
5 yes or no?
6          MR. DeVORE:  Objection.  Form.
7 Unclear as to what time frame we're talking about.
8          THE WITNESS:  Receiving as in the
9 bullpen or in intake receiving?
10 BY MS. ERICKSON:
11      Q.   What do you call receiving?  Do you
12 call it -- is medical intake called receiving?
13      A.   I call it receiving or intake.
14      Q.   Okay.  So then we'll just use bullpen.
15 Are Cermak staffed at the bullpen?
16      A.   Not to my knowledge.
17      Q.   Okay.  So then when an inmate leaves
18 medical intake and goes to the bullpen, when they
19 do, is someone from Cermak supposed to be there to
20 provide medical care?
21      A.   Not to my knowledge.
22      Q.   Okay.  So then if an inmate is in the
23 bullpen and they need medical care, are they
24 allowed to get medical care while they're in
25 there?

23 (Pages 86 - 89)

Page 90

1    A.   Yes.
2    Q.   How? How do they get medical care?
3    A.   DOC would let medical -- make medical
4  aware.
5    Q.   How do they do that?
6    A.   They could call. They could call
7  medical.
8    Q.   Okay. So if a person is in medical --
9    A.   Could take them to urgent --
10   Q.   Sorry to interrupt you. Go ahead.
11   A.   They could call medical.
12   Q.   So if a person is in the bullpen, are
13  they in -- are they behind a glass where they're
14  not really right next to a correctional officer?
15       MR. DeVORE: Objection. Form. And
16  when you're talking about a person, are you
17  talking about a detainee or are you talking about
18  somebody who works there?
19  BY MS. ERICKSON:
20   Q.   I don't know. Are correctional
21  officers held in the bullpen? Are there --
22  correctional officers are held in the bullpen?
23       MR. DeVORE: Try to get a good
24  question. Objection. Form. I'm unclear --
25       THE WITNESS: I'm not aware of any of

Page 91

1  that. I'm not aware of any glass in the bullpen.
2        MR. DeVORE: Susan, since you just
3  answered that question, do you need to take a
4  break? It's about 11:10.
5        THE WITNESS: Yeah. Please. Thank
6  you.
7        MS. ERICKSON: Okay. We'll go back to
8  that. Thanks. Do you want to take ten minutes?
9        MR. DeVORE: Ten minutes? Okay.
10            (A break was taken from
11              11:11 a.m. until
12              11:25 a.m.)
13       MS. ERICKSON: We'll go back on then.
14  BY MS. ERICKSON:
15   Q.   So before the break we were talking
16  about the bullpen, and I'm going to ask you a few
17  more questions about that.
18            How is an inmate supposed to
19  receive medical care when they're in the bullpen?
20   A.   I believe they would go to -- they
21  would take them to urgent care.
22   Q.   Who's they?
23   A.   DOC.
24   Q.   Okay. So it's the responsibility of
25  DOC to handle medical issues when an inmate is in

Page 92

1  the bullpen?
2        MR. DeVORE: Objection. Mischarac-
3  terizes testimony. Asked and answered. Form.
4        You can answer, if you can.
5        THE WITNESS: Is it the DO -- it would
6  be an emergency -- it depends on what it's for.
7  BY MS. ERICKSON:
8    Q.   What do you mean?
9        MR. DeVORE: Objection. Asked and
10  answered plenty of times.
11  BY MS. ERICKSON:
12   Q.   Go ahead.
13   A.   If the detainee needs emergency care,
14  they would call, and they would -- medical would
15  come to the bullpen. Otherwise, they would take
16  them to urgent care.
17   Q.   Who's they?
18   A.   DOC.
19   Q.   Okay. So if there's --
20   A.   DOC would take them to urgent care.
21   Q.   So how does the DOC -- how do the
22  correctional officers in the bullpen know that
23  it's an emergency?
24        MR. DeVORE: Objection. Calls for
25  speculation. She testified that she's not in that

Page 93

1  area.
2        THE WITNESS: That would be up to the
3  DOC.
4  BY MS. ERICKSON:
5    Q.   So the correctional officer would make
6  the determination that it was an emergency and
7  that the patient needed to be taken to urgent
8  care?
9        MR. DeVORE: Objection. Calls for
10  speculation. Mischaracterizes testimony.
11        THE WITNESS: Just one moment.
12            (There was an interruption
13              at the door.)
14        THE WITNESS: I apologize.
15  BY MS. ERICKSON:
16   Q.   Do you need a break?
17   A.   No. No. I'm all right.
18   Q.   Okay.
19   A.   Could you rephrase the question?
20   Q.   Because you didn't understand it?
21   A.   Yes. It's too broad. Always or all.
22  Nothing is always.
23   Q.   Oh.
24   A.   Do they always?
25   Q.   I don't think I said always. But I'll

24 (Pages 90 - 93)

Page 94

1  rephrase it.
2     A.   Okay.
3     Q.   When inmates are in the bullpen and
4  they require medical care, you just testified that
5  if it's an emergency they, being the correctional
6  officers, would take the inmate to get medical
7  care at urgent care.  Is that right?
8     A.   No.
9     Q.   No, that's not right?
10    A.   No.
11    Q.   Okay.
12    A.   They would call --
13            (Simultaneous speaking.)
14  BY MS. ERICKSON:
15    Q.   Hang on.  Hang on.  Hang on.  Please
16  let me ask a question.
17          So when an inmate is in the bullpen
18  and needs medical care, when do they go to urgent
19  care?
20        MR. DeVORE:  Objection.  Calls for
21  speculation.
22        MS. ERICKSON:  She just testified.
23  BY MS. ERICKSON:
24    Q.   I just want to know according to your
25  knowledge.

Page 95

1     A.   If they needed medical care, the DOC
2  could take them to urgent care.
3     Q.   Okay.  They could.  But to your
4  knowledge do they?  Do the correctional officers
5  take inmates to medical care in urgent care?
6     A.   To my knowledge, they take them when
7  they need medical care.
8     Q.   So yes?  To your knowledge, yes?
9     A.   To my knowledge.
10    Q.   Yes?
11    A.   To my knowledge.
12    Q.   Is it yes or no?  Yes?
13        MR. DeVORE:  Objection.  Asked and
14  answered.
15        MS. ERICKSON:  She didn't say yes or
16  no.
17  BY MS. ERICKSON:
18    Q.   Just yes or no.
19        MR. DeVORE:  Well, objection.  Form.
20        MS. ERICKSON:  What's the objection?
21        MR. DeVORE:  Form.
22  BY MS. ERICKSON:
23    Q.   Yes, the correctional officers take
24  the inmates to urgent care when they need medical
25  help?

Page 96

1        MR. DeVORE:  Objection.  Form.
2        THE WITNESS:  To the best of my
3  knowledge, that is what they do.
4  BY MS. ERICKSON:
5     Q.   And you testified that correctional
6  officers take inmates to urgent care when it's an
7  emergency only?
8        MR. DeVORE:  Objection.  Calls for
9  speculation.
10        THE WITNESS:  No, I did not say that.
11  BY MS. ERICKSON:
12    Q.   No, you didn't.  Okay.  So then
13  correct me.  When do correctional officers take
14  inmates from the bullpen to urgent care?
15    A.   If they need medical care, the DOC can
16  take them to urgent care.  I cannot -- do they
17  always?  That I don't know.  I don't work for the
18  DOC.  They are to take them to urgent care if they
19  require medical care.  If it's an emergency, then
20  they would call urgent care or EMTs to come there.
21    Q.   So is that the policy of Cook County
22  Department of Corrections --
23    A.   I don't know --
24    Q.   -- if an inmate -- please let me
25  finish my question.  Please.

Page 97

1          Is it the policy of Cook County
2  Department of Corrections and Cermak that when an
3  inmate needs medical care and they're in the
4  bullpen that a correctional officer should take
5  them to urgent care?
6        MR. DeVORE:  Object.  Objection.
7  Calls for speculation.  She testified she doesn't
8  work for DOC.  She doesn't know about their
9  policies.
10        MS. ERICKSON:  No speaking objection.
11  Just what's the objection?  Form?
12        MR. DeVORE:  I already said it.
13        THE WITNESS:  I don't have access --
14  I don't work for the DOC.  That would be a DOC
15  policy and a DOC movement.  That would be in the
16  DOC's policies.
17    Q.   Okay.  So it's in the DOC policies
18  you're thinking?
19        MR. DeVORE:  Objection.  Mischarac-
20  terizes testimony.
21  BY MS. ERICKSON:
22    Q.   You just said it was in the policies,
23  the DOC policies.  Right?
24    A.   It should be in DOC's policies, not

25 (Pages 94 - 97)

1  our policies.
2      Q.  That's what I said.  Right?  Okay.
3          MR. DeVORE:  She said it should be.
4  And she also said --
5  BY MS. ERICKSON:
6      Q.  That's what you said is --
7          MR. DeVORE:  -- she didn't know.  She
8  also said she didn't know.
9          MS. ERICKSON:  All right.  Let's just
10 let her testify.  Okay?  Thanks, Jason.
11         MR. DeVORE:  Ask better questions.
12 BY MS. ERICKSON:
13     Q.  All right.  So, to your knowledge,
14 when it's an emergent situation, inmates go to
15 urgent care from the bullpen.  Right?
16     A.  To my knowledge what?
17     Q.  When it's an emergency, inmates go
18 from the bullpen to urgent care, taken by
19 correctional officers?
20     A.  No.
21     Q.  No?  In what situations should a
22 correctional officer take the inmate to urgent
23 care?
24     A.  If they need medical care.
25     Q.  So any kind of medical care?

1      A.  No.  Not an emergency.  EMTs are going
2  to come to the bullpen.  DOC is not going to
3  transfer someone that's requiring emergency care.
4      Q.  Okay.
5      A.  So --
6      Q.  Sorry to interrupt.  Go ahead.
7      A.  That's it.
8      Q.  So if an inmate is in the bullpen and
9  needs emergent care, then you're saying somebody
10 from the DOC would call to get the EMT to come and
11 care for the inmate.  Is that right?
12     A.  Or the nurse.  Whoever.  Someone from
13 medical, yes.
14     Q.  Okay.  And what types of situations
15 are considered emergencies where an EMT would come
16 to the bullpen?
17         MR. DeVORE:  Objection.  Incomplete
18 hypothetical.  Calls for speculation.  And are you
19 asking -- and form.
20         You can answer, if you understand
21 the question.
22         THE WITNESS:  In what type of an
23 emergency would they -- could you rephrase?  Could
24 you re-ask the question?
25         MS. ERICKSON:  Debbie, would you mind

1  repeating the question, please.
2              (The following question
3              was read back:
4              "Q.  And what types of
5              situations are considered
6              emergencies where an EMT
7              would come to the
8              bullpen?")
9          THE WITNESS:  Okay.  So you want --
10         MR. DeVORE:  Same objections.
11         THE WITNESS:  I have to think on it.
12         What would be an example?  It could
13 be, say, someone got stung by a bee and they have
14 an allergic reaction, anaphylactic reaction.  They
15 would call medical to come to the bullpen.
16 BY MS. ERICKSON:
17     Q.  And who would -- how would the
18 correctional officer know that it's an emergency?
19         MR. DeVORE:  Objection.  Calls for
20 speculation.  Form.
21         THE WITNESS:  That would be up to the
22 DOC.
23 BY MS. ERICKSON:
24     Q.  Okay.  So the correctional officer
25 would decide whether an EMT or a nurse should be

1  called to come?
2          MR. DeVORE:  Objection.  Mischarac-
3  terizes --
4          THE WITNESS:  They would call medical.
5          MR. DeVORE:  -- testimony.
6  BY MS. ERICKSON:
7      Q.  What did you -- Susan, what did you
8  say?
9          MR. DeVORE:  Objection --
10         THE WITNESS:  They would call --
11         MR. DeVORE:  -- mischaracterizes
12 testimony.
13         THE WITNESS:  -- medical.
14         MR. DeVORE:  Objection.  Mischarac-
15 terizes her testimony.
16         MS. ERICKSON:  Okay.  You said that
17 three times.  Thank you.  Got it.
18         MR. DeVORE:  Okay.  I just want to
19 make sure it was clear for the record.
20         MS. ERICKSON:  Got it.
21 BY MS. ERICKSON:
22     Q.  Susan, do you need the question read
23 back?
24     A.  Yes, please.
25         MS. ERICKSON:  Okay.  Debbie, would

Page 102

1 you mind reading it back, please.
2         (The following question
3         was read back:
4         "Q. So the correctional
5         officer would decide
6         whether an EMT or a nurse
7         should be called to
8         come?")
9     THE WITNESS: The DOC would call
10 medical.
11 BY MS. ERICKSON:
12    Q. When you say DOC, you're talking about
13 the correctional officers. Right?
14    A. Yes. Would call medical and report
15 the --
16    Q. Correct.
17    A. -- concern.
18    Q. So in a situation when an inmate has
19 an anaphylactic reaction to a bee sting, the
20 correctional officer would call medical to call
21 and help the inmate. And what other -- and what
22 other medical situations would a correctional
23 officer call for an EMT or a nurse to come to the
24 bullpen?
25    MR. DeVORE: Objection. Calls for

Page 103

1 speculation. Incomplete hypothetical. Form.
2    You can go ahead and answer it, if
3 you know what she means.
4    THE WITNESS: So --
5    MR. DeVORE: And also calls for a
6 narrative.
7 BY MS. ERICKSON:
8    Q. It's a simple question. You can
9 answer it.
10    A. What other type of a situation? An
11 emergency situation or one that the DOC deems that
12 they felt that it was an emergency. They could
13 call the medical for any reason, any question or
14 concern.
15    Q. Okay. So did you understand the
16 question that I asked?
17    A. Perhaps maybe I didn't. I thought I
18 answered it, the different reasons why they would
19 call.
20    Q. Did you talk to Mr. DeVore during the
21 break?
22    A. Who's Mr. DeVore?
23    Q. Jason. Did you talk to Jason during
24 the break?
25    A. Briefly.

Page 104

1    Q. Okay. So besides an anaphylactic
2 reaction to a bee sting, in what other situations
3 are you familiar in which a correctional officer
4 calls for an EMT or nurse to come to the bullpen
5 to help an inmate with a medical situation?
6    MR. DeVORE: Objection. Form. Calls
7 for a hypothetical. Calls for a narrative.
8 Outside of -- disproportionate to the needs of
9 this case.
10    Go ahead.
11    THE WITNESS: Perhaps a bad
12 laceration.
13    I have somebody at my door. Can I
14 shoo them away?
15 BY MS. ERICKSON:
16    Q. Sure.
17    A. Okay.
18    Q. Is it medical staff that visits you or
19 is that correctional officers?
20    A. When?
21    Q. Just now, the two interruptions you
22 had. Who was knocking on your door?
23    A. That was Department of Corrections.
24    Q. What are they coming to see you for?
25    A. I didn't ask him.

Page 105

1    Q. Okay.
2    A. I kindly just shooed them away.
3    Q. Okay. So if an inmate is -- I mean,
4 what other situations you're familiar with
5 that medical would come to the bullpen to tend to
6 the patient?
7    A. I don't work in that area. It would
8 be just anything that the DOC would feel maybe
9 uncomfortable, they need to talk to medical. They
10 could call them for any particular reason.
11 Vomiting. You know, just I could go on with any
12 medical condition the DOC can call and ask them,
13 and then they could say, well, bring him over or
14 they're on their way to the bullpen.
15    Q. But that's the custom and practice of
16 how it usually goes nowadays in --
17    A. I don't work down there, so I don't
18 know. But that's what you asked would be
19 situations that they could do that.
20    Q. So what time frame are you talking
21 about that you're familiar with this?
22    A. They can ask any time, they can call
23 medical with a question.
24    Q. Has this been the custom and practice
25 at Cook County Department of Corrections since

27 (Pages 102 - 105)

Page 106

1 2015?
2      MR. DeVORE: Objection. Calls for
3 speculation. Outside the scope of her knowledge.
4      If you can answer, answer.
5      THE WITNESS: I don't know how -- what
6 their -- what the DOC's policy is and who does the
7 calling. I don't work down there. I don't know
8 the answer.
9 BY MS. ERICKSON:
10   Q.  Well, then how do you know that when
11 there's a bee sting or a bad laceration or when
12 the DOC feels uncomfortable they can call medical
13 and medical will either come or they can bring the
14 inmate to medical? How do you know that?
15      MR. DeVORE: Objection. Asked and
16 answered.
17      THE WITNESS: Because they can -- they
18 can always call medical. I guess I don't under-
19 stand. How do I -- there's no policy that I'm
20 aware of because I don't work down there.
21 BY MS. ERICKSON:
22   Q.  No. I just want to know --
23   A.  I don't work for the DOC.
24   Q.  I know. But you're involved with
25 medical. So I'm just trying to figure out how do

Page 107

1 you know this knowledge? Right? Is it something
2 -- has this been a custom and practice since
3 2015 that you're aware of where if someone is in
4 the bullpen and they have a medical need, a
5 correctional officer calls medical and medical
6 either sends someone down there or the
7 correctional officer takes the inmate to medical?
8      MR. DeVORE: Objection. Form. Asked
9 and answered. Calls for speculation. All in
10 part.
11      Go ahead.
12      THE WITNESS: As far as I am aware.
13 To the best of my knowledge, yes.
14 BY MS. ERICKSON:
15   Q.  Okay. So that's been the custom and
16 practice. Okay.
17      MR. DeVORE: Objection. Asked and
18 answered. Mischaracterizes testimony. She said
19 she doesn't work there. She says she doesn't know
20 what the custom and practice is of the DOC. Form.
21 BY MS. ERICKSON:
22   Q.  You just said yes. So that was yes to
23 my yes?
24   A.  To the best of my knowledge, yeah.
25   Q.  Okay.

Page 108

1   A.  I don't work for the DOC.
2   Q.  No. I know. You've said that.
3   A.  So I don't know what the policies are.
4   Q.  Mm-hmm. And then have you ever been
5 familiar with the situation where an inmate has
6 chest pain and they're in the bullpen and they
7 need as-needed nitroglycerin?
8   A.  Have I been involved in that
9 situation? No.
10   Q.  You haven't? You haven't reviewed any
11 grievances to that effect?
12   A.  Oh, you asked me if I was involved in
13 that situation. I don't know the location. I
14 don't recall the location. But there's been
15 grievances of nitroglycerin.
16   Q.  So if an inmate has chest pains and
17 they're in the bullpen and they're complaining,
18 "I have chest pains. I had a heart attack before.
19 These are prescribed medications," what should a
20 Cook County correctional officer do?
21      MR. DeVORE: Objection. Calls for --
22 incomplete hypothetical and form of question.
23 Unclear what you're asking. And it's also clearly
24 an incomplete hypothetical.
25      MS. ERICKSON: You said that already.

Page 109

1 Thanks. Got it.
2      MR. DeVORE: Yeah.
3      THE WITNESS: So what should the DOC
4 officer do? Call -- call his supervisor. Or I
5 don't know what their policy is, what the DOC
6 officer is supposed to do.
7 BY MS. ERICKSON:
8   Q.  Should they do something, though, if
9 an inmate is complaining of chest pains and
10 they've had a heart attack before?
11   A.  I don't know. How would the -- yeah.
12 I don't know how the DOC officer would know that
13 they had a heart attack before. But if he's
14 having chest pain, I would call -- I as a person
15 would call. But I don't know what DOC's policy
16 is. But they would call medical and get advice.
17   Q.  I mean --
18   A.  They can call a nurse. They could
19 call urgent care. They would call medical to
20 get -- to be advised or their supervisor to get
21 advised.
22   Q.  So they would call medical or they
23 should call medical? Which --
24      MR. DeVORE: Objection. Mischarac-
25 terizes her testimony.

28 (Pages 106 - 109)

1      THE WITNESS: Or their supervisor or
2  whatever their policy tells them to do.
3  BY MS. ERICKSON:
4      Q.   So they should call medical or they
5  would call medical?
6      A.   Whatever their policy tells them to
7  do.
8      Q.   Well, from what you just said, there
9  is no policy.  And you testified that -- and/or
10  you don't know the policy.  But you testified --
11      A.   Right.  I don't know the policy.  I
12  didn't say there wasn't one.  Because I don't work
13  for DOC, so I don't know what their policy would
14  be if --
15      Q.   Okay.  But, based on your knowledge,
16  what you know is that correctional officers
17  can/would generally call medical when there's a
18  medical situation in the bullpen.  So why does a
19  chest pain not qualify as a medical concern that
20  necessitates a call to medical?
21      MR. DeVORE: Objection. Mischarac-
22  terizes her testimony again.
23      THE WITNESS: Who said that it wasn't?
24  BY MS. ERICKSON:
25      Q.   So it is.  Right?

1      A.   Is chest pain a medical concern?  Yes.
2      Q.   Is it a -- is it a medical concern for
3  another heart attack?
4      MR. DeVORE: Objection. Incomplete
5  hypothetical.  Calls for speculation.  Form of
6  question.
7      THE WITNESS: I would not know that
8  they were having a -- that they were -- that chest
9  pain would necessarily be a heart attack.  It
10  could be angina.
11  BY MS. ERICKSON:
12      Q.   Doesn't angina just mean chest pain?
13      A.   Well, it's chest pain, yes.
14  Necessarily a heart attack?  No.
15      Q.   Are you a registered nurse?
16      A.   Yes.
17      Q.   You're still a registered nurse today?
18      A.   Yes.
19      Q.   Were you a registered nurse from 2015
20  to 2017?
21      A.   Yes.
22      Q.   Okay.  And so is chest pain considered
23  a sign or a symptom of a heart attack?
24      A.   Yes.
25      Q.   Okay.  And if -- if an inmate is

1  having a sign or a symptom of a heart attack, in
2  your medical opinion would that patient need
3  medicine if there's a prescription for that?
4      MR. DeVORE: Objection. Calls for
5  speculation.  Incomplete hypothetical.  Form.
6      THE WITNESS: He would need medical
7  care.
8  BY MS. ERICKSON:
9      Q.   Are you done answering?  I'm sorry.
10      A.   Yeah, I wouldn't know all of the
11  history of the patient.  It's a vague question.
12  Would he need medicine?  I don't know what
13  medicine would I give him.  It would depend on his
14  orders.  I don't know the answer to your question.
15      Q.   Okay.  So if the inmate has a
16  prescription and an order for nitroglycerin PRN,
17  as needed, and he complains about chest pain, is
18  the inmate supposed to get the nitroglycerin for
19  that chest pain?
20      A.   If he has an order for it, yes.
21      Q.   And in the order if it says PRN, how
22  soon after he has chest pain does he need to get
23  the medication?
24      A.   I don't have a number for that.  As --
25  as soon as he possibly can get it.

1      Q.   So if an inmate is in the bullpen, he
2  complains he has chest pain and he has a
3  prescription for nitroglycerin, he should get the
4  medication as soon as possible.  Right?
5      A.   As soon as he possibly can get the
6  medication.
7      Q.   Yes?
8      A.   The PRN.  PRN, yes.
9      Q.   So why doesn't that happen at Cook
10  County?
11      MR. DeVORE: Objection. Foundation.
12  Assumes facts not in evidence.  Argumentative.
13  BY MS. ERICKSON:
14      Q.   Are you familiar with patients who are
15  prescribed nitroglycerin at Cook County?
16      A.   Do I know them, their names and stuff?
17  No.
18      Q.   Are you familiar with the fact that
19  there are patients at Cook County who are
20  prescribed nitroglycerin?
21      A.   Yes.
22      Q.   And what are they prescribed
23  nitroglycerin for?
24      A.   For chest pain, angina.
25      Q.   Are any inmates at Cook County allowed

29 (Pages 110 - 113)

Page 114

1 to keep nitroglycerin on them as a KOP?
2    A.   If the provider has ordered it that
3 way.
4    Q.   So does that occur where sometimes the
5 physician will order a nitroglycerin KOP?
6    A.   If the doctor has ordered it KOP, then
7 he can have, you know.
8    Q.   Are you familiar with medical records
9 and orders of inmates at Cook County where they
10 have an order for KOP nitroglycerin?
11    A.   I do not know of any detainees' names
12 that has that -- that order.
13    Q.   Not the names.  Are you familiar with
14 the fact that inmates at Cook County are given a
15 prescription for nitroglycerin and they're allowed
16 to keep it on their person?
17    A.   Am I aware of any that -- like a whole
18 bottle of nitroglycerin?  I'm -- no, I'm not
19 aware.
20    Q.   No.  I didn't say a whole bottle.  Are
21 they allowed to keep nitroglycerin on their person
22 at all?  Is any inmate allowed to do that?
23       MR. DeVORE:  Objection.  Form.  It's
24 confusing.
25       THE WITNESS:  I don't know the answer

Page 115

1 to that question.  I don't know if there's --
2 BY MS. ERICKSON:
3    Q.   Do you --
4    A.   -- anybody with that order.
5    Q.   If an inmate has -- if one of the
6 grievances you review has an issue with
7 nitroglycerin, will you look up that inmate's
8 medical records to see what the order was for the
9 nitroglycerin?
10    A.   If I had a grievance?  Yes.
11    Q.   That's your custom and practice?
12    A.   Yes.
13    Q.   Okay.  So then if you look up the
14 inmate had an order for nitroglycerin and -- have
15 you seen KOP next to the nitroglycerin order?
16    A.   I don't recall.  I just don't recall.
17 I suppose that it could be.  I just don't recall.
18    Q.   Why would inmates not be allowed to
19 carry nitroglycerin on their person?
20    A.   Because it's for their safety and the
21 safety of others.  Also, you don't want somebody
22 just taking nitroglycerin and not letting anybody
23 know that they're having chest pain, just taking
24 it.
25    Q.   But how do you know that a patient --

Page 116

1 that an inmate wouldn't tell a medical provider,
2 "I've been having chest pain and I took a pill
3 before I saw you today"?
4    A.   They should -- if they're having chest
5 pain and they are taking nitroglycerin and they're
6 not getting any relief from the nitroglycerin,
7 they shouldn't be waiting for a provider's
8 appointment.
9    Q.   I don't understand what you're talking
10 about.  I didn't ask you about that.  What does
11 that mean?
12    A.   Well, you said if they -- would they
13 tell when they went to see the provider, would
14 they tell them, "Yeah, I had chest pain."  I would
15 think that they would tell -- let a nurse know,
16 "I'm having --
17    Q.   Oh, yes, that's what I mean.  Let's
18 say, is it possible that an inmate would have
19 nitroglycerin KOP and if they needed to take the
20 medication before med pass they could take the
21 medication and then let the nurse know, "I had
22 chest pain two hours ago, and I took a nitro"?  Is
23 that a possible situation?
24    A.   They could do that.
25    Q.   Is it possible --

Page 117

1    A.   They could do that.
2    Q.   Okay.  So then why can't that --
3    A.   Would you do it that way?  I wouldn't.
4    Q.   Why?
5    A.   Because you should let medical know if
6 you're having chest pain.
7    Q.   But that would be letting medical
8 know.
9    A.   Why would he wait -- why would he wait
10 two hours?  I don't understand your question, your
11 line of questioning, why he would wait --
12    Q.   Well, what other opportunity would he
13 have to talk to medical?  I mean, I assume if he
14 had medical right there he could say, "I have
15 chest pains."
16       MR. DeVORE:  Is that a question?
17 BY MS. ERICKSON:
18    Q.   But is medical always present in the
19 living units?
20       MR. DeVORE:  Objection.  Asked and
21 answered.
22       THE WITNESS:  DOC is there, and they
23 would call medical.
24 BY MS. ERICKSON:
25    Q.   Okay.  Okay.  So going back to the

30 (Pages 114 - 117)

Page 118

1 nitroglycerin, you're not familiar with any
2 patients who are given nitroglycerin KOP?
3     MR. DeVORE: Objection. Mischarac-
4 terizes her testimony. Asked and answered four
5 minutes ago.
6 BY MS. ERICKSON:
7   Q.  Right?
8   A.  I don't -- I don't recall any order.
9   Q.  Okay.
10   A.  I just don't recall.
11   Q.  Are there any medications that are
12 given KOP and actually given as KOP at Cook
13 County?
14   A.  Yes.
15   Q.  Which ones?
16   A.  Which ones medicines?
17   Q.  Yes.
18   A.  There's a lot of different medications
19 that are given.
20   Q.  Which ones? Which medications?
21     MR. DeVORE: Objection. Calls for a
22 narrative.
23     MS. ERICKSON: It doesn't call for a
24 narrative. Specifically they --
25     MR. DeVORE: It also seeks information

Page 119

1 outside the needs -- seeks information
2 disproportionate to the needs of this case. It
3 has nothing to do with this case whatsoever.
4     MS. ERICKSON: It's the whole issue in
5 the case.
6 BY MS. ERICKSON:
7   Q.  So, Ms. -- Susan, can you answer the
8 question? Do you need it read back?
9   A.  Okay. No. You want to know
10 medications that would be -- could be written as
11 KOP medications?
12   Q.  Not could be written. Which ones are
13 given in Cook County as KOP medications.
14   A.  You want a list of all the medications
15 that are given KOP?
16   Q.  If you can give me five, that would be
17 a good start. Can you give me five?
18     MR. DeVORE: Objection. It calls for
19 speculation. And also --
20 BY MS. ERICKSON:
21   Q.  She's a registered -- you're a
22 registered nurse. Right?
23   A.  Yes.
24   Q.  Okay. So do you know which
25 medications are given KOP?

Page 120

1   A.  Not -- amoxicillin.
2   Q.  Amoxicillin?
3   A.  Could be. Not always but could be.
4 It would depend on the -- depend on the detainee.
5 Tylenol. What would be another one? Keflex.
6   Q.  What's that for?
7   A.  It's an antibiotic. Oh, what would be
8 a good -- hydrochlorothiazide.
9   Q.  What's that used for?
10   A.  Blood pressure.
11     How much does that give me?
12   Q.  You're doing good. If you know of any
13 more. That was four.
14   A.  Oh, there's thousands of meds. Is
15 that what you want? Calcium.
16     MR. DeVORE: Same objections.
17 BY MS. ERICKSON:
18   Q.  Yeah. Go ahead.
19     MR. DeVORE: Same objections.
20 BY MS. ERICKSON:
21   Q.  Calcium? Is Advil? Is Advil given
22 KOP?
23   A.  Can be.
24   Q.  Is albuterol?
25   A.  Can be.

Page 121

1   Q.  Are any mental health medications --
2 strike that.
3     Are any antidepressants or
4 anti-anxiety medications given KOP?
5   A.  No.
6   Q.  Why not?
7   A.  Safety of self and others.
8   Q.  Because why?
9   A.  Well, because they could take too many
10 or because they do have mental health issues or
11 they could leave them where somebody else could
12 take them. And that would be a danger to others
13 because it's not always when they have mental
14 health issues are they responsible.
15   Q.  Okay.
16   A.  So for safety of self and others.
17   Q.  Does Cermak administer pain
18 medications like oxy or any other narcotics?
19   A.  They can.
20   Q.  Okay. And I take it those are not
21 KOP. Right?
22   A.  No.
23   Q.  Is it possible that an inmate could
24 take too many Advil and it would harm their
25 safety?

31 (Pages 118 - 121)

Page 122

1      MR. DeVORE: Objection. Objection.
2  Calls for information outside the scope of this --
3  disproportionate to the needs of this case.
4      Go ahead.
5      THE WITNESS: Could someone take too
6  much Advil? Yes.
7  BY MS. ERICKSON:
8      Q.  And overdose?
9      A.  I suppose, yes.
10     Q.  Could someone take too much Tylenol
11 and overdose?
12     A.  Yes.
13     Q.  Okay. Could an inmate take too much,
14 I don't know how you say it, hydrochlorothiazide
15 and overdose?
16     MR. DeVORE: Objection. Incomplete
17 hypothetical. Calls for speculation. Form.
18     THE WITNESS: Yes.
19 BY MS. ERICKSON:
20     Q.  Okay. But yet all of those
21 medications are given KOP. Right?
22     A.  Depending on the situation, yes.
23     Q.  And so then what is the difference
24 between those medications that are given KOP and
25 nitroglycerin?

Page 123

1      MR. DeVORE: Objection. Calls for
2  medical testimony. She already testified she's
3  not a provider, nor does she work as a
4  manufacturer.
5      But you can answer, if you can.
6      THE WITNESS: It would be the provider
7  that would -- would write that order.
8  BY MS. ERICKSON:
9      Q.  I don't understand. Earlier --
10     A.  The provider would write the order.
11     Q.  No. I didn't ask about who writes the
12 order. Earlier you testified that nitroglycerin
13 may not be given as KOP due to the safety of the
14 inmate and other people. So what is the -- what
15 does that mean in this context? What are you
16 saying?
17     A.  Geez, I don't remember saying that.
18 They can't have it KOP because he needs it -- if
19 he's having chest pain, the person would need to
20 notify DOC or nursing, have the DOC notify
21 nursing, let them know they're having chest pain.
22     Q.  But why, though? I mean, if there's
23 thousands of medications that are actually
24 administered KOP, why can't nitroglycerin be given
25 KOP? What's the difference?

Page 124

1      A.  It's a different medication.
2      Q.  Does it -- does it -- I mean, can
3  people -- is it custom and practice within Cook
4  County that patients are taking nitroglycerin and
5  getting high off of it?
6      A.  That I wouldn't have no knowledge of
7  that.
8      Q.  Oh. Well, then what's the issue with
9  the safety of the inmates and others?
10     MR. DeVORE: Objection. Asked and
11 answered. She just testified to this.
12     THE WITNESS: Because if it -- if a
13 detainee is taking nitroglycerin, then he needs to
14 notify medical --
15 BY MS. ERICKSON:
16     Q.  What's the issue --
17     A.  -- or notify the DOC so that they can
18 notify medical. It's just a --
19     Q.  But what's the issue in safety for
20 that inmate that they can't have the nitro on
21 them?
22     MR. DeVORE: Objection to form.
23 Unclear if you're talking about this case or just
24 any inmate or detainee.
25     You can answer, to the extent you

Page 125

1  can, in terms of general or specific detainees.
2      MS. ERICKSON: Okay. Stop. You can
3  stop coaching her.
4  BY MS. ERICKSON:
5      Q.  You can answer the question, if you do
6  understand it.
7      A.  Could you repeat --
8      MS. ERICKSON: Sure. Debbie, would
9  you mind asking the question, again.
10     (The following question
11         was read back:
12         "Q.  But what's the issue
13         in safety for that inmate
14         that they can't have the
15         nitro on them?")
16     THE WITNESS: So that they can -- when
17 they have chest pain they can report it to the
18 nurse.
19 BY MS. ERICKSON:
20     Q.  But there's not a nurse. When an
21 inmate is in the living unit, is there a nurse --
22     A.  Access to medical -- access to medical
23 through the Department of Corrections.
24     Q.  Was -- that wasn't a full sentence.
25 What do you mean?

32 (Pages 122 - 125)

Page 126

1     A.   They would notify --
2          MR. DeVORE:  You cut her off.  That's
3  why it wasn't a full sentence.
4          THE WITNESS:  You would notify -- they
5  would notify the Department of Corrections, an
6  officer, who would notify medical.
7  BY MS. ERICKSON:
8     Q.   But earlier --
9     A.   If there was no medical there.
10     Q.   Sorry.  Are you done?
11     A.   I'm done.
12     Q.   Okay.  But earlier you testified that
13  if an inmate is prescribed nitroglycerin and
14  they're experiencing chest pains they should take
15  the medication as soon as he possibly can.  Right?
16     A.   As soon as it's possible.
17     Q.   So it would be faster to have the
18  medication on the person than to have to have the
19  correctional officer call someone in medical and
20  have that person come over and actually give the
21  medication.  Right?
22     A.   It would be sooner.  Would it be
23  safer?  I don't -- yeah, I don't know where we're
24  going.  But he would get it sooner.
25     Q.   Okay.  And are you familiar with

Page 127

1  any --
2     A.   If he did have it on his person, he
3  would get it sooner.
4     Q.   Are you familiar with any situations
5  that have occurred since 2015 where an inmate has
6  overdosed on nitroglycerin?
7     A.   Not to my knowledge.
8     Q.   Did you ever work in the dispensary at
9  Cook County Department of Corrections?
10     A.   No.
11     Q.   How does -- how do the correctional
12  officers from the living units contact medical?
13     A.   By phone.
14     Q.   Not radio?
15     A.   Or they could use a radio.
16     Q.   In your time reviewing grievances
17  since 2015, has there ever been a time where there
18  was no one in the dispensary when the correctional
19  officer from the living unit called the
20  dispensary?
21     A.   I would have no knowledge of that.
22     Q.   Are you familiar with the lawsuit
23  where 559 females, including nurses, correctional
24  officers, and LPNs, filed a sexual harassment suit
25  against Cook County and Cook County Sheriff's

Page 128

1  Office for sexual harassment?
2     A.   Do I have any knowledge of it?  No.
3     Q.   Do you know --
4     A.   I'm not familiar with it.
5     Q.   You've never heard about it?
6     A.   I've heard that there was one.  But I
7  don't know any details, how many.  You said 550?
8  I don't know anything about that, any details of
9  it.
10     Q.   Have you ever gone to the living units
11  at any point?
12     A.   Dispensaries and RTU, you know,
13  because it's right there.  But to go to -- I've
14  taken a tour.  But to go to the living units, I
15  haven't been, no.  No.
16     Q.   So you --
17     A.   Not in a while.  Just on a tour.
18     Q.   When did you go on a tour?
19     A.   When I first started.
20     Q.   In 2012?
21     A.   Yes.
22     Q.   Did the inmates make sexually lewd
23  comments to you?
24     A.   No.
25     Q.   Have you --

Page 129

1     A.   No.
2     Q.   -- heard -- have you heard that nurses
3  do not want to go to the living units because
4  inmates are making sexually offensive and lewd
5  comments towards them?
6     A.   No, I haven't heard that.
7     Q.   That's not something that's discussed
8  within management?
9     A.   Not to my knowledge.  Not that I'm
10  aware of.
11     Q.   Are you considered a manager as a
12  clinical performance improvement analyst?
13     A.   The manager?  No, I'm not a manager.
14     Q.   Do you supervise anyone?
15     A.   No.
16     Q.   Have you ever supervised anyone since
17  you've worked at Cook County?
18     A.   No.
19     Q.   Who is your boss?
20     A.   Right now my boss is Irene.  Oh, gosh,
21  I'm bad with names, so I don't recall her last
22  name.
23     Q.   You can look it up.  We'll wait.
24     A.   All right.  I'll get into her -- I'll
25  get into my e-mail.  Marks.

33 (Pages 126 - 129)

Page 130

1    Q.   How do you spell that?
2    A.   M-a-r-k-s.
3    Q.   What is her title?
4    A.   I don't know her title.  CQI director.
5  CQI director.  I don't know exactly what title
6  they gave her.  But she's the -- she's over me.
7  CQI manager, director.  I don't -- I don't -- I
8  would think it's CQI director.  I don't know
9  exactly what it is.
10   Q.   What does it say after -- when she
11  sends you an e-mail, what does it say after her
12  name?
13   A.   Well, let me look it up.  Okay.  Give
14  me a minute.  I got to keep looking.
15       MR. DeVORE:  If you don't know, you
16  don't need to do the research.
17       THE WITNESS:  You know, I'm not
18  finding it.  I'm just finding a response.  I don't
19  know what her title is.
20  BY MS. ERICKSON:
21   Q.   So from 2015 through '17 you didn't
22  supervise any nurses or LPNs?
23       MR. DeVORE:  Objection.  Asked and
24  answered.
25       THE WITNESS:  That's correct.

Page 131

1  BY MS. ERICKSON:
2    Q.   Okay.  And you didn't supervise any
3  CRWs?
4        MR. DeVORE:  Same objection.  She just
5  answered it.
6  BY MS. ERICKSON:
7    Q.   Do you know who supervises the nurses
8  and LPNs?
9    A.   The director of nursing and the
10  manager -- and the managers.
11   Q.   What's the name of the director of
12  nursing?
13   A.   I don't -- I don't recall her name.
14   Q.   Is there more than one?
15   A.   Just the one that I know of.  I think,
16  yeah, just one director of nursing.
17   Q.   Okay.  Who supervises the CRWs?
18   A.   That's DOC.
19   Q.   Who in DOC?
20   A.   Who is their direct manager?  I don't
21  know.  You would have to ask somebody in the DOC.
22   Q.   What is the name of the title -- what
23  is the title of the person who oversees the CRWs?
24   A.   I don't know.  I don't know the answer
25  to that question.

Page 132

1    Q.   How often do you meet with
2  Irene Marks?
3    A.   At least weekly.
4    Q.   For what purpose?
5    A.   Weekly meeting.
6    Q.   Who's in the meeting?
7    A.   Irene, Doris, me, and -- my mind went
8  blank -- Angela.
9    Q.   And Doris and Angela, are they from
10  Cermak or Cook County?
11   A.   Cermak.
12   Q.   Does anyone from Cook County attend
13  your weekly meetings with Irene?
14   A.   No.
15   Q.   Do you ever have any meetings with
16  anyone working in the Cook County side?
17   A.   Yes.
18   Q.   When do you have those?
19   A.   Usually weekly.
20   Q.   What day of the week do you meet with
21  Irene?
22   A.   It can vary.  Tuesday.  Wednesday.  It
23  varies.
24   Q.   Was Irene your boss in 2015 to '17?
25   A.   No.

Page 133

1    Q.   Who was your boss then?
2    A.   Linda Follenweider.
3    Q.   How do you spell her last name?
4    A.   I don't know.  I could guess, but I
5  don't -- I don't know how to spell that last name.
6    Q.   Okay.  Can you say it again?  Because
7  I'll get asked and I don't know.
8    A.   Follenweider.  It's Follenweider.
9    Q.   Like F-o-l-d-e-n-w-e-i-d-e-r [sic],
10  something like that?
11   A.   Could be.
12   Q.   Okay.
13   A.   Could be.
14   Q.   So she was your supervisor from 2015
15  to 2017?
16   A.   Yes.
17   Q.   What was her title?
18   A.   CQI director.
19   Q.   Okay.
20   A.   I would suppose.  I'm not certain.
21   Q.   So she had the same role as
22  Irene Marks but in an earlier time?
23   A.   Correct.
24   Q.   Okay.  And when Linda Follenweider
25  stopped being your boss, did Irene Marks start to

34 (Pages 130 - 133)

Page 134

1 become your supervisor?
2     A.   No.
3     Q.   Who was your supervisor after Linda?
4     A.   Kelly.
5     Q.   What's Kelly's last name?
6     A.   I don't recall.
7     Q.   How long was Linda your supervisor?
8     A.   For CQI? Oh, I don't recall exactly
9 the length of time. Two years perhaps.
10     Q.   But she was your supervisor from 2015
11 to 2017?
12     A.   Yes.
13     Q.   And how long was Kelly your super-
14 visor?
15     A.   You know, Kelly was not -- I'm sorry,
16 Kelly was not my supervisor. She was the CQI
17 director. But Linda continued on as my super-
18 visor. That was an error on my part. She was
19 CQI director. But Linda maintained being my
20 supervisor.
21     Q.   Okay. So Kelly came in and was CQI
22 director. And then what did Linda's role change
23 to?
24     A.   She was the COO.
25     Q.   COO of Cermak?

Page 135

1     A.   Correct.
2     Q.   And then at some point did Kelly leave
3 Cermak?
4     A.   That's correct.
5     Q.   And at that point did Irene become
6 your supervisor?
7     A.   No.
8     Q.   Who was your supervisor then?
9     A.   It still was Linda. Kelly was not --
10 I had made an error. Kelly was not my supervisor.
11 She was the CQI director, but she didn't take over
12 as my supervisor. It stayed Linda.
13     Q.   Oh, I'm sorry if I misspoke.
14     A.   That's okay.
15     Q.   So at some point Linda was not your
16 supervisor anymore. Right? Is she --
17     A.   No.
18     Q.   Is she still your supervisor?
19     A.   She isn't, no.
20     Q.   Okay.
21     A.   No, she's not.
22     Q.   And then at some point you got a new
23 supervisor, right, after Linda?
24     A.   Yes. For a short term, it was -- you
25 know, I can't remember his name. I don't recall

Page 136

1 his name.
2     Q.   Why did --
3     A.   Why don't I recall his name? Because
4 I'm bad with names.
5     Q.   Oh, no, that's -- I didn't know you
6 didn't finish. That wasn't my question.
7     A.   Okay.
8     Q.   Why did Linda leave?
9     A.   She resigned.
10     Q.   Do you know why?
11     A.   No.
12     Q.   And in 2017 a man became your super-
13 visor?
14     A.   No. Linda had remained my supervisor
15 until the middle of 2020.
16     Q.   All right. Thank you for that. And
17 in the middle of 2020 this man became your super-
18 visor?
19     A.   Yes. For a short time. And I don't
20 recall his name.
21     Q.   And how long was he your supervisor?
22     MR. DeVORE: You said a short time.
23     THE WITNESS: I don't recall the
24 length of time.
25     / / /

Page 137

1 BY MS. ERICKSON:
2     Q.   Okay. And then when did Irene become
3 your supervisor?
4     A.   In '21, middle of '21, late May-ish of
5 '21.
6     Q.   All right. And so you met -- it
7 sounds -- so when Linda was your supervisor from
8 2015 to 2020, did you have weekly meetings with
9 her?
10     A.   I don't know that they were weekly,
11 but we had -- we had meetings.
12     Q.   How often did you have meetings with
13 Linda?
14     A.   I don't recall. Nothing that was
15 scheduled.
16     Q.   Were they monthly meetings with Linda?
17     A.   No. They weren't scheduled.
18     Q.   Okay. When you met with Linda from
19 2015 to 2020, was it a group of people that met
20 with her or was it just you individually?
21     A.   Sometimes it was just me individually.
22 Sometimes me and Kelly.
23     Q.   Why did Kelly start working on the
24 team when Linda had been the CQI director?
25     A.   'Cuz Linda took a promotion.

35 (Pages 134 - 137)

1    Q.   Well, from -- I don't understand.
2  From 2017 to 2020 Linda was above Kelly?
3    A.   Correct.
4    Q.   Ah, okay.  What was -- what was
5  Linda's position from --
6    A.   COO.  COO.
7    Q.   And from 2015 to 2017 did you have
8  regular meetings with anyone from Cook County?
9    A.   Nothing that was scheduled or regular.
10   Q.   Well, I'm sorry, what's that?
11   A.   Did I have meetings with -- yes.
12  Nothing that I recall.  Sometimes they were
13  monthly.  Sometimes -- they were varied.
14   Q.   And what types of situations between
15  2015 and 2017 did you meet with Cook County
16  Department of Corrections staff?
17   A.   Situations?  Just for a meeting.
18   Q.   So those were scheduled meetings?
19   A.   Not scheduled.  Just meet to review.
20  Not review the grievances, but returns or
21  something like that, returns and smoothing out
22  processes of, like, the transfer forms.  Nothing
23  per se regarding a grievance.  Just -- that's it.
24   Q.   Okay.  So from 2015 to 2017 you met
25  with Cook County staff for unscheduled meetings,

1  and the purpose was to review returns and
2  smoothing out processes?
3    A.   Grievance receipt and returns, when
4  they bring grievances to me and then I return them
5  to them, to make sure that the process is smooth.
6  Anything that we can do to improve things.  This
7  was pretty much what the meetings were about.
8    Q.   Are you the only one from Cermak --
9  strike that.
10       From 2015 to 2017, were you the
11  only person from Cermak that was reviewing
12  grievances?
13   A.   As in receipt of?  No.  Because
14  there's other people that look at the grievances.
15   Q.   From Cermak?
16   A.   Correct.
17   Q.   Who are they?
18   A.   Mental health, dental, and then
19  nursing.  I would review some with the provider on
20  an as-needed basis.  I wouldn't necessarily give
21  them grievances, but we would discuss them.  I
22  would bring them and discuss them.
23   Q.   So what -- I don't -- I don't fully
24  understand the process with grievances.  So when
25  an inmate has a grievance, they're supposed to

1  fill out a specific form.  Right?
2    A.   That's correct.
3    Q.   And what does a -- what is an inmate
4  supposed to do with the form after they fill it
5  out?
6    A.   Okay.  So they complete the form and
7  then it goes to DOC.  Now, if there's a box or
8  they hand it to them and they put it somewhere,
9  that I don't know, that's the DOC process.
10       And, from there, the CRW or
11  supervisor would look at the grievances.  They
12  code them according to what type of a grievance
13  that it would be.  And then they also assign it
14  with a control number.  And they also decide if
15  it's a grievance or an emergency grievance.
16       And so then they would -- a clerk
17  or a CRW, somebody puts it in the system.  I'm not
18  a part of that, so I'm not sure where in that
19  process they do that.  They would put it -- list
20  it by the control number.  They would list it on
21  like a transfer sheet.  It's kind of like a chain
22  of custody.
23       We would also do the same thing
24  with grievances that were completed.  They would
25  be listed on a transfer sheet by control number.

1        So then when the CRW would -- or
2  whoever would bring the grievance to my office,
3  the grievances for that day to my office, then we
4  would swap out and we would check to make sure
5  that the grievances that they are giving us are
6  actually the grievances listed on the transfer
7  form by the control number.
8        DOC would -- or whoever was working
9  for DOC, the clerk, would also do the same thing
10  with the ones that they are receiving from us that
11  are completed.
12       And so when that process is done,
13  then we take those grievances that -- that are new
14  that I've just received and we date stamp them
15  right away.
16       So then I take those -- I would
17  give some to dental, whichever ones belonged to
18  dental, and mental health, and then the rest would
19  be put in by -- paper clipped or rubber banded
20  together and dated when they would be due.  And
21  that's how I do grievances is by date due.
22       MR. DeVORE:  It's about 12:30.  Are
23  you done with your answer?
24       THE WITNESS:  I am.
25       MR. DeVORE:  Okay.  It's about 12:30.

36 (Pages 138 - 141)

Page 142

1 We've been going about three and a half hours. It
2 might be a good place to take a break.
3        MR. COYNE: That's fine. You know,
4 before we break -- this is John Coyne -- I just
5 wanted to mention I did send an e-mail yesterday
6 morning informing the parties that -- and
7 plaintiff's counsel that I have a 2 o'clock
8 conference call and mandatory call scheduled by a
9 federal court judge that I do need to participate
10 in, and I do need to break in the event the
11 deposition is still going. And Kirstin was kind
12 enough to respond on that, stating no objection,
13 we would just have to go off the record so I could
14 attend that call. I do not know -- and, again,
15 this is for the record, I do not know specifically
16 how long that call will take, but I will inform
17 the Court when I have the opportunity that this
18 deposition is ongoing. So I just wanted to state
19 that for the record so everybody is on the same
20 page.
21        MS. ERICKSON: Yep. Thanks, John.
22        MR. DeVORE: We obviously have no
23 issue with that.
24        MR. COYNE: Yeah. I appreciate it.
25 Thank you. How long are we breaking for?

Page 143

1        MS. ERICKSON: I don't know.
2        Jason, what do you want?
3        MR. DeVORE: Maybe 30 minutes.
4        MR. COYNE: That's fine, whatever you
5 guys like.
6        MS. ERICKSON: That's going to push
7 our dep back and we're going to keep going.
8        MR. DeVORE: Well, that's fine. You
9 know people need to eat, right? We want a witness
10 that's -- you know, is fully nourished. Right?
11        MS. ERICKSON: All right. Well, I'm
12 just saying for the record it's seven hours, so
13 we'll just keep going then. All right. See you
14 at 1:00 then.
15        MR. COYNE: At 1:00. Thanks.
16        MR. DeVORE: Thanks.
17        (A break was taken from
18            12:29 p.m. until
19            1:02 p.m.)
20        MS. ERICKSON: We're back on the
21 record.
22 BY MS. ERICKSON:
23    Q.   I want to go back to the medications
24 we were talking about before, the KOP medications.
25    A.   Yes.

Page 144

1    Q.   Is albuterol given KOP?
2    A.   Yes.
3    Q.   Is it possible to overdose on
4 albuterol?
5    A.   Yes.
6    Q.   Are correctional officers trained on
7 what is considered a medical emergency?
8    A.   That I wouldn't -- wouldn't have any
9 knowledge of that. That would be DOC.
10    Q.   Were you trained to handle emergencies
11 at Cook County Department of Corrections?
12    A.   I don't understand. I don't work in
13 the emergency department, and I don't work as a
14 floor nurse or work in the dispensary. But I'm a
15 nurse.
16    Q.   Right. No. Were you trained --
17    A.   But I haven't worked -- by here? No.
18 No.
19    Q.   Okay. Do you know how a correctional
20 officer calls 9-1-1 from the living unit?
21    A.   No.
22    Q.   No, you don't know?
23    A.   No, I don't.
24    Q.   What do you consider a medical
25 emergency?

Page 145

1    A.   What do I consider a medical
2 emergency?
3    Q.   Yeah.
4    A.   Anything that requires a -- that's
5 such -- what do I consider a medical emergency?
6 Unconsciousness. Do you want a -- like I said
7 earlier, a bee sting if there's a reaction could
8 be. Bad laceration. GI bleed.
9    Q.   GI bleed.
10    A.   Is that enough?
11    Q.   Yeah.
12    A.   Okay.
13    Q.   And then are chest pains considered a
14 medical emergency in your opinion?
15    A.   It depends upon the assessment what
16 is, you know, the chest pain. There's different
17 reasons for chest pains.
18    Q.   If at the outset someone has chest
19 pain, is that report of chest pain considered an
20 emergent situation?
21        MR. DeVORE: Objection. Foundation.
22 Unclear.
23 BY MS. ERICKSON:
24    Q.   You can answer.
25    A.   It can be. It depends on the cause or

37 (Pages 142 - 145)

Page 146

1 the -- yeah.
2     Q.   As someone -- as someone that reviews
3 the grievance forms, do you believe that
4 correctional officers should be trained in
5 evaluating whether a situation is an emergency or
6 a nonemergency?
7     A.   That wouldn't be my role to make that
8 determination.  If they should be trained,
9 medically trained?  That wouldn't be in my role to
10 even make that decision.
11    Q.   Is part of your job as an auditor --
12 as an auditor -- strike that.
13         Is part of your job reviewing
14 grievances to try and make the situation better
15 for the inmate that's filed the grievance?
16    A.   Yes.
17    Q.   So -- okay.  So if there's a grievance
18 -- have you come upon situations where it seemed
19 as if correctional officers are not trained
20 medically?
21    A.   They're not trained -- they're not --
22 they don't -- they're not trained -- I don't know
23 what the DOC is regarding their policies and
24 training for the DOC officers.  I'm not involved
25 in that part of it.  I'm not -- I don't work for

Page 147

1 the DOC.  So that would be their determination.
2     Q.   In 2015 to 2017 was nitroglycerin
3 allowed to be on the medical cart?
4     A.   I don't have knowledge of that.  I
5 don't recall.  I don't recall if it was freely on
6 the medical cart.  I don't recall.
7     Q.   Are as-needed medications on the med
8 cart?
9         MR. DeVORE:  Objection to form as to
10 what's an as-needed medication.
11 BY MS. ERICKSON:
12    Q.   You can answer.
13    A.   Medications, the pharmacy loads the
14 med cart.  And then a nurse would take the cart
15 out with, I would assume, that.  I can only
16 assume.  I don't know the answer to that question.
17    Q.   And what do you assume?
18    A.   That the -- that PRN medications are
19 on the cart.
20    Q.   In your time working at Cook County
21 and Cermak, have you ever experienced a time where
22 there's been a shortage of a certain kind of
23 medication?
24    A.   There was.  But I don't recall what it
25 was.  But I don't think it affected us.  It was

Page 148

1 just kind of like a memo.  And it was kind of
2 nationwide.  I don't recall the name of the
3 medication.  I just remember that there was
4 something.  But it was nationwide.  It wasn't
5 particularly Cermak.
6     Q.   When was that?
7     A.   I don't recall.  But it's been since
8 I've worked here.
9     Q.   And that was a memo that was sent out
10 to all the nurses?
11    A.   It was on the news.  It was on the
12 news.  I don't remember the name of the
13 medication.  I probably will on my way home or
14 2 o'clock in the morning, but right now I don't
15 recall what it was.  But it was just a medication.
16    Q.   Right.  I'm not talking about
17 nationwide shortages.  Was there a shortage within
18 Cermak at some point?
19    A.   That I don't recall.  Particularly
20 Cermak I don't recall, a particular Cermak
21 medication shortage.
22    Q.   I'm going to share my screen here.
23 Let me know if you see this document.  One second.
24 Can you see this, Susan?
25    A.   No.  Okay.  I can now.

Page 149

1     Q.   All right.  I'm going to make it
2 smaller.  I'm marking this as Exhibit A.  It's
3 Interagency Directive number 64.5.45.0, and the
4 subject is medication administration and
5 distribution.
6         (Shebel Deposition
7          Exhibit A was marked.)
8 BY MS. ERICKSON:
9     Q.   On the top right do you see the
10 effective date, Susan?
11    A.   I do.  May 13, '17.
12        MR. COYNE:  Kirstin, I'm sorry, is
13 this one Bates-stamped?
14        MS. ERICKSON:  This one is 0000 --
15 five zeros and a 7.
16        MR. COYNE:  Thank you.
17        MS. ERICKSON:  It's a ten-page
18 document.
19        MR. COYNE:  Thank you.
20        MS. ERICKSON:  Mm-hmm.  Mm-hmm.
21 BY MS. ERICKSON:
22    Q.   I believe it was -- the effective date
23 was May 17, 2013.  Is that the way you understand
24 it?
25    A.   Yes.

38 (Pages 146 - 149)

1    Q.   Okay.  And you were employed by Cook
2  County at that time.  Right?
3    A.   Yes.
4    Q.   Have you seen -- have you seen this
5  interagency directive?
6    A.   I would have to -- if I could look at
7  it.
8    Q.   I'll give you a minute then to read
9  this part.
10    A.   Can I scroll it all the way down?  Do
11  I have control of that?
12    Q.   No.
13    A.   I don't.
14    Q.   I can scroll down and then we can go
15  back up if you want.
16    A.   Okay.  But then I can come up on my
17  own?  No, I can't.  Oh, yeah, I guess I can.
18    Q.   So we can just start on the first
19  page.  It's not --
20    A.   Okay.
21    Q.   If you don't remember, it is what it
22  is.
23    A.   Okay.
24    Q.   But do you recall -- do you recall --
25    A.   I don't -- I don't remember this

1  particular page.
2    Q.   Okay.  And are you -- what is the
3  process by which you would be informed of a new
4  interagency directive in 2013?
5    A.   2013, I was doing audits then.
6    Q.   Mm-hmm.
7    A.   I don't recall.  Just a meeting would
8  be one way.  I don't believe these policies were
9  on -- I would have seen policies in a meeting.  I
10  just don't recall this.
11    Q.   Is there --
12    A.   I would --
13    Q.   Sorry, are you done?
14    A.   Yeah, I'm done.
15    Q.   In 2013 did you receive e-mails with
16  new policies or interagency directives?
17    A.   I don't know if they -- I don't recall
18  how I got them.
19    Q.   Is it --
20    A.   They were in a book.
21    Q.   I'm sorry?
22    A.   I think they were just in a book.  I
23  don't recall getting them by e-mail.  I just
24  really don't recall.
25    Q.   Where would -- where would the

1  policies be in a book?
2    A.   In the CQI office.
3    Q.   So is it -- I mean, as an auditor were
4  you informed of new policies and interagency
5  directives or was -- was it more you would go to
6  CQI if you wanted to learn about new policies?
7    A.   Per policy per reference of what I was
8  auditing.  But to sit and read the whole policy
9  book --
10    Q.   Right.
11    A.   -- you know, sitting, yeah.
12    Q.   So which way -- so how would you learn
13  about a policy if you needed to use it to review
14  and audit medical records or anything else --
15    A.   It would be on -- it would be on -- it
16  would be on paper like this.  Not on a computer.
17    Q.   How did you learn about the policy
18  that you needed to read?
19          MR. DeVORE:  Objection.  Asked and
20  answered.
21          THE WITNESS:  I would look in the
22  policy book.
23  BY MS. ERICKSON:
24    Q.   So was it your custom and practice in
25  2013 to --

1    A.   Some were on --
2    Q.   Hang on.  Hang on.  Hang on.  Let me
3  finish.
4          Was it your custom and practice in
5  2013 to go to CQI and look at the paper copy of
6  the policy when you needed to review one?
7    A.   Some of them were online.  Yeah, I
8  could -- I could look at the book.
9    Q.   Is that what you did?
10    A.   I would at times, yes, to see the
11  paper copy, yes.
12    Q.   Did you look at any of the policies
13  online in and around 2013?
14    A.   I -- I did.
15    Q.   Are the policies on a certain -- are
16  the policies on a certain platform electronically?
17    A.   Yes.  In the intranet.
18    Q.   Does the intranet have a name?
19    A.   Go to Cermak intranet or, you know,
20  Cook County Health Systems' own internet and go to
21  Cermak and then click under Cermak policies.
22    Q.   Okay.  Were you required as part of
23  your job in 2013 to '17 to go onto the Cermak
24  intranet or go to the CQI to read policies?
25    A.   Was I required?  Now, this is -- okay.

39 (Pages 150 - 153)

Page 154

1  Cermak policies, I looked at the Cermak policies.
2  Did anybody say sit and memorize the policies?
3  No.  I just looked at the policies.
4      Q.   And when you looked -- when you say
5  you looked at the policies, do you consider the
6  interagency directive to be a policy that you
7  would need to read as a Cermak staff member?
8      A.   This would have -- this would be an
9  intra-agency [sic] directive, and I don't recall
10 seeing -- I really would have to read this because
11 you're taking me back to 2013.  If I could look at
12 it, I could perhaps recollect more.
13     Q.   Yeah, no, I understand.  There's more
14 than one interagency directive, from what I've
15 seen.  My question is more do you consider an
16 interagency directive to be a policy?
17     A.   An interagency directive is a policy.
18     Q.   All right.  And then looking at the
19 policy here in Roman numeral II, can you read
20 that?
21     A.   I can, yeah.
22     Q.   And does the second sentence say:
23 "Safe medication passage is essential to providing
24 inmates with medically necessary treatment and
25 requires cooperation and coordination between

Page 155

1  CCDOC and Cermak"?
2      A.   Correct.
3      Q.   Okay.
4      A.   Correct.
5      Q.   So this policy mandates that Cook
6  County and Cermak are responsible for
7  administering medication to inmates.  Right?
8      A.   Yes.  Cohesively.
9      Q.   Right.  And then under Roman numeral
10 III, I don't know if you can see that, it says:
11 "This order is applicable to all Cook County
12 Department of Corrections and Cermak Health
13 Services of Cook County employees and is for
14 strict compliance."
15     A.   Mm-hmm.
16     Q.   Do you see that?
17     A.   I saw that.
18     Q.   What does it mean to you, strict
19 compliance?
20     A.   Strict compliance?  That that is the
21 -- that is the directive and that's how it is to
22 be.
23     Q.   And looking at the second page, it has
24 certain definitions.  We won't go into many of
25 them.  Okay.  We're on page four under -- what

Page 156

1  section is this -- but it's C, Section C.  It
2  says:  "KOP medication distribution.  Cermak staff
3  shall start medication distribution at scheduled
4  times."  And then under B it states:  "New KOP
5  medications orders will be distributed daily."
6          Are you familiar with the policy
7  for KOP medications being that they would be
8  dropped off daily to inmates?
9      A.   New KOP medications, like a new order,
10 that they would be dropped off, they would be
11 delivered.
12     Q.   They would be delivered where?  What
13 does that mean to you?
14     A.   To the detainee.
15     Q.   Okay.  And then if an inmate had a KOP
16 medication, would there be enough in the bottle or
17 container for several days to your knowledge?
18     A.   Boy, this changed.  Yes, for until the
19 next delivery, next cycle fill.
20     Q.   From 20 --
21     A.   Until the next cycle fill was
22 scheduled.  There should be enough 'til the next
23 cycle fill.
24     Q.   In 2015 to 2017 how long was there in
25 between each cycle fill?

Page 157

1      A.   I don't recall exactly.
2      Q.   Okay.  Do you know what it is
3  nowadays?
4      A.   I think it varies, so I could not
5  answer that question.
6      Q.   Okay.  And this is more just for my
7  understanding.  Is a PRN medication a whole
8  different category from DXD or KOP?
9      A.   Dose by dose, that would mean that the
10 nurse would have to provide each dose.
11     Q.   Okay.
12     A.   And then you can also get a dose by
13 dose, it's PRN, you have to -- you must request
14 it, you must request it from the nurse PRN.
15     Q.   And if -- and if the nurse is at the
16 living unit for med pass and an inmate requests a
17 certain medication that they have in an order PRN,
18 should the -- should the nurse have the medication
19 on the cart?  Or how does that work?
20     A.   She should.  Mm-hmm.
21     Q.   Is it ever a situation where, from
22 what you've seen, that the PRN medication is not
23 on the cart during a med pass and the nurse has to
24 call over to the dispensary or somewhere else in
25 medical to bring the medication to the inmate?

40 (Pages 154 - 157)

Page 158

1    A.   Yes.
2    Q.   Okay.
3    A.   I've heard of that, yes.
4    Q.   Okay.  Have you -- do you ever look at
5 the medical records of inmates who transfer back
6 and forth between Livingston and Cook County?
7    A.   In particularly?
8    Q.   If you need --
9    A.   I would have no reason to go into
10 other -- 'cuz it's a different jail.
11    Q.   If you --
12    A.   You mean per -- I guess I don't
13 understand your question.
14    Q.   Oh, sure.  If you needed to look at
15 records from an outside facility for a specific
16 grievance that you're reviewing, do you have
17 access to look at the medical records from
18 Livingston, for example?
19    A.   No.
20    Q.   Okay.  And in 2015 to '17 did Cermak
21 staff deliver the medication rosters to the watch
22 tower roll call two hours prior to med pass?
23    A.   Watch tower?  What did you say?  I
24 didn't understand -- I didn't hear you actually.
25    Q.   You didn't hear me.  Okay.  From 2015

Page 159

1 to '17, did Cermak staff deliver medication
2 rosters to a watch tower roll call two hours
3 before med pass?
4    A.   Not to my knowledge.  I don't recall
5 any of that.  I would have no knowledge of that.
6    Q.   Okay.  I'm going to put up Exhibit B.
7 One moment.
8           (Shebel Deposition
9            Exhibit B was marked.)
10 BY MS. ERICKSON:
11    Q.   Okay.  Can you see this, Susan?
12    A.   Yes.
13    Q.   All right.  So I've -- I'm marking as
14 Exhibit B for identification Sheriff's Office,
15 Cook County, Illinois, General Order, Department
16 of Corrections.  The subject is inmate grievance
17 procedure.  Bates-stamped 000999.  And it's a
18 20-page document.  The number of the order is
19 24.14.5.0.
20        Are you familiar -- oh, strike
21 that.
22        And the effective date is
23 October 21, 2014.
24        Are you familiar with this
25 document, Susan?

Page 160

1    A.   No.  No.
2    Q.   You've never seen it?
3    A.   No.
4    Q.   You've never had to evaluate it in
5 your role as someone that --
6    A.   It's a DOC policy.  I've not seen it.
7    Q.   Do you have a specific policy that you
8 apply as someone from Cermak reviewing grievances?
9    A.   I have a policy that DOC sent to me.
10 But this doesn't look --
11    Q.   You have a policy that DOC sent to
12 you?
13    A.   I have a policy that was in a -- in a
14 book.  And then I have Cermak's policy regarding
15 grievances.
16    Q.   What's the -- what's the policy name
17 for the one that -- for Cermak?
18    A.   Grievances.  I don't know the exact
19 name.  It's grievances.
20    Q.   And what's the name of the policy that
21 you received from CCDOC related to grievances?
22    A.   Just grievances.
23    Q.   And you know that this isn't the
24 policy?
25    A.   This -- I'm not familiar with this.

Page 161

1 I've not seen this.  This is a DOC policy, and I
2 don't -- didn't have this.
3    Q.   But you just said you received a DOC
4 policy related to grievances.
5    A.   It was not this.
6    Q.   How do you know?
7    A.   It was -- it was -- 'cuz this does not
8 look familiar to me.
9    Q.   Do you have the other policy with you?
10    A.   No, I don't.
11    Q.   Okay.  Well, you've reviewed -- it
12 sounds like you've reviewed a CCDOC policy related
13 to grievances, so this could be the policy.
14        In looking at page two, there are
15 definitions under Roman numeral VII.  Under A,
16 it's for -- there's a definition of a correctional
17 rehab worker.  Under B is the emergency grievance.
18 C is the grievance.  Right?
19    A.   Correct.
20    Q.   I believe earlier you testified that
21 someone -- either the CRW or her -- his or her
22 supervisor receives the grievances from the inmate
23 and then that person who receives the form decides
24 if it is an emergency grievance or a grievance.
25 Is that right?

41 (Pages 158 - 161)

1    A.   Somebody in the DOC makes that
2  decision, CRW or supervisor or whoever they deem
3  makes that decision.
4    Q.   So on page 17 of this policy -- are
5  you familiar with this grievance form?
6    A.   Yes.
7    Q.   And so what you're saying is in the
8  top left corner here where it says grievance form
9  processed as emergency grievance, grievance, or
10 non-grievance request, someone from DOC checks one
11 of these boxes after they review the grievance?
12   A.   Correct.
13   Q.   And then in what situations have you
14 seen that a document is marked as a non-grievance?
15   A.   We don't -- haven't done that anymore.
16   Q.   Since when?
17   A.   I believe it was 2019. I don't have
18 the -- I don't have the exact date.
19   Q.   Why -- oh, go ahead.
20   A.   I don't -- I just don't remember
21 exactly when they stopped doing non-grievances.
22   Q.   Do you know why CCDOC has stopped
23 marking grievances as non-grievance?
24   A.   No. They just discontinued that.
25   Q.   Okay.

1    A.   I wasn't involved in that process.
2  Just that they were not -- were no longer
3  non-grievances. There were grievances or
4  emergency grievances.
5    Q.   Understood. When this process -- but
6  prior to 2019 someone from CCDOC would
7  occasionally check the non-grievance request box.
8  Right?
9    A.   Mm-hmm.
10   Q.   And was -- when it was -- when that
11 grievance form was checked as non-grievance, did
12 you have any particular responsibility in
13 reviewing the grievance?
14   A.   I did as long as it was for Cermak.
15 At one time the grievances went to the nurses if
16 they were nursing grievances. Did that answer
17 your question?
18   Q.   Yeah. I just didn't know if you were
19 done. Thank you.
20        From your experience looking at
21 grievances, were forms that were marked as
22 non-grievance sometimes not reviewed by anybody
23 from CCDOC or Cermak?
24   A.   Not anything that I would have any
25 knowledge of. Like disregarded? They were

1  never -- if they were received by us, they were
2  never disregarded.
3    Q.   What types of situations were marked
4  as non-grievance or requests?
5    A.   That was DOC that made that
6  determination. And it was because they just
7  didn't meet the specifications for a grievance
8  because it was, you know, like late, a late
9  grievance, wasn't within the time.
10   Q.   Were there other reasons that a
11 grievance form would be marked as non-grievance?
12   A.   That would -- really the DOC made that
13 decision. And I just treated them as answering
14 them either way.
15   Q.   So from 2015 to the present if you
16 received a grievance form that was marked as
17 non-grievance but there was a medical issue on the
18 form written by the inmate, would you take action
19 to help resolve the medical issue?
20   A.   Yes. Just as if it was a grievance.
21   Q.   Okay.
22   A.   It was still answered, yes.
23   Q.   And the CRW is the person that picks
24 up the grievance form. Right?
25   A.   Whoever DOC has to do it.

1    Q.   Okay.
2    A.   You know, that would be them that
3  would make that assignment.
4    Q.   Okay. And so then looking at the top
5  left, we have the different types of grievances.
6  And then to the right of that it says referred to
7  Cermak Health Services, superintendent, or other.
8  Who checks off where the -- where this form should
9  go?
10   A.   Whoever is processing the grievance
11 from DOC. Department of Corrections completes
12 that.
13   Q.   So is it the same person that picks up
14 the form and decides whether it's an emergency
15 grievance, grievance, or non-grievance?
16   A.   I don't know that answer. Just it was
17 -- it would be DOC.
18   Q.   Could it be a correctional officer
19 that makes that decision?
20   A.   I don't know the answer to that
21 question. It would be whoever they assigned it
22 to, which is -- typically is a CRW or a super-
23 visor.
24   Q.   Supervisor of what?
25   A.   The division.

42 (Pages 162 - 165)

Page 166

1    Q.   So is that a CCDOC supervisor of the
2 division of correction?
3    A.   Yeah. Yes.
4    Q.   And then who decides the top, what the
5 control number is?
6    A.   The DOC.
7    Q.   Do you know if it's the same person
8 that fills out the other two boxes --
9    A.   No, I do not.
10    Q.   -- we were talking about?
11    A.   No. No, I do not know.
12    Q.   Have you ever seen on a grievance form
13 or heard from someone within the facility that an
14 inmate was not allowed to fill out another
15 grievance form because they already grieved the
16 issue?
17    A.   Have I ever heard that? No.
18    Q.   You have never heard that --
19    A.   No.
20    Q.   -- before?
21    A.   No. They're not allowed to -- no.
22    Q.   Who's not allowed to?
23    A.   You said that they are not allowed,
24 that the detainee is not allowed to fill out
25 another form because he's filled out too many?

Page 167

1 No, I've not -- I've not heard that.
2    Q.   Have you ever seen that on a form, a
3 grievance form?
4    A.   That they've complained of that? Is
5 that your question?
6    Q.   Yes.
7    A.   That the detainee has complained of
8 that?
9    Q.   Mm-hmm.
10    A.   Yes.
11    Q.   Yes, you've heard of that?
12    A.   Yes. I've seen that.
13    Q.   Does that concern you?
14    A.   Anything that they have on there can
15 be concerning.
16    Q.   Is that a legitimate rule or policy
17 within Cook County or Cermak that an inmate is not
18 allowed to grieve the same issue more than once?
19        MR. DeVORE: Objection. Foundation.
20 Form.
21        THE WITNESS: Could you rephrase that?
22 I don't understand the question.
23        MS. ERICKSON: Debbie, can you repeat
24 the question, please.
25            ///

Page 168

1        (The following question
2        was read back:
3        "Q. Is that a legitimate
4        rule or policy within Cook
5        County or Cermak that an
6        inmate is not allowed to
7        grieve the same issue more
8        than once?")
9        MR. DeVORE: Same objection. She
10 already testified she wasn't a policy-maker. You
11 asked about a legitimate policy.
12 BY MS. ERICKSON:
13    Q.   This is just according to your
14 knowledge, Susan.
15    A.   No. No.
16    Q.   Is it a custom and practice inside
17 Cook County Department of Corrections that either
18 people from Cermak or Cook County tell inmates
19 that they cannot grieve an issue more than once?
20    A.   Is this a policy are you asking or
21 have I heard of anything? I've not heard anybody
22 say this, no.
23    Q.   But you've seen it in the --
24    A.   I've not heard anybody say this to a
25 detainee.

Page 169

1    Q.   But you've seen it in the grievances?
2    A.   I've seen a grievance where, yes.
3    Q.   And what did you do in following up
4 from that particular complaint from an inmate?
5    A.   I don't recall. Oftentimes they can
6 complain of various complaints. But if that was
7 just the issue on the grievance, I would probably
8 refer that to the nursing management so they can
9 look into it.
10        Excuse me.
11        (There was an interruption
12        at the door.)
13        THE WITNESS: I apologize.
14 BY MS. ERICKSON:
15    Q.   It's okay.
16        So if someone had written in the
17 grievance form that someone told them they can't
18 grieve an issue more than once, that's -- that
19 would be referred --
20    A.   And it was a nursing issue, it was --
21 they were complaining about a Cermak staff, then
22 it would -- the nursing management would look into
23 it.
24    Q.   Okay. I'm going to repeat the
25 question. Please wait until --

43 (Pages 166 - 169)

Page 170

1      A.   Oh, okay.
2      Q.   -- I finish the question because it's
3  confusing for the record.
4      A.   Okay.
5      Q.   So when you have -- in situations when
6  you have seen in a grievance form "Somebody told
7  me not" -- "I can't grieve an issue more than
8  once," you would report that to someone from
9  nursing management?
10         MR. DeVORE:  Objection.  Form and
11  maybe suggests a misunderstanding of the types of
12  grievances she gets.
13         MS. ERICKSON:  That's not an
14  objection.
15         MR. DeVORE:  Form.  Assumes facts not
16  in evidence.  Outside the scope of her knowledge.
17         Go ahead, Susan.
18         Maybe she needs an explanation.
19         THE WITNESS:  I don't understand who
20  -- could you re-ask the question?
21         MS. ERICKSON:  Debbie, can you repeat
22  the question, please.
23             (The following question
24              was read back:
25             "Q.   So when you have --

Page 171

1              in situations when you
2              have seen in a grievance
3              form, 'Somebody told me
4              not' -- 'I can't grieve
5              an issue more than once,'
6              you would report that to
7              someone from nursing
8              management?")
9         THE WITNESS:  If this was a Cermak
10  grievance and they were complaining about nursing
11  or medical.
12  BY MS. ERICKSON:
13      Q.   What?
14      A.   That's my answer.
15      Q.   What would you do?  You didn't say
16  what you would do.
17      A.   I would refer to nursing management
18  for review.
19      Q.   If only it was a Cermak or nursing
20  issue?
21      A.   Anything from Cermak.  I wouldn't --
22  if it was a DOC issue, if they're saying the DOC
23  is saying this, it's a DOC grievance, it's not
24  mine to answer.  I don't manage DOC.
25      Q.   But what if they --

Page 172

1      A.   Cermak doesn't manage DOC.
2      Q.   Right.
3      A.   So it would go back to DOC to
4  investigate or whatever.
5      Q.   But you used the same grievance form
6  in Cermak as CCDOC.  Right?
7      A.   Yes.
8      Q.   Okay.  So when you say it's a
9  grievance -- a Cermak grievance, what do you mean?
10      A.   That they've sent it here, that it's a
11  medical issue.
12      Q.   So it becomes a medical issue when
13  someone from Cook County determines that it should
14  be referred to Cermak?
15      A.   Correct.  They make -- they do -- they
16  code it.  DOC codes it.  There's different codes,
17  and they've determined that it belongs to DOC or
18  they've determined that it belongs to Cermak.  It
19  would depend on who the detainee was complaining
20  about.
21      Q.   So, in Cermak, the medical team
22  wouldn't even see this form even if there were a
23  medical issue in here if the person from Cook
24  County marked it wrong and referred it to the
25  wrong place.  Right?

Page 173

1      A.   Correct.
2      Q.   If it's marked as referred to
3  superintendent, is that a form that someone at
4  Cermak will review?
5      A.   Probably not.  It would depend on the
6  code that they put on it.
7      Q.   The control number?
8      A.   Probably -- no.  There's a code.
9  There's a control number.  But there's also a
10  code.
11      Q.   Is that the number that they put right
12  here?
13      A.   No.  It's on the front form.
14      Q.   Oh.  Where do they normally put the
15  code?
16      A.   Scroll up higher.  It's up at the top,
17  right between --
18         MR. DeVORE:  We don't have any that
19  are filled out.
20         THE WITNESS:  No.  And it's by hand.
21  BY MS. ERICKSON:
22      Q.   And where is it?  Right here in the
23  top?
24      A.   Yes.
25      Q.   Okay.  And is that the current

44 (Pages 170 - 173)

1 practice nowadays?
2    A.   Yes.
3    Q.   Has that changed at all since 2017?
4    A.   No.
5    Q.   Okay.  And is it possible -- strike
6 that.
7             Have you seen a situation where
8 there's one control number for two different
9 grievances?
10    A.   Yes.
11    Q.   In what situations does -- do two
12 grievances get the same control number?
13    A.   See, that would be the DOC that would
14 make that determination.  So if they've come to me
15 with the same control number, I still just answer
16 the grievances, answer the complaints.  Sometimes
17 the dates are different but close or the complaint
18 is the same or -- those are the only two things
19 that I can think of.  I'm sure there's others.
20 But I'll just answer them the same as if they were
21 separate.
22    Q.   I'm going back to if an inmate wrote
23 that they weren't allowed to grieve an issue more
24 than once but it did not state if the person that
25 told them that was a Cermak person or a Cook

1 County staff.  Would Cermak ever see that form if
2 there's no medical issue in it?
3    A.   It's possible.
4    Q.   It's possible what?
5    A.   If they've -- it's possible that we
6 would not see it.  It depends on if they send it
7 to us.
8    Q.   Okay.  So it could be that --
9    A.   Depending on the code.
10    Q.   All right.  And then what are the
11 codes that are possible?
12    A.   I don't have them memorized.
13    Q.   What's 190?
14    A.   Medication.
15    Q.   Is there one for security?
16    A.   There's several for security.  I don't
17 have those memorized.
18    Q.   Okay.
19    A.   250 would be dental.  210 would be
20 mental health.  200 is medical.
21    Q.   That's okay.  You don't have to --
22    A.   Is that enough?
23    Q.   Yeah.  Yeah.
24    A.   Okay.
25    Q.   But, though, again, just to say -- I'm

1 interested -- Cook County, again, is the one that
2 makes the determination of what the grievance code
3 is that goes on the form.  Right?
4    A.   Correct.
5    Q.   Okay.  And then the superintendent, is
6 a superintendent over -- does he or she oversee
7 both Cook County and Cermak?
8    A.   I don't know all the job duties of the
9 superintendent.  We have a COO that's over
10 operations.  But then -- oh, custody, they're here
11 for custody.
12             So I don't understand exactly what
13 you are asking.
14    Q.   Sure.  Is there a superintendent just
15 for Cermak staff?
16    A.   No.
17    Q.   Is there a superintendent that
18 oversees Cermak at all?
19    A.   There's superintendents I believe in
20 each division.  It could have changed.  They could
21 be -- some could be for a couple divisions.  But,
22 from my last recollection, there's one per
23 division.
24    Q.   But my question is about Cermak.  Do
25 you consider Cermak to be a division?

1    A.   Yes.
2    Q.   Okay.  So then there is a super-
3 intendent over Cermak?
4    A.   There's a superintendent in Cermak.
5    Q.   So when this is referred to a
6 superintendent, which superintendent would the
7 form be referred to?
8    A.   It would depend on the division.
9    Q.   Okay.  So the person that decides to
10 refer it to either Cermak, superintendent, or
11 other also decides which superintendent to send
12 the form to?
13    A.   It depends on the division that the
14 detainee is living in or where -- or where his
15 complaint is coming from.  They can live in one
16 area but be complaining about another.  And it
17 would be whichever superintendent is relative to
18 the complaint.
19    Q.   Understood.  And so Cook County makes
20 a lot of decisions upon receiving this grievance
21 form before you would even see it.  Right?
22    A.   Correct.
23    Q.   Do you review the health service
24 request forms as well?
25    A.   As they're -- as they are relevant.

45 (Pages 174 - 177)

Page 178

1  But I do get into the chart. And I don't have the
2  paper health service request form. There are --
3  they are scanned in. But I also look at the
4  visit, the encounter with the nurse.
5      Q.  I don't understand. If an inmate
6  fills out a health service request form, do they
7  always see a nurse?
8      A.  No. They're just ordering -- no, they
9  don't always see a nurse.
10     Q.  Okay. So you said you review health
11 service request forms when they're relevant?
12     A.  To the grievance.
13     Q.  Okay. So only when they're relevant
14 to the grievance?
15     A.  Yeah.
16     Q.  How do you know if an H -- health
17 service request form is relevant to a grievance?
18     A.  I'll look at the date and I'll just go
19 through and start reviewing health service request
20 form, the visits, see if there's nursing visits,
21 and just go down --
22     Q.  So you're -- sorry.
23     A.  -- the report. Uh-huh.
24     Q.  So you're doing an evaluation at that
25 point to see what's their most recent care and

Page 179

1  what other issues have they complained about?
2      A.  And what other issues they've
3  complained about? I just review their -- starting
4  from and maybe prior to their complaint and just
5  review the medical record.
6      Q.  So it sounds like you look at the date
7  of the grievance and then you will look in the
8  medical chart to see if there's any health service
9  request forms on that date or around that date.
10 Is that right?
11     A.  Yes. On or around. Uh-huh. And then
12 I'll look at other things. Their meds. Just I
13 kind of look through the whole chart. Do I look
14 at every documentation or encounter? No. I would
15 never finish. But as much as that I can look at
16 that pertains to the grievance.
17     Q.  Okay.
18         MR. COYNE: Just let me interrupt.
19 I'm going to have to sign off here on the break so
20 I can queue up on the conference call. There's a
21 number of parties. So I'll either let them know
22 -- you know, I don't know how long it's going to
23 take, but I'm going to let them know I'm in a
24 deposition. So I will report back before too long
25 and fill you in and take a break.

Page 180

1          MS. ERICKSON: All right. We'll take
2  a break.
3          MR. COYNE: Thank you.
4             (A break was taken from
5              1:54 p.m. until 2:16 p.m.)
6          MS. ERICKSON: We'll go back on.
7  BY MS. ERICKSON:
8      Q.  Do you know if grievance forms are
9  supposed to be picked up daily by the CRWs from
10 the living units?
11     A.  That's my understanding, except
12 weekends.
13     Q.  Except weekends?
14     A.  Yeah. I don't believe they -- I don't
15 believe they pick them up on weekends.
16     Q.  Okay.
17     A.  At least we don't receive them on
18 weekends.
19     Q.  I'm going to show that policy again.
20 One moment here. Susan, can you see it, this
21 document?
22     A.  I can.
23     Q.  Did you say yes?
24     A.  Yes, I can.
25     Q.  Are you familiar with this form, the

Page 181

1  CRW Inmate Grievance/Non-Grievance Request
2  Tracking Log?
3      A.  No. It looks like it's a DOC tool.
4      Q.  Oh. So you don't ever see this?
5      A.  No.
6      Q.  Do you have any similar form like this
7  for Cermak?
8      A.  Nothing with subject matter. Just
9  that return, chain of custody with the control
10 number. There's no DOC number or anything
11 identifying on it other than the control number.
12 No subject matter or any of -- just the date it
13 was received. And then when we give it to the
14 DOC, whoever is coming here to pick them up, would
15 be the date that -- you know, the date that it
16 transpired that we gave it to them.
17     Q.  And how often do the staff from DOC
18 come to pick up grievance forms from you?
19     A.  Typically it's daily, except weekends
20 and holidays.
21     Q.  What's the name of the form that
22 Cermak uses to track grievance forms?
23     A.  The transfer form, transfer sheet.
24     Q.  So it's called the Cermak transfer
25 sheet?

46 (Pages 178 - 181)

Page 182

1    A.   Not Cermak.  Just inmate transfer.  It
2  was made by -- DOC made it, had it printed.  It's
3  a carbon.  We get a copy.  They get a copy because
4  it's signed, and then here's your copy, there's
5  their copy.
6    Q.   So do you fill out the inmate transfer
7  sheet individually for every grievance that you
8  receive?
9    A.   We list what we're returning by
10  control number.  It's just like lines, and you put
11  their control number and then there's like 15, 15,
12  30 per page, and then we attach the grievance to
13  that.  And then there's like a little check box.
14  And as they go through to make sure, yes, this is
15  the grievance we're receiving and they put a
16  little check by it.  When it's all checked that
17  they are receiving the grievances that we're
18  saying, then they sign it and tear it.  We keep
19  half -- one copy and they keep a copy.  And then
20  we do the same thing with the ones that they bring
21  to us.
22    Q.   Are those forms scanned electroni-
23  cally?
24    A.   No.  No.
25    Q.   Do the inmate transfer sheets from

Page 183

1  2015 to '17 still exist?
2    A.   I -- are you -- transfer -- now I'm
3  unclear.  Are you talking about the grievance
4  form, the grievance form coming here, or the
5  detainee being transferred?  I'm confused now.
6    Q.   Me, too.  You just said that when
7  the -- Cermak has a sheet in which they -- they
8  write down all of the grievance forms that they
9  receive on it.  Is that right?
10    A.   They -- that they are bringing to us.
11    Q.   Okay.
12    A.   To Cermak.
13    Q.   And you called that --
14    A.   And it goes by the control number.
15    Q.   And you call that form a transfer
16  sheet?
17    A.   Yes.
18    Q.   And does the -- do the transfer sheets
19  that you receive that pertain to grievance forms
20  for 2015 through '17 still exist?
21    A.   I don't -- I don't know the answer to
22  that question.  I don't know if they exist still.
23    Q.   Was that the custom and practice that
24  you were using from 2015 to '17 for grievance
25  forms?

Page 184

1    A.   Yes.
2    Q.   How many days do you have to review a
3  grievance before you need to give it back to Cook
4  County Department of Corrections to give to the
5  inmate?
6    A.   Fifteen.
7    Q.   Are you familiar with the early
8  warning system?
9    A.   Just one moment.
10         (There was an interruption
11         at the door.)
12       THE WITNESS:  Okay.
13  BY MS. ERICKSON:
14    Q.   You can take a minute and read it.
15    A.   No.  Okay.  No.  I don't use this.
16  That's DOC.
17    Q.   Okay.  So you've never heard of a --
18    A.   No.
19    Q.   You've never heard of this?  Do you
20  have a similar system in Cermak in which if
21  there's any patterns identified where three or
22  more of the grievances are reflected within the
23  same division there's some type of report that's
24  generated?
25    A.   No.

Page 185

1    Q.   So what if there's a pattern in
2  medication not -- not being given to an inmate and
3  that occurs more than three times?  There's no
4  sort of report that's generated to sort of audit
5  that?
6    A.   I don't do the audits now.  I just do
7  the grievances.  I'm sure there is some type of a
8  tracking tool.  I don't know.  I don't.
9    Q.   Do you sign any type of log book when
10  you receive the grievance forms from Cook County
11  Department of Corrections?
12    A.   Do I sign a log book?
13    Q.   A log book --
14    A.   That transfer form, we go through it,
15  and it's initialed.
16    Q.   Okay.
17    A.   But a log book?  I don't have a log
18  book.
19    Q.   Who -- what's the title of the person
20  that drops off the grievance forms to you?
21    A.   It could be a clerk or CRW.  It could
22  also be --
23         What happened?  Did something
24  happen?
25    Q.   I'm not sure.  You can continue,

47 (Pages 182 - 185)

Page 186

1 though.
2     A.   Continue?  Did you want me -- am I on
3 mute?
4     Q.   No.  No.  No.
5          So the clerk or CRW drops off the
6 grievance forms to you?
7     A.   Yeah.  I don't know their titles.  I
8 just know that they're from DOC.
9     Q.   Okay.  And I believe you stated
10 earlier that the grievance forms are scanned
11 electronically?
12     A.   That's on the DOC's part how they --
13 how they do that.  I don't know when in the
14 process they do that.  But we -- I have no part of
15 that.
16     Q.   Do you know where those electronic
17 forms are stored?
18     A.   DOC.
19     Q.   Are you considered an inmate services
20 supervisor?
21     A.   No.
22     Q.   Do you know if there's a policy
23 anywhere within Cook County or Cermak that states
24 that an inmate cannot grieve an issue more than
25 once?

Page 187

1     A.   Not that I recall.
2     Q.   And you said that you only review
3 health service request forms in order to evaluate
4 grievances.  Right?
5          MR. DeVORE:  Objection.  Mischarac-
6 terizes her testimony.  I don't believe that's how
7 she testified.
8 BY MS. ERICKSON:
9     Q.   You can answer.
10     A.   I review health service request forms
11 that are relevant to the grievance that -- it may
12 not be the only time I review a health service
13 request form.  I can review just to go back in
14 time further than just directly surrounding a
15 grievance.
16     Q.   Whose role is it to -- strike that.
17          Whose role is it from Cermak to
18 review the health service request forms?
19     A.   That would be nursing.
20     Q.   So the nursing manager is in charge of
21 that?
22     A.   That you would -- the DOC -- the
23 director of nursing and the nurse managers would
24 make that assignment.  I don't know who in nursing
25 that they assign for the health service request

Page 188

1 form clinic that would review it.
2     Q.   Okay.  And who from Cermak picks up
3 the health service request forms from the living
4 units?
5     A.   I believe that it would be the nurses.
6     Q.   Do you know if they pick up the health
7 service request forms when they're making their
8 rounds for med pass?
9     A.   I don't know exactly when they -- when
10 they pick them up.
11     Q.   How were you trained in your position
12 as the clinical performance improvement analyst?
13     A.   How was I trained?  I didn't take any
14 training class for this position.
15     Q.   Since you've -- since you've been at
16 Cook County in 2012 have you received any type of
17 training?
18     A.   Training class?  No.
19     Q.   Does anyone review -- strike that.
20          Who -- does anyone audit your
21 review of the grievance forms?
22     A.   That would be DOC.  No, not -- DOC did
23 at one time.  They may still.  I don't.  I'm not a
24 part of that.
25     Q.   So between 2015 and 2017 the

Page 189

1 Department of Corrections reviewed your medical
2 evaluation of an inmate's grievance?
3     A.   My medical evaluation?  No.  I just
4 thought you meant the grievance, if they evaluated
5 my grievance.  The COO would look at my grievances
6 randomly.
7     Q.   The COO of Cermak reviewed your
8 grievances at random?
9     A.   Yes.
10     Q.   Did you ever bring grievances to the
11 COO or the director of nursing asking for help on
12 how to resolve the issue?
13     A.   Yes.
14     Q.   In what types of situations have you
15 asked for help from them?
16     A.   I don't recall.
17     Q.   Have you asked the COO and director of
18 nursing for help when you couldn't get ahold of
19 someone from Cook County?
20     A.   Are you talking DOC or medical?
21     Q.   DOC.
22     A.   Why would I get a -- I don't under-
23 stand your question because I don't answer DOC's
24 grievances.
25     Q.   But in your review as a Cermak staff,

48 (Pages 186 - 189)

Page 190

1  do you ever decide that you need to speak with a
2  correctional officer in your review of what
3  happened?
4      A.  No.  That would be DOC that would
5  answer that part of the grievance.  Sometimes
6  there's multiple issues in a grievance, and some
7  could be DOC, some could be medical, or they could
8  be both.  DOC would answer their part, and then I
9  would answer my part.  So there could be two
10  components of one grievance.  Although, it
11  shouldn't be, we do it, we take care of it anyway.
12     Q.  What do you mean?
13     A.  Well, it makes it difficult when the
14  detainee has more than one issue on the grievance,
15  when he starts complaining of several issues.  But
16  we still address it, you know.  If there's a
17  medical part of it, then medical answers that.
18  And then DOC answers their part.
19     Q.  And then after both sides address the
20  issue or issues in the grievance, do both parties
21  come together to discuss the grievance at all?
22     A.  No.  No.  Because I would have
23  answered the medical part; they would have
24  answered the DOC part.  I don't manage DOC or
25  would know what the officer, who they even were.

Page 191

1  I don't really know all the officers.  They would
2  just know more of it.  Just like the medical, for
3  them to review the medical, go into the chart,
4  they don't.  So if there was --
5      Q.  What if someone from DOC doesn't
6  understand what you've written as the medical
7  response?
8      A.  They could contact me.
9      Q.  Has that happened --
10     A.  They could contact me or they could
11  contact their supervisor.
12     Q.  Does that --
13     A.  If they don't understand what medical
14  is writing.
15     Q.  Sorry to interrupt.  Does that happen
16  sometimes where you receive a call and they say,
17  "Susan, what were you meaning in this situation?
18  What happened in this situation because it's not
19  written on the form"?
20     A.  No, not to my knowledge that I recall.
21     Q.  Do you remember Mr. William Dukes?
22     A.  No.
23     Q.  You never met him?
24     A.  I don't know him.
25     Q.  Okay.  I'm going to put up his

Page 192

1  grievances.  Give me one moment here.
2                (Shebel Deposition
3                Exhibit C was marked.)
4  BY MS. ERICKSON:
5      Q.  Can you see this document, Susan?
6      A.  I can.
7      Q.  Okay.  So I'm marking as Exhibit C
8  Mr. Dukes' grievances.  It starts on page CCSAO
9  Dukes 000963.  And I'm just going to pull some of
10  these out.  Okay.  I'm on page 000978.  I'll give
11  you a minute to review what's written in the
12  complaint.  Can you see it?
13     A.  I do.
14     Q.  Okay.  Let me know when you're ready.
15     A.  I'm ready.
16     Q.  All right.  So the date on this
17  particular grievance is December 3, 2015.  Right?
18     A.  Yes.
19     Q.  For William Dukes.  Right?
20     A.  Yes.
21     Q.  And at that time it looks like he was
22  housed in Division 10 living unit 2-C.  Correct?
23     A.  Yes.
24     Q.  Okay.  So this date here 12/3/15, is
25  that the date on which he wrote the grievance?

Page 193

1      A.  Yes.  That he says that it is, yes.
2      Q.  Okay.  And then looking -- and then
3  underneath his complaint, it looks like Mr. Dukes
4  signed it 12/3/15.  Right?
5      A.  Yes.
6      Q.  And then right underneath that there's
7  the section CRW/platoon counselor N. Jones
8  signs it and dates it 12/3/15.  Right?
9      A.  Yes.
10     Q.  So does that mean she's the CRW that
11  picked up this grievance form from Division 10,
12  2-C?
13     A.  She may have been -- I don't know if
14  she was a CRW.  I don't know her title.
15     Q.  Well, it's okay.  Okay.
16     A.  But she is DOC or was DOC.
17     Q.  So does this mean that she is the one
18  that picked up the grievance form and dated it
19  December 3, '15?
20     A.  She's the one that reviewed it and
21  signed it and dated it.  I don't know that she was
22  the one that picked it up.
23     Q.  And then, from what you know and your
24  experience working and reviewing grievance forms,
25  would N. Jones be the person that decided if it

49 (Pages 190 - 193)

1 was an emergency grievance, grievance, or
2 non-grievance?
3    A.   That would be my understanding.
4    Q.   So N. Jones decided this form was a
5 grievance and it should be referred to Cermak
6 Health Services.  Right?
7    A.   Yes.
8    Q.   And from your understanding reviewing
9 these forms -- reviewing this form, wouldn't
10 N. Jones have written the control number as well?
11    A.   There is a control number, yes.
12    Q.   Did N. Jones write that, based on your
13 experience with these forms?
14    A.   She could have.  I don't -- it's DOC.
15 I don't know if she is the one that gave it the
16 control number.  But by the signature it looks
17 like she's the one that read it, signed it, and
18 dated it.
19    Q.   Okay.  And then this is the code you
20 were talking about earlier, what's here in the
21 middle of the page?
22    A.   Yes.
23    Q.   And who would have -- who stamped it
24 and put code 190?
25    A.   I can -- I would think that whoever

1 read it would have put that code.
2    Q.   So N. Jones decided it was a 190 and
3 stamped it?
4    A.   I would -- whoever was in charge of
5 the grievances.  I would think that that was her,
6 but I can't -- I can't testify to that --
7    Q.   Right.
8    A.   -- that she was the one that did that.
9 But --
10    Q.   Okay.
11    A.   -- it is CO -- it is DOC that does
12 that.
13    Q.   All right.  And then this time stamp
14 here, December 8 sometime, maybe 9:10 a.m., is
15 that something you would have put on the form?
16    A.   Me or a clerk, whoever received it.
17    Q.   Whoever received it in Cermak?
18    A.   Correct.
19    Q.   Okay.  So there's clerks at Cook
20 County and then there's clerks at Cermak?
21    A.   Yes.  There would be one clerk that
22 would do this.
23    Q.   All right.  So it's received on
24 December --
25    A.   And also I -- or I could have done it.

1 It just depends who did it.
2    Q.   Right.  Yeah.  No.  I'm just --
3    A.   Okay.
4    Q.   So he -- so Mr. Dukes fills it out on
5 the 3rd of December, N. Jones from Cook County
6 picks it up on that same day, and then five days
7 later it gets to you at Cermak to review.
8 Correct?
9    A.   That seems right.
10    Q.   And I'm only seeing it because the
11 next page is the response.  And your -- is that
12 your name on there, Susan Shebel?
13    A.   That is my name.
14    Q.   Okay.  And it looks like you have
15 signed the date 12/17/15.  Is that the date that
16 you reviewed this grievance form?
17    A.   Yes.
18    Q.   Do you normally review the form all in
19 one sitting?
20    A.   Not always.
21    Q.   So if you marked 12/17/15, when --
22 when did you review the form?
23    A.   I would have completed it on that date
24 12/17/15.  On that one it's 12/17/15.  But not
25 all -- it would depend.  But it looks like the

1 medications, that that was 12/17/15.
2    Q.   How many grievance forms do you
3 receive in a day to review?
4    A.   It varies.  It's hard to pinpoint
5 because it varies by so many different things.
6    Q.   Okay.  Could it be as low as 20 and as
7 high as 100?
8    A.   Yes.
9    Q.   Okay.  And then this -- go ahead.
10    A.   I don't think I've gotten a hundred in
11 one day, but I have gotten over 80.
12    Q.   Okay.  So this particular -- on this
13 particular grievance, as you saw, Mr. Dukes was
14 complaining about wanting nitroglycerin to keep on
15 his person.  Is that accurate?
16    A.   Yes.
17    Q.   And his specific action is -- action
18 he's requesting is:  "To be given my nitroglycerin
19 medication to keep on person in a sealed, airtight
20 container.  When needed, any delay waiting for a
21 nurse to arrive with it could be fatal for me.
22 Thank you."
23        So you would have -- you reviewed
24 this when you saw the form.  Right?
25    A.   I did.

1    Q.   All right.  And then, let's see, so
2  who writes on the second page, who writes 190
3  medical prescription at the top of the page?
4    A.   That would be the DOC.  They wrote
5  that.
6    Q.   Okay.  So now we're on page 000979.
7  And is this all of your handwriting starting at --
8  I don't know, where it starts, it says Cermak --
9    A.   No.
10   Q.   -- 12/4/15?
11   A.   No.  That's not my handwriting.
12  That's DOC.
13   Q.   Okay.  So someone from DOC wrote
14  CRW/platoon counselor referred this grievance/
15  request to Cermak on December 4, 2015.  Is that
16  accurate?
17   A.   Correct.
18   Q.   The response by personnel handling
19  referral.  So this would also be someone from Cook
20  County?
21   A.   That was me.
22   Q.   Oh, this is you.  Okay.  So what is it
23  that you wrote there?
24   A.   "Your medications are dose by dose, so
25  you cannot have a supply of meds for yours and

1  others' safety."
2    Q.   Did you look in Mr. Dukes' medical
3  records to see if this medication was a DXD?
4    A.   I would have.
5    Q.   Did you -- I mean, if you looked --
6  I mean, we can look at the medical records.  But
7  let me just put them up here so we can see.
8        Can you see this record?
9    A.   No.  That doesn't look like anything
10  that I see.
11   Q.   Do you see Medication Administration
12  Record at the top of this?
13   A.   Yeah, this doesn't look --
14   Q.   Okay.  I just wanted to make sure you
15  could see the document.
16   A.   Oh, okay.  Yeah, I see it.
17   Q.   Yeah.  That's all.
18        So this is the -- these are the
19  medical records from Mr. William Dukes.  And I'm
20  going to go to the orders that he had entered
21  around that time.  He arrived on November 25,
22  2015.  So we're on page -- we're marking this --
23  I'm marking this as Exhibit D, and it's Mr. Dukes'
24  medical records.
25        ///

1        (Shebel Deposition
2        Exhibit D was marked.)
3  BY MS. ERICKSON:
4    Q.   The first page is CCSAO Dukes 000001.
5  And we're currently on 000503.
6        So when Mr. Dukes arrived on --
7  actually, it looks like the 24th of November 2015
8  this record shows his intake.  Is that accurate,
9  from what you can tell?
10   A.   This doesn't -- see, I look at the
11  computer, so this does not look like a familiar
12  format for me.
13   Q.   Mm-hmm.  Okay.  Well, all the dates on
14  this record were going -- are November 24, 2015.
15  Correct?
16   A.   Yes.
17   Q.   I'm scrolling down to -- I'm scrolling
18  down to 000504.  It looks like actually the first
19  record of Mr. Dukes having a prescription for
20  nitroglycerin is December 8, 2015, because the
21  next date is December 9, December 8, December
22  2015.  Can you see that, the December 8, 2015,
23  nitro?
24   A.   I see that.
25   Q.   So in reviewing his grievance in

1  December -- about December 3, you went into his
2  medical records and you saw that he had a
3  dose-by-dose prescription for nitroglycerin.  Do
4  you see --
5    A.   Let me see the grievance again so I
6  can see what I wrote.
7    Q.   Sure.  One second.  Can you see it?
8    A.   Yes.
9    Q.   All right.
10   A.   So it was 12/8, correct, was the
11  order?
12   Q.   Yes.
13   A.   I looked at the chart.  And it's dated
14  12/17, so he would have had the order at that
15  time.
16   Q.   But is it a dose-by-dose order?
17   A.   Yes.
18   Q.   Hold on.  I'm going to put it up
19  again.  Okay.  We're back on the medical records,
20  page 505.
21   A.   Mm-hmm.
22   Q.   Where in this -- where in this order
23  for nitroglycerin on December 8, 2015, does it say
24  dose by dose or DXD?
25   A.   It doesn't because they don't write it

51 (Pages 198 - 201)

Page 202

1  if it's -- if it's not KOP, if it's not ordered
2  KOP, then it's dose by dose.
3      Q.   Okay.  So PRN means as needed.  Right?
4      A.   Correct.
5      Q.   So I don't understand.  Isn't -- does
6  dose by dose mean that you take -- every time you
7  get medication you get that specific medication?
8      A.   I'm sorry, could you rephrase that?
9      Q.   What's the difference between dose by
10 dose and as needed?
11     A.   Okay.  So they're -- dose by dose
12 means you get the medication from the nurse.  KOP
13 means you just -- you give it to yourself as it's
14 ordered.  You can have dose by dose PRN and you
15 can also have KOP PRN.
16     Q.   Okay.  But if it doesn't say --
17     A.   Does that answer your question now?
18     Q.   Yes.  So if it doesn't say KOP PRN,
19 it's -- by default is it dose by dose PRN?
20     A.   Unless it says KOP, it's dose by dose.
21     Q.   Okay.  And so Mr. -- it looks like
22 Mr. Dukes grieved this issue on December 3 and
23 five days later he got an order for it and then by
24 the time you looked at it on December 17 at that
25 point --

Page 203

1      A.   He had an order.
2      Q.   -- he had an order for it.  Right?
3      A.   Correct.
4      Q.   Did you help facilitate getting him an
5  order for nitroglycerin?
6      A.   I could have, but I -- I don't recall.
7      Q.   Okay.
8      A.   He could have had a -- I would have to
9  look at the chart to see maybe he had a provider
10 visit in between that time.  I don't recall.
11     Q.   Okay.  After an inmate goes through
12 the medical intake process and sees a provider,
13 being a physician or a physician's assistant, how
14 long after that date does it take for an inmate to
15 actually get the medication as prescribed?
16     A.   It would depend on if it was dose by
17 dose or KOP medication because they're on a weekly
18 eligible -- at that time, I believe it was weekly
19 or every two weeks.  Within a couple days, within
20 a day, day and a half, maybe two.  It would depend
21 on the time when the medication was ordered, the
22 time of the day.
23     Q.   Okay.  Well, while we're here, looking
24 at the medications that were ordered for Mr. Dukes
25 on November 24, 2015, we're starting on page 502,

Page 204

1  it looks like he had an evaluation for chronic --
2  he had a chronic disease alert order entered for
3  dyslipidemia.  What does that mean?
4      A.   Fat.
5      Q.   Okay.
6      A.   Fat in the blood.
7      Q.   And then --
8      A.   Probably high cholesterol.
9      Q.   Okay.  And then, the next one, he had
10 a chronic disease alert order for hypertension.
11 Right?
12     A.   Mm-hmm.
13     Q.   Next he had an order for albuterol.
14 Correct?
15     A.   Yes.
16     Q.   And that's taken for asthma?
17     A.   Yes.
18     Q.   And then he had doxazosin prescribed.
19 What is that used for?
20     A.   I believe that that is for the
21 prostate.  I would -- that's a generic name, so I
22 would have to look that up.  So I don't recall,
23 but that would be my first thought.
24     Q.   All right.  And then he has
25 amoxicillin prescribed.  Right?

Page 205

1      A.   Yes.
2      Q.   And then at the same time he had some
3  kind of diet CCDOC order.  And it looks like he
4  had a cholesterol/fat restricted/low salt, routine
5  diet.  Right?
6      A.   Yes.
7      Q.   All right.  We're continuing on to
8  page 504.  He had a medical classification order
9  for dose-by-dose medical.  Do you understand what
10 that order means?
11     A.   Yes.  Medication through dose by dose.
12 He's an M2.
13     Q.   What does that mean?
14     A.   That he would be out in a division
15 where they pass the meds, where there's nurses
16 that pass the meds.  He's not GP.
17     Q.   Okay.  The next order is security
18 alert CCDOC, and it looks like he's in protective
19 custody, routine.  Correct?
20     A.   Mm-hmm.
21     Q.   The next one, he has a chest PA.  What
22 does the PA stand for?
23     A.   Where are you reading?
24     Q.   In the middle here.
25     A.   Chest x-ray.

52 (Pages 202 - 205)

Page 206

1    Q.   Okay.  So this is the following day.
2  Now it's -- now it's November 25, 2015, at
3  5:00 p.m. he had the chest x-ray.  Correct?  Is
4  that what it says?
5    A.   Yeah.
6    Q.   Okay.  And then it looks like the next
7  particular medication starts -- or is ordered on
8  December 9, 2015.  Right?
9    A.   Yes.
10    Q.   Okay.  So after Mr. Dukes is
11  prescribed all these medications on November 24,
12  2015, the records are silent and they don't show
13  that he got medications after this for three
14  months.  Is that possible?
15    A.   No.
16    Q.   I'll go up to -- I'll go to -- up that
17  section so you can maybe help explain what
18  happened, if you know.
19    A.   We had -- this is 2015.  Some were in
20  a different -- I wish I could think of the name of
21  the system.  It was a different medication system
22  for documenting the meds.  I'm curious as to maybe
23  that could be what it is.
24    Q.   What was the name of that system?
25    A.   I'm wondering if it was just Cerner

Page 207

1  medication.  There was -- we were just starting
2  rolling out the Pyxis.  And, I'm sorry, I just
3  don't recall.
4    Q.   Okay.  All right.  Well, I'm going
5  back up to the top of chronologically in 2015 when
6  Mr. Dukes was admitted to Cook County Department
7  of Corrections.  One second.  Sorry.
8      On page 333, it shows that the
9  first date that Mr. Dukes received medication was
10  on March 27, 2016, but yet he had orders on
11  November 24 and 25 -- November 24, 2015.  How does
12  that happen?
13    A.   I don't know the answer to your
14  question except the only thing that I could think
15  of is that it's documented in another place.
16    MR. DeVORE:  Are we still talking
17  about the grievance where it says he's on
18  nitroglycerin but he wants it KOP?  Is that what
19  we're still talking about?
20    MS. ERICKSON:  No.  This is sort of a
21  secondary related issue.
22  BY MS. ERICKSON:
23    Q.   Okay.  So you don't know long and
24  short?
25    A.   No, I don't know where it would be

Page 208

1  documented.
2    Q.   Mm-hmm.  Okay.  Okay.  So going back
3  to the grievance from December 3, 2015, we're on
4  page 979 of the grievance documents, after you
5  signed this on December 17, 2015, what did you --
6  what do you do with the document?
7    A.   Then it is put on that transfer sheet
8  by the control number.
9    Q.   Mm-hmm.
10    A.   List all of the different control
11  numbers of the grievances that were -- that I'm
12  ready to have go back to the DOC.  And then they
13  come in and they pick them up and they check, you
14  know, the box they received it.
15    Q.   And then it gets to Mr. Dukes and he
16  signs it on December 29, 2015.  Right?
17    A.   That's correct.
18    Q.   It looks like -- it seems like part of
19  the policy, to exhaust administrative remedies
20  appeals must be made within 14 days of the date
21  the inmate received the response.  Correct?
22    A.   Yes.
23    Q.   And, in this case, Mr. Dukes fills out
24  the appeal on the same date, December 29, 2015,
25  and he notes:  "This" -- "These are emergency

Page 209

1  medication, nitroglycerin, just as an asthma
2  inhaler ... that I can have?"
3      Was there any consideration that
4  you remember about whether to give him this
5  nitroglycerin as a KOP?
6    A.   That would be up to the provider to
7  write that order.
8    Q.   Did you talk to the provider about it?
9    A.   I don't recall.  I'd have to look more
10  thoroughly into the chart to see.
11    Q.   If you talked to the provider about
12  this grievance, would it be in the medical chart
13  for Mr. Dukes?
14    A.   No.  I would want to see why he cannot
15  have the nitroglycerin other than he's on M2 and
16  dose by dose.  The medication was ordered dose by
17  dose.
18    Q.   Okay.  And then so then you received
19  the document -- there's a date on the bottom of
20  the form next to your signature January 12, 2016.
21  Is that the date that you received the form back?
22    A.   That would be the date that I -- that
23  I answered this.
24    Q.   Okay.  That's the date you answered
25  it.  And it looks like there's a time stamp right

53 (Pages 206 - 209)

Page 210

1  within your response to Mr. Dukes on December 31,
2  2015, at 9:06 a.m. which is upside down. Is that
3  correct?
4      A.  Yeah. Yes.
5      Q.  Okay. Is that something --
6      A.  Yeah.
7      Q.  -- your office would have done --
8      A.  Yes.
9      Q.  -- once you received --
10     A.  We date stamp the grievances and the
11 appeals when we get them.
12     Q.  All right. And then it looks like you
13 wrote: "You should never take a few nitroglycerin
14 without medical personnel being made aware. That
15 would mean you're having chest pains and not
16 getting relief or more frequent episodes."
17         Did I read that right?
18     A.  Yes.
19     Q.  All right. So then the reason, as you
20 said before, is he basically -- explain -- explain
21 this answer to us, if you could.
22     A.  Okay. I was just advising him that he
23 shouldn't take a few nitroglycerin without the
24 medical being aware because that means he's having
25 more episodes and angina and that would mean

Page 211

1  you're having chest pain and you need to let the
2  provider know that you're not -- or the nurse know
3  you're not getting relief from the nitro or you're
4  having more frequent episodes of the angina. It
5  was just an advisement. I was trying to assist in
6  helping --
7      Q.  So you're --
8      A.  And there could be other reasons why
9  he couldn't have the KOP. I just, from looking at
10 this grievance, I don't know what they are. I'd
11 have to look at the chart. But this would be one
12 of them.
13     Q.  Okay. So it sounds like he would need
14 to speak to the provider and somehow tell the
15 provider that he needed medication to be KOP?
16     A.  Well, I don't know that he would tell
17 the provider that he needed. Because if the
18 provider deems that he should not have his
19 medication KOP, that's up to the provider to make
20 that decision based on what he feels for his
21 safety or the safety of others. And I don't know
22 that unless I would --
23     Q.  Based on what -- based on what's
24 documented by you and Mr. Dukes, is there any way
25 of knowing whether you spoke with any provider

Page 212

1  within Cermak to look at and potentially schedule
2  a visit for Mr. Dukes to have the nitroglycerin
3  reconsidered?
4      A.  I would have -- I wouldn't have made a
5  documentation in the chart. I wouldn't have made
6  a documentation in the chart that I was referring
7  the patient to the provider to see if he would
8  change the dose-by-dose medication to KOP. I
9  would not have written that.
10     Q.  Why?
11     A.  It's just not appropriate. I would --
12 I would -- maybe I would speak with the provider
13 or see if he has a provider visit coming due and
14 he could discuss it with the provider.
15     Q.  But did you ever speak to Mr. Dukes
16 personally in person about this form?
17     A.  No.
18     Q.  So then how is he supposed to know
19 that the next -- maybe the next step for him would
20 be to tell the provider, ask the provider, "Is
21 there any way that I can get this KOP"?
22     A.  He could submit a health service
23 request form. He could -- I would have to look at
24 the chart really to answer that question. I just
25 can't answer it.

Page 213

1      Q.  Okay. I'm going on. All right. I'm
2  on page 982, and this is another grievance filled
3  out by Mr. Dukes on February 4, 2016. It looks
4  like it was -- it was referred to Cermak Health
5  Services. Right?
6      A.  Yes.
7      Q.  And it was labeled -- it was also
8  labeled a non-grievance by Cook County. Right?
9      A.  Yes.
10     Q.  So I'm not sure if this is -- tell me
11 if this is right. If it's a non-grievance, is
12 there no control number assigned to it?
13     A.  That's correct.
14     Q.  All right. So then looking at the
15 contents, it was referred to Cermak Health
16 Services but yet there was no -- there was no
17 documentation showing that anyone from Cermak
18 reviewed the document. Is that -- is that normal
19 for a non-grievance?
20     A.  I would have gotten the
21 non-grievances. There's no other page to this?
22     Q.  No. So that -- so it's February 4,
23 2016. This looks to be a duplicate. This could
24 be it.
25     A.  So his grievance was already answered.

54 (Pages 210 - 213)

1    Q.   Okay.  So this grievance on page 982
2    appears to be similar or the same as the one on
3    983, so I'm just going to address the one that's
4    on 982 for simplicity.
5          And so on 982 there's the grievance
6    form Mr. Dukes filled out on February 4, 2016,
7    with no control number.
8    A.   Excuse me.  He wrote the same on both
9    pages?
10   Q.   Let's -- we can review both and see
11   here.
12   A.   Okay.
13   Q.   Okay.  So he's talking about an
14   incident on February 1, 2016, at 7:30 p.m. in
15   Division 10, 2-C.  And if you want to take a
16   moment, you can review it.
17   A.   Okay.
18   Q.   Okay.  So it looks like on this date,
19   on February 1, 2016, Mr. Dukes informed the 2-C
20   medication nurse that he needed his heart
21   medication, nitroglycerin.  Right?
22   A.   Yes.
23   Q.   And then he states that:  "I was then
24   forced to stand in the 2-C interlock while she
25   finished with her medication line for 2-C before

1    I was then sent to the dispensary in order to be
2    sent to Cermak for medical attention due to the
3    fact that my nitroglycerin medication was missing
4    from Tier 2-C's medication cart - a cart only
5    medical staff have access to."
6          When Mr. Dukes is referring to
7    Cermak, do you understand that to be the location
8    where you're at?
9    A.   Yeah.  Urgent care.  It sounds like
10   they sent him to urgent care.  I would have to
11   look at the record, but that's what it sounds
12   like.
13   Q.   So urgent care --
14   A.   They sent him to the nurse and then to
15   the urgent care.
16   Q.   So in this particular situation again
17   Mr. Dukes is taking nitroglycerin for chest pain
18   as needed.  Right?
19   A.   Yes.
20   Q.   And he goes to the med line and wants
21   the medication in the normal process, and they
22   didn't have it on the cart.  Right?
23   A.   That's what he's saying.  Mm-hmm.
24   Q.   And then he had to go to the
25   dispensary and then walk all the way to Cermak

1    urgent care.  Right?
2    A.   I don't see where it says there --
3    then sent to dispensary in order to be sent to
4    Cermak.
5    Q.   So is Cermak --
6    A.   Did he walk?  I didn't see walk.  I
7    don't know how he got to Cermak.
8    Q.   Is there another way to get there
9    besides walk?
10   A.   Well, if they put him in a chair or
11   whatever, I don't know.  I don't know.  I'd have
12   to see the chart.  I don't know what happened.
13   Q.   So they could have possibly put him in
14   a wheelchair and chaired him there?
15   A.   Sure.
16   Q.   Okay.  All right.  So he has to go
17   about a mile, either walking or in a wheelchair,
18   to Cermak to get as-needed heart medication?
19   A.   I don't know the distance.
20   Q.   I mean, do you think it took more than
21   ten minutes for him to get this medication?
22        MR. DeVORE:  Objection.  Calls for
23   speculation.
24        THE WITNESS:  I don't know.
25             / / /

1    BY MS. ERICKSON:
2    Q.   Okay.  And so Mr. Dukes, his action
3    that he's requesting is that basically:  "That my
4    life not be placed in jeopardy due to Cermak staff
5    incompetence; that I be allowed immediate access
6    to my emergency rescue medications and not forced
7    to wait for hours and walk a mile or more while
8    experiencing chest pains in order to obtain them."
9          And I believe he signed this on
10   February 4.  It looks like N. Jones picked it up
11   the next day on February 5, 2016.  Correct?
12   A.   That's what -- yes, that's what's
13   written.
14   Q.   The following page is what appears to
15   me to be a repeat.  Let me know if --
16   A.   Oh, it's the same thing?  Okay.
17   Q.   Do you agree?
18   A.   I'd have to compare.  It sounds like
19   it.  They both start "On the above date."
20   Q.   And then going on to 984, it looks
21   like it was marked as 200 medical treatment.  And
22   someone from Cook County wrote:  "This issue has
23   previously been grieved.  Refer to control number
24   2016X0534."
25        What does that mean?

Page 218

1    A.   It sounds like that he had grieved it
2  before and they gave him an actual control number
3  for that grievance, that it was grieved before
4  with a control number.
5    Q.   So is it -- is it that if an inmate
6  has a specific issue like this, a nitroglycerin
7  issue, there will be one control number assigned
8  to that issue and any time an inmate has it then
9  they would have that same number?
10    A.   No.  Different control number for
11  every grievance.
12    Q.   Okay.  So then what is -- I mean, why
13  would this person write that it's been previously
14  grieved?
15    A.   Apparently this issue was grieved
16  before and they gave it a control number.  It must
17  have been the same date.  It's been grieved before
18  and given a control number, so apparently the same
19  date.  I don't know.  I can't see the other
20  grievance to know if they were the same date as --
21  is it the same date and the same grievance, are
22  they writing the same thing for the same date.
23    Q.   Mm-hmm.
24    A.   And then it's been given a control
25  number and being addressed.

Page 219

1    Q.   But to you does this mean that because
2  it has been grieved before it can't be grieved
3  again?
4         MR. DeVORE:  Objection.  Calls for
5  speculation.  It's somebody else clearly was the
6  one who responded to this grievance.
7         THE WITNESS:  Yes, that's DOC that
8  wrote that.  So I don't know what grievance.  I
9  don't have the other one, so I don't know.
10  BY MS. ERICKSON:
11    Q.   Okay.  Well, we'll look at it.  I
12  think it's one we're going to look at.
13         And so Laura Seerman -- what?  Yes?
14  Oh, no, I didn't hear what you said.
15         So, in response, Laura Seerman
16  reviewed it and signed:  "You do not have
17  nitroglycerin ordered."
18         Is nitro -- strike that.
19         Is Laura Seerman someone that does
20  the same job that you do?
21    A.   She was a nurse that worked here.
22  Sometimes the nurses answered the grievances.
23    Q.   Okay.  So the issue here at this point
24  is he doesn't have --
25    A.   A nurse manager.  Uh-huh.

Page 220

1    Q.   What's that?
2    A.   She would have been a nurse manager.
3    Q.   All right.  So, according to her,
4  there's no nitroglycerin ordered.  Do you know if
5  it's custom and practice for everyone that reviews
6  the grievances, like in your position, would they
7  normally look at the orders to see if there's an
8  order for that medication?
9    A.   Yes.
10    Q.   Okay.  So I'm going to stop sharing my
11  screen.
12         And let's go to the medical
13  records.  Can you see the records?
14    A.   I can.
15    Q.   The date of the grievance was
16  February, February 1.  Okay.  So we're looking at
17  Mr. Dukes' orders on page 507 of his medical
18  records, and it looks like there is no order for
19  nitroglycerin on that date or any date before
20  that.  So what is an inmate supposed to do if they
21  need the nitroglycerin and it's not ordered?
22    A.   They would go see a nurse.  I could
23  refer them to urgent care --
24    Q.   Okay.  Do you know if --
25    A.   -- or see the provider.

Page 221

1         I'm sorry.  What were you going to
2  say?
3    Q.   No.  I'm sorry, too.
4         Do you know if there's a certain --
5  if an order for nitroglycerin is limited to only
6  be given for a week or two weeks?
7    A.   No.  I've not heard that.  A doctor
8  can order medication as they deem.  That's not my
9  -- that's kind of out of my scope to guess when a
10  doctor is going to -- how long he's going to order
11  a medication for.  That is really up to them.
12  That's their expertise.
13    Q.   Okay.  We're going to page 969 of the
14  grievances.  This is the grievance by Mr. Dukes
15  written on December 8, 2015.  It looks like it
16  was marked as a non-grievance and referred to
17  superintendent Division 10.  Is that correct?
18    A.   That's what it looks like, yes.
19    Q.   And then this particular -- well, if
20  we look at the complaint, he was writing about an
21  incident on December 7, 2015, between 5:30 and
22  11:00 p.m. at the receiving max P/C court return
23  bullpen.  Is that right?
24    A.   Yes.
25    Q.   All right.  And then it looks like he

56 (Pages 218 - 221)

Page 222

1 states: "Upon being returned from my Maywood
2 Court appearance, I was forced to sit in a bullpen
3 for hours. At approximately 9:00 p.m., I began
4 experiencing chest pains and started asking for
5 medical attention via intercom and by asking
6 officers passing the bullpen for an hour. The
7 2:00-to-10:00 shift did nothing and the 10:00-to-
8 6:00 shift did nothing until after they'd finished
9 their personal start of shift rituals. Then they
10 escorted me back to Division 10, forcing me to
11 walk over a mile with chest pains."
12        Does that seem like a Cermak issue?
13    A.  It could be both because he's
14 complaining that he's in a bullpen and DOC was not
15 answering him and neither were the nursing. So it
16 could be one of those instances where it would be
17 more than one area that would answer that.
18    Q.  Okay. If it were -- if the person who
19 reviewed the form and marked it as a non-grievance
20 thought that it should have been referred to the
21 superintendent of Division 10 and Cermak, should
22 the person have marked superintendent Division 10
23 and then mark the box Cermak's -- Cermak as well?
24    A.  They would have put an X by Cermak.
25 I would have seen an X at Cermak also.

Page 223

1    Q.  So if the person who reviewed this
2 form wanted someone from Cermak to review it, did
3 they need to put an X in the box for Cermak Health
4 Services in order for someone from Cermak to
5 review it?
6    A.  It didn't necessarily have to have an
7 X in the box, but they have to bring the grievance
8 over to Cermak.
9    Q.  Okay. So it could potentially -- you
10 could have reviewed it but it just wouldn't say
11 that Cermak reviewed it?
12    A.  No, that's not what I said. There
13 just wouldn't have been -- perhaps maybe there
14 wasn't an X in the box but they brought it over to
15 us anyway.
16    Q.  Okay. So Mr. Dukes fills out this
17 form on December 8, 2015, it looks like he signs
18 it that day, and N. Jones picks it up on the same
19 date. Correct?
20    A.  Yes.
21    Q.  And there does not seem to be any
22 review of that form in the records. Do you have
23 any understanding of why that would be?
24    A.  No, I do not.
25    Q.  But there should have been a review by

Page 224

1 Cermak?
2    A.  It could have been, yes.
3    Q.  Should have been?
4    A.  I would have reviewed it.
5    Q.  Is that a yes?
6    A.  Yes.
7    Q.  And, again, Mr. Dukes is having to
8 walk over a mile just to get nitroglycerin. Isn't
9 that right?
10    A.  That I don't know how far it is. A
11 mile? I don't know. I don't know the distance.
12    Q.  Well, according to him, he said he
13 walked over a mile to get medication with chest
14 pain?
15    A.  According to him, it's a mile, yes,
16 that's correct.
17    Q.  So this initial -- the page we just
18 looked at is a bit confusing because this is for
19 an incident on 12/7/15 from 5:30 to 11:00 p.m.,
20 and the following page he fills out another
21 grievance with the same date from 6:00 to
22 11:00 p.m. And we're on page 970 of the grievance
23 forms. I mean, you're not Mr. Dukes, but have you
24 ever seen inmates that fill out two of the -- two
25 forms for the same grievance?

Page 225

1    A.  Yes.
2    Q.  Why do they -- why do they do that,
3 from what you know?
4    A.  I have -- I have no knowledge of why
5 they write many grievances.
6    Q.  We're going to page 987 of the
7 grievances. This was a grievance filled out by
8 Mr. Dukes on December -- strike that --
9 January 18, 2016, while he was housed in
10 Division 10, 2-C. Correct? Is that what it says?
11    A.  Yeah.
12    Q.  And whoever picked up the form from
13 Cook County checked it as a grievance and referred
14 it to Cermak Health Services. Correct?
15    A.  Yes.
16    Q.  And this is the one that was given the
17 control number I believe we looked at earlier,
18 2016X0534.
19    A.  Okay.
20    Q.  Okay. This first form that we're
21 looking at for that -- for January 18, 2016, is
22 for an incident that's on January 11, 2016, at
23 9:15 a.m. in Division 10, Tier 2-C. And, again,
24 as I just read, the last four of that control
25 number is 0534.

57 (Pages 222 - 225)

Page 226

1    On the following page, Mr. Dukes
2 filled out another grievance for a different date
3 on January 12, 2016, for what he called a repeat
4 occurrence from 4:00 p.m. to 8:30 p.m.  And it
5 has the same control number on it, 2016X0534.  Do
6 you -- do you know why the same control number
7 would be on an incident that took place on
8 January 12, 2016, and an incident that took place
9 on January 11, 2016?
10    A.  That would be DOC that could answer
11 that better 'cuz they are the ones that assign the
12 control number.
13    Q.  So you wouldn't know why that was --
14 why that would happen?
15    A.  No, I wouldn't know their specific
16 reason.  I could only guess.  But I wouldn't --
17 I don't know.  It's not my job to assign control
18 numbers.
19    Q.  What do you -- what do you think the
20 issue was?
21    A.  Oh, well, I have to read it.
22    Q.  Okay.  All right.  So then we're
23 looking at the grievance on page 987.  This is the
24 one that occurred on January 11, 2016, at
25 9:15 a.m.

Page 227

1    A.  You know -- okay.  I'll read this, and
2 then I'd like to take a break.
3    Q.  We can take a break now.
4    A.  Okay.
5    Q.  Yeah, let's --
6    MR. COYNE:  How long?
7    MS. ERICKSON:  Ten minutes?  Want to
8 come back at -- how about 3:40?
9    MR. COYNE:  Okay.  Sounds good.
10    (A break was taken from
11    3:27 p.m. until 3:44 p.m.)
12    THE WITNESS:  Could I ask you a
13 question?
14 BY MS. ERICKSON:
15    Q.  Yeah.
16    A.  If you could go slower with the
17 grievances because it makes me -- the flipping,
18 the flipping makes me dizzy.
19    Q.  Okay.  Sorry about that.
20    A.  It's too fast for me.  Thank you.
21    Q.  For sure.
22    The grievances that we reviewed
23 before, one of them specifically saying -- where
24 Mr. Dukes said he had to walk over a mile to get
25 nitroglycerin for chest pain, as someone that's

Page 228

1 reviewing these grievances is it concerning to you
2 that an inmate needs to walk that far to get an
3 as-needed chest medication?
4    MR. DeVORE:  Objection.  Assumes facts
5 not in evidence.
6    You can answer.
7    THE WITNESS:  I would look into it.
8 I would be concerned.
9 BY MS. ERICKSON:
10    Q.  Okay.
11    A.  If that was the case.
12    Q.  All right.  I'm going to put up the
13 grievances again.  Okay.  So I'm on page -- it's
14 hard -- I know it's very hard going back and
15 forth.  Page 991 of the grievances.  And this
16 looks like a response that you made on March 2,
17 2016.  Is that right?
18    A.  Yes.
19    Q.  And it's for control number 2016X0534.
20 Right?
21    A.  Yes.
22    Q.  And I'm going to flip back up to the
23 two forms we just looked at that both have that
24 same control number.
25    A.  Okay.

Page 229

1    Q.  One second here.  So this first one on
2 page 987 is one -- the one on January 11, 2016, at
3 9:15 a.m., and Mr. Dukes wrote:  "On the above
4 date and time, I informed OFC Addison I was having
5 chest pains and asked her to contact Division 10's
6 dispensary for my nitroglycerin medication.  I was
7 told by her she tried to call but no one's in the
8 dispensary - I would have to wait for medication
9 line to come.  Thirty-five minutes later I was
10 finally given my nitroglycerin along with my other
11 medications.  By this time, the nitro had little
12 effect and I had to be sent to Cermak ER because
13 there was no dispensary staff in Div 10 to take my
14 vital signs."
15    From what you've seen in your time
16 working at Cermak, is it typical that there would
17 not be anyone in the dispensary at 9:15 a.m.?
18    A.  I can't answer that question.  It
19 would depend on what division that they're
20 working.  But I would think that there would be
21 somebody at 9:15.  I really can't answer that
22 question.
23    Q.  So in this particular grievance it
24 looks like there's several issues.  His --
25 Mr. Dukes' as-needed medication is given to him at

Page 230

1 least 35 minutes after he requests it. Right?
2    A.   Mm-hmm.
3    Q.   And then at that point he said it has
4 little effect. Are you familiar with
5 nitroglycerin not having an effect on the person
6 if not given in a short-enough window?
7    A.   No.
8    Q.   Did you ever ask anyone --
9    A.   -- I'm sorry.
10    Q.   No, no, go ahead.
11    A.   No. Usually the nitro if given within
12 30 minutes -- I would have to really look at his
13 chart and see more of what is going on to draw a
14 conclusion, if that's what you're wanting from me.
15    Q.   Did you -- would you ever ask someone
16 else what's the window of time in which this
17 particular medication needs to be given to an
18 inmate to be effective?
19    A.   No. I've not asked that for it to be
20 effective.
21    Q.   Okay. Do you have any sort of
22 guidebook that you use as a nurse where you look
23 up medications and how they're prescribed and
24 administered?
25    A.   Yes, you can look up medications.

Page 231

1    Q.   Do you have that with you in your
2 office?
3    A.   You can get it on the computer.
4    Q.   Have you ever looked up how long --
5 how long after someone has chest pains they should
6 take nitroglycerin for it to be effective?
7    A.   I don't recall.
8    Q.   And then again in this situation it
9 looks like Mr. Dukes had to be sent to the Cermak
10 ER which he believed to be a mile away just to get
11 his vital signs checked. Right?
12    A.   That's what he is saying.
13    Q.   Okay. He signed it on January 18,
14 2016, on the date that he completed it. N. Jones
15 signed it on January 19, 2016, after she picked it
16 up.
17         The next day, he had another
18 incident on January 12, 2016, between 4:00 p.m.
19 and 8:30 p.m. And this is on page 987. It was
20 marked as again the control number 2016X0534 and
21 checked with a -- checked as a grievance and to be
22 referred to Cermak Health Services. Do you see
23 all that on this form?
24    A.   I do.
25    Q.   Okay. And Mr. Dukes wrote it's a

Page 232

1 repeat occurrence on here. And at this -- for
2 this particular grievance he wrote that he was in
3 the RCDC max P/C court return bullpen. And he
4 wrote: At approx 6:00 p.m. while waiting in the
5 RCDC bullpen to be returned to Division 10, I
6 began having chest pains (I have CCDOC-documented
7 heart disease with a history of heart attacks).
8 I informed numerous RCDC staff, including an
9 Officer Commack, of my chest pains and requesting
10 medical attention. Even when I held a large
11 'chest pain' sign in front of the cameras, no one
12 in RCDC would do anything to assist me, including
13 refusing to answer the call button on the
14 intercom."
15         And he requested that: "I be
16 provided with prompt medical attention when I
17 request it and/or that I be provided with my
18 emergency rescue medications immediately upon
19 request, i.e. nitroglycerin tablets."
20         Was that all accurately read, from
21 what you could tell?
22    A.   Yes.
23    Q.   So he grieved the same issue on
24 January 11, 2016, and again on January 12, 2016.
25 Right?

Page 233

1    A.   Yes.
2    Q.   And he notes the name of the staff who
3 were involved are RCDC Officer Luna and says
4 something about the RCDC holding cameras, which is
5 hard to read.
6         N. Jones picks up this particular
7 grievance again on January 19, 2016. Right?
8    A.   Yes.
9    Q.   The day after it's written.
10         And then I believe, going back
11 to -- scrolling is hard. Sorry about that. Going
12 back to page 991, this is where you made a
13 response about the 2016X0534 control number.
14         And prior to your response, it
15 looks like someone from Cook County wrote: "CRW
16 scanned a copy of Part A to RCDC supt" --
17    A.   Superintendent.
18    Q.   -- "superintendent to address sworn
19 staff. However, refer to Cermak to address
20 medical" --
21         (Technical difficulties.)
22         (A discussion was held off
23          the record.)
24    MS. ERICKSON: All right. Thank you.
25 So we'll pick up back up there.

59 (Pages 230 - 233)

Page 234

1  BY MS. ERICKSON:
2      Q.   So going back here: "Medical issues/
3  medical treatment."
4           And this is what someone from Cook
5  County Department of Corrections wrote on this
6  form on January 22, 2016.  Right?
7      A.   That's correct.
8      Q.   Okay.  And then it looks like it says
9  CRW/platoon counselor referred this grievance/
10 request to Cermak.  Right?
11     A.   Yes.
12     Q.   Okay.  And then what -- what did you
13 write in response?
14     A.   Called to dispensary to address his
15 complaints and he refused to come.  And then
16 he's -- and then now he's currently at Livingston.
17     Q.   And you wrote this on -- and you wrote
18 this on March 2, 2016.  Right?
19     A.   Correct.
20     Q.   But you were supposed to respond
21 within 15 days?
22     A.   That's correct.
23     Q.   And at that point it's over -- over a
24 month later?
25     A.   That's correct.

Page 235

1      Q.   In this case what do you mean -- what
2  do you mean he refused to come?
3      A.   He would not come to the dispensary to
4  talk with the nurse nor -- and address his
5  complaints.  He wouldn't come.  He refused.
6      Q.   How do you know that's what it means
7  by "refused to come"?  Is that typically what you
8  write in this type of situation?
9      A.   I don't understand.  If they refuse,
10 they refuse, and then I would write they refuse.
11     Q.   So in this -- in this type -- I
12 imagine you've had this before.  In this type of
13 situation where you say, "I called the dispensary
14 to address complaints," what -- what would you --
15 in this type of situation, what would you ask --
16     A.   He was called.  He was called to the
17 dispensary --
18     Q.   Okay.
19     A.   -- to address his complaints, discuss
20 with the nurse and address all his complaints.
21 And he wouldn't come.  He refused.
22     Q.   Okay.  And then you note he's
23 currently at Livingston.  Right?
24     A.   Yes.  And then currently at Livingston.
25     Q.   The next -- I don't know why there's

Page 236

1  multiple.  On page 992, it contains the same
2  information as far as a response from the CRW and
3  then what you just read and signed on March 2,
4  2016.  Right?
5      A.   It's the same paper you just showed me
6  or is this another paper?
7      Q.   It looks to be the same to me.
8      A.   Okay.
9      Q.   And then this is Mr. Dukes receives it
10 and signs it on March 8, 2016, and notes in his
11 appeal: "This still doesn't address the issue of
12 receiving medical care for serious medical
13 issues."
14          And, in response, J. Mueller --
15 I imagine J. Mueller wrote this on March 9, 2016.
16 Is that who would have written the response to the
17 appeal?
18     A.   Yes.  Yes.
19     Q.   And J. Mueller is an administrator?
20     A.   He works for DOC.
21     Q.   Okay.  And what's her first name?
22     A.   It's John.
23     Q.   Oh.  It's him.
24          And he notes: "Per CHS
25 documentation is" -- I don't know if I can read

Page 237

1  that.  Can you read that?
2      A.   Something is "regarding care
3  provided."
4      Q.   That's okay.  You don't have to guess.
5  But the last -- does the last part say
6  "original" --
7      A.   "Original response to stand."
8      Q.   Okay.  So when John Mueller writes
9  this and signs it, does he do any work between
10 reading what Mr. Dukes writes on March 8 and
11 March 9 when he writes this "original response to
12 stand"?
13          MR. DeVORE:  Objection.  Calls for
14 speculation.
15          THE WITNESS:  You would have to ask
16 Mr. Mueller.
17 BY MS. ERICKSON:
18     Q.   Okay.  But no one from Cermak reviews
19 what you've written and signs the form?
20     A.   I'm sorry, what?  Nobody reviews?  He
21 had to --
22     Q.   No one from Cermak reviews this form,
23 right, after you?
24     A.   It looks like it went to DOC.  He had
25 left.  He was at Livingston, so.  So that wasn't

Page 238

1   -- that was DOC. He went to DOC.
2       Q.   I understand. So we've looked at
3   several of Mr. Dukes' grievances about
4   nitroglycerin and chest pains, and you reviewed
5   many of the ones that we went over. Right?
6       A.   Yes.
7       Q.   Is there -- is there a point at which
8   after an inmate has the same issue about
9   medication four-plus times that Cermak and Cook
10  County get together and make some kind of plan to
11  try and help this inmate with the medication?
12      A.   It would depend on the reason that his
13  medication is ordered the way that it is. It's
14  up to the provider as to how that he orders this
15  medication and what is the chest pain. I don't --
16  because I'm not -- I haven't had an opportunity to
17  get into his -- his notes what was the pain. Was
18  it anxiety? There's many things that can cause
19  chest pain than just what he's saying is a heart
20  attack, not that he's not, but I'm just saying
21  because the fact that I can't get into the chart.
22  Is it epigastric? Is it heartburn? Anxiety
23  causes chest pain. There's different reasons for
24  chest pain. So it doesn't mean because he's
25  having chest pain that he needs -- that he's

Page 239

1   having a heart attack.
2       Q.   No --
3       A.   You would have to --
4       Q.   Right. But he's grieved several
5   times, we've already looked at at least four of
6   them, at which he's talking -- within a short
7   period of time, and you're the one that reviewed
8   the forms, of chest pain. "I'm in the bullpen,
9   I'm in my living unit, and I can't get medication
10  within less than 35 minutes or I don't get it at
11  all." And is there a point at which Cermak and
12  Cook County decide there's a bigger issue here and
13  we need to look at this inmate more closely and
14  figure out a different plan for his medication?
15      A.   I think they would discuss it with the
16  provider. The providers would discuss it if it
17  was an issue. Also, he did request -- say that he
18  wasn't getting his --
19           I have to click that off. It's
20  covering you.
21           -- that he was not getting his
22  medication, his nitro, and that was before it was
23  even ordered.
24      Q.   Right. So he was -- I don't -- we can
25  put up his records, but he was coming back and

Page 240

1   forth from Livingston County and sometimes he was
2   there at Livingston for a week and then he'd
3   come back to Cook County for one to three weeks.
4   And so what would normally happen if an inmate
5   has a -- a detainee has a medication order at
6   Livingston for nitroglycerin and then they come
7   back to CCDOC and go through medical intake again
8   and either don't get that order -- the
9   prescription for nitroglycerin or they just can't
10  get the medication? What is the inmate supposed
11  to do?
12      A.   He would -- he would discuss with the
13  provider that -- I don't understand the question.
14      Q.   No. That's good. So, but does he --
15  does that provider, the physician or PA, see the
16  grievance forms at all?
17      A.   No. No. They are not given the
18  grievance. They're not in the medical records.
19      Q.   What do you mean?
20      A.   The grievances aren't printed in the
21  medical records.
22      Q.   I understand. So there's a lot of --
23  there's a lot of channels that a detainee has to
24  go through in order to get nitroglycerin either
25  administered when they need it or have it ordered

Page 241

1   at Cook County, from what we've seen. Is that
2   correct?
3       A.   I would have -- I would have to look
4   at his medical records to make that -- to see if
5   there's an issue with him getting his medications.
6       Q.   What do you mean?
7       A.   I'd have to look at his medical record
8   and see what was going on other than the grievance
9   because they need to confirm, you know, there's
10  some issues I need to confirm with the medical
11  record and I would talk to the provider. So not
12  always -- I look at -- I look at the grievance and
13  I see what the issue is that they're complaining
14  about and try to pursue and help them the best
15  that I can. But not always what they are saying
16  is necessarily so. So I have to also check that
17  out and is there a way that we can help them with
18  that, too. Sometimes it's education.
19      Q.   So you're saying sometimes inmate --
20  detainees make things up when they put -- when
21  they write these grievances?
22      A.   I could say that sometimes that
23  they're not accurate.
24      Q.   Okay. And a couple minutes ago you
25  testified that you would -- you would look at the

61 (Pages 238 - 241)

Page 242

1  grievance and then you would talk -- you would
2  talk to the medical provider to see if there's
3  anything that can be done to resolve the issue.
4  Right?
5      A.  Not with every grievance.  It would --
6  it would depend.
7      Q.  Well --
8      A.  Not every --
9      Q.  But when does a -- sorry to interrupt.
10 When does it become a pattern where -- I mean, I
11 could go through at least five to ten more of
12 similar grievances like this, but I'll spare us.
13 When does it become such a pattern that Cook
14 County and/or Cermak decide that the patient --
15 that the inmate is not getting it, they're not
16 getting the medication, they're not understanding
17 the process, and we need to actually do something
18 different?
19     A.  I would think that they do look at the
20 medications.  And I don't know exactly how to
21 answer your question as to when do they look at
22 it.  It's -- you'd have to talk to the pharmacy or
23 whoever.
24         I don't keep grievances or a log of
25 the grievances.  So if he's written me a grievance

Page 243

1  a month ago, I would probably not necessarily
2  remember --
3      Q.  Are there other inmates --
4      A.  -- him.
5      Q.  Sorry.  Are there other -- are there
6  other inmates or detainees that have expressed
7  similar complaints about being, you know, denied
8  or not getting nitroglycerin within a certain time
9  period or it being dose by dose and not KOP?
10     A.  I've had detainees complain that they
11 would like their medication be KOP versus dose by
12 dose and vice versa or -- maybe not.  But nothing
13 that I recall about nitroglycerin.
14     Q.  Okay.  So this -- this particular --
15     A.  That I recall.
16     Q.  Okay.  So this particular case about
17 the nitroglycerin seems like it's a common type of
18 issue, but in Mr. Dukes' case it's specific to
19 nitroglycerin?
20     A.  It's not a common issue.  It's a
21 common request that they want their dose-by-dose
22 meds to be KOP.  It's not necessarily an issue.
23 It's a request.  And a lot of the times they can't
24 for different reasons, such as if they are a
25 mental health patient they can't have dose by

Page 244

1  dose.
2      Q.  You mean they can't have KOP?
3      A.  I'm sorry.  That's correct, they can't
4  have KOP.
5      Q.  So if you're a mental health patient,
6  you for sure can't get KOP medication?
7      A.  Not -- not pills.  Maybe an albuterol.
8  But not -- not pills.
9      Q.  Is that something -- is that some-
10 thing --
11     A.  Safety.
12     Q.  Is that something that anyone from
13 Cook County or Cermak discusses with the detainee
14 so they know that is the reason they can't get the
15 KOP?
16     A.  Yes.  Mental health could discuss it.
17 The provider would discuss it.  Oftentimes if
18 they're a mental health patient they have a P code
19 if they're on mental health meds.
20     Q.  Mm-hmm.
21     A.  So that would be at least a P2.  And
22 so, no, they have to have dose-by-dose meds.
23     Q.  What's a P2?
24     A.  It's a level of care for a mental
25 health patient.  That would be that they would

Page 245

1  require -- that they're on meds, mental health
2  meds, and so they are to be put in an area for a
3  division or area that they receive dose-by-dose
4  medications.
5      Q.  Okay.  And then as far as any other
6  medications that are dose by dose, you said that
7  from the time the inmate goes through intake to
8  the time they get their prescribed medications it
9  could be generally a day and a half to two days?
10     A.  It could be.  It depends on the
11 medication also.  But, yes, generally speaking,
12 yes.  KOP could be -- could be different, could be
13 different.
14     Q.  Could that be dangerous to patients
15 who need the medication every 6 to 12 hours?
16         MR. DeVORE:  Objection.  Calls for
17 speculation.
18         You can answer.
19         THE WITNESS:  Yeah, I don't know.
20 BY MS. ERICKSON:
21     Q.  Well, do certain medications have --
22     A.  KOP?  Yeah, yeah, I would think that
23 they would -- they may put them in -- they
24 wouldn't be a GP.  They wouldn't be a KOP.  They
25 would probably make them a dose by dose.

62 (Pages 242 - 245)

1 Sometimes they -- the providers will do that just
2 to start them, you know, start the -- see where
3 they're at, and then from there we can down the
4 road maybe make them KOP, so.
5     Q.   I don't know what you're talking
6 about.  I was just asking if the delay of not
7 getting prescribed medications 24 to 48 hours
8 after an inmate comes in to Cook County could be
9 dangerous to inmates when they have, for example,
10 heart medications that they need to take.
11    A.   It could be if they didn't get their
12 medications.
13    Q.   Have you ever sat in a meeting or
14 talked to anyone anywhere at Cermak or Cook County
15 about this one-and-a-half-to two-day delay that it
16 takes for inmates to get medication when they come
17 to Cook County?
18        MR. DeVORE:  Objection.  Mischarac-
19 terizes testimony regarding the length of time to
20 get medicines distributed.
21        You can go ahead.
22        THE WITNESS:  No.  No.
23 BY MS. ERICKSON:
24    Q.   No?
25    A.   Not that I recall.

1     Q.   Has anyone ever talked about creating
2 a new policy or changing some inner working of
3 Cermak or Cook County so that inmates get their
4 medication within 12 hours when they arrive to
5 Cook County?
6     A.   I don't know that -- it's pharmacy.
7 It depends on when they come to jail.
8     Q.   Why is that?
9     A.   Well, because the pharmacy isn't open
10 24/7.
11    Q.   So --
12    A.   And then it depends on when they get
13 the records, when they place the orders, and then
14 they have to be delivered.
15    Q.   Who's responsible for placing the
16 orders?
17    A.   Providers.
18    Q.   So doctors or PAs?
19    A.   Correct.  Or psychiatrists, mental
20 health, dental.
21    Q.   And are the orders placed electroni-
22 cally?
23    A.   Yes.
24    Q.   And then after they -- and after they
25 enter the orders, pharmacy is supposed to fill

1 those orders?
2     A.   Yes.
3     Q.   What are the pharmacy hours?
4     A.   I don't know exactly what their hours
5 are, no.  I don't know their daytime hours.  I
6 don't know the exact hours when they come and when
7 their day ends.
8     Q.   Does the pharmacy work on weekends?
9     A.   I believe so.  You'd have to ask them.
10 I don't know that answer.  But I believe so.
11    Q.   And then after pharmacy fills the
12 order, who is responsible for dropping the
13 medication off at the med carts?
14    A.   Pharmacy.  Pharmacy.
15    Q.   Pharmacists actually do it or are
16 there clerks?
17    A.   Pharmacy.  I don't know if they do it
18 by reloading cassettes or how they do it.  I
19 don't-- I don't work for pharmacy.  But pharmacy
20 dispenses.
21    Q.   Have you ever -- have you ever thought
22 that there could be medication after they've
23 entered Cook County --
24        (Technical difficulties.)
25        / / /

1        (A discussion was held off
2        the record.)
3        MS. ERICKSON:  I gotcha.  All right.
4 So I'll re-ask that one.
5 BY MS. ERICKSON:
6     Q.   Susan, have you ever thought that
7 there is -- there could be a better way where
8 medication could get to detainees faster after
9 they're admitted to Cook County?
10    A.   I think there's always -- always room
11 for improvement in everything.  But that's not up
12 to me regarding the pharmacist's duties and how
13 this Pyxis and all the movements of pharmacy
14 works.  I think that would be better worked out
15 with pharmacy and maybe a committee, work
16 committee or something, but not -- not me.
17    Q.   Mm-hmm.  Is there -- does the quality
18 control supervisor look into issues like this
19 where there's medication delays?
20    A.   All types of issues.
21    Q.   That's a yes?
22    A.   Yes.  All types of issues is CQI.
23    Q.   Okay.  And, to your knowledge, were
24 there any working groups or quality control
25 committees that were looking at any of the aspects

Page 250

1  of the medication administration at Cook County
2  right now?
3      A.   That I'm not -- I have no privy of
4  that.  I don't know.
5      Q.   Okay.
6      A.   That would be CQI.
7      Q.   All right.  Those are all the
8  questions I have right now.  Thank you very much,
9  Susan.
10        MR. COYNE:  I don't have any
11 questions.
12        MR. DeVORE:  I have none.
13        MS. ERICKSON:  All right.  Debbie,
14 I'll send you the exhibits.
15        THE COURT REPORTER:  Signature?
16        MR. DeVORE:  We'll reserve.  Actually,
17 no, we'll waive it.
18        THE COURT REPORTER:  Are you ordering
19 this typed up, Kirstin?
20        MS. ERICKSON:  Please, yes, Debbie.
21        MR. DeVORE:  We'll reserve then.
22        THE COURT REPORTER:  And do you want a
23 copy, Jason?
24        MR. DeVORE:  Can I talk to my client?
25 But obviously I understand in order to view it

Page 251

1  we'll have to order it.  So yeah, let me see.
2        MR. COYNE:  Was signature waived or
3  reserved?
4        MS. ERICKSON:  I think he switched it
5  to reserved.
6        MR. DeVORE:  I switched it.  I
7  reserved it.
8        MS. ERICKSON:  We'll order a copy
9  whenever after it's approved.
10        THE COURT REPORTER:  We really don't
11 hold the original while waiting for signature.
12 We'll get it to you so you'll have it.
13        And then, Mr. Coyne, do you need a
14 copy?
15        MR. COYNE:  No copy.  Thank you.  I
16 appreciate it.  No copy needed.
17             (The deposition was
18              concluded at 4:20 p.m.)
19             (Signature was there-
20              after waived per further
21              communication with
22              Mr. DeVore.)
23        --oo0oo--
24
25

Page 252

1              CERTIFICATE
2                 OF
3        CERTIFIED SHORTHAND REPORTER
4
5      I, DEBRA L. KLESZYK, a Certified Shorthand
6  Reporter of the State of Illinois, CSR License
7  084-002981, do hereby certify:
8      That previous to the commencement of the
9  examination of the aforesaid witness, the witness
10 was duly sworn by me to testify the whole truth
11 concerning the matters herein;
12     That the foregoing deposition transcript
13 was stenographically reported by me and was there-
14 after reduced to typewriting under my personal
15 direction and constitutes, to the best of my
16 ability, a true and accurate record of the
17 testimony given and the proceedings had at the
18 aforesaid deposition;
19     That the said deposition was taken before
20 me remotely via videoconference at the time and
21 place specified;
22     That I am not a relative or employee or
23 attorney or counsel for any of the parties herein,
24 nor a relative or employee of such attorney or
25 counsel for any of the parties hereto, nor am I

Page 253

1  interested directly or indirectly in the outcome
2  of this action.
3      IN WITNESS WHEREOF, I do hereunto set my
4  hand at Elk Grove Village, Illinois, this 25th day
5  of May, 2022.
6
7
8              _____
                  DEBRA L. KLESZYK
9              Certified Shorthand Reporter
                 License No. 084-002981
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

64 (Pages 250 - 253)

**[& - 2022]**                                                                                    Page 1

**&**

**&**   3:3

**0**

**0000**   149:14
**000001**   4:17 200:4
**000503**   200:5
**000504**   200:18
**000963**   4:16 192:9
**000978**   192:10
**000979**   198:6
**000999**   159:17
**008948**   1:5
**0534**   225:25
**084-002981**   252:7
   253:9

**1**

**1**   8:10 214:14,19
   220:16
**10**   25:7,8 45:5
   192:22 193:11
   214:15 221:17
   222:10,21,22
   225:10,23 229:13
   232:5
**10's**   229:5
**100**   49:6 197:7
**10:00**   222:7,7
**10:05**   42:14
**10:07**   42:17
**11**   1:23 2:5 225:22
   226:9,24 229:2
   232:24
**11:00**   221:22
   224:19,22
**11:10**   91:4
**11:11**   91:11
**11:25**   91:12
**12**   56:18 209:20
   226:3,8 231:18
   232:24 245:15

247:4
**12/17**   201:14
**12/17/15**   196:15
   196:21,24,24
   197:1
**12/3/15**   192:24
   193:4,8
**12/4/15**   198:10
**12/7/15**   224:19
**12/8**   201:10
**1207**   4:16
**12:00**   59:19,20
**12:29**   143:18
**12:30**   141:22,25
**13**   149:11
**14**   208:20
**149**   4:12
**15**   182:11,11
   193:19 234:21
**159**   4:14
**17**   31:1 130:21
   132:24 149:11,23
   153:23 158:20
   159:1 162:4 183:1
   183:20,24 202:24
   208:5
**1750**   3:18
**18**   225:9,21 231:13
**1875**   253:8
**19**   12:12 30:22
   231:15 233:7
**190**   175:13 194:24
   195:2 198:2
**192**   4:15
**1957**   8:10
**1975**   9:12
**1984**   9:17,24 10:18
   10:19 12:1,17
**1:00**   56:17,17,21
   57:4,13 58:6,21
   59:15,18 60:25

143:14,15
**1:02**   143:19
**1:54**   180:5

**2**

**2**   142:7 148:14
   192:22 193:12
   214:15,19,24,25
   215:4 225:10,23
   228:16 234:18
   236:3
**20**   3:11 156:20
   159:18 197:6
**200**   4:17 175:20
   217:21
**2003**   14:21
**2012**   20:23 21:8
   22:3 30:21,25
   31:8,11,23 32:9,22
   33:3 34:22 35:1
   35:12,15,19 37:16
   38:14 42:25 43:20
   45:20 49:15 54:11
   54:16 55:10 56:3
   57:11,20 65:11
   66:12 128:20
   188:16
**2013**   11:10 149:23
   151:4,5,15 152:25
   153:5,13,23
   154:11
**2014**   159:23
**2015**   30:25 35:1,12
   35:15,19 49:23,25
   50:7,10,15 51:8,19
   54:11,16 55:2,10
   56:3 57:11,20
   62:24 65:11 66:12
   66:12 67:13 106:1
   107:3 111:19
   127:5,17 130:21
   132:24 133:14

134:10 137:8,19
138:7,15,24
139:10 147:2
156:24 158:20,25
164:15 183:1,20
183:24 188:25
192:17 198:15
199:22 200:7,14
200:20,22,22
201:23 203:25
206:2,8,12,19
207:5,11 208:3,5
208:16,24 210:2
221:15,21 223:17
**2016**   207:10
209:20 213:3,23
214:6,14,19
217:11 225:9,21
225:22 226:3,8,9
226:24 228:17
229:2 231:14,15
231:18 232:24,24
233:7 234:6,18
236:4,10,15
**2016x0534**   217:24
225:18 226:5
228:19 231:20
233:13
**2017**   30:22 31:10
111:20 133:15
134:11 136:12
138:2,7,15,24
139:10 147:2
156:24 174:3
188:25
**2019**   1:5 162:17
163:6
**2020**   136:15,17
137:8,19 138:2
**2022**   1:23 2:6
253:5

**[21 - administration]**                                                     Page 2

**21** 137:4,4,5
159:23
**210** 175:19
**22** 234:6
**24** 200:14 203:25
206:11 207:11,11
246:7
**24.14.5.0.** 159:19
**24/7** 247:10
**24th** 200:7
**25** 199:21 206:2
207:11
**250** 175:19
**25th** 253:4
**27** 207:10
**2700** 2:8 8:19
41:24
**29** 208:16,24
**2:00** 222:7
**2:16** 180:5

**3**

**3** 192:17 193:19
201:1 202:22
208:3
**30** 5:16 143:3
182:12 230:12
**300-4479** 3:12
**31** 210:1
**312** 3:5,12,19
**332-2400** 3:5
**333** 207:8
**35** 8:23 230:1
239:10
**3500** 19:25
**3:27** 227:11
**3:40** 227:8
**3:44** 227:11
**3rd** 196:5

**4**

**4** 198:15 213:3,22
214:6 217:10
**48** 246:7
**4:00** 226:4 231:18
**4:20** 251:18

**5**

**5** 4:5 217:11
**502** 203:25
**504** 205:8
**505** 201:20
**507** 220:17
**525** 3:11
**53** 3:18
**550** 128:7
**559** 127:23
**59.80** 21:5
**5:00** 56:17,18 57:4
57:15 58:6,22,23
59:15,18 60:25
206:3
**5:30** 221:21
224:19

**6**

**6** 245:15
**600** 3:4
**60602** 3:4,11
**60604** 3:18
**64.5.45.0** 149:3
**6:00** 57:13,13
59:19,20 60:11,11
60:13,14,20,20
61:2,2 222:8
224:21 232:4

**7**

**7** 149:15 221:21
**7:30** 214:14

**8**

**8** 79:2,5,7 195:14
200:20,21,22
201:23 221:15
223:17 236:10
237:10
**80** 197:11
**87** 9:4
**8:00** 58:22
**8:30** 226:4 231:19

**9**

**9** 200:21 206:8
236:15 237:11
**9-1-1** 144:20
**929-4308** 3:19
**962** 4:17
**969** 221:13
**970** 224:22
**979** 208:4
**982** 213:2 214:1,4
214:5
**983** 214:3
**984** 217:20
**987** 225:6 226:23
229:2 231:19
**991** 228:15 233:12
**992** 236:1
**9:05** 2:6
**9:06** 210:2
**9:10** 195:14
**9:15** 225:23
226:25 229:3,17
229:21
**9:55** 42:16

**a**

**a.m.** 2:6 42:16,17
56:16 57:4,20
58:5,21,22 60:11
60:13,20 91:11,12
195:14 210:2

225:23 226:25
229:3,17
**ability** 252:16
**able** 16:21 41:25
**acceptable** 56:24
**access** 7:24 51:21
97:13 125:22,22
158:17 215:5
217:5
**account** 58:25
**accuracy** 71:10
**accurate** 71:18
197:15 198:16
200:8 241:23
252:16
**accurately** 71:4
232:20
**ace** 69:2
**action** 18:15 64:7
64:10 164:18
197:17,17 217:2
253:2
**actual** 218:2
**addison** 1:12
229:4
**address** 8:11,12,14
8:15,21 190:16,19
214:3 233:18,19
234:14 235:4,14
235:19,20 236:11
**addressed** 218:25
**administer** 57:22
121:17
**administered** 4:24
52:5 123:24
230:24 240:25
**administering**
155:7
**administration**
4:12 149:4 199:11
250:1

**administrative**
66:5 208:19
**administrator**
19:10 236:19
**admitted** 207:6
249:9
**advice** 109:16
**advil** 120:21,21
121:24 122:6
**advised** 109:20,21
**advisement** 211:5
**advising** 210:22
**aforesaid** 252:9,18
**afternoons** 75:8
**agency** 12:12
154:9
**ago** 78:1 116:22
118:5 241:24
243:1
**agree** 217:17
**agreement** 5:14
**ah** 16:11 138:4
**ahead** 33:19 73:1
84:24 87:25 90:10
92:12 99:6 103:2
104:10 107:11
120:18 122:4
162:19 170:17
197:9 230:10
246:21
**ahold** 189:18
**airtight** 197:19
**albuterol** 120:24
144:1,4 204:13
244:7
**alert** 204:2,10
205:18
**allegations** 66:8,9
**allergic** 100:14
**allowed** 89:24
113:25 114:15,21

114:22 115:18
147:3 166:14,21
166:22,23,24
167:18 168:6
174:23 217:5
**altman** 1:12 3:21
**amoxicillin** 120:1
120:2 204:25
**analyst** 21:10,12
42:23,24,25
129:12 188:12
**anaphylactic**
100:14 102:19
104:1
**andrews** 1:16
**angela** 132:8,9
**angina** 111:10,12
113:24 210:25
211:4
**answer** 7:3,9,15
8:3 27:8,11,12
28:8 29:22 31:2
33:15 37:21 44:11
47:6,19 48:24
49:13 50:11,24
53:6 54:8,20,22
55:8,22,25 59:24
62:12,13 63:13
64:21 65:6 66:20
67:1 68:13 69:20
69:21 70:11,15
71:8,13,25 73:3
74:7,17 77:17,19
79:23 81:7,20
83:12 84:5 86:15
88:4 92:4 99:20
103:2,9 106:4,4,8
112:14 114:25
119:7 123:5
124:25 125:5
131:24 141:23

145:24 147:12,16
157:5 163:16
165:16,20 171:14
171:24 174:15,16
174:20 183:21
187:9 189:23
190:5,8,9 202:17
207:13 210:21
212:24,25 222:17
226:10 228:6
229:18,21 232:13
242:21 245:18
248:10
**answered** 32:24
33:14 70:5,18
71:6,7 82:3 83:9
84:17 87:25 91:3
92:3,10 95:14
103:18 106:16
107:9,18 117:21
118:4 124:11
130:24 131:5
152:20 164:22
190:23,24 209:23
209:24 213:25
219:22
**answering** 72:25
112:9 164:13
222:15
**answers** 6:23
190:17,18
**anti** 121:4
**antibiotic** 120:7
**antidepressants**
121:3
**anxiety** 121:4
238:18,22
**anybody** 115:4,22
154:2 163:22
168:21,24

**anymore** 38:19
135:16 162:15
**anyway** 190:11
223:15
**apologize** 93:14
169:13
**apparently** 218:15
218:18
**appeal** 208:24
236:11,17
**appeals** 208:20
210:11
**appearance** 222:2
**appeared** 2:8 3:6
3:14,20
**appears** 214:2
217:14
**applicable** 5:17
155:11
**applied** 21:22
**apply** 160:8
**appointment** 77:2
116:8
**appreciate** 142:24
251:16
**appreciated** 8:5
**appropriate** 19:22
212:11
**appropriately**
70:8
**approved** 251:9
**approx** 232:4
**approximately**
19:25 34:23 222:3
**area** 26:13 29:15
29:16 33:22 80:21
81:6 93:1 105:7
177:16 222:17
245:2,3
**areas** 26:13

**argumentative**
113:12
**arias** 1:13
**arrested** 78:6
**arrive** 197:21
247:4
**arrived** 199:21
200:6
**asked** 33:13,17,20
62:16 71:5 73:7
82:3 83:8 84:17
86:16 87:25 92:3
92:9 95:13 103:16
105:18 106:15
107:8,17 108:12
117:20 118:4
124:10 130:23
133:7 152:19
168:11 189:15,17
229:5 230:19
**asking** 30:17
83:18 99:19
108:23 125:9
168:20 176:13
189:11 222:4,5
246:6
**aspect** 17:24 18:17
**aspects** 249:25
**aspirin** 30:17
**aspirins** 29:15
**assessment** 145:15
**assessments** 13:16
13:16 15:5
**assign** 140:13
187:25 226:11,17
**assigned** 44:19
45:23 50:20 57:1
165:21 213:12
218:7
**assignment** 165:3
187:24

**assigns** 46:9
**assist** 63:5 211:5
232:12
**assistant** 13:17
14:15 40:18,20,23
41:3,4,9 203:13
**assisted** 43:4,6,12
**associate** 9:19,22
**assume** 7:10
117:13 147:15,16
147:17
**assumes** 113:12
170:15 228:4
**assure** 72:12
**asthma** 204:16
209:1
**attach** 182:12
**attack** 108:18
109:10,13 111:3,9
111:14,23 112:1
238:20 239:1
**attacks** 232:7
**attend** 9:5,13,24
132:12 142:14
**attending** 9:23
**attention** 215:2
222:5 232:10,16
**attest** 56:8
**attorney** 11:24
252:23,24
**audit** 16:16,21,25
17:23,23 18:1
22:5 23:7 31:6,20
31:21 32:1,1,7
35:7 38:15 39:24
49:16,16 53:1,12
64:17,19 152:14
185:4 188:20
**audited** 17:24
35:15

**auditing** 22:2
34:21 35:2 43:1,1
152:8
**auditor** 31:18
146:11,12 152:3
**audits** 16:4,16,22
16:25 17:7,8
18:25 21:16,19
53:3,10,15,23 55:7
55:7,9 68:12
151:5 185:6
**avenue** 2:8 8:19
**aware** 6:15 90:4
90:25 91:1 106:20
107:3,12 114:17
114:19 129:10
210:14,24

**b**

**b** 4:14 5:11 156:6
159:6,9,14 161:17
**back** 7:13 12:13
14:13 22:5 42:14
42:18,20 46:23
51:2 62:2 77:3,15
77:22 86:19,19,22
87:13 91:7,13
100:3 101:23
102:1,3 117:25
119:8 125:11
143:7,20,23
150:15 154:11
158:5 168:2
170:24 172:3
174:22 179:24
180:6 184:3
187:13 201:19
207:5 208:2,12
209:21 222:10
227:8 228:14,22
233:10,12,25
234:2 239:25

240:3,7
**background** 5:22
**bad** 52:2 79:22
104:11 106:11
129:21 136:4
145:8
**baker** 3:3
**bandages** 22:24
**banded** 141:19
**based** 110:15
194:12 211:20,23
211:23
**basically** 73:19
210:20 217:3
**basis** 139:20
**bates** 149:13
159:17
**bed** 43:12 44:15
44:16 45:19 46:12
46:16 49:17
**bee** 100:13 102:19
104:2 106:11
145:7
**began** 22:3 35:23
36:22 38:17 65:22
66:2 222:3 232:6
**beginning** 35:21
36:6 85:18
**behalf** 2:2 3:6,14
3:20
**believe** 12:11
16:23 33:16 43:25
48:1 56:7 60:10
77:25 78:19 91:20
146:3 149:22
151:8 161:20
162:17 176:19
180:14,15 186:9
187:6 188:5
203:18 204:20
217:9 225:17

233:10 248:9,10
**believed** 231:10
**belonged** 141:17
**belongs** 172:17,18
**benton** 9:14
**best** 51:20 96:2
  107:13,24 241:14
  252:15
**better** 7:19,20
  17:5 57:1 84:5
  98:11 146:14
  226:11 249:7,14
**bid** 56:13 58:8,11
**bigger** 239:12
**birth** 8:9
**bit** 224:18
**blank** 132:8
**bleed** 145:8,9
**blood** 120:10
  204:6
**bloodworth** 1:17
**body's** 55:24
**book** 43:6,7
  151:20,22 152:1,9
  152:22 153:8
  160:14 185:9,12
  185:13,17,18
**born** 9:4
**boss** 129:19,20
  132:24 133:1,25
**bottle** 114:18,20
  156:16
**bottom** 209:19
**boulevard** 3:18
**box** 140:7 163:7
  182:13 208:14
  222:23 223:3,7,14
**boxes** 162:11
  166:8
**boy** 12:12 22:4
  156:18

**bozyk** 1:13
**break** 8:4 42:1,8
  42:10,15 91:4,10
  91:15 93:16
  103:21,24 142:2,4
  142:10 143:17
  179:19,25 180:2,4
  227:2,3,10
**breaking** 142:25
**breaks** 8:2
**brief** 68:25
**briefly** 103:25
**bring** 18:18,25
  28:4,5 82:9
  105:13 106:13
  139:4,22 141:2
  157:25 182:20
  189:10 223:7
**bringing** 183:10
**brings** 27:15
**broad** 93:21
**brought** 18:11,14
  19:2 223:14
**buchanan** 1:13
  3:21
**buffalo** 9:6
**building** 24:13,21
  25:9 41:22 47:23
  48:2,6,8,12 49:4
  49:12 67:10 73:21
  78:17 79:2,14,19
  80:5
**buildings** 68:7
**bullpen** 80:21
  81:23 82:9,21
  83:2,6,21 88:12,14
  88:16,19 89:9,14
  89:15,18,23 90:12
  90:21,22 91:1,16
  91:19 92:1,15,22
  94:3,17 96:14

97:4 98:15,18
99:2,8,16 100:8,15
102:24 104:4
105:5,14 107:4
108:6,17 110:18
113:1 221:23
222:2,6,14 232:3,5
239:8
**button** 232:13

## c

**c** 1:14,16 3:1,17,17
  4:15 156:1,1
  161:18 192:3,7,22
  193:12 214:15,19
  214:24,25 221:22
  225:10,23 232:3
**c's** 215:4
**calcium** 120:15,21
**california** 2:8 8:19
  41:24
**call** 8:7 39:2 68:2
  68:4,24 88:9
  89:11,12,13 90:6,6
  90:11 92:14 94:12
  96:20 99:10
  100:15 101:4,10
  102:9,14,20,20,23
  103:13,19 105:10
  105:12,22 106:12
  106:18 109:4,4,14
  109:15,16,18,19
  109:19,22,23
  110:4,5,17,20
  117:23 118:23
  126:19 142:8,8,14
  142:16 157:24
  158:22 159:2
  179:20 183:15
  191:16 229:7
  232:13

**called** 5:4 12:3
  43:16 89:12 101:1
  102:7 127:19
  181:24 183:13
  226:3 234:14
  235:13,16,16
**calling** 81:2 106:7
**calls** 29:20 43:21
  60:5 66:19 72:23
  74:6 82:2 83:9
  92:24 93:9 94:20
  96:8 97:7 99:18
  100:19 102:25
  103:5 104:4,6,7
  106:2 107:5,9
  108:21 111:5
  112:4 118:21
  119:18 122:2,17
  123:1 144:20
  216:22 219:4
  237:13 245:16
**cally** 182:23
  247:22
**cameras** 232:11
  233:4
**capacity** 1:7,10,12
  55:21
**carbon** 182:3
**care** 10:7,7,25
  11:1,3,5 12:23,25
  13:4,5,8,9,14,24
  14:1,13,14,20,24
  15:1,4,9,13 16:3
  17:20 24:6 44:18
  44:20,22 45:4,13
  46:5,6,10,13,14,20
  48:15,18,19 72:6
  72:10,11 75:11,20
  76:6,8,17 78:12,13
  79:10,12,24 80:11
  82:10,15,17 85:22

85:25 86:1,2,9
87:4,20 88:20
89:20,23,24 90:2
91:19,21 92:13,16
92:20 93:8 94:4,7
94:7,18,19 95:1,2
95:5,5,7,24 96:6
96:14,15,16,18,19
96:20 97:3,5
98:15,18,23,24,25
99:3,9,11 109:19
112:7 178:25
190:11 215:9,10
215:13,15 216:1
220:23 236:12
237:2 244:24
**carry** 115:19
**cart** 23:16 27:10
27:20,22,22,23,24
28:6,12,13 29:17
34:5,6,9,11,14
46:23 47:1,8
52:11 147:3,6,8,14
147:14,19 157:19
157:23 215:4,4,22
**carts** 26:7,19,21
26:23 27:1,4,6,10
27:16,19 28:5,7
248:13
**case** 2:2 6:14 26:4
104:9 119:2,3,5
122:3 124:23
208:23 228:11
235:1 243:16,18
**cassettes** 28:5
248:18
**category** 157:8
**catheters** 22:22
**cause** 145:25
238:18

**causes** 6:21 238:23
**ccdoc** 155:1
160:21 161:12
162:22 163:6,23
166:1 172:6 205:3
205:18 232:6
240:7
**ccsao** 4:16,17
192:8 200:4
**center** 15:20,23
16:2,20 19:15
20:2,9
**cents** 21:6
**cermak** 1:9,11 6:4
6:12 20:20,22,25
21:8,24 23:21
24:4,15 26:22
38:14,17 39:6
41:6,7,9,14,18,21
41:22 42:5 47:23
47:23 48:3,9,9,12
49:1,4,11 50:15
51:12,18 52:3
54:2,4,15 55:10
58:18 65:1,19
66:17,25 68:18
70:2,6,25 71:11
72:5,17 73:4,9,11
73:16 79:5,25
80:1,3,4,5,6,8,11
80:23,24 84:3,10
85:7 88:12,16,23
89:4,15,19 97:2
121:17 132:10,11
134:25 135:3
139:8,11,15
147:21 148:5,18
148:20,20 153:19
153:21,21,23
154:1,1,7 155:1,6
155:12 156:2

158:20 159:1
160:8,17 163:14
163:23 165:7
167:17 168:5,18
169:21 171:9,19
171:21 172:1,6,9
172:14,18,21
173:4 174:25
175:1 176:7,15,18
176:24,25 177:3,4
177:10 181:7,22
181:24 182:1
183:7,12 184:20
186:23 187:17
188:2 189:7,25
194:5 195:17,20
196:7 198:8,15
212:1 213:4,15,17
215:2,7,25 216:4,5
216:7,18 217:4
222:12,21,23,24
222:25 223:2,3,4,8
223:11 224:1
225:14 229:12,16
231:9,22 233:19
234:10 237:18,22
238:9 239:11
242:14 244:13
246:14 247:3
**cermak's** 80:25
160:14 222:23
**cerner** 51:13,15,16
51:18,22 52:5
206:25
**certain** 18:18
58:18 75:7,12
77:9 133:20
147:22 153:15,16
155:24 157:17
221:4 243:8
245:21

**certificate** 252:1
**certificates** 10:3
11:1,9
**certification** 15:10
15:12
**certified** 2:3 10:5
252:3,5 253:9
**certify** 252:7
**ceus** 10:5,10,12
**chain** 140:21
181:9
**chair** 216:10
**chaired** 216:14
**chance** 68:5
**change** 21:25 22:1
45:7,11 134:22
212:8
**changed** 44:1,7
49:25 156:18
174:3 176:20
**changeover** 32:17
**changes** 45:8,12
**changing** 247:2
**channels** 240:23
**charge** 44:9 46:16
64:17 73:16,18,19
85:5,5 88:6
187:20 195:4
**chart** 18:1,4,5
50:22 51:5,6,22
52:22 178:1 179:8
179:13 191:3
201:13 203:9
209:10,12 211:11
212:5,6,24 216:12
230:13 238:21
**charts** 16:25 17:12
17:12,13,14,15,19
**check** 21:21 23:2,6
23:12 141:4 163:7
182:13,16 208:13

241:16
**checked** 21:21
22:20 163:11
182:16 225:13
231:11,21,21
**checker** 23:2,3
**checking** 23:2,3
**checks** 162:10
165:8
**chest** 108:6,16,18
109:9,14 110:19
111:1,8,12,13,22
112:17,19,22
113:2,24 115:23
116:2,4,14,22
117:6,15 123:19
123:21 125:17
126:14 145:13,16
145:17,18,19
205:21,25 206:3
210:15 211:1
215:17 217:8
222:4,11 224:13
227:25 228:3
229:5 231:5 232:6
232:9,11 238:4,15
238:19,23,24,25
239:8
**chicago** 2:8 3:4,11
3:18
**chief** 40:23
**cholesterol** 204:8
205:4
**chronic** 204:1,2,10
**chronologically**
207:5
**chs** 236:24
**circumstances** 6:3
**city** 12:6,22 13:4
**civil** 2:7 5:16

**clarify** 53:15
**clark** 3:11
**class** 188:14,18
**classes** 15:12
**classification**
205:8
**clear** 23:22 101:19
**clearly** 108:23
219:5
**clerk** 140:16 141:9
185:21 186:5
195:16,21
**clerks** 195:19,20
248:16
**click** 22:14 153:21
239:19
**client** 250:24
**clinic** 26:12 188:1
**clinical** 21:9,11
42:21,24 129:12
188:12
**clinically** 15:7
**clipped** 141:19
**close** 13:2 174:17
**closely** 239:13
**coaching** 125:3
**code** 140:12
172:16 173:6,8,10
173:15 175:9
176:2 194:19,24
195:1 244:18
**codes** 172:16,16
175:11
**cohesively** 155:8
**coincide** 21:19
**college** 9:13,14,23
10:4
**colleges** 9:25
**combined** 47:10
**come** 30:12 42:14
51:3 75:8 77:15

77:22 78:5 92:15
96:20 99:2,10,15
100:7,15 101:1
102:8,23 104:4
105:5 106:13
126:20 146:18
150:16 174:14
181:18 190:21
208:13 227:8
229:9 234:15
235:2,3,5,7,21
240:3,6 246:16
247:7 248:6
**comes** 76:10,21
246:8
**coming** 74:14 77:3
78:2,6 104:24
177:15 181:14
183:4 212:13
239:25
**commack** 232:9
**commencement**
252:8
**commencing** 2:6
**comments** 128:23
129:5
**committed** 58:1
**committee** 249:15
249:16
**committees**
249:25
**common** 243:17
243:20,21
**communicate**
67:14,17,25 68:1
**communication**
251:21
**company** 19:14
32:19
**compare** 217:18

**compartments**
28:1,2
**complain** 169:6
243:10
**complained** 167:4
167:7 179:1,3
**complaining**
108:17 109:9
169:21 171:10
172:19 177:16
190:15 197:14
222:14 241:13
**complains** 112:17
113:2
**complaint** 169:4
174:17 177:15,18
179:4 192:12
193:3 221:20
**complaints** 169:6
174:16 234:15
235:5,14,19,20
243:7
**complete** 140:6
**completed** 140:24
141:11 196:23
231:14
**completes** 165:11
**compliance**
155:14,19,20
**components** 55:25
190:10
**computer** 7:23
38:22 39:1,12
51:22 52:11 55:14
152:16 200:11
231:3
**concern** 102:17
103:14 110:19
111:1,2 167:13
**concerned** 228:8

**concerning** 167:15 228:1 252:11
**concluded** 251:18
**conclusion** 230:14
**condition** 105:12
**conference** 142:8 179:20
**confirm** 241:9,10
**confused** 89:3 183:5
**confusing** 29:19 114:24 170:3 224:18
**consider** 144:24 145:1,5 154:5,15 176:25
**consideration** 209:3
**considered** 99:15 100:5 111:22 129:11 144:7 145:13,19 186:19
**constitutes** 252:15
**contact** 72:2,13 127:12 191:8,10 191:11 229:5
**contacted** 8:17
**contacting** 73:16
**container** 156:17 197:20
**contains** 236:1
**contents** 213:15
**context** 53:12 123:15
**continue** 36:23 185:25 186:2
**continued** 134:17
**continuing** 205:7
**continuous** 16:12 16:13

**control** 16:7 43:12 44:15,16 45:19 46:14,25 49:17 84:8 140:14,20,25 141:7 150:11 166:5 173:7,9 174:8,12,15 181:9 181:11 182:10,11 183:14 194:10,11 194:16 208:8,10 213:12 214:7 217:23 218:2,4,7 218:10,16,18,24 225:17,24 226:5,6 226:12,17 228:19 228:24 231:20 233:13 249:18,24
**convicted** 11:15
**coo** 40:18,20 41:3 41:4,9,14 55:14 134:24,25 138:6,6 176:9 189:5,7,11 189:17
**cook** 1:6,8,8,9,11 20:24 21:1 23:20 23:23 24:9,12,21 35:16 36:7,12,19 36:22 37:15 38:6 38:17 39:22 41:5 41:6,19,23 46:15 47:22 65:1,22 66:2 96:21 97:1 105:25 108:20 113:9,15,19,25 114:9,14 118:12 119:13 124:3 127:9,25,25 129:17 132:10,12 132:16 138:8,15 138:25 144:11 147:20 150:1

153:20 155:5,11 155:13 158:6 159:15 167:17 168:4,17,18 172:13,23 174:25 176:1,7 177:19 184:3 185:10 186:23 188:16 189:19 195:19 196:5 198:19 207:6 213:8 217:22 225:13 233:15 234:4 238:9 239:12 240:3 241:1 242:13 244:13 246:8,14,17 247:3 247:5 248:23 249:9 250:1
**cooperation** 154:25
**coordination** 154:25
**coordinator** 42:21 42:22
**copy** 153:5,11 182:3,3,4,5,19,19 233:16 250:23 251:8,14,15,16
**corizon** 17:2,5 19:14
**corner** 162:8
**correct** 10:14 11:22 12:19 15:8 16:8 17:17 18:19 18:20,24 19:16 21:13 24:5,7,10,23 25:6 30:4 35:11 35:13,13,18 39:10 39:15,18 40:25 50:1,3,8 63:1

65:12 69:11,25 75:21 86:11 96:13 102:16 130:25 133:23 135:1,4 138:3 139:16 140:2 155:2,4 161:19 162:12 172:15 173:1 176:4 177:22 192:22 195:18 196:8 198:17 200:15 201:10 202:4 203:3 204:14 205:19 206:3 208:17,21 210:3 213:13 217:11 221:17 223:19 224:16 225:10,14 234:7 234:19,22,25 241:2 244:3 247:19
**correction** 63:15 166:2
**correctional** 15:19 15:23 16:2,20 19:15 20:2,9 69:15,23 73:15 90:14,20,22 92:22 93:5 94:5 95:4,23 96:5,13 97:4 98:19,22 100:18 100:24 102:4,13 102:20,22 104:3 104:19 107:5,7 108:20 110:16 126:19 127:11,18 127:23 144:6,19 146:4,19 161:16 165:18 190:2

**corrections** 23:24 24:12 70:24 71:20 88:21 96:22 97:2 104:23 105:25 125:23 126:5 127:9 138:16 144:11 155:12 159:16 165:11 168:17 184:4 185:11 189:1 207:7 234:5
**corrective** 64:7,10
**correctly** 63:8
**counsel** 8:18 142:7 252:23,25
**counselor** 193:7 198:14 234:9
**count** 6:6 23:10 24:15 49:5
**counted** 22:11,12
**county** 1:6,8,8,10 1:11 20:24 21:1 23:20,23 24:9,12 24:21 35:17 36:7 36:12,19,22 37:15 38:6,18 39:22 41:5,6,19,23 46:15 47:22 65:1,22 66:2 96:21 97:1 105:25 108:20 113:10,15,19,25 114:9,14 118:13 119:13 124:4 127:9,25,25 129:17 132:10,12 132:16 138:8,15 138:25 144:11 147:20 150:2 153:20 155:6,11 155:13 158:6 159:15 167:17

168:5,17,18 172:13,24 175:1 176:1,7 177:19 184:4 185:10 186:23 188:16 189:19 195:20 196:5 198:20 207:6 213:8 217:22 225:13 233:15 234:5 238:10 239:12 240:1,3 241:1 242:14 244:13 246:8,14,17 247:3 247:5 248:23 249:9 250:1
**couple** 13:12 176:21 203:19 241:24
**court** 1:1 6:24 7:4 61:11,14 63:21 65:3 77:22 142:9 142:17 221:22 222:2 232:3 250:15,18,22 251:10
**covering** 239:20
**coyne** 3:17,17 62:11,15 142:3,4 142:24 143:4,15 149:12,16,19 179:18 180:3 227:6,9 250:10 251:2,13,15
**cqi** 16:4,6,9,23 18:12 130:4,5,7,8 133:18 134:8,16 134:19,21 135:11 137:24 152:2,6 153:5,24 249:22 250:6

**creating** 247:1
**crime** 11:16
**cross** 25:20
**crw** 140:10,17 141:1 161:21 162:2 164:23 165:22 181:1 185:21 186:5 193:7,10,14 198:14 233:15 234:9 236:2
**crws** 131:3,17,23 180:9
**csr** 252:6
**curious** 206:22
**current** 8:11,21 66:16 67:8,13 173:25
**currently** 65:14 200:5 234:16 235:23,24
**custody** 72:4 85:6 86:2 140:22 176:10,11 181:9 205:19
**custom** 39:7 40:3 105:15,24 107:2 107:15,20 115:11 124:3 152:24 153:4 168:16 183:23 220:5
**cut** 126:2
**cutoff** 75:19
**cuz** 22:5 60:15 61:6 72:1 73:25 137:25 158:10 161:7 226:11
**cycle** 156:19,21,23 156:25

**d**

**d** 1:15,18 4:1,17 133:9,9 199:23 200:2
**daily** 156:5,8 180:9 181:19
**danger** 121:12
**dangerous** 245:14 246:9
**dart** 1:7
**date** 8:9 22:25 34:15 44:2 45:10 141:14,21 149:10 149:22 159:22 162:18 178:18 179:6,9,9 181:12 181:15,15 192:16 192:24,25 196:15 196:15,23 200:21 203:14 207:9 208:20,24 209:19 209:21,22,24 210:10 214:18 217:19 218:17,19 218:20,21,22 220:15,19,19 223:19 224:21 226:2 229:4 231:14
**dated** 141:20 193:18,21 194:18 201:13
**dates** 22:12,20 174:17 193:8 200:13
**daughter** 8:25 9:1 9:2,2
**day** 16:15,15 39:17 48:21,22 50:14,14,16,16,17 50:17,20,21 51:3

58:12,14,16,20
60:25 132:20
141:3 196:6 197:3
197:11 203:20,20
203:22 206:1
217:11 223:18
231:17 233:9
245:9 246:15
248:7 253:4
**days** 77:14 156:17
184:2 196:6
202:23 203:19
208:20 234:21
245:9
**daytime** 248:5
**debbie** 61:23
86:19 87:10 99:25
101:25 125:8
167:23 170:21
250:13,20
**debra** 2:3 252:5
253:8
**december** 192:17
193:19 195:14,24
196:5 198:15
200:20,21,21,21
200:22 201:1,1,23
202:22,24 206:8
208:3,5,16,24
210:1 221:15,21
223:17 225:8
**decide** 18:16 46:8
63:2,9 81:10
82:14 85:7,10
100:25 102:5
140:14 190:1
239:12 242:14
**decided** 36:19
193:25 194:4
195:2

**decides** 45:2,18
60:1 161:23
165:14 166:4
177:9,11
**deciding** 46:16
**decision** 82:17
146:10 162:2,3
164:13 165:19
211:20
**decisions** 177:20
**deem** 162:2 221:8
**deems** 103:11
211:18
**default** 202:19
**defendant** 6:10
66:8
**defendants** 1:19
3:14,21
**definition** 161:16
**definitions** 155:24
161:15
**degree** 9:16,18,19
9:22
**delay** 197:20
246:6,15
**delays** 249:19
**deliver** 158:21
159:1
**delivered** 156:11
156:12 247:14
**delivery** 156:19
**denied** 243:7
**dental** 74:21,23,24
74:24 139:18
141:17,18 175:19
247:20
**dep** 143:7
**department** 23:24
24:12 53:20 55:4
70:24 71:20 88:21
96:22 97:2 104:23

105:25 125:23
126:5 127:9
138:16 144:11,13
155:12 159:15
165:11 168:17
184:4 185:11
189:1 207:6 234:5
**depend** 59:16 77:1
81:12 112:13
120:4,4 172:19
173:5 177:8
196:25 203:16,20
229:19 238:12
242:6
**depending** 57:23
122:22 175:9
**depends** 56:13
57:14 59:7,8,9
75:6 76:5,25 82:5
82:11 88:7 92:6
145:15,25 175:6
177:13 196:1
245:10 247:7,12
**deposition** 1:21
2:1 5:13,15,25
7:24 11:18 142:11
142:18 149:6
159:8 179:24
192:2 200:1
251:17 252:12,18
252:19
**depositions** 6:5
**describe** 31:17
74:13
**described** 77:25
**description** 4:11
**design** 22:6
**details** 128:7,8
**detainee** 33:18,21
65:4 82:6 84:9
85:5,6,15 86:9

87:4,20 90:17
92:13 120:4
124:13,24 156:14
166:24 167:7
168:25 172:19
177:14 183:5
190:14 240:5,23
244:13
**detainees** 17:13,16
19:20 82:7 114:11
125:1 241:20
243:6,10 249:8
**determination**
82:12 93:6 146:8
147:1 164:6
174:14 176:2
**determine** 46:5
50:21 54:3,4
61:18 62:6
**determined** 46:12
78:9 172:17,18
**determines** 28:17
45:15 76:12
172:13
**developing** 44:3,4
**devore** 3:9,10 8:16
29:18 33:13,16
36:13 37:5,19
40:6 41:10,15
42:6 43:21 53:11
53:17 54:17 58:24
60:5 65:4 66:18
70:17 71:2,5 72:8
72:20,23 74:5,15
82:2 83:8,24
84:14,17 85:11
86:10,12 87:23
89:6 90:15,23
91:2,9 92:2,9,24
93:9 94:20 95:13
95:19,21 96:1,8

97:6,12,20 98:3,7
98:11 99:17
100:10,19 101:2,5
101:9,11,14,18
102:25 103:5,20
103:22 104:6
106:2,15 107:8,17
108:21 109:2,24
110:21 111:4
112:4 113:11
114:23 117:16,20
118:3,21,25
119:18 120:16,19
122:1,16 123:1
124:10,22 126:2
130:15,23 131:4
136:22 141:22,25
142:22 143:3,8,16
145:21 147:9
152:19 167:19
168:9 170:10,15
173:18 187:5
207:16 216:22
219:4 228:4
237:13 245:16
246:18 250:12,16
250:21,24 251:6
251:22
**devoreradunsky....**
3:12,13
**dialysis** 48:20,22
**diet** 205:3,5
**difference** 122:23
123:25 202:9
**different** 16:16
17:9,9,25 18:12
25:18 28:8 29:25
32:12,14,22 33:20
44:20 46:20 55:24
56:16,19 57:18,18
61:4 67:11 81:11

81:19 88:7 103:18
118:18 124:1
145:16 157:8
158:10 165:5
172:16 174:8,17
197:5 206:20,21
208:10 218:10
226:2 238:23
239:14 242:18
243:24 245:12,13
**difficult** 7:3
190:13
**difficulties** 233:21
248:24
**direct** 87:24
131:20
**direction** 252:15
**directive** 4:12
149:3 150:5 151:4
154:6,9,14,16,17
155:21
**directives** 151:16
152:5
**directly** 15:6
32:19 69:10 81:22
82:5 187:14 253:1
**director** 1:9,10
14:15,16,17 16:23
19:4,8,9,10 31:21
32:7 55:14 130:4
130:5,7,8 131:9,11
131:16 133:18
134:17,19,22
135:11 137:24
187:23 189:11,17
**discipline** 18:13
19:5
**disciplined** 66:1
**disciplines** 16:17
17:9 18:12 19:3,6

**disciplining** 69:7
**discontinued**
162:24
**discuss** 11:23
18:14,22 139:21
139:22 190:21
212:14 235:19
239:15,16 240:12
244:16,17
**discussed** 129:7
**discusses** 244:13
**discussion** 233:22
249:1
**disease** 204:2,10
232:7
**dishonesty** 11:16
**dispensaries** 23:18
68:7 128:12
**dispensary** 25:12
25:14,15,17,23
26:3,10,14 66:25
68:16 127:8,18,20
144:14 157:24
215:1,25 216:3
229:6,8,13,17
234:14 235:3,13
235:17
**dispenses** 248:20
**disposing** 22:17
**disproportionate**
104:8 119:2 122:3
**disregarded**
163:25 164:2
**distance** 216:19
224:11
**distributed** 156:5
246:20
**distribution** 4:13
149:5 156:2,3
**district** 1:1,1

**div** 229:13
**division** 1:2 21:21
24:20,20,22,23
25:7,8 26:24 27:7
28:8 44:20,23,25
45:2,5 46:17,19,20
64:1,5 77:5 79:2,7
81:9,22 82:5
165:25 166:2
176:20,23,25
177:8,13 184:23
192:22 193:11
205:14 214:15
221:17 222:10,21
222:22 225:10,23
229:5,19 232:5
245:3
**divisions** 67:12
176:21
**dizzy** 227:18
**doc** 45:14 46:5,7
46:14 51:3 65:8
69:18,20 70:2,4,6
71:9,11,12,15,25
72:3,4,12,17 73:2
73:3,7,12,14,17,25
80:22,23 81:9
82:14,19 83:3,15
84:4,21 85:8,16
86:1,7,8 87:1,2,6
87:17,18 88:8,13
90:3 91:23,25
92:18,20,21 93:3
95:1 96:15,18
97:8,14,14,15,18
97:24 99:2,10
100:22 102:9,12
103:11 105:8,12
106:12,23 107:20
108:1 109:3,5,12
110:13 117:22

[doc - electronic]                                                                Page 12

123:20,20 124:17
131:18,19,21
140:7,9 141:8,9
144:9 146:23,24
147:1 160:6,9,11
161:1,3 162:1,10
164:5,12,25
165:11,17 166:6
171:22,22,23,24
172:1,3,16,17
174:13 181:3,10
181:14,17 182:2
184:16 186:8,18
187:22 188:22,22
189:20,21 190:4,7
190:8,18,24,24
191:5 193:16,16
194:14 195:11
198:4,12,13
208:12 219:7
222:14 226:10
236:20 237:24
238:1,1
**doc's**  72:14 80:24
82:12 83:18 97:16
97:25 106:6
109:15 186:12
189:23
**doctor**  45:1 59:8,9
59:10,12 75:4,20
76:3 114:6 221:7
221:10
**doctor's**  12:23
77:2
**doctors**  26:11
247:18
**document**  148:23
149:18 159:18,25
162:14 180:21
192:5 199:15
208:6 209:19

213:18
**documentation**
179:14 212:5,6
213:17 236:25
**documented**
207:15 208:1
211:24 232:6
**documenting**
206:22
**documents**  5:24
208:4
**doing**  16:15 31:20
31:24,25 32:6
55:9,17,18,20 78:8
120:12 151:5
162:21 178:24
**don**  13:17,18
**door**  93:13 104:13
104:22 169:12
184:11
**doris**  132:7,9
**dose**  28:24,24,24
32:18,20 33:22
157:9,9,10,12,13
198:24,24 201:3,3
201:16,16,24,24
202:2,2,6,6,9,10
202:11,11,14,14
202:19,19,20,20
203:16,17 205:9,9
205:11,11 209:16
209:16,16,17
212:8,8 243:9,9,11
243:12,21,21,25
244:1,22,22 245:3
245:3,6,6,25,25
**double**  36:25
**downstairs**  78:16
**doxazosin**  204:18
**draw**  230:13

**drawer**  30:14,18
**drawers**  27:25
28:14 29:13 32:13
33:11,12
**dropped**  156:8,10
**dropping**  248:12
**drops**  185:20
186:5
**drug**  32:19 33:17
**due**  123:13 141:20
141:21 212:13
215:2 217:4
**dukes**  1:3 4:16,17
5:20,23 11:21
29:2,10 191:21
192:8,9,19 193:3
196:4 197:13
199:2,19,23 200:4
200:6,19 202:22
203:24 206:10
207:6,9 208:15,23
209:13 210:1
211:24 212:2,15
213:3 214:6,19
215:6,17 217:2
220:17 221:14
223:16 224:7,23
225:8 226:1
227:24 229:3,25
231:9,25 236:9
237:10 238:3
243:18
**duly**  5:1,5 252:10
**dunmars**  1:17
**duplicate**  213:23
**duties**  13:15 49:25
50:6 70:2 176:8
249:12
**dxd**  157:8 199:3
201:24

**dynamics**  47:3
52:9
**dyslipidemia**
204:3

**e**

**e**  1:12 3:1,1,21 4:1
5:11,11 51:12
67:19 129:25
130:11 133:9,9,9
142:5 151:15,23
**earlier**  61:3 123:9
123:12 126:8,12
133:22 145:7
161:20 186:10
194:20 225:17
**early**  61:11 65:2
184:7
**eastern**  1:2
**eat**  143:9
**education**  5:22
241:18
**effect**  108:11
229:12 230:4,5
**effective**  149:10
149:22 159:22
230:18,20 231:6
**either**  7:8 21:20
32:25 33:5 60:23
72:12 106:13
107:6 161:21
164:14 168:17
177:10 179:21
216:17 240:8,24
**electroni**  182:22
247:21
**electronic**  17:20
18:6 35:20 36:6
36:11,20,23 38:1,5
38:16 39:1,7,8,25
51:12 53:5,16,23
186:16

**electronically** 40:5
52:22 153:16
186:11
**eligible** 203:18
**elk** 253:4
**emergencies** 99:15
100:6 144:10
**emergency** 92:6
92:13,23 93:6
94:5 96:7,19
98:17 99:1,3,23
100:18 103:11,12
140:15 144:7,13
144:25 145:2,5,14
146:5 161:17,24
162:9 163:4
165:14 194:1
208:25 217:6
232:18
**emergent** 98:14
99:9 145:20
**employed** 150:1
**employee** 21:2
252:22,24
**employees** 155:13
**employment** 5:22
**emt** 99:10,15
100:6,25 102:6,23
104:4
**emts** 96:20 99:1
**enclosed** 30:4
**encounter** 178:4
179:14
**ended** 38:2
**ends** 248:7
**entailed** 21:18
**entails** 36:14
69:16
**enter** 51:25 76:23
247:25

**entered** 53:16
199:20 204:2
248:23
**entitled** 2:2
**epigastric** 238:22
**episodes** 210:16
210:25 211:4
**er** 229:12 231:10
**erickson** 3:3 4:5
5:8,12,18,19 8:20
29:24 33:15,23
36:18 37:6,10
38:3 40:12 41:12
41:17 42:9,13,18
42:19 43:23 53:13
53:14,21 54:23
59:1,2 60:9 61:23
62:8,14,18 65:5
66:23 70:23 71:3
71:14 72:16,24
74:10 75:3 82:13
83:11 84:1,15,22
85:13 86:14,18
87:8 88:1 89:10
90:19 91:7,13,14
92:7,11 93:4,15
94:14,22,23 95:15
95:17,20,22 96:4
96:11 97:10,17,22
98:5,9,12 99:25
100:16,23 101:6
101:16,20,21,25
102:11 103:7
104:15 106:9,21
107:14,21 108:25
109:7 110:3,24
111:11 112:8
113:13 115:2
117:17,24 118:6
118:23 119:4,6,20
120:17,20 122:7

122:19 123:8
124:15 125:2,4,8
125:19 126:7
130:20 131:1,6
137:1 142:21
143:1,6,11,20,22
145:23 147:11
149:8,14,17,20,21
152:23 159:10
167:23 168:12
169:14 170:13,21
171:12 173:21
180:1,6,7 184:13
187:8 192:4 200:3
207:20,22 217:1
219:10 227:7,14
228:9 233:24
234:1 237:17
245:20 246:23
249:3,5 250:13,20
251:4,8
**error** 134:18
135:10
**escorted** 222:10
**essential** 154:23
**essentially** 30:21
50:4
**evaluate** 160:4
187:3
**evaluated** 189:4
**evaluating** 146:5
**evaluation** 178:24
189:2,3 204:1
**event** 142:10
**everybody** 18:13
19:11 38:21 56:20
142:19
**evidence** 113:12
170:16 228:5
**exact** 11:13 34:15
41:16 47:24

160:18 162:18
248:6
**exactly** 37:25 38:2
56:6 130:5,9
134:8 157:1
162:21 176:12
188:9 242:20
248:4
**exam** 10:15,19,21
**examination** 4:4
5:7 252:9
**examined** 5:5
**example** 29:1
52:20 57:20 59:19
100:12 158:18
246:9
**examples** 61:4,6
81:13
**exceptions** 26:2
**exchange** 27:10
**excuse** 169:10
214:8
**exhaust** 208:19
**exhibit** 4:11,12,14
4:15,17 149:2,7
159:6,9,14 192:3,7
199:23 200:2
**exhibits** 4:10
250:14
**exist** 183:1,20,22
**experience** 163:20
193:24 194:13
**experienced**
147:21
**experiencing**
126:14 217:8
222:4
**expertise** 221:12
**expiration** 22:12
22:20,25

**expired** 23:1
**explain** 21:17
   44:17 50:9 206:17
   210:20,20
**explanation**
   170:18
**expressed** 243:6
**extent** 71:7 124:25

**f**

**f** 133:9
**facilitate** 203:4
**facilities** 14:6
**facility** 12:23
   13:10,11,14,24
   14:20,24 15:3
   23:24 24:3,9
   26:19 63:15 77:14
   78:2 158:15
   166:13
**fact** 113:18 114:14
   215:3 238:21
**facts** 113:12
   170:15 228:4
**fair** 7:5,11,25
**fall** 61:8
**familiar** 104:3
   105:4,21 108:5
   113:14,18 114:8
   114:13 118:1
   126:25 127:4,22
   128:4 156:6
   159:20,24 160:25
   161:8 162:5
   180:25 184:7
   200:11 230:4
**fan** 7:16
**far** 6:15 30:9 60:1
   79:16,18 107:12
   224:10 228:2
   236:2 245:5

**fashion** 30:25
**fast** 227:20
**faster** 126:17
   249:8
**fat** 204:4,6 205:4
**fatal** 197:21
**february** 213:3,22
   214:6,14,19
   217:10,11 220:16
   220:16
**federal** 2:7 5:16
   10:5 14:8 142:9
**feel** 105:8
**feels** 106:12
   211:20
**felony** 11:16
**felt** 103:12
**females** 127:23
**fifteen** 184:6
**figure** 73:12
   106:25 239:14
**file** 17:20
**filed** 127:24
   146:15
**fill** 26:23 27:1,5,16
   28:5 140:1,4
   156:19,21,23,25
   166:14,24 179:25
   182:6 224:24
   247:25
**filled** 166:25
   173:19 213:2
   214:6 225:7 226:2
**filling** 28:7
**fills** 28:2 166:8
   178:6 196:4
   208:23 223:16
   224:20 248:11
**finally** 229:10
**find** 40:1 63:13
   64:4 68:17

**finding** 63:12
   130:18,18
**fine** 8:16 142:3
   143:4,8
**finish** 7:2 35:14
   96:25 136:6 153:3
   170:2 179:15
**finished** 214:25
   222:8
**first** 5:5 9:20
   10:22 16:21
   128:19 150:18
   200:4,18 204:23
   207:9 225:20
   229:1 236:21
**five** 12:18 20:10
   20:11,12 29:2,14
   77:14 119:16,17
   149:15 196:6
   202:23 229:9
   242:11
**flip** 228:22
**flipping** 227:17,18
**floor** 24:19,25
   144:14
**focus** 16:13
**follenweider**
   133:2,8,8,24
**following** 14:7
   16:17 62:1 86:21
   87:12 100:2 102:2
   125:10 168:1
   169:3 170:23
   206:1 217:14
   224:20 226:1
**follows** 5:6
**forced** 214:24
   217:6 222:2
**forcing** 222:10
**foregoing** 252:12

**form** 29:18,19
   36:13 37:19 40:6
   54:17 63:11,20
   64:10 66:19 74:16
   89:6 90:15,24
   92:3 95:19,21
   96:1 97:11 99:19
   100:20 103:1
   104:6 107:8,20
   108:22 111:5
   112:5 114:23
   122:17 124:22
   140:1,4,6 141:7
   147:9 161:23
   162:5,8 163:11
   164:11,16,18,24
   165:8,14 166:12
   166:15,25 167:2,3
   167:20 169:17
   170:6,10,15 171:3
   172:5,22 173:3,13
   175:1 176:3 177:7
   177:12,21 178:2,6
   178:17,20 180:25
   181:6,21,23 183:4
   183:4,15 185:14
   187:13 188:1
   191:19 193:11,18
   194:4,9 195:15
   196:16,18,22
   197:24 209:20,21
   212:16,23 214:6
   222:19 223:2,17
   223:22 225:12,20
   231:23 234:6
   237:19,22
**format** 200:12
**forms** 62:10,24
   138:22 146:3
   163:21 177:24
   178:11 179:9

180:8 181:18,22
182:22 183:8,19
183:25 185:10,20
186:6,10,17 187:3
187:10,18 188:3,7
188:21 193:24
194:9,13 197:2
224:23,25 228:23
239:8 240:16
**forth** 18:14 19:2
158:6 228:15
240:1
**forty** 65:15
**foster** 1:13
**foundation** 66:18
72:9 113:11
145:21 167:19
**fountainview**
14:25 15:15
**four** 58:16,19,20
60:25 118:4
120:13 155:25
225:24 238:9
239:5
**frame** 77:9 89:7
105:20
**freely** 147:5
**frequent** 210:16
211:4
**frequently** 18:17
**friday** 20:4,7
**front** 173:13
232:11
**full** 20:2 78:8
125:24 126:3
**fully** 139:23
143:10
**functionally** 29:17
**further** 187:14
251:20

**g**

**galindo** 1:14
**geez** 123:17
**general** 4:14 46:1
60:15 125:1
159:15
**generally** 37:7
81:25 110:17
245:9,11
**generated** 184:24
185:4
**generic** 204:21
**getting** 54:5 72:18
78:23 116:6 124:5
151:23 203:4
210:16 211:3
239:18,21 241:5
242:15,16 243:8
246:7
**gi** 145:8,9
**give** 8:14,15 19:21
28:19 32:13 34:8
38:12 47:3 52:9
60:2 63:25 68:4
112:13 119:16,17
120:11 126:20
130:13 139:20
141:17 150:8
181:13 184:3,4
192:1,10 202:13
209:4
**given** 5:25 46:18
55:11 114:14
118:2,12,12,19
119:13,15,25
120:21 121:4
122:21,24 123:13
123:24 144:1
185:2 197:18
218:18,24 221:6
225:16 229:10,25

230:6,11,17
240:17 252:17
**gives** 52:13
**giving** 55:2 61:4,6
141:5
**glass** 90:13 91:1
**glitch** 39:12
**go** 6:17 7:13 8:4
12:13 14:6,13,23
15:17 16:5 18:4
20:17 21:20,21
23:5 26:22 30:14
32:12 33:19 42:18
42:20 44:18 45:2
46:8,18 49:9 51:5
61:11 62:20 63:5
63:21 67:9,9 68:2
68:16 69:9 72:13
72:25 76:6,7,13
77:5,14,15,21,22
78:3 80:19,20
81:6,8,17,19,21,25
82:1,10,14,17,20
83:1,14 84:19,23
85:15,22,24 87:25
90:10 91:7,13,20
92:12 94:18 98:14
98:17 99:6 103:2
104:10 105:11
107:11 120:18
122:4 128:13,14
128:18 129:3
142:13 143:23
150:14 152:5
153:5,19,20,23,24
155:24 158:9
162:19 165:9
170:17 172:3
178:18,21 180:6
182:14 185:14
187:13 191:3

197:9 199:20
206:16,16 208:12
215:24 216:16
220:12,22 227:16
230:10 240:7,24
242:11 246:21
**goes** 30:17,18 76:2
80:18 81:4 84:9
85:16 88:19 89:18
105:16 140:7
176:3 183:14
203:11 215:20
245:7
**going** 5:21 7:10,13
23:10 36:19 46:22
56:20 65:2 77:3,4
77:5 83:6 91:16
99:1,2 117:25
126:24 142:1,11
143:6,7,7,13
148:22 149:1
159:6 169:24
174:22 179:19,22
179:23 180:19
191:25 192:9
199:20 200:14
201:18 207:4
208:2 213:1 214:3
217:20 219:12
220:10 221:1,10
221:10,13 225:6
228:12,14,22
230:13 233:10,11
234:2 241:8
**good** 18:15 42:11
90:23 119:17
120:8,12 142:2
227:9 240:14
**goodness** 57:12
**gosh** 129:20

[gotcha - health]                                                                    Page 16

gotcha 249:3
gotten 197:10,11
  213:20
gp 45:24 205:16
  245:24
graduate 9:7 12:8
graduating 9:24
  10:3
greater 49:6,7,9
green 1:17
grievance 4:14
  50:25 62:9,24
  63:11,20 64:10
  69:14,24 70:5
  74:2 115:10
  138:23 139:3,25
  140:12,15,15
  141:2 146:3,15,17
  158:16 159:16
  161:17,18,24,24
  162:5,8,9,9,10,11
  162:14,23 163:7
  163:11,11,13,22
  164:4,7,9,11,11,16
  164:17,20,24
  165:10,15,15,15
  166:12,15 167:3
  169:2,7,17 170:6
  171:2,10,23 172:5
  172:9,9 176:2
  177:20 178:12,14
  178:17 179:7,16
  180:8 181:1,1,18
  181:22 182:7,12
  182:15 183:3,4,8
  183:19,24 184:3
  185:10,20 186:6
  186:10 187:11,15
  188:21 189:2,4,5
  190:5,6,10,14,20
  190:21 192:17,25

193:11,18,24
194:1,1,2,5 196:16
197:2,13 198:14
200:25 201:5
207:17 208:3,4
209:12 211:10
213:2,8,11,19,25
214:1,5 218:3,11
218:20,21 219:6,8
220:15 221:14,16
222:19 223:7
224:21,22,25
225:7,13 226:2,23
229:23 231:21
232:2 233:7 234:9
240:16,18 241:8
241:12 242:1,5,25
grievances 4:15
  11:20,21,23 49:23
  50:11,19 61:17
  62:4 68:13,23
  108:11,15 115:6
  127:16 138:20
  139:4,12,14,21,24
  140:11,24 141:3,5
  141:6,13,21
  146:14 160:8,15
  160:18,19,21,22
  161:4,13,22
  162:21,23 163:3,3
  163:4,15,16,21
  165:5 169:1
  170:12 174:9,12
  174:16 182:17
  184:22 185:7
  187:4 189:5,8,10
  189:24 192:1,8
  195:5 208:11
  210:10 213:21
  219:22 220:6
  221:14 225:5,7

227:17,22 228:1
228:13,15 238:3
240:20 241:21
242:12,24,25
grieve 167:18
  168:7,19 169:18
  170:7 171:4
  174:23 186:24
grieved 166:15
  202:22 217:23
  218:1,3,14,15,17
  219:2,2 232:23
  239:4
ground 6:17
group 82:8 83:17
  137:19
groups 249:24
grove 253:4
guess 19:4 70:21
  106:18 133:4
  150:17 158:12
  221:9 226:16
  237:4
guessing 11:12
  14:21 34:16
guesstimate 19:22
guide 43:10,15
guidebook 230:22
guidelines 14:8,8
  32:5 43:5,5,8,10
  43:17,19 44:3,4,7
  44:10 49:17
guys 143:5

**h**

h 5:11 178:16
half 20:10,11,12
  142:1 182:19
  203:20 245:9
  246:15
hand 140:8 173:20
  253:4

handle 69:5 72:15
  91:25 144:10
handling 198:18
handwriting
  198:7,11
hang 57:10 94:15
  94:15,15 153:2,2,2
happen 56:21
  113:9 185:24
  191:15 207:12
  226:14 240:4
happened 64:5
  185:23 190:3
  191:9,18 206:18
  216:12
happens 71:21
  73:5 81:16 88:24
harassment
  127:24 128:1
harbor 9:14
hard 38:12 44:16
  52:25 59:23 63:17
  88:4 197:4 228:14
  228:14 233:5,11
harm 121:24
health 1:9,11 19:8
  41:24 45:3 48:19
  74:21,25 75:1
  121:1,10,14
  139:18 141:18
  153:20 155:12
  165:7 175:20
  177:23 178:2,6,10
  178:16,19 179:8
  187:3,10,12,18,25
  188:3,6 194:6
  212:22 213:4,15
  223:3 225:14
  231:22 243:25
  244:5,16,18,19,25
  245:1 247:20

**hear** 6:18 7:20
9:21 20:13 85:14
85:18 158:24,25
219:14
**heard** 62:12 128:5
128:6 129:2,2,6
158:3 166:13,17
166:18 167:1,11
168:21,21,24
184:17,19 221:7
**heart** 108:18
109:10,13 111:3,9
111:14,23 112:1
214:20 216:18
232:7,7 238:19
239:1 246:10
**heartburn** 238:22
**held** 90:21,22
232:10 233:22
249:1
**help** 89:4 95:25
102:21 104:5
164:19 189:11,15
189:18 203:4
206:17 238:11
241:14,17
**helped** 21:25
**helping** 63:13
211:6
**hereto** 252:25
**hereunto** 253:3
**high** 9:5 124:5
197:7 204:8
**higher** 48:15,18,19
173:16
**hiring** 66:21
**history** 5:22
112:11 232:7
**hmm** 50:18 56:10
56:23 57:16 59:25
60:18 78:7 82:23

85:23 87:22 108:4
149:20,20 151:6
155:15 157:20
163:9 167:9
200:13 201:21
204:12 205:20
208:2,9 215:23
218:23 230:2
244:20 249:17
**hold** 201:18
251:11
**holding** 80:22 81:6
233:4
**holidays** 181:20
**home** 8:12,14 12:4
12:17 148:13
**hospital** 42:4 48:9
48:10 79:25
**hour** 21:4 75:12
75:13 222:6
**hourly** 21:2,3
**hours** 56:7,7,10,15
56:18 59:16 61:9
61:9 65:13 116:22
117:10 142:1
143:12 158:22
159:2 217:7 222:3
245:15 246:7
247:4 248:3,4,5,6
**housed** 48:5,11
49:4 192:22 225:9
**huh** 178:23 179:11
219:25
**huhs** 6:25
**hundred** 49:7,10
197:10
**hydrochlorothia...**
120:8 122:14
**hypertension**
204:10

**hypothetical** 74:6
99:18 103:1 104:7
108:22,24 111:5
112:5 122:17

**i**

**i.e.** 232:19
**idea** 67:4
**identification**
159:14
**identified** 18:9
184:21
**identify** 18:21
**identifying** 181:11
**idle** 15:21
**ii** 154:19
**iii** 155:10
**illinois** 1:1,8,8 2:4
2:9 3:4,11,18
159:15 252:6
253:4
**imagine** 81:11
235:12 236:15
**immediate** 217:5
**immediately**
232:18
**implementation**
36:11,14
**improve** 139:6
**improvement**
16:10,12,14 21:9
21:11 42:21,25
129:12 188:12
249:11
**incident** 214:14
221:21 224:19
225:22 226:7,8
231:18
**including** 127:23
232:8,12
**incompetence**
217:5

**incomplete** 74:5
99:17 103:1
108:22,24 111:4
112:5 122:16
**index** 4:10
**indiana** 14:3,11
15:25
**indianapolis** 11:6
16:24
**indirectly** 253:1
**individual** 33:11
**individually** 30:8
30:13 33:5 137:20
137:21 182:7
**infirmary** 16:5
24:16 48:10,13,17
**inform** 142:16
**information** 72:21
118:25 119:1
122:2 236:2
**informed** 151:3
152:4 214:19
229:4 232:8
**informing** 142:6
**inhaler** 209:2
**initial** 224:17
**initialed** 185:15
**inmate** 4:14 28:21
28:22,23 29:1
30:7 32:11,14
33:3,12 37:3,4,15
37:17 39:25 45:2
45:5 46:18 52:14
52:16,21 57:19
58:7,20 63:20
64:23,25 65:4
71:21,24 73:5,20
74:2,14 75:5,19
76:2,10,21 77:10
77:13,21 78:2
80:18 81:4 83:7

85:9 86:6,24
87:15 88:19 89:17
89:22 91:18,25
94:6,17 96:24
97:3 98:22 99:8
99:11 102:18,21
104:5 105:3
106:14 107:7
108:5,16 109:9
111:25 112:15,18
113:1 114:22
115:5,14 116:1,18
121:23 122:13
123:14 124:20,24
125:13,21 126:13
127:5 139:25
140:3 146:15
156:15 157:16,25
159:16 161:22
164:18 166:14
167:17 168:6
169:4 174:22
178:5 181:1 182:1
182:6,25 184:5
185:2 186:19,24
203:11,14 208:21
218:5,8 220:20
228:2 230:18
238:8,11 239:13
240:4,10 241:19
242:15 245:7
246:8
**inmate's** 29:14
51:6 115:7 189:2
**inmates** 17:13
26:24 27:6,19
28:20 30:3 31:13
38:7 39:20 48:5
51:9 52:4 54:5
55:3 62:24 70:25
72:18 81:16,25

82:20 88:24 89:4
94:3 95:5,24 96:6
96:14 98:14,17
113:25 114:9,14
115:18 124:9
128:22 129:4
154:24 155:7
156:8 158:5
168:18 224:24
243:3,6 246:9,16
247:3
**inner** 247:2
**input** 19:13
**inside** 168:16
**instances** 222:16
**intake** 74:19 75:2
75:5,10,16 76:2,6
76:6,11,21 77:16
77:23 78:3,8,11,15
78:16 79:6,17
80:19 81:5,17
82:1,18,21 89:9,12
89:13,18 200:8
203:12 240:7
245:7
**integrated** 18:6
**intendent** 177:3
**interagency** 4:12
149:3 150:5 151:4
151:16 152:4
154:6,14,16,17
**intercom** 222:5
232:14
**interested** 176:1
253:1
**interlock** 214:24
**internet** 153:20
**interrupt** 67:5
90:10 99:6 179:18
191:15 242:9

**interruption** 93:12
169:11 184:10
**interruptions**
104:21
**intra** 154:9
**intranet** 153:17,18
153:19,24
**intricacies** 40:10
**investigate** 172:4
**investigation** 64:4
68:21
**involved** 44:13
47:16 61:13,14
62:17 66:21 69:6
84:12 88:23 89:2
106:24 108:8,12
146:24 163:1
233:3
**involving** 11:16
**irene** 129:20 132:2
132:7,13,21,24
133:22,25 135:5
137:2
**ish** 137:4
**issue** 18:9,21,23
19:1 50:24 61:18
62:7 63:3,12 64:8
64:11 66:16 69:15
69:16,23 73:13
84:12 86:8 87:2
87:18 115:6 119:4
124:8,16,19
125:12 142:23
164:17,19 166:16
167:18 168:7,19
169:7,18,20 170:7
171:5,20,22
172:11,12,23
174:23 175:2
186:24 189:12
190:14,20 202:22

207:21 217:22
218:6,7,8,15
219:23 222:12
226:20 232:23
236:11 238:8
239:12,17 241:5
241:13 242:3
243:18,20,22
**issues** 6:22 63:5,6
91:25 121:10,14
179:1,2 190:6,15
190:20 229:24
234:2 236:13
241:10 249:18,20
249:22
**ivs** 16:5 57:15

**j**

**j** 1:7,13,14,15,16
236:14,15,19
**jackson** 3:18
**jail** 78:5 80:6
158:10 247:7
**james** 1:17
**january** 209:20
225:9,21,22 226:3
226:8,9,24 229:2
231:13,15,18
232:24,24 233:7
234:6
**jason** 3:10 98:10
103:23,23 143:2
250:23
**jcc** 3:19
**jdevore** 3:12
**jeopardy** 217:4
**job** 20:4 50:4,7
63:2,4 64:15
65:23 70:2 146:11
146:13 153:23
176:8 219:20
226:17

**jobs** 49:25
**john** 3:17,17 142:4
 142:21 236:22
 237:8
**johncoynelaw.c...**
 3:19
**jones** 193:7,25
 194:4,10,12 195:2
 196:5 217:10
 223:18 231:14
 233:6
**judge** 142:9
**judgment** 66:14
**july** 8:10

**k**

**k** 130:2
**kampe** 40:15 41:8
 41:14 44:13
**keep** 10:12 114:1
 114:16,21 130:14
 143:7,13 182:18
 182:19 197:14,19
 242:24
**keeps** 51:1
**keflex** 120:5
**kelly** 134:4,13,15
 134:16,21 135:2,9
 135:10 137:22,23
 138:2
**kelly's** 134:5
**kept** 23:16 26:8
 33:22
**kerickson** 3:5
**kimberly** 3:10
**kind** 39:11 69:16
 98:25 140:21
 142:11 147:22
 148:1,1 179:13
 205:3 221:9
 238:10

**kindly** 105:2
**kirstin** 3:3 5:19
 53:11 62:13
 142:11 149:12
 250:19
**kleszyk** 2:3 252:5
 253:8
**kmusick** 3:13
**knocking** 104:22
**know** 6:16,20 7:8
 7:14,15 14:10,19
 19:21 22:23 24:14
 27:9,23 28:4,6
 29:9,16 30:11,12
 31:2 34:15,16
 35:22 37:24 38:1
 38:1,11,11 39:19
 39:21,23 40:17
 44:1,2,6,11,14
 45:4,6,9,10,14,18
 47:5,19,24 48:24
 49:13 51:24 52:7
 53:10,22,24,25
 54:1,21 55:5,8,17
 55:18,19,21,23,25
 57:6,21 60:8,25
 64:6,14,22 65:7,9
 65:18 66:20 67:1
 67:7 68:4 70:9
 71:17 73:2,3,5,8
 73:17,24,25 75:7
 75:13 77:17,19
 78:18 79:10,20,21
 80:15 81:7,13,20
 82:11 88:10 90:20
 92:22 94:24 96:17
 96:23 97:8 98:7,8
 100:18 103:3
 105:11,18 106:5,7
 106:10,14,22,24
 107:1,19 108:2,3

108:13 109:5,11
 109:12,12,15
 110:10,11,13,16
 111:7 112:10,12
 112:14 113:16
 114:7,11,25 115:1
 115:23,25 116:15
 116:21 117:5,8
 119:9,24 120:12
 122:14 123:21
 126:23 128:3,7,8
 128:12 130:4,5,8
 130:15,17,19
 131:7,15,21,24,24
 133:4,5,7 134:15
 135:25 136:5,10
 137:10 140:9
 142:3,14,15 143:1
 143:9,10 144:19
 144:22 145:16
 146:22 147:16
 148:23 151:17
 152:11 153:19
 155:10 157:2
 160:18,23 161:6
 162:22 163:18
 164:8 165:2,16,20
 166:7,11 176:8
 178:16 179:21,22
 179:22,23 180:8
 181:15 183:21,22
 185:8 186:7,8,13
 186:16,22 187:24
 188:6,9 190:16,25
 191:1,2,24 192:14
 193:13,14,21,23
 194:15 198:8
 206:18 207:13,23
 207:25 208:14
 211:2,2,10,16,21
 212:18 216:7,11

216:11,12,19,24
 217:15 218:19,20
 219:8,9 220:4,24
 221:4 224:10,11
 224:11 225:3
 226:6,13,15,17
 227:1 228:14
 235:6,25 236:25
 241:9 242:20
 243:7 244:14
 245:19 246:2,5
 247:6 248:4,5,6,10
 248:17 250:4
**knowing** 211:25
**knowledge** 36:21
 37:22 43:24 49:18
 51:20 53:9 54:25
 67:6 75:23 77:24
 88:17 89:16,21
 94:25 95:4,6,8,9
 95:11 96:3 98:13
 98:16 106:3 107:1
 107:13,24 110:15
 124:6 127:7,21
 128:2 129:9 144:9
 147:4 156:17
 159:4,5 163:25
 168:14 170:16
 191:20 225:4
 249:23
**known** 58:18
 81:16
**knows** 38:21
**kop** 114:1,5,6,10
 115:15 116:19
 118:2,12,12
 119:11,13,15,25
 120:22 121:4,21
 122:21,24 123:13
 123:18,24,25
 143:24 144:1

156:2,4,7,9,15
157:8 202:1,2,12
202:15,18,20
203:17 207:18
209:5 211:9,15,19
212:8,21 243:9,11
243:22 244:2,4,6
244:15 245:12,22
245:24 246:4

**l**

**l** 1:5,16,17 2:3
5:11 133:9 252:5
253:8
**la** 15:1
**labeled** 28:23
213:7,8
**laceration** 104:12
106:11 145:8
**lake** 9:14,23 10:3
**large** 232:10
**lasalle** 3:4
**late** 137:4 164:8,8
**laura** 219:13,15,19
**law** 3:17
**lawsuit** 5:20 6:11
66:7 127:22
**lawsuits** 6:8
**learn** 152:6,12,17
**leave** 66:5 67:9
68:3 77:2 121:11
135:2 136:8
**leaves** 77:13,21
89:17
**leaving** 61:11
**leeway** 56:5,6
**left** 12:11 14:17,19
76:25 77:2 162:8
165:5 237:25
**legitimate** 167:16
168:3,11

**length** 134:9
136:24 246:19
**letting** 115:22
117:7
**level** 44:18,20 45:4
45:12 46:5,6,9,13
46:13,19 48:15,18
48:19 79:1 244:24
**levels** 44:21
**lewd** 128:22 129:4
**license** 10:13
15:10,11 252:6
253:9
**life** 13:9,14,24
14:1,13,14,20,24
217:4
**limited** 7:24 221:5
**linda** 40:15 41:8
41:14 44:13 133:2
133:24 134:3,7,17
134:19 135:9,12
135:15,23 136:8
136:14 137:7,13
137:16,18,24,25
138:2
**linda's** 134:22
138:5
**line** 80:20 117:11
214:25 215:20
229:9
**lines** 43:11,16
182:10
**list** 45:21 65:9
119:14 140:19,20
182:9 208:10
**listed** 140:25
141:6
**little** 28:1,1 182:13
182:16 229:11
230:4

**live** 8:21,24,25
177:15
**lived** 8:22
**living** 117:19
125:21 127:12,19
128:10,14 129:3
144:20 157:16
177:14 180:10
188:3 192:22
239:9
**livingston** 158:6
158:18 234:16
235:23,24 237:25
240:1,2,6
**llc** 3:3,9
**loads** 147:13
**located** 12:5,6
15:24 23:17 24:8
26:18 33:10 47:22
**location** 47:24
79:17 108:13,14
215:7
**lock** 27:25
**locke** 1:17
**locked** 27:22
28:15
**log** 181:2 185:9,12
185:13,17,17
242:24
**long** 8:22 10:6,25
11:4,5 13:1,11
14:10 15:1,14
20:8 34:20 49:20
80:16 134:7,13
136:21 142:16,25
156:24 163:14
179:22,24 203:14
207:23 221:10
227:6 231:4,5
**longer** 163:2

**look** 18:2 27:24
51:5 115:7,13
129:23 130:13
139:14 140:11
150:6 152:21
153:5,8,12 154:11
158:4,14,17
160:10 161:8
169:9,22 178:3,18
179:6,7,12,13,13
179:15 189:5
199:2,6,9,13
200:10,11 203:9
204:22 209:9
211:11 212:1,23
215:11 219:11,12
220:7 221:20
228:7 230:12,22
230:25 239:13
241:3,7,12,12,25
242:19,21 249:18
**looked** 17:20 51:8
154:1,3,4,5 199:5
201:13 202:24
224:18 225:17
228:23 231:4
238:2 239:5
**looking** 55:24
61:16 62:3 130:14
154:18 155:23
161:14 163:20
165:4 193:2
203:23 211:9
213:14 220:16
225:21 226:23
249:25
**looks** 181:3 192:21
193:3 194:16
196:14,25 200:7
200:18 202:21
204:1 205:3,18

206:6 208:18
209:25 210:12
213:3,23 214:18
217:10,20 220:18
221:15,18,25
223:17 228:16
229:24 231:9
233:15 234:8
236:7 237:24
**lost** 79:22
**lot** 118:18 177:20
240:22,23 243:23
**loud** 7:22
**low** 197:6 205:4
**lower** 78:25
**lpns** 127:24
130:22 131:8
**luna** 233:3

**m**

**m** 1:12,13 3:3
130:2
**m2** 205:12 209:15
**machine** 47:9
**mail** 67:19 129:25
130:11 142:5
151:23
**mails** 151:15
**main** 13:15 40:7
**maintain** 36:24
**maintained**
134:19
**maker** 168:10
**making** 12:12
129:4 188:7
**man** 136:12,17
**manage** 69:18,25
82:12,19 83:3,19
83:22,23 84:3,4,7
84:8,11,18,23,24
85:1,8,17 86:1,4,4
87:6 171:24 172:1

190:24
**managed** 22:13
86:7,25 87:16
**management**
88:20 129:8 169:8
169:22 170:9
171:8,17
**manager** 64:1,13
64:15 69:5,12
129:11,13,13
130:7 131:10,20
187:20 219:25
220:2
**managers** 55:13
68:20 69:11
131:10 187:23
**manages** 83:15,16
84:4 88:13
**mandates** 155:5
**mandatory** 142:8
**manner** 32:14
**manufacturer**
123:4
**mar** 38:25 39:4,15
**march** 207:10
228:16 234:18
236:3,10,15
237:10,11
**mark** 18:18
222:23
**marked** 4:11
149:7 159:9
162:14 163:21
164:3,11,16
172:24 173:2
192:3 196:21
200:2 217:21
221:16 222:19,22
231:20
**marking** 149:2
159:13 162:23

192:7 199:22,23
**marks** 129:25
132:2 133:22,25
**matter** 181:8,12
**matters** 252:11
**mauck** 3:3
**mauckbaker.com**
3:5
**max** 221:22 232:3
**maywood** 222:1
**meals** 57:25
**mean** 6:9 8:17
17:19 19:7 22:10
23:4,9,14,21 25:23
30:16 31:24 34:4
36:25 40:21 44:15
48:14 51:5 57:17
58:11 60:14,18,19
61:1 64:2 67:11
72:2 73:4,9 80:4
84:7 92:8 105:3
109:17 111:12
116:11,17 117:13
123:15,22 124:2
125:25 152:3
155:18 156:13
157:9 158:12
172:9 190:12
193:10,17 199:5,6
202:6 204:3
205:13 210:15,25
216:20 217:25
218:12 219:1
224:23 235:1,2
238:24 240:19
241:6 242:10
244:2
**meaning** 20:19
25:19 191:17
**means** 36:15 40:8
45:25 103:3 202:3

202:12,13 205:10
210:24 235:6
**meant** 53:12 189:4
**measures** 17:10
**med** 22:4,8 23:13
23:16,19 24:8,11
24:13,16,24 25:9
25:12,14,15,17,22
25:22,23 26:3,7,7
26:13,14,18 27:1,4
27:4,6,10,15 38:15
43:1,1 47:1 49:16
49:16 52:11 55:1
57:5,6,7,10,21,22
60:12,15,19 61:7
70:20 116:20
147:7,14 157:16
157:23 158:22
159:3 188:8
215:20 248:13
**medicaid** 14:9
**medical** 1:9 4:17
10:6 13:20,24
14:4,11 17:15,18
18:4 19:14 21:22
22:13,22,25 23:6
24:6 25:2,4 35:20
36:6,11,20,24
37:18 38:5,16
39:7,8,21,24 40:1
40:4,10,14,18,24
41:20 45:3,15,22
45:23 48:18 51:6
51:9,12,21 52:22
53:1,5,16,23 54:3
54:16,18 55:23
66:24 69:16,21
70:3 71:12 72:2,3
74:20,21,23 75:5,9
77:10,15,23 78:3
78:14 79:6,17

80:19 81:4,17
82:1,21,25,25
84:11 86:8,9 87:2
87:4,18,20 88:8,12
89:12,18,20,23,24
90:2,3,3,7,8,11
91:19,25 92:14
94:4,6,18 95:1,5,7
95:24 96:15,19
97:3 98:24,25
99:13 100:15
101:4,13 102:10
102:14,20,22
103:13 104:5,18
105:5,9,12,23
106:12,13,14,18
106:25 107:4,5,5,7
109:16,19,22,23
110:4,5,17,18,19
110:20 111:1,2
112:2,6 114:8
115:8 116:1 117:5
117:7,13,14,18,23
123:2 124:14,18
125:22,22 126:6,9
126:19 127:12
144:7,24 145:1,5
145:14 147:3,6
152:14 157:25
158:5,17 164:17
164:19 171:11
172:11,12,21,23
175:2,20 179:5,8
189:1,3,20 190:7
190:17,17,23
191:2,3,6,13 198:3
199:2,6,19,24
201:2,19 203:12
205:8,9 209:12
210:14,24 215:2,5
217:21 220:12,17

222:5 232:10,16
233:20 234:2,3
236:12,12 240:7
240:18,21 241:4,7
241:10 242:2
**medical's** 82:16
**medically** 146:9
146:20 154:24
**medicare** 14:9
**medication** 4:12
22:18 26:19,20
27:18 28:13,19,24
29:3 30:3,6,21,24
32:12,13 33:4,10
34:5,6,6,9,12 37:2
37:4,18 52:1,4,14
52:15,18,21 54:5
55:3 57:24 58:18
59:4,5,7 60:4,14
61:12,13,15 63:20
63:22 65:2 71:1
71:16,22,22 72:6
73:6,21 74:4,4
76:13,22 112:23
113:4,6 116:20,21
124:1 126:15,18
126:21 147:10,23
148:3,13,15,21
149:4 154:23
155:7 156:2,3,16
157:7,17,18,22,25
158:21 159:1
175:14 185:2
197:19 199:3,11
202:7,7,12 203:15
203:17,21 205:11
206:7,21 207:1,9
209:1,16 211:15
211:19 212:8
214:20,21,25
215:3,4,21 216:18

216:21 220:8
221:8,11 224:13
228:3 229:6,8,25
230:17 238:9,11
238:13,15 239:9
239:14,22 240:5
240:10 242:16
243:11 244:6
245:11,15 246:16
247:4 248:13,22
249:8,19 250:1
**medications** 23:15
26:23 27:6 28:21
29:2,14 30:2
31:13 32:2 47:14
47:15 52:8 55:11
56:25 57:14 58:3
60:2 61:5 70:8,14
71:10 72:19 76:3
76:11,23 108:19
118:11,18,20
119:10,11,13,14
119:25 121:1,4,18
122:21,24 123:23
143:23,24 147:7
147:13,18 156:5,7
156:9 197:1
198:24 203:24
206:11,13 217:6
229:11 230:23,25
232:18 241:5
242:20 245:4,6,8
245:21 246:7,10
246:12
**medicine** 71:19
112:3,12,13
**medicines** 118:16
246:20
**meds** 13:17 15:5
25:16 26:9 27:1
27:15,20,21 28:2

29:5,9 30:11 31:3
31:5,7 32:9 33:22
34:7,16,18,19,21
35:5,16 37:14
39:14 47:2,5 56:4
56:16,20 58:5
60:24 61:14 70:10
120:14 179:12
198:25 205:15,16
206:22 243:22
244:19,22 245:1,2
**meet** 132:1,20
138:15,19 164:7
**meeting** 19:5
132:5,6 138:17
151:7,9 246:13
**meetings** 132:13
132:15 137:8,11
137:12,16 138:8
138:11,18,25
139:7
**member** 154:7
**members** 67:16
**memo** 148:1,9
**memorize** 154:2
**memorized** 175:12
175:17
**mental** 19:8 45:3
48:19 74:21,25
75:1 121:1,10,13
139:18 141:18
175:20 243:25
244:5,16,18,19,24
245:1 247:19
**mention** 142:5
**meraz** 1:14
**merged** 17:4 19:18
**message** 68:4
**met** 137:6,18,19
138:24 191:23

**metoprolols** 29:16
**michigan** 9:6,14
  9:15,23 10:3 12:6
  12:22 13:4
**middle** 136:15,17
  137:4 194:21
  205:24
**mile** 80:12,13,13
  80:17 216:17
  217:7 222:11
  224:8,11,13,15
  227:24 231:10
**mind** 99:25 102:1
  125:9 132:7
**mine** 171:24
**minute** 78:1 80:14
  130:14 150:8
  184:14 192:11
**minutes** 42:10
  78:1 91:8,9 118:5
  143:3 216:21
  227:7 229:9 230:1
  230:12 239:10
  241:24
**mischarac** 72:8
  83:24 85:11 92:2
  97:20 101:2,14
  109:24 110:21
  118:3 187:5
  246:18
**mischaracterizes**
  41:11 86:13 93:10
  101:11 107:18
**misrepresents**
  87:24
**missing** 215:3
**misspoke** 135:13
**misunderstanding**
  170:11
**mm** 50:18 56:10
  56:23 57:16 59:25

60:18 78:7 82:23
  85:23 108:4
  149:20,20 151:6
  155:15 157:20
  163:9 167:9
  200:13 201:21
  204:12 205:20
  208:2,9 215:23
  218:23 230:2
  244:20 249:17
**modifying** 44:9
**moment** 43:14
  93:11 159:7
  180:20 184:9
  192:1 214:16
**monday** 20:4,7
**monitor** 46:25
**month** 234:24
  243:1
**monthly** 137:16
  138:13
**months** 206:14
**morning** 56:4
  61:11,12 65:2
  142:6 148:14
**move** 7:15 72:12
  84:20
**moved** 46:4 78:18
**movement** 46:14
  72:12 80:23 82:12
  82:19 83:2,19,19
  83:22 84:3,4,7,11
  84:19,21,24 85:1,8
  86:5 87:7 97:15
**movements**
  249:13
**moving** 84:25
**mueller** 236:14,15
  236:19 237:8,16
**multiple** 190:6
  236:1

**musick** 3:10
**mute** 186:3

**n**

**n** 1:13 3:1,21 4:1
  133:9 193:7,25
  194:4,10,12 195:2
  196:5 217:10
  223:18 231:14
  233:6
**name** 5:9,10,19
  11:3 17:3 19:17
  29:11,11 30:13
  34:10 51:11
  129:22 130:12
  131:11,13,22
  133:3,5 134:5
  135:25 136:1,3,20
  148:2,12 153:18
  160:16,19,20
  181:21 196:12,13
  204:21 206:20,24
  233:2 236:21
**named** 6:11
**names** 113:16
  114:11,13 129:21
  136:4
**narcotics** 121:18
**narrative** 29:20
  103:6 104:7
  118:22,24
**nationwide** 148:2
  148:4,17
**nclex** 10:15 12:1
  12:16
**necessarily** 46:19
  58:8 111:9,14
  139:20 223:6
  241:16 243:1,22
**necessary** 154:24
**necessitates**
  110:20

**need** 26:8 38:18
  42:1 46:4,18
  48:16,20 50:21,23
  52:3 61:12 63:10
  68:18,21 71:22
  72:13,19 75:9
  76:3,7,11,12,16,22
  77:15 78:9 81:10
  82:9,10,11,17,18
  82:20 84:19 85:21
  86:9 87:5,21
  89:23 91:3 93:16
  95:7,24 96:15
  98:24 101:22
  105:9 107:4 108:7
  112:2,6,12,22
  119:8 123:19
  130:16 142:9,10
  143:9 154:7 158:8
  184:3 190:1 211:1
  211:13 220:21
  223:3 239:13
  240:25 241:9,10
  242:17 245:15
  246:10 251:13
**needed** 18:17
  21:21 22:12 42:7
  46:24 58:5 63:20
  64:6 71:22 74:3
  74:22,23,25 76:18
  93:7 95:1 108:7
  112:17 116:19
  139:20 147:7,10
  152:13,18 153:6
  158:14 197:20
  202:3,10 211:15
  211:17 214:20
  215:18 216:18
  228:3 229:25
  251:16

**needs** 25:4 28:21
44:18 51:25 57:24
65:1 73:5 75:5
77:10 82:14 85:8
85:15 92:13 94:18
97:3 99:9 104:8
119:1,2 122:3
123:18 124:13
170:18 228:2
230:17 238:25
**neither** 222:15
**never** 34:19 80:15
81:16 128:5 160:2
160:4 164:1,2
166:18 179:15
184:17,19 191:23
210:13
**new** 9:6 135:22
141:13 151:3,16
152:4,6 156:4,9,9
247:2
**newer** 34:9
**news** 148:11,12
**nighttime** 79:21
**nitro** 116:22
124:20 125:15
200:23 211:3
219:18 229:11
230:11 239:22
**nitroglycerin**
108:7,15 112:16
112:18 113:3,15
113:20,23 114:1,5
114:10,15,18,21
115:7,9,14,15,19
115:22 116:5,6,19
118:1,2 122:25
123:12,24 124:4
124:13 126:13
127:6 147:2
197:14,18 200:20

201:3,23 203:5
207:18 209:1,5,15
210:13,23 212:2
214:21 215:3,17
218:6 219:17
220:4,19,21 221:5
224:8 227:25
229:6,10 230:5
231:6 232:19
238:4 240:6,9,24
243:8,13,17,19
**nods** 6:25
**non** 162:10,14,21
162:23 163:3,7,11
163:22 164:4,11
164:17 165:15
181:1 194:2 213:8
213:11,19,21
221:16 222:19
**nonemergency**
146:6
**noon** 58:22
**normal** 213:18
215:21
**normally** 26:1
173:14 196:18
220:7 240:4
**north** 3:4,11
**northern** 1:1
**note** 235:22
**notes** 208:25 233:2
236:10,24 238:17
**notice** 5:14
**notified** 73:14
**notify** 64:23 65:1
123:20,20 124:14
124:17,18 126:1,4
126:5,6
**nourished** 143:10
**november** 199:21
200:7,14 203:25

206:2,11 207:11
207:11
**nowadays** 40:3
105:16 157:3
174:1
**number** 19:22
82:6 112:24
140:14,20,25
141:7 149:3
159:18 166:5
173:7,9,11 174:8
174:12,15 179:21
181:10,10,11
182:10,11 183:14
194:10,11,16
208:8 213:12
214:7 217:23
218:2,4,7,9,10,16
218:18,25 225:17
225:25 226:5,6,12
228:19,24 231:20
233:13
**numbers** 208:11
226:18
**numeral** 154:19
155:9 161:15
**numerous** 232:8
**nurse** 12:7,8,9,25
13:5,15 15:13
29:8 32:12 37:2,3
37:14,16 51:25
52:13,14 55:13
57:21 64:1,7,14
68:24 69:5 70:10
70:13,14 71:23
74:20 76:12 99:12
100:25 102:6,23
104:4 109:18
111:15,17,19
116:15,21 119:22
125:18,20,21

144:14,15 147:14
157:10,14,15,18
157:23 178:4,7,9
187:23 197:21
202:12 211:2
214:20 215:14
219:21,25 220:2
220:22 230:22
235:4,20
**nurses** 26:11,25
27:1 28:19 32:1,8
34:21 35:4,16
49:11 52:3 55:2
64:16,17,18,19
65:18 66:16 68:20
68:22 69:4,7,9,12
82:16 127:23
129:2 130:22
131:7 148:10
163:15 188:5
205:15 219:22
**nursing** 1:11 9:19
9:19,22 10:6,13
12:4,17,21 13:9,14
13:24 14:6,14,14
14:16,16,20,24
19:10 31:22 32:7
43:4,5,8,10,10,15
43:16,19 44:6,10
49:17 55:4,15
64:13 68:19,19
72:14 74:24
123:20,21 131:9
131:12,16 139:19
163:16 169:8,20
169:22 170:9
171:7,10,17,19
178:20 187:19,20
187:23,24 189:11
189:18 222:15

**o**

o 133:9
o'clock 142:7
  148:14
oaks 12:4,21
oath 4:24
object 83:24 97:6
objecting 29:19
objection 29:18
  33:13 36:13 37:19
  40:6,7 41:10
  43:21 54:17 60:5
  66:18 71:2,5 72:8
  72:20 74:5,15
  82:2 83:8 84:14
  85:11 86:10,12
  87:23,24 89:6
  90:15,24 92:2,9,24
  93:9 94:20 95:13
  95:19,20 96:1,8
  97:6,10,11,20
  99:17 100:19
  101:2,9,14 102:25
  104:6 106:2,15
  107:8,17 108:21
  109:24 110:21
  111:4 112:4
  113:11 114:23
  117:20 118:3,21
  119:18 122:1,1,16
  123:1 124:10,22
  130:23 131:4
  142:12 145:21
  147:9 152:19
  167:19 168:9
  170:10,14 187:5
  216:22 219:4
  228:4 237:13
  245:16 246:18
objections 4:23
  100:10 120:16,19

obtain 217:8
obviously 142:22
  250:25
occasionally 20:6
  69:11 163:7
occur 114:4
occurred 127:5
  226:24
occurrence 226:4
  232:1
occurs 185:3
october 159:23
ofc 229:4
offensive 129:4
office 1:6 11:24
  42:2,4 67:9,14
  68:2 128:1 141:2
  141:3 152:2
  159:14 210:7
  231:2
officer 40:24
  69:16,19,23 70:9
  70:13,20 73:15
  90:14 93:5 97:4
  98:22 100:18,24
  102:5,20,23 104:3
  107:5,7 108:20
  109:4,6,12 126:6
  126:19 127:19
  144:20 165:18
  190:2,25 232:9
  233:3
officers 70:1 90:21
  90:22 92:22 94:6
  95:4,23 96:6,13
  98:19 102:13
  104:19 110:16
  127:12,24 144:6
  146:4,19,24 191:1
  222:6

offices 3:17
official 1:7,10,12
oftentimes 169:5
  244:17
oh 11:2 29:13
  34:13 36:2,9 42:9
  43:4 45:8,12
  57:12 67:23 76:12
  78:24 80:22 83:13
  93:23 108:12
  116:17 120:7,14
  124:8 129:20
  134:8 135:13
  136:5 150:17
  158:14 159:20
  162:19 170:1
  173:14 176:10
  181:4 198:22
  199:16 217:16
  219:14 226:21
  236:23
okay 6:7,12,16,18
  6:25 7:15,16,18,19
  8:5,7 10:9,21,24
  11:11,14 12:3,14
  12:15 13:23 14:13
  14:23 15:9,14
  16:11 18:7 19:12
  19:19 20:1,8,15
  22:16 24:2,8,11
  25:1,18,21 26:6,17
  28:17 29:8,13,25
  30:9,20 31:9,11,15
  32:3,8,11 33:2,24
  34:1,13 36:5,9,22
  37:13 38:4,24
  39:3,11,16 40:9,13
  41:1,25 42:9,13
  43:15 44:22 46:3
  46:11,15,22 47:18
  47:21 48:23,25

49:20 50:2,9,16
51:8 52:18 53:4
54:2 57:19 58:17
59:21 60:10 61:10
62:15,16,20,23
68:6 69:6 74:18
75:18 76:1,20
77:6,21,25 79:4,9
79:19 80:7,10,18
81:24 85:3,21
86:3 88:15 89:14
89:17,22 90:8
91:7,9,24 92:19
93:18 94:2,11
95:3 96:12 97:18
98:2,10 99:4,14
100:9,24 101:16
101:18,25 103:15
104:1,17 105:1,3
107:15,16,25
110:15 111:22,25
112:15 115:13
117:2,25,25 118:9
119:9,24 121:15
121:20 122:13,20
125:2 126:12,25
130:13 131:2,17
133:6,12,19,24
134:21 135:14,20
136:7 137:2,18
138:4,24 140:6
141:25 144:19
145:12 146:17
148:25 150:1,16
150:20,23 151:2
153:22,25 155:3
155:25 156:15
157:2,6,11 158:2,4
158:20,25 159:6
159:11 161:11
162:25 164:21

165:1,4 169:15,24
170:1,4 172:8
173:25 174:5
175:8,18,21,24
176:5 177:2,9
178:10,13 179:17
180:16 183:11
184:12,15,17
185:16 186:9
188:2 191:25
192:7,10,14,24
193:2,15,15
194:19 195:10,19
196:3,14 197:6,9
197:12 198:6,13
198:22 199:14,16
200:13 201:19
202:3,11,16,21
203:7,11,23 204:5
204:9 205:17
206:1,6,10 207:4
207:23 208:2,2
209:18,24 210:5
210:22 211:13
213:1 214:1,12,13
214:17,18 216:16
217:2,16 218:12
219:11,23 220:10
220:16,24 221:13
222:18 223:9,16
225:19,20 226:22
227:1,4,9,19
228:10,13,25
230:21 231:13,25
234:8,12 235:18
235:22 236:8,21
237:4,8,18 241:24
243:14,16 245:5
249:23 250:5
**old** 9:1,2 22:18

**once** 167:18 168:8
168:19 169:18
170:8 171:5
174:24 186:25
210:9
**one's** 229:7
**ones** 29:10 72:1
118:15,16,20
119:12 141:10,17
182:20 226:11
238:5
**ongoing** 142:18
**online** 153:7,13
**oo0oo** 251:23
**open** 247:9
**operating** 40:23
**operations** 22:4,8
40:22 41:5 43:2
49:16 176:10
**opinion** 112:2
145:14
**opportunity**
117:12 142:17
238:16
**order** 4:14 56:14
58:6,17 59:3,4,17
60:3,14,19 69:1
70:7 76:18,19,23
77:11 83:1 85:24
112:16,20,21
114:5,10,12 115:4
115:8,14,15 118:8
123:7,10,12
155:11 156:9
157:17 159:15,18
187:3 201:11,14
201:16,22 202:23
203:1,2,5 204:2,10
204:13 205:3,8,10
205:17 209:7
215:1 216:3 217:8

220:8,18 221:5,8
221:10 223:4
240:5,8,24 248:12
250:25 251:1,8
**ordered** 56:14,19
57:1 61:5 114:2,6
202:1,14 203:21
203:24 206:7
209:16 219:17
220:4,21 238:13
239:23 240:25
**ordering** 178:8
250:18
**orders** 76:4,9
112:14 114:9
156:5 199:20
207:10 220:7,17
238:14 247:13,16
247:21,25 248:1
**original** 237:6,7
237:11 251:11
**orlando** 11:7
**outcome** 253:1
**outset** 145:18
**outside** 33:6 67:14
78:2,6 104:8
106:3 119:1 122:2
158:15 170:16
**overall** 24:1
**overdose** 122:8,11
122:15 144:3
**overdosed** 127:6
**oversee** 31:12
65:10 176:6
**overseeing** 55:11
**oversees** 131:23
176:18
**oversight** 54:24
55:1,16
**overtime** 65:16

**oxy** 121:18

**p**

**p** 1:17 3:1,1 57:13
57:14 61:2,2
221:22 232:3
244:18
**p.m.** 56:17,21 57:4
57:4,20 58:6,6
58:21,22,22,23,23
60:11,14,20
143:18,19 180:5,5
206:3 214:14
221:22 222:3
224:19,22 226:4,4
227:11,11 231:18
231:19 232:4
251:18
**p2** 244:21,23
**pa** 75:4,20 76:3,13
205:21,22 240:15
**package** 29:5 30:4
30:7 47:11,14
**packaged** 30:3,8
**packages** 47:14
**page** 4:4 142:20
149:17 150:19
151:1 155:23,25
159:18 161:14
162:4 182:12
192:8,10 194:21
196:11 198:2,3,6
199:22 200:4
201:20 203:25
205:8 207:8 208:4
213:2,21 214:1
217:14 220:17
221:13 224:17,20
224:22 225:6
226:1,23 228:13
228:15 229:2
231:19 233:12

236:1

**pages** 214:9

**paid** 21:4 65:18

**pain** 108:6 109:14
110:19 111:1,9,12
111:13,22 112:17
112:19,22 113:2
113:24 115:23
116:2,5,14,22
117:6 121:17
123:19,21 125:17
145:16,19,19
211:1 215:17
224:14 227:25
232:11 238:15,17
238:19,23,24,25
239:8

**pains** 108:16,18
109:9 117:15
126:14 145:13,17
210:15 217:8
222:4,11 229:5
231:5 232:6,9
238:4

**paper** 18:3,4,5,6,8
36:24 38:6,19,23
38:25 39:4,9,13,15
39:19,21 40:4
51:9 141:19
152:16 153:5,11
178:2 236:5,6

**part** 9:20 18:1
35:9 36:10 41:20
44:3,5 45:15
61:17 62:4,23
69:21 70:3,4
107:10 134:18
140:18 146:11,13
146:25 150:9
153:22 186:12,14
188:24 190:5,8,9

190:17,18,23,24
208:18 233:16
237:5

**partee** 1:14

**partially** 18:24

**participate** 142:9

**particular** 17:24
18:17 28:14 29:1
29:5,9 30:7 46:17
105:10 148:20
151:1 163:12
169:4 192:17
197:12,13 206:7
215:16 221:19
229:23 230:17
232:2 233:6
243:14,16

**particularly** 148:5
148:19 158:7

**parties** 4:23 5:15
142:6 179:21
190:20 252:23,25

**parts** 55:22

**party** 6:8

**pas** 75:15 247:18

**pass** 10:19,22
30:11 31:5,7 32:8
34:7,9,16,18 38:15
43:1 47:2,5 49:16
52:4,8 55:1 56:16
56:24 57:5 60:12
60:15 61:14,15
70:21 116:20
157:16,23 158:22
159:3 188:8
205:15,16

**passage** 154:23

**passed** 12:1 30:21
30:22,24 31:13
34:19 35:16 37:4
39:13 56:4 59:6

60:24

**passes** 37:2,14
57:6,7,11 70:10

**passing** 13:17 26:9
29:9 31:3 32:2
34:21 35:5 70:14
222:6

**paths** 25:20

**patient** 13:16 15:4
15:4,5 44:17 52:1
58:4 72:6,13 81:4
93:7 105:6 112:2
112:11 115:25
212:7 242:14
243:25 244:5,18
244:25

**patients** 15:7
26:11,12,24 45:21
48:11,13,16,20
49:3 61:10 70:7
113:14,19 118:2
124:4 245:14

**pattern** 185:1
242:10,13

**patterns** 184:21

**paycheck** 20:24

**pen** 81:19,21

**pending** 8:4

**people** 25:4 31:6
39:13 68:17 83:17
89:4 123:14 124:3
137:19 139:14
143:9 168:18

**performance** 21:9
21:11 42:21,25
129:12 188:12

**period** 37:5,6,20
37:22 40:7 74:16
239:7 243:9

**perry** 1:14

**person** 40:13 53:8
60:3,8 63:5 67:19
67:20,24 69:10
73:17 84:25 90:8
90:12,16 109:14
114:16,21 115:19
123:19 126:18,20
127:2 131:23
139:11 161:23
164:23 165:13
166:7 172:23
174:24,25 177:9
185:19 193:25
197:15,19 212:16
218:13 222:18,22
223:1 230:5

**personal** 222:9
252:14

**personally** 68:23
212:16

**personnel** 64:8,11
198:18 210:14

**pertain** 183:19

**pertains** 179:16

**pharmacist** 27:5

**pharmacist's**
249:12

**pharmacists**
248:15

**pharmacy** 19:10
26:25 27:3,9,12,15
27:18 28:2,6
32:20 33:5 47:12
47:12,14,21,25
147:13 242:22
247:6,9,25 248:3,8
248:11,14,14,17
248:19,19 249:13
249:15

**phone** 7:23 67:19
68:3,24 127:13

phrased 29:19
physician 76:14
  114:5 203:13
  240:15
physician's 203:13
physicians 75:15
pick 51:3 180:15
  181:14,18 188:6
  188:10 208:13
  233:25
picked 180:9
  193:11,18,22
  217:10 225:12
  231:15
picks 164:23
  165:13 188:2
  196:6 223:18
  233:6
pill 28:20,20,25
  30:3,15 116:2
pills 47:9 244:7,8
pinpoint 197:4
place 78:15 79:6
  86:7,24 87:15
  142:2 172:25
  207:15 226:7,8
  247:13 252:21
placed 217:4
  247:21
places 67:10 73:20
placing 247:15
plaintiff 1:4 2:2
  3:7
plaintiff's 142:7
plan 18:15 63:14
  238:10 239:14
platform 153:16
platoon 193:7
  198:14 234:9
please 5:9 6:23 7:8
  8:3 35:14 42:12

61:24 86:20 91:5
  94:15 96:24,25
  100:1 101:24
  102:1 167:24
  169:25 170:22
  250:20
plenty 92:10
plus 238:9
point 6:21 14:16
  34:1,17 39:12
  54:11 72:5 83:6
  128:11 135:2,5,15
  135:22 148:18
  178:25 202:25
  219:23 230:3
  234:23 238:7
  239:11
policies 16:18,20
  21:20,25 22:1
  72:14 80:24 97:9
  97:16,18,23,24,25
  98:1 108:3 146:23
  151:8,9,16 152:1,4
  152:6 153:12,15
  153:16,21,24
  154:1,1,2,3,5
policy 32:6 37:15
  38:18,20 39:6
  51:24 76:1 77:19
  96:21 97:1,15
  106:6,19 109:5,15
  110:2,6,9,10,11,13
  152:7,8,13,17,22
  153:6 154:6,16,17
  154:19 155:5
  156:6 160:6,7,9,11
  160:13,14,16,20
  160:24 161:1,4,9
  161:12,13 162:4
  167:16 168:4,10
  168:11,20 180:19

186:22 208:19
  247:2
popping 51:1
population 46:2
porte 15:1
position 21:8
  138:5 188:11,14
  220:6
possible 113:4
  116:18,23,25
  121:23 126:16
  144:3 174:5 175:3
  175:4,5,11 206:14
possibly 112:25
  113:5 126:15
  216:13
potentially 212:1
  223:9
powerchart 51:17
  51:18,22 52:5
practice 39:8 40:3
  105:15,24 107:2
  107:16,20 115:11
  124:3 152:24
  153:4 168:16
  174:1 183:23
  220:5
pratt 1:18
prepackaged
  28:21
preparation 11:18
prescribed 108:19
  113:15,20,22
  126:13 203:15
  204:18,25 206:11
  230:23 245:8
  246:7
prescription 112:3
  112:16 113:3
  114:15 198:3
  200:19 201:3

240:9
present 37:16 55:2
  66:12 71:23
  117:18 164:15
pressure 120:10
pretty 75:25 139:7
previous 252:8
previously 217:23
  218:13
prewrapped 29:4
printed 182:2
  240:20
prior 54:10 65:2
  158:22 163:6
  179:4 233:14
privy 250:3
prn 112:16,21
  113:8,8 147:18
  157:7,13,14,17,22
  202:3,14,15,18,19
probably 26:4
  148:13 169:7
  173:5,8 204:8
  243:1 245:25
problem 18:10
procedure 2:7
  4:14 5:16 27:9
  28:7 159:17
proceedings
  252:17
process 32:17
  34:12,14 46:24
  47:17 55:6 64:25
  65:7,9 66:22
  74:13,18 77:23
  78:1,4 80:19 81:2
  82:1 139:5,24
  140:9,19 141:12
  151:3 163:1,5
  186:14 203:12
  215:21 242:17

processed   162:9
processes   138:22
  139:2
processing   165:10
promotion   65:21
  137:25
prompt   232:16
properly   22:13
prostate   204:21
protective   205:18
provide   24:6
  89:20 157:10
provided   16:22,24
  17:1,2 23:8
  232:16,17 237:3
provider   44:19
  45:3 46:8,9,17
  56:12,13 59:11
  75:9 76:7,16,18,22
  76:23 77:4 78:10
  78:10,11,12 82:18
  114:2 116:1,13
  123:3,6,10 139:19
  203:9,12 209:6,8
  209:11 211:2,14
  211:15,17,18,19
  211:25 212:7,12
  212:13,14,20,20
  220:25 238:14
  239:16 240:13,15
  241:11 242:2
  244:17
provider's   116:7
providers   239:16
  246:1 247:17
providing   154:23
psychiatrist   19:9
psychiatrists
  247:19
pull   192:9

purpose   54:19
  68:16 132:4 139:1
pursuant   2:6 5:14
  5:15
pursue   241:14
push   143:6
put   15:21 29:14
  30:4,10 47:10,15
  52:4,6,14 66:4
  81:22 140:8,19
  141:19 159:6
  173:6,11,14
  182:10,15 191:25
  194:24 195:1,15
  199:7 201:18
  208:7 216:10,13
  222:24 223:3
  228:12 239:25
  241:20 245:2,23
puts   27:18,20
  140:17
putting   81:12
pyxis   32:16 34:2,7
  34:10,13 46:23,23
  47:1,2,7,13,16
  52:6 207:2 249:13

## q

qid   58:9,16,17
  59:4
qualify   110:19
quality   16:7,12,14
  17:10 249:17,24
question   7:2,7,10
  7:11 8:3 27:8,11
  28:9 29:21 31:3
  32:24 36:8,14
  37:1,7,23 41:19
  44:12 47:20 49:14
  50:13 52:2,25
  53:6 54:9,22 55:8
  55:22 56:1 59:23

61:19,20,24 62:1
62:12 63:7,14,16
63:18 64:21 65:6
66:21 67:2 68:5
68:25 69:21 70:11
70:16,21,22 71:13
72:1,25 74:16
76:9 77:18,20
79:23 81:8 84:5
86:17,20,21 87:9
87:10,12 88:2
90:24 91:3 93:19
94:16 96:25 99:21
99:24 100:1,2
101:22 102:2
103:8,13,16
105:23 108:22
111:6 112:11,14
115:1 117:10,16
119:8 125:5,9,10
131:25 136:6
147:16 154:15
157:5 158:13
163:17 165:21
167:5,22,24 168:1
169:25 170:2,20
170:22,23 176:24
183:22 189:23
202:17 207:14
212:24 227:13
229:18,22 240:13
242:21
questioning
  117:11
questions   5:21,23
  28:11 42:7 91:17
  98:11 250:8,11
queue   179:20
quick   7:17
quicker   47:11

qureshi   1:15

## r

r   1:13 3:1 130:2
  133:9
radio   127:14,15
radunsky   3:9
  11:24
ramifications   34:8
random   189:8
randomly   189:6
range   19:23 44:22
  61:8
ray   205:25 206:3
rcdc   232:3,5,8,12
  233:3,4,16
rdc   78:19,21,22,23
reaction   100:14,14
  102:19 104:2
  145:7
read   62:2 86:19,19
  86:22 87:10,13
  100:3 101:22
  102:3 119:8
  125:11 150:8
  152:8,18 153:24
  154:7,10,19 168:2
  170:24 184:14
  194:17 195:1
  210:17 225:24
  226:21 227:1
  232:20 233:5
  236:3,25 237:1
reading   63:10
  102:1 205:23
  237:10
ready   192:14,15
  208:12
real   7:16
really   22:23 28:6
  36:15 48:10 56:1
  65:9 90:14 151:24

154:10 164:12
191:1 212:24
221:11 229:21
230:12 251:10
**reason** 82:25,25
83:13 103:13
105:10 158:9
210:19 226:16
238:12 244:14
**reasons** 81:14
103:18 145:17
164:10 211:8
238:23 243:24
**reaudited** 18:16
18:18
**recall** 10:8 11:2,13
13:21 17:4 19:18
21:5 36:1,3,3
43:14 49:19 51:10
56:6 66:10,13
74:9 108:14
115:16,16,17
118:8,10 129:21
131:13 134:6,8
135:25 136:3,20
136:23 137:14
138:12 147:5,5,6
147:24 148:2,7,15
148:19,20 150:24
150:24 151:7,10
151:17,23,24
154:9 157:1 159:4
169:5 187:1
189:16 191:20
203:6,10 204:22
207:3 209:9 231:7
243:13,15 246:25
**receipt** 139:3,13
**receive** 9:16 10:25
61:12 63:21 91:19
151:15 180:17

182:8 183:9,19
185:10 191:16
197:3 245:3
**received** 10:2 11:9
37:17 141:14
160:21 161:3
164:1,16 181:13
188:16 195:16,17
195:23 207:9
208:14,21 209:18
209:21 210:9
**receives** 161:22,23
236:9
**receiving** 74:3,8
74:11,14,19 78:16
80:20 88:19,24
89:2,4,8,9,11,12
89:13 141:10
177:20 182:15,17
221:22 236:12
**recollect** 154:12
**recollection** 56:9
176:22
**recommendation**
46:13
**reconsidered**
212:3
**record** 5:9,12
21:22 35:20 38:1
40:4 55:21,23
101:19 142:13,15
142:19 143:12,21
170:3 179:5 199:8
199:12 200:8,14
200:19 215:11
233:23 241:7,11
249:2 252:16
**records** 4:17 18:3
18:5 36:11,20,23
36:24 37:18 38:5
38:6,17,19 39:7,8

39:9,19,22,25 40:1
40:10,14,18,24
41:2,3 51:9,12
53:2,5,16,23 54:16
54:18 114:8 115:8
152:14 158:5,15
158:17 199:3,6,19
199:24 201:2,19
206:12 220:13,13
220:18 223:22
239:25 240:18,21
241:4 247:13
**red** 12:4,21
**reduced** 252:14
**refer** 74:22 75:1
75:10 76:16 78:12
79:11 169:8
171:17 177:10
217:23 220:23
233:19
**reference** 77:19
152:7
**referral** 198:19
**referred** 64:12
165:6 169:19
172:14,24 173:2
177:5,7 194:5
198:14 213:4,15
221:16 222:20
225:13 231:22
234:9
**referring** 212:6
215:6
**reflect** 5:12
**reflected** 184:22
**refuse** 235:9,10,10
**refused** 234:15
235:2,5,7,21
**refusing** 232:13
**regarding** 5:21
138:23 146:23

160:14 237:2
246:19 249:12
**registered** 111:15
111:17,19 119:21
119:22
**regular** 79:16
138:8,9
**regularly** 45:8,12
**rehab** 161:17
**related** 160:21
161:4,12 207:21
**relative** 177:17
252:22,24
**relevant** 177:25
178:11,13,17
187:11
**relief** 116:6 210:16
211:3
**reloading** 248:18
**remained** 136:14
**remedies** 208:19
**remember** 7:14
11:8 19:17,19
123:17 135:25
148:3,12 150:21
150:25 162:20
191:21 209:4
243:2
**remotely** 2:5 4:24
252:20
**repeat** 7:9 61:21
61:23 86:16 125:7
167:23 169:24
170:21 217:15
226:3 232:1
**repeating** 100:1
**rephrase** 7:9 36:9
37:13 93:19 94:1
99:23 167:21
202:8

**report** 31:19,20
  32:4 102:14
  125:17 145:19
  170:8 171:6
  178:23 179:24
  184:23 185:4
**reported** 31:21
  252:13
**reporter** 2:4 6:24
  7:4 250:15,18,22
  251:10 252:3,6
  253:9
**represent** 5:20
**represented** 18:13
**request** 157:13,14
  162:10 163:7
  177:24 178:2,6,11
  178:17,19 179:9
  181:1 187:3,10,13
  187:18,25 188:3,7
  198:15 212:23
  232:17,19 234:10
  239:17 243:21,23
**requested** 232:15
**requesting** 74:3
  197:18 217:3
  232:9
**requests** 157:16
  164:4 230:1
**require** 94:4 96:19
  245:1
**required** 13:6 37:3
  37:8 153:22,25
**requires** 145:4
  154:25
**requiring** 99:3
**rescue** 217:6
  232:18
**research** 130:16
**reserve** 250:16,21

**reserved** 251:3,5,7
**resigned** 136:9
**resolve** 18:22
  61:18 62:6 63:3,4
  63:6 73:12 164:19
  189:12 242:3
**resolved** 6:14
**resolving** 63:12
**respond** 69:22
  142:12 234:20
**responded** 219:6
**response** 130:18
  191:7 196:11
  198:18 208:21
  210:1 219:15
  228:16 233:13,14
  234:13 236:2,14
  236:16 237:7,11
**responsibilities**
  35:8 50:10
**responsibility**
  31:12 61:17 62:5
  91:24 163:12
**responsible** 22:17
  73:23 81:3 121:14
  155:6 247:15
  248:12
**rest** 85:17 141:18
**restricted** 205:4
**retention** 66:16
**return** 139:4
  181:9 221:22
  232:3
**returned** 222:1
  232:5
**returning** 182:9
**returns** 138:20,21
  139:1,3
**review** 11:19 19:1
  39:24 50:22,23
  53:4,11 54:15

62:9,9,24 64:1,3
  64:13,16 68:21
  69:14 115:6
  138:19,20 139:1
  139:19 152:13
  153:6 162:11
  171:18 173:4
  177:23 178:10
  179:3,5 184:2
  187:2,10,12,13,18
  188:1,19,21
  189:25 190:2
  191:3 192:11
  196:7,18,22 197:3
  214:10,16 223:2,5
  223:22,25
**reviewed** 16:20
  17:15,18 19:2
  63:19 74:1,2
  108:10 161:11,12
  163:22 189:1,7
  193:20 196:16
  197:23 213:18
  219:16 222:19
  223:1,10,11 224:4
  227:22 238:4
  239:7
**reviewing** 17:11
  17:12 127:16
  139:11 146:13
  158:16 160:8
  163:13 178:19
  193:24 194:8,9
  200:25 228:1
**reviews** 146:2
  220:5 237:18,20
  237:22
**right** 6:16,20
  23:23 24:1,4,6,9
  24:14 25:5 31:6
  32:9 33:6,7 34:25

39:14,17 41:9
  42:2,13 52:5,23
  55:6,12 57:7
  62:10,25 69:10
  75:2,4 76:24 78:4
  79:14 81:9 82:8
  84:12 85:9 88:18
  88:21,25 90:14
  93:17 94:7,9
  97:24 98:2,9,13,15
  99:11 102:13
  107:1 110:11,25
  113:4 117:14
  118:7 119:22
  121:21 122:21
  126:15,21 128:13
  129:20,24 135:16
  135:23 136:16
  137:6 140:1
  141:15 143:9,10
  143:11,13 144:16
  148:14,16 149:1,9
  150:2 152:10
  154:18 155:7,9
  159:13 161:18,25
  163:8 164:24
  165:6 172:2,6,25
  173:11,17,22
  175:10 176:3
  177:21 179:10
  180:1 183:9 187:4
  192:16,17,19
  193:4,6,8 194:6
  195:7,13,23 196:2
  196:9 197:24
  198:1 201:9 202:3
  203:2 204:11,24
  204:25 205:5,7
  206:8 207:4
  208:16 209:25
  210:12,17,19

213:1,5,8,11,14
214:21 215:18,22
216:1,16 220:3
221:23,25 224:9
226:22 228:12,17
228:20 230:1
231:11 232:25
233:7,24 234:6,10
234:18 235:23
236:4 237:23
238:5 239:4,24
242:4 249:3 250:2
250:7,8,13
**rituals** 222:9
**rivera** 1:15
**road** 246:4
**rodriguez** 1:15
**role** 13:3 15:2 16:1
18:10 19:11 21:15
21:17,23,24 31:17
34:20 35:25 36:5
40:16 42:20 45:19
49:21 50:10,14
54:10 55:24 62:23
64:18,20 66:11
67:8,13 133:21
134:22 146:7,9
160:5 187:16,17
**roles** 24:4 43:3
49:15
**roll** 36:6 158:22
159:2
**rolling** 207:2
**roman** 154:19
155:9 161:15
**room** 22:4,8 23:13
23:15,19 24:13,24
25:9,13,14,15,17
25:22,22,24,25
26:1,3,7,13,14,14
27:5,16 43:2

49:16 249:10
**rooms** 24:8,11,16
26:18
**rosters** 158:21
159:2
**rotation** 17:25
**rounds** 188:8
**routine** 205:4,19
**rtu** 24:18,23 78:23
78:25,25 79:1,5,8
79:9,17 80:12
128:12
**rubber** 141:19
**rule** 5:16 167:16
168:4
**rules** 2:7 5:17 6:17

**s**

**s** 1:16,17,18 3:1
5:11 130:2
**safe** 154:23
**safer** 126:23
**safety** 115:20,21
121:7,16,25
123:13 124:9,19
125:13 199:1
211:21,21 244:11
**salary** 21:2
**salmon** 1:15
**salt** 205:4
**sat** 246:13
**saw** 116:3 155:17
197:13,24 201:2
**saying** 25:15 27:17
38:4 44:17 45:1
52:10 59:3 81:2,3
84:24,25 99:9
123:16,17 143:12
162:7 171:22,23
182:18 215:23
227:23 231:12
238:19,20 241:15

241:19
**says** 38:20 46:17
58:17 59:3 107:19
112:21 155:10
156:2 162:8 165:6
193:1 198:8
202:20 206:4
207:17 216:2
225:10 233:3
234:8
**scanned** 40:2
178:3 182:22
186:10 233:16
**schedule** 212:1
**scheduled** 137:15
137:17 138:9,18
138:19 142:8
156:3,22
**scheduling** 49:14
**school** 9:5
**scope** 54:8,18
106:3 122:2
170:16 221:9
**screen** 148:22
220:11
**screening** 74:21
74:22 76:15
**scroll** 150:10,14
173:16
**scrolling** 200:17
200:17 233:11
**se** 138:23
**sealed** 197:19
**second** 25:8
148:23 154:22
155:23 198:2
201:7 207:7 229:1
**secondary** 207:21
**section** 156:1,1
193:7 206:17

**security** 175:15,16
205:17
**see** 26:1,11,12
31:19,23,24 74:22
74:23,25 75:5,9,20
76:3,7,13,16,22
77:4,4,10 78:10,10
78:12 82:18
104:24 115:8
116:13 143:13
148:23,24 149:9
153:10 155:10,16
159:11 172:22
174:13 175:1,6
177:21 178:7,9,20
178:25 179:8
180:20 181:4
192:5,12 198:1
199:3,7,8,10,11,15
199:16 200:10,22
200:24 201:4,5,6,7
203:9 209:10,14
212:7,13 214:10
216:2,6,12 218:19
220:7,13,22,25
230:13 231:22
240:15 241:4,8,13
242:2 246:2 251:1
**seeing** 55:10
154:10 196:10
**seeks** 72:20 118:25
119:1
**seen** 47:4,7,8,8
82:7 115:15 150:4
150:4 151:9
154:15 157:22
160:2,6 161:1
162:14 166:12
167:2,12 168:23
169:1,2 170:6
171:2 174:7

222:25 224:24
229:15 241:1
**seerman** 219:13
219:15,19
**sees** 44:25 203:12
**self** 121:7,16
**send** 51:2 83:21
142:5 175:6
177:11 250:14
**sends** 107:6
130:11
**sense** 17:1 39:5
77:7,8
**sent** 75:19 148:9
160:9,11 172:10
215:1,2,10,14
216:3,3 229:12
231:9
**sentence** 125:24
126:3 154:22
**separate** 29:7
30:15 33:12
174:21
**separately** 29:4
69:20
**serious** 236:12
**service** 23:8,9
177:23 178:2,6,11
178:17,19 179:8
187:3,10,12,18,25
188:3,7 212:22
**services** 1:9,11
155:13 165:7
186:19 194:6
213:5,16 223:4
225:14 231:22
**set** 5:14 27:21
29:14 49:2 253:3
**seven** 143:12
**sexual** 127:24
128:1

**sexually** 128:22
129:4
**share** 148:22
**sharing** 220:10
**shebel** 1:22 2:1 4:3
5:3,11,13 149:6
159:8 192:2
196:12 200:1
**sheet** 140:21,25
181:23,25 182:7
183:7,16 208:7
**sheets** 182:25
183:18
**sheriff** 1:7
**sheriff's** 1:6
127:25 159:14
**shift** 222:7,8,9
**shoo** 104:14
**shooed** 105:2
**short** 13:18 14:18
135:24 136:19,22
207:24 230:6
239:6
**shortage** 147:22
148:17,21
**shortages** 148:17
**shorthand** 2:3
252:3,5 253:9
**show** 180:19
206:10
**showed** 236:5
**showing** 213:17
**shows** 200:8 207:8
**shutdown** 38:22
39:2
**sic** 133:9 154:9
**side** 132:16
**sides** 190:19
**sign** 111:23 112:1
179:19 182:18
185:9,12 232:11

**signature** 194:16
209:20 250:15
251:2,11,19 253:8
**signed** 5:24 182:4
193:4,21 194:17
196:15 208:5
217:9 219:16
231:13,15 236:3
**signs** 193:8 208:16
223:17 229:14
231:11 236:10
237:9,19
**silent** 206:12
**similar** 30:25
181:6 184:20
214:2 242:12
243:7
**simple** 103:8
**simplicity** 214:4
**simultaneous**
94:13
**sit** 82:9 152:8
154:2 222:2
**sitting** 152:11
196:19
**situation** 63:24
72:15 82:23 98:14
102:18 103:10,11
104:5 108:5,9,13
110:18 116:23
122:22 145:20
146:5,14 157:21
174:7 191:17,18
215:16 231:8
235:8,13,15
**situations** 98:21
99:14 100:5
102:22 104:2
105:4,19 127:4
138:14,17 146:18
162:13 164:3

170:5 171:1
174:11 189:14
**six** 13:2 59:15
**slower** 227:16
**smaller** 149:2
**smith** 1:13 3:21
**smooth** 139:5
**smoothing** 138:21
139:2
**social** 19:9
**sold** 19:17
**somebody** 50:23
90:18 99:9 104:13
115:21 121:11
131:21 140:17
162:1 170:6 171:3
219:5 229:21
**soon** 112:22,25
113:4,5 126:15,16
**sooner** 126:22,24
127:3
**sorry** 20:14 22:14
30:23 36:2 42:1
62:11,17 63:14
67:4,5,23 71:13
78:25 84:23 85:20
90:10 99:6 112:9
126:10 134:15
135:13 138:10
149:12 151:13,21
178:22 191:15
202:8 207:2,7
221:1,3 227:19
230:9 233:11
237:20 242:9
243:5 244:3
**sort** 185:4,4
207:20 230:21
**sounds** 18:19
34:24 39:12 46:15
52:10 57:3 81:5

84:10 86:6,23
87:14 137:7
161:12 179:6
211:13 215:9,11
217:18 218:1
227:9
**source** 33:6
**south** 24:17
**southeast** 24:17
**spare** 242:12
**speak** 40:13 41:8
54:9 68:19,20,22
69:9,12 70:1,3
190:1 211:14
212:12,15
**speaking** 94:13
97:10 245:11
**specific** 5:23 24:4
39:6 43:2,7 48:2
52:15 58:5 59:5
60:15 76:12 125:1
140:1 158:15
160:7 197:17
202:7 218:6
226:15 243:18
**specifically** 118:24
142:15 227:23
**specifications**
164:7
**specified** 252:21
**speculation** 43:22
60:6 66:19 72:23
74:6 82:3 83:9
92:25 93:10 94:21
96:9 97:7 99:18
100:20 103:1
106:3 107:9 111:5
112:5 119:19
122:17 216:23
219:5 237:14
245:17

**spell** 5:10 130:1
133:3,5
**spoke** 211:25
**spot** 14:18 33:10
33:24
**staff** 26:22 66:24
67:16 104:18
138:16,25 154:7
156:2 158:21
159:1 169:21
175:1 176:15
181:17 189:25
215:5 217:4
229:13 232:8
233:2,19
**staffed** 66:25
89:15
**stamp** 141:14
195:13 209:25
210:10
**stamped** 149:13
159:17 194:23
195:3
**stand** 16:9 60:22
106:19 189:23
205:22 214:24
237:7,12
**start** 16:5 20:21
22:7 85:20 119:17
133:25 137:23
150:18 156:3
178:19 217:19
222:9 246:2,2
**started** 12:8 21:7
37:25 38:2,5 39:6
128:19 222:4
**starting** 179:3
198:7 203:25
207:1
**starts** 190:15
192:8 198:8 206:7

**state** 2:4 5:9 13:20
13:25 14:2,7,8
142:18 174:24
252:6
**stated** 186:9
**states** 1:1 51:25
156:4 186:23
214:23 222:1
**stating** 142:12
**stationed** 88:15
**stayed** 135:12
**stenographically**
252:13
**step** 212:19
**steps** 63:10 79:20
**sting** 102:19 104:2
106:11 145:7
**stipulated** 4:23
**stipulation** 4:22
**stop** 125:2,3
220:10
**stopped** 37:25
133:25 162:21,22
**stored** 39:22
186:17
**street** 3:4,11
**strict** 155:14,18,20
**strictly** 83:2
**strike** 21:23 28:18
30:23 39:20 50:4
52:2,19 54:3,14,25
57:8 64:23 73:9
121:2 139:9
146:12 159:20
174:5 187:16
188:19 219:18
225:8
**strips** 30:12
**stroger** 42:4 80:8
**stuff** 113:16

**stung** 100:13
**subject** 149:4
159:16 181:8,12
**submit** 212:22
**suggests** 170:11
**suit** 127:24
**suite** 3:4,11,18
**super** 134:13,17
136:12,17 165:22
177:2
**superintendent**
165:7 173:3 176:5
176:6,9,14,17
177:4,6,6,10,11,17
221:17 222:21,22
233:17,18
**superintendents**
176:19
**supervise** 129:14
130:22 131:2
**supervised** 129:16
**supervises** 131:7
131:17
**supervisor** 109:4
109:20 110:1
133:14 134:1,3,7
134:10,16,20
135:6,8,10,12,16
135:18,23 136:14
136:21 137:3,7
140:11 161:22
162:2 165:24
166:1 186:20
191:11 249:18
**supplies** 22:13,22
23:6
**supply** 22:25 69:1
198:25
**suppose** 83:18
115:17 122:9
133:20

**supposed** 29:3
37:16 54:6 56:4
57:21 71:24 75:24
89:19 91:18 109:6
112:18 139:25
140:4 180:9
212:18 220:20
234:20 240:10
247:25
**supposing** 83:5
**supt** 233:16
**sure** 6:23 7:2 8:8
14:7 16:17 19:23
22:11 23:1,7,9,11
32:24,25 33:1
41:16 42:9 52:25
69:2 70:7,25
72:18 86:18
101:19 104:16
125:8 139:5
140:18 141:4
158:14 174:19
176:14 182:14
185:7,25 199:14
201:7 213:10
216:15 227:21
244:6
**surrounding**
187:14
**surveyor** 10:6,6
13:20,25 14:5,11
**susan** 1:22 2:1 4:3
5:3,11,13 8:7,7
91:2 101:7,22
119:7 148:24
149:10 159:11,25
168:14 170:17
180:20 191:17
192:5 196:12
249:6 250:9

**swap** 141:4
**switched** 251:4,6
**sworn** 5:2,5
233:18 252:10
**symptom** 111:23
112:1
**syringes** 22:23,24
**system** 32:17 34:6
36:7 38:10 40:5
51:11 52:15
140:17 184:8,20
206:21,21,24
**systems** 153:20

**t**

**tablets** 232:19
**take** 6:24 7:4 8:2
10:10,12,15,17,21
10:24 29:3 32:6
32:13 42:1,8,10
50:19 58:10 78:15
81:8,21 82:4,8
84:20 86:1,2 90:9
91:3,8,21 92:15,20
94:6 95:2,5,6,23
96:6,13,16,18 97:4
98:22 116:19,20
121:9,12,20,24
122:5,10,13
126:14 135:11
141:13,16 142:2
142:16 147:14
164:18 179:23,25
180:1 184:14
188:13 190:11
202:6 203:14
210:13,23 214:15
227:2,3 229:13
231:6 246:10
**taken** 2:1,5 5:13
5:15 42:15 57:25
63:10 91:10 93:7

98:18 128:14
143:17 180:4
204:16 227:10
252:19
**takes** 52:1 79:6
84:21 107:7
246:16
**talk** 25:7 31:11
50:24 67:18 68:18
72:17 73:11
103:20,23 105:9
117:13 209:8
235:4 241:11
242:1,2,22 250:24
**talked** 209:11
246:14 247:1
**talking** 23:23
58:25 79:21 89:7
90:16,17,17 91:15
102:12 105:20
116:9 124:23
143:24 148:16
166:10 183:3
189:20 194:20
207:16,19 214:13
239:6 246:5
**taylor** 1:16
**team** 18:21 137:24
172:21
**tear** 182:18
**technical** 233:21
248:24
**telephone** 88:9
**tell** 44:24 49:8
80:17 88:11 116:1
116:13,14,15
168:18 200:9
211:14,16 212:20
213:10 232:21
**tells** 110:2,6

**templates** 17:1,2,6
**ten** 42:10 80:14
81:15 91:8,9
149:17 216:21
227:7 242:11
**tend** 105:5
**terizes** 72:9 83:25
85:12 92:3 97:21
101:3,15 109:25
110:22 118:4
187:6 246:19
**term** 10:6,25 11:5
15:1 135:24
**terms** 25:18 125:1
**terrace** 14:25
15:15
**testified** 5:6 41:16
83:10 92:25 94:4
94:22 96:5 97:7
110:9,10 123:2,12
124:11 126:12
161:20 168:10
187:7 241:25
**testify** 98:10 195:6
252:10
**testimony** 41:11
72:9 83:25 85:12
86:13 87:25 92:3
93:10 97:21 101:5
101:12,15 107:18
109:25 110:22
118:4 123:2 187:6
246:19 252:17
**testing** 11:6
**thank** 11:14 20:13
21:14 42:24 59:25
91:5 101:17
136:16 142:25
149:16,19 163:19
180:3 197:22
227:20 233:24

**[thank - tylenol]**

250:8 251:15
**thanks** 91:8 98:10
109:1 142:21
143:15,16
**thing** 15:22 51:1
62:20 140:23
141:9 182:20
207:14 217:16
218:22 244:10
**things** 16:6,15
17:25 22:11 46:21
81:11 139:6
174:18 179:12
197:5 238:18
241:20
**think** 16:24 27:13
30:14 41:15 53:17
62:12 80:13 93:25
100:11 116:15
130:8 131:15
147:25 151:22
157:4 174:19
194:25 195:5
197:10 206:20
207:14 216:20
219:12 226:19
229:20 239:15
242:19 245:22
249:10,14 251:4
**thinking** 26:20
97:19
**third** 58:15
**thirty** 229:9
**thomas** 1:7
**thoroughly** 209:10
**thought** 103:17
189:4 204:23
222:20 248:21
249:6
**thousands** 120:14
123:23

**three** 34:24,24
49:9 58:14 101:17
142:1 184:21
185:3 206:13
240:3
**tid** 58:9,13
**tier** 215:4 225:23
**time** 7:5 10:22
13:18 14:18 17:21
20:2 37:5,6,15,20
37:22 38:13 40:7
45:11 52:1 55:12
55:12 56:3,11,12
56:14 65:8 70:8
71:1,4 74:16 75:6
75:7,7,18,19 76:2
76:10,21 77:9
79:11 81:18 89:7
105:20,22 127:16
127:17 133:22
134:9 136:19,22
136:24 147:20,21
150:2 163:15
164:9 187:12,14
188:23 192:21
195:13 199:21
201:15 202:6,24
203:10,18,21,22
205:2 209:25
218:8 229:4,11,15
230:16 239:7
243:8 245:7,8
246:19 252:20
**timed** 80:15
**timer** 15:21
**times** 56:16,19
57:7,8,10,18 58:5
58:14,16,19,21
59:5,13 60:1,25
61:5,7 92:10
101:17 153:10

156:4 185:3 238:9
239:5 243:23
**title** 40:17 41:16
49:22,24 65:23
130:3,4,5,19
131:22,23 133:17
185:19 193:14
**titles** 186:7
**today** 5:21 43:20
50:7 52:21 111:17
116:3
**told** 169:17 170:6
171:3 174:25
229:7
**tool** 181:3 185:8
**top** 47:10 149:9
162:8 165:4 166:4
173:16,23 198:3
199:12 207:5
**torres** 1:16,16
**totally** 88:6
**tour** 128:14,17,18
**tower** 158:22,23
159:2
**town** 11:3
**track** 68:1 181:22
**tracking** 181:2
185:8
**trained** 144:6,10
144:16 146:4,8,9
146:19,21,22
188:11,13
**training** 146:24
188:14,17,18
**trainings** 10:25
**transcript** 252:12
**transfer** 99:3
138:22 140:21,25
141:6 158:5
181:23,23,24
182:1,6,25 183:2

183:15,18 185:14
208:7
**transferred** 183:5
**transition** 32:21
**transpired** 181:16
**treated** 164:13
**treatment** 154:24
217:21 234:3
**treatments** 15:4
**triage** 13:6
**trick** 48:25
**tried** 229:7
**triplett** 1:18
**true** 252:16
**truth** 252:10
**try** 7:22 60:23
90:23 146:14
238:11 241:14
**trying** 25:19 28:11
38:9,12,16 41:13
48:25 49:1 81:1
106:25 211:5
**tuesday** 132:22
**tunnels** 79:22,23
**turn** 7:16
**twice** 58:12
**two** 7:4 12:18
15:16 34:23 42:7
49:9 56:7,7,10,15
60:16,16 61:9,9
78:1 104:21
116:22 117:10
134:9 158:22
159:2 161:14
166:8 174:8,11,18
190:9 203:19,20
221:6 224:24,24
228:23 245:9
246:15
**tylenol** 120:5
122:10

**type** 30:15 34:10
80:21 99:22
103:10 140:12
184:23 185:7,9
188:16 235:8,11
235:12,15 243:17
**typed** 250:19
**types** 16:14,14
99:14 100:4
138:14 164:3
165:5 170:11
189:14 249:20,22
**typewriting**
252:14
**typical** 229:16
**typically** 165:22
181:19 235:7

**u**

**uh** 6:25 178:23
179:11 219:25
**unclear** 37:20
74:15 89:7 90:24
108:23 124:23
145:22 183:3
**uncomfortable**
105:9 106:12
**unconsciousness**
145:6
**undergrad** 9:18
**underneath** 193:3
193:6
**understand** 7:8
17:5 25:8,19
26:16 28:11 29:21
30:19 36:8,16
37:1,12,23 38:9,13
38:16 41:13 46:22
49:1 50:12 56:2,2
63:7,14,16 68:15
70:22 71:8 80:9
81:1 83:4 93:20

99:20 103:15
116:9 117:10
123:9 125:6 138:1
139:24 144:12
149:23 154:13
158:13,24 167:22
170:19 176:12
178:5 191:6,13
202:5 205:9 215:7
235:9 238:2
240:13,22 250:25
**understanding**
25:10,12 157:7
180:11 194:3,8
223:23 242:16
**understood** 7:10
33:1 57:3 58:4
163:5 177:19
**unit** 24:17,18
28:23 32:18,19
33:22 60:8 125:21
127:19 144:20
157:16 192:22
239:9
**united** 1:1
**units** 117:19
127:12 128:10,14
129:3 180:10
188:4
**unscheduled**
138:25
**upside** 210:2
**urgency** 12:25
**urgent** 12:23 13:4
13:5,7 16:3 75:10
75:19 76:6,8,17
78:12,13 79:10,12
79:24 80:11 82:10
82:15,17 85:22,25
86:1,2 90:9 91:21
92:16,20 93:7

94:7,18 95:2,5,24
96:6,14,16,18,20
97:5 98:15,18,22
109:19 215:9,10
215:13,15 216:1
220:23
**usage** 7:23
**use** 15:9 24:14
26:20 36:20 38:22
39:4,8 89:14
127:15 152:13
184:15 230:22
**uses** 25:18 27:9
51:12 181:22
**usually** 23:18
25:16,17 57:9,25
66:25 67:20,24
69:3 75:8 105:16
132:19 230:11

**v**

**v** 1:5
**vague** 50:12,13
112:11
**validity** 4:24
**variables** 58:2
59:23 61:7 88:7
**variation** 61:1
**varied** 10:11 19:21
138:13
**varies** 132:23
157:4 197:4,5
**various** 73:20
169:6
**vary** 132:22
**verbal** 6:24
**versa** 243:12
**versus** 243:11
**vice** 243:12
**videoconference**
2:5 3:6,14,20
252:20

**view** 250:25
**vii** 161:15
**village** 253:4
**visit** 17:22 67:9
68:6,16 178:4
203:10 212:2,13
**visits** 104:18
178:20,20
**visor** 134:14,18
136:13,18 165:23
**visual** 74:24
**vital** 229:14
231:11
**voices** 7:4
**vomiting** 105:11

**w**

**w** 1:14,15 133:9
**wait** 35:14 117:9,9
117:11 129:23
169:25 217:7
229:8
**waiting** 116:7
197:20 232:4
251:11
**waive** 4:23 250:17
**waived** 251:2,20
**walk** 80:14 215:25
216:6,6,9 217:7
222:11 224:8
227:24 228:2
**walked** 224:13
**walking** 216:17
**want** 26:2 38:13
39:2 42:10,20
50:16 91:8 94:24
100:9 101:18
106:22 115:21
119:9,14 120:15
129:3 143:2,9,23
145:6 150:15
186:2 209:14

**[want - wrong]**

214:15 227:7
243:21 250:22
**wanted** 142:5,18
152:6 199:14
223:2
**wanting** 197:14
230:14
**wants** 207:18
215:20
**warning** 184:8
**watch** 32:8 158:21
158:23 159:2
**watched** 38:15
**way** 30:1,20,22
31:12 35:16 49:1
75:22,24 105:14
114:3 117:3
148:13 149:23
150:10 151:8
152:12 164:14
211:24 212:21
215:25 216:8
238:13 241:17
249:7
**ways** 35:4
**we've** 142:1 238:2
239:5 241:1
**weather** 79:22
**wednesday** 132:22
**week** 23:5 65:14
132:20 221:6
240:2
**weekends** 20:5
180:12,13,15,18
181:19 248:8
**weekly** 132:3,5,13
132:19 137:8,10
203:17,18
**weeks** 203:19
221:6 240:3

**went** 12:22 14:25
15:19 17:19
116:13 132:7
163:15 201:1
237:24 238:1,5
**west** 3:18 24:17
**westville** 15:19,23
15:25 16:1,15,19
19:15,20 20:1,8,16
**whatsoever** 47:17
119:3
**wheelchair** 216:14
216:17
**whereof** 253:3
**whichever** 141:17
177:17
**william** 1:3 5:20
29:2 191:21
192:19 199:19
**window** 55:12
56:22 58:25 60:16
60:16 61:8 230:6
230:16
**wish** 206:20
**witness** 2:7 4:3 5:1
5:4 8:19 29:23
33:21 36:17 37:8
37:24 40:9 42:6
42:12 53:19 54:21
60:7 62:16 66:20
70:19 71:9 72:10
72:22 74:8,18
82:4 84:18 86:11
87:6,22 89:8
90:25 91:5 92:5
93:2,11,14 96:2,10
97:13 99:22 100:9
100:11,21 101:4
101:10,13 102:9
103:4 104:11
106:5,17 107:12

109:3 110:1,23
111:7 112:6
114:25 117:22
122:5,18 123:6
124:12 125:16
126:4 130:17,25
136:23 141:24
143:9 152:21
167:21 169:13
170:19 171:9
173:20 184:12
216:24 219:7
227:12 228:7
237:15 245:19
246:22 252:9,9
253:3
**wondering** 206:25
**word** 24:14 57:2
**work** 8:15 12:10
12:20 13:8,19
14:23 17:22 19:9
20:1,5,17 29:17
47:1 60:7 65:13
65:16 68:18 70:6
70:25 75:25 96:17
97:8,14 105:7,17
106:7,20,23
107:19 108:1
110:12 123:3
127:8 144:12,13
144:14 146:25
157:19 237:9
248:8,19 249:15
**worked** 12:3,7,12
12:17 13:9,13,14
13:17 14:1 16:3,4
19:3 41:18 129:17
144:17 148:8
219:21 249:14
**worker** 161:17

**working** 6:12 12:2
13:4 15:6 20:21
21:7 38:14 49:12
50:15 65:22 66:2
81:15 132:16
137:23 141:8
147:20 193:24
229:16,20 247:2
249:24
**works** 41:20 52:7
75:22 90:18
236:20 249:14
**wound** 10:7 11:1,3
15:9,12
**wrap** 69:2
**wrapped** 28:25
32:18 33:5
**write** 37:3,9,17
39:13 59:12 64:9
85:24 123:7,10
183:8 194:12
201:25 209:7
218:13 225:5
234:13 235:8,10
241:21
**writes** 59:8,9
123:11 198:2,2
237:8,10,11
**writing** 37:25 43:5
44:4 191:14
218:22 221:20
**written** 119:10,12
164:18 169:16
191:6,19 192:11
194:10 212:9
217:13 221:15
233:9 236:16
237:19 242:25
**wrong** 18:20,20
172:24,25

[wrote - zoom]

**wrote**   174:22
192:25 198:4,13
198:23 201:6
210:13 214:8
217:22 219:8
229:3 231:25
232:2,4 233:15
234:5,17,17
236:15

**x**

**x**   4:1 205:25 206:3
222:24,25 223:3,7
223:14

**y**

**yeah**   7:21 8:13 9:3
9:11 12:19 14:17
22:9,23 24:18
28:10 34:20 37:13
37:13 40:9 42:9
52:25 62:19 63:9
63:17 75:25 77:8
77:8 80:9,23,24
83:14 85:2 91:5
107:24 109:2,11
112:10 116:14
120:18 126:23
131:16 142:24
145:3,11 146:1
150:17 151:14
152:11 153:7
154:13,21 163:18
166:3 175:23,23
178:15 180:14
186:7 196:2
199:13,16,17
206:5 210:4,6
215:9 225:11
227:5,15 245:19
245:22,22 251:1

**year**   9:9,10,16
10:17 11:13 13:21
14:12,19 20:21
35:22 36:4
**years**   7:13 8:23
11:8 12:10,13,18
13:2,12,12,21
15:16 20:10,11,12
34:23,24 81:15
134:9
**yep**   53:13 142:21
**yesterday**   142:5

**z**

**z**   1:14
**zeros**   149:15
**zoom**   6:21 7:25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# Exhibit 2

KeyCite Yellow Flag - Negative Treatment
Distinguished by Dean v. Wexford Health Sources, Inc., 7th Cir.(Ill.), November 10, 2021

849 F.3d 372
United States Court of Appeals, Seventh Circuit.

Alma GLISSON, Personal Representative of the Estate of Nicholas L. Glisson, Plaintiff-Appellant,

v.

INDIANA DEPARTMENT OF CORRECTIONS, et al., Defendants-Appellees.

No. 15-1419
|
Argued September 7, 2016
|
Decided February 21, 2017

**Synopsis**

**Background:** Personal representative of state prisoner's estate filed action in state court under § 1983 and state law alleging that department of corrections, its private medical services provider, and provider's employees were deliberately indifferent to prisoner's serious medical needs, in violation of Eighth Amendment. After removal, the United States District Court for the Southern District of Indiana, Sarah Evans Barker, J., 2014 WL 2511579, entered summary judgment in defendants' favor on all federal claims, and remanded state law claims to state court. Plaintiff appealed. The Court of Appeals, 813 F.3d 662, affirmed.

**[Holding:]** On rehearing en banc, the Court of Appeals, Wood, Chief Judge, held that Monell liability could be premised upon provider's purported decision not to require coordination of medical care for complications arising from prisoner's laryngectomy.

Reversed and remanded.

Sykes, Circuit Judge, dissented and filed opinion in which Bauer, Flaum, and Kanne, Circuit Judges, joined.

West Headnotes (5)

**[1]** **Civil Rights**  Criminal law enforcement; prisons

If institutional policies are themselves deliberately indifferent to quality of care provided to prisoner, institutional liability for Eighth Amendment violations is possible under § 1983. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

62 Cases that cite this headnote

**[2]** **Civil Rights**  Persons Liable in General

Private corporation that has contracted to provide essential government services is subject under § 1983 to at least same rules that apply to public entities. 42 U.S.C.A. § 1983.

39 Cases that cite this headnote

**[3]** **Civil Rights**  Persons Liable in General
**Civil Rights**  Governmental Ordinance, Policy, Practice, or Custom

Critical question in evaluating Monell liability under § 1983 is whether municipal or corporate policy or custom gave rise to harm, or if instead harm resulted from entity's agents' acts. 42 U.S.C.A. § 1983.

122 Cases that cite this headnote

**[4]** **Civil Rights**  Governmental Ordinance, Policy, Practice, or Custom

To establish that municipal policy or custom caused constitutional violation, plaintiff asserting Monell liability claim under § 1983 may show that (1) action that is alleged to be unconstitutional implements or executes policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers; (2) constitutional deprivation was visited pursuant to governmental custom, even though such custom has not received formal approval through body's official decisionmaking

channels; or (3) government's policy or custom is made by those whose edicts or acts may fairly be said to represent official policy. 42 U.S.C.A. § 1983.

232 Cases that cite this headnote

**[5]** **Federal Civil Procedure** 🔑 Civil rights cases in general

Genuine issues of material fact as to whether risks arising from purported decision by department of corrections' private medical services provider not to require any kind of formal coordination of medical care either within institution or across institutions for prisoners suffering from chronic diseases created risk that was sufficiently obvious as to constitute deliberate indifference to prisoners' serious medical needs, and whether failure to coordinate care resulted in state inmate's death precluded summary judgment in § 1983 action alleging that inmate's death was result of provider's failure to coordinate treatment for complications arising from his laryngectomy. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

39 Cases that cite this headnote

**\*373** Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. No. 1:12-cv-1418-SEB-MJD—Sarah Evans Barker, *Judge*.

**Attorneys and Law Firms**

Michael K. Sutherlin, Attorney, SUTHERLIN & ASSOCIATES, Indianapolis, IN, for Plaintiff-Appellant.

Carol A. Dillon, J. Richard Moore, Attorneys, BLEEKE DILLON CRANDALL, PC, Indianapolis, IN, for Defendant-Appellee.

Before Wood, Chief Judge, and Bauer, Posner, Flaum, Easterbrook, Kanne, Rovner, Williams, Sykes, and Hamilton, Circuit Judges.

**Opinion**

Wood, Chief Judge.

Nicholas Glisson entered the custody of the Indiana Department of Corrections on September 3, 2010, upon being sentenced for dealing in a controlled substance (selling one prescription pill to a friend who turned out to be a confidential informant). Thirty-seven days later, he was dead from starvation, acute renal failure, and associated conditions. His mother, Alma Glisson, brought this lawsuit under 42 U.S.C. § 1983. She asserts that the medical care Glisson received at the hands of the Department's chosen provider, Correctional Medical Services, Inc. (known as Corizon) violated his rights under the Eighth **\*374** Amendment to the U.S. Constitution (made applicable to the states by the Fourteenth Amendment). A panel of this court concluded that Corizon was entitled to summary judgment in its favor. See *Glisson v. Indiana Dep't of Corr.*, 813 F.3d 662 (7th Cir. 2016). The court decided to rehear the case *en banc* in order to examine the standards for corporate liability in such a case. We conclude that Glisson presented enough evidence of disputed, material issues of fact to proceed to trial, and we therefore reverse the district court's judgment.

I

There is no doubt that Glisson had long suffered from serious health problems. He had been diagnosed with laryngeal cancer in 2003. In October of that year, he had radical surgery in which his larynx and part of his pharynx were removed, along with portions of his mandible (jawbone) and 13 teeth. He was left with a permanent stoma (that is, an opening in his throat), into which a tracheostomy tube was normally inserted. He needed a voice prosthesis to speak.

And that was not all. Glisson's 2003 surgery and follow-up radiation left his neck too weak to support his head; this in turn made his head slump forward in a way that impeded his breathing. Because physical therapy and medication for this condition were ineffective, he wore a neck brace. He also developed cervical spine damage. In 2008 doctors placed a gastrojejunostomy tube ("G-tube") in his upper abdomen for supplemental feeding. In addition to the problems attributable to the cancer, Glisson suffered from hypothyroidism, depression, and impairments resulting from his smoking and excessive alcohol use. Finally, there was some evidence of cognitive decline.

Despite all this, Glisson was able to live independently. He learned to clean and suction his stoma. With occasional help from his mother, he was able to use his feeding tube when

necessary. He was able to swallow well enough to take his food and other supplements by mouth most of the time. His hygiene was fine, and he helped with household chores such as mowing the lawn, cleaning, and cooking. He also provided care to his grandmother and his dying brother.

The events leading up to Glisson's death began when a friend, acting as a confidential informant for the police, convinced Glisson to give the friend a prescription painkiller.[1] Glisson was charged and convicted for this infraction, and on August 31, 2010, he was sentenced to a period of incarceration and transferred to the Wayne County Jail. (All relevant dates from this point onward were in 2010.) Before sentencing, Dr. Richard Borrowdale, one of his physicians, wrote a letter to the court expressing serious concern about Glisson's ability to survive in a prison setting. Dr. Borrowdale noted Glisson's severe disabilities from cancer and alcohol dependence, his difficulty speaking because of the laryngectomy, his trouble swallowing, his severe curvature of the spine (kyphosis), and his problems walking. The conclusion of the letter was, unfortunately, prophetic: "This patient is severely disabled, and I do not feel that he **\*375** would survive if he was incarcerated." Dr. William Fisher, another of Glisson's physicians, also warned that Glisson "would not do well if incarcerated."

Many of Glisson's disabilities were apparent at a glance, and his family tried to prepare him (and his custodians) for his incarceration. They brought his essential supplies, including his neck brace and the suction machine, mirror, and light that he used for his tracheostomy, to the Jail. When he was transferred on September 3 to the Reception Diagnostic Center of the Indiana Department of Corrections ("INDOC"), the Jail sent along his mirror, light, and neck brace. It is unclear what happened next to these items, but Glisson never received the neck brace, nor was he given a replacement.

At INDOC's Diagnostic Center, Glisson first came under Corizon's care, when upon his arrival Nurse Tim Sanford assessed his condition. Sanford recorded Glisson's account of his medication regimen and noted that Glisson appeared to be alert and able to communicate. Sanford noted that Glisson had a tracheostomy that had to be suctioned six times a day, and that Glisson had a feeding tube but that he took food through it only when he had difficulty swallowing. While Glisson was at the Diagnostic Center, medical personnel noted occasional problems with his blood pressure, pulse, and oxygen saturation level, as well as some signs of confusion and anger.

Several different medical providers saw Glisson while he was at the Diagnostic Center: Drs. Jill Gallien and Steven Conant (a psychiatrist); Nurses Rachel Johnson, Carla DeWalt, and Victoria Crawford; and mental health counselor Mary Serna. In addition, Health Services Administrator Kelly Kurtz contacted Glisson's mother to ask about his medical history and his behavior at home. Her inquiry was the only one that occurred throughout Glisson's incarceration, and there is no evidence that Mrs. Glisson's response (that Glisson did not behave oddly at home) was communicated to anyone else.

Ultimately the Diagnostic Center decided to place Glisson in INDOC's Plainfield Correctional Facility. Glisson was transferred there on September 17; an intake examination performed by Licensed Practical Nurse (LPN) Nikki Robinson revealed that he weighed 119 pounds and had normal vital signs. On September 21, Dr. James Mozillo ordered Glisson to be placed in the general population with a bottom-bunk pass.

Upon reaching Plainfield, Glisson's medical care—again furnished by Corizon—began to resemble the blind men's description of the elephant. A host of Corizon providers at Plainfield had a hand in Glisson's treatment. As far as we can glean from the record, they include the following: Drs. Malak Hermina (the lead physician at Plainfield), Mozillo, and Conant (again); Director of Nursing Rhonda Kessler; Registered Nurses (RNs) Mary Combs, Carol A. Griffin, Melissa Pearson, and Jennifer Hoffmeyer; LPNs Robinson, Allison M. Ortiz, and Paula J. Kuria; and mental health professional Catherine Keefer. Andy Dunnigan, Plainfield's Health Services Administrator, also played some part. We assume for the sake of argument here that none of these people, and none of the individual providers at the Diagnostic Center, personally did anything that would qualify as "deliberate indifference" for Eighth Amendment purposes. Most of them had so little to do with Glisson that such a conclusion is quite unlikely. The question before us is instead whether, because of a deliberate policy choice pursuant to which no one was responsible for coordinating his overall care, Corizon itself **\*376** violated Glisson's Eighth Amendment rights.

Predictably, given the number of actors, Glisson's care over the first few weeks of his residence at Plainfield was disjointed: no provider developed a medical treatment plan, and thus no one was able to check Glisson's progress against any such plan. In fact, for his first 24 days in INDOC custody

(including the time at the Diagnostic Center), no Corizon provider even reviewed his medical history. Granted, before Glisson arrived at Plainfield, Dr. Gallien had requested his medical history on September 10. But there is no evidence that anyone responded to this request. Indeed, no one at the Center followed up, nor did anyone at Plainfield do anything until September 27, when Dr. Hermina saw Glisson and asked for the records; he received them within several hours.

At that visit, Dr. Hermina made an alarming observation about Glisson's weight. As we noted, when Glisson arrived at Plainfield he weighed only 119 pounds. On September 27, Dr. Hermina noted that Glisson appeared cachectic, which means undernourished to the point that the person has physical wasting and loss of weight and muscle mass —in a word, he is starving. See MedicineNet, Definition of Cachectic, http://www.medicinenet.com/script/main/art.asp? articlekey=40464 (last visited on February 21, as were all websites cited in this opinion). Although the medical personnel at the Diagnostic Center had ordered the nutritional supplement Ensure for Glisson, and apparently that order carried over to Plainfield, Dr. Hermina ordered a second nutritional supplement, Jevity. Remarkably, it appears that he did not weigh Glisson—at least, there is no record of a September 27 weight. He did, however, review Glisson's earlier lab work, which showed anemia and high creatinine (a sign of impaired kidney function). Later that day, Dr. Hermina reviewed the medical records he had just received and learned that Glisson suffered from (among other things) kyphosis and back pain (for which he was treated with the opioids OxyContin and Oxycodone), gastroparesis (partial paralysis of the stomach), neck pain, and several mental conditions (depression, poor memory, mild cognitive decline).

As time went on, along with the physical problems of cachexia, renal decline, and neck weakness (in part attributable to the fact that no one ever gave him his neck brace), Glisson's mental status was deteriorating. Dr. Hermina wondered if Glisson belonged in the psychiatric unit at a different prison, but he displayed no awareness of the fact that Dr. Conant had just conducted a mental-health evaluation on Glisson on September 23. Dr. Conant's findings were worrying, but no one connected them with any of the physical data on file, such as Glisson's tendency to have inadequate oxygen profusion and his cachexia. Dr. Conant found that Glisson was restless, paranoid, delusional, hallucinating, and insomniac. He placed Glisson under close observation and settled on a diagnosis of unspecified psychosis; he saw no need for medication. (This too is odd: Glisson was actually

already on psychotropic medications; while at Plainfield he was abruptly switched from Effexor to Prozac without any evaluation, weaning, or monitoring. The two drugs work quite differently, and Dr. Diane Sommer, the expert retained by Glisson's estate, concluded that "[t]his abrupt change in medication contributed to [Glisson's] acute decline in function.")

Had Dr. Conant looked at something resembling a complete chart, he would have seen that Glisson had no history of psychosis, and he might have considered, as the post-mortem experts did, the more *377 obvious possibility that lack of oxygen and food was affecting Glisson's mental performance. Dr. Conant noted that Glisson had been experiencing hallucinations, which the doctor thought were caused by morphine. This observation was reached in an information vacuum. In fact, as the medical records Dr. Hermina reviewed just days later show, Glisson had been on narcotic medication without adverse effects for quite a while prior to his incarceration. Had Dr. Conant known of Glisson's medical history, he would have known that morphine was an unlikely cause for the hallucinations and he would have looked further.

The Corizon providers never took any steps to integrate the growing body of evidence of Glisson's malnutrition with his overall mental and physical health. The physical signs were clear even before he arrived at Plainfield. On September 4, Glisson's urinalysis results showed the presence of ketones and leukocytes. Dr. Sommer's report notes that "[k]etones suggest the presence of other medical conditions such as anorexia, starvation, acute or severe illness and hyperthyroidism to name a few." The Corizon staff at the Diagnostic Center did nothing to address either potential problem, even though a second urine sample taken on September 5 showed an increase in ketones and leukocytes. No physician reviewed either of those lab results, despite the fact that a note dated September 5 says that Glisson was not eating and seemed confused. Rather than probing the signs of infection, starvation, and dehydration further, the staff opted to put Glisson in the psychiatric unit under suicide watch.

The blood work at the Center continued to raise red flags. On September 9, it came back with signs of abnormal renal function. Although Glisson met with Dr. Gallien the next day, no one looked at the bloodwork until ten days after Glisson's transfer to Plainfield, at his September 27 visit with Dr. Hermina. At that point, Dr. Hermina ordered fasting labs for September 28. When the results were

returned on September 29, they showed acute renal failure—information that prompted Dr. Hermina to send Glisson immediately to Wishard Hospital. Taking the facts favorably to Glisson, the record indicates that he was already slipping into renal distress as early as September 4 or 9, and that the uncoordinated care Corizon furnished was a central cause for the increasing acuteness of his condition.

Glisson was discharged from Wishard and returned to Plainfield shortly after midnight on October 7. The discharge summary included the following diagnoses:

- Acute renal failure/acidosis/hyperkalemia on top of chronic kidney disease

- Acute respiratory insufficiency/pneumonia

- Tracheoesophageal voice prosthesis replacement

- Hypothyroidism

- Malnutrition

- Squamous cell carcinoma of left lateral tongue

- Hypertension

- Chronic pain

- Dementia/psychological disorder/depression

- Pressure wound on the sacrum

The morning after Glisson's return, Dr. Hermina saw him and reviewed the Wishard summary. He ordered the continuation of the medications prescribed at Wishard. RN Griffin saw him later that day, and the next day both Dr. Hermina and several nurses saw him. LPN Ortiz noted that he did not eat any of his breakfast. In fact, Dr. Hermina had ordered G-tube feeding only (which does not seem to have happened), **378** and so it is not clear why he had a tray.

On October 10, around 6:00 a.m., RN Combs was told that Glisson had been wandering about in a disoriented way. She tried to talk to him, but he apparently did not understand her. At 8:30 a.m., the staff notified RN Combs that Glisson was not moving and that there seemed to be blood in his bed. She found him unresponsive and called 911. The emergency team responded, and he was pronounced dead at 8:35 a.m.

The county coroner, Joseph Neuman, concluded that the cause of Glisson's death was complications from laryngeal cancer, with contributory chronic renal disease. He also

observed that Glisson had extreme emaciation and cachexia. He then asked Dr. Steven Radentz, a forensic pathologist, to render a more detailed opinion. Dr. Radentz agreed with Neuman's overall assessment and added that Glisson's rapid-onset altered mental state could have resulted from hypoxia (insufficient oxygen saturation) and acute renal failure. Complications from laryngeal cancer include, Dr. Radentz said, aspiration pneumonia, acute renal failure, and hyperkalemia (elevated blood potassium, which can lead to cardiac arrest, see MedicineNet, Definition of Hyperkalemia, http://www.medicinenet.com/hyperkalemia/article.htm).

## II

Alma Glisson filed this suit in state court in her capacity as Personal Representative of Glisson's Estate. She raised claims under both state law and 42 U.S.C. § 1983 against several of the doctors and nurses who were involved in Glisson's care, against INDOC, and against Corizon. The district court granted summary judgment in favor of the defendants on all of her federal claims, and it remanded the state-law claims to the state court. See *Glisson v. Indiana Dep't of Corr.*, No. 1:12-cv-1418-SEB-MJD, 2014 WL 2511579 (S.D. Ind. June 4, 2014). On appeal, Mrs. Glisson has limited her arguments to her claim against Corizon. As noted earlier, a panel of this court ruled that Mrs. Glisson failed to present enough evidence to defeat summary judgment in Corizon's favor. That conclusion rested on both a legal conclusion about what it takes to find an entity such as Corizon liable, as well as the characterization of the facts in the summary judgment record.

[1] It is somewhat unusual to see an Eighth Amendment case relating to medical care in a prison in which the plaintiff does not argue that the individual medical provider was deliberately indifferent to a serious medical need. See *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). But unusual does not mean impossible, and this case well illustrates why an organization might be liable even if its individual agents are not. Without the full picture, each person might think that her decisions were an appropriate response to a problem; her failure to situate the care within a broader context could be at worst negligent, or even grossly negligent, but not deliberately indifferent. But if institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible.

**[2]**  Ever since the Supreme Court decided *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the availability of entity liability under section 1983 has been established. This rule is not limited to municipal corporations, although that was the type of entity involved in *Monell* itself. As we and our sister circuits recognize, a private corporation that has contracted to  **\*379**  provide essential government services is subject to at least the same rules that apply to public entities. See, *e.g.*, *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789–90 (7th Cir. 2014); *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982); *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408–09 (2d Cir. 1990); *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir. 1992) (citing cases); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996). (We questioned in *Shields* whether private corporations might also be subject to *respondeat superior* liability, unlike their public counterparts, see 746 F.3d at 790–92, but we have no need in the present case to address that question and we thus leave it for another day.)

**[3]**  **[4]**  The critical question under *Monell*, reaffirmed in *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 131 S.Ct. 447, 178 L.Ed.2d 460 (2010), is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents. There are several ways in which a plaintiff might prove this essential element. First, she might show that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Humphries*, 562 U.S. at 35, 131 S.Ct. 447 (quoting *Monell*, 436 U.S. at 690, 98 S.Ct. 2018). Second, she might prove that the "constitutional deprivation[ ] [was] visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018. Third, the plaintiff might be able to show that a government's policy or custom is "made ... by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694, 98 S.Ct. 2018. As we put the point in one case, "[a] person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government...." *Vodak v. City of Chicago*, 639 F.3d 738, 747 (7th Cir. 2011). Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice.

The central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell* is exclusive), caused the constitutional deprivation. It does not matter if the policy was duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach. One could easily imagine either kind of strategy for a police department: one department might follow a policy of zero-tolerance for low-level drug activity in a particular area, arresting every small-time seller; while another department might follow a policy of by-passing the lower-level actors in favor of a focus on the kingpins. The hands-off policy is just as much a "policy" as the 100% enforcement policy is.

Mrs. Glisson asserts that Corizon had a deliberate policy not to require any kind of formal coordination of medical care either within an institution (such as the Diagnostic Center or Plainfield) or across institutions for prisoners who are transferred. This is not the same as an allegation that Corizon was oblivious to the entire issue of care coordination. Read fairly, she is saying that Corizon consciously decided *not* to include this service, not that it had never thought about the issue and thus had nothing that could be called a policy.

**[5]**  In some cases, it may be difficult to tell the difference between inadvertence and a policy to omit something, but on the facts presented by Mrs. Glisson, this is not  **\*380**  one of them. INDOC has Chronic Disease Intervention Guidelines, which explain what policies its health-care providers are required to implement. Healthcare Directive HCSD-2.06 states that each facility must adopt instructions for proper management of chronic diseases, and it spells out what those instructions should address. Among other things, it calls for "planned care in a continuous fashion" and care that is "organized and ... consistent across facility lines." It specifically mandates a treatment plan for chronic cases —both an initial plan and one that is updated as care needs change. In the face of this directive, which appeared *seven years* before Glisson showed up in prison, Corizon consciously chose not to adopt the recommended policies— not for Glisson, not for anyone. As relevant to Glisson's case, it admitted that his care at INDOC was based only on general standards of medical and nursing care, not on any "written policies, procedures, or protocols." It relied on none of the Health Care Service Directives in the course of his treatment.

That in itself, of course, does not describe an Eighth Amendment violation. Nothing in the U.S. Constitution required Corizon to follow INDOC's policies. The point is

a more subtle one: the existence of the INDOC Guidelines, with which Corizon was admittedly familiar, is evidence that could persuade a trier of fact that Corizon consciously chose the approach that it took. That approach itself may or may not have led to a constitutional violation. Suppose, for instance, that the state guidelines call for a primary-care physician to coordinate all care, both basic and specialized, and a company such as Corizon decides to ignore the guidelines and instead to hire hospitalists to coordinate care. This would represent a conscious policy choice, but in all likelihood one that does not violate any inmate's constitutional rights. Moving closer to the facts of this case, it is also possible that a health-care provider's deliberate policy choice not to implement the state's guidelines does not lead to dire results. Some guidelines may be foolish or ineffective. A decision not to implement them would be a deliberate policy choice, but in such a case not one that gave rise to an Eighth Amendment violation.

Other courts have endorsed the distinction we are drawing in their decisions. For example, in *Long v. Cnty. of Los Angeles,* 442 F.3d 1178 (9th Cir. 2006), an elderly man reported to the county jail to begin serving a 120-day sentence. At that time, as his attorney informed the Director of the Jail Medical Services Division, he weighed more than 350 pounds and was suffering from congestive heart failure (among other ailments). He had been under the care of a doctor affiliated with the Department of Veterans Affairs. During the ensuing 18 days, he received uncoordinated and inadequate care, was ultimately transferred to a hospital by ambulance, but died 14 hours later. The district court granted summary judgment for the county, but the Ninth Circuit reversed. It began by acknowledging that "[a] policy can be one of action or inaction." *Id.* at 1185. The plaintiff (the decedent's widow) attacked the county's "policies of inaction in the following areas: (1) its failure adequately to train MSB medical staff, and (2) an absence of adequate general policies to guide the medical staff's exercise of its professionally-informed discretion." *Id.* at 1190. With respect to the second ground, the court held that there was a triable issue on whether the county's failure to implement several policies amounted to deliberate indifference. *Id.*

The Third Circuit also encountered a similar case and resolved it in favor of the plaintiff: *Natale v. Camden Cnty. Corr. Facility,* 318 F.3d 575 (3d Cir. 2003). In that case a diabetic inmate brought a **\*381** *Monell* suit in which he asserted that he suffered a stroke because New Jersey's Prison Health Service failed to provide him with insulin. Addressing Natale's claim against the Health Service itself, the court

began with the common observation that "the Natales must provide evidence that there was a relevant PHS policy or custom, and that the policy caused the constitutional violation they allege." *Id.* at 583–84. It then recalled this point from *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989):

> But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390, 109 S.Ct. 1197. The Third Circuit applied that principle to the facts before it and concluded that "[a] reasonable jury could conclude that the failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs." *Natale,* 318 F.3d at 585; see also *Warren v. District of Columbia,* 353 F.3d 36, 39 (D.C. Cir. 2004) (ex-prisoner stated claim in *Monell* suit alleging that the District's policy or custom caused constitutional violations in prison conditions and medical care; "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction").

We are not breaking new ground in this area; to the contrary, this court has recognized these principles for years. In *Sims v. Mulcahy,* 902 F.2d 524 (7th Cir. 1990), we observed that "in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Id.* at 543 (citing *Avery v. Cnty. of Burke,* 660 F.2d 111, 114 (4th Cir. 1981); *Murray v. City of Chicago,* 634 F.2d 365, 366–67 (7th Cir. 1980)). In the same vein, we said in *Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293 (7th Cir. 2010), that "in situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable." *Id.* at 303; see also *King v. Kramer,* 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction").

Notably, neither the Supreme Court in *Harris,* nor the Ninth Circuit, nor the Third Circuit, said that institutional liability was possible only if the record reflected numerous examples

of the constitutional violation in question. The key is whether there is a conscious decision not to take action. That can be proven in a number of ways, including but not limited to repeated actions. A single memo or decision showing that the choice not to act is deliberate could also be enough. The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?

We reiterate that the question whether Corizon had a policy to eschew any way of coordinating care is not the only hurdle plaintiff faces: she must also prove that the approach Corizon took violated her son's constitutional rights. At trial, there is no **\*382** reason why Corizon would not be entitled to introduce evidence of its track record, if it believes that this evidence will vindicate its decision not to follow the INDOC guidelines. (If it does so, it presumably would also have to face less flattering news about its record. See, *e.g.,* David Royse, "Medical battle behind bars: Big prison healthcare firm Corizon struggles to win contracts," Modern Healthcare, April 11, 2015, at http://www.modernhealthcare.com/article/20150411/MAGAZINE/304119981; Matt Stroud, "Why Are Prisoners Dying in County Jail?" Bloomberg, June 2, 2015, at https://www.bloomberg.com/news/articles/2015-06-02/why-are-prisoners-dying-in-county-jail-. That issue, like the others we have identified, must await development at a trial.)

One does not need to be an expert to know that complex, chronic illness requires comprehensive and coordinated care. In *Harris,* the Court recognized that because it is a "moral certainty" that police officers "will be required to arrest fleeing felons," "the need to train officers in the constitutional limitations on the use of deadly force ... can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." 489 U.S. at 390 n. 10, 109 S.Ct. 1197. A jury could find that it was just as certain that Corizon providers would be confronted with patients with chronic illnesses, and that the need to establish protocols for the coordinated care of chronic illnesses is obvious. And in the final analysis, if a jury reasonably could find that Corizon's "policymakers ... [were] deliberately indifferent to the need" for such protocols, and that the absence of protocols caused Glisson's death. *Id.* at 390, 109 S.Ct. 1197.

A jury could further conclude that Corizon had actual knowledge that, without protocols for coordinated, comprehensive treatment, the constitutional rights of

chronically ill inmates would sometimes be violated, and in the face of that knowledge it nonetheless "adopt[ed] a policy of inaction." *Kramer,* 680 F.3d at 1021. Finally, that jury could conclude that Corizon, indifferent to the serious risk such a course posed to chronically ill inmates, made "a deliberate choice to follow a course of action ... from among various alternatives" to do nothing. *Harris,* 489 U.S. at 389, 109 S.Ct. 1197. *Monell* requires no more.

In closing, we reiterate that we are not holding that the Constitution or any other source of federal law required Corizon to adopt the Directives or any other particular document. But the Constitution does require it to ensure that a well-recognized risk for a defined class of prisoners not be deliberately left to happenstance. Corizon had notice of the problems posed by a total lack of coordination. Yet despite that knowledge, it did nothing for more than seven years to address that risk. There is no magic number of injuries that must occur before its failure to act can be considered deliberately indifferent. See *Woodward v. Corr. Med. Servs.,* 368 F.3d 917, 929 (7th Cir. 2004) ("CMS does not get a 'one free suicide' pass.").

Nicholas Glisson may not have been destined to live a long life, but he was managing his difficult medical situation successfully until he fell into the hands of the Indiana prison system and its medical-care provider, Corizon. Thirty-seven days after he entered custody and came under Corizon's care, he was dead. On this record, a jury could find that Corizon's decision not to enact centralized treatment protocols for chronically ill inmates led directly to his death. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

**\*383** Sykes, Circuit Judge, with whom Bauer, Flaum, and Kanne, Circuit Judges, join, dissenting.

Today the court endorses *Monell* liability without evidence of corporate fault or causation. That contradicts long-settled principles of municipal liability under § 1983. The doctrinal shift is subtle but significant. The court rests its decision on the conceptual idea that a *gap* in official policy can sometimes be treated as an *actual* policy for purposes of municipal liability under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). I have no quarrel with that as a theoretical matter. A municipality's failure to have a formal policy in place on a particular subject may represent its intentional decision *not* to have such a

policy—that is, a policy *not* to have a policy—and that institutional choice may in appropriate circumstances form the basis of a *Monell* claim. The Supreme Court's cases, and ours, leave room for this theory of institutional liability under § 1983.

But identifying an official policy is just the first step in *Monell* analysis; it is not the whole ballgame. Evidence of an official policy or custom is a necessary but not sufficient condition to advance a *Monell* claim to trial. The plaintiff also must adduce evidence on two additional elements: (1) institutional fault, which in this context means the municipality's deliberate indifference to a known or obvious risk that its policy will likely lead to constitutional violations; and (2) causation. Because *Monell* doctrine applies to private corporations that contract to provide essential governmental services, *see Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789–90 (7th Cir. 2014); *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982), these requirements apply in full to Mrs. Glisson's claim against Corizon, Indiana's prison healthcare provider, for the death of her son while in state custody.

But Mrs. Glisson produced no evidence to support the fault and causation elements of her claim. My colleagues identify none, yet they hold that a reasonable jury could find in her favor. I do not see how, without evidence on two of the three elements of the claim. The court's decision thus materially alters *Monell* doctrine in this circuit. With respect, I cannot join it.

To understand how the court's decision works a change in the law, it's helpful to begin with *Monell* itself. The familiar holding of the case is that § 1983 provides a remedy against a municipality for its *own* constitutional torts but not those of its employees or agents; the statute doesn't authorize vicarious liability under the common-law doctrine of *respondeat superior*. *Monell*, 436 U.S. at 691–92, 98 S.Ct. 2018.

To separate direct-liability claims from vicarious-liability claims, the Supreme Court announced the now-canonical "policy or custom" requirement:

Local governing bodies ... can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is

an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

**\*384** *Id.* at 690–91, 98 S.Ct. 2018 (footnote omitted). Put more succinctly, *Monell* holds that when a plaintiff seeks to impose liability on a municipality under § 1983, he must have evidence that a municipal policy or custom—or the act of an authorized final policymaker, which amounts to the same thing—actually caused his constitutional injury.

But *Monell* sketched only the outlines of the doctrine; it took later decisions to fill in the details. Most pertinent here is *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). There the Court provided a primer for how to apply *Monell* doctrine in actual practice. But first the Court elaborated on the rationale for the policy-or-custom requirement:

Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability *on the theory that the relevant practice is so widespread as to have the force of law.*

*Id.* at 403–04, 117 S.Ct. 1382 (emphasis added) (citation omitted).

The Court made it clear, however, that identifying an official policy or widespread custom is not sufficient to support a finding of liability:

[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, *a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.*

*Id.* at 404, 117 S.Ct. 1382 (second emphasis added). The culpability requirement—what I've referred to as "corporate

fault" or "institutional fault"—must be tied to the specific alleged constitutional violation. *Id.* at 405, 117 S.Ct. 1382. The causation element requires evidence that the municipality's *own* action *directly* caused the constitutional injury.

*Brown* involved a *Monell* claim by a plaintiff who was injured when a sheriff's deputy pulled her from a car and forced her to the ground during an arrest after a high-speed chase. *Id.* at 400–01, 117 S.Ct. 1382. The deputy had amassed a criminal record before joining the sheriff's department— misdemeanor convictions for battery, resisting arrest, and public drunkenness—but the sheriff hadn't reviewed it closely before hiring him. *Id.* at 401, 117 S.Ct. 1382. The injured plaintiff sued the county under *Monell*, attributing her injury to the sheriff's lax hiring practices. *Id.*

The Court rejected the claim, holding that a single instance of excessive force—the plaintiff's own injury—wasn't enough to trigger municipal liability. *Id.* at 415, 117 S.Ct. 1382. The Court began by tracing *Monell*'s basic requirements— an express policy or widespread custom, municipal fault, and causation—and then explained how these elements apply in different types of cases. First up were the obvious cases. The Court explained that when a *Monell* claimant alleges that "a particular municipal action *itself* violates federal law, ... resolving ... issues of fault and causation is straightforward." *Id.* at 404, 117 S.Ct. 1382. "[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected **\*385** right *necessarily* establishes that the municipality acted culpably." *Id.* at 405, 117 S.Ct. 1382 (emphasis added). In the same way, when a legislative decision or an act of a final policymaker *itself* violates federal law, causation is clear and nothing more is needed; in that situation the act is *necessarily* the "moving force" behind the plaintiff's injury. *Id.*

Most *Monell* claims are more complicated, however, and Mrs. Glisson's claim is not in this straightforward category. She does not contend that Corizon's failure to promulgate formal protocols for chronically ill inmates *itself* violated the Constitution. My colleagues concede the point, acknowledging that Corizon's failure to adopt protocols for chronically ill inmates "does not [in itself] describe an Eighth Amendment violation." Majority Op. at p. 380. Where, as here, the challenged policy or custom is not itself unlawful, something more is required to establish corporate culpability and causation.

Helpfully, *Brown* contains further instructions for *Monell* claims like this one that do *not* rest on allegations that a municipal policy on its face violates federal law. This part of *Brown* begins with a warning that's worth repeating here. The Court cautioned that *Monell* claims "not involving an allegation that the municipal action itself violated federal law ... present much more difficult problems of proof." *Brown*, 520 U.S. at 406, 117 S.Ct. 1382. Difficulties arise because claims of this type necessarily rest on the theory that a municipal policy or custom, though not itself unconstitutional, nonetheless led to constitutional torts by municipal employees acting in accordance with it. *Monell* claims in this category blur the line between municipal liability and *respondeat superior* liability; the Court worried that the line would collapse in actual practice. *Id.* at 407– 08, 117 S.Ct. 1382. To guard against that risk, the Court instructed the judiciary to "adhere to rigorous requirements of culpability and causation" when evaluating *Monell* claims of this kind. *Id.* at 415, 117 S.Ct. 1382 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability.").

More specifically, the Court held that

> a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights *must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences.* A showing of simple or even heightened negligence will not suffice.

*Id.* at 407, 117 S.Ct. 1382 (emphasis added) (citation omitted) (internal quotation marks omitted). For this holding the Court drew on principles announced in its earlier decision in *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), which involved a claim that shift supervisors at a city jail were inadequately trained to recognize an inmate's need for psychiatric intervention. *Brown* described *Harris*'s holding this way:

> We concluded [in *Harris*] that an "inadequate training" claim could be the basis for § 1983 liability in "limited circumstances." [489 U.S.] at 387 [109 S.Ct. 1197]. We spoke, however, of a deficient training "program," necessarily intended to apply over time to municipal employees. *Id.* at 390 [109 S.Ct. 1197]. Existence of a "program" makes proof of fault and causation at least possible in an inadequate training case. *If a program does not prevent constitutional violations, municipal*

*decisionmakers may eventually be put on notice that a new program is called for.* Their continued adherence to an approach that they **\*386** know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability. ... In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the "moving force" behind the plaintiff's injury.

*Brown*, 520 U.S. at 407–08, 117 S.Ct. 1382 (emphasis added).

*Harris*, in turn, drew on *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). There a plurality of the Court observed that "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.* at 824, 105 S.Ct. 2427 (opinion of Rehnquist, J.) (footnotes omitted).

Together these decisions stand for the proposition that a *Monell* plaintiff's own injury, without more, is insufficient to establish municipal fault and causation. The plaintiff must instead present evidence of a pattern of constitutional injuries traceable to the challenged policy or custom—or at least more than one. Only then is the record sufficient to permit an inference that the municipality was on notice that its policy or custom, though lawful on its face, had failed to prevent constitutional torts. Put slightly differently, the plaintiff's own injury, standing alone, does not permit an inference of institutional deliberate indifference to a *known* risk of constitutional violations. "Nor will it be readily apparent that the municipality's action caused the injury in question, because the plaintiff can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action, rather than from some other intervening cause." *Brown*, 520 U.S. at 408–09, 117 S.Ct. 1382.

In short, except in the unusual case in which an express policy (or an act of an authorized policymaker) is *itself* unconstitutional, a *Monell* plaintiff must produce evidence of a series of constitutional injuries traceable to the challenged municipal policy or custom; the failure to do so means a failure of proof on the fault and causation elements of the claim. *Brown* is unequivocal on this point: If the plaintiff can point *only* to his own injury, "the danger that a municipality will be held liable without fault is high" and the claim ordinarily fails. *Id.* at 408, 117 S.Ct. 1382.

It's true that *Brown* and *Harris* do not foreclose the possibility that the requirement of pattern evidence might be relaxed in a narrow set of circumstances where the likelihood of recurring constitutional violations is an obvious or "highly predictable consequence" of the municipality's policy choice. *Id.* at 409–10, 117 S.Ct. 1382. Addressing the inadequate-training context in particular, *Brown* acknowledged the "possibility" that "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such violation, could trigger municipal liability." *Id.* at 409, 117 S.Ct. 1382. But the Court took great pains to emphasize the narrowness of this "hypothesized" exception:

> In leaving open [in *Harris*] the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, **\*387** *we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.* The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that [the] policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.
> *Id.* at 409–10, 117 S.Ct. 1382.

Despite the contextual language, I see no reason to think that this hypothetical path to liability in the absence of pattern evidence is open *only* in failure-to-train cases. So I agree with my colleagues that evidence of repeated constitutional violations is not *always* required to advance a *Monell* claim to trial. But it's clear that this path to corporate liability is quite narrow. If the plaintiff lacks evidence of a pattern of constitutional injuries traceable to the challenged policy or custom, *Monell* liability is not possible *unless* the evidence shows that the plaintiff's situation was a recurring one (i.e., not unusual, random, or isolated) and the likelihood of

constitutional injury was an obvious or highly predictable consequence of the municipality's policy choice. The Court's use of the terms "obvious" and "highly predictable" is plainly meant to limit the scope of this exception to those truly rare cases in which the policy or custom in question is so certain to produce constitutional harm that inferences of corporate deliberate indifference and causation are reasonable even in the absence of any prior injuries—that is, in the absence of the kind of evidence normally required to establish constructive notice.

Our cases have always followed this understanding of *Monell* doctrine. We have held that a gap in municipal policy can sometimes support a *Monell* claim. *See, e.g., Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). But we have also recognized that claims grounded on the failure to have a policy must be scrutinized with great care. *Calhoun*, 408 F.3d at 380 ("At times, the absence of a policy might reflect a decision to act unconstitutionally, but the Supreme Court has repeatedly told us to be cautious about drawing that inference." (citing *Brown*, 520 U.S. at 409, 117 S.Ct. 1382; *Harris*, 489 U.S. at 388, 109 S.Ct. 1197)).

And in all cases we have consistently required *Monell* plaintiffs to produce evidence of more than one constitutional injury traceable to the challenged policy or custom (unless, of course, the policy or custom is itself unconstitutional, in which case the singular wrong to the plaintiffs is clearly attributable to the municipality rather than its employees). *See, e.g., Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) (explaining that *Monell* claims "normally require evidence that the identified practice or custom caused multiple injuries"); *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (explaining that a *Monell* plaintiff "must show more than the deficiencies specific to his own experience" and allowing the claim to proceed based on a Department of Justice report documenting multiple instances of inadequate medical care in the jail); **\*388** *Dixon*, 819 F.3d at 348–49 (same); *Calhoun*, 408 F.3d at 380 (explaining that a *Monell* claim ordinarily "requires more evidence than a single incident to establish liability"); *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003) (same); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) (same); *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000) (A *Monell* plaintiff must show that "the policy itself is unconstitutional" or produce evidence of "a series of

constitutional violations from which [institutional] deliberate indifference can be inferred.").

Finally, following the Supreme Court's lead in *Brown* and *Harris,* we have left open the possibility that a *Monell* claim might proceed to trial based on the plaintiff's injury alone, but only in rare cases where constitutional injury is a manifest and highly predictable consequence of the municipality's policy choice. *See Chatham*, 839 F.3d at 685–86; *Calhoun*, 408 F.3d at 381. So far, we've allowed recovery under this exception only once, in a case involving a jail healthcare provider's failure to ensure that its suicide-prevention protocols were scrupulously followed. *See Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917 (7th Cir. 2004).

To be more specific, in *Woodward* a jail's private healthcare provider had guidelines in place for inmate suicide risk identification and prevention. *Id.* at 921. An inmate committed suicide 16 days after he was booked into the jail; his estate sued the corporate healthcare provider alleging a systemic failure to enforce compliance with the guidelines. *Id.* at 919–20. The evidence at trial established that the provider neither trained its employees on how to use the guidelines nor monitored their compliance with them, and in fact had long condoned widespread violations of the nominally mandatory procedures. *Id.* at 925–29. A jury returned a verdict for the estate and we affirmed. Although there was no evidence of prior suicides at the jail, we held that *Monell* liability was appropriate because inmate suicide is an obvious and highly predictable consequence of a jail healthcare provider's thoroughgoing failure to enforce its suicide-prevention program. *Id.* at 929.

This case is not at all like *Woodward*. While it's patently obvious that a systemic failure to enforce a jail suicide-prevention program will eventually result in inmate suicide, inmate death is not an obvious or highly predictable consequence of the alleged policy lapse at the center of this case. Mrs. Glisson claims that Corizon's failure to promulgate formal guidelines for the care of chronically ill inmates as required by INDOC Directive HCSD-2.06 caused her son's death. Everyone agrees that nothing in "the Constitution or any other source of federal law required Corizon to adopt the Directive[ ] or any other particular document." Majority Op. at p. 382. So *evidence* is needed to prove corporate culpability and causation; in the usual case, this means evidence of a series of prior similar injuries. But Mrs. Glisson presented no evidence that other inmates were harmed by the failure to have protocols in place as required by the Directive.

In the absence of prior injuries, Corizon was not on notice that protocols were needed to prevent constitutional torts. So Mrs. Glisson cannot prevail unless she can show that inmate death was an obvious or highly predictable consequence of the failure to promulgate formal protocols of the type specified in HCSD-2.06.

She has not done so. Her expert witness, Dr. Dianne Sommer, did not offer an opinion on the subject; the doctor's declaration states only that certain aspects of Nicholas Glisson's treatment fell below the standard of care. My colleagues insist that "[o]ne does not need to be an expert to know that **\*389** complex, chronic illness requires comprehensive and coordinated care." Majority Op. at p. 382. Perhaps not, but it's conceptually improper to frame the issue at that level of generality.

This is a complicated medical-indifference case. It's far from obvious that formal protocols of the sort required by Directive HCSD-2.06 were needed to prevent constitutional torts of the kind allegedly suffered by Nicholas Glisson. The Directive itself is entirely nonspecific. It contains only the following instructions: (1) "[o]ffenders with serious chronic health conditions need to receive planned care in a continuous fashion"; (2) chronic conditions must be identified and "a treatment plan must be established"; and (3) the treatment plan "should be maintained current" and "[a]s care needs change, the treatment plan should be updated." In other words: Have a treatment plan and update it as needed.

During discovery Mrs. Glisson asked Corizon to produce "all policies, procedures, and/or protocols relied on in developing the course of treatment for Nicholas Glisson." Corizon objected based on overbreadth and asked for a more targeted document request. Subject to the objection, Corizon gave this response: "Mr. Glisson's medical care and treatment at IDOC were based on standards of medical and nursing care, and generally were not dictated by written policies, procedures or protocols."

My colleagues do not explain how Corizon's adherence to professional standards of medical and nursing care amounts to deliberate indifference to a known or obvious risk of harm. More to the point, they do not explain how inmate death was an obvious or highly predictable consequence of Corizon's failure to promulgate protocols in compliance with the very loose and highly generalized instructions contained in Directive HCSD-2.06. Unlike the jail-suicide

case, it is neither self-evident nor predictable—let alone *highly* predictable—that Corizon's reliance on professional standards of medical and nursing care (instead of HCSD-2.06-compliant protocols) would lead to constitutional injuries of the sort suffered by Nicholas Glisson.

My colleagues say that the absence of formal protocols for chronically ill inmates created "a well-recognized risk" and "Corizon had notice of the problems posed by a total lack of coordination." Majority Op. at p. 382. No evidence supports these assertions. No expert testified that the standard of care requires a corporate healthcare provider to promulgate formal protocols on this subject, so the record doesn't even clear the bar for simple negligence. *Monell* liability requires proof of culpability significantly *greater* than simple negligence. It also requires evidence that Corizon's action—not the actions of its doctors and nurses—*directly* caused the injury. There is no such evidence here. Without the necessary evidentiary support, a jury cannot possibly draw the requisite inferences of corporate fault and causation. On this record, a verdict for Mrs. Glisson is not possible.

More broadly, by eliding the normal requirement of pattern evidence and relying instead on sweeping and unsubstantiated generalizations about the obviousness of the risk, my colleagues have significantly expanded a previously narrow exception to the general rule that a valid *Monell* claim requires evidence of prior injuries in order to establish corporate deliberate indifference and causation. The Supreme Court has instructed us to rigorously enforce the requirements of corporate culpability and causation to ensure that municipal liability does not collapse into vicarious liability. Today's decision does not heed that instruction.

**\*390** Nicholas Glisson arrived in Indiana's custody suffering from complicated and serious medical conditions. Some of Corizon's medical professionals may have been negligent in his care, as Dr. Sommer maintains, and their negligence may have hastened his death. That's a tragic outcome, to be sure; if substantiated, the wrong can be compensated in a state medical-malpractice suit. Under traditional principles of *Monell* liability, however, there is no basis for a jury to find that Corizon was deliberately indifferent to a known or obvious risk that its failure to adopt formal protocols in compliance with HCSD-2.06 would likely lead to constitutional violations. Nor is there a factual basis to find that this alleged gap in corporate policy caused Glisson's death. Accordingly, I would affirm the summary judgment for Corizon.

**All Citations**

849 F.3d 372

Footnotes

1   It is not entirely clear from the record on appeal when this offense took place. Glisson's arrest record indicates that he was arrested for dealing in a controlled substance on July 31, 2007, and was released the same day on a $25,000 bond. The next entry is on August 31, 2010—the day he was sentenced and entered custody. The sentencing information sheet gives him one day's credit for jail time. It thus appears that the incarceration at issue in this case was based on this three-year-old arrest.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.