Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION
3
    WILLIAM DUKES,                    )
4                                     )
              Plaintiff,              )
5                                     )
        v.                            )    17-CV-7095
6                                     )
    COOK COUNTY SHERIFF'S OFFICE;     )
7    THOMAS J. DART, in his           )
    official capacity as Sheriff     )
8    of Cook County, Illinois;        )
    COOK COUNTY, ILLINOIS;           )
9    MEDICAL DIRECTOR OF CERMAK       )
    HEALTH SERVICES OF COOK          )
10   COUNTY in his or her official    )
    capacity; DIRECTOR OF            )
11   NURSING OF CERMAK HEALTH         )
    SERVICES OF COOK COUNTY, in      )
12   his or her official capacity;    )
    M. ADDISON; E. ALTMAN;           )
13   J. ARIAS; M. BOZYK;              )
    N. BUCHANAN-SMITH; R. FOSTER;    )
14   C. GALINDO; J. MERAZ;            )
    W. PARTEE; Z. PERRY;             )
15   A. QURESHI; W. RIVERA;           )
    J. RODRIGUEZ; D. SALMON;         )
16   S. TAYLOR; J. TORRES;            )
    L. TORRES; C. ANDREWS;           )
17   A. BLOODWORTH; Q. DUNMARS;       )
    P. GREEN; S. JAMES; L. LOCKE;    )
18   S. PRATT; and D. TRIPLETT;       )
                                     )
19             Defendants.           )
    _____)
20
21
                    DEPOSITION OF
22
              DAN JAMES FINTEL, M.D.
23
                  April 17, 2023
24
25

Exhibit A

Page 2

1  The deposition of DAN JAMES FINTEL, M.D., taken
2  on behalf of the plaintiff in the above-entitled
3  case before Debra L. Kleszyk, a Certified
4  Shorthand Reporter within and for the State of
5  Illinois, taken remotely via videoconference on
6  April 17, 2023, commencing at 1:07 p.m., pursuant
7  to the Federal Rules of Civil Procedure. The
8  witness was located at Suite 600, 676 North
9  St. Clair, Chicago, Illinois.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                  I N D E X
2
3  WITNESS: DAN JAMES FINTEL, M.D.
4  EXAMINATION                          PAGE
5   By Ms. Kott                   6, 75, 90
6   By Mr. Radunsky               61, 86, 93
7
8
9
10           INDEX OF EXHIBITS
11  EXHIBIT      DESCRIPTION              PAGE
12  Exhibit 1      report                    6
13  Exhibit 2      curriculum vitae          9
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1         A P P E A R A N C E S
2
3  MAUCK & BAKER, LLC
   BY:  MS. JUDITH A. KOTT
4  One North LaSalle Street, Suite 600
   Chicago, Illinois 60602
5  (312) 332-2400
   jkott@mauckbaker.com
6
      Appeared via videoconference on behalf
7   of Plaintiff
8
9
   DeVORE RADUNSKY, LLC
10  BY:  MR. TROY S. RADUNSKY
       MS. ELLEN HODES
11  230 West Monroe Street, Suite 230
   Chicago, Illinois 60606
12  (312) 300-4479
   tradunsky@devoreradunsky.com
13
      Appeared via videoconference on behalf
14   of Defendants
15
16
17
18
19
20
21
22
23
24
25

Page 5

1         THE COURT REPORTER:  My name is
2  Debbie Kleszyk.  I am an Illinois Certified
3  Shorthand Reporter.
4         The parties participating in this
5  deposition acknowledge that I am not physically
6  present in the room with the witness and that I
7  will be reporting this deposition remotely.  At
8  this time I ask counsel to indicate your
9  stipulation to waive any objections to the
10  validity of the oath administered remotely,
11  starting with the noticing attorney.
12         MS. KOTT:  Yes.  Judith Kott.  Agreed.
13         MR. RADUNSKY:  Troy Radunsky for the
14  defendant.  We also agree.
15             (The witness was duly
16              sworn.)
17         DAN JAMES FINTEL, M.D.,
18  called as a witness herein, having been
19  first duly sworn, was examined and
20  testified as follows:
21         MS. KOTT:  Thank you.
22         Let the record reflect that this is
23  the discovery deposition of Dr. Dan Fintel.  This
24  deposition is being taken pursuant to notice, the
25  Illinois Code of Civil Procedure, and all the

Page 6

1 other applicable Illinois rules.
2          EXAMINATION
3          BY MS. KOTT
4     Q.   Doctor, actually, before I go into --
5 well, first state your name for the record.
6     A.   Dan James Fintel. F-i-n-t-e-l.
7     Q.   And before this deposition did you
8 review some documents?
9     A.   I did.
10    Q.   And what were those documents you
11 reviewed?
12    A.   Well, I have page one of my summary
13 report in front of me, and that sets out the
14 materials that were sent to me by Mr. Radunsky and
15 his firm that I reviewed. And, you know, I can
16 read those separately into the record or you can
17 adopt my report --
18    A.   Well, actually, I did give the court
19 reporter a copy of your report.
20          Could you mark that as Exhibit 1.
21 Fintel Exhibit 1.
22          (Fintel Deposition
23           Exhibit 1 was marked
24           for identification.)
25          / / /

Page 7

1 BY MS. KOTT:
2     Q.   So included in that report, Doctor, it
3 indicates some records reviewed. Do you want to
4 indicate for the record what those records are you
5 reviewed?
6     A.   You want me to read --
7     Q.   Yes.
8     A.   -- all those records into the record?
9     Q.   Yes.
10    A.   Fine. Plaintiff's third amended
11 complaint. The Cook County medication
12 distribution policy. The 2012 to 2014 Pontiac
13 prison medical records. The 2014 through 2018
14 Livingston County Jail medical records. Cermak
15 medical records. St. Francis hospital records.
16 UIC hospital records. And records of Swedish
17 Covenant, including the echocardiogram of
18 Dr. Tarabey, T-a-r-a-b-e-y.
19          Continuing on with the second half
20 of the list. The WIDU/PCC Community Wellness
21 Center, including the records of Dr. Paek,
22 P-a-e-k. Loyola University records, including
23 those of Dr. Darki, D-a-r-k-i, the head of
24 interventional cardiology at Gottlieb.
25          Plaintiff's, quote, missing doses

Page 8

1 spreadsheet, which you put together, and
2 settlement demand letter. Plaintiff's deposition;
3 that's from Mr. Dukes. And three depositions
4 exhibits -- and exhibits of Dr. Paek, Tarabey, and
5 Darki.
6          MR. RADUNSKY: And, just for the
7 record, Judith, I mean, you can call the missing
8 dose spreadsheet whatever you want. I mean,
9 that's what Kirstin called it. So, you know, you
10 can call that whatever. It's what came with your
11 settlement demand letter.
12          MS. KOTT: Right.
13 BY MS. KOTT:
14    Q.   And would you agree that in that
15 missing dose spreadsheet that came with the
16 settlement demand letter that included in that
17 there's nothing called ACCUflo records? Correct?
18    A.   The -- correct. The ACCUflo records
19 were not included within that spreadsheet, that
20 data.
21    Q.   And, I'm sorry, go ahead. Was there
22 anything else --
23    A.   I was going to say, and I did review
24 the ACCUflo records before the judge had his order
25 of not including them as admissible within the

Page 9

1 case. But in -- and my opinions will be based not
2 upon the review of the ACCUflo records.
3     Q.   Great.
4     A.   And I'll explain that in greater --
5     Q.   And that's what I was going to ask you
6 next.
7     A.   -- detail later.
8          MR. RADUNSKY: Thanks for making that
9 clear.
10          MS. KOTT: Yes. I just wanted to make
11 that clear for the record given that we have an
12 order prohibiting the discussion of ACCUflo
13 records.
14          MR. RADUNSKY: We do. We absolutely
15 agree with that, Judith, 100 percent.
16          MS. KOTT: Okay. Could you please
17 mark the doctor's CV as Exhibit 2.
18          (Fintel Deposition
19           Exhibit 2 was marked
20           for identification.)
21 BY MS. KOTT:
22    Q.   So, Doctor, where do you currently
23 work?
24    A.   I work for Northwestern Medicine at
25 Northwestern Memorial Hospital. And I'm giving

3 (Pages 6 - 9)

Page 10

1 this deposition from my academic office on the
2 sixth floor of one of the many buildings of the
3 Northwestern Medicine campus at 676 North
4 St. Clair.
5     Q. And are you -- in your deposition
6 today, are you referring to any documents in front
7 of you?
8     A. I have my computers which have the
9 Dukes file, which have all these records in them
10 digitally. The only paper, I actually have a
11 printout of my report, which I'm holding up to the
12 camera. Everything else is all digitally present
13 in front of me.
14     Q. Okay. And what is your title there at
15 Northwestern?
16     A. Professor of medicine in the medical
17 school and senior attending at the hospital.
18     Q. How long have you had that job?
19     A. Well, I've been at Northwestern since
20 1985 when I arrived after my fellowship. And I've
21 risen through the academic ranks from associate in
22 medicine to assistant professor to associate
23 professor and then professor, and that was
24 probably more than ten years ago.
25         I've also held a number of

Page 11

1 administrative positions including director of the
2 coronary care unit, director of quality assurance
3 for the department of medicine, and chairman of a
4 number of committees over the years. But
5 currently now I'm not active in administration,
6 although I'm in several committees.
7         And I'm a member of the clinical
8 faculty at Northwestern.
9     Q. Thank you. And what are some of your
10 duties at that place of employment?
11     A. I have both extensive clinical duties
12 and academic duties. And let me just divide them
13 for you so you understand how I spend my month,
14 year, whatever.
15         About 80, 85 percent of the time
16 I'm directly involved in clinical care. And that
17 clinical care might include attending in the
18 coronary care unit or in the observation unit
19 which I do for about 16 weeks per year roughly.
20 And that's a seven-day-a-week job when I round
21 every day with the teams at those locations and
22 I'm the attending for all of the patients.
23         I also have a very busy outpatient
24 practice. I probably have more than 1200
25 outpatient visits a year across the street in the

Page 12

1 Galter 19th floor cardiology clinic where I see
2 patients who come in both locally from the Chicago
3 area, nationally, and some international patients.
4 I have a very busy outpatient practice.
5         I also am a nuclear cardiologist,
6 so I perform and interpret more than a thousand
7 nuclear scans per year. I'm a board-certified
8 nuclear cardiologist. I also perform and
9 interpret many thousands of electrocardiograms
10 every year, probably more than 20,000. I read two
11 to three days a month 200 EKGs for the hospital
12 digitally. And I also read EKGs on all my
13 patients in the unit. I do consults.
14         And that would summarize my
15 clinical activities here at Northwestern.
16         My academic duties have to do with
17 overseeing clinical trials, which are enumerated
18 in my curriculum vitae. I'm not as busy doing
19 that now. It's 10 or 15 percent of my time. And
20 I have done research trials in a number of areas
21 of clinical cardiology, all of which are
22 summarized in my curriculum vitae.
23         And I also teach. I teach via
24 lectures, seminars, and, at the bedside, medical
25 students, medical interns, residents, fellows, and

Page 13

1 visiting cardiologists from other institutions.
2         I also give lectures throughout the
3 country. It used to be, before COVID, throughout
4 the world, but I haven't been in any international
5 meetings since COVID. But that's starting up
6 again. And I'm an invited lecturer in a number of
7 locations, and I speak in multiple areas of
8 cardiology.
9     Q. It's an impressive background, Doctor.
10     A. Thank you.
11     MR. RADUNSKY: Sure.
12 BY MS. KOTT:
13     Q. Where did you attend school?
14     A. Well, my formative years were right
15 here in Illinois. I went to Evanston Township
16 High School where I'm proud to say it was the
17 number one high school in the country at that time
18 and I was very well prepared for my next level of
19 education which was at Yale College where I
20 graduated with -- magna cum laude with a degree,
21 a Bachelor of Science, in molecular biophysics and
22 biochemistry. Before it became a popular major,
23 it was for the brave few at that time in 1971
24 through '75 when I was attending.
25         I then traveled to Boston where I

4 (Pages 10 - 13)

Page 14

1 attended Harvard Medical School in the Harvard-MIT
2 program in health, science, and technology. And I
3 graduated in 1979 from Harvard Med with a degree
4 of Doctor of Medicine also magna cum laude based
5 on my research activities and thesis that I wrote.
6         I then stayed on the East Coast and
7 traveled to New York City where I completed a
8 three-year residency in internal medicine at the
9 Mount Sinai Hospital in Manhattan and then to
10 Baltimore for another three years, culminating in
11 1985 when I was trained in cardiology and took my
12 boards in cardiology in 1985.
13         My final boards -- or second --
14 penultimate were in critical care medicine. I
15 took those boards when I was attending here
16 already at Northwestern and took and passed them
17 in 1987 but haven't retaken those because I didn't
18 need them for my current position.
19         My final boards were in nuclear
20 cardiology which I took and passed some years
21 later and then retook, when I had to, 10 or 12
22 years later.
23     Q.   So in addition to the Doctor of
24 Medicine -- what year was that you received it?
25     A.   The M.D. degree was '79. The B.S.

Page 15

1 Degree in '75. The completion of internal
2 medicine in '82. And the completion of cardiology
3 in '85.
4     Q.   Okay.
5     A.   So I'm a 20th Century person.
6         MR. RADUNSKY: I was going to say that
7 makes you 35 years old. Right?
8         THE WITNESS: Exactly. I just
9 celebrated a birthday double that last week
10 actually.
11 BY MS. KOTT:
12     Q.   Have you taught any medical classes?
13     A.   Have I taught?
14     Q.   Yes.
15     A.   Oh, yes.
16     Q.   And, if so, what and when?
17     A.   For --
18     Q.   Cardiology.
19     A.   For about 12 years, I taught to the
20 Northwestern medical students the lectures on
21 acute myocardial infarction and acute myocardial
22 ischemia, cardiac diagnostic tests like stress
23 tests, EKGs, and scans, and cardiovascular
24 pharmacology. I gave those lectures for I think
25 maybe 12 years or so and up until 3 years ago.

Page 16

1 And then one of my former students, who's now on
2 the faculty and just a pleasure, she's taken over
3 that task from me. But I do get invited to give
4 lectures every once in a while to the residents.
5 I do that several times per year. And to the
6 fellows I give cardiology grand rounds.
7     Q.   Okay. Are you a member of my
8 professional associations?
9     A.   I am. I'm a fellow at the American
10 College of Cardiology. I'm a fellow of the
11 American College of Physicians. That's for
12 internists. I think I'm still a fellow, but I
13 don't know if I've paid my dues, of the American
14 College of Chest Physicians. I'm a member of the
15 American Heart Association, a professional member,
16 and I've served on a number of committees. Those
17 are the organizations that come to mind. And I
18 know that gets into dues that I pay as well to
19 maintain --
20     Q.   Have you received --
21     A.   -- my membership.
22     Q.   -- any honors or awards?
23     A.   Yes. Those are listed in my
24 curriculum vitae. I received honors at every
25 level of my training, honors at Yale and Harvard,

Page 17

1 and honors in fellowship for the research that I
2 did and honors at Northwestern for clinical
3 service and clinical excellence. And for the
4 last, I don't know, five or seven years, I've
5 received teaching distinction honors every year.
6 I have a little round badge to show for it, but I
7 keep it in my drawer because it would make me look
8 military on my white coat.
9     Q.   Do you specialize in any particular
10 field?
11     A.   Within the general area of cardiology,
12 I'm a critical care cardiologist, I'm a nuclear
13 cardiologist, and I'm an expert in lipid
14 management and hypertension management, both
15 problems that Mr. Dukes has had.
16     Q.   What specific training did you have in
17 your area of your specialty?
18     A.   That specific training was at
19 Johns Hopkins for cardiology. A number of courses
20 I've either taught at or participated in over the
21 last 35 years. I regularly go to national
22 meetings and attend seminars in those meetings to
23 keep up-to-date. And I lecture in a lot of these
24 areas as well at Northwestern and elsewhere.
25     Q.   Do you have any publications or

5 (Pages 14 - 17)

Page 18

1  research?
2      A.   Those are listed in my curriculum
3  vitae, yes.
4      Q.   And what about licenses, what licenses
5  do you possess?
6      A.   I currently only am licensed in
7  Illinois. I had been licensed in Wisconsin when
8  I was a camp doctor for my kid's camp. I also
9  was licensed in Maryland when I trained in
10  Johns Hopkins, New York City when I trained in
11  New York, and New Jersey when I moonlit in
12  New Jersey while I was a resident in New York.
13  Those are the only licenses I've held. But the
14  only current one is Illinois.
15      Q.   And do you have any board certifica-
16  tions?
17      A.   I do. And, in order, those board
18  certifications: internal medicine in 1982,
19  cardiology in 1985, critical care medicine in
20  1987, and nuclear cardiology sometime in the
21  1990s.
22      Q.   Okay. Would you agree that all your
23  previous places of employment are listed in your
24  CV, Doctor?
25      A.   Yes.

Page 19

1      MR. RADUNSKY:  Yeah, I mean, Judith,
2  I don't know what you're putting on the screen
3  because, I mean, I haven't seen it, but I'm
4  assuming --
5      MS. KOTT:  It's the same CV that was
6  -- the only reason why -- and can we go off the
7  record a minute?
8      MR. RADUNSKY:  Of course.
9         (A discussion was held off
10           the record.)
11      MS. KOTT:  Back on the record.
12  BY MS. KOTT:
13      Q.   Did you describe in your CV any
14  technical or scientific studies that you
15  conducted?
16      A.   They're not described in the CV. The
17  title of the research is there, but, beyond that,
18  there's no paragraph explanation of what the goal
19  of a particular research project is, no.
20      Q.   Were any of those studies related to
21  heart, cardiology?
22      A.   All of them were.
23      Q.   Okay. Has your work been peer
24  reviewed?
25      A.   Yes. All of the -- in the section

Page 20

1  that's called peer-reviewed journals, peer-
2  reviewed articles, all of those are peer-reviewed
3  publications. There's other areas of my CV where
4  I list nonpeer-reviewed summaries I've written for
5  laypeople, journalists, et cetera. But the
6  publications in the peer-reviewed section are all
7  peer reviewed.
8      Q.   Okay. So, in coming here today to
9  render an opinion, did you receive some money from
10  defense counsel?
11      A.   Not --
12      MR. RADUNSKY:  Objection to the form
13  of the question.
14         You can answer.
15      THE WITNESS:  I have received one
16  check so far which reflected an initial invoice
17  that was sent in the fall, maybe in November of --
18  I don't have it in front of me -- of 2022. There
19  was another invoice that was sent a month or so
20  ago. And then there will be a larger invoice
21  reflecting a further review to prepare for the
22  deposition, interactions I've had with
23  Mr. Radunsky. And that I haven't put together
24  yet, but I have a billing person who does that.
25  And, of course, as soon as that's put together,

Page 21

1  that will be sent to you through Mr. Radunsky.
2  But I put -- I've probably invested somewhere
3  between 20 and 30 hours in this case to date.
4  BY MS. KOTT:
5      Q.   All right. And have you ever
6  testified as an expert or given a report for
7  Mr. Radunsky's law firm before?
8      A.   No. In fact, the first time we met
9  was on the telephone and then in a Zoom meeting we
10  had to discuss my findings. I've never worked
11  with his firm before. And I don't know how he
12  came about knowing about me. But that was our
13  first interaction.
14      Q.   And what is your experience just sort
15  of broadly, not in specifics, but what is your
16  experience as it relates to, you know, giving
17  expert reports in litigation?
18      A.   I have very extensive experience
19  starting from 1988. And I'm just estimating, and
20  that's what I've said in other depositions, but I
21  think I've been involved in more than 700 cases.
22  I review two to three new cases a month.
23         The cases are primarily medico-
24  legal, but I've also done cases having to do with
25  incarcerated individuals who have suffered or

Page 22

1  allegedly suffered certain harms. And I've
2  commented on both sides regarding cardiovascular
3  issues. I limit my opinions to cardiology and
4  cardiovascular issues. I've done some workers'
5  comp cases. I do about five to ten of those per
6  year generally supporting the employer but
7  sometimes the worker.
8          I did mention that the general
9  breakdown of the work that I've done is about
10 two-thirds defense cases, it's an estimate,
11 one-third plaintiff cases. And then the state of
12 Illinois, I do just about all defense cases in
13 Illinois.
14         And I've done a little bit of
15 worker's liability, and I've done a few patent
16 cases as well in which there were patent
17 challenges to establish drugs.
18     Q.  So when you're talking about your
19 experience, about 700 cases, how many of those
20 were in Illinois?
21     A.  Of the medical mal cases, I would say
22 between 50 and 70 percent have been Illinois. The
23 rest are throughout the rest of the country.
24     Q.  And of those 50 to 70 percent in
25 Illinois, how many of those opinions have been for

Page 23

1  incarcerated individuals in Illinois?
2      A.  In the last 20 years, I think I've
3  done one or two cases in federal court having to
4  do with issues of alleged police brutality or
5  choking during arrest and what happened to the
6  individual. The answer to your question is
7  probably three or four cases. I don't remember
8  the names right off the bat. And some were
9  federal. I'm wondering if any of them was state.
10 The ones that stick in my mind are federal because
11 I've testified in federal court.
12     Q.  So, if I'm understanding you
13 correctly, out of the 50 to 70 percent for which
14 you gave an expert opinion, three or four of those
15 were for incarcerated individuals. Right?
16     A.  Yes. Literally a handful.
17         And I testified in federal court
18 three months ago in Michigan, in Lansing, the
19 capital of Michigan, on behalf of a plaintiff who
20 died in jail due to alcohol withdrawal delirium
21 that was not properly responded to by the jail
22 staff.
23     Q.  But in Illinois all of those have been
24 on behalf of the defendant for incarcerated
25 individuals. Correct?

Page 24

1      A.  No. I think of the very few, there
2  were several on behalf of the police that were
3  alleged to have harmed someone. One or two were
4  on behalf of the injured person who expired in
5  jail due to cardiac arrest. So I was on both
6  sides of those cases. And I suppose if you look
7  up one of the court reporter databases you can
8  look me up in those cases.
9      Q.  Given your best estimate, would you
10 say that half of those, the expert opinion, was
11 for defendant and half for plaintiff or three-
12 quarters for defendant and a quarter for
13 plaintiff?
14     A.  Well, since there were only three or
15 four cases, Ms. Kott, it was pretty evenly split.
16 When we talk medical mal, of general medical mal
17 cases, then the numbers were much, much greater,
18 and that's where my two-thirds/one-third split
19 defense to plaintiff. But in the handful of
20 incarceration cases, I think there were a few on
21 each side.
22     Q.  Okay. How would you describe standard
23 of care?
24     A.  The standard of care is the medical
25 decisions made by a reasonably well-trained

Page 25

1  individual practicing within the general standards
2  of the community. Standard of care doesn't mean
3  best care. Standard of care means acceptable care
4  within the standards of that medical community.
5      Q.  Would you agree that a proper standard
6  of care for a medical doctor is to ensure that
7  prescription medication is filled and given to
8  patients as prescribed?
9      A.  Yes.
10     Q.  In your experience as a senior
11 attending cardiologist at Northwestern -- or
12 Northwest Memorial Hospital, is it your
13 expectation that when you order a prescription for
14 medication that the prescription will be
15 immediately filled and given to the patient?
16     A.  It depends on the clinical situation.
17 Some medications need to be given stat or
18 immediately in the next few minutes. Others we
19 start within the next few days based on the
20 clinical situation. Some we plan to start in the
21 future based on how the patient is doing with
22 other medications. So it all depends on the
23 clinical situation. But it ranges from immediate
24 to several weeks or months.
25     Q.  When you prescribe certain dosages of

7 (Pages 22 - 25)

Page 26

1 heart medication for a patient, is there a reason
2 that you fill out the prescription?
3     A.   Of course.  The doctor needs to
4 specify the name of the medication, the route of
5 administration, the dose of the medication, and
6 the frequency of the medication.  Those are all
7 essential parts of a prescription.
8     Q.   And is there an expectation as a
9 medical doctor that the prescription will be
10 filled?
11     A.   Yes.
12     Q.   And that it will be filled during the
13 time frame as indicated on the prescription?
14     A.   Yes.
15     Q.   As a senior attending cardiologist at
16 Northwest Memorial Hospital, how do you react when
17 you find out that prescriptions for medications
18 that you have ordered have not been filled?
19     A.   It depends on the response of the
20 patient.  It depends on who is at fault.  Is it
21 that the patient received the sheet of paper or
22 the electronic prescription and chose not to get
23 it filled?  That happens sometimes.  Sometimes
24 it's a misadministration by a pharmacy.  I've been
25 involved in misadministration cases with Walgreens

Page 27

1 and others on both sides in which there's an
2 allegation of harm due to the filling of the wrong
3 pill or the wrong dose of the pill, the wrong
4 route of administration.  So it's -- there are
5 many steps along the pathway that can lead to
6 failure of the patient getting their medication,
7 some related to the patient, some related to the
8 system in which the patient is receiving their
9 medical care.
10     Q.   Okay.  And, just for phraseology, when
11 I say "to a reasonable degree of medical
12 certainty" today, it means to a reasonable degree
13 of medical certainty within the field of
14 cardiology, if we can all agree to that.
15     MR. RADUNSKY:  Yeah.
16     THE WITNESS:  Yes.
17     MS. KOTT:  Okay.  Good.
18 BY MS. KOTT:
19     Q.   So, to a reasonable degree of medical
20 certainty, would you agree that it is a reasonable
21 expectation of a cardiology patient that when he
22 or she learns that he has been prescribed
23 medication that there is a reason for that
24 prescribed medication and that the prescribed
25 medication needs to be filled right away or as

Page 28

1 necessary in the prescription and that it's
2 necessary for his -- his or her health?
3     MR. RADUNSKY:  I just object to the
4 form of the question.  I'm not sure I understand
5 it.
6     Dr. Fintel, you can answer it, of
7 course.
8     THE WITNESS:  As I testified just a
9 few minutes ago, I believe it's a reasonable
10 expectation that a patient will fill a prescrip-
11 tion given to then and will take it as ordered,
12 yes.
13 BY MS. KOTT:
14     Q.   Okay.  And, to a reasonable degree of
15 medical certainty, what would your response be if
16 the prescriptions you ordered were not filled
17 57 percent of the time and not given to the
18 patients as prescribed?
19     MR. RADUNSKY:  Just object to the
20 form.  Foundation.  I think it assumes facts not
21 in evidence.
22     You can answer.
23     THE WITNESS:  I was going to say for
24 the record in my answer I don't agree with the
25 premise of that question in this particular case.

Page 29

1     But assuming that medications
2 were not filled 57 percent of the time or only
3 57 percent of the time, depending on the time
4 lapsing between medication administration and
5 depending on the type of pill, there is the
6 potential for harm.  That doesn't mean that harm
7 will occur.  It all depends on the patient, the
8 drug, and how that medication is actually
9 administered.
10 BY MS. KOTT:
11     Q.   To a reasonable degree of medical
12 certainty, what is your opinion regarding whether
13 the medications prescribed and the specific
14 dosages were appropriate in this case?
15     MR. RADUNSKY:  Before you answer,
16 Dr. Fintel, and, Judith, we can just agree you
17 don't have to preface every question "to a
18 reasonable degree of medical certainty."  We can
19 have Dr. Fintel, if he wants, have all his
20 opinions be to a reasonable degree of medical
21 certainty --
22     MS. KOTT:  Okay.
23     MR. RADUNSKY:  -- unless he tells you
24 that they're not.  And that way I think your
25 questions will be smoother.

8 (Pages 26 - 29)

Page 30

1    MS. KOTT: Yeah. If Dr. Fintel agrees
2 to that, that's certainly fine.
3    MR. RADUNSKY: Dr. Fintel?
4    THE WITNESS: Agreed.
5    MR. RADUNSKY: Okay.
6    THE WITNESS: I do. And when I can't
7 answer to a reasonable degree of medical
8 certainty, I will state that.
9    MR. RADUNSKY: That's great. I
10 appreciate that.
11    Judith, I didn't mean to interrupt.
12 Can you re-ask your question?
13    Or, Debbie, can you ask it --
14    MS. KOTT: That streamlines it.
15    MR. RADUNSKY: Yeah. That's what I
16 was trying to do. No problem. I just forgot your
17 last question.
18    Debbie, if you can find it and you
19 want to read it before I went off on a tangent,
20 that would be great.
21    (The following question
22    was read back:
23    "Q. To a reasonable
24    degree of medical
25    certainty, what is your

Page 31

1    opinion regarding whether
2    the medications prescribed
3    and the specific dosages
4    were appropriate in this
5    case?")
6    THE WITNESS: The medications that
7 were prescribed were all appropriate. He was
8 prescribed aspirin whose purpose is to block
9 platelet activation and help prevent stroke or
10 heart attack. He was prescribed a beta blocker
11 known as metoprolol whose purpose is to lower
12 blood pressure, lower heart rate, and improve the
13 mismatch between supply and demand that patients
14 with coronary artery disease have. And certainly
15 Mr. Dukes had coronary artery disease. He was
16 prescribed a statin medication whose purpose is to
17 lower cholesterol. And, from what I could see,
18 most of the time it was atorvastatin,
19 a-t-o-r-v-a-s-t-a-t-i-n, and that's the world's
20 most commonly prescribed cholesterol-lowering
21 medication. And there were other noncardiac
22 medications he was prescribed that I won't be
23 commenting on. But those are all appropriate and
24 part of the standard of care.
25    ///

Page 32

1 BY MS. KOTT:
2    Q. And what percentage of statin had he
3 been prescribed during the time frame that's the
4 basis of this deposition today?
5    A. I'm sorry, I don't understand the
6 question by "what percentage of."
7    Q. Well, okay, so what I'm saying is
8 we're talking about a time frame of roughly
9 between 2015, 2015 to 2017, in our discussion
10 today for your deposition. And what I'm asking is
11 of the records that you reviewed for which he was
12 prescribed, of atorvastatin what was the amount
13 that he was prescribed?
14    A. Oh, the dose?
15    Q. The dose. Sorry. Like 40, 20, 10.
16    A. I don't have the dose in my records.
17 I thought it was 10 or 20. I'm not sure. The
18 dose of atorvastatin ranges from 10 to 80. We
19 tend to use 80 more commonly. But I didn't
20 indicate dose in my notes, so I don't know that
21 number. I don't want to guess. If you want to
22 show me, you know, one of the prescriptions, then
23 I can comment on the appropriateness of that
24 dose. But anywhere from 10 to 80 would have been
25 appropriate.

Page 33

1    Q. So you were aware that he had a stent
2 put in him in the past. Is that right?
3    A. His first incarceration at Pontiac was
4 in 2012, and he sustained a posterolateral
5 myocardial infarction at which time he received a
6 stent for one of his coronary arteries at that
7 time, yes.
8    Q. Okay. In your review of the records,
9 do you know what arteries that he received a stent
10 in?
11    A. I thought it was the circumflex. And
12 then he went on to have an infarct in the left
13 anterior descending in May of 2020 at Loyola.
14    MR. RADUNSKY: Can you spell that?
15 Circumflex? Is it circumflex like it sounds?
16    THE WITNESS: c-i-r-c-u-m-f-l-e-x.
17    If you want to flash up the cath
18 report, I can elaborate on that to a greater
19 degree. That was in 2012, an unrelated
20 incarceration, myocardial infarction.
21 BY MS. KOTT:
22    Q. Okay. Is it standard practice as a
23 doctor that once a stent has been put into a
24 cardiac patient that the statin dose is higher at
25 first right after the stent and then gets lower

9 (Pages 30 - 33)

Page 34

1  over time?
2      A.   Actually, we've stopped lowering the
3  dose.  Now we keep the patient on a high dose
4  indefinitely.  Not all practitioners were doing
5  that in 2015, '16, and '17, and I'm not
6  criticizing them if they didn't.  But we tend to
7  keep statin doses high forever once a stent has
8  been put in.  Not all practitioners do that.  But
9  that's most common.
10     Q.   And what is the reason for having the
11 dose high?
12     A.   Because we think it has more of an
13 anti-atherosclerotic effect at a higher dose than
14 at a lower dose.
15     Q.   One second here.
16     A.   Sure.
17     Q.   Would you agree that if a patient
18 received his prescribed heart medication approxi-
19 mately only 40 percent of the time that would be
20 considered to be below the standard of care?
21         MR. RADUNSKY:  Just object to form and
22 foundation.  It assumes facts not in evidence.
23 It's a hypothetical.
24         You can answer.  Go ahead.
25         THE WITNESS:  Again, I want to make

Page 35

1  clear in answering the question that I strongly do
2  not believe that his medications were only
3  prescribed 40 percent of the time and in that this
4  individual frequently returned to Livingston jail
5  where between 2015 and 2019 he spent most of his
6  time.  It was only a small time spent in the Cook
7  County jail generally for several days to two
8  weeks at a time.  There was one 94-day period from
9  the end of 2015, I think November, to the
10 beginning of 2016.
11         But, in some patients, not taking
12 medications contiguously for months could have a
13 deleterious effect.  I say could have.  We have no
14 definite scientific study that brief interruptions
15 in guidelines-prescribed therapy have any
16 increased likelihood of a heart attack or a
17 stroke.  And, in fact, we have very clear data in
18 this case, as evidenced by the stress test that
19 was performed I think January 8 at Loyola of 2020,
20 that there was no provocable ischemia, left
21 ventricular function was normal, and he had not
22 suffered any harm during the period of time during
23 his incarceration from 2012 through 2019 as
24 evidenced by the echocardiogram and the stress
25 test.  So there could be a potential for harm, but

Page 36

1  there was absolutely no harm in this individual.
2          Had he been admitted to the
3  hospital with a heart attack, say, at the end of
4  2015 or 2016 at a time in which Plaintiff alleges
5  he wasn't receiving his medications, then a
6  reasonable relationship cause and effect would be
7  established between an untoward outcome early in
8  2016 and the alleged withholding of medications in
9  the last few weeks of 2015.  But those aren't the
10 facts in evidence.
11 BY MS. KOTT:
12     Q.   So you mentioned that he had taken a
13 stress test and an echocardiogram.  Is there any
14 indication that he had a calcium score, anything
15 indicating the function of calcium in his heart?
16     A.   Well, I don't have calcium scores in
17 my notes.  But I would expect his calcium score to
18 be quite high.  He had multivessel coronary
19 disease.  This man had a stent in 2012 and then
20 required another stent in 2020 in May when he had
21 his anterior myocardial infarction.  So I would
22 expect his calcium score to be quite high.
23     Q.   And what does a calcium score
24 indicate, a high --
25     A.   That athero --

Page 37

1      Q.   Rather, let me rephrase.  What does a
2  high calcium score indicate?
3      A.   That atherosclerosis is present.
4  There's not a direct relationship between the
5  number of narrowings and the location of the
6  narrowing in a calcium score itself.  You can have
7  a moderately high calcium score and no lesion
8  greater than 50 percent or a moderately low
9  calcium score and a 99 percent lesion.  But having
10 elevated calcium is a marker for coronary artery
11 disease, which he clearly had.
12     Q.   Would you agree that -- let me strike
13 that.
14         How would you define anxiety?
15     A.   Anxiety is a clinical state in which a
16 person has internal and external manifestations of
17 anxiousness, of feeling unwell, nervous, unsure of
18 what's going to happen to them.  I'm not a
19 psychiatrist, but that's how I think about it as a
20 cardiologist.
21     Q.   Okay.  That's fair.  And would you
22 agree that anxiety is harmful?
23     A.   No.  It all depends on the degree and
24 severity of anxiety.  The reality is, living in
25 our modern world, most of us experience anxiety

Page 38

1 symptoms sometimes during the week, some people
2 more than others. And a moderate level of anxiety
3 is, unfortunately, part of modern-day living.
4 Is there a direct relationship
5 between anxiety and myocardial infarction? The
6 relationship is relatively tenuous, and one would
7 have to quantify the degree of anxiety that the
8 patient is having.
9 Q. Are events which cause a patient
10 anxiety generally good?
11 A. It depends on the event. If the
12 anxiety has to do with, say, hoping to be released
13 from incarceration and then the patient is
14 released from incarceration, that can have
15 beneficial effects for the individual. Different
16 individuals perceive, describe, and experience
17 anxiety in different ways.
18 Q. In your practice you said you've had
19 an outpatient practice for how long, Doctor?
20 A. From the day I came at Northwestern.
21 Obviously it's grown in volume --
22 Q. Sure.
23 A. -- since I've come. And being listed
24 as one of Chicago's outstanding cardiologists for
25 the last ten years has certainly led to more

Page 39

1 people knocking at the door to see me in my
2 office. But I have a very busy outpatient
3 practice. I'll be there tomorrow.
4 Q. In your practice, have you observed
5 patients experiencing anxiety for not receiving
6 medication as prescribed?
7 A. I've had patients experiencing anxiety
8 for any one of a number of reasons, and that may
9 be one of them. Family situations, job
10 situations, social interactions all bring on
11 anxiety. And not receiving medications is another
12 potential mechanism of anxiety, a very uncommon
13 one, but, yes.
14 Q. In Mr. Dukes' case, did he have a
15 family history of heart disease?
16 A. Yes, he did. You can't choose your
17 parents generally, and families are rife with
18 cardiovascular disease. That was known even
19 before he was incarcerated.
20 Q. So theoretically if a patient had a
21 family history of heart disease, was incarcerated,
22 and did not receive 57 percent of his prescribed
23 heart medication, would you agree that in not
24 receiving that prescribed medication 57 percent of
25 the time that that would produce negative anxiety

Page 40

1 in the patient?
2 MR. RADUNSKY: Just object to the
3 foundation. Assumes facts not in evidence. I
4 don't know where the 57 percent is coming from.
5 Subject to that, Dr. Fintel, you
6 can answer.
7 THE WITNESS: Again, I reiterate that
8 the factual material that I've seen, including
9 the ACCUflo records showing that, indeed, he
10 received --
11 MS. KOTT: Okay. I would strike
12 anything related to anything --
13 MR. RADUNSKY: Yeah. No, I think what
14 he was saying -- go ahead. Let him finish.
15 THE WITNESS: I was saying that's not
16 the basis of my opinions.
17 MR. RADUNSKY: That's what I knew you
18 were going to say.
19 That's what he was going to say,
20 Judith. It's not the basis of his opinion.
21 THE WITNESS: But that's the facts of
22 the case. And the facts of the case are different
23 from the hypothetical. But accepting your
24 hypothetical and in answering your question, in
25 fairness to you, Ms. Kott, I will accept the

Page 41

1 hypothetical that 57 percent of the time he wasn't
2 receiving these medications for the limited period
3 of time that he was at Cook County jail, not at
4 Livingston where he spent more than 90 percent of
5 his time, it's theoretically possible that the
6 failure to receive a cardiac medication could have
7 deleterious consequences.
8 And that would be measured by
9 developing unstable angina, being in the hospital
10 with a new heart attack, with a new coronary
11 event. And absolutely none of that ever happened.
12 The first time he was in a hospital
13 after release from jail with a documented coronary
14 -- potential coronary event was May 18 of 2020
15 because the January 8 admission was for chest pain
16 that did not turn out to be associated with any
17 myocardial damage.
18 So the answer to your question is
19 theoretically it's possible, but it didn't occur
20 here.
21 BY MS. KOTT:
22 Q. And that is based on your opinion
23 based on a review of the record. Is that right?
24 A. Yes. And, again, my opinion does not
25 require nor is based on the ACCUflo records. I

11 (Pages 38 - 41)

Page 42

1 want to make that clear. I wouldn't mention that
2 to a jury if the judge has excluded that.
3        But that is the reality of the
4 situation. But I'm accepting your hypothetical
5 that, indeed, he was not given his medications
6 during the time he was visiting Cook County jail
7 for his court appearances from 2015 to 2019. The
8 rest of the time was spent receiving his medica-
9 tions at Livingston. And there is no evidence
10 that his coronary disease had gone out of control,
11 that he needed to be in a hospital because he was
12 missing his medications and he was suffering an
13 acute coronary event.
14    Q.   So let's talk about this back and
15 forth between Livingston and Cook County. It's
16 fair to say you don't have direct evidence or
17 documents to confirm exactly how long he was at
18 each facility or how long he had to stay at Cook
19 County before being transferred back to
20 Livingston. Is that correct?
21    A.   I haven't set up a spreadsheet.
22 Perhaps I should have, like you did and for your
23 client, looking at the total days that he was at
24 Cook County versus Livingston. I know he was at
25 Livingston from 2015 to 2019 and would make brief

Page 43

1 trips upstate to Cook County to await a court
2 hearing. The longest visit I think was 96 days.
3 Most of the other visits I think were a few days
4 to a few weeks. And so I estimated that, far and
5 away, the greatest majority of his time was at
6 Livingston. But I don't have an exact date count.
7 I'm someone does. Maybe Mr. Radunsky has,
8 but he hasn't shared it with me.
9    Q.   So I guess my point here is that we're
10 not disputing as far as Livingston that he
11 received his medication there. What is in dispute
12 is in Cook County --
13    A.   Yes.
14    Q.   -- and I guess what I'm trying to
15 establish is you don't have an exact time frame of
16 how long he had to wait to get heard in court or
17 how long he had to stay in Cook County before
18 being shipped back to Livingston. Right?
19        MR. RADUNSKY: Just object to the
20 form. I think he has already answered that
21 question. He was going back and forth, Judith.
22 So, I mean, like you said, there was --
23        MS. KOTT: But he said 97 days, but
24 then he was kind of vague on some of the others.
25 So I just wanted to --

Page 44

1        MR. RADUNSKY: Well --
2        THE WITNESS: I was vague because they
3 differed in time. Some of them were a few days.
4 Some of them were a few weeks.
5        MR. RADUNSKY: Right. Right. Right.
6        MS. KOTT: And some of them a few
7 months.
8        MR. RADUNSKY: Yeah. And you're both
9 wrong. It was 78 days I think when I looked at
10 the housing record was the longest time that he
11 was there. But other than that, Dr. Fintel, and
12 you're right, Judith, it's a matter of anywhere
13 between it looks like 7 days up to 16 days
14 depending on which time -- what time period you're
15 looking at.
16 BY MS. KOTT:
17    Q.   In other words, and I know this is a
18 ridiculous analogy, but it wasn't like he was at
19 Cook County and then went back to Livingston to
20 get his medicine and then went back to Cook the
21 next day and back and forth. Once at Cook County,
22 he has to wait for a pretrial conference or
23 whatever was going on in Cook County, like --
24    A.   Yes.
25    Q.   All right.

Page 45

1    A.   That's my understanding.
2    Q.   Okay.
3        MR. RADUNSKY: Yeah.
4        THE WITNESS: Legal issues having to
5 do with the overturning of his initial conviction
6 and then governing when his incarceration would
7 end.
8 BY MS. KOTT:
9    Q.   Okay. Would you agree to a reasonable
10 degree of medical certainty -- sorry, I forgot not
11 to include that.
12        MR. RADUNSKY: That's okay.
13 BY MS. KOTT:
14    Q.   -- that heart patients who are reliant
15 on other people for their prescriptions, such as
16 heart patients that are at the hospital or
17 incarcerated individuals, may experience a higher
18 degree of negative anxiety than a heart patient
19 who can fill their own prescription?
20    A.   I agree that that's theoretically
21 possible. I've not seen any objective determi-
22 nation of the degree of anxiety that Mr. Dukes had
23 while he was at Cook County jail.
24    Q.   Would you agree that prolonged anxiety
25 multiplies harm to a patient?

12 (Pages 42 - 45)

Page 46

1    A.   That's theoretically possible.  But,
2  again, there's absolutely no objective data here
3  in this case.  And the objective data which we do
4  have suggests no harm in that stress echo was
5  normal in January of 2020, several months after
6  release from the hospital -- from the jail.
7    Q.   To a reasonable degree of medical
8  certainty, would you agree a heart patient with a
9  family history of heart disease who experienced
10 prolonged anxiety for not receiving prescription
11 medication may have increased anxiety that could
12 lead to a negative effect both emotionally and
13 physically?
14   A.   I agree that that's possible.  I don't
15 believe that occurred in this case based on the
16 objective data that we have.
17   Q.   Okay.  And you're basing your opinions
18 on objective data of the cardiac stress test.  But
19 no other test, as far as you know, was done as far
20 as quantifying or capturing his emotional anxiety.
21 Correct?
22   A.   The only tests that I saw were several
23 echos I think in 2018.  He received an echo that
24 again showed overall preserved left ventricular
25 function, no evidence of any new heart damage.

Page 47

1         In fact, every time his myocardial
2  function was assessed up until the myocardial
3  infarction of 2020 in May, his overall heart
4  function was normal.  And he had a small area of
5  decreased function where he had the heart attack
6  in 2012.  They all spoke to one conclusion, that
7  he had no evident progression of his coronary
8  disease during that time during his incarceration.
9         Regarding the quantitation of
10 anxiety, I don't see any quantitation.  I don't
11 recall him seeing a psychiatrist and having some
12 assessment of the degree of his anxiety.  And he
13 was on a medicine fluoxetine, which I think is an
14 antidepressant or it may have some anti-anxiety
15 effects, f-l-u-o-x-e-t-i-n-e, that he was
16 prescribed as well.
17   Q.   To your knowledge, when he was -- when
18 was he prescribed that fluoxetine?
19   A.   It was prescribed in various times
20 during his hospitalization.  I don't have a
21 spreadsheet of when that was.  I focused on the
22 cardiac medications.  But I did see fluoxetine as
23 one of his prescribed medications.
24   Q.   All right.  And I understand you're
25 not a psychologist, but fluoxetine could also be

Page 48

1  prescribed for anxiety.  Is that correct?
2    A.   Yes.  It's primarily in this SSRI
3  family, which stands for soluble serotonin
4  reuptake inhibitor.  It's -- Prozac was the trade
5  name which burst upon clinical care about 25, 30
6  years ago and was a major step forward in the
7  treatment of depression.  It can also treat
8  obsessive compulsive disorder, panic disorder.
9  And he was prescribed that.
10   Q.   Would you agree that patients with a
11 family history of heart disease, including some
12 deaths in the family due to heart disease, would
13 be at a higher risk of experiencing negative
14 anxiety than those people who did not come from a
15 family history of heart disease?
16   A.   Well, family history is one of the
17 many, many risk factors that Mr. Dukes had.  In
18 fact, he had every single risk factor I'm aware
19 of:  smoking, overweight, hyperlipidemia, hyper-
20 tension, family history, sedentary lifestyle.  So
21 this was one of multiple, each life-threatening
22 risk factors that he had, none of which were
23 related to incarceration.
24   Q.   In your experience as a senior
25 attending cardiologist, have you ever observed

Page 49

1  patients who experienced anxiety when they were
2  not given their medications as prescribed?
3    A.   Yes.  Some of them --
4    Q.   Do you agree --
5    A.   -- couldn't afford it.
6    Q.   I'm sorry, go ahead.
7    A.   Some of them lost their medication.
8  Some of them lost their insurance, they couldn't
9  afford it.  All kinds of reasons.
10   Q.   Would you agree that negative anxiety
11 and prolonged anxiety can cause harm to a patient,
12 including harm to a patient's heart?
13   A.   It can.  But we assess that with a
14 number of noninvasive and occasionally invasive
15 tests.
16   Q.   Do you consider it to be good medical
17 practice to put patients at risk of a cardiac
18 event if they are not given their medications as
19 prescribed, even if not everyone ends up having a
20 cardiac event?
21   A.   I believe that medications should be
22 given as prescribed as much as possible, yes.
23   Q.   Would you agree that statin medica-
24 tions are important to regulate blood pressure and
25 cholesterol for patients at high risk of cardiac

13 (Pages 46 - 49)

1  disease?
2     A.  Well, statin medications don't
3  regulate blood pressure.  They modify cholesterol
4  metabolism.  And that's their role, and they do it
5  quite well.
6     Q.  Do you advise heart patients to
7  continue to take statins on a continuous basis and
8  that it's unhealthy over time to interrupt that
9  statin dosage as prescribed as it can lead to
10  either clogged arteries or an increased chance of
11  a serious cardiac arrest?
12     A.  I tell them it could potentially cause
13  harm if they interrupted their statin therapy.
14  But the reality is that many patients may go
15  several days, sometimes several weeks, if they run
16  out of a medication until it gets renewed and
17  tolerate that just fine.  But generally I tell
18  patients to take the medications as prescribed on
19  a daily basis.
20     Q.  Would you consider it putting patients
21  at risk of harm if they are prescribed medications
22  but then -- let me strike that one.  I think it
23  was already asked.  I'm going to strike that
24  question.
25        Other than speculation, you have no

1  evidence to suggest that William Dukes' alleged
2  preexisting conditions were substantially more
3  likely to put him at a high risk of another
4  cardiac episode than limitation of his prescribed
5  medication dosages at Cook County jail.  Correct?
6     A.  What my testimony is is that there's
7  always the potential for harm and an acute cardiac
8  event when medications are abruptly stopped and
9  then restarted.  But there was absolutely no
10  evidence in this case that such harm occurred.  I
11  was looking for it as I read the records, but I
12  found no evidence of that.  And that will be my
13  testimony in front of the jury.
14        But the general question, can
15  stopping medications be harmful?  The answer
16  always has to be yes.  But it's a question of
17  degree and what happens with that patient.
18  Fortunately, the medications he was on were
19  promptly restarted, assuming they were stopped,
20  assuming, when he came to Livingston.
21        And as I stated on page four or
22  five of my statement, many of them were long-
23  lasting effects.  For example, aspirin hangs
24  around for a week or longer.  Statins, for several
25  weeks in terms of their effects on cholesterol.

1  And beta blockers, several days.
2     Q.  In your review of the records, you
3  don't see any indication that either at Pontiac
4  jail or at Livingston County Jail that at any of
5  those places that there were missed dosages of
6  his -- of Dukes' prescription medication.  Is that
7  right?
8     A.  That's correct.
9     Q.  That, in fact, it was only at Cook
10  County jail that there was alleged missed dosages
11  of prescription medication.  Correct?
12     A.  That's correct.
13     Q.  Okay.  In your review of all the
14  documents in this case, did you note records
15  indicating that William Dukes had anxiety?
16     A.  Yes.  He had anxiety, and he was
17  treated for it.
18     Q.  If so, what would those records have
19  shown?
20     A.  That he was on medications that have
21  to do with emotional states.  He was somebody who
22  had been a heavy user of alcohol and smoking.  And
23  withdrawal from these can create all kinds of
24  anxious states as well.
25     Q.  Other than fluoxetine, was there any

1  other medication that you know of that he was on
2  for anxiety?
3     A.  I'm not aware as I sit here in that I
4  focused on cardiac medications.
5        MS. KOTT:  I'm going to go off the
6  record for just a minute and I'm going to just
7  take a brief pause.  I'll be right back.
8        MR. RADUNSKY:  Sure.
9        THE WITNESS:  Sure.
10        (A break was taken from
11           2:07 p.m. until 2:08 p.m.)
12  BY MS. KOTT:
13     Q.  So in your review of the records,
14  Doctor, did you find how long that Mr. Dukes had
15  been on fluoxetine?
16     A.  No.  I didn't focus upon that.
17        MR. RADUNSKY:  I'm sorry, what was
18  the -- what was the medicine there, Judith?
19        THE WITNESS:  Fluoxetine.
20        MR. RADUNSKY:  Oh, fluoxetine.  Okay.
21  My apologies.  Go ahead.  Sorry.  Thanks.
22  BY MS. KOTT:
23     Q.  And I apologize if you already
24  answered this and it's a repeat question, but did
25  you say that to your knowledge do you know if

Page 54

1 there's any other medication that he was
2 prescribed for anxiety other than fluoxetine?
3    A.   You asked me, and my answer was I
4 don't know.
5    Q.   Okay.
6    A.   Perhaps that's on your spreadsheet of
7 medications, you know, allegedly not administered.
8    Q.   So I understand you reviewed some of
9 the depositions, some of the doctors' depositions.
10 And with regard to Dr. Paek's, P-a-e-k,
11 deposition --
12    A.   Mm-hmm.
13    Q.   -- isn't it true you have no personal
14 knowledge that William Dukes actually was
15 performing roofing work the next day after leaving
16 the hospital or the circumstances behind that
17 incident referred to by Dr. Paek? Correct?
18    A.   I personally obviously did not speak
19 with Mr. Dukes to confirm that history. But I
20 thought he had told some health workers that day
21 after discharge and the time when he had a freshly
22 placed stent in the left anterior descending
23 artery that he had come back to do roof work. But
24 I don't know what the other sources of that
25 statement are.

Page 55

1    Q.   So, in fact, you don't know if it was
2 him going to receive a -- or to deliver an
3 off-work note, a note to be off work, or anything
4 of that nature. Correct?
5    A.   I don't know anything about that.
6       I'm ready.
7    Q.   Oh, I'm sorry, I thought you were
8 referring to something. I thought you were
9 referring to something.
10    A.   I'm just looking at --
11    Q.   I'm sorry.
12    A.   -- page five of my report --
13    Q.   Okay.
14    A.   -- numbered paragraph eight in which I
15 state that he was performing roofing work on the
16 next day after leaving the hospital against
17 medical advice. And the source of that was
18 Dr. Paek's deposition. I don't know where she
19 found that out. I presume by talking to her
20 patient. But that's for the jury to decide when
21 that evidence is presented.
22    Q.   Right. In other words, it's not
23 having spoken directly with Mr. Dukes to get that
24 information. Correct?
25    A.   Of course. That's correct.

Page 56

1    Q.   Have you ever had any malpractice
2 claims against you or on your malpractice
3 insurance related to medications?
4    A.   No. And one or two claims were
5 dropped before they ever got to the deposition
6 stage.
7       And I'm currently involved in a
8 case that's just in the earliest stages, hasn't
9 been dropped yet. But I think there's an
10 allegation that a member of our team administered
11 a glucose-reducing drug and it lowered the
12 patient's glucose. It wasn't my order. But I was
13 listed with that. Hopefully that will be dropped
14 shortly. But, no, that's the closest I ever came
15 to an allegation regarding drugs.
16       But I've had no judgments against
17 me, have never been in court in a malpractice case
18 other than as an expert or as a treater.
19    Q.   After you completed your report [sic],
20 did you arrive at a conclusion?
21    A.   What was the first part of your
22 phrase? After what of my report?
23    Q.   After you completed --
24    A.   Oh.
25    Q.   -- your review of the documents --

Page 57

1    A.   Yes.
2    Q.   -- did you arrive at a conclusion?
3 And, if so, what was that conclusion?
4       MR. RADUNSKY:  Well, you mean the 12
5 opinions --
6       MS. KOTT:  I'm sorry, the opinions --
7       MR. RADUNSKY:  -- in his report?
8       MS. KOTT:  -- yes.
9       MR. RADUNSKY:  I mean, he's got 12 of
10 them. Okay. I mean, you want him to -- okay. I
11 don't know --
12       MS. KOTT:  Let's go --
13       MR. RADUNSKY:  -- what you're asking.
14       MS. KOTT:  -- through them
15 individually.
16       MR. RADUNSKY:  I mean, obviously he's
17 got 12 of them. I don't think you want him to
18 read each one. Or maybe you do. I don't know.
19       THE WITNESS:  An overall answer to
20 your question, I don't believe that Mr. Dukes was
21 harmed in any way by any alleged lack of
22 administration of cardiac medications during his
23 visits to Cook County. And in my 12 opinions I
24 lay out the basis for that and the facts that I
25 see in the case and the cardiology physiology of

15 (Pages 54 - 57)

Page 58

1  my background as a clinical cardiologist to
2  support my opinion.
3      BY MS. KOTT:
4      Q.   On page four of your additional
5  opinion -- I guess this might be the time to put
6  the screen up -- you talk about cardioprotective
7  medicines such as aspirin, statins.  And then
8  almost about four lines up [sic] from that, you
9  say nitroglycerin is appropriate therapy for the
10 treatment of an acute chest pain episode but has
11 never been shown to be cardioprotective, so not
12 taking nitroglycerin does not cause or prevent a
13 heart attack.
14     A.   Correct.
15     Q.   So does not taking nitroglycerin, can
16 that cause extreme negative anxiety for an inmate
17 that has a family history of cardiac disease?
18     A.   Yes.  It can further the state of
19 anxiety not receiving the medication.
20     Q.   And what is the utility of nitro-
21 glycerin?
22     A.   It's a dilator of blood vessels, both
23 the venous side of the circulation and the
24 arterial side of circulation, and it transiently
25 improves myocardial blood flow.  It doesn't

Page 59

1  prevent heart attacks.  We wish that it did.  But
2  it helps treat the pain of transient myocardial
3  ischemia by evening out the imbalance of supply
4  and demand experienced by the heart muscle.
5      Q.   So if somebody is experiencing extreme
6  anxiety, if -- that is to say a heart patient in a
7  similar situation such as Dukes, if they were to
8  take nitroglycerin it would have a beneficial
9  effect on their body and their -- reducing their
10 anxiety?
11     A.   It can.  We don't use it primarily for
12 anxiety.  We use it for chest pain.  But it
13 indirectly could relieve or reduce anxiety by
14 reducing the chest pain.
15     Q.   I see.  What is the way that you
16 relied on the principles or methods in forming
17 your report and your opinion today?
18     A.   Based on my 35-year-plus experience as
19 a critical care cardiologist, CCU director, and an
20 active clinical cardiologist, and knowing how the
21 drugs work and utilizing them as appropriately as
22 possible, and in being familiar with the
23 literature about how the drugs work, what's in the
24 textbooks, et cetera.
25     Q.   And would you agree that there is some

Page 60

1  literature in the textbooks that indicates that if
2  a person were to not take their medication,
3  whether it's fluoxetine or a statin or aspirin,
4  over a lengthy period of time that that can cause
5  increased anxiety in that patient?
6      MR. RADUNSKY:  Just objection to
7  foundation.  I mean, you know, it's a very, very,
8  very general question, and it might even be
9  speculative.
10     You can answer.
11     THE WITNESS:  As I've stated before, a
12 prolonged withdrawal of needed medications could
13 potentially cause harm to a patient.  I've agreed
14 to that when you've asked me that.  After all,
15 that's why we prescribe medication for patients.
16     But we have to look at the
17 individual patient and how they've done and when
18 they've returned to their normal medications,
19 which we know is -- you and I disagreed when he
20 returned to Livingston -- he received all the
21 medications that were prescribed for him.  So my
22 conclusions are based on what happened to
23 Mr. Dukes and not just the general conclusion that
24 not taking medications could potentially have
25 adverse consequences.

Page 61

1  BY MS. KOTT:
2      Q.   And, as I think you previously
3  testified, your basis of your opinion was on the
4  stress test and the other tests that you -- the
5  echocardiogram.  You did not see any test as it
6  related to him not getting psychological effect or
7  increased anxiety for not having his prescribed
8  medication.  Correct?
9      A.   Correct.  I have not been commenting
10 on the state of anxiety, which you --
11     Q.   Or the effect of -- or lack of
12 fluoxetine or any of that medication in his
13 increased anxiety.  Correct?
14     A.   That's correct.
15     Q.   When coming to your conclusion, did
16 you rely on specific scientific or technical
17 principles or methods that are widely used in your
18 field?
19     A.   Yes.
20     MS. KOTT:  That's all I have for now,
21 Troy.
22         EXAMINATION
23     BY MR. RADUNSKY:
24     Q.   All right.  Dr. Fintel, just a couple
25 things.  All of your opinions obviously are to a

16 (Pages 58 - 61)

Page 62

1 reasonable degree of medical certainty within the
2 field of cardiology. Right?
3    A.   Yes, they are.
4    Q.   And your report is comprised of six
5 pages?
6    A.   Yes.
7    Q.   And all the records you reviewed are
8 noted on page one. Correct?
9    A.   Yes.
10   Q.   And which physician depositions did
11 you look at?
12   A.   The three were his primary care
13 physician/family doctor, Dr. Paek; the
14 cardiologist, Dr. Tarabey, who reviewed his
15 echocardiogram when he was at Swedish, although
16 didn't treat him himself; and Dr. Darki, who as I
17 could tell had the most interaction with him,
18 albeit a short one, D-a-r-k-i, at Gottlieb when he
19 had his acute myocardial infarction.
20   Q.   Do you remember when he was admitted
21 in May of 2020 for the myocardial infarction that
22 it was related to an incident that occurred in his
23 basement or his house and flooding? Do you
24 remember that?
25   A.   Yes. And that was stressful for him.

Page 63

1    Q.   Exactly. I mean, and that incident
2 occurred, what, ten months after he had been
3 released from jail?
4    A.   That is correct.
5    Q.   When you looked at all -- when you
6 looked at all the records that you reviewed in
7 this case, did you see any evidence at all that
8 Mr. Dukes was at an increased risk for another
9 myocardial event because he had missed statins?
10 And I don't care how many statins he missed, just
11 was he at an increased risk at all for any amount
12 of statins that he missed?
13   A.   I saw no comment from any of the
14 treating physicians about that issue. Again,
15 strong support of that is the fact that he was not
16 admitted with a heart attack or a new acute
17 coronary problem during the time that he was
18 allegedly not receiving the drugs. And when he,
19 indeed, had objective myocardial testing such as
20 in 2018 while incarcerated, 2020 when he was no
21 longer in jail, his overall heart function was
22 unchanged.
23   Q.   And I remember earlier you had
24 mentioned that -- I don't think you mentioned the
25 number, but do you recall looking at six different

Page 64

1 echos between October 2012 and October 2021?
2    A.   I do.
3    Q.   I think you misspoke. You had said
4 that there were two echos in 2018. There was
5 actually two in 2015. Does that make sense?
6    A.   Yes. He was evaluated by, I think,
7 clinicians up here in the Chicago area.
8    Q.   Right.
9    A.   And the echos showed -- and one of
10 them was a stress test, stress echo, which showed
11 no ischemia.
12   Q.   Is there a better objective test to
13 determine the function of his heart and how his
14 heart is doing than an echo test?
15   A.   No. It's one of our standard tests
16 that we do on a routine basis. And now, remember,
17 you're taking testimony from a nuclear
18 cardiologist --
19   Q.   Right.
20   A.   -- and that is considered an
21 equivalent technology. His doctors chose not to
22 do a nuclear, which would have been a perfectly
23 good choice. We split our cases between stress
24 echos and stress nucleuses. They're both very
25 reliable.

Page 65

1    Q.   Do you see anything in these echos
2 that would suggest to you that he was at an
3 increased risk for a myocardial event because he
4 missed medication or wasn't given all the doses
5 that he should have been given?
6    A.   No.
7    Q.   All right. And when you read your
8 first opinion, number one, you note that even
9 though he was being shuttled back and forth to
10 Cook County over a two-year period he was still
11 going back to Livingston and getting all of his
12 statins. Correct?
13   A.   Correct.
14   Q.   So he was never, ever missing statins
15 for really long or extended periods of time
16 consecutively. Correct? He never stopped.
17 Correct?
18   A.   Correct. Had it been a year of not
19 taking his statin, it might have been a very
20 different outcome. But the longest, as you
21 corrected me, was 78, not 98, days, and most of
22 the alleged missing was at most weeks at a time.
23   Q.   And then you also mentioned in that
24 first opinion that he was taking statins regularly
25 between 2018 and 2020. Correct?

17 (Pages 62 - 65)

Page 66

1    A.   Correct.  And that's what he told his
2    doctors when he was admitted to the hospital.
3    Q.   So he was taking his statins regularly
4    at least for several years prior to the myocardial
5    infarction in May of 2020.  Correct?
6    A.   Correct.
7    Q.   Did you ever -- did you ever see any
8    medical record at all where there was -- anybody
9    had made a causal link, any medical provider,
10   between him missing doses of statins and him being
11   at any type of increased risk for a cardiac event?
12   A.   No.
13   Q.   I wanted to ask you, and we didn't get
14   into this, the keeping medication on the person,
15   or what's been known as KOP.  You're familiar with
16   this issue?
17   A.   Yes.
18   Q.   All right.
19   A.   It's an issue that was important in
20   his hospitalization at Cook County and at
21   Livingston.
22   Q.   Right.  And it was your understanding
23   -- was it your understanding that Mr. Dukes wanted
24   to keep his nitroglycerin on his person when he
25   was at the Cook County jail?

Page 67

1    A.   Yes.  He expressed that.  But that was
2    in variance with the KOP policy that was present
3    at both Cook County and at Livingston.  Both of
4    those had a policy that nitroglycerin had to be
5    dispensed by the caregiver, the nurse or the
6    doctor, as it was on numerous occasions and not --
7    was not a KOP medication that he kept in his room.
8    Q.   Do you have any criticism of that
9    policy or is that something that you would agree
10   with that it's better that he doesn't keep
11   nitroglycerin on him purpose -- on his person?
12   A.   It's a compound question, so I'll
13   answer both --
14   Q.   Okay.
15   A.   -- parts of the question.
16        Number one, I don't criticize that
17   policy.  That's what we have as well in our
18   hospital even with patients with coronary disease.
19        And one of the reasons is that
20   repetitive administration over several minutes of
21   nitroglycerin can drop the blood pressure
22   substantially and can cause life-threatening
23   hypotension.  It may also cause symptoms which
24   aren't life threatening but indicate that it's
25   working, like headache.

Page 68

1        And, in fact, there's a
2    documentation in the Cook County records during
3    one of the administrations of the nitroglycerin
4    that he indeed had a headache, which says that it
5    was working.  Although, Mr. Dukes doesn't recall
6    that from his deposition.  But it's easy to forget
7    that perhaps.
8        But it's one of the reasons that
9    nitroglycerin is given under a monitored -- under
10   a monitored clinical situation, to make sure that
11   the patient is feeling okay after the nitro-
12   glycerin and is not on the floor with hypotension.
13   Q.   And you had mentioned, I think just a
14   few minutes ago, that he wasn't allowed to keep
15   his nitroglycerin on his person either in
16   Livingston or in Cook County.  You saw records of
17   that effect?
18   A.   Correct.  Nor are our patients at the
19   hospital.  They have to ask for it.
20   Q.   All right.  Being a cardiologist for
21   35 years, knowing that you had 10-year history of
22   echocardiograms, did that give you a good idea of
23   what likely caused or didn't cause the myocardial
24   event that he had in May of 2020?
25   A.   Yes.

Page 69

1    Q.   Now, you had mentioned also that he
2    seemed to check all the boxes with respect to
3    being at risk for a future heart attack.  And I
4    think you mentioned smoking.  Is that right?
5    A.   I tell my -- especially young patients
6    like Mr. Dukes, who's only 47, that continuing to
7    smoke is like taking a loaded pistol to one's
8    forehead because the incidence of coronary events,
9    despite all the good medicines we prescribe and
10   that he was prescribed, patients will still
11   progress and can have myocardial infarctions if
12   they continue to smoke.  And that, coupled with
13   his high blood pressure that he was receiving at
14   least one agent for treatment, his high
15   cholesterol, his diabetes, his obesity, his
16   relatively-less-than-active lifestyle, all
17   contributed to a whopping risk of a myocardial
18   event, which he still has today in that, as you
19   use the term, he checked all the boxes
20   unfortunately for his cardiovascular risk.
21   Q.   Would those contributing -- I'm sorry,
22   strike that.
23        Would those conditions be more
24   likely than not or more probable than not
25   contributing causes to the myocardial event as

18 (Pages 66 - 69)

1 opposed to missing doses of medication or statins?

2    A.   Overwhelmingly so. The combination of
3 his multiple cardiovascular risk factors,
4 including his family history as well, together
5 were the overwhelming cause of any further
6 progression of coronary disease. And it's very
7 likely that it will continue to progress. And it
8 was not the alleged missing of several days of
9 medications.

10    Q.   In your sixth opinion, you mention
11 that Dr. Tarabey saw on the October 21 echo-
12 cardiogram that his heart function was normal and
13 the findings were just due to the prior heart
14 attack that he had in 2012. Correct?

15    A.   Yes. Which was the finding in the
16 posterolateral wall.

17    Q.   Okay. And I wanted to ask, the
18 roofing work as we talked about, that came after
19 -- the day after he was discharged -- or that he
20 left the hospital against medical advice after
21 having a stent placed in his heart again.
22 Correct?

23    A.   Yes. That was highly dangerous
24 because patients can be dizzy after being in the
25 hospital and being on medications for their heart,

1 and they're on a greater degree of blood thinners.
2 And the consequence of a fall or an injury while
3 working on a roof could be devastating.

4    Q.   And obviously as a cardiologist and
5 somebody who has treated thousands of patients who
6 have stents placed in their heart, would you
7 recommend that your patient leave the hospital
8 against medical advice the day after having that
9 procedure?

10    A.   Certainly not. And I'm glad for
11 Mr. Dukes he survived it.

12    Q.   When you looked at Dr. Paek's
13 deposition, do you recall that she had made or
14 tried to encourage him to find a cardiologist that
15 could treat him on a more regular basis?

16    A.   Yes.

17    Q.   And did you see that she was trying to
18 do that for a period of years with him?

19    A.   That's what she indicated in her
20 deposition. That's right.

21    Q.   Okay. In a general sense -- I want to
22 just ask you about your 11th opinion. If an
23 officer, for instance, hypothetically with limited
24 medical training were to receive a complaint from
25 a detainee who they didn't know had a prior heart

1 condition and they were just complaining of chest
2 pain, in your opinion would those types of
3 complaints be considered a severe medical
4 condition, something that a layperson would know?

5    A.   In the absence of some of the
6 conditions I described in my answer, like being
7 very sweaty, dizzy, about to pass out, not
8 breathing well, none of which were described or
9 experienced fortunately by Mr. Dukes, I wouldn't
10 expect a nontrained jail personnel to be able to
11 make a differential diagnosis. That's why a nurse
12 or doctor are required to evaluate the patient.

13    Q.   In your fifth opinion, I see that you
14 said that, as Dr. Darki testified, there's no
15 trial examining the consequences of not receiving
16 someone's medication for that time period. Can
17 you explain what that meant, what you meant there?

18    A.   Sure. We make conclusions about
19 optimal medical care based on clinical trials
20 which test various approaches to treatment. And
21 neither Dr. Darki nor I am aware of any organized
22 trial in which patients were taken off a
23 medication for a period of time and put back on it
24 to see what deleterious effects there could be.
25 That happens in real life all the time when

1 patients are admitted to the hospital or different
2 hospital medications are changed and the patient
3 can be observed for the development of a adverse
4 cardiac consequence and treated for it.

5          And fortunately for Mr. Dukes, as
6 I've testified, during the period of time from
7 2015-2017 and then on to the time of leaving
8 incarceration in 2019, there's no evidence that he
9 was in the hospital for new heart damage or any
10 evidence by the stress tests that he had had new
11 blockages that developed --

12    Q.   Okay.

13    A.   -- which were theoretical potential
14 complications of not taking the medication. It
15 didn't occur here. That's why it's speculation to
16 say that not having the medications in his case
17 puts him at harm at all. There's no objective
18 evidence for that.

19    Q.   In the 12th opinion, you mention that
20 you would expect a myocardial infarction or
21 serious cardiac event to have occurred due to lack
22 of taking statin medications within days to weeks
23 of not taking it, not years as was the case here.
24 Can you explain what you meant there?

25    A.   What I meant was let's assume, as

Page 74

1  Ms. Kott did in the allegations, that he wasn't
2  receiving statin therapy. Let's assume that's
3  correct. Then we would have expected a clotting
4  event, a new acute cardiac event, to indicate that
5  he wasn't getting the medications he needed and
6  that had an immediately harmful effect.
7          In fact, the time that we have an
8  objective event is May, I think, 18th, 2020, when
9  he was admitted after the flood in his basement
10 with an acute anterior myocardial infarction due
11 to an occlusion of the left anterior descending
12 coronary artery, which was treated with guide wire
13 and a stent and ballooning into the left anterior
14 descending coronary artery. And that is almost a
15 year after being discharged from the jail
16 environment. So the facts of the case strongly
17 argue against the plaintiff's conclusion that the
18 alleged nonadministration for days to weeks at a
19 time and, in one case, two months of his
20 medication harmed him during that period of time.
21     Q.  Did you see any significant cardiac
22 event between 2015 and 2017 when he was at the
23 Cook County jail?
24     A.  No.
25     Q.  And do you have any criticism of any

Page 75

1  of the medical treatment provided by the health-
2  care professionals at Cermak?
3      A.  No. And, indeed, we have a patient
4  who has a negative stress test in 2020 suggesting
5  that he was having appropriate care for his
6  cardiac condition.
7      Q.  Okay. I have nothing else. Thanks.
8          RE-EXAMINATION
9          BY MS. KOTT
10     Q.  I have just a few follow-ups. Thank
11 you for your patience, Doctor.
12     A.  Sure.
13     Q.  Would you agree that someone that has
14 a plaque buildup in their arteries, that it can
15 take time between the time of an initial plaque
16 buildup until a cardiac event occurs?
17     A.  Yes, it can.
18     Q.  And that, given the span of time in
19 Dukes' case, that it is not unreasonable to rule
20 out that that could have been the case here?
21     A.  Let me understand. That was a double
22 negative in that question. Given the fact that
23 months to years after this alleged period of
24 nonadministration of medications a stress test
25 showed no provocable ischemia, and that generally

Page 76

1  will pick up blockages of 50 percent or greater in
2  the stress echo lab, had he indeed had the kind of
3  plaque buildup that's slow that you just asked me
4  and I said, yes, can occur, we would have seen
5  some evidence of progression of coronary disease
6  at that time, which was not present.
7          And the fact that he suddenly
8  occluded the left anterior descending artery five
9  months later in May is a direct consequence of the
10 multiple cardiac risk factors he had. And I'm not
11 going to relist all of the six or seven cardiac
12 risk factors he had which would put him at
13 lifelong risk as long as he continues to smoke of
14 sudden plaque ruptures like occurred in May.
15         So the objective evidence that we
16 have in this case in months after release from
17 jail doesn't support the conclusion you asked me
18 about, even though that's theoretically possible.
19     Q.  So in your extensive experience,
20 Doctor, as a -- in cardiac care, you would agree
21 that a stress test is not the only measure of
22 damage to the arteries. In fact, I think --
23     A.  Correct.
24     Q.  -- as you had mentioned earlier, a
25 calcium score would be very indicative of arterial

Page 77

1  plaque as well. Correct?
2      A.  But there's not a direct relationship
3  between the calcium value and the stenoses that
4  are present. In fact, paradoxically, patients
5  placed on statins, even though we know statins can
6  be life saving and slow the progression of
7  coronary disease, can still see increases in
8  coronary calcium over the years due to the
9  continued accumulation of calcium into the
10 coronary arteries. So an elevated calcium score
11 does not exactly predict where the stenoses are
12 and how severe they are.
13     Q.  Right. But I guess my question is,
14 doctors in cardiology typically do an extensive
15 amount of tests, not only a stress test, to
16 measure the plaque in an artery but also a calcium
17 score and, if needed, an angioplasty, for
18 instance?
19     A.  Or a coronary angiogram which may
20 result in a coronary angioplasty, which is what he
21 had when he presented in May 2020 with the acute
22 left anterior descending myocardial infarction.
23     Q.  Do you have any knowledge that
24 Mr. Dukes took his paperwork, paperwork as in all
25 his medications, with him whenever he came from

20 (Pages 74 - 77)

Page 78

1 Livingston County Jail to Cook County jail?
2    A. I don't know what he did with his
3 paperwork.
4    Q. So you don't know if he gave that to
5 any of the prison officials or the nurses or
6 anything like that?
7    A. I'm not -- I'm not disagreeing with
8 it. I just don't know if he did. My answer is I
9 don't know.
10    Q. Okay. In your medical practice, have
11 you ever advised patients to go off of their
12 statin or, you know, anxiety -- like fluoxetine or
13 anything like that if they feel like it?
14    A. I haven't advised that if they feel
15 like it. I've advised them to go off if they're
16 having a problem with the medication, if they're
17 having a side effect or an adverse consequence, or
18 if it's not working. Some people are resistant
19 and need a different dose or a different statin.
20 So I may have switched medications. But I haven't
21 stated to patients, as you asked in your question,
22 that if they feel like it they can just stop.
23    Q. And you don't have any personal
24 knowledge that any warden at Cook County jail did
25 not have any -- and I apologize for the double

Page 79

1 negative again -- but did not have any knowledge
2 of the prior health condition of Mr. Dukes?
3    MR. RADUNSKY: Object to that form of
4 the question.
5    You can answer.
6    THE WITNESS: I don't know what the
7 wardens know -- knew.
8    MR. RADUNSKY: Right. Speculation.
9 BY MS. KOTT:
10    Q. Okay. And, earlier, when counsel --
11 when Troy was asking you a few questions, you
12 said, quote, alleged missing of several days of
13 medication, end quote. But, in fact, there was a
14 period of time, I believe that Troy mentioned 72
15 days, in which he was consecutively without
16 medication. Would you agree?
17    A. If that is, indeed, the facts of the
18 case -- I don't believe that to be the case -- but
19 if that is, indeed, the facts of the case, then
20 that would be that one episode that was a little
21 beyond two months. The others were much shorter.
22    Q. And you can't rule out the lack of
23 receiving prescribed medication as one of the high
24 risks of a potential coronary event. Correct?
25    MR. RADUNSKY: Object to the form and

Page 80

1 the foundation. It's speculative.
2    You can answer. You can answer.
3    THE WITNESS: I would agree that it's
4 theoretically possible that not taking cardiac
5 medications for 72 days could have negative
6 consequences for the patient. I agree that that's
7 certainly a possibility. I have throughout the
8 deposition agreed with you when you've asked that
9 question.
10    But, in Mr. Dukes' case, looking
11 carefully at what happened to him and how well he
12 did with his noninvasive cardiac tests, I would
13 state that that didn't occur for him. And, again,
14 part of the reason is that he did not have any
15 evident progression of his disease during this
16 period of time.
17 BY MS. KOTT:
18    Q. Related to that question, you don't
19 have any evidence to suggest that being without
20 fluoxetine or any of his other medications would
21 have caused an increased amount of negative
22 anxiety in Mr. Dukes. Correct?
23    MR. RADUNSKY: It's been asked and
24 answered.
25    You can answer it again.

Page 81

1    THE WITNESS: I answered that not
2 receiving medications could certainly increase
3 Mr. Dukes' level of anxiety.
4 BY MS. KOTT:
5    Q. So you mentioned before about that
6 patients need to ask for nitroglycerin to be
7 dispensed. And do you have any evidence in this
8 case to show how often Mr. Dukes asked for the
9 nitroglycerin and how often it was actually
10 dispensed?
11    A. I think there were at least six times
12 during which he asked for it. Maybe it was more
13 than that. He received it four to five times.
14 Several times he saw a doctor and a doctor
15 evaluated him and didn't think he needed it.
16    Q. And would you agree that not receiving
17 nitroglycerin would have caused him more increased
18 discomfort or pain?
19    A. Not necessarily because if, indeed, he
20 was not having ischemic pain, not receiving the
21 nitroglycerin would have had little or no effect
22 in any cardiac pain if the etiology was not
23 transient myocardial ischemia. Even if it was
24 transient myocardial ischemia, there's no evidence
25 that the failure to receive nitroglycerin causes

21 (Pages 78 - 81)

Page 82

1 patients to go on to develop complete occlusion or
2 myocardial infarctions. They may experience more
3 pain, but then that wears off within several
4 minutes.
5     Q.  But, as I think you testified, they
6 could also experience more increased anxiety
7 without the distribution or the receipt of the
8 nitroglycerin?
9     A.  Yes. I've agreed with you that the
10 patient could have -- Mr. Dukes could have had
11 more anxiety.
12    Q.  And do you -- did you not -- strike
13 that.
14         You don't have all of the times
15 that Mr. Dukes complained of chest pain to the
16 nurse at Cook County jail that you reviewed.
17 Correct?  You only reviewed the actual records
18 from Cook County jail?
19    A.  That's all I had, yes.
20    Q.  So you would agree that there are
21 times that he may have complained of chest pain
22 that are not in the actual records?
23        MR. RADUNSKY:  Objection.
24 Speculation.  You're asking him to -- I mean,
25 that's complete speculation.

Page 83

1        MS. KOTT:  Okay --
2        MR. RADUNSKY:  You can answer --
3        MS. KOTT:  -- I'll withdraw that.
4        MR. RADUNSKY:  Yeah, I mean that's
5 utter speculation.
6         Go ahead.  You can -- you can
7 answer.
8        MS. KOTT:  I'll strike that.
9        MR. RADUNSKY:  You can strike it,
10 yeah.  Complete speculation.
11        THE WITNESS:  I don't have that
12 information.
13        MS. KOTT:  Okay.
14        THE WITNESS:  I have what's documented
15 in the records.  And the nurses stated in their
16 deposition testimony, as I understand it, that
17 they responded.  When Mr. Dukes complained of
18 pain, they evaluated him.
19 BY MS. KOTT:
20    Q.  And you don't have any personal
21 knowledge that an alleged flooding actually
22 increased Mr. Dukes' anxiety.  Correct?
23    A.  Well, having suffered a flood myself
24 in one of my prior homes, it's a very stressful
25 event.  And speaking as a regular person, not as a

Page 84

1 physician, having to deal with the consequence of
2 water in your basement damaging is stressful to
3 anyone, including Mr. Dukes who was a cardiac
4 patient.
5    Q.  And you mentioned earlier about this
6 doctor that you reviewed that indicated there was
7 no research out there.  I believe it was Dr. --
8    A.  Darki.
9    Q.  -- Darki.  Do you know of any article
10 where it states that a cardiac patient with a
11 family history and with all the, you know, alarms
12 so to speak --
13    A.  Risk factors.
14    Q.  -- risk factors is or isn't at a
15 higher risk of anxiety and -- let's just go with
16 anxiety first -- is at a higher risk of anxiety
17 for not receiving medication for a whole year?
18        MR. RADUNSKY:  Just object to the form
19 of the question.
20         You can answer, if you understand.
21        THE WITNESS:  I'm not an expert in the
22 anxiety literature.  But when patients with any
23 condition don't get their medications, anxiety
24 levels can increase.  And I'm sure that's in the
25 literature.

Page 85

1         But in this case one has to relate
2 that increased anxiety with an adverse outcome.
3 BY MS. KOTT:
4    Q.  And the adverse outcome that you're
5 talking about was the diagnostic objective tests
6 that you discussed previously.  Correct?
7    A.  Of a significant progression of
8 coronary disease due to the anxiety and not to the
9 multiple underlying risk factors for heart
10 disease.
11    Q.  Likewise, you don't know of an article
12 that confirms that it's all right for a cardiac
13 patient with a family history to go without
14 statins or his or her heart medication for a whole
15 entire year.  Correct?
16    A.  I don't -- I'm not aware of any
17 article that looks specifically at outcomes with
18 controlled removal from medications and then
19 adding them back.  That's correct.
20    Q.  And so that would -- it would be --
21 finally, my final question would be, you don't
22 know of any article that has a specific range of
23 days that equates negative outcome of heart
24 function with missed dosages of prescribed
25 medication?

22 (Pages 82 - 85)

Page 86

1    A.   That's correct.
2    Q.   That's all I have.
3         RE-EXAMINATION
4         BY MR. RADUNSKY
5    Q.   Okay.  Just a couple more.
6         To follow up with what Judith was
7    saying, Dr. Fintel, there's no evidence, medical
8    or scientific, that missing a certain amount of
9    statins would increase a person's risk of a
10   cardiac event.  Is that fair to say?
11   A.   Correct.
12   Q.   All right.  And when you looked at all
13   his records, did you ever find a calcium score for
14   him?
15   A.   I didn't.  That's why I wondered if
16   there was something that I missed.  And Ms. Kott
17   was asking me about that.  I'd be happy to comment
18   on the calcium score and its location.  I evaluate
19   that in my work as a nuclear cardiologist.
20   Q.   And echos -- I mean, echos can see
21   calcium, can't they?
22   A.   Yes.  But they don't quantitate the
23   coronary artery calcium.
24   Q.   Sure.  That I understand.  But if it
25   was significant enough or, I mean, there was

Page 87

1    evidence of it on an echo, I mean, would a calcium
2    test typically, I mean, be ordered or is it not
3    something that's routinely ordered just because
4    you see calcium on an echo?
5    A.   If calcium is seen on an echo, it's
6    generally in the valve, like the mitral valve or
7    the aortic valve, not in the coronary arteries.
8    They're not imaged in an echocardiogram.
9    Q.   Did you see any evidence of plaque
10   buildup between 2015 and 2017 because he missed
11   his statin doses?
12   A.   No.
13   Q.   Did you see any evidence at all that
14   he would need an angioplasty, something invasive
15   like that?
16   A.   I saw evidence that he wouldn't need
17   an angioplasty:  the lack of changes in his heart
18   function and the lack of provocable ischemia on
19   his stress echos.
20   Q.   And even if we -- let's say we did
21   even know the calcium score, I mean, would there
22   be any way to know whether or not that calcium
23   score was somehow related to him missing doses of
24   statins versus some other cause?
25   A.   No evidence I'm aware of in the

Page 88

1    calcium -- coronary artery literature that relates
2    to withholding or not receiving needed medications
3    and an acceleration of calcium.
4    Q.   In your opinion, was his
5    treatment with respect to the cardiac issues that
6    he had from 2012 all the way through 2021, did it
7    meet the standard of care?
8    A.   Yes.
9    Q.   He just didn't walk in to Loyola in
10   May of 2020 out of the blue.  He walked in because
11   there was a precipitating event at his home that
12   led to stress that then led him to the hospital
13   that he reported at Loyola.  Correct?
14   A.   Yes.
15   Q.   Okay.  He didn't have to offer that
16   information about the flood in his basement.
17   Correct?  I mean, he could have just said that he
18   was there because he had chest pain.  But he
19   volunteered that he had an incident at his home
20   that led him in to the emergency room.  Correct?
21   A.   Yes.
22   Q.   And I think you mentioned this before,
23   but, I mean, you're aware that -- or do you
24   believe -- I shouldn't even say that -- based on
25   your review of the records that he was an -- that

Page 89

1    he was an alcoholic?
2    A.   Well, I read that --
3         MS. KOTT:  Objection.  Relevance.
4         MR. RADUNSKY:  Sure.  It goes towards
5    his heart condition.  I mean, that can, you know,
6    weaken his heart.  So that's the relevance.
7         THE WITNESS:  I saw entries in the
8    chart that he consumed up to 24 beers in a short
9    period of time, like a day.  That would be four
10   six packs.
11   BY MR. RADUNSKY:
12   Q.   Can you --
13   A.   And that can have direct deleterious
14   effect on the heart muscle.
15   Q.   That's what I was going to ask you.
16   I mean, what effect does alcohol have on the heart
17   muscle, I mean, if you're using it over a long
18   period of time, years?
19   A.   A small amount of alcohol, that is up
20   to seven to ten drinks per week, that is one to
21   one and a half drinks a day, has been shown to
22   have some beneficial effects.  But as the alcohol
23   consumption increases, all times -- all kinds of
24   problems develop, including potentially weakening
25   of the heart muscle or coronary events like

23 (Pages 86 - 89)

Page 90

1  stroke, high blood pressure.
2      Q.   What about the diabetes, I mean,
3  what's the effect on his heart from having
4  diabetes?
5      A.   It can be brutal.  But diabetes is one
6  of the most significant, like smoking, risk
7  factors that dramatically increases the rate of
8  coronary artery disease progression and the
9  fragility of blood pressures.  That's why diabetes
10 is a huge role and challenge.
11     Q.   And it was your understanding that he
12 was even continuing to smoke and while he was
13 being treated for his heart condition even after
14 his heart attack.  Correct?
15     A.   That's my understanding.
16     Q.   I have nothing else.  Thanks.
17         MS. KOTT:  Just like one or two other
18 questions.
19         MR. RADUNSKY:  Sure.
20             RE-EXAMINATION
21             BY MS. KOTT
22     Q.   Do you agree that someone who is in an
23 extreme state of anxiety may participate in
24 smoking?
25     A.   Some people smoke because they're

Page 91

1  anxious.  Other people are anxious if they're not
2  smoking.  So certainly smoking and anxiety can be
3  closely related to one another.
4      Q.   Same question with regard to alcohol
5  consumption.
6      A.   Yes.  Similar answers.
7      Q.   And you don't have any personal
8  knowledge as to the amount of alcohol or the
9  amount of cigarettes that Mr. Dukes took.  Right?
10     A.   Not personal knowledge.  It's just
11 what I read in the summaries of caregivers who had
12 asked him questions about how much he was drinking
13 and how much he was smoking.
14     Q.   And do you have any knowledge if any
15 of his diabetes medications had not been
16 administered to him?
17     A.   I don't know about the diabetes
18 medications.
19     Q.   And would you agree that if he had not
20 received his diabetic medication that that would
21 cause more anxiety for Mr. Dukes?
22         MR. RADUNSKY:  Objection.  Foundation.
23         You can answer.
24         THE WITNESS:  I would agree not
25 receiving a medication could cause more anxiety.

Page 92

1  BY MS. KOTT:
2      Q.   Would you agree that there's some
3  literature and that some doctors believe that a
4  calcium score is more indicative of ordering an
5  angioplasty than a stress test?
6      A.   That's a pretty vague question.  Some
7  doctors will do a coronary calcium score to tell a
8  patient, look, you have coronary disease, and
9  we'll proceed to a stress -- to a cath.  Others
10 would say there's not a direct relationship
11 between the intensity of blockage and your
12 coronary score, so let's do a stress test to see
13 what your physiology is.  Different doctors would
14 handle that differently.
15     Q.   So you would agree that a stress test
16 is not the only objective indication of diagnosing
17 heart disease in a patient?
18         MR. RADUNSKY:  Asked and answered.
19         THE WITNESS:  Yes, I would certainly
20 agree.  There are stress nuclear studies, there
21 are stress MRIs, magnetic resonance images, and
22 there's nuclear angiography.  These are all
23 different ways of assessing physiology and
24 anatomy.
25         MS. KOTT:  Well, thank you, Doctor.

Page 93

1  That's all I have for you today, unless Troy has
2  anything else.
3          MR. RADUNSKY:  I've got just one more.
4              RE-EXAMINATION
5              BY MR. RADUNSKY
6      Q.   Dr. Fintel, millions of people suffer
7  extreme anxiety and don't smoke and are not
8  alcoholics.  Right?
9      A.   Correct.
10     Q.   Okay.  I've got nothing else.
11         MS. KOTT:  All right.  Thank you,
12 Doctor, for your time.
13         MR. RADUNSKY:  What do you want to do?
14 Do you want to reserve or waive?  It's up to you,
15 Dr. F.
16         THE WITNESS:  I'll take a look at it.
17         MR. RADUNSKY:  Okay.  That's fine.
18         Deb, I'll definitely take it.
19         MS. KOTT:  And also for us -- did you
20 get my information in the beginning or do you need
21 that?
22             (A discussion was held off
23              the record.)
24         THE COURT REPORTER:  So, Judith, you
25 are ordering a transcript then?

24 (Pages 90 - 93)

Page 94

1      MS. KOTT: Yes.
2          (The deposition concluded
3          at 2:57 p.m.)
4          (Signature was reserved.)
5          --oo0oo--
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 95

1          CERTIFICATE
2          OF
3     CERTIFIED SHORTHAND REPORTER
4
5      I, DEBRA L. KLESZYK, a Certified Shorthand
6 Reporter of the State of Illinois, CSR License
7 084-002981, do hereby certify:
8      That previous to the commencement of the
9 examination of the aforesaid witness, the witness
10 was duly sworn by me to testify the whole truth
11 concerning the matters herein;
12      That the foregoing deposition transcript
13 was stenographically reported by me and was there-
14 after reduced to typewriting under my personal
15 direction and constitutes, to the best of my
16 ability, a true and accurate record of the
17 testimony given and the proceedings had at the
18 aforesaid deposition;
19      That the said deposition was taken before
20 me remotely via videoconference at the time and
21 place specified;
22      That I am not a relative or employee or
23 attorney or counsel for any of the parties herein,
24 nor a relative or employee of such attorney or
25 counsel for any of the parties hereto, nor am I

Page 96

1 interested directly or indirectly in the outcome
2 of this action.
3      IN WITNESS WHEREOF, I do hereunto set my
4 verified digital signature this 27th day of April,
5 2023.
6
7
8            *Debra L. Kleszyk*
           DEBRA L. KLESZYK
9       Certified Shorthand Reporter
       License No. 084-002981
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 97

1        Veritext Legal Solutions
2         1100 Superior Ave
         Suite 1820
3        Cleveland, Ohio 44114
        Phone: 216-523-1313
4
5 April 27, 2023
6 To: Mr. Radunsky
7 Case Name: Dukes, William v. Addison Et Al
8 Veritext Reference Number: 5852221
9 Witness: Dan James Fintel , MD     Deposition Date: 4/17/2023
10 Dear Sir:
11 Enclosed please find a deposition transcript. Please have the witness
12 review the transcript and note any changes or corrections on the
13 included errata sheet, indicating the page, line number, change, and
14 the reason for the change. Have the witness' signature notarized and
15 forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
19 If the errata is not returned within thirty days of your receipt of
this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

25 (Pages 94 - 97)

Page 98

1    DEPOSITION REVIEW
    CERTIFICATION OF WITNESS

2

    ASSIGNMENT REFERENCE NO: 5852221
3    CASE NAME: Dukes, William v. Addison Et Al
    DATE OF DEPOSITION: 4/17/2023
4    WITNESS' NAME: Dan James Fintel , MD
5    In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have made no changes to the testimony
    as transcribed by the court reporter.

8

    _____
9  Date          Dan James Fintel , MD
10    Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
        They have read the transcript;
13       They signed the foregoing Sworn
          Statement; and
14       Their execution of this Statement is of
          their free act and deed.
15
    I have affixed my name and official seal
16
  this _____ day of_____, 20____.
17
        _____
18    Notary Public
19    _____
    Commission Expiration Date
20
21
22
23
24
25

Page 99

1    DEPOSITION REVIEW
    CERTIFICATION OF WITNESS

2

    ASSIGNMENT REFERENCE NO: 5852221
3    CASE NAME: Dukes, William v. Addison Et Al
    DATE OF DEPOSITION: 4/17/2023
4    WITNESS' NAME: Dan James Fintel , MD
5    In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9    I request that these changes be entered
    as part of the record of my testimony.
10
    I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date         Dan James Fintel , MD
14
    Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17       They have read the transcript;
        They have listed all of their corrections
18       in the appended Errata Sheet;
        They signed the foregoing Sworn
19       Statement; and
        Their execution of this Statement is of
20       their free act and deed.
21    I have affixed my name and official seal
22  this _____ day of_____, 20____.
23  _____
    Notary Public
24
    _____
25  Commission Expiration Date

Page 100

1    ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS MIDWEST
2    ASSIGNMENT NO: 5852221
3  PAGE/LINE(S) /    CHANGE    /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
  _____  _____
20  Date         Dan James Fintel , MD
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
    Notary Public
24
    _____
25  Commission Expiration Date

26 (Pages 98 - 100)

**[& - 75]**                                                          Page 1

| & | | | |
|---|---|---|---|

**&**

**&**   3:3

**0**

**084-002981**
95:7 96:9

**1**

**1**   4:12 6:20,21
6:23
**10**   12:19 14:21
32:15,17,18,24
68:21
**100**   9:15
**1100**   97:1
**11th**   71:22
**12**   14:21 15:19
15:25 57:4,9
57:17,23
**1200**   11:24
**12th**   73:19
**15**   12:19
**16**   11:19 34:5
44:13
**17**   1:5,23 2:6
34:5
**18**   41:14
**1820**   97:2
**1875**   96:8
**18th**   74:8
**1971**   13:23
**1979**   14:3
**1982**   18:18
**1985**   10:20
14:11,12 18:19

**1987**   14:17
18:20
**1988**   21:19
**1990s**   18:21
**19th**   12:1
**1:07**   2:6

**2**

**2**   4:13 9:17,19
**20**   21:3 23:2
32:15,17 98:16
99:22 100:22
**20,000**   12:10
**200**   12:11
**2012**   7:12 33:4
33:19 35:23
36:19 47:6
64:1 70:14
88:6
**2014**   7:12,13
**2015**   32:9,9
34:5 35:5,9
36:4,9 42:7,25
64:5 74:22
87:10
**2015-2017**   73:7
**2016**   35:10
36:4,8
**2017**   32:9
74:22 87:10
**2018**   7:13
46:23 63:20
64:4 65:25
**2019**   35:5,23
42:7,25 73:8

**2020**   33:13
35:19 36:20
41:14 46:5
47:3 62:21
63:20 65:25
66:5 68:24
74:8 75:4
77:21 88:10
**2021**   64:1 88:6
**2022**   20:18
**2023**   1:23 2:6
96:5 97:4
**20th**   15:5
**21**   70:11
**216-523-1313**
97:3
**230**   3:11,11
**24**   89:8
**25**   48:5
**27**   97:4
**27th**   96:4
**2:07**   53:11
**2:08**   53:11
**2:57**   94:3

**3**

**3**   15:25
**30**   21:3 48:5
**300-4479**   3:12
**312**   3:5,12
**332-2400**   3:5
**35**   15:7 17:21
59:18 68:21

**4**

**4/17/2023**   97:8
98:3 99:3
**40**   32:15 34:19
35:3
**44114**   97:2
**47**   69:6

**5**

**50**   22:22,24
23:13 37:8
76:1
**57**   28:17 29:2,3
39:22,24 40:4
41:1
**5852221**   97:7
98:2 99:2
100:2

**6**

**6**   4:5,12
**600**   2:8 3:4
**60602**   3:4
**60606**   3:11
**61**   4:6
**676**   2:8 10:3

**7**

**7**   44:13
**70**   22:22,24
23:13
**700**   21:21
22:19
**7095**   1:5
**72**   79:14 80:5
**75**   4:5 13:24
15:1

Exhibit A

**[78 - albeit]**                                                    Page 2

| | | | |
|---|---|---|---|
| **78** 44:9 65:21 | **accept** 40:25 | **addison** 1:12 | **aforesaid** 95:9 |
| **79** 14:25 | **acceptable** 25:3 | 97:6 98:3 99:3 | 95:18 |
| **8** | **accepting** | **addition** 14:23 | **agent** 69:14 |
| | 40:23 42:4 | **additional** 58:4 | **ago** 10:24 |
| **8** 35:19 41:15 | **accordance** | **address** 97:15 | 15:25 20:20 |
| **80** 11:15 32:18 | 98:5 99:5 | **administered** | 23:18 28:9 |
| 32:19,24 | **accuflo** 8:17,18 | 5:10 29:9 54:7 | 48:6 68:14 |
| **82** 15:2 | 8:24 9:2,12 | 56:10 91:16 | **agree** 5:14 8:14 |
| **85** 11:15 15:3 | 40:9 41:25 | **administration** | 9:15 18:22 |
| **86** 4:6 | **accumulation** | 11:5 26:5 27:4 | 25:5 27:14,20 |
| **9** | 77:9 | 29:4 57:22 | 28:24 29:16 |
| | **accurate** 95:16 | 67:20 | 34:17 37:12,22 |
| **9** 4:13 | **acknowledge** | **administrations** | 39:23 45:9,20 |
| **90** 4:5 41:4 | 5:5 98:11 | 68:3 | 45:24 46:8,14 |
| **93** 4:6 | 99:16 | **administrative** | 48:10 49:4,10 |
| **94** 35:8 | **act** 98:14 99:20 | 11:1 | 49:23 59:25 |
| **96** 43:2 | **action** 96:2 | **admissible** 8:25 | 67:9 75:13 |
| **97** 43:23 | **activation** 31:9 | **admission** | 76:20 79:16 |
| **98** 65:21 | **active** 11:5 | 41:15 | 80:3,6 81:16 |
| **99** 37:9 | 59:20 69:16 | **admitted** 36:2 | 82:20 90:22 |
| **a** | **activities** 12:15 | 62:20 63:16 | 91:19,24 92:2 |
| | 14:5 | 66:2 73:1 74:9 | 92:15,20 |
| **ability** 95:16 | **actual** 82:17,22 | **adopt** 6:17 | **agreed** 5:12 |
| **able** 72:10 | **actually** 6:4,18 | **adverse** 60:25 | 30:4 60:13 |
| **above** 2:2 | 10:10 15:10 | 73:3 78:17 | 80:8 82:9 |
| 97:17 | 29:8 34:2 | 85:2,4 | **agrees** 30:1 |
| **abruptly** 51:8 | 54:14 64:5 | **advice** 55:17 | **ahead** 8:21 |
| **absence** 72:5 | 81:9 83:21 | 70:20 71:8 | 34:24 40:14 |
| **absolutely** 9:14 | **acute** 15:21,21 | **advise** 50:6 | 49:6 53:21 |
| 36:1 41:11 | 42:13 51:7 | **advised** 78:11 | 83:6 |
| 46:2 51:9 | 58:10 62:19 | 78:14,15 | **al** 97:6 98:3 |
| **academic** 10:1 | 63:16 74:4,10 | **affixed** 98:15 | 99:3 |
| 10:21 11:12 | 77:21 | 99:21 | **alarms** 84:11 |
| 12:16 | **adding** 85:19 | **afford** 49:5,9 | **albeit** 62:18 |
| **acceleration** | | | |
| 88:3 | | | |

**alcohol**  23:20
  52:22 89:16,19
  89:22 91:4,8
**alcoholic**  89:1
**alcoholics**  93:8
**allegation**  27:2
  56:10,15
**allegations**
  74:1
**alleged**  23:4
  24:3 36:8 51:1
  52:10 57:21
  65:22 70:8
  74:18 75:23
  79:12 83:21
**allegedly**  22:1
  54:7 63:18
**alleges**  36:4
**allowed**  68:14
**altman**  1:12
**amended**  7:10
**american**  16:9
  16:11,13,15
**amount**  32:12
  63:11 77:15
  80:21 86:8
  89:19 91:8,9
**analogy**  44:18
**anatomy**  92:24
**andrews**  1:16
**angina**  41:9
**angiogram**
  77:19
**angiography**
  92:22

**angioplasty**
  77:17,20 87:14
  87:17 92:5
**answer**  20:14
  23:6 28:6,22
  28:24 29:15
  30:7 34:24
  40:6 41:18
  51:15 54:3
  57:19 60:10
  67:13 72:6
  78:8 79:5 80:2
  80:2,25 83:2,7
  84:20 91:23
**answered**
  43:20 53:24
  80:24 81:1
  92:18
**answering**  35:1
  40:24
**answers**  91:6
**anterior**  33:13
  36:21 54:22
  74:10,11,13
  76:8 77:22
**anti**  34:13
  47:14
**antidepressant**
  47:14
**anxiety**  37:14
  37:15,22,24,25
  38:2,5,7,10,12
  38:17 39:5,7
  39:11,12,25
  45:18,22,24

46:10,11,20
47:10,12,14
48:1,14 49:1
49:10,11 52:15
52:16 53:2
54:2 58:16,19
59:6,10,12,13
60:5 61:7,10
61:13 78:12
80:22 81:3
82:6,11 83:22
84:15,16,16,22
84:23 85:2,8
90:23 91:2,21
91:25 93:7
**anxious**  52:24
  91:1,1
**anxiousness**
  37:17
**anybody**  66:8
**aortic**  87:7
**apologies**  53:21
**apologize**  53:23
  78:25
**appear**  98:11
  99:15
**appearances**
  42:7
**appeared**  3:6
  3:13
**appended**
  99:11,18
**applicable**  6:1
**appreciate**
  30:10

**approaches**
  72:20
**appropriate**
  29:14 31:4,7
  31:23 32:25
  58:9 75:5
**appropriately**
  59:21
**appropriaten...**
  32:23
**approxi**  34:18
**april**  1:23 2:6
  96:4 97:4
**area**  12:3 17:11
  17:17 47:4
  64:7
**areas**  12:20
  13:7 17:24
  20:3
**argue**  74:17
**arias**  1:13
**arrest**  23:5
  24:5 50:11
**arrive**  56:20
  57:2
**arrived**  10:20
**arterial**  58:24
  76:25
**arteries**  33:6,9
  50:10 75:14
  76:22 77:10
  87:7
**artery**  31:14,15
  37:10 54:23
  74:12,14 76:8

77:16 86:23
88:1 90:8
**article** 84:9
85:11,17,22
**articles** 20:2
**asked** 50:23
54:3 60:14
76:3,17 78:21
80:8,23 81:8
81:12 91:12
92:18
**asking** 32:10
57:13 79:11
82:24 86:17
**aspirin** 31:8
51:23 58:7
60:3
**assess** 49:13
**assessed** 47:2
**assessing** 92:23
**assessment**
47:12
**assignment**
98:2 99:2
100:2
**assistant** 10:22
**associate** 10:21
10:22
**associated**
41:16
**association**
16:15
**associations**
16:8

**assume** 73:25
74:2
**assumes** 28:20
34:22 40:3
**assuming** 19:4
29:1 51:19,20
**assurance** 11:2
**athero** 36:25
**atherosclerosis**
37:3
**atherosclerotic**
34:13
**atorvastatin**
31:18 32:12,18
**attached** 99:7
**attack** 31:10
35:16 36:3
41:10 47:5
58:13 63:16
69:3 70:14
90:14
**attacks** 59:1
**attend** 13:13
17:22
**attended** 14:1
**attending**
10:17 11:17,22
13:24 14:15
25:11 26:15
48:25
**attorney** 5:11
95:23,24
**authorize**
99:11

**ave** 97:1
**await** 43:1
**awards** 16:22
**aware** 33:1
48:18 53:3
72:21 85:16
87:25 88:23

**b**

**b** 7:18
**b.s.** 14:25
**bachelor** 13:21
**back** 19:11
30:22 42:14,19
43:18,21 44:19
44:20,21 53:7
54:23 65:9,11
72:23 85:19
97:15
**background**
13:9 58:1
**badge** 17:6
**baker** 3:3
**ballooning**
74:13
**baltimore**
14:10
**based** 9:1 14:4
25:19,21 41:22
41:23,25 46:15
59:18 60:22
72:19 88:24
**basement**
62:23 74:9
84:2 88:16

**basing** 46:17
**basis** 32:4
40:16,20 50:7
50:19 57:24
61:3 64:16
71:15
**bat** 23:8
**bedside** 12:24
**beers** 89:8
**beginning**
35:10 93:20
**behalf** 2:2 3:6
3:13 23:19,24
24:2,4
**believe** 28:9
35:2 46:15
49:21 57:20
79:14,18 84:7
88:24 92:3
**beneficial**
38:15 59:8
89:22
**best** 24:9 25:3
95:15
**beta** 31:10 52:1
**better** 64:12
67:10
**beyond** 19:17
79:21
**billing** 20:24
**biochemistry**
13:22
**biophysics**
13:21

**birthday**  15:9
**bit**  22:14
**block**  31:8
**blockage**  92:11
**blockages**
  73:11 76:1
**blocker**  31:10
**blockers**  52:1
**blood**  31:12
  49:24 50:3
  58:22,25 67:21
  69:13 71:1
  90:1,9
**bloodworth**
  1:17
**blue**  88:10
**board**  12:7
  18:15,17
**boards**  14:12
  14:13,15,19
**body**  59:9
**boston**  13:25
**boxes**  69:2,19
**bozyk**  1:13
**brave**  13:23
**break**  53:10
**breakdown**
  22:9
**breathing**  72:8
**brief**  35:14
  42:25 53:7
**bring**  39:10
**broadly**  21:15
**brutal**  90:5

**brutality**  23:4
**buchanan**  1:13
**buildings**  10:2
**buildup**  75:14
  75:16 76:3
  87:10
**burst**  48:5
**busy**  11:23
  12:4,18 39:2

**c**

**c**  1:14,16 3:1
  33:16,16
**ca**  97:25
**calcium**  36:14
  36:15,16,17,22
  36:23 37:2,6,7
  37:9,10 76:25
  77:3,8,9,10,16
  86:13,18,21,23
  87:1,4,5,21,22
  88:1,3 92:4,7
**call**  8:7,10
**called**  5:18 8:9
  8:17 20:1
**camera**  10:12
**camp**  18:8,8
**campus**  10:3
**capacity**  1:7,10
  1:12
**capital**  23:19
**capturing**
  46:20
**cardiac**  15:22
  24:5 33:24
  41:6 46:18

47:22 49:17,20
49:25 50:11
51:4,7 53:4
57:22 58:17
66:11 73:4,21
74:4,21 75:6
75:16 76:10,11
76:20 80:4,12
81:22 84:3,10
85:12 86:10
88:5
**cardiogram**
  70:12
**cardiologist**
  12:5,8 17:12
  17:13 25:11
  26:15 37:20
  48:25 58:1
  59:19,20 62:14
  64:18 68:20
  71:4,14 86:19
**cardiologists**
  13:1 38:24
**cardiology**  7:24
  12:1,21 13:8
  14:11,12,20
  15:2,18 16:6
  16:10 17:11,19
  18:19,20 19:21
  22:3 27:14,21
  57:25 62:2
  77:14
**cardioprotect...**
  58:6,11

**cardiovascular**
  15:23 22:2,4
  39:18 69:20
  70:3
**care**  11:2,16,17
  11:18 14:14
  17:12 18:19
  24:23,24 25:2
  25:3,3,3,6 27:9
  31:24 34:20
  48:5 59:19
  62:12 63:10
  72:19 75:2,5
  76:20 88:7
**carefully**  80:11
**caregiver**  67:5
**caregivers**
  91:11
**case**  2:3 9:1
  21:3 28:25
  29:14 31:5
  35:18 39:14
  40:22,22 46:3
  46:15 51:10
  52:14 56:8,17
  57:25 63:7
  73:16,23 74:16
  74:19 75:19,20
  76:16 79:18,18
  79:19 80:10
  81:8 85:1 97:6
  98:3 99:3
**cases**  21:21,22
  21:23,24 22:5
  22:10,11,12,16

22:19,21 23:3
23:7 24:6,8,15
24:17,20 26:25
64:23
**cath** 33:17 92:9
**causal** 66:9
**cause** 36:6 38:9
49:11 50:12
58:12,16 60:4
60:13 67:22,23
68:23 70:5
87:24 91:21,25
**caused** 68:23
80:21 81:17
**causes** 69:25
81:25
**ccu** 59:19
**celebrated** 15:9
**center** 7:21
**century** 15:5
**cermak** 1:9,11
7:14 75:2
**certain** 22:1
25:25 86:8
**certainly** 30:2
31:14 38:25
71:10 80:7
81:2 91:2
92:19
**certainty** 27:12
27:13,20 28:15
29:12,18,21
30:8,25 45:10
46:8 62:1

**certifica** 18:15
**certificate** 95:1
99:11
**certification**
98:1 99:1
**certifications**
18:18
**certified** 2:3
5:2 12:7 95:3,5
96:9
**certify** 95:7
**cetera** 20:5
59:24
**chairman** 11:3
**challenge** 90:10
**challenges**
22:17
**chance** 50:10
**change** 97:13
97:14 99:8
100:3
**changed** 73:2
**changes** 87:17
97:12 98:7
99:7,9
**chart** 89:8
**check** 20:16
69:2
**checked** 69:19
**chest** 16:14
41:15 58:10
59:12,14 72:1
82:15,21 88:18
**chicago** 2:9 3:4
3:11 12:2 64:7

**chicago's** 38:24
**choice** 64:23
**choking** 23:5
**cholesterol**
31:17,20 49:25
50:3 51:25
69:15
**choose** 39:16
**chose** 26:22
64:21
**cigarettes** 91:9
**circulation**
58:23,24
**circumflex**
33:11,15,15
**circumstances**
54:16
**city** 14:7 18:10
**civil** 2:7 5:25
98:5 99:5
**claims** 56:2,4
**clair** 2:9 10:4
**classes** 15:12
**clear** 9:9,11
35:1,17 42:1
**clearly** 37:11
**cleveland** 97:2
**client** 42:23
**clinic** 12:1
**clinical** 11:7,11
11:16,17 12:15
12:17,21 17:2
17:3 25:16,20
25:23 37:15
48:5 58:1

59:20 68:10
72:19
**clinicians** 64:7
**clogged** 50:10
**closely** 91:3
**closest** 56:14
**clotting** 74:3
**coast** 14:6
**coat** 17:8
**code** 5:25
**college** 13:19
16:10,11,14
**combination**
70:2
**come** 12:2
16:17 38:23
48:14 54:23
**coming** 20:8
40:4 61:15
**commencem...**
95:8
**commencing**
2:6
**comment** 32:23
63:13 86:17
**commented**
22:2
**commenting**
31:23 61:9
**commission**
98:19 99:25
100:25
**committees**
11:4,6 16:16

Exhibit A

**[common - corrections]**                                          Page 7

**common** 34:9
**commonly**
  31:20 32:19
**community**
  7:20 25:2,4
**comp** 22:5
**complained**
  82:15,21 83:17
**complaining**
  72:1
**complaint** 7:11
  71:24
**complaints**
  72:3
**complete** 82:1
  82:25 83:10
**completed** 14:7
  56:19,23 97:15
**completion**
  15:1,2
**complications**
  73:14
**compound**
  67:12
**comprised** 62:4
**compulsive**
  48:8
**computers** 10:8
**concerning**
  95:11
**concluded** 94:2
**conclusion** 47:6
  56:20 57:2,3
  60:23 61:15
  74:17 76:17

**conclusions**
  60:22 72:18
**condition** 72:1
  72:4 75:6 79:2
  84:23 89:5
  90:13
**conditions** 51:2
  69:23 72:6
**conducted**
  19:15
**conference**
  44:22
**confirm** 42:17
  54:19
**confirms** 85:12
**consecutively**
  65:16 79:15
**consequence**
  71:2 73:4 76:9
  78:17 84:1
**consequences**
  41:7 60:25
  72:15 80:6
**consider** 49:16
  50:20
**considered**
  34:20 64:20
  72:3
**constitutes**
  95:15
**consults** 12:13
**consumed** 89:8
**consumption**
  89:23 91:5

**contiguously**
  35:12
**continue** 50:7
  69:12 70:7
**continued** 77:9
**continues**
  76:13
**continuing**
  7:19 69:6
  90:12
**continuous**
  50:7
**contributed**
  69:17
**contributing**
  69:21,25
**control** 42:10
**controlled**
  85:18
**conviction** 45:5
**cook** 1:6,8,8,9
  1:11 7:11 35:6
  41:3 42:6,15
  42:18,24 43:1
  43:12,17 44:19
  44:20,21,23
  45:23 51:5
  52:9 57:23
  65:10 66:20,25
  67:3 68:2,16
  74:23 78:1,24
  82:16,18
**copy** 6:19
**coronary** 11:2
  11:18 31:14,15

  33:6 36:18
  37:10 41:10,13
  41:14 42:10,13
  47:7 63:17
  67:18 69:8
  70:6 74:12,14
  76:5 77:7,8,10
  77:19,20 79:24
  85:8 86:23
  87:7 88:1
  89:25 90:8
  92:7,8,12
**correct** 8:17,18
  23:25 42:20
  46:21 48:1
  51:5 52:8,11
  52:12 54:17
  55:4,24,25
  58:14 61:8,9
  61:13,14 62:8
  63:4 65:12,13
  65:16,17,18,25
  66:1,5,6 68:18
  70:14,22 74:3
  76:23 77:1
  79:24 80:22
  82:17 83:22
  85:6,15,19
  86:1,11 88:13
  88:17,20 90:14
  93:9
**corrected** 65:21
**corrections**
  97:12 99:17

**correctly** 23:13
**counsel** 5:8
20:10 79:10
95:23,25
**count** 43:6
**country** 13:3
13:17 22:23
**county** 1:6,8,8
1:10,11 7:11
7:14 35:7 41:3
42:6,15,19,24
43:1,12,17
44:19,21,23
45:23 51:5
52:4,10 57:23
65:10 66:20,25
67:3 68:2,16
74:23 78:1,1
78:24 82:16,18
98:10 99:15
**couple** 61:24
86:5
**coupled** 69:12
**course** 19:8
20:25 26:3
28:7 55:25
**courses** 17:19
**court** 1:1 5:1
6:18 23:3,11
23:17 24:7
42:7 43:1,16
56:17 93:24
98:7
**covenant** 7:17

**covid** 13:3,5
**create** 52:23
**critical** 14:14
17:12 18:19
59:19
**criticism** 67:8
74:25
**criticize** 67:16
**criticizing** 34:6
**csr** 95:6
**culminating**
14:10
**cum** 13:20 14:4
**current** 14:18
18:14
**currently** 9:22
11:5 18:6 56:7
**curriculum**
4:13 12:18,22
16:24 18:2
**cv** 1:5 9:17
18:24 19:5,13
19:16 20:3

---
**d**
---

**d** 1:15,18 4:1
7:23 62:18
**daily** 50:19
**damage** 41:17
46:25 73:9
76:22
**damaging** 84:2
**dan** 1:22 2:1
4:3 5:17,23 6:6
97:8 98:4,9
99:4,13 100:20

**dangerous**
70:23
**darki** 7:23 8:5
62:16 72:14,21
84:8,9
**dart** 1:7
**data** 8:20 35:17
46:2,3,16,18
**databases** 24:7
**date** 17:23 21:3
43:6 97:8 98:3
98:9,19 99:3
99:13,25
100:20,25
**day** 11:20,21
35:8 38:3,20
44:21 54:15,20
55:16 70:19
71:8 89:9,21
96:4 98:16
99:22 100:22
**days** 12:11
25:19 35:7
42:23 43:2,3
43:23 44:3,9
44:13,13 50:15
52:1 65:21
70:8 73:22
74:18 79:12,15
80:5 85:23
97:18
**deal** 84:1
**dear** 97:10
**deaths** 48:12

**deb** 93:18
**debbie** 5:2
30:13,18
**debra** 2:3 95:5
96:8
**decide** 55:20
**decisions** 24:25
**decreased** 47:5
**deed** 98:14
99:20
**deemed** 97:19
**defendant** 5:14
23:24 24:11,12
**defendants**
1:19 3:14
**defense** 20:10
22:10,12 24:19
**define** 37:14
**definite** 35:14
**definitely** 93:18
**degree** 13:20
14:3,25 15:1
27:11,12,19
28:14 29:11,18
29:20 30:7,24
33:19 37:23
38:7 45:10,18
45:22 46:7
47:12 51:17
62:1 71:1
**deleterious**
35:13 41:7
72:24 89:13
**delirium** 23:20

**deliver** 55:2
**demand** 8:2,11
8:16 31:13
59:4
**department**
11:3 97:22
**depending** 29:3
29:5 44:14
**depends** 25:16
25:22 26:19,20
29:7 37:23
38:11
**deposition** 1:21
2:1 5:5,7,23,24
6:7,22 8:2 9:18
10:1,5 20:22
32:4,10 54:11
55:18 56:5
68:6 71:13,20
80:8 83:16
94:2 95:12,18
95:19 97:8,11
98:1,3 99:1,3
**depositions** 8:3
21:20 54:9,9
62:10
**depression**
48:7
**descending**
33:13 54:22
74:11,14 76:8
77:22
**describe** 19:13
24:22 38:16

**described**
19:16 72:6,8
**description**
4:11
**despite** 69:9
**detail** 9:7
**detainee** 71:25
**determi** 45:21
**determine**
64:13
**devastating**
71:3
**develop** 82:1
89:24
**developed**
73:11
**developing**
41:9
**development**
73:3
**devore** 3:9
**devoreraduns...**
3:12
**diabetes** 69:15
90:2,4,5,9
91:15,17
**diabetic** 91:20
**diagnosing**
92:16
**diagnosis** 72:11
**diagnostic**
15:22 85:5
**died** 23:20
**differed** 44:3

**different** 38:15
38:17 40:22
63:25 65:20
73:1 78:19,19
92:13,23
**differential**
72:11
**differently**
92:14
**digital** 96:4
**digitally** 10:10
10:12 12:12
**dilator** 58:22
**direct** 37:4 38:4
42:16 76:9
77:2 89:13
92:10
**direction** 95:15
**directly** 11:16
55:23 96:1
**director** 1:9,10
11:1,2 59:19
**disagreed**
60:19
**disagreeing**
78:7
**discharge**
54:21
**discharged**
70:19 74:15
**discomfort**
81:18
**discovery** 5:23
**discuss** 21:10

**discussed** 85:6
**discussion** 9:12
19:9 32:9
93:22
**disease** 31:14
31:15 36:19
37:11 39:15,18
39:21 42:10
46:9 47:8
48:11,12,15
50:1 58:17
67:18 70:6
76:5 77:7
80:15 85:8,10
90:8 92:8,17
**disorder** 48:8,8
**dispensed** 67:5
81:7,10
**dispute** 43:11
**disputing** 43:10
**distinction** 17:5
**distribution**
7:12 82:7
**district** 1:1,1
**divide** 11:12
**division** 1:2
**dizzy** 70:24
72:7
**doctor** 6:4 7:2
9:22 13:9 14:4
14:23 18:8,24
25:6 26:3,9
33:23 38:19
53:14 62:13
67:6 72:12

75:11 76:20
81:14,14 84:6
92:25 93:12
**doctor's** 9:17
**doctors** 54:9
64:21 66:2
77:14 92:3,7
92:13
**documentation**
68:2
**documented**
41:13 83:14
**documents** 6:8
6:10 10:6
42:17 52:14
56:25
**doing** 12:18
25:21 34:4
64:14
**door** 39:1
**dosage** 50:9
**dosages** 25:25
29:14 31:3
51:5 52:5,10
85:24
**dose** 8:8,15
26:5 27:3
32:14,15,16,18
32:20,24 33:24
34:3,3,11,13,14
78:19
**doses** 7:25 34:7
65:4 66:10
70:1 87:11,23

**double** 15:9
75:21 78:25
**dr** 5:23 7:18,21
7:23 8:4 28:6
29:16,19 30:1
30:3 40:5
44:11 54:10,17
55:18 61:24
62:13,14,16
70:11 71:12
72:14,21 84:7
86:7 93:6,15
**dramatically**
90:7
**drawer** 17:7
**drinking** 91:12
**drinks** 89:20,21
**drop** 67:21
**dropped** 56:5,9
56:13
**drug** 29:8
56:11
**drugs** 22:17
56:15 59:21,23
63:18
**due** 23:20 24:5
27:2 48:12
70:13 73:21
74:10 77:8
85:8
**dues** 16:13,18
**dukes** 1:3 8:3
10:9 17:15
31:15 39:14
45:22 48:17

51:1 52:6,15
53:14 54:14,19
55:23 57:20
59:7 60:23
63:8 66:23
68:5 69:6
71:11 72:9
73:5 75:19
77:24 79:2
80:10,22 81:3
81:8 82:10,15
83:17,22 84:3
91:9,21 97:6
98:3 99:3
**duly** 5:15,19
95:10
**dunmars** 1:17
**duties** 11:10,11
11:12 12:16

**e**

**e** 1:12 3:1,1 4:1
6:6 7:18,22
33:16 47:15,15
54:10
**earlier** 63:23
76:24 79:10
84:5
**earliest** 56:8
**early** 36:7
**east** 14:6
**eastern** 1:2
**easy** 68:6
**echo** 46:4,23
64:10,14 70:11
76:2 87:1,4,5

**echocardiogr...**
7:17 35:24
36:13 61:5
62:15 87:8
**echocardiogr...**
68:22
**echos** 46:23
64:1,4,9,24
65:1 86:20,20
87:19
**education**
13:19
**effect** 34:13
35:13 36:6
46:12 59:9
61:6,11 68:17
74:6 78:17
81:21 89:14,16
90:3
**effects** 38:15
47:15 51:23,25
72:24 89:22
**eight** 55:14
**either** 17:20
50:10 52:3
68:15
**ekgs** 12:11,12
15:23
**elaborate** 33:18
**electrocardio...**
12:9
**electronic**
26:22
**elevated** 37:10
77:10

**[ellen - extensive]**                                Page 11

ellen   3:10
email   97:17
emergency
  88:20
emotional
  46:20 52:21
emotionally
  46:12
employee   95:22
  95:24
employer   22:6
employment
  11:10 18:23
enclosed   97:11
encourage
  71:14
ends   49:19
ensure   25:6
entered   99:9
entire   85:15
  98:5 99:5
entitled   2:2
entries   89:7
enumerated
  12:17
environment
  74:16
episode   51:4
  58:10 79:20
equates   85:23
equivalent
  64:21
errata   97:13,18
  99:7,10,18
  100:1

especially   69:5
essential   26:7
establish   22:17
  43:15
established
  36:7
estimate   22:10
  24:9
estimated   43:4
estimating
  21:19
et   20:5 59:24
  97:6 98:3 99:3
etiology   81:22
evaluate   72:12
  86:18
evaluated   64:6
  81:15 83:18
evanston   13:15
evening   59:3
evenly   24:15
event   38:11
  41:11,14 42:13
  49:18,20 51:8
  63:9 65:3
  66:11 68:24
  69:18,25 73:21
  74:4,4,8,22
  75:16 79:24
  83:25 86:10
  88:11
events   38:9
  69:8 89:25
evidence   28:21
  34:22 36:10

40:3 42:9,16
46:25 51:1,10
51:12 55:21
63:7 73:8,10
73:18 76:5,15
80:19 81:7,24
86:7 87:1,9,13
87:16,25
evidenced
  35:18,24
evident   47:7
  80:15
exact   43:6,15
exactly   15:8
  42:17 63:1
  77:11
examination
  4:4 6:2 61:22
  75:8 86:3
  90:20 93:4
  95:9
examined   5:19
examining
  72:15
example   51:23
excellence   17:3
excluded   42:2
executed   99:10
execution
  98:14 99:19
exhibit   4:11,12
  4:13 6:20,21
  6:23 9:17,19
exhibits   4:10
  8:4,4

expect   36:17,22
  72:10 73:20
expectation
  25:13 26:8
  27:21 28:10
expected   74:3
experience
  21:14,16,18
  22:19 25:10
  37:25 38:16
  45:17 48:24
  59:18 76:19
  82:2,6
experienced
  46:9 49:1 59:4
  72:9
experiencing
  39:5,7 48:13
  59:5
expert   17:13
  21:6,17 23:14
  24:10 56:18
  84:21
expiration
  98:19 99:25
  100:25
expired   24:4
explain   9:4
  72:17 73:24
explanation
  19:18
expressed   67:1
extended   65:15
extensive   11:11
  21:18 76:19

Exhibit A

**[extensive - formative]** Page 12

| | | | |
|---|---|---|---|
| 77:14 | **fairness** 40:25 | 29:2 | **flash** 33:17 |
| **external** 37:16 | **fall** 20:17 71:2 | **filling** 27:2 | **flood** 74:9 |
| **extreme** 58:16 | **familiar** 59:22 | **final** 14:13,19 | 83:23 88:16 |
| 59:5 90:23 | 66:15 | 85:21 | **flooding** 62:23 |
| 93:7 | **families** 39:17 | **finally** 85:21 | 83:21 |
| **f** | **family** 39:9,15 | **find** 26:17 | **floor** 10:2 12:1 |
| | 39:21 46:9 | 30:18 53:14 | 68:12 |
| **f** 6:6 33:16 | 48:3,11,12,15 | 71:14 86:13 | **flow** 58:25 |
| 47:15 93:15 | 48:16,20 58:17 | 97:11 | **fluoxetine** |
| **facility** 42:18 | 62:13 70:4 | **finding** 70:15 | 47:13,18,22,25 |
| **fact** 21:8 35:17 | 84:11 85:13 | **findings** 21:10 | 52:25 53:15,19 |
| 47:1 48:18 | **far** 20:16 43:4 | 70:13 | 53:20 54:2 |
| 52:9 55:1 | 43:10 46:19,19 | **fine** 7:10 30:2 | 60:3 61:12 |
| 63:15 68:1 | **fault** 26:20 | 50:17 93:17 | 78:12 80:20 |
| 74:7 75:22 | **federal** 2:7 23:3 | **finish** 40:14 | **focus** 53:16 |
| 76:7,22 77:4 | 23:9,10,11,17 | **fintel** 1:22 2:1 | **focused** 47:21 |
| 79:13 | **feel** 78:13,14,22 | 4:3 5:17,23 6:6 | 53:4 |
| **factor** 48:18 | **feeling** 37:17 | 6:21,22 9:18 | **follow** 75:10 |
| **factors** 48:17 | 68:11 | 28:6 29:16,19 | 86:6 |
| 48:22 70:3 | **fellow** 16:9,10 | 30:1,3 40:5 | **following** 30:21 |
| 76:10,12 84:13 | 16:12 | 44:11 61:24 | **follows** 5:20 |
| 84:14 85:9 | **fellows** 12:25 | 86:7 93:6 97:8 | **foregoing** |
| 90:7 | 16:6 | 98:4,9 99:4,13 | 95:12 98:13 |
| **facts** 28:20 | **fellowship** | 100:20 | 99:18 |
| 34:22 36:10 | 10:20 17:1 | **firm** 6:15 21:7 | **forehead** 69:8 |
| 40:3,21,22 | **field** 17:10 | 21:11 | **forever** 34:7 |
| 57:24 74:16 | 27:13 61:18 | **first** 5:19 6:5 | **forget** 68:6 |
| 79:17,19 | 62:2 | 21:8,13 33:3 | **forgot** 30:16 |
| **factual** 40:8 | **fifth** 72:13 | 33:25 41:12 | 45:10 |
| **faculty** 11:8 | **file** 10:9 | 56:21 65:8,24 | **form** 20:12 |
| 16:2 | **fill** 26:2 28:10 | 84:16 | 28:4,20 34:21 |
| **failure** 27:6 | 45:19 | **five** 17:4 22:5 | 43:20 79:3,25 |
| 41:6 81:25 | **filled** 25:7,15 | 51:22 55:12 | 84:18 |
| **fair** 37:21 | 26:10,12,18,23 | 76:8 81:13 | **formative** |
| 42:16 86:10 | 27:25 28:16 | | 13:14 |

Exhibit A

**former** 16:1
**forming** 59:16
**forth** 42:15
  43:21 44:21
  65:9
**fortunately**
  51:18 72:9
  73:5
**forward** 48:6
  97:15
**foster** 1:13
**found** 51:12
  55:19
**foundation**
  28:20 34:22
  40:3 60:7 80:1
  91:22
**four** 23:7,14
  24:15 51:21
  58:4,8 81:13
  89:9
**fragility** 90:9
**frame** 26:13
  32:3,8 43:15
**francis** 7:15
**free** 98:14
  99:20
**frequency** 26:6
**frequently** 35:4
**freshly** 54:21
**front** 6:13 10:6
  10:13 20:18
  51:13
**function** 35:21
  36:15 46:25

47:2,4,5 63:21
64:13 70:12
85:24 87:18
**further** 20:21
  58:18 70:5
**future** 25:21
  69:3

## g

**galindo** 1:14
**galter** 12:1
**general** 17:11
  22:8 24:16
  25:1 51:14
  60:8,23 71:21
**generally** 22:6
  35:7 38:10
  39:17 50:17
  75:25 87:6
**getting** 27:6
  61:6 65:11
  74:5
**give** 6:18 13:2
  16:3,6 68:22
**given** 9:11 21:6
  24:9 25:7,15
  25:17 28:11,17
  42:5 49:2,18
  49:22 65:4,5
  68:9 75:18,22
  95:17
**giving** 9:25
  21:16
**glad** 71:10
**glucose** 56:11
  56:12

**glycerin** 58:21
  68:12
**go** 6:4 8:21
  17:21 19:6
  34:24 40:14
  49:6 50:14
  53:5,21 57:12
  78:11,15 82:1
  83:6 84:15
  85:13
**goal** 19:18
**goes** 89:4
**going** 8:23 9:5
  15:6 28:23
  37:18 40:18,19
  43:21 44:23
  50:23 53:5,6
  55:2 65:11
  76:11 89:15
**good** 27:17
  38:10 49:16
  64:23 68:22
  69:9
**gottlieb** 7:24
  62:18
**governing** 45:6
**graduated**
  13:20 14:3
**grand** 16:6
**great** 9:3 30:9
  30:20
**greater** 9:4
  24:17 33:18
  37:8 71:1 76:1

**greatest** 43:5
**green** 1:17
**grown** 38:21
**guess** 32:21
  43:9,14 58:5
  77:13
**guide** 74:12
**guidelines**
  35:15

## h

**half** 7:19 24:10
  24:11 89:21
**handful** 23:16
  24:19
**handle** 92:14
**hangs** 51:23
**happen** 37:18
**happened** 23:5
  41:11 60:22
  80:11
**happens** 26:23
  51:17 72:25
**happy** 86:17
**harm** 27:2 29:6
  29:6 35:22,25
  36:1 45:25
  46:4 49:11,12
  50:13,21 51:7
  51:10 60:13
  73:17
**harmed** 24:3
  57:21 74:20
**harmful** 37:22
  51:15 74:6

**[harms - including]**                                          Page 14

**harms**  22:1
**harvard**  14:1,1
  14:3 16:25
**head**  7:23
**headache**  67:25
  68:4
**health**  1:9,11
  14:2 28:2
  54:20 75:1
  79:2
**heard**  43:16
**hearing**  43:2
**heart**  16:15
  19:21 26:1
  31:10,12 34:18
  35:16 36:3,15
  39:15,21,23
  41:10 45:14,16
  45:18 46:8,9
  46:25 47:3,5
  48:11,12,15
  49:12 50:6
  58:13 59:1,4,6
  63:16,21 64:13
  64:14 69:3
  70:12,13,21,25
  71:6,25 73:9
  85:9,14,23
  87:17 89:5,6
  89:14,16,25
  90:3,13,14
  92:17
**heavy**  52:22
**held**  10:25
  18:13 19:9

  93:22
**help**  31:9
**helps**  59:2
**hereto**  95:25
**hereunto**  96:3
**high**  13:16,17
  34:3,7,11
  36:18,22,24
  37:2,7 49:25
  51:3 69:13,14
  79:23 90:1
**higher**  33:24
  34:13 45:17
  48:13 84:15,16
**highly**  70:23
**history**  39:15
  39:21 46:9
  48:11,15,16,20
  54:19 58:17
  68:21 70:4
  84:11 85:13
**hmm**  54:12
**hodes**  3:10
**holding**  10:11
**home**  88:11,19
**homes**  83:24
**honors**  16:22
  16:24,25 17:1
  17:2,5
**hopefully**  56:13
**hoping**  38:12
**hopkins**  17:19
  18:10
**hospital**  7:15
  7:16 9:25

  10:17 12:11
  14:9 25:12
  26:16 36:3
  41:9,12 42:11
  45:16 46:6
  54:16 55:16
  66:2 67:18
  68:19 70:20,25
  71:7 73:1,2,9
  88:12
**hospitalization**
  47:20 66:20
**hours**  21:3
**house**  62:23
**housing**  44:10
**huge**  90:10
**hyper**  48:19
**hyperlipidemia**
  48:19
**hypertension**
  17:14
**hypotension**
  67:23 68:12
**hypothetical**
  34:23 40:23,24
  41:1 42:4
**hypothetically**
  71:23

  **i**

**idea**  68:22
**identification**
  6:24 9:20
**illinois**  1:1,8,8
  2:5,9 3:4,11
  5:2,25 6:1

  13:15 18:7,14
  22:12,13,20,22
  22:25 23:1,23
  95:6
**imaged**  87:8
**images**  92:21
**imbalance**  59:3
**immediate**
  25:23
**immediately**
  25:15,18 74:6
**important**
  49:24 66:19
**impressive**  13:9
**improve**  31:12
**improves**  58:25
**incarcerated**
  21:25 23:1,15
  23:24 39:19,21
  45:17 63:20
**incarceration**
  24:20 33:3,20
  35:23 38:13,14
  45:6 47:8
  48:23 73:8
**incidence**  69:8
**incident**  54:17
  62:22 63:1
  88:19
**include**  11:17
  45:11
**included**  7:2
  8:16,19 97:13
**including**  7:17
  7:21,22 8:25

11:1 40:8
48:11 49:12
70:4 84:3
89:24
**incorporated**
99:12
**increase** 81:2
84:24 86:9
**increased**
35:16 46:11
50:10 60:5
61:7,13 63:8
63:11 65:3
66:11 80:21
81:17 82:6
83:22 85:2
**increases** 77:7
89:23 90:7
**indefinitely**
34:4
**index** 4:10
**indicate** 5:8 7:4
32:20 36:24
37:2 67:24
74:4
**indicated** 26:13
71:19 84:6
**indicates** 7:3
60:1
**indicating**
36:15 52:15
97:13
**indication**
36:14 52:3
92:16

**indicative**
76:25 92:4
**indirectly**
59:13 96:1
**individual** 23:6
25:1 35:4 36:1
38:15 60:17
**individually**
57:15
**individuals**
21:25 23:1,15
23:25 38:16
45:17
**infarct** 33:12
**infarction**
15:21 33:5,20
36:21 38:5
47:3 62:19,21
66:5 73:20
74:10 77:22
**infarctions**
69:11 82:2
**information**
55:24 83:12
88:16 93:20
**inhibitor** 48:4
**initial** 20:16
45:5 75:15
**injured** 24:4
**injury** 71:2
**inmate** 58:16
**instance** 71:23
77:18
**institutions**
13:1

**insurance** 49:8
56:3
**intensity** 92:11
**interaction**
21:13 62:17
**interactions**
20:22 39:10
**interested** 96:1
**internal** 14:8
15:1 18:18
37:16
**international**
12:3 13:4
**internists** 16:12
**interns** 12:25
**interpret** 12:6
12:9
**interrupt** 30:11
50:8
**interrupted**
50:13
**interruptions**
35:14
**interventional**
7:24
**invasive** 49:14
87:14
**invested** 21:2
**invited** 13:6
16:3
**invoice** 20:16
20:19,20
**involved** 11:16
21:21 26:25
56:7

**ischemia** 15:22
35:20 59:3
64:11 75:25
81:23,24 87:18
**ischemic** 81:20
**issue** 63:14
66:16,19
**issues** 22:3,4
23:4 45:4 88:5

**j**

**j** 1:7,13,14,15
1:16
**jail** 7:14 23:20
23:21 24:5
35:4,7 41:3,13
42:6 45:23
46:6 51:5 52:4
52:4,10 63:3
63:21 66:25
72:10 74:15,23
76:17 78:1,1
78:24 82:16,18
**james** 1:17,22
2:1 4:3 5:17
6:6 97:8 98:4,9
99:4,13 100:20
**january** 35:19
41:15 46:5
**jersey** 18:11,12
**jkott** 3:5
**job** 10:18 11:20
39:9
**johns** 17:19
18:10

**[journalists - licenses]**

**journalists**
20:5

**journals**   20:1

**judge**   8:24 42:2

**judgments**
56:16

**judith**   3:3 5:12
8:7 9:15 19:1
29:16 30:11
40:20 43:21
44:12 53:18
86:6 93:24

**jury**   42:2 51:13
55:20

**k**

**k**   7:22,23 54:10
62:18

**keep**   17:7,23
34:3,7 66:24
67:10 68:14

**keeping**   66:14

**kept**   67:7

**kid's**   18:8

**kind**   43:24 76:2

**kinds**   49:9
52:23 89:23

**kirstin**   8:9

**kleszyk**   2:3 5:2
95:5 96:8

**knew**   40:17
79:7

**knocking**   39:1

**know**   6:15 8:9
16:13,18 17:4
19:2 21:11,16

32:20,22 33:9
40:4 42:24
44:17 46:19
53:1,25 54:4,7
54:24 55:1,5
55:18 57:11,18
60:7,19 71:25
72:4 77:5 78:2
78:4,8,9,12
79:6,7 84:9,11
85:11,22 87:21
87:22 89:5
91:17

**knowing**   21:12
59:20 68:21

**knowledge**
47:17 53:25
54:14 77:23
78:24 79:1
83:21 91:8,10
91:14

**known**   31:11
39:18 66:15

**kop**   66:15 67:2
67:7

**kott**   3:3 4:5
5:12,12,21 6:3
7:1 8:12,13
9:10,16,21
13:12 15:11
19:5,11,12
21:4 24:15
27:17,18 28:13
29:10,22 30:1
30:14 32:1

33:21 36:11
40:11,25 41:21
43:23 44:6,16
45:8,13 53:5
53:12,22 57:6
57:8,12,14
58:3 61:1,20
74:1 75:9 79:9
80:17 81:4
83:1,3,8,13,19
85:3 86:16
89:3 90:17,21
92:1,25 93:11
93:19 94:1

**l**

**l**   1:16,17 2:3
6:6 33:16
47:15 95:5
96:8

**lab**   76:2

**lack**   57:21
61:11 73:21
79:22 87:17,18

**lansing**   23:18

**lapsing**   29:4

**larger**   20:20

**lasalle**   3:4

**lasting**   51:23

**laude**   13:20
14:4

**law**   21:7

**lay**   57:24

**laypeople**   20:5

**layperson**   72:4

**lead**   27:5 46:12
50:9

**learns**   27:22

**leave**   71:7

**leaving**   54:15
55:16 73:7

**lecture**   17:23

**lecturer**   13:6

**lectures**   12:24
13:2 15:20,24
16:4

**led**   38:25 88:12
88:12,20

**left**   33:12 35:20
46:24 54:22
70:20 74:11,13
76:8 77:22

**legal**   21:24
45:4 97:1
100:1

**lengthy**   60:4

**lesion**   37:7,9

**letter**   8:2,11,16
97:19

**level**   13:18
16:25 38:2
81:3

**levels**   84:24

**liability**   22:15

**license**   95:6
96:9

**licensed**   18:6,7
18:9

**licenses**   18:4,4
18:13

Exhibit A

**life** 48:21 67:22 67:24 72:25 77:6
**lifelong** 76:13
**lifestyle** 48:20 69:16
**likelihood** 35:16
**likely** 51:3 68:23 69:24 70:7
**likewise** 85:11
**limit** 22:3
**limitation** 51:4
**limited** 41:2 71:23
**line** 97:13 99:7 100:3
**lines** 58:8
**link** 66:9
**lipid** 17:13
**list** 7:20 20:4
**listed** 16:23 18:2,23 38:23 56:13 99:7,17
**listing** 99:7
**literally** 23:16
**literature** 59:23 60:1 84:22,25 88:1 92:3
**litigation** 21:17
**little** 17:6 22:14 79:20 81:21

**living** 37:24 38:3
**livingston** 7:14 35:4 41:4 42:9 42:15,20,24,25 43:6,10,18 44:19 51:20 52:4 60:20 65:11 66:21 67:3 68:16 78:1
**llc** 3:3,9
**loaded** 69:7
**locally** 12:2
**located** 2:8
**location** 37:5 86:18
**locations** 11:21 13:7
**locke** 1:17
**long** 10:18 38:19 42:17,18 43:16,17 51:22 53:14 65:15 76:13 89:17
**longer** 51:24 63:21
**longest** 43:2 44:10 65:20
**look** 17:7 24:6 24:8 60:16 62:11 92:8 93:16
**looked** 44:9 63:5,6 71:12

86:12
**looking** 42:23 44:15 51:11 55:10 63:25 80:10
**looks** 44:13 85:17
**lost** 49:7,8
**lot** 17:23
**low** 37:8
**lower** 31:11,12 31:17 33:25 34:14
**lowered** 56:11
**lowering** 31:20 34:2
**loyola** 7:22 33:13 35:19 88:9,13

**m**

**m** 1:12,13 33:16
**m.d.** 1:22 2:1 4:3 5:17 14:25
**made** 24:25 66:9 71:13 98:7
**magna** 13:20 14:4
**magnetic** 92:21
**maintain** 16:19
**major** 13:22 48:6
**majority** 43:5

**make** 9:10 17:7 34:25 42:1,25 64:5 68:10 72:11,18
**makes** 15:7
**making** 9:8
**mal** 22:21 24:16,16
**malpractice** 56:1,2,17
**man** 36:19
**management** 17:14,14
**manhattan** 14:9
**manifestations** 37:16
**mark** 6:20 9:17
**marked** 6:23 9:19
**marker** 37:10
**maryland** 18:9
**mately** 34:19
**material** 40:8
**materials** 6:14
**matter** 44:12
**matters** 95:11
**mauck** 3:3
**mauckbaker....** 3:5
**md** 97:8 98:4,9 99:4,13 100:20
**mean** 8:7,8 19:1,3 25:2 29:6 30:11

**[mean - missing]** Page 18

| | | | |
|---|---|---|---|
| 43:22 57:4,9 57:10,16 60:7 63:1 82:24 83:4 86:20,25 87:1,2,21 88:4 88:17,23 89:5 89:16,17 90:2 | **medication** 7:11 25:7,14 26:1,4,5,6 27:6 27:23,24,25 29:4,8 31:16 31:21 34:18 39:6,23,24 41:6 43:11 46:11 49:7 50:16 51:5 52:6,11 53:1 54:1 58:19 60:2,15 61:8 61:12 65:4 66:14 67:7 70:1 72:16,23 73:14 74:20 78:16 79:13,16 79:23 84:17 85:14,25 91:20 91:25 | 73:22 74:5 75:24 77:25 78:20 80:5,20 81:2 84:23 85:18 88:2 91:15,18 | **meraz** 1:14 |
| | | | **met** 21:8 |
| | | | **metabolism** 50:4 |
| | | | **methods** 59:16 61:17 |
| | | **medicine** 9:24 10:3,16,22 11:3 14:4,8,14 14:24 15:2 18:18,19 44:20 47:13 53:18 | **metoprolol** 31:11 |
| | | | **michigan** 23:18 23:19 |
| **means** 25:3 27:12 | | | **midwest** 97:17 100:1 |
| **meant** 72:17,17 73:24,25 | | **medicines** 58:7 69:9 | **military** 17:8 |
| | | **medico** 21:23 | **millions** 93:6 |
| **measure** 76:21 77:16 | | **meet** 88:7 | **mind** 16:17 23:10 |
| **measured** 41:8 | | **meeting** 21:9 | **minute** 19:7 53:6 |
| **mechanism** 39:12 | | **meetings** 13:5 17:22,22 | **minutes** 25:18 28:9 67:20 68:14 82:4 |
| **med** 14:3 | | **member** 11:7 16:7,14,15 56:10 | |
| **medica** 42:8 49:23 | | | **misadministr...** 26:24,25 |
| **medical** 1:9 7:13,14,15 10:16 12:24,25 14:1 15:12,20 22:21 24:16,16 24:24 25:4,6 26:9 27:9,11 27:13,19 28:15 29:11,18,20 30:7,24 45:10 46:7 49:16 55:17 62:1 66:8,9 70:20 71:8,24 72:3 72:19 75:1 78:10 86:7 | **medications** 25:17,22 26:17 29:1,13 31:2,6 31:22 35:2,12 36:5,8 39:11 41:2 42:5,12 47:22,23 49:2 49:18,21 50:2 50:18,21 51:8 51:15,18 52:20 53:4 54:7 56:3 57:22 60:12,18 60:21,24 70:9 70:25 73:2,16 | **membership** 16:21 | **mismatch** 31:13 |
| | | **memorial** 9:25 25:12 26:16 | **missed** 52:5,10 63:9,10,12 65:4 85:24 86:16 87:10 |
| | | **mention** 22:8 42:1 70:10 73:19 | **missing** 7:25 8:7,15 42:12 65:14,22 66:10 70:1,8 79:12 86:8 87:23 |
| | | **mentioned** 36:12 63:24,24 65:23 68:13 69:1,4 76:24 79:14 81:5 84:5 88:22 | |

**[misspoke - notes]**                              Page 19

| | | | |
|---|---|---|---|
| **misspoke** 64:3 | **muscle** 59:4 | **need** 14:18 | **nonadministr...** |
| **mit** 14:1 | 89:14,17,25 | 25:17 78:19 | 74:18 75:24 |
| **mitral** 87:6 | **myocardial** | 81:6 87:14,16 | **noncardiac** |
| **mm** 54:12 | 15:21,21 33:5 | 93:20 | 31:21 |
| **moderate** 38:2 | 33:20 36:21 | **needed** 42:11 | **noninvasive** |
| **moderately** | 38:5 41:17 | 60:12 74:5 | 49:14 80:12 |
| 37:7,8 | 47:1,2 58:25 | 77:17 81:15 | **nonpeer** 20:4 |
| **modern** 37:25 | 59:2 62:19,21 | 88:2 | **nontrained** |
| 38:3 | 63:9,19 65:3 | **needs** 26:3 | 72:10 |
| **modify** 50:3 | 66:4 68:23 | 27:25 | **normal** 35:21 |
| **molecular** | 69:11,17,25 | **negative** 39:25 | 46:5 47:4 |
| 13:21 | 73:20 74:10 | 45:18 46:12 | 60:18 70:12 |
| **money** 20:9 | 77:22 81:23,24 | 48:13 49:10 | **north** 2:8 3:4 |
| **monitored** 68:9 | 82:2 | 58:16 75:4,22 | 10:3 |
| 68:10 | | 79:1 80:5,21 | **northern** 1:1 |
| **monroe** 3:11 | **n** | 85:23 | **northwest** |
| **month** 11:13 | **n** 1:13 3:1 4:1 | **neither** 72:21 | 25:12 26:16 |
| 12:11 20:19 | 6:6 31:19 | **nervous** 37:17 | **northwestern** |
| 21:22 | 47:15 | **never** 21:10 | 9:24,25 10:3 |
| **months** 23:18 | **name** 5:1 6:5 | 56:17 58:11 | 10:15,19 11:8 |
| 25:24 35:12 | 26:4 48:5 97:6 | 65:14,16 | 12:15 14:16 |
| 44:7 46:5 63:2 | 98:3,4,15 99:3 | **new** 14:7 18:10 | 15:20 17:2,24 |
| 74:19 75:23 | 99:4,21 | 18:11,11,12,12 | 25:11 38:20 |
| 76:9,16 79:21 | **names** 23:8 | 21:22 41:10,10 | **notarized** |
| **moonlit** 18:11 | **narrowing** 37:6 | 46:25 63:16 | 97:14 |
| **mount** 14:9 | **narrowings** | 73:9,10 74:4 | **notary** 97:25 |
| **mris** 92:21 | 37:5 | **nitro** 58:20 | 98:10,18 99:15 |
| **multiple** 13:7 | **nation** 45:22 | 68:11 | 99:23 100:23 |
| 48:21 70:3 | **national** 17:21 | **nitroglycerin** | **note** 52:14 55:3 |
| 76:10 85:9 | **nationally** 12:3 | 58:9,12,15 | 55:3 65:8 |
| **multiplies** | **nature** 55:4 | 59:8 66:24 | 97:12 |
| 45:25 | **necessarily** | 67:4,11,21 | **noted** 62:8 |
| **multivessel** | 81:19 | 68:3,9,15 81:6 | **notes** 32:20 |
| 36:18 | **necessary** 28:1 | 81:9,17,21,25 | 36:17 |
| | 28:2 | 82:8 | |

Exhibit A

notice  5:24
noticing  5:11
november
    20:17 35:9
nuclear  12:5,7
    12:8 14:19
    17:12 18:20
    64:17,22 86:19
    92:20,22
nucleuses
    64:24
number  10:25
    11:4 12:20
    13:6,17 16:16
    17:19 32:21
    37:5 39:8
    49:14 63:25
    65:8 67:16
    97:7,13
numbered
    55:14
numbers  24:17
    99:7
numerous  67:6
nurse  67:5
    72:11 82:16
nurses  78:5
    83:15
nursing  1:11

**o**

o  31:19 47:15
oath  5:10
obesity  69:15
object  28:3,19
    34:21 40:2

43:19 79:3,25
    84:18
objection  20:12
    60:6 82:23
    89:3 91:22
objections  5:9
objective  45:21
    46:2,3,16,18
    63:19 64:12
    73:17 74:8
    76:15 85:5
    92:16
observation
    11:18
observed  39:4
    48:25 73:3
obsessive  48:8
obviously
    38:21 54:18
    57:16 61:25
    71:4
occasionally
    49:14
occasions  67:6
occluded  76:8
occlusion  74:11
    82:1
occur  29:7
    41:19 73:15
    76:4 80:13
occurred  46:15
    51:10 62:22
    63:2 73:21
    76:14

occurs  75:16
october  64:1,1
    70:11
offer  88:15
office  1:6 10:1
    39:2
officer  71:23
official  1:7,10
    1:12 98:15
    99:21
officials  78:5
oh  15:15 32:14
    53:20 55:7
    56:24
ohio  97:2
okay  9:16
    10:14 15:4
    16:7 18:22
    19:23 20:8
    24:22 27:10,17
    28:14 29:22
    30:5 32:7 33:8
    33:22 37:21
    40:11 45:2,9
    45:12 46:17
    52:13 53:20
    54:5 55:13
    57:10,10 67:14
    68:11 70:17
    71:21 73:12
    75:7 78:10
    79:10 83:1,13
    86:5 88:15
    93:10,17

old  15:7
once  16:4 33:23
    34:7 44:21
one's  69:7
ones  23:10
oo0oo  94:5
opinion  20:9
    23:14 24:10
    29:12 31:1
    40:20 41:22,24
    58:2,5 59:17
    61:3 65:8,24
    70:10 71:22
    72:2,13 73:19
    88:4
opinions  9:1
    22:3,25 29:20
    40:16 46:17
    57:5,6,23
    61:25
opposed  70:1
optimal  72:19
order  8:24 9:12
    18:17 25:13
    56:12
ordered  26:18
    28:11,16 87:2
    87:3
ordering  92:4
    93:25
organizations
    16:17
organized
    72:21

**outcome** 36:7 65:20 85:2,4 85:23 96:1
**outcomes** 85:17
**outpatient** 11:23,25 12:4 38:19 39:2
**outstanding** 38:24
**overall** 46:24 47:3 57:19 63:21
**overseeing** 12:17
**overturning** 45:5
**overweight** 48:19
**overwhelming** 70:5
**overwhelmin...** 70:2
**own** 45:19

**p**

**p** 1:17 3:1,1 7:22 54:10
**p.m.** 2:6 53:11 53:11 94:3
**packs** 89:10
**paek** 7:21 8:4 54:17 62:13
**paek's** 54:10 55:18 71:12
**page** 4:4,11 6:12 51:21

55:12 58:4 62:8 97:13,15 99:7 100:3
**pages** 62:5
**paid** 16:13
**pain** 41:15 58:10 59:2,12 59:14 72:2 81:18,20,22 82:3,15,21 83:18 88:18
**panic** 48:8
**paper** 10:10 26:21
**paperwork** 77:24,24 78:3
**paradoxically** 77:4
**paragraph** 19:18 55:14
**parents** 39:17
**part** 31:24 38:3 56:21 80:14 99:9
**partee** 1:14
**participate** 90:23
**participated** 17:20
**participating** 5:4
**particular** 17:9 19:19 28:25
**parties** 5:4 95:23,25

**parts** 26:7 67:15
**pass** 72:7
**passed** 14:16 14:20
**past** 33:2
**patent** 22:15,16
**pathway** 27:5
**patience** 75:11
**patient** 25:15 25:21 26:1,20 26:21 27:6,7,8 27:21 28:10 29:7 33:24 34:3,17 38:8,9 38:13 39:20 40:1 45:18,25 46:8 49:11 51:17 55:20 59:6 60:5,13 60:17 68:11 71:7 72:12 73:2 75:3 80:6 82:10 84:4,10 85:13 92:8,17
**patient's** 49:12 56:12
**patients** 11:22 12:2,3,13 25:8 28:18 31:13 35:11 39:5,7 45:14,16 48:10 49:1,17,25 50:6,14,18,20 60:15 67:18

68:18 69:5,10 70:24 71:5 72:22 73:1 77:4 78:11,21 81:6 82:1 84:22
**pause** 53:7
**pay** 16:18
**pcc** 7:20
**peer** 19:23 20:1 20:1,2,6,7
**penultimate** 14:14
**people** 38:1 39:1 45:15 48:14 78:18 90:25 91:1 93:6
**perceive** 38:16
**percent** 9:15 11:15 12:19 22:22,24 23:13 28:17 29:2,3 34:19 35:3 37:8,9 39:22 39:24 40:4 41:1,4 76:1
**percentage** 32:2,6
**perfectly** 64:22
**perform** 12:6,8
**performed** 35:19
**performing** 54:15 55:15

**period** 35:8,22 41:2 44:14 60:4 65:10 71:18 72:16,23 73:6 74:20 75:23 79:14 80:16 89:9,18
**periods** 65:15
**perry** 1:14
**person** 15:5 20:24 24:4 37:16 60:2 66:14,24 67:11 68:15 83:25
**person's** 86:9
**personal** 54:13 78:23 83:20 91:7,10 95:14
**personally** 54:18 98:11 99:15
**personnel** 72:10
**pharmacology** 15:24
**pharmacy** 26:24
**phone** 97:3
**phrase** 56:22
**phraseology** 27:10
**physically** 5:5 46:13
**physician** 62:10,13 84:1

**physicians** 16:11,14 63:14
**physiology** 57:25 92:13,23
**pick** 76:1
**pill** 27:3,3 29:5
**pistol** 69:7
**place** 11:10 95:21
**placed** 54:22 70:21 71:6 77:5
**places** 18:23 52:5
**plaintiff** 1:4 2:2 3:7 22:11 23:19 24:11,13 24:19 36:4
**plaintiff's** 7:10 7:25 8:2 74:17
**plan** 25:20
**plaque** 75:14 75:15 76:3,14 77:1,16 87:9
**platelet** 31:9
**please** 9:16 97:11,11
**pleasure** 16:2
**plus** 59:18
**point** 43:9
**police** 23:4 24:2
**policy** 7:12 67:2,4,9,17
**pontiac** 7:12 33:3 52:3

**popular** 13:22
**position** 14:18
**positions** 11:1
**possess** 18:5
**possibility** 80:7
**possible** 41:5 41:19 45:21 46:1,14 49:22 59:22 76:18 80:4
**posterolateral** 33:4 70:16
**potential** 29:6 35:25 39:12 41:14 51:7 73:13 79:24
**potentially** 50:12 60:13,24 89:24
**practice** 11:24 12:4 33:22 38:18,19 39:3 39:4 49:17 78:10
**practicing** 25:1
**practitioners** 34:4,8
**pratt** 1:18
**precipitating** 88:11
**predict** 77:11
**preexisting** 51:2
**preface** 29:17

**premise** 28:25
**prepare** 20:21
**prepared** 13:18
**prescribe** 25:25 60:15 69:9
**prescribed** 25:8 27:22,24 27:24 28:18 29:13 31:2,7,8 31:10,16,20,22 32:3,12,13 34:18 35:3,15 39:6,22,24 47:16,18,19,23 48:1,9 49:2,19 49:22 50:9,18 50:21 51:4 54:2 60:21 61:7 69:10 79:23 85:24
**prescrip** 28:10
**prescription** 25:7,13,14 26:2,7,9,13,22 28:1 45:19 46:10 52:6,11
**prescriptions** 26:17 28:16 32:22 45:15
**present** 5:6 10:12 37:3 67:2 76:6 77:4
**presented** 55:21 77:21

**preserved** 46:24
**pressure** 31:12 49:24 50:3 67:21 69:13 90:1
**pressures** 90:9
**presume** 55:19
**pretrial** 44:22
**pretty** 24:15 92:6
**prevent** 31:9 58:12 59:1
**previous** 18:23 95:8
**previously** 61:2 85:6
**primarily** 21:23 48:2 59:11
**primary** 62:12
**principles** 59:16 61:17
**printout** 10:11
**prior** 66:4 70:13 71:25 79:2 83:24
**prison** 7:13 78:5
**probable** 69:24
**probably** 10:24 11:24 12:10 21:2 23:7
**problem** 30:16 63:17 78:16

**problems** 17:15 89:24
**procedure** 2:7 5:25 71:9 98:5 99:5
**proceed** 92:9
**proceedings** 95:17
**produce** 39:25
**production** 97:15,17,22
**professional** 16:8,15
**professionals** 75:2
**professor** 10:16 10:22,23,23
**program** 14:2
**progress** 69:11 70:7
**progression** 47:7 70:6 76:5 77:6 80:15 85:7 90:8
**prohibiting** 9:12
**project** 19:19
**prolonged** 45:24 46:10 49:11 60:12
**promptly** 51:19
**proper** 25:5
**properly** 23:21
**proud** 13:16

**provided** 75:1
**provider** 66:9
**provocable** 35:20 75:25 87:18
**prozac** 48:4
**psychiatrist** 37:19 47:11
**psychological** 61:6
**psychologist** 47:25
**public** 98:10,18 99:15,23 100:23
**publications** 17:25 20:3,6
**purpose** 31:8 31:11,16 67:11
**pursuant** 2:6 5:24
**put** 8:1 20:23 20:25 21:2 33:2,23 34:8 49:17 51:3 58:5 72:23 76:12
**puts** 73:17
**putting** 19:2 50:20

**q**

**quality** 11:2
**quantify** 38:7
**quantifying** 46:20

**quantitate** 86:22
**quantitation** 47:9,10
**quarter** 24:12
**quarters** 24:12
**question** 20:13 23:6 28:4,25 29:17 30:12,17 30:21 32:6 35:1 40:24 41:18 43:21 50:24 51:14,16 53:24 57:20 60:8 67:12,15 75:22 77:13 78:21 79:4 80:9,18 84:19 85:21 91:4 92:6
**questions** 29:25 79:11 90:18 91:12
**quite** 36:18,22 50:5
**quote** 7:25 79:12,13
**qureshi** 1:15

**r**

**r** 1:13 3:1 7:18 7:23 31:19 33:16 62:18
**radunsky** 3:9 3:10 4:6 5:13 5:13 6:14 8:6

Exhibit A

**[radunsky - related]** Page 24

9:8,14 13:11
15:6 19:1,8
20:12,23 21:1
27:15 28:3,19
29:15,23 30:3
30:5,9,15
33:14 34:21
40:2,13,17
43:7,19 44:1,5
44:8 45:3,12
53:8,17,20
57:4,7,9,13,16
60:6 61:23
79:3,8,25
80:23 82:23
83:2,4,9 84:18
86:4 89:4,11
90:19 91:22
92:18 93:3,5
93:13,17 97:5
**radunsky's**
21:7
**range** 85:22
**ranges** 25:23
32:18
**ranks** 10:21
**rate** 31:12 90:7
**rather** 37:1
**react** 26:16
**read** 6:16 7:6
12:10,12 30:19
30:22 51:11
57:18 65:7
89:2 91:11
98:5,6,12 99:5

99:6,17
**reading** 97:19
**ready** 55:6
**real** 72:25
**reality** 37:24
42:3 50:14
**really** 65:15
**reason** 19:6
26:1 27:23
34:10 80:14
97:14 99:8
100:3
**reasonable**
27:11,12,19,20
28:9,14 29:11
29:18,20 30:7
30:23 36:6
45:9 46:7 62:1
**reasonably**
24:25
**reasons** 39:8
49:9 67:19
68:8
**recall** 47:11
63:25 68:5
71:13
**receipt** 82:7
97:18
**receive** 20:9
39:22 41:6
55:2 71:24
81:25
**received** 14:24
16:20,24 17:5
20:15 26:21

33:5,9 34:18
40:10 43:11
46:23 60:20
81:13 91:20
**receiving** 27:8
36:5 39:5,11
39:24 41:2
42:8 46:10
58:19 63:18
69:13 72:15
74:2 79:23
81:2,16,20
84:17 88:2
91:25
**recommend**
71:7
**record** 5:22 6:5
6:16 7:4,8 8:7
9:11 19:7,10
19:11 28:24
41:23 44:10
53:6 66:8
93:23 95:16
99:9
**records** 7:3,4,8
7:13,14,15,15
7:16,16,21,22
8:17,18,24 9:2
9:13 10:9
32:11,16 33:8
40:9 41:25
51:11 52:2,14
52:18 53:13
62:7 63:6 68:2
68:16 82:17,22

83:15 86:13
88:25
**reduce** 59:13
**reduced** 95:14
**reducing** 56:11
59:9,14
**reference** 97:7
98:2 99:2
**referenced**
98:11 99:15
**referred** 54:17
**referring** 10:6
55:8,9
**reflect** 5:22
**reflected** 20:16
**reflecting**
20:21
**regard** 54:10
91:4
**regarding** 22:2
29:12 31:1
47:9 56:15
**regular** 71:15
83:25
**regularly** 17:21
65:24 66:3
**regulate** 49:24
50:3
**reiterate** 40:7
**relate** 85:1
**related** 19:20
27:7,7 40:12
48:23 56:3
61:6 62:22
80:18 87:23

**[related - rounds]**

91:3
relates  21:16
  88:1
relationship
  36:6 37:4 38:4
  38:6 77:2
  92:10
relative  95:22
  95:24
relatively  38:6
  69:16
release  41:13
  46:6 76:16
released  38:12
  38:14 63:3
relevance  89:3
  89:6
reliable  64:25
reliant  45:14
relied  59:16
relieve  59:13
relist  76:11
rely  61:16
remember  23:7
  62:20,24 63:23
  64:16
remotely  2:5
  5:7,10 95:20
removal  85:18
render  20:9
renewed  50:16
repeat  53:24
repetitive
  67:20

rephrase  37:1
report  4:12
  6:13,17,19 7:2
  10:11 21:6
  33:18 55:12
  56:19,22 57:7
  59:17 62:4
reported  88:13
  95:13
reporter  2:4
  5:1,3 6:19 24:7
  93:24 95:3,6
  96:9 98:7
reporting  5:7
reports  21:17
request  99:9,11
require  41:25
required  36:20
  72:12 97:25
research  12:20
  14:5 17:1 18:1
  19:17,19 84:7
reserve  93:14
reserved  94:4
residency  14:8
resident  18:12
residents  12:25
  16:4
resistant  78:18
resonance
  92:21
respect  69:2
  88:5
responded
  23:21 83:17

response  26:19
  28:15
rest  22:23,23
  42:8
restarted  51:9
  51:19
result  77:20
retaken  14:17
retook  14:21
returned  35:4
  60:18,20 97:18
reuptake  48:4
review  6:8 8:23
  9:2 20:21
  21:22 33:8
  41:23 52:2,13
  53:13 56:25
  88:25 97:12
  98:1 99:1
reviewed  6:11
  6:15 7:3,5
  19:24 20:1,2,2
  20:4,6,7 32:11
  54:8 62:7,14
  63:6 82:16,17
  84:6
ridiculous
  44:18
rife  39:17
right  8:12
  13:14 15:7
  21:5 23:8,15
  27:25 33:2,25
  41:23 43:18
  44:5,5,5,12,25

47:24 52:7
  53:7 55:22
  61:24 62:2
  64:8,19 65:7
  66:18,22 68:20
  69:4 71:20
  77:13 79:8
  85:12 86:12
  91:9 93:8,11
risen  10:21
risk  48:13,17
  48:18,22 49:17
  49:25 50:21
  51:3 63:8,11
  65:3 66:11
  69:3,17,20
  70:3 76:10,12
  76:13 84:13,14
  84:15,16 85:9
  86:9 90:6
risks  79:24
rivera  1:15
rodriguez  1:15
role  50:4 90:10
roof  54:23 71:3
roofing  54:15
  55:15 70:18
room  5:6 67:7
  88:20
roughly  11:19
  32:8
round  11:20
  17:6
rounds  16:6

**[route - sinai]**                                                    Page 26

| | | | |
|---|---|---|---|
| **route**  26:4 27:4 | 37:6,7,9 76:25 | **sense**  64:5 | **sheriff**  1:7 |
| **routine**  64:16 | 77:10,17 86:13 | 71:21 | **sheriff's**  1:6 |
| **routinely**  87:3 | 86:18 87:21,23 | **sent**  6:14 20:17 | **shipped**  43:18 |
| **rule**  75:19 | 92:4,7,12 | 20:19 21:1 | **short**  62:18 |
| 79:22 | **scores**  36:16 | **separately**  6:16 | 89:8 |
| **rules**  2:7 6:1 | **screen**  19:2 | **serious**  50:11 | **shorter**  79:21 |
| 98:5 99:5 | 58:6 | 73:21 | **shorthand**  2:4 |
| **run**  50:15 | **seal**  98:15 | **serotonin**  48:3 | 5:3 95:3,5 96:9 |
| **ruptures**  76:14 | 99:21 | **served**  16:16 | **shortly**  56:14 |

| s |
|---|

| | | | |
|---|---|---|---|
| **s**  1:16,17,18 3:1 | **second**  7:19 | **service**  17:3 | **show**  17:6 |
| 3:10 31:19 | 14:13 34:15 | **services**  1:9,11 | 32:22 81:8 |
| 97:15 99:8,8 | **section**  19:25 | **set**  42:21 96:3 | **showed**  46:24 |
| 100:3 | 20:6 | **sets**  6:13 | 64:9,10 75:25 |
| **salmon**  1:15 | **sedentary** | **settlement**  8:2 | **showing**  40:9 |
| **saving**  77:6 | 48:20 | 8:11,16 | **shown**  52:19 |
| **saw**  46:22 | **see**  12:1 31:17 | **seven**  11:20 | 58:11 89:21 |
| 63:13 68:16 | 39:1 47:10,22 | 17:4 76:11 | 97:16 |
| 70:11 81:14 | 52:3 57:25 | 89:20 | **shuttled**  65:9 |
| 87:16 89:7 | 59:15 61:5 | **several**  11:6 | **sic**  56:19 58:8 |
| **saying**  32:7 | 63:7 65:1 66:7 | 16:5 24:2 | **side**  24:21 |
| 40:14,15 86:7 | 71:17 72:13,24 | 25:24 35:7 | 58:23,24 78:17 |
| **says**  68:4 | 74:21 77:7 | 46:5,22 50:15 | **sides**  22:2 24:6 |
| **scans**  12:7 | 86:20 87:4,9 | 50:15 51:24 | 27:1 |
| 15:23 | 87:13 92:12 | 52:1 66:4 | **signature**  94:4 |
| **school**  10:17 | **seeing**  47:11 | 67:20 70:8 | 96:4,8 97:14 |
| 13:13,16,17 | **seemed**  69:2 | 79:12 81:14 | **signed**  98:13 |
| 14:1 | **seen**  19:3 40:8 | 82:3 | 99:18 |
| **science**  13:21 | 45:21 76:4 | **severe**  72:3 | **significant** |
| 14:2 | 87:5 | 77:12 | 74:21 85:7 |
| **scientific**  19:14 | **seminars**  12:24 | **severity**  37:24 | 86:25 90:6 |
| 35:14 61:16 | 17:22 | **shared**  43:8 | **signing**  97:19 |
| 86:8 | **senior**  10:17 | **sheet**  26:21 | **similar**  59:7 |
| **score**  36:14,17 | 25:10 26:15 | 97:13 99:7,10 | 91:6 |
| 36:22,23 37:2 | 48:24 | 99:18 100:1 | **sinai**  14:9 |

| | | | |
|---|---|---|---|
| **sincerely** 97:21 | **soon** 20:25 | **split** 24:15,18 | **statement** |
| **single** 48:18 | **sorry** 8:21 32:5 | 64:23 | 51:22 54:25 |
| **sir** 97:10 | 32:15 45:10 | **spoke** 47:6 | 98:13,14 99:19 |
| **sit** 53:3 | 49:6 53:17,21 | **spoken** 55:23 | 99:19 |
| **situation** 25:16 | 55:7,11 57:6 | **spreadsheet** | **states** 1:1 52:21 |
| 25:20,23 42:4 | 69:21 | 8:1,8,15,19 | 52:24 84:10 |
| 59:7 68:10 | **sort** 21:14 | 42:21 47:21 | **statin** 31:16 |
| **situations** 39:9 | **sounds** 33:15 | 54:6 | 32:2 33:24 |
| 39:10 | **source** 55:17 | **ssri** 48:2 | 34:7 49:23 |
| **six** 62:4 63:25 | **sources** 54:24 | **st** 2:9 7:15 10:4 | 50:2,9,13 60:3 |
| 76:11 81:11 | **span** 75:18 | **staff** 23:22 | 65:19 73:22 |
| 89:10 | **speak** 13:7 | **stage** 56:6 | 74:2 78:12,19 |
| **sixth** 10:2 | 54:18 84:12 | **stages** 56:8 | 87:11 |
| 70:10 | **speaking** 83:25 | **standard** 24:22 | **statins** 50:7 |
| **slow** 76:3 77:6 | **specialize** 17:9 | 24:24 25:2,3,5 | 51:24 58:7 |
| **small** 35:6 47:4 | **specialty** 17:17 | 31:24 33:22 | 63:9,10,12 |
| 89:19 | **specific** 17:16 | 34:20 64:15 | 65:12,14,24 |
| **smith** 1:13 | 17:18 29:13 | 88:7 | 66:3,10 70:1 |
| **smoke** 69:7,12 | 31:3 61:16 | **standards** 25:1 | 77:5,5 85:14 |
| 76:13 90:12,25 | 85:22 | 25:4 | 86:9 87:24 |
| 93:7 | **specifically** | **stands** 48:3 | **stay** 42:18 |
| **smoking** 48:19 | 85:17 | **start** 25:19,20 | 43:17 |
| 52:22 69:4 | **specifics** 21:15 | **starting** 5:11 | **stayed** 14:6 |
| 90:6,24 91:2,2 | **specified** 95:21 | 13:5 21:19 | **stenographic...** |
| 91:13 | **specify** 26:4 | **stat** 25:17 | 95:13 |
| **smoother** 29:25 | **speculation** | **state** 2:4 6:5 | **stenoses** 77:3 |
| **social** 39:10 | 50:25 73:15 | 22:11 23:9 | 77:11 |
| **soluble** 48:3 | 79:8 82:24,25 | 30:8 37:15 | **stent** 33:1,6,9 |
| **solutions** 97:1 | 83:5,10 | 55:15 58:18 | 33:23,25 34:7 |
| 100:1 | **speculative** | 61:10 80:13 | 36:19,20 54:22 |
| **somebody** | 60:9 80:1 | 90:23 95:6 | 70:21 74:13 |
| 52:21 59:5 | **spell** 33:14 | 98:10 99:15 | **stents** 71:6 |
| 71:5 | **spend** 11:13 | **stated** 51:21 | **step** 48:6 |
| **someone's** | **spent** 35:5,6 | 60:11 78:21 | **steps** 27:5 |
| 72:16 | 41:4 42:8 | 83:15 | |

stick 23:10
stipulation 5:9
stop 78:22
stopped 34:2
  51:8,19 65:16
stopping 51:15
streamlines
  30:14
street 3:4,11
  11:25
stress 15:22
  35:18,24 36:13
  46:4,18 61:4
  64:10,10,23,24
  73:10 75:4,24
  76:2,21 77:15
  87:19 88:12
  92:5,9,12,15,20
  92:21
stressful 62:25
  83:24 84:2
strike 37:12
  40:11 50:22,23
  69:22 82:12
  83:8,9
stroke 31:9
  35:17 90:1
strong 63:15
strongly 35:1
  74:16
students 12:25
  15:20 16:1
studies 19:14
  19:20 92:20

study 35:14
subject 40:5
subscribed
  98:10 99:14
  100:21
substantially
  51:2 67:22
sudden 76:14
suddenly 76:7
suffer 93:6
suffered 21:25
  22:1 35:22
  83:23
suffering 42:12
suggest 51:1
  65:2 80:19
suggesting 75:4
suggests 46:4
suite 2:8 3:4,11
  97:2
summaries
  20:4 91:11
summarize
  12:14
summarized
  12:22
summary 6:12
superior 97:1
supply 31:13
  59:3
support 58:2
  63:15 76:17
supporting
  22:6

suppose 24:6
sure 13:11 28:4
  32:17 34:16
  38:22 43:7
  53:8,9 68:10
  72:18 75:12
  84:24 86:24
  89:4 90:19
survived 71:11
sustained 33:4
sweaty 72:7
swedish 7:16
  62:15
switched 78:20
sworn 5:16,19
  95:10 98:10,13
  99:14,18
  100:21
symptoms 38:1
  67:23
system 27:8

**t**

t 6:6 7:18 31:19
  31:19,19 47:15
take 28:11 50:7
  50:18 53:7
  59:8 60:2
  75:15 93:16,18
taken 2:1,5
  5:24 16:2
  36:12 53:10
  72:22 95:19
talk 24:16
  42:14 58:6

talked 70:18
talking 22:18
  32:8 55:19
  85:5
tangent 30:19
tarabey 7:18
  8:4 62:14
  70:11
task 16:3
taught 15:12
  15:13,19 17:20
taylor 1:16
teach 12:23,23
teaching 17:5
team 56:10
teams 11:21
technical 19:14
  61:16
technology
  14:2 64:21
telephone 21:9
tell 50:12,17
  62:17 69:5
  92:7
tells 29:23
ten 10:24 22:5
  38:25 63:2
  89:20
tend 32:19 34:6
tension 48:20
tenuous 38:6
term 69:19
terms 51:25
test 35:18,25
  36:13 46:18,19

61:4,5 64:10
64:12,14 72:20
75:4,24 76:21
77:15 87:2
92:5,12,15
**testified** 5:20
21:6 23:11,17
28:8 61:3
72:14 73:6
82:5
**testify** 95:10
**testimony** 51:6
51:13 64:17
83:16 95:17
98:6,7 99:6,9
99:12
**testing** 63:19
**tests** 15:22,23
46:22 49:15
61:4 64:15
73:10 77:15
80:12 85:5
**textbooks**
59:24 60:1
**thank** 5:21 11:9
13:10 75:10
92:25 93:11
**thanks** 9:8
53:21 75:7
90:16
**theoretical**
73:13
**theoretically**
39:20 41:5,19
45:20 46:1

76:18 80:4
**therapy** 35:15
50:13 58:9
74:2
**thesis** 14:5
**things** 61:25
**think** 15:24
16:12 21:21
23:2 24:1,20
28:20 29:24
34:12 35:9,19
37:19 40:13
43:2,3,20 44:9
46:23 47:13
50:22 56:9
57:17 61:2
63:24 64:3,6
68:13 69:4
74:8 76:22
81:11,15 82:5
88:22
**thinners** 71:1
**third** 7:10
22:11 24:18
**thirds** 22:10
24:18
**thirty** 97:18
**thomas** 1:7
**thought** 32:17
33:11 54:20
55:7,8
**thousand** 12:6
**thousands** 12:9
71:5

**threatening**
48:21 67:22,24
**three** 8:3 12:11
14:8,10 21:22
23:7,14,18
24:11,14 62:12
**time** 5:8 11:15
12:19 13:17,23
21:8 26:13
28:17 29:2,3,3
31:18 32:3,8
33:5,7 34:1,19
35:3,6,6,8,22
36:4 39:25
41:1,3,5,12
42:6,8 43:5,15
44:3,10,14,14
47:1,8 50:8
54:21 58:5
60:4 63:17
65:15,22 72:16
72:23,25 73:6
73:7 74:7,19
74:20 75:15,15
75:18 76:6
79:14 80:16
89:9,18 93:12
95:20
**times** 16:5
47:19 81:11,13
81:14 82:14,21
89:23
**tion** 28:11
**tions** 18:16
42:9 49:24

**title** 10:14
19:17
**today** 10:6 20:8
27:12 32:4,10
59:17 69:18
93:1
**together** 8:1
20:23,25 70:4
**told** 54:20 66:1
**tolerate** 50:17
**tomorrow** 39:3
**took** 14:11,15
14:16,20 77:24
91:9
**torres** 1:16,16
**total** 42:23
**towards** 89:4
**township** 13:15
**trade** 48:4
**tradunsky** 3:12
**trained** 14:11
18:9,10 24:25
**training** 16:25
17:16,18 71:24
**transcribed**
98:7
**transcript**
93:25 95:12
97:11,12 98:5
98:12 99:5,11
99:17
**transferred**
42:19
**transient** 59:2
81:23,24

**transiently**
58:24
**traveled** 13:25
14:7
**treat** 48:7 59:2
62:16 71:15
**treated** 52:17
71:5 73:4
74:12 90:13
**treater** 56:18
**treating** 63:14
**treatment** 48:7
58:10 69:14
72:20 75:1
88:5
**trial** 72:15,22
**trials** 12:17,20
72:19
**tried** 71:14
**triplett** 1:18
**trips** 43:1
**troy** 3:10 5:13
61:21 79:11,14
93:1
**true** 54:13
95:16
**truth** 95:10
**trying** 30:16
43:14 71:17
**turn** 41:16
**two** 12:10
21:22 22:10
23:3 24:3,18
35:7 56:4 64:4
64:5 65:10

74:19 79:21
90:17
**type** 29:5 66:11
**types** 72:2
**typewriting**
95:14
**typically** 77:14
87:2

**u**

**u** 33:16 47:15
**uic** 7:16
**unchanged**
63:22
**uncommon**
39:12
**under** 68:9,9
95:14
**underlying**
85:9
**understand**
11:13 28:4
32:5 47:24
54:8 75:21
83:16 84:20
86:24
**understanding**
23:12 45:1
66:22,23 90:11
90:15
**unfortunately**
38:3 69:20
**unhealthy** 50:8
**unit** 11:2,18,18
12:13

**united** 1:1
**university** 7:22
**unreasonable**
75:19
**unrelated**
33:19
**unstable** 41:9
**unsure** 37:17
**untoward** 36:7
**unwell** 37:17
**ups** 75:10
**upstate** 43:1
**use** 32:19 59:11
59:12 69:19
**used** 13:3 61:17
**user** 52:22
**using** 89:17
**utility** 58:20
**utilizing** 59:21
**utter** 83:5

**v**

**v** 1:5 31:19
97:6 98:3 99:3
**vague** 43:24
44:2 92:6
**validity** 5:10
**value** 77:3
**valve** 87:6,6,7
**variance** 67:2
**various** 47:19
72:20
**venous** 58:23
**ventricular**
35:21 46:24

**verified** 96:4
**veritext** 97:1,7
100:1
**veritext.com.**
97:17
**versus** 42:24
87:24
**vessels** 58:22
**videoconfere...**
2:5 3:6,13
95:20
**visit** 43:2
**visiting** 13:1
42:6
**visits** 11:25
43:3 57:23
**vitae** 4:13
12:18,22 16:24
18:3
**volume** 38:21
**volunteered**
88:19

**w**

**w** 1:14,15
**wait** 43:16
44:22
**waive** 5:9 93:14
**waived** 97:19
**walgreens**
26:25
**walk** 88:9
**walked** 88:10
**wall** 70:16
**want** 7:3,6 8:8
30:19 32:21,21

Exhibit A

33:17 34:25
42:1 57:10,17
71:21 93:13,14
**wanted**  9:10
43:25 66:13,23
70:17
**wants**  29:19
**warden**  78:24
**wardens**  79:7
**water**  84:2
**way**  29:24
57:21 59:15
87:22 88:6
**ways**  38:17
92:23
**we've**  34:2
**weaken**  89:6
**weakening**
89:24
**wears**  82:3
**week**  11:20
15:9 38:1
51:24 89:20
**weeks**  11:19
25:24 35:8
36:9 43:4 44:4
50:15 51:25
65:22 73:22
74:18
**wellness**  7:20
**went**  13:15
30:19 33:12
44:19,20
**west**  3:11

**whereof**  96:3
**white**  17:8
**whopping**
69:17
**widely**  61:17
**widu**  7:20
**william**  1:3
51:1 52:15
54:14 97:6
98:3 99:3
**wire**  74:12
**wisconsin**  18:7
**wish**  59:1
**withdraw**  83:3
**withdrawal**
23:20 52:23
60:12
**withholding**
36:8 88:2
**witness**  2:8 4:3
5:6,15,18 15:8
20:15 27:16
28:8,23 30:4,6
31:6 33:16
34:25 40:7,15
40:21 44:2
45:4 53:9,19
57:19 60:11
79:6 80:3 81:1
83:11,14 84:21
89:7 91:24
92:19 93:16
95:9,9 96:3
97:8,11 98:1,4
98:11 99:1,4

99:15
**witness'**  97:14
**wondered**
86:15
**wondering**
23:9
**words**  44:17
55:22
**work**  9:23,24
19:23 22:9
54:15,23 55:3
55:3,15 59:21
59:23 70:18
86:19
**worked**  21:10
**worker**  22:7
**worker's**  22:15
**workers**  22:4
54:20
**working**  67:25
68:5 71:3
78:18
**world**  13:4
37:25
**world's**  31:19
**written**  20:4
**wrong**  27:2,3,3
44:9
**wrote**  14:5

**x**

**x**  4:1 33:16
47:15

**y**

**y**  7:18
**yale**  13:19
16:25
**yeah**  19:1
27:15 30:1,15
40:13 44:8
45:3 83:4,10
**year**  11:14,19
11:25 12:7,10
14:8,24 16:5
17:5 22:6
59:18 65:10,18
68:21 74:15
84:17 85:15
**years**  10:24
11:4 13:14
14:10,20,22
15:7,19,25,25
17:4,21 23:2
38:25 48:6
66:4 68:21
71:18 73:23
75:23 77:8
89:18
**york**  14:7 18:10
18:11,12
**young**  69:5

**z**

**z**  1:14
**zoom**  21:9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Exhibit A

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit A