

RICHARD C. BAKER
SOO YEON LEE
JOHN W. MAUCK

JUDITH A. KOTT

ONE NORTH LASALLE STREET, SUITE 3150
CHICAGO, ILLINOIS 60602

WWW.MAUCKBAKER.COM
TEL: 312.726.1243  FAX: 866.619.8661

WHITMAN H. BRISKY

OF COUNSEL

**CONFIDENTIAL LETTER – TO BE USED FOR SETTLEMENT PURPOSES ONLY**

May 4, 2023

Troy Radunsky
Jason DeVore
Zachary Stillman
DeVore Radunsky LLC
27 N. Wacker Dr., Suite 431
Chicago, Illinois 60606
*tradunsky@devoreradunsky.com*
*jdevore@devoreradunsky.com*
*zstillman@devoreradunsky.com*

**RE:** Settlement Re-Demand Letter
Case # 17-cv-7095
**Dukes v. Thomas Dart, et al.**
Our file # 3621.01

Dear Counsel:

We are in receipt of your April 25, counteroffer of $2,500 to our client. We reject this offer as it is completely unreasonable given the number of missed doses of which our client was deprived while detained at Cook County Department of Corrections between November 2015 and November 2017. In addition, the Defendants' offer is rejected due to the evidence supporting Plaintiff William Dukes' claims in his Third Amended Complaint against Defendants for deliberate indifference to a serious medical need under 42 U.S.C. § 1983 for deprivations of his constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution

**Background**

On November 14, 2019, Plaintiff William Dukes filed his Third Amended Complaint alleging that Defendants' deliberate indifference to a serious medical need constituted a violation of the Eighth and Fourteenth Amendments. (See Dkt. 90). Mr. Dukes also claimed in Count III of his Third Amended Complaint that Defendants violated *Monell* in that the conduct of not providing Mr. Dukes his necessary heart medication, even though Plaintiff repeatedly informed both security staff and medical staff of his past heart attack and ongoing heart disease, was so persistent and widespread that it represents standard operating procedure at the CCDOC.

On July 6, 2022, Plaintiff's counsel sent defense counsel a lengthy letter with a settlement demand of $321,500, explaining Mr. Dukes' position that given Defendants' failure to provide Mr. Dukes with his medications on approximately 1,053 occasions, as ordered by the CCDOC physicians and physicians assistants, that a jury could reasonably find a *Monell* violation that amounted to the deliberate indifference to Mr. Dukes' serious medical needs. As stated in that original settlement demand letter, the plaintiff had known "serious health problems" when he was admitted. Dukes continued to be denied his prescribed medications, despite numerous pleas by him to the Defendants that his medication to be provided to him to alleviate his chest pain.

On October 25, 2022, Defendant's counsel responded with a settlement counteroffer of $1,000, citing defendant's position that the plaintiff had not proven the existenance of any policy or widespread custom and practice whereby medication was denied to inmates who had a heart condition.

In the spirit of cooperation and good faith, and in an effort to settle the case, plaintiff's counsel responded on December 21, 2022 with a counter-demand of $250,000. Plaintiff's counsel reiterated Mr. Dukes' position that a jury would likely be persuaded that the individual defendants should be found liable for their participation in the policy of "reckless disregard and inaction" that CCDOC enacted, whether through facially or through implicit policy of conduct through the jail.

### **Legal Standard**

Cook County can be held liable for actions or inactions that take place at Cook County Department of Corrections under Section 1983. Under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), a local government entity can be sued directly when its official policy, custom, or practice causes a constitutional violation under Section 1983. "To state a claim under Section 1983 against a municipality, a plaintiff must allege that an official policy or custom caused theconstitutional violation, and that the official policy or custom was the 'moving force behind the violation." *Hill v. Cook Cty.*, 463 F. Supp. 3d 820, 841 (N.D. Ill. 2020).

Several cases from rulings by the United States Court of Appeals, Seventh Circuit have upheld inmates' claims of Section 1983 Eighth and Fourteenth Amendment violations for deliberate indifference to a prisoner's serious medical needs. In *Glisson v. Indiana* Department of Corrections, the Seventh Circuit reversed and remanded the District Court's granting of summary judgment for defendants finding deliberate indifference against the medical care provider, Corizon, when an inmate died after being incarcerated for 37 days. 849 F. 3d 372, 382 (7th Cir., 2017). In so holding, the Court stated that "the Constitution does require [the medical provider] to ensure that a well-recognized risk for a defined class of prisoners not be left to happenstance." *Id*. at 382.

The plaintiff in Glisson had known "serious health problems" when he was admitted. In evaluating the facts and evidence, the Court found that a jury could conclude that the medical provider "had actual knowledge that, without protocols for coordinated, comprehensive treatment, the constitutional rights of chronically ill inmates would sometimes be violated, and in the fact of that knowledge it nonetheless 'adopt[ed] a policy of inaction." *Id*. at 382, quoting *King v. Kramer*, 680 F. 3d 1013, 1021 (7th Cir. 2012) (where municipality has actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction."). The Court Court continued and stated that a jury could conclude that the medical provider, Corizon, was "indifferent to

the serious risk such a course posed to chronically ill inmates, made 'a deliberate choice to follow a course of action…from among various alternatives' to do nothing [] *Monell* requires no more." Id., quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197 (1989) (internal citations omitted). The Glisson Court also held that "**The hands-off policy is just as much a 'policy' as the 100% enforcement policy is**. *Id*. at 379 (emphasis added)

In another case, the Seventh Circuit reversed summary judgment in favor of Defendant-Appellee prison physicians where the state inmate filed a § 1983 action for deliberate indifference to his complaints of rectal bleeding and complaints of unresolved pain. *Goodloe v. Sood, et al.,* 947 F. 3d 1026, 1030 (7th Cir., 2020) In *Goodloe*, the Seventh Circuit Court held that an inmate can establish deliberate indifference by showing that medical personnel continued with a course of treatment they knew was ineffective, and that "'inexplicable delay' in responding to an inmate's serious medical condition can reflect deliberate indifference." *Id.* at 1031. Despite Goodloe complaining five times between May 28 and July 31, 2014 of his ongoing rectal pain that he insisted was not yet diagnosed or treated and was "internal", along with Goodloe filing four lengthy and detailed grievances to the staff at Hill Correctional Center, it was not until September, 2014 that Defendant Dr. Sood determined that Goodloe needed to be evaluated by a colorectal specialist. *Id*. at 1029. The *Goodloe* Court noted that "patients are often the best source of information about their medical condition", and despite Goodloe's repeated claims that his situation was getting worse, his complaint prompted no action by the defendants and no effort to arrange for an outside consultation. *Id*. at 1027, 1032. As such, the Seventh Circuit held that "A jury could find that there was no medical justification for the delay." *Id*. at 1032.

The Seventh Circuit Court of Appeals also vacated the district court's ruling granting summary judgment in favor of Defendant Nurse Nordahl, Dr. Daley, and Sharon Zunker (director of the Bureau of Health Services) and held that it was an issue for the jury as to whether the defendants' claim that Plaintiff-Appellant Greeno was malingering and did not have a severe medical need. *Greeno v. Daley et al.,* 414 F. 3d 645, 655 (7th Cir., 2005) While incarcerated at Racine Correctional Institutiion, Greeno first began complaining of severe heartburn in December, 1994, and his symptoms persisted and intensified from January until July 1995 and Greeno's multiple letters to nurses and filed numerous inmate complaints that were not responded to adequately by Defendants. *Id.* at 650. Greeno appealed at least seven of his inmate complaints where he discussed his severe heartburn with frequent vomiting, his inability to receive effective medication and a bland diet, and the refusal of any prison official to refer him to an outside specialist for further testing. *Id*. at 652. The *Greeno* Court noted that "A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Id*. at 653. The Seventh Circuit also held that a prisoner does not need to establish that prison officials desired or intended the harm that resulted, it is enough for an inmate to show that the defendants knew of a substantial risk of harm (the fact that the risk was obvious) and they nevertheless disregarded the risk. *Id.* The *Greeno* Court also held that "there is no requirement that a prisoner provide "objective" evidence of his pain and suffering—self-reporting is often the only indicator a doctor has of a patient's condition…The fact that a condition does not produce 'objective' symptoms does not entitle the medical staff to ignore it…Subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition." *Id*. at 655.

3

Exhibit B

### Mr. Dukes' Monell Claim Against Defendants

Each time that Mr. Dukes was admitted to CCDOC from the time he was first admitted in November, 2015 to November 2017, he went through an intake process and was prescribed medications. From the first intake exam on November 25, 2015, William Dukes told the medical provider that he had heart disease, high cholesterol, hypertension, and asthma (in addition to other injuries like neck pain at that first intake). See "CCSAO 000174-000180." Both Cermak and Cook County knew through these intake exams by a physician or physician's assistant that Mr. Dukes had suffered a heart attack while housed at Pontiac Correctional Center in 2012, and that as a result, he needed to take medications for his heart, blood pressure, high cholesterol, asthma, and for anxiety. Mr. Dukes was told to take his medication as prescribed and he requested his prescribed medications daily whenever he did not receive them as prescribed or on time.

Even though Mr. Dukes was prescribed Atorvastatin, Aspirin, Metopropol, Nitroglycerin (prescribed "as needed"), Alburterol, Doxazosin, Fluoxetine, and Fenofibrate, which are in the medical records produced by Defendant in this case, **he was denied 1,045 scheduled doses of his prescribed medications over 156.5 days. Mr. Dukes was housed in CCDOC for 156.5 days and did not receive any of his prescribed medications. Additionally, Mr. Dukes was denied his prescribed Nitroglycerin on time or at all on at least eight (8) occasions according to his grievance forms and Health Service Request Forms (or "HSRF").** See Table of Missed Doses and Nitroglycerin.

This intentional failure, indifference, and/or lack of coordination by Cook County and its agents in not administering 1,045 scheduled doses of prescribed medications to Mr. Dukes (between November 2015 and November 2017) and denying his timely as-needed chest pain medication amounted to a widespread practice that is so permanent and well-settled that it constitutes a custom or practice. The interagency directives and other policies of Cook County and its agents clearly outline procedures and steps that both Cook County and Cermak employees and agents are supposed to take so that detainees receive their prescribed medications and emergency medical treatment safely and in a timely manner. Specifically, Interagency Directive No. 64.5.44.9 at 1, provides that "<u>**Communication and cooperation between departments is vital in providing inmates with prompt health care in a secure manner**</u>." (emphasis added). Furthermore, the Interagency Directive No. 64.5.45.0 at 1 states that "<u>**The correctional officer plays an essential role in the medication distribution teams, as outlined below, but shall not handle the medication.**</u>" (emphasis added).

While defendant correctional officers claimed they had no responsibility with grievance documents or Health Service Request Forms, Mr. Dukes' only method for obtaining healthcare if his medications were not available through the regular MedPass, Mr. Dukes in fact was at the mercy of the Cook County correctional officers much of the time. Cook County and Cermak's combined violation of a coordinated interagency directive by multiple players amounts to widespread practice sufficient to show that both entities were responsible in ensuring that Mr. Dukes received his prescribed medications, on time and on schedule.

One of Mr. Dukes' grievance forms shows that he requested to be transferred back to Livingston County according to a court order that was entered on February 3, 2016, so that Mr. Dukes could receive his medications in a timely manner. However, Cook County violated that order by prohibiting Mr. Dukes from returning to Livingston in April 2016. An internal email from Cook County Sheriff, Renee

Hubs, on April 12, 2016, states that "there is a cost for housing inmates at an outlying county" and that Cook County does "not have to honor court orders." (See CCDOC grievance forms at 1001). Instead, Mr. Dukes had to stay at CCDOC for another month, thereby denying him a month's worth of medication for the expense saved by Cook County. That cost savings, while putting Mr. Dukes at risk, is evidence of deliberate indifference.

Just because Defendant correctional officers and nurses and Nursing Supervisor Shebel all denied responsibility for Mr. Dukes not receiving his daily medications for 156.5 days/1,045 doses and delayed or no treatment of Nitroglycerin at least eight (8) times, Defendants' liability is not eliminated. It is undispjuted that Cook County and Cermak's own records show that Mr. Dukes was dnied 1,045 prescribed daily medications over 156.5 days and denied Nitroglycerin at least eight times. Plaintiff believes the records establish Defendants' liability and clear the way for a determination and award of damages for Plaintiff.

### Testimony That Supports Deliberate Indifference to Duke's Serious Medical Medical Need

### William Dukes

Mr. Dukes testified at his deposition, and his many grievance and healthcare service request forms demonstrate, that he informed Cook County and its agents, all of the correctional officers on his living units, Cermak nurses, Cermak supervisor and auditor, Susan Shebel, RN, CRW Jones and CRW Chestine, Lieutenant Lewis, and their supervisors that he was not receiving his prescribed medications and needed them urgently, especially the as-needed Nitroglycerin, since being first admitted on November 25, 2017. In contrast, he also testified that he always received his prescribed daily medications and as-needed Nitroglycerin medication within a few minutes while residing at Livingston County. Mr. Dukes also testified that he developed diabetes during his imprisonment at Cook County between 2015 and 2017.

Mr. Dukes testified that he experienced issues with his HSRFs being collected and reviewed. Early on, in November 2015, Mr. Dukes requested his daily prescribed medications and Nitroglycerin "KOP" (keep on person) through HSRFs. However, because he was not receiving responses to the forms and was not receiving the medication "KOP" as requested, he started submitting grievance forms to request his prescribed medications and to grieve when he did not receive his Nitroglycerin in a timely manner or at all.

Mr. Dukes' inability to receive Nitroglycerin became significant during the numerous times that he experience chest pains. During the time frame from November 2015-November 2017, Dukes testified that he had between 5-8 episodes where his chest pain lasted from one to three hours, with at least two of them lasting overnight. When his chest pain lasted overnight, the only thing that would temporarily relieve his pain was when he laid down on the cold concrete to reduce the pain, but if he got up, the pain was still there. Dukes testified that officers Buchanan-Smith and Altman did nothing to assist him. Even though he would ask for help, they would not return for help and sometimes when they returned in the morning to deliver breakfast at 4:30 in the morning to Mr. Dukes' cell mate, they would find Dukes still lying on the floor of his cell and still not assist him. The chest pain could last from one hour to 12-14 hours. Nurses also refused to give him his medication when he was experiencing chest pain. It was

difficult to impossible to find out the nurses' names because they typically had their name tag turned backwards, and sometimes just said "Nurse," when he asked the nurse her name.

In one instance where Mr. Dukes was experiencing chest pain and called out for help, he was told by the security guard that he would have to wait for med line to come. Mr. Dukes had to wait 35 more minutes until they showed up and then he had to walk handcuffed for a mile from Division10 to Cermak since the medicine had no immediate effect, and there was no one in the dispensary. Another time when he was in the bull pen and asked for help and requested Med Tech, he had to wait 4 ½ hours until someone came to give him Nitroglycerin.

Sometimes, Mr. Dukes had to wait a significantly long time to receive any sort of response from Nurse Shebel related to his grievance or appeal. For example, Mr. Dukes filled out a grievance on March 29, 2016, stating that he was experiencing chest pains and requested his prescribed Nitroglycerin, but the nurse said "No." In his grievance, Mr. Dukes asked that the audio and video of his request be preserved. It was not until two months later (on May 31, 2016), that Mr. Dukes got a written response from Ms. Shebel stating that there was "No documentation initiating request for PRN medication." Mr. Dukes immediately appealed her response that very day, on May 31, 2016.

**Nursing Supervisor Susan Shebel**

Nurse Shebel tesfitied that if a detainee who was prescribed Nitroglycerin complained of chest pains, the detainee should receive the Nitroglycerin "as soon as he possibly can get the medication." Shebel Dep. 113: 5-6. 118-127, May 11, 2022. In her deposition, Ms. Shebel testified that she did not know the answer to the question as to why the first time Mr. Dukes received his medication was on March 27, 2016, even though he had orders from November 24, 2015 for all of his medication. Shebel Dep. 207: 8-15, May 11, 2022. Ms. Shebel also testified that the pharmacy isn't open 24/7 at the prison, and that she has never had a meeting with anyone at Cermak or Cook County about the delay it takes for inmates to get their medication when they come to Cook County. Shebel Dep. 246: 13-22, 247: 9, May 11, 2022. Nurse Shebel also testified that Cook County CRW social workers were responsible for picking up the Cook County grievance forms and deciding whether the form should be marked as a "non-grievance," "emergency grievance," or "grievance." Shebel Dep. 140: 6-22, May 11, 2022. Nursing Supervisor Shebel testified as well that if the grievance is not checked to be "referred to Cermak," Cermak will never see the grievance. Shebel Dep. 172: 12-25, May 11, 2022.

**Nurse Ashley Bloodworth**

In her deposition, Nurse Bloodworth testified that she agreed with the policy statement in the Cook County directive that prescribed medication is a medically necessary form of treatment and stated that it was important for inmates to receive their medications on time. Bloodworth Dep. 58: 8-16, Feb. 4, 2022. Nurse Bloodworth further testified that chest pains are a sign and symptom of a heart attack and that the signs and symptoms leading up to a heart attack are serious medical needs. Bloodworth Dep. 128: 17-22, 129: 13-15, Feb. 4, 2022.

6

Exhibit B

**Dr. Dan Fintel (Defendant's Expert Witness)**

Defendant's expert witness Dr. Dan Fintel confirmed that the proper standard of care was for a doctor to ensure that prescription medication was filled and given to patients as prescribed. Fintel Dep. 25. Additionally, Dr. Fintel testified that it was a reasonable expectation that a patient would fill a prescription given to them and take it as ordered. Fintel Dep. 75. Furthermore, Dr. Fintel testified that assuming medication was filled only 57% of the time, there was the potential of harm to the patient. Fintel Dep. 28: Moreover, Dr. Fintel testified that plaque build-up in arteries can take time between the initial plaque build-up until a cardiac event occurs. Fintel Dep. 75. In his review of the records, Dr. Fintel stated in his deposition that although Mr. Dukes had a stress test and an echocardiogram, there was no indication that he ever had a calcium test performed on his heart, and had one been performed, he would have expected it to be high since he had multivessel coronary disease with artherosclerosis. Fintel Dep. 36. Dr. Fintel also testified that in his review of the records he could see that Mr. Dukes had a family history of heart disease and that "It's theoretically possible that the failure to receive a cardiac medication could have deleterious consequences." In his expert testimony, Dr. Fintel testified to his agreement that prolonged anxiety can cause harm to a patient's heart, and that he tells his own patients of the potential harm if they interrupted their statin therapy. Fintel Dep. 49-50. .Finally, Dr. Fintel testified that diabetes is one of the most significant risk factors that dramatically increases the rate of coronary artery disease progression and the fragility of blood pressure. Fintel Dep. 91.

**Medical Damages**

The U.S. Supreme Court has held that Eighth Amendment principles prohibits jail personnel from "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). The Eighth Amendment's prohibition against cruel and unusual punishment can be violated where prison officials' conduct demonstrated deliberate indifference to the serious medical need of a prisoner. *Wynn v. Southward,* 251 F.3d 588, 594 (7th Cir. 2001) More specifically, the *Wynn* Court held that Plaintiff-Appellant had alleged facts sufficient to state an Eighth Amendment claim against Defendants Indiana Department of Corrections, the Indiana State Prison, and two corrections officers for deliberate indifference to Wynn's serious medical need for his heart medication. *Wynn v. Southward, et al.,* 251 F. 3d 588, 594 (7th Cir., 2001) The *Wynn* Court held that the officers were deliberately indifferent to Wynn's serious medical need for his heart medication when the evidence established that Wynn had repeatedly told prison officials that he needed his heart medication "immediately" and that those officials did not respond to his requests, that he had made two written requests for his medication to Defendant Southward, that as a result of the lapse in his medication his heart had been "fluttering", and that he risked "heavy chest pains" if he did not resume his medication. *Id.*

The Seventh Circuit Court of Appeals has held that in order to determine the appropriate amount of damages, judges must consider comparable awards. *Jutzi-Johnson v. U.S.,* 263 F.3d 753, 759 (7th Cir. 2001) While a determination of comparable awards is not exact, the *Jutzi-Johnson* Court noted that one must look to similar cases to determine what a reasonable damages award could be in front of a jury. In a similar federal court case, the Court applied a comparable formula where the detainee was denied medical care for undiagnosed neuropathy for two and a half months. The Court awarded the detainee $300/day for the "pain and suffering he experienced as a result of undiagnosed neuropathy" and $100/day for "the pain and additional distress he experienced following the TIAs [transient ischemic

attacks]. *Armour v. Tchaptchet*, 2:17-CV-050-JTM (N.D. Ind. Jan. 31, 2022) (Slip Opinion) In the *Armour* case, Plaintiff credibly testified that he had experienced significant pain related to his undiagnosed neuropathy beginning in July and continuing through September, and that the pain was constant, chronic, and excruciating even after he had made his doctor aware of its existence. *Id*. Not only did Armour credibly testify that the pain interfered with his sleep and caused him significant emotional distress, but he also noted he was placed in medical isolation in conditions similar to administrate detention ("the hole") for a week, where he felt mentally anguished and depressed because he feared another TIA or full-blown stroke. *Id*. at 9. The Armour Court concluded that it is clear a delay in providing adequate treatment or medication can lead to pain and "needless suffering. *Id*. at 12.

     Mr. Dukes' case is distinguishable from the *Armour* case because Cook County and Cermak new about Mr. Dukes' heart disease, high blood pressure, and high cholesterol diagnoses when he arrived to CCDOC each time from November 2015 to November 2017. Mr. Dukes' case is also distinct because he was denied over 156 days of seven to nine prescribed medications over a period of two years. Thia ia not a slight "miss" by Cook County—when a jury hears that the number of consecutive days that Mr. Dukes was denied his heart and related medications, along with the egregious nature of the Nitroglycerin denials when Mr. Dukes clearly informed both the security guards and nurses that he was experiencing chest pains and requested the Nitroglycerin, coupled with the fact that he experienced a widow maker heart attack less than a year after being discharged from CCDOC, it is expected that the jury will support a similar but more substantial formula than the Court award in *Armour*.

     In contrast to the plaintiff-appellant in the Wynn case who repeatedly told prison officials he needed his heart medication "immediately" and made two written requests for his heart medication and warned that he risked heavy chest pains if he did not receive his medication, Mr. Dukes testified that actually experienced heavy chest pains and had 5-8 episodes where his chest pain lasted from one to three hours, with at least two of them lasting overnight where the only temporary relief he could get was when he laid down on the floor, but if he got up the pain was still there. *Wynn v. Southward, et al.,* 251 F. 3d 588, 594 (7th Cir., 2001)

     It is undisputed that when Mr. Dukes arrived at Cook County, that he had a serious medical condition. Not only was it well-documented in his chart that Mr. Dukes had heart disease (along with a family history of heart disease) but each of his prescriptions and dosages were clearly laid out in his medical chart. The evidence in Mr. Dukes' case undeniably demonstrates Defendants' deliberate indifference to a serious medical need and is actionable under *Monell*. Mr. Dukes was denied 1,045 scheduled doses of his prescribed medications over 156.5 days. Mr. Dukes continually had to advocate for himself through well-documented grievances and appeals in an effort to persuade Defendants that his serious medical condition of chest pains was an indication that he needed his prescribed heart medication, including the Nitroglycerin. Even defendants' expert doctor Dr. Dan Fintel acknowledged that it was a reasonable expectation that prescribed medication was filled and given to patients as prescribed. The inaction and indifference to Mr. Dukes' repeated grievances and appeals established a clear pattern of "hands-off" that was disallowed by the Seventh Circuit Court of Appeals, especially referenced in the *Glisson* opinion as discussed above.

     For the above-referenced reasons, we hereby issue a re-demand of $250,000.00 based on the aforementioned Seventh Circuit Court of Appeals case law, including the case of *Armour v. Tchaptchet*, 2:17-CV-050-JTM (N.D. Ind. Jan. 31, 2022) (Slip Opinion). Our client deserves at least $250,000 from

the Defendants for the aforementioned evidence establishing their medical indifference to a serious medical need under Section 1983, not only for the 1,046 missed doses of medication and the eight documented denials or delays of receiving Nitroglycerin as needed, but also for the above-referenced evidence establishing that the Defendants exhibited deliberate indifference to William Dukes' serious medical condition and numerous complaints of chest pain. Specifically, it is not unreasonable that a jury could find an award of $300 for Mr. Dukes for each missed prescribed dose of his regular, daily heart and related medications, and $1,000 for each documented Nitroglycerin denial when he also verbalized to Defendants that he was experiencing chest pain and needed the Nitroglycerin that had been prescribed to him to take on an "as needed" basis. It is likely that a jury would also award the remainder to Mr. Dukes for his pain and suffering, coupled with his prolonged anxiety. Defendant's own expert, Dr. Dan Fintel, admitted in his deposition that prolonged anxiety an cause harm to a patient's heart and he tells his own patients in his practice that patients could potentially cause harm if they interrupted their statin therapy. Fintel Dep. 49: Although anxiety standing alone is difficult to quantify, continued and systematic anxiety and fear, coupled with Dr. Dan Fintel's testimony confirming the damage that prolonged anxiety can cause to one's heart, creates a circumstance where a jury could reasonably find that Plaintiff sustained injuries caused by the deliberate indifference by Defendants to a serious medical condition.

Sincerely,

*/s/ Judith A. Kott*

Judith A. Kott
jkott@mauckbaker.com
(312) 977-0479