

RICHARD C. BAKER
SOO YEON LEE
JOHN W. MAUCK
───────
KIRSTIN M. ERICKSON

ONE NORTH LASALLE STREET, SUITE 600
CHICAGO, ILLINOIS 60602

WWW.MAUCKBAKER.COM
TEL: 312.726.1243 FAX: 866.619.8661

WHITMAN H. BRISKY
OF COUNSEL

**CONFIDENTIAL LETTER – TO BE USED FOR SETTLEMENT PURPOSES ONLY**

July 6, 2022

Troy Radunsky
DeVore Radunsky LLC
27 N. Wacker Dr., Suite 431
Chicago, Illinois 60606
*tradunsky@devoreradunsky.com*

**RE:    Case # 17-cv-7095**
   **Dukes v. Thomas Dart, et al.**
   **Our file # 3621.01**

Dear Troy:

Based on the evidence produced in discovery and the deposition testimony of Defendants Partee, Bloodworth and Addison, and Susan Shebel, RN, Plaintiff believes he would prevail on a *Monell* claim against Cook County at trial. The failure to provide Mr. Dukes with his prescribed medications on approximately 1,053 occasions as ordered by the CCDOC physicians and physicians assistants was an Eighth Amendment *Monell* violation that amounted to deliberate indifference to his serious medical needs.[1]

## LEGAL STANDARD

Cook County can be held liable for actions or inactions that take place at Cook County Department of Corrections under Section 1983. Under *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 56 L.Ed.2d 611, 98 S.Ct. 2018 (1978), a local government entity can be sued directly when its official policy, custom, or practice causes a constitutional violation under Section 1983. "To state a claim under section 1983 against a municipality, a plaintiff must allege that an official policy or custom caused the constitutional violation, and that the official policy or custom was the 'moving force' behind the violation." *Hill v. Cook Cty.*, 463 F. Supp. 3d 820, 841 (N.D. Ill. 2020). See *Estate of Sims ex rel. v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007).

---

[1] Mr. Dukes was incarcerated at several Illinois prisons since 2004 when he was charged with double homicide and later convicted in 2011. His conviction was overturned in July 2019 after a new trial. Mr. Dukes was wrongfully convicted and served 15 years as an innocent man.

1

Exhibit A

The plaintiff "must demonstrate that there is a policy at issue rather than a random event." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). "This may take the form of an implicit policy or a gap in expressed policies, or a series of violations to lay the premise of deliberate indifference." *Id.* "A plaintiff may demonstrate an official policy through: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Estate of Sims*, 506 F.3d at 515.

In *Glisson v. Indiana Department of Corrections*, the Seventh Circuit reversed and remanded the District Court's granting of summary judgment for defendants finding deliberate indifference against the medical care provider, Corizon, when an inmate died after being incarcerated for 37 days. 849 F.3d 372, 382 (7th Cir. 2017). In so holding, the Court stated that "the Constitution does require [the medical provider] to ensure that a well-recognized risk for a defined class of prisoners not be left to happenstance." *Id.* at 382.

The plaintiff had known "serious health problems" when he was admitted. In evaluating the facts and evidence, the Court found that a jury could conclude that the medical provider "had actual knowledge that, without protocols for coordinated, comprehensive treatment, the constitutional rights of chronically ill inmates would sometimes be violated, and in the face of that knowledge it nonetheless 'adopt[ed] a policy of inaction.'" *Id.* at 382, quoting *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"). The Court continued and stated that a jury could conclude that the medical provider, Corizon, was "indifferent to the serious risk such a course posed to chronically ill inmates, made 'a deliberate choice to follow a course of action ... from among various alternatives' to do nothing [] *Monell* requires no more." *Id.*, quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197 (1989) (internal citations omitted).

As the Seventh Circuit explained, "[t]he central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell* is exclusive), caused the constitutional deprivation. It does not matter if the policy was duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach. One could easily imagine either kind of strategy for a police department: one department might follow a policy of zero-tolerance for low-level drug activity in a particular area, arresting every small-time seller; while another department might follow a policy of by-passing the lower-level actors in favor of a focus on the kingpins. **The hands-off policy is just as much a "policy" as the 100% enforcement policy is.**" *Glisson* at 379 (emphasis added).

### MR. DUKES' MONELL CLAIM AGAINST DEFENDANT, COOK COUNTY

Every time Mr. Dukes was admitted to CCDOC between November 2015 and November 2017, he went through the intake process and was prescribed medications. From the first intake exam on November 25, 2015, Mr. Dukes told the medical provider that he had heart disease, high cholesterol, hypertension, and asthma (in addition to other injuries like neck pain at that first intake). See "CCSAO 000174-000180." Cermak and Cook County knew through these intake exams by a physician or physician's assistant that Mr. Dukes suffered a heart attack while housed at Pontiac Correctional Center in 2012, and that as a result, he needed to take medications for his heart, blood pressure, high cholesterol, asthma, and for anxiety. All of his prescribed medications were essential for his heart to continue to function at an optimal level. Mr. Dukes

was told to take his medications as prescribed, and he requested his prescribed medications daily when he did not receive them as prescribed or on time.

Cook County and Cermak knew that Mr. Dukes had a history of a heart attack and a stent. The physicians and PAs prescribed heart and related medications accordingly. He was prescribed Atorvastatin, Aspirin, Metoprolol, Nitroglycerin, Albuterol, Doxazosin, Fluoxetine, and Fenofibrate, which are in the medical records produced by Defendants in this case. The Nitroglyerin was prescribed "as needed." **However, Mr. Dukes was denied 1,045 scheduled doses of his prescribed medications over 156.5 days.[2] Mr. Dukes was housed in CCDOC for 156.5 days and did not receive any of his prescribed medications. Additionally, Mr. Dukes was denied his prescribed Nitroglycerin on time or at all on at least eight (8) occasions according to his grievance forms and Health Service Request Forms (or "HSRF").** See attached Table of Missed Doses and Nitroglycerin.

Mr. Dukes suffered at the hands of the inaction and lack of coordination of many correctional officers, nurses, physicians, physician's assistants, Correctional Rehabilitative Workers ("CRW"s), supervisors, Cermak staff, Cook County Sheriff Dart (collectively "Cook County and its agents"), all of whom work for Cook County as either direct employees or agents of Cook County by virtue of the interagency directives and policies that outline collaborative work that Cook County and Cermak are supposed to strictly comply with to ensure that detainees are given their prescribed medications.

Mr. Dukes was prescribed Nitroglycerin each time he reentered CCDOC from Livingston County Correctional Facility. In November 2015, he requested that Nitroglycerin be given to him as KOP (keep on person) in a HSRF. Notably, Nursing Supervisor and RN, Susan Shebel, testified in accordance with the MAR policy, that there are many medications that are in fact administered as "KOP" at CCDOC. Nurse Shebel testified that Oxycodone, Albuterol, Advil, Tylenol, Amoxycillin, in addition to thousands of other medications, are administered as KOP, and that many of these medications, including Oxycodone and Tylenol, could be taken to excess, which would cause a detainee to overdose. Nurse Shebel also testified that if a detainee who was prescribed Nitroglycerin complained of chest pains, the detainee should receive the Nitroglycerin "as soon as he possibly can get the medication." Shebel Dep. 113:5-6. 118-127, May 11, 2022. However, Nurse Shebel could give no reason to distinguish why Nitroglycerin was not "safe" enough for Mr. Dukes to keep on his person while Oxycodone, Tylenol, and many other medications that were actually "unsafe," given her testimony that a detainee could overdose on those KOP medications. This lack of reasoning to deny Mr. Dukes his prescribed medication is another form of a widespread custom that amounts to a policy or practice of denying him his necessary and life-sustaining medications.

This intentional failure, indifference, and/or lack of coordination by Cook County and its agents in not administering 1,045 scheduled doses of prescribed medications to Mr. Dukes (between November 2015 and November 2017) and denying his timely as-needed chest pain medication amounted to a widespread practice that is so permanent and well-settled that it constitutes a custom or practice. The interagency directives and other policies of Cook County and its agents clearly outline procedures and steps that both Cook County and Cermak employees and agents are supposed to take so that detainees receive their prescribed medications and emergency medical treatment safely and in a timely manner. Defendants and Nursing Supervisor, Susan Shebel, testified that a certain job was the responsibility of the "Cook County

---

[2] By way of contrast, when Mr. Dukes was incarcerated at Livingston Correctional Center from 2015 until 2019, their medical records show Mr. Dukes always received his prescribed medications in a timely manner.

3

side" and "not Cermak" or vice versa. Defendant correctional officers claimed they had no responsibility with grievance documents or Health Service Request Forms, Mr. Dukes' only method for obtaining healthcare if his medications were not available through the regular MedPass. However, Mr. Dukes was at the mercy of the Cook County correctional officers much of the time.

**When Mr. Dukes was in the Receiving bullpen ("RCDC") after returning from court and in his living unit, Mr. Dukes requested Nitroglycerin eight (8) times for chest pain, and his request was either flat out ignored or severely delayed such that when he received the medication, it had no effect.** On two separate occasions on March 29, 2016, Mr. Dukes filed grievances for failures by a Cermak nurse and several Cook County correctional officers for denying him his as-needed medication. That day between 4:00 a.m. and 6:00 a.m., Mr. Dukes requested Nitroglycerin before going to court, and the nurse told him "no." When he returned that evening at 7:50 p.m., he again experienced chest pains while waiting in RCDC and asked any and all correctional officers that walked by for Nitroglycerin. The correctional officers ignored him for a long time, and eventually 2 hours and 20 minutes later, Mr. Dukes received Nitroglycerin. At that point, the medication does not work. On six (6) other occasions, Mr. Dukes documented the time, date, and circumstances in which he requested Nitroglycerin from multiple people—which required him to walk a mile to go to the Cermak ER a few times, once because there was no nurses or staff in the dispensary by his living unit, and the other time, there was no Nitroglycerin on the MedCart or in the dispensary. And these are eight of the documented incidents. Mr. Dukes will testify about additional requests for Nitroglycerin prior to bedtime, which he was also denied.

As an institution with many moving parts with interagency directives and hundreds of policies for correctional officers and Cermak medical staff who work together daily, it is relevant that the correctional officers had a duty and responsibility to assist detainees like Mr. Dukes when they complained of not receiving their prescribed medications. Whether these denials were due to the CRW not coming every day, the HSRFs not being picked up daily, no one following up on the inmate's grievance form, or for any other reason, the correctional officers are a spoke in the wheels in providing medical care and treatment to the detainees at CCDOC.

One of the most important interagency directives that shows that both Cook County *and* Cermak are both liable for administering medications to detainees in a collaborative manner is "Cook County, Illinois Interagency Directive," (No. 64.5.45.0) effective May 17, 2013, for "Medication Administration and Distribution." This interagency directive provides that "[*p*]*rescribed medication is a medically necessary form of treatment*. Safe medication passage is essential to providing inmates with medically necessary treatment, and *requires cooperation and coordination between CCDOC and Cermak*. Goals of this interagency collaboration are to:
1. Administer of Distribute medication effectively;
2. Prevent drug hoarding, misuse and diversion;
3. Avoid medication errors; and
4. Maintain staff safety.

…C. *The correctional officer plays an essential role* in the medication distribution teams, as outlined below, but shall not handle the medication." See Interagency Directive No. 64.5.45.0 at 1 (emphasis added).

Defendant Nurse Bloodworth, Cermak Nursing Supervisor, Susan Shebel, and Defendant Correctional Officer Addison admitted that this interagency directive was to be strictly complied

with. See Bloodworth Dep. 59:5-12, Feb. 4, 2022; Shebel Dep. 9-22, May 11, 2022; Addison Dep. 67:20-24, 68:1-2, April 20, 2022.

Cook County and Cermak's combined violation of a coordinated interagency directive by multiple players amounts to widespread practice, or an as-applied violation, sufficient to show that both entities were responsible in ensuring that Mr. Dukes received his prescribed medications, on time and on schedule.

Another policy that demonstrates that Cermak is an agent of Cook County, thereby imposing liability on Cook County, is "Cook County, Illinois Interagency Directive," (No. 64.5.44.0) effective Sept. 12, 2011, for "Non-Emergency Health Service Requests." The purpose of this interagency policy is to "establish[h] the policy and procedures to be followed by all Cook County Department of Corrections (CCDOC) and Cermak Health Services of Cook County (Cermak) employees with regard to the provision, collection, and management of inmate non-emergency health service requests." The policy continues by stating that "[i]t is the _shared_ policy of CCDOC and Cermak to provide the opportunity for inmates to request non-emergency health services on a _daily basis_, regardless of their housing assignment, security level, or custody status. CCDOC and Cermak have separate responsibilities in ensuring that inmate requests for medical, dental, or mental health services are collected and addressed in a _timely_ manner, and that inmates are kept safe and secure during the provision of health care. Both departments shall ensure language or literacy issues do not pose a barrier for inmates seeking health service. _Communication and cooperation between departments is vital in providing inmates with prompt health care in a secure manner_." See Interagency Directive No. 64.5.44.0 at 1, emphasis added.

Just because Defendant correctional officers and nurses and Nursing Supervisor Shebel all denied responsibility for Mr. Dukes not receiving his daily medications for 156.5 days/1,045 doses and delayed or no treatment of Nitroglycerin at least eight (8) times, Defendants' liability is not eliminated. It is undisputed that Cook County and Cermak's own records show that Mr. Dukes was denied 1,045 prescribed daily medications over 156.5 days and denied Nitroglycerin at least eight times. Plaintiff believes the records establish Defendants' liability and clear the way for a determination and award of damages for Plaintiff. The aforementioned policies will be introduced at trial along with Mr. Dukes' medical records, Cook County grievance forms, and Cermak Health Service Request Forms showing that Mr. Dukes consistently requested and grieved according to the Inmate Handbook, and was denied his prescribed medications.

One of Mr. Dukes' grievance forms shows that he requested to be transferred back to Livingston County according to a court order that was entered on February 3, 2016, so that Mr. Dukes could receive his medications in a timely manner. However, Cook County violated that order by prohibiting Mr. Dukes from returning to Livingston in April 2016. An internal email from Cook County Sheriff, Renee Hubbs, on April 12, 2016, states that "there is a cost for housing inmates at an outlying county" and that Cook County does "not have to honor court orders." (See CCDOC grievance forms at 1001). Instead, Mr. Dukes had to stay at CCDOC for another month, thereby denying him a month's worth of medication for the expense saved by Cook County. That cost saving damaged Mr. Dukes.

### Testimony that Supports Mr. Dukes' _Monell_ Claim

Mr. Dukes testified and his many grievance and healthcare service request forms demonstrate that he informed Cook County and its agents, all of the correctional officers on his living units, Cermak nurses, Cermak supervisor and auditor, Susan Shebel, RN, CRW Jones and CRW Chestine, Lieutenant Lewis, and their supervisors that he was not receiving his prescribed medications and needed them

5

urgently, especially the as-needed Nitroglycerin, since being first admitted on November 25, 2017. He also testified that he always received his prescribed daily medications and as-needed Nitroglycerin medication within a few minutes while residing at Livingston County.

Mr. Dukes testified that he experienced issues with his HSRFs being collected and reviewed. Early on, in November 2015, Mr. Dukes requested his daily prescribed medications and Nitroglycerin "KOP" (keep on person) through HSRFs. However, because he was not receiving responses to the forms and was not receiving the medication "KOP" as requested, he started submitting grievance forms to request his prescribed medications and to grieve when he did not receive his Nitroglycerin in a timely manner or at all.

Mr. Dukes testified that he would lay on the ground of his living unit at times when his chest hurt. He testified that the correctional officers would see him and do nothing. He testified that he told every correctional officer in his living units that he was being denied his prescribed medications to no avail. This is what Mr. Dukes will testify to at trial.



Q: Mr. Dukes, you were asked earlier about the length of time that you experienced chest pains. What is the greatest number of hours consecutively that you were experiencing chest pains?

A. It was anywhere from one hour to a few hours, and at times it'd last all night –

Q. So what –

A. -- 12, 14 hours. I'd have to lay on bare concrete with no shirt on to help relieve the pain because nobody would help.

Q. Where were you at when you would lay on the concrete?

A. In the cell.

Q. Were you experiencing any other symptoms besides the chest pain when you were laying on the floor in the cell?

A. Just the pain that radiates from around your heart, your back, some in my back, middle to left back, upper left shoulder, neck area.

Q. Did that cause you anxiety to be on the floor with your shirt off with chest pains?

A. Yeah. Because you don't know who's been walking on the floor with athlete's foot that you're going to get fungus on your back or what you might catch. Bugs, rats, mice running around inside the place. It caused a lot of anxiety.

Q. Were you fearful for your life during those hours when you had chest pain?

A. Yes.

Q. Did correctional officers see you laying on the ground with your shirt off in pain?

A.     Yeah. "What's wrong with you?" "I'm having chest pains. Can you call a nurse?" And they'd just keep walking doing their calendar or whatever they were doing at the time and going about their business. You wouldn't see them again for the rest of the night 'til breakfast time, when it was the overnight ones. They'd come in and pass out the breakfast trays, and that was it, that was the last time you seen them until shift -- an officer until shift change, despite what I knew to be their policy at the time --

Q.     When --

A.     -- as far as checks.

Q.     Mr. Dukes, when would be the – strike that. In a day what would be the latest time that you would see a correctional officer come by?

A.     Right around 11:00 give or take a few minutes depending on if they came a little early or came a little late. They would do their count. And then you would not see an officer come into the pod again until breakfast time when they brought the trays to serve to the individual cells. They'd open the cells door by -- or cell by cell and hand in the trays to how ever -- one or two inmates, depending on how many were in the cell.

Q.     What time would breakfast be at?

A.     4 o'clock, 4:30 in the morning. We go five, five and a half hours.

Q.     Okay.

A.     And it would be the same officers that see me laying there. I'm still laying there. They'd open the door and hand the trays to my cellmate and keep going.

Q.     So when you would see the officer on the nights when you were in chest pain all night, you would see them at 11:00 p.m. and report chest pain and then again at 4:00 or 4:30 a.m.?

A.     Yes.

Q.     And what did they do at 4:00 a.m. when you reported chest pain?

A.     Hand the trays to my -- the breakfast trays to my cellmate. Or if I didn't have one, they'd set my breakfast tray on the floor and close the door and lock it and go to the next cell.

Q.     Did they say anything to you when you said, "I have chest pain"?

A.     No.

Q.     Did they look at you on the floor when you were laying there?

A.     Yeah. I mean a lot of times, "Why are you still on the floor?" "My chest still hurts." "I called medical. They never responded." That was a couple of the responses I got.

Dukes Dep. 322:9-325:23, Jan. 24, 2022.

Plaintiff also testified that many correctional officers and CRWs told him he could not complete another grievance about his medications because he had already "grieved" that issue. This is nonsensical. How is a detainee who is prohibited from receiving medical care in any other fashion supposed to obtain his medications if he cannot ask for them? This violates Cook County and Cermak's policies for medication administration and Cook County's grievance policy.

When Nursing Supervisor Shebel was asked about being denied the opportunity to "grieve" an issue again, she testified that she had seen this written in grievance forms before and if the grievance was related to "medical," she "would probably refer that to the nursing management so they can look into it." She continued by saying that "if it was a DOC issue, if they're saying the DOC is saying this, it's a DOC grievance, it's not mine to answer. I don't manage DOC." Thus, if the supervisor on the Cermak side observes that an issue is not allowed to be grieved again, she *decides* if she wants to follow up and "oftentimes" does nothing if it is a "DOC" staff person telling the detainee that the detainee cannot grieve the same issue again. Nurse Shebel's testimony demonstrates that supervisors who review and sign off on grievance forms has seen and remembers detainees writing that they are being told that they cannot "grieve the same issue" again despite the issue not being resolved. Shebel Dep. 168-172, May 11, 2022.

**<u>All Plaintiff needs to show is that there was a policy or practice in place at CCDOC, whether it be an actual written policy or a practice of inaction and lack of coordination, that caused Mr. Dukes to be denied his prescribed medications</u>**. The burden is not on Mr. Dukes to prove why the policy exists, all of the players involved in the policy, or any other facts related to the denial of the medication. And Mr. Dukes has met his burden—Cook County and Cermak records show that he was denied 1,045 doses of his prescribed medications and his as-needed Nitroglycerin on at least eight (8) occasions.

The wall in the communication between a detainee and Cook County and Cermak demonstrates a "widespread practice" of failure, inaction, or indifference that denies detainees, and specifically, Mr. Dukes his Eighth Amendment right to medical care while at CCDOC.

Mr. Dukes does not need to prove that correctional officers knew or did not know about the Health Service Request Forms. However, at trial, Correctional Officer Partee's testimony that he did not even know what a HSRF was—even though the interagency directive states that correctional officers were supposed to "ensure that blank Health Service Request Forms are available at all times to inmates at a designated location for each living unit"—will be persuasive to show the lack of knowledge and coordination by correctional officers. Interagency Directive No. 64.5.44.0 at 2. This lack of knowledge presents a serious issue and is further evidence that Cook County correctional officers violate this directive by not even knowing what the health form is that detainees are supposed to fill out for medical non-emergencies.

Nursing Supervisor Shebel also testified that Cook County was responsible for picking up the Cook County grievance forms and deciding whether the form should be marked as a "non-grievance," "emergency grievance," or "grievance." This discretionary decision made only by a CRW social worker employed by Cook County is considerable evidence of Cook County's essential involvement in a detainee's medical care and treatment. The CRW social worker also decides who to refer the grievance to, the Supervisor, Cermak, or "Other." If the CRW social worker decides after reviewing what the detainee wrote that there is not a medical issue in the grievance, the form will not be checked to go to "Cermak." This discretion coupled with the fact that Cook County staff do not receive any medical training besides CPR is alarming! As Cook

County CRW "N. Jones" did, she read Dukes' grievance stating that he had "chest pain" and needed his Nitro "KOP." In making a medical determination, she decided that this grievance was not medical in nature or for some other reason, checked the box as a "non-grievance" and it was *not* referred to Cermak. As Nursing Supervisor Shebel testified, if the grievance is not checked to be "referred to Cermak," Cermak will never see the grievance. This is further evidence of the inefficiencies, lack of understanding of policy, lack of medical training, and lack of collaboration between Cook County and Cermak, which are evidence of a widespread custom and practice so well-settled that it is effectively a custom or policy.

### Analysis of Damages to Mr. Dukes

CRWs are also supposed to maintain a stack of HSRFs and visit each living unit daily to pick up grievance forms. Interagency Directive No. 64.5.44.0 at 2. However, according to the testimony of Correctional Officer Partee, who was the CO for Mr. Dukes from his first day at CCDOC on November 25, 2015, through February 12, 2016, when Mr. Dukes did not receive *any of his prescribed medications*, the CRWs did not come to the living unit every daily to pick up grievances. Instead, Partee testified that the social worker came by "maybe one or two times a week." Partee Dep. 70:10-18, Jan. 30, 2022. This intentional inaction and lack of following its own policies, which Mr. Dukes was obligated to follow with no other choice of medical care, left Mr. Dukes' grievance requesting his daily prescribed medication and Nitroglycerin in a lockbox that was not picked up according to the Interagency Directive No. 64.5.44.0. Unfortunately for Mr. Dukes, he suffered physically, mentally, and emotionally due to the inaction and coordinated effort to do nothing to administer his daily prescribed and as-needed Nitroglycerin medications.

Despite majority Defendants' continued assertion that "Cook County" and the correctional officers have nothing to do with medication distribution to inmates, this claim on its face, is an admission of the accepted custom or practice to violate its own policy to ensure that all inmates receive their prescribed medications by the collaborative efforts of Cook County and Cermak staff. Counsel for Defendants, Cook County, the Cook County Sheriff's Office, and many other correctional officers and nurses, claimed that Cermak is its own corporation and wholly unrelated to Cook County, and then later admitted that Cermak is owned by Cook County. As such, any and all actions and inactions taken by Cermak staff, Cermak supervisors, and other Cermak employees related to daily medical and emergency medical care for Mr. Dukes and other policies under which Cermak is obligated to collaborate with Cook County, makes Cook County liable for Cermak's actions and inactions. Further, any actions that Cook County staff or its agents took or decided not to take related to daily medical and emergency medical treatment for Mr. Dukes makes Cook County joint and severally liable. Both Cook County and Cermak are liable for the denial of Mr. Dukes' prescribed daily and as-needed medications.

Dukes continued to be denied his prescribed medications. Defendants claim that Mr. Dukes should have remembered the officers' names—otherwise, it is obvious he did not actually report his symptoms and need for his necessary, life-saving medications. However, that is unnecessary. The facts remain that there are physician orders in Dukes' medical records for every time he reentered CCDOC, and these orders show that he was prescribed Atorvastatin, Aspirin, Metoprolol, Nitroglycerin, Albuterol, Doxazosin, Fluoxetine, and Fenofibrate. These are heart medications, supporting blood pressure medications, and an anti-anxiety medication, all necessary to prevent another heart attack. The Fluoxetine (Prozac) also shows that Mr. Dukes was in fact experiencing anxiety because of being denied his medications while left in the "care" of Cook County at CCDOC, which will likely be persuasive to a jury.

As a result of Cook County and its agents denying Mr. Dukes his Nitroglycerin as soon as possible, or within minutes of experiencing chest pains, Cook County and its agents caused Mr. Dukes physical chest pains that lasted from 30 minutes up to 14 hours according to his testimony, caused Mr. Dukes physical pain that "radiate[d] from around [his] heart, [his] back, some in [his] back, middle to left back, upper left shoulder, [and] neck area." This lasted for hours when he could have had his medication "KOP" or within minutes if the C.O. and nurses responded fast enough. He also experienced anxiety and fear for his life over prolonged periods of time because he knew another heart attack was possible and imminent if he did not receive his mediations.

When a jury hears this testimony and the number of times that Mr. Dukes was denied his daily prescribed medications coupled with the as needed Nitroglycerin, the jury will most likely award significant damages to Mr. Dukes for this mental, emotional, and physical suffering.

A jury will find Mr. Dukes particularly sympathetic since he was given all his prescribed medications at Livingston County Jail every time he resided there and due to the fact that he spent over 14 years in prison and was found to be innocent. The jury will also be persuaded by the fact that Mr. Dukes had a widow maker heart attack in April of 2020, just 9 months after being released from CCDOC.

Being convinced that Mr. Dukes will secure a significant jury verdict after the jury hears the evidence in this case and to limit litigation costs, Plaintiff will settle his claims against Defendants if they pay him $300 per missed dose of prescribed daily medication and $1,000 for each documented denial of Nitroglycerin being administered on time or at all when requested, in addition to attorneys' fees and costs. In total, the settlement demand for Mr. Dukes is $321,500. Plaintiff will seek attorneys' fees and costs separately from the Court.

In a similar federal court recently, the Court applied a comparable formula when the detainee was denied medical care for undiagnosed neuropathy for two and a half months. The Court awarded the detainee $300 per day for "pain and suffering he experienced as a result of undiagnosed neuropathy" and $100 per day for "the pain and additional distress he experienced following the TIAs [transient ischemic attacks]." See attached *Armour v. Tchaptchet*, 2022 WL 500554, No. 2:17 CV 50, Feb. 18, 2022 (Slip Opinion).

Mr. Dukes' case is distinguishable from *Armour* because Cook County and Cermak knew about Mr. Dukes' heart disease, high blood pressure, and high cholesterol diagnoses when he arrived to CCDOC each time from November 2015 to November 2017. Mr. Dukes' case is also distinct because he was denied over 156 days of seven to nine prescribed medication over a period of two years. This is not a slight "miss" by Cook County—when a jury hears that the number of consecutive days that Mr. Dukes was denied his heart and related medications along with the egregious nature of the Nitroglycerin denials coupled with the fact that he experienced a widow maker heart attack less than a year after being discharged from CCDOC, the jury will support a similar but more substantial formula than *Armour*. Mr. Dukes should be paid $300 for each missed prescribed dose of his regular, daily heart and related medications and $1,000 for each documented Nitroglycerin denial. In total, the award of $321,500 is warranted due to the extensive pain and suffering that Mr. Dukes documented and testified to in his deposition.

Exhibit A

Please respond to our demand within 14 days. If no settlement can be reached, we will need to schedule the depositions of Mr. Dukes' treating physicians so they can be taken prior to the court-imposed deadline of August 31, 2022.

Sincerely,

***Kirstin M. Erickson***

Kirstin M. Erickson
kerickson@mauckbaker.com
(312) 726-2093