Page 1

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION
3
    WILLIAM DUKES,                    )
4                                     )
                   Plaintiff,         )
5                                     )
        v.                            )     2019 L 008948
6                                     )
    COOK COUNTY SHERIFF'S OFFICE;     )
7   THOMAS J. DART, in his            )
    official capacity as Sheriff      )
8   of Cook County, Illinois;         )
    COOK COUNTY, ILLINOIS;            )
9   MEDICAL DIRECTOR OF CERMAK        )
    HEALTH SERVICES OF COOK           )
10  COUNTY in his or her official     )
    capacity; DIRECTOR OF             )
11  NURSING OF CERMAK HEALTH          )
    SERVICES OF COOK COUNTY, in       )
12  his or her official capacity;     )
    M. ADDISON; E. ALTMAN;            )
13  J. ARIAS; M. BOZYK;               )
    N. BUCHANAN-SMITH; R. FOSTER;     )
14  C. GALINDO; J. MERAZ;             )
    W. PARTEE; Z. PERRY;              )
15  A. QURESHI; W. RIVERA;            )
    J. RODRIGUEZ; D. SALMON;          )
16  S. TAYLOR; J. TORRES;             )
    L. TORRES; C. ANDREWS;            )
17  A. BLOODWORTH; Q. DUNMARS;        )
    P. GREEN; S. JAMES; L. LOCKE;     )
18  S. PRATT; and D. TRIPLETT;        )
                                      )
19              Defendants.           )
    _____)
20
21
                    DEPOSITION OF
22
                    SUSAN SHEBEL
23
                    May 11, 2022
24
25

Page 2

1    The deposition of SUSAN SHEBEL, taken on
2  behalf of the plaintiff in the above-entitled case
3  before Debra L. Kleszyk, a Certified Shorthand
4  Reporter within and for the State of Illinois,
5  taken remotely via videoconference on May 11,
6  2022, commencing at 9:05 a.m., pursuant to the
7  Federal Rules of Civil Procedure.  The witness
8  appeared at 2700 California Avenue, Chicago,
9  Illinois.

Page 3

1    A P P E A R A N C E S
2
3  MAUCK & BAKER, LLC
   BY:  MS. KIRSTIN M. ERICKSON
4  One North LaSalle Street, Suite 600
   Chicago, Illinois 60602
5  (312) 332-2400
   kerickson@mauckbaker.com
6
     Appeared via videoconference on behalf
7    of Plaintiff
8
9
   DeVORE RADUNSKY, LLC
10 BY:  MR. JASON DeVORE
       MS. KIMBERLY MUSICK
11 20 North Clark Street, Suite 525
   Chicago, Illinois 60602
12 (312) 300-4479
   jdevore@devoreradunsky.com
13 kmusick@devoreradunsky.com
14   Appeared via videoconference on behalf
     of Defendants
15
16
17 LAW OFFICES OF JOHN C. COYNE
   BY:  MR. JOHN C. COYNE
18 53 West Jackson Boulevard, Suite 1750
   Chicago, Illinois 60604
19 (312) 929-4308
   jcc@johncoynelaw.com
20
     Appeared via videoconference on behalf
21   of Defendants N. Buchanan-Smith and
     E. Altman
22
23
24
25

Page 4

1    I N D E X
2
3  WITNESS:  SUSAN SHEBEL
4  EXAMINATION                    PAGE
5    By Ms. Erickson              5
6
7
8
9
10    INDEX OF EXHIBITS
11 EXHIBIT    DESCRIPTION         MARKED
12 Exhibit A    Interagency Directive    149
              Medication Administration
13            and Distribution
14 Exhibit B    General Order      159
              Inmate Grievance Procedure
15
   Exhibit C    grievances      192
16    (CCSAO Dukes 000963 - 1207)
17 Exhibit D    medical records      200
              (CCSAO Dukes 000001 - 962)
18
19
20
21
22    STIPULATION
23 The parties stipulated to waive any objections to
24 the validity of the oath administered remotely.
25

Page 5

1         (The witness was duly
2         sworn.)
3           SUSAN SHEBEL,
4     called as a witness herein, having been
5     first duly sworn, was examined and
6     testified as follows:
7           EXAMINATION
8         BY MS. ERICKSON
9    Q.  Please state your name for the record
10 and spell your last name.
11    A.  Susan Shebel.  S-h-e-b-e-l.
12      MS. ERICKSON:  Let the record reflect
13 this is the deposition of Susan Shebel taken
14 pursuant to notice and set by agreement of the
15 parties.  The deposition will be taken pursuant to
16 Federal Rule of Civil Procedure 30 and all other
17 applicable rules.
18 BY MS. ERICKSON:
19    Q.  My name is Kirstin Erickson, and I
20 represent William Dukes in this lawsuit.  I'm
21 going to ask you some questions today regarding
22 your background, education, employment history,
23 and then questions specific to Mr. Dukes and
24 documents that you signed of his.
25      Have you ever given a deposition

2 (Pages 2 - 5)

Page 6

1  before?
2      A.  Yes.
3      Q.  In what circumstances?
4      A.  For Cermak.
5      Q.  How many depositions?
6      A.  I don't have a count.
7      Q.  Okay.  How many -- have you been a
8  party to lawsuits?
9      A.  What do you mean?
10     Q.  As a defendant --
11     A.  I was named in a lawsuit, yes.
12     Q.  Okay.  While working at Cermak?
13     A.  Yes.
14     Q.  Is that case resolved?
15     A.  As far as I'm aware.
16     Q.  Okay.  All right.  Well, then you know
17 the ground rules, but I'll just go over them.
18         Can you hear me okay?
19     A.  I can.
20     Q.  All right.  Let me know if you can't
21 at some point and we can -- because Zoom causes
22 some issues sometimes.
23         Please make sure all your answers
24 are verbal.  The court reporter can't take down
25 nods or uh-huhs.  Okay?

Page 7

1      A.  Yes.
2      Q.  Make sure I finish my question before
3  you begin to answer as it's difficult for the
4  court reporter to take down two voices at the same
5  time.  Is that fair?
6      A.  Yes.
7      Q.  If I ask a question that you don't
8  understand, please let me know, and I'll either
9  repeat it or rephrase it.  But if you answer the
10 question, I'm going to assume that you understood
11 the question.  Is that fair?
12     A.  Yes.
13     Q.  I'm going to go back a few years.  If
14 you don't remember something or you don't know the
15 answer, just let me know, and I'll move on.  Okay?
16     A.  Okay.  Let me turn my fan off real
17 quick.
18     Q.  Okay.
19     A.  Okay.  That's better.
20     Q.  Can you hear me better?
21     A.  Yeah.
22     Q.  I'll try and be loud, but.
23         And then computer and phone usage
24 during the deposition is limited to access to the
25 Zoom.  Is that fair?

Page 8

1      A.  Yes.
2      Q.  And then we can take breaks, but just
3  if you could please answer the question that's
4  pending before we go on break, that would be
5  appreciated.  Okay?
6      A.  Yes.
7      Q.  Okay.  Susan -- can I call you Susan?
8      A.  Sure.  Yes.
9      Q.  What is your date of birth?
10     A.  July 1, 1957.
11     Q.  What is your current address?
12     A.  My home address?
13     Q.  Yeah.
14     A.  Do I have to give my home address?
15 Can I give you my work address?
16         MR. DeVORE:  That's fine.
17         I mean, she can be contacted
18 through counsel as well.
19         THE WITNESS:  2700 California Avenue.
20 BY MS. ERICKSON:
21     Q.  Your current address where you live,
22 how long have you lived there?
23     A.  It will be 35 years.
24     Q.  Who do you live with?
25     A.  I live with myself, my daughter.

Page 9

1      Q.  How old is your daughter?
2      A.  My daughter, how old is my daughter?
3      Q.  Yeah.
4      A.  She was born in '87.
5      Q.  Where did you attend high school?
6      A.  New Buffalo, Michigan.
7      Q.  What -- did you graduate?
8      A.  Yes.
9      Q.  What year --
10     Q.  What year?
11     Q.  Yeah.
12     A.  1975.
13     Q.  And where did you attend college?
14     A.  Lake Michigan College, Benton Harbor,
15 Michigan.
16     Q.  What year did you receive your degree?
17     A.  1984.
18     Q.  And what was your undergrad degree in?
19     A.  Nursing.  Associate degree, nursing.
20     Q.  What was the first part?  I couldn't
21 hear.
22     A.  Associate degree, nursing.
23     Q.  After attending Lake Michigan College
24 and graduating in 1984, did you attend any other
25 colleges?

3 (Pages 6 - 9)

Page 10

1     A.    No.
2     Q.    Have you received any other
3   certificates after graduating from Lake Michigan
4   College?
5     A.    CEUs. I was federal certified for
6   medical surveyor, nursing surveyor, for long-term
7   care. Wound care. Some of them have been a
8   while. I don't recall them all.
9     Q.    Okay.
10    A.    And then the CEUs that you take,
11  varied.
12    Q.    Are the CEUs what you take to keep up
13  your nursing license?
14    A.    Correct.
15    Q.    Did you take the NCLEX exam?
16    A.    Yes.
17    Q.    What year did you take that?
18    A.    1984.
19    Q.    So did you pass the exam in 1984?
20    A.    Yes.
21    Q.    Okay. Do you have to take that exam
22  again after the first time you pass it?
23    A.    No.
24    Q.    Okay. Where did you take the
25  trainings to receive the long-term care and the

Page 11

1   wound care certificates?
2     A.    I -- oh, it's been a -- I don't recall
3   the name of the town for the wound care. It's
4   been so long.
5             Long-term care was down in
6   Indianapolis, and then the testing was down in
7   Orlando.
8     Q.    Do you remember about what years you
9   received those certificates?
10    A.    I would like to say 2013.
11    Q.    Okay.
12    A.    But, no, I'm guessing on that. So I
13  don't recall the exact year.
14    Q.    That's okay. Thank you.
15            Have you ever been convicted of a
16  felony or a crime involving dishonesty?
17    A.    No.
18    Q.    In preparation for your deposition,
19  did you review anything?
20    A.    Grievances.
21    Q.    Which -- Mr. Dukes' grievances?
22    A.    Correct.
23    Q.    Did you discuss those grievances with
24  Mr. Radunsky or any attorney from his office?
25    A.    Yes.

Page 12

1     Q.    So after you passed the NCLEX in 1984,
2   where did you begin working?
3     A.    Okay. I worked at -- it's called
4   Red Oaks Nursing Home.
5     Q.    Where is that located?
6     A.    It was located in Michigan City.
7     Q.    And you worked there as a nurse?
8     A.    Started out as graduate nurse and then
9   nurse, yes.
10    Q.    What years did you work there?
11    A.    I believe I left in -- because I've
12  worked agency, too. So 19 -- boy, you're making
13  me go back a few years.
14    Q.    Okay.
15    A.    Okay.
16    Q.    So it was after you got your NCLEX in
17  1984, you worked at this nursing home for was it
18  like two to five years?
19    A.    Yeah. Yes. Correct.
20    Q.    And then where did you work after you
21  were at Red Oaks Nursing?
22    A.    I went to Michigan City. It was a
23  doctor's facility. The urgent care.
24    Q.    And what did you --
25    A.    Urgency care nurse.

Page 13

1     Q.    How long were you there?
2     A.    Close to six years.
3     Q.    And what was your role while you were
4   working at Michigan City urgent care?
5     A.    I was the urgent care nurse. I did
6   triage and whatever was required.
7     Q.    Then after you were at the urgent
8   care, where did you work?
9     A.    I worked for Life Care Nursing
10  facility.
11    Q.    How long were you at that facility?
12    A.    A couple years. A few years.
13    Q.    When you worked at the -- when you
14  worked at Life Care Nursing facility, what were
15  your main duties as a nurse?
16    A.    Assessments, patient assessments.
17  Passing meds. I also worked as an assistant DON
18  and DON for a short time.
19            In between there, I did work for
20  the State as a medical surveyor. But I'm -- it's
21  been so many years that I can't recall what year
22  was -- that I did what.
23    Q.    That's okay. So before you were at
24  Life Care Nursing facility you were a medical
25  surveyor for the State?

4 (Pages 10 - 13)

Page 14

1    A.   I worked at Life Care, yes.
2    Q.   Which state?
3    A.   Indiana.
4    Q.   What does one do as a medical
5  surveyor?
6    A.   You go into nursing facilities and
7  make sure that they're following the State
8  guidelines, State and Federal guidelines, for
9  Medicare, Medicaid.
10   Q.   Do you know how long you were a
11 medical surveyor for Indiana?
12   A.   It was a year.
13   Q.   Okay.  Let's go back to Life Care
14 Nursing.  So you were at Life Care Nursing, and
15 you said that you were the assistant director of
16 nursing and the director of nursing at one point?
17   A.   Yeah.  The director left, and I took
18 her spot for a short time.
19   Q.   Do you know about what year you left
20 Life Care Nursing facility?
21   A.   I would be guessing.  It was 2003
22 perhaps, around in there.
23   Q.   Okay.  And where did you go work after
24 Life Care Nursing facility?
25   A.   I went to Fountainview Terrace in

Page 15

1  La Porte.  That's also long-term care.
2    Q.   And what was your role at that
3  facility?
4    A.   Patient -- patient care, treatments,
5  meds, patient assessments.
6    Q.   So you were working directly
7  clinically for patients?
8    A.   Correct.
9    Q.   Okay.  Did you use your wound care
10 license or certification --
11   A.   It wasn't a license.  It was just
12 classes, certification.  No, I was not a wound
13 care nurse.
14   Q.   Okay.  How long were you at
15 Fountainview Terrace?
16   A.   About two years.
17   Q.   And then where did you go to after
18 that?
19   A.   I went to Westville Correctional
20 Center.
21        I've got to put this idle timer
22 thing off.
23        Westville Correctional Center.
24   Q.   Where is that located?
25   A.   Westville, Indiana.

Page 16

1    Q.   What was your role at Westville
2  Correctional Center?
3    A.   I worked in the urgent care.  I did
4  the CQI, the audits.  I've worked in the -- in the
5  infirmary.  Sometimes I used to go start the IVs
6  and things like that.  But mainly it was the CQI.
7    Q.   So you mainly did quality control?
8    A.   Correct.
9    Q.   What does the I stand for in CQI?
10   A.   Improvement.
11   Q.   Ah.  Okay.
12   A.   Continuous quality improvement.
13   Q.   So as having a focus in continuous
14 quality improvement, what types of -- what types
15 of things were you doing day to day at Westville?
16   A.   Audits.  I would audit the different
17 disciplines, make sure they were following the
18 policies.
19   Q.   So while you were at Westville
20 Correctional Center, you reviewed the policies
21 first and then were able to audit?
22   A.   I was provided with audits from the
23 CQI director.  I believe she was down in -- I
24 think she was in Indianapolis.  So they provided
25 the audits.  And then I would audit the charts.

Page 17

1  They provided the templates, if that makes sense.
2  The templates were provided by Corizon.  They had
3  another name before that, and I don't -- I don't
4  recall what it is.  They merged.
5    Q.   So, just to understand better, Corizon
6  gave you templates of what?
7    A.   Audits.
8    Q.   Audits of what?
9    A.   Different disciplines.  Different
10 quality measures.
11   Q.   And you said that you were reviewing
12 charts.  What charts were you reviewing?
13   A.   The detainees' charts or inmates'
14 charts.
15   Q.   So you reviewed the medical charts of
16 the detainees?
17   A.   Correct.
18   Q.   When you say you reviewed the medical
19 charts, does that mean that you went into their
20 electronic file and looked at all of the care
21 through the whole time they were there or was it
22 after each visit?  How did that work?
23   A.   According to the audit, I would audit
24 that particular aspect of what was being audited.
25 There was like a rotation of different things that

Page 18

1  you would audit, and that's the part of the chart
2  that I would look at.
3       Some of the records were paper,
4  paper chart, and I would have to go into medical
5  records and get their paper chart.  They were
6  integrated between paper and electronic.
7    Q.  Okay.
8    A.  So some were paper.
9    Q.  And then when you identified an issue
10 or a problem, what did you do in that role?
11   A.  That would have been brought to the --
12 we had like a CQI -- different disciplines.
13 Everybody represented their discipline, and it
14 would be brought forth and we would discuss what
15 would be a good plan of action.  And then that --
16 that would be reaudited and we'd decide when and
17 how frequently that particular aspect needed to be
18 reaudited to bring it up to a certain mark.
19   Q.  So it sounds like, and correct me if
20 I'm wrong, whenever -- correct me if I'm wrong.
21 Whenever you would identify an issue, the team
22 would get together and discuss how to resolve that
23 issue?
24   A.  No.  We did -- it's partially correct.
25 I would bring all of the audits, and we would

Page 19

1  review all of them.  Whether there was an issue or
2  not, they were reviewed.  It was brought forth
3  between -- to all the disciplines that worked at
4  the -- their -- I guess the director of each
5  discipline.  We would have a meeting.
6    Q.  When you say disciplines, what do you
7  mean?
8    A.  Like the mental health director,
9  social work director, psychiatrist, the
10 administrator, director of nursing, pharmacy.
11 Everybody that had a role.
12   Q.  Okay.
13   A.  And would have input.
14   Q.  Was Corizon the medical company at
15 Westville Correctional Center?
16   A.  That's correct.  There was another
17 one, but I don't remember their name.  They sold
18 or merged, and I don't recall.
19   Q.  Okay.  Do you remember about how many
20 detainees there was at Westville?
21   A.  I know it varied.  I could give you a
22 guesstimate number, if that would be appropriate.
23   Q.  Sure.  Like even if it's a range
24 between --
25   A.  Approximately 3500.

Page 20

1    Q.  Okay.  And did you work at Westville
2  Correctional Center full time?
3    A.  Yes.
4    Q.  Was it a Monday-through-Friday job or
5  did you work weekends as well?
6    A.  Occasionally.  But mainly it was
7  Monday through Friday.
8    Q.  Okay.  How long were you at Westville
9  Correctional Center?
10   A.  About five and a half years.
11   Q.  Five and a half years?
12   A.  About five and a half years.
13   Q.  Thank you.  I couldn't hear you.
14   A.  I'm sorry.
15   Q.  No, it's okay.
16       And then after Westville where did
17 you go to work?
18   A.  Then I came here.
19   Q.  And "here" meaning?
20   A.  Cermak.
21   Q.  What year did you start working at
22 Cermak?
23   A.  2012.
24   Q.  Is your paycheck from Cook County or
25 from Cermak?

Page 21

1    A.  Cook County.
2    Q.  Are you a salary or hourly employee?
3    A.  Hourly.
4    Q.  And how much do you get paid per hour?
5    A.  59.80 something.  I don't recall the
6  cents.
7    Q.  When you started working at -- for
8  Cermak in 2012, what was your position?
9    A.  Clinical performance improvement
10 analyst.
11   Q.  Clinical performance improvement
12 analyst?
13   A.  Correct.
14   Q.  Thank you.  And what did you do in
15 that role?
16   A.  Audits.
17   Q.  Can you explain more what that role
18 entailed?
19   A.  I just made audits that would coincide
20 with the policies and then either go out to the
21 division and check what needed to be checked or go
22 through the medical record, whatever applied.
23   Q.  Did you have a role -- strike that.
24       Have you had a role at Cermak where
25 you have helped change policies at all?

6 (Pages 18 - 21)

Page 22

1    A.   No.  I don't change policies, no.
2    Q.   So what did -- what were you auditing
3  in 2012 when you began?
4    A.   Med room operations.  Boy, it's taking
5  me back.  What else did I audit?  'Cuz I had to
6  design the --
7    Q.   Let's just start with that one.  You
8  said med room operations?
9    A.   Yeah.
10    Q.   What does that mean?
11    A.   Make sure that things were counted
12  that needed to be counted.  Expiration dates were
13  managed properly of medical supplies.
14        Let me click that out.  I'm sorry.
15  What?
16    Q.   That's okay.
17        Were you responsible for disposing
18  of medication if it was too old?
19    A.   No.
20    Q.   So you checked the expiration dates of
21  what?
22    A.   Of medical supplies.  Catheters, you
23  know, syringes -- well, no, not really -- yeah,
24  syringes, just bandages, anything that was a
25  medical supply that would have an expiration date

Page 23

1  on it and make sure that it's -- it's not expired.
2  Just check that.  I'm checking the checker.
3  Checking the checker.
4    Q.   What does that mean?
5    A.   I didn't go around every week and
6  check all the medical supplies.  I would just do
7  an audit to make sure that it was being -- that
8  service was being provided.
9    Q.   So by service, you mean make sure
10  someone else was going to count?
11    A.   Make sure that it was being done.  I
12  would actually check it.
13    Q.   And when you say med room, what does
14  that mean?
15    A.   That's the room where medications are
16  kept.  Med cart.
17    Q.   Where is that located?
18    A.   Usually in the dispensaries.
19    Q.   So is there more than one med room at
20  Cook County?
21    A.   Yes.  You mean Cermak?  Yes.  Yes.
22    Q.   Just to be clear, so when I'm -- so
23  we're talking right now about the Cook County
24  Department of Corrections facility --
25    A.   Yes.

Page 24

1    Q.   -- overall.  Right?
2    A.   Okay.  Yes.
3    Q.   And then within that whole facility
4  Cermak has specific roles.  Right?
5    A.   Correct.
6    Q.   To provide medical care.  Right?
7    A.   Correct.
8    Q.   Okay.  So the med rooms are located
9  within the Cook County facility.  Right?
10    A.   Correct.
11    Q.   Okay.  And then how many med rooms are
12  there at Cook County Department of Corrections?
13    A.   There's a med room in every building.
14  I don't know if that's the right word to use.  And
15  then Cermak -- I have to count because there's
16  more med rooms in the infirmary because there's
17  one in each unit, like south, southeast, west.
18  Yeah, there's one in each unit.  And then in RTU
19  there's one on each floor.  And then each
20  division, there's one in each division.
21    Q.   So is each building at Cook County a
22  division?
23    A.   Correct.  Except for RTU is a division
24  but it has more than one med room.  There's one
25  for each floor.

Page 25

1    Q.   Okay.  And that's because it's a
2  medical, more --
3    A.   Yes.
4    Q.   -- for people with medical needs.
5  Right?
6    A.   Correct.
7    Q.   So let's just talk about Division 10
8  for a second so I understand.  So in Division 10
9  is there one med room for the whole building?
10    A.   That would be my understanding.  I
11  have not been out there for a while.  But my
12  understanding is one -- one dispensary, one med
13  room.
14    Q.   When you say dispensary and med room
15  or med room dispensary, are you saying --
16    A.   That's where I usually -- the meds
17  are -- the med room is usually in the dispensary.
18    Q.   Okay.  Everyone uses different terms,
19  so I'm trying to understand what you're meaning so
20  we don't cross paths.
21    A.   Okay.
22    Q.   So the med room, when you say med room
23  you mean the dispensary as well or is it the med
24  room --
25    A.   It's a room with -- it would be --

7 (Pages 22 - 25)

Page 26

1  normally it would be a room.  Always -- see,
2  there's so many exceptions, so I don't want to say
3  that there's always a med room in a dispensary
4  because that's not the case.  And then I probably
5  have --
6     Q.   That's okay.
7     A.   The med room is where the med carts
8  are kept and anything that you would need for
9  passing your meds.
10          And then the dispensary would be
11 where the nurses would see patients and doctors
12 would see patients.  It's more like the clinic
13 area.  Some areas have the med room.  There's a
14 room in the dispensary where the med room is, and
15 in some it is -- it was not.
16    Q.   I understand.
17    A.   Okay.
18    Q.   So the med rooms that are located
19 throughout the facility all have medication carts?
20    A.   I'm thinking that they use medication
21 carts, yes.
22    Q.   And that's where Cermak staff go to
23 fill the carts with the medications for the
24 patients -- or the inmates in that division?
25    A.   The nurses -- the pharmacy -- the

Page 27

1  nurses don't fill the med carts with meds.
2     Q.   Who does?
3     A.   That's the pharmacy.
4     Q.   So then the med carts are in the med
5  room, and that's where the pharmacist would fill
6  the med carts with medications for the inmates in
7  the division?
8     A.   I can't answer that question.  I don't
9  know how -- what procedure the pharmacy uses with
10 the med cart, if they do an exchange of carts or
11 what they do.  I can't answer that question.  It
12 would be more the pharmacy could answer that.  I
13 don't think --
14    Q.   So but --
15    A.   The pharmacy brings meds up to the med
16 room to fill the carts.
17    Q.   So but you're saying someone from
18 pharmacy is the one who puts the medication on the
19 carts for the inmates?
20    A.   Puts the meds on the cart?  They
21 would -- they would -- they don't set meds on the
22 cart because it's a locked cart.
23    Q.   In the cart?  I don't know.  What does
24 the cart look like?
25    A.   It has drawers and they lock and they

Page 28

1  have little compartments in the -- little
2  compartments for the meds.  And the pharmacy fills
3  those.
4          Now, I don't know if they bring
5  cassettes up to fill the carts or if they bring
6  the cart to pharmacy.  I really don't know their
7  procedure for them filling the carts or even if
8  it's different in each division.  I can't answer
9  that question.
10    Q.   Yeah, I didn't ask you that many
11 questions yet.  I'm just trying to understand the
12 cart.
13          So the cart has the medication on
14 it.  You said it has particular drawers that can
15 be locked?
16    A.   Yes.
17    Q.   Okay.  And who determines -- well,
18 strike that.
19          Do the nurses give out medication
20 like pill by pill to the inmates or are the
21 medications that an inmate needs prepackaged for
22 the inmate?
23    A.   They're labeled for the inmate, unit
24 dose if it's a dose-by-dose medication.  They're
25 wrapped, each pill.

Page 29

1     Q.   If a particular inmate, for example
2  Mr. William Dukes, has five medications he's
3  supposed to take, would they be -- each medication
4  would be prewrapped separately or is it one
5  particular package all the meds are in there
6  together?
7     A.   They would be separate.
8     Q.   Okay.  And then how does the nurse
9  know, who's passing the meds, which particular
10 ones are for Mr. Dukes?
11    A.   His name would be on it.  His name
12 would be on it.
13    Q.   Oh okay.  In the drawers how are they
14 set up?  Is one inmate's five medications put next
15 to each other or is it aspirins in this area, I
16 don't know, metoprolols in this area?  How does
17 it -- how does it work functionally on the cart?
18          MR. DeVORE:  Objection.  Form.  I was
19 objecting as to form.  It's confusing as phrased.
20 It calls for a narrative.
21          If you understand the question, you
22 can answer it.
23          THE WITNESS:  I didn't.
24 BY MS. ERICKSON:
25    Q.   Okay.  So I'll ask again a different

8 (Pages 26 - 29)

Page 30

1  way.
2       You said that the medications for
3  inmates are packaged and the medication pill is
4  put into a package enclosed. Correct?
5      A.  Yes.
6      Q.  And is there more than one medication
7  in one particular package for an inmate?
8      A.  They're individually packaged.
9      Q.  Okay. And then as far as how they're
10 put on --
11     A.  I don't pass the meds, so I don't know
12 if -- I just know that they come in strips
13 individually with their name on it. But what
14 drawer they go in and how they -- I don't think
15 they separate them by type of pill.
16     Q.  What does that mean?
17     A.  You were asking if aspirin goes in one
18 drawer and something else goes in another. I don't
19 understand that, so.
20     Q.  Well, okay. So was the -- was the way
21 that medication was passed in 2012 essentially the
22 same way it was passed in 2017 through '19? Or
23 strike that. Sorry.
24      Was medication passed in the same
25 or similar fashion in 2012 as it was in 2015

Page 31

1  through '17?
2      A.  I don't know the answer to that
3  question. I wasn't passing the meds.
4      Q.  But you --
5      A.  I don't pass the meds.
6      Q.  Right. But do you audit the people
7  that do pass meds at all?
8      A.  I did in 2012.
9      Q.  Okay.
10     A.  But not 2017.
11     Q.  Okay. So let's just talk about 2012.
12 So it was your responsibility to oversee the way
13 in which medications were passed to inmates?
14     A.  No.
15     Q.  Okay.
16     A.  It was --
17     Q.  Can you describe your role as an
18 auditor?
19     A.  I would report -- I would see how they
20 were doing it and report it on an audit. And then
21 the audit would be reported to the director of
22 nursing.
23     Q.  So in 2012 you said you see how they
24 doing it. What does that mean? See how
25 they -- who was doing what?

Page 32

1      A.  Audit. Audit how the nurses were
2  passing the medications.
3      Q.  Okay.
4      A.  And then I would -- I would report
5  what was within the guidelines according to the
6  policy, how they were doing it, and then take that
7  audit to the director of nursing.
8      Q.  Okay. So you did watch nurses pass
9  out meds in 2012. Right?
10     A.  Yes.
11     Q.  Okay. And so if one inmate had more
12 than one medication, would a nurse go in different
13 drawers to take out the medication to give to the
14 inmate, or was there a different manner in which
15 they did that?
16     A.  They had -- they had a Pyxis. It was
17 in the process of a changeover of the system. So
18 they were -- they were unit dose wrapped, some
19 from -- directly from the drug company as in unit
20 dose and then some were from the pharmacy. And
21 it was in a transition. So how they do it now
22 would be different than 2012. There's been -- I
23 don't --
24     Q.  I'm not sure you answered my question.
25     A.  I'm not sure I did either. I'm not

Page 33

1  sure I understood.
2      Q.  That's okay. I'll ask again.
3       So if an inmate in 2012 had more
4  than one medication -- and you said that they're
5  individually wrapped either by the pharmacy or by
6  an outside source. Right? You've already said
7  that. Right?
8      A.  Yes.
9      Q.  But then if there's more than one
10 medication, are they located in the same spot in
11 the drawers for that one individual or are they in
12 separate drawers for the one inmate?
13     MR. DeVORE: Objection. Asked and
14 answered.
15     MS. ERICKSON: She didn't answer it.
16     MR. DeVORE: Well, I believe she did
17 before when you asked her if they were by drug and
18 she said they weren't, they were by detainee.
19      But go ahead if there's something
20 different asked.
21     THE WITNESS: So each detainee had
22 their area where their meds were kept, unit dose.
23 BY MS. ERICKSON:
24     Q.  Okay. All together in one spot?
25     A.  Yes.

9 (Pages 30 - 33)

Page 34

1    Q.   Okay.  And then you said at some point
2   there was a -- did you say Pyxis?
3    A.   I did.
4    Q.   What does that mean?
5    A.   That's just a medication cart.  It's a
6   medication cart, just a medication system.  I
7   don't pass meds out of the Pyxis, so I couldn't
8   give you the ramifications of it all.  But it's
9   the newer medication pass cart.
10   Q.   Is Pyxis just a name of the type of
11  cart?
12   A.   Yes.  Or the medication process.
13   Q.   Oh okay.  And when did the Pyxis
14  process and cart begin?
15   A.   I don't know the exact date.  I would
16  be guessing.  I don't know.  I don't pass the meds
17  after that point.
18   Q.   But you didn't pass the meds --
19   A.   Or I never passed the meds actually.
20   Q.   Yeah.  So how long were you in a role
21  where you were auditing nurses passing meds?  From
22  2012 until when?
23   A.   Approximately two years.  No.  Maybe
24  it's three.  Maybe it's three years.  Sounds about
25  right.

Page 35

1    Q.   So from 2012 until 2015 you were
2   auditing --
3    A.   Yes.
4    Q.   -- the ways in which nurses were
5   passing meds?
6    A.   No, that isn't all that -- it wasn't
7   the only audit that I did.  I had other
8   responsibilities.
9    Q.   But is that what -- is that part of
10  what you did --
11   A.   Correct.
12   Q.   -- from 2012 to 2015 --
13   A.   Correct.  Correct.
14   Q.   Please wait until I finish.
15       From 2012 until 2015, you audited
16  the way in which nurses passed meds at Cook
17  County?
18   A.   Correct.
19   Q.   From 2012 until 2015, was there an
20  electronic medical record?
21   A.   Yes.  It was beginning, yes.
22   Q.   Do you know about what year that
23  began?
24   A.   No, I do not.
25   Q.   Did you have any role in --

Page 36

1    A.   I don't recall.
2    Q.   -- how -- oh sorry.
3    A.   I don't recall.  I don't recall the
4   year.
5    Q.   Okay.  Did you have any role in
6   beginning to roll out the electronic medical
7   system at Cook County?
8    A.   I don't understand your question.
9    Q.   Oh okay.  I'll rephrase.
10       Did you have any part in the
11  implementation of using electronic medical records
12  at Cook County?
13       MR. DeVORE:  Objection to form as to
14  what implementation entails and what the question
15  really means.
16       If you understand what --
17       THE WITNESS:  I don't.
18  BY MS. ERICKSON:
19   Q.   Who decided that Cook County was going
20  to use electronic medical records?
21   A.   I don't have a knowledge of that.
22   Q.   Okay.  And when Cook County began
23  using electronic records, did it continue to
24  maintain paper medical records?
25   A.   I don't under -- you mean double?  I

Page 37

1   don't understand your question.
2    Q.   So when a nurse passes medication to
3   an inmate, is the nurse required to write down
4   that the medication was passed to the inmate?
5       MR. DeVORE:  When?  What time period?
6       MS. ERICKSON:  Any time period.  The
7   question is just generally.
8       THE WITNESS:  Was she ever required to
9   write it down?
10  BY MS. ERICKSON:
11   Q.   No.  I'll --
12   A.   I don't understand.
13   Q.   Yeah, yeah, I'll rephrase.  It's okay.
14       When a nurse passes meds to an
15  inmate, under Cook County policy from any time
16  from 2012 until the present, is the nurse supposed
17  to write down that the inmate received the
18  medication in the medical records?
19       MR. DeVORE:  Objection as to form.
20  Unclear what the time period is.
21       But you can answer for whatever
22  time period that you have knowledge about, if you
23  understand the question.
24       THE WITNESS:  I don't know when they
25  stopped writing exactly and when they started the

10 (Pages 34 - 37)

Page 38

1 electronic record. I don't know. I don't know
2 when -- exactly when one started and one ended.
3 BY MS. ERICKSON:
4     Q.   Okay. So are you saying that when
5 electronic medical records started being used at
6 Cook County there were no paper records used for
7 inmates?
8     A.   No, I did not say that.
9     Q.   I'm just trying to understand the
10 system.
11     A.   I know. I know.
12     Q.   I'm not trying to give you a hard
13 time. I just want to understand. So you've been
14 there since 2012 working for Cermak. You've been
15 in audit. You've watched med pass. And I'm
16 trying to understand. When electronic medical
17 records began being used at Cermak and Cook
18 County, was there a policy that said we don't need
19 to do paper records anymore?
20     A.   No. There is no policy that says that
21 because there can be, as everybody knows, a
22 computer shutdown or whatever and then you use a
23 paper.
24     Q.   Okay.
25     A.   Paper MAR. But now it's all

Page 39

1 electronic unless there is a computer, whatever
2 you want to call it, shutdown.
3     Q.   Okay.
4     A.   Then they would use a paper MAR.
5     Q.   That makes sense. So maybe there was
6 no specific policy, but when Cermak started using
7 electronic medical records was it the custom and
8 practice to use electronic medical records and not
9 paper records?
10     A.   Correct.
11     Q.   Okay. And then if there was some kind
12 of computer glitch, it sounds like at that point
13 people would write down on paper when they passed
14 meds. Is that right?
15     A.   A paper MAR. Correct.
16     Q.   Okay. And that's still used to this
17 day. Right?
18     A.   Correct.
19     Q.   Do you know where the paper records
20 for inmates -- strike that.
21         Do you know where the paper medical
22 records are stored at Cook County?
23     A.   No. I don't know what they are.
24     Q.   If you had to audit or review medical
25 records of an inmate that were not electronic, how

Page 40

1 would you find those medical records?
2     A.   They could be scanned.
3     Q.   Is it the custom and practice nowadays
4 that if a medical record was paper before it
5 should be on the system electronically?
6         MR. DeVORE: Objection. Form as to
7 time period. And that's my main objection as to
8 what "before" means.
9         THE WITNESS: Okay. Yeah, you would
10 have to ask medical records all those intricacies.
11 I don't --
12 BY MS. ERICKSON:
13     Q.   Okay. Who's the person I should speak
14 with in medical records?
15     A.   Linda Kampe.
16     Q.   What's her role?
17     A.   She's a -- I don't know her title.
18 Medical records and assistant COO.
19     Q.   What's that?
20     A.   Assistant COO.
21     Q.   What does that mean?
22     A.   Operations.
23     Q.   She's the assistant chief operating
24 officer of medical records?
25     A.   Correct.

Page 41

1     Q.   Okay.
2     A.   No. Not of records. She's over
3 records and the assistant COO.
4     Q.   The assistant COO of what?
5     A.   Operations here at Cook County.
6     Q.   Of Cermak or Cook County?
7     A.   Yes. Cermak.
8     Q.   So I should speak with Linda Kampe,
9 who's assistant COO of Cermak. Right?
10         MR. DeVORE: Objection. That
11 mischaracterizes her testimony.
12 BY MS. ERICKSON:
13     Q.   I'm just trying to understand. Is
14 Linda Kampe the COO of Cermak?
15         MR. DeVORE: I think she just
16 testified she wasn't sure of her exact title.
17 BY MS. ERICKSON:
18     Q.   I just -- she worked for Cermak or for
19 Cook County? That's the question.
20     A.   She works for the medical part.
21     Q.   Cermak?
22     A.   Because Cermak is this building. And
23 I had said that before. So I don't -- Cook County
24 Health at 2700 California.
25     Q.   Okay. Are you able --

11 (Pages 38 - 41)

Page 42

1    A.   I need to take a break.  I'm sorry.
2    Q.   Are you in your office right now?
3    A.   I am.
4    Q.   Is your office at Stroger Hospital?
5    A.   No.  I'm at Cermak.
6        MR. DeVORE:  The witness just said
7    before your last two questions that she needed to
8    take a break.
9        MS. ERICKSON:  Oh, okay.  Yeah.  Sure.
10   We can take a break.  Do you want ten minutes?  Is
11   that good?
12       THE WITNESS:  Yes, please.
13       MS. ERICKSON:  Okay.  All right.
14   We'll come back at 10:05.
15           (A break was taken from
16               9:55 a.m. until
17               10:07 a.m.)
18       MS. ERICKSON:  We can go back on then.
19   BY MS. ERICKSON:
20   Q.   So I want to go back to your role as
21   the clinical performance improvement coordinator.
22   Was it coordinator?
23   A.   Analyst.
24   Q.   Analyst.  Thank you.  The clinical
25   performance improvement analyst since 2012.

Page 43

1    Besides auditing med pass and auditing the med
2    room operations, did you have any other specific
3    roles?
4    A.   Oh.  I assisted with the nursing
5    guidelines.  They were writing nursing guidelines.
6    I assisted with that book.
7    Q.   It's a specific book you said?
8    A.   Nursing guidelines.
9    Q.   Is it --
10   A.   Nursing guidelines.  Nursing guide-
11   lines.
12           I assisted with the bed control.
13   Q.   Anything else?
14   A.   Not that I can recall at the moment.
15   Q.   Okay.  And then the nursing guide-
16   lines, is that what they were called?  Nursing
17   guidelines?
18   A.   Yes.
19   Q.   Are those nursing guidelines the same
20   as they were in 2012 today?
21       MR. DeVORE:  Objection.  Calls for
22   speculation.
23   BY MS. ERICKSON:
24   Q.   To your knowledge.
25   A.   I don't believe so.

Page 44

1    Q.   Do you know when they changed?
2    A.   No.  The date, I don't know.  I'm not
3    a part of that, developing the guidelines or --
4    writing the guidelines or developing them.  I'm
5    not a part of that.
6    Q.   Do you know how often the nursing
7    guidelines changed?
8    A.   No.
9    Q.   Who is in charge of modifying the
10   nursing guidelines?
11   A.   I don't know the answer to that
12   question.
13   Q.   Is Linda Kampe involved in that?
14   A.   I don't know.
15   Q.   And what does bed control mean?
16   A.   Bed control is when you -- it's hard
17   to explain.  When a -- saying where a patient
18   needs to go according to their level of care,
19   according to what the provider assigned to them,
20   the level of care.  Each division has different
21   levels.
22   Q.   Okay.  So what is the range of care
23   per division?
24   A.   I don't -- I can't tell you what
25   division sees what.

Page 45

1    Q.   So you're saying is it the doctor that
2    decides which division an inmate will go to?
3    A.   A provider, mental health or medical.
4    Q.   Do you know what level of care
5    Division 10 is for an inmate?
6    A.   As in when?  I wouldn't know because
7    they change.
8    Q.   Oh, it changes regularly --
9    A.   I don't know when.  And I wouldn't
10   know if you gave me a date what it would have been
11   at that time.  They change.
12   Q.   Oh, it changes regularly, the level of
13   care --
14   A.   That I don't know.  That's DOC and
15   medical that determines all that.  I'm not a part
16   of that.
17   Q.   So then --
18   A.   Who decides that, I don't know.
19   Q.   So what was your role in bed control
20   in 2012?
21   A.   So there would be a list of patients
22   that would be in -- say they were medical and they
23   had just been assigned to medical but maybe they
24   were in GP --
25   Q.   Which means?

12 (Pages 42 - 45)

Page 46

1    A.   -- and I would say that -- general
2  population.
3    Q.   Okay.
4    A.   -- that they need to be moved to this
5  level of care.  Then DOC would determine where
6  according to where they had that level of care.
7    Q.   So DOC being, like you said, the
8  provider would decide where they should go?
9    A.   The provider assigns the level of
10  care.
11    Q.   Okay.
12    A.   And their bed is determined by the
13  level of care, the recommendation of level of
14  care.  And then DOC is in control of movement.
15    Q.   Okay.  So it sounds like Cook County
16  is in charge of deciding which bed but the
17  provider says which division that particular
18  inmate should go to given their need?
19    A.   Not division necessarily but level of
20  care.  Because each division can be different
21  things.
22    Q.   Okay.  I understand.  And then going
23  back to the Pyxis, why -- why was the Pyxis cart
24  and process needed?
25    A.   Just monitor.  More control.

Page 47

1    Q.   How does the Pyxis med cart work?
2    A.   I don't pass meds out of the Pyxis, so
3  I couldn't give you all the dynamics of it.
4    Q.   Have you seen it?
5    A.   I don't pass meds.  I don't know the
6  answer to that.
7    Q.   Have you seen the Pyxis?
8    A.   I've seen it.  I've seen the cart.
9    Q.   Is it -- is it a machine where pills
10  are put in from the top and like somehow combined
11  quicker in a package?
12    A.   No.  That's pharmacy.  Pharmacy has --
13  that would be just -- no.  The Pyxis doesn't
14  package the medications.  The pharmacy packages
15  the medications.  And how they put them in the
16  Pyxis or whatever, I'm not involved in that
17  process whatsoever.
18    Q.   Okay.
19    A.   So I don't know the answer to that
20  question.
21    Q.   Okay.  And where is the pharmacy
22  located at Cook County?
23    A.   Cermak.  Cermak building.  I don't
24  know their exact location.
25    Q.   Is there just one pharmacy?

Page 48

1    A.   I believe so, yes.
2    Q.   And there's a specific building for
3  Cermak?
4    A.   Yes.
5    Q.   Are any inmates housed in that
6  building?
7    A.   Yes.
8    Q.   Which building is it?
9    A.   Cermak.  Cermak Hospital.  It isn't
10  really hospital.  It's the -- it's the infirmary.
11    Q.   Which patients are housed in the
12  Cermak building?
13    A.   Infirmary patients.
14    Q.   What does that mean?
15    A.   Higher level of care.
16    Q.   So which patients need to be in the
17  infirmary?
18    A.   Higher level of care for medical and
19  higher level of care for mental health.
20    Q.   Are these patients that need dialysis
21  every day?
22    A.   Dialysis every day?  I don't --
23    Q.   That's okay.
24    A.   I don't know the answer to that.
25    Q.   It's okay.  I'm not trying to trick

Page 49

1  you.  I'm just trying to understand the way Cermak
2  is set up.
3        And how many patients are there
4  housed at the Cermak building?
5    A.   I don't have the count.
6    Q.   Greater than 100?
7    A.   I would say greater than a hundred.
8  But that's all that I could tell you.  I couldn't
9  go up to two or three.  Just I would say greater
10  than a hundred.
11    Q.   Are there Cermak nurses that are only
12  working in that building?
13    A.   I don't know the answer to that
14  question.  I don't do scheduling.
15    Q.   Did you have any other roles in 2012
16  besides audit med pass, audit med room operations,
17  and nursing guidelines and bed control?
18    A.   Not to my knowledge.  Not that I
19  recall.
20    Q.   Okay.  And how long were you in that
21  role as the --
22    A.   That's still my title.  But I do
23  grievances since 2015.
24    Q.   You have the same title but you've
25  just changed jobs or duties since 2015?

13 (Pages 46 - 49)

Page 50

1    A.    Correct.
2    Q.    Okay.
3    A.    Correct.
4    Q.    Had has your job essentially -- strike
5    that.
6            Have you had the same duties in
7    your job since 2015 until today?
8    A.    Correct.
9    Q.    Okay.  And can you explain your
10   responsibilities since 2015 in your role?
11   A.    I answer the grievances.
12           It's vague.  I don't understand the
13   question.  It seems vague to me.
14   Q.    What do you do day to day in your role
15   working at Cermak since 2015?
16   A.    Day to day?  Okay.  So you want my
17   day-to-day?
18   Q.    Mm-hmm.
19   A.    I would take out the grievances that
20   are assigned for me to do that day or that I
21   determine need to be done that day, and then I
22   would get into their chart and review.  And if
23   there's somebody that I need to review it with or
24   talk to about an issue, I would do that.  Answer
25   the grievance.  And then --

Page 51

1            This thing keeps popping up.
2            And then we would send it back to
3    DOC when they come pick them up the next day.
4    Q.    And when you said you get into the
5    chart, does that mean that you go and look at that
6    inmate's medical chart?
7    A.    Yes.
8    Q.    Okay.  Since 2015 have you looked at
9    paper medical records for inmates?
10   A.    I may have, but not that I recall.
11   Q.    What's the name of the system that
12   Cermak uses for electronic e-medical records?
13   A.    Cerner.
14   Q.    What's that?
15   A.    Cerner.
16   Q.    Cerner?
17   A.    PowerChart.
18   Q.    Has Cermak used Cerner PowerChart
19   since 2015?
20   A.    To the best of my knowledge, yes.
21   Q.    And you have access to the medical
22   chart through Cerner PowerChart on your computer?
23   A.    Yes.
24   Q.    Is there a policy that you know of
25   that states that a nurse needs to enter the

Page 52

1    medication that a patient takes at that time?
2    Strike that.  That was a bad question.
3            Do the nurses through Cermak need
4    to put medication that they pass to inmates into
5    Cerner PowerChart right after it's administered?
6    A.    They put it in Pyxis.
7    Q.    How do -- do you know how that works?
8    A.    I don't pass medications, so I
9    couldn't give you the dynamics of it.
10   Q.    So it sounds like you're saying that
11   on the med cart there's a computer?
12   A.    Yes.
13   Q.    And then after a nurse gives the
14   medication to an inmate, the nurse would put in
15   the system that they gave a specific medication to
16   that inmate?
17   A.    Yes.
18   Q.    Okay.  And then if a medication --
19   strike that.
20           If there's no -- like, for example,
21   if today no one gave an inmate medication, it
22   wouldn't be in the medical chart electronically.
23   Right?
24   A.    Could you say that again?
25   Q.    Yeah.  Sure.  It's a hard question.

Page 53

1            So you -- do you audit the medical
2    records at all?
3    A.    I don't do audits now.
4    Q.    Okay.  Does anyone review the
5    electronic medical records?
6    A.    I couldn't answer that question who
7    that would be.
8    Q.    Is there a person, though?
9    A.    I don't -- not to my knowledge that I
10   know of.  I'm not in that audits.
11           MR. DeVORE:  And, Kirstin, by review
12   you meant audit in that context?
13           MS. ERICKSON:  Yes.  Yep.
14   BY MS. ERICKSON:
15   Q.    So, just to clarify, no one audits the
16   electronic medical records after they're entered?
17           MR. DeVORE:  I don't think that's what
18   she said.
19           THE WITNESS:  That wouldn't be my
20   department, so I wouldn't.
21   BY MS. ERICKSON:
22   Q.    So do you know is there someone who
23   audits the electronic medical records?
24   A.    That I don't know who that would be.
25   Q.    Does someone do it that you know of?

Page 54

1    A.   Not that I know of.
2    Q.   Okay.  So how does -- how does Cermak
3  determine if the medical -- strike that.
4        How does Cermak determine if
5  inmates are getting the medication when they're
6  supposed to?
7    A.   That's not what -- that's not within
8  my scope of what I do, so I can't answer that.  I
9  can't speak to that question.
10   Q.   What about in your prior role from
11  2012 to 2015, how -- at that point you were the --
12   A.   We have --
13   Q.   -- how did anyone or did anyone --
14  strike that.
15        Did anyone at Cermak review the
16  medical records from 2012 to 2015?
17        MR. DeVORE:  Objection as to form as
18  to scope and what medical records and for what
19  purpose.
20        You can answer, if you can.
21        THE WITNESS:  I don't -- I don't know
22  the answer to that question.
23  BY MS. ERICKSON:
24   Q.   Is there any oversight to your
25  knowledge about -- strike that.

Page 55

1        Is there any oversight of med pass
2  from 2015 to the present of nurses giving
3  medication to inmates?
4    A.   That would be the nursing department.
5  And I don't -- or IT.  I don't -- I don't know
6  their process right now as to how they do their
7  audits.  I don't do the audits now, so that's not
8  in my -- I don't know the answer to that question.
9    Q.   But when you were doing audits from
10  2012 to 2015, was anyone seeing -- from Cermak was
11  anyone overseeing if medications were given at the
12  right time, within the time window, within the --
13   A.   There's nurse managers.  There's IT.
14  There's computer.  The COO.  The director of
15  nursing.
16   Q.   What about them?  Was there oversight?
17   A.   I don't know who was doing it.  I
18  don't know who was doing it --
19   Q.   Do you know if it was done?
20   A.   -- and to what -- who's doing what in
21  what record in what capacity.  I don't know the
22  answer to that question.  There's so many parts of
23  a medical record, and I don't know what every-
24  body's role is into looking at those different
25  components.  I don't know the answer to that

Page 56

1  question, I really do not.
2    Q.   I understand.  I understand.
3        From 2012 to 2015, what time were
4  meds supposed to be passed in the morning?
5    A.   There's a -- there's a leeway, and I
6  don't -- I don't recall exactly what the leeway
7  is.  I believe it's two hours before and two hours
8  after.  But I don't -- I can't attest to that.
9  That is just my recollection.
10   Q.   Mm-hmm.  And, what, two hours before
11  and after what time?
12   A.   Whatever time the provider -- like if
13  it was BID.  It depends on what the provider
14  ordered.  Did they order at a time?  Then you'd
15  have two hours before or after.  There's so many
16  different times to pass meds.  9:00 a.m.,
17  9:00 p.m.  9:00, 1:00, and 5:00.  9:00, 1:00,
18  5:00, and 9:00.  Every 12 hours.  There's so many
19  different times that they can be ordered.  Because
20  everybody is not going to get their meds at
21  1:00 p.m. because it just can't happen, so there's
22  a window --
23   Q.   Mm-hmm.
24   A.   -- that is acceptable to pass the
25  medications as to -- according to when they're

Page 57

1  assigned -- or ordered I should say is a better
2  word.
3    Q.   Understood.  So it sounds like there's
4  a 9:00 a.m., 1:00 p.m., 5:00 p.m., and 9:00 p.m.
5  med pass.
6    A.   I don't know what the med passes --
7  what times med passes are right now.
8    Q.   What times -- strike that.
9    A.   Usually --
10   Q.   Hang on.  What times were the med
11  passes from 2012 to 2015?
12   A.   Oh, my goodness.  Well, there could be
13  9:00, 1:00, 5:00 and 9:00.  6:00 A, 6:00 P,
14  9:00 A, 9:00 P.  It depends on the medications.
15  And then if they had IVs --
16   Q.   Mm-hmm.
17   A.   -- I mean, it could just be all
18  different -- all different times.
19   Q.   Okay.  So if an inmate has, for
20  example, during 2012 to 2015 an a.m. and a p.m.
21  med, how is the nurse supposed to know when to
22  administer the med?
23   A.   Well, it could be depending upon what
24  the medication is, if it's something that needs to
25  be taken with meals.  Usually if there was --

15 (Pages 54 - 57)

Page 58

1 9:00 and 9:00. Am I committed to 9:00 and 9:00?
2 No. Because there's just so many variables with
3 medications.
4 Q. No. Understood. But if a patient
5 needed meds at specific times like 9:00 a.m.,
6 1:00 p.m., 5:00 p.m., would that be in the order
7 for the inmate?
8 A. Not necessarily. It could be BID,
9 TID, QID.
10 Q. Can you take us through those? What
11 does BID mean again?
12 A. Twice a day.
13 Q. And TID?
14 A. Three times a day.
15 Q. And what was the third one you said?
16 A. QID. Four times a day.
17 Q. Okay. So if an order says QID for a
18 certain medication, is it known throughout Cermak
19 then whatever the four times are throughout the
20 day, that the inmate will get them at those four
21 times, whether it's 9:00 a.m., 1:00 p.m.,
22 5:00 p.m., 9:00 p.m., or 8:00 a.m., noon,
23 5:00 p.m., 9:00 p.m.?
24 MR. DeVORE: Are you taking into
25 account the window she was just talking about?

Page 59

1 MS. ERICKSON: No.
2 BY MS. ERICKSON:
3 Q. I'm just saying if the order says --
4 will the order for the medication just say QID or
5 will it say the specific times the medication
6 should be passed?
7 A. It depends on the medication. It
8 depends on what the doctor writes. It can -- it
9 depends on what the doctor writes.
10 Q. What if the doctor doesn't --
11 A. Or provider, I should say.
12 Q. What if the doctor doesn't write
13 times?
14 A. Then it could be up to -- it would be
15 9:00, 1:00, 5:00 and 9:00. It could be every six
16 hours. It would just depend.
17 Q. But if it's not in the order --
18 A. It could be both 9:00, 1:00, 5:00 and
19 9:00, as an example. It could be 12:00, 6:00,
20 12:00, 6:00.
21 Q. Okay.
22 A. There's just -- there's so many
23 variables, it's just a very hard question to
24 answer.
25 Q. Mm-hmm. No. Thank you.

Page 60

1 So as far as who decides what times
2 to give the medications, if it doesn't say in the
3 order who is that person?
4 A. It would be the medication --
5 MR. DeVORE: Objection. Calls for
6 speculation.
7 THE WITNESS: I don't work on the
8 unit, so I don't know who that person would be.
9 BY MS. ERICKSON:
10 Q. Okay. And I believe you said there
11 was -- there would be a 6:00 a.m. and a 6:00 p.m.
12 med pass. What -- are those --
13 A. No. There could be a 6:00 a.m. and
14 6:00 p.m. medication order. It doesn't mean
15 that's a specific general med pass. 'Cuz there's
16 a window. There's a window, two and two before
17 and after.
18 Q. Mm-hmm. But what do you mean that --
19 what do you mean that the med order would be
20 6:00 a.m., 6:00 p.m.?
21 A. I said it could be. I don't under-
22 stand.
23 Q. I don't either. Let me try again.
24 So the meds can be passed, you
25 know, four times a day at 9:00, 1:00, 5:00, 9:00

Page 61

1 or a variation of those. But what did you mean
2 when you said 6:00 A, 6:00 P, 9:00 A, 9:00 P
3 earlier?
4 A. I was giving you examples of different
5 times that medications are -- can be ordered or --
6 'cuz there's so many -- I was giving you examples
7 that there's so many variables of med times and
8 that they can fall into the range of that window,
9 two hours before and two hours after.
10 Q. Okay. What about when patients are
11 leaving to go to court early in the morning but
12 they need to receive a morning medication?
13 A. I'm not involved in the medication
14 pass and the court meds. I'm not involved in that
15 medication pass.
16 Q. But do you -- in looking at the
17 grievances, is part of your responsibility to
18 determine how to resolve the issue?
19 A. What's your question?
20 Q. That was my question.
21 A. How was it -- could you repeat it
22 then?
23 MS. ERICKSON: Debbie, can you repeat
24 the question, please.
25 ///

16 (Pages 58 - 61)

Page 62

1         (The following question
2         was read back:
3         "Q. In looking at the
4         grievances, is part of
5         your responsibility to
6         determine how to resolve
7         the issue?")
8 BY MS. ERICKSON:
9    Q. You review. You review grievance
10 forms. Right?
11       MR. COYNE: I'm sorry, was there an
12 answer to that question? I don't think I heard
13 it. Did she answer, Kirstin, or no?
14       MS. ERICKSON: No.
15       MR. COYNE: Okay.
16       THE WITNESS: Okay. So you asked me
17 if I am involved in -- could you -- I'm sorry --
18 BY MS. ERICKSON:
19    Q. Yeah. Do you --
20    A. My thing was off. Okay. There we go.
21    Q. Are you with us?
22    A. I am.
23    Q. Okay. As part of your role since
24 2015, you review the grievance forms from inmates.
25 Right?

Page 63

1    A. Correct.
2    Q. And is it your job to decide how to
3 resolve the issue?
4    A. It is not my job to resolve all the
5 issues. I could go to a person that could assist
6 me. But I can't resolve all the issues.
7       Did I understand your question
8 correctly?
9    Q. Yeah. So did you -- so do you decide
10 what next steps need to be taken after reading a
11 grievance form?
12    A. As in resolving the issue or finding
13 -- helping to find their answer? I still don't
14 understand the question. I'm sorry. As in a plan
15 of correction for the facility? Or I just don't
16 understand your question.
17    Q. Yeah, it seems like it's a hard
18 question.
19       So have you ever reviewed a
20 grievance form where an inmate needed medication
21 to go to court but they didn't receive the
22 medication?
23    A. I may have.
24    Q. And what did you do in that situation?
25    A. I would give it to -- I would have the

Page 64

1 nurse manager of that division do a review.
2    Q. What does it mean for them to do a
3 review?
4    A. To do like an investigation and find
5 out what happened. It's their division, and they
6 would know more as to if there needed to be a
7 corrective action for the nurse. It would be more
8 like a personnel issue.
9    Q. And then would you write that
10 corrective action on the grievance form?
11    A. No. It would be a personnel issue.
12 So, no, I don't. I just said it was referred to
13 the nursing manager for review, something to that.
14    Q. And then how do you know if the nurse
15 manager does her job?
16    A. I don't review the nurses. I don't
17 audit the nurses. I'm not in charge of the
18 nurses. That would be -- that's not my role.
19    Q. Does anyone audit the nurses?
20    A. That I don't -- that's not my role.
21 So I don't -- I can't answer that question. I
22 don't know.
23    Q. How does an inmate notify -- strike
24 that.
25       What's the process for an inmate to

Page 65

1 notify Cook County or Cermak that he or she needs
2 medication early in the morning prior to going to
3 court?
4       MR. DeVORE: Detainee. Not inmate.
5 BY MS. ERICKSON:
6    Q. Is there an answer to the question?
7    A. Yes, I don't know the process for that
8 now. At one time there was a -- DOC gave them a
9 list. But I don't know their process really.
10    Q. So you didn't have to oversee that at
11 all in 2012 to 2015?
12    A. Correct.
13    Q. And then how many hours do you work
14 per week currently?
15    A. Forty.
16    Q. Do you work overtime ever?
17    A. No.
18    Q. Do you know how much nurses get paid
19 at Cermak?
20    A. No.
21    Q. Did you ever get a promotion since you
22 began working at Cook County?
23    A. Same job. Same title.
24    Q. So is that a no?
25    A. No.

17 (Pages 62 - 65)

Page 66

1    Q.   Have you ever been disciplined since
2  you began working at Cook County?
3    A.   No.
4    Q.   Have you ever been put on
5  administrative leave?
6    A.   No.
7    Q.   In the lawsuit where you're a
8  defendant, what are the allegations -- what were
9  the allegations against you?
10   A.   This I don't recall.
11   Q.   Did it have to do with your role from
12  2012 to 2015 or 2015 to the present?
13   A.   I don't -- I don't recall.
14   Q.   Was there a judgment against you?
15   A.   No.
16   Q.   Is retention of nurses a current issue
17  for Cermak?
18       MR. DeVORE:  Objection.  Foundation,
19  form, and calls for speculation.
20       THE WITNESS:  I don't know the answer
21  to that question.  I'm not involved in the hiring
22  process.
23  BY MS. ERICKSON:
24   Q.   How many medical staff are there
25  usually staffed in the Cermak dispensary?

Page 67

1    A.   I don't know the answer to that
2  question.
3    Q.   Are there --
4    A.   I don't have any idea.  Sorry.
5    Q.   Sorry to interrupt.  What did you say?
6    A.   I don't have any knowledge of that,
7  how many there are.  I don't know.
8    Q.   In your current role, do you ever
9  leave your office to go through -- to go visit
10  places throughout the building?
11   A.   You mean like in the different
12  divisions?  No.
13   Q.   In your current role since 2015, do
14  you communicate with anyone outside of the office
15  that you're in?
16   A.   As in staff members?  Yes.
17   Q.   How do you communicate with them?
18   A.   Talk.
19   Q.   On the phone?  E-mail?  In person?
20   A.   Usually in person.
21   Q.   And where --
22   A.   Sometimes by --
23   Q.   Oh, sorry.
24   A.   Usually in person.
25   Q.   Where do you all communicate?

Page 68

1    A.   Where do we communicate?  I'll track
2  them down, go to their office.  I could call them
3  on the phone.  Sometimes I'll leave them a
4  message, you know, "Give me a call when you get a
5  chance.  I have a question."
6    Q.   Okay.  But do you visit the
7  dispensaries in other buildings --
8    A.   No.
9    Q.   -- ever?
10   A.   No.
11   Q.   Why not?
12   A.   I don't do audits.  I would -- because
13  I have grievances to answer.
14   Q.   But --
15   A.   I don't understand.  There would be no
16  purpose for me to go visit a dispensary.
17   Q.   How do you find the people that you
18  need to talk to who work at Cermak?
19   A.   I speak with the nursing -- nursing
20  managers.  And they speak with their nurses, if
21  need be, to do a review or investigation.
22   Q.   So you don't ever speak to the nurses
23  personally about grievances?
24   A.   I may call a nurse up on the phone for
25  a brief question.  But it maybe would be like a

Page 69

1  supply, so-and-so has an order for something, an
2  ace wrap, could you make sure he gets that.
3  That's not -- that's not very often.  Usually
4  anything that would have to do with the nurses
5  would be the nurse manager would handle it.
6    Q.   Okay.  So you're not involved with
7  disciplining nurses?
8    A.   No.
9    Q.   And you don't go speak to nurses
10  directly in person.  Right?
11   A.   Correct.  Managers occasionally.  But
12  not nurses.  Not -- the manager would speak with
13  them.
14   Q.   And when you review the grievance, if
15  there seems to be an issue with a correctional
16  officer that entails some kind of medical issue,
17  what do you do?
18   A.   I don't manage DOC.  So anything that
19  has to do with an officer would be something that
20  the DOC would answer separately.  And I would
21  answer to the medical part of that question.
22   Q.   So you don't -- you don't respond to
23  the correctional officer issue at all if it's in
24  the grievance?
25   A.   That's correct.  I don't manage the

18 (Pages 66 - 69)

Page 70

1  officers, so I can't speak to anything -- their
2  job duties. That's DOC. And we're Cermak. So I
3  would speak to the medical part of it. And
4  anything that has to do with the DOC part of the
5  grievance would be answered by them.
6      Q.  Does the DOC and Cermak work together
7  in order to make sure that patients get their
8  medications on time and appropriately?
9      A.  I know there's an officer that is with
10  the nurse when she passes the meds. Does that
11  answer your question?
12      Q.  No. It was --
13      A.  There's an officer with the nurse when
14  the nurse is passing her medications.
15      Q.  No. That wasn't the answer. It's a
16  yes-or-no question.
17          MR. DeVORE: She did. She just
18  answered it.
19          THE WITNESS: Does it -- then I --
20  does the officer have anything to do with med
21  pass? Is that your question? I guess I don't
22  understand your question.
23  BY MS. ERICKSON:
24      Q.  Does the Department of Corrections and
25  Cermak work together to make sure that inmates

Page 71

1  have their medication on time --
2          MR. DeVORE: Objection.
3  BY MS. ERICKSON:
4      Q.  -- on time and accurately?
5          MR. DeVORE: Objection. Asked and
6  answered.
7          To the extent it's not answered or
8  you understand it, you can answer again.
9          THE WITNESS: DOC doesn't have
10  anything to do with the accuracy of medications or
11  anything. That's DOC. And then Cermak is
12  medical. So DOC has nothing to do -- I can't
13  answer your question. I'm sorry.
14  BY MS. ERICKSON:
15      Q.  The DOC has nothing to do with
16  medication?
17      A.  No. They can't -- how do they know if
18  it's accurate? They don't -- they're not --
19  they're not in medicine. They're in the
20  Department of Corrections.
21      Q.  But what happens when an inmate has an
22  as-needed medication and they need that medication
23  and no nurse present? Then what -- then
24  what is the inmate supposed to do?
25      A.  That would be DOC that could answer

Page 72

1  that question for you 'cuz they would be the ones
2  that would contact medical. I mean, the -- if
3  there's no medical there, then it's DOC because
4  DOC is over custody.
5      Q.  But so then at that point Cermak
6  doesn't care if the patient gets the medication or
7  not?
8          MR. DeVORE: Objection. Mischarac-
9  terizes testimony. Foundation.
10          THE WITNESS: They care; they're just
11  not there. They care, but they're not there. So
12  DOC has to assure either movement to move the
13  patient to wherever they need to go or to contact
14  nursing. That would be DOC's policies as to how
15  they would handle that situation.
16  BY MS. ERICKSON:
17      Q.  So who from DOC would talk to Cermak
18  to make sure that inmates are getting their
19  medications when they need them?
20          MR. DeVORE: Objection. Seeks
21  information --
22          THE WITNESS: That --
23          MR. DeVORE: It calls for speculation.
24  BY MS. ERICKSON:
25      Q.  You were answering the question. Go

Page 73

1  ahead. What did you say?
2      A.  I don't know. That would be DOC that
3  would answer that. DOC would know.
4      Q.  What do you mean no one from Cermak
5  would know what happens when an inmate needs
6  medication and it's not around?
7      A.  You asked me who in DOC, and I don't
8  know.
9      Q.  So who from Cermak -- I mean, strike
10  that.
11          Would someone from Cermak talk to
12  someone from DOC to figure out how to resolve an
13  issue like this?
14      A.  If DOC notified them.
15      Q.  Would a correctional officer be in
16  charge of contacting someone from Cermak?
17      A.  I don't know what DOC person would be
18  in charge of it.
19      Q.  So basically no one is in charge, and
20  an inmate could be at various places in the
21  building and not get medication --
22      A.  That's not what I said.
23      Q.  And who's responsible?
24      A.  I said that I don't know. I didn't
25  say no one. I said I don't know 'cuz it's DOC.

19 (Pages 70 - 73)

Page 74

1    Q.   Have you ever reviewed -- have you
2  ever reviewed a grievance where an inmate was in
3  receiving and they were requesting as-needed
4  medication and no one gave them the medication?
5        MR. DeVORE:  Objection.  Incomplete
6  hypothetical.  Calls for speculation.
7        You can answer, if you can.
8        THE WITNESS:  In receiving?  No, not
9  to my -- not that I recall.
10 BY MS. ERICKSON:
11   Q.   Have you ever been to receiving?
12   A.   Yes.  It's been a while, but yes.
13   Q.   Can you describe the process of an
14 inmate coming through receiving?
15        MR. DeVORE:  Objection.  Unclear as to
16 what time period.  Form of the question.
17        You can answer, if you can.
18        THE WITNESS:  Okay.  So the process as
19 in, like, for intake receiving them from -- they
20 would do a -- the nurse would do a medical
21 screening, dental, medical, mental health
22 screening, refer them to -- if they needed to see
23 medical.  If they needed to see dental, they would
24 do a dental, the nursing would do a dental visual.
25 And then mental health, if they needed to see

Page 75

1  mental health, they would refer them to -- they're
2  right there at intake.
3  BY MS. ERICKSON:
4    Q.   Is there a doctor or PA right there at
5  intake when an inmate needs to see medical?
6    A.   It depends on the time.  If it's after
7  a certain time, and I don't know what time that
8  is -- they usually come in the afternoons -- if
9  they need to see medical and the provider at
10 intake is -- then they would refer them to urgent
11 care.
12   Q.   So if after a certain hour -- do you
13 know what hour that is when --
14   A.   No.
15   Q.   -- there's no physicians or PAs at the
16 intake?
17   A.   No.  No, I don't.
18   Q.   Okay.  But then after that time, that
19 cutoff time, the inmate would be sent to urgent
20 care to see a doctor or PA?
21   A.   Correct.
22   Q.   Was that always the way it works to
23 your knowledge?
24   A.   That's the way that it's supposed to
25 work pretty much, yeah.

Page 76

1    Q.   Okay.  And is it policy that every
2  time an inmate goes through intake that if they
3  need medications they will see a doctor or a PA to
4  get those orders?
5    A.   It depends.  They would get -- they
6  would go to urgent care intake.  From intake, if
7  they need to see a provider they would go to
8  urgent care.
9    Q.   But the question was about orders.  So
10 is it every time that a -- if an inmate comes
11 through intake and they need medications and the
12 nurse determines, oh, they need this specific
13 medication, will they always go see a PA or a
14 physician?
15   A.   If they -- they do a screening.  And
16 if they need to see the provider, they would refer
17 them to urgent care.  And that's how they do it.
18 And then the provider would order what they needed
19 to order.
20   Q.   Okay.  So they would always -- every
21 time the inmate comes through intake, they would
22 see a provider if they need medication, and that
23 provider would enter an order for the medications.
24 Right?
25   A.   It depends on why they have left.  And

Page 77

1  I don't -- it would depend on why they would have
2  leave.  If they've left for a doctor's appointment
3  and they're coming back, they're not going to
4  see -- they're not going to see a provider,
5  they're going to go to their division.
6    Q.   Okay.
7    A.   Does that make sense?
8    Q.   Yeah.  It makes sense, yeah.
9         Is there a certain time frame after
10 which the inmate needs to see medical again for an
11 order?
12   A.   For what?
13   Q.   Like if -- like if an inmate leaves
14 for five days to go to another facility and they
15 come back, do they need to go through a medical
16 intake again?
17   A.   I don't know the answer to that
18 question.  I would have to -- I'd have to
19 reference the policy.  I don't know the answer to
20 that question.
21   Q.   Okay.  If an inmate leaves to go to
22 court and come back, do they have to go through
23 the medical intake process again?
24   A.   Not to my knowledge.
25   Q.   Okay.  So I believe what you described

20 (Pages 74 - 77)

Page 78

1　just a minute or two minutes ago was the process
2　when an inmate is coming from outside the facility
3　and they have to go through the medical intake
4　process. Right?
5　　A.　If they've come from the jail, they've
6　been arrested, they're coming from the outside --
7　　Q.　Mm-hmm.
8　　A.　-- they're doing a full intake, then
9　they would -- and it was determined that they need
10　to see the provider, they would see the provider.
11　If the provider wasn't at intake, then they would
12　refer them to urgent care and a provider would see
13　them in urgent care.
14　　Q.　And where is -- where does medical
15　intake take place?
16　　A.　Downstairs in the intake receiving.
17　　Q.　At which building are we in?
18　　A.　You know, it's moved. It's in -- I
19　believe it's in RDC.
20　　Q.　What's that?
21　　A.　RDC.
22　　Q.　RDC?
23　　A.　Not RDC. RTU. I'm getting --
24　　Q.　Oh.
25　　A.　RTU. Sorry. It's RTU. The lower

Page 79

1　level of RTU.
2　　Q.　So is that the Division 8 building?
3　　A.　Yes.
4　　Q.　Okay.
5　　A.　RTU. But Cermak is also 8 also.
6　　Q.　So medical intake takes place in
7　Division 8 in the --
8　　A.　RTU.
9　　Q.　-- RTU? Okay. And that's the only --
10　　A.　And then also urgent care. You know,
11　if it's after time, then they would refer them to
12　urgent care.
13　　Q.　Is that -- that's not in that same
14　building. Right?
15　　A.　No. No.
16　　Q.　How far away is it from the regular
17　medical intake location and RTU?
18　　A.　Not too far.
19　　Q.　Okay. A building away?
20　　A.　I don't know how many steps. And then
21　you're talking, you know, if it's nighttime or the
22　weather is bad, the tunnels. And I get lost in
23　the tunnels, so I can't answer that question.
24　　Q.　Is the urgent care at -- it's at the
25　Cermak Hospital?

Page 80

1　　A.　Cermak here, yes.
2　　Q.　Is that --
3　　A.　Cermak here.
4　　Q.　What does that mean, Cermak here?
5　　A.　This building here, Cermak, at the
6　jail. Cermak.
7　　Q.　Okay.
8　　A.　It's not Stroger. It's Cermak.
9　　Q.　Yeah, I understand.
10　　A.　Okay.
11　　Q.　So the urgent care at Cermak, is that
12　about a mile away from the RTU?
13　　A.　A mile? I don't think it's a mile.
14　　Q.　Is it about a ten-minute walk?
15　　A.　I don't know. I've never timed it.
16　I haven't been down there for so long that I
17　couldn't tell you. But it's not a mile.
18　　Q.　Okay. So after an inmate goes through
19　the medical intake process, do they have to go
20　through the receiving line or go to like a
21　bullpen-type area?
22　　A.　Oh. That's DOC. That's holding and
23　movement. Yeah, Cermak -- that's DOC. That's
24　DOC's policies. And, yeah, that's not Cermak.
25　That's not Cermak's --

Page 81

1　　Q.　I'm just trying to understand the
2　process. I'm not calling -- I'm not saying anyone
3　is responsible. I'm just saying so after the
4　patient -- the inmate goes through the medical
5　intake, do they have to -- it sounds like they
6　have to go to a holding area?
7　　A.　I don't know the answer to that
8　question if they have to go there or they can take
9　them right to the division or what DOC does with
10　them, what they decide what they need to do with
11　them. I imagine there's different things that
12　depend on why they're putting them where or taking
13　them where, and I don't know those examples or
14　reasons.
15　　Q.　In your ten years of working there,
16　you've never known what happens to inmates after
17　they go through medical intake?
18　　A.　Not every time. Everything is
19　different. You said do they always go to the pen.
20　I don't know the answer. I can't say that they
21　always go to the pen. They could take them
22　directly to the division, sometimes put them in
23　the -- in like a bullpen.
24　　Q.　So what's the -- okay. So let's not
25　say always. Where do inmates generally go after

21 (Pages 78 - 81)

Page 82

1 they go through the medical intake process?
2     MR. DeVORE: Objection. Calls for
3 speculation. Asked and answered.
4     THE WITNESS: Sometimes they take them
5 directly to the division. It depends on where
6 they're at and what detainee, what number of
7 detainees, how many they've seen, is this the last
8 one, we'll take the group right now, or do they
9 need to sit in the bullpen until we bring others.
10 Does one of them need to go to urgent care? You
11 know, it depends on their -- what they need and
12 DOC's determination of how to manage the movement.
13 BY MS. ERICKSON:
14     Q.  Does DOC decide if someone needs to go
15 to urgent care?
16     A.  The nurses -- that would be medical's
17 decision that they need to go to urgent care, like
18 they need to see the provider for intake. And
19 then DOC would -- they manage the movement.
20     Q.  When do inmates need to go to the
21 bullpen after their medical intake?
22     A.  When do they?
23     Q.  Mm-hmm. In what situation?
24     A.  Nothing -- nothing that has to do with
25 a medical reason. There's no medical reason why

Page 83

1 we would -- we would order them to go to a
2 bullpen. That's -- that's strictly movement.
3 That's DOC. That's how they manage it.
4     Q.  I understand. But my --
5     A.  I'm supposing.
6     Q.  What's the point of going to a bullpen
7 for an inmate?
8     MR. DeVORE: Objection. Asked and
9 answered. Calls for speculation. She's already
10 testified she has nothing to do with that.
11 BY MS. ERICKSON:
12     Q.  You can answer.
13     A.  Oh. What would be a reason?
14     Q.  Yeah. Why do they go there?
15     A.  That's how DOC manages.
16     Q.  Manages what?
17     A.  A group of people. I'm -- you're
18 asking me to suppose. I don't -- that's DOC's
19 movement. That's how they manage movement.
20 That's not anything that has to --
21     Q.  They send to bullpen? That's how they
22 manage movement?
23     A.  I don't manage --
24     MR. DeVORE: Object. It mischarac-
25 terizes the testimony.

Page 84

1 BY MS. ERICKSON:
2     Q.  What did you say?
3     A.  I don't manage movement. Cermak
4 doesn't manage movement. That's DOC that manages,
5 so they could better answer your question than I
6 could.
7     Q.  What do you mean by manage movement?
8     A.  Manage. They're in control of where
9 the detainee goes.
10     Q.  But you -- but it sounds like Cermak
11 does manage the movement when there's a medical
12 issue involved. Right?
13     A.  No.
14     MR. DeVORE: Objection.
15 BY MS. ERICKSON:
16     Q.  No?
17     MR. DeVORE: Asked and answered.
18     THE WITNESS: No. They don't manage
19 movement. They say where they need to go. But
20 they don't move them. They don't take them there.
21 It's DOC that takes them. So that's movement.
22 BY MS. ERICKSON:
23     Q.  So when you say manage -- sorry. Go
24 ahead. So when you're saying manage movement,
25 you're saying the person that's actually moving

Page 85

1 them, that's the manage movement?
2     A.  Yeah.
3     Q.  Okay. But someone --
4     A.  They would be -- they would be in
5 charge of the detainee. We're not in charge of
6 the custody of the detainee.
7     Q.  But someone from Cermak could decide
8 how DOC needs to manage the movement of that
9 inmate. Right?
10     A.  They would decide where the --
11     MR. DeVORE: Objection. Mischarac-
12 terizes testimony.
13 BY MS. ERICKSON:
14     Q.  I can't hear --
15     A.  -- where the detainee needs to go.
16 And then from there it goes to DOC. Then they
17 manage the rest of it.
18     Q.  I couldn't hear the beginning of it.
19     A.  We don't --
20     Q.  Sorry, can you just start over?
21     A.  Okay. So we would say that they need
22 to go to urgent care.
23     Q.  Mm-hmm.
24     A.  Maybe even write the order they go to
25 urgent care. But then after that, that's up to

22 (Pages 82 - 85)

Page 86

1  the DOC to take them to urgent care and manage
2  their custody to take them to urgent care.
3      Q.  Okay.
4      A.  So they manage it.  They manage the
5  movement of it.
6      Q.  It sounds like if the inmate is in a
7  place where they're being managed by DOC and they
8  have a medical issue it's on DOC to do something
9  to get the detainee the medical care they need?
10         MR. DeVORE:  Objection.
11         THE WITNESS:  That's correct.
12         MR. DeVORE:  Objection.  That
13  mischaracterizes her testimony.
14  BY MS. ERICKSON:
15      Q.  What was the answer?
16      A.  You asked -- could you repeat your
17  question?
18         MS. ERICKSON:  Sure.  Let's have it
19  read back because -- Debbie, could you read back
20  the question, please.
21         (The following question
22               was read back:
23               "Q.  It sounds like if the
24               inmate is in a place where
25               they're being managed by

Page 87

1               DOC and they have a
2               medical issue it's on DOC
3               to do something to get the
4               detainee the medical care
5               they need?")
6         THE WITNESS:  DOC would manage the
7  movement.
8         MS. ERICKSON:  That wasn't the
9  question.
10         Debbie, can you read the question
11  again.
12         (The following question
13               was read back:
14               "Q.  It sounds like if the
15               inmate is in a place where
16               they're being managed by
17               DOC and they have a
18               medical issue it's on DOC
19               to do something to get the
20               detainee the medical care
21               they need?")
22         THE WITNESS:  Hmm.
23         MR. DeVORE:  And my objection was --
24  my objection was misrepresents her direct
25  testimony and asked and answered.  Go ahead.

Page 88

1  BY MS. ERICKSON:
2      Q.  It's just a yes-or-no question.
3  That's it.
4      A.  It's hard to answer yes or no.
5      Q.  Why?
6      A.  Are they totally in charge of -- is
7  there -- because it depends on different variables
8  as to is it just DOC there, is there any medical
9  there, is there a telephone they can call someone.
10  I don't know.
11      Q.  So then, you tell me, is there someone
12  from medical from Cermak at the bullpen?
13      A.  Someone at the -- DOC manages the
14  bullpen.
15      Q.  Okay.  So is there someone stationed
16  at the bullpen from Cermak?
17      A.  Not to my knowledge.
18      Q.  All right.  So that's -- so then when
19  an inmate goes to receiving or the bullpen,
20  they're under the care and management of the
21  Department of Corrections.  Right?
22      A.  Yes.
23      Q.  And Cermak is not involved in what
24  happens to the inmates while they're in receiving.
25  Right?

Page 89

1      A.  I wouldn't say that they're not
2  involved in anything in receiving.
3      Q.  So they are -- I'm confused.  Are
4  people from Cermak at receiving to help inmates,
5  yes or no?
6         MR. DeVORE:  Objection.  Form.
7  Unclear as to what time frame we're talking about.
8         THE WITNESS:  Receiving as in the
9  bullpen or in intake receiving?
10  BY MS. ERICKSON:
11      Q.  What do you call receiving?  Do you
12  call it -- is medical intake called receiving?
13      A.  I call it receiving or intake.
14      Q.  Okay.  So then we'll just use bullpen.
15  Are Cermak staffed at the bullpen?
16      A.  Not to my knowledge.
17      Q.  Okay.  So then when an inmate leaves
18  medical intake and goes to the bullpen, when they
19  do, is someone from Cermak supposed to be there to
20  provide medical care?
21      A.  Not to my knowledge.
22      Q.  Okay.  So then if an inmate is in the
23  bullpen and they need medical care, are they
24  allowed to get medical care while they're in
25  there?

23 (Pages 86 - 89)

Page 90

1    A.   Yes.
2    Q.   How?  How do they get medical care?
3    A.   DOC would let medical -- make medical
4  aware.
5    Q.   How do they do that?
6    A.   They could call.  They could call
7  medical.
8    Q.   Okay.  So if a person is in medical --
9    A.   Could take them to urgent --
10    Q.   Sorry to interrupt you.  Go ahead.
11    A.   They could call medical.
12    Q.   So if a person is in the bullpen, are
13  they in -- are they behind a glass where they're
14  not really right next to a correctional officer?
15         MR. DeVORE:  Objection.  Form.  And
16  when you're talking about a person, are you
17  talking about a detainee or are you talking about
18  somebody who works there?
19  BY MS. ERICKSON:
20    Q.   I don't know.  Are correctional
21  officers held in the bullpen?  Are there --
22  correctional officers are held in the bullpen?
23         MR. DeVORE:  Try to get a good
24  question.  Objection.  Form.  I'm unclear --
25         THE WITNESS:  I'm not aware of any of

Page 91

1  that.  I'm not aware of any glass in the bullpen.
2         MR. DeVORE:  Susan, since you just
3  answered that question, do you need to take a
4  break?  It's about 11:10.
5         THE WITNESS:  Yeah.  Please.  Thank
6  you.
7         MS. ERICKSON:  Okay.  We'll go back to
8  that.  Thanks.  Do you want to take ten minutes?
9         MR. DeVORE:  Ten minutes?  Okay.
10         (A break was taken from
11              11:11 a.m. until
12              11:25 a.m.)
13         MS. ERICKSON:  We'll go back on then.
14  BY MS. ERICKSON:
15    Q.   So before the break we were talking
16  about the bullpen, and I'm going to ask you a few
17  more questions about that.
18         How is an inmate supposed to
19  receive medical care when they're in the bullpen?
20    A.   I believe they would go to -- they
21  would take them to urgent care.
22    Q.   Who's they?
23    A.   DOC.
24    Q.   Okay.  So it's the responsibility of
25  DOC to handle medical issues when an inmate is in

Page 92

1  the bullpen?
2         MR. DeVORE:  Objection.  Mischarac-
3  terizes testimony.  Asked and answered.  Form.
4         You can answer, if you can.
5         THE WITNESS:  Is it the DO -- it would
6  be an emergency -- it depends on what it's for.
7  BY MS. ERICKSON:
8    Q.   What do you mean?
9         MR. DeVORE:  Objection.  Asked and
10  answered plenty of times.
11  BY MS. ERICKSON:
12    Q.   Go ahead.
13    A.   If the detainee needs emergency care,
14  they would call, and they would -- medical would
15  come to the bullpen.  Otherwise, they would take
16  them to urgent care.
17    Q.   Who's they?
18    A.   DOC.
19    Q.   Okay.  So if there's --
20    A.   DOC would take them to urgent care.
21    Q.   So how does the DOC -- how do the
22  correctional officers in the bullpen know that
23  it's an emergency?
24         MR. DeVORE:  Objection.  Calls for
25  speculation.  She testified that she's not in that

Page 93

1  area.
2         THE WITNESS:  That would be up to the
3  DOC.
4  BY MS. ERICKSON:
5    Q.   So the correctional officer would make
6  the determination that it was an emergency and
7  that the patient needed to be taken to urgent
8  care?
9         MR. DeVORE:  Objection.  Calls for
10  speculation.  Mischaracterizes testimony.
11         THE WITNESS:  Just one moment.
12         (There was an interruption
13              at the door.)
14         THE WITNESS:  I apologize.
15  BY MS. ERICKSON:
16    Q.   Do you need a break?
17    A.   No.  No.  I'm all right.
18    Q.   Okay.
19    A.   Could you rephrase the question?
20    Q.   Because you didn't understand it?
21    A.   Yes.  It's too broad.  Always or all.
22  Nothing is always.
23    Q.   Oh.
24    A.   Do they always?
25    Q.   I don't think I said always.  But I'll

24 (Pages 90 - 93)

Page 94

1 rephrase it.
2    A.  Okay.
3    Q.  When inmates are in the bullpen and
4 they require medical care, you just testified that
5 if it's an emergency they, being the correctional
6 officers, would take the inmate to get medical
7 care at urgent care.  Is that right?
8    A.  No.
9    Q.  No, that's not right?
10    A.  No.
11    Q.  Okay.
12    A.  They would call --
13         (Simultaneous speaking.)
14 BY MS. ERICKSON:
15    Q.  Hang on.  Hang on.  Hang on.  Please
16 let me ask a question.
17         So when an inmate is in the bullpen
18 and needs medical care, when do they go to urgent
19 care?
20         MR. DeVORE:  Objection.  Calls for
21 speculation.
22         MS. ERICKSON:  She just testified.
23 BY MS. ERICKSON:
24    Q.  I just want to know according to your
25 knowledge.

Page 95

1    A.  If they needed medical care, the DOC
2 could take them to urgent care.
3    Q.  Okay.  They could.  But to your
4 knowledge do they?  Do the correctional officers
5 take inmates to medical care in urgent care?
6    A.  To my knowledge, they take them when
7 they need medical care.
8    Q.  So yes?  To your knowledge, yes?
9    A.  To my knowledge.
10    Q.  Yes?
11    A.  To my knowledge.
12    Q.  Is it yes or no?  Yes?
13         MR. DeVORE:  Objection.  Asked and
14 answered.
15         MS. ERICKSON:  She didn't say yes or
16 no.
17 BY MS. ERICKSON:
18    Q.  Just yes or no.
19         MR. DeVORE:  Well, objection.  Form.
20         MS. ERICKSON:  What's the objection?
21         MR. DeVORE:  Form.
22 BY MS. ERICKSON:
23    Q.  Yes, the correctional officers take
24 the inmates to urgent care when they need medical
25 help?

Page 96

1         MR. DeVORE:  Objection.  Form.
2         THE WITNESS:  To the best of my
3 knowledge, that is what they do.
4 BY MS. ERICKSON:
5    Q.  And you testified that correctional
6 officers take inmates to urgent care when it's an
7 emergency only?
8         MR. DeVORE:  Objection.  Calls for
9 speculation.
10         THE WITNESS:  No, I did not say that.
11 BY MS. ERICKSON:
12    Q.  No, you didn't.  Okay.  So then
13 correct me.  When do correctional officers take
14 inmates from the bullpen to urgent care?
15    A.  If they need medical care, the DOC can
16 take them to urgent care.  I cannot -- do they
17 always?  That I don't know.  I don't work for the
18 DOC.  They are to take them to urgent care if they
19 require medical care.  If it's an emergency, then
20 they would call urgent care or EMTs to come there.
21    Q.  So is that the policy of Cook County
22 Department of Corrections --
23    A.  I don't know --
24    Q.  -- if an inmate -- please let me
25 finish my question.  Please.

Page 97

1         Is it the policy of Cook County
2 Department of Corrections and Cermak that when an
3 inmate needs medical care and they're in the
4 bullpen that a correctional officer should take
5 them to urgent care?
6         MR. DeVORE:  Object.  Objection.
7 Calls for speculation.  She testified she doesn't
8 work for DOC.  She doesn't know about their
9 policies.
10         MS. ERICKSON:  No speaking objection.
11 Just what's the objection?  Form?
12         MR. DeVORE:  I already said it.
13         THE WITNESS:  I don't have access --
14 I don't work for the DOC.  That would be a DOC
15 policy and a DOC movement.  That would be in the
16 DOC's policies.
17 BY MS. ERICKSON:
18    Q.  Okay.  So it's in the DOC policies
19 you're thinking?
20         MR. DeVORE:  Objection.  Mischarac-
21 terizes testimony.
22 BY MS. ERICKSON:
23    Q.  You just said it was in the policies,
24 the DOC policies.  Right?
25    A.  It should be in DOC's policies, not

25 (Pages 94 - 97)

Page 98

1  our policies.
2      Q.  That's what I said.  Right?  Okay.
3          MR. DeVORE:  She said it should be.
4  And she also said --
5  BY MS. ERICKSON:
6      Q.  That's what you said is --
7          MR. DeVORE:  -- she didn't know.  She
8  also said she didn't know.
9          MS. ERICKSON:  All right.  Let's just
10  let her testify.  Okay?  Thanks, Jason.
11          MR. DeVORE:  Ask better questions.
12  BY MS. ERICKSON:
13      Q.  All right.  So, to your knowledge,
14  when it's an emergent situation, inmates go to
15  urgent care from the bullpen.  Right?
16      A.  To my knowledge what?
17      Q.  When it's an emergency, inmates go
18  from the bullpen to urgent care, taken by
19  correctional officers?
20      A.  No.
21      Q.  No?  In what situations should a
22  correctional officer take the inmate to urgent
23  care?
24      A.  If they need medical care.
25      Q.  So any kind of medical care?

Page 99

1      A.  No.  Not an emergency.  EMTs are going
2  to come to the bullpen.  DOC is not going to
3  transfer someone that's requiring emergency care.
4      Q.  Okay.
5      A.  So --
6      Q.  Sorry to interrupt.  Go ahead.
7      A.  That's it.
8      Q.  So if an inmate is in the bullpen and
9  needs emergent care, then you're saying somebody
10  from the DOC would call to get the EMT to come and
11  care for the inmate.  Is that right?
12      A.  Or the nurse.  Whoever.  Someone from
13  medical, yes.
14      Q.  Okay.  And what types of situations
15  are considered emergencies where an EMT would come
16  to the bullpen?
17          MR. DeVORE:  Objection.  Incomplete
18  hypothetical.  Calls for speculation.  And are you
19  asking -- and form.
20          You can answer, if you understand
21  the question.
22          THE WITNESS:  In what type of an
23  emergency would they -- could you rephrase?  Could
24  you re-ask the question?
25          MS. ERICKSON:  Debbie, would you mind

Page 100

1  repeating the question, please.
2              (The following question
3              was read back:
4              "Q.  And what types of
5              situations are considered
6              emergencies where an EMT
7              would come to the
8              bullpen?")
9          THE WITNESS:  Okay.  So you want --
10          MR. DeVORE:  Same objections.
11          THE WITNESS:  I have to think on it.
12          What would be an example?  It could
13  be, say, someone got stung by a bee and they have
14  an allergic reaction, anaphylactic reaction.  They
15  would call medical to come to the bullpen.
16  BY MS. ERICKSON:
17      Q.  And who would -- how would the
18  correctional officer know that it's an emergency?
19          MR. DeVORE:  Objection.  Calls for
20  speculation.  Form.
21          THE WITNESS:  That would be up to the
22  DOC.
23  BY MS. ERICKSON:
24      Q.  Okay.  So the correctional officer
25  would decide whether an EMT or a nurse should be

Page 101

1  called to come?
2          MR. DeVORE:  Objection.  Mischarac-
3  terizes --
4          THE WITNESS:  They would call medical.
5          MR. DeVORE:  -- testimony.
6  BY MS. ERICKSON:
7      Q.  What did you -- Susan, what did you
8  say?
9          MR. DeVORE:  Objection --
10          THE WITNESS:  They would call --
11          MR. DeVORE:  -- mischaracterizes
12  testimony.
13          THE WITNESS:  -- medical.
14          MR. DeVORE:  Objection.  Mischarac-
15  terizes her testimony.
16          MS. ERICKSON:  Okay.  You said that
17  three times.  Thank you.  Got it.
18          MR. DeVORE:  Okay.  I just want to
19  make sure it was clear for the record.
20          MS. ERICKSON:  Got it.
21  BY MS. ERICKSON:
22      Q.  Susan, do you need the question read
23  back?
24      A.  Yes, please.
25          MS. ERICKSON:  Okay.  Debbie, would

26 (Pages 98 - 101)

Page 102

1  you mind reading it back, please.
2          (The following question
3          was read back:
4          "Q.  So the correctional
5          officer would decide
6          whether an EMT or a nurse
7          should be called to
8          come?")
9      THE WITNESS:  The DOC would call
10  medical.
11  BY MS. ERICKSON:
12    Q.  When you say DOC, you're talking about
13  the correctional officers.  Right?
14    A.  Yes.  Would call medical and report
15  the --
16    Q.  Correct.
17    A.  -- concern.
18    Q.  So in a situation when an inmate has
19  an anaphylactic reaction to a bee sting, the
20  correctional officer would call medical to call
21  and help the inmate.  And what other -- and what
22  other medical situations would a correctional
23  officer call for an EMT or a nurse to come to the
24  bullpen?
25      MR. DeVORE:  Objection.  Calls for

Page 103

1  speculation.  Incomplete hypothetical.  Form.
2          You can go ahead and answer it, if
3  you know what she means.
4      THE WITNESS:  So --
5      MR. DeVORE:  And also calls for a
6  narrative.
7  BY MS. ERICKSON:
8    Q.  It's a simple question.  You can
9  answer it.
10    A.  What other type of a situation?  An
11  emergency situation or one that the DOC deems that
12  they felt that it was an emergency.  They could
13  call the medical for any reason, any question or
14  concern.
15    Q.  Okay.  So did you understand the
16  question that I asked?
17    A.  Perhaps maybe I didn't.  I thought I
18  answered it, the different reasons why they would
19  call.
20    Q.  Did you talk to Mr. DeVore during the
21  break?
22    A.  Who's Mr. DeVore?
23    Q.  Jason.  Did you talk to Jason during
24  the break?
25    A.  Briefly.

Page 104

1    Q.  Okay.  So besides an anaphylactic
2  reaction to a bee sting, in what other situations
3  are you familiar in which a correctional officer
4  calls for an EMT or nurse to come to the bullpen
5  to help an inmate with a medical situation?
6      MR. DeVORE:  Objection.  Form.  Calls
7  for a hypothetical.  Calls for a narrative.
8  Outside of -- disproportionate to the needs of
9  this case.
10      Go ahead.
11      THE WITNESS:  Perhaps a bad
12  laceration.
13      I have somebody at my door.  Can I
14  shoo them away?
15  BY MS. ERICKSON:
16    Q.  Sure.
17    A.  Okay.
18    Q.  Is it medical staff that visits you or
19  is that correctional officers?
20    A.  When?
21    Q.  Just now, the two interruptions you
22  had.  Who was knocking on your door?
23    A.  That was Department of Corrections.
24    Q.  What are they coming to see you for?
25    A.  I didn't ask him.

Page 105

1    Q.  Okay.
2    A.  I kindly just shooed them away.
3    Q.  Okay.  So if an inmate is -- I mean,
4  what are other situations you're familiar with
5  that medical would come to the bullpen to tend to
6  the patient?
7    A.  I don't work in that area.  It would
8  be just anything that the DOC would feel maybe
9  uncomfortable, they need to talk to medical.  They
10  could call them for any particular reason.
11  Vomiting.  You know, just I could go on with any
12  medical condition the DOC can call and ask them,
13  and then they could say, well, bring him over or
14  they're on their way to the bullpen.
15    Q.  But that's the custom and practice of
16  how it usually goes nowadays in --
17    A.  I don't work down there, so I don't
18  know.  But that's what you asked would be
19  situations that they could do that.
20    Q.  So what time frame are you talking
21  about that you're familiar with this?
22    A.  They can ask any time, they can call
23  medical with a question.
24    Q.  Has this been the custom and practice
25  at Cook County Department of Corrections since

27 (Pages 102 - 105)

Page 106

1  2015?
2      MR. DeVORE: Objection. Calls for
3  speculation. Outside the scope of her knowledge.
4      If you can answer, answer.
5      THE WITNESS: I don't know how -- what
6  their -- what the DOC's policy is and who does the
7  calling. I don't work down there. I don't know
8  the answer.
9  BY MS. ERICKSON:
10     Q.  Well, then how do you know that when
11 there's a bee sting or a bad laceration or when
12 the DOC feels uncomfortable they can call medical
13 and medical will either come or they can bring the
14 inmate to medical? How do you know that?
15     MR. DeVORE: Objection. Asked and
16 answered.
17     THE WITNESS: Because they can -- they
18 can always call medical. I guess I don't under-
19 stand. How do I -- there's no policy that I'm
20 aware of because I don't work down there.
21 BY MS. ERICKSON:
22     Q.  No. I just want to know --
23     A.  I don't work for the DOC.
24     Q.  I know. But you're involved with
25 medical. So I'm just trying to figure out how do

Page 107

1  you know this knowledge? Right? Is it something
2  -- has this been a custom and practice since
3  2015 that you're aware of where if someone is in
4  the bullpen and they have a medical need, a
5  correctional officer calls medical and medical
6  either sends someone down there or the
7  correctional officer takes the inmate to medical?
8      MR. DeVORE: Objection. Form. Asked
9  and answered. Calls for speculation. All in
10 part.
11     Go ahead.
12     THE WITNESS: As far as I am aware.
13 To the best of my knowledge, yes.
14 BY MS. ERICKSON:
15     Q.  Okay. So that's been the custom and
16 practice. Okay.
17     MR. DeVORE: Objection. Asked and
18 answered. Mischaracterizes testimony. She said
19 she doesn't work there. She says she doesn't know
20 what the custom and practice is of the DOC. Form.
21 BY MS. ERICKSON:
22     Q.  You just said yes. So that was yes to
23 my yes?
24     A.  To the best of my knowledge, yeah.
25     Q.  Okay.

Page 108

1      A.  I don't work for the DOC.
2      Q.  No. I know. You've said that.
3      A.  So I don't know what the policies are.
4      Q.  Mm-hmm. And then have you ever been
5  familiar with the situation where an inmate has
6  chest pain and they're in the bullpen and they
7  need as-needed nitroglycerin?
8      A.  Have I been involved in that
9  situation? No.
10     Q.  You haven't? You haven't reviewed any
11 grievances to that effect?
12     A.  Oh, you asked me if I was involved in
13 that situation. I don't know the location. I
14 don't recall the location. But there's been
15 grievances of nitroglycerin.
16     Q.  So if an inmate has chest pains and
17 they're in the bullpen and they're complaining,
18 "I have chest pains. I had a heart attack before.
19 These are prescribed medications," what should a
20 Cook County correctional officer do?
21     MR. DeVORE: Objection. Calls for --
22 incomplete hypothetical and form of question.
23 Unclear what you're asking. And it's also clearly
24 an incomplete hypothetical.
25     MS. ERICKSON: You said that already.

Page 109

1  Thanks. Got it.
2      MR. DeVORE: Yeah.
3      THE WITNESS: So what should the DOC
4  officer do? Call -- call his supervisor. Or I
5  don't know what their policy is, what the DOC
6  officer is supposed to do:
7  BY MS. ERICKSON:
8      Q.  Should they do something, though, if
9  an inmate is complaining of chest pains and
10 they've had a heart attack before?
11     A.  I don't know. How would the -- yeah.
12 I don't know how the DOC officer would know that
13 they had a heart attack before. But if he's
14 having chest pain, I would call -- I as a person
15 would call. But I don't know what DOC's policy
16 is. But they would call medical and get advice.
17     Q.  I mean --
18     A.  They can call a nurse. They could
19 call urgent care. They would call medical to
20 get -- to be advised or their supervisor to get
21 advised.
22     Q.  So they would call medical or they
23 should call medical? Which --
24     MR. DeVORE: Objection. Mischarac-
25 terizes her testimony.

28 (Pages 106 - 109)

Page 110

1 THE WITNESS: Or their supervisor or
2 whatever their policy tells them to do.
3 BY MS. ERICKSON:
4 Q. So they should call medical or they
5 would call medical?
6 A. Whatever their policy tells them to
7 do.
8 Q. Well, from what you just said, there
9 is no policy. And you testified that -- and/or
10 you don't know the policy. But you testified --
11 A. Right. I don't know the policy. I
12 didn't say there wasn't one. Because I don't work
13 for DOC, so I don't know what their policy would
14 be if --
15 Q. Okay. But, based on your knowledge,
16 what you know is that correctional officers
17 can/would generally call medical when there's a
18 medical situation in the bullpen. So why does a
19 chest pain not qualify as a medical concern that
20 necessitates a call to medical?
21 MR. DeVORE: Objection. Mischarac-
22 terizes her testimony again.
23 THE WITNESS: Who said that it wasn't?
24 BY MS. ERICKSON:
25 Q. So it is. Right?

Page 111

1 A. Is chest pain a medical concern? Yes.
2 Q. Is it a -- is it a medical concern for
3 another heart attack?
4 MR. DeVORE: Objection. Incomplete
5 hypothetical. Calls for speculation. Form of
6 question.
7 THE WITNESS: I would not know that
8 they were having a -- that they were -- that chest
9 pain would necessarily be a heart attack. It
10 could be angina.
11 BY MS. ERICKSON:
12 Q. Doesn't angina just mean chest pain?
13 A. Well, it's chest pain, yes.
14 Necessarily a heart attack? No.
15 Q. Are you a registered nurse?
16 A. Yes.
17 Q. You're still a registered nurse today?
18 A. Yes.
19 Q. Were you a registered nurse from 2015
20 to 2017?
21 A. Yes.
22 Q. Okay. And so is chest pain considered
23 a sign or a symptom of a heart attack?
24 A. Yes.
25 Q. Okay. And if -- if an inmate is

Page 112

1 having a sign or a symptom of a heart attack, in
2 your medical opinion would that patient need
3 medicine if there's a prescription for that?
4 MR. DeVORE: Objection. Calls for
5 speculation. Incomplete hypothetical. Form.
6 THE WITNESS: He would need medical
7 care.
8 BY MS. ERICKSON:
9 Q. Are you done answering? I'm sorry.
10 A. Yeah, I wouldn't know all of the
11 history of the patient. It's a vague question.
12 Would he need medicine? I don't know what
13 medicine would I give him. It would depend on his
14 orders. I don't know the answer to your question.
15 Q. Okay. So if the inmate has a
16 prescription and an order for nitroglycerin PRN,
17 as needed, and he complains about chest pain, is
18 the inmate supposed to get the nitroglycerin for
19 that chest pain?
20 A. If he has an order for it, yes.
21 Q. And in the order if it says PRN, how
22 soon after he has chest pain does he need to get
23 the medication?
24 A. I don't have a number for that. As --
25 as soon as he possibly can get it.

Page 113

1 Q. So if an inmate is in the bullpen, he
2 complains he has chest pain and he has a
3 prescription for nitroglycerin, he should get the
4 medication as soon as possible. Right?
5 A. As soon as he possibly can get the
6 medication.
7 Q. Yes?
8 A. The PRN. PRN, yes.
9 Q. So why doesn't that happen at Cook
10 County?
11 MR. DeVORE: Objection. Foundation.
12 Assumes facts not in evidence. Argumentative.
13 BY MS. ERICKSON:
14 Q. Are you familiar with patients who are
15 prescribed nitroglycerin at Cook County?
16 A. Do I know them, their names and stuff?
17 No.
18 Q. Are you familiar with the fact that
19 there are patients at Cook County who are
20 prescribed nitroglycerin?
21 A. Yes.
22 Q. And what are they prescribed
23 nitroglycerin for?
24 A. For chest pain, angina.
25 Q. Are any inmates at Cook County allowed

29 (Pages 110 - 113)

Page 114

1 to keep nitroglycerin on them as a KOP?
2    A.   If the provider has ordered it that
3 way.
4    Q.   So does that occur where sometimes the
5 physician will order a nitroglycerin KOP?
6    A.   If the doctor has ordered it KOP, then
7 he can have, you know.
8    Q.   Are you familiar with medical records
9 and orders of inmates at Cook County where they
10 have an order for KOP nitroglycerin?
11    A.   I do not know of any detainees' names
12 that has that -- that order.
13    Q.   Not the names.  Are you familiar with
14 the fact that inmates at Cook County are given a
15 prescription for nitroglycerin and they're allowed
16 to keep it on their person?
17    A.   Am I aware of any that -- like a whole
18 bottle of nitroglycerin?  I'm -- no, I'm not
19 aware.
20    Q.   No.  I didn't say a whole bottle.  Are
21 they allowed to keep nitroglycerin on their person
22 at all?  Is any inmate allowed to do that?
23        MR. DeVORE:  Objection.  Form.  It's
24 confusing.
25        THE WITNESS:  I don't know the answer

Page 115

1 to that question.  I don't know if there's --
2 BY MS. ERICKSON:
3    Q.   Do you --
4    A.   -- anybody with that order.
5    Q.   If an inmate has -- if one of the
6 grievances you review has an issue with
7 nitroglycerin, will you look up that inmate's
8 medical records to see what the order was for the
9 nitroglycerin?
10    A.   If I had a grievance?  Yes.
11    Q.   That's your custom and practice?
12    A.   Yes.
13    Q.   Okay.  So then if you look up the
14 inmate had an order for nitroglycerin and -- have
15 you seen KOP next to the nitroglycerin order?
16    A.   I don't recall.  I just don't recall.
17 I suppose that it could be.  I just don't recall.
18    Q.   Why would inmates not be allowed to
19 carry nitroglycerin on their person?
20    A.   Because it's for their safety and the
21 safety of others.  Also, you don't want somebody
22 just taking nitroglycerin and not letting anybody
23 know that they're having chest pain, just taking
24 it.
25    Q.   But how do you know that a patient --

Page 116

1 that an inmate wouldn't tell a medical provider,
2 "I've been having chest pain and I took a pill
3 before I saw you today"?
4    A.   They should -- if they're having chest
5 pain and they are taking nitroglycerin and they're
6 not getting any relief from the nitroglycerin,
7 they shouldn't be waiting for a provider's
8 appointment.
9    Q.   I don't understand what you're talking
10 about.  I didn't ask you about that.  What does
11 that mean?
12    A.   Well, you said if they -- would they
13 tell when they went to see the provider, would
14 they tell them, "Yeah, I had chest pain."  I would
15 think that they would tell -- let a nurse know,
16 "I'm having --
17    Q.   Oh, yes, that's what I mean.  Let's
18 say, is it possible that an inmate would have
19 nitroglycerin KOP and if they needed to take the
20 medication before med pass they could take the
21 medication and then let the nurse know, "I had
22 chest pain two hours ago, and I took a nitro"?  Is
23 that a possible situation?
24    A.   They could do that.
25    Q.   Is it possible --

Page 117

1    A.   They could do that.
2    Q.   Okay.  So then why can't that --
3    A.   Would you do it that way?  I wouldn't.
4    Q.   Why?
5    A.   Because you should let medical know if
6 you're having chest pain.
7    Q.   But that would be letting medical
8 know.
9    A.   Why would he wait -- why would he wait
10 two hours?  I don't understand your question, your
11 line of questioning, why he would wait --
12    Q.   Well, what other opportunity would he
13 have to talk to medical?  I mean, I assume if he
14 had medical right there he could say, "I have
15 chest pains."
16        MR. DeVORE:  Is that a question?
17 BY MS. ERICKSON:
18    Q.   But is medical always present in the
19 living units?
20        MR. DeVORE:  Objection.  Asked and
21 answered.
22        THE WITNESS:  DOC is there, and they
23 would call medical.
24 BY MS. ERICKSON:
25    Q.   Okay.  Okay.  So going back to the

30 (Pages 114 - 117)

Page 118

1 nitroglycerin, you're not familiar with any
2 patients who are given nitroglycerin KOP?
3          MR. DeVORE: Objection. Mischarac-
4 terizes her testimony. Asked and answered four
5 minutes ago.
6 BY MS. ERICKSON:
7     Q.   Right?
8     A.   I don't -- I don't recall any order.
9     Q.   Okay.
10    A.   I just don't recall.
11    Q.   Are there any medications that are
12 given KOP and actually given as KOP at Cook
13 County?
14    A.   Yes.
15    Q.   Which ones?
16    A.   Which ones medicines?
17    Q.   Yes.
18    A.   There's a lot of different medications
19 that are given.
20    Q.   Which ones? Which medications?
21          MR. DeVORE: Objection. Calls for a
22 narrative.
23          MS. ERICKSON: It doesn't call for a
24 narrative. Specifically they --
25          MR. DeVORE: It also seeks information

Page 119

1 outside the needs -- seeks information
2 disproportionate to the needs of this case. It
3 has nothing to do with this case whatsoever.
4          MS. ERICKSON: It's the whole issue in
5 the case.
6 BY MS. ERICKSON:
7     Q.   So, Ms. -- Susan, can you answer the
8 question? Do you need it read back?
9     A.   Okay. No. You want to know
10 medications that would be -- could be written as
11 KOP medications?
12    Q.   Not could be written. Which ones are
13 given in Cook County as KOP medications.
14    A.   You want a list of all the medications
15 that are given KOP?
16    Q.   If you can give me five, that would be
17 a good start. Can you give me five?
18          MR. DeVORE: Objection. It calls for
19 speculation. And also --
20 BY MS. ERICKSON:
21    Q.   She's a registered -- you're a
22 registered nurse. Right?
23    A.   Yes.
24    Q.   Okay. So do you know which
25 medications are given KOP?

Page 120

1     A.   Not -- amoxicillin.
2     Q.   Amoxicillin?
3     A.   Could be. Not always but could be.
4 It would depend on the -- depend on the detainee.
5 Tylenol. What would be another one? Keflex.
6     Q.   What's that for?
7     A.   It's an antibiotic. Oh, what would be
8 a good -- hydrochlorothiazide.
9     Q.   What's that used for?
10    A.   Blood pressure.
11         How much does that give me?
12    Q.   You're doing good. If you know of any
13 more. That was four.
14    A.   Oh, there's thousands of meds. Is
15 that what you want? Calcium.
16         MR. DeVORE: Same objections.
17 BY MS. ERICKSON:
18    Q.   Yeah. Go ahead.
19         MR. DeVORE: Same objections.
20 BY MS. ERICKSON:
21    Q.   Calcium? Is Advil? Is Advil given
22 KOP?
23    A.   Can be.
24    Q.   Is albuterol?
25    A.   Can be.

Page 121

1     Q.   Are any mental health medications --
2 strike that.
3         Are any antidepressants or
4 anti-anxiety medications given KOP?
5     A.   No.
6     Q.   Why not?
7     A.   Safety of self and others.
8     Q.   Because why?
9     A.   Well, because they could take too many
10 or because they do have mental health issues or
11 they could leave them where somebody else could
12 take them. And that would be a danger to others
13 because it's not always when they have mental
14 health issues are they responsible.
15    Q.   Okay.
16    A.   So for safety of self and others.
17    Q.   Does Cermak administer pain
18 medications like oxy or any other narcotics?
19    A.   They can.
20    Q.   Okay. And I take it those are not
21 KOP. Right?
22    A.   No.
23    Q.   Is it possible that an inmate could
24 take too many Advil and it would harm their
25 safety?

31 (Pages 118 - 121)

Page 122

1        MR. DeVORE: Objection. Objection.
2  Calls for information outside the scope of this --
3  disproportionate to the needs of this case.
4        Go ahead.
5        THE WITNESS: Could someone take too
6  much Advil? Yes.
7  BY MS. ERICKSON:
8     Q.   And overdose?
9     A.   I suppose, yes.
10    Q.   Could someone take too much Tylenol
11 and overdose?
12    A.   Yes.
13    Q.   Okay. Could an inmate take too much,
14 I don't know how you say it, hydrochlorothiazide
15 and overdose?
16       MR. DeVORE: Objection. Incomplete
17 hypothetical. Calls for speculation. Form.
18       THE WITNESS: Yes.
19 BY MS. ERICKSON:
20    Q.   Okay. But yet all of those
21 medications are given KOP. Right?
22    A.   Depending on the situation, yes.
23    Q.   And so then what is the difference
24 between those medications that are given KOP and
25 nitroglycerin?

Page 123

1        MR. DeVORE: Objection. Calls for
2  medical testimony. She already testified she's
3  not a provider, nor does she work as a
4  manufacturer.
5        But you can answer, if you can.
6        THE WITNESS: It would be the provider
7  that would -- would write that order.
8  BY MS. ERICKSON:
9     Q.   I don't understand. Earlier --
10    A.   The provider would write the order.
11    Q.   No. I didn't ask about who writes the
12 order. Earlier you testified that nitroglycerin
13 may not be given as KOP due to the safety of the
14 inmate and other people. So what is the -- what
15 does that mean in this context? What are you
16 saying?
17    A.   Geez, I don't remember saying that.
18 They can't have it KOP because he needs it -- if
19 he's having chest pain, the person would need to
20 notify DOC or nursing, have the DOC notify
21 nursing, let them know they're having chest pain.
22    Q.   But why, though? I mean, if there's
23 thousands of medications that are actually
24 administered KOP, why can't nitroglycerin be given
25 KOP? What's the difference?

Page 124

1     A.   It's a different medication.
2     Q.   Does it -- does it -- I mean, can
3  people -- is it custom and practice within Cook
4  County that patients are taking nitroglycerin and
5  getting high off of it?
6     A.   That I wouldn't have no knowledge of
7  that.
8     Q.   Oh. Well, then what's the issue with
9  the safety of the inmates and others?
10       MR. DeVORE: Objection. Asked and
11 answered. She just testified to this.
12       THE WITNESS: Because if it -- if a
13 detainee is taking nitroglycerin, then he needs to
14 notify medical --
15 BY MS. ERICKSON:
16    Q.   What's the issue --
17    A.   -- or notify the DOC so that they can
18 notify medical. It's just a --
19    Q.   But what's the issue in safety for
20 that inmate that they can't have the nitro on
21 them?
22       MR. DeVORE: Objection to form.
23 Unclear if you're talking about this case or just
24 any inmate or detainee.
25       You can answer, to the extent you

Page 125

1  can, in terms of general or specific detainees.
2        MS. ERICKSON: Okay. Stop. You can
3  stop coaching her.
4  BY MS. ERICKSON:
5     Q.   You can answer the question, if you do
6  understand it.
7     A.   Could you repeat --
8        MS. ERICKSON: Sure. Debbie, would
9  you mind asking the question, again.
10       (The following question
11            was read back:
12        "Q. But what's the issue
13          in safety for that inmate
14          that they can't have the
15          nitro on them?")
16       THE WITNESS: So that they can -- when
17 they have chest pain they can report it to the
18 nurse.
19 BY MS. ERICKSON:
20    Q.   But there's not a nurse. When an
21 inmate is in the living unit, is there a nurse --
22    A.   Access to medical -- access to medical
23 through the Department of Corrections.
24    Q.   Was -- that wasn't a full sentence.
25 What do you mean?

32 (Pages 122 - 125)

Page 126

1     A.   They would notify --
2         MR. DeVORE:  You cut her off.  That's
3   why it wasn't a full sentence.
4         THE WITNESS:  You would notify -- they
5   would notify the Department of Corrections, an
6   officer, who would notify medical.
7   BY MS. ERICKSON:
8     Q.   But earlier --
9     A.   If there was no medical there.
10    Q.   Sorry.  Are you done?
11    A.   I'm done.
12    Q.   Okay.  But earlier you testified that
13  if an inmate is prescribed nitroglycerin and
14  they're experiencing chest pains they should take
15  the medication as soon as he possibly can.  Right?
16    A.   As soon as it's possible.
17    Q.   So it would be faster to have the
18  medication on the person than to have to have the
19  correctional officer call someone in medical and
20  have that person come over and actually give the
21  medication.  Right?
22    A.   It would be sooner.  Would it be
23  safer?  I don't -- yeah, I don't know where we're
24  going.  But he would get it sooner.
25    Q.   Okay.  And are you familiar with

Page 127

1   any --
2     A.   If he did have it on his person, he
3   would get it sooner.
4     Q.   Are you familiar with any situations
5   that have occurred since 2015 where an inmate has
6   overdosed on nitroglycerin?
7     A.   Not to my knowledge.
8     Q.   Did you ever work in the dispensary at
9   Cook County Department of Corrections?
10    A.   No.
11    Q.   How does -- how do the correctional
12  officers from the living units contact medical?
13    A.   By phone.
14    Q.   Not radio?
15    A.   Or they could use a radio.
16    Q.   In your time reviewing grievances
17  since 2015, has there ever been a time where there
18  was no one in the dispensary when the correctional
19  officer from the living unit called the
20  dispensary?
21    A.   I would have no knowledge of that.
22    Q.   Are you familiar with the lawsuit
23  where 559 females, including nurses, correctional
24  officers, and LPNs, filed a sexual harassment suit
25  against Cook County and Cook County Sheriff's

Page 128

1   Office for sexual harassment?
2     A.   Do I have any knowledge of it?  No.
3     Q.   Do you know --
4     A.   I'm not familiar with it.
5     Q.   You've never heard about it?
6     A.   I've heard that there was one.  But I
7   don't know any details, how many.  You said 550?
8   I don't know anything about that, any details of
9   it.
10    Q.   Have you ever gone to the living units
11  at any point?
12    A.   Dispensaries and RTU, you know,
13  because it's right there.  But to go to -- I've
14  taken a tour.  But to go to the living units, I
15  haven't been, no.  No.
16    Q.   So you --
17    A.   Not in a while.  Just on a tour.
18    Q.   When did you go on a tour?
19    A.   When I first started.
20    Q.   In 2012?
21    A.   Yes.
22    Q.   Did the inmates make sexually lewd
23  comments to you?
24    A.   No.
25    Q.   Have you --

Page 129

1     A.   No.
2     Q.   -- heard -- have you heard that nurses
3   do not want to go to the living units because
4   inmates are making sexually offensive and lewd
5   comments towards them?
6     A.   No, I haven't heard that.
7     Q.   That's not something that's discussed
8   within management?
9     A.   Not to my knowledge.  Not that I'm
10  aware of.
11    Q.   Are you considered a manager as a
12  clinical performance improvement analyst?
13    A.   The manager?  No, I'm not a manager.
14    Q.   Do you supervise anyone?
15    A.   No.
16    Q.   Have you ever supervised anyone since
17  you've worked at Cook County?
18    A.   No.
19    Q.   Who is your boss?
20    A.   Right now my boss is Irene.  Oh, gosh,
21  I'm bad with names, so I don't recall her last
22  name.
23    Q.   You can look it up.  We'll wait.
24    A.   All right.  I'll get into her -- I'll
25  get into my e-mail.  Marks.

33 (Pages 126 - 129)

Page 130

1    Q.   How do you spell that?
2    A.   M-a-r-k-s.
3    Q.   What is her title?
4    A.   I don't know her title. CQI director.
5  CQI director. I don't know exactly what title
6  they gave her. But she's the -- she's over me.
7  CQI manager, director. I don't -- I don't -- I
8  would think it's CQI director. I don't know
9  exactly what it is.
10    Q.   What does it say after -- when she
11  sends you an e-mail, what does it say after her
12  name?
13    A.   Well, let me look it up. Okay. Give
14  me a minute. I got to keep looking.
15        MR. DeVORE: If you don't know, you
16  don't need to do the research.
17        THE WITNESS: You know, I'm not
18  finding it. I'm just finding a response. I don't
19  know what her title is.
20  BY MS. ERICKSON:
21    Q.   So from 2015 through '17 you didn't
22  supervise any nurses or LPNs?
23        MR. DeVORE: Objection. Asked and
24  answered.
25        THE WITNESS: That's correct.

Page 131

1  BY MS. ERICKSON:
2    Q.   Okay. And you didn't supervise any
3  CRWs?
4        MR. DeVORE: Same objection. She just
5  answered it.
6  BY MS. ERICKSON:
7    Q.   Do you know who supervises the nurses
8  and LPNs?
9    A.   The director of nursing and the
10  manager -- and the managers.
11    Q.   What's the name of the director of
12  nursing?
13    A.   I don't -- I don't recall her name.
14    Q.   Is there more than one?
15    A.   Just the one that I know of. I think,
16  yeah, just one director of nursing.
17    Q.   Okay. Who supervises the CRWs?
18    A.   That's DOC.
19    Q.   Who in DOC?
20    A.   Who is their direct manager? I don't
21  know. You would have to ask somebody in the DOC.
22    Q.   What is the name of the title -- what
23  is the title of the person who oversees the CRWs?
24    A.   I don't know. I don't know the answer
25  to that question.

Page 132

1    Q.   How often do you meet with
2  Irene Marks?
3    A.   At least weekly.
4    Q.   For what purpose?
5    A.   Weekly meeting.
6    Q.   Who's in the meeting?
7    A.   Irene, Doris, me, and -- my mind went
8  blank -- Angela.
9    Q.   And Doris and Angela, are they from
10  Cermak or Cook County?
11    A.   Cermak.
12    Q.   Does anyone from Cook County attend
13  your weekly meetings with Irene?
14    A.   No.
15    Q.   Do you ever have any meetings with
16  anyone working in the Cook County side?
17    A.   Yes.
18    Q.   When do you have those?
19    A.   Usually weekly.
20    Q.   What day of the week do you meet with
21  Irene?
22    A.   It can vary. Tuesday. Wednesday. It
23  varies.
24    Q.   Was Irene your boss in 2015 to '17?
25    A.   No.

Page 133

1    Q.   Who was your boss then?
2    A.   Linda Follenweider.
3    Q.   How do you spell her last name?
4    A.   I don't know. I could guess, but I
5  don't -- I don't know how to spell that last name.
6    Q.   Okay. Can you say it again? Because
7  I'll get asked and I don't know.
8    A.   Follenweider. It's Follenweider.
9    Q.   Like F-o-l-d-e-n-w-e-i-d-e-r [sic],
10  something like that?
11    A.   Could be.
12    Q.   Okay.
13    A.   Could be.
14    Q.   So she was your supervisor from 2015
15  to 2017?
16    A.   Yes.
17    Q.   What was her title?
18    A.   CQI director.
19    Q.   Okay.
20    A.   I would suppose. I'm not certain.
21    Q.   So she had the same role as
22  Irene Marks but in an earlier time?
23    A.   Correct.
24    Q.   Okay. And when Linda Follenweider
25  stopped being your boss, did Irene Marks start to

34 (Pages 130 - 133)

Page 134

1  become your supervisor?
2     A.   No.
3     Q.   Who was your supervisor after Linda?
4     A.   Kelly.
5     Q.   What's Kelly's last name?
6     A.   I don't recall.
7     Q.   How long was Linda your supervisor?
8     A.   For CQI?  Oh, I don't recall exactly
9  the length of time.  Two years perhaps.
10    Q.   But she was your supervisor from 2015
11 to 2017?
12    A.   Yes.
13    Q.   And how long was Kelly your super-
14 visor?
15    A.   You know, Kelly was not -- I'm sorry,
16 Kelly was not my supervisor.  She was the CQI
17 director.  But Linda continued on as my super-
18 visor.  That was an error on my part.  She was
19 CQI director.  But Linda maintained being my
20 supervisor.
21    Q.   Okay.  So Kelly came in and was CQI
22 director.  And then what did Linda's role change
23 to?
24    A.   She was the COO.
25    Q.   COO of Cermak?

Page 135

1     A.   Correct.
2     Q.   And then at some point did Kelly leave
3  Cermak?
4     A.   That's correct.
5     Q.   And at that point did Irene become
6  your supervisor?
7     A.   No.
8     Q.   Who was your supervisor then?
9     A.   It still was Linda.  Kelly was not --
10 I had made an error.  Kelly was not my supervisor.
11 She was the CQI director, but she didn't take over
12 as my supervisor.  It stayed Linda.
13    Q.   Oh, I'm sorry if I misspoke.
14    A.   That's okay.
15    Q.   So at some point Linda was not your
16 supervisor anymore.  Right?  Is she --
17    A.   No.
18    Q.   Is she still your supervisor?
19    A.   She isn't, no.
20    Q.   Okay.
21    A.   No, she's not.
22    Q.   And then at some point you got a new
23 supervisor, right, after Linda?
24    A.   Yes.  For a short term, it was -- you
25 know, I can't remember his name.  I don't recall

Page 136

1  his name.
2     Q.   Why did --
3     A.   Why don't I recall his name?  Because
4  I'm bad with names.
5     Q.   Oh, no, that's -- I didn't know you
6  didn't finish.  That wasn't my question.
7     A.   Okay.
8     Q.   Why did Linda leave?
9     A.   She resigned.
10    Q.   Do you know why?
11    A.   No.
12    Q.   And in 2017 a man became your super-
13 visor?
14    A.   No.  Linda had remained my supervisor
15 until the middle of 2020.
16    Q.   All right.  Thank you for that.  And
17 in the middle of 2020 this man became your super-
18 visor?
19    A.   Yes.  For a short time.  And I don't
20 recall his name.
21    Q.   And how long was he your supervisor?
22         MR. DeVORE:  You said a short time.
23         THE WITNESS:  I don't recall the
24 length of time.
25            / / /

Page 137

1  BY MS. ERICKSON:
2     Q.   Okay.  And then when did Irene become
3  your supervisor?
4     A.   In '21, middle of '21, late May-ish of
5  '21.
6     Q.   All right.  And so you met -- it
7  sounds -- so when Linda was your supervisor from
8  2015 to 2020, did you have weekly meetings with
9  her?
10    A.   I don't know that they were weekly,
11 but we had -- we had meetings.
12    Q.   How often did you have meetings with
13 Linda?
14    A.   I don't recall.  Nothing that was
15 scheduled.
16    Q.   Were they monthly meetings with Linda?
17    A.   No.  They weren't scheduled.
18    Q.   Okay.  When you met with Linda from
19 2015 to 2020, was it a group of people that met
20 with her or was it just you individually?
21    A.   Sometimes it was just me individually.
22 Sometimes me and Kelly.
23    Q.   Why did Kelly start working on the
24 team when Linda had been the CQI director?
25    A.   'Cuz Linda took a promotion.

35 (Pages 134 - 137)

Page 138

1    Q.   Well, from -- I don't understand.
2  From 2017 to 2020 Linda was above Kelly?
3    A.   Correct.
4    Q.   Ah, okay.  What was -- what was
5  Linda's position from --
6    A.   COO.  COO.
7    Q.   And from 2015 to 2017 did you have
8  regular meetings with anyone from Cook County?
9    A.   Nothing that was scheduled or regular.
10   Q.   Well, I'm sorry, what's that?
11   A.   Did I have meetings with -- yes.
12  Nothing that I recall.  Sometimes they were
13  monthly.  Sometimes -- they were varied.
14   Q.   And what types of situations between
15  2015 and 2017 did you meet with Cook County
16  Department of Corrections staff?
17   A.   Situations?  Just for a meeting.
18   Q.   So those were scheduled meetings?
19   A.   Not scheduled.  Just meet to review.
20  Not review the grievances, but returns or
21  something like that, returns and smoothing out
22  processes of, like, the transfer forms.  Nothing
23  per se regarding a grievance.  Just -- that's it.
24   Q.   Okay.  So from 2015 to 2017 you met
25  with Cook County staff for unscheduled meetings,

Page 139

1  and the purpose was to review returns and
2  smoothing out processes?
3    A.   Grievance receipt and returns, when
4  they bring grievances to me and then I return them
5  to them, to make sure that the process is smooth.
6  Anything that we can do to improve things.  This
7  was pretty much what the meetings were about.
8    Q.   Are you the only one from Cermak --
9  strike that.
10       From 2015 to 2017, were you the
11  only person from Cermak that was reviewing
12  grievances?
13   A.   As in receipt of?  No.  Because
14  there's other people that look at the grievances.
15   Q.   From Cermak?
16   A.   Correct.
17   Q.   Who are they?
18   A.   Mental health, dental, and then
19  nursing.  I would review some with the provider on
20  an as-needed basis.  I wouldn't necessarily give
21  them grievances, but we would discuss them.  I
22  would bring them and discuss them.
23   Q.   So what -- I don't -- I don't fully
24  understand the process with grievances.  So when
25  an inmate has a grievance, they're supposed to

Page 140

1  fill out a specific form.  Right?
2    A.   That's correct.
3    Q.   And what does a -- what is an inmate
4  supposed to do with the form after they fill it
5  out?
6    A.   Okay.  So they complete the form and
7  then it goes to DOC.  Now, if there's a box or
8  they hand it to them and they put it underneath,
9  that I don't know, that's the DOC process.
10       And, from there, the CRW or
11  supervisor would look at the grievances.  They
12  code them according to what type of a grievance
13  that it would be.  And then they also assign it
14  with a control number.  And they also decide if
15  it's a grievance or an emergency grievance.
16       And so then they would -- a clerk
17  or a CRW, somebody puts it in the system.  I'm not
18  a part of that, so I'm not sure where in that
19  process they do that.  They would put it -- list
20  it by the control number.  They would list it on
21  like a transfer sheet.  It's kind of like a chain
22  of custody.
23       We would also do the same thing
24  with grievances that were completed.  They would
25  be listed on a transfer sheet by control number.

Page 141

1       So then when the CRW would -- or
2  whoever would bring the grievance to my office,
3  the grievances for that day to my office, then we
4  would swap out and we would check to make sure
5  that the grievances that they are giving us are
6  actually the grievances listed on the transfer
7  form by the control number.
8       DOC would -- or whoever was working
9  for DOC, the clerk, would also do the same thing
10  with the ones that they are receiving from us that
11  are completed.
12       And so when that process is done,
13  then we take those grievances that -- that are new
14  that I've just received and we date stamp them
15  right away.
16       So then I take those -- I would
17  give some to dental, whichever ones belonged to
18  dental, and mental health, and then the rest would
19  be put in by -- paper clipped or rubber banded
20  together and dated when they would be due.  And
21  that's how I do grievances is by date due.
22       MR. DeVORE: It's about 12:30.  Are
23  you done with your answer?
24       THE WITNESS: I am.
25       MR. DeVORE: Okay.  It's about 12:30.

36 (Pages 138 - 141)

Page 142

1  We've been going about three and a half hours. It
2  might be a good place to take a break.
3        MR. COYNE: That's fine. You know,
4  before we break -- this is John Coyne -- I just
5  wanted to mention I did send an e-mail yesterday
6  morning informing the parties that -- and
7  plaintiff's counsel that I have a 2 o'clock
8  conference call and mandatory call scheduled by a
9  federal court judge that I do need to participate
10 in, and I do need to break in the event the
11 deposition is still going. And Kirstin was kind
12 enough to respond on that, stating no objection,
13 we would just have to go off the record so I could
14 attend that call. I do not know -- and, again,
15 this is for the record, I do not know specifically
16 how long that call will take, but I will inform
17 the Court when I have the opportunity that this
18 deposition is ongoing. So I just wanted to state
19 that for the record so everybody is on the same
20 page.
21       MS. ERICKSON: Yep. Thanks, John.
22       MR. DeVORE: We obviously have no
23 issue with that.
24       MR. COYNE: Yeah. I appreciate it.
25 Thank you. How long are we breaking for?

Page 143

1        MS. ERICKSON: I don't know.
2        Jason, what do you want?
3  MR. DeVORE: Maybe 30 minutes.
4        MR. COYNE: That's fine, whatever you
5  guys like.
6        MS. ERICKSON: That's going to push
7  our dep back and we're going to keep going.
8        MR. DeVORE: Well, that's fine. You
9  know people need to eat, right? We want a witness
10 that's -- you know, is fully nourished. Right?
11       MS. ERICKSON: All right. Well, I'm
12 just saying for the record it's seven hours, so
13 we'll just keep going then. All right. See you
14 at 1:00 then.
15       MR. COYNE: At 1:00. Thanks.
16       MR. DeVORE: Thanks.
17            (A break was taken from
18             12:29 p.m. until
19              1:02 p.m.)
20       MS. ERICKSON: We're back on the
21 record.
22 BY MS. ERICKSON:
23    Q.    I want to go back to the medications
24 we were talking about before, the KOP medications.
25    A.    Yes.

Page 144

1     Q.    Is albuterol given KOP?
2     A.    Yes.
3     Q.    Is it possible to overdose on
4  albuterol?
5     A.    Yes.
6     Q.    Are correctional officers trained on
7  what is considered a medical emergency?
8     A.    That I wouldn't -- wouldn't have any
9  knowledge of that. That would be DOC.
10    Q.    Were you trained to handle emergencies
11 at Cook County Department of Corrections?
12    A.    I don't understand. I don't work in
13 the emergency department, and I don't work as a
14 floor nurse or work in the dispensary. But I'm a
15 nurse.
16    Q.    Right. No. Were you trained --
17    A.    But I haven't worked -- by here? No.
18 No.
19    Q.    Okay. Do you know how a correctional
20 officer calls 9-1-1 from the living unit?
21    A.    No.
22    Q.    No, you don't know?
23    A.    No, I don't.
24    Q.    What do you consider a medical
25 emergency?

Page 145

1     A.    What do I consider a medical
2  emergency?
3     Q.    Yeah.
4     A.    Anything that requires a -- that's
5  such -- what do I consider a medical emergency?
6  Unconsciousness. Do you want a -- like I said
7  earlier, a bee sting if there's a reaction could
8  be. Bad laceration. GI bleed.
9     Q.    GI bleed.
10    A.    Is that enough?
11    Q.    Yeah.
12    A.    Okay.
13    Q.    And then are chest pains considered a
14 medical emergency in your opinion?
15    A.    It depends upon the assessment what
16 is, you know, the chest pain. There's different
17 reasons for chest pains.
18    Q.    If at the outset someone has chest
19 pain, is that report of chest pain considered an
20 emergent situation?
21       MR. DeVORE: Objection. Foundation.
22 Unclear.
23 BY MS. ERICKSON:
24    Q.    You can answer.
25    A.    It can be. It depends on the cause or

37 (Pages 142 - 145)

Page 146

1 the -- yeah.
2    Q.   As someone -- as someone that reviews
3 the grievance forms, do you believe that
4 correctional officers should be trained in
5 evaluating whether a situation is an emergency or
6 a nonemergency?
7    A.   That wouldn't be my role to make that
8 determination.  If they should be trained,
9 medically trained?  That wouldn't be in my role to
10 even make that decision.
11    Q.   Is part of your job as an auditor --
12 as an auditor -- strike that.
13         Is part of your job reviewing
14 grievances to try and make the situation better
15 for the inmate that's filed the grievance?
16    A.   Yes.
17    Q.   So -- okay.  So if there's a grievance
18 -- have you come upon situations where it seemed
19 as if correctional officers are not trained
20 medically?
21    A.   They're not trained -- they're not --
22 they don't -- they're not trained -- I don't know
23 what the DOC is regarding their policies and
24 training for the DOC officers.  I'm not involved
25 in that part of it.  I'm not -- I don't work for

Page 147

1 the DOC.  So that would be their determination.
2    Q.   In 2015 to 2017 was nitroglycerin
3 allowed to be on the medical cart?
4    A.   I don't have knowledge of that.  I
5 don't recall.  I don't recall if it was freely on
6 the medical cart.  I don't recall.
7    Q.   Are as-needed medications on the med
8 cart?
9         MR. DeVORE:  Objection to form as to
10 what's an as-needed medication.
11 BY MS. ERICKSON:
12    Q.   You can answer.
13    A.   Medications, the pharmacy loads the
14 med cart.  And then a nurse would take the cart
15 out with, I would assume, that.  I can only
16 assume.  I don't know the answer to that question.
17    Q.   And what do you assume?
18    A.   That the -- that PRN medications are
19 on the cart.
20    Q.   In your time working at Cook County
21 and Cermak, have you ever experienced a time where
22 there's been a shortage of a certain kind of
23 medication?
24    A.   There was.  But I don't recall what it
25 was.  But I don't think it affected us.  It was

Page 148

1 just kind of like a memo.  And it was kind of
2 nationwide.  I don't recall the name of the
3 medication.  I just remember that there was
4 something.  But it was nationwide.  It wasn't
5 particularly Cermak.
6    Q.   When was that?
7    A.   I don't recall.  But it's been since
8 I've worked here.
9    Q.   And that was a memo that was sent out
10 to all the nurses?
11    A.   It was on the news.  It was on the
12 news.  I don't remember the name of the
13 medication.  I probably will on my way home or
14 2 o'clock in the morning, but right now I don't
15 recall what it was.  But it was just a medication.
16    Q.   Right.  I'm not talking about
17 nationwide shortages.  Was there a shortage within
18 Cermak at some point?
19    A.   That I don't recall.  Particularly
20 Cermak I don't recall, a particular Cermak
21 medication shortage.
22    Q.   I'm going to share my screen here.
23 Let me know if you see this document.  One second.
24 Can you see this, Susan?
25    A.   No.  Okay.  I can now.

Page 149

1    Q.   All right.  I'm going to make it
2 smaller.  I'm marking this as Exhibit A.  It's
3 Interagency Directive number 64.5.45.0, and the
4 subject is medication administration and
5 distribution.
6         (Shebel Deposition
7          Exhibit A was marked.)
8 BY MS. ERICKSON:
9    Q.   On the top right do you see the
10 effective date, Susan?
11    A.   I do.  May 13, '17.
12         MR. COYNE:  Kirstin, I'm sorry, is
13 this one Bates-stamped?
14         MS. ERICKSON:  This one is 0000 --
15 five zeros and a 7.
16         MR. COYNE:  Thank you.
17         MS. ERICKSON:  It's a ten-page
18 document.
19         MR. COYNE:  Thank you.
20         MS. ERICKSON:  Mm-hmm.  Mm-hmm.
21 BY MS. ERICKSON:
22    Q.   I believe it was -- the effective date
23 was May 17, 2013.  Is that the way you understand
24 it?
25    A.   Yes.

38 (Pages 146 - 149)

Page 150

1 Q. Okay. And you were employed by Cook
2 County at that time. Right?
3 A. Yes.
4 Q. Have you seen -- have you seen this
5 interagency directive?
6 A. I would have to -- if I could look at
7 it.
8 Q. I'll give you a minute then to read
9 this part.
10 A. Can I scroll it all the way down? Do
11 I have control of that?
12 Q. No.
13 A. I don't.
14 Q. I can scroll down and then we can go
15 back up if you want.
16 A. Okay. But then I can come up on my
17 own? No, I can't. Oh, yeah, I guess I can.
18 Q. So we can just start on the first
19 page. It's not --
20 A. Okay.
21 Q. If you don't remember, it is what it
22 is.
23 A. Okay.
24 Q. But do you recall -- do you recall --
25 A. I don't -- I don't remember this

Page 151

1 particular page.
2 Q. Okay. And are you -- what is the
3 process by which you would be informed of a new
4 interagency directive in 2013?
5 A. 2013, I was doing audits then.
6 Q. Mm-hmm.
7 A. I don't recall. Just a meeting would
8 be one way. I don't believe these policies were
9 on -- I would have seen policies in a meeting. I
10 just don't recall this.
11 Q. Is there --
12 A. I would --
13 Q. Sorry, are you done?
14 A. Yeah, I'm done.
15 Q. In 2013 did you receive e-mails with
16 new policies or interagency directives?
17 A. I don't know if they -- I don't recall
18 how I got them.
19 Q. Is it --
20 A. They were in a book.
21 Q. I'm sorry?
22 A. I think they were just in a book. I
23 don't recall getting them by e-mail. I just
24 really don't recall.
25 Q. Where would -- where would the

Page 152

1 policies be in a book?
2 A. In the CQI office.
3 Q. So is it -- I mean, as an auditor were
4 you informed of new policies and interagency
5 directives or was -- was it more you would go to
6 CQI if you wanted to learn about new policies?
7 A. Per policy per reference of what I was
8 auditing. But to sit and read the whole policy
9 book --
10 Q. Right.
11 A. -- you know, sitting, yeah.
12 Q. So which way -- so how would you learn
13 about a policy if you needed to use it to review
14 and audit medical records or anything else --
15 A. It would be on -- it would be on -- it
16 would be on paper like this. Not on a computer.
17 Q. How did you learn about the policy
18 that you needed to read?
19 MR. DeVORE: Objection. Asked and
20 answered.
21 THE WITNESS: I would look in the
22 policy book.
23 BY MS. ERICKSON:
24 Q. So was it your custom and practice in
25 2013 to --

Page 153

1 A. Some were on --
2 Q. Hang on. Hang on. Hang on. Let me
3 finish.
4 Was it your custom and practice in
5 2013 to go to CQI and look at the paper copy of
6 the policy when you need to review one?
7 A. Some of them were online. Yeah, I
8 could -- I could look at the book.
9 Q. Is that what you did?
10 A. I would at times, yes, to see the
11 paper copy, yes.
12 Q. Did you look at any of the policies
13 online in and around 2013?
14 A. I -- I did.
15 Q. Are the policies on a certain -- are
16 the policies on a certain platform electronically?
17 A. Yes. In the intranet.
18 Q. Does the intranet have a name?
19 A. Go to Cermak intranet or, you know,
20 Cook County Health Systems' own internet and go to
21 Cermak and then click under Cermak policies.
22 Q. Okay. Were you required as part of
23 your job in 2013 to '17 to go onto the Cermak
24 intranet or go to the CQI to read policies?
25 A. Was I required? Now, this is -- okay.

39 (Pages 150 - 153)

1 Cermak policies, I looked at the Cermak policies.
2 Did anybody say sit and memorize the policies?
3 No. I just looked at the policies.
4      Q.   And when you looked -- when you say
5 you looked at the policies, do you consider the
6 interagency directive to be a policy that you
7 would need to read as a Cermak staff member?
8      A.   This would have -- this would be an
9 intra-agency [sic] directive, and I don't recall
10 seeing -- I really would have to read this because
11 you're taking me back to 2013. If I could look at
12 it, I could perhaps recollect more.
13     Q.   Yeah, no, I understand. There's more
14 than one interagency directive, from what I've
15 seen. My question is more do you consider an
16 interagency directive to be a policy?
17     A.   An interagency directive is a policy.
18     Q.   All right. And then looking at the
19 policy here in Roman numeral II, can you read
20 that?
21     A.   I can, yeah.
22     Q.   And does the second sentence say:
23 "Safe medication passage is essential to providing
24 inmates with medically necessary treatment and
25 requires cooperation and coordination between

1 CCDOC and Cermak"?
2      A.   Correct.
3      Q.   Okay.
4      A.   Correct.
5      Q.   So this policy mandates that Cook
6 County and Cermak are responsible for
7 administering medication to inmates. Right?
8      A.   Yes. Cohesively.
9      Q.   Right. And then under Roman numeral
10 III, I don't know if you can see that, it says:
11 "This order is applicable to all Cook County
12 Department of Corrections and Cermak Health
13 Services of Cook County employees and is for
14 strict compliance."
15     A.   Mm-hmm.
16     Q.   Do you see that?
17     A.   I saw that.
18     Q.   What does it mean to you, strict
19 compliance?
20     A.   Strict compliance? That that is the
21 -- that is the directive and that's how it is to
22 be.
23     Q.   And looking at the second page, it has
24 certain definitions. We won't go into many of
25 them. Okay. We're on page four under -- what

1 section this is -- but it's C, Section C. It
2 says: "KOP medication distribution. Cermak staff
3 shall start medication distribution at scheduled
4 times." And then under B it states: "New KOP
5 medications orders will be distributed daily."
6           Are you familiar with the policy
7 for KOP medications being that they would be
8 dropped off daily to inmates?
9      A.   New KOP medications, like a new order,
10 that they would be dropped off, they would be
11 delivered.
12     Q.   They would be delivered where? What
13 does that mean to you?
14     A.   To the detainee.
15     Q.   Okay. And then if an inmate had a KOP
16 medication, would there be enough in the bottle or
17 container for several days to your knowledge?
18     A.   Boy, this changed. Yes, for until the
19 next delivery, next cycle fill.
20     Q.   From 20 --
21     A.   Until the next cycle fill was
22 scheduled. There should be enough 'til the next
23 cycle fill.
24     Q.   In 2015 to 2017 how long was there in
25 between each cycle fill?

1      A.   I don't recall exactly.
2      Q.   Okay. Do you know what it is
3 nowadays?
4      A.   I think it varies, so I could not
5 answer that question.
6      Q.   Okay. And this is more just for my
7 understanding. Is a PRN medication a whole
8 different category from DXD or KOP?
9      A.   Dose by dose, that would mean that the
10 nurse would have to provide each dose.
11     Q.   Okay.
12     A.   And then you can also get a dose by
13 dose, it's PRN, you have to -- you must request
14 it, you must request it from the nurse PRN.
15     Q.   And if -- and if the nurse is at the
16 living unit for med pass and an inmate requests a
17 certain medication that they have in an order PRN,
18 should the -- should the nurse have the medication
19 on the cart? Or how does that work?
20     A.   She should. Mm-hmm.
21     Q.   Is it ever a situation where, from
22 what you've seen, that the PRN medication is not
23 on the cart during a med pass and the nurse has to
24 call over to the dispensary or somewhere else in
25 medical to bring the medication to the inmate?

40 (Pages 154 - 157)

Page 158

1   A.  Yes.
2   Q.  Okay.
3   A.  I've heard of that, yes.
4   Q.  Okay.  Have you -- do you ever look at
5   the medical records of inmates who transfer back
6   and forth between Livingston and Cook County?
7   A.  In particularly?
8   Q.  If you need --
9   A.  I would have no reason to go into
10  other -- 'cuz it's a different jail.
11  Q.  If you --
12  A.  You mean per -- I guess I don't
13  understand your question.
14  Q.  Oh, sure.  If you needed to look at
15  records from an outside facility for a specific
16  grievance that you're reviewing, do you have
17  access to look at the medical records from
18  Livingston, for example?
19  A.  No.
20  Q.  Okay.  And in 2015 to '17 did Cermak
21  staff deliver the medication rosters to the watch
22  tower roll call two hours prior to med pass?
23  A.  Watch tower?  What did you say?  I
24  didn't understand -- I didn't hear you actually.
25  Q.  You didn't hear me.  Okay.  From 2015

Page 159

1   to '17, did Cermak staff deliver medication
2   rosters to a watch tower roll call two hours
3   before med pass?
4   A.  Not to my knowledge.  I don't recall
5   any of that.  I would have no knowledge of that.
6   Q.  Okay.  I'm going to put up Exhibit B.
7   One moment.
8           (Shebel Deposition
9           Exhibit B was marked.)
10  BY MS. ERICKSON:
11  Q.  Okay.  Can you see this, Susan?
12  A.  Yes.
13  Q.  All right.  So I've -- I'm marking as
14  Exhibit B for identification Sheriff's Office,
15  Cook County, Illinois, General Order, Department
16  of Corrections.  The subject is inmate grievance
17  procedure.  Bates-stamped 000999.  And it's a
18  20-page document.  The number of the order is
19  24.14.5.0.
20      Are you familiar -- oh, strike
21  that.
22      And the effective date is
23  October 21, 2014.
24      Are you familiar with this
25  document, Susan?

Page 160

1   A.  No.  No.
2   Q.  You've never seen it?
3   A.  No.
4   Q.  You've never had to evaluate it in
5   your role as someone that --
6   A.  It's a DOC policy.  I've not seen it.
7   Q.  Do you have a specific policy that you
8   apply as someone from Cermak reviewing grievances?
9   A.  I have a policy that DOC sent to me.
10  But this doesn't look --
11  Q.  You have a policy that DOC sent to
12  you?
13  A.  I have a policy that was in a -- in a
14  book.  And then I have Cermak's policy regarding
15  grievances.
16  Q.  What's the -- what's the policy name
17  for the one that -- for Cermak?
18  A.  Grievances.  I don't know the exact
19  name.  It's grievances.
20  Q.  And what's the name of the policy that
21  you received from CCDOC related to grievances?
22  A.  Just grievances.
23  Q.  And you know that this isn't the
24  policy?
25  A.  This -- I'm not familiar with this.

Page 161

1   I've not seen this.  This is a DOC policy, and I
2   don't -- didn't have this.
3   Q.  But you just said you received a DOC
4   policy related to grievances.
5   A.  It was not this.
6   Q.  How do you know?
7   A.  It was -- it was -- 'cuz this does not
8   look familiar to me.
9   Q.  Do you have the other policy with you?
10  A.  No, I don't.
11  Q.  Okay.  Well, you've reviewed -- it
12  sounds like you've reviewed a CCDOC policy related
13  to grievances, so this could be the policy.
14      In looking at page two, there are
15  definitions under Roman numeral VII.  Under A,
16  it's for -- there's a definition of a correctional
17  rehab worker.  Under B is the emergency grievance.
18  C is the grievance.  Right?
19  A.  Correct.
20  Q.  I believe earlier you testified that
21  someone -- either the CRW or her -- his or her
22  supervisor receives the grievances from the inmate
23  and then that person who receives the form decides
24  if it is an emergency grievance or a grievance.
25  Is that right?

41 (Pages 158 - 161)

Page 162

1    A.   Somebody in the DOC makes that
2 decision, CRW or supervisor or whoever they deem
3 makes that decision.
4    Q.   So on page 17 of this policy -- are
5 you familiar with this grievance form?
6    A.   Yes.
7    Q.   And so what you're saying is in the
8 top left corner here where it says grievance form
9 processed as emergency grievance, grievance, or
10 non-grievance request, someone from DOC checks one
11 of these boxes after they review the grievance?
12   A.   Correct.
13   Q.   And then in what situations have you
14 seen that a document is marked as a non-grievance?
15   A.   We don't -- haven't done that anymore.
16   Q.   Since when?
17   A.   I believe it was 2019.  I don't have
18 the -- I don't have the exact date.
19   Q.   Why -- oh, go ahead.
20   A.   I don't -- I just don't remember
21 exactly when they stopped doing non-grievances.
22   Q.   Do you know why CCDOC has stopped
23 marking grievances as non-grievance?
24   A.   No.  They just discontinued that.
25   Q.   Okay.

Page 163

1    A.   I wasn't involved in that process.
2 Just that they were not -- were no longer
3 non-grievances.  There were grievances or
4 emergency grievances.
5    Q.   Understood.  When this process -- but
6 prior to 2019 someone from CCDOC would
7 occasionally check the non-grievance request box.
8 Right?
9    A.   Mm-hmm.
10   Q.   And was -- when it was -- when that
11 grievance form was checked as non-grievance, did
12 you have any particular responsibility in
13 reviewing the grievance?
14   A.   I did as long as it was for Cermak.
15 At one time the grievances went to the nurses if
16 they were nursing grievances.  Did that answer
17 your question?
18   Q.   Yeah.  I just didn't know if you were
19 done.  Thank you.
20        From your experience looking at
21 grievances, were forms that were marked as
22 non-grievance sometimes not reviewed by anybody
23 from CCDOC or Cermak?
24   A.   Not anything that I would have any
25 knowledge of.  Like disregarded?  They were

Page 164

1 never -- if they were received by us, they were
2 never disregarded.
3    Q.   What types of situations were marked
4 as non-grievance or requests?
5    A.   That was DOC that made that
6 determination.  And it was because they just
7 didn't meet the specifications for a grievance
8 because it was, you know, like late, a late
9 grievance, wasn't within the time.
10   Q.   Were there other reasons that a
11 grievance form would be marked as non-grievance?
12   A.   That would -- really the DOC made that
13 decision.  And I just treated them as answering
14 them either way.
15   Q.   So from 2015 to the present if you
16 received a grievance form that was marked as
17 non-grievance but there was a medical issue on the
18 form written by the inmate, would you take action
19 to help resolve the medical issue?
20   A.   Yes.  Just as if it was a grievance.
21   Q.   Okay.
22   A.   It was still answered, yes.
23   Q.   And the CRW is the person that picks
24 up the grievance form.  Right?
25   A.   Whoever DOC has to do it.

Page 165

1    Q.   Okay.
2    A.   You know, that would be them that
3 would make that assignment.
4    Q.   Okay.  And so then looking at the top
5 left, we have the different types of grievances.
6 And then to the right of that it says referred to
7 Cermak Health Services, superintendent, or other.
8 Who checks off where the -- where this form should
9 go?
10   A.   Whoever is processing the grievance
11 from DOC.  Department of Corrections completes
12 that.
13   Q.   So is it the same person that picks up
14 the form and decides whether it's an emergency
15 grievance, grievance, or non-grievance?
16   A.   I don't know that answer.  Just it was
17 -- it would be DOC.
18   Q.   Could it be a correctional officer
19 that makes that decision?
20   A.   I don't know the answer to that
21 question.  It would be whoever they assigned it
22 to, which is -- typically is a CRW or a super-
23 visor.
24   Q.   Supervisor of what?
25   A.   The division.

42 (Pages 162 - 165)

1     Q.   So is that a CCDOC supervisor of the
2  division of correction?
3     A.   Yeah.  Yes.
4     Q.   And then who decides the top, what the
5  control number is?
6     A.   The DOC.
7     Q.   Do you know if it's the same person
8  that fills out the other two boxes --
9     A.   No, I do not.
10    Q.   -- we were talking about?
11    A.   No.  No, I do not know.
12    Q.   Have you ever seen on a grievance form
13 or heard from someone within the facility that an
14 inmate was not allowed to fill out another
15 grievance form because they already grieved the
16 issue?
17    A.   Have I ever heard that?  No.
18    Q.   You have never heard that --
19    A.   No.
20    Q.   -- before?
21    A.   No.  They're not allowed to -- no.
22    Q.   Who's not allowed to?
23    A.   You said that they are not allowed,
24 that the detainee is not allowed to fill out
25 another form because he's filled out too many?

1  No, I've not -- I've not heard that.
2     Q.   Have you ever seen that on a form, a
3  grievance form?
4     A.   That they've complained of that?  Is
5  that your question?
6     Q.   Yes.
7     A.   That the detainee has complained of
8  that?
9     Q.   Mm-hmm.
10    A.   Yes.
11    Q.   Yes, you've heard of that?
12    A.   Yes.  I've seen that.
13    Q.   Does that concern you?
14    A.   Anything that they have on there can
15 be concerning.
16    Q.   Is that a legitimate rule or policy
17 within Cook County or Cermak that an inmate is not
18 allowed to grieve the same issue more than once?
19         MR. DeVORE:  Objection.  Foundation.
20 Form.
21         THE WITNESS:  Could you rephrase that?
22 I don't understand the question.
23         MS. ERICKSON:  Debbie, can you repeat
24 the question, please.
25              ///

1              (The following question
2              was read back:
3              "Q.  Is that a legitimate
4              rule or policy within Cook
5              County or Cermak that an
6              inmate is not allowed to
7              grieve the same issue more
8              than once?")
9         MR. DeVORE:  Same objection.  She
10 already testified she wasn't a policy-maker.  You
11 asked about a legitimate policy.
12 BY MS. ERICKSON:
13    Q.   This is just according to your
14 knowledge, Susan.
15    A.   No.  No.
16    Q.   Is it a custom and practice inside
17 Cook County Department of Corrections that either
18 people from Cermak or Cook County tell inmates
19 that they cannot grieve an issue more than once?
20    A.   Is this a policy are you asking or
21 have I heard of anything?  I've not heard anybody
22 say this, no.
23    Q.   But you've seen it in the --
24    A.   I've not heard anybody say this to a
25 detainee.

1     Q.   But you've seen it in the grievances?
2     A.   I've seen a grievance where, yes.
3     Q.   And what did you do in following up
4  from that particular complaint from an inmate?
5     A.   I don't recall.  Oftentimes they can
6  complain of various complaints.  But if that was
7  just the issue on the grievance, I would probably
8  refer that to the nursing management so they can
9  look into it.
10         Excuse me.
11              (There was an interruption
12              at the door.)
13         THE WITNESS:  I apologize.
14 BY MS. ERICKSON:
15    Q.   It's okay.
16         So if someone had written in the
17 grievance form that someone told them they can't
18 grieve an issue more than once, that's -- that
19 would be referred --
20    A.   And it was a nursing issue, it was --
21 they were complaining about a Cermak staff, then
22 it would -- the nursing management would look into
23 it.
24    Q.   Okay.  I'm going to repeat the
25 question.  Please wait until --

Page 170

1    A.   Oh, okay.
2    Q.   -- I finish the question because it's
3 confusing for the record.
4    A.   Okay.
5    Q.   So when you have -- in situations when
6 you have seen in a grievance form "Somebody told
7 me not" -- "I can't grieve an issue more than
8 once," you would report that to someone from
9 nursing management?
10        MR. DeVORE:  Objection.  Form and
11 maybe suggests a misunderstanding of the types of
12 grievances she gets.
13        MS. ERICKSON:  That's not an
14 objection.
15        MR. DeVORE:  Form.  Assumes facts not
16 in evidence.  Outside the scope of her knowledge.
17        Go ahead, Susan.
18        Maybe she needs an explanation.
19        THE WITNESS:  I don't understand who
20 -- could you re-ask the question?
21        MS. ERICKSON:  Debbie, can you repeat
22 the question, please.
23             (The following question
24             was read back:
25             "Q.  So when you have --

Page 171

1             in situations when you
2             have seen in a grievance
3             form, 'Somebody told me
4             not' -- 'I can't grieve
5             an issue more than once,'
6             you would report that to
7             someone from nursing
8             management?")
9        THE WITNESS:  If this was a Cermak
10 grievance and they were complaining about nursing
11 or medical.
12 BY MS. ERICKSON:
13    Q.   What?
14    A.   That's my answer.
15    Q.   What would you do?  You didn't say
16 what you would do.
17    A.   I would refer to nursing management
18 for review.
19    Q.   If only it was a Cermak or nursing
20 issue?
21    A.   Anything from Cermak.  I wouldn't --
22 if it was a DOC issue, if they're saying the DOC
23 is saying this, it's a DOC grievance, it's not
24 mine to answer.  I don't manage DOC.
25    Q.   But what if they --

Page 172

1    A.   Cermak doesn't manage DOC.
2    Q.   Right.
3    A.   So it would go back to DOC to
4 investigate or whatever.
5    Q.   But you used the same grievance form
6 in Cermak as CCDOC.  Right?
7    A.   Yes.
8    Q.   Okay.  So when you say it's a
9 grievance -- a Cermak grievance, what do you mean?
10    A.   That they've sent it here, that it's a
11 medical issue.
12    Q.   So it becomes a medical issue when
13 someone from Cook County determines that it should
14 be referred to Cermak?
15    A.   Correct.  They make -- they do -- they
16 code it.  DOC codes it.  There's different codes,
17 and they've determined that it belongs to DOC or
18 they've determined that it belongs to Cermak.  It
19 would depend on who the detainee was complaining
20 about.
21    Q.   So, in Cermak, the medical team
22 wouldn't even see this form even if there were a
23 medical issue in here if the person from Cook
24 County marked it wrong and referred it to the
25 wrong place.  Right?

Page 173

1    A.   Correct.
2    Q.   If it's marked as referred to
3 superintendent, is that a form that someone at
4 Cermak will review?
5    A.   Probably not.  It would depend on the
6 code that they put on it.
7    Q.   The control number?
8    A.   Probably -- no.  There's a code.
9 There's a control number.  But there's also a
10 code.
11    Q.   Is that the number that they put right
12 here?
13    A.   No.  It's on the front form.
14    Q.   Oh.  Where do they normally put the
15 code?
16    A.   Scroll up higher.  It's up at the top,
17 right between --
18        MR. DeVORE:  We don't have any that
19 are filled out.
20        THE WITNESS:  No.  And it's by hand.
21 BY MS. ERICKSON:
22    Q.   And where is it?  Right here in the
23 top?
24    A.   Yes.
25    Q.   Okay.  And is that the current

44 (Pages 170 - 173)

Page 174

1  practice nowadays?
2      A.   Yes.
3      Q.   Has that changed at all since 2017?
4      A.   No.
5      Q.   Okay.  And is it possible -- strike
6  that.
7           Have you seen a situation where
8  there's one control number for two different
9  grievances?
10     A.   Yes.
11     Q.   In what situations does -- do two
12  grievances get the same control number?
13     A.   See, that would be the DOC that would
14  make that determination.  So if they've come to me
15  with the same control number, I still just answer
16  the grievances, answer the complaints.  Sometimes
17  the dates are different but close or the complaint
18  is the same or -- those are the only two things
19  that I can think of.  I'm sure there's others.
20  But I'll just answer them the same as if they were
21  separate.
22     Q.   I'm going back to if an inmate wrote
23  that they weren't allowed to grieve an issue more
24  than once but it did not state if the person that
25  told them that was a Cermak person or a Cook

Page 175

1  County staff.  Would Cermak ever see that form if
2  there's no medical issue in it?
3      A.   It's possible.
4      Q.   It's possible what?
5      A.   If they've -- it's possible that we
6  would not see it.  It depends on if they send it
7  to us.
8      Q.   Okay.  So it could be that --
9      A.   Depending on the code.
10     Q.   All right.  And then what are the
11  codes that are possible?
12     A.   I don't have them memorized.
13     Q.   What's 190?
14     A.   Medication.
15     Q.   Is there one for security?
16     A.   There's several for security.  I don't
17  have those memorized.
18     Q.   Okay.
19     A.   250 would be dental.  210 would be
20  mental health.  200 is medical.
21     Q.   That's okay.  You don't have to --
22     A.   Is that enough?
23     Q.   Yeah.  Yeah.
24     A.   Okay.
25     Q.   But, though, again, just to say -- I'm

Page 176

1  interested -- Cook County, again, is the one that
2  makes the determination of what the grievance code
3  is that goes on the form.  Right?
4      A.   Correct.
5      Q.   Okay.  And then the superintendent, is
6  a superintendent over -- does he or she oversee
7  both Cook County and Cermak?
8      A.   I don't know all the job duties of the
9  superintendent.  We have a COO that's over
10  operations.  But then -- oh, custody, they're here
11  for custody.
12          So I don't understand exactly what
13  you are asking.
14     Q.   Sure.  Is there a superintendent just
15  for Cermak staff?
16     A.   No.
17     Q.   Is there a superintendent that
18  oversees Cermak at all?
19     A.   There's superintendents I believe in
20  each division.  It could have changed.  They could
21  be -- some could be for a couple divisions.  But,
22  from my last recollection, there's one per
23  division.
24     Q.   But my question is about Cermak.  Do
25  you consider Cermak to be a division?

Page 177

1      A.   Yes.
2      Q.   Okay.  So then there is a super-
3  intendent over Cermak?
4      A.   There's a superintendent in Cermak.
5      Q.   So when this is referred to a
6  superintendent, which superintendent would the
7  form be referred to?
8      A.   It would depend on the division.
9      Q.   Okay.  So the person that decides to
10  refer it to either Cermak, superintendent, or
11  other also decides which superintendent to send
12  the form to?
13     A.   It depends on the division that the
14  detainee is living in or where -- or where his
15  complaint is coming from.  They can live in one
16  area but be complaining about another.  And it
17  would be whichever superintendent is relative to
18  the complaint.
19     Q.   Understood.  And so Cook County makes
20  a lot of decisions upon receiving this grievance
21  form before you would even see it.  Right?
22     A.   Correct.
23     Q.   Do you review the health service
24  request forms as well?
25     A.   As they're -- as they are relevant.

45 (Pages 174 - 177)

Page 178

1  But I do get into the chart. And I don't have the
2  paper health service request form. There are --
3  they are scanned in. But I also look at the
4  visit, the encounter with the nurse.
5      Q.  I don't understand. If an inmate
6  fills out a health service request form, do they
7  always see a nurse?
8      A.  No. They're just ordering -- no, they
9  don't always see a nurse.
10     Q.  Okay. So you said you review health
11 service request forms when they're relevant?
12     A.  To the grievance.
13     Q.  Okay. So only when they're relevant
14 to the grievance?
15     A.  Yeah.
16     Q.  How do you know if an H -- health
17 service request form is relevant to a grievance?
18     A.  I'll look at the date and I'll just go
19 through and start reviewing health service request
20 form, the visits, see if there's nursing visits,
21 and just go down --
22     Q.  So you're -- sorry.
23     A.  -- the report. Uh-huh.
24     Q.  So you're doing an evaluation at that
25 point to see what's their most recent care and

Page 179

1  what other issues have they complained about?
2      A.  And what other issues they've
3  complained about? I just review their -- starting
4  from and maybe prior to their complaint and just
5  review the medical record.
6      Q.  So it sounds like you look at the date
7  of the grievance and then you will look in the
8  medical chart to see if there's any health service
9  request forms on that date or around that date.
10 Is that right?
11     A.  Yes. On or around. Uh-huh. And then
12 I'll look at other things. Their meds. Just I
13 kind of look through the whole chart. Do I look
14 at every documentation or encounter? No. I would
15 never finish. But as much as that I can look at
16 that pertains to the grievance.
17     Q.  Okay.
18         MR. COYNE: Just let me interrupt.
19 I'm going to have to sign off here on the break so
20 I can queue up on the conference call. There's a
21 number of parties. So I'll either let them know
22 -- you know, I don't know how long it's going to
23 take, but I'm going to let them know I'm in a
24 deposition. So I will report back before too long
25 and fill you in and take a break.

Page 180

1          MS. ERICKSON: All right. We'll take
2  a break.
3          MR. COYNE: Thank you.
4             (A break was taken from
5             1:54 p.m. until 2:16 p.m.)
6          MS. ERICKSON: We'll go back on.
7  BY MS. ERICKSON:
8      Q.  Do you know if grievance forms are
9  supposed to be picked up daily by the CRWs from
10 the living units?
11     A.  That's my understanding, except
12 weekends.
13     Q.  Except weekends?
14     A.  Yeah. I don't believe they -- I don't
15 believe they pick them up on weekends.
16     Q.  Okay.
17     A.  At least we don't receive them on
18 weekends.
19     Q.  I'm going to show that policy again.
20 One moment here. Susan, can you see it, this
21 document?
22     A.  I can.
23     Q.  Did you say yes?
24     A.  Yes, I can.
25     Q.  Are you familiar with this form, the

Page 181

1  CRW Inmate Grievance/Non-Grievance Request
2  Tracking Log?
3      A.  No. It looks like it's a DOC tool.
4      Q.  Oh. So you don't ever see this?
5      A.  No.
6      Q.  Do you have any similar form like this
7  for Cermak?
8      A.  Nothing with subject matter. Just
9  that return, chain of custody with the control
10 number. There's no DOC number or anything
11 identifying on it other than the control number.
12 No subject matter or any of -- just the date it
13 was received. And then when we give it to the
14 DOC, whoever is coming here to pick them up, would
15 be the date that -- you know, the date that it
16 transpired that we gave it to them.
17     Q.  And how often do the staff from DOC
18 come to pick up grievance forms from you?
19     A.  Typically it's daily, except weekends
20 and holidays.
21     Q.  What's the name of the form that
22 Cermak uses to track grievance forms?
23     A.  The transfer form, transfer sheet.
24     Q.  So it's called the Cermak transfer
25 sheet?

46 (Pages 178 - 181)

Page 182

1    A.   Not Cermak.  Just inmate transfer.  It
2  was made by -- DOC made it, had it printed.  It's
3  a carbon.  We get a copy.  They get a copy because
4  it's signed, and then here's your copy, there's
5  their copy.
6    Q.   So do you fill out the inmate transfer
7  sheet individually for every grievance that you
8  receive?
9    A.   We list what we're returning by
10  control number.  It's just like lines, and you put
11  their control number and then there's like 15, 15,
12  30 per page, and then we attach the grievance to
13  that.  And then there's like a little check box.
14  And as they go through to make sure, yes, this is
15  the grievance we're receiving and they put a
16  little check by it.  When it's all checked that
17  they are receiving the grievances that we're
18  saying, then they sign it and tear it.  We keep
19  half -- one copy and they keep a copy.  And then
20  we do the same thing with the ones that they bring
21  to us.
22    Q.   Are those forms scanned electroni-
23  cally?
24    A.   No.  No.
25    Q.   Do the inmate transfer sheets from

Page 183

1  2015 to '17 still exist?
2    A.   I -- are you -- transfer -- now I'm
3  unclear.  Are you talking about the grievance
4  form, the grievance form coming here, or the
5  detainee being transferred?  I'm confused now.
6    Q.   Me, too.  You just said that when
7  the -- Cermak has a sheet in which they -- they
8  write down all of the grievance forms that they
9  receive on it.  Is that right?
10    A.   They -- that they are bringing to us.
11    Q.   Okay.
12    A.   To Cermak.
13    Q.   And you called that --
14    A.   And it goes by the control number.
15    Q.   And you call that form a transfer
16  sheet?
17    A.   Yes.
18    Q.   And does the -- do the transfer sheets
19  that you receive that pertain to grievance forms
20  for 2015 through '17 still exist?
21    A.   I don't -- I don't know the answer to
22  that question.  I don't know if they exist still.
23    Q.   Was that the custom and practice that
24  you were using from 2015 to '17 for grievance
25  forms?

Page 184

1    A.   Yes.
2    Q.   How many days do you have to review a
3  grievance before you need to give it back to Cook
4  County Department of Corrections to give to the
5  inmate?
6    A.   Fifteen.
7    Q.   Are you familiar with the early
8  warning system?
9    A.   Just one moment.
10       (There was an interruption
11       at the door.)
12    THE WITNESS:  Okay.
13  BY MS. ERICKSON:
14    Q.   You can take a minute and read it.
15    A.   No.  Okay.  No.  I don't use this.
16  That's DOC.
17    Q.   Okay.  So you've never heard of a --
18    A.   No.
19    Q.   You've never heard of this?  Do you
20  have a similar system in Cermak in which if
21  there's any patterns identified where three or
22  more of the grievances are reflected within the
23  same division there's some type of report that's
24  generated?
25    A.   No.

Page 185

1    Q.   So what if there's a pattern in
2  medication not -- not being given to an inmate and
3  that occurs more than three times?  There's no
4  sort of report that's generated to sort of audit
5  that?
6    A.   I don't do the audits now.  I just do
7  the grievances.  I'm sure there is some type of a
8  tracking tool.  I don't know.  I don't.
9    Q.   Do you sign any type of log book when
10  you receive the grievance forms from Cook County
11  Department of Corrections?
12    A.   Do I sign a log book?
13    Q.   A log book --
14    A.   That transfer form, we go through it,
15  and it's initialed.
16    Q.   Okay.
17    A.   But a log book?  I don't have a log
18  book.
19    Q.   Who -- what's the title of the person
20  that drops off the grievance forms to you?
21    A.   It could be a clerk or CRW.  It could
22  also be --
23       What happened?  Did something
24  happen?
25    Q.   I'm not sure.  You can continue,

47 (Pages 182 - 185)

Page 186

1  though.
2      A.  Continue?  Did you want me -- am I on
3  mute?
4      Q.  No.  No.  No.
5          So the clerk or CRW drops off the
6  grievance forms to you?
7      A.  Yeah.  I don't know their titles.  I
8  just know that they're from DOC.
9      Q.  Okay.  And I believe you stated
10 earlier that the grievance forms are scanned
11 electronically?
12     A.  That's on the DOC's part how they --
13 how they do that.  I don't know when in the
14 process they do that.  But we -- I have no part of
15 that.
16     Q.  Do you know where those electronic
17 forms are stored?
18     A.  DOC.
19     Q.  Are you considered an inmate services
20 supervisor?
21     A.  No.
22     Q.  Do you know if there's a policy
23 anywhere within Cook County or Cermak that states
24 that an inmate cannot grieve an issue more than
25 once?

Page 187

1      A.  Not that I recall.
2      Q.  And you said that you only review
3  health service request forms in order to evaluate
4  grievances.  Right?
5          MR. DeVORE:  Objection.  Mischarac-
6  terizes her testimony.  I don't believe that's how
7  she testified.
8  BY MS. ERICKSON:
9      Q.  You can answer.
10     A.  I review health service request forms
11 that are relevant to the grievance that -- it may
12 not be the only time I review a health service
13 request form.  I can review just to go back in
14 time further than just directly surrounding a
15 grievance.
16     Q.  Whose role is it to -- strike that.
17         Whose role is it from Cermak to
18 review the health service request forms?
19     A.  That would be nursing.
20     Q.  So the nursing manager is in charge of
21 that?
22     A.  That you would -- the DOC -- the
23 director of nursing and the nurse managers would
24 make that assignment.  I don't know who in nursing
25 that they assign for the health service request

Page 188

1  form clinic that would review it.
2      Q.  Okay.  And who from Cermak picks up
3  the health service request forms from the living
4  units?
5      A.  I believe that it would be the nurses.
6      Q.  Do you know if they pick up the health
7  service request forms when they're making their
8  rounds for med pass?
9      A.  I don't know exactly when they -- when
10 they pick them up.
11     Q.  How were you trained in your position
12 as the clinical performance improvement analyst?
13     A.  How was I trained?  I didn't take any
14 training class for this position.
15     Q.  Since you've -- since you've been at
16 Cook County in 2012 have you received any type of
17 training?
18     A.  Training class?  No.
19     Q.  Does anyone review -- strike that.
20         Who -- does anyone audit your
21 review of the grievance forms?
22     A.  That would be DOC.  No, not -- DOC did
23 at one time.  They may still.  I don't.  I'm not a
24 part of that.
25     Q.  So between 2015 and 2017 the

Page 189

1  Department of Corrections reviewed your medical
2  evaluation of an inmate's grievance?
3      A.  My medical evaluation?  No.  I just
4  thought you meant the grievance, if they evaluated
5  my grievance.  The COO would look at my grievances
6  randomly.
7      Q.  The COO of Cermak reviewed your
8  grievances at random?
9      A.  Yes.
10     Q.  Did you ever bring grievances to the
11 COO or the director of nursing asking for help on
12 how to resolve the issue?
13     A.  Yes.
14     Q.  In what types of situations have you
15 asked for help from them?
16     A.  I don't recall.
17     Q.  Have you asked the COO and director of
18 nursing for help when you couldn't get ahold of
19 someone from Cook County?
20     A.  Are you talking DOC or medical?
21     Q.  DOC.
22     A.  Why would I get a -- I don't under-
23 stand your question because I don't answer DOC's
24 grievances.
25     Q.  But in your review as a Cermak staff,

48 (Pages 186 - 189)

Page 190

1  do you ever decide that you need to speak with a
2  correctional officer in your review of what
3  happened?
4      A.  No.  That would be DOC that would
5  answer that part of the grievance.  Sometimes
6  there's multiple issues in a grievance, and some
7  could be DOC, some could be medical, or they could
8  be both.  DOC would answer their part, and then I
9  would answer my part.  So there could be two
10  components of one grievance.  Although, it
11  shouldn't be, we do it, we take care of it anyway.
12      Q.  What do you mean?
13      A.  Well, it makes it difficult when the
14  detainee has more than one issue on the grievance,
15  when he starts complaining of several issues.  But
16  we still address it, you know.  If there's a
17  medical part of it, then medical answers that.
18  And then DOC answers their part.
19      Q.  And then after both sides address the
20  issue or issues in the grievance, do both parties
21  come together to discuss the grievance at all?
22      A.  No.  No.  Because I would have
23  answered the medical part; they would have
24  answered the DOC part.  I don't manage DOC or
25  would know what the officer, who they even were.

Page 191

1  I don't really know all the officers.  They would
2  just know more of it.  Just like the medical, for
3  them to review the medical, go into the chart,
4  they don't.  So if there was --
5      Q.  What if someone from DOC doesn't
6  understand what you've written as the medical
7  response?
8      A.  They could contact me.
9      Q.  Has that happened --
10      A.  They could contact me or they could
11  contact their supervisor.
12      Q.  Does that --
13      A.  If they don't understand what medical
14  is writing.
15      Q.  Sorry to interrupt.  Does that happen
16  sometimes where you receive a call and they say,
17  "Susan, what were you meaning in this situation?
18  What happened in this situation because it's not
19  written on the form"?
20      A.  No, not to my knowledge that I recall.
21      Q.  Do you remember Mr. William Dukes?
22      A.  No.
23      Q.  You never met him?
24      A.  I don't know him.
25      Q.  Okay.  I'm going to put up his

Page 192

1  grievances.  Give me one moment here.
2          (Shebel Deposition
3           Exhibit C was marked.)
4  BY MS. ERICKSON:
5      Q.  Can you see this document, Susan?
6      A.  I can.
7      Q.  Okay.  So I'm marking as Exhibit C
8  Mr. Dukes' grievances.  It starts on page CCSAO
9  Dukes 000963.  And I'm just going to pull some of
10  these out.  Okay.  I'm on page 000978.  I'll give
11  you a minute to review what's written in the
12  complaint.  Can you see it?
13      A.  I do.
14      Q.  Okay.  Let me know when you're ready.
15      A.  I'm ready.
16      Q.  All right.  So the date on this
17  particular grievance is December 3, 2015.  Right?
18      A.  Yes.
19      Q.  For William Dukes.  Right?
20      A.  Yes.
21      Q.  And at that time it looks like he was
22  housed in Division 10 living unit 2-C.  Correct?
23      A.  Yes.
24      Q.  Okay.  So this date here 12/3/15, is
25  that the date on which he wrote the grievance?

Page 193

1      A.  Yes.  That he says that it is, yes.
2      Q.  Okay.  And then looking -- and then
3  underneath his complaint, it looks like Mr. Dukes
4  signed it 12/3/15.  Right?
5      A.  Yes.
6      Q.  And then right underneath that there's
7  the section where CRW/platoon counselor N. Jones
8  signs it and dates it 12/3/15.  Right?
9      A.  Yes.
10      Q.  So does that mean she's the CRW that
11  picked up this grievance form from Division 10,
12  2-C?
13      A.  She may have been -- I don't know if
14  she was a CRW.  I don't know her title.
15      Q.  Well, it's okay.  Okay.
16      A.  But she is DOC or was DOC.
17      Q.  So does this mean that she is the one
18  that picked up the grievance form and dated it
19  December 3, '15?
20      A.  She's the one that reviewed it and
21  signed it and dated it.  I don't know that she was
22  the one that picked it up.
23      Q.  And then, from what you know and your
24  experience working and reviewing grievance forms,
25  would N. Jones be the person that decided if it

49 (Pages 190 - 193)

Page 194

1  was an emergency grievance, grievance, or
2  non-grievance?
3      A.   That would be my understanding.
4      Q.   So N. Jones decided this form was a
5  grievance and it should be referred to Cermak
6  Health Services.  Right?
7      A.   Yes.
8      Q.   And from your understanding reviewing
9  these forms -- reviewing this form, wouldn't
10  N. Jones have written the control number as well?
11      A.   There is a control number, yes.
12      Q.   Did N. Jones write that, based on your
13  experience with these forms?
14      A.   She could have.  I don't -- it's DOC.
15  I don't know if she is the one that gave it the
16  control number.  But by the signature it looks
17  like she's the one that read it, signed it, and
18  dated it.
19      Q.   Okay.  And then this is the code you
20  were talking about earlier, what's here in the
21  middle of the page?
22      A.   Yes.
23      Q.   And who would have -- who stamped it
24  and put code 190?
25      A.   I can -- I would think that whoever

Page 195

1  read it would have put that code.
2      Q.   So N. Jones decided it was a 190 and
3  stamped it?
4      A.   I would -- whoever was in charge of
5  the grievances.  I would think that that was her,
6  but I can't -- I can't testify to that --
7      Q.   Right.
8      A.   -- that she was the one that did that.
9  But --
10      Q.   Okay.
11      A.   -- it is CO -- it is DOC that does
12  that.
13      Q.   All right.  And then this time stamp
14  here, December 8 sometime, maybe 9:10 a.m., is
15  that something you would have put on the form?
16      A.   Me or a clerk, whoever received it.
17      Q.   Whoever received it in Cermak?
18      A.   Correct.
19      Q.   Okay.  So there's clerks at Cook
20  County and then there's clerks at Cermak?
21      A.   Yes.  There would be one clerk that
22  would do this.
23      Q.   All right.  So it's received on
24  December --
25      A.   And also I -- or I could have done it.

Page 196

1  It just depends who did it.
2      Q.   Right.  Yeah.  No.  I'm just --
3      A.   Okay.
4      Q.   So he -- so Mr. Dukes fills it out on
5  the 3rd of December, N. Jones from Cook County
6  picks it up on that same day, and then five days
7  later it gets to you at Cermak to review.
8  Correct?
9      A.   That seems right.
10      Q.   And I'm only seeing it because the
11  next page is the response.  And your -- is that
12  your name on there, Susan Shebel?
13      A.   That is my name.
14      Q.   Okay.  And it looks like you have
15  signed the date 12/17/15.  Is that the date that
16  you reviewed this grievance form?
17      A.   Yes.
18      Q.   Do you normally review the form all in
19  one sitting?
20      A.   Not always.
21      Q.   So if you marked 12/17/15, when --
22  when did you review the form?
23      A.   I would have completed it on that date
24  12/17/15.  On that one it's 12/17/15.  But not
25  all -- it would depend.  But it looks like the

Page 197

1  medications, that that was 12/17/15.
2      Q.   How many grievance forms do you
3  receive in a day to review?
4      A.   It varies.  It's hard to pinpoint
5  because it varies by so many different things.
6      Q.   Okay.  Could it be as low as 20 and as
7  high as 100?
8      A.   Yes.
9      Q.   Okay.  And then this -- go ahead.
10      A.   I don't think I've gotten a hundred in
11  one day, but I have gotten over 80.
12      Q.   Okay.  So this particular -- on this
13  particular grievance, as you saw, Mr. Dukes was
14  complaining about wanting nitroglycerin to keep on
15  his person.  Is that accurate?
16      A.   Yes.
17      Q.   And his specific action is -- action
18  he's requesting is:  "To be given my nitroglycerin
19  medication to keep on person in a sealed, airtight
20  container.  When needed, any delay waiting for a
21  nurse to arrive with it could be fatal for me.
22  Thank you."
23          So you would have -- you reviewed
24  this when you saw the form.  Right?
25      A.   I did.

50 (Pages 194 - 197)

Page 198

1    Q.   All right.  And then, let's see, so
2  who writes on the second page, who writes 190
3  medical prescription at the top of the page?
4    A.   That would be the DOC.  They wrote
5  that.
6    Q.   Okay.  So now we're on page 000979.
7  And is this all of your handwriting starting at --
8  I don't know, where it starts, it says Cermak --
9    A.   No.
10   Q.   -- 12/4/15?
11   A.   No.  That's not my handwriting.
12  That's DOC.
13   Q.   Okay.  So someone from DOC wrote
14  CRW/platoon counselor referred this grievance/
15  request to Cermak on December 4, 2015.  Is that
16  accurate?
17   A.   Correct.
18   Q.   The response by personnel handling
19  referral.  So this would also be someone from Cook
20  County?
21   A.   That was me.
22   Q.   Oh, this is you.  Okay.  So what is it
23  that you wrote there?
24   A.   "Your medications are dose by dose, so
25  you cannot have a supply of meds for yours and

Page 199

1  others' safety."
2    Q.   Did you look in Mr. Dukes' medical
3  records to see if this medication was a DXD?
4    A.   I would have.
5    Q.   Did you -- I mean, if you looked --
6  I mean, we can look at the medical records.  But
7  let me just put them up here so we can see.
8         Can you see this record?
9    A.   No.  That doesn't look like anything
10  that I see.
11   Q.   Do you see Medication Administration
12  Record at the top of this?
13   A.   Yeah, this doesn't look --
14   Q.   Okay.  I just wanted to make sure you
15  could see the document.
16   A.   Oh, okay.  Yeah, I see it.
17   Q.   Yeah.  That's all.
18         So this is the -- these are the
19  medical records from Mr. William Dukes.  And I'm
20  going to go to the orders that he had entered
21  around that time.  He arrived on November 25,
22  2015.  So we're on page -- we're marking this --
23  I'm marking this as Exhibit D, and it's Mr. Dukes'
24  medical records.
25              ///

Page 200

1              (Shebel Deposition
2            Exhibit D was marked.)
3  BY MS. ERICKSON:
4    Q.   The first page is CCSAO Dukes 000001.
5  And we're currently on 000503.
6         So when Mr. Dukes arrived on --
7  actually, it looks like the 24th of November 2015
8  this record shows his intake.  Is that accurate,
9  from what you can tell?
10   A.   This doesn't -- see, I look at the
11  computer, so this does not look like a familiar
12  format for me.
13   Q.   Mm-hmm.  Okay.  Well, all the dates on
14  this record were going -- are November 24, 2015.
15  Correct?
16   A.   Yes.
17   Q.   I'm scrolling down to -- I'm scrolling
18  down to 000504.  It looks like actually the first
19  record of Mr. Dukes having a prescription for
20  nitroglycerin is December 8, 2015, because the
21  next date is December 9, December 8, December
22  2015.  Can you see that, the December 8, 2015,
23  nitro?
24   A.   I see that.
25   Q.   So in reviewing his grievance in

Page 201

1  December -- about December 3, you went into his
2  medical records and you saw that he had a
3  dose-by-dose prescription for nitroglycerin.  Do
4  you see --
5    A.   Let me see the grievance again so I
6  can see what I wrote.
7    Q.   Sure.  One second.  Can you see it?
8    A.   Yes.
9    Q.   All right.
10   A.   So it was 12/8, correct, was the
11  order?
12   Q.   Yes.
13   A.   I looked at the chart.  And it's dated
14  12/17, so he would have had the order at that
15  time.
16   Q.   But is it a dose-by-dose order?
17   A.   Yes.
18   Q.   Hold on.  I'm going to put it up
19  again.  Okay.  We're back on the medical records,
20  page 505.
21   A.   Mm-hmm.
22   Q.   Where in this -- where in this order
23  for nitroglycerin on December 8, 2015, does it say
24  dose by dose or DXD?
25   A.   It doesn't because they don't write it

51 (Pages 198 - 201)

Page 202

1  if it's -- if it's not KOP, if it's not ordered
2  KOP, then it's dose by dose.
3      Q.   Okay.  So PRN means as needed.  Right?
4      A.   Correct.
5      Q.   So I don't understand.  Isn't -- does
6  dose by dose mean that you take -- every time you
7  get medication you get that specific medication?
8      A.   I'm sorry, could you rephrase that?
9      Q.   What's the difference between dose by
10 dose and as needed?
11     A.   Okay.  So they're -- dose by dose
12 means you get the medication from the nurse.  KOP
13 means you just -- you give it to yourself as it's
14 ordered.  You can have dose by dose PRN and you
15 can also have KOP PRN.
16     Q.   Okay.  But if it doesn't say --
17     A.   Does that answer your question now?
18     Q.   Yes.  So if it doesn't say KOP PRN,
19 it's -- by default is it dose by dose PRN?
20     A.   Unless it says KOP, it's dose by dose.
21     Q.   Okay.  And so Mr. -- it looks like
22 Mr. Dukes grieved this issue on December 3 and
23 five days later he got an order for it and then by
24 the time you looked at it on December 17 at that
25 point --

Page 203

1      A.   He had an order.
2      Q.   -- he had an order for it.  Right?
3      A.   Correct.
4      Q.   Did you help facilitate getting him an
5  order for nitroglycerin?
6      A.   I could have, but I -- I don't recall.
7      Q.   Okay.
8      A.   He could have had a -- I would have to
9  look at the chart to see maybe he had a provider
10 visit in between that time.  I don't recall.
11     Q.   Okay.  After an inmate goes through
12 the medical intake process and sees a provider,
13 being a physician or a physician's assistant, how
14 long after that date does it take for an inmate to
15 actually get the medication as prescribed?
16     A.   It would depend on if it was dose by
17 dose or KOP medication because they're on a weekly
18 eligible -- at that time, I believe it was weekly
19 or every two weeks.  Within a couple days, within
20 a day, day and a half, maybe two.  It would depend
21 on the time when the medication was ordered, the
22 time of the day.
23     Q.   Okay.  Well, while we're here, looking
24 at the medications that were ordered for Mr. Dukes
25 on November 24, 2015, we're starting on page 502,

Page 204

1  it looks like he had an evaluation for chronic --
2  he had a chronic disease alert order entered for
3  dyslipidemia.  What does that mean?
4      A.   Fat.
5      Q.   Okay.
6      A.   Fat in the blood.
7      Q.   And then --
8      A.   Probably high cholesterol.
9      Q.   Okay.  And then, the next one, he had
10 a chronic disease alert order for hypertension.
11 Right?
12     A.   Mm-hmm.
13     Q.   Next he had an order for albuterol.
14 Correct?
15     A.   Yes.
16     Q.   And that's taken for asthma?
17     A.   Yes.
18     Q.   And then he had doxazosin prescribed.
19 What is that used for?
20     A.   I believe that that is for the
21 prostate.  I would -- that's a generic name, so I
22 would have to look that up.  So I don't recall,
23 but that would be my first thought.
24     Q.   All right.  And then he has
25 amoxicillin prescribed.  Right?

Page 205

1      A.   Yes.
2      Q.   And then at the same time he had some
3  kind of diet CCDOC order.  And it looks like he
4  had a cholesterol/fat restricted/low salt, routine
5  diet.  Right?
6      A.   Yes.
7      Q.   All right.  We're continuing on to
8  page 504.  He had a medical classification order
9  for dose-by-dose medical.  Do you understand what
10 that order means?
11     A.   Yes.  Medication through dose by dose.
12 He's an M2.
13     Q.   What does that mean?
14     A.   That he would be out in a division
15 where they pass the meds, where there's nurses
16 that pass the meds.  He's not GP.
17     Q.   Okay.  The next order is security
18 alert CCDOC, and it looks like he's in protective
19 custody, routine.  Correct?
20     A.   Mm-hmm.
21     Q.   The next one, he has a chest PA.  What
22 does the PA stand for?
23     A.   Where are you reading?
24     Q.   In the middle here.
25     A.   Chest x-ray.

52 (Pages 202 - 205)

1    Q.   Okay.  So this is the following day.
2  Now it's -- now it's November 25, 2015, at
3  5:00 p.m. he had the chest x-ray.  Correct?  Is
4  that what it says?
5    A.   Yeah.
6    Q.   Okay.  And then it looks like the next
7  particular medication starts -- or is ordered on
8  December 9, 2015.  Right?
9    A.   Yes.
10    Q.   Okay.  So after Mr. Dukes is
11  prescribed all these medications on November 24,
12  2015, the records are silent and they don't show
13  that he got medications after this for three
14  months.  Is that possible?
15    A.   No.
16    Q.   I'll go up to -- I'll go to -- up that
17  section so you can maybe help explain what
18  happened, if you know.
19    A.   We had -- this is 2015.  Some were in
20  a different -- I wish I could think of the name of
21  the system.  It was a different medication system
22  for documenting the meds.  I'm curious as to maybe
23  that could be what it is.
24    Q.   What was the name of that system?
25    A.   I'm wondering if it was just Cerner

1  medication.  There was -- we were just starting
2  rolling out the Pyxis.  And, I'm sorry, I just
3  don't recall.
4    Q.   Okay.  All right.  Well, I'm going
5  back up to the top of chronologically in 2015 when
6  Mr. Dukes was admitted to Cook County Department
7  of Corrections.  One second.  Sorry.
8        On page 333, it shows that the
9  first date that Mr. Dukes received medication was
10  on March 27, 2016, but yet he had orders on
11  November 24 and 25 -- November 24, 2015.  How does
12  that happen?
13    A.   I don't know the answer to your
14  question except the only thing that I could think
15  of is that it's documented in another place.
16    MR. DeVORE:  Are we still talking
17  about the grievance where it says he's on
18  nitroglycerin but he wants it KOP?  Is that what
19  we're still talking about?
20    MS. ERICKSON:  No.  This is sort of a
21  secondary related issue.
22  BY MS. ERICKSON:
23    Q.   Okay.  So you don't know long and
24  short?
25    A.   No, I don't know where it would be

1  documented.
2    Q.   Mm-hmm.  Okay.  Okay.  So going back
3  to the grievance from December 3, 2015, we're on
4  page 979 of the grievance documents, after you
5  signed this on December 17, 2015, what did you --
6  what do you do with the document?
7    A.   Then it is put on that transfer sheet
8  by the control number.
9    Q.   Mm-hmm.
10    A.   List all of the different control
11  numbers of the grievances that were -- that I'm
12  ready to have go back to the DOC.  And then they
13  come in and they pick them up and they check, you
14  know, the box they received it.
15    Q.   And then it gets to Mr. Dukes and he
16  signs it on December 29, 2015.  Right?
17    A.   That's correct.
18    Q.   It looks like -- it seems like part of
19  the policy, to exhaust administrative remedies
20  appeals must be made within 14 days of the date
21  the inmate received the response.  Correct?
22    A.   Yes.
23    Q.   And, in this case, Mr. Dukes fills out
24  the appeal on the same date, December 29, 2015,
25  and he notes:  "This" -- "These are emergency

1  medication, nitroglycerin, just as an asthma
2  inhaler ... that I can have?"
3        Was there any consideration that
4  you remember about whether to give him this
5  nitroglycerin as a KOP?
6    A.   That would be up to the provider to
7  write that order.
8    Q.   Did you talk to the provider about it?
9    A.   I don't recall.  I'd have to look more
10  thoroughly into the chart to see.
11    Q.   If you talked to the provider about
12  this grievance, would it be in the medical chart
13  for Mr. Dukes?
14    A.   No.  I would want to see why he cannot
15  have the nitroglycerin other than he's on M2 and
16  dose by dose.  The medication was ordered dose by
17  dose.
18    Q.   Okay.  And then so then you received
19  the document -- there's a date on the bottom of
20  the form next to your signature January 12, 2016.
21  Is that the date that you received the form back?
22    A.   That would be the date that I -- that
23  I answered this.
24    Q.   Okay.  That's the date you answered
25  it.  And it looks like there's a time stamp right

53 (Pages 206 - 209)

Page 210

1  within your response to Mr. Dukes on December 31,
2  2015, at 9:06 a.m. which is upside down. Is that
3  correct?
4      A.   Yeah. Yes.
5      Q.   Okay. Is that something --
6      A.   Yeah.
7      Q.   -- your office would have done --
8      A.   Yes.
9      Q.   -- once you received --
10     A.   We date stamp the grievances and the
11  appeals when we get them.
12     Q.   All right. And then it looks like you
13  wrote: "You should never take a few nitroglycerin
14  without medical personnel being made aware. That
15  would mean you're having chest pains and not
16  getting relief or more frequent episodes."
17          Did I read that right?
18     A.   Yes.
19     Q.   All right. So then the reason, as you
20  said before, is he basically -- explain -- explain
21  this answer to us, if you could.
22     A.   Okay. I was just advising him that he
23  shouldn't take a few nitroglycerin without the
24  medical being aware because that means he's having
25  more episodes and angina and that would mean

Page 211

1  you're having chest pain and you need to let the
2  provider know that you're not -- or the nurse know
3  you're not getting relief from the nitro or you're
4  having more frequent episodes of the angina. It
5  was just an advisement. I was trying to assist in
6  helping --
7      Q.   So you're --
8      A.   And there could be other reasons why
9  he couldn't have the KOP. I just, from looking at
10  this grievance, I don't know what they are. I'd
11  have to look at the chart. But this would be one
12  of them.
13     Q.   Okay. So it sounds like he would need
14  to speak to the provider and somehow tell the
15  provider that he needed medication to be KOP?
16     A.   Well, I don't know that he would tell
17  the provider that he needed. Because if the
18  provider deems that he should not have his
19  medication KOP, that's up to the provider to make
20  that decision based on what he feels for his
21  safety or the safety of others. And I don't know
22  that unless I would --
23     Q.   Based on what -- based on what's
24  documented by you and Mr. Dukes, is there any way
25  of knowing whether you spoke with any provider

Page 212

1  within Cermak to look at and potentially schedule
2  a visit for Mr. Dukes to have the nitroglycerin
3  reconsidered?
4      A.   I would have -- I wouldn't have made a
5  documentation in the chart. I wouldn't have made
6  a documentation in the chart that I was referring
7  the patient to the provider to see if he would
8  change the dose-by-dose medication to KOP. I
9  would not have written that.
10     Q.   Why?
11     A.   It's just not appropriate. I would --
12  I would -- maybe I would speak with the provider
13  or see if he has a provider visit coming due and
14  he could discuss it with the provider.
15     Q.   But did you ever speak to Mr. Dukes
16  personally in person about this form?
17     A.   No.
18     Q.   So then how is he supposed to know
19  that the next -- maybe the next step for him would
20  be to tell the provider, ask the provider, "Is
21  there any way that I can get his KOP"?
22     A.   He could submit a health service
23  request form. He could -- I would have to look at
24  the chart really to answer that question. I just
25  can't answer it.

Page 213

1      Q.   Okay. I'm going on. All right. I'm
2  on page 982, and this is another grievance filled
3  out by Mr. Dukes on February 4, 2016. It looks
4  like it was -- it was referred to Cermak Health
5  Services. Right?
6      A.   Yes.
7      Q.   And it was labeled -- it was also
8  labeled a non-grievance by Cook County. Right?
9      A.   Yes.
10     Q.   So I'm not sure if this is -- tell me
11  if this is right. If it's a non-grievance, is
12  there no control number assigned to it?
13     A.   That's correct.
14     Q.   All right. So then looking at the
15  contents, it was referred to Cermak Health
16  Services but yet there was no -- there was no
17  documentation showing that anyone from Cermak
18  reviewed the document. Is that -- is that normal
19  for a non-grievance?
20     A.   I would have gotten the
21  non-grievances. There's no other page to this?
22     Q.   No. So that -- so it's February 4,
23  2016. This looks to be a duplicate. This could
24  be it.
25     A.   So his grievance was already answered.

54 (Pages 210 - 213)

Page 214

1  Q.  Okay.  So this grievance on page 982
2 appears to be similar or the same as the one on
3 983, so I'm just going to address the one that's
4 on 982 for simplicity.
5       And so on 982 there's the grievance
6 form Mr. Dukes filled out on February 4, 2016,
7 with no control number.
8  A.  Excuse me.  He wrote the same on both
9 pages?
10  Q.  Let's -- we can review both and see
11 here.
12  A.  Okay.
13  Q.  Okay.  So he's talking about an
14 incident on February 1, 2016, at 7:30 p.m. in
15 Division 10, 2-C.  And if you want to take a
16 moment, you can review it.
17  A.  Okay.
18  Q.  Okay.  So it looks like on this date,
19 on February 1, 2016, Mr. Dukes informed the 2-C
20 medication nurse that he needed his heart
21 medication, nitroglycerin.  Right?
22  A.  Yes.
23  Q.  And then he states that:  "I was then
24 forced to stand in the 2-C interlock while she
25 finished with her medication line for 2-C before

Page 215

1 I was then sent to the dispensary in order to be
2 sent to Cermak for medical attention due to the
3 fact that my nitroglycerin medication was missing
4 from Tier 2-C's medication cart - a cart only
5 medical staff have access to."
6       When Mr. Dukes is referring to
7 Cermak, do you understand that to be the location
8 where you're at?
9  A.  Yeah.  Urgent care.  It sounds like
10 they sent him to urgent care.  I would have to
11 look at the record, but that's what it sounds
12 like.
13  Q.  So urgent care --
14  A.  They sent him to the nurse and then to
15 the urgent care.
16  Q.  So in this particular situation again
17 Mr. Dukes is taking nitroglycerin for chest pain
18 as needed.  Right?
19  A.  Yes.
20  Q.  And he goes to the med line and wants
21 the medication in the normal process, and they
22 didn't have it on the cart.  Right?
23  A.  That's what he's saying.  Mm-hmm.
24  Q.  And then he had to go to the
25 dispensary and then walk all the way to Cermak

Page 216

1 urgent care.  Right?
2  A.  I don't see where it says there --
3 then sent to dispensary in order to be sent to
4 Cermak.
5  Q.  So is Cermak --
6  A.  Did he walk?  I didn't see walk.  I
7 don't know how he got to Cermak.
8  Q.  Is there another way to get there
9 besides walk?
10  A.  Well, if they put him in a chair or
11 whatever, I don't know.  I don't know.  I'd have
12 to see the chart.  I don't know what happened.
13  Q.  So they could have possibly put him in
14 a wheelchair and chaired him there?
15  A.  Sure.
16  Q.  Okay.  All right.  So he has to go
17 about a mile, either walking or in a wheelchair,
18 to Cermak to get as-needed heart medication?
19  A.  I don't know the distance.
20  Q.  I mean, do you think it took more than
21 ten minutes for him to get this medication?
22       MR. DeVORE:  Objection.  Calls for
23 speculation.
24       THE WITNESS:  I don't know.
25            / / /

Page 217

1 BY MS. ERICKSON:
2  Q.  Okay.  And so Mr. Dukes, his action
3 that he's requesting is that basically:  "That my
4 life not be placed in jeopardy due to Cermak staff
5 incompetence; that I be allowed immediate access
6 to my emergency rescue medications and not forced
7 to wait for hours and walk a mile or more while
8 experiencing chest pains in order to obtain them."
9       And I believe he signed this on
10 February 4.  It looks like N. Jones picked it up
11 the next day on February 5, 2016.  Correct?
12  A.  That's what -- yes, that's what's
13 written.
14  Q.  The following page is what appears to
15 me to be a repeat.  Let me know if --
16  A.  Oh, it's the same thing?  Okay.
17  Q.  Do you agree?
18  A.  I'd have to compare.  It sounds like
19 it.  They both start "On the above date."
20  Q.  And then going on to 984, it looks
21 like it was marked as 200 medical treatment.  And
22 someone from Cook County wrote:  "This issue has
23 previously been grieved.  Refer to control number
24 2016X0534."
25       What does that mean?

55 (Pages 214 - 217)

Page 218

1    A.   It sounds like that he had grieved it
2  before and they gave him an actual control number
3  for that grievance, that it was grieved before
4  with a control number.
5    Q.   So is it -- is it that if an inmate
6  has a specific issue like this, a nitroglycerin
7  issue, there will be one control number assigned
8  to that issue and any time an inmate has it then
9  they would have that same number?
10   A.   No.  Different control number for
11  every grievance.
12   Q.   Okay.  So then what is -- I mean, why
13  would this person write that it's been previously
14  grieved?
15   A.   Apparently this issue was grieved
16  before and they gave it a control number.  It must
17  have been the same date.  It's been grieved before
18  and given a control number, so apparently the same
19  date.  I don't know.  I can't see the other
20  grievance to know if they were the same date as --
21  is it the same date and the same grievance, are
22  they writing the same thing for the same date.
23   Q.   Mm-hmm.
24   A.   And then it's been given a control
25  number and being addressed.

Page 219

1    Q.   But to you does this mean that because
2  it has been grieved before it can't be grieved
3  again?
4         MR. DeVORE:  Objection.  Calls for
5  speculation.  It's somebody else clearly was the
6  one who responded to this grievance.
7         THE WITNESS:  Yes, that's DOC that
8  wrote that.  So I don't know what grievance.  I
9  don't have the other one, so I don't know.
10  BY MS. ERICKSON:
11   Q.   Okay.  Well, we'll look at it.  I
12  think it's one we're going to look at.
13        And so Laura Seerman -- what?  Yes?
14  Oh, no, I didn't hear what you said.
15        So, in response, Laura Seerman
16  reviewed it and signed:  "You do not have
17  nitroglycerin ordered."
18        Is nitro -- strike that.
19        Is Laura Seerman someone that does
20  the same job that you do?
21   A.   She was a nurse that worked here.
22  Sometimes the nurses answered the grievances.
23   Q.   Okay.  So the issue here at this point
24  is he doesn't have --
25   A.   A nurse manager.  Uh-huh.

Page 220

1    Q.   What's that?
2    A.   She would have been a nurse manager.
3    Q.   All right.  So, according to her,
4  there's no nitroglycerin ordered.  Do you know if
5  it's custom and practice for everyone that reviews
6  the grievances, like in your position, would they
7  normally look at the orders to see if there's an
8  order for that medication?
9    A.   Yes.
10   Q.   Okay.  So I'm going to stop sharing my
11  screen.
12        And let's go to the medical
13  records.  Can you see the records?
14   A.   I can.
15   Q.   The date of the grievance was
16  February, February 1.  Okay.  So we're looking at
17  Mr. Dukes' orders on page 507 of his medical
18  records, and it looks like there is no order for
19  nitroglycerin on that date or any date before
20  that.  So what is an inmate supposed to do if they
21  need the nitroglycerin and it's not ordered?
22   A.   They would go see a nurse.  I could
23  refer them to urgent care --
24   Q.   Okay.  Do you know if --
25   A.   -- or see the provider.

Page 221

1         I'm sorry.  What were you going to
2  say?
3    Q.   No.  I'm sorry, too.
4         Do you know if there's a certain --
5  if an order for nitroglycerin is limited to only
6  be given for a week or two weeks?
7    A.   No.  I've not heard that.  A doctor
8  can order medication as they deem.  That's not my
9  -- that's kind of out of my scope to guess when a
10  doctor is going to -- how long he's going to order
11  a medication for.  That is really up to them.
12  That's their expertise.
13   Q.   Okay.  We're going to page 969 of the
14  grievances.  This is the grievance by Mr. Dukes
15  written on December 8, 2015.  It looks like it
16  was marked as a non-grievance and referred to
17  superintendent Division 10.  Is that correct?
18   A.   That's what it looks like, yes.
19   Q.   And then this particular -- well, if
20  we look at the complaint, he was writing about an
21  incident on December 7, 2015, between 5:30 and
22  11:00 p.m. at the receiving max P/C court return
23  bullpen.  Is that right?
24   A.   Yes.
25   Q.   All right.  And then it looks like he

56 (Pages 218 - 221)

Page 222

1  states: "Upon being returned from my Maywood
2  Court appearance, I was forced to sit in a bullpen
3  for hours. At approximately 9:00 p.m., I began
4  experiencing chest pains and started asking for
5  medical attention via intercom and by asking
6  officers passing the bullpen for an hour. The
7  2:00-to-10:00 shift did nothing and the 10:00-to-
8  6:00 shift did nothing until after they'd finished
9  their personal start of shift rituals. Then they
10 escorted me back to Division 10, forcing me to
11 walk over a mile with chest pains."
12        Does that seem like a Cermak issue?
13    A.  It could be both because he's
14 complaining that he's in a bullpen and DOC was not
15 answering him and neither were the nursing. So it
16 could be one of those instances where it would be
17 more than one area that would answer that.
18    Q.  Okay. If it were -- if the person who
19 reviewed the form and marked it as a non-grievance
20 thought that it should have been referred to the
21 superintendent of Division 10 and Cermak, should
22 the person have marked superintendent Division 10
23 and then mark the box Cermak's -- Cermak as well?
24    A.  They would have put an X by Cermak.
25 I would have seen an X at Cermak also.

Page 223

1    Q.  So if the person who reviewed this
2  form wanted someone from Cermak to review it, did
3  they need to put an X in the box for Cermak Health
4  Services in order for someone from Cermak to
5  review it?
6    A.  It didn't necessarily have to have an
7  X in the box, but they have to bring the grievance
8  over to Cermak.
9    Q.  Okay. So it could potentially -- you
10 could have reviewed it but it just wouldn't say
11 that Cermak reviewed it?
12    A.  No, that's not what I said. There
13 just wouldn't have been -- perhaps maybe there
14 wasn't an X in the box but they brought it over to
15 us anyway.
16    Q.  Okay. So Mr. Dukes fills out this
17 form on December 8, 2015, it looks like he signs
18 it that day, and N. Jones picks it up on the same
19 date. Correct?
20    A.  Yes.
21    Q.  And there does not seem to be any
22 review of that form in the records. Do you have
23 any understanding of why that would be?
24    A.  No, I do not.
25    Q.  But there should have been a review by

Page 224

1  Cermak?
2    A.  It could have been, yes.
3    Q.  Should have been?
4    A.  I would have reviewed it.
5    Q.  Is that a yes?
6    A.  Yes.
7    Q.  And, again, Mr. Dukes is having to
8  walk over a mile just to get nitroglycerin. Isn't
9  that right?
10    A.  That I don't know how far it is. A
11 mile? I don't know. I don't know the distance.
12    Q.  Well, according to him, he said he
13 walked over a mile to get medication with chest
14 pain?
15    A.  According to him, it's a mile, yes,
16 that's correct.
17    Q.  So this initial -- the page we just
18 looked at is a bit confusing because this is for
19 an incident on 12/7/15 from 5:30 to 11:00 p.m.,
20 and the following page he fills out another
21 grievance with the same date from 6:00 to
22 11:00 p.m. And we're on page 970 of the grievance
23 forms. I mean, you're not Mr. Dukes, but have you
24 ever seen inmates that fill out two of the -- two
25 forms for the same grievance?

Page 225

1    A.  Yes.
2    Q.  Why do they -- why do they do that,
3  from what you know?
4    A.  I have -- I have no knowledge of why
5  they write many grievances.
6    Q.  We're going to page 987 of the
7  grievances. This was a grievance filled out by
8  Mr. Dukes on December -- strike that --
9  January 18, 2016, while he was housed in
10 Division 10, 2-C. Correct? Is that what it says?
11    A.  Yeah.
12    Q.  And whoever picked up the form from
13 Cook County checked it as a grievance and referred
14 it to Cermak Health Services. Correct?
15    A.  Yes.
16    Q.  And this is the one that was given the
17 control number I believe we looked at earlier,
18 2016X0534.
19    A.  Okay.
20    Q.  Okay. This first form that we're
21 looking at for that -- for January 18, 2016, is
22 for an incident that's on January 11, 2016, at
23 9:15 a.m. in Division 10, Tier 2-C. And, again,
24 as I just read, the last four of that control
25 number is 0534.

57 (Pages 222 - 225)

Page 226

1    On the following page, Mr. Dukes
2  filled out another grievance for a different date
3  on January 12, 2016, for what he called a repeat
4  occurrence from 4:00 p.m. to 8:30 p.m. And it
5  has the same control number on it, 2016X0534. Do
6  you -- do you know why the same control number
7  would be on an incident that took place on
8  January 12, 2016, and an incident that took place
9  on January 11, 2016?
10   A.   That would be DOC that could answer
11 that better 'cuz they are the ones that assign the
12 control number.
13   Q.   So you wouldn't know why that was --
14 why that would happen?
15   A.   No, I wouldn't know their specific
16 reason. I could only guess. But I wouldn't --
17 I don't know. It's not my job to assign control
18 numbers.
19   Q.   What do you -- what do you think the
20 issue was?
21   A.   Oh, well, I have to read it.
22   Q.   Okay. All right. So then we're
23 looking at the grievance on page 987. This is the
24 one that occurred on January 11, 2016, at
25 9:15 a.m.

Page 227

1    A.   You know -- okay. I'll read this, and
2  then I'd like to take a break.
3    Q.   We can take a break now.
4    A.   Okay.
5    Q.   Yeah, let's --
6      MR. COYNE: How long?
7      MS. ERICKSON: Ten minutes? Want to
8  come back at -- how about 3:40?
9      MR. COYNE: Okay. Sounds good.
10       (A break was taken from
11            3:27 p.m. until 3:44 p.m.)
12     THE WITNESS: Could I ask you a
13 question?
14 BY MS. ERICKSON:
15   Q.   Yeah.
16   A.   If you could go slower with the
17 grievances because it makes me -- the flipping,
18 the flipping makes me dizzy.
19   Q.   Okay. Sorry about that.
20   A.   It's too fast for me. Thank you.
21   Q.   For sure.
22       The grievances that we reviewed
23 before, one of them specifically saying -- where
24 Mr. Dukes said he had to walk over a mile to get
25 nitroglycerin for chest pain, as someone that's

Page 228

1  reviewing these grievances is it concerning to you
2  that an inmate needs to walk that far to get an
3  as-needed chest medication?
4      MR. DeVORE: Objection. Assumes facts
5  not in evidence.
6      You can answer.
7      THE WITNESS: I would look into it.
8  I would be concerned.
9  BY MS. ERICKSON:
10   Q.   Okay.
11   A.   If that was the case.
12   Q.   All right. I'm going to put up the
13 grievances again. Okay. So I'm on page -- it's
14 hard -- I know it's very hard going back and
15 forth. Page 991 of the grievances. And this
16 looks like a response that you made on March 2,
17 2016. Is that right?
18   A.   Yes.
19   Q.   And it's for control number 2016X0534.
20 Right?
21   A.   Yes.
22   Q.   And I'm going to flip back up to the
23 two forms we just looked at that both have that
24 same control number.
25   A.   Okay.

Page 229

1    Q.   One second here. So this first one on
2  page 987 is one -- the one on January 11, 2016, at
3  9:15 a.m., and Mr. Dukes wrote: "On the above
4  date and time, I informed OFC Addison I was having
5  chest pains and asked her to contact Division 10's
6  dispensary for my nitroglycerin medication. I was
7  told by her she tried to call but no one's in the
8  dispensary - I would have to wait for medication
9  line to come. Thirty-five minutes later I was
10 finally given my nitroglycerin along with my other
11 medications. By this time, the nitro had little
12 effect and I had to be sent to Cermak ER because
13 there was no dispensary staff in Div 10 to take my
14 vital signs."
15       From what you've seen in your time
16 working at Cermak, is it typical that there would
17 not be anyone in the dispensary at 9:15 a.m.?
18   A.   I can't answer that question. It
19 would depend on what division that they're
20 working. But I would think that there would be
21 somebody at 9:15. I really can't answer that
22 question.
23   Q.   So in this particular grievance it
24 looks like there's several issues. His --
25 Mr. Dukes' as-needed medication is given to him at

58 (Pages 226 - 229)

Page 230

1 least 35 minutes after he requests it. Right?
2    A. Mm-hmm.
3    Q. And then at that point he said it has
4 little effect. Are you familiar with
5 nitroglycerin not having an effect on the person
6 if not given in a short-enough window?
7    A. No.
8    Q. Did you ever ask anyone --
9    A. -- I'm sorry.
10    Q. No, no, go ahead.
11    A. Usually the nitro if given within
12 30 minutes -- I would have to really look at his
13 chart and see more of what is going on to draw a
14 conclusion, if that's what you're wanting from me.
15    Q. Did you -- would you ever ask someone
16 else what's the window of time in which this
17 particular medication needs to be given to an
18 inmate to be effective?
19    A. No. I've not asked that for it to be
20 effective.
21    Q. Okay. Do you have any sort of
22 guidebook that you use as a nurse where you look
23 up medications and how they're prescribed and
24 administered?
25    A. Yes, you can look up medications.

Page 231

1    Q. Do you have that with you in your
2 office?
3    A. You can get it on the computer.
4    Q. Have you ever looked up how long --
5 how long after someone has chest pains they should
6 take nitroglycerin for it to be effective?
7    A. I don't recall.
8    Q. And then again in this situation it
9 looks like Mr. Dukes had to be sent to the Cermak
10 ER which he believed to be a mile away just to get
11 his vital signs checked. Right?
12    A. That's what he is saying.
13    Q. Okay. He signed on January 18,
14 2016, on the date that he completed it. N. Jones
15 signed it on January 19, 2016, after she picked it
16 up.
17        The next day, he had another
18 incident on January 12, 2016, between 4:00 p.m.
19 and 8:30 p.m. And this is on page 987. It was
20 marked again the control number 2016X0534 and
21 checked with a -- checked as a grievance and to be
22 referred to Cermak Health Services. Do you see
23 all that on this form?
24    A. I do.
25    Q. Okay. And Mr. Dukes wrote it's a

Page 232

1 repeat occurrence on here. And at this -- for
2 this particular grievance he wrote that he was in
3 the RCDC max P/C court return bullpen. And he
4 wrote: At approx 6:00 p.m. while waiting in the
5 RCDC bullpen to be returned to Division 10, I
6 began having chest pains (I have CCDOC-documented
7 heart disease with a history of heart attacks).
8 I informed numerous RCDC staff, including an
9 Officer Commack, of my chest pains and requesting
10 medical attention. Even when I held a large
11 'chest pain' sign in front of the cameras, no one
12 in RCDC would do anything to assist me, including
13 refusing to answer the call button on the
14 intercom."
15        And he requested that: "I be
16 provided with prompt medical attention when I
17 request it and/or that I be provided with my
18 emergency rescue medications immediately upon
19 request, i.e. nitroglycerin tablets."
20        Was that all accurately read, from
21 what you could tell?
22    A. Yes.
23    Q. So he grieved the same issue on
24 January 11, 2016, and again on January 12, 2016.
25 Right?

Page 233

1    A. Yes.
2    Q. And he notes the name of the staff who
3 were involved are RCDC Officer Luna and says
4 something about the RCDC holding cameras, which is
5 hard to read.
6        N. Jones picks up this particular
7 grievance again on January 19, 2016. Right?
8    A. Yes.
9    Q. The day after it's written.
10        And then, I believe, going back
11 to -- scrolling is hard. Sorry about that. Going
12 back to page 991, this is where you made a
13 response about the 2016X0534 control number.
14        And prior to your response, it
15 looks like someone from Cook County wrote: "CRW
16 scanned a copy of Part A to RCDC supt" --
17    A. Superintendent.
18    Q. -- "superintendent to address sworn
19 staff. However, refer to Cermak to address
20 medical" --
21        (Technical difficulties.)
22        (A discussion was held off
23        the record.)
24        MS. ERICKSON: All right. Thank you.
25 So we'll pick up back up there.

59 (Pages 230 - 233)

Page 234

1  BY MS. ERICKSON:
2      Q.   So going back here:  "Medical issues/
3  medical treatment."
4           And this is what someone from Cook
5  County Department of Corrections wrote on this
6  form on January 22, 2016.  Right?
7      A.   That's correct.
8      Q.   Okay.  And then it looks like it says
9  CRW/platoon counselor referred this grievance/
10 request to Cermak.  Right?
11     A.   Yes.
12     Q.   Okay.  And then what -- what did you
13 write in response?
14     A.   Called to dispensary to address his
15 complaints and he refused to come.  And then
16 he's -- and then now he's currently at Livingston.
17     Q.   And you wrote this on -- and you wrote
18 this on March 2, 2016.  Right?
19     A.   Correct.
20     Q.   But you were supposed to respond
21 within 15 days?
22     A.   That's correct.
23     Q.   And at that point it's over -- over a
24 month later?
25     A.   That's correct.

Page 235

1      Q.   In this case what do you mean -- what
2  do you mean he refused to come?
3      A.   He would not come to the dispensary to
4  talk with the nurse nor -- and address his
5  complaints.  He wouldn't come.  He refused.
6      Q.   How do you know that's what it means
7  by "refused to come"?  Is that typically what you
8  write in this type of situation?
9      A.   I don't understand.  If they refuse,
10 they refuse, and then I would write they refuse.
11     Q.   So in this -- in this type -- I
12 imagine you've had this before.  In this type of
13 situation where you say, "I called the dispensary
14 to address complaints," what -- what would you --
15 in this type of situation, what would you ask --
16     A.   He was called.  He was called to the
17 dispensary --
18     Q.   Okay.
19     A.   -- to address his complaints, discuss
20 with the nurse and address all his complaints.
21 And he wouldn't come.  He refused.
22     Q.   Okay.  And then you note he's
23 currently at Livingston.  Right?
24     A.   Yes.  And then currently at Livingston.
25     Q.   The next -- I don't know why there's

Page 236

1  multiple.  On page 992, it contains the same
2  information as far as a response from the CRW and
3  then what you just read and signed on March 2,
4  2016.  Right?
5      A.   It's the same paper you just showed me
6  or is this another paper?
7      Q.   It looks to be the same to me.
8      A.   Okay.
9      Q.   And then this is Mr. Dukes receives it
10 and signs it on March 8, 2016, and notes in his
11 appeal:  "This still doesn't address the issue of
12 receiving medical care for serious medical
13 issues."
14          And, in response, J. Mueller --
15 I imagine J. Mueller wrote this on March 9, 2016.
16 Is that who would have written the response to the
17 appeal?
18     A.   Yes.  Yes.
19     Q.   And J. Mueller is an administrator?
20     A.   He works for DOC.
21     Q.   Okay.  And what's her first name?
22     A.   It's John.
23     Q.   Oh.  It's him.
24          And he notes:  "Per CHS
25 documentation is" -- I don't know if I can read

Page 237

1  that.  Can you read that?
2      A.   Something is "regarding care
3  provided."
4      Q.   That's okay.  You don't have to guess.
5  But the last -- does the last part say
6  "original" --
7      A.   "Original response to stand."
8      Q.   Okay.  So when John Mueller writes
9  this and signs it, does he do any work between
10 reading what Mr. Dukes writes on March 8 and
11 March 9 when he writes this "original response to
12 stand"?
13          MR. DeVORE:  Objection.  Calls for
14 speculation.
15          THE WITNESS:  You would have to ask
16 Mr. Mueller.
17 BY MS. ERICKSON:
18     Q.   Okay.  But no one from Cermak reviews
19 what you've written and signs the form?
20     A.   I'm sorry, what?  Nobody reviews?  He
21 had to --
22     Q.   No one from Cermak reviews this form,
23 right, after you?
24     A.   It looks like it went to DOC.  He had
25 left.  He was at Livingston, so.  So that wasn't

60 (Pages 234 - 237)

Page 238

1  -- that was DOC. He went to DOC.
2      Q. I understand. So we've looked at
3  several of Mr. Dukes' grievances about
4  nitroglycerin and chest pains, and you reviewed
5  many of the ones that we went over. Right?
6      A. Yes.
7      Q. Is there -- is there a point at which
8  after an inmate has the same issue about
9  medication four-plus times that Cermak and Cook
10 County get together and make some kind of plan to
11 try and help this inmate with the medication?
12     A. It would depend on the reason that his
13 medication is ordered the way that it is. It's
14 up to the provider as to how that he orders this
15 medication and what is the chest pain. I don't --
16 because I'm not -- I haven't had an opportunity to
17 get into his -- his notes what was the pain. Was
18 it anxiety? There's many things that can cause
19 chest pain than just what he's saying is a heart
20 attack, not that he's not, but I'm just saying
21 because the fact that I can't get into the chart.
22 Is it epigastric? Is it heartburn? Anxiety
23 causes chest pain. There's different reasons for
24 chest pain. So it doesn't mean because he's
25 having chest pain that he needs -- that he's

Page 239

1  having a heart attack.
2      Q. No --
3      A. You would have to --
4      Q. Right. But he's grieved several
5  times, we've already looked at at least four of
6  them, at which he's talking -- within a short
7  period of time, and you're the one that reviewed
8  the forms, of chest pain. "I'm in the bullpen,
9  I'm in my living unit, and I can't get medication
10 within less than 35 minutes or I don't get it at
11 all." And is there a point at which Cermak and
12 Cook County decide there's a bigger issue here and
13 we need to look at this inmate more closely and
14 figure out a different plan for his medication?
15     A. I think they would discuss it with the
16 provider. The providers would discuss it if it
17 was an issue. Also, he did request -- say that he
18 wasn't getting his --
19         I have to click that off. It's
20 covering you.
21         -- that he was not getting his
22 medication, his nitro, and that was before it was
23 even ordered.
24     Q. Right. So he was -- I don't -- we can
25 put up his records, but he was coming back and

Page 240

1  forth from Livingston County and sometimes he was
2  there at Livingston for a week and then he'd
3  come back to Cook County for one to three weeks.
4  And so what would normally happen if an inmate
5  has a -- a detainee has a medication order at
6  Livingston for nitroglycerin and then they come
7  back to CCDOC and go through medical intake again
8  and either don't get that order -- the
9  prescription for nitroglycerin or they just can't
10 get the medication? What is the inmate supposed
11 to do?
12     A. He would -- he would discuss with the
13 provider that -- I don't understand the question.
14     Q. No. That's good. So, but does he --
15 does that provider, the physician or PA, see the
16 grievance forms at all?
17     A. No. No. They are not given the
18 grievance. They're not in the medical records.
19     Q. What do you mean?
20     A. The grievances aren't printed in the
21 medical records.
22     Q. I understand. So there's a lot of --
23 there's a lot of channels that a detainee has to
24 go through in order to get nitroglycerin either
25 administered when they need it or have it ordered

Page 241

1  at Cook County, from what we've seen. Is that
2  correct?
3      A. I would have -- I would have to look
4  at his medical records to make that -- to see if
5  there's an issue with him getting his medications.
6      Q. What do you mean?
7      A. I'd have to look at his medical record
8  and see what was going on other than the grievance
9  because they need to confirm, you know, there's
10 some issues I need to confirm with the medical
11 record and I would talk to the provider. So not
12 always -- I look at -- I look at the grievance and
13 I see what the issue is that they're complaining
14 about and try to pursue and help them the best
15 that I can. But not always what they are saying
16 is necessarily so. So I have to also check that
17 out and is there a way that we can help them with
18 that, too. Sometimes it's education.
19     Q. So you're saying sometimes inmate --
20 detainees make things up when they put -- when
21 they write these grievances?
22     A. I could say that sometimes that
23 they're not accurate.
24     Q. Okay. And a couple minutes ago you
25 testified that you would -- you would look at the

61 (Pages 238 - 241)

Page 242

1  grievance and then you would talk -- you would
2  talk to the medical provider to see if there's
3  anything that can be done to resolve the issue.
4  Right?
5      A.  Not with every grievance.  It would --
6  it would depend.
7      Q.  Well --
8      A.  Not every --
9      Q.  But when does a -- sorry to interrupt.
10  When does it become a pattern where -- I mean, I
11  could go through at least five to ten more of
12  similar grievances like this, but I'll spare us.
13  When does it become such a pattern that Cook
14  County and/or Cermak decide that the patient --
15  that the inmate is not getting it, they're not
16  getting the medication, they're not understanding
17  the process, and we need to actually do something
18  different?
19      A.  I would think that they do look at the
20  medications.  And I don't know exactly how to
21  answer your question as to when do they look at
22  it.  It's -- you'd have to talk to the pharmacy or
23  whoever.
24          I don't keep grievances or a log of
25  the grievances.  So if he's written me a grievance

Page 243

1  a month ago, I would probably not necessarily
2  remember --
3      Q.  Are there other inmates --
4      A.  -- him.
5      Q.  Sorry.  Are there other -- are there
6  other inmates or detainees that have expressed
7  similar complaints about being, you know, denied
8  or not getting nitroglycerin within a certain time
9  period or it being dose by dose and not KOP?
10      A.  I've had detainees complain that they
11  would like their medication be KOP versus dose by
12  dose and vice versa or -- maybe not.  But nothing
13  that I recall about nitroglycerin.
14      Q.  Okay.  So this -- this particular --
15      A.  That I recall.
16      Q.  Okay.  So this particular case about
17  the nitroglycerin seems like it's a common type of
18  issue, but in Mr. Dukes' case it's specific to
19  nitroglycerin?
20      A.  It's not a common issue.  It's a
21  common request that they want their dose-by-dose
22  meds to be KOP.  It's not necessarily an issue.
23  It's a request.  And a lot of the times they can't
24  for different reasons, such as if they are a
25  mental health patient they can't have dose by

Page 244

1  dose.
2      Q.  You mean they can't have KOP?
3      A.  I'm sorry.  That's correct, they can't
4  have KOP.
5      Q.  So if you're a mental health patient,
6  you for sure can't get KOP medication?
7      A.  Not -- not pills.  Maybe an albuterol.
8  But not -- not pills.
9      Q.  Is that something -- is that some-
10  thing --
11      A.  Safety.
12      Q.  Is that something that anyone from
13  Cook County or Cermak discusses with the detainee
14  so they know that is the reason they can't get the
15  KOP?
16      A.  Yes.  Mental health could discuss it.
17  The provider would discuss it.  Oftentimes if
18  they're a mental health patient they have a P code
19  if they're on mental health meds.
20      Q.  Mm-hmm.
21      A.  So that would be at least a P2.  And
22  so, no, they have to have dose-by-dose meds.
23      Q.  What's a P2?
24      A.  It's a level of care for a mental
25  health patient.  That would be that they would

Page 245

1  require -- that they're on meds, mental health
2  meds, and so they are to be put in an area for a
3  division or area that they receive dose-by-dose
4  medications.
5      Q.  Okay.  And then as far as any other
6  medications that are dose by dose, you said that
7  from the time the inmate goes through intake to
8  the time they get their prescribed medications it
9  could be generally a day and a half to two days?
10      A.  It could be.  It depends on the
11  medication also.  But, yes, generally speaking,
12  yes.  KOP could be -- could be different, could be
13  different.
14      Q.  Could that be dangerous to patients
15  who need the medication every 6 to 12 hours?
16      MR. DeVORE:  Objection.  Calls for
17  speculation.
18          You can answer.
19      THE WITNESS:  Yeah, I don't know.
20  BY MS. ERICKSON:
21      Q.  Well, do certain medications have --
22      A.  KOP?  Yeah, yeah, I would think that
23  they would -- they may put them in -- they
24  wouldn't be a GP.  They wouldn't be a KOP.  They
25  would probably make them a dose by dose.

62 (Pages 242 - 245)

Page 246

1  Sometimes they -- the providers will do that just
2  to start them, you know, start the -- see where
3  they're at, and then from there we can down the
4  road maybe make them KOP, so.
5      Q.  I don't know what you're talking
6  about.  I was just asking if the delay of not
7  getting prescribed medications 24 to 48 hours
8  after an inmate comes in to Cook County could be
9  dangerous to inmates when they have, for example,
10 heart medications that they need to take.
11     A.  It could be if they didn't get their
12 medications.
13     Q.  Have you ever sat in a meeting or
14 talked to anyone anywhere at Cermak or Cook County
15 about this one-and-a-half-to two-day delay that it
16 takes for inmates to get medication when they come
17 to Cook County?
18     MR. DeVORE:  Objection.  Mischarac-
19 terizes testimony regarding the length of time to
20 get medicines distributed.
21     You can go ahead.
22     THE WITNESS:  No.  No.
23 BY MS. ERICKSON:
24     Q.  No?
25     A.  Not that I recall.

Page 247

1      Q.  Has anyone ever talked about creating
2  a new policy or changing some inner working of
3  Cermak or Cook County so that inmates get their
4  medication within 12 hours when they arrive to
5  Cook County?
6      A.  I don't know that -- it's pharmacy.
7  It depends on when they come to jail.
8      Q.  Why is that?
9      A.  Well, because the pharmacy isn't open
10 24/7.
11     Q.  So --
12     A.  And then it depends on when they get
13 the records, when they place the orders, and then
14 they have to be delivered.
15     Q.  Who's responsible for placing the
16 orders?
17     A.  Providers.
18     Q.  So doctors or PAs?
19     A.  Correct.  Or psychiatrists, mental
20 health, dental.
21     Q.  And are the orders placed electroni-
22 cally?
23     A.  Yes.
24     Q.  And then after they -- and after they
25 enter the orders, pharmacy is supposed to fill

Page 248

1  those orders?
2      A.  Yes.
3      Q.  What are the pharmacy hours?
4      A.  I don't know exactly what their hours
5  are, no.  I don't know their daytime hours.  I
6  don't know the exact hours when they come and when
7  their day ends.
8      Q.  Does the pharmacy work on weekends?
9      A.  I believe so.  You'd have to ask them.
10 I don't know that answer.  But I believe so.
11     Q.  And then after pharmacy fills the
12 order, who is responsible for dropping the
13 medication off at the med carts?
14     A.  Pharmacy.  Pharmacy.
15     Q.  Pharmacists actually do it or are
16 there clerks?
17     A.  Pharmacy.  I don't know if they do it
18 by reloading cassettes or how they do it.  I
19 don't-- I don't work for pharmacy.  But pharmacy
20 dispenses.
21     Q.  Have you ever -- have you ever thought
22 that there could be medication after they've
23 entered Cook County --
24     (Technical difficulties.)
25     ///

Page 249

1      (A discussion was held off
2      the record.)
3      MS. ERICKSON:  I gotcha.  All right.
4  So I'll re-ask that one.
5  BY MS. ERICKSON:
6      Q.  Susan, have you ever thought that
7  there is -- there could be a better way where
8  medication could get to detainees faster after
9  they're admitted to Cook County?
10     A.  I think there's always -- always room
11 for improvement in everything.  But that's not up
12 to me regarding the pharmacist's duties and how
13 this Pyxis and all the movements of pharmacy
14 works.  I think that would be better worked out
15 with pharmacy and maybe a committee, work
16 committee or something, but not -- not me.
17     Q.  Mm-hmm.  Is there -- does the quality
18 control supervisor look into issues like this
19 where there's medication delays?
20     A.  All types of issues.
21     Q.  That's a yes?
22     A.  Yes.  All types of issues is CQI.
23     Q.  Okay.  And, to your knowledge, were
24 there any working groups or quality control
25 committees that are looking at any of the aspects

63 (Pages 246 - 249)

Page 250

1  of the medication administration at Cook County
2  right now?
3      A.   That I'm not -- I have no privy of
4  that.  I don't know.
5      Q.   Okay.
6      A.   That would be CQI.
7      Q.   All right.  Those are all the
8  questions I have right now.  Thank you very much,
9  Susan.
10      MR. COYNE:  I don't have any
11  questions.
12      MR. DeVORE:  I have none.
13      MS. ERICKSON:  All right.  Debbie,
14  I'll send you the exhibits.
15      THE COURT REPORTER:  Signature?
16      MR. DeVORE:  We'll reserve.  Actually,
17  no, we'll waive it.
18      THE COURT REPORTER:  Are you ordering
19  this typed up, Kirstin?
20      MS. ERICKSON:  Please, yes, Debbie.
21      MR. DeVORE:  We'll reserve then.
22      THE COURT REPORTER:  And do you want a
23  copy, Jason?
24      MR. DeVORE:  Can I talk to my client?
25  But obviously I understand in order to view it

Page 251

1  we'll have to order it.  So yeah, let me see.
2      MR. COYNE:  Was signature waived or
3  reserved?
4      MS. ERICKSON:  I think he switched it
5  to reserved.
6      MR. DeVORE:  I switched it.  I
7  reserved it.
8      MS. ERICKSON:  We'll order a copy
9  whenever after it's approved.
10      THE COURT REPORTER:  We really don't
11  hold the original while waiting for signature.
12  We'll get it to you so you'll have it.
13      And then, Mr. Coyne, do you need a
14  copy?
15      MR. COYNE:  No copy.  Thank you.  I
16  appreciate it.  No copy needed.
17      (The deposition was
18          concluded at 4:20 p.m.)
19      (Signature was there-
20          after waived per further
21          communication with
22          Mr. DeVore.)
23      --oo0oo--
24
25

Page 252

1          CERTIFICATE
2             OF
3  CERTIFIED SHORTHAND REPORTER
4
5      I, DEBRA L. KLESZYK, a Certified Shorthand
6  Reporter of the State of Illinois, CSR License
7  084-002981, do hereby certify:
8      That previous to the commencement of the
9  examination of the aforesaid witness, the witness
10  was duly sworn by me to testify the whole truth
11  concerning the matters herein;
12      That the foregoing deposition transcript
13  was stenographically reported by me and was there-
14  after reduced to typewriting under my personal
15  direction and constitutes, to the best of my
16  ability, a true and accurate record of the
17  testimony given and the proceedings had at the
18  aforesaid deposition;
19      That the said deposition was taken before
20  me remotely via videoconference at the time and
21  place specified;
22      That I am not a relative or employee or
23  attorney or counsel for any of the parties herein,
24  nor a relative or employee of such attorney or
25  counsel for any of the parties hereto, nor am I

Page 253

1  interested directly or indirectly in the outcome
2  of this action.
3      IN WITNESS WHEREOF, I do hereunto set my
4  hand at Elk Grove Village, Illinois, this 25th day
5  of May, 2022.
6
7
8                _Debra J. Kleszyk_
                 DEBRA L. KLESZYK
9             Certified Shorthand Reporter
                License No. 084-002981
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

64 (Pages 250 - 253)

**[& - 2022]**  Page 1

| & | | | |
|---|---|---|---|

**&**  3:3

**0**

**0000**  149:14
**000001**  4:17 200:4
**000503**  200:5
**000504**  200:18
**000963**  4:16 192:9
**000978**  192:10
**000979**  198:6
**000999**  159:17
**008948**  1:5
**0534**  225:25
**084-002981**  252:7
253:9

**1**

**1**  8:10 214:14,19
220:16
**10**  25:7,8 45:5
192:22 193:11
214:15 221:17
222:10,21,22
225:10,23 229:13
232:5
**10's**  229:5
**100**  49:6 197:7
**10:00**  222:7,7
**10:05**  42:14
**10:07**  42:17
**11**  1:23 2:5 225:22
226:9,24 229:2
232:24
**11:00**  221:22
224:19,22
**11:10**  91:4
**11:11**  91:11
**11:25**  91:12
**12**  56:18 209:20
226:3,8 231:18
232:24 245:15

247:4
**12/17**  201:14
**12/17/15**  196:15
196:21,24,24
197:1
**12/3/15**  192:24
193:4,8
**12/4/15**  198:10
**12/7/15**  224:19
**12/8**  201:10
**1207**  4:16
**12:00**  59:19,20
**12:29**  143:18
**12:30**  141:22,25
**13**  149:11
**14**  208:20
**149**  4:12
**15**  182:11,11
193:19 234:21
**159**  4:14
**17**  31:1 130:21
132:24 149:11,23
153:23 158:20
159:1 162:4 183:1
183:20,24 202:24
208:5
**1750**  3:18
**18**  225:9,21 231:13
**1875**  253:8
**19**  12:12 30:22
231:15 233:7
**190**  175:13 194:24
195:2 198:2
**192**  4:15
**1957**  8:10
**1975**  9:12
**1984**  9:17,24 10:18
10:19 12:1,17
**1:00**  56:17,17,21
57:4,13 58:6,21
59:15,18 60:25

143:14,15
**1:02**  143:19
**1:54**  180:5

**2**

**2**  142:7 148:14
192:22 193:12
214:15,19,24,25
215:4 225:10,23
228:16 234:18
236:3
**20**  3:11 156:20
159:18 197:6
**200**  4:17 175:20
217:21
**2003**  14:21
**2012**  20:23 21:8
22:3 30:21,25
31:8,11,23 32:9,22
33:3 34:22 35:1
35:12,15,19 37:16
38:14 42:25 43:20
45:20 49:15 54:11
54:16 55:10 56:3
57:11,20 65:11
66:12 128:20
188:16
**2013**  11:10 149:23
151:4,5,15 152:25
153:5,13,23
154:11
**2014**  159:23
**2015**  30:25 35:1,12
35:15,19 49:23,25
50:7,10,15 51:8,19
54:11,16 55:2,10
56:3 57:11,20
62:24 65:11 66:12
66:12 67:13 106:1
107:3 111:19
127:5,17 130:21
132:24 133:14

134:10 137:8,19
138:7,15,24
139:10 147:2
156:24 158:20,25
164:15 183:1,20
183:24 188:25
192:17 198:15
199:22 200:7,14
200:20,22,22
201:23 203:25
206:2,8,12,19
207:5,11 208:3,5
208:16,24 210:2
221:15,21 223:17
**2016**  207:10
209:20 213:3,23
214:6,14,19
217:11 225:9,21
225:22 226:3,8,9
226:24 228:17
229:2 231:14,15
231:18 232:24,24
233:7 234:6,18
236:4,10,15
**2016x0534**  217:24
225:18 226:5
228:19 231:20
233:13
**2017**  30:22 31:10
111:20 133:15
134:11 136:12
138:2,7,15,24
139:10 147:2
156:24 174:3
188:25
**2019**  1:5 162:17
163:6
**2020**  136:15,17
137:8,19 138:2
**2022**  1:23 2:6
253:5

**[21 - administration]**                                                    Page 2

**21** 137:4,4,5
  159:23
**210** 175:19
**22** 234:6
**24** 200:14 203:25
  206:11 207:11,11
  246:7
**24.14.5.0.** 159:19
**24/7** 247:10
**24th** 200:7
**25** 199:21 206:2
  207:11
**250** 175:19
**25th** 253:4
**27** 207:10
**2700** 2:8 8:19
  41:24
**29** 208:16,24
**2:00** 222:7
**2:16** 180:5

**3**

**3** 192:17 193:19
  201:1 202:22
  208:3
**30** 5:16 143:3
  182:12 230:12
**300-4479** 3:12
**31** 210:1
**312** 3:5,12,19
**332-2400** 3:5
**333** 207:8
**35** 8:23 230:1
  239:10
**3500** 19:25
**3:27** 227:11
**3:40** 227:8
**3:44** 227:11
**3rd** 196:5

**4**

**4** 198:15 213:3,22
  214:6 217:10
**48** 246:7
**4:00** 226:4 231:18
**4:20** 251:18

**5**

**5** 4:5 217:11
**502** 203:25
**504** 205:8
**505** 201:20
**507** 220:17
**525** 3:11
**53** 3:18
**550** 128:7
**559** 127:23
**59.80** 21:5
**5:00** 56:17,18 57:4
  57:13 58:6,22,23
  59:15,18 60:25
  206:3
**5:30** 221:21
  224:19

**6**

**6** 245:15
**600** 3:4
**60602** 3:4,11
**60604** 3:18
**64.5.45.0** 149:3
**6:00** 57:13,13
  59:19,20 60:11,11
  60:13,14,20,20
  61:2,2 222:8
  224:21 232:4

**7**

**7** 149:15 221:21
**7:30** 214:14

**8**

**8** 79:2,5,7 195:14
  200:20,21,22
  201:23 221:15
  223:17 236:10
  237:10
**80** 197:11
**87** 9:4
**8:00** 58:22
**8:30** 226:4 231:19

**9**

**9** 200:21 206:8
  236:15 237:11
**9-1-1** 144:20
**929-4308** 3:19
**962** 4:17
**969** 221:13
**970** 224:22
**979** 208:4
**982** 213:2 214:1,4
  214:5
**983** 214:3
**984** 217:20
**987** 225:6 226:23
  229:2 231:19
**991** 228:15 233:12
**992** 236:1
**9:05** 2:6
**9:06** 210:2
**9:10** 195:14
**9:15** 225:23
  226:25 229:3,17
  229:21
**9:55** 42:16

**a**

**a.m.** 2:6 42:16,17
  56:16 57:4,20
  58:5,21,22 60:11
  60:13,20 91:11,12
  195:14 210:2

  225:23 226:25
  229:3,17
**ability** 252:16
**able** 16:21 41:25
**acceptable** 56:24
**access** 7:24 51:21
  97:13 125:22,22
  158:17 215:5
  217:5
**account** 58:25
**accuracy** 71:10
**accurate** 71:18
  197:15 198:16
  200:8 241:23
  252:16
**accurately** 71:4
  232:20
**ace** 69:2
**action** 18:15 64:7
  64:10 164:18
  197:17,17 217:2
  253:2
**actual** 218:2
**addison** 1:12
  229:4
**address** 8:11,12,14
  8:15,21 190:16,19
  214:3 233:18,19
  234:14 235:4,14
  235:19,20 236:11
**addressed** 218:25
**administer** 57:22
  121:17
**administered** 4:24
  52:5 123:24
  230:24 240:25
**administering**
  155:7
**administration**
  4:12 149:4 199:11
  250:1

**administrative**
66:5 208:19
**administrator**
19:10 236:19
**admitted** 207:6
249:9
**advice** 109:16
**advil** 120:21,21
121:24 122:6
**advised** 109:20,21
**advisement** 211:5
**advising** 210:22
**aforesaid** 252:9,18
**afternoons** 75:8
**agency** 12:12
154:9
**ago** 78:1 116:22
118:5 241:24
243:1
**agree** 217:17
**agreement** 5:14
**ah** 16:11 138:4
**ahead** 33:19 73:1
84:24 87:25 90:10
92:12 99:6 103:2
104:10 107:11
120:18 122:4
162:19 170:17
197:9 230:10
246:21
**ahold** 189:18
**airtight** 197:19
**albuterol** 120:24
144:1,4 204:13
244:7
**alert** 204:2,10
205:18
**allegations** 66:8,9
**allergic** 100:14
**allowed** 89:24
113:25 114:15,21

114:22 115:18
147:3 166:14,21
166:22,23,24
167:18 168:6
174:23 217:5
**altman** 1:12 3:21
**amoxicillin** 120:1
120:2 204:25
**analyst** 21:10,12
42:23,24,25
129:12 188:12
**anaphylactic**
100:14 102:19
104:1
**andrews** 1:16
**angela** 132:8,9
**angina** 111:10,12
113:24 210:25
211:4
**answer** 7:3,9,15
8:3 27:8,11,12
28:8 29:22 31:2
33:15 37:21 44:11
47:6,19 48:24
49:13 50:11,24
53:6 54:8,20,22
55:8,22,25 59:24
62:12,13 63:13
64:21 65:6 66:20
67:1 68:13 69:20
69:21 70:11,15
71:8,13,25 73:3
74:7,17 77:17,19
79:23 81:7,20
83:12 84:5 86:15
88:4 92:4 99:20
103:2,9 106:4,4,8
112:14 114:25
119:7 123:5
124:25 125:5
131:24 141:23

145:24 147:12,16
157:5 163:16
165:16,20 171:14
171:24 174:15,16
174:20 183:21
187:9 189:23
190:5,8,9 202:17
207:13 210:21
212:24,25 222:17
226:10 228:6
229:18,21 232:13
242:21 245:18
248:10
**answered** 32:24
33:14 70:5,18
71:6,7 82:3 83:9
84:17 87:25 91:3
92:3,10 95:14
103:18 106:16
107:9,18 117:21
118:4 124:11
130:24 131:5
152:20 164:22
190:23,24 209:23
209:24 213:25
219:22
**answering** 72:25
112:9 164:13
222:15
**answers** 6:23
190:17,18
**anti** 121:4
**antibiotic** 120:7
**antidepressants**
121:3
**anxiety** 121:4
238:18,22
**anybody** 115:4,22
154:2 163:22
168:21,24

**anymore** 38:19
135:16 162:15
**anyway** 190:11
223:15
**apologize** 93:14
169:13
**apparently** 218:15
218:18
**appeal** 208:24
236:11,17
**appeals** 208:20
210:11
**appearance** 222:2
**appeared** 2:8 3:6
3:14,20
**appears** 214:2
217:14
**applicable** 5:17
155:11
**applied** 21:22
**apply** 160:8
**appointment** 77:2
116:8
**appreciate** 142:24
251:16
**appreciated** 8:5
**appropriate** 19:22
212:11
**appropriately**
70:8
**approved** 251:9
**approx** 232:4
**approximately**
19:25 34:23 222:3
**area** 26:13 29:15
29:16 33:22 80:21
81:6 93:1 105:7
177:16 222:17
245:2,3
**areas** 26:13

**argumentative** 113:12

**arias** 1:13

**arrested** 78:6

**arrive** 197:21 247:4

**arrived** 199:21 200:6

**asked** 33:13,17,20 62:16 71:5 73:7 82:3 83:8 84:17 86:16 87:25 92:3 92:9 95:13 103:16 105:18 106:15 107:8,17 108:12 117:20 118:4 124:10 130:23 133:7 152:19 168:11 189:15,17 229:5 230:19

**asking** 30:17 83:18 99:19 108:23 125:9 168:20 176:13 189:11 222:4,5 246:6

**aspect** 17:24 18:17

**aspects** 249:25

**aspirin** 30:17

**aspirins** 29:15

**assessment** 145:15

**assessments** 13:16 13:16 15:5

**assign** 140:13 187:25 226:11,17

**assigned** 44:19 45:23 50:20 57:1 165:21 213:12 218:7

**assignment** 165:3 187:24

**assigns** 46:9

**assist** 63:5 211:5 232:12

**assistant** 13:17 14:15 40:18,20,23 41:3,4,9 203:13

**assisted** 43:4,6,12

**associate** 9:19,22

**assume** 7:10 117:13 147:15,16 147:17

**assumes** 113:12 170:15 228:4

**assure** 72:12

**asthma** 204:16 209:1

**attach** 182:12

**attack** 108:18 109:10,13 111:3,9 111:14,23 112:1 238:20 239:1

**attacks** 232:7

**attend** 9:5,13,24 132:12 142:14

**attending** 9:23

**attention** 215:2 222:5 232:10,16

**attest** 56:8

**attorney** 11:24 252:23,24

**audit** 16:16,21,25 17:23,23 18:1 22:5 23:7 31:6,20 31:21 32:1,1,7 35:7 38:15 39:24 49:16,16 53:1,12 64:17,19 152:14 185:4 188:20

**audited** 17:24 35:15

**auditing** 22:2 34:21 35:2 43:1,1 152:8

**auditor** 31:18 146:11,12 152:3

**audits** 16:4,16,22 16:25 17:7,8 18:25 21:16,19 53:3,10,15,23 55:7 55:7,9 68:12 151:5 185:6

**avenue** 2:8 8:19

**aware** 6:15 90:4 90:25 91:1 106:20 107:3,12 114:17 114:19 129:10 210:14,24

**b**

**b** 4:14 5:11 156:4 159:6,9,14 161:17

**back** 7:13 12:13 14:13 22:5 42:14 42:18,20 46:23 51:2 62:2 77:3,15 77:22 86:19,19,22 87:13 91:7,13 100:3 101:23 102:1,3 117:25 119:8 125:11 143:7,20,23 150:15 154:11 158:5 168:2 170:24 172:3 174:22 179:24 180:6 184:3 187:13 201:19 207:5 208:2,12 209:21 222:10 227:8 228:14,22 233:10,12,25 234:2 239:25

240:3,7

**background** 5:22

**bad** 52:2 79:22 104:11 106:11 129:21 136:4 145:8

**baker** 3:3

**bandages** 22:24

**banded** 141:19

**based** 110:15 194:12 211:20,23 211:23

**basically** 73:19 210:20 217:3

**basis** 139:20

**bates** 149:13 159:17

**bed** 43:12 44:15 44:16 45:19 46:12 46:16 49:17

**bee** 100:13 102:19 104:2 106:11 145:7

**began** 22:3 35:23 36:22 38:17 65:22 66:2 222:3 232:6

**beginning** 35:21 36:6 85:18

**behalf** 2:2 3:6,14 3:20

**believe** 12:11 16:23 33:16 43:25 48:1 56:7 60:10 77:25 78:19 91:20 146:3 149:22 151:8 161:20 162:17 176:19 180:14,15 186:9 187:6 188:5 203:18 204:20 217:9 225:17

233:10 248:9,10
**believed** 231:10
**belonged** 141:17
**belongs** 172:17,18
**benton** 9:14
**best** 51:20 96:2
　107:13,24 241:14
　252:15
**better** 7:19,20
　17:5 57:1 84:5
　98:11 146:14
　226:11 249:7,14
**bid** 56:13 58:8,11
**bigger** 239:12
**birth** 8:9
**bit** 224:18
**blank** 132:8
**bleed** 145:8,9
**blood** 120:10
　204:6
**bloodworth** 1:17
**body's** 55:24
**book** 43:6,7
　151:20,22 152:1,9
　152:22 153:8
　160:14 185:9,12
　185:13,17,18
**born** 9:4
**boss** 129:19,20
　132:24 133:1,25
**bottle** 114:18,20
　156:16
**bottom** 209:19
**boulevard** 3:18
**box** 140:7 163:7
　182:13 208:14
　222:23 223:3,7,14
**boxes** 162:11
　166:8
**boy** 12:12 22:4
　156:18

**bozyk** 1:13
**break** 8:4 42:1,8
　42:10,15 91:4,10
　91:15 93:16
　103:21,24 142:2,4
　142:10 143:17
　179:19,25 180:2,4
　227:2,3,10
**breaking** 142:25
**breaks** 8:2
**brief** 68:25
**briefly** 103:25
**bring** 18:18,25
　28:4,5 82:9
　105:13 106:13
　139:4,22 141:2
　157:25 182:20
　189:10 223:7
**bringing** 183:10
**brings** 27:15
**broad** 93:21
**brought** 18:11,14
　19:2 223:14
**buchanan** 1:13
　3:21
**buffalo** 9:6
**building** 24:13,21
　25:9 41:22 47:23
　48:2,6,8,12 49:4
　49:12 67:10 73:21
　78:17 79:2,14,19
　80:5
**buildings** 68:7
**bullpen** 80:21
　81:23 82:9,21
　83:2,6,21 88:12,14
　88:16,19 89:9,14
　89:15,18,23 90:12
　90:21,22 91:1,16
　91:19 92:1,15,22
　94:3,17 96:14

97:4 98:15,18
99:2,8,16 100:8,15
102:24 104:4
105:5,14 107:4
108:6,17 110:18
113:1 221:23
222:2,6,14 232:3,5
239:8
**button** 232:13

### c

**c** 1:14,16 3:1,17,17
　4:15 156:1,1
　161:18 192:3,7,22
　193:12 214:15,19
　214:24,25 221:22
　225:10,23 232:3
**c's** 215:4
**calcium** 120:15,21
**california** 2:8 8:19
　41:24
**call** 8:7 39:2 68:2
　68:4,24 88:9
　89:11,12,13 90:6,6
　90:11 92:14 94:12
　96:20 99:10
　100:15 101:4,10
　102:9,14,20,20,23
　103:13,19 105:10
　105:12,22 106:12
　106:18 109:4,4,14
　109:15,16,18,19
　109:19,22,23
　110:4,5,17,20
　117:23 118:23
　126:19 142:8,8,14
　142:16 157:24
　158:22 159:2
　179:20 183:15
　191:16 229:7
　232:13

**called** 5:4 12:3
　43:16 89:12 101:1
　102:7 127:19
　181:24 183:13
　226:3 234:14
　235:13,16,16
**calling** 81:2 106:7
**calls** 29:20 43:21
　60:5 66:19 72:23
　74:6 82:2 83:9
　92:24 93:9 94:20
　96:8 97:7 99:18
　100:19 102:25
　103:5 104:4,6,7
　106:2 107:5,9
　108:21 111:5
　112:4 118:21
　119:18 122:2,17
　123:1 144:20
　216:22 219:4
　237:13 245:16
**cally** 182:23
　247:22
**cameras** 232:11
　233:4
**capacity** 1:7,10,12
　55:21
**carbon** 182:3
**care** 10:7,7,25
　11:1,3,5 12:23,25
　13:4,5,8,9,14,24
　14:1,13,14,20,24
　15:1,4,9,13 16:3
　17:20 24:6 44:18
　44:20,22 45:4,13
　46:5,6,10,13,14,20
　48:15,18,19 72:6
　72:10,11 75:11,20
　76:6,8,17 78:12,13
　79:10,12,24 80:11
　82:10,15,17 85:22

**[care - check]** Page 6

85:25 86:1,2,9
87:4,20 88:20
89:20,23,24 90:2
91:19,21 92:13,16
92:20 93:8 94:4,7
94:7,18,19 95:1,2
95:5,5,7,24 96:6
96:14,15,16,18,19
96:20 97:3,5
98:15,18,23,24,25
99:3,9,11 109:19
112:7 178:25
190:11 215:9,10
215:13,15 216:1
220:23 236:12
237:2 244:24
**carry** 115:19
**cart** 23:16 27:10
27:20,22,22,23,24
28:6,12,13 29:17
34:5,6,9,11,14
46:23 47:1,8
52:11 147:3,6,8,14
147:14,19 157:19
157:23 215:4,4,22
**carts** 26:7,19,21
26:23 27:1,4,6,10
27:16,19 28:5,7
248:13
**case** 2:2 6:14 26:4
104:9 119:2,3,5
122:3 124:23
208:23 228:11
235:1 243:16,18
**cassettes** 28:5
248:18
**category** 157:8
**catheters** 22:22
**cause** 145:25
238:18

**causes** 6:21 238:23
**ccdoc** 155:1
160:21 161:12
162:22 163:6,23
166:1 172:6 205:3
205:18 232:6
240:7
**ccsao** 4:16,17
192:8 200:4
**center** 15:20,23
16:2,20 19:15
20:2,9
**cents** 21:6
**cermak** 1:9,11 6:4
6:12 20:20,22,25
21:8,24 23:21
24:4,15 26:22
38:14,17 39:6
41:6,7,9,14,18,21
41:22 42:5 47:23
47:23 48:3,9,9,12
49:1,4,11 50:15
51:12,18 52:3
54:2,4,15 55:10
58:18 65:1,19
66:17,25 68:18
70:2,6,25 71:11
72:5,17 73:4,9,11
73:16 79:5,25
80:1,3,4,5,6,8,11
80:23,24 84:3,10
85:7 88:12,16,23
89:4,15,19 97:2
121:17 132:10,11
134:25 135:3
139:8,11,15
147:21 148:5,18
148:20,20 153:19
153:21,21,23
154:1,1,7 155:1,6
155:12 156:2

158:20 159:1
160:8,17 163:14
163:23 165:7
167:17 168:5,18
169:21 171:9,19
171:21 172:1,6,9
172:14,18,21
173:4 174:25
175:1 176:7,15,18
176:24,25 177:3,4
177:10 181:7,22
181:24 182:1
183:7,12 184:20
186:23 187:17
188:2 189:7,25
194:5 195:17,20
196:7 198:8,15
212:1 213:4,15,17
215:2,7,25 216:4,5
216:7,18 217:4
222:12,21,23,24
222:25 223:2,3,4,8
223:11 224:1
225:14 229:12,16
231:9,22 233:19
234:10 237:18,22
238:9 239:11
242:14 244:13
246:14 247:3
**cermak's** 80:25
160:14 222:23
**cerner** 51:13,15,16
51:18,22 52:5
206:25
**certain** 18:18
58:18 75:7,12
77:9 133:20
147:22 153:15,16
155:24 157:17
221:4 243:8
245:21

**certificate** 252:1
**certificates** 10:3
11:1,9
**certification** 15:10
15:12
**certified** 2:3 10:5
252:3,5 253:9
**certify** 252:7
**ceus** 10:5,10,12
**chain** 140:21
181:9
**chair** 216:10
**chaired** 216:14
**chance** 68:5
**change** 21:25 22:1
45:7,11 134:22
212:8
**changed** 44:1,7
49:25 156:18
174:3 176:20
**changeover** 32:17
**changes** 45:8,12
**changing** 247:2
**channels** 240:23
**charge** 44:9 46:16
64:17 73:16,18,19
85:5,5 88:6
187:20 195:4
**chart** 18:1,4,5
50:22 51:5,6,22
52:22 178:1 179:8
179:13 191:3
201:13 203:9
209:10,12 211:11
212:5,6,24 216:12
230:13 238:21
**charts** 16:25 17:12
17:12,13,14,15,19
**check** 21:21 23:2,6
23:12 141:4 163:7
182:13,16 208:13

241:16
**checked** 21:21
22:20 163:11
182:16 225:13
231:11,21,21
**checker** 23:2,3
**checking** 23:2,3
**checks** 162:10
165:8
**chest** 108:6,16,18
109:9,14 110:19
111:1,8,12,13,22
112:17,19,22
113:2,24 115:23
116:2,4,14,22
117:6,15 123:19
123:21 125:17
126:14 145:13,16
145:17,18,19
205:21,25 206:3
210:15 211:1
215:17 217:8
222:4,11 224:13
227:25 228:3
229:5 231:5 232:6
232:9,11 238:4,15
238:19,23,24,25
239:8
**chicago** 2:8 3:4,11
3:18
**chief** 40:23
**cholesterol** 204:8
205:4
**chronic** 204:1,2,10
**chronologically**
207:5
**chs** 236:24
**circumstances** 6:3
**city** 12:6,22 13:4
**civil** 2:7 5:16

**clarify** 53:15
**clark** 3:11
**class** 188:14,18
**classes** 15:12
**classification**
205:8
**clear** 23:22 101:19
**clearly** 108:23
219:5
**clerk** 140:16 141:9
185:21 186:5
195:16,21
**clerks** 195:19,20
248:16
**click** 22:14 153:21
239:19
**client** 250:24
**clinic** 26:12 188:1
**clinical** 21:9,11
42:21,24 129:12
188:12
**clinically** 15:7
**clipped** 141:19
**close** 13:2 174:17
**closely** 239:13
**coaching** 125:3
**code** 140:12
172:16 173:6,8,10
173:15 175:9
176:2 194:19,24
195:1 244:18
**codes** 172:16,16
175:11
**cohesively** 155:8
**coincide** 21:19
**college** 9:13,14,23
10:4
**colleges** 9:25
**combined** 47:10
**come** 30:12 42:14
51:3 75:8 77:15

77:22 78:5 92:15
96:20 99:2,10,15
100:7,15 101:1
102:8,23 104:4
105:5 106:13
126:20 146:18
150:16 174:14
181:18 190:21
208:13 227:8
229:9 234:15
235:2,3,5,7,21
240:3,6 246:16
247:7 248:6
**comes** 76:10,21
246:8
**coming** 74:14 77:3
78:2,6 104:24
177:15 181:14
183:4 212:13
239:25
**commack** 232:9
**commencement**
252:8
**commencing** 2:6
**comments** 128:23
129:5
**committed** 58:1
**committee** 249:15
249:16
**committees**
249:25
**common** 243:17
243:20,21
**communicate**
67:14,17,25 68:1
**communication**
251:21
**company** 19:14
32:19
**compare** 217:18

**compartments**
28:1,2
**complain** 169:6
243:10
**complained** 167:4
167:7 179:1,3
**complaining**
108:17 109:9
169:21 171:10
172:19 177:16
190:15 197:14
222:14 241:13
**complains** 112:17
113:2
**complaint** 169:4
174:17 177:15,18
179:4 192:12
193:3 221:20
**complaints** 169:6
174:16 234:15
235:5,14,19,20
243:7
**complete** 140:6
**completed** 140:24
141:11 196:23
231:14
**completes** 165:11
**compliance**
155:14,19,20
**components** 55:25
190:10
**computer** 7:23
38:22 39:1,12
51:22 52:11 55:14
152:16 200:11
231:3
**concern** 102:17
103:14 110:19
111:1,2 167:13
**concerned** 228:8

**[concerning - correctional]** Page 8

| | | | |
|---|---|---|---|
| **concerning** 167:15 | **control** 16:7 43:12 | 153:20 155:5,11 | 65:12 69:11,25 |
| 228:1 252:11 | 44:15,16 45:19 | 155:13 158:6 | 75:21 86:11 96:13 |
| **concluded** 251:18 | 46:14,25 49:17 | 159:15 167:17 | 102:16 130:25 |
| **conclusion** 230:14 | 84:8 140:14,20,25 | 168:4,17,18 | 133:23 135:1,4 |
| **condition** 105:12 | 141:7 150:11 | 172:13,23 174:25 | 138:3 139:16 |
| **conference** 142:8 | 166:5 173:7,9 | 176:1,7 177:19 | 140:2 155:2,4 |
| 179:20 | 174:8,12,15 181:9 | 184:3 185:10 | 161:19 162:12 |
| **confirm** 241:9,10 | 181:11 182:10,11 | 186:23 188:16 | 172:15 173:1 |
| **confused** 89:3 | 183:14 194:10,11 | 189:19 195:19 | 176:4 177:22 |
| 183:5 | 194:16 208:8,10 | 196:5 198:19 | 192:22 195:18 |
| **confusing** 29:19 | 213:12 214:7 | 207:6 213:8 | 196:8 198:17 |
| 114:24 170:3 | 217:23 218:2,4,7 | 217:22 225:13 | 200:15 201:10 |
| 224:18 | 218:10,16,18,24 | 233:15 234:4 | 202:4 203:3 |
| **consider** 144:24 | 225:17,24 226:5,6 | 238:9 239:12 | 204:14 205:19 |
| 145:1,5 154:5,15 | 226:12,17 228:19 | 240:3 241:1 | 206:3 208:17,21 |
| 176:25 | 228:24 231:20 | 242:13 244:13 | 210:3 213:13 |
| **consideration** | 233:13 249:18,24 | 246:8,14,17 247:3 | 217:11 221:17 |
| 209:3 | **convicted** 11:15 | 247:5 248:23 | 223:19 224:16 |
| **considered** 99:15 | **coo** 40:18,20 41:3 | 249:9 250:1 | 225:10,14 234:7 |
| 100:5 111:22 | 41:4,9,14 55:14 | **cooperation** | 234:19,22,25 |
| 129:11 144:7 | 134:24,25 138:6,6 | 154:25 | 241:2 244:3 |
| 145:13,19 186:19 | 176:9 189:5,7,11 | **coordination** | 247:19 |
| **constitutes** 252:15 | 189:17 | 154:25 | **correction** 63:15 |
| **contact** 72:2,13 | **cook** 1:6,8,8,9,11 | **coordinator** 42:21 | 166:2 |
| 127:12 191:8,10 | 20:24 21:1 23:20 | 42:22 | **correctional** 15:19 |
| 191:11 229:5 | 23:23 24:9,12,21 | **copy** 153:5,11 | 15:23 16:2,20 |
| **contacted** 8:17 | 35:16 36:7,12,19 | 182:3,3,4,5,19,19 | 19:15 20:2,9 |
| **contacting** 73:16 | 36:22 37:15 38:6 | 233:16 250:23 | 69:15,23 73:15 |
| **container** 156:17 | 38:17 39:22 41:5 | 251:8,14,15,16 | 90:14,20,22 92:22 |
| 197:20 | 41:6,19,23 46:15 | **corizon** 17:2,5 | 93:5 94:5 95:4,23 |
| **contains** 236:1 | 47:22 65:1,22 | 19:14 | 96:5,13 97:4 |
| **contents** 213:15 | 66:2 96:21 97:1 | **corner** 162:8 | 98:19,22 100:18 |
| **context** 53:12 | 105:25 108:20 | **correct** 10:14 | 100:24 102:4,13 |
| 123:15 | 113:9,15,19,25 | 11:22 12:19 15:8 | 102:20,22 104:3 |
| **continue** 36:23 | 114:9,14 118:12 | 16:8 17:17 18:19 | 104:19 107:5,7 |
| 185:25 186:2 | 119:13 124:3 | 18:20,24 19:16 | 108:20 110:16 |
| **continued** 134:17 | 127:9,25,25 | 21:13 24:5,7,10,23 | 126:19 127:11,18 |
| **continuing** 205:7 | 129:17 132:10,12 | 25:6 30:4 35:11 | 127:23 144:6,19 |
| **continuous** 16:12 | 132:16 138:8,15 | 35:13,13,18 39:10 | 146:4,19 161:16 |
| 16:13 | 138:25 144:11 | 39:15,18 40:25 | 165:18 190:2 |
| | 147:20 150:1 | 50:1,3,8 63:1 | |

corrections 23:24
24:12 70:24 71:20
88:21 96:22 97:2
104:23 105:25
125:23 126:5
127:9 138:16
144:11 155:12
159:16 165:11
168:17 184:4
185:11 189:1
207:7 234:5
corrective 64:7,10
correctly 63:8
counsel 8:18 142:7
252:23,25
counselor 193:7
198:14 234:9
count 6:6 23:10
24:15 49:5
counted 22:11,12
county 1:6,8,8,10
1:11 20:24 21:1
23:20,23 24:9,12
24:21 35:17 36:7
36:12,19,22 37:15
38:6,18 39:22
41:5,6,19,23 46:15
47:22 65:1,22
66:2 96:21 97:1
105:25 108:20
113:10,15,19,25
114:9,14 118:13
119:13 124:4
127:9,25,25
129:17 132:10,12
132:16 138:8,15
138:25 144:11
147:20 150:2
153:20 155:6,11
155:13 158:6
159:15 167:17

168:5,17,18
172:13,24 175:1
176:1,7 177:19
184:4 185:10
186:23 188:16
189:19 195:20
196:5 198:20
207:6 213:8
217:22 225:13
233:15 234:5
238:10 239:12
240:1,3 241:1
242:14 244:13
246:8,14,17 247:3
247:5 248:23
249:9 250:1
couple 13:12
176:21 203:19
241:24
court 1:1 6:24 7:4
61:11,14 63:21
65:3 77:22 142:9
142:17 221:22
222:2 232:3
250:15,18,22
251:10
covering 239:20
coyne 3:17,17
62:11,15 142:3,4
142:24 143:4,15
149:12,16,19
179:18 180:3
227:6,9 250:10
251:2,13,15
cqi 16:4,6,9,23
18:12 130:4,5,7,8
133:18 134:8,16
134:19,21 135:11
137:24 152:2,6
153:5,24 249:22
250:6

creating 247:1
crime 11:16
cross 25:20
crw 140:10,17
141:1 161:21
162:2 164:23
165:22 181:1
185:21 186:5
193:7,10,14
198:14 233:15
234:9 236:2
crws 131:3,17,23
180:9
csr 252:6
curious 206:22
current 8:11,21
66:16 67:8,13
173:25
currently 65:14
200:5 234:16
235:23,24
custody 72:4 85:6
86:2 140:22
176:10,11 181:9
205:19
custom 39:7 40:3
105:15,24 107:2
107:15,20 115:11
124:3 152:24
153:4 168:16
183:23 220:5
cut 126:2
cutoff 75:19
cuz 22:5 60:15
61:6 72:1 73:25
137:25 158:10
161:7 226:11
cycle 156:19,21,23
156:25

## d

d 1:15,18 4:1,17
133:9,9 199:23
200:2
daily 156:5,8
180:9 181:19
danger 121:12
dangerous 245:14
246:9
dart 1:7
date 8:9 22:25
34:15 44:2 45:10
141:14,21 149:10
149:22 159:22
162:18 178:18
179:6,9,9 181:12
181:15,15 192:16
192:24,25 196:15
196:15,23 200:21
203:14 207:9
208:20,24 209:19
209:21,22,24
210:10 214:18
217:19 218:17,19
218:20,21,22
220:15,19,19
223:19 224:21
226:2 229:4
231:14
dated 141:20
193:18,21 194:18
201:13
dates 22:12,20
174:17 193:8
200:13
daughter 8:25 9:1
9:2,2
day 16:15,15
39:17 48:21,22
50:14,14,16,16,17
50:17,20,21 51:3

**[day - devore]** Page 10

58:12,14,16,20
60:25 132:20
141:3 196:6 197:3
197:11 203:20,20
203:22 206:1
217:11 223:18
231:17 233:9
245:9 246:15
248:7 253:4
**days** 77:14 156:17
184:2 196:6
202:23 203:19
208:20 234:21
245:9
**daytime** 248:5
**debbie** 61:23
86:19 87:10 99:25
101:25 125:8
167:23 170:21
250:13,20
**debra** 2:3 252:5
253:8
**december** 192:17
193:19 195:14,24
196:5 198:15
200:20,21,21,21
200:22 201:1,1,23
202:22,24 206:8
208:3,5,16,24
210:1 221:15,21
223:17 225:8
**decide** 18:16 46:8
63:2,9 81:10
82:14 85:7,10
100:25 102:5
140:14 190:1
239:12 242:14
**decided** 36:19
193:25 194:4
195:2

**decides** 45:2,18
60:1 161:23
165:14 166:4
177:9,11
**deciding** 46:16
**decision** 82:17
146:10 162:2,3
164:13 165:19
211:20
**decisions** 177:20
**deem** 162:2 221:8
**deems** 103:11
211:18
**default** 202:19
**defendant** 6:10
66:8
**defendants** 1:19
3:14,21
**definition** 161:16
**definitions** 155:24
161:15
**degree** 9:16,18,19
9:22
**delay** 197:20
246:6,15
**delays** 249:19
**deliver** 158:21
159:1
**delivered** 156:11
156:12 247:14
**delivery** 156:19
**denied** 243:7
**dental** 74:21,23,24
74:24 139:18
141:17,18 175:19
247:20
**dep** 143:7
**department** 23:24
24:12 53:20 55:4
70:24 71:20 88:21
96:22 97:2 104:23

105:25 125:23
126:5 127:9
138:16 144:11,13
155:12 159:15
165:11 168:17
184:4 185:11
189:1 207:6 234:5
**depend** 59:16 77:1
81:12 112:13
120:4,4 172:19
173:5 177:8
196:25 203:16,20
229:19 238:12
242:6
**depending** 57:23
122:22 175:9
**depends** 56:13
57:14 59:7,8,9
75:6 76:5,25 82:5
82:11 88:7 92:6
145:15,25 175:6
177:13 196:1
245:10 247:7,12
**deposition** 1:21
2:1 5:13,15,25
7:24 11:18 142:11
142:18 149:6
159:8 179:24
192:2 200:1
251:17 252:12,18
252:19
**depositions** 6:5
**describe** 31:17
74:13
**described** 77:25
**description** 4:11
**design** 22:6
**details** 128:7,8
**detainee** 33:18,21
65:4 82:6 84:9
85:5,6,15 86:9

87:4,20 90:17
92:13 120:4
124:13,24 156:14
166:24 167:7
168:25 172:19
177:14 183:5
190:14 240:5,23
244:13
**detainees** 17:13,16
19:20 82:7 114:11
125:1 241:20
243:6,10 249:8
**determination**
82:12 93:6 146:8
147:1 164:6
174:14 176:2
**determine** 46:5
50:21 54:3,4
61:18 62:6
**determined** 46:12
78:9 172:17,18
**determines** 28:17
45:15 76:12
172:13
**developing** 44:3,4
**devore** 3:9,10 8:16
29:18 33:13,16
36:13 37:5,19
40:6 41:10,15
42:6 43:21 53:11
53:17 54:17 58:24
60:5 65:4 66:18
70:17 71:2,5 72:8
72:20,23 74:5,15
82:2 83:8,24
84:14,17 85:11
86:10,12 87:23
89:6 90:15,23
91:2,9 92:2,9,24
93:9 94:20 95:13
95:19,21 96:1,8

97:6,12,20 98:3,7
98:11 99:17
100:10,19 101:2,5
101:9,11,14,18
102:25 103:5,20
103:22 104:6
106:2,15 107:8,17
108:21 109:2,24
110:21 111:4
112:4 113:11
114:23 117:16,20
118:3,21,25
119:18 120:16,19
122:1,16 123:1
124:10,22 126:2
130:15,23 131:4
136:22 141:22,25
142:22 143:3,8,16
145:21 147:9
152:19 167:19
168:9 170:10,15
173:18 187:5
207:16 216:22
219:4 228:4
237:13 245:16
246:18 250:12,16
250:21,24 251:6
251:22
**devoreradunsky....**
3:12,13
**dialysis** 48:20,22
**diet** 205:3,5
**difference** 122:23
123:25 202:9
**different** 16:16
17:9,9,25 18:12
25:18 28:8 29:25
32:12,14,22 33:20
44:20 46:20 55:24
56:16,19 57:18,18
61:4 67:11 81:11

81:19 88:7 103:18
118:18 124:1
145:16 157:8
158:10 165:5
172:16 174:8,17
197:5 206:20,21
208:10 218:10
226:2 238:23
239:14 242:18
243:24 245:12,13
**difficult** 7:3
190:13
**difficulties** 233:21
248:24
**direct** 87:24
131:20
**direction** 252:15
**directive** 4:12
149:3 150:5 151:4
154:6,9,14,16,17
155:21
**directives** 151:16
152:5
**directly** 15:6
32:19 69:10 81:22
82:5 187:14 253:1
**director** 1:9,10
14:15,16,17 16:23
19:4,8,9,10 31:21
32:7 55:14 130:4
130:5,7,8 131:9,11
131:16 133:18
134:17,19,22
135:11 137:24
187:23 189:11,17
**discipline** 18:13
19:5
**disciplined** 66:1
**disciplines** 16:17
17:9 18:12 19:3,6

**disciplining** 69:7
**discontinued**
162:24
**discuss** 11:23
18:14,22 139:21
139:22 190:21
212:14 235:19
239:15,16 240:12
244:16,17
**discussed** 129:7
**discusses** 244:13
**discussion** 233:22
249:1
**disease** 204:2,10
232:7
**dishonesty** 11:16
**dispensaries** 23:18
68:7 128:12
**dispensary** 25:12
25:14,15,17,23
26:3,10,14 66:25
68:16 127:8,18,20
144:14 157:24
215:1,25 216:3
229:6,8,13,17
234:14 235:3,13
235:17
**dispenses** 248:20
**disposing** 22:17
**disproportionate**
104:8 119:2 122:3
**disregarded**
163:25 164:2
**distance** 216:19
224:11
**distributed** 156:5
246:20
**distribution** 4:13
149:5 156:2,3
**district** 1:1,1

**div** 229:13
**division** 1:2 21:21
24:20,20,22,23
25:7,8 26:24 27:7
28:8 44:20,23,25
45:2,5 46:17,19,20
64:1,5 77:5 79:2,7
81:9,22 82:5
165:25 166:2
176:20,23,25
177:8,13 184:23
192:22 193:11
205:14 214:15
221:17 222:10,21
222:22 225:10,23
229:5,19 232:5
245:3
**divisions** 67:12
176:21
**dizzy** 227:18
**doc** 45:14 46:5,7
46:14 51:3 65:8
69:18,20 70:2,4,6
71:9,11,12,15,25
72:3,4,12,17 73:2
73:3,7,12,14,17,25
80:22,23 81:9
82:14,19 83:3,15
84:4,21 85:8,16
86:1,7,8 87:1,2,6
87:17,18 88:8,13
90:3 91:23,25
92:18,20,21 93:3
95:1 96:15,18
97:8,14,14,15,18
97:24 99:2,10
100:22 102:9,12
103:11 105:8,12
106:12,23 107:20
108:1 109:3,5,12
110:13 117:22

**[doc - electronic]**

123:20,20 124:17
131:18,19,21
140:7,9 141:8,9
144:9 146:23,24
147:1 160:6,9,11
161:1,3 162:1,10
164:5,12,25
165:11,17 166:6
171:22,22,23,24
172:1,3,16,17
174:13 181:3,10
181:14,17 182:2
184:16 186:8,18
187:22 188:22,22
189:20,21 190:4,7
190:8,18,24,24
191:5 193:16,16
194:14 195:11
198:4,12,13
208:12 219:7
222:14 226:10
236:20 237:24
238:1,1
**doc's** 72:14 80:24
82:12 83:18 97:16
97:25 106:6
109:15 186:12
189:23
**doctor** 45:1 59:8,9
59:10,12 75:4,20
76:3 114:6 221:7
221:10
**doctor's** 12:23
77:2
**doctors** 26:11
247:18
**document** 148:23
149:18 159:18,25
162:14 180:21
192:5 199:15
208:6 209:19

213:18
**documentation**
179:14 212:5,6
213:17 236:25
**documented**
207:15 208:1
211:24 232:6
**documenting**
206:22
**documents** 5:24
208:4
**doing** 16:15 31:20
31:24,25 32:6
55:9,17,18,20 78:8
120:12 151:5
162:21 178:24
**don** 13:17,18
**door** 93:13 104:13
104:22 169:12
184:11
**doris** 132:7,9
**dose** 28:24,24,24
32:18,20 33:22
157:9,9,10,12,13
198:24,24 201:3,3
201:16,16,24,24
202:2,2,6,6,9,10
202:11,11,14,14
202:19,19,20,20
203:16,17 205:9,9
205:11,11 209:16
209:16,16,17
212:8,8 243:9,9,11
243:12,21,21,25
244:1,22,22 245:3
245:3,6,6,25,25
**double** 36:25
**downstairs** 78:16
**doxazosin** 204:18
**draw** 230:13

**drawer** 30:14,18
**drawers** 27:25
28:14 29:13 32:13
33:11,12
**dropped** 156:8,10
**dropping** 248:12
**drops** 185:20
186:5
**drug** 32:19 33:17
**due** 123:13 141:20
141:21 212:13
215:2 217:4
**dukes** 1:3 4:16,17
5:20,23 11:21
29:2,10 191:21
192:8,9,19 193:3
196:4 197:13
199:2,19,23 200:4
200:6,19 202:22
203:24 206:10
207:6,9 208:15,23
209:13 210:1
211:24 212:2,15
213:3 214:6,19
215:6,17 217:2
220:17 221:14
223:16 224:7,23
225:8 226:1
227:24 229:3,25
231:9,25 236:9
237:10 238:3
243:18
**duly** 5:1,5 252:10
**dunmars** 1:17
**duplicate** 213:23
**duties** 13:15 49:25
50:6 70:2 176:8
249:12
**dxd** 157:8 199:3
201:24

**drawer** 30:14,18 — (column 4)
**dynamics** 47:3
52:9
**dyslipidemia**
204:3

**e**

**e** 1:12 3:1,1,21 4:1
5:11,11 51:12
67:19 129:25
130:11 133:9,9,9
142:5 151:15,23
**earlier** 61:3 123:9
123:12 126:8,12
133:22 145:7
161:20 186:10
194:20 225:17
**early** 61:11 65:2
184:7
**eastern** 1:2
**eat** 143:9
**education** 5:22
241:18
**effect** 108:11
229:12 230:4,5
**effective** 149:10
149:22 159:22
230:18,20 231:6
**either** 7:8 21:20
32:25 33:5 60:23
72:12 106:13
107:6 161:21
164:14 168:17
177:10 179:21
216:17 240:8,24
**electroni** 182:22
247:21
**electronic** 17:20
18:6 35:20 36:6
36:11,20,23 38:1,5
38:16 39:1,7,8,25
51:12 53:5,16,23
186:16

**electronically** 40:5
52:22 153:16
186:11
**eligible** 203:18
**elk** 253:4
**emergencies** 99:15
100:6 144:10
**emergency** 92:6
92:13,23 93:6
94:5 96:7,19
98:17 99:1,3,23
100:18 103:11,12
140:15 144:7,13
144:25 145:2,5,14
146:5 161:17,24
162:9 163:4
165:14 194:1
208:25 217:6
232:18
**emergent** 98:14
99:9 145:20
**employed** 150:1
**employee** 21:2
252:22,24
**employees** 155:13
**employment** 5:22
**emt** 99:10,15
100:6,25 102:6,23
104:4
**emts** 96:20 99:1
**enclosed** 30:4
**encounter** 178:4
179:11
**ended** 38:2
**ends** 248:7
**entailed** 21:18
**entails** 36:14
69:16
**enter** 51:25 76:23
247:25

**entered** 53:16
199:20 204:2
248:23
**entitled** 2:2
**epigastric** 238:22
**episodes** 210:16
210:25 211:4
**er** 229:12 231:10
**erickson** 3:3 4:5
5:8,12,18,19 8:20
29:24 33:15,23
36:18 37:6,10
38:3 40:12 41:12
41:17 42:9,13,18
42:19 43:23 53:13
53:14,21 54:23
59:1,2 60:9 61:23
62:8,14,18 65:5
66:23 70:23 71:3
71:14 72:16,24
74:10 75:3 82:13
83:11 84:1,15,22
85:13 86:14,18
87:8 88:1 89:10
90:19 91:7,13,14
92:7,11 93:4,15
94:14,22,23 95:15
95:17,20,22 96:4
96:11 97:10,17,22
98:5,9,12 99:25
100:16,23 101:6
101:16,20,21,25
102:11 103:7
104:15 106:9,21
107:14,21 108:25
109:7 110:3,24
111:11 112:8
113:13 115:2
117:17,24 118:6
118:23 119:4,6,20
120:17,20 122:7

122:19 123:8
124:15 125:2,4,8
125:19 126:7
130:20 131:1,6
137:1 142:21
143:1,6,11,20,22
145:23 147:11
149:8,14,17,20,21
152:23 159:10
167:23 168:12
169:14 170:13,21
171:12 173:21
180:1,6,7 184:13
187:8 192:4 200:3
207:20,22 217:1
219:10 227:7,14
228:9 233:24
234:1 237:17
245:20 246:23
249:3,5 250:13,20
251:4,8
**error** 134:18
135:10
**escorted** 222:10
**essential** 154:23
**essentially** 30:21
50:4
**evaluate** 160:4
187:3
**evaluated** 189:4
**evaluating** 146:5
**evaluation** 178:24
189:2,3 204:1
**event** 142:10
**everybody** 18:13
19:11 38:21 56:20
142:19
**evidence** 113:12
170:16 228:5
**exact** 11:13 34:15
41:16 47:24

160:18 162:18
248:6
**exactly** 37:25 38:2
56:6 130:5,9
134:8 157:1
162:21 176:12
188:9 242:20
248:4
**exam** 10:15,19,21
**examination** 4:4
5:7 252:9
**examined** 5:5
**example** 29:1
52:20 57:20 59:19
100:12 158:18
246:9
**examples** 61:4,6
81:13
**exceptions** 26:2
**exchange** 27:10
**excuse** 169:10
214:8
**exhaust** 208:19
**exhibit** 4:11,12,14
4:15,17 149:2,7
159:6,9,14 192:3,7
199:23 200:2
**exhibits** 4:10
250:14
**exist** 183:1,20,22
**experience** 163:20
193:24 194:13
**experienced**
147:21
**experiencing**
126:14 217:8
222:4
**expertise** 221:12
**expiration** 22:12
22:20,25

Exhibit D

**[expired - forms]**                                                   Page 14

**expired** 23:1
**explain** 21:17
  44:17 50:9 206:17
  210:20,20
**explanation**
  170:18
**expressed** 243:6
**extent** 71:7 124:25

**f**

**f** 133:9
**facilitate** 203:4
**facilities** 14:6
**facility** 12:23
  13:10,11,14,24
  14:20,24 15:3
  23:24 24:3,9
  26:19 63:15 77:14
  78:2 158:15
  166:13
**fact** 113:18 114:14
  215:3 238:21
**facts** 113:12
  170:15 228:4
**fair** 7:5,11,25
**fall** 61:8
**familiar** 104:3
  105:4,21 108:5
  113:14,18 114:8
  114:13 118:1
  126:25 127:4,22
  128:4 156:6
  159:20,24 160:25
  161:8 162:5
  180:25 184:7
  200:11 230:4
**fan** 7:16
**far** 6:15 30:9 60:1
  79:16,18 107:12
  224:10 228:2
  236:2 245:5

**fashion** 30:25
**fast** 227:20
**faster** 126:17
  249:8
**fat** 204:4,6 205:4
**fatal** 197:21
**february** 213:3,22
  214:6,14,19
  217:10,11 220:16
  220:16
**federal** 2:7 5:16
  10:5 14:8 142:9
**feel** 105:8
**feels** 106:12
  211:20
**felony** 11:16
**felt** 103:12
**females** 127:23
**fifteen** 184:6
**figure** 73:12
  106:25 239:14
**file** 17:20
**filed** 127:24
  146:15
**fill** 26:23 27:1,5,16
  28:5 140:1,4
  156:19,21,23,25
  166:14,24 179:25
  182:6 224:24
  247:25
**filled** 166:25
  173:19 213:2
  214:6 225:7 226:2
**filling** 28:7
**fills** 28:2 166:8
  178:6 196:4
  208:23 223:16
  224:20 248:11
**finally** 229:10
**find** 40:1 63:13
  64:4 68:17

**finding** 63:12
  130:18,18
**fine** 8:16 142:3
  143:4,8
**finish** 7:2 35:14
  96:25 136:6 153:3
  170:2 179:15
**finished** 214:25
  222:8
**first** 5:5 9:20
  10:22 16:21
  128:19 150:18
  200:4,18 204:23
  207:9 225:20
  229:1 236:21
**five** 12:18 20:10
  20:11,12 29:2,14
  77:14 119:16,17
  149:15 196:6
  202:23 229:9
  242:11
**flip** 228:22
**flipping** 227:17,18
**floor** 24:19,25
  144:14
**focus** 16:13
**follenweider**
  133:2,8,8,24
**following** 14:7
  16:17 62:1 86:21
  87:12 100:2 102:2
  125:10 168:1
  169:3 170:23
  206:1 217:14
  224:20 226:1
**follows** 5:6
**forced** 214:24
  217:6 222:2
**forcing** 222:10
**foregoing** 252:12

**form** 29:18,19
  36:13 37:19 40:6
  54:17 63:11,20
  64:10 66:19 74:16
  89:6 90:15,24
  92:3 95:19,21
  96:1 97:11 99:19
  100:20 103:1
  104:6 107:8,20
  108:22 111:5
  112:5 114:23
  122:17 124:22
  140:1,4,6 141:7
  147:9 161:23
  162:5,8 163:11
  164:11,16,18,24
  165:8,14 166:12
  166:15,25 167:2,3
  167:20 169:17
  170:6,10,15 171:3
  172:5,22 173:3,13
  175:1 176:3 177:7
  177:12,21 178:2,6
  178:17,20 180:25
  181:6,21,23 183:4
  183:4,15 185:14
  187:13 188:1
  191:19 193:11,18
  194:4,9 195:15
  196:16,18,22
  197:24 209:20,21
  212:16,23 214:6
  222:19 223:2,17
  223:22 225:12,20
  231:23 234:6
  237:19,22
**format** 200:12
**forms** 62:10,24
  138:22 146:3
  163:21 177:24
  178:11 179:9

180:8 181:18,22
182:22 183:8,19
183:25 185:10,20
186:6,10,17 187:3
187:10,18 188:3,7
188:21 193:24
194:9,13 197:2
224:23,25 228:23
239:8 240:16
**forth** 18:14 19:2
158:6 228:15
240:1
**forty** 65:15
**foster** 1:13
**foundation** 66:18
72:9 113:11
145:21 167:19
**fountainview**
14:25 15:15
**four** 58:16,19,20
60:25 118:4
120:13 155:25
225:24 238:9
239:5
**frame** 77:9 89:7
105:20
**freely** 147:5
**frequent** 210:16
211:4
**frequently** 18:17
**friday** 20:4,7
**front** 173:13
232:11
**full** 20:2 78:8
125:24 126:3
**fully** 139:23
143:10
**functionally** 29:17
**further** 187:14
251:20

**g**

**galindo** 1:14
**geez** 123:17
**general** 4:14 46:1
60:15 125:1
159:15
**generally** 37:7
81:25 110:17
245:9,11
**generated** 184:24
185:4
**generic** 204:21
**getting** 54:5 72:18
78:23 116:6 124:5
151:23 203:4
210:16 211:3
239:18,21 241:5
242:15,16 243:8
246:7
**gi** 145:8,9
**give** 8:14,15 19:21
28:19 32:13 34:8
38:12 47:3 52:9
60:2 63:25 68:4
112:13 119:16,17
120:11 126:20
130:13 139:20
141:17 150:8
181:13 184:3,4
192:1,10 202:13
209:4
**given** 5:25 46:18
55:11 114:14
118:2,12,12,19
119:13,15,25
120:21 121:4
122:21,24 123:13
123:24 144:1
185:2 197:18
218:18,24 221:6
225:16 229:10,25

230:6,11,17
240:17 252:17
**gives** 52:13
**giving** 55:2 61:4,6
141:5
**glass** 90:13 91:1
**glitch** 39:12
**go** 6:17 7:13 8:4
12:13 14:6,13,23
15:17 16:5 18:4
20:17 21:20,21
23:5 26:22 30:14
32:12 33:19 42:18
42:20 44:18 45:2
46:8,18 49:9 51:5
61:11 62:20 63:5
63:21 67:9,9 68:2
68:16 69:9 72:13
72:25 76:6,7,13
77:5,14,15,21,22
78:3 80:19,20
81:6,8,17,19,21,25
82:1,10,14,17,20
83:1,14 84:19,23
85:15,22,24 87:25
90:10 91:7,13,20
92:12 94:18 98:14
98:17 99:6 103:2
104:10 105:11
107:11 120:18
122:4 128:13,14
128:18 129:3
142:13 143:23
150:14 152:5
153:5,19,20,23,24
155:24 158:9
162:19 165:9
170:17 172:3
178:18,21 180:6
182:14 185:14
187:13 191:3

197:9 199:20
206:16,16 208:12
215:24 216:16
220:12,22 227:16
230:10 240:7,24
242:11 246:21
**goes** 30:17,18 76:2
80:18 81:4 84:9
85:16 88:19 89:18
105:16 140:7
176:3 183:14
203:11 215:20
245:7
**going** 5:21 7:10,13
23:10 36:19 46:22
56:20 65:2 77:3,4
77:5 83:6 91:16
99:1,2 117:25
126:24 142:1,11
143:6,7,7,13
148:22 149:1
159:6 169:24
174:22 179:19,22
179:23 180:19
191:25 192:9
199:20 200:14
201:18 207:4
208:2 213:1 214:3
217:20 219:12
220:10 221:1,10
221:10,13 225:6
228:12,14,22
230:13 233:10,11
234:2 241:8
**good** 18:15 42:11
90:23 119:17
120:8,12 142:2
227:9 240:14
**goodness** 57:12
**gosh** 129:20

**gotcha** 249:3
**gotten** 197:10,11
  213:20
**gp** 45:24 205:16
  245:24
**graduate** 9:7 12:8
**graduating** 9:24
  10:3
**greater** 49:6,7,9
**green** 1:17
**grievance** 4:14
  50:25 62:9,24
  63:11,20 64:10
  69:14,24 70:5
  74:2 115:10
  138:23 139:3,25
  140:12,15,15
  141:2 146:3,15,17
  158:16 159:16
  161:17,18,24,24
  162:5,8,9,9,10,11
  162:14,23 163:7
  163:11,11,13,22
  164:4,7,9,11,11,16
  164:17,20,24
  165:10,15,15,15
  166:12,15 167:3
  169:2,7,17 170:6
  171:2,10,23 172:5
  172:9,9 176:2
  177:20 178:12,14
  178:17 179:7,16
  180:8 181:1,1,18
  181:22 182:7,12
  182:15 183:3,4,8
  183:19,24 184:3
  185:10,20 186:6
  186:10 187:11,15
  188:21 189:2,4,5
  190:5,6,10,14,20
  190:21 192:17,25

  193:11,18,24
  194:1,1,2,5 196:16
  197:2,13 198:14
  200:25 201:5
  207:17 208:3,4
  209:12 211:10
  213:2,8,11,19,25
  214:1,5 218:3,11
  218:20,21 219:6,8
  220:15 221:14,16
  222:19 223:7
  224:21,22,25
  225:7,13 226:2,23
  229:23 231:21
  232:2 233:7 234:9
  240:16,18 241:8
  241:12 242:1,5,25
**grievances** 4:15
  11:20,21,23 49:23
  50:11,19 61:17
  62:4 68:13,23
  108:11,15 115:6
  127:16 138:20
  139:4,12,14,21,24
  140:11,24 141:3,5
  141:6,13,21
  146:14 160:8,15
  160:18,19,21,22
  161:4,13,22
  162:21,23 163:3,3
  163:4,15,16,21
  165:5 169:1
  170:12 174:9,12
  174:16 182:17
  184:22 185:7
  187:4 189:5,8,10
  189:24 192:1,8
  195:5 208:11
  210:10 213:21
  219:22 220:6
  221:14 225:5,7

  227:17,22 228:1
  228:13,15 238:3
  240:20 241:21
  242:12,24,25
**grieve** 167:18
  168:7,19 169:18
  170:7 171:4
  174:23 186:24
**grieved** 166:15
  202:22 217:23
  218:1,3,14,15,17
  219:2,2 232:23
  239:4
**ground** 6:17
**group** 82:8 83:17
  137:19
**groups** 249:24
**grove** 253:4
**guess** 19:4 70:21
  106:18 133:4
  150:17 158:12
  221:9 226:16
  237:4
**guessing** 11:12
  14:21 34:16
**guesstimate** 19:22
**guide** 43:10,15
**guidebook** 230:22
**guidelines** 14:8,8
  32:5 43:5,5,8,10
  43:17,19 44:3,4,7
  44:10 49:17
**guys** 143:5

---

**h**

**h** 5:11 178:16
**half** 20:10,11,12
  142:1 182:19
  203:20 245:9
  246:15
**hand** 140:8 173:20
  253:4

**handle** 69:5 72:15
  91:25 144:10
**handling** 198:18
**handwriting**
  198:7,11
**hang** 57:10 94:15
  94:15,15 153:2,2,2
**happen** 56:21
  113:9 185:24
  191:15 207:12
  226:14 240:4
**happened** 64:5
  185:23 190:3
  191:9,18 206:18
  216:12
**happens** 71:21
  73:5 81:16 88:24
**harassment**
  127:24 128:1
**harbor** 9:14
**hard** 38:12 44:16
  52:25 59:23 63:17
  88:4 197:4 228:14
  228:14 233:5,11
**harm** 121:24
**health** 1:9,11 19:8
  41:24 45:3 48:19
  74:21,25 75:1
  121:1,10,14
  139:18 141:18
  153:20 155:12
  165:7 175:20
  177:23 178:2,6,10
  178:16,19 179:8
  187:3,10,12,18,25
  188:3,6 194:6
  212:22 213:4,15
  223:3 225:14
  231:22 243:25
  244:5,16,18,19,25
  245:1 247:20

**hear** 6:18 7:20
9:21 20:13 85:14
85:18 158:24,25
219:14
**heard** 62:12 128:5
128:6 129:2,2,6
158:3 166:13,17
166:18 167:1,11
168:21,21,24
184:17,19 221:7
**heart** 108:18
109:10,13 111:3,9
111:14,23 112:1
214:20 216:18
232:7,7 238:19
239:1 246:10
**heartburn** 238:22
**held** 90:21,22
232:10 233:22
249:1
**help** 89:4 95:25
102:21 104:5
164:19 189:11,15
189:18 203:4
206:17 238:11
241:14,17
**helped** 21:25
**helping** 63:13
211:6
**hereto** 252:25
**hereunto** 253:3
**high** 9:5 124:5
197:7 204:8
**higher** 48:15,18,19
173:16
**hiring** 66:21
**history** 5:22
112:11 232:7
**hmm** 50:18 56:10
56:23 57:16 59:25
60:18 78:7 82:23

85:23 87:22 108:4
149:20,20 151:6
155:15 157:20
163:9 167:9
200:13 201:21
204:12 205:20
208:2,9 215:23
218:23 230:2
244:20 249:17
**hold** 201:18
251:11
**holding** 80:22 81:6
233:4
**holidays** 181:20
**home** 8:12,14 12:4
12:17 148:13
**hospital** 42:4 48:9
48:10 79:25
**hour** 21:4 75:12
75:13 222:6
**hourly** 21:2,3
**hours** 56:7,7,10,15
56:18 59:16 61:9
61:9 65:13 116:22
117:10 142:1
143:12 158:22
159:2 217:7 222:3
245:15 246:7
247:4 248:3,4,5,6
**housed** 48:5,11
49:4 192:22 225:9
**huh** 178:23 179:11
219:25
**huhs** 6:25
**hundred** 49:7,10
197:10
**hydrochlorothia...**
120:8 122:14
**hypertension**
204:10

**hypothetical** 74:6
99:18 103:1 104:7
108:22,24 111:5
112:5 122:17

**i**

**i.e.** 232:19
**idea** 67:4
**identification**
159:14
**identified** 18:9
184:21
**identify** 18:21
**identifying** 181:11
**idle** 15:21
**ii** 154:19
**iii** 155:10
**illinois** 1:1,8,8 2:4
2:9 3:4,11,18
159:15 252:6
253:4
**imagine** 81:11
235:12 236:15
**immediate** 217:5
**immediately**
232:18
**implementation**
36:11,14
**improve** 139:6
**improvement**
16:10,12,14 21:9
21:11 42:21,25
129:12 188:12
249:11
**incident** 214:14
221:21 224:19
225:22 226:7,8
231:18
**including** 127:23
232:8,12
**incompetence**
217:5

**incomplete** 74:5
99:17 103:1
108:22,24 111:4
112:5 122:16
**index** 4:10
**indiana** 14:3,11
15:25
**indianapolis** 11:6
16:24
**indirectly** 253:1
**individual** 33:11
**individually** 30:8
30:13 33:5 137:20
137:21 182:7
**infirmary** 16:5
24:16 48:10,13,17
**inform** 142:16
**information** 72:21
118:25 119:1
122:2 236:2
**informed** 151:3
152:4 214:19
229:4 232:8
**informing** 142:6
**inhaler** 209:2
**initial** 224:17
**initialed** 185:15
**inmate** 4:14 28:21
28:22,23 29:1
30:7 32:11,14
33:3,12 37:3,4,15
37:17 39:25 45:2
45:5 46:18 52:14
52:16,21 57:19
58:7,20 63:20
64:23,25 65:4
71:21,24 73:5,20
74:2,14 75:5,19
76:2,10,21 77:10
77:13,21 78:2
80:18 81:4 83:7

**[inmate - job]**

85:9 86:6,24
87:15 88:19 89:17
89:22 91:18,25
94:6,17 96:24
97:3 98:22 99:8
99:11 102:18,21
104:5 105:3
106:14 107:7
108:5,16 109:9
111:25 112:15,18
113:1 114:22
115:5,14 116:1,18
121:23 122:13
123:14 124:20,24
125:13,21 126:13
127:5 139:25
140:3 146:15
156:15 157:16,25
159:16 161:22
164:18 166:14
167:17 168:6
169:4 174:22
178:5 181:1 182:1
182:6,25 184:5
185:2 186:19,24
203:11,14 208:21
218:5,8 220:20
228:2 230:18
238:8,11 239:13
240:4,10 241:19
242:15 245:7
246:8
**inmate's** 29:14
51:6 115:7 189:2
**inmates** 17:13
26:24 27:6,19
28:20 30:3 31:13
38:7 39:20 48:5
51:9 52:4 54:5
55:3 62:24 70:25
72:18 81:16,25

82:20 88:24 89:4
94:3 95:5,24 96:6
96:14 98:14,17
113:25 114:9,14
115:18 124:9
128:22 129:4
154:24 155:7
156:8 158:5
168:18 224:24
243:3,6 246:9,16
247:3
**inner** 247:2
**input** 19:13
**inside** 168:16
**instances** 222:16
**intake** 74:19 75:2
75:5,10,16 76:2,6
76:6,11,21 77:16
77:23 78:3,8,11,15
78:16 79:6,17
80:19 81:5,17
82:1,18,21 89:9,12
89:13,18 200:8
203:12 240:7
245:7
**integrated** 18:6
**intendent** 177:3
**interagency** 4:12
149:3 150:5 151:4
151:16 152:4
154:6,14,16,17
**intercom** 222:5
232:14
**interested** 176:1
253:1
**interlock** 214:24
**internet** 153:20
**interrupt** 67:5
90:10 99:6 179:18
191:15 242:9

**interruption** 93:12
169:11 184:10
**interruptions**
104:21
**intra** 154:9
**intranet** 153:17,18
153:19,24
**intricacies** 40:10
**investigate** 172:4
**investigation** 64:4
68:21
**involved** 44:13
47:16 61:13,14
62:17 66:21 69:6
84:12 88:23 89:2
106:24 108:8,12
146:24 163:1
233:3
**involving** 11:16
**irene** 129:20 132:2
132:7,13,21,24
133:22,25 135:5
137:2
**ish** 137:4
**issue** 18:9,21,23
19:1 50:24 61:18
62:7 63:3,12 64:8
64:11 66:16 69:15
69:16,23 73:13
84:12 86:8 87:2
87:18 115:6 119:4
124:8,16,19
125:12 142:23
164:17,19 166:16
167:18 168:7,19
169:7,18,20 170:7
171:5,20,22
172:11,12,23
174:23 175:2
186:24 189:12
190:14,20 202:22

207:21 217:22
218:6,7,8,15
219:23 222:12
226:20 232:23
236:11 238:8
239:12,17 241:5
241:13 242:3
243:18,20,22
**issues** 6:22 63:5,6
91:25 121:10,14
179:1,2 190:6,15
190:20 229:24
234:2 236:13
241:10 249:18,20
249:22
**ivs** 16:5 57:15

**j**

**j** 1:7,13,14,15,16
236:14,15,19
**jackson** 3:18
**jail** 78:5 80:6
158:10 247:7
**james** 1:17
**january** 209:20
225:9,21,22 226:3
226:8,9,24 229:2
231:13,15,18
232:24,24 233:7
234:6
**jason** 3:10 98:10
103:23,23 143:2
250:23
**jcc** 3:19
**jdevore** 3:12
**jeopardy** 217:4
**job** 20:4 50:4,7
63:2,4 64:15
65:23 70:2 146:11
146:13 153:23
176:8 219:20
226:17

**jobs** 49:25
**john** 3:17,17 142:4
  142:21 236:22
  237:8
**johncoynelaw.c...**
  3:19
**jones** 193:7,25
  194:4,10,12 195:2
  196:5 217:10
  223:18 231:14
  233:6
**judge** 142:9
**judgment** 66:14
**july** 8:10

### k

**k** 130:2
**kampe** 40:15 41:8
  41:14 44:13
**keep** 10:12 114:1
  114:16,21 130:14
  143:7,13 182:18
  182:19 197:14,19
  242:24
**keeps** 51:1
**keflex** 120:5
**kelly** 134:4,13,15
  134:16,21 135:2,9
  135:10 137:22,23
  138:2
**kelly's** 134:5
**kept** 23:16 26:8
  33:22
**kerickson** 3:5
**kimberly** 3:10
**kind** 39:11 69:16
  98:25 140:21
  142:11 147:22
  148:1,1 179:13
  205:3 221:9
  238:10

**kindly** 105:2
**kirstin** 3:3 5:19
  53:11 62:13
  142:11 149:12
  250:19
**kleszyk** 2:3 252:5
  253:8
**kmusick** 3:13
**knocking** 104:22
**know** 6:16,20 7:8
  7:14,15 14:10,19
  19:21 22:23 24:14
  27:9,23 28:4,6
  29:9,16 30:11,12
  31:2 34:15,16
  35:22 37:24 38:1
  38:1,11,11 39:19
  39:21,23 40:17
  44:1,2,6,11,14
  45:4,6,9,10,14,18
  47:5,19,24 48:24
  49:13 51:24 52:7
  53:10,22,24,25
  54:1,21 55:5,8,17
  55:18,19,21,23,25
  57:6,21 60:8,25
  64:6,14,22 65:7,9
  65:18 66:20 67:1
  67:7 68:4 70:9
  71:17 73:2,3,5,8
  73:17,24,25 75:7
  75:13 77:17,19
  78:18 79:10,20,21
  80:15 81:7,13,20
  82:11 88:10 90:20
  92:22 94:24 96:17
  96:23 97:8 98:7,8
  100:18 103:3
  105:11,18 106:5,7
  106:10,14,22,24
  107:1,19 108:2,3

108:13 109:5,11
  109:12,12,15
  110:10,11,13,16
  111:7 112:10,12
  112:14 113:16
  114:7,11,25 115:1
  115:23,25 116:15
  116:21 117:5,8
  119:9,24 120:12
  122:14 123:21
  126:23 128:3,7,8
  128:12 130:4,5,8
  130:15,17,19
  131:7,15,21,24,24
  133:4,5,7 134:15
  135:25 136:5,10
  137:10 140:9
  142:3,14,15 143:1
  143:9,10 144:19
  144:22 145:16
  146:22 147:16
  148:23 151:17
  152:11 153:19
  155:10 157:2
  160:18,23 161:6
  162:22 163:18
  164:8 165:2,16,20
  166:7,11 176:8
  178:16 179:21,22
  179:22,23 180:8
  181:15 183:21,22
  185:8 186:7,8,13
  186:16,22 187:24
  188:6,9 190:16,25
  191:1,2,24 192:14
  193:13,14,21,23
  194:15 198:8
  206:18 207:13,23
  207:25 208:14
  211:2,2,10,16,21
  212:18 216:7,11

216:11,12,19,24
  217:15 218:19,20
  219:8,9 220:4,24
  221:4 224:10,11
  224:11 225:3
  226:6,13,15,17
  227:1 228:14
  235:6,25 236:25
  241:9 242:20
  243:7 244:14
  245:19 246:2,5
  247:6 248:4,5,6,10
  248:17 250:4
**knowing** 211:25
**knowledge** 36:21
  37:22 43:24 49:18
  51:20 53:9 54:25
  67:6 75:23 77:24
  88:17 89:16,21
  94:25 95:4,6,8,9
  95:11 96:3 98:13
  98:16 106:3 107:1
  107:13,24 110:15
  124:6 127:7,21
  128:2 129:9 144:9
  147:4 156:17
  159:4,5 163:25
  168:14 170:16
  191:20 225:4
  249:23
**known** 58:18
  81:16
**knows** 38:21
**kop** 114:1,5,6,10
  115:15 116:19
  118:2,12,12
  119:11,13,15,25
  120:22 121:4,21
  122:21,24 123:13
  123:18,24,25
  143:24 144:1

156:2,4,7,9,15
157:8 202:1,2,12
202:15,18,20
203:17 207:18
209:5 211:9,15,19
212:8,21 243:9,11
243:22 244:2,4,6
244:15 245:12,22
245:24 246:4

**l**

**l**  1:5,16,17 2:3
5:11 133:9 252:5
253:8
**la**  15:1
**labeled**  28:23
213:7,8
**laceration**  104:12
106:11 145:8
**lake**  9:14,23 10:3
**large**  232:10
**lasalle**  3:4
**late**  137:4 164:8,8
**laura**  219:13,15,19
**law**  3:17
**lawsuit**  5:20 6:11
66:7 127:22
**lawsuits**  6:8
**learn**  152:6,12,17
**leave**  66:5 67:9
68:3 77:2 121:11
135:2 136:8
**leaves**  77:13,21
89:17
**leaving**  61:11
**leeway**  56:5,6
**left**  12:11 14:17,19
76:25 77:2 162:8
165:5 237:25
**legitimate**  167:16
168:3,11

**length**  134:9
136:24 246:19
**letting**  115:22
117:7
**level**  44:18,20 45:4
45:12 46:5,6,9,13
46:13,19 48:15,18
48:19 79:1 244:24
**levels**  44:21
**lewd**  128:22 129:4
**license**  10:13
15:10,11 252:6
253:9
**life**  13:9,14,24
14:1,13,14,20,24
217:4
**limited**  7:24 221:5
**linda**  40:15 41:8
41:14 44:13 133:2
133:24 134:3,7,17
134:19 135:9,12
135:15,23 136:8
136:14 137:7,13
137:16,18,24,25
138:2
**linda's**  134:22
138:5
**line**  80:20 117:11
214:25 215:20
229:9
**lines**  43:11,16
182:10
**list**  45:21 65:9
119:14 140:19,20
182:9 208:10
**listed**  140:25
141:6
**little**  28:1,1 182:13
182:16 229:11
230:4

**live**  8:21,24,25
177:15
**lived**  8:22
**living**  117:19
125:21 127:12,19
128:10,14 129:3
144:20 157:16
177:14 180:10
188:3 192:22
239:9
**livingston**  158:6
158:18 234:16
235:23,24 237:25
240:1,2,6
**llc**  3:3,9
**loads**  147:13
**located**  12:5,6
15:24 23:17 24:8
26:18 33:10 47:22
**location**  47:24
79:17 108:13,14
215:7
**lock**  27:25
**locke**  1:17
**locked**  27:22
28:15
**log**  181:2 185:9,12
185:13,17,17
242:24
**long**  8:22 10:6,25
11:4,5 13:1,11
14:10 15:1,14
20:8 34:20 49:20
80:16 134:7,13
136:21 142:16,25
156:24 163:14
179:22,24 203:14
207:23 221:10
227:6 231:4,5
**longer**  163:2

**look**  18:2 27:24
51:5 115:7,13
129:23 130:13
139:14 140:11
150:6 152:21
153:5,8,12 154:11
158:4,14,17
160:10 161:8
169:9,22 178:3,18
179:6,7,12,13,13
179:15 189:5
199:2,6,9,13
200:10,11 203:9
204:22 209:9
211:11 212:1,23
215:11 219:11,12
220:7 221:20
228:7 230:12,22
230:25 239:13
241:3,7,12,12,25
242:19,21 249:18
**looked**  17:20 51:8
154:1,3,4,5 199:5
201:13 202:24
224:18 225:17
228:23 231:4
238:2 239:5
**looking**  55:24
61:16 62:3 130:14
154:18 155:23
161:14 163:20
165:4 193:2
203:23 211:9
213:14 220:16
225:21 226:23
249:25
**looks**  181:3 192:21
193:3 194:16
196:14,25 200:7
200:18 202:21
204:1 205:3,18

206:6 208:18
209:25 210:12
213:3,23 214:18
217:10,20 220:18
221:15,18,25
223:17 228:16
229:24 231:9
233:15 234:8
236:7 237:24
**lost** 79:22
**lot** 118:18 177:20
240:22,23 243:23
**loud** 7:22
**low** 197:6 205:4
**lower** 78:25
**lpns** 127:24
130:22 131:8
**luna** 233:3

**m**

**m** 1:12,13 3:3
130:2
**m2** 205:12 209:15
**machine** 47:9
**mail** 67:19 129:25
130:11 142:5
151:23
**mails** 151:15
**main** 13:15 40:7
**maintain** 36:24
**maintained**
134:19
**maker** 168:10
**making** 12:12
129:4 188:7
**man** 136:12,17
**manage** 69:18,25
82:12,19 83:3,19
83:22,23 84:3,4,7
84:8,11,18,23,24
85:1,8,17 86:1,4,4
87:6 171:24 172:1

190:24
**managed** 22:13
86:7,25 87:16
**management**
88:20 129:8 169:8
169:22 170:9
171:8,17
**manager** 64:1,13
64:15 69:5,12
129:11,13,13
130:7 131:10,20
187:20 219:25
220:2
**managers** 55:13
68:20 69:11
131:10 187:23
**manages** 83:15,16
84:4 88:13
**mandates** 155:5
**mandatory** 142:8
**manner** 32:14
**manufacturer**
123:4
**mar** 38:25 39:4,15
**march** 207:10
228:16 234:18
236:3,10,15
237:10,11
**mark** 18:18
222:23
**marked** 4:11
149:7 159:9
162:14 163:21
164:3,11,16
172:24 173:2
192:3 196:21
200:2 217:21
221:16 222:19,22
231:20
**marking** 149:2
159:13 162:23

192:7 199:22,23
**marks** 129:25
132:2 133:22,25
**matter** 181:8,12
**matters** 252:11
**mauck** 3:3
**mauckbaker.com**
3:5
**max** 221:22 232:3
**maywood** 222:1
**meals** 57:25
**mean** 6:9 8:17
17:19 19:7 22:10
23:4,9,14,21 25:23
30:16 31:24 34:4
36:25 40:21 44:15
48:14 51:5 57:17
58:11 60:14,18,19
61:1 64:2 67:11
72:2 73:4,9 80:4
84:7 92:8 105:3
109:17 111:12
116:11,17 117:13
123:15,22 124:2
125:25 152:3
155:18 156:13
157:9 158:12
172:9 190:12
193:10,17 199:5,6
202:6 204:3
205:13 210:15,25
216:20 217:25
218:12 219:1
224:23 235:1,2
238:24 240:19
241:6 242:10
244:2
**meaning** 20:19
25:19 191:17
**means** 36:15 40:8
45:25 103:3 202:3

202:12,13 205:10
210:24 235:6
**meant** 53:12 189:4
**measures** 17:10
**med** 22:4,8 23:13
23:16,19 24:8,11
24:13,16,24 25:9
25:12,14,15,17,22
25:22,23 26:3,7,7
26:13,14,18 27:1,4
27:4,6,10,15 38:15
43:1,1 47:1 49:16
49:16 52:11 55:1
57:5,6,7,10,21,22
60:12,15,19 61:7
70:20 116:20
147:7,14 157:16
157:23 158:22
159:3 188:8
215:20 248:13
**medicaid** 14:9
**medical** 1:9 4:17
10:6 13:20,24
14:4,11 17:15,18
18:4 19:14 21:22
22:13,22,25 23:6
24:6 25:2,4 35:20
36:6,11,20,24
37:18 38:5,16
39:7,8,21,24 40:1
40:4,10,14,18,24
41:20 45:3,15,22
45:23 48:18 51:6
51:9,12,21 52:22
53:1,5,16,23 54:3
54:16,18 55:23
66:24 69:16,21
70:3 71:12 72:2,3
74:20,21,23 75:5,9
77:10,15,23 78:3
78:14 79:6,17

80:19 81:4,17
82:1,21,25,25
84:11 86:8,9 87:2
87:4,18,20 88:8,12
89:12,18,20,23,24
90:2,3,3,7,8,11
91:19,25 92:14
94:4,6,18 95:1,5,7
95:24 96:15,19
97:3 98:24,25
99:13 100:15
101:4,13 102:10
102:14,20,22
103:13 104:5,18
105:5,9,12,23
106:12,13,14,18
106:25 107:4,5,5,7
109:16,19,22,23
110:4,5,17,18,19
110:20 111:1,2
112:2,6 114:8
115:8 116:1 117:5
117:7,13,14,18,23
123:2 124:14,18
125:22,22 126:6,9
126:19 127:12
144:7,24 145:1,5
145:14 147:3,6
152:14 157:25
158:5,17 164:17
164:19 171:11
172:11,12,21,23
175:2,20 179:5,8
189:1,3,20 190:7
190:17,17,23
191:2,3,6,13 198:3
199:2,6,19,24
201:2,19 203:12
205:8,9 209:12
210:14,24 215:2,5
217:21 220:12,17

222:5 232:10,16
233:20 234:2,3
236:12,12 240:7
240:18,21 241:4,7
241:10 242:2
**medical's** 82:16
**medically** 146:9
146:20 154:24
**medicare** 14:9
**medication** 4:12
22:18 26:19,20
27:18 28:13,19,24
29:3 30:3,6,21,24
32:12,13 33:4,10
34:5,6,6,9,12 37:2
37:4,18 52:1,4,14
52:15,18,21 54:5
55:3 57:24 58:18
59:4,5,7 60:4,14
61:12,13,15 63:20
63:22 65:2 71:1
71:16,22,22 72:6
73:6,21 74:4,4
76:13,22 112:23
113:4,6 116:20,21
124:1 126:15,18
126:21 147:10,23
148:3,13,15,21
149:4 154:23
155:7 156:2,3,16
157:7,17,18,22,25
158:21 159:1
175:14 185:2
197:19 199:3,11
202:7,7,12 203:15
203:17,21 205:11
206:7,21 207:1,9
209:1,16 211:15
211:19 212:8
214:20,21,25
215:3,4,21 216:18

216:21 220:8
221:8,11 224:13
228:3 229:6,8,25
230:17 238:9,11
238:13,15 239:9
239:14,22 240:5
240:10 242:16
243:11 244:6
245:11,15 246:16
247:4 248:13,22
249:8,19 250:1
**medications** 23:15
26:23 27:6 28:21
29:2,14 30:2
31:13 32:2 47:14
47:15 52:8 55:11
56:25 57:14 58:3
60:2 61:5 70:8,14
71:10 72:19 76:3
76:11,23 108:19
118:11,18,20
119:10,11,13,14
119:25 121:1,4,18
122:21,24 123:23
143:23,24 147:7
147:13,18 156:5,7
156:9 197:1
198:24 203:24
206:11,13 217:6
229:11 230:23,25
232:18 241:5
242:20 245:4,6,8
245:21 246:7,10
246:12
**medicine** 71:19
112:3,12,13
**medicines** 118:16
246:20
**meds** 13:17 15:5
25:16 26:9 27:1
27:15,20,21 28:2

29:5,9 30:11 31:3
31:5,7 32:9 33:22
34:7,16,18,19,21
35:5,16 37:14
39:14 47:2,5 56:4
56:16,20 58:5
60:24 61:14 70:10
120:14 179:12
198:25 205:15,16
206:22 243:22
244:19,22 245:1,2
**meet** 132:1,20
138:15,19 164:7
**meeting** 19:5
132:5,6 138:17
151:7,9 246:13
**meetings** 132:13
132:15 137:8,11
137:12,16 138:8
138:11,18,25
139:7
**member** 154:7
**members** 67:16
**memo** 148:1,9
**memorize** 154:2
**memorized** 175:12
175:17
**mental** 19:8 45:3
48:19 74:21,25
75:1 121:1,10,13
139:18 141:18
175:20 243:25
244:5,16,18,19,24
245:1 247:19
**mention** 142:5
**meraz** 1:14
**merged** 17:4 19:18
**message** 68:4
**met** 137:6,18,19
138:24 191:23

metoprolols 29:16
michigan 9:6,14
9:15,23 10:3 12:6
12:22 13:4
middle 136:15,17
137:4 194:21
205:24
mile 80:12,13,13
80:17 216:17
217:7 222:11
224:8,11,13,15
227:24 231:10
mind 99:25 102:1
125:9 132:7
mine 171:24
minute 78:1 80:14
130:14 150:8
184:14 192:11
minutes 42:10
78:1 91:8,9 118:5
143:3 216:21
227:7 229:9 230:1
230:12 239:10
241:24
mischarac 72:8
83:24 85:11 92:2
97:20 101:2,14
109:24 110:21
118:3 187:5
246:18
mischaracterizes
41:11 86:13 93:10
101:11 107:18
misrepresents
87:24
missing 215:3
misspoke 135:13
misunderstanding
170:11
mm 50:18 56:10
56:23 57:16 59:25

60:18 78:7 82:23
85:23 108:4
149:20,20 151:6
155:15 157:20
163:9 167:9
200:13 201:21
204:12 205:20
208:2,9 215:23
218:23 230:2
244:20 249:17
modifying 44:9
moment 43:14
93:11 159:7
180:20 184:9
192:1 214:16
monday 20:4,7
monitor 46:25
month 234:24
243:1
monthly 137:16
138:13
months 206:14
morning 56:4
61:11,12 65:2
142:6 148:14
move 7:15 72:12
84:20
moved 46:4 78:18
movement 46:14
72:12 80:23 82:12
82:19 83:2,19,19
83:22 84:3,4,7,11
84:19,21,24 85:1,8
86:5 87:7 97:15
movements
249:13
moving 84:25
mueller 236:14,15
236:19 237:8,16
multiple 190:6
236:1

musick 3:10
mute 186:3

**n**

n 1:13 3:1,21 4:1
133:9 193:7,25
194:4,10,12 195:2
196:5 217:10
223:18 231:14
233:6
name 5:9,10,19
11:3 17:3 19:17
29:11,11 30:13
34:10 51:11
129:22 130:12
131:11,13,22
133:3,5 134:5
135:25 136:1,3,20
148:2,12 153:18
160:16,19,20
181:21 196:12,13
204:21 206:20,24
233:2 236:21
named 6:11
names 113:16
114:11,13 129:21
136:4
narcotics 121:18
narrative 29:20
103:6 104:7
118:22,24
nationwide 148:2
148:4,17
nclex 10:15 12:1
12:16
necessarily 46:19
58:8 111:9,14
139:20 223:6
241:16 243:1,22
necessary 154:24
necessitates
110:20

need 26:8 38:18
42:1 46:4,18
48:16,20 50:21,23
52:3 61:12 63:10
68:18,21 71:22
72:13,19 75:9
76:3,7,11,12,16,22
77:15 78:9 81:10
82:9,10,11,17,18
82:20 84:19 85:21
86:9 87:5,21
89:23 91:3 93:16
95:7,24 96:15
98:24 101:22
105:9 107:4 108:7
112:2,6,12,22
119:8 123:19
130:16 142:9,10
143:9 154:7 158:8
184:3 190:1 211:1
211:13 220:21
223:3 239:13
240:25 241:9,10
242:17 245:15
246:10 251:13
needed 18:17
21:21 22:12 42:7
46:24 58:5 63:20
64:6 71:22 74:3
74:22,23,25 76:18
93:7 95:1 108:7
112:17 116:19
139:20 147:7,10
152:13,18 153:6
158:14 197:20
202:3,10 211:15
211:17 214:20
215:18 216:18
228:3 229:25
251:16

**needs** 25:4 28:21
44:18 51:25 57:24
65:1 73:5 75:5
77:10 82:14 85:8
85:15 92:13 94:18
97:3 99:9 104:8
119:1,2 122:3
123:18 124:13
170:18 228:2
230:17 238:25
**neither** 222:15
**never** 34:19 80:15
81:16 128:5 160:2
160:4 164:1,2
166:18 179:15
184:17,19 191:23
210:13
**new** 9:6 135:22
141:13 151:3,16
152:4,6 156:4,9,9
247:2
**newer** 34:9
**news** 148:11,12
**nighttime** 79:21
**nitro** 116:22
124:20 125:15
200:23 211:3
219:18 229:11
230:11 239:22
**nitroglycerin**
108:7,15 112:16
112:18 113:3,15
113:20,23 114:1,5
114:10,15,18,21
115:7,9,14,15,19
115:22 116:5,6,19
118:1,2 122:25
123:12,24 124:4
124:13 126:13
127:6 147:2
197:14,18 200:20

201:3,23 203:5
207:18 209:1,5,15
210:13,23 212:2
214:21 215:3,17
218:6 219:17
220:4,19,21 221:5
224:8 227:25
229:6,10 230:5
231:6 232:19
238:4 240:6,9,24
243:8,13,17,19
**nods** 6:25
**non** 162:10,14,21
162:23 163:3,7,11
163:22 164:4,11
164:17 165:15
181:1 194:2 213:8
213:11,19,21
221:16 222:19
**nonemergency**
146:6
**noon** 58:22
**normal** 213:18
215:21
**normally** 26:1
173:14 196:18
220:7 240:4
**north** 3:4,11
**northern** 1:1
**note** 235:22
**notes** 208:25 233:2
236:10,24 238:17
**notice** 5:14
**notified** 73:14
**notify** 64:23 65:1
123:20,20 124:14
124:17,18 126:1,4
126:5,6
**nourished** 143:10
**november** 199:21
200:7,14 203:25

206:2,11 207:11
207:11
**nowadays** 40:3
105:16 157:3
174:1
**number** 19:22
82:6 112:24
140:14,20,25
141:7 149:3
159:18 166:5
173:7,9,11 174:8
174:12,15 179:21
181:10,10,11
182:10,11 183:14
194:10,11,16
208:8 213:12
214:7 217:23
218:2,4,7,9,10,16
218:18,25 225:17
225:25 226:5,6,12
228:19,24 231:20
233:13
**numbers** 208:11
226:18
**numeral** 154:19
155:9 161:15
**numerous** 232:8
**nurse** 12:7,8,9,25
13:5,15 15:13
29:8 32:12 37:2,3
37:14,16 51:25
52:13,14 55:13
57:21 64:1,7,14
68:24 69:5 70:10
70:13,14 71:23
74:20 76:12 99:12
100:25 102:6,23
104:4 109:18
111:15,17,19
116:15,21 119:22
125:18,20,21

144:14,15 147:14
157:10,14,15,18
157:23 178:4,7,9
187:23 197:21
202:12 211:2
214:20 215:14
219:21,25 220:2
220:22 230:22
235:4,20
**nurses** 26:11,25
27:1 28:19 32:1,8
34:21 35:4,16
49:11 52:3 55:2
64:16,17,18,19
65:18 66:16 68:20
68:22 69:4,7,9,12
82:16 127:23
129:2 130:22
131:7 148:10
163:15 188:5
205:15 219:22
**nursing** 1:11 9:19
9:19,22 10:6,13
12:4,17,21 13:9,14
13:24 14:6,14,14
14:16,16,20,24
19:10 31:22 32:7
43:4,5,8,10,10,15
43:16,19 44:6,10
49:17 55:4,15
64:13 68:19,19
72:14 74:24
123:20,21 131:9
131:12,16 139:19
163:16 169:8,20
169:22 170:9
171:7,10,17,19
178:20 187:19,20
187:23,24 189:11
189:18 222:15

| **o** | **obtain** 217:8 | **offices** 3:17 | 49:20 50:2,9,16 |
|---|---|---|---|
| **o** 133:9 | **obviously** 142:22 | **official** 1:7,10,12 | 51:8 52:18 53:4 |
| **o'clock** 142:7 | 250:25 | **oftentimes** 169:5 | 54:2 57:19 58:17 |
| 148:14 | **occasionally** 20:6 | 244:17 | 59:21 60:10 61:10 |
| **oaks** 12:4,21 | 69:11 163:7 | **oh** 11:2 29:13 | 62:15,16,20,23 |
| **oath** 4:24 | **occur** 114:4 | 34:13 36:2,9 42:9 | 68:6 69:6 74:18 |
| **object** 83:24 97:6 | **occurred** 127:5 | 43:4 45:8,12 | 75:18 76:1,20 |
| **objecting** 29:19 | 226:24 | 57:12 67:23 76:12 | 77:6,21,25 79:4,9 |
| **objection** 29:18 | **occurrence** 226:4 | 78:24 80:22 83:13 | 79:19 80:7,10,18 |
| 33:13 36:13 37:19 | 232:1 | 93:23 108:12 | 81:24 85:3,21 |
| 40:6,7 41:10 | **occurs** 185:3 | 116:17 120:7,14 | 86:3 88:15 89:14 |
| 43:21 54:17 60:5 | **october** 159:23 | 124:8 129:20 | 89:17,22 90:8 |
| 66:18 71:2,5 72:8 | **ofc** 229:4 | 134:8 135:13 | 91:7,9,24 92:19 |
| 72:20 74:5,15 | **offensive** 129:4 | 136:5 150:17 | 93:18 94:2,11 |
| 82:2 83:8 84:14 | **office** 1:6 11:24 | 158:14 159:20 | 95:3 96:12 97:18 |
| 85:11 86:10,12 | 42:2,4 67:9,14 | 162:19 170:1 | 98:2,10 99:4,14 |
| 87:23,24 89:6 | 68:2 128:1 141:2 | 173:14 176:10 | 100:9,24 101:16 |
| 90:15,24 92:2,9,24 | 141:3 152:2 | 181:4 198:22 | 101:18,25 103:15 |
| 93:9 94:20 95:13 | 159:14 210:7 | 199:16 217:16 | 104:1,17 105:1,3 |
| 95:19,20 96:1,8 | 231:2 | 219:14 226:21 | 107:15,16,25 |
| 97:6,10,11,20 | **officer** 40:24 | 236:23 | 110:15 111:22,25 |
| 99:17 100:19 | 69:16,19,23 70:9 | **okay** 6:7,12,16,18 | 112:15 115:13 |
| 101:2,9,14 102:25 | 70:13,20 73:15 | 6:25 7:15,16,18,19 | 117:2,25,25 118:9 |
| 104:6 106:2,15 | 90:14 93:5 97:4 | 8:5,7 10:9,21,24 | 119:9,24 121:15 |
| 107:8,17 108:21 | 98:22 100:18,24 | 11:11,14 12:3,14 | 121:20 122:13,20 |
| 109:24 110:21 | 102:5,20,23 104:3 | 12:15 13:23 14:13 | 125:2 126:12,25 |
| 111:4 112:4 | 107:5,7 108:20 | 14:23 15:9,14 | 130:13 131:2,17 |
| 113:11 114:23 | 109:4,6,12 126:6 | 16:11 18:7 19:12 | 133:6,12,19,24 |
| 117:20 118:3,21 | 126:19 127:19 | 19:19 20:1,8,15 | 134:21 135:14,20 |
| 119:18 122:1,1,16 | 144:20 165:18 | 22:16 24:2,8,11 | 136:7 137:2,18 |
| 123:1 124:10,22 | 190:2,25 232:9 | 25:1,18,21 26:6,17 | 138:4,24 140:6 |
| 130:23 131:4 | 233:3 | 28:17 29:8,13,25 | 141:25 144:19 |
| 142:12 145:21 | **officers** 70:1 90:21 | 30:9,20 31:9,11,15 | 145:12 146:17 |
| 147:9 152:19 | 90:22 92:22 94:6 | 32:3,8,11 33:2,24 | 148:25 150:1,16 |
| 167:19 168:9 | 95:4,23 96:6,13 | 34:1,13 36:5,9,22 | 150:20,23 151:2 |
| 170:10,14 187:5 | 98:19 102:13 | 37:13 38:4,24 | 153:22,25 155:3 |
| 216:22 219:4 | 104:19 110:16 | 39:3,11,16 40:9,13 | 155:25 156:15 |
| 228:4 237:13 | 127:12,24 144:6 | 41:1,25 42:9,13 | 157:2,6,11 158:2,4 |
| 245:16 246:18 | 146:4,19,24 191:1 | 43:15 44:22 46:3 | 158:20,25 159:6 |
| **objections** 4:23 | 222:6 | 46:11,15,22 47:18 | 159:11 161:11 |
| 100:10 120:16,19 | | 47:21 48:23,25 | 162:25 164:21 |

165:1,4 169:15,24
170:1,4 172:8
173:25 174:5
175:8,18,21,24
176:5 177:2,9
178:10,13 179:17
180:16 183:11
184:12,15,17
185:16 186:9
188:2 191:25
192:7,10,14,24
193:2,15,15
194:19 195:10,19
196:3,14 197:6,9
197:12 198:6,13
198:22 199:14,16
200:13 201:19
202:3,11,16,21
203:7,11,23 204:5
204:9 205:17
206:1,6,10 207:4
207:23 208:2,2
209:18,24 210:5
210:22 211:13
213:1 214:1,12,13
214:17,18 216:16
217:2,16 218:12
219:11,23 220:10
220:16,24 221:13
222:18 223:9,16
225:19,20 226:22
227:1,4,9,19
228:10,13,25
230:21 231:13,25
234:8,12 235:18
235:22 236:8,21
237:4,8,18 241:24
243:14,16 245:5
249:23 250:5
**old** 9:1,2 22:18

**once** 167:18 168:8
168:19 169:18
170:8 171:5
174:24 186:25
210:9
**one's** 229:7
**ones** 29:10 72:1
118:15,16,20
119:12 141:10,17
182:20 226:11
238:5
**ongoing** 142:18
**online** 153:7,13
**oo0oo** 251:23
**open** 247:9
**operating** 40:23
**operations** 22:4,8
40:22 41:5 43:2
49:16 176:10
**opinion** 112:2
145:14
**opportunity**
117:12 142:17
238:16
**order** 4:14 56:14
58:6,17 59:3,4,17
60:3,14,19 69:1
70:7 76:18,19,23
77:11 83:1 85:24
112:16,20,21
114:5,10,12 115:4
115:8,14,15 118:8
123:7,10,12
155:11 156:9
157:17 159:15,18
187:3 201:11,14
201:16,22 202:23
203:1,2,5 204:2,10
204:13 205:3,8,10
205:17 209:7
215:1 216:3 217:8

220:8,18 221:5,8
221:10 223:4
240:5,8,24 248:12
250:25 251:1,8
**ordered** 56:14,19
57:1 61:5 114:2,6
202:1,14 203:21
203:24 206:7
209:16 219:17
220:4,21 238:13
239:23 240:25
**ordering** 178:8
250:18
**orders** 76:4,9
112:14 114:9
156:5 199:20
207:10 220:7,17
238:14 247:13,16
247:21,25 248:1
**original** 237:6,7
237:11 251:11
**orlando** 11:7
**outcome** 253:1
**outset** 145:18
**outside** 33:6 67:14
78:2,6 104:8
106:3 119:1 122:2
158:15 170:16
**overall** 24:1
**overdose** 122:8,11
122:15 144:3
**overdosed** 127:6
**oversee** 31:12
65:10 176:6
**overseeing** 55:11
**oversees** 131:23
176:18
**oversight** 54:24
55:1,16
**overtime** 65:16

**oxy** 121:18

**p**

**p** 1:17 3:1,1 57:13
57:14 61:2,2
221:22 232:3
244:18
**p.m.** 56:17,21 57:4
57:4,4,20 58:6,6
58:21,22,22,23,23
60:11,14,20
143:18,19 180:5,5
206:3 214:14
221:22 222:3
224:19,22 226:4,4
227:11,11 231:18
231:19 232:4
251:18
**p2** 244:21,23
**pa** 75:4,20 76:3,13
205:21,22 240:15
**package** 29:5 30:4
30:7 47:11,14
**packaged** 30:3,8
**packages** 47:14
**page** 4:4 142:20
149:17 150:19
151:1 155:23,25
159:18 161:14
162:4 182:12
192:8,10 194:21
196:11 198:2,3,6
199:22 200:4
201:20 203:25
205:8 207:8 208:4
213:2,21 214:1
217:14 220:17
221:13 224:17,20
224:22 225:6
226:1,23 228:13
228:15 229:2
231:19 233:12

236:1

**pages** 214:9

**paid** 21:4 65:18

**pain** 108:6 109:14
110:19 111:1,9,12
111:13,22 112:17
112:19,22 113:2
113:24 115:23
116:2,5,14,22
117:6 121:17
123:19,21 125:17
145:16,19,19
211:1 215:17
224:14 227:25
232:11 238:15,17
238:19,23,24,25
239:8

**pains** 108:16,18
109:9 117:15
126:14 145:13,17
210:15 217:8
222:4,11 229:5
231:5 232:6,9
238:4

**paper** 18:3,4,5,6,8
36:24 38:6,19,23
38:25 39:4,9,13,15
39:19,21 40:4
51:9 141:19
152:16 153:5,11
178:2 236:5,6

**part** 9:20 18:1
35:9 36:10 41:20
44:3,5 45:15
61:17 62:4,23
69:21 70:3,4
107:10 134:18
140:18 146:11,13
146:25 150:9
153:22 186:12,14
188:24 190:5,8,9

190:17,18,23,24
208:18 233:16
237:5

**partee** 1:14

**partially** 18:24

**participate** 142:9

**particular** 17:24
18:17 28:14 29:1
29:5,9 30:7 46:17
105:10 148:20
151:1 163:12
169:4 192:17
197:12,13 206:7
215:16 221:19
229:23 230:17
232:2 233:6
243:14,16

**particularly** 148:5
148:19 158:7

**parties** 4:23 5:15
142:6 179:21
190:20 252:23,25

**parts** 55:22

**party** 6:8

**pas** 75:15 247:18

**pass** 10:19,22
30:11 31:5,7 32:8
34:7,9,16,18 38:15
43:1 47:2,5 49:16
52:4,8 55:1 56:16
56:24 57:5 60:12
60:15 61:14,15
70:21 116:20
157:16,23 158:22
159:3 188:8
205:15,16

**passage** 154:23

**passed** 12:1 30:21
30:22,24 31:13
34:19 35:16 37:4
39:13 56:4 59:6

60:24

**passes** 37:2,14
57:6,7,11 70:10

**passing** 13:17 26:9
29:9 31:3 32:2
34:21 35:5 70:14
222:6

**paths** 25:20

**patient** 13:16 15:4
15:4,5 44:17 52:1
58:4 72:6,13 81:4
93:7 105:6 112:2
112:11 115:25
212:7 242:14
243:25 244:5,18
244:25

**patients** 15:7
26:11,12,24 45:21
48:11,13,16,20
49:3 61:10 70:7
113:14,19 118:2
124:4 245:14

**pattern** 185:1
242:10,13

**patterns** 184:21

**paycheck** 20:24

**pen** 81:19,21

**pending** 8:4

**people** 25:4 31:6
39:13 68:17 83:17
89:4 123:14 124:3
137:19 139:14
143:9 168:18

**performance** 21:9
21:11 42:21,25
129:12 188:12

**period** 37:5,6,20
37:22 40:7 74:16
239:7 243:9

**perry** 1:14

**person** 40:13 53:8
60:3,8 63:5 67:19
67:20,24 69:10
73:17 84:25 90:8
90:12,16 109:14
114:16,21 115:19
123:19 126:18,20
127:2 131:23
139:11 161:23
164:23 165:13
166:7 172:23
174:24,25 177:9
185:19 193:25
197:15,19 212:16
218:13 222:18,22
223:1 230:5

**personal** 222:9
252:14

**personally** 68:23
212:16

**personnel** 64:8,11
198:18 210:14

**pertain** 183:19

**pertains** 179:16

**pharmacist** 27:5

**pharmacist's**
249:12

**pharmacists**
248:15

**pharmacy** 19:10
26:25 27:3,9,12,15
27:18 28:2,6
32:20 33:5 47:12
47:12,14,21,25
147:13 242:22
247:6,9,25 248:3,8
248:11,14,14,17
248:19,19 249:13
249:15

**phone** 7:23 67:19
68:3,24 127:13

phrased  29:19
physician  76:14
  114:5 203:13
  240:15
physician's  203:13
physicians  75:15
pick  51:3 180:15
  181:14,18 188:6
  188:10 208:13
  233:25
picked  180:9
  193:11,18,22
  217:10 225:12
  231:15
picks  164:23
  165:13 188:2
  196:6 223:18
  233:6
pill  28:20,20,25
  30:3,15 116:2
pills  47:9 244:7,8
pinpoint  197:4
place  78:15 79:6
  86:7,24 87:15
  142:2 172:25
  207:15 226:7,8
  247:13 252:21
placed  217:4
  247:21
places  67:10 73:20
placing  247:15
plaintiff  1:4 2:2
  3:7
plaintiff's  142:7
plan  18:15 63:14
  238:10 239:14
platform  153:16
platoon  193:7
  198:14 234:9
please  5:9 6:23 7:8
  8:3 35:14 42:12

61:24 86:20 91:5
  94:15 96:24,25
  100:1 101:24
  102:1 167:24
  169:25 170:22
  250:20
plenty  92:10
plus  238:9
point  6:21 14:16
  34:1,17 39:12
  54:11 72:5 83:6
  128:11 135:2,5,15
  135:22 148:18
  178:25 202:25
  219:23 230:3
  234:23 238:7
  239:11
policies  16:18,20
  21:20,25 22:1
  72:14 80:24 97:9
  97:16,18,23,24,25
  98:1 108:3 146:23
  151:8,9,16 152:1,4
  152:6 153:12,15
  153:16,21,24
  154:1,1,2,3,5
policy  32:6 37:15
  38:18,20 39:6
  51:24 76:1 77:19
  96:21 97:1,15
  106:6,19 109:5,15
  110:2,6,9,10,11,13
  152:7,8,13,17,22
  153:6 154:6,16,17
  154:19 155:5
  156:6 160:6,7,9,11
  160:13,14,16,20
  160:24 161:1,4,9
  161:12,13 162:4
  167:16 168:4,10
  168:11,20 180:19

186:22 208:19
  247:2
popping  51:1
population  46:2
porte  15:1
position  21:8
  138:5 188:11,14
  220:6
possible  113:4
  116:18,23,25
  121:23 126:16
  144:3 174:5 175:3
  175:4,5,11 206:14
possibly  112:25
  113:5 126:15
  216:13
potentially  212:1
  223:9
powerchart  51:17
  51:18,22 52:5
practice  39:8 40:3
  105:15,24 107:2
  107:16,20 115:11
  124:3 152:24
  153:4 168:16
  174:1 183:23
  220:5
pratt  1:18
prepackaged
  28:21
preparation  11:18
prescribed  108:19
  113:15,20,22
  126:13 203:15
  204:18,25 206:11
  230:23 245:8
  246:7
prescription  112:3
  112:16 113:3
  114:15 198:3
  200:19 201:3

240:9
present  37:16 55:2
  66:12 71:23
  117:18 164:15
pressure  120:10
pretty  75:25 139:7
previous  252:8
previously  217:23
  218:13
prewrapped  29:4
printed  182:2
  240:20
prior  54:10 65:2
  158:22 163:6
  179:4 233:14
privy  250:3
prn  112:16,21
  113:8,8 147:18
  157:7,13,14,17,22
  202:3,14,15,18,19
probably  26:4
  148:13 169:7
  173:5,8 204:8
  243:1 245:25
problem  18:10
procedure  2:7
  4:14 5:16 27:9
  28:7 159:17
proceedings
  252:17
process  32:17
  34:12,14 46:24
  47:17 55:6 64:25
  65:7,9 66:22
  74:13,18 77:23
  78:1,4 80:19 81:2
  82:1 139:5,24
  140:9,19 141:12
  151:3 163:1,5
  186:14 203:12
  215:21 242:17

processed 162:9
processes 138:22
  139:2
processing 165:10
promotion 65:21
  137:25
prompt 232:16
properly 22:13
prostate 204:21
protective 205:18
provide 24:6
  89:20 157:10
provided 16:22,24
  17:1,2 23:8
  232:16,17 237:3
provider 44:19
  45:3 46:8,9,17
  56:12,13 59:11
  75:9 76:7,16,18,22
  76:23 77:4 78:10
  78:10,11,12 82:18
  114:2 116:1,13
  123:3,6,10 139:19
  203:9,12 209:6,8
  209:11 211:2,14
  211:15,17,18,19
  211:25 212:7,12
  212:13,14,20,20
  220:25 238:14
  239:16 240:13,15
  241:11 242:2
  244:17
provider's 116:7
providers 239:16
  246:1 247:17
providing 154:23
psychiatrist 19:9
psychiatrists
  247:19
pull 192:9

purpose 54:19
  68:16 132:4 139:1
pursuant 2:6 5:14
  5:15
pursue 241:14
push 143:6
put 15:21 29:14
  30:4,10 47:10,15
  52:4,6,14 66:4
  81:22 140:8,19
  141:19 159:6
  173:6,11,14
  182:10,15 191:25
  194:24 195:1,15
  199:7 201:18
  208:7 216:10,13
  222:24 223:3
  228:12 239:25
  241:20 245:2,23
puts 27:18,20
  140:17
putting 81:12
pyxis 32:16 34:2,7
  34:10,13 46:23,23
  47:1,2,7,13,16
  52:6 207:2 249:13

**q**

qid 58:9,16,17
  59:4
qualify 110:19
quality 16:7,12,14
  17:10 249:17,24
question 7:2,7,10
  7:11 8:3 27:8,11
  28:9 29:21 31:3
  32:24 36:8,14
  37:1,7,23 41:19
  44:12 47:20 49:14
  50:13 52:2,25
  53:6 54:9,22 55:8
  55:22 56:1 59:23

61:19,20,24 62:1
  62:12 63:7,14,16
  63:18 64:21 65:6
  66:21 67:2 68:5
  68:25 69:21 70:11
  70:16,21,22 71:13
  72:1,25 74:16
  76:9 77:18,20
  79:23 81:8 84:5
  86:17,20,21 87:9
  87:10,12 88:2
  90:24 91:3 93:19
  94:16 96:25 99:21
  99:24 100:1,2
  101:22 102:2
  103:8,13,16
  105:23 108:22
  111:6 112:11,14
  115:1 117:10,16
  119:8 125:5,9,10
  131:25 136:6
  147:16 154:15
  157:5 158:13
  163:17 165:21
  167:5,22,24 168:1
  169:25 170:2,20
  170:22,23 176:24
  183:22 189:23
  202:17 207:14
  212:24 227:13
  229:18,22 240:13
  242:21
questioning
  117:11
questions 5:21,23
  28:11 42:7 91:17
  98:11 250:8,11
queue 179:20
quick 7:17
quicker 47:11

qureshi 1:15

**r**

r 1:13 3:1 130:2
  133:9
radio 127:14,15
radunsky 3:9
  11:24
ramifications 34:8
random 189:8
randomly 189:6
range 19:23 44:22
  61:8
ray 205:25 206:3
rcdc 232:3,5,8,12
  233:3,4,16
rdc 78:19,21,22,23
reaction 100:14,14
  102:19 104:2
  145:7
read 62:2 86:19,19
  86:22 87:10,13
  100:3 101:22
  102:3 119:8
  125:11 150:8
  152:8,18 153:24
  154:7,10,19 168:2
  170:24 184:14
  194:17 195:1
  210:17 225:24
  226:21 227:1
  232:20 233:5
  236:3,25 237:1
reading 63:10
  102:1 205:23
  237:10
ready 192:14,15
  208:12
real 7:16
really 22:23 28:6
  36:15 48:10 56:1
  65:9 90:14 151:24

154:10 164:12
191:1 212:24
221:11 229:21
230:12 251:10
**reason** 82:25,25
83:13 103:13
105:10 158:9
210:19 226:16
238:12 244:14
**reasons** 81:14
103:18 145:17
164:10 211:8
238:23 243:24
**reaudited** 18:16
18:18
**recall** 10:8 11:2,13
13:21 17:4 19:18
21:5 36:1,3,3
43:14 49:19 51:10
56:6 66:10,13
74:9 108:14
115:16,16,17
118:8,10 129:21
131:13 134:6,8
135:25 136:3,20
136:23 137:14
138:12 147:5,5,6
147:24 148:2,7,15
148:19,20 150:24
150:24 151:7,10
151:17,23,24
154:9 157:1 159:4
169:5 187:1
189:16 191:20
203:6,10 204:22
207:3 209:9 231:7
243:13,15 246:25
**receipt** 139:3,13
**receive** 9:16 10:25
61:12 63:21 91:19
151:15 180:17

182:8 183:9,19
185:10 191:16
197:3 245:3
**received** 10:2 11:9
37:17 141:14
160:21 161:3
164:1,16 181:13
188:16 195:16,17
195:23 207:9
208:14,21 209:18
209:21 210:9
**receives** 161:22,23
236:9
**receiving** 74:3,8
74:11,14,19 78:16
80:20 88:19,24
89:2,4,8,9,11,12
89:13 141:10
177:20 182:15,17
221:22 236:12
**recollect** 154:12
**recollection** 56:9
176:22
**recommendation**
46:13
**reconsidered**
212:3
**record** 5:9,12
21:22 35:20 38:1
40:4 55:21,23
101:19 142:13,15
142:19 143:12,21
170:3 179:5 199:8
199:12 200:8,14
200:19 215:11
233:23 241:7,11
249:2 252:16
**records** 4:17 18:3
18:5 36:11,20,23
36:24 37:18 38:5
38:6,17,19 39:7,8

39:9,19,22,25 40:1
40:10,14,18,24
41:2,3 51:9,12
53:2,5,16,23 54:16
54:18 114:8 115:8
152:14 158:5,15
158:17 199:3,6,19
199:24 201:2,19
206:12 220:13,13
220:18 223:22
239:25 240:18,21
241:4 247:13
**red** 12:4,21
**reduced** 252:14
**refer** 74:22 75:1
75:10 76:16 78:12
79:11 169:8
171:17 177:10
217:23 220:23
233:19
**reference** 77:19
152:7
**referral** 198:19
**referred** 64:12
165:6 169:19
172:14,24 173:2
177:5,7 194:5
198:14 213:4,15
221:16 222:20
225:13 231:22
234:9
**referring** 212:6
215:6
**reflect** 5:12
**reflected** 184:22
**refuse** 235:9,10,10
**refused** 234:15
235:2,5,7,21
**refusing** 232:13
**regarding** 5:21
138:23 146:23

160:14 237:2
246:19 249:12
**registered** 111:15
111:17,19 119:21
119:22
**regular** 79:16
138:8,9
**regularly** 45:8,12
**rehab** 161:17
**related** 160:21
161:4,12 207:21
**relative** 177:17
252:22,24
**relevant** 177:25
178:11,13,17
187:11
**relief** 116:6 210:16
211:3
**reloading** 248:18
**remained** 136:14
**remedies** 208:19
**remember** 7:14
11:8 19:17,19
123:17 135:25
148:3,12 150:21
150:25 162:20
191:21 209:4
243:2
**remotely** 2:5 4:24
252:20
**repeat** 7:9 61:21
61:23 86:16 125:7
167:23 169:24
170:21 217:15
226:3 232:1
**repeating** 100:1
**rephrase** 7:9 36:9
37:13 93:19 94:1
99:23 167:21
202:8

**report** 31:19,20
32:4 102:14
125:17 145:19
170:8 171:6
178:23 179:24
184:23 185:4
**reported** 31:21
252:13
**reporter** 2:4 6:24
7:4 250:15,18,22
251:10 252:3,6
253:9
**represent** 5:20
**represented** 18:13
**request** 157:13,14
162:10 163:7
177:24 178:2,6,11
178:17,19 179:9
181:1 187:3,10,13
187:18,25 188:3,7
198:15 212:23
232:17,19 234:10
239:17 243:21,23
**requested** 232:15
**requesting** 74:3
197:19 217:3
232:9
**requests** 157:16
164:4 230:1
**require** 94:4 96:19
245:1
**required** 13:6 37:3
37:8 153:22,25
**requires** 145:4
154:25
**requiring** 99:3
**rescue** 217:6
232:18
**research** 130:16
**reserve** 250:16,21

**reserved** 251:3,5,7
**resigned** 136:9
**resolve** 18:22
61:18 62:6 63:3,4
63:6 73:12 164:19
189:12 242:3
**resolved** 6:14
**resolving** 63:12
**respond** 69:22
142:12 234:20
**responded** 219:6
**response** 130:18
191:7 196:11
198:18 208:21
210:1 219:15
228:16 233:13,14
234:13 236:2,14
236:16 237:7,11
**responsibilities**
35:8 50:10
**responsibility**
31:12 61:17 62:5
91:24 163:12
**responsible** 22:17
73:23 81:3 121:14
155:6 247:15
248:12
**rest** 85:17 141:18
**restricted** 205:4
**retention** 66:16
**return** 139:4
181:9 221:22
232:3
**returned** 222:1
232:5
**returning** 182:9
**returns** 138:20,21
139:1,3
**review** 11:19 19:1
39:24 50:22,23
53:4,11 54:15

62:9,9,24 64:1,3
64:13,16 68:21
69:14 115:6
138:19,20 139:1
139:19 152:13
153:6 162:11
171:18 173:4
177:23 178:10
179:3,5 184:2
187:2,10,12,13,18
188:1,19,21
189:25 190:2
191:3 192:11
196:7,18,22 197:3
214:10,16 223:2,5
223:22,25
**reviewed** 16:20
17:15,18 19:2
63:19 74:1,2
108:10 161:11,12
163:22 189:1,7
193:20 196:16
197:23 213:18
219:16 222:19
223:1,10,11 224:4
227:22 238:4
239:7
**reviewing** 17:11
17:12 127:16
139:11 146:13
158:16 160:8
163:13 178:19
193:24 194:8,9
200:25 228:1
**reviews** 146:2
220:5 237:18,20
237:22
**right** 6:16,20
23:23 24:1,4,6,9
24:14 25:5 31:6
32:9 33:6,7 34:25

39:14,17 41:9
42:2,13 52:5,23
55:6,12 57:7
62:10,25 69:10
75:2,4 76:24 78:4
79:14 81:9 82:8
84:12 85:9 88:18
88:21,25 90:14
93:17 94:7,9
97:24 98:2,9,13,15
99:11 102:13
107:1 110:11,25
113:4 117:14
118:7 119:22
121:21 122:21
126:15,21 128:13
129:20,24 135:16
135:23 136:16
137:6 140:1
141:15 143:9,10
143:11,13 144:16
148:14,16 149:1,9
150:2 152:10
154:18 155:7,9
159:13 161:18,25
163:8 164:24
165:6 172:2,6,25
173:11,17,22
175:10 176:3
177:21 179:10
180:1 183:9 187:4
192:16,17,19
193:4,6,8 194:6
195:7,13,23 196:2
196:9 197:24
198:1 201:9 202:3
203:2 204:11,24
204:25 205:5,7
206:8 207:4
208:16 209:25
210:12,17,19

213:1,5,8,11,14
214:21 215:18,22
216:1,16 220:3
221:23,25 224:9
226:22 228:12,17
228:20 230:1
231:11 232:25
233:7,24 234:6,10
234:18 235:23
236:4 237:23
238:5 239:4,24
242:4 249:3 250:2
250:7,8,13
**rituals** 222:9
**rivera** 1:15
**road** 246:4
**rodriguez** 1:15
**role** 13:3 15:2 16:1
18:10 19:11 21:15
21:17,23,24 31:17
34:20 35:25 36:5
40:16 42:20 45:19
49:21 50:10,14
54:10 55:24 62:23
64:18,20 66:11
67:8,13 133:21
134:22 146:7,9
160:5 187:16,17
**roles** 24:4 43:3
49:15
**roll** 36:6 158:22
159:2
**rolling** 207:2
**roman** 154:19
155:9 161:15
**room** 22:4,8 23:13
23:15,19 24:13,24
25:9,13,14,15,17
25:22,22,24,25
26:1,3,7,13,14,14
27:5,16 43:2

49:16 249:10
**rooms** 24:8,11,16
26:18
**rosters** 158:21
159:2
**rotation** 17:25
**rounds** 188:8
**routine** 205:4,19
**rtu** 24:18,23 78:23
78:25,25 79:1,5,8
79:9,17 80:12
128:12
**rubber** 141:19
**rule** 5:16 167:16
168:4
**rules** 2:7 5:17 6:17

**s**

**s** 1:16,17,18 3:1
5:11 130:2
**safe** 154:23
**safer** 126:23
**safety** 115:20,21
121:7,16,25
123:13 124:9,19
125:13 199:1
211:21,21 244:11
**salary** 21:2
**salmon** 1:15
**salt** 205:4
**sat** 246:13
**saw** 116:3 155:17
197:13,24 201:2
**saying** 25:15 27:17
38:4 44:17 45:1
52:10 59:3 81:2,3
84:24,25 99:9
123:16,17 143:12
162:7 171:22,23
182:18 215:23
227:23 231:12
238:19,20 241:15

241:19
**says** 38:20 46:17
58:17 59:3 107:19
112:21 155:10
156:2 162:8 165:6
193:1 198:8
202:20 206:4
207:17 216:2
225:10 233:3
234:8
**scanned** 40:2
178:3 182:22
186:10 233:16
**schedule** 212:1
**scheduled** 137:15
137:17 138:9,18
138:19 142:8
156:3,22
**scheduling** 49:14
**school** 9:5
**scope** 54:8,18
106:3 122:2
170:16 221:9
**screen** 148:22
220:11
**screening** 74:21
74:22 76:15
**scroll** 150:10,14
173:16
**scrolling** 200:17
200:17 233:11
**se** 138:23
**sealed** 197:19
**second** 25:8
148:23 154:22
155:23 198:2
201:7 207:7 229:1
**secondary** 207:21
**section** 156:1,1
193:7 206:17

**security** 175:15,16
205:17
**see** 26:1,11,12
31:19,23,24 74:22
74:23,25 75:5,9,20
76:3,7,13,16,22
77:4,4,10 78:10,10
78:12 82:18
104:24 115:8
116:13 143:13
148:23,24 149:9
153:10 155:10,16
159:11 172:22
174:13 175:1,6
177:21 178:7,9,20
178:25 179:8
180:20 181:4
192:5,12 198:1
199:3,7,8,10,11,15
199:16 200:10,22
200:24 201:4,5,6,7
203:9 209:10,14
212:7,13 214:10
216:2,6,12 218:19
220:7,13,22,25
230:13 231:22
240:15 241:4,8,13
242:2 246:2 251:1
**seeing** 55:10
154:10 196:10
**seeks** 72:20 118:25
119:1
**seen** 47:4,7,8,8
82:7 115:15 150:4
150:4 151:9
154:15 157:22
160:2,6 161:1
162:14 166:12
167:2,12 168:23
169:1,2 170:6
171:2 174:7

222:25 224:24
229:15 241:1
**seerman** 219:13
219:15,19
**sees** 44:25 203:12
**self** 121:7,16
**send** 51:2 83:21
142:5 175:6
177:11 250:14
**sends** 107:6
130:11
**sense** 17:1 39:5
77:7,8
**sent** 75:19 148:9
160:9,11 172:10
215:1,2,10,14
216:3,3 229:12
231:9
**sentence** 125:24
126:3 154:22
**separate** 29:7
30:15 33:12
174:21
**separately** 29:4
69:20
**serious** 236:12
**service** 23:8,9
177:23 178:2,6,11
178:17,19 179:8
187:3,10,12,18,25
188:3,7 212:22
**services** 1:9,11
155:13 165:7
186:19 194:6
213:5,16 223:4
225:14 231:22
**set** 5:14 27:21
29:14 49:2 253:3
**seven** 143:12
**sexual** 127:24
128:1

**sexually** 128:22
129:4
**share** 148:22
**sharing** 220:10
**shebel** 1:22 2:1 4:3
5:3,11,13 149:6
159:8 192:2
196:12 200:1
**sheet** 140:21,25
181:23,25 182:7
183:7,16 208:7
**sheets** 182:25
183:18
**sheriff** 1:7
**sheriff's** 1:6
127:25 159:14
**shift** 222:7,8,9
**shoo** 104:14
**shooed** 105:2
**short** 13:18 14:18
135:24 136:19,22
207:24 230:6
239:6
**shortage** 147:22
148:17,21
**shortages** 148:17
**shorthand** 2:3
252:3,5 253:9
**show** 180:19
206:12
**showed** 236:5
**showing** 213:17
**shows** 200:8 207:8
**shutdown** 38:22
39:2
**sic** 133:9 154:9
**side** 132:16
**sides** 190:19
**sign** 111:23 112:1
179:19 182:18
185:9,12 232:11

**signature** 194:16
209:20 250:15
251:2,11,19 253:8
**signed** 5:24 182:4
193:4,21 194:17
196:15 208:5
217:9 219:16
231:13,15 236:3
**signs** 193:8 208:16
223:17 229:14
231:11 236:10
237:9,19
**silent** 206:12
**similar** 30:25
181:6 184:20
214:2 242:12
243:7
**simple** 103:8
**simplicity** 214:4
**simultaneous**
94:13
**sit** 82:9 152:8
154:2 222:2
**sitting** 152:11
196:19
**situation** 63:24
72:15 82:23 98:14
102:18 103:10,11
104:5 108:5,9,13
110:18 116:23
122:22 145:20
146:5,14 157:21
174:7 191:17,18
215:16 231:8
235:8,13,15
**situations** 98:21
99:14 100:5
102:22 104:2
105:4,19 127:4
138:14,17 146:18
162:13 164:3

170:5 171:1
174:11 189:14
**six** 13:2 59:15
**slower** 227:16
**smaller** 149:2
**smith** 1:13 3:21
**smooth** 139:5
**smoothing** 138:21
139:2
**social** 19:9
**sold** 19:17
**somebody** 50:23
90:18 99:9 104:13
115:21 121:11
131:21 140:17
162:1 170:6 171:3
219:5 229:21
**soon** 112:22,25
113:4,5 126:15,16
**sooner** 126:22,24
127:3
**sorry** 20:14 22:14
30:23 36:2 42:1
62:11,17 63:14
67:4,5,23 71:13
78:25 84:23 85:20
90:10 99:6 112:9
126:10 134:15
135:13 138:10
149:12 151:13,21
178:22 191:15
202:8 207:2,7
221:1,3 227:19
230:9 233:11
237:20 242:9
243:5 244:3
**sort** 185:4,4
207:20 230:21
**sounds** 18:19
34:24 39:12 46:15
52:10 57:3 81:5

84:10 86:6,23
87:14 137:7
161:12 179:6
211:13 215:9,11
217:18 218:1
227:9
**source** 33:6
**south** 24:17
**southeast** 24:17
**spare** 242:12
**speak** 40:13 41:8
54:9 68:19,20,22
69:9,12 70:1,3
190:1 211:14
212:12,15
**speaking** 94:13
97:10 245:11
**specific** 5:23 24:4
39:6 43:2,7 48:2
52:15 58:5 59:5
60:15 76:12 125:1
140:1 158:15
160:7 197:17
202:7 218:6
226:15 243:18
**specifically** 118:24
142:15 227:23
**specifications**
164:7
**specified** 252:21
**speculation** 43:22
60:6 66:19 72:23
74:6 82:3 83:9
92:25 93:10 94:21
96:9 97:7 99:18
100:20 103:1
106:3 107:9 111:5
112:5 119:19
122:17 216:23
219:5 237:14
245:17

**spell** 5:10 130:1
133:3,5
**spoke** 211:25
**spot** 14:18 33:10
33:24
**staff** 26:22 66:24
67:16 104:18
138:16,25 154:7
156:2 158:21
159:1 169:21
175:1 176:15
181:17 189:25
215:5 217:4
229:13 232:8
233:2,19
**staffed** 66:25
89:15
**stamp** 141:14
195:13 209:25
210:10
**stamped** 149:13
159:17 194:23
195:3
**stand** 16:9 60:22
106:19 189:23
205:22 214:24
237:7,12
**start** 16:5 20:21
22:7 85:20 119:17
133:25 137:23
150:18 156:3
178:19 217:19
222:9 246:2,2
**started** 12:8 21:7
37:25 38:2,5 39:6
128:19 222:4
**starting** 179:3
198:7 203:25
207:1
**starts** 190:15
192:8 198:8 206:7

**state** 2:4 5:9 13:20
13:25 14:2,7,8
142:18 174:24
252:6
**stated** 186:9
**states** 1:1 51:25
156:4 186:23
214:23 222:1
**stating** 142:12
**stationed** 88:15
**stayed** 135:12
**stenographically**
252:13
**step** 212:19
**steps** 63:10 79:20
**sting** 102:19 104:2
106:11 145:7
**stipulated** 4:23
**stipulation** 4:22
**stop** 125:2,3
220:10
**stopped** 37:25
133:25 162:21,22
**stored** 39:22
186:17
**street** 3:4,11
**strict** 155:14,18,20
**strictly** 83:2
**strike** 21:23 28:18
30:23 39:20 50:4
52:2,19 54:3,14,25
57:8 64:23 73:9
121:2 139:9
146:12 159:20
174:5 187:16
188:19 219:18
225:8
**strips** 30:12
**stroger** 42:4 80:8
**stuff** 113:16

**stung** 100:13
**subject** 149:4
159:16 181:8,12
**submit** 212:22
**suggests** 170:11
**suit** 127:24
**suite** 3:4,11,18
**super** 134:13,17
136:12,17 165:22
177:2
**superintendent**
165:7 173:3 176:5
176:6,9,14,17
177:4,6,6,10,11,17
221:17 222:21,22
233:17,18
**superintendents**
176:19
**supervise** 129:14
130:22 131:2
**supervised** 129:16
**supervises** 131:7
131:17
**supervisor** 109:4
109:20 110:1
133:14 134:1,3,7
134:10,16,20
135:6,8,10,12,16
135:18,23 136:14
136:21 137:3,7
140:11 161:22
162:2 165:24
166:1 186:20
191:11 249:18
**supplies** 22:13,22
23:6
**supply** 22:25 69:1
198:25
**suppose** 83:18
115:17 122:9
133:20

supposed 29:3
  37:16 54:6 56:4
  57:21 71:24 75:24
  89:19 91:18 109:6
  112:18 139:25
  140:4 180:9
  212:18 220:20
  234:20 240:10
  247:25
supposing 83:5
supt 233:16
sure 6:23 7:2 8:8
  14:7 16:17 19:23
  22:11 23:1,7,9,11
  32:24,25 33:1
  41:16 42:9 52:25
  69:2 70:7,25
  72:18 86:18
  101:19 104:16
  125:8 139:5
  140:18 141:4
  158:14 174:19
  176:14 182:14
  185:7,25 199:14
  201:7 213:10
  216:15 227:21
  244:6
surrounding
  187:14
surveyor 10:6,6
  13:20,25 14:5,11
susan 1:22 2:1 4:3
  5:3,11,13 8:7,7
  91:2 101:7,22
  119:7 148:24
  149:10 159:11,25
  168:14 170:17
  180:20 191:17
  192:5 196:12
  249:6 250:9

swap 141:4
switched 251:4,6
sworn 5:2,5
  233:18 252:10
symptom 111:23
  112:1
syringes 22:23,24
system 32:17 34:6
  36:7 38:10 40:5
  51:11 52:15
  140:17 184:8,20
  206:21,21,24
systems 153:20

**t**

tablets 232:19
take 6:24 7:4 8:2
  10:10,12,15,17,21
  10:24 29:3 32:6
  32:13 42:1,8,10
  50:19 58:10 78:15
  81:8,21 82:4,8
  84:20 86:1,2 90:9
  91:3,8,21 92:15,20
  94:6 95:2,5,6,23
  96:6,13,16,18 97:4
  98:22 116:19,20
  121:9,12,20,24
  122:5,10,13
  126:14 135:11
  141:13,16 142:2
  142:16 147:14
  164:18 179:23,25
  180:1 184:14
  188:13 190:11
  202:6 203:14
  210:13,23 214:15
  227:2,3 229:13
  231:6 246:10
taken 2:1,5 5:13
  5:15 42:15 57:25
  63:10 91:10 93:7

98:18 128:14
  143:17 180:4
  204:16 227:10
  252:19
takes 52:1 79:6
  84:21 107:7
  246:16
talk 25:7 31:11
  50:24 67:18 68:18
  72:17 73:11
  103:20,23 105:9
  117:13 209:8
  235:4 241:11
  242:1,2,22 250:24
talked 209:11
  246:14 247:1
talking 23:23
  58:25 79:21 89:7
  90:16,17,17 91:15
  102:12 105:20
  116:9 124:23
  143:24 148:16
  166:10 183:3
  189:20 194:20
  207:16,19 214:13
  239:6 246:5
taylor 1:16
team 18:21 137:24
  172:21
tear 182:18
technical 233:21
  248:24
telephone 88:9
tell 44:24 49:8
  80:17 88:11 116:1
  116:13,14,15
  168:18 200:9
  211:14,16 212:20
  213:10 232:21
tells 110:2,6

templates 17:1,2,6
ten 42:10 80:14
  81:15 91:8,9
  149:17 216:21
  227:7 242:11
tend 105:5
terizes 72:9 83:25
  85:12 92:3 97:21
  101:3,15 109:25
  110:22 118:4
  187:6 246:19
term 10:6,25 11:5
  15:1 135:24
terms 25:18 125:1
terrace 14:25
  15:15
testified 5:6 41:16
  83:10 92:25 94:4
  94:22 96:5 97:7
  110:9,10 123:2,12
  124:11 126:12
  161:20 168:10
  187:7 241:25
testify 98:10 195:6
  252:10
testimony 41:11
  72:9 83:25 85:12
  86:13 87:25 92:3
  93:10 97:21 101:5
  101:12,15 107:18
  109:25 110:22
  118:4 123:2 187:6
  246:19 252:17
testing 11:6
thank 11:14 20:13
  21:14 42:24 59:25
  91:5 101:17
  136:16 142:25
  149:16,19 163:19
  180:3 197:22
  227:20 233:24

250:8 251:15
**thanks** 91:8 98:10
109:1 142:21
143:15,16
**thing** 15:22 51:1
62:20 140:23
141:9 182:20
207:14 217:16
218:22 244:10
**things** 16:6,15
17:25 22:11 46:21
81:11 139:6
174:18 179:12
197:5 238:18
241:20
**think** 16:24 27:13
30:14 41:15 53:17
62:12 80:13 93:25
100:11 116:15
130:8 131:15
147:25 151:22
157:4 174:19
194:25 195:5
197:10 206:20
207:14 216:20
219:12 226:19
229:20 239:15
242:19 245:22
249:10,14 251:4
**thinking** 26:20
97:19
**third** 58:15
**thirty** 229:9
**thomas** 1:7
**thoroughly** 209:10
**thought** 103:17
189:4 204:23
222:20 248:21
249:6
**thousands** 120:14
123:23

**three** 34:24,24
49:9 58:14 101:17
142:1 184:21
185:3 206:13
240:3
**tid** 58:9,13
**tier** 215:4 225:23
**time** 7:5 10:22
13:18 14:18 17:21
20:2 37:5,6,15,20
37:22 38:13 40:7
45:11 52:1 55:12
55:12 56:3,11,12
56:14 65:8 70:8
71:1,4 74:16 75:6
75:7,7,18,19 76:2
76:10,21 77:9
79:11 81:18 89:7
105:20,22 127:16
127:17 133:22
134:9 136:19,22
136:24 147:20,21
150:2 163:15
164:9 187:12,14
188:23 192:21
195:13 199:21
201:15 202:6,24
203:10,18,21,22
205:2 209:25
218:8 229:4,11,15
230:16 239:7
243:8 245:7,8
246:19 252:20
**timed** 80:15
**timer** 15:21
**times** 56:16,19
57:7,8,10,18 58:5
58:14,16,19,21
59:5,13 60:1,25
61:5,7 92:10
101:17 153:10

156:4 185:3 238:9
239:5 243:23
**title** 40:17 41:16
49:22,24 65:23
130:3,4,5,19
131:22,23 133:17
185:19 193:14
**titles** 186:7
**today** 5:21 43:20
50:7 52:21 111:17
116:3
**told** 169:17 170:6
171:3 174:25
229:7
**tool** 181:3 185:8
**top** 47:10 149:9
162:8 165:4 166:4
173:16,23 198:3
199:12 207:5
**torres** 1:16,16
**totally** 88:6
**tour** 128:14,17,18
**tower** 158:22,23
159:2
**town** 11:3
**track** 68:1 181:22
**tracking** 181:2
185:8
**trained** 144:6,10
144:16 146:4,8,9
146:19,21,22
188:11,13
**training** 146:24
188:14,17,18
**trainings** 10:25
**transcript** 252:12
**transfer** 99:3
138:22 140:21,25
141:6 158:5
181:23,23,24
182:1,6,25 183:2

183:15,18 185:14
208:7
**transferred** 183:5
**transition** 32:21
**transpired** 181:16
**treated** 164:13
**treatment** 154:24
217:21 234:3
**treatments** 15:4
**triage** 13:6
**trick** 48:25
**tried** 229:7
**triplett** 1:18
**true** 252:16
**truth** 252:10
**try** 7:22 60:23
90:23 146:14
238:11 241:14
**trying** 25:19 28:11
38:9,12,16 41:13
48:25 49:1 81:1
106:25 211:5
**tuesday** 132:22
**tunnels** 79:22,23
**turn** 7:16
**twice** 58:12
**two** 7:4 12:18
15:16 34:23 42:7
49:9 56:7,7,10,15
60:16,16 61:9,9
78:1 104:21
116:22 117:10
134:9 158:22
159:2 161:14
166:8 174:8,11,18
190:9 203:19,20
221:6 224:24,24
228:23 245:9
246:15
**tylenol** 120:5
122:10

**[type - want]**

**type** 30:15 34:10
80:21 99:22
103:10 140:12
184:23 185:7,9
188:16 235:8,11
235:12,15 243:17
**typed** 250:19
**types** 16:14,14
99:14 100:4
138:14 164:3
165:5 170:11
189:14 249:20,22
**typewriting**
252:14
**typical** 229:16
**typically** 165:22
181:19 235:7

**u**

**uh** 6:25 178:23
179:11 219:25
**unclear** 37:20
74:15 89:7 90:24
108:23 124:23
145:22 183:3
**uncomfortable**
105:9 106:12
**unconsciousness**
145:6
**undergrad** 9:18
**underneath** 193:3
193:6
**understand** 7:8
17:5 25:8,19
26:16 28:11 29:21
30:19 36:8,16
37:1,12,23 38:9,13
38:16 41:13 46:22
49:1 50:12 56:2,2
63:7,14,16 68:15
70:22 71:8 80:9
81:1 83:4 93:20

**99:20 103:15**
116:9 117:10
123:9 125:6 138:1
139:24 144:12
149:23 154:13
158:13,24 167:22
170:19 176:12
178:5 191:6,13
202:5 205:9 215:7
235:9 238:2
240:13,22 250:25
**understanding**
25:10,12 157:7
180:11 194:3,8
223:23 242:16
**understood** 7:10
33:1 57:3 58:4
163:5 177:19
**unit** 24:17,18
28:23 32:18,19
33:22 60:8 125:21
127:19 144:20
157:16 192:22
239:9
**united** 1:1
**units** 117:19
127:12 128:10,14
129:3 180:10
188:4
**unscheduled**
138:25
**upside** 210:2
**urgency** 12:25
**urgent** 12:23 13:4
13:5,7 16:3 75:10
75:19 76:6,8,17
78:12,13 79:10,12
79:24 80:11 82:10
82:15,17 85:22,25
86:1,2 90:9 91:21
92:16,20 93:7

94:7,18 95:2,5,24
96:6,14,16,18,20
97:5 98:15,18,22
109:19 215:9,10
215:13,15 216:1
220:23
**usage** 7:23
**use** 15:9 24:14
26:20 36:20 38:22
39:4,8 89:14
127:15 152:13
184:15 230:22
**uses** 25:18 27:9
51:12 181:22
**usually** 23:18
25:16,17 57:9,25
66:25 67:20,24
69:3 75:8 105:16
132:19 230:11

**v**

**v** 1:5
**vague** 50:12,13
112:11
**validity** 4:24
**variables** 58:2
59:23 61:7 88:7
**variation** 61:1
**varied** 10:11 19:21
138:13
**varies** 132:23
157:4 197:4,5
**various** 73:20
169:6
**vary** 132:22
**verbal** 6:24
**versa** 243:12
**versus** 243:11
**vice** 243:12
**videoconference**
2:5 3:6,14,20
252:20

**view** 250:25
**vii** 161:15
**village** 253:4
**visit** 17:22 67:9
68:6,16 178:4
203:10 212:2,13
**visits** 104:18
178:20,20
**visor** 134:14,18
136:13,18 165:23
**visual** 74:24
**vital** 229:14
231:11
**voices** 7:4
**vomiting** 105:11

**w**

**w** 1:14,15 133:9
**wait** 35:14 117:9,9
117:11 129:23
169:25 217:7
229:8
**waiting** 116:7
197:20 232:4
251:11
**waive** 4:23 250:17
**waived** 251:2,20
**walk** 80:14 215:25
216:6,6,9 217:7
222:11 224:8
227:24 228:2
**walked** 224:13
**walking** 216:17
**want** 26:2 38:13
39:2 42:10,20
50:16 91:8 94:24
100:9 101:18
106:22 115:21
119:9,14 120:15
129:3 143:2,9,23
145:6 150:15
186:2 209:14

214:15 227:7
243:21 250:22
**wanted** 142:5,18
152:6 199:14
223:2
**wanting** 197:14
230:14
**wants** 207:18
215:20
**warning** 184:8
**watch** 32:8 158:21
158:23 159:2
**watched** 38:15
**way** 30:1,20,22
31:12 35:16 49:1
75:22,24 105:14
114:3 117:3
148:13 149:23
150:10 151:8
152:12 164:14
211:24 212:21
215:25 216:8
238:13 241:17
249:7
**ways** 35:4
**we've** 142:1 238:2
239:5 241:1
**weather** 79:22
**wednesday** 132:22
**week** 23:5 65:14
132:20 221:6
240:2
**weekends** 20:5
180:12,13,15,18
181:19 248:8
**weekly** 132:3,5,13
132:19 137:8,10
203:17,18
**weeks** 203:19
221:6 240:3

**went** 12:22 14:25
15:19 17:19
116:13 132:7
163:15 201:1
237:24 238:1,5
**west** 3:18 24:17
**westville** 15:19,23
15:25 16:1,15,19
19:15,20 20:1,8,16
**whatsoever** 47:17
119:3
**wheelchair** 216:14
216:17
**whereof** 253:3
**whichever** 141:17
177:17
**william** 1:3 5:20
29:2 191:21
192:19 199:19
**window** 55:12
56:22 58:25 60:16
60:16 61:8 230:6
230:16
**wish** 206:20
**witness** 2:7 4:3 5:1
5:4 8:19 29:23
33:21 36:17 37:8
37:24 40:9 42:6
42:12 53:19 54:21
60:7 62:16 66:20
70:19 71:9 72:10
72:22 74:8,18
82:4 84:18 86:11
87:6,22 89:8
90:25 91:5 92:5
93:2,11,14 96:2,10
97:13 99:22 100:9
100:11,21 101:4
101:10,13 102:9
103:4 104:11
106:5,17 107:12

109:3 110:1,23
111:7 112:6
114:25 117:22
122:5,18 123:6
124:12 125:16
126:4 130:17,25
136:23 141:24
143:9 152:21
167:21 169:13
170:19 171:9
173:20 184:12
216:24 219:7
227:12 228:7
237:15 245:19
246:22 252:9,9
253:3
**wondering** 206:25
**word** 24:14 57:2
**work** 8:15 12:10
12:20 13:8,19
14:23 17:22 19:9
20:1,5,17 29:17
47:1 60:7 65:13
65:16 68:18 70:6
70:25 75:25 96:17
97:8,14 105:7,17
106:7,20,23
107:19 108:1
110:12 123:3
127:8 144:12,13
144:14 146:25
157:19 237:9
248:8,19 249:15
**worked** 12:3,7,12
12:17 13:9,13,14
13:17 14:1 16:3,4
19:3 41:18 129:17
144:17 148:8
219:21 249:14
**worker** 161:17

**working** 6:12 12:2
13:4 15:6 20:21
21:7 38:14 49:12
50:15 65:22 66:2
81:15 132:16
137:23 141:8
147:20 193:24
229:16,20 247:2
249:24
**works** 41:20 52:7
75:22 90:18
236:20 249:14
**wound** 10:7 11:1,3
15:9,12
**wrap** 69:2
**wrapped** 28:25
32:18 33:5
**write** 37:3,9,17
39:13 59:12 64:9
85:24 123:7,10
183:8 194:12
201:25 209:7
218:13 225:5
234:13 235:8,10
241:21
**writes** 59:8,9
123:11 198:2,2
237:8,10,11
**writing** 37:25 43:5
44:4 191:14
218:22 221:20
**written** 119:10,12
164:18 169:16
191:6,19 192:11
194:10 212:9
217:13 221:15
233:9 236:16
237:19 242:25
**wrong** 18:20,20
172:24,25

**[wrote - zoom]**

| wrote 174:22 | year 9:9,10,16 |
|---|---|
| 192:25 198:4,13 | 10:17 11:13 13:21 |
| 198:23 201:6 | 14:12,19 20:21 |
| 210:13 214:8 | 35:22 36:4 |
| 217:22 219:8 | years 7:13 8:23 |
| 229:3 231:25 | 11:8 12:10,13,18 |
| 232:2,4 233:15 | 13:2,12,12,21 |
| 234:5,17,17 | 15:16 20:10,11,12 |
| 236:15 | 34:23,24 81:15 |

**x**

| x 4:1 205:25 206:3 |
|---|
| 222:24,25 223:3,7 |
| 223:14 |

**y**

| yeah 7:21 8:13 9:3 |
|---|
| 9:11 12:19 14:17 |
| 22:9,23 24:18 |
| 28:10 34:20 37:13 |
| 37:13 40:9 42:9 |
| 52:25 62:19 63:9 |
| 63:17 75:25 77:8 |
| 77:8 80:9,23,24 |
| 83:14 85:2 91:5 |
| 107:24 109:2,11 |
| 112:10 116:14 |
| 120:18 126:23 |
| 131:16 142:24 |
| 145:3,11 146:1 |
| 150:17 151:14 |
| 152:11 153:7 |
| 154:13,21 163:18 |
| 166:3 175:23,23 |
| 178:15 180:14 |
| 186:7 196:2 |
| 199:13,16,17 |
| 206:5 210:4,6 |
| 215:9 225:11 |
| 227:5,15 245:19 |
| 245:22,22 251:1 |

| 134:9 |
|---|
| yep 53:13 142:21 |
| yesterday 142:5 |

**z**

| z 1:14 |
|---|
| zeros 149:15 |
| zoom 6:21 7:25 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Exhibit D

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Exhibit D