Page 1

1               IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION
3    WILLIAM DUKES,                    )
                                       )
4               Plaintiff,             )
                                       )
5         vs.                          )  No. 2019 L 008948
                                       )
6    COOK COUNTY SHERIFF'S OFFICE,     )
     et al.,                           )
7                                      )
                Defendants.            )
8
9

10          The Zoom Video Conference Deposition of
11   MONSHAI ADDISON, called as a witness for examination,
12   taken pursuant to the provisions of the Code of Civil
13   Procedure and the Rules of the Supreme Court of the
14   State of Illinois pertaining to the taking of
15   depositions for the purpose of discovery, taken before
16   Annamarie Block, a Certified Shorthand Reporter of said
17   State, on the 20th day of April A.D. 2022 at the hour
18   of 11:00 a.m.
19               All participants appeared remotely with
20   the witness physically located at an unspecified
21   location.
22
23
24

Page 2

1  APPEARANCES:
2  MAUCK & BAKER, LLC
      1 North LaSalle Street, Suite 600
3  Chicago, Illinois 60602
      (312) 726-1243
4  kerickson@mauckbaker.com
      BY:  Ms. Kirstin Erikson,
5
          appeared on behalf of Plaintiff;
6
      DEVORE & RADUNSKY
7  20 North Clark Street, Suite 525
      Chicago, Illinois 60602
8  (312) 300-4479
      tradunsky@devoreradunsky.com
9  BY:  Mr. Troy Radunsky,
        Ms. Kimberly Musick,
10
          appeared on behalf of Defendant Cook County
11      Sheriff's Office and the deponent;
12  LAW OFFICES OF JOHN C. COYNE
        20 North Upper Wacker Drive
13  Chicago, Illinois 60606
        (312) 583-9500
14  jcc@johncoynelaw.com
        BY:  Mr. John Coyne,
15
          appeared on behalf of Defendant.
16
17
18
19
20
21
22
23
24

Page 3

1              I N D E X
2  WITNESS:
3  MONSHAI ADDISON
4  Examination        Pages  4 - 107
      By Ms. Erickson
5
      Examination          Pages 108 - 115
6  By Mr. Radunsky
7  Further Examination      Pages 116 - 117
      By Ms. Erickson
8
9      I N D E X  O F  E X H I B I T S
10
    EXHIBIT      DESCRIPTION        PAGE
11
    Deposition    Defendant Monshai    21
12  Exhibit A      Addison's Answers to
                  Plaintiff William
13                Dukes' Interrogatories
14  Deposition    Excel Spreadsheet    58
      Exhibit B
15
    Deposition    Cook County Illinois  66
16  Exhibit C      Interagency Directive
                  Medication Administration
17                and Distribution Document
18  Deposition    Excerpt of Grievance  84
      Exhibit D
19
20  CERTIFIED QUESTIONS:
21  Page  34, Lines 22-23
      Page  53, Lines 19-20
22  Page  63, Lines 5-6
      Page  81, Lines 20-23
23  Page 107, Lines 2-3
24

Page 4

1              (Witness sworn.)
2              MONSHAI ADDISON,
3  called as a witness herein, having been first duly
4  sworn, was examined and testified as follows:
5              E X A M I N A T I O N
6  BY MS. ERICKSON:
7      Q.  Please state your name for the record, and
8  spell your last name.
9      A.  Monshai Addison, a-d-d-i-s-o-n.
10        MS. ERICKSON:  Let the record reflect this is
11  the deposition of Monshai Addison taken pursuant to
12  notice and set by agreement of the parties.  The
13  deposition will be taken pursuant to Federal Rule 30
14  and all applicable rules.
15          My name is Kirstin Erickson, and I
16  represent the plaintiff Mr. William Dukes in this
17  lawsuit.  I'm going to ask you some questions today
18  regarding your background, education and then
19  employment history and questions related to your work
20  as a correctional officer at the Cook County Department
21  of Corrections and your interactions with Mr. Dukes.
22  BY MS. ERICKSON:
23      Q.  Have you ever given a deposition before?
24      A.  Yes.

Page 5

1      Q.  Under what circumstance was that?
2      A.  I'm sorry.  You froze.
3      Q.  What did you give a deposition for?
4      A.  It was an inmate before, and then another
5  legal case.
6      Q.  Was the other legal case related to you?
7      A.  Yes.
8      Q.  What kind of case was it?
9      A.  A case about the job.  A sexual harassment
10  case.
11      Q.  Did you file that case?
12      A.  Yes.
13      Q.  Please let me know if there's any issues with
14  hearing me like we just had.  I'll just go over the
15  ground rules for this deposition today.  Please make
16  sure all of your answers are verbal as the Court
17  Reporter can't take down head nods or uh-huhs.  Does
18  that make sense?
19      A.  Yes.
20      Q.  Make sure I answer -- sorry.  Make sure I
21  finish my question before you begin to answer because
22  it's difficult for the Court Reporter to take down two
23  voices at the same time.  Does that sound fair?
24      A.  Yes.

2 (Pages 2 - 5)

Page 6

1    Q.  If I ask you a question that you don't
2  understand, please just let me know and I'll either
3  repeat it or rephrase it.  If you answer the question,
4  I'm going to assume that you understood what was asked.
5  Is that fair?
6    A.  Yes.
7    Q.  I'm going to ask you some questions going
8  back a few years.  If you don't remember something or
9  you don't know the answer to my question, just let me
10 know and I'll move on, okay?
11   A.  Okay.
12   Q.  Is there anybody else in the room with you?
13   A.  No.
14   Q.  You should not communicate with anyone during
15 the deposition other than myself and the Court Reporter
16 unless we take a break, in which case you can --
17   A.  I'm sorry.  I didn't hear you.  It froze.
18   Q.  You should not communicate with anyone else
19 during the deposition besides myself and the Court
20 Reporter.  If we go on break, obviously you can speak
21 with your attorney.  Does that sound good?
22   A.  Yes.
23   Q.  And computer and phone usage is limited to
24 this Zoom deposition.  Will you be able to see if I put

Page 7

1  documents up?  Will you be able to see them?
2    A.  Yes.
3    Q.  If you need a break, just let me know.  I
4  would just ask that you answer the question that's
5  pending.  Does that sound good?
6    A.  Yes.
7    Q.  Can I call you Monshai?
8    A.  Monshai.
9    Q.  Monshai, what is your date of birth?
10   A.  7/26/1974.
11   Q.  And what is your current address?
12     MR. RADUNSKY:  Let's go off the record.  Do
13 you want to give her your address?  I don't know why
14 it's relevant.  Is it necessary, Kirstin?
15     MS. ERICKSON:  Yes.
16     MR. RADUNSKY:  It is?  When you can get a
17 hold of her through me?
18     MS. ERICKSON:  Go ahead, Monshai.
19         (WHEREUPON, the witness'
20           address was provided off the
21           record.)
22     MR. RADUNSKY:  We can go back on the record,
23 Annamarie.
24

Page 8

1  BY MS. ERICKSON:
2    Q.  How long have you lived at that address,
3  Monshai?
4    A.  Three years.
5    Q.  Who do you currently live with?
6    A.  Myself and my --
7    Q.  I'm sorry.  You broke up.  What did you say?
8    A.  Myself and my kids.
9    Q.  How old are your kids?
10   A.  24, 20, 17 and 13.
11   Q.  Are you married?
12   A.  No.
13   Q.  Have you ever been married?
14   A.  No.
15   Q.  Where did you attend high school?
16   A.  Waukegan High School.
17   Q.  Did you graduate?
18   A.  Yes.
19   Q.  What year did you graduate?
20   A.  1992.
21   Q.  Did you attend college after Waukegan High
22 School?
23   A.  Yeah.
24   Q.  Where did you attend?

Page 9

1    A.  Harold Washington, Chicago State and Roxbury.
2    Q.  When you attended Harold Washington, how long
3  were you there?
4    A.  About two years.
5    Q.  What years did you attend Harold Washington?
6    A.  1992-1993 I believe.
7    Q.  What were you studying?
8    A.  I didn't have a major at that time.
9    Q.  So general classes?
10   A.  Yes.
11   Q.  Did you receive any degree during those years
12 at Harold Washington?
13   A.  No.
14   Q.  And then later you returned to Chicago State,
15 correct?
16   A.  Correct.
17   Q.  What years did you attend Chicago State?
18   A.  I want to say like '94 to like '96 or
19 something.
20   Q.  1994 to 1996?
21   A.  Yes.
22   Q.  What did you study during those years at
23 Chicago State?
24   A.  Biology.

3 (Pages 6 - 9)

Page 10

1   Q.  Did you receive a degree?
2   A.  No.
3   Q.  And then you said you attended Roxbury. Is
4 that Roxbury College?
5   A.  Yes.
6   Q.  Where is it located?
7   A.  Boston.
8   Q.  What years did you attend Roxbury?
9   A.  Like '93 I believe.
10   Q.  Just 1993?
11   A.  Yes.
12   Q.  Was it in person or remote?
13   A.  It was in person.
14   Q.  Just so I understand, you didn't get an
15 Associate's degree at any of these, right?
16   A.  No.
17   Q.  Are you currently employed?
18   A.  Yes.
19   Q.  Where are you employed?
20   A.  I'm sorry. You froze.
21   Q.  Are you currently employed at the Cook County
22 Department of Corrections?
23   A.  Yes.
24   Q.  How long have you worked at the Cook County

Page 11

1 Department of Corrections?
2   A.  Since 2001.
3   Q.  What was your role when you began working
4 there in 2001?
5   A.  Truant officer.
6   Q.  If you remember, what divisions did you work
7 on or division when you started working in 2001?
8   A.  3NA division, four, Division 10, pre-release,
9 Division 2, Division 11 and CCB movement.
10   Q.  What was the last one?
11   A.  CCB movement.
12   Q.  What does that mean?
13   A.  Court movement.
14   Q.  So that means when an inmate leaves and comes
15 to go to Court you were working in that area?
16   A.  Escorting them. Yes.
17   Q.  And then -- so in 2001 did you work in all of
18 those divisions?
19   A.  No. In 2001 I worked in 3NA.
20   Q.  Can you explain how many moves to the
21 different divisions over the years you have been
22 working at Cook County?
23   A.  I bidded for the different divisions.
24   Q.  You what? I'm sorry.

Page 12

1   A.  I bid.
2   Q.  What does that mean?
3   A.  Like every year we get to bid to either stay
4 where we're at or go to another division.
5   Q.  When does the bidding take place?
6   A.  It depends. It may take place in March or
7 it may take place in February or it may take place in
8 April. It depends.
9   Q.  So between 2001 and the present, did you
10 intend to switch every year or how does that work for
11 you as far as deciding to bid or not bid?
12   A.  Every so many years I decided to bid out.
13   Q.  And when you decided to bid, did you decide
14 to go to Division 10 at some point?
15   A.  Yes.
16   Q.  When did you decide to transition or bid out
17 to go to Division 10?
18   A.  I believe like around 2008 I want to say.
19 Somewhere around there.
20   Q.  Why did you decide to bid out to go to
21 Division 10?
22   A.  I wanted a change.
23   Q.  Have you been in Division 10 ever since then?
24   A.  Ever since what?

Page 13

1   Q.  Since you moved there in 2008.
2   A.  I bid out of Division 10.
3   Q.  I'm sorry. I totally misunderstood that.
4 What happened in 2008?
5   A.  I bid into Division 10.
6   Q.  Sorry. You're breaking up. That's part of
7 what's hard. So in 2008 you bid to start working in
8 Division 10 or leave Division 10?
9   A.  To start working.
10   Q.  That's what I thought you said. And then how
11 long did you stay in Division 10 after 2008?
12   A.  I left there in 2016.
13   Q.  Why did you leave in 2016 from Division 10?
14   A.  I wanted something different.
15   Q.  Where did you move to from Division 10 in
16 2016?
17   A.  Pre-release.
18   Q.  What do you do when you work as a
19 correctional officer in pre-release?
20   A.  I worked for the detainees, and I also worked
21 for the superintendent.
22   Q.  What was the first thing you did for the
23 detainees?
24   A.  I worked with the detainees on the different

4 (Pages 10 - 13)

Page 14

1 tiers, as well as worked for the superintendent as his
2 assistant.
3    Q. So how long did you work in pre-release from
4 2016?
5    A. I think they closed it in 2017.
6    Q. And what month in 2016 did you move to
7 pre-release?
8    A. I think February, but I'm not sure.
9    Q. When you were working in pre-release and you
10 sat on different tiers, what does that mean?
11    A. I monitored the MAs. If they had to do the
12 drug program, I monitored the drug program that they
13 were in.
14    Q. So sitting on different tiers means that you
15 monitor the drug program?
16    A. Yes.
17    Q. Did you have any other specific
18 responsibilities in sitting on different tiers during
19 that time?
20    A. Yes. I placed different detainees in the
21 drug treatment program from the Judges. When the
22 Judges would send orders over I did that, as well as I
23 worked as his assistant.
24    Q. You worked for who as an assistant?

Page 15

1    A. The superintendent.
2    Q. Okay. What work have you done for the
3 superintendent since you started working on
4 pre-release?
5    A. As far as the working for the superintendent
6 I made sure our counts were right, dealt with different
7 directors, attend meetings with him, took notes and
8 stuff like that. Administrative stuff.
9    Q. Are you still in that role today?
10    A. No, I'm not.
11    Q. When did you stop working in pre-release?
12 You said at the end of 2017?
13    A. Sometime in 2017 when they closed the
14 building down.
15    Q. Do you know why they closed the building
16 down?
17    A. No.
18    Q. Where have you been working ever since
19 pre-released was closed?
20    A. I went to -- Division 11 and CCB Court.
21    Q. You said CCB Court is -- can you explain what
22 that role is again?
23    A. Yes. We go to all the divisions and pick up
24 in the Courts that have criminal Court inside the jail.

Page 16

1 We transport them to the courtroom.
2    Q. Okay. And was that program the CCB Courts in
3 place in 2015 through 2017?
4    A. No. I'm not sure when they started, but it
5 wasn't in 2015.
6    Q. Did it have -- so what happened in 2015 to
7 2017 when inmates needed to go to Court?
8    A. They were doing something different.
9    Q. Do you know when this started, the CCB Court?
10    A. No, I don't.
11    Q. Let's go back to 2015 and 2016 when you were
12 work in Division 10. How many units are there in
13 Division 10?
14      MR. RADUNSKY: How many cells in the entire
15 tier?
16 BY MS. ERICKSON:
17    Q. Do you understand what --
18    A. Can you clarify for me?
19    Q. There was a Tier 2C and Division 10, right?
20    A. Yes.
21    Q. So does that mean there was a Division A-B-D
22 as well?
23    A. Correct. It's not division. It's Tier
24 A-B-C-D.

Page 17

1      MR. RADUNSKY: We can cut to the chase. I
2 mean do you know how many cells are in the entire
3 Division 10, which I think is the question.
4      THE WITNESS: I don't know exactly how many
5 cells. I know -- I want to say 24 cells.
6      MS. ERICKSON: I can't hear what's going
7 on.
8      THE WITNESS: That's my dog. Sorry.
9      MR. RADUNSKY: Monshai, what was your answer?
10 How many cells are there?
11      MS. ERICKSON: Hang on, Troy. I didn't ask
12 that question. Let me ask the question, and you can
13 interject if you have an objection.
14 BY MS. ERICKSON:
15    Q. Tier A-B-C-D, did you work on Tier 2C
16 throughout 2015 and 2016?
17    A. I'm not sure of the time period.
18    Q. Did you ever work in Division 10-Tier 2A?
19    A. Yes.
20    Q. Did you ever work in 2C?
21    A. Yes.
22    Q. Did you work in 2D?
23    A. Yes.
24    Q. Is Division 10 only one floor or are there

5 (Pages 14 - 17)

Page 18

1 multiple floors of Division 10?
2   A.   Multiple floors.
3   Q.   How many floors are there in Division 10?
4   A.   Four.
5   Q.   So these particulars ones, Tiers A-B-C-D, are
6 those all located on floor two?
7   A.   Correct.
8   Q.   Does every floor have like A-B-C-D for the
9 floor?
10  A.   They do, yes.
11  Q.   What determined whether you were working on
12 Tier 2, Division 10 or Tier 2B or Division 10-Tier 2C?
13  A.   The way the lieutenant did the roster.
14  Q.   Did it vary from week to week whether you
15 were on 2C or B?  How did it work?
16  A.   Sometimes you would have it for a 90-day
17 assignment, so it varied.
18  Q.   The lieutenant would decide which tier to put
19 you on then?
20  A.   Yes.
21  Q.   So then what -- I mean you worked on several
22 different divisions and tiers.  You worked in Division
23 10 for at least seven years, right?
24  A.   Yes.

Page 19

1   Q.   Were there advantages to working in Division
2 10 that you didn't experience working in Division 9?
3       MR. RADUNSKY:  Objection to form.  How is it
4 relevant?  You can answer.
5       THE WITNESS:  I didn't work in nine, so I
6 don't know how it was.
7 BY MS. ERICKSON:
8   Q.   Were there any advantages to working in
9 Division 10 that you didn't experience working in the
10 other divisions or places that you worked as a
11 correctional officer?
12      MR. RADUNSKY:  Same objection.  I don't know
13 what you mean when you say advantages, but you can
14 answer the question if you understand.
15      THE WITNESS:  No.
16 BY MS. ERICKSON:
17  Q.   Why did you prefer or decide to stay working
18 on Division 10 from 2008 to 2016?
19  A.   There wasn't nowhere I wanted to go at the
20 time.
21  Q.   Was the job substantially the same when you
22 were working in Division 3 or 8 or 10?
23  A.   Yes.
24  Q.   You just preferred Division 10?

Page 20

1   A.   I'm not understanding.
2   Q.   I'm just trying to understand why you decided
3 to stay in Division 10.
4   A.   There was no reason.  I just stayed.
5   Q.   Okay.  Have you ever been convicted of a
6 felony or crime involving dishonesty?
7   A.   No.
8   Q.   In preparing for the deposition, did you
9 review anything?
10  A.   Yes.
11  Q.   What did you review?
12  A.   I reviewed the disciplinary report, and I
13 reviewed my portion of the lawsuit.
14      MR. RADUNSKY:  She means the grievance, not
15 the disciplinary report.
16 BY MS. ERICKSON:
17  Q.   So you reviewed the grievance where your name
18 is listed on the report?
19  A.   Yes.
20  Q.   Did you talk to anyone other than your
21 attorney in preparing for your deposition today?
22  A.   No.
23  Q.   I'm going to share my screen here.  Can you
24 see the document here?

Page 21

1   A.   Yes.
2   Q.   At the top it says Defendant Monshai
3 Addison's Answers to Plaintiff William Dukes'
4 Interrogatories?
5   A.   Yes.
6   Q.   Did you review these before you signed them?
7   A.   Yes.
8   Q.   Is this your signature?
9   A.   I don't see a signature.
10  Q.   Do you see this?
11  A.   Yes.
12  Q.   So you signed this after reviewing the
13 Answers to Interrogatories --
14  A.   Yes.
15  Q.   -- on November 15, 2021?
16  A.   Yes.
17  Q.   You answered the interrogatories truthfully
18 to the best of your knowledge?
19  A.   Yes.
20  Q.   So I want to go back to your time as a
21 correctional officer in Division 10 in late 2015
22 through February of 2016.  What were your job duties as
23 a correctional officer?
24  A.   My job duties was to monitor the MAs,

6 (Pages 18 - 21)

Page 22

1 supervise them, provide them with the things that they
2 need; toiletries, meals. Make sure the security of
3 inmates was good.
4    Q. What paperwork did you have to fill out?
5    MR. RADUNSKY: Objection. That's a pretty
6 broad question. You're asking in general what types of
7 paperwork or --
8    MS. ERICKSON: No speaking objections.
9    MR. RADUNSKY: I don't understand the
10 question. It's pretty broad what type of paperwork.
11 That's my objection. If you ask a specific question --
12    MS. ERICKSON: No speaking objections. You
13 can answer the question, Monshai.
14    MR. RADUNSKY: I'll tell her to do that; but
15 you can answer, Monshai, if you understand it.
16    THE WITNESS: My tier book -- I had a tier
17 book that I had to fill out.
18 BY MS. ERICKSON:
19    Q. How often did you have to fill out the tier
20 book?
21    A. Everyday.
22    Q. And everyday what did you write in the tier
23 book?
24    A. We would put our hourly checks up in there

Page 23

1 when we feed the detainees.
2    Q. How often would you write -- how often do you
3 write in the tier book everyday?
4    MR. RADUNSKY: Asked and answered. Go ahead.
5 You can answer. She said everyday.
6    THE WITNESS: Everyday.
7 BY MS. ERICKSON:
8    Q. During the day how many times do you write in
9 the tier book?
10    MR. RADUNSKY: Objection to form of the
11 question. It's going to vary from day to day. You can
12 answer.
13    THE WITNESS: I usually write up until the
14 end of my shift. I fill it in all the way up to the
15 end of my shift.
16 BY MS. ERICKSON:
17    Q. How many times throughout the day? It could
18 be like ten to 15 times or once. Just so I understand.
19    MR. RADUNSKY: Objection; asked and answered.
20 She just told you she does it at the end of her shift
21 everyday.
22    MS. ERICKSON: Let her --
23    MR. RADUNSKY: It's asked and answered. She
24 just answered your question. You heard her answer, and

Page 24

1 then just asked the same question again after she
2 answered. You can answer again, Monshai.
3    THE WITNESS: I'm not sure exactly how many
4 times. I just know I would fill it out all the way
5 until the end of my day.
6 BY MS. ERICKSON:
7    Q. Thanks. How many pages per shift did you
8 write in the book?
9    MR. RADUNSKY: Objection to form of the
10 question, vague. You can answer, Monshai, if you
11 understand.
12    THE WITNESS: It's two pages, but you might
13 only write on the first page.
14 BY MS. ERICKSON:
15    Q. And this is something that you were doing in
16 November of 2015 through February of 2016?
17    A. If I was on a tier, yes.
18    Q. Is that something that is still done
19 throughout Cook County Department of Corrections if you
20 know?
21    A. It was, yes.
22    Q. Do you know if correctional officers ever
23 stopped having to fill out a tier book or this type of
24 book when they were on a living unit?

Page 25

1    A. No.
2    Q. No you don't know or --
3    A. I don't know.
4    Q. So you put hourly checks in. What were
5 hourly checks for?
6    A. Just letting them know I checked on my tier
7 to make sure everybody was okay.
8    Q. Did you ever have to use the bar code scanner
9 to check to see if inmates were okay?
10    A. Yes.
11    Q. Was that done hourly or more frequently?
12    A. It was done hourly, but probably frequently
13 as well.
14    Q. So in what types of situations would you scan
15 more frequently than hourly?
16    A. If an incident was going on.
17    Q. Like what?
18    A. A fight or something like that.
19    Q. So if there's a fight going on, what's your
20 first initial responsibility?
21    MR. RADUNSKY: Hold on. Objection; form,
22 relevance. I mean how is any of this relevant to your
23 client's claim?
24    MS. ERICKSON: No speaking objections.

7 (Pages 22 - 25)

1      MR. RADUNSKY:  Hold on.  Stop interrupting
2  me.  Can I make my record?  None of this is relevant.
3  It's not part of your client's complaint.  It's way
4  outside the scope.  It really -- I mean there's no
5  basis for these questions about riots or responses or
6  any of it.  Monshai, you can answer the question.  I'm
7  not going to let this go on long, Kristin.  Go ahead.
8      THE WITNESS:  I would notify my supervisor.
9  BY MS. ERICKSON:
10    Q.  So if there's an incident going on you notify
11  the supervisor.  How do you do that?
12    A.  Via radio.
13    Q.  Did you have a radio on Division 10-Tier 2C
14  in November of 2015 through February of 2016?
15    A.  I'm sorry.  I didn't understand you.
16    Q.  Did I break up?
17    A.  Yes.
18    Q.  Did you have a radio in Division 10-Tier 2C,
19  in November of 2015 through February of 2016?
20    A.  Yes.
21    Q.  If there's an incident it sounds like you
22  said you would notify the supervisor via radio.  What
23  would be the next thing you would do as the
24  correctional officer in that living unit?

1    A.  Wait for the backup to come.
2    Q.  One more time.
3    A.  Wait for backup to come.
4    Q.  And then at some point you would go around
5  and scan to see who was in their cells?
6    A.  You broke up again.
7    Q.  When would you do the bar scanner to check in
8  on inmates?  If there's an incident?
9    A.  No.  It was every hour.
10    Q.  If there was an incident you didn't check in
11  more regularly with the bar code scanner?
12    A.  No.  I only had to do the bar code scanner on
13  the hour.
14    Q.  What time did the detainees get fed generally
15  in Division 10-Tier 2C?
16      MR. RADUNSKY:  Objection to relevance.  I
17  mean this is harassment of my witness, and I'm ready to
18  cut this off.  If you want to take this to the Judge,
19  that's completely fine.
20      This case has nothing to do at all with
21  him eating or not eating.  It's a medical indifference
22  case.  That's what you pled.  You've now just spent the
23  last ten minutes questioning my witness about riots and
24  her response to those and responses to incidences.

1  This wasn't an incident.  An incident would be
2  documented in an incident report and this wasn't, so
3  you're talking about things that are not relevant.
4      MS. ERICKSON:  Let me just take the
5  deposition.
6      MR. RADUNSKY:  I'm trying, but you're wasting
7  time.  Please get to the point.
8      MS. ERICKSON:  I'm taking the deposition.
9  Can I go on?
10      MR. RADUNSKY:  We'll see if you can.  Go
11  ahead.
12      MS. ERICKSON:  Annamarie, would you mind
13  reading back the last question.
14        (Record read.)
15      THE WITNESS:  I'm not really sure of the
16  time.  It varies.  Maybe between 11:00 and 12:00.
17  BY MS. ERICKSON:
18    Q.  Okay.  What shift did you work from November
19  of 2015 through February of 2016?
20    A.  The 7:00 to 3:00 shift.
21    Q.  Did you write in the tier book when the nurse
22  came to give medication to inmates in
23  Division 10-Tier 2C?
24    A.  Yes.

1    Q.  Did you write the time when the nurse arrived
2  and when the nurse left to give medication?
3    A.  I believe I wrote the time that the nurse
4  came, but I'm not sure.
5    Q.  Was there anything else that you wrote in the
6  tier book?
7    A.  No.
8    Q.  At the end of a shift how did you -- strike
9  that.
10      At the end of a shift besides the tier
11  book was there any sort of telling the next
12  correctional officer how that shift went with the
13  inmates?
14    A.  Yes.
15    Q.  What did you do?
16    A.  So only tell them if something serious
17  happened on a tier I would relate that to him or her.
18    Q.  You broke up.  Can you repeat that, please?
19      Do you want the question read back?
20    A.  No.  I said that I would relay -- if
21  something was serious I would relay it to the officer
22  letting him know that this happened.  A fight on the
23  tier or something like that.  I would only relate the
24  serious.

8 (Pages 26 - 29)

Page 30

1    Q.  It broke up.  Would you mind repeating,
2 Monshai?
3    A.  I would only relay the serious stuff.  If
4 there was a fight, I would let them know who was on the
5 tier and --
6        MR. RADUNSKY:  It's breaking up a lot.  Maybe
7 go off camera and see what happens and if that clears
8 it up.  It's starting to become an issue.
9        THE WITNESS:  Okay.
10 BY MS. ERICKSON:
11    Q.  Let's try one more time.  What I heard -- and
12 you can fill in the blanks -- what happened when the
13 new guard would come at the end of your shift?
14    A.  I would let them know how many people was on
15 a tier.  How many people was at Court or at the
16 hospital or -- something like that.  If there was a
17 fight, I would let them know there was a fight.
18    Q.  So you would tell them these things
19 specifically?
20    A.  Yes.
21    Q.  Was that a yes?
22    A.  Yes.
23    Q.  Did you note in the tier book whether the CRW
24 arrived on the unit?

Page 31

1    A.  Can you repeat that?  It keeps freezing.  I
2 don't know if it's my Internet or -- I'm going to try
3 moving around in my house.  Can you repeat the
4 question?
5        MS. ERICKSON:  Annamarie, would you mind
6 reading it back.
7            (Record read).
8        THE WITNESS:  No.
9 BY MS. ERICKSON:
10    Q.  You sounded good on that one.  Maybe this is
11 a good spot.  Do you have any medical training,
12 Monshai?
13    A.  Limited medical training.
14    Q.  What medical training have you received?
15    A.  CPR training.
16    Q.  That's through the Cook County Department of
17 Corrections?
18    A.  Yes.
19    Q.  How often did you receive the CPR training
20 with CCDOC?
21    A.  Usually like every 18 months or something
22 like that.  12 to 18 months.
23    Q.  In Division 10-Tier 2C can you explain what
24 the layout of that particular living unit was?

Page 32

1    A.  Once you walk in you walk into the interlock.
2 And the picture that's here, I believe my monitor area
3 would be to the right once you walk in the interlock
4 area and then the inmates are housed in front of me.
5    Q.  Did you have a door you had to go through to
6 get into the monitor area?
7    A.  Yes.
8    Q.  Is Division 10 maximum security?
9    A.  It is medium and maximum.
10    Q.  During your shift in Division 10-Tier 2C,
11 where would you be during the shift?
12    A.  In my monitor area.
13    Q.  And you would leave the monitor area at what
14 times?
15    A.  For lunch.
16    Q.  For your lunch?
17    A.  For my lunch or if I had to relieve somebody
18 out I would leave at that time as well, and then when
19 it's time for me to leave at the end of my shift.
20    Q.  What time did you normally take lunch in
21 November of 2015 through February of 2016?
22    A.  I don't recall.
23    Q.  How does it work when you need to use the
24 restroom?

Page 33

1    A.  I request a 44.
2    Q.  What happens with a 44?
3    A.  I'll get a relief.
4    Q.  You get a what?
5    A.  A relief.
6    Q.  Okay.  When you get a relief, what happens?
7    A.  There would be another officer there in my
8 place.
9    Q.  When you went to relieve someone else, who
10 would be at Division 10-Tier 2C?
11    A.  It would be another officer.
12    Q.  If you had to relieve someone else another
13 officer comes to you first, and then you leave?
14    A.  Yes.
15    Q.  When you worked in the monitor area, were you
16 allowed to use your cellphone?
17    A.  No.
18    Q.  Do cellphones work in Division 10-2C?
19    A.  I didn't know.
20        MR. RADUNSKY:  Object to form of the question
21 How would she know if everyone's cellphone works in
22 Division 10-2C?  It's total speculation.
23        MS. ERICKSON:  Noted.
24

9 (Pages 30 - 33)

Page 34

1 BY MS. ERICKSON:

2 Q. So, Monshai, did you say that you don't know

3 if your cellphone worked in Division 10-Tier 2C?

4 A. I did not know.

5 Q. When you worked in Division 10-Tier 2C from

6 November of 2015 through February of 2016, were you the

7 only officer on duty throughout the shift from 7:00 to

8 3:00?

9 MR. RADUNSKY: Object to form. What do you

10 mean? The whole jail, on that tier or -- that's such a

11 vague question.

12 MS. ERICKSON: Annamarie, can you read back

13 the question, please.

14 (Record read.)

15 MR. RADUNSKY: I'm going to object to form of

16 the question. When you say 7:00 to 3:00 the only

17 officer on duty, I don't know what that means. You can

18 answer if you understand.

19 THE WITNESS: I was the only officer on that

20 tier.

21 BY MS. ERICKSON:

22 Q. Did you ever read books when you were on the

23 shift?

24 MR. RADUNSKY: My God. Hold on. Objection;

Page 35

1 relevance. Don't answer the question. Total

2 harassment. It has nothing to do with the case. You

3 don't have to answer it. You can certify the question

4 if you want.

5 MS. ERICKSON: Are you listening to your

6 attorney to not answer the question?

7 THE WITNESS: Yes.

8 MS. ERICKSON: I'll certify the question.

9 BY MS. ERICKSON:

10 Q. Monshai, did you ever study any sort of

11 anything while you were working on Division 10-Tier 2C

12 from November of 2015 through February of 2016?

13 MR. RADUNSKY: Objection to form of the

14 question. I mean study anything? It's vague.

15 Monshai, you can answer if you understand it.

16 THE WITNESS: No.

17 BY MS. ERICKSON:

18 Q. How many days a week did you work from

19 November of 2015 through February of 2016 at Cook

20 County Department of Corrections?

21 A. You said -- I'm sorry. Can you repeat that

22 one more time.

23 Q. Sure. I'm talking about this specific time

24 period when you worked on the unit Mr. Dukes was on

Page 36

1 from November of 2015 through February of 2016. How

2 many days per week did you work in that unit?

3 A. I'm not sure. I don't know.

4 Q. Were you ever promoted in your time working

5 at the Cook County Department of Corrections?

6 A. No.

7 Q. Were you ever disciplined in your time

8 working at the Cook County Department of Corrections?

9 A. No.

10 Q. Did you ever get put on administrative leave?

11 A. No.

12 Q. Did you ever take time off for a vacation

13 from 2001 until the present while working for the Cook

14 County --

15 MR. RADUNSKY: Don't answer, Monshai.

16 Objection; relevance. It has nothing to do with this

17 case. You don't need to answer that question. You can

18 certify it.

19 MS. ERICKSON: Monshai, are you following

20 your attorney's advice?

21 MR. RADUNSKY: This is almost harassment of

22 my witness. I've never terminated a dep but I'm

23 getting close, because I think that you're just -- I

24 mean this is beyond --

Page 37

1 MS. ERICKSON: You're yelling right now.

2 MR. RADUNSKY: I think this is beyond the

3 scope of your lawsuit and you're getting into issues

4 and you have been that have no bearing on this case.

5 Questions like that are nothing but designed to harass.

6 That's my record. If you keep doing this, we are going

7 to terminate and just have the Judge decide these

8 issues. We have been in this dep for an hour, and

9 you've really explored nothing in this case.

10 MS. ERICKSON: Can I continue or do you need

11 more time?

12 MR. RADUNSKY: Go ahead.

13 MS. ERICKSON: Monshai, do you remember the

14 question?

15 THE WITNESS: No, I don't.

16 MS. ERICKSON: Annamarie, would you mind

17 reading back the question.

18 (Record read.)

19 THE WITNESS: I'm not sure.

20 BY MS. ERICKSON:

21 Q. How many cells are there in

22 Division 10-Tier 2C?

23 A. 24.

24 Q. Is maximum capacity 48 inmates?

10 (Pages 34 - 37)

Page 38

1     A.  Yes. Hold on. I'm going to -- I believe
2 it's 24 cells, but I'm trying to think. Was it two
3 people in a cell? Yes, it was. Yes, 48.
4     Q.  Was there a computer in the monitor room in
5 Division 10-Tier 2C?
6     A.  Yes.
7     Q.  Did you use that computer during your shift?
8     A.  Yes.
9     Q.  What did you use the computer for?
10     A.  To write up incidents, check Court dates and
11 stuff like that.
12     Q.  Did you ever have to leave the unit to use a
13 computer because the one in Division 10-Tier 2C wasn't
14 working?
15     A.  I don't recall.
16     Q.  When the nurse or when Cermak came to give
17 medication, where was the medication administered to
18 the inmates?
19     A.  I believe it was cell to cell.
20     Q.  Can you describe that process?
21     A.  Yes. The nurse will walk around with the
22 cart with the officer to pass out meds.
23     Q.  When that nurse was there with the correction
24 officer to pass out meds, where would you be located?

Page 39

1     A.  In my monitor area.
2     Q.  Did you ever have inmates in Division 10
3 complain to you after the nurse came by that they
4 didn't get their medication?
5     A.  I don't recall.
6     Q.  Where is the lockbox for grievances in
7 Division 10-Tier 2C?
8     A.  In the interlock area.
9     Q.  How did the inmates get access to that
10 lockbox?
11     A.  I would open the tier door to let them out so
12 that they can put it inside the box.
13     Q.  Who picked up the grievance forms out of that
14 lockbox?
15     A.  The social worker.
16     Q.  Is the social worker also called the CRW?
17     A.  Yes.
18     MR. RADUNSKY: Can we take a short break?
19     MS. ERICKSON: Sure. How much time?
20     MR. RADUNSKY: We'll come back in ten
21 minutes.
22     (Short break.)
23     MS. ERICKSON: Back on the record.
24

Page 40

1 BY MS. ERICKSON:
2     Q.  Before we went on break we were talking about
3 the CRW or social worker. Did you say that the CRW or
4 social worker is the one that picked up the grievance
5 forms?
6     A.  Yes.
7     Q.  And how often did the CRW come to the unit in
8 Division 10-Tier 2C from November of 2015 through
9 February of 2016?
10     A.  Usually like once a day.
11     Q.  Did they have a specific time they would come
12 through Division 10-Tier 2C?
13     A.  No, they didn't.
14     Q.  Did you have grievance forms available to
15 inmates if they needed one as a correctional officer?
16     A.  Yes.
17     Q.  Where were those forms located?
18     A.  In my monitor area.
19     Q.  How would inmates inform you that he or she
20 needed a grievance form?
21     A.  They would let me know they needed a
22 grievance form and I would let the social worker know
23 and she would hand me some to give to them.
24     Q.  So how would inmates get your attention to

Page 41

1 talk to you?
2     A.  Come to the tier door, and ask can they come
3 out.
4     Q.  In Division 10 how often were inmates allowed
5 to come out to the common area of that living unit?
6     MR. RADUNSKY: Common area? You can answer,
7 Monshai.
8     THE WITNESS: Are you referring to the
9 interlock area?
10 BY MS. ERICKSON:
11     Q.  You tell me the term that you would use. If
12 an inmate leaves the cell, takes one step out of a
13 cell, what do you call that area there?
14     A.  That's their tier area.
15     Q.  So were inmates allowed to leave their cell
16 to go into the tier just to hang out for a period of
17 time?
18     MR. RADUNSKY: Kirstin, it's called the day
19 room.
20 BY MS. ERICKSON:
21     Q.  Go ahead, Monshai.
22     A.  Yes. They would leave to come out to the day
23 room.
24     Q.  And how long were inmates allowed to be in

11 (Pages 38 - 41)

Page 42

1 the day room per day?
2     A.   They would come out -- I actually can't
3 recall that time frame.
4     Q.   Is that the time when the inmate would come
5 to you to let them know -- to let you know they needed
6 a form or needed you for something?
7         MR. RADUNSKY:  Object to form of the
8 question; so broad.  You can answer if you
9 understand.
10        THE WITNESS:  Yes.
11 BY MS. ERICKSON:
12    Q.   And if it wasn't an inmate's time to be in
13 the day room area and they were in the cell, how did
14 the inmate get your attention?
15    A.   Another inmate would let me know.
16    Q.   Where was the lockbox for the health service
17 form for Division 10-Tier 2C?
18    A.   In the interlock area.
19    Q.   So if an inmate had a form completed, what
20 would they do in order to put it in that box?
21    A.   Let me know to put the form in the box, and I
22 would open the door for them to put it in there.
23    Q.   How did an inmate acquire a health service
24 request form?

Page 43

1         MR. RADUNSKY:  Object to form.  I mean you're
2 asking all these broad questions that can vary
3 depending on thousands of inmates.  You can answer.
4         THE WITNESS:  Through the nurse.
5 BY MS. ERICKSON:
6     Q.   So everytime -- was it everytime the nurse
7 came to the unit the nurse had health service request
8 forms?
9         MR. RADUNSKY:  Objection; speculation.
10        THE WITNESS:  I'm sorry.  I don't understand
11 the question.
12 BY MS. ERICKSON:
13    Q.   Just so I understand.  Did the nurse come to
14 Division 10-Tier 2C twice a day to give medication?
15    A.   I don't recall.
16    Q.   Did the nurse come to Division 10-Tier 2C to
17 give medication on a daily basis?
18    A.   Yes.
19    Q.   Was the only way for an inmate on Division
20 10-Tier 2C to get a health service request form from
21 the nurse?
22    A.   Yes.
23    Q.   Did you ever encounter a situation where
24 inmates come complained to you that the nurse didn't

Page 44

1 have any health service request forms?
2     A.   I don't recall.
3     Q.   Who picked up the completed health service
4 request forms from the lockbox?
5     A.   The health request form wasn't in the
6 lockbox.  They gave them directly to the nurse when the
7 nurse came on the tier.
8     Q.   So there was never a box where the health
9 service request forms were placed into?
10    A.   No.
11    Q.   Was it always that way -- strike that.
12         Was that always the way that health
13 service request forms were handled by Cermak throughout
14 your whole time working at the CCDOC?
15    A.   I don't know.
16    Q.   Was that the method used in 2015 and 2016 in
17 Division 10-Tier 2C?
18         MR. RADUNSKY:  Objection; asked and answered.
19 She just said she didn't know.  You're asking her to
20 speculate.  You can answer.
21         THE WITNESS:  I don't know.
22 BY MS. ERICKSON:
23    Q.   I'm just trying to understand.  A minute ago
24 you said -- you testified that inmates gave the service

Page 45

1 request forms to the nurse.  In what time frame are you
2 talking about that that occurred?
3     A.   That occurred when I was there before I left.
4 I don't know what happened previous or after.  I don't
5 know.
6     Q.   What do you mean by "there"?
7     A.   In the division.
8     Q.   Division 10?
9     A.   Yes.
10    Q.   So that was the procedure for the health
11 service request forms from 2008 through 2016?
12         MR. RADUNSKY:  Objection; misstates her
13 testimony.  That's not what she said.  You can answer
14 again.
15         THE WITNESS:  I said I don't know what
16 happened in 2008.  I know when I was there between 2015
17 and 2016 that's how they were doing it that.
18 BY MS. ERICKSON:
19    Q.   Okay.  Did you ever see inmates give the
20 service request form to the nurse?
21    A.   Yes.
22    Q.   Did you ever have to do cross-watch for
23 another division when you worked at Division 10-Tier 2C
24 from November of 2015 through February of 2016?

12 (Pages 42 - 45)

Page 46

1      MR. RADUNSKY: Object to form of the
2  question. I don't know what you mean by cross-watch.
3  You can answer if you understand.
4      THE WITNESS: I don't recall.
5  BY MS. ERICKSON:
6    Q.  Do you know an Officer Culmack (phonetic)?
7    A.  No.
8    Q.  Do you know an Officer Luna (phonetic)?
9    A.  No.
10   Q.  If you needed to call the nurses' station
11 outside of Division 10-Tier 2C, what is the name of the
12 place where you would be calling?
13   A.  The dispensary.
14   Q.  Where is the dispensary located that you
15 would call from Division 10-Tier 2C?
16   A.  On the second floor. Around the corner on
17 the second floor.
18   Q.  Would you use a radio to call the dispensary
19 or a phone?
20     MR. RADUNSKY: Objection. When? That's such
21 a broad question. You can answer.
22     THE WITNESS: I would call on the phone.
23 BY MS. ERICKSON:
24   Q.  How far away was the dispensary from

Page 47

1  Division 10-Tier 2C?
2    A.  Around the corner.
3    Q.  If you left your monitor room -- if you got
4  up and left and walked to the dispensary, how long
5  would it take you to walk there?
6    A.  A minute.
7    Q.  At anytime when you were working in Division
8  10 did you call the dispensary and no one picked up the
9  phone?
10   A.  I don't recall.
11   Q.  How many people worked in the dispensary
12 during your shift?
13   A.  I'm not sure.
14   Q.  Who works in the dispensary?
15   A.  The nurses, doctors. We have officers in
16 there as well. The medical assistant.
17   Q.  At times when you called the nurse
18 dispensary -- strike that.
19     If you call the dispensary and you say
20 that a person is having a medical emergency, what
21 happens?
22   A.  When I call there they always answer, and
23 they'll come in -- come over to the tier to see the
24 detainee to see what's going on with them.

Page 48

1    Q.  If you call the dispensary and say there's a
2  -- report of a medical emergency, who would come over
3  from the dispensary? Like whoever was there, was it a
4  nurse or a doctor? If you know.
5    A.  It would be a nurse.
6    Q.  In a medical emergency type of situation,
7  would the nurse come to the unit within five minutes?
8    A.  Yes.
9    Q.  When you call the dispensary, how does the
10 person in the dispensary know the type of medical
11 situation it is and whether it's an emergency or not?
12     MR. RADUNSKY: Objection; speculation.
13 You're asking her to interpret a thousand different
14 scenarios, and what nurses are thinking. I don't
15 understand the question. You can answer, Monshai, if
16 you understand.
17     THE WITNESS: I don't understand. I don't
18 know.
19 BY MS. ERICKSON:
20   Q.  When you call the -- for example, if an
21 inmate has a headache and needs medication, is that a
22 situation where you would call the dispensary and say
23 this inmate needs medication or needs a nurse?
24   A.  Yes.

Page 49

1    Q.  So you would only tell the dispensary this
2  inmate has a headache, right?
3      MR. RADUNSKY: Objection; asked and
4  answered.
5      THE WITNESS: Yes.
6  BY MS. ERICKSON:
7    Q.  And then if an inmate was feeling dizzy,
8  would you call the dispensary to get medical help?
9    A.  Yes.
10   Q.  Did you ever have a situation in any of your
11 years at the Cook County Department of Corrections when
12 you were working but you didn't know that the inmate
13 was having a medical emergency because of the distance
14 between you and the person?
15     MR. RADUNSKY: Object to form of the
16 question. I have no idea what you're asking. Monshai,
17 you can answer if you understand.
18     THE WITNESS: I don't understand.
19 BY MS. ERICKSON:
20   Q.  So let's say -- earlier you testified that
21 there would be half of the inmates go out to the daily
22 room for part of the day.
23     What if one of those inmates that is in
24 their cell has an medical emergency but they are out of

13 (Pages 46 - 49)

Page 50

1 your periphery or your visual. How did they get
2 medical attention if they can't get your attention?
3     MR. RADUNSKY: Objection to the form,
4 foundation, incomplete hypothetical, assumes facts not
5 in evidence. You can answer, Monshai, if you
6 understand.
7     THE WITNESS: I'm still not understanding.
8 BY MS. ERICKSON:
9     Q. Have you ever had to call 911 for any inmates
10 at anytime that you've worked at Cook County?
11     A. No. I wouldn't call 911.
12     Q. So that's not part of the procedure if
13 someone is having a medical emergency?
14     A. No.
15     MR. RADUNSKY: That's not her testimony.
16 That's not what she said earlier. You totally
17 misstated her testimony. She said she would call her
18 supervisor.
19     MS. ERICKSON: Just state your objection.
20     MR. RADUNSKY: Asked and answered. And now
21 you're reasking questions. She said that she would
22 call her supervisor who would call 911. She doesn't
23 have a phone. Now you're reasking the same question.
24     MS. ERICKSON: Noted.

Page 51

1 BY MS. ERICKSON:
2     Q. Monshai, you can answer.
3     A. Can you rephrase it? I'm not understanding.
4     Q. Sure. You testified earlier that there was a
5 phone -- there was actually a phone inside Division
6 10-Tier 2C, right?
7     A. Yes.
8     Q. Just understanding because your attorney said
9 something else. If -- did you -- you never had a
10 situation where you had to call 911 while you were
11 working on Division 10-Tier 2C?
12     A. We had outside lines where we could call
13 directly outside. The supervisor, the nurse, has to
14 call because my phone is only in-house.
15     Q. Okay.
16     MR. RADUNSKY: Which was my basis for the
17 foundation objection. I mean without laying foundation
18 and the questions are so broad it's unfair to the
19 witness because you're just assuming all these things
20 because you don't understand.
21     MS. ERICKSON: Just state the basis of your
22 objection, and we'll move on.
23     MR. RADUNSKY: I think I did.
24

Page 52

1 BY MS. ERICKSON:
2     Q. In your years working at the Cook County
3 Department of Corrections when you called the
4 dispensary to report some kind of serious medical
5 emergency did you know if the nurse or dispensary was
6 going to call 911?
7     MR. RADUNSKY: Objection; speculation.
8 Monshai, you can answer the question.
9     THE WITNESS: I don't know.
10 BY MS. ERICKSON:
11     Q. I mean did they not -- they didn't tell you
12 at the dispensary to expect paramedics on the living
13 unit?
14     MR. RADUNSKY: Objection; form and
15 foundation. You haven't established that she's even
16 been in that situation. She said she's never had to
17 call 911. You're asking her hypotheticals and what she
18 would do in situations that have never occurred.
19     I mean none of this has anything to do
20 with your client's case. I mean we're an
21 hour-and-a-half into this and you haven't explored any
22 of the issues that your client has really pled. Are we
23 going to get to the issues in this case --
24     MS. ERICKSON: Note your objection. I'm

Page 53

1 going to move on to my next question.
2     MR. RADUNSKY: Here's what I'm going to do.
3 If we don't start getting to the issues in the case I'm
4 just going to get up and we're going to terminate the
5 deposition and go in front of the Judge in about half
6 an hour.
7     `    I'm hoping that you start asking
8 relevant questions and not just asking questions that I
9 think are just on your outline and you feel you have to
10 ask. These are not issues in the case. I think you
11 know that. I think if the Court reads this transcript
12 they're going to agree. Let's see what happens in the
13 next half hour. I would just ask that you please get
14 to the issues in the case and stop wasting everybody's
15 time.
16     MS. ERICKSON: Just say your objection.
17     THE WITNESS: I did. I'm made my record.
18 BY MS. ERICKSON:
19     Q. So if you got sick during a shift, what would
20 you do, Monshai?
21     MR. RADUNSKY: If she got sick during a
22 shift? How is that relevant? Do not answer that
23 question. I mean honestly I'm ready to almost
24 terminate this. You're badgering my witness about what

14 (Pages 50 - 53)

Page 54

1  she would do if she got sick. She's not answering it.
2  Ask your next question.
3      MS. ERICKSON: Monshai, did you understand
4  the question?
5      THE WITNESS: No, I did not.
6      MS. ERICKSON: Annamarie, can you read the
7  question back.
8          (Record read.)
9      MR. RADUNSKY: Same objection. Don't answer
10  the question, Monshai. It's harassment. Has nothing
11  to do with this case. You can tell her that you
12  understood the question and you're being instructed by
13  your lawyer not to answer it and you're refusing to do
14  it, okay?
15      THE WITNESS: Okay. I'm being instructed by
16  my attorney not to answer.
17      MS. ERICKSON: Certify the question.
18  BY MS. ERICKSON:
19      Q. Since you've been employed at Cook County
20  Department of Corrections, have you had meetings with
21  supervisors?
22      MR. RADUNSKY: About what? Scope. When?
23  Objection; form of the question. You can answer if you
24  understand.

Page 55

1      THE WITNESS: Can you rephrase it?
2  BY MS. ERICKSON:
3      Q. Since you have been employed at Cook County
4  Department of Corrections since 2001, did you have
5  meetings with supervisors where you would sit down
6  together and talk?
7      A. No.
8      Q. Was Lucas Robert your manager in 2015 through
9  2017?
10      A. Who?
11      Q. Lucas Robert.
12      A. I don't know who that is.
13      MR. RADUNSKY: Object to form. There's no
14  managers at the jail. It's not in the hierarchy.
15  BY MS. ERICKSON:
16      Q. Did you receive training while working at
17  Cook County Department of Corrections?
18      A. Yes.
19      Q. What topics did you receive training on at
20  anytime while working at Cook County?
21      A. We did computer, which is the LMS training,
22  our field training and limited medical training at the
23  field training.
24      Q. What does the field training entail?

Page 56

1      A. That's going -- we would review any new
2  policies. Like the LMS training we would go over our
3  gun training, incident reports, writing incident
4  reports and CPR.
5      Q. Who conducted the training for the field
6  training?
7      A. It would be a field training supervisor.
8      Q. For what sorts of situations did you write an
9  incident report?
10      A. One more time.
11      Q. For what types of situations did you write an
12  incident report?
13      A. If there was a fight, I would write an
14  incident report for a fight.
15      Q. Is that the only situation you would write an
16  incident report for?
17      A. Yes.
18      Q. You said in the field training you review new
19  policies. Did you receive a paper copy of the policies
20  or how did that training go?
21      A. Yes. We would receive a paper copy.
22      Q. Were there only certain policies that you
23  would receive in field training or was it everytime
24  there was a new policy you got it? How did that work?

Page 57

1      A. I don't recall.
2      Q. How often did you have field training in 2015
3  through 2017?
4      A. Every 12 to 18 months.
5      Q. How long was the field training?
6      A. About a week.
7      Q. Was there a pass-fail or was it simply
8  attending the field training?
9      A. Attending it.
10      Q. Where did field training take place?
11      A. Morraine Valley.
12      Q. What is Morraine Valley?
13      A. A college.
14      Q. How did the LMS computer training work?
15      A. Just log in, and then we complete the
16  assignment.
17      Q. How were you notified that you had LMS
18  training that you had to complete?
19      A. We would get an e-mail.
20      Q. Do you have the same e-mail as you did in
21  2015 and 2016 for work?
22      A. Yes.
23      MR. RADUNSKY: No, you don't. Your e-mail
24  addressed changed.

15 (Pages 54 - 57)

1      THE WITNESS: You're right. I'm sorry.
2  BY MS. ERICKSON:
3      Q.  Was your e-mail address monshai.addison@cc
4  sheriff.org in November of 2015 through 2017?
5      A.  No, it was different.
6      Q.  Okay. What was it?
7      A.  I believe it was monshai.addison@cookcounty
8  sheriff.org or something like that.
9      Q.  I'm going to share my screen here. Can you
10 see this Excel spreadsheet?
11     A.  It's small. I can't see it.
12     Q.  I'll make it bigger. I'm marking as
13 Exhibit B what is Bate's stamped 0001405. What is
14 marked as a copy of LMS transcript underscore 726603
15 underscore Addison.
16         Monshai, is that your correction officer
17 number 726603?
18     A.  Correct.
19     Q.  Have you ever seen this document before?
20     A.  No, I haven't.
21     Q.  I'll scroll to the bottom. Is this your name
22 on the left, Monshai Addison?
23     A.  Yes.
24     Q.  And then we're on Row 63. It has your name,

1  your e-mail listed as monshai.addison@ccsheriff.org?
2      A.  Yes.
3      Q.  Going over to the right it looks like the
4  date of that specific training was March 2, 2016,
5  correct?
6      A.  If that's what it says.
7      Q.  I'll go up. That's Column F, which is for
8  enrollment date. The column to the right of that is
9  the start date, and the one next to that is completion
10 date.
11         It looks like you completed this
12 particular training for advanced mental health on April
13 12, 2016. Is that what you understand this to say?
14     A.  Yes.
15     MR. RADUNSKY: The record says what it says,
16 Kirstin. She's not going to remember the specific date
17 she took it. The record speaks for itself. If you're
18 just going to go through this record and say "did you
19 take this course at this time on this day" we can save
20 time and stipulate that she did.
21     MS. ERICKSON: I'm laying a foundation for
22 questions. Noted.
23 BY MS. ERICKSON:
24     Q.  Did you take any LMS training prior to March

1  2, 2016?
2      A.  I don't recall.
3      Q.  And it looks like in 2016 you had three LMS
4  trainings, right?
5      A.  That's what it's showing.
6      Q.  And then in 2017 it looks like you had 16 LMS
7  trainings; is that accurate?
8      A.  Yes.
9      Q.  And nine of those trainings took place in
10 November of 2017, correct?
11     A.  Yes.
12     MR. RADUNSKY: Again, we're stipulating to
13 all this. I don't understand why you --
14     MS. ERICKSON: Is there an objection?
15     MR. RADUNSKY: No, Kirstin, but you know how
16 discovery works. If we're willing to stipulate to
17 these questions what you're asking her about "is this
18 entry saying what it's saying" this is not a proper --
19 this is not a proper deposition. We're stipulating to
20 a record. If you want to make a final point or get --
21     MS. ERICKSON: State your objection.
22     MR. RADUNSKY: We're stipulating, Kirstin.
23 You don't seem to understand what that means. You're
24 going to disregard what I'm saying and ask her these

1  questions anyway in the face of a lawyer who represents
2  her. We're stipulating to what the records say. This
3  is really a waste of time.
4      MS. ERICKSON: State your objection.
5      MR. RADUNSKY: I've already made it. The
6  objection was that we stipulated that these questions
7  are harassment --
8      MS. ERICKSON: I am going to ask her
9  questions. Just state your objection.
10     MR. RADUNSKY: You made that clear.
11     MS. ERICKSON: There was no objection.
12     MR. RADUNSKY: Honestly, I've got about 15
13 minutes left before I'm ready to just pull the plug on
14 this. Go ahead. Ask your questions.
15 BY MS. ERICKSON:
16     Q.  Monshai, do you know why you took nine LMS
17 trainings in November of 2017?
18     A.  No.
19     Q.  Do you know what -- do you see this training
20 from November of 2020 called tier logs?
21     A.  Yes.
22     Q.  If we scroll to the right, it looks like it
23 was a 60-minute exam. Do you remember anything from
24 that training on tier logs?

Page 62

1  A.  No, I don't.

2  Q.  Did you use tier logs before that date?

3  A.  Yes.

4  Q.  Is this tier log the same as the tier logs

5  that you were talking about earlier?

6  A.  Yes.

7  Q.  It looks like on November 28th you also took

8  an LMS on reporting.  Do you know what the reporting

9  LMS was about?

10  A.  No.

11  Q.  Was there a certain amount of LMS training

12  you were supposed to take per year or just sporadic as

13  they were e-mailed to you?

14  A.  As they were e-mailed to me.

15  Q.  And then it looks like starting in May of

16  2019 to the present there's several LMS trainings, but

17  there's no documentation that you took them.  Do you

18  know if you received e-mails about specific training

19  since May of 2019?

20  A.  Yes.

21  Q.  Do you have any understanding as to why --

22  did you take those exams?

23  A.  No.  I did not take them.

24  Q.  Why did you not take those courses?

Page 63

1  A.  I'm not at work right now.

2  Q.  So during this whole time period you were not

3  working?

4  A.  Correct.  Yes.

5  Q.  What's the reason you are not working since

6  May 6, 2019?

7  A.  A work injury.

8  Q.  What happened?

9  MR. RADUNSKY:  Objection; relevance.  How is

10  that relevant to your case?  Don't answer the question.

11  You can certify it.

12  MS. ERICKSON:  Are you following your

13  attorney's instructions?

14  THE WITNESS:  Yes.

15  MS. ERICKSON:  Certify the question.

16  BY MS. ERICKSON:

17  Q.  So what is the time that you were at Cook

18  County Department of Corrections?  In early May of

19  2019?

20  A.  Yes.  May of 2019 was the last time I was

21  there.

22  Q.  What is your specific injury?

23  MR. RADUNSKY:  Objection.  Don't answer it.

24  It has nothing to do with this case.  You don't need to

Page 64

1  respond, Monshai.  You can certify the question,

2  Kirstin.  She understood it.

3  MS. ERICKSON:  Are you following your

4  attorney's instructions?

5  THE WITNESS:  Yes.

6  MR. RADUNSKY:  I want the record to note that

7  after I asked you and we've already certified the

8  question literally a minute-and-a-half ago on her

9  medical condition, which has nothing to do with your

10  client's case, you then asked another question a minute

11  later.

12  If that isn't textbook harassment of my

13  client after we asked you professionally to certify the

14  question I don't know what is.

15  MS. ERICKSON:  Just state your objection.

16  MR. RADUNSKY:  I just did.  The deposition is

17  about to be over if you continue to do this purposely

18  to harass her.  It's not appreciated.

19  Do you want to explain on the record how

20  her medical injury is relevant to your client's case?

21  MS. ERICKSON:  State the objection.

22  MR. RADUNSKY:  It's harassment; otherwise

23  explain to me and maybe I'll let her answer how her

24  medical condition is relevant to your case.  Can you do

Page 65

1  that?

2  MS. ERICKSON:  I'm going to continue.

3  MR. RADUNSKY:  I didn't think so.  You're

4  acknowledging you're harassing my client and you refuse

5  to offer an explanation on the record of relevance.

6  It's designed to harass.  I've asked you four times in

7  this deposition to please stop doing that with my

8  client.

9  If we can get to the issues in the case

10  that would be great; otherwise we are getting to the

11  end of this.

12  MS. ERICKSON:  That was a good three minutes.

13  I'm going on with my next question.  I going to request

14  on the record Monshai's employment file.

15  MR. RADUNSKY:  You can make a formal request

16  for it if you want it.

17  BY MS. ERICKSON:

18  Q.  Did you learn about the medical

19  Administration and Distribution Interagency Directive

20  after May of 2013?

21  MR. RADUNSKY:  Object to form of the

22  question.  Why don't you show her the policy and ask

23  her if she's seen it.  You can answer, Monshai.

24  THE WITNESS:  I don't understand.  Can you

17 (Pages 62 - 65)

Veritext Legal Solutions

Page 66

1 rephrase the question, please?
2 BY MS. ERICKSON:
3     Q.   Sure.  There's an interagency directive
4 that's called the Medication Administration and
5 Distribution Interagency Directive.
6     A.   Yes.
7     Q.   Did you ever hear or learn about that
8 interagency directive?
9     A.   When I spoke with my attorney the other day.
10     Q.   Had you ever seen it before?
11     A.   No.
12     Q.   Have you ever heard of it before you talked
13 to your attorney about it?
14     A.   No.
15     Q.   I'm going to share my screen.  Can you see
16 this document, Monshai?
17     A.   Yes.
18     Q.   I'm marking as Exhibit C the Cook County
19 Illinois Interagency Directive Medication
20 Administration and Distribution document, effective
21 date May 17, 2013 and the number of this directive is
22 64.5.45.0.  It's a ten-page document.  I just have a
23 few questions about it.
24     A.   Okay.

Page 67

1     Q.   So it says -- can you see that it says:  This
2 directive establishes the procedures to be followed by
3 Cook County Department of Corrections and Cermak Health
4 Services of Cook County employees with regard to the
5 administration and distribution of medication.
6          Do you see that?
7     A.   Yes, I see it.
8     Q.   And then under Policy in C it states, quote:
9 The correctional officer plays an essential role in
10 the medication distribution team, as outlined below,
11 but shall not handle medication, end quote.
12          Do you see that as well?
13     A.   Yes.
14     Q.   Did you ever handle medications for any
15 inmates?
16     A.   No.
17     Q.   Were you part of the medical distribution
18 team in Division 10-2C?
19     A.   I don't recall.
20     Q.   Under Applicability in Roman numeral III it
21 states:  This order is applicable to all Cook County
22 Department of Corrections and Cermak Health Services of
23 Cook County employees and is for strict compliance.
24          What do you understand strict compliance

Page 68

1 to mean?
2     A.   That you follow the directions.
3     Q.   On Page 2 if you look under B under
4 Definitions it talks about keep-on-person medications.
5     A.   Yes.
6     Q.   Did you ever hear inmates say that they had a
7 keep-on-person or KOP medications?
8     A.   Yes.
9     Q.   For what types of medical issues would a --
10 what kind of medications would be KOP from your
11 knowledge and experience?
12     A.   I'm not really familiar with the exact
13 medication, but an inhaler would be one of them.
14          MR. RADUNSKY:  Asthma?
15          THE WITNESS:  Yes.
16 BY MS. ERICKSON:
17     Q.   How did you know if an inmate had a KOP
18 medication?
19     A.   I really won't know.  That would be between
20 the medical staff.  I wouldn't know exactly if they had
21 it on their person.
22     Q.   Who is the Cook County Department of
23 Corrections Watch Commander?
24          MR. RADUNSKY:  What period?  You can answer,

Page 69

1 Monshai, if you understand the question.
2          THE WITNESS:  I don't recall.  We've had
3 several different ones.
4 BY MS. ERICKSON:
5     Q.   What does the Watch Commander do?
6     A.   Runs the whole shift.
7     Q.   Is there a Watch Commander for each floor in
8 Division 10?
9     A.   No.  Just the division.
10     Q.   What is roll call?
11     A.   That's where we report to in the morning
12 before we get our assignment.
13     Q.   Where does roll call take place?
14     A.   In a particular room.
15     Q.   Is that where the Watch Commander is located?
16     A.   No.  He has his office.
17     Q.   Do you know if on Division 10 in 2015 through
18 2017 the Cermak staff delivered the medication roster
19 to the Watch Commander?
20     A.   I don't know.
21     Q.   So all these questions about
22 Division 10-Tier 2C from 2015 through 2017 when Cermak
23 for med pass arrived to give medication to inmates did
24 you gather inmate identification cards for positive

18 (Pages 66 - 69)

Page 70

1 identification?

2     MR. RADUNSKY: Objection. She said she never

3 instituted this policy herself. You asked her if she

4 had done these things, and she said she didn't. She

5 was never part of med pass.

6        How is this a fair question? You can

7 answer. Stop asking her these questions when she

8 clearly told you she was not involved in the med pass,

9 but you're saying when you're involved in med pass did

10 you do these things. It's not a fair question.

11     MS. ERICKSON: Stop coaching the witness, and

12 let her answer.

13     MR. RADUNSKY: Kirstin, I'm not coaching the

14 witness. Try to ask better questions. I mean this is

15 painstakingly not fair to the witness. Monshai, you

16 can answer.

17     THE WITNESS: I wasn't involved in the med

18 pass, so I don't know.

19 BY MS. ERICKSON:

20    Q. You never did anything to help with the med

21 pass at all?

22     MR. RADUNSKY: Objection; asked and answered.

23 She's told you she didn't handle inmate medication

24 distribution. Now you've just asked her again. You

Page 71

1 asked her the same question five minutes ago. Go

2 ahead. You can answer again.

3     THE WITNESS: No. Can you repeat the

4 question?

5     MR. RADUNSKY: That's fine. You answered

6 it.

7 BY MS. ERICKSON:

8    Q. I want to go back. You never physically

9 received a copy of this interagency directive, right?

10    A. I've probably seen it before, but it's been

11 so long I didn't remember it until my attorney showed

12 it to me.

13    Q. After you learned about the directive, were

14 you told you needed to do certain things according to

15 what this says?

16     MR. RADUNSKY: Are you asking her if she was

17 told to follow the policy? You can answer, Monshai.

18     THE WITNESS: Of course you're supposed to

19 follow policy.

20     MR. RADUNSKY: Let's take a ten-minute break,

21 please. It's 1:01 and we'll come back at like 1:10.

22     (Short break.)

23     MS. ERICKSON: We're back on the record.

24 Monshai, are you there?

Page 72

1     THE WITNESS: I am here. I did want to let

2 you know that during med pass they line up in the day

3 room single file, side by side --

4 BY MS. ERICKSON:

5    Q. Are you talking -- let's go back. Are you

6 talking about Division 10-Tier 2C?

7    A. Yes.

8    Q. So you're switching your testimony. Earlier

9 you testified that the nurse would come and go cell to

10 cell to give medication and now you're saying that they

11 don't, they actually line up?

12    A. No. I'm saying they do both. They did both.

13    Q. Can you explain? How does that work?

14    A. Well, if everybody -- so if everybody is out

15 they line up in a single file in a line and they get

16 their meds that way.

17     If it's people -- inmates in a cell

18 they'll go to the cell with the officer. The nurse

19 will go to the cell with the officer, and dispense them

20 their meds.

21    Q. So there's a time when everyone is out of

22 their cell at the same time?

23    A. There are times, yes. It has been times when

24 they were out -- all out or half and half or however

Page 73

1 they did it.

2    Q. So you're saying that there's times when

3 there's 48 inmates in the day room all at the same

4 time?

5    A. Yes.

6    Q. And so when all -- how long are inmates --

7 strike that.

8     How long are all 48 inmates allowed to

9 stay in the day area?

10    A. They would all stay out until right before my

11 shift. Like an hour before my shift would change.

12    Q. So there would be 48 inmates in the day room

13 until 2:00 o'clock p.m?

14    A. Yes.

15    Q. When did all 48 inmates get released to go

16 into the day room?

17    A. Like around I want to say 7:30, 8:00.

18 Somewhere around there.

19    Q. A.m?

20    A. Yes.

21    Q. So this is different. Now your testimony is

22 that inmates -- all 48 inmates are allowed to be in the

23 day area from 7:30 a.m. until 2:00 p.m?

24    A. There was a time period yes when all inmates

19 (Pages 70 - 73)

Page 74

1 would be out. I can't recall the time period, but
2 there was a time period where all inmates would be out
3 and then they went on half and half. I can't remember
4 when they exactly implemented it.
5    Q. Okay. Let's go back to medical --
6       MR. RADUNSKY: -- out of their cells almost
7 all day in the day room. If you come and you look and
8 you inspect the jail --
9       MS. ERICKSON: You don't need you to testify.
10      MR. RADUNSKY: Then don't mischaracterize the
11 witness' testimony or be misleading. If she doesn't
12 understand your question she's allowed to clarify her
13 testimony on the record, and that's what she's doing.
14 She didn't change anything. She's just trying to help
15 you understand.
16 BY MS. ERICKSON:
17    Q. So we're going back to Exhibit C. The
18 Administration Interagency Directive. Just so it's
19 clear for the record, you did know what you were
20 supposed to do according to this directive or you
21 didn't know what you were supposed to do in 2015, 2016?
22    A. I did know.
23    Q. And did you gather the inmates'
24 identification for positive identification prior to

Page 75

1 them receiving medication?
2       MR. RADUNSKY: Objection. It's been asked
3 and answered now four times, Kirstin. She said she did
4 not do med pass, and that she's familiar with the
5 policy. You just keep asking her the same questions.
6 No matter what I say you're going to do what you want
7 to do. Monshai, answer the question.
8       THE WITNESS: I didn't do med pass. That
9 wasn't what I did.
10 BY MS. ERICKSON:
11    Q. I just asked about the identification.
12    A. No.
13    Q. Did you notify the medication team of any
14 inmate whose behavior warranted a concern or any other
15 factor that may impact the medication pass?
16    A. I'm sorry. I don't understand what you're
17 saying.
18    Q. Did you ever -- when the nursing team arrived
19 at Division 10-Tier 2C did you ever report to anyone on
20 that team that a specific inmate's behavior was
21 different?
22    A. Behavior -- I'm not understanding when you
23 say behavior.
24    Q. Did you ever notify the nursing team that an

Page 76

1 inmate is acting weird or maybe needs medical
2 attention?
3    A. Yes.
4       MR. RADUNSKY: Objection to form of the
5 question acting weird, may need medical attention.
6 These are really -- you can answer, Monshai.
7       THE WITNESS: When you say acting weird, I
8 don't know what you mean by acting weird.
9       MR. RADUNSKY: You don't have to answer her
10 question. She can explain it to you. It's not your
11 job. Let her rephrase the question.
12 BY MS. ERICKSON:
13    Q. When the nursing team arrived, did you ever
14 tell the nursing team about any of the inmates'
15 behavior?
16    A. Not about behavior, no.
17    Q. When the nursing team arrived, did you ever
18 tell them about specific medical needs for specific
19 inmates?
20    A. Yes.
21    Q. What types of medical needs do you report to
22 the medication team?
23    A. I can't really recall the types of -- I can't
24 recall. I can't tell you right now today what I told

Page 77

1 them. I don't remember.
2    Q. Did you ever suspend any activities in the
3 living unit until the medication pass was complete?
4    A. I don't recall.
5    Q. Did the medication team ever need backup when
6 they arrived at Division 10-Tier 2C?
7    A. Can you rephrase it? What you say backup,
8 what do you mean?
9    Q. I don't know. The policy says provide
10 backup. What does backup mean to you?
11    A. There's an officer that goes around with the
12 nurse, if that's what you're talking about. Or are you
13 saying does she come with another nurse? I'm not sure.
14 An officer would be there.
15    Q. So whenever the nurse came to give
16 medication, an officer was always with the nurse?
17    A. Yes.
18    Q. Do you know anything about Method I and
19 Method II? Does E make any sense to you, move inmates
20 according to Method I or Method II as described in
21 Section VII, Subsection F and G of this directive?
22    A. No.
23    Q. What is the general population versus the
24 special management lockdowns?

20 (Pages 74 - 77)

1   A.  I'm sorry.  I'm not understanding what you're
2 saying.
3   Q.  Do you know what special management lockdowns
4 means?
5   A.  Most likely probably people that are on 24
6 hour -- what is it -- 23-one.  You get an hour out a
7 day, so that would be the special management lockdown.
8   Q.  Did you know anything about the doses being
9 different for general population versus special
10 management lockdowns?
11   A.  No, because I don't dispense the medication.
12   Q.  Did you instruct inmates how to complete a
13 grievance form?
14   A.  No.
15   Q.  On Division 10-Tier 2C from 2017 to 2017 did
16 you ever encounter a situation where an inmate wanted a
17 grievance form and you did not have one available?
18   A.  I don't recall.
19   Q.  Did you instruct inmates what to do with the
20 grievance form after it was completed?
21       MR. RADUNSKY:  Objection.  She said she
22 doesn't instruct inmates how to complete them.  Asked
23 and answered.  You can answer again.
24       THE WITNESS:  No.

1 BY MS. ERICKSON:
2   Q.  Did you make every effort to resolve an
3 inmate's needs or concerns at the initial point of
4 contact prior to escalation to a grievance?
5   A.  I'm not understanding what you're saying,
6 because I wouldn't know if they would be putting in a
7 grievance.  I wouldn't know that.  I would help the
8 inmate if they would tell me something was wrong or
9 they needed something, yes.
10   Q.  What types of ways did you help inmates?
11   A.  In they need to talk to the social worker or
12 needed the nurse.  Stuff like that.
13   Q.  Besides needing a social worker and a nurse,
14 did inmates tell you they needed anything else?
15   A.  They might want to speak to the supervisor.
16   Q.  Why would an inmate want to speak to the
17 supervisor?
18   A.  They may have some type of concern.  I don't
19 know.  I can't remember.
20   Q.  If an inmate wanted to speak to a supervisor,
21 what would you do?
22   A.  I would let the supervisor know and when they
23 come and make rounds they would talk to them.
24   Q.  When did supervisors make rounds in 2015

1 through 2017?
2   A.  Maybe four times a day; three, four times a
3 day.
4   Q.  Would it be three to four times during your
5 shift or generally throughout the whole day?
6   A.  My shift.
7   Q.  What was the purpose of the supervisor making
8 rounds three to four times a day?
9   A.  Making sure everything was okay.
10   Q.  Did you have inmate orientation handbooks in
11 Division 10-Tier 2C?
12   A.  Did I have what now?
13   Q.  The inmate -- are you familiar with the
14 inmate orientation handbook?
15   A.  I'm familiar with them, but I wouldn't have
16 them at intake.
17   Q.  Did you ensure that you had blank health
18 service request forms available to inmates in Division
19 10-Tier 2C?
20   A.  Can you rephrase the question?
21   Q.  Did you have any way -- strike that.
22       Did you make health service request
23 forms available to inmates?
24   A.  They get them from the nurse.

1       MR. RADUNSKY:  Thank you.  You beat me to the
2 punch.  I was going to say it's been asked and answered
3 twice.
4 BY MS. ERICKSON:
5   Q.  In your time as a correctional officer since
6 2001 has an inmate complained of being nauseous or that
7 they had been vomiting?
8   A.  I don't recall.
9   Q.  In your time as a correctional officer since
10 2001 has an inmate ever complained to you that his or
11 her arms were numb or feel weak?
12   A.  I don't recall.
13   Q.  In your time as a CO since 2001 have inmates
14 ever complained of having chest pains to you?
15   A.  I don't recall.
16   Q.  In 2015 through 2017 did inmates ever
17 complain to you of needing a prescribed heart
18 medication?
19   A.  I don't recall.  No until this case came up.
20   Q.  So the only way that you had the capability
21 of connecting with medical staff from
22 Division 10-Tier 2C was to pick up the phone and call
23 the dispensary, correct?
24       MR. RADUNSKY:  Objection; mischaracterizes

21 (Pages 78 - 81)

Page 82

1 her testimony. It's been asked and answered. She's
2 already explained this three times. Don't answer it.
3 You can certify the question.
4     THE WITNESS: I'm listening to my attorney.
5     MS. ERICKSON: I'll certify the question.
6 BY MS. ERICKSON:
7   Q. Do you remember William Dukes?
8   A. I don't remember him, no. Not until this
9 came.
10   Q. According to the records, you worked 40 days
11 when Mr. Dukes was housed in Division 10-Tier 2C from
12 November 25, 2015 through February 12, 2016?
13   MR. RADUNSKY: Objection; foundation. Unless
14 you're going to put that on the screen that's an unfair
15 question. Assumes facts not in evidence. Monshai, if
16 you know you can answer.
17   THE WITNESS: I don't know.
18 BY MS. ERICKSON:
19   Q. Do you know how many men were on Division 10
20 who were white, six foot with reddish brown hair, about
21 260 pounds?
22   A. No. I don't know.
23   Q. Did you ever write any notes about Mr. Dukes?
24   A. No.

Page 83

1   Q. You don't remember Mr. Dukes telling you he
2 had a heart attack a few years before, and had to take
3 his heart medication?
4   A. No.
5   MR. RADUNSKY: Objection; assumes facts not
6 in evidence. That's an allegation. You answered it,
7 Monshai. You're good.
8   MS. ERICKSON: What was the answer?
9   MR. RADUNSKY: She said no.
10 BY MS. ERICKSON:
11   Q. Monshai, what was your answer?
12   A. No.
13   Q. In 2015 through 2017 did you ever see any
14 inmate lying on the floor in their cell?
15   A. No.
16   Q. Did inmates lie on the floor in the day area?
17   A. No.
18   Q. So when all 48 inmates were out, did they all
19 stand or sit on the floor? What did they do?
20   A. There's benches, chairs.
21   Q. So when 48 inmates are out at the same time,
22 none of them sat on the floor?
23   A. I don't recall that. I can't remember.
24   Q. Has any supervisor at Cook County Department

Page 84

1 of Corrections or anyone from Cermak told you that
2 chest pain is a symptom of a heart attack?
3   A. Supervisor, no; nurse, no.
4   Q. Do you know that a heart attack can kill
5 someone?
6   A. Yes.
7   Q. Do you know if any inmate had a heart attack
8 during any of your shifts since 2001 at Cook County?
9   A. No.
10   Q. Have you ever spoken to a paramedic at any
11 point while working as a CO at Cook County?
12   A. Yes.
13   Q. For what situations?
14   A. Passing out medication. Sometimes paramedics
15 pass out medication.
16   Q. Is a paramedic in Cook County also called a
17 med tech?
18   A. I'm not sure.
19   Q. I'm going to put up what I'm marking as
20 Exhibit D. Can you see this document here?
21   A. Yes.
22   Q. I'm labeling it Exhibit D. It's an excerpt
23 from CCSAO Dukes grievance and Court documents, which
24 the defendant labeled as Exhibit C. We're going to

Page 85

1 Page CCSAO Dukes 000978.
2   Do you see this is a grievance form for
3 Mr. William Dukes written on December 3, 2015?
4   A. Yes.
5   Q. Were you working on Division 10-Tier 2C at
6 that time?
7   A. I don't recall.
8   Q. If we look at the body of the grievance form,
9 the date of the incident is from intake 11/24/15,
10 arrow, and ongoing, end quote. The specific notation
11 of the incident you noted as heart disease. I'll give
12 you a moment to just read this.
13   A. I've read it.
14   Q. Have you ever seen this form before?
15   A. No. I wouldn't see the grievance forms.
16   Q. Have you ever had a situation where an inmate
17 fills out the grievance form and then talks to you as
18 the CO about the grievance form?
19   A. I don't recall.
20   Q. It's possible that Mr. Dukes talked about him
21 wanting his KOP medication nitroglycerine?
22   MR. RADUNSKY: Objection; asked and answered.
23 She said she doesn't recall. You can answer it again.
24   THE WITNESS: I don't recall.

22 (Pages 82 - 85)

Page 86

1 BY MS. ERICKSON:
2    Q.  How far is the RCDC from Division 10-Tier 2C?
3    A.  Maybe like a ten-minute walk.  I'm not sure.
4    Q.  Did you ever work in RCDC in all of your time
5 as a correctional officer since 2001?
6    A.  No.
7    Q.  Have you ever been in that area?
8    A.  Passing through, yes.
9    Q.  How many correctional officers are stationed
10 to work in that area?
11   A.  I'm not sure.
12   Q.  When you worked for the superintendent, did
13 you ever do any work with the RCDC correctional
14 officers for that area?
15       MR. RADUNSKY:  Objection.  She just asked and
16 answered it and told you.  You can answer again.
17       THE WITNESS:  No.
18 BY MS. ERICKSON:
19   Q.  Well, look at CCSAO 000983.  It's another
20 grievance form filled out by Mr. William Dukes on what
21 appears to be February 4, 2016.
22       Is this visible to you, Monshai?
23   A.  Yes.
24   Q.  And it looks like you wrote this for date of

Page 87

1 incident February 1, 2016 at 7:30 p.m. Division 10, 2C;
2 is that accurate?
3    A.  Yes.
4    Q.  I'll give you a moment to just read the body
5 of the grievance.
6    A.  I'm done.
7    Q.  Did you ever hear from any inmates that the
8 medication that they needed was not on the med pass
9 cart?
10       MR. RADUNSKY:  You asked her that, and she
11 answered it.  You can answer again, Monshai.
12       THE WITNESS:  I don't recall.
13 BY MS. ERICKSON:
14   Q.  Did some inmates get to take little packages
15 of medication back to their cell with them?
16       MR. RADUNSKY:  Objection; form of the
17 question.  When?  What time period?  It's such a broad
18 question.  You can answer if you understand.
19       THE WITNESS:  I don't understand.  Can you
20 rephrase what --
21       MR. RADUNSKY:  Hold on.  She doesn't know
22 about an inmate's medical condition because of HIPAA
23 reasons; so unless an inmate is telling her something
24 she's not privy to their medical records, and she's

Page 88

1 explained that.
2       My objection is you're asking her
3 questions after she's given you answers, and then you
4 keep recasting and mischaracterizing her testimony.
5 That's my objection.
6 BY MS. ERICKSON:
7    Q.  Okay.  In 2015 to 2017 when you were working
8 as a correctional officer in Division 10-Tier 2C did
9 you ever see inmates leaving the med pass cart with a
10 package of medication?
11   A.  I don't recall.  I wasn't there.  It was the
12 medical officer that would be there.
13   Q.  After inmates received their medication, did
14 they go back to their cell?
15       MR. RADUNSKY:  She just told you she wasn't
16 there.  She just told you she wasn't there, and then
17 you're asking her to tell you what they did.  It
18 doesn't make any sense to me.
19       It's totally unfair to the witness here.
20 After she's given you answers it's like you don't want
21 to hear the responses and then you just keep clawing
22 ahead with your questions regardless of the answer, and
23 I don't understand why.  Monshai, you can answer again.
24       THE WITNESS:  I don't know.  I don't know if

Page 89

1 they went back with it.
2 BY MS. ERICKSON:
3    Q.  Just to clarify based on your last answer,
4 what do you mean you weren't there?  You weren't in
5 Division 10-Tier 2C?
6       MR. RADUNSKY:  That's not what she said, and
7 you know it.  You're purposely -- what she meant and
8 what she's talking about.  It's clear as day.  Monshai,
9 you can answer it again.  Go ahead.
10       THE WITNESS:  I wasn't there when they were
11 getting the meds passed out.  The officer would be
12 there beside the nurse while they were getting meds.
13 BY MS. ERICKSON:
14   Q.  You were in the monitor area, right?
15   A.  Yes.
16   Q.  Moving to CCSAO Dukes 000987, which is
17 another grievance filled out by William Dukes while in
18 Division 10-Tier 2C.  He completed it January 18, 2016
19 for date of incident January 11, 2016 at 9:15 a.m.
20       Can you see all that?
21   A.  Yes.
22   Q.  And then it says the specific location of the
23 incident was Division 10-Tier 2C; is that right?
24   A.  Yes.

23 (Pages 86 - 89)

Page 90

1 Q. I'll give you a minute to read through it.

2          (Brief pause on the record.)

3 A. Okay.

4 Q. It states, quote, on the above date and time

5 I informed Ofc. Addison I was having chest pains and

6 asked her to contact Division 10 dispensary for my

7 nitroglycerine medication. I was told by her that she

8 tried to call but no one is in the dispensary, hyphen,

9 I would have to wait for the medication line to come.

10 Period. 35 minutes later I was finally given my

11 nitroglycerin along with my other medications. Period.

12 By this time the nitro had little effect and I had to

13 be sent to Cermak ER because there was no dispensary

14 staff with Division 10 to take my vital signs. Period,

15 end quote.

16          Is that you he's talking about in this

17 grievance?

18 A. I assume. He said -- yes. He put my name in

19 here.

20 Q. Was there another Officer Addison?

21 MR RADUNSKY: She just said yes, Kirstin.

22 Why would you ask her that question? She said it was

23 her.

24 MS. ERICKSON: She broke up in the beginning

Page 91

1 for me, so I asked her because I wanted to clarify.

2 BY MS. ERICKSON:

3 Q. Do you remember this incident?

4 A. I do not.

5 Q. You don't remember Mr. Dukes having

6 complained about needing his heart medication during

7 this time period?

8 A. I don't remember.

9 Q. So if he wrote that he was told by you that

10 you called the dispensary and no one answered, would he

11 have any reason to lie as an inmate?

12 A. Well, first off, there's always someone in

13 the dispensary. That's No. 1. There is always someone

14 in the dispensary. And it would not take no 35

15 minutes. If they are coming out to do the meds, it

16 does not take 35 minutes. I would believe he lied

17 because it's right around the corner from the tier.

18 Q. From your understanding reading this note and

19 this grievance, do you believe this was an as-needed

20 medication or was it like regular like med pass

21 medication?

22 A. I don't know about the meds.

23 MR RADUNSKY: You can answer.

24 THE WITNESS: I don't know anything about

Page 92

1 meds.

2 BY MS. ERICKSON:

3 Q. So you don't know -- I mean generally if med

4 pass was occurring would you need to call the

5 dispensary to tell them to come?

6 A. No.

7 Q. So your testimony is that he was lying and it

8 didn't take 35 minutes for him to receive

9 nitroglycerine?

10 A. Correct. If I called the dispensary, there

11 was someone there and they would have told me the nurse

12 is en route or bring him over; so the nurse had to have

13 been en route, and he received his medicine. It

14 wouldn't have been no 35 minutes.

15 Q. What do you mean bring him over?

16 A. Take him to the dispensary.

17 Q. Who would take him to the dispensary?

18 A. I would.

19 Q. If he were taken to the dispensary, wouldn't

20 he have written he was taken to the dispensary?

21 MR. RADUNSKY: Objection; speculation. Are

22 you asking her to determine what he wrote, and why?

23 Not a fair question. You can answer, Monshai.

24 Speculation in my objection.

Page 93

1 THE WITNESS: Can you rephrase the question?

2 MS. ERICKSON: Annamarie, can you repeat the

3 question, please.

4          (Record read.)

5 THE WITNESS: I don't know.

6 MR. RADUNSKY: Objection; speculation.

7 BY MS. ERICKSON:

8 Q. What did you say, Monshai?

9 A. I said I don't know.

10 Q. So if you ever had to bring an inmate to the

11 dispensary, who watches the inmates that are in

12 Division 10-Tier 2C?

13 A. I would walk him to the door. The officer

14 would be sitting right there by my door, maybe two

15 steps over, and then would give -- I would let him know

16 that I have one guy coming to the dispensary and he

17 would watch him walk to the dispensary.

18 Q. This other officer would be right outside of

19 Division 10-Tier 2C?

20 A. Yeah. About two steps over.

21 Q. What's the name of that particular officer's

22 duty?

23 MR. RADUNSKY: What? Form of the question.

24 What? You can answer if you understand, Monshai.

24 (Pages 90 - 93)

Page 94

1      THE WITNESS: That was just his post.
2  BY MS. ERICKSON:
3    Q.  So what would the name of that post be?
4  Division 10-Tier 2C hallway?
5    A.  Most likely hallway post.
6    Q.  Was there always a hallway post correctional
7  officer in every hallway in Division 10?
8    A.  No.  Just on the second floor.
9    Q.  Why only on the second floor?
10   A.  That's where they had dispensary movement, as
11  well as the barber shop and stuff like that.
12   Q.  So dispensary for the whole building was just
13  on the second for?
14   A.  Yes.
15   Q.  And the barber shop was on the second floor?
16   A.  Yes.
17   Q.  There would be one officer or multiple
18  officers on the hallway post?
19   A.  Multiple officers.
20   Q.  How many officers would be on the second
21  floor in 2015 through 2017?
22   A.  I'm not sure, but roughly two to four
23  officers.  Somewhere around there.
24   Q.  How many of the two to four officers would be

Page 95

1  in the same hallway of Division 10-Tier 2C?
2    A.  All of them.
3    Q.  How long is the hallway where the door is to
4  go into Division 10-Tier 2C?
5    A.  One more time.
6    Q.  How long is the hallway where the door is to
7  go into Division 10-Tier 2C?
8    A.  It's not that long.
9    Q.  Is it like less than a football field?
10   A.  Yes.
11   Q.  Less than like crossing a street downtown?
12      MR. RADUNSKY:  Objection; form.  That's so
13  vague, Kirstin.  You can answer, Monshai.  Just tell
14  her how many feet if you know.
15      THE WITNESS:  About two to three steps, and
16  then you're in the hallway.
17  BY MS. ERICKSON:
18   Q.  I mean -- sorry.  From one end of the hallway
19  -- like if you're walking down the hallway and there's
20  doors on the right and doors on the left, how long is
21  the hallway from one end all the way to the other end?
22      MR. RADUNSKY:  You can give her a range.
23      THE WITNESS:  Probably a fourth of a block.
24

Page 96

1  BY MS. ERICKSON:
2    Q.  So in instances where you need to take
3  inmates over to the dispensary, would you always walk
4  up Division 10-Tier 2C and see an officer there and
5  then ask that officer to escort an inmate to the
6  dispensary?
7    A.  Yes.
8    Q.  Did you ever have to escort an inmate to the
9  Cermak ER?
10   A.  I don't recall.
11   Q.  If an inmate had to go to the Cermak ER for
12  any reason, who would normally escort the inmate?
13   A.  The Cermak officer.
14   Q.  Who was the Cermak officer?
15   A.  I'm not -- I don't know.
16      MR. RADUNSKY:  You have those records,
17  Kirstin.  They're just officers assigned specifically
18  to Cermak.
19  BY MS. ERICKSON:
20   Q.  Where do the Cermak officers hang out during
21  a shift?
22      MR. RADUNSKY:  I'll object to the form of
23  that question.  You can answer, Monshai.
24      THE WITNESS:  Down in the intake area of

Page 97

1  Division 10.
2  BY MS. ERICKSON:
3    Q.  The intake area of Division 10, is that on
4  the second floor?
5    A.  No.
6    Q.  Where is it?
7    A.  In the basement.
8    Q.  So if an inmate needed to go to the Cermak
9  ER, how would you get a hold of the Cermak officers?
10   A.  I wouldn't.  I would get a hold of the intake
11  officer.
12   Q.  And who is that?
13   A.  I don't know.
14   Q.  You call an intake officer, not a Cermak
15  officer, if someone needed to go to the ER?
16   A.  Correct.
17   Q.  How do you know you're calling an inmate
18  officer, and not a Cermak officer?
19   A.  That's the only person that answers the
20  intake phone line.
21   Q.  And then the intake officer tells the Cermak
22  officer an inmate needs to go to the ER?
23   A.  Yes.
24   Q.  If there's an emergency where an inmate needs

25 (Pages 94 - 97)

Page 98

1 to go to the Cermak ER and you call the intake officer,
2 how long would it normally take for the Cermak officer
3 to come up to the Division 10-Tier 2C?
4    A. The Cermak officer wouldn't come to the tier.
5 The inmate would -- the inmate would be in intake in
6 the basement waiting on the Cermak officer.
7    Q. Just to be clear. If there's an inmate who
8 is housed on Division 10-Tier 2C and currently located
9 in that location and lets you know that they have an
10 emergency and need to go to the ER, what do you do?
11    A. I'll call them and let them know I have one
12 guy that needs to go to intake for Cermak.
13    Q. So then what happens next?
14    A. The movement officer comes and takes them
15 down to intake.
16    Q. Who is the moving officer? Is that the same
17 as the Cermak --
18    A. No. That's a different officer.
19    Q. Does the moving officer move the inmate when
20 they're going to Court?
21    A. Yes.
22    Q. How does an inmate receive medication if they
23 have to go to Court, and it's not med pass time?
24    A. I'm not sure. I'm not there when they do

Page 99

1 that.
2    Q. What time do inmates usually leave to go to
3 Court?
4    A. Around 5:00, 5:30 somewhere.
5    Q. What's your understanding of the procedure of
6 how inmates have their medication when they have to
7 leave to go to Court?
8    A. I don't know. I was never there when they
9 had to go to Court. I don't know that procedure.
10    Q. Do you know if there's anytime when all of
11 the nurses or staff from the dispensary leave that
12 dispensary for some reason?
13    A. No. It's always someone in the dispensary.
14    Q. Have you ever encountered a situation where
15 the medication isn't on the cart and you called
16 dispensary and they don't have the medication either --
17    A. No.
18    Q. -- like the situation here?
19    A. What situation?
20    Q. Mr. Dukes' situation.
21    A. I don't know anything like that.
22    Q. Do you know the CRW N.Jones?
23    A. Yes.
24    Q. What's her first name?

Page 100

1    A. I can't remember.
2    Q. Nikita (phonetic)?
3    A. I don't know. I can't remember.
4    Q. Did you ever hear about inmates having issues
5 with getting medication while waiting in the RCDC
6 bullpen?
7    A. No.
8    Q. Did you ever hear about issues related to
9 inmates not getting medication when you were working
10 for the superintendent of Cook County Department of
11 Corrections?
12    A. No.
13    Q. Did you ever study nursing?
14    A. No.
15    Q. The sexual harassment case you talked about
16 earlier, when was that filed?
17    MR. RADUNSKY: I'm going to object to this
18 whole line of questioning. I'll let her answer this
19 one question; otherwise it's really irrelevant to this
20 lawsuit.
21    THE WITNESS: 2015.
22 BY MS. ERICKSON:
23    Q. Is it ongoing?
24    A. Yes.

Page 101

1    MR. RADUNSKY: Don't answer questions about
2 your lawsuit. You don't need to answer. It has
3 nothing to do with this case. It's a personal issue.
4 BY MS. ERICKSON:
5    Q. Is the reason that you're not working right
6 now in Cook County related to the deposition that you
7 gave about that inmate?
8    MR. RADUNSKY: What? That mischaracterizes
9 her testimony. You can answer, Monshai.
10    THE WITNESS: Repeat it for me, please.
11 BY MS. ERICKSON:
12    Q. At the beginning of the deposition you
13 testified that you gave a deposition in a case related
14 to an inmate.
15    I'm asking if that is connected to the
16 reason you are not working right now at Cook County.
17    A. No.
18    Q. Were the tier logs given any other name
19 besides tier log?
20    A. No.
21    Q. You never heard them called a living unit
22 log?
23    A. I don't recall.
24    Q. Was the tier log like a green leather book?

26 (Pages 98 - 101)

Page 102

1    A.  It might be green, maybe blue.
2    Q.  Was it leather?
3    A.  No.  It was plastic.
4    Q.  Going back to the meetings.  You testified
5  that you didn't have any meeting with supervisors since
6  your time working at CCDOC.
7          Did you have meeting with other
8  correctional officers that were formal meetings?
9    A.  No.
10    Q.  We didn't receive the field training
11  documentation.  Would that have been documented
12  somewhere?
13    A.  Field training -- I'm not sure.
14    Q.  Did you receive an annual review during all
15  the time you worked at Cook County Department of
16  Corrections?
17    A.  No.
18    Q.  How often, if ever, did you receive
19  performance reviews?
20    A.  I can't recall.
21    Q.  Have you received a performance review while
22  working at Cook County Department of Corrections?
23    A.  I don't recall.
24    Q.  Does anyone from the superintendent's office

Page 103

1  ever do reviews to see -- I don't know -- about
2  complaints from officers?
3    A.  Yes.
4    Q.  How does that happen?
5    A.  They talk -- they sit down and they talk to
6  the superintendent about the different grievances that
7  they have.
8    Q.  And then what happens after they talk to the
9  superintendent?
10    A.  They rectify the issue.
11    Q.  Who was the superintendent in Division
12  10-Tier 2C in 2015 through 2017?
13    A.  I can't recall.
14    Q.  Did you ever sit down with superintendent and
15  talk about grievances that you had?
16    A.  No, I didn't.  No one came to me about
17  grievances, so I wouldn't know if there was a grievance
18  out there.
19    Q.  No one talked to you about this grievance
20  with your name in it for Mr. Dukes?
21    A.  No.
22    Q.  But it was -- was it standard procedure
23  you're saying that after an inmate completes a
24  grievance that the superintendent talks to the officer

Page 104

1  about the grievance?
2    A.  I did not say the officer.  I said he would
3  sit down with different people, social worker, like the
4  supervisors, and talk about -- that's when they talk
5  about the grievances whether there's an issue and they
6  try to rectify it.
7    Q.  How often does the superintendent have those
8  meetings about grievances?
9    A.  I can't really recall how often it was.
10    Q.  When you were working for the superintendent,
11  how often was it?
12    A.  It would have to be a major grievance.  A
13  very serious grievance.  Again, I can't tell you how
14  often it was done.
15    Q.  What do you mean a serious grievance?
16    A.  Whatever they felt was serious.  I didn't
17  deal with grievances, so I don't know what they felt
18  was serious; but if it was serious they would discuss
19  it, and rectify it.
20    Q.  Who is "they"?
21    A.  It would be the social worker, superintendent
22  and the supervisor and they would have a meeting.
23    Q.  Do you know of anyone that was fired as a
24  result of a grievance form and meeting with the

Page 105

1  superintendent, social worker and supervisor?
2          Did you hear me?
3    A.  No.
4    Q.  After a service request form was turned in to
5  the nurse, do you know what happened after that?
6    A.  No.
7    Q.  Did a superintendent or supervisor ever come
8  to Division 10-Tier 2C to see a specific inmate about
9  their grievance?
10    A.  I don't recall.
11    Q.  When the supervisor made their rounds four
12  times a day, did they ever talk about specific inmates?
13    A.  I don't recall.
14    Q.  When the supervisor would come four times a
15  day what did they do when they entered Division 10-Tier
16  2C?
17    A.  Sign the log book.
18    Q.  If there was something in the log book that
19  was like a medical issue or concern, did the
20  superintendent -- sorry -- did the supervisor tell you
21  what he or she was going to do with the information?
22    A.  There was nothing in the log book about any
23  medical condition.
24    Q.  When the supervisor came to sign the log

27 (Pages 102 - 105)

Page 106

1  book, did the supervisor talk to you?
2      A.  Yes.
3      Q.  What would the supervisor say to you?
4      A.  Just asking is everything okay, any issues.
5      Q.  What types of situations would you tell the
6  supervisor that everything was not okay on a living
7  unit?
8      A.  If I felt like a fight was getting ready to
9  break out or something that I could see like escalating
10 I would let them know about it.
11     Q.  Was Division 10 all men?
12     A.  Yes.
13     Q.  Did inmates ever harass female correctional
14 officers like yourself?
15        MR. RADUNSKY:  Objection; relevance.  You can
16 answer.
17        THE WITNESS:  Yes.
18 BY MS. ERICKSON:
19     Q.  When that happened, what would you do?
20        MR. RADUNSKY:  Objection; relevance.  Why
21 does this matter?  Beyond relevance.  I'll let her
22 answer one more question, but it's outside the scope of
23 plaintiff's lawsuit.
24        THE WITNESS:  Let my supervisor know.

Page 107

1  BY MS. ERICKSON:
2      Q.  Did you ever ask to be switched to another
3  division because of harassment from inmates?
4      A.  That's not how it works.
5      Q.  How does it work?
6         MR. RADUNSKY:  Objection.  Why are we going
7  down this line of questioning?  How is this relevant?
8  Monshai, you don't need to answer these questions.  It
9  has nothing to do with the lawsuit, Kirstin.  If you
10 want to explain to me the relevance, I'll let her
11 answer these questions.  If not, we'll certify these
12 questions.
13        MS. ERICKSON:  Monshai, did you understand
14 the question?
15        THE WITNESS:  Yes.  I'm listening to my
16 attorney.
17        MS. ERICKSON:  I'll certify the question.  I
18 think that's all I've got right now.  Thank you very
19 much, Monshai.
20        MR. COYNE:  I don't have any questions.
21        MR. RADUNSKY:  Monshai, I have really just a
22 few questions.
23
24

Page 108

1           E X A M I N A T I O N
2  BY MR. RADUNSKY:
3      Q.  I just want to be clear.  If an inmate like
4  Mr. Dukes is reporting chest pains like he did in his
5  grievance or names you on January 11, 2016, am I
6  correct that that's not going to be in any log book,
7  correct?
8      A.  Correct.
9      Q.  If something is a life-threatening condition,
10 that might be in a log book or a 911 emergency, right?
11     A.  Correct.
12     Q.  But this document that we've seen today where
13 Mr. Dukes filed a grievance with your name on it where
14 he said he was having chest pains, that would not be an
15 entry that you would put in any log book; am I right?
16     A.  Correct.
17     Q.  Now, just as a general principle, officers
18 are not allowed to see an inmate's grievance, correct?
19     A.  Correct.
20     Q.  In other words, you have no idea that an
21 inmate filed a grievance against you unless there's an
22 investigation where a supervisor comes and sees you or
23 there's a lawsuit like this, correct?
24     A.  Correct.

Page 109

1      Q.  Prior to this lawsuit and this grievance, had
2  any supervisor talked to you about any grievance
3  against you?
4      A.  No.
5      Q.  I think you said you are not a doctor; that
6  you just have limited basic medical training, correct?
7      A.  Correct.
8      Q.  But you know even not being a doctor that if
9  somebody is having a heart attack or a laceration or
10 their head is cracked open that's a serious medical
11 condition, correct?
12     A.  Yes.
13     Q.  An inmate complaining of chest pains or let's
14 say dizziness or nausea or vomiting or let's say they
15 are having trouble with their ankle, to you based on
16 your medical training that's not a serious medical
17 condition, correct?
18     A.  Correct.
19     Q.  Now, Mr. Dukes in his grievance - and you
20 said this already -- mentioned that he had to wait 35
21 minutes for him to get his medication and you just
22 don't think that that would ever be the case based on
23 your experience, correct?
24     A.  Correct.

28 (Pages 106 - 109)

Page 110

1  Q.  And you personally if something like that was
2  in progress would walk over to the dispensary and go
3  get a nurse or a trained medical professional?
4  A.  Correct.  Or take him.
5  Q.  Now, the same with medical records.  You are
6  not allowed to look at medical records, correct?
7  A.  Correct.
8  Q.  So unless an inmate tells you what their
9  prior medical history is and you remember it, you
10 wouldn't know anything about an inmate's medical
11 condition; is that right?
12 A.  Correct.
13 Q.  Now, in this case you don't remember
14 Mr. Dukes ever telling you that he had a prior heart
15 condition or heart attack back in 2012, right?
16 A.  Correct.  I don't remember Mr. Dukes.
17 Q.  And when we looked at his grievance that
18 mentioned your name in it, do you recall when we looked
19 at it a couple minutes ago it didn't say that he had a
20 heart attack in there, correct?
21 A.  Correct.
22 Q.  As far as you know based on medical records
23 that you and I reviewed yesterday from January 11, 2016
24 and based on his own grievance, he did get

Page 111

1  nitroglycerine and he did go to Cermak that day,
2  correct?
3  A.  Correct.
4  Q.  You mentioned earlier when Kirstin asked you
5  that you've seen inmates with inhalers walking around
6  the jail and using inhalers for asthma?
7  A.  Correct.
8  Q.  Did you have an understanding just based on
9  your visual observation that those inhalers medical
10 personnel were allowed to let those inmates keep those
11 on their person?
12 A.  Yes.
13 Q.  As far as what medications inmates could keep
14 on their person, that was not your decision; that was
15 something that Cermak and medical professionals would
16 decide, right?
17 A.  Correct.
18 Q.  I want to make this clear, because I think it
19 was a little murky in the deposition.  You're saying
20 that you have seen med pass take place inside of a
21 single room where inmates line up and other instances
22 where a nurse might just walk around the tier and go
23 from cell to cell; is that right?
24 A.  Correct.

Page 112

1  Q.  And I know it's not uncommon but to have all
2  of the inmates out of their cells and in the day room
3  that happens all the time, right?
4  A.  Yes.
5  Q.  And they're just allowed out of their cell.
6  They're not confined and locked up in solitary or in
7  special confinement 23 hours a day, right?
8  A.  Right.
9  Q.  Now, you mentioned -- and I know you're not
10 part of med pass -- but do you know if the nurses that
11 do med pass did they have a computer with them so that
12 they're logging in information in their computer?
13 A.  Yes.
14 Q.  So your log book, for instance, that you
15 mentioned would maybe indicate when the nurse was
16 coming by for med pass on any specific day, would that
17 also be in their computer chart?
18 A.  I'm not sure.
19 Q.  Have you ever had an inmate have a heart
20 attack in front of you?
21 A.  No.
22 Q.  If Mr. Dukes was actually having a heart
23 attack in front of you, not just complaining of chest
24 pains, that would have been something that could

Page 113

1  potentially be life threatening, right?
2  A.  Yes.
3  Q.  That's not something that you're going to
4  forget either, correct?
5  A.  No.
6  Q.  Just to clear this up on the record in case
7  the Judge wants to know.  Monshai, the reason that
8  you're off work is because an inmate kicked you in the
9  back and you suffered a back injury; is that right?
10 A.  Correct.
11 Q.  And you're hoping to go back to work when
12 you're feeling better?
13 A.  Yes.
14 Q.  Are there clocks on the wall inside the jail?
15 A.  In the monitor area if they're working , yes.
16 Q.  When you say in the monitor area, meaning in
17 your specific private room for officers?
18 A.  Yes.
19 Q.  In other words, inmates if they were looking
20 around the day room or anywhere in the tier they're not
21 going to be able to see a clock on the wall, right?
22 A.  No.
23 Q.  Again, you have nothing to do with med pass.
24 You're familiar with the policy, but you're not

29 (Pages 110 - 113)

1 involved in escorting the nurses through the tier,
2 correct?
3    A. Correct.
4    Q. And obviously all the policies that you saw
5 today and any policy that you've worked under at the
6 jail, you've never been told not to follow a policy,
7 right?
8    A. No, I haven't.
9    Q. I mean you try as hard as you can to follow
10 whatever the policies are from the jail, right?
11    A. Correct.
12    Q. And as you said, you've never been
13 disciplined for anything?
14    A. No.
15    Q. The other grievance that Miss Erickson had
16 shown you, not the ones not involving you, were you
17 aware of those grievances?
18    A. No. I'm not aware of no grievance.
19    Q. You had no idea that Mr. Dukes was making
20 these complaints to you or any other officers that he
21 wasn't receiving medication or wasn't getting medical
22 care in a timely fashion?
23    A. No.
24    Q. I think you made this clear. The LMS

1 records, is the reason you haven't had any subsequent
2 training after March of 2019 is because you have been
3 out of work with the injury?
4    A. Yes.
5    Q. But clearly -- and I know this wasn't pointed
6 out necessarily -- but there's a couple entries in your
7 LMS records where you have had some basic medical
8 training, correct?
9    A. Correct.
10    Q. As far as what the specific courses were
11 exactly and what you were taught, you don't remember
12 all that, right?
13    A. No, I don't.
14    Q. For instance, I saw that you got Narcan
15 training if somebody has an overdose. Do you remember
16 that?
17    A. I don't remember. No, I don't.
18    Q. You're not going to disagree if your LMS
19 records show you took that course on a computer and you
20 passed it?
21    A. Correct.
22    MR. RADUNSKY: That's all I've got.
23    MS. ERICKSON: I just have two follow-up
24 questions.

1    F U R T H E R   E X A M I N A T I O N
2 BY MS. ERICKSON:
3    Q. Monshai, if an inmate is having a heart
4 attack how do you know?
5    A. Well, usually they're grabbing their chest
6 watching TV shows and stuff like that. Grabbing their
7 chest, complaining their chest is hurting, numbness,
8 feeling lightheaded. Stuff like that.
9    Q. You broke up. They would be complaining of
10 what?
11    A. Numbness, grabbing their chest, can't breath.
12    Q. Chest pains?
13    A. Yes. Probably bent over, feeling
14 lightheaded. Like that.
15    Q. You never encountered that situation so you
16 don't know if an individual could be having a heart
17 attack if they are just having chest pains, right?
18    A. No, I never encountered that.
19    Q. Back to the clock for a minute. You
20 testified there's a clock in the monitor area where
21 you're stationed?
22    A. Yes.
23    Q. Is there glass through which you can look and
24 can see the inmates in the living unit?

1    A. Yes.
2    Q. So if an inmate who was not in their cell
3 came up to the window, could they see the clock?
4    A. If they came up to the window if the clock
5 was working. Sometimes they don't work.
6    Q. So is that a yes?
7    A. Yes.
8    MS. ERICKSON: That's all I have. Thank you
9 very much, Monshai.
10    MR. RADUNSKY: We'll reserve signature.
11 Assuming Kirstin orders, I'll take a copy.
12    MS. ERICKSON: We'll take the original,
13 e-tran.
14       (Witness excused.)
15       (Signature reserved to Attorney
16       Radunsky.)
17       (Deposition concluded 2:25 p.m.)
18 AND FURTHER DEPONENT SAYETH NAUGHT
19
20
21
22
23
24

Page 118

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, ANNAMARIE BLOCK, a Certified Shorthand Reporter of the State of Illinois, CSR License No. 084-003519, do hereby certify:

That previous to the commencement of the examination of the aforesaid witness, the witness was duly sworn by me to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me and was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had at the aforesaid deposition;

That the said deposition was taken before me at the time and place specified;

Page 119

That I am not a relative or employee or attorney or counsel for any of the parties herein, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I interested directly or indirectly in the outcome of this action.

ANNAMARIE BLOCK, CSR
License No. 084-003519

My Commission Expires: May 31, 2023

Page 120

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

May 6, 2022

To: Mr. Troy Radunsky

Case Name: Dukes, William v. Cook County Sheriff's Office, Et Al.

Veritext Reference Number: 5175062

Witness: Monshai Addison          Deposition Date: 4/20/2022

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

Page 121

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 5175062
CASE NAME: Dukes, William v. Cook County Sheriff's Office, Et Al.
DATE OF DEPOSITION: 4/20/2022
WITNESS' NAME: Monshai Addison

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_____
Date                Monshai Addison

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of _____, 20_____.

_____
Notary Public

_____
Commission Expiration Date

31 (Pages 118 - 121)

Page 122

1         DEPOSITION REVIEW
        CERTIFICATION OF WITNESS

2

       ASSIGNMENT REFERENCE NO: 5175062
3        CASE NAME: Dukes, William v. Cook County Sheriff's Office, Et Al.
       DATE OF DEPOSITION: 4/20/2022
4        WITNESS' NAME: Monshai Addison
5        In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9        I request that these changes be entered
       as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
       that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____
    Date       Monshai Addison
14
       Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
       the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
       They have listed all of their corrections
18        in the appended Errata Sheet;
       They signed the foregoing Sworn
19        Statement; and
       Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20____.
23   _____
       Notary Public
24
    _____
25        Commission Expiration Date

---

Page 123

1         ERRATA SHEET

      VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 5175062
3   PAGE/LINE(S) /     CHANGE     /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

  _____   _____
20   Date       Monshai Addison
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
      Notary Public
24
    _____
25       Commission Expiration Date

32 (Pages 122 - 123)

Exhibit F

**[& - 2c]**                                                                 Page 1

| & |
| --- |
| **&** 2:2,6 |

| 0 |
| --- |
| **0001405** 58:13 |
| **000978** 85:1 |
| **000983** 86:19 |
| **000987** 89:16 |
| **008948** 1:5 |
| **084-003519** 118:7 |
| 119:8 |

| 1 |
| --- |
| **1** 2:2 87:1 91:13 |
| **10** 11:8 12:14,17 |
| 12:21,23 13:2,5,8 |
| 13:8,11,13,15 |
| 16:12,13,19 17:3 |
| 17:18,24 18:1,3,12 |
| 18:12,23 19:2,9,18 |
| 19:22,24 20:3 |
| 21:21 26:13,18 |
| 27:15 28:23 31:23 |
| 32:8,10 33:10 |
| 34:3,5 35:11 |
| 37:22 38:5,13 |
| 39:2,7 40:8,12 |
| 41:4 42:17 43:14 |
| 43:16,20 44:17 |
| 45:8,23 46:11,15 |
| 47:1,8 51:6,11 |
| 69:8,17,22 72:6 |
| 75:19 77:6 78:15 |
| 80:11,19 81:22 |
| 82:11,19 85:5 |
| 86:2 87:1 88:8 |
| 89:5,18,23 90:6,14 |
| 93:12,19 94:4,7 |
| 95:1,4,7 96:4 97:1 |
| 97:3 98:3,8 |
| 103:12 105:8,15 |
| 106:11 |

**10-2c** 33:18,22
67:18
**107** 3:4,23
**108** 3:5
**11** 11:9 15:20
89:19 108:5
110:23
**11/24/15** 85:9
**1100** 120:1
**115** 3:5
**116** 3:7
**117** 3:7
**11:00** 1:18 28:16
**12** 31:22 57:4
59:13 82:12
**12:00** 28:16
**13** 8:10
**15** 21:15 23:18
61:12
**16** 60:6
**17** 8:10 66:21
**18** 31:21,22 57:4
89:18
**1820** 120:2
**19-20** 3:21
**1903** 119:7
**1992** 8:20
**1992-1993** 9:6
**1993** 10:10
**1994** 9:20
**1996** 9:20
**1:01** 71:21
**1:10** 71:21

| 2 |
| --- |
| **2** 11:9 18:12 59:4 |
| 60:1 68:3 |
| **2-3** 3:23 |
| **20** 2:7,12 8:10 |
| 121:16 122:22 |
| 123:22 |

**20-23** 3:22
**2001** 11:2,4,7,17
11:19 12:9 36:13
55:4 81:6,10,13
84:8 86:5
**2008** 12:18 13:1,4
13:7,11 19:18
45:11,16
**2012** 110:15
**2013** 65:20 66:21
**2015** 16:3,5,6,11
17:16 21:21 24:16
26:14,19 28:19
32:21 34:6 35:12
35:19 36:1 40:8
44:16 45:16,24
55:8 57:2,21 58:4
69:17,22 74:21
79:24 81:16 82:12
83:13 85:3 88:7
94:21 100:21
103:12
**2016** 13:12,13,16
14:4,6 16:11
17:16 19:18 21:22
24:16 26:14,19
28:19 32:21 34:6
35:12,19 36:1
40:9 44:16 45:11
45:17,24 57:21
59:4,13 60:1,3
74:21 82:12 86:21
87:1 89:18,19
108:5 110:23
**2017** 14:5 15:12,13
16:3,7 55:9 57:3
58:4 60:6,10
61:17 69:18,22
78:15,15 80:1
81:16 83:13 88:7
94:21 103:12

**2019** 1:5 62:16,19
63:6,19,20 115:2
**2020** 61:20
**2021** 21:15
**2022** 1:17 120:4
**2023** 119:10
**20th** 1:17
**21** 3:11
**216-523-1313**
120:3
**22-23** 3:21
**23** 78:6 112:7
**24** 8:10 17:5 37:23
38:2 78:5
**25** 82:12
**260** 82:21
**28th** 62:7
**2:00** 73:13,23
**2:25** 117:17
**2a** 17:18
**2b** 18:12
**2c** 16:19 17:15,20
18:12,15 26:13,18
27:15 28:23 31:23
32:10 33:10 34:3
34:5 35:11 37:22
38:5,13 39:7 40:8
40:12 42:17 43:14
43:16,20 44:17
45:23 46:11,15
47:1 51:6,11
69:22 72:6 75:19
77:6 78:15 80:11
80:19 81:22 82:11
85:5 86:2 87:1
88:8 89:5,18,23
93:12,19 94:4
95:1,4,7 96:4 98:3
98:8 103:12 105:8
105:16

[2d - answered]

**2d** 17:22

**3**

**3** 19:22 85:3
**30** 4:13
**300-4479** 2:8
**31** 119:10
**312** 2:3,8,13
**34** 3:21
**35** 90:10 91:14,16
92:8,14 109:20
**3:00** 28:20 34:8,16
**3na** 11:8,19

**4**

**4** 3:4 86:21
**4/20/2022** 120:8
121:3 122:3
**40** 82:10
**44** 33:1,2
**44114** 120:2
**48** 37:24 38:3 73:3
73:8,12,15,22
83:18,21

**5**

**5-6** 3:22
**5175062** 120:7
121:2 122:2 123:2
**525** 2:7
**53** 3:21
**58** 3:14
**583-9500** 2:13
**5:00** 99:4
**5:30** 99:4

**6**

**6** 63:6 120:4
**60** 61:23
**600** 2:2
**60602** 2:3,7
**60606** 2:13

**63** 3:22 58:24
**64.5.45.0.** 66:22
**66** 3:15

**7**

**7/26/1974** 7:10
**726-1243** 2:3
**726603** 58:14,17
**7:00** 28:20 34:7,16
**7:30** 73:17,23 87:1

**8**

**8** 19:22
**81** 3:22
**84** 3:18
**8:00** 73:17

**9**

**9** 19:2
**90** 18:16
**911** 50:9,11,22
51:10 52:6,17
108:10
**93** 10:9
**94** 9:18
**96** 9:18
**9:15** 89:19

**a**

**a.d.** 1:17
**a.m** 73:19
**a.m.** 1:18 73:23
89:19
**able** 6:24 7:1
113:21
**access** 39:9
**accurate** 60:7 87:2
**acknowledge**
121:11 122:16
**acknowledging**
65:4
**acquire** 42:23

**act** 121:14 122:20
**acting** 76:1,5,7,8
**action** 119:5
**activities** 77:2
**addison** 1:11 3:3
4:2,9,11 58:15,22
90:5,20 120:8
121:4,9 122:4,13
123:20
**addison's** 3:12
21:3
**address** 7:11,13,20
8:2 58:3 120:15
**addressed** 57:24
**administered**
38:17
**administration**
3:16 65:19 66:4
66:20 67:5 74:18
**administrative**
15:8 36:10
**advanced** 59:12
**advantages** 19:1,8
19:13
**advice** 36:20
**affixed** 121:15
122:21
**aforesaid** 118:9,16
**ago** 44:23 64:8
71:1 110:19
**agree** 53:12
**agreement** 4:12
**ahead** 7:18 23:4
26:7 28:11 37:12
41:21 61:14 71:2
88:22 89:9
**al** 1:6 120:6 121:3
122:3
**allegation** 83:6
**allowed** 33:16
41:4,15,24 73:8,22

**74:12 108:18**
110:6 111:10
112:5
**amount** 62:11
**ankle** 109:15
**annamarie** 1:16
7:23 28:12 31:5
34:12 37:16 54:6
93:2 118:5 119:8
**annual** 102:14
**answer** 5:20,21
6:3,9 7:4 17:9
19:4,14 22:13,15
23:5,12,24 24:2,10
26:6 34:18 35:1,3
35:6,15 36:15,17
41:6 42:8 43:3
44:20 45:13 46:3
46:21 47:22 48:15
49:17 50:5 51:2
52:8 53:22 54:9
54:13,16,23 63:10
63:23 64:23 65:23
68:24 70:7,12,16
71:2,17 75:7 76:6
76:9 78:23 82:2
82:16 83:8,11
85:23 86:16 87:11
87:18 88:22,23
89:3,9 91:23
92:23 93:24 95:13
96:23 100:18
101:1,2,9 106:16
106:22 107:8,11
**answered** 21:17
23:4,19,23,24 24:2
44:18 49:4 50:20
70:22 71:5 75:3
78:23 81:2 82:1
83:6 85:22 86:16
87:11 91:10

**[answering - book]**

answering 54:1
answers 3:12 5:16
  21:3,13 88:3,20
  97:19
anybody 6:12
anytime 47:7
  50:10 55:20 99:10
anyway 61:1
appear 121:11
  122:15
appearances 2:1
appeared 1:19 2:5
  2:10,15
appears 86:21
appended 122:11
  122:18
applicability
  67:20
applicable 4:14
  67:21
appreciated 64:18
april 1:17 12:8
  59:12
area 11:15 32:2,4
  32:6,12,13 33:15
  39:1,8 40:18 41:5
  41:6,9,13,14 42:13
  42:18 73:9,23
  83:16 86:7,10,14
  89:14 96:24 97:3
  113:15,16 116:20
arms 81:11
arrived 29:1 30:24
  69:23 75:18 76:13
  76:17 77:6
arrow 85:10
asked 6:4 23:4,19
  23:23 24:1 44:18
  49:3 50:20 64:7
  64:10,13 65:6
  70:3,22,24 71:1

75:2,11 78:22
  81:2 82:1 85:22
  86:15 87:10 90:6
  91:1 111:4
asking 22:6 43:2
  44:19 48:13 49:16
  52:17 53:7,8
  60:17 70:7 71:16
  75:5 88:2,17
  92:22 101:15
  106:4
assigned 96:17
assignment 18:17
  57:16 69:12 121:2
  122:2 123:2
assistant 14:2,23
  14:24 47:16
associate's 10:15
assume 6:4 90:18
assumes 50:4
  82:15 83:5
assuming 51:19
  117:11
asthma 68:14
  111:6
attached 122:7
attack 83:2 84:2,4
  84:7 109:9 110:15
  110:20 112:20,23
  116:4,17
attend 8:15,21,24
  9:5,17 10:8 15:7
attended 9:2 10:3
attending 57:8,9
attention 40:24
  42:14 50:2,2 76:2
  76:5
attorney 6:21
  20:21 35:6 51:8
  54:16 66:9,13
  71:11 82:4 107:16

117:15 119:2,3
attorney's 36:20
  63:13 64:4
authorize 122:11
available 40:14
  78:17 80:18,23
ave 120:1
aware 114:17,18

**b**

b 3:9,14 16:21,24
  17:15 18:5,8,15
  58:13 68:3
back 6:8 7:22
  16:11 21:20 28:13
  29:19 31:6 34:12
  37:17 39:20,23
  54:7 71:8,21,23
  72:5 74:5,17
  87:15 88:14 89:1
  102:4 110:15
  113:9,9,11 116:19
  120:15
background 4:18
backup 27:1,3
  77:5,7,10,10
badgering 53:24
baker 2:2
bar 25:8 27:7,11
  27:12
barber 94:11,15
based 89:3 109:15
  109:22 110:22,24
  111:8
basement 97:7
  98:6
basic 109:6 115:7
basis 26:5 43:17
  51:16,21
bate's 58:13
bearing 37:4

beat 81:1
began 11:3
beginning 90:24
  101:12
behalf 2:5,10,15
behavior 75:14,20
  75:22,23 76:15,16
believe 9:6 10:9
  12:18 29:3 32:2
  38:1,19 58:7
  91:16,19
benches 83:20
bent 116:13
best 21:18
better 70:14
  113:12
beyond 36:24 37:2
  106:21
bid 12:1,3,11,11
  12:12,13,16,20
  13:2,5,7
bidded 11:23
bidding 12:5
bigger 58:12
biology 9:24
birth 7:9
blank 80:17
blanks 30:12
block 1:16 95:23
  118:5 119:8
blue 102:1
body 85:8 87:4
book 22:16,17,20
  22:23 23:3,9 24:8
  24:23,24 28:21
  29:6,11 30:23
  101:24 105:17,18
  105:22 106:1
  108:6,10,15
  112:14

**[books - college]**

**books** 34:22
**boston** 10:7
**bottom** 58:21
**box** 39:12 42:20
  42:21 44:8
**break** 6:16,20 7:3
  26:16 39:18,22
  40:2 71:20,22
  106:9
**breaking** 13:6
  30:6
**breath** 116:11
**brief** 90:2
**bring** 92:12,15
  93:10
**broad** 22:6,10
  42:8 43:2 46:21
  51:18 87:17
**broke** 8:7 27:6
  29:18 30:1 90:24
  116:9
**brown** 82:20
**building** 15:14,15
  94:12
**bullpen** 100:6

**c**

**c** 2:12 3:16 16:24
  17:15 18:5,8
  66:18 67:8 74:17
  84:24
**ca** 120:24
**call** 7:7 41:13
  46:10,15,18,22
  47:8,19,22 48:1,9
  48:20,22 49:8
  50:9,11,17,22,22
  51:10,12,14 52:6
  52:17 69:10,13
  81:22 90:8 92:4
  97:14 98:1,11

**called** 1:11 4:3
  39:16 41:18 47:17
  52:3 61:20 66:4
  84:16 91:10 92:10
  99:15 101:21
**calling** 46:12
  97:17
**camera** 30:7
**capability** 81:20
**capacity** 37:24
**cards** 69:24
**care** 114:22
**cart** 38:22 87:9
  88:9 99:15
**case** 5:5,6,8,9,10
  5:11 6:16 27:20
  27:22 35:2 36:17
  37:4,9 52:20,23
  53:3,10,14 54:11
  63:10,24 64:10,20
  64:24 65:9 81:19
  100:15 101:3,13
  109:22 110:13
  113:6 120:6 121:3
  122:3
**cc** 58:3
**ccb** 11:9,11 15:20
  15:21 16:2,9
**ccdoc** 31:20 44:14
  102:6
**ccsao** 84:23 85:1
  86:19 89:16
**ccsheriff.org** 59:1
**cell** 38:3,19,19
  41:12,13,15 42:13
  49:24 72:9,10,17
  72:18,19,22 83:14
  87:15 88:14
  111:23,23 112:5
  117:2

**cellphone** 33:16
  33:21 34:3
**cellphones** 33:18
**cells** 16:14 17:2,5
  17:5,10 27:5
  37:21 38:2 74:6
  112:2
**cermak** 38:16
  44:13 67:3,22
  69:18,22 84:1
  90:13 96:9,11,13
  96:14,18,20 97:8,9
  97:14,18,21 98:1,2
  98:4,6,12,17 111:1
  111:15
**certain** 56:22
  62:11 71:14
**certificate** 118:1
  122:11
**certification** 121:1
  122:1
**certified** 1:16 3:20
  64:7 118:3,5
**certify** 35:3,8
  36:18 54:17 63:11
  63:15 64:1,13
  82:3,5 107:11,17
  118:7
**chairs** 83:20
**change** 12:22
  73:11 74:14
  120:13,14 122:8
  123:3
**changed** 57:24
**changes** 120:12
  121:7 122:7,9
**chart** 112:17
**chase** 17:1
**check** 25:9 27:7,10
  38:10

**checked** 25:6
**checks** 22:24 25:4
  25:5
**chest** 81:14 84:2
  90:5 108:4,14
  109:13 112:23
  116:5,7,7,11,12,17
**chicago** 2:3,7,13
  9:1,14,17,23
**circumstance** 5:1
**civil** 1:12 121:5
  122:5
**claim** 25:23
**clarify** 16:18
  74:12 89:3 91:1
**clark** 2:7
**classes** 9:9
**clawing** 88:21
**clear** 61:10 74:19
  89:8 98:7 108:3
  111:18 113:6
  114:24
**clearly** 70:8 115:5
**clears** 30:7
**cleveland** 120:2
**client** 52:22 64:13
  65:4,8
**client's** 25:23 26:3
  52:20 64:10,20
**clock** 113:21
  116:19,20 117:3,4
**clocks** 113:14
**close** 36:23
**closed** 14:5 15:13
  15:15,19
**coaching** 70:11,13
**code** 1:12 25:8
  27:11,12
**college** 8:21 10:4
  57:13

**[column - cut]**

**column**  59:7,8
**come**  27:1,3 30:13
  39:20 40:7,11
  41:2,2,5,22 42:2,4
  43:13,16,24 47:23
  47:23 48:2,7
  71:21 72:9 74:7
  77:13 79:23 90:9
  92:5 98:3,4 105:7
  105:14
**comes**  11:14 33:13
  98:14 108:22
**coming**  91:15
  93:16 112:16
**commander**  68:23
  69:5,7,15,19
**commencement**
  118:8
**commission**
  119:10 121:19
  122:25 123:25
**common**  41:5,6
**communicate**  6:14
  6:18
**complain**  39:3
  81:17
**complained**  43:24
  81:6,10,14 91:6
**complaining**
  109:13 112:23
  116:7,9
**complaint**  26:3
**complaints**  103:2
  114:20
**complete**  57:15,18
  77:3 78:12,22
**completed**  42:19
  44:3 59:11 78:20
  89:18 120:15
**completely**  27:19

**completes**  103:23
**completion**  59:9
**compliance**  67:23
  67:24
**computer**  6:23
  38:4,7,9,13 55:21
  57:14 112:11,12
  112:17 115:19
**concern**  75:14
  79:18 105:19
**concerning**  118:10
**concerns**  79:3
**concluded**  117:17
**condition**  64:9,24
  87:22 105:23
  108:9 109:11,17
  110:11,15
**conducted**  56:5
**conference**  1:10
**confined**  112:6
**confinement**  112:7
**connected**  101:15
**connecting**  81:21
**constitutes**  118:15
**contact**  79:4 90:6
**continue**  37:10
  64:17 65:2
**convicted**  20:5
**cook**  1:6 2:10 3:15
  4:20 10:21,24
  11:22 24:19 31:16
  35:19 36:5,8,13
  49:11 50:10 52:2
  54:19 55:3,17,20
  63:17 66:18 67:3
  67:4,21,23 68:22
  83:24 84:8,11,16
  100:10 101:6,16
  102:15,22 120:6
  121:3 122:3

**cookcounty**  58:7
**copy**  56:19,21
  58:14 71:9 117:11
**corner**  46:16 47:2
  91:17
**correct**  9:15,16
  16:23 18:7 58:18
  59:5 60:10 63:4
  81:23 92:10 97:16
  108:6,7,8,11,16,18
  108:19,23,24
  109:6,7,11,17,18
  109:23,24 110:4,6
  110:7,12,16,20,21
  111:2,3,7,17,24
  113:4,10 114:2,3
  114:11 115:8,9,21
**correction**  38:23
  58:16
**correctional**  4:20
  13:19 19:11 21:21
  21:23 24:22 26:24
  29:12 40:15 67:9
  81:5,9 86:5,9,13
  88:8 94:6 102:8
  106:13
**corrections**  4:21
  10:22 11:1 24:19
  31:17 35:20 36:5
  36:8 49:11 52:3
  54:20 55:4,17
  63:18 67:3,22
  68:23 84:1 100:11
  102:16,22 120:12
  122:17
**counsel**  119:2,3
**counts**  15:6
**county**  1:6 2:10
  3:15 4:20 10:21
  10:24 11:22 24:19
  31:16 35:20 36:5

36:8,14 49:11
  50:10 52:2 54:19
  55:3,17,20 63:18
  66:18 67:3,4,21,23
  68:22 83:24 84:8
  84:11,16 100:10
  101:6,16 102:15
  102:22 120:6
  121:3,10 122:3,15
**couple**  110:19
  115:6
**course**  59:19
  71:18 115:19
**courses**  62:24
  115:10
**court**  1:1,13 5:16
  5:22 6:15,19
  11:13,15 15:20,21
  15:24 16:7,9
  30:15 38:10 53:11
  84:23 98:20,23
  99:3,7,9 121:7
**courtroom**  16:1
**courts**  15:24 16:2
**coyne**  2:12,14
  107:20
**cpr**  31:15,19 56:4
**cracked**  109:10
**crime**  20:6
**criminal**  15:24
**cross**  45:22 46:2
**crossing**  95:11
**crw**  30:23 39:16
  40:3,3,7 99:22
**csr**  118:6 119:8
**culmack**  46:6
**current**  7:11
**currently**  8:5
  10:17,21 98:8
**cut**  17:1 27:18

| d | deemed 120:19 | determine 92:22 | 93:11,16,17 94:10 |
|---|---|---|---|
| **d** 3:1,9,18 4:9,9 | **defendant** 2:10,15 | **determined** 18:11 | 94:12 96:3,6 |
| 16:21,24 17:15 | 3:11 21:2 84:24 | **devore** 2:6 | 99:11,12,13,16 |
| 18:5,8 84:20,22 | **defendants** 1:7 | **devoreradunsky....** | 110:2 |
| **daily** 43:17 49:21 | **definitions** 68:4 | 2:8 | **dispense** 72:19 |
| **date** 7:9 59:4,8,9 | **degree** 9:11 10:1 | **different** 11:21,23 | 78:11 |
| 59:10,16 62:2 | 10:15 | 13:14,24 14:10,14 | **disregard** 60:24 |
| 66:21 85:9 86:24 | **delivered** 69:18 | 14:18,20 15:6 | **distance** 49:13 |
| 89:19 90:4 120:8 | **dep** 36:22 37:8 | 16:8 18:22 48:13 | **distribution** 3:17 |
| 121:3,9,19 122:3 | **department** 4:20 | 58:5 69:3 73:21 | 65:19 66:5,20 |
| 122:13,25 123:20 | 10:22 11:1 24:19 | 75:21 78:9 98:18 | 67:5,10,17 70:24 |
| 123:25 | 31:16 35:20 36:5 | 103:6 104:3 | **district** 1:1,1 |
| **dates** 38:10 | 36:8 49:11 52:3 | **difficult** 5:22 | **division** 1:2 11:7,8 |
| **day** 1:17 18:16 | 54:20 55:4,17 | **direction** 118:14 | 11:8,9,9 12:4,14 |
| 23:8,11,11,17 24:5 | 63:18 67:3,22 | **directions** 68:2 | 12:17,21,23 13:2,5 |
| 40:10 41:18,22 | 68:22 83:24 | **directive** 3:16 | 13:8,8,11,13,15 |
| 42:1,1,13 43:14 | 100:10 102:15,22 | 65:19 66:3,5,8,19 | 15:20 16:12,13,19 |
| 49:22 59:19 66:9 | 120:22 | 66:21 67:2 71:9 | 16:21,23 17:3,18 |
| 72:2 73:3,9,12,16 | **depending** 43:3 | 71:13 74:18,20 | 17:24 18:1,3,12,12 |
| 73:23 74:7,7 78:7 | **depends** 12:6,8 | 77:21 | 18:22 19:1,2,9,18 |
| 80:2,3,5,8 83:16 | **deponent** 2:11 | **directly** 44:6 | 19:22,24 20:3 |
| 89:8 105:12,15 | 117:18 | 51:13 119:4 | 21:21 26:13,18 |
| 111:1 112:2,7,16 | **deposition** 1:10 | **directors** 15:7 | 27:15 28:23 31:23 |
| 113:20 121:16 | 3:11,14,15,18 4:11 | **disagree** 115:18 | 32:8,10 33:10,18 |
| 122:22 123:22 | 4:13,23 5:3,15 | **disciplinary** 20:12 | 33:22 34:3,5 |
| **days** 35:18 36:2 | 6:15,19,24 20:8,21 | 20:15 | 35:11 37:22 38:5 |
| 82:10 120:18 | 28:5,8 53:5 60:19 | **disciplined** 36:7 | 38:13 39:2,7 40:8 |
| **deal** 104:17 | 64:16 65:7 101:6 | 114:13 | 40:12 41:4 42:17 |
| **dealt** 15:6 | 101:12,13 111:19 | **discovery** 1:15 | 43:14,16,19 44:17 |
| **dear** 120:10 | 117:17 118:12,16 | 60:16 | 45:7,8,23,23 46:11 |
| **december** 85:3 | 118:17 120:8,11 | **discuss** 104:18 | 46:15 47:1,7 51:5 |
| **decide** 12:13,16,20 | 121:1,3 122:1,3 | **disease** 85:11 | 51:11 67:18 69:8 |
| 18:18 19:17 37:7 | **depositions** 1:15 | **dishonesty** 20:6 | 69:9,17,22 72:6 |
| 111:16 | **describe** 38:20 | **dispensary** 46:13 | 75:19 77:6 78:15 |
| **decided** 12:12,13 | **described** 77:20 | 46:14,18,24 47:4,8 | 80:11,18 81:22 |
| 20:2 | **description** 3:10 | 47:11,14,18,19 | 82:11,19 85:5 |
| **deciding** 12:11 | **designed** 37:5 65:6 | 48:1,3,9,10,22 | 86:2 87:1 88:8 |
| **decision** 111:14 | **detainee** 47:24 | 49:1,8 52:4,5,12 | 89:5,18,23 90:6,14 |
| **deed** 121:14 | **detainees** 13:20,23 | 81:23 90:6,8,13 | 93:12,19 94:4,7 |
| 122:20 | 13:24 14:20 23:1 | 91:10,13,14 92:5 | 95:1,4,7 96:4 97:1 |
| | 27:14 | 92:10,16,17,19,20 | 97:3 98:3,8 |

103:11 105:8,15
106:11 107:3
**divisions** 11:6,18
11:21,23 15:23
18:22 19:10
**dizziness** 109:14
**dizzy** 49:7
**doctor** 48:4 109:5
109:8
**doctors** 47:15
**document** 3:17
20:24 58:19 66:16
66:20,22 84:20
108:12
**documentation**
62:17 102:11
**documented** 28:2
102:11
**documents** 7:1
84:23
**dog** 17:8
**doing** 16:8 24:15
37:6 45:17 65:7
74:13
**door** 32:5 39:11
41:2 42:22 93:13
93:14 95:3,6
**doors** 95:20,20
**doses** 78:8
**downtown** 95:11
**drive** 2:12
**drug** 14:12,12,15
14:21
**dukes** 1:3 3:13
4:16,21 21:3
35:24 82:7,11,23
83:1 84:23 85:1,3
85:20 86:20 89:16
89:17 91:5 99:20
103:20 108:4,13
109:19 110:14,16

112:22 114:19
120:6 121:3 122:3
**duly** 4:3 118:10
**duties** 21:22,24
**duty** 34:7,17 93:22

**e**

**e** 3:1,9,9 4:5 57:19
57:20,23 58:3
59:1 62:13,14,18
77:19 108:1 116:1
116:1 117:13
**earlier** 49:20
50:16 51:4 62:5
72:8 100:16 111:4
**early** 63:18
**eastern** 1:2
**eating** 27:21,21
**education** 4:18
**effect** 90:12
**effective** 66:20
**effort** 79:2
**either** 6:2 12:3
99:16 113:4
**email** 120:17
**emergency** 47:20
48:2,6,11 49:13,24
50:13 52:5 97:24
98:10 108:10
**employed** 10:17
10:19,21 54:19
55:3
**employee** 119:1,3
**employees** 67:4,23
**employment** 4:19
65:14
**en** 92:12,13
**enclosed** 120:11
**encounter** 43:23
78:16
**encountered** 99:14
116:15,18

**enrollment** 59:8
**ensure** 80:17
**entail** 55:24
**entered** 105:15
122:9
**entire** 16:14 17:2
121:5 122:5
**entries** 115:6
**entry** 60:18
108:15
**er** 90:13 96:9,11
97:9,15,22 98:1,10
**erickson** 3:4,7 4:6
4:10,15,22 7:15,18
8:1 16:16 17:6,11
17:14 19:7,16
20:16 22:8,12,18
23:7,16,22 24:6,14
25:24 26:9 28:4,8
28:12,17 30:10
31:5,9 33:23 34:1
34:12,21 35:5,8,9
35:17 36:19 37:1
37:10,13,16,20
39:19,23 40:1
41:10,20 42:11
43:5,12 44:22
45:18 46:5,23
48:19 49:6,19
50:8,19,24 51:1,21
52:1,10,24 53:16
53:18 54:3,6,17,18
55:2,15 58:2
59:21,23 60:14,21
61:4,8,11,15 63:12
63:15,16 64:3,15
64:21 65:2,12,17
66:2 68:16 69:4
70:11,19 71:7,23
72:4 74:9,16
75:10 76:12 79:1

81:4 82:5,6,18
83:8,10 86:1,18
87:13 88:6 89:2
89:13 90:24 91:2
92:2 93:2,7 94:2
95:17 96:1,19
97:2 100:22 101:4
101:11 106:18
107:1,13,17
114:15 115:23
116:2 117:8,12
**erikcson** 2:4
**errata** 120:13,18
122:7,10,18 123:1
**escalating** 106:9
**escalation** 79:4
**escort** 96:5,8,12
**escorting** 11:16
114:1
**essential** 67:9
**established** 52:15
**establishes** 67:2
**et** 1:6 120:6 121:3
122:3
**everybody** 25:7
72:14,14
**everybody's** 53:14
**everyday** 22:21,22
23:3,5,6,21
**everyone's** 33:21
**everytime** 43:6,6
56:23
**evidence** 50:5
82:15 83:6
**exact** 68:12
**exactly** 17:4 24:3
68:20 74:4 115:11
**exam** 61:23
**examination** 1:11
3:4,5,7 118:9

**examined** 4:4
**example** 48:20
**exams** 62:22
**excel** 3:14 58:10
**excerpt** 3:18 84:22
**excused** 117:14
**executed** 122:10
**execution** 121:14
 122:19
**exhibit** 3:10,12,14
 3:16,18 58:13
 66:18 74:17 84:20
 84:22,24
**expect** 52:12
**experience** 19:2,9
 68:11 109:23
**expiration** 121:19
 122:25 123:25
**expires** 119:10
**explain** 11:20
 15:21 31:23 64:19
 64:23 72:13 76:10
 107:10
**explained** 82:2
 88:1
**explanation** 65:5
**explored** 37:9
 52:21

**f**

**f** 3:9 59:7 77:21
 116:1
**face** 61:1
**factor** 75:15
**facts** 50:4 82:15
 83:5
**fail** 57:7
**fair** 5:23 6:5 70:6
 70:10,15 92:23
**familiar** 68:12
 75:4 80:13,15
 113:24

**far** 12:11 15:5
 46:24 86:2 110:22
 111:13 115:10
**fashion** 114:22
**february** 12:7
 14:8 21:22 24:16
 26:14,19 28:19
 32:21 34:6 35:12
 35:19 36:1 40:9
 45:24 82:12 86:21
 87:1
**fed** 27:14
**federal** 4:13
**feed** 23:1
**feel** 53:9 81:11
**feeling** 49:7
 113:12 116:8,13
**feet** 95:14
**felony** 20:6
**felt** 104:16,17
 106:8
**female** 106:13
**field** 55:22,23,24
 56:5,7,18,23 57:2
 57:5,8,10 95:9
 102:10,13
**fight** 25:18,19
 29:22 30:4,17,17
 56:13,14 106:8
**file** 5:11 65:14
 72:3,15
**filed** 100:16
 108:13,21
**fill** 22:4,17,19
 23:14 24:4,23
 30:12
**filled** 86:20 89:17
**fills** 85:17
**final** 60:20
**finally** 90:10

**find** 120:11
**fine** 27:19 71:5
**finish** 5:21
**fired** 104:23
**first** 4:3 13:22
 24:13 25:20 33:13
 91:12 99:24
**five** 48:7 71:1
**floor** 17:24 18:6,8
 18:9 46:16,17
 69:7 83:14,16,19
 83:22 94:8,9,15,21
 97:4
**floors** 18:1,2,3
**follow** 68:2 71:17
 71:19 114:6,9
 115:23
**followed** 67:2
**following** 36:19
 63:12 64:3
**follows** 4:4
**foot** 82:20
**football** 95:9
**foregoing** 118:12
 121:13 122:18
**forget** 113:4
**form** 19:3 23:10
 24:9 25:21 33:20
 34:9,15 35:13
 40:20,22 42:6,7,17
 42:19,21,24 43:1
 43:20 44:5 45:20
 46:1 49:15 50:3
 52:14 54:23 55:13
 65:21 76:4 78:13
 78:17,20 85:2,8,14
 85:17,18 86:20
 87:16 93:23 95:12
 96:22 104:24
 105:4

**formal** 65:15
 102:8
**forms** 39:13 40:5
 40:14,17 43:8
 44:1,4,9,13 45:1
 45:11 80:18,23
 85:15
**forward** 120:15
**foundation** 50:4
 51:17,17 52:15
 59:21 82:13
**four** 11:8 18:4
 65:6 75:3 80:2,2,4
 80:8 94:22,24
 105:11,14
**fourth** 95:23
**frame** 42:3 45:1
**free** 121:14 122:20
**freezing** 31:1
**frequently** 25:11
 25:12,15
**front** 32:4 53:5
 112:20,23
**froze** 5:2 6:17
 10:20
**further** 3:7 117:18

**g**

**g** 77:21
**gather** 69:24
 74:23
**general** 9:9 22:6
 77:23 78:9 108:17
**generally** 27:14
 80:5 92:3
**getting** 36:23 37:3
 53:3 65:10 89:11
 89:12 100:5,9
 106:8 114:21
**give** 5:3 7:13 28:22
 29:2 38:16 40:23
 43:14,17 45:19

69:23 72:10 77:15
85:11 87:4 90:1
93:15 95:22
**given** 4:23 88:3,20
90:10 101:18
118:15
**glass** 116:23
**go** 5:14 6:20 7:12
7:18,22 11:15
12:4,14,17,20
15:23 16:7,11
19:19 21:20 23:4
26:7,7 27:4 28:9
28:10 30:7 32:5
37:12 41:16,21
49:21 53:5 56:2
56:20 59:7,18
61:14 71:1,8 72:5
72:9,18,19 73:15
74:5 88:14 89:9
95:4,7 96:11 97:8
97:15,22 98:1,10
98:12,23 99:2,7,9
110:2 111:1,22
113:11
**god** 34:24
**goes** 77:11
**going** 4:17 6:4,7,7
17:6 20:23 23:11
25:16,19 26:7,10
31:2 34:15 37:6
38:1 47:24 52:6
52:23 53:1,2,4,4
53:12 56:1 58:9
59:3,16,18 60:24
61:8 65:2,13,13
66:15 74:17 75:6
81:2 82:14 84:19
84:24 98:20
100:17 102:4
105:21 107:6

108:6 113:3,21
115:18
**good** 6:21 7:5 22:3
31:10,11 65:12
83:7
**grabbing** 116:5,6
116:11
**graduate** 8:17,19
**great** 65:10
**green** 101:24
102:1
**grievance** 3:18
20:14,17 39:13
40:4,14,20,22
78:13,17,20 79:4,7
84:23 85:2,8,15,17
85:18 86:20 87:5
89:17 90:17 91:19
103:17,19,24
104:1,12,13,15,24
105:9 108:5,13,18
108:21 109:1,2,19
110:17,24 114:15
114:18
**grievances** 39:6
103:6,15,17 104:5
104:8,17 114:17
**ground** 5:15
**guard** 30:13
**gun** 56:3
**guy** 93:16 98:12

**h**

**h** 3:9 116:1
**hair** 82:20
**half** 49:21 52:21
53:5,13 64:8
72:24,24 74:3,3
**hallway** 94:4,5,6,7
94:18 95:1,3,6,16
95:18,19,21

**hand** 40:23
**handbook** 80:14
**handbooks** 80:10
**handle** 67:11,14
70:23
**handled** 44:13
**hang** 17:11 41:16
96:20
**happen** 103:4
**happened** 13:4
16:6 29:17,22
30:12 45:4,16
63:8 105:5 106:19
**happens** 30:7 33:2
33:6 47:21 53:12
98:13 103:8 112:3
**harass** 37:5 64:18
65:6 106:13
**harassing** 65:4
**harassment** 5:9
27:17 35:2 36:21
54:10 61:7 64:12
64:22 100:15
107:3
**hard** 13:7 114:9
**harold** 9:1,2,5,12
**head** 5:17 109:10
**headache** 48:21
49:2
**health** 42:16,23
43:7,20 44:1,3,5,8
44:12 45:10 59:12
67:3,22 80:17,22
**hear** 6:17 17:6
66:7 68:6 87:7
88:21 100:4,8
105:2
**heard** 23:24 30:11
66:12 101:21
**hearing** 5:14

**heart** 81:17 83:2,3
84:2,4,7 85:11
91:6 109:9 110:14
110:15,20 112:19
112:22 116:3,16
**help** 49:8 70:20
74:14 79:7,10
**hereto** 119:4
**hierarchy** 55:14
**high** 8:15,16,21
**hipaa** 87:22
**history** 4:19 110:9
**hold** 7:17 25:21
26:1 34:24 38:1
87:21 97:9,10
**honestly** 53:23
61:12
**hoping** 53:7
113:11
**hospital** 30:16
**hour** 1:17 27:9,13
37:8 52:21 53:6
53:13 73:11 78:6
78:6
**hourly** 22:24 25:4
25:5,11,12,15
**hours** 112:7
**house** 31:3 51:14
**housed** 32:4 82:11
98:8
**huhs** 5:17
**hurting** 116:7
**hyphen** 90:8
**hypothetical** 50:4
**hypotheticals**
52:17

**i**

**idea** 49:16 108:20
114:19
**identification**
69:24 70:1 74:24

74:24 75:11
**ii** 77:19,20
**iii** 67:20
**illinois** 1:1,14 2:3
  2:7,13 3:15 66:19
  118:6
**impact** 75:15
**implemented** 74:4
**incidences** 27:24
**incident** 25:16
  26:10,21 27:8,10
  28:1,1,2 56:3,3,9
  56:12,14,16 85:9
  85:11 87:1 89:19
  89:23 91:3
**incidents** 38:10
**included** 120:13
**incomplete** 50:4
**incorporated**
  122:12
**indicate** 112:15
**indicating** 120:13
**indifference** 27:21
**indirectly** 119:5
**individual** 116:16
**inform** 40:19
**information**
  105:21 112:12
**informed** 90:5
**inhaler** 68:13
**inhalers** 111:5,6,9
**initial** 25:20 79:3
**injury** 63:7,22
  64:20 113:9 115:3
**inmate** 5:4 11:14
  41:12 42:4,14,15
  42:19,23 43:19
  48:21,23 49:2,7,12
  68:17 69:24 70:23
  75:14 76:1 78:16
  79:8,16,20 80:10

80:13,14 81:6,10
83:14 84:7 85:16
87:23 91:11 93:10
96:5,8,11,12 97:8
97:17,22,24 98:5,5
98:7,19,22 101:7
101:14 103:23
105:8 108:3,21
109:13 110:8
112:19 113:8
116:3 117:2
**inmate's** 42:12
  75:20 79:3 87:22
  108:18 110:10
**inmates** 16:7 22:3
  25:9 27:8 28:22
  29:13 32:4 37:24
  38:18 39:2,9
  40:15,19,24 41:4
  41:15,24 43:3,24
  44:24 45:19 49:21
  49:23 50:9 67:15
  68:6 69:23 72:17
  73:3,6,8,12,15,22
  73:22,24 74:2,23
  76:14,19 77:19
  78:12,19,22 79:10
  79:14 80:18,23
  81:13,16 83:16,18
  83:21 87:7,14
  88:9,13 93:11
  96:3 99:2,6 100:4
  100:9 105:12
  106:13 107:3
  111:5,10,13,21
  112:2 113:19
  116:24
**inside** 15:24 39:12
  51:5 111:20
  113:14

**inspect** 74:8
**instance** 112:14
  115:14
**instances** 96:2
  111:21
**instituted** 70:3
**instruct** 78:12,19
  78:22
**instructed** 54:12
  54:15
**instructions** 63:13
  64:4
**intake** 80:16 85:9
  96:24 97:3,10,14
  97:20,21 98:1,5,12
  98:15
**intend** 12:10
**interactions** 4:21
**interagency** 3:16
  65:19 66:3,5,8,19
  71:9 74:18
**interested** 119:4
**interject** 17:13
**interlock** 32:1,3
  39:8 41:9 42:18
**internet** 31:2
**interpret** 48:13
**interrogatories**
  3:13 21:4,13,17
**interrupting** 26:1
**investigation**
  108:22
**involved** 70:8,9,17
  114:1
**involving** 20:6
  114:16
**irrelevant** 100:19
**issue** 30:8 101:3
  103:10 104:5
  105:19

**issues** 5:13 37:3,8
  52:22,23 53:3,10
  53:14 65:9 68:9
  100:4,8 106:4

**j**

**jail** 15:24 34:10
  55:14 74:8 111:6
  113:14 114:6,10
**january** 89:18,19
  108:5 110:23
**jcc** 2:14
**job** 5:9 19:21
  21:22,24 76:11
**john** 2:12,14
**johncoynelaw.c...**
  2:14
**judge** 27:18 37:7
  53:5 113:7
**judges** 14:21,22

**k**

**keep** 37:6 68:4,7
  75:5 88:4,21
  111:10,13
**keeps** 31:1
**kerickson** 2:4
**kicked** 113:8
**kids** 8:8,9
**kill** 84:4
**kimberly** 2:9
**kind** 5:8 52:4
  68:10
**kirstin** 2:4 4:15
  7:14 41:18 59:16
  60:15,22 64:2
  70:13 75:3 90:21
  95:13 96:17 107:9
  111:4 117:11
**know** 5:13 6:2,9
  6:10 7:3,13 15:15
  16:9 17:2,4,5 19:6

**[know - marked]**                                                                    Page 11

19:12 24:4,20,22
25:2,3,6 29:22
30:4,14,17 31:2
33:19,21 34:2,4,17
36:3 40:21,22
42:5,5,15,21 44:15
44:19,21 45:4,5,15
45:16 46:2,6,8
48:4,10,18 49:12
52:5,9 53:11
55:12 60:15 61:16
61:19 62:8,18
64:14 68:17,19,20
69:17,20 70:18
72:2 74:19,21,22
76:8 77:9,18 78:3
78:8 79:6,7,19,22
82:16,17,19,22
84:4,7 87:21
88:24,24 89:7
91:22,24 92:3
93:5,9,15 95:14
96:15 97:13,17
98:9,11 99:8,9,10
99:21,22 100:3
103:1,17 104:17
104:23 105:5
106:10,24 109:8
110:10,22 112:1,9
112:10 113:7
115:5 116:4,16
**knowledge** 21:18
68:11
**kop** 68:7,10,17
85:21
**kristin** 26:7

**l**

**l** 1:5
**labeled** 84:24
**labeling** 84:22

**laceration** 109:9
**lasalle** 2:2
**late** 21:21
**law** 2:12
**lawsuit** 4:17 20:13
37:3 100:20 101:2
106:23 107:9
108:23 109:1
**lawyer** 54:13 61:1
**laying** 51:17 59:21
**layout** 31:24
**learn** 65:18 66:7
**learned** 71:13
**leather** 101:24
102:2
**leave** 13:8,13
32:13,18,19 33:13
36:10 38:12 41:15
41:22 99:2,7,11
**leaves** 11:14 41:15
**leaving** 88:9
**left** 13:12 29:2
45:3 47:3,4 58:22
61:13 95:20
**legal** 5:5,6 120:1
123:1
**letter** 120:19
**letting** 25:6 29:22
**license** 118:6
119:8
**lie** 83:16 91:11
**lied** 91:16
**lieutenant** 18:13
18:18
**life** 108:9 113:1
**lighteaded** 116:8
116:14
**limited** 6:23 31:13
55:22 109:6
**line** 72:2,11,15,15
90:9 97:20 100:18

107:7 111:21
120:13 122:7
123:3
**lines** 3:21,21,22,22
3:23 51:12
**listed** 20:18 59:1
122:7,17
**listening** 35:5 82:4
107:15
**listing** 122:7
**literally** 64:8
**little** 87:14 90:12
111:19
**live** 8:5
**lived** 8:2
**living** 24:24 26:24
31:24 41:5 52:12
77:3 101:21 106:6
116:24
**llc** 2:2
**lms** 55:21 56:2
57:14,17 58:14
59:24 60:3,6
61:16 62:8,9,11,16
114:24 115:7,18
**located** 1:20 10:6
18:6 38:24 40:17
46:14 69:15 98:8
**location** 1:21
89:22 98:9
**lockbox** 39:6,10
39:14 42:16 44:4
44:6
**lockdown** 78:7
**lockdowns** 77:24
78:3,10
**locked** 112:6
**log** 57:15 62:4
101:19,22,24
105:17,18,22,24
108:6,10,15

112:14
**logging** 112:12
**logs** 61:20,24 62:2
62:4 101:18
**long** 8:2 9:2 10:24
13:14 14:3 26:7
41:24 47:4 57:5
71:11 73:6,8 95:3
95:6,8,20 98:2
**look** 68:3 74:7
85:8 86:19 110:6
116:23
**looked** 110:17,18
**looking** 113:19
**looks** 59:3,11 60:3
60:6 61:22 62:7
62:15 86:24
**lot** 30:6
**lucas** 55:8,11
**luna** 46:8
**lunch** 32:15,16,17
32:20
**lying** 83:14 92:7

**m**

**m** 4:5 108:1 116:1
**madam** 120:10
**mail** 57:19,20,23
58:3 59:1
**mailed** 62:13,14
**mails** 62:18
**major** 9:8 104:12
**making** 80:7,9
114:19
**management**
77:24 78:3,7,10
**manager** 55:8
**managers** 55:14
**march** 12:6 59:4
59:24 115:2
**marked** 58:14

**[marking - murky]**

marking 58:12
  66:18 84:19
married 8:11,13
mas 14:11 21:24
matter 75:6
  106:21
matters 118:11
mauck 2:2
mauckbaker.som
  2:4
maximum 32:8,9
  37:24
meals 22:2
mean 11:12 12:2
  14:10 16:21 17:2
  18:21 19:13 25:22
  26:4 27:17 34:10
  35:14 36:24 43:1
  45:6 46:2 51:17
  52:11,19,20 53:23
  68:1 70:14 76:8
  77:8,10 89:4 92:3
  92:15 95:18
  104:15 114:9
meaning 113:16
means 11:14 14:14
  20:14 34:17 60:23
  78:4
meant 89:7
med 69:23 70:5,8
  70:9,17,20 72:2
  75:4,8 84:17 87:8
  88:9 91:20 92:3
  98:23 111:20
  112:10,11,16
  113:23
medical 27:21
  31:11,13,14 47:16
  47:20 48:2,6,10
  49:8,13,24 50:2,13
  52:4 55:22 64:9

64:20,24 65:18
  67:17 68:9,20
  74:5 76:1,5,18,21
  81:21 87:22,24
  88:12 105:19,23
  109:6,10,16,16
  110:3,5,6,9,10,22
  111:9,15 114:21
  115:7
medication 3:16
  28:22 29:2 38:17
  38:17 39:4 43:14
  43:17 48:21,23
  66:4,19 67:5,10,11
  68:13,18 69:18,23
  70:23 72:10 75:1
  75:13,15 76:22
  77:3,5,16 78:11
  81:18 83:3 84:14
  84:15 85:21 87:8
  87:15 88:10,13
  90:7,9 91:6,20,21
  98:22 99:6,15,16
  100:5,9 109:21
  114:21
medications 67:14
  68:4,7,10 90:11
  111:13
medicine 92:13
medium 32:9
meds 38:22,24
  72:16,20 89:11,12
  91:15,22 92:1
meeting 102:5,7
  104:22,24
meetings 15:7
  54:20 55:5 102:4
  102:8 104:8
men 82:19 106:11
mental 59:12

mentioned 109:20
  110:18 111:4
  112:9,15
method 44:16
  77:18,19,20,20
midwest 120:17
  123:1
mind 28:12 30:1
  31:5 37:16
minute 44:23 47:6
  61:23 64:8,10
  71:20 86:3 90:1
  116:19
minutes 27:23
  39:21 48:7 61:13
  65:12 71:1 90:10
  91:15,16 92:8,14
  109:21 110:19
mischaracterize
  74:10
mischaracterizes
  81:24 101:8
mischaracterizing
  88:4
misleading 74:11
misstated 50:17
misstates 45:12
misunderstood
  13:3
moment 85:12
  87:4
monitor 14:15
  21:24 32:2,6,12,13
  33:15 38:4 39:1
  40:18 47:3 89:14
  113:15,16 116:20
monitored 14:11
  14:12
monshai 1:11 3:3
  3:11 4:2,9,11 7:7
  7:8,9,18 8:3 17:9

21:2 22:13,15
  24:2,10 26:6 30:2
  31:12 34:2 35:10
  35:15 36:15,19
  37:13 41:7,21
  48:15 49:16 50:5
  51:2 52:8 53:20
  54:3,10 58:16,22
  61:16 64:1 65:23
  66:16 69:1 70:15
  71:17,24 75:7
  76:6 82:15 83:7
  83:11 86:22 87:11
  88:23 89:8 92:23
  93:8,24 95:13
  96:23 101:9 107:8
  107:13,19,21
  113:7 116:3 117:9
  120:8 121:4,9
  122:4,13 123:20
monshai's 65:14
monshai.addison
  58:3,7 59:1
month 14:6
months 31:21,22
  57:4
morning 69:11
morraine 57:11,12
move 6:10 13:15
  14:6 51:22 53:1
  77:19 98:19
moved 13:1
movement 11:9,11
  11:13 94:10 98:14
moves 11:20
moving 31:3 89:16
  98:16,19
multiple 18:1,2
  94:17,19
murky 111:19

| | | | |
|---|---|---|---|
| musick 2:9 | new 30:13 56:1,18 | numbers 122:7 | 61:4,6,9,11 63:9 |

**n**

n 3:1,9 4:5,5,9
  108:1,1 116:1,1
n.jones 99:22
name 4:7,8,15
  20:17 46:11 58:21
  58:24 90:18 93:21
  94:3 99:24 101:18
  103:20 108:13
  110:18 120:6
  121:3,4,15 122:3,4
  122:21
names 108:5
narcan 115:14
naught 117:18
nausea 109:14
nauseous 81:6
necessarily 115:6
necessary 7:14
need 7:3 22:2
  32:23 36:17 37:10
  63:24 74:9 76:5
  77:5 79:11 92:4
  96:2 98:10 101:2
  107:8
needed 16:7 40:15
  40:20,21 42:5,6
  46:10 71:14 79:9
  79:12,14 87:8
  91:19 97:8,15
needing 79:13
  81:17 91:6
needs 48:21,23,23
  76:1,18,21 79:3
  97:22,24 98:12
never 36:22 44:8
  51:9 52:16,18
  70:2,5,20 71:8
  99:8 101:21 114:6
  114:12 116:15,18

new 30:13 56:1,18
  56:24
nikita 100:2
nine 19:5 60:9
  61:16
nitro 90:12
nitroglycerin
  90:11
nitroglycerine
  85:21 90:7 92:9
  111:1
nods 5:17
normally 32:20
  96:12 98:2
north 2:2,7,12
northern 1:1
notarized 120:14
notary 120:24
  121:10,18 122:15
  122:23 123:23
notation 85:10
note 30:23 52:24
  64:6 91:18 120:12
noted 33:23 50:24
  59:22 85:11
notes 15:7 82:23
notice 4:12
notified 57:17
notify 26:8,10,22
  75:13,24
november 21:15
  24:16 26:14,19
  28:18 32:21 34:6
  35:12,19 36:1
  40:8 45:24 58:4
  60:10 61:17,20
  62:7 82:12
numb 81:11
number 58:17
  66:21 120:7,13

numbers 122:7
numbness 116:7
  116:11
numeral 67:20
nurse 28:21 29:1,2
  29:3 38:16,21,23
  39:3 43:4,6,7,13
  43:16,21,24 44:6,7
  45:1,20 47:17
  48:4,5,7,23 51:13
  52:5 72:9,18
  77:12,13,15,16
  79:12,13 80:24
  84:3 89:12 92:11
  92:12 105:5 110:3
  111:22 112:15
nurses 46:10
  47:15 48:14 99:11
  112:10 114:1
nursing 75:18,24
  76:13,14,17
  100:13

**o**

o 3:9 4:5,9 108:1
  116:1
o'clock 73:13
object 33:20 34:9
  34:15 42:7 43:1
  46:1 49:15 55:13
  65:21 96:22
  100:17
objection 17:13
  19:3,12 22:5,11
  23:10,19 24:9
  25:21 27:16 34:24
  35:13 36:16 43:9
  44:18 45:12 46:20
  48:12 49:3 50:3
  50:19 51:17,22
  52:7,14,24 53:16
  54:9,23 60:14,21

61:4,6,9,11 63:9
  63:23 64:15,21
  70:2,22 75:2 76:4
  78:21 81:24 82:13
  83:5 85:22 86:15
  87:16 88:2,5
  92:21,24 93:6
  95:12 106:15,20
  107:6
objections 22:8,12
  25:24
observation 111:9
obviously 6:20
  114:4
occurred 45:2,3
  52:18
occurring 92:4
ofc 90:5
offer 65:5
office 1:6 2:11
  69:16 102:24
  120:6 121:3 122:3
officer 4:20 11:5
  13:19 19:11 21:21
  21:23 26:24 29:12
  29:21 33:7,11,13
  34:7,17,19 38:22
  38:24 40:15 46:6
  46:8 58:16 67:9
  72:18,19 77:11,14
  77:16 81:5,9 86:5
  88:8,12 89:11
  90:20 93:13,18
  94:7,17 96:4,5,13
  96:14 97:11,14,15
  97:18,18,21,22
  98:1,2,4,6,14,16
  98:18,19 103:24
  104:2
officer's 93:21

**[officers - preferred]**                                    Page 14

**officers**  24:22
  47:15 86:9,14
  94:18,19,20,23,24
  96:17,20 97:9
  102:8 103:2
  106:14 108:17
  113:17 114:20
**offices**  2:12
**official**  121:15
  122:21
**ohio**  120:2
**okay**  6:10,11 15:2
  16:2 20:5 25:7,9
  28:18 30:9 33:6
  45:19 51:15 54:14
  54:15 58:6 66:24
  74:5 80:9 88:7
  90:3 106:4,6
**old**  8:9
**once**  23:18 32:1,3
  40:10
**ones**  18:5 69:3
  114:16
**ongoing**  85:10
  100:23
**open**  39:11 42:22
  109:10
**order**  42:20 67:21
**orders**  14:22
  117:11
**orientation**  80:10
  80:14
**original**  117:12
**outcome**  119:5
**outline**  53:9
**outlined**  67:10
**outside**  26:4 46:11
  51:12,13 93:18
  106:22
**overdose**  115:15

**p**

**p.m**  73:13,23
**p.m.**  87:1 117:17
**package**  88:10
**packages**  87:14
**page**  3:10,21,21,22
  3:22,23 24:13
  66:22 68:3 85:1
  120:13,15 122:7
  123:3
**pages**  3:4,5,7 24:7
  24:12
**pain**  84:2
**pains**  81:14 90:5
  108:4,14 109:13
  112:24 116:12,17
**painstakingly**
  70:15
**paper**  56:19,21
**paperwork**  22:4,7
  22:10
**paramedic**  84:10
  84:16
**paramedics**  52:12
  84:14
**part**  13:6 26:3
  49:22 50:12 67:17
  70:5 112:10 122:9
**participants**  1:19
**particular**  31:24
  59:12 69:14 93:21
**particulars**  18:5
**parties**  4:12 119:2
  119:4
**pass**  38:22,24 57:7
  69:23 70:5,8,9,18
  70:21 72:2 75:4,8
  75:15 77:3 84:15
  87:8 88:9 91:20
  92:4 98:23 111:20
  112:10,11,16

113:23
**passed**  89:11
  115:20
**passing**  84:14 86:8
**pause**  90:2
**pending**  7:5
**people**  30:14,15
  38:3 47:11 72:17
  78:5 104:3
**performance**
  102:19,21
**period**  17:17
  35:24 41:16 63:2
  68:24 73:24 74:1
  74:2 87:17 90:10
  90:11,14 91:7
**periphery**  50:1
**person**  10:12,13
  47:20 48:10 49:14
  68:4,7,21 97:19
  111:11,14
**personal**  101:3
  118:14
**personally**  110:1
  121:11 122:15
**personnel**  111:10
**pertaining**  1:14
**phone**  6:23 46:19
  46:22 47:9 50:23
  51:5,5,14 81:22
  97:20 120:3
**phonetic**  46:6,8
  100:2
**physically**  1:20
  71:8
**pick**  15:23 81:22
**picked**  39:13 40:4
  44:3 47:8
**picture**  32:2
**place**  12:5,6,7,7
  16:3 33:8 46:12

57:10 60:9 69:13
  111:20 118:18
**placed**  14:20 44:9
**places**  19:10
**plaintiff**  1:4 2:5
  3:12 4:16 21:3
**plaintiff's**  106:23
**plastic**  102:3
**plays**  67:9
**please**  4:7 5:13,15
  6:2 28:7 29:18
  34:13 53:13 65:7
  66:1 71:21 93:3
  101:10 120:11,11
**pled**  27:22 52:22
**plug**  61:13
**point**  12:14 27:4
  28:7 60:20 79:3
  84:11
**pointed**  115:5
**policies**  56:2,19,19
  56:22 114:4,10
**policy**  56:24 65:22
  67:8 70:3 71:17
  71:19 75:5 77:9
  113:24 114:5,6
**population**  77:23
  78:9
**portion**  20:13
**positive**  69:24
  74:24
**possible**  85:20
**post**  94:1,3,5,6,18
**potentially**  113:1
**pounds**  82:21
**pre**  11:8 13:17,19
  14:3,7,9 15:4,11
  15:19
**prefer**  19:17
**preferred**  19:24

| | | | |
|---|---|---|---|
| **preparing** 20:8,21 | **pull** 61:13 | **questions** 3:20 | 81:1,24 82:13 |
| **prescribed** 81:17 | **punch** 81:2 | 4:17,19 6:7 26:5 | 83:5,9 85:22 |
| **present** 12:9 36:13 | **purpose** 1:15 80:7 | 37:5 43:2 50:21 | 86:15 87:10,16,21 |
| 62:16 | **purposely** 64:17 | 51:18 53:8,8 | 88:15 89:6 90:21 |
| **pretty** 22:5,10 | 89:7 | 59:22 60:17 61:1 | 91:23 92:21 93:6 |
| **previous** 45:4 | **pursuant** 1:12 | 61:6,9,14 66:23 | 93:23 95:12,22 |
| 118:8 | 4:11,13 | 69:21 70:7,14 | 96:16,22 100:17 |
| **principle** 108:17 | **put** 6:24 18:18 | 75:5 88:3,22 | 101:1,8 106:15,20 |
| **prior** 59:24 74:24 | 22:24 25:4 36:10 | 101:1 107:8,11,12 | 107:6,21 108:2 |
| 79:4 109:1 110:9 | 39:12 42:20,21,22 | 107:20,22 115:24 | 115:22 117:10,16 |
| 110:14 | 82:14 84:19 90:18 | **quote** 67:8,11 | 120:5 |
| **private** 113:17 | 108:15 | 85:10 90:4,15 | **range** 95:22 |
| **privy** 87:24 | **putting** 79:6 | **r** | **rcdc** 86:2,4,13 |
| **probably** 25:12 | | | 100:5 |
| 71:10 78:5 95:23 | **q** | **r** 116:1,1 | **read** 28:14 29:19 |
| 116:13 | **question** 5:21 6:1 | **radio** 26:12,13,18 | 31:7 34:12,14,22 |
| **procedure** 1:13 | 6:3,9 7:4 17:3,12 | 26:22 46:18 | 37:18 54:6,8 |
| 45:10 50:12 99:5 | 17:12 19:14 22:6 | **radunsky** 2:6,9 | 85:12,13 87:4 |
| 99:9 103:22 121:5 | 22:10,11,13 23:11 | 3:6 7:12,16,22 | 90:1 93:4 121:5,6 |
| 122:5 | 23:24 24:1,10 | 16:14 17:1,9 19:3 | 121:12 122:5,6,17 |
| **procedures** 67:2 | 26:6 28:13 29:19 | 19:12 20:14 22:5 | **reading** 28:13 |
| **proceedings** | 31:4 33:20 34:11 | 22:9,14 23:4,10,19 | 31:6 37:17 91:18 |
| 118:16 | 34:13,16 35:1,3,6 | 23:23 24:9 25:21 | 120:19 |
| **process** 38:20 | 35:8,14 36:17 | 26:1 27:16 28:6 | **reads** 53:11 |
| **production** 120:15 | 37:14,17 42:8 | 28:10 30:6 33:20 | **ready** 27:17 53:23 |
| 120:17,22 | 43:11 46:2,21 | 34:9,15,24 35:13 | 61:13 106:8 |
| **professional** 110:3 | 48:15 49:16 50:23 | 36:15,21 37:2,12 | **really** 26:4 28:15 |
| **professionally** | 52:8 53:1,23 54:2 | 39:18,20 41:6,18 | 37:9 52:22 61:3 |
| 64:13 | 54:4,7,10,12,17,23 | 42:7 43:1,9 44:18 | 68:12,19 76:6,23 |
| **professionals** | 63:10,15 64:1,8,10 | 45:12 46:1,20 | 100:19 104:9 |
| 111:15 | 64:14 65:13,22 | 48:12 49:3,15 | 107:21 |
| **program** 14:12,12 | 66:1 69:1 70:6,10 | 50:3,15,20 51:16 | **reasking** 50:21,23 |
| 14:15,21 16:2 | 71:1,4 74:12 75:7 | 51:23 52:7,14 | **reason** 20:4 63:5 |
| **progress** 110:2 | 76:5,10,11 80:20 | 53:2,21 54:9,22 | 91:11 96:12 99:12 |
| **promoted** 36:4 | 82:3,5,15 87:17,18 | 55:13 57:23 59:15 | 101:5,16 113:7 |
| **proper** 60:18,19 | 90:22 92:23 93:1 | 60:12,15,22 61:5 | 115:1 120:14 |
| **provide** 22:1 77:9 | 93:3,23 96:23 | 61:10,12 63:9,23 | 122:8 123:3 |
| **provided** 7:20 | 100:19 106:22 | 64:6,16,22 65:3,15 | **reasons** 87:23 |
| **provisions** 1:12 | 107:14,17 | 65:21 68:14,24 | **recall** 32:22 38:15 |
| **public** 121:10,18 | **questioning** 27:23 | 70:2,13,22 71:5,16 | 39:5 42:3 43:15 |
| 122:15,23 123:23 | 100:18 107:7 | 71:20 74:6,10 | 44:2 46:4 47:10 |
| | | 75:2 76:4,9 78:21 | |

57:1 60:2 67:19
69:2 74:1 76:23
76:24 77:4 78:18
81:8,12,15,19
83:23 85:7,19,23
85:24 87:12 88:11
96:10 101:23
102:20,23 103:13
104:9 105:10,13
110:18
**recasting** 88:4
**receipt** 120:18
**receive** 9:11 10:1
31:19 55:16,19
56:19,21,23 92:8
98:22 102:10,14
102:18
**received** 31:14
62:18 71:9 88:13
92:13 102:21
**receiving** 75:1
114:21
**record** 4:7,10 7:12
7:21,22 26:2
28:14 31:7 34:14
37:6,18 39:23
53:17 54:8 59:15
59:17,18 60:20
64:6,19 65:5,14
71:23 74:13,19
90:2 93:4 113:6
118:15 122:9
**records** 61:2 82:10
87:24 96:16 110:5
110:6,22 115:1,7
115:19
**rectify** 103:10
104:6,19
**reddish** 82:20
**reduced** 118:14

**reference** 120:7
121:2 122:2
**referenced** 121:11
122:15
**referring** 41:8
**reflect** 4:10
**refuse** 65:4
**refusing** 54:13
**regard** 67:4
**regarding** 4:18
**regardless** 88:22
**regular** 91:20
**regularly** 27:11
**relate** 29:17,23
**related** 4:19 5:6
100:8 101:6,13
**relative** 119:1,3
**relay** 29:20,21
30:3
**release** 11:8 13:17
13:19 14:3,7,9
15:4,11
**released** 15:19
73:15
**relevance** 25:22
27:16 35:1 36:16
63:9 65:5 106:15
106:20,21 107:10
**relevant** 7:14 19:4
25:22 26:2 28:3
53:8,22 63:10
64:20,24 107:7
**relief** 33:3,5,6
**relieve** 32:17 33:9
33:12
**remember** 6:8
11:6 37:13 59:16
61:23 71:11 74:3
77:1 79:19 82:7,8
83:1,23 91:3,5,8
100:1,3 110:9,13

110:16 115:11,15
115:17
**remote** 10:12
**remotely** 1:19
**repeat** 6:3 29:18
31:1,3 35:21 71:3
93:2 101:10
**repeating** 30:1
**rephrase** 6:3 51:3
55:1 66:1 76:11
77:7 80:20 87:20
93:1
**report** 20:12,15,18
28:2 48:2 52:4
56:9,12,14,16
69:11 75:19 76:21
**reported** 118:13
**reporter** 1:16 5:17
5:22 6:15,20
118:3,6 121:7
**reporting** 62:8,8
108:4
**reports** 56:3,4
**represent** 4:16
**represents** 61:1
**request** 33:1 42:24
43:7,20 44:1,4,5,9
44:13 45:1,11,20
65:13,15 80:18,22
105:4 122:9,11
**required** 120:24
**reserve** 117:10
**reserved** 117:15
**resolve** 79:2
**respond** 64:1
**response** 27:24
**responses** 26:5
27:24 88:21
**responsibilities**
14:18

**responsibility**
25:20
**restroom** 32:24
**result** 104:24
**returned** 9:14
120:18
**review** 20:9,11
21:6 56:1,18
102:14,21 120:12
121:1 122:1
**reviewed** 20:12,13
20:17 110:23
**reviewing** 21:12
**reviews** 102:19
103:1
**right** 10:15 15:6
16:19 18:23 32:3
37:1 49:2 51:6
58:1 59:3,8 60:4
61:22 63:1 71:9
73:10 76:24 89:14
89:23 91:17 93:14
93:18 95:20 101:5
101:16 107:18
108:10,15 110:11
110:15 111:16,23
112:3,7,8 113:1,9
113:21 114:7,10
115:12 116:17
**riots** 26:5 27:23
**robert** 55:8,11
**role** 11:3 15:9,22
67:9
**roll** 69:10,13
**roman** 67:20
**room** 6:12 38:4
41:19,23 42:1,13
47:3 49:22 69:14
72:3 73:3,12,16
74:7 111:21 112:2
113:17,20

**roster**  18:13 69:18
**roughly**  94:22
**rounds**  79:23,24
  80:8 105:11
**route**  92:12,13
**row**  58:24
**roxbury**  9:1 10:3
  10:4,8
**rule**  4:13
**rules**  1:13 4:14
  5:15 121:5 122:5
**runs**  69:6

**s**

**s**  3:9 4:9 120:15
  122:8,8 123:3
**sat**  14:10 83:22
**save**  59:19
**saw**  114:4 115:14
**sayeth**  117:18
**saying**  60:18,18,24
  70:9 72:10,12
  73:2 75:17 77:13
  78:2 79:5 103:23
  111:19
**says**  21:2 59:6,15
  59:15 67:1,1
  71:15 77:9 89:22
**scan**  25:14 27:5
**scanner**  25:8 27:7
  27:11,12
**scenarios**  48:14
**school**  8:15,16,22
**scope**  26:4 37:3
  54:22 106:22
**screen**  20:23 58:9
  66:15 82:14
**scroll**  58:21 61:22
**seal**  121:15 122:21
**second**  46:16,17
  94:8,9,13,15,20
  97:4

**section**  77:21
**security**  22:2 32:8
**see**  6:24 7:1 20:24
  21:9,10 25:9 27:5
  28:10 30:7 45:19
  47:23,24 53:12
  58:10,11 61:19
  66:15 67:1,6,7,12
  83:13 84:20 85:2
  85:15 88:9 89:20
  96:4 103:1 105:8
  106:9 108:18
  113:21 116:24
  117:3
**seen**  58:19 65:23
  66:10 71:10 85:14
  108:12 111:5,20
**sees**  108:22
**send**  14:22
**sense**  5:18 77:19
  88:18
**sent**  90:13
**serious**  29:16,21
  29:24 30:3 52:4
  104:13,15,16,18
  104:18 109:10,16
**service**  42:16,23
  43:7,20 44:1,3,9
  44:13,24 45:11,20
  80:18,22 105:4
**services**  67:4,22
**set**  4:12
**seven**  18:23
**sexual**  5:9 100:15
**share**  20:23 58:9
  66:15
**sheet**  120:13 122:7
  122:10,18 123:1
**sheriff's**  1:6 2:11
  120:6 121:3 122:3

**sheriff.org**  58:4,8
**shift**  23:14,15,20
  24:7 28:18,20
  29:8,10,12 30:13
  32:10,11,19 34:7
  34:23 38:7 47:12
  53:19,22 69:6
  73:11,11 80:5,6
  96:21
**shifts**  84:8
**shop**  94:11,15
**short**  39:18,22
  71:22
**shorthand**  1:16
  118:3,5
**show**  65:22 115:19
**showed**  71:11
**showing**  60:5
**shown**  114:16
  120:16
**shows**  116:6
**sick**  53:19,21 54:1
**side**  72:3,3
**sign**  105:17,24
**signature**  21:8,9
  117:10,15 119:7
  120:14
**signed**  21:6,12
  121:13 122:18
**signing**  120:19
**signs**  90:14
**simply**  57:7
**sincerely**  120:21
**single**  72:3,15
  111:21
**sir**  120:10
**sit**  55:5 83:19
  103:5,14 104:3
**sitting**  14:14,18
  93:14

**situation**  43:23
  48:6,11,22 49:10
  51:10 52:16 56:15
  78:16 85:16 99:14
  99:18,19,20
  116:15
**situations**  25:14
  52:18 56:8,11
  84:13 106:5
**six**  82:20
**small**  58:11
**social**  39:15,16
  40:3,4,22 79:11,13
  104:3,21 105:1
**solitary**  112:6
**solutions**  120:1
  123:1
**somebody**  32:17
  109:9 115:15
**sorry**  5:2,20 6:17
  8:7 10:20 11:24
  13:3,6 17:8 26:15
  35:21 43:10 58:1
  75:16 78:1 95:18
  105:20
**sort**  29:11 35:10
**sorts**  56:8
**sound**  5:23 6:21
  7:5
**sounded**  31:10
**sounds**  26:21
**speak**  6:20 79:15
  79:16,20
**speaking**  22:8,12
  25:24
**speaks**  59:17
**special**  77:24 78:3
  78:7,9 112:7
**specific**  14:17
  22:11 35:23 40:11
  59:4,16 62:18

63:22 75:20 76:18
76:18 85:10 89:22
105:8,12 112:16
113:17 115:10
**specifically** 30:19
96:17
**specified** 118:18
**speculate** 44:20
**speculation** 33:22
43:9 48:12 52:7
92:21,24 93:6
**spell** 4:8
**spent** 27:22
**spoke** 66:9
**spoken** 84:10
**sporadic** 62:12
**spot** 31:11
**spreadsheet** 3:14
58:10
**staff** 68:20 69:18
81:21 90:14 99:11
**stamped** 58:13
**stand** 83:19
**standard** 103:22
**start** 13:7,9 53:3,7
59:9
**started** 11:7 15:3
16:4,9
**starting** 30:8
62:15
**state** 1:14,17 4:7
9:1,14,17,23 50:19
51:21 60:21 61:4
61:9 64:15,21
118:6 121:10
122:15
**statement** 121:13
121:14 122:19,19
**states** 1:1 67:8,21
90:4

**station** 46:10
**stationed** 86:9
116:21
**stay** 12:3 13:11
19:17 20:3 73:9
73:10
**stayed** 20:4
**stenographically**
118:13
**step** 41:12
**steps** 93:15,20
95:15
**stipulate** 59:20
60:16
**stipulated** 61:6
**stipulating** 60:12
60:19,22 61:2
**stop** 15:11 26:1
53:14 65:7 70:7
70:11
**stopped** 24:23
**street** 2:2,7 95:11
**strict** 67:23,24
**strike** 29:8 44:11
47:18 73:7 80:21
**study** 9:22 35:10
35:14 100:13
**studying** 9:7
**stuff** 15:8,8 30:3
38:11 79:12 94:11
116:6,8
**subscribed** 121:10
122:14 123:21
**subsection** 77:21
**subsequent** 115:1
**substantially**
19:21
**suffered** 113:9
**suite** 2:2,7 120:2
**superintendent**
13:21 14:1 15:1,3

15:5 86:12 100:10
103:6,9,11,14,24
104:7,10,21 105:1
105:7,20
**superintendent's**
102:24
**superior** 120:1
**supervise** 22:1
**supervisor** 26:8,11
26:22 50:18,22
51:13 56:7 79:15
79:17,20,22 80:7
83:24 84:3 104:22
105:1,7,11,14,20
105:24 106:1,3,6
106:24 108:22
109:2
**supervisors** 54:21
55:5 79:24 102:5
104:4
**supposed** 62:12
71:18 74:20,21
**supreme** 1:13
**sure** 5:16,20,20
14:8 15:6 16:4
17:17 22:2 24:3
25:7 28:15 29:4
35:23 36:3 37:19
39:19 47:13 51:4
66:3 77:13 80:9
84:18 86:3,11
94:22 98:24
102:13 112:18
**suspend** 77:2
**switch** 12:10
**switched** 107:2
**switching** 72:8
**sworn** 4:1,4
118:10 121:10,13
122:14,18 123:21

**symptom** 84:2

**t**

**t** 3:9 4:5 108:1
116:1,1
**take** 5:17,22 6:16
12:5,6,7,7 27:18
28:4 32:20 36:12
39:18 47:5 57:10
59:19,24 62:12,22
62:23,24 69:13
71:20 83:2 87:14
90:14 91:14,16
92:8,16,17 96:2
98:2 110:4 111:20
117:11,12
**taken** 1:12,15 4:11
4:13 92:19,20
118:17
**takes** 41:12 98:14
**talk** 20:20 41:1
55:6 79:11,23
103:5,5,8,15 104:4
104:4 105:12
106:1
**talked** 66:12 85:20
100:15 103:19
109:2
**talking** 28:3 35:23
40:2 45:2 62:5
72:5,6 77:12 89:8
90:16
**talks** 68:4 85:17
103:24
**taught** 115:11
**team** 67:10,18
75:13,18,20,24
76:13,14,17,22
77:5
**tech** 84:17
**tell** 22:14 29:16
30:18 41:11 49:1

52:11 54:11 76:14
76:18,24 79:8,14
88:17 92:5 95:13
104:13 105:20
106:5
**telling** 29:11 83:1
87:23 110:14
**tells** 97:21 110:8
**ten** 23:18 27:23
39:20 66:22 71:20
86:3
**term** 41:11
**terminate** 37:7
53:4,24
**terminated** 36:22
**testified** 4:4 44:24
49:20 51:4 72:9
101:13 102:4
116:20
**testify** 74:9 118:10
**testimony** 45:13
50:15,17 72:8
73:21 74:11,13
82:1 88:4 92:7
101:9 118:15
121:6,7 122:6,9,12
**textbook** 64:12
**thank** 81:1 107:18
117:8
**thanks** 24:7
**thing** 13:22 26:23
**things** 22:1 28:3
30:18 51:19 70:4
70:10 71:14
**think** 14:5,8 17:3
36:23 37:2 38:2
51:23 53:9,10,11
65:3 107:18 109:5
109:22 111:18
114:24

**thinking** 48:14
**thirty** 120:18
**thought** 13:10
**thousand** 48:13
**thousands** 43:3
**threatening** 108:9
113:1
**three** 8:4 60:3
65:12 80:2,4,8
82:2 95:15
**tier** 16:15,19,23
17:15,15,18 18:12
18:12,12,18 22:16
22:16,19,22 23:3,9
24:17,23 25:6
26:13,18 27:15
28:21,23 29:6,10
29:17,23 30:5,15
30:23 31:23 32:10
33:10 34:3,5,10,20
35:11 37:22 38:5
38:13 39:7,11
40:8,12 41:2,14,16
42:17 43:14,16,20
44:7,17 45:23
46:11,15 47:1,23
51:6,11 61:20,24
62:2,4,4 69:22
72:6 75:19 77:6
78:15 80:11,19
81:22 82:11 85:5
86:2 88:8 89:5,18
89:23 91:17 93:12
93:19 94:4 95:1,4
95:7 96:4 98:3,4,8
101:18,19,24
103:12 105:8,15
111:22 113:20
114:1
**tiers** 14:1,10,14,18
18:5,22

**time** 5:23 9:8
14:19 17:17 19:20
21:20 27:2,14
28:7,16 29:1,3
30:11 32:18,19,20
35:22,23 36:4,7,12
37:11 39:19 40:11
41:17 42:3,4,12
44:14 45:1 53:15
56:10 59:19,20
61:3 63:2,17,20
72:21,22 73:4,24
74:1,2 81:5,9,13
83:21 85:6 86:4
87:17 90:4,12
91:7 95:5 98:23
99:2 102:6,15
112:3 118:18
**timely** 114:22
**times** 23:8,17,18
24:4 32:14 47:17
65:6 72:23,23
73:2 75:3 80:2,2,4
80:8 82:2 105:12
105:14
**today** 4:17 5:15
15:9 20:21 76:24
108:12 114:5
**toiletries** 22:2
**told** 23:20 70:8,23
71:14,17 76:24
84:1 86:16 88:15
88:16 90:7 91:9
92:11 114:6
**top** 21:2
**topics** 55:19
**total** 33:22 35:1
**totally** 13:3 50:16
88:19
**tradunsky** 2:8

**trained** 110:3
**training** 31:11,13
31:14,15,19 55:16
55:19,21,22,22,23
55:24 56:2,3,5,6,7
56:18,20,23 57:2,5
57:8,10,14,18 59:4
59:12,24 61:19,24
62:11,18 102:10
102:13 109:6,16
115:2,8,15
**trainings** 60:4,7,9
61:17 62:16
**tran** 117:13
**transcribed** 121:7
**transcript** 53:11
58:14 118:12
120:11,12 121:5
121:12 122:5,11
122:17
**transition** 12:16
**transport** 16:1
**treatment** 14:21
**tried** 90:8
**trouble** 109:15
**troy** 2:9 17:11
120:5
**truant** 11:5
**true** 118:15
**truth** 118:10
**truthfully** 21:17
**try** 30:11 31:2
70:14 104:6 114:9
**trying** 20:2 28:6
38:2 44:23 74:14
**turned** 105:4
**tv** 116:6
**twice** 43:14 81:3
**two** 5:22 9:4 18:6
24:12 38:2 93:14
93:20 94:22,24

**[two - witness]** Page 20

95:15 115:23
**type** 22:10 24:23
48:6,10 79:18
**types** 22:6 25:14
56:11 68:9 76:21
76:23 79:10 106:5
**typewriting**
118:14

**u**

**u** 116:1
**uh** 5:17
**uncommon** 112:1
**underscore** 58:14
58:15
**understand** 6:2
10:14 16:17 19:14
20:2 22:9,15
23:18 24:11 26:15
34:18 35:15 42:9
43:10,13 44:23
46:3 48:15,16,17
49:17,18 50:6
51:20 54:3,24
59:13 60:13,23
65:24 67:24 69:1
74:12,15 75:16
87:18,19 88:23
93:24 107:13
**understanding**
20:1 50:7 51:3,8
62:21 75:22 78:1
79:5 91:18 99:5
111:8
**understood** 6:4
54:12 64:2
**unfair** 51:18 82:14
88:19
**unit** 24:24 26:24
30:24 31:24 35:24
36:2 38:12 40:7
41:5 43:7 48:7

52:13 77:3 101:21
106:7 116:24
**united** 1:1
**units** 16:12
**unspecified** 1:20
**upper** 2:12
**usage** 6:23
**use** 25:8 32:23
33:16 38:7,9,12
41:11 46:18 62:2
**usually** 23:13
31:21 40:10 99:2
116:5

**v**

**v** 120:6 121:3
122:3
**vacation** 36:12
**vague** 24:10 34:11
35:14 95:13
**valley** 57:11,12
**varied** 18:17
**varies** 28:16
**vary** 18:14 23:11
43:2
**verbal** 5:16
**veritext** 120:1,7
123:1
**veritext.com.**
120:17
**versus** 77:23 78:9
**video** 1:10
**vii** 77:21
**visible** 86:22
**visual** 50:1 111:9
**vital** 90:14
**voices** 5:23
**vomiting** 81:7
109:14
**vs** 1:5

**w**

**wacker** 2:12
**wait** 27:1,3 90:9
109:20
**waiting** 98:6 100:5
**waived** 120:19
**walk** 32:1,1,3
38:21 47:5 86:3
93:13,17 96:3
110:2 111:22
**walked** 47:4
**walking** 95:19
111:5
**wall** 113:14,21
**want** 7:13 9:18
12:18 17:5 21:20
27:18 29:19 35:4
60:20 64:6,19
65:16 71:8 72:1
73:17 75:6 79:15
79:16 88:20
107:10 108:3
111:18
**wanted** 12:22
13:14 19:19 78:16
79:20 91:1
**wanting** 85:21
**wants** 113:7
**warranted** 75:14
**washington** 9:1,2
9:5,12
**waste** 61:3
**wasting** 28:6
53:14
**watch** 45:22 46:2
68:23 69:5,7,15,19
93:17
**watches** 93:11
**watching** 116:6
**waukegan** 8:16,21

**way** 18:13 23:14
24:4 26:3 43:19
44:11,12 72:16
80:21 81:20 95:21
**ways** 79:10
**we've** 64:7 69:2
108:12
**weak** 81:11
**week** 18:14,14
35:18 36:2 57:6
**weird** 76:1,5,7,8
**went** 15:20 29:12
33:9 40:2 74:3
89:1
**white** 82:20
**william** 1:3 3:12
4:16 21:3 82:7
85:3 86:20 89:17
120:6 121:3 122:3
**willing** 60:16
**window** 117:3,4
**witness** 1:11,20
3:2 4:1,3 7:19
17:4,8 19:5,15
22:16 23:6,13
24:3,12 26:8
27:17,23 28:15
30:9 31:8 34:19
35:7,16 36:22
37:15,19 41:8
42:10 43:4,10
44:21 45:15 46:4
46:22 48:17 49:5
49:18 50:7 51:19
52:9 53:17,24
54:5,15 55:1 58:1
63:14 64:5 65:24
68:15 69:2 70:11
70:14,15,17 71:3
71:18 72:1 74:11
75:8 76:7 78:24

82:4,17 85:24
86:17 87:12,19
88:19,24 89:10
91:24 93:1,5 94:1
95:15,23 96:24
100:21 101:10
106:17,24 107:15
117:14 118:9,9
120:8,11 121:1,4
121:11 122:1,4,15
**witness'** 120:14
**words** 108:20
113:19
**work** 4:19 11:6,17
12:10 13:18 14:3
15:2 16:12 17:15
17:18,20,22 18:15
19:5 28:18 32:23
33:18 35:18 36:2
56:24 57:14,21
63:1,7 72:13 86:4
86:10,13 107:5
113:8,11 115:3
117:5
**worked** 10:24
11:19 13:20,20,24
14:1,23,24 18:21
18:22 19:10 33:15
34:3,5 35:24
45:23 47:11 50:10
82:10 86:12
102:15 114:5
**worker** 39:15,16
40:3,4,22 79:11,13
104:3,21 105:1
**working** 11:3,7,15
11:22 13:7,9 14:9
15:3,5,11,18 18:11
19:1,2,8,9,17,22
35:11 36:4,8,13
38:14 44:14 47:7

49:12 51:11 52:2
55:16,20 63:3,5
84:11 85:5 88:7
100:9 101:5,16
102:6,22 104:10
113:15 117:5
**works** 33:21 47:14
60:16 107:4
**write** 22:22 23:2,3
23:8,13 24:8,13
28:21 29:1 38:10
56:8,11,13,15
82:23
**writing** 56:3
**written** 85:3 92:20
**wrong** 79:8
**wrote** 29:3,5 86:24
91:9 92:22

**x**

**x** 3:1,9,9 4:5 108:1
116:1

**y**

**yeah** 8:23 93:20
**year** 8:19 12:3,10
62:12
**years** 6:8 8:4 9:4,5
9:11,17,22 10:8
11:21 12:12 18:23
49:11 52:2 83:2
**yelling** 37:1
**yesterday** 110:23

**z**

**zoom** 1:10 6:24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Exhibit F

```
                    VERITEXT LEGAL SOLUTIONS
            COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

     Veritext Legal Solutions represents that the
     foregoing transcript is a true, correct and complete
     transcript of the colloquies, questions and answers
     as submitted by the court reporter. Veritext Legal
     Solutions further represents that the attached
     exhibits, if any, are true, correct and complete
     documents as submitted by the court reporter and/or
     attorneys in relation to this deposition and that
     the documents were processed in accordance with
     our litigation support and production standards.

     Veritext Legal Solutions is committed to maintaining
     the confidentiality of client and witness information,
     in accordance with the regulations promulgated under
     the Health Insurance Portability and Accountability
     Act (HIPAA), as amended with respect to protected
     health information and the Gramm-Leach-Bliley Act, as
     amended, with respect to Personally Identifiable
     Information (PII). Physical transcripts and exhibits
     are managed under strict facility and personnel access
     controls. Electronic files of documents are stored
     in encrypted form and are transmitted in an encrypted
     fashion to authenticated parties who are permitted to
     access the material. Our data is hosted in a Tier 4
     SSAE 16 certified facility.

     Veritext Legal Solutions complies with all federal and
     State regulations with respect to the provision of
     court reporting services, and maintains its neutrality
     and independence regardless of relationship or the
     financial outcome of any litigation. Veritext requires
     adherence to the foregoing professional and ethical
     standards from all of its subcontractors in their
     independent contractor agreements.

     Inquiries about Veritext Legal Solutions'
     confidentiality and security policies and practices
     should be directed to Veritext's Client Services
     Associates indicated on the cover of this document or
     at www.veritext.com.
```

Exhibit F