# IN THE MATTER OF:

## DUKES
-v-
## CHICAGO

WILLIAM DUKES

21 CV 3672

January 17, 2023

Cynthia A. Pavesich & Associates
(312) 214-1992
cagoodreporter@pavesich.com

DUKES v. CHICAGO

WILLIAM DUKES

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILLIAM DUKES,          )
            Plaintiff,   )
                         )
        vs               )  NO. 21-cv-3672
                         )
CHICAGO POLICE SERGEANT  )
JAMES WASHBURN, #20372;  )
CHICAGO POLICE DETECTIVE )
ROLANDO RODRIGUEZ,       )
#20751; CICERO POLICE    )
DETECTIVE DARLENE        )
SOBCZAK, #123; CICERO    )
POLICE DETECTIVE ROBERT  )
DONEGAN, #488; CICERO    )
POLICE DETECTIVE ALLAN   )
PINEDA, #496; COOK       )
COUNTY STATE'S ATTORNEY  )
INVESTIGATOR BRIAN       )
KILLACKY, #361; COOK     )
COUNTY STATE'S ATTORNEY  )
KIM FOXX; CITY OF        )
CHICAGO; and TOWN OF     )
CICERO,                  )
            Defendants.  )

The deposition of WILLIAM DUKES, called by the Defendants for examination, pursuant to notice, and pursuant to the rules of Civil Procedure for the District Courts of the United States, taken before Cynthia A. Pavesich Good, Certified Shorthand Reporter within and for the State of Illinois, at 2602 South California Avenue, Post 5, Chicago, Illinois, on Tuesday, January 17th, 2023, at 9:00 a.m.

## Page 2

1   A P P E A R A N C E S
2   PRESENT:
3
        MR. STEPHEN L. RICHARDS,
4
        Attorney At Law,
5       53 West Jackson Boulevard,
        Suite 756,
6       Chicago, Illinois 60604,
        (773) 817-6927,
7       sricha5461@aol.com,
8       appeared on behalf of William Dukes;
9
10  MR. BRIAN P. GAINER, of the firm of
11      Johnson & Bell,
        33 West Monroe Street,
12      Suite 2700,
        Chicago, Illinois 60603-5404,
13      (312) 372-0770,
        gainerb@jbltd.com,
14
        appeared on behalf of Chicago Police
15      Sergeant James Washburn, #20372; Chicago
        Police Detective Rolando Rodriguez,
16      #20751; City of Chicago;
17
18  MR. ANDREW Y. ACKER, of the firm of
19      Law Offices of Storino, Ramello &
        Durkin,
20      9501 West Devon Avenue,
        Rosemont, Illinois 60018
21      (847) 318-9500,
        aacker@srd-law.com,
22
        appeared on behalf of Cicero Police
23      Detective Darlene Sobczak, #123; Cicero
        Police Detective Robert Donegan, #488;
24      Cicero Police Detective Allan Pineda,

## Page 3

1   A P P E A R A N C E S
2   Cont...
3
4   MS. AMY M. KUNZER, of the firm of
5       Tribler, Orpett & Meyer, P.C.,
        225 West Washington Street,
6       Suite 2550,
        Chicago, Illinois 60606-2418,
7       (312) 201-6448,
        amkunzer@tribler.com,
8
        appeared on behalf of Cook County
9       State's Attorney Investigator Brian
        Killacky, #361;
10
11  MR. SEAN M. SULLIVAN, of the firm of
12      Del Galdo Law Group, LLC,
13      1441 South Harlem Avenue,
        Berwyn, Illinois 60402,
14      (708) 222-7000,
        sullivan@dlglawgroup.com,
15
        appeared on behalf of Town of Cicero.
16
17
18
19
20           *    *    *    *    *
21
22
23
24

## Page 4

1               I N D E X
2             WILLIAM DUKES
3   EXAMINATION                    PAGE:LINE
4   Direct Examination.....................05:09
        By Mr. Acker
5   Direct Examination.....................249:08
        By Ms. Kunzer
6   Direct Examination.....................284:01
        By Mr. Gainer
7   Direct Examination.....................363:15
        By Mr. Sullivan
8   Cross-Examination......................421:07
        By Mr. Richards
9   Redirect Examination...................435:01
        By Mr. Sullivan
10  Redirect Examination...................442:10
        By Mr. Gainer
11  Redirect Examination...................443:07
        By Mr. Acker
12  Recross-Examination....................445:01
        By Mr. Richards
13  Further Redirect Examination...........445:12
        By Mr. Sullivan
14
15  EXHIBITS                       PAGE:LINE
16  Dukes Deposition Exhibit No. 1, id......85:18
        (First Amended Complaint)
17  Dukes Deposition Exhibit No. 2, id......176:01
        (Dukes' Responses to Sobczak)
18  Dukes Deposition Exhibit No. 3, id......180:18
        (Cicero PD Supplement Report)
19  Dukes Deposition Exhibit No. 4, id......209:19
        (Miranda Warning)
20  Dukes Deposition Exhibit No. 5, id......234:06
        (Dukes' Responses to Donegan)
21  Dukes Deposition Exhibit No. 6, id......238:20
        (Cicero PD Supplement Report)
22  Dukes Deposition Exhibit No. 7, id......244:01
        (Plaintiff's Responses to Pineda)
23  Dukes Deposition Exhibit No. 8, id......363:11
        (Dukes' Criminal History Report)
24

1 (Pages 1 to 4)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                           WILLIAM DUKES

| Page 5 | Page 6 |
|---|---|

Page 5

1   WHEREUPON:
2           (Witness sworn.)
3           *   *   *
4           WILLIAM DUKES,
5
6   called as a witness herein, having been first
7   duly sworn, was examined and testified as
8   follows:
9           DIRECT EXAMINATION
10          BY MR. ACKER:
11      Q.  Sir, my name is Andrew Acker, A-c-k-e-r.
12  I'm the attorney for Darlene Sobczak, Robert
13  Donegan, and Allan Pineda.  I'm going to be
14  asking a series of questions today.
15          As counsel indicated, you're required
16  to answer them truthfully.  If you don't
17  understand a question, please let us know and
18  we'll rephrase it.
19          Otherwise, if you answer it, we're
20  going to assume that you knew the answer and that
21  you understood the question and your answer is
22  accurate, and it's what you really mean, not
23  something else.
24          Do you understand?

Page 6

1       A.  Okay.
2       Q.  Because the court reporter can only take
3   down one of ourselves talking at one time, allow
4   me to ask the question then you can answer, and
5   I'll not talk during your time; agreed?
6       A.  Agreed.
7       Q.  Okay, do you presently suffer any medical
8   conditions?
9       A.  Diabetic, right nerve damage in my feet,
10  diabetes, heart disease, asthma.
11      Q.  Okay, so are you under any medications --
12  taking any medications for those conditions?
13      A.  Yes.
14      Q.  And what are you taking?
15      A.  Metoprolol is heart medicine, blood
16  pressure, Plavix, also for the heart disease,
17  Metformin for diabetes.  Gabapentin is for the
18  nerve pain and Albuterol.
19      Q.  Do you presently suffer from any
20  psychological disorders?
21      A.  Depression.  I take Prozac, a small dose.
22      Q.  Okay, do you have any medical conditions
23  that would prevent you from understanding the
24  questions I'm asking or providing the answers to

Page 7

1   those questions?
2       A.  No.
3       Q.  What is your date of birth, sir?
4       A.  December 16, 1967.
5       Q.  So your present age is?
6       A.  55.
7       Q.  Okay, so where were you born?
8       A.  Chicago.
9       Q.  What is your parents' names?
10      A.  Birth parents were William Ray Dukes and
11  Carolyn Luella (phonetic).
12      Q.  Are they still living?
13      A.  My mother is.  My father died in '72.
14      Q.  Where does your mother live?
15      A.  I think in Tennessee now.  I'm not sure,
16  either Tennessee or California.  I was raised by my
17  dad's parents.
18      Q.  Do you have any siblings?
19      A.  Two brothers, Ronald Dukes and Bobby Dukes.
20      Q.  And where do they reside?
21      A.  Bobby is in Florida.  Ronnie is in
22  Tennessee and I got half brothers.  One's in
23  California.  One's in Tennessee.
24      Q.  Okay, so who's your closest living

Page 8

1   relative, the one in Tennessee?
2       A.  My brother Ronnie, yes.
3       Q.  Okay, what is your highest level of
4   education?
5       A.  Vocational certifications, college level
6   vocational certifications, and Associate's
7   degree.
8       Q.  And where are those certificates obtained
9   from?
10      A.  Rend Lake College, Lakeland College and one
11  other I can't remember the name of.
12      Q.  Okay, the approximate dates of those
13  certifications?
14      A.  Between '99 and '03.
15      Q.  So is it a true statement that you
16  graduated high school or no?
17      A.  I have a GED from Daytona Beach Community
18  College, Daytona, Florida.
19      Q.  So approximately what year did you get your
20  GED?
21      A.  July 25th, 1985.
22      Q.  Okay, so in 1985 you were approximately
23  what age?
24      A.  '85 I would have been 16 or 17.

2 (Pages 5 to 8)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

| Page 9 | Page 10 |
|---|---|

**Page 9**

1   Q.  Okay, and what did you do for employment
2   after high school?
3   A.  Construction.
4   Q.  And where was that, sir?
5   A.  Job sites, building sites, apartment
6   building.
7   Q.  State?
8   A.  Oh, where?  Florida.  I moved to Chicago
9   and I worked in a factory.
10  Q.  When did you move to Chicago?
11  A.  August of '85.
12  Q.  August of '85?
13  A.  I've been working since I was 13.
14  Q.  Okay, so you've been in Illinois since
15  1985?
16  A.  Yes.
17  Q.  Okay.
18  A.  I was born here until I was, like, 12 years
19  old.
20  Q.  Okay, so I'm going to move forward in time
21  to the year of 1993.
22  A.  Okay.
23  Q.  Okay, how old were you in 1993?
24  A.  '93, '67, 26, 25, 25.

**Page 10**

1   Q.  Okay, and where did you live in January --
2   let's start with January '93?
3   A.  Briefly in Tennessee then I came back to
4   Chicago.
5   Q.  Okay, when you came back to Chicago,
6   approximately what month was that?
7   A.  March, maybe April.
8   Q.  March or April of 1993?
9   A.  Yes.
10  Q.  And where did you live?
11  A.  North side of Chicago near Diversey and
12  California, 2700 block of Richmond.  I can't
13  remember the exact -- 2758?  Yeah, 2758 North
14  Richmond.
15  Q.  And who did you -- Can you identify any of
16  the people that you lived at that address on
17  Richmond, North Richmond?
18  A.  The Jaramillos.  It's spelled Jaramillo,
19  J-a-r-a-m-i-l-l-o.
20  Q.  Yeah, first name?
21  A.  There was ten of us, Aaron, Lupe,
22  Guadalupe, Efrain, me, Efrain's brother Fernando,
23  Alicia, Irma, Carla, and Norvix.  Carla and
24  Norvix were kids.  They were teenagers, 14, 15,

**Page 11**

1   16 years old, those two.  The other ones were all
2   adults.
3   Q.  When did you -- When do you believe you
4   started establishing residence in the North
5   Richmond?
6   A.  April or May -- Or no, not April or May.
7   March or April when I came back to Chicago.
8   Q.  Okay, so when you -- Between the time --
9   Let's see here.
10          By the time you got to Chicago, had you
11  ever been charged or convicted of any crimes?
12  A.  Yes.
13  Q.  Can you tell us -- This is prior to 1993.
14  A.  Commercial burglary, I went into a
15  warehouse to get out of the rain and possession
16  of a forged instrument.  I forged some checks.
17  Q.  Okay, anything else?
18  A.  That was all prior to that.
19  Q.  This is up to 1993?
20  A.  Yes.
21  Q.  So where were those prosecutions occurring?
22  A.  The forgery was Chicago and the burglary
23  was also Chicago.
24  Q.  Nothing in Florida?

**Page 12**

1   A.  No, nothing in Florida.  What else was it?
2   The burglary and forgery were Chicago, and the
3   forgeries were also I had -- It was the time my
4   grandmother died that raised me, basically the
5   mother -- the only mother I knew.  She died.
6          In a two-week period I cashed checks
7   here in Illinois and in Kentucky, and I did some
8   time in Kentucky for writing a couple checks
9   there too, but it was all part of one continuous
10  thing, the sentence and the forgeries.
11  Q.  Okay, how much time did you do for the
12  forgeries?
13  A.  Total, 14 to 16 months.
14  Q.  Okay, what about the other one, the -- the
15  burglary?
16  A.  Probation.
17  Q.  Okay, so by the time you got to Illinois,
18  who were you socializing with in 1993?
19  A.  '93?
20  Q.  Yeah.
21  A.  Friends.
22  Q.  Okay.
23  A.  And in-laws of my dad's sister.
24  Q.  Okay, did you drink alcohol at that time?

3 (Pages 9 to 12)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO

WILLIAM DUKES

---

Page 13

1    A. Yeah.
2    Q. How much alcohol were you drinking in a
3    given week?
4    A. In a given week?
5    Q. Yeah.
6    A. Throughout the week, maybe two six-packs.
7    Q. Okay, did you do drugs during this time in
8    1993?
9    A. Occasionally.
10   Q. What drugs were you doing in 1993?
11   A. Marijuana and probably cocaine.
12   Q. Okay, did you have a girlfriend in 1993?
13   A. Nothing official. I had friends, a couple
14   girls that were friends with benefits I believe
15   is the correct term. They weren't really
16   girlfriends.
17   Q. Tell me about when the first time you met
18   Marilyn Williams?
19   A. I was working as a delivery
20   driver/maintenance -- vehicle and building
21   maintenance for National Salad Oil, 3950 South
22   Cicero.
23      Now I don't know if the name of the guy
24   was Sharma Satinder (phonetic) or Satinder

---

Page 14

1    Sharma. He was from India, and he took me to a
2    flea market on Cicero Avenue. I can't remember
3    the name. It's across from a drive-thru movie
4    theater.
5       He took me there to get tools. He
6    takes one of his vehicles and to look at another
7    vehicle that somebody was selling there he was
8    thinking about buying for a delivery vehicle.
9       And the vehicle he was talking about
10   buying was a Chevy Blazer that was owned by
11   Marilyn Williams, and that's when I met her, at
12   the flea market.
13   Q. So if you were -- 1993, what was your
14   primary vocation as far as what you did for work,
15   fix cars?
16   A. Delivery driver and maintenance for Sharma.
17   Q. Okay, so the National Salad job that you
18   were talking about --
19   A. Right.
20   Q. -- was part of your job to provide vehicle
21   repairs?
22   A. Yeah.
23   Q. So when you went to meet Marilyn Williams,
24   where was she in the flea market?

---

Page 15

1    A. It was a large indoor facility. It was
2    chaotic. It was a weekend. I went in there with
3    him, and it was just chaotic, somewhere in the
4    center area.
5    Q. Okay, I mean, did she have a booth? Was
6    she selling --
7    A. Yeah, she had a booth there. She was
8    selling leather coats.
9    Q. Okay, now, again, you cut me off there.
10   A. I'm sorry.
11   Q. That's okay.
12      So the first time you met Marilyn
13   Williams, what approximate date do you believe
14   that happened? Let's start with the month in
15   1993.
16   A. Late April.
17   Q. Okay, April '93?
18   A. Yes.
19   Q. And the discussion you had with Marilyn
20   Williams was regarding the condition of the -- of
21   some type of vehicle that she was selling?
22   A. No. Actually Sharma introduced me to her,
23   and I said hi. I think Lucy was there too in the
24   booth with Marilyn that day.

---

Page 16

1       And he said yeah, I'm gonna have him
2    look at the vehicle, and that was it. I didn't
3    talk to her about it or anything.
4    Q. So the discussion with Marilyn was five
5    minutes?
6    A. Between me and her?
7    Q. Yeah.
8    A. Probably just hi, nice to meet you and
9    that's about it.
10   Q. Okay, when was the next time you met
11   Marilyn or have any interactions with Marilyn?
12   A. Maybe a week later.
13   Q. Where was that?
14   A. I was at work, and Sharma came to me and
15   said Lucy was coming for me to look at her car.
16   Something was wrong with it.
17      So he's paying me. So I went out there
18   and looked at it. It was just a minor part. Me
19   and Lucy went to the auto parts store and got it.
20   We came back and I put it on and she left.
21      The next day Lucy called me and said
22   her mom knew a mechanic that was looking for
23   somebody and I could maybe make more money
24   working for him than I could with Sharma.

---

4 (Pages 13 to 16)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

|                      Page 17                      |                      Page 18                      |
| --- | --- |

**Page 17**

1        So I got on the bus after work and went
2    and got off near Marilyn's house, and that's
3    where they met me, and Lucy took me to a couple
4    garages, and I got hired at one of them.
5        And then we went back to her house
6    where she was staying with Marilyn, and Marilyn
7    suggested I move in with them because it's only a
8    block-and-a-half, two blocks away from where I
9    was gonna be working.
10        Why would I go back to the city every
11    night?  They said they were only gonna charge me
12    50 bucks a week so, okay.
13    Q.  So by the time Marilyn suggests that you
14    move in with her, move in with them in the
15    apartment, how many times had you met them?
16    A.  The flea market with them, brief meeting
17    introduction to Lucy and Marilyn, and then a week
18    later Lucy, and then the next day Lucy and
19    Marilyn so a week or less, less than two weeks.
20    Q.  Okay.
21    A.  Three times.
22    Q.  Describe for me Marilyn and her physical
23    presentation.
24    A.  I don't understand.

**Page 18**

1    Q.  Yeah.  How tall is she?
2        How much did she weigh?
3    A.  Oh, she's kind of short.  So I'd say 5'4 or
4    something, 120, 130 pounds maybe, if that.
5    Q.  Was she attractive?
6    A.  She was an older lady at the time to me.
7    Now I'm 55.  45 doesn't seem that old.
8    Q.  Okay, so Marilyn was approximately 45 years
9    of age at the time you first met her?
10    A.  I thought she was in her 50's.
11    Q.  Okay.
12    A.  I found her actual age out later.
13    Q.  And you were approximately 28 at this time?
14    A.  I was 25.
15    Q.  25, okay.
16        So describe for me Lucy's physical
17    appearance?
18    A.  5'6, a little taller than her mom, maybe
19    57, 110 pounds.
20    Q.  Okay, was she attractive?
21    A.  Yes, she was.
22    Q.  So was Marilyn dating anyone, seeing anyone
23    at that time?
24    A.  Not that I know of.

**Page 19**

1    Q.  How about Lucy, was she seeing anyone at
2    that time?
3    A.  She was staying at Marilyn's house with her
4    kids, getting away from her boyfriend, her old
5    boyfriend or current boyfriend.  I don't know
6    what it was at the time.
7    Q.  What's his name?
8    A.  Keith -- No, Kevin.
9    Q.  And what do you know about Kevin?
10    A.  Just some bits and pieces that Lucy had
11    furnished about him being a construction worker
12    of some type and that was about it.
13    Q.  Do you know who the parents of -- Who the
14    father of the children were?
15    A.  No.
16    Q.  How old were the children?
17    A.  Bridget was seven, eight years old; and
18    Dustin was maybe two.
19    Q.  Okay, and how long into you -- Let me
20    back up.  Strike that.
21        Did you meet the children before you
22    moved in?
23    A.  They were there when I came back from the
24    different job -- the mechanics jobs that Lucy had

**Page 20**

1    took me to.  Marilyn had been watching them I
2    guess.  When I came in and sat down at the table
3    with Marilyn and Lucy, the kids were there.  So I
4    met them then.
5    Q.  Describe the house that Marilyn lived in.
6    A.  Corner building, two flat, front living
7    room with a bedroom off to one side, dining room
8    with the front entryway and another bedroom and
9    then short hallway, bathroom and kitchen on one
10    side and the third bedroom and pantry on the
11    other and then the enclosed back porch.
12    Q.  So you're describing for me the layout of
13    which floor?
14    A.  The second.
15    Q.  Was there an apartment on the first floor?
16    A.  I think there were two.
17    Q.  And do you know the individuals who resided
18    in those apartments?
19    A.  The front one I think was -- There were two
20    apartments.  The front one was empty, and the
21    rear one which would have been near the back
22    porch under the back -- or not under the back
23    porch but near the back porch, Marko Tomazovich
24    and his girlfriend Debbie or Denise -- Diane.

5 (Pages 17 to 20)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

---

Page 21

1    Q. Did you know him -- Marko from before?
2    A. No.
3    Q. Never met him before?
4    A. No. I couldn't stand the guy actually.
5    You could hear him yelling and screaming at his
6    girlfriend on the weekends, and you'd see her
7    bruised up the next day after a couple of the
8    shouting fests that they had with each other. He
9    was always drinking. I tried to avoid him as
10   much as possible.
11   Q. So as I understand your testimony, you were
12   invited by Marilyn to live on the second floor;
13   is that correct?
14   A. Yes.
15   Q. And did you have a discussion with Marilyn
16   about what the rental payment obligations would
17   be for you to reside there?
18   A. Yeah. She said just stay here, 50 bucks a
19   week, and that was it. I was, like, okay. She
20   brought up the money and staying there.
21   Q. She expected you to pay her 50 bucks a
22   week?
23   A. Yeah.
24   Q. Okay, and describe for me where in the

---

Page 22

1    layout that you just described earlier on the
2    second floor, which bedroom did you occupy?
3    A. It would have been the rear bedroom off the
4    kitchen or it was, not would have been. It was
5    the rear bedroom off the kitchen.
6    Q. Okay, and so did you bring your stuff in
7    there?
8    A. Yeah, I brought my clothes.
9    Q. Any other personal possessions you brought
10   in?
11   A. That's about all I had at the time.
12   Q. Okay, so where was this place that you were
13   working at down the street as a mechanic?
14       What was the name of it?
15   A. It was a Hispanic gentleman that was off of
16   Ogden. I don't remember the name. It was an
17   indoor garage, like an old storage building with
18   a car lot attached to it.
19   Q. Right.
20       How long did that last?
21   A. Two-and-a-half, three months.
22   Q. Okay, so, again, we're now moved in to
23   Marilyn's, I'm assuming from our discussion, some
24   time in the end of April of 1993?

---

Page 23

1    A. Late April, early May, yes.
2    Q. Okay, so by that time, late April, early
3    May of 1993, you're working down the street at
4    the Hispanic garage; is that correct?
5    A. Correct.
6    Q. Okay, how many hours a week did you work
7    there?
8    A. Eight to ten hours a day.
9    Q. Yeah.
10   A. Six days a week.
11   Q. Did you have a vehicle at that time?
12   A. 1967 Chevy pickup.
13   Q. Okay, what type of plates did you have on
14   it?
15   A. Tennessee.
16   Q. Okay, and where did you park that?
17   A. At Marilyn's house either on the driveway
18   or where Tomazovich usually parked his Camaro.
19   Q. Okay, is there an alley behind the
20   property?
21   A. There is but Marilyn -- There was no
22   parking there. Her garage was one foot off the
23   alley, and there was a fence. Her garage opened
24   on to the street. It was a corner building.

---

Page 24

1    Q. Okay, so did Marilyn have a vehicle at that
2    time?
3    A. Yes.
4    Q. What kind of car did she have?
5    A. Her and Lucy both had the same kind of
6    vehicle. They were both Oldsmobiles.
7        I put the engine in Marilyn's at the
8    garage because that's where her car was. It was
9    an Oldsmobile Cutlass Supreme or something. It
10   was a four-door car.
11   Q. Okay, and did Lucy have the same make and
12   model?
13   A. Similar. I think the years were off by a
14   couple.
15   Q. Okay, so did you do work on both of those
16   vehicles?
17   A. Yes.
18   Q. And describe for me the type of work that
19   you did on those vehicles.
20   A. Marilyn's car was in the mechanic's shop
21   where I started working. I finished installing
22   the engine that he just couldn't get around to.
23   He didn't have enough help. I was the only help
24   he had after he hired me, the exhaust and that's

---

                                    6 (Pages 21 to 24)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                         WILLIAM DUKES

Page 25

1  about it.
2          Then she got the car back, and there
3  was problems with it because the engine she had
4  supplied the guy had sat in her garage for years
5  I guess, and it was just problems.
6          Lucy's car was a lot of minor stuff,
7  change the thermostat, change an oil sensor. The
8  oil sensor is what I changed when she first came
9  to the job at National Salad Oil for me to fix
10 the car.
11     Q. Okay, so what was the arrangements or
12 payment of those services?
13         Did Lucy and Marilyn pay your garage or
14 pay you?
15     A. The car -- Marilyn had to pay because
16 that's who I was working for. That's where her
17 car was.
18         But doing the other stuff I did at the
19 house in the driveway off of Marilyn's garage.
20 And oh, don't worry about it. I'd tell her not
21 to worry about it, her or Lucy not to worry about
22 it.
23         Then when I'd go to pay -- give her 50
24 bucks for the rent, she'd say don't worry about

Page 26

1  it. You fixed my car. So it was just give and
2  take exchange.
3      Q. Okay, so you would attempt on a monthly --
4  on a weekly basis to give her the $50 rent, but
5  she on occasion would tell you not to because you
6  had done work?
7      A. Right, or I went and helped her do some
8  other things that she wouldn't have been doing.
9      Q. Describe that for me.
10     A. Go to Indiana, stay there, by fire --
11 Marilyn would buy fireworks, and then she'd sell
12 them back here in the city prior to the 4th of
13 July.
14     Q. Okay, you were helping her do that?
15     A. I drove over there with her and Lucy and
16 the kids. I guess she figured we'd make it look
17 like a family thing and she wouldn't get stopped.
18     Q. Okay, how many fireworks are we talking
19 about?
20     A. She bought 500, $1,000 worth of fireworks.
21     Q. Okay, did you ever work at the flea market?
22     A. No. I went in there to get tools or
23 stopped in to say hi, and that was about it.
24     Q. Okay, so as far as the downstairs, the one

Page 27

1  apartment was left empty for the time that you
2  were there?
3      A. Yeah.
4      Q. Is there a reason --
5      A. The front one.
6      Q. Yeah, the front one, right?
7      A. Yeah, it would have been the front
8  apartment, right.
9      Q. So is there any reason why she didn't give
10 you that apartment when it was open?
11     A. She wanted 5 or $600 a month for rent. I
12 couldn't afford that.
13     Q. Okay, so she was still trying to get
14 somebody to come in and rent that front apartment
15 on the first floor?
16     A. Yeah. She used to take ads out in the
17 local paper out there. I forget what it -- Penny
18 Pincher? No, Penny Saver. She would take ads
19 out in different local papers out there.
20     Q. So as far as living in Marilyn's house,
21 again, I'm now in May of 1993.
22     A. Okay.
23     Q. So was there any obligation -- You know,
24 how did you get your food that month, May of

Page 28

1  1993?
2      A. I'd usually eat at work cuz there's a
3  restaurant on Ogden Avenue half a block, and the
4  boss would send me to go get something to eat for
5  him. I'd order sandwiches for me.
6          Then we'd be there until -- In the
7  evening I'd get food there. If I'd go back to
8  the house, Marilyn would have food. Here, you
9  want something? Yeah, okay. To be polite I'd
10 eat something, not all the time but occasionally.
11         75 percent of the time, three out of
12 four times, I would eat what she offered just to
13 be polite so she wouldn't think I was being rude
14 or think she was dirty or something like that.
15     Q. So you didn't buy food and put it in the
16 kitchen or in the refrigerator, right?
17     A. I mean, orange juice and sandwich meat and
18 stuff like that, yeah.
19     Q. Okay, did you use the kitchen and cook in
20 there?
21     A. I could have. Yeah, I could have. I had.
22     Q. Okay, did you -- Which bathroom did you use
23 in the house?
24     A. The one upstairs.

7 (Pages 25 to 28)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO
WILLIAM DUKES

Page 29

1    Q. Okay, there's only one, right?
2    A. Yeah.
3    Q. And it's right across from the middle
4  bedroom?
5    A. It's more in the middle between the two
6  bedrooms, the third and the second, the middle
7  and the one I was staying in. There's like a
8  short hallway between them, between the living
9  room and the kitchen, and the bathroom was off of
10 that.
11   Q. So I'm talking about May of 1993.
12      Where in the house did Marilyn live?
13 Which room was hers?
14   A. Marilyn stayed in the middle bedroom off
15 the dining room.
16   Q. Okay, where did Lucy and her children stay?
17   A. In the front bedroom.
18   Q. Okay, then there's the dining room/living
19 room in the front, right?
20   A. Yeah. That was basically an unused room,
21 and Marilyn used what should have been the dining
22 room, the center room, off of her bedroom as the
23 -- where the sofa and the stuff was at.
24   Q. Okay, was there a TV in there?

Page 30

1    A. Yeah, an old floor model wood box TV.
2    Q. And where would the kids play?
3    A. Right there in the middle room, right off
4  of Marilyn's bedroom.
5    Q. Okay.
6    A. Or anywhere they wanted to.
7    Q. Did Marilyn drink alcohol in May of 1993?
8    A. I'm not sure if she did or not. I never --
9  I don't remember seeing her drinking it
10 specifically. I've seen her drinking out of a
11 glass. I don't know what was in it.
12   Q. Okay, but you don't know if she was
13 drinking alcohol or whatever?
14   A. No.
15   Q. How about doing drugs, was Marilyn doing
16 drugs in May of 1993?
17   A. Not that I know of. She had pills in the
18 medicine cabinet, but I don't remember paying
19 attention to what they were.
20   Q. Okay, tell me about Lucy.
21      Did she drink alcohol in May of 1993?
22   A. Yeah.
23   Q. And what alcohol did she drink?
24   A. Bacardi.

Page 31

1    Q. And how much Bacardi do you think she drank
2  in a given week?
3    A. I'm not sure of that because she worked as
4  a waitress, a cocktail waitress at a -- It wasn't
5  a strip club. They didn't take their clothes
6  off. Well, they did but it was -- they went down
7  to a bathing suit.
8    Q. Okay, did --
9    A. Lucy wasn't a dancer. She was a server.
10 That was it.
11   Q. Okay, did Lucy do drugs in May of 1993?
12   A. Not that I know of.
13   Q. Were you doing drugs in May of 1993?
14   A. Occasionally I would snort cocaine.
15   Q. Did you do cocaine with Lucy?
16   A. No.
17   Q. Did Lucy know you were doing cocaine?
18   A. No.
19   Q. So you told me about Lucy working as a
20 cocktail waitress.
21      Was that the only job she had in May of
22 1993?
23   A. I'm not sure which -- I know she was
24 working as a cocktail waitress, but I'm not sure

Page 32

1  if she worked at another place prior to that and
2  then went to there or if that was the whole time.
3    Q. So have we now identified all the people
4  that were residing in Marilyn's house in May of
5  1993?
6    A. Marilyn, the two kids, Lucy, me, Tomazovich
7  and Debbie -- Diane. No, there was a guy renting
8  a room that Marilyn had built off her back porch.
9      She enclosed the back -- She enclosed
10 -- made a room off the back porch and rented that
11 out. I think his name was Keith. I don't know
12 his last name.
13   Q. Okay, how long was Keith there?
14   A. He left -- He was there when I got there,
15 and I moved out at the end of July. He had left
16 a few weeks before that. So the first or second
17 week of July he left.
18   Q. Okay, tell me about Keith.
19   A. He was approximately the same age.
20   Q. As who?
21   A. As me and Lucy.
22   Q. Mmm-hmm.
23   A. Mid 20's and his mouth was, like, wired
24 shut. He had braces. He was in some kind of

8 (Pages 29 to 32)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                      WILLIAM DUKES

Page 33

1    accident and messed up his teeth.
2        Q. Wired up?
3        A. Like braces. I can't remember. I think it
4    was just the rubber bands he might have had on
5    there to keep his jaws closed, but he always
6    talked with his teeth gnashed together.
7        Q. What did he do?
8        A. I don't know.
9        Q. Did he work?
10       A. I don't know. I'd go to work and he was
11   either -- I don't know if he was in his room or
12   not. I'd just go out the back door and go to
13   work.
14       Q. So I'm a little confused.
15           You described for me the -- You'd come
16   up the stairway and you'd be in the kitchen,
17   right? Is that --
18       A. The back porch, yes.
19       Q. There's two stairs, two stair entrances?
20       A. There's one in the front of the building,
21   and there's one in the rear.
22       Q. Okay.
23       A. I always entered in the rear of the
24   building because I never had a key to the front

Page 34

1    entryway. Marilyn didn't use the front entryway.
2        Q. So if you go up the back stairs on the
3    second floor, you'd be in what area?
4        A. You'd be on the back porch.
5        Q. Back porch?
6        A. Yeah. You'd walk in and there'd be -- Off
7    the back door to your right there's the pantry,
8    kitchen to your right. After that is the --
9    there's a counter and a small -- and the bedroom,
10   then the hallway with the bathroom on the left,
11   and then you go into another doorway and you're
12   in the dining room, what would be considered the
13   dining room.
14       Q. Okay, so you described for me that you were
15   living in the bedroom off the kitchen, right?
16       A. Right.
17       Q. So where is this other bedroom that Keith
18   was living in?
19       A. All right, you walk in the back door on --
20   for the enclosed porch was in the center of the
21   building.
22       Q. Yeah.
23       A. You walk in to your left. You go up a
24   curvy stairwell, and you're on the second floor

Page 35

1    landing, and on the second floor landing you're
2    on -- from the back door to the edge of the porch
3    -- the back wall of the porch and maybe six feet
4    from the back door to the back wall on the porch
5    and then maybe four feet from the stair to the
6    wall to the extra bedroom, what would have been
7    the fourth bedroom. That's where -- It was off
8    the back porch. It was right there.
9        Q. Okay, but by what you described for me
10   before, there was three bedrooms in the hallway.
11   There was one off the kitchen. That's four.
12           This sounds like a fifth or am I
13   missing something?
14       A. You're missing something. The front one
15   next to the living room --
16       Q. Yep.
17       A. -- the second one in the middle next to the
18   dining room, the third one next to the kitchen.
19   The one off the back porch, that was just a room
20   she made. It was not part of the house.
21       Q. Right, it was an add-on?
22       A. Yeah, like the porch.
23       Q. Okay, so could you access that fourth
24   bedroom, the add-on, without going into the main

Page 36

1    building?
2        A. Yeah.
3        Q. Okay.
4        A. That's where the door was for.
5        Q. Okay.
6        A. There was a window that used to be the
7    kitchen window to open up to the outside. It
8    opened up into that room from inside the house.
9        Q. Right. So, again, I'm talking about this
10   time, again, May of 1993.
11           Did you borrow any money from Marilyn?
12       A. Yeah, occasionally.
13       Q. How much did you borrow?
14       A. 10, 15, 20 bucks here and there and give it
15   back to her on payday.
16       Q. Okay, during this time did you go to
17   Lincoln Tech?
18       A. Yeah, I started Lincoln Tech, I think, the
19   beginning of July or the end of June of that
20   year.
21       Q. Okay, what were you studying there?
22       A. I think it was automotive. That's all they
23   did was automotive and diesel technology.
24       Q. And did Marilyn assist you in getting in

                                  9  (Pages 33 to 36)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 37

1  there?
2      A. She gave me a rent receipt to show proof of
3  address, and that's about it pretty much. Pell
4  Grant and student -- I don't even know if I got a
5  student loan. I know I got grants to go.
6      Q. Did she loan you any money to go to Lincoln
7  Tech?
8      A. No. I didn't have to pay any cash up
9  front. It was all sign the paper and go.
10     Q. So as I understand your testimony, in May
11 of 1993 the most you ever borrowed from Marilyn
12 was 10 or 15 bucks?
13     A. It might have been 20 or just something to
14 fill the tank so I can go back and forth to
15 school because that was on, like, 100th, 95th,
16 100th Street south, and Marilyn was at 30, 3000
17 north. So I had to drive 70 blocks --
18     Q. Okay.
19     A. -- each way.
20     Q. How long did you attend Lincoln Tech?
21     A. Up until September.
22     Q. September of what year?
23     A. '93.
24     Q. Okay, and what happened then?

Page 38

1      A. I just gave up on it. They pulled me into
2  the station. Darlene Sobczak pulled me into the
3  station with her partner.
4          One day after work they pulled me over
5  and made me follow them in my truck from Chicago
6  back to Cicero and then they -- I gave them blood
7  samples and everything, DNA and all that stuff,
8  and I was, like, the hell with school. I stayed
9  working. I'd started another job by then after I
10 left Marilyn's house.
11     Q. So, again, I'm back in May of 1993.
12     A. Okay.
13     Q. Did you ever play with Lucy's kids?
14     A. Yeah.
15     Q. What did you do?
16     A. Push them on the swing, throw a ball, play
17 peek-a-boo with the little boy, Dustin, help
18 Bridget draw or put together one of her toys.
19         I think Marilyn had me take Bridget to
20 something at the public library a couple times,
21 like a reading. They take the kids and wait for
22 them or come back and pick them up an hour later,
23 and they would read them stories or something.
24     Q. Okay.

Page 39

1      A. It wasn't too far from her house.
2      Q. Okay, did you discuss with Lucy her
3  relationship with the fathers of the children?
4      A. Dustin, she said she didn't wanna talk
5  about it. He was an asshole; and Bridget, the
6  subject just really never came up.
7      Q. The fathers never came around?
8      A. Not that I knew of, no.
9      Q. Okay, did you know their names?
10     A. No. At that time, no, I didn't.
11     Q. Okay, again, I'm on May of 1993.
12         Were you romantically involved with
13 anyone?
14     A. Romantically, no, just some girlfriends --
15 or friends that were -- female friends that were
16 with benefits.
17     Q. Okay, so how about Lucy in May of 1993, was
18 she romantically involved with anyone?
19     A. Well, being there, I found out she was at
20 her mom's house to separate -- temporary
21 separation from Kevin, the boyfriend she had been
22 living with.
23         It was a temporary separation just to
24 see where they were at and then that was all I

Page 40

1  knew about that cuz he'd come around, and she
2  wouldn't want to talk to him.
3      Q. Where did Kevin live?
4      A. I think it was a couple blocks away from
5  where Marilyn lived -- where we were staying or
6  where I was living with Marilyn.
7      Q. Okay, so did you ever have a romantic
8  relationship with Lucy?
9      A. We had a sexual relationship and a
10 friendship.
11     Q. And when did this start?
12     A. Maybe three weeks, the end of May '93.
13     Q. Okay.
14     A. We were sitting up late one night. The
15 kids were sleeping with Marilyn in her room. Me
16 and Lucy were -- Lucy was on the couch. I was
17 sitting up against the couch on the floor. It
18 just started.
19     Q. So did you have sexual relationships with
20 Lucy in Marilyn's house?
21     A. Yes.
22     Q. And where in the house?
23     A. My bedroom, the back bedroom.
24     Q. The back bedroom?

10 (Pages 37 to 40)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                        WILLIAM DUKES

Page 41

1    A. Off the kitchen, not the one off the back
2  porch.
3    Q. Right.
4       How often do you think you had sex with
5  Lucy in Marilyn's house?
6    A. At least a couple times a week.  We had sex
7  in the front room where she was staying too,
8  front bedroom.
9    Q. Okay.
10   A. The car a couple times when we went to the
11 casino, the hotel when we spent the night over
12 there in Indiana.
13   Q. So this is picking up towards the end of
14 May of 1993.
15      Still working at the Hispanic garage
16 down the street?
17   A. Yeah.
18   Q. Still paying Marilyn 50 bucks a week?
19   A. Well, when she'd accept it, if I hadn't
20 done any work that week on her cars or around the
21 house or helped her with something else.
22   Q. Yeah.  Did you get along with Marilyn?
23   A. Yeah, as much as anybody.  Well, Marilyn
24 was the type of person you get along with.  She's

Page 42

1  nice people, but she was bold is the right word
2  for it.
3       She didn't mean no harm by it.  You'd
4  argue with her and then five minutes later
5  you're, oh, sorry.  You're friendly, shaking
6  hands, giving each other hugs and going on about
7  your business, no animosity, no whatever you call
8  it, carrying a grudge or anything like that.
9    Q. What kind of stuff would she be vocal
10 about?
11   A. Lucy seeing Kevin, not getting stuff done
12 around the house with me or with Lucy.  She was
13 always trying to get me to start a second room to
14 see if she could rent that off the back porch on
15 the first floor and just didn't have the
16 materials.
17   Q. Did you ever talk to Marilyn about your
18 relationship with Lucy?
19   A. No, but I came home one day, and there was
20 condoms laying on top of the dresser in my room.
21 I'm thinking what the heck, and I guess Marilyn
22 put them there.
23   Q. Did you use condoms when you had sexual
24 relationships with Lucy?

Page 43

1    A. No, because Lucy said she had her tubes
2  tied I think it's called.  She said she couldn't
3  get pregnant.
4    Q. Did you believe that Marilyn approved of
5  your relationship with Lucy?
6    A. Yeah.  She was the one that suggested I buy
7  a bottle of Bacardi the first time, and I think
8  Marilyn looked at me as a means to an end to get
9  rid of Kevin.  I think.  I'm not sure, but that
10 was just my impression at the time.
11   Q. So let me ask you about Marilyn's
12 relationship with Kevin.
13      Did you think that she liked Kevin or
14 disliked Kevin?
15   A. I think she disliked him.
16   Q. And how did you --
17   A. As far as disliked him for a partner for
18 Lucy and the kids.
19   Q. Okay.
20   A. I think Marilyn disliked him because she
21 thought he would take Marilyn -- I mean, take
22 Lucy away from her thereby taking the kids with
23 him, and she wouldn't see the kids, her
24 grandkids.  Because with Marilyn, the kids were

Page 44

1  her world and basically hers.  I mean, it was
2  like she was the mom.
3    Q. So you believe that Marilyn had a close
4  relationship with Dustin and Bridget?
5    A. Yes, she did.  She had a close relationship
6  with Lucy too.  I think that's why she disliked
7  Kevin was because she was afraid Kevin was gonna
8  take Lucy away.
9    Q. Okay, it wasn't anything specific that
10 Kevin did that Marilyn told you she didn't like?
11   A. Not that I know of, no.
12   Q. Okay, did Lucy ever tell you about her
13 break up with Kevin when you first started seeing
14 her?
15   A. It came up, but I can't remember the exact
16 topic.  I don't think it was anything major.  I
17 think it was just her way of -- How do you say
18 it?  Absence makes the heart grow fonder, trying
19 to push him into getting married or something.  I
20 don't know.  That's just how it seemed.
21   Q. Did you ever talk to Lucy about getting
22 married?
23   A. No.
24   Q. No, that never came around?

11 (Pages 41 to 44)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 45

1      A. We might have mentioned it or something,
2  but it wasn't anything serious.  It was -- I
3  don't even think when we talked about marriage it
4  was between me and her.  It was just in general.
5      Q. So I'm now moving into June of 1993.
6      A. Okay.
7      Q. Again, we're still living with Marilyn?
8      A. Yeah.
9      Q. Still living in the same room off the
10  kitchen?
11      A. Yes, inside the apartment.
12      Q. And you're still paying monthly rent -- or
13  weekly rent rather, 50 bucks a week?
14      A. Yeah.
15      Q. So the same arrangement of what we talked
16  about with Lucy in the front room, Marilyn in the
17  middle and then Marko downstairs and then Keith
18  in the back room --
19      A. Yes.
20      Q. -- off the porch, right?
21      A. Yes.
22      Q. Those people were all still there?
23      A. Yes.
24      Q. Okay, so tell me about what you know about

Page 46

1  Marko.
2      A. He's just a -- From what I seen of him, he
3  was just a drunk.  He didn't work.  His
4  girlfriend was a drunk too.
5          They'd go out.  You'd see them leave.
6  They'd be drinking in the morning.  You'd see
7  them with their beer in their hands, putting
8  coolers in the car.
9          And I guess -- I heard them a couple
10  times saying they were going to the forest
11  preserve.  I guess that's where they went to
12  drink with their buddies.
13          They'd come home sometimes.  He'd look
14  like he got beat up, and you'd hear them arguing
15  through the floors or through the open windows,
16  and then the next day you'd see Diane bruised up.
17      Q. Again, I'm talking about June of '93.
18      A. Yeah.
19      Q. Approximately how many times in June of '93
20  did you observe these kinds of behaviors from
21  Marko?
22      A. Pretty much daily with him.
23      Q. Do you know if Marko was doing drugs?
24      A. He appeared to be.  I never seen him do it,

Page 47

1  but he appeared to be doing drugs, yes.
2      Q. Okay, what made you believe that he was
3  doing drugs?
4      A. Just the personal experience, just knowing
5  people that were bad on that stuff and seeing how
6  he looked.  He looked the same.  You don't eat.
7  You drink, you eat; but if you're doing drugs,
8  you don't eat.
9      Q. Did you --
10      A. I mean, Diane, you could see her with, what
11  do you call it, scabs on her arms like she was
12  shooting up.  So I assumed if she's doing that,
13  he is too.
14      Q. Did you ever do that?
15      A. Shoot up?  No.
16      Q. So, again, focusing on June of 1993, you
17  were, again, drinking?
18      A. Yeah.
19      Q. A couple six-packs a week?
20      A. Yeah.
21      Q. You were doing drugs?
22      A. Not very often but yeah, I'd go into the
23  city and stop at some friends' house or
24  something, and they'd offer a line of cocaine,

Page 48

1  okay, and then I'd go on about my business.
2      Q. Okay, in June you were still working for
3  the Hispanic garage?
4      A. Yes.
5      Q. Okay, the -- Did you ever drink with Marko
6  in June of 1993?
7      A. No.  I never -- I was outside working on my
8  truck, and I had a six-pack sitting beside the
9  truck; and he came up, oh, let me get one.
10          I gave him one just to get him the heck
11  away from me, and that would be about the only
12  time I ever considered -- you could consider me
13  drinking with him.
14      Q. Okay.
15      A. I just gave him a beer to get him the hell
16  away from me.  I didn't like the man.
17      Q. You didn't like him, right?
18      A. Right.
19      Q. Okay, did he ever offer drugs to do with
20  you?
21      A. No, because then I would have had an excuse
22  to beat the hell out of him.
23      Q. So as far as your relationship with Lucy,
24  did you ever discuss your relationship with Lucy

12 (Pages 45 to 48)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 49

1   with Marko?
2       A.  No.
3       Q.  Did you ever discuss your relationship with
4   Lucy with Marilyn in June of 1993?
5       A.  Not relationship just -- I don't even know
6   how to describe it.  It wasn't a relationship.
7   It was just friends with benefits.
8           It was -- I think Marilyn knew we were
9   having sex, but she didn't say anything about it.
10  We didn't really discuss it.
11      Q.  So --
12      A.  She tried to get the kids -- She tried to
13  get Dustin to call me Daddy Bill.  Don't.  I'd
14  catch Dustin.  He'd say it every now and then.
15  He just --
16          I think she did it more as being cute
17  because Dustin had, like, a -- He was two years
18  old.  He had a speech impediment at the time.  He
19  hadn't fully developed his words, and I think
20  that's the only reason Marilyn was doing that.
21      Q.  Okay, did you discuss your relationship
22  with Lucy with anyone in June of 1993?
23      A.  Not that I recall.  I said it was -- Diane,
24  Marko's girlfriend, had said something to me one

Page 50

1   day about, oh, you guys gonna take the front
2   apartment?  No.  Well, you seeing each other
3   so... No.  That was about it.
4       Q.  Okay.
5       A.  I do recall that, and I did discuss it with
6   Keith, but he knew that something was going on,
7   and he became very aloof.  He was rude toward me
8   it seemed like.  He was, like, jealous.
9       Q.  Do you think that he was attracted to Lucy?
10      A.  Yeah.  Before me and Lucy started fooling
11  around, he had made comments about her.  Oh,
12  she's hot and stuff like that.  So yeah, he was
13  attracted.
14      Q.  Okay, you don't know if she ever had any
15  relationships with him though, right?
16      A.  No.  I remember being in the house one
17  night in my bedroom, and Marilyn came running
18  past.  Lucy, Lucy, come here, look at this, and
19  they run back towards the back door.
20          Marilyn had a big two-foot by two-foot
21  window cut into the back door going to the porch,
22  and the lights were off in the kitchen and
23  everything, and her and Lucy were standing -- I
24  come out of my room and looked.  They're looking.

Page 51

1   Keith was having sex with Diane on the back porch
2   stairwell where it curved down.
3       Q.  That was Marko's girlfriend?
4       A.  Yeah.
5       Q.  Okay, that was the only time you ever
6   witnessed that?
7       A.  I couldn't hardly witness it, but I could
8   see the tops of their head; and I was, like,
9   what's going on?  They're screwing.
10          Marilyn and Lucy said they're screwing.
11  Be quiet.  To them it was a comedy, and to me it
12  was too.  I just went back and laid back -- went
13  back in my room.
14      Q.  So, again, I'm in June of 1993.
15          Did you borrow money from anyone in
16  June of 1993?
17      A.  June of '93?  Marilyn, I might have got
18  some money till payday and then maybe from my
19  boss an advance until payday.  He paid me half of
20  whatever he charged for labor on the job.
21      Q.  So in June of 1993 you're still enrolled in
22  Lincoln Tech?
23      A.  Yeah, I believe that's -- I can't
24  remember -- I think it was mid-June or somewhere

Page 52

1   around that area when I started.  They had talked
2   me into going to school saying -- Lucy and
3   Marilyn talked me into going, but they never had
4   to pay anything because I didn't have to pay
5   anything to start.  Lincoln Tech, everything was
6   through the government.
7       Q.  Okay.
8       A.  Student loans, Pell Grants, other grants.
9   All you had to do was prove you were low income,
10  and I had no problem with doing that.
11      Q.  Again, June of 1993, some of these
12  questions are a repeat.  So I'm just going to go
13  through them, all right?
14          Did you interact with Lucy's children
15  in June of 1993?
16      A.  Yeah, they're kids.  They wanna play, you
17  play.
18      Q.  Did you go places with Lucy and her
19  children in June of 1993?
20      A.  Public pool, the hotel in Indiana when we
21  bought fireworks the next day with Marilyn.
22  Marilyn wanted to look at some property in
23  southern -- not -- off of Interstate 55 down near
24  Plainfield.

13 (Pages 49 to 52)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 53

1      So we went down there and stayed one
2   night, and the next day we drove around looking,
3   just drive by, looking for for sale signs and
4   riding around with the kids in the car. That's
5   about it.
6      Q. This is in June of '93 you believe?
7      A. Yeah. By that time Marilyn had bought a
8   minivan because the car she had had too many
9   problems.
10      The one I fixed at the garage with her
11   old engine out of her garage, that didn't last.
12   So that car stayed parked in the garage, and she
13   bought a minivan that I did a lot of work on.
14      Q. Okay, June of 1993 were you still
15   romantically involved with Lucy?
16      A. We still had a sexual relationship, yes.
17      Q. Okay, was Lucy romantically involved with
18   anyone other than you in June of 1993?
19      A. That I knew of then or that I cared about?
20   No. I think she was still seeing Kevin off and
21   on; but, like I said, me and Lucy were just
22   friends with benefits.
23      Q. So at the time of June of 1993 were you
24   involved with anyone other than Lucy?

Page 54

1      A. No. That time, no.
2      Q. Again, you were still having sexual
3   relationships with Lucy in Marilyn's house in
4   June of 1993?
5      A. Yes.
6      Q. Moving forward to July of 1993, you were
7   still living in Marilyn's house in the apartment
8   off the kitchen?
9      A. Yes.
10      Q. And still working at the Hispanic garage
11   down the street, July of 1993?
12      A. Yeah. I was getting ready -- He was
13   getting ready to let me go then because we had
14   caught up on all the work that he had backed up,
15   and then he didn't have any -- He couldn't afford
16   the -- He didn't have enough work for two people.
17   He had enough work for himself, and that was it.
18      Q. Okay, July of 1993, were you still paying
19   50 bucks a week to Marilyn?
20      A. Yeah, when she'd accept it. If I hadn't
21   done any other work or helped her at the flea
22   market, not the flea market where she had the
23   leather shop or the leather booth for coats.
24   She'd go to a flea market that was a drive-in.

Page 55

1   It's a south side Ingalls Street. Balboa?
2      No, I can't think of -- There was a
3   drive-in there, and they had a weekend flea
4   market set up, outdoor flea market. That's where
5   she would set up a table with knickknacks and
6   various odds and ends and sell fireworks under
7   the table.
8      Q. So you would go with her --
9      A. Yeah --
10      Q. -- to the outdoor --
11      A. -- because it's outdoors, and I'd be like
12   her security. Because two girls doing it with
13   kids, people try to steal. If there was a guy
14   there then -- Well, I was a big guy.
15      Q. And there was some fireworks being sold --
16      A. Yes.
17      Q. -- in Illinois?
18      A. Yeah.
19      Q. Okay, again, July of 1993, was Marilyn
20   drinking alcohol?
21      A. Like I said, not that I know of. She may
22   have been but I didn't know it.
23      Q. Okay, July of 1993, was Marilyn doing
24   drugs?

Page 56

1      A. Not that I know of.
2      Q. And July of 1993, other than the flea
3   market where she had the leather booth and the
4   other place that you were just telling me about
5   near Balboa, any other sources of income other
6   than that that you know of?
7      A. The rent and people would come around the
8   house late at night. It was summertime. She
9   didn't have air conditioning, and the windows
10   were open, and you could hear people yelling and
11   stuff outside the windows on the side of the
12   house, and she was buying stuff.
13      Like, somebody coming around selling a
14   window air conditioner. She'd buy it, and I'd
15   have to go down and put it in her car, and she'd
16   take it to the flea market, and I'd help her
17   carry it inside. She'd sell the air conditioner.
18      She was buying stolen stuff I guess.
19   Well, I don't guess. I know that's what it was
20   because that's the only reason somebody would
21   come around at 2:00 or 3:00 o'clock in the
22   morning selling stuff.
23      Q. So she was basically fencing stolen items?
24      A. Yes.

14 (Pages 53 to 56)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                   WILLIAM DUKES

Page 57

1    Q. Okay, did you ever talk to her about that?
2    A. Nope, none of my business. I just helped
3    her put it in the car and then that was it.
4    Q. Okay, so how about -- Again, we're in July
5    of '93.
6        Was Lucy working?
7    A. Yeah, she was working at the -- as a
8    cocktail waitress.
9    Q. Okay, was Lucy drinking alcohol in July of
10   '93?
11   A. I drank with her. We went to the casino
12   and had drinks. We went to a bar there in Cicero
13   and had drinks. We drank at the house so, yeah.
14   Q. Okay, was Lucy doing drugs in July of 1993?
15   A. Not that I know of.
16   Q. Were you doing -- Were you drinking alcohol
17   in July of 1993?
18   A. Yes.
19   Q. And, again, we previously had talked about
20   doing a couple six-packs a week.
21       Were you still doing that?
22   A. About the same, yeah.
23   Q. Were you doing drugs in July of 1993?
24   A. If somebody offered, yeah, occasionally.

Page 58

1    Q. And tell me about the -- When you separated
2    from your garage, when approximately was that?
3    A. It would have been around the first week of
4    July '93.
5    Q. Okay.
6    A. And I went back to working with Sharma at
7    National Salad Oil.
8    Q. Okay, so you didn't have any interruption
9    in your employment?
10   A. No, because I only worked for Sharma for --
11   Yeah, it was a few weeks I worked for Sharma,
12   like, until the end of July, and that was it.
13   Q. Okay, where did you start working after
14   that?
15   A. Standard Generator on the Chicago side of
16   Ogden, the east side of Cicero Avenue. You went
17   over that old rickety bridge that used to be
18   there.
19       I tried to walk across that bridge one
20   time until I seen a hole the size of this table.
21   I said uh-uh, and I turned around and went back.
22       So yeah, I worked for Standard
23   Generator from, like, the end of the last week of
24   July all the way up until September of '93.

Page 59

1    Q. Okay, what did you do there?
2    A. Mechanic.
3    Q. Okay, what was your wage?
4    A. Back then? 7, $8 an hour. I'm not sure.
5    Q. Did you borrow any money from anyone in
6    July of 1993?
7    A. Same thing, ask Marilyn, 5, 10, 20 bucks
8    for gas or something and then give it back at the
9    end of the week.
10   Q. Okay, beyond that, did you borrow money
11   from anyone else?
12   A. I might have got money from people to go
13   buy parts for their vehicles.
14   Q. Okay.
15   A. Stuff like that. And then I'd get the
16   parts and then come back later that day or later
17   in the week and put the parts on the car.
18   Q. Okay, so, again, the same kind of questions
19   that we asked before about are you still
20   romantically involved with Lucy in July of '93?
21   A. Yes.
22   Q. Were you involved -- Were you having sexual
23   relationships with anyone else in July of 1993?
24   A. Not that I recall, no.

Page 60

1    Q. You were having sexual relationships with
2    Lucy in July of 1993 in the house, Marilyn's
3    house?
4    A. In the house, the car, hotel.
5    Q. I want to move into August of 1993.
6        So by now you're no longer working at
7    the Hispanic garage down the street?
8    A. Right.
9    Q. You're now at Standard Generator, correct?
10   A. Correct.
11   Q. You're still going to Lincoln Tech?
12   A. Yes.
13   Q. You're still living in Marilyn's house?
14   A. August? No.
15   Q. Okay.
16   A. I moved out of Marilyn's house
17   approximately July 26th, '93.
18   Q. Why did you move?
19   A. It would have been a Sunday. I just had a
20   bag or two of clothes. I put them in my truck
21   and went back to where I was staying in Chicago
22   off of Richmond.
23       Like I said, I'm not sure of the exact
24   date, but the 26th, say it was a Sunday when I

15 (Pages 57 to 60)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 61

1   got my stuff and left. That Friday, two days
2   earlier in the evening, Lucy had come to me and
3   said -- showed me a ring she had on her finger,
4   and I said, nice; and she said, I hope you don't
5   get mad, but me and Kevin are getting married
6   tomorrow morning.
7            I said, I'm not mad. I says, you gotta
8   do what's right for you and the kids. I
9   understand that. She said, my mom is having a
10  fit; and I think she was -- Marilyn did go out
11  drinking that night. I'm not sure if she did or
12  not. I don't remember seeing her come home.
13           But Lucy put the kids to bed, and me
14  and her had -- After she told me she was getting
15  married to Kevin the next morning, me and her one
16  more time for old times sake.
17           We went into my room, and we had sex,
18  and we slept together until 6:00 o'clock the next
19  morning when I had to get up and go to work cuz
20  she got married at 9:00 o'clock in the morning or
21  thereabouts.
22           And then Marilyn told her she had to
23  get -- She was gonna -- I guess she was gonna
24  still stay at the house with Marilyn and the

Page 62

1   kids; and Marilyn said, no, he's your husband.
2   You've gotta stay with him now. I don't want no
3   problems.
4            She didn't want no problems with me
5   being there with her and then Kevin showing up
6   and causing problems because his wife is with
7   another man.
8            So she made Lucy go. Marilyn made Lucy
9   go live with her husband now that Saturday when
10  she got married; and then Sunday, I guess Marilyn
11  calmed down enough, and we were talking.
12           She goes, I'm not gonna see the
13  kids any more because she's not gonna be able to
14  come over here with you here. I said, look, I
15  can still go back to where I was staying in
16  Chicago with my friends. That's no problem.
17           There was no animosity in it. I
18  understood where she was coming from. She wanted
19  to be sure she could see her grandkids regularly.
20  They were like her world. She lived for them
21  kids. So I just went back.
22  Q.  So as far as -- Let me back up here.
23           So if I understand your timeline here,
24  Friday July 24th, is that about right and then --

Page 63

1   A.  Yeah, the 24th does sound right, yes.
2   Q.  That's the day she showed up with the ring?
3   A.  Yeah. I'm not positive of the date, but
4   I'm pretty sure that is the date.
5   Q.  The next day, Saturday, July 25, she gets
6   married?
7   A.  Right.
8   Q.  The next day, July 26, you move out?
9   A.  Yeah.
10  Q.  Okay, so let me talk about July 24th a
11  little bit.
12  A.  Okay.
13  Q.  So you're working that day?
14  A.  Yeah.
15  Q.  You come home at the end of the day?
16  A.  Yeah.
17  Q.  About what time?
18  A.  I was working with Sharma by then and
19  delivering. So it was probably 5:00, 6:00, 7:00
20  o'clock at night.
21  Q.  Okay, Lucy was home?
22  A.  No. Actually nobody was there.
23  Q.  Okay, how long until they showed up?
24  A.  Hour maybe, two, about 9:00 o'clock I

Page 64

1   guess.
2   Q.  Okay, and it was Lucy and her kids or just
3   Lucy?
4   A.  Lucy and the kids.
5   Q.  Okay, was Marilyn with them?
6   A.  No.
7   Q.  She was not?
8   A.  No.
9   Q.  So you're at the house alone.
10           Then Lucy and her two kids show up?
11  A.  Yeah.
12  Q.  And describe for me what she said to you at
13  that time?
14  A.  She showed me the ring. Oh, that's nice.
15  She said, yeah, don't get mad. Me and Kevin are
16  getting married tomorrow.
17           I just told her she's gotta do what's
18  right for her and the kids. I understand that.
19  No hard feelings. We're still friends, and we
20  had sex one more time for old time sake.
21  Q.  Okay, so tell me about that. As far as --
22  So you're -- You get home 5:00, 6:00, 7:00. She
23  comes home an hour or so later.
24           You still have a couple three hours

                              16 (Pages 61 to 64)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 65

1    before midnight, right?
2        A. Yeah. She put the kids to bed.
3        Q. And then you have sex with her in which
4    bedroom?
5        A. I wanna say it was mine, but I remember
6    waking up in the front bedroom, hers. She put
7    the kids to bed in Marilyn's room.
8        Q. Okay, Marilyn didn't show up that night?
9        A. Marilyn was there the next morning. I know
10   that.
11       Q. Okay, but when you were having sex with
12   Lucy, she wasn't there?
13       A. Not that I know of. She could have came in
14   while we were in the front room -- front bedroom.
15       Q. But you weren't aware of it?
16       A. No.
17       Q. Did you have any discussions with Marilyn
18   that night?
19       A. That night? No.
20       Q. Okay, did you -- Tell me about how you felt
21   about Lucy getting married.
22           Were you disappointed?
23       A. No. She had to do what was right for her
24   and her kids. I understand that.

Page 66

1        Q. Were you jealous?
2        A. No.
3        Q. Were you mad?
4        A. No. There was no reason to be. I
5    didn't -- I was 25. I didn't want two kids that
6    I wasn't the father, and I didn't know how she
7    supported them.
8            So I didn't know of any fathers being
9    around. I didn't want the hassle with having to
10   deal with the fathers and me being step-dad, and
11   I knew she was -- By then I knew she was still
12   seeing Kevin.
13           So it was, like I said, friends with
14   benefits. There was no animosity toward her.
15       Q. So let's talk about July 25th.
16           You told me you woke up about 6:00
17   a.m.?
18       A. Get ready for work and Marilyn shows up
19   handing me a bunch of papers. What's this? Oh,
20   that's so she can't get married. It's her IDs
21   and stuff.
22           What do you want me to do? Oh, just
23   take them with you. She can't get married.
24   Maybe she'll think about it and change her mind.

Page 67

1    So I did.
2            I come home at lunch time, and Lucy was
3    there getting her stuff because I guess by then
4    Marilyn had kicked her out because she found out
5    that she had already got married or she was able
6    to get married anyway despite Marilyn taking her
7    IDs.
8            So she was there when I got there at
9    lunch because I was working right down the
10   street. They lived off of 31st and Cicero, and I
11   worked at 3950 South Cicero. So it was just down
12   the street, and I stopped to grab something to
13   eat or something.
14           I can't remember why I stopped, and
15   Lucy asked me if I had her IDs. I said, yeah,
16   your mom gave them to me this morning to stop you
17   from getting married. She said, it didn't work,
18   and she showed me a piece of paper.
19           I didn't pay attention to it, but I
20   assumed it was the marriage license or
21   certificate, and I gave her her IDs back.
22       Q. So when Marilyn handed them over to you,
23   that was what time?
24       A. 6:00, 6:30 in the morning.

Page 68

1        Q. 6:30 in the morning?
2        A. Somewhere in that vicinity, yeah.
3        Q. Did you talk to her about what was the
4    reason she was giving them to you?
5        A. No, she told me here, take these. This way
6    she can't get married. She ain't got IDs. They
7    won't let her get married. Marilyn stated it. I
8    didn't ask what it was for. She told me up front
9    what it was for.
10       Q. Did you look at what she gave you?
11       A. Briefly. I had a stack of papers, and I
12   could see some of the top stuff and it was -- One
13   of them was an ID. One of them was, it wasn't a
14   credit card, like an insurance card or something.
15   I don't recall exactly. It was another type of
16   card. It wasn't a credit card, and that was it.
17       Q. How many documents do you think there were
18   in total? More than two?
19       A. Oh, yeah.
20       Q. More than five?
21       A. Up to ten.
22       Q. Up to ten?
23       A. Between five and ten.
24       Q. Okay.

17 (Pages 65 to 68)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 69

1    A. One of them was a receipt for a bill too.
2  I can't remember, electric or light, electric or
3  gas, something like that.
4    Q. And what did you do with them?
5    A. I left to go to work and put them in the
6  glove box of the truck.  Then when I came back, I
7  took them out and carried them upstairs.  I was
8  gonna leave them in Lucy's room, but she was
9  there.  So I gave them to her.
10   Q. Was Marilyn there?
11   A. No.  Marilyn was at the flea market then.
12   Q. Okay, and what --
13   A. The kids were -- Lucy said the kids were
14  with Kevin.
15   Q. And what did you talk about with Lucy at
16  that time?
17   A. Nothing.  I just asked her -- I told her I
18  thought you were gonna stay here.  She said,
19  yeah, my mom told me to get out.  I'm married
20  now.  She's afraid Kevin won't let me come over
21  here with you.  I said, okay.
22   Q. So you understood that Marilyn basically
23  threw Lucy out of the house?
24   A. Yes.

Page 70

1    Q. And did you talk with Lucy at that time
2  about you continuing to live there?
3    A. No.  It just didn't come up.  I had to
4  hurry up and get what I came to get, something to
5  eat, and go.
6    Q. So talk to me about -- Did Marilyn come
7  back later on July 25th?
8    A. Yeah, it was around dark I guess.
9    Q. Did you talk to her at that time?
10   A. Briefly.  She was just mad and didn't wanna
11  talk and be bothered with anybody.  I think she
12  was at the corner bar by her house too.  That's
13  where she was coming from.
14       I'm not sure if that's where -- cuz I
15  seen the car there, and she came walking from
16  that direction.  I'm not sure if she was at the
17  bar.  She just came walking from that direction.
18  She might have just been walking around the
19  neighborhood.
20   Q. Okay.
21   A. She was, hi, and talked about whatever we
22  talked about and briefly mentioned something.
23  She didn't wanna be bothered was the attitude she
24  gave off.  So I just backed off and let her cool

Page 71

1  down, and the next morning we talked.
2    Q. Before we get to that, I'm still on the
3  25th.
4       So how long did you talk with Marilyn
5  on the 25th?
6    A. It would have been less than two minutes
7  when I seen her coming back.
8    Q. Okay, so the topic of you staying in the
9  house or leaving the house didn't come up on
10  July 25th?
11   A. No.  It came up the next morning.
12   Q. Okay, so let's talk about the next morning,
13  July 26th.
14       What time did you get up?
15   A. I had a late night the night before,
16  probably about around 8:00 or 9:00.
17   Q. So yeah, you said you had a late night.
18       So you went somewhere that night?
19   A. No, not that night, the night before I was
20  up pretty late when me and Lucy were fooling
21  around the day before she got married.
22   Q. Okay.
23   A. And I went to work, delivery driver, a lot
24  of stuff because everything had to be manually

Page 72

1  unloaded, manually carried into the stores,
2  manually carried to the truck, around 1,500 pound
3  bags of food stuffs from overseas.  Like I said,
4  about 8:00 or 9:00 o'clock in the morning I got
5  up.
6    Q. Okay, who was there?
7    A. Just Marilyn.  She was in the kitchen
8  messing around cooking or cleaning dishes,
9  something.
10   Q. What did you talk about?
11   A. Not much.  Lucy came up.  What's going on
12  with Lucy?  She said, she's with her husband.  I
13  said, I understand that.
14       It just got around to where she didn't
15  think Lucy was gonna -- She hinted with me there,
16  and I caught on real quick.  Look, I can go back
17  to my friend's house in Chicago where I was
18  staying.  That's no problem.  I can do it today
19  if you want.  And she said, okay, and that was
20  it.  We were friends.
21   Q. So when you said you were going to your
22  friend's house in Chicago, who's that?
23   A. The Jaramillos.
24   Q. So you had known the Jaramillos from

18 (Pages 69 to 72)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 73

1    before?
2        A. Yeah.
3        Q. Before 1993?
4        A. Yes.
5        Q. How did you know them?
6        A. I worked with one of the females from the
7    house.
8        Q. Okay, which one was that?
9        A. Irma; and her husband Aaron, I knew him
10   because he was -- He worked for Indian Groceries
11   and Spices out of Skokie. National Salad Oil was
12   their competitor.
13           But National Salad Oil packaged
14   five-gallon jugs, plastic jugs and cardboard
15   cartons of corn oil, vegetable oil, soy bean oil,
16   all that stuff that National -- that Indian
17   Groceries and Spices had to get to deliver to
18   their customers. So I knew Aaron too.
19       Q. So getting back to your discussion with
20   Marilyn on the morning of July 26th, how long did
21   that discussion last?
22       A. I don't know. We drank coffee, maybe a
23   half hour or so, about maybe a half hour.
24       Q. And did you understand the discussion you

Page 74

1    were having with Marilyn was that she wanted you
2    to leave?
3        A. That was my impression. I mean, I picked
4    up on it pretty quick. That's okay. It's no
5    problem. It's like Lucy getting married. She
6    had to do what's right for her kids.
7            And now Marilyn wanted to make sure she
8    did what she thought she had to do in order for
9    the kids -- Lucy to be bringing the kids back
10   around to her.
11       Q. Okay.
12       A. It wasn't any skin off my back. My friends
13   on the north side of Chicago live two or three
14   blocks from the expressway, and I worked half a
15   block from the expressway or one expressway.
16           I just jump on one and go to the other
17   and then I'm home. It wasn't no big deal. On
18   certain days driving down Cicero Avenue just ten
19   blocks took as long as it would to get on the
20   expressway and go ten miles.
21       Q. So what did you do after you packed up your
22   stuff from Marilyn's?
23       A. Put it in the truck and went to -- come
24   back to the city, stopped at my friend's house

Page 75

1    and talked to him. He said, sure, come on back.
2        Q. Describe for me the arrangement at that
3    house?
4        A. The four guys, me, Aaron, Efrain, and
5    Guadalupe. $500 a month rent, that's $125 a
6    piece for the guys. The gas bill was a hundred
7    bucks. So that's $25 a piece. We split
8    everything four ways between the guys.
9        Q. Okay.
10       A. One had to take care of the kids. That
11   money went -- That woman, she worked -- That
12   money went for the kids.
13           The one lady, Lupe's wife, she took
14   care of the kids during the day when everybody
15   else was at work. She didn't pay. Just the guys
16   paid -- split everything four ways, and it worked
17   out good. It was $125 a month for rent versus
18   $50 a week when --
19       Q. So it was a little bit more?
20       A. Yeah, a little more, but I was working full
21   time doing the delivery, and there was other
22   stuff too, side jobs with cars and everything
23   else, and I still stayed in touch with Marilyn
24   cuz I was working right near the house.

Page 76

1    I'd stop there every now and then. I
2    would see her mini van at the flea market because
3    she was what you call old school. She got
4    privileges. She parked her vehicle inside the
5    fenced-in lot right there facing Cicero. I see
6    it. I'll stop in.
7            And I'd stop by every now and then,
8    borrow five or ten bucks and pay her back at the
9    end of the week went I got paid. It was an
10   ongoing back and forth.
11           If she needed help at the house, I'd go
12   stop and help her fix something; and she called
13   me and said that one of the applications I put
14   in, they were calling me.
15           She called me at my house in Chicago
16   and said, yeah, the mechanics place in Chicago is
17   calling you. What's the name of it? I said,
18   okay, give me their address. She just gave me
19   their phone number, and I called them. So I went
20   in and got hired, Standard Generator.
21       Q. Okay, so let me slow you down here.
22           Getting back to this place on North
23   Richmond with the Jaramillos, describe for me how
24   many floors?

19 (Pages 73 to 76)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 77

1      A.  First floor apartment, first floor front
2   apartment.
3      Q.  Okay, is that --
4      A.  With a basement, the trap door that went to
5   a basement room where there are three rooms in
6   the basement.
7      Q.  All right, and that's where your room was,
8   in the basement?
9      A.  Yeah.
10      Q.  And how many entrances to the building?
11      A.  Front door, rear door to the apartment, and
12   the hatch in the floor to the basement and the
13   back door to the basement where you'd go to the
14   laundry room area in the basement and the utility
15   rooms of the apartment building so three
16   entrances.
17      Q.  So you'd be able to come in and out of
18   there any time of day?
19      A.  Usually.  There's always somebody up.
20   There was a lot of people there.
21      Q.  Did they have any house rules about when
22   you can come in and come out?
23      A.  They were unwritten rules; but yeah, we
24   usually were always in by 8:00, 9:00, 10:00

Page 78

1   o'clock and that was it.  If anything, we'd be
2   sitting on the front porch later than that on hot
3   days and stuff like that.
4      Q.  So would they physically lock the doors to
5   prevent people from coming in and out after 8:00,
6   9:00, 10:00 o'clock?
7      A.  Yeah.  I mean, if nobody was there, you
8   just hit the button; and then if you got in a
9   little late, you would knock on the door or hit
10   the doorbell.
11      Q.  So this is -- Again, I'm in the timeframe
12   of early August 1993.
13      A.  Okay.
14      Q.  So you move back up to North Richmond with
15   the Jaramillos.
16          Not long after that you get some
17   contact from Marilyn about the Standard Generator
18   job?
19      A.  I think that was right after I moved out.
20      Q.  Yeah, early August?
21      A.  No.  It would have been late July within
22   the first -- the last few days of July and the
23   first few days of August --
24      Q.  Okay.

Page 79

1      A.  -- when they called and I started working
2   at Standard Generator.
3      Q.  All right, so for August of 1993, were you
4   romantically involved with anyone?
5      A.  No.
6      Q.  Did you -- When was the next time you saw
7   Lucy in August of 1993?
8      A.  Well, I had seen her a couple times, a
9   couple times at the apartment.  In July, right
10   after she got married, I saw her off and on here
11   and there.
12          I had to -- I seen her one time by her
13   job where she worked as the cocktail waitress.
14   There was -- It wasn't AutoZone back then.  It
15   was something else, Giant Auto or Trak Auto in
16   the strip mall where she worked, and I was doing
17   some work out there with somebody and had to go
18   get a part, and I seen her and said hi and stuff
19   like that.
20          And I guess she thought I was coming to
21   see her.  I said no, I'm just getting parts, but
22   she said something like I can't.  I gotta work
23   here.  They get mad.
24          She's a cocktail waitress at a semi

Page 80

1   strip club or quasi strip club or whatever you
2   call it, and I could understand that.  They
3   didn't want the patrons fraternizing with the
4   help because it looked like a prostitution ring
5   or something the way she explained it to me
6   prior.
7      Q.  Did you ever go to Kevin's house to see
8   Lucy?
9      A.  Right after she got married, yes.  I
10   wasn't -- I didn't go to the house to see her.  I
11   seen her outside, and I said, look, hide your car
12   cuz your mom is talking about taking it because I
13   guess Marilyn's -- Lucy's Oldsmobile was in
14   Marilyn's name, and Marilyn was talking about
15   repoing her car from her.
16          I said just hide your car because your
17   mom is talking about -- And Kevin wanted to
18   fight.  I said, look, man.  I'm not trying to
19   take your girl.  You're married.  I'm leaving.  I
20   think that was the day I left.  I think it was
21   that Sunday that I seen them.
22          I said, look, I'm not staying there
23   anymore.  So you can let her go over there with
24   the kids or whatever, but Marilyn's talking about

20  (Pages 77 to 80)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 81

1    taking the car.  What, you ain't got nowhere to
2    stay?  I said, I got somewhere to stay.  You can
3    stay here.
4           I guess he was trying to appease Lucy
5    so he can be a nice guy.  I don't know.  I didn't
6    wanna stay there.  No, I didn't know how much he
7    knew about me and Lucy's relationship, wake up
8    with a baseball bat in my head or something.
9    Q.  So let me ask you this:  We had talked
10   about your discussions with Marilyn.  You never
11   mentioned anything about the repossession of the
12   car.
13          When did that discussion occur?
14   A.  That would have been that day, that morning
15   that I talked about leaving.  It just slipped my
16   mind until you said something about me going by
17   their house.  It was just the way I had to leave
18   to go get out of the neighborhood to get back to
19   my route home.
20   Q.  What else did you talk to Marilyn about
21   that you haven't told us?
22   A.  That's about all that comes to mind right
23   now.
24   Q.  Okay.

Page 82

1    A.  We talked about Tomazovich's -- She sent me
2    and Lucy to the Currency Exchange to get some
3    paper eviction notice, five-day notice, 15-day
4    notices signed.
5           I went with Lucy when she -- This was
6    before she got married.  She handed them to
7    Marko, and he was threatening to kill them and
8    calling them bitches and everything else.
9    Q.  Yeah, we'll get to that.  Let me break that
10   down.
11          So you're talking about an event that
12   happened in June of '93, July of '93?
13   A.  June, July of '93 with the eviction
14   notices.
15   Q.  So Marilyn was upset with Marko; is that
16   correct?
17   A.  Yeah.
18   Q.  And why was Marilyn upset with Marko?
19   A.  He wasn't paying his rent, and he was
20   beating his girlfriend up a lot, and his father
21   wasn't paying his rent anymore.
22   Q.  How did you know that?
23   A.  Marilyn.
24   Q.  So Marilyn asked you to go with them to the

Page 83

1    Currency Exchange, and what was the purpose of
2    that?
3    A.  I went -- She asked -- Sent Lucy to the
4    Currency Exchange to get a thing notarized.
5    Q.  Okay.
6    A.  And they knew the person there because
7    Marilyn signed the paper, and Lucy wasn't the
8    signer.  So the lady didn't wanna do it at first.
9    She goes, come on, you know my mom.  I guess they
10   called.  Yeah, I signed.  Okay.
11          They stamped it with a notary stamp,
12   and we went and Lucy knocked on the door, and I
13   was standing in the living room in case Marko
14   tried anything, and he just got mouthy.
15   Q.  Okay, so tell me what Lucy said to him.
16   A.  Here, my mom told me to give you this.
17   What is it?  It's an eviction, five-day notice or
18   15-day notice, whatever it was, and he started
19   cussing and screaming and threatening.
20   Q.  So his statements that he was making were
21   directed at whom, at Lucy, at you, at Marilyn,
22   who?
23   A.  At Lucy and Marilyn.
24   Q.  And what was he saying as best you recall?

Page 84

1    A.  Just basically threats.  He was gonna hurt
2    them.  He'll catch them when they're alone and
3    fuck up their cars, do all kinds of shit.
4           And I wanted to go at him.  Lucy
5    grabbed my arm and said, no, come on, let's go
6    upstairs; and he was yelling and screaming
7    outside on the sidewalk for a minute or two after
8    that and that was it.  He shut up.
9    Q.  So when you were moving out from Marilyn's
10   in July of -- July 26th, 1993, did you have any
11   discussions about any monies that were still owed
12   by you to her?
13   A.  No.  If I owed her 10, 20 bucks, I told her
14   that I'd pay her on Friday if I owed her.  I
15   don't remember.  I don't recall.
16   Q.  Okay, so as of August of 1993, did you
17   suffer from any medical conditions?
18   A.  August of '93?
19   Q.  Yes, sir.
20   A.  I had so many over the years.  I can't
21   remember.  I don't think so.
22   Q.  Okay, how about psychological conditions in
23   1993?
24   A.  Maybe minor depression or something.

21 (Pages 81 to 84)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 85

1    Q. Okay, were you consulting any medical care
2    professional in August of 1993, going to the
3    doctor?
4    A. 30 years ago, I can't remember.
5    Q. Okay, were you taking any prescription
6    medications in August of 1993?
7    A. Again, I can't remember if I was or not. I
8    might have been. I just don't recall it.
9    Q. Okay, I'm going to switch gears here and
10   give you a document I'm going to mark as
11   deposition Exhibit No. 1, and this is a copy of
12   the amended complaint that your attorney filed
13   for you in this case.
14        And bear with me because we can't give
15   you anything with paperclips or staples.
16   A. I know. He's gonna search me before I
17   leave. I ain't gonna touch nothing.
18        (Whereupon, Dukes Deposition
19        Exhibit No. 1 was marked for
20        identification.)
21   MR. ACKER: That's all right. Very good.
22   This is deposition Exhibit No. 1. It's marked,
23   and this is the First Amended Complaint, document
24   number 63 filed April 27th, 2022, and it's a

Page 86

1    19-page document. I'm going to give this to you,
2    and I want you to take a look at it.
3        (Document tendered.)
4        THE WITNESS: Okay, what am I looking for?
5    BY MR. ACKER:
6    Q. Have you ever seen it before?
7    A. Actually, no. I think I've seen the front
8    page. I never really looked through it all.
9    Q. Okay, so did you --
10   A. Or I have looked through it and I just
11   don't recall. There's so much legal stuff with
12   this. I can't discern which is which sometimes.
13   Q. Do you have any recollection of your
14   attorney providing this to you for review in
15   April of 2022?
16   A. I signed it I think. I reviewed a lot of
17   paperwork. I know that. I think this was an
18   E-sign.
19   Q. Yeah, I don't think you could sign. I
20   think Steven signed for you.
21   A. I authorized him to sign it. Yeah, I
22   remember it. I just can't remember the contents
23   of it.
24   Q. Okay, we're going to go through it here in

Page 87

1    a minute. So just hold tight.
2    A. Okay.
3    Q. So as far as -- Again, since you haven't
4    reviewed them, you know, I'm going to just ask
5    you a series of questions about, you know, some
6    of the specificity of these allegations and ask
7    you to let me know if you believe they're true
8    and correct or if there's something else that you
9    recall about them.
10        Okay, so I'm going to go through the
11   complaint, okay?
12   A. Okay.
13   Q. So I'm going to turn your attention to the
14   bottom of page four. There's a section
15   identified as evidence at trial.
16   A. All right, okay, 20, item number 20.
17   Q. Yeah, evidence at trial, beginning with
18   that.
19        So you attended the trial?
20   A. Yes.
21   Q. Your state criminal trial?
22   A. Yes.
23   Q. And was that in or about December of 2011?
24   A. It was.

Page 88

1    Q. And you witnessed the statements that were
2    made during the trial?
3    A. Well, as best could be from where my
4    position in the courtroom was.
5    Q. Okay, at the bottom of page four, paragraph
6    21 --
7    A. Okay.
8    Q. -- begins Marilyn Williams owned a house in
9    Cicero.
10        That's a true statement, correct?
11   A. Yes.
12   Q. In the summer of 1993, she lived upstairs
13   in the house with her daughter Lucy and Lucy's
14   two children, Dustin, then two years old, and
15   Bridget who was eight.
16   A. Yes.
17   Q. Those are true and correct, correct?
18   A. Yes.
19   Q. Marilyn rented part of the first floor to
20   Marko Tomazovich, right?
21   A. Yes.
22   Q. Do you believe Marilyn owned the house?
23   A. Yeah. I believe she owned the house, yes.
24   Q. And do you believe Marilyn lived upstairs

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                        WILLIAM DUKES

Page 89

1   with Lucy and her two children before the summer
2   of 1993?
3        A. Yes.
4        Q. Okay, paragraph 22: "Some time that summer
5   Marilyn met Plaintiff William Dukes. She leased
6   a second unit on the first floor to Dukes for
7   about two months. Lucy briefly engaged in a
8   sexual relationship with Dukes that summer."
9             Do you believe those allegations to be
10  true and correct?
11       A. Sentence number two is -- No.
12       Q. No, it's not?
13       A. No.
14       Q. So what would you correct that as?
15       A. I didn't rent part of the second unit on
16  the first floor. I rented a room off of
17  Marilyn's unit in her apartment upstairs.
18       Q. Okay, any other things -- statements
19  contained in 22 that you believe are incorrect?
20       A. No. The rest is correct.
21       Q. Okay, looking at paragraph 23: On
22  July 23rd, 1993, Lucy told William Dukes that she
23  was going to marry her longtime boyfriend, Kevin
24  Rhynes, the next day. Dukes wished her good

Page 90

1   luck.
2             Lucy had sex with Dukes that night and
3   married Kevin at the courthouse the next day.
4   Lucy and her children moved into Kevin's home,
5   and Dukes moved out of Marilyn's house soon
6   thereafter.
7             Do you believe those allegations are
8   true and correct?
9        A. Yes.
10       Q. Is there any statements in there that you
11  think that need to be changed?
12       A. I wished her good luck. We had sex. She
13  married Kevin the next day. Lucy and her
14  children moved in with Kevin the next -- on the
15  -- I guess the 24th, and I moved out on the 25th.
16       Q. Okay, so, again, we were talking generally
17  about the time period. You thought it was maybe
18  the 24th was that Friday.
19             It may have been the 23rd, is that
20  correct, was that Friday?
21       A. Yeah.
22       Q. Okay, so we would just back up the dates
23  that you had discussed earlier about Saturday
24  being the 25th. It's really the 24th.

Page 91

1             And then that Sunday would be the 25th,
2   right?
3        A. Yeah. It would have been Friday, Saturday,
4   Sunday.
5        Q. Okay, assuming that July 3rd, 1993 is a
6   Friday, correct?
7        A. Assuming, yes.
8        Q. Okay, so where did this conversation occur
9   when Lucy told you she was going to marry Kevin?
10       A. By the kitchen cabinet standing in -- I was
11  standing in front of my door to my bedroom.
12       Q. Yeah, when was --
13       A. In the kitchen.
14       Q. Okay, was that the first time you heard
15  that Lucy was going to marry Kevin?
16       A. Yes.
17       Q. Did anyone tell you about the marriage
18  before Lucy?
19       A. No.
20       Q. Did Marilyn tell you about Lucy's marriage
21  to Kevin?
22       A. How do you mean?
23       Q. She talked about the marriage, right?
24       A. Yeah, after.

Page 92

1        Q. Okay.
2        A. That morning, before it happened, she
3   handed me the IDs.
4        Q. Okay, so she did provide you with Lucy's
5   identifications prior to the wedding, correct?
6        A. Yes. She was trying to put a stop to the
7   wedding.
8        Q. Okay.
9        A. So she could talk sense into Lucy or
10  something I guess you'd call it.
11       Q. Okay, and, again, we talked about you had
12  sex with Lucy that night before she got married,
13  correct?
14       A. Yeah. I was in bed with her up to three
15  hours before she got married.
16       Q. Okay, how long do you believe your sex
17  lasted with her that night?
18       A. We were up most of the night.
19       Q. Okay, so moving on to the next paragraph,
20  24: Tomazovich had a severe problem with
21  substance abuse and addiction. His father helped
22  him pay the rent; but by the summer of 1993,
23  Tomazovich's father decided to stop giving
24  Tomazovich money, and Tomazovich stopped paying

23 (Pages 89 to 92)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 93

1  rent.
2         Do you believe those allegations are
3  true and correct?
4     A. I think Tomazovich stopped paying rent
5  before that, and the father was paying it, and
6  the father just stopped paying the rent too.
7     Q. Okay, so how did you know that Marko had a
8  severe problem with substance abuse and
9  addiction?
10    A. Like I said, you always seen him -- I
11 always -- Every time I seen him leaving the house
12 or something, he's caring a six-pack or had a
13 beer in his hand. He appeared drunk or high.
14 It's hard to tell.
15        But he appeared drunk because he had --
16 I assume drunk because he had alcohol in his
17 hand, and you'd see him carrying coolers to the
18 car, carrying them out, throwing beer cans out.
19        I'd take Marilyn's garbage down the
20 stairs and throw them in the garbage, and there
21 would be bags of cans in the garage, beer cans.
22 So if we weren't throwing them out of Marilyn's
23 house, there was only -- nobody living in the
24 front unit, the only place it could come from is

Page 94

1  from him.
2     Q. How did you know he was addicted?
3     A. He's not working and he's always drinking.
4     Q. Did you ever use drugs with Marko?
5     A. No.
6     Q. How do you know Marko's father helped him
7  pay the rent?
8     A. Marilyn had mentioned it here and there. I
9  just didn't -- It was basically none of my
10 business. So it didn't pertain to me. So it was
11 in one ear and out the other.
12    Q. Do you know how much Marko's rent was?
13    A. No; but if I would have rented the front
14 apartment, it would have been 4 or $500 a month
15 at the time, so probably about the same.
16    Q. Okay, so paragraph 25 --
17    A. I'm assuming.
18    Q. I'm sorry. You all set?
19    A. Yeah.
20    Q. Okay, paragraph 25: Lucy handed Tomazovich
21 an eviction notice for failure to pay the rent.
22 Marilyn and Lucy told Tomazovich they just wanted
23 him to move out.
24    A. Well, I was there with Lucy when she handed

Page 95

1  him one of them.
2     Q. I'm going to keep going here.
3     A. And he did say that.
4     Q. He said, fuck you, bitches. I ain't
5  paying?
6     A. Yep.
7     Q. "Later Tomazovich said to Marilyn, one day,
8  I'm going to get you when you're alone. You
9  better watch your back. I'm going to kill you."
10    A. I didn't hear him say he was gonna kill
11 them that night. He said he was gonna beat them
12 or something, break their shit, meaning their
13 vehicles or their house or something.
14    Q. Okay.
15    A. That's what I took it to mean. I went to
16 turn around to go confront him about it, and Lucy
17 grabbed my arms and said, come on, let's go
18 upstairs, and we went upstairs.
19    Q. So your testimony is you did not personally
20 witness Marko making a statement I'm going to
21 kill you?
22    A. He said something about he was gonna hurt
23 them.
24    Q. Okay.

Page 96

1     A. I didn't -- It could have went either way.
2  He was gonna hurt them breaking their property or
3  he was gonna hurt them physically.
4     Q. All right, so other than that modification,
5  you believe these allegations in paragraph 25
6  would be true and correct?
7     A. Yes, I do.
8     Q. And you witnessed the event of Lucy handing
9  Marko the eviction notice?
10    A. Yep, more than one.
11    Q. Okay, and approximately what date did this
12 occur?
13    A. This would have been late June.
14    Q. Okay.
15    A. I assume. I can't be positive. Like I
16 said, it's 30 years ago, but it was within a few
17 weeks; and, again, a week later she handed him
18 another notice.
19        I can't remember. There's multiple
20 notices that she was required to give like a
21 ten-day, a five-day, a 15, something like that.
22    Q. Okay, did you witness Marilyn or Lucy
23 making statements to Marko to the effect they
24 just wanted him to move out?

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 97

1    A. Yes, I did.
2    Q. And who was making those statements?
3    A. Lucy mostly because Marilyn would have went
4  off the verbal deep end I guess you'd call it.
5  She would have got very loud and adamant about
6  some things.
7    Q. Okay.
8    A. But then 20 minutes later, an hour later
9  she would have been back to herself again and
10  just stayed away from him.
11    Q. All right, and so did you witness
12  subsequent events when Marko made a statement to
13  Marilyn, I'm gonna get you when you're alone?
14        Was that at the time when the first
15  eviction notice was served or was that some other
16  event?
17    A. I don't think it was the first one. It
18  would have been the second time Lucy handed him
19  the eviction notice because I told her I didn't
20  want her going -- don't give him shit was my
21  exact words to her unless I'm there with you
22  because if he gets stupid and does something to
23  you like he does Diane, I was gonna hurt him.
24    Q. Did you ever --

Page 98

1    A. He was known to hit -- I knew him to hit
2  women because he was smacking his girlfriend
3  around. You could hear it sometimes through the
4  windows.
5    Q. So did you ever talk to Marilyn about
6  hurting Marilyn -- Or I'm sorry.
7        Did you ever talk to Marko about him
8  trying to hurt Marilyn?
9    A. No. Lucy had asked me to avoid him because
10  Lucy knew that if he got smart with me and said
11  anything like that that I would have hit him.
12    Q. Did you believe Marko to be a violent
13  person?
14    A. Well, seeing Diane with black eyes and fat
15  lips, torn clothes, bruises on her arms not from
16  track marks from needles but from, like, where
17  somebody hit her or grabbed her.
18    Q. So did you ever personally witness those
19  incidents where she was being beaten or violence
20  used against her?
21    A. Nope. I heard it. I don't know what
22  part -- I was never in his unit. So I don't
23  know -- The building, say, is shaped like this
24  (indicating) piece of paper, longer than it is

Page 99

1  wide.
2        You got the rear half or two-fifths of
3  the apartment building was Tomazovich's unit.
4  Part of his unit was underneath my bedroom. One
5  of his windows was underneath my bedroom window.
6        I could hear what was going on. You
7  could hear him throwing stuff or pushing each
8  other and falling against things.
9        You could hear, like, skin on skin
10  contact like a slap or a punch. They are
11  distinct sounds. You could hear it and then the
12  next day she'd be bruised up.
13    Q. So the next two paragraphs, 26 and 27, the
14  first one being 26: On August 28th, 1993, Lucy
15  left Bridget and Dustin with Marilyn while Lucy
16  went to work her shift as a cocktail waitress
17  from 5:00 p.m. until closing. She went to
18  Marilyn's home the next morning. So I'm going to
19  stop right there.
20        So are these facts that you knew in
21  advance?
22        Did you know this as of the 28th of '93
23  that she was working her shift that night?
24    A. No, I didn't know where she worked.

Page 100

1    Q. You subsequently learned that though at
2  trial, correct?
3    A. Yes.
4    Q. And then she went to Marilyn's home the
5  next day is the last allegation on 26.
6        You didn't have personal knowledge of
7  that, did you?
8    A. No.
9    Q. Paragraph 27: Lucy found the front door
10  ajar, and then she saw Dustin sleeping on a
11  couch. Lucy found Marilyn and Bridget in the
12  bathtub dead. She picked up the telephone but
13  heard no dial tone.
14        She went down to Tomazovich's unit and
15  banged on the door. When he answered, she told
16  him to call 9-1-1. Tomazovich came upstairs with
17  her and then went to a neighbor's home to call
18  police.
19        Do you have any personal knowledge of
20  these events, sir?
21    A. No. I just learned this at -- how it went
22  down at trial with that.
23    Q. Okay, 28 and 29 are allegations regarding
24  the medical examiner's events and police recovery

25 (Pages 97 to 100)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 101

1    of evidence.
2            Do you see those, sir?
3        A. Which number?
4        Q. 28 and 29, the top of page six.
5        A. Okay.
6        Q. So the first one, paragraph 28: The
7    medical examiner found that Bridget died when
8    someone tied a ligature around her neck and cut
9    off her air.
10           Do you have any personal knowledge of
11   those facts, sir?
12       A. No.
13       Q. Tears of her vagina indicated that she had
14   been raped shortly before her death.
15           Do you have any personal knowledge of
16   those facts?
17       A. No.
18       Q. Marilyn died from suffocation.
19           Do you have any personal knowledge of
20   those facts?
21       A. No.
22       Q. Her head bore marks showing the result of
23   blunt force trauma shortly before death.
24           Do you have any knowledge of those

Page 102

1    facts, sir?
2        A. No. All this I learned at trial.
3        Q. Okay, and then paragraph 29 talks about the
4    evidence recovered from Marilyn's home.
5            Do you have any personal knowledge of
6    those facts?
7        A. No.
8        Q. Okay, turning your attention to paragraph
9    30: In an initial interview on August 29th,
10   1993, Tomazovich told Defendant Cicero Police
11   Detective Darlene Sobczak he knew nothing about
12   the murders.
13           He told Sobczak that he bled on his
14   shirt and jeans in a fight at a bar. He also
15   said he bled on his clothes during a fight in the
16   woods.
17           Do you have any personal knowledge of
18   these allegations, sir?
19       A. No.
20       Q. Did you believe that -- Did you believe
21   that -- I'm sorry.
22           Do you know the source of these
23   allegations?
24       A. In number 30?

Page 103

1        Q. Yes, sir.
2        A. No, I don't. I've seen Tomazovich coming
3    home, getting out of his car with blood on him
4    before, but not at this time. This was before I
5    left --
6        Q. Okay.
7        A. -- in July. This is August. This is after
8    the murders. I see that.
9        Q. Right.
10       A. I've had knowledge of this happening to him
11   before as far as him coming home bloody with
12   blood on his clothes and stuff after he'd been in
13   an apparent fight somewhere, but I didn't know
14   where or who it was with.
15           Like I said, prior to my moving out and
16   after my moving out, I didn't want nothing to do
17   with the man.
18       Q. Okay, turning your attention to paragraph
19   31: In October 1994, police arrested Tomazovich
20   for two robberies. Tomazovich pled guilty, and
21   the Court sentenced him to six years in prison.
22           Do you have any personal knowledge of
23   these facts?
24       A. No, I do not.

Page 104

1        Q. Did you know that Tomazovich was engaged in
2    robberies at that time?
3        A. No, I didn't.
4        Q. Do you know whether or not he, in fact,
5    served any time as a result of these robberies?
6        A. After the fact through trial and stuff,
7    yeah, but at the time, no.
8        Q. Okay, paragraph 32: In March 1995, Sobczak
9    again interviewed Tomazovich about the murders of
10   Marilyn and Bridget because he remained a suspect
11   in the case.
12           Tomazovich again said he knew nothing
13   about the murders, but he changed his story when
14   Sobczak interviewed him in August of 1995.
15   Tomazovich then said that he watched while Dukes
16   murdered Marilyn and raped and murdered Bridget.
17           Do you believe these allegations to be
18   true and correct?
19       A. That I did this? No. That he said
20   something like this or this is how Sobczak -- how
21   she interviewed him and when it happened, that's
22   what was brought up at trial.
23       Q. Okay, but you don't have any personal
24   knowledge of these events otherwise?

26 (Pages 101 to 104)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 105

1    A. No.
2    Q. Did you believe or do you have any reason
3  to believe that Marko did or did not make these
4  statements to Sobczak?
5         You don't know if he told her, Sobczak,
6  that or not, right?
7    A. No, I don't know if he did or not.
8    Q. Okay, paragraph 33: Police arrested Dukes
9  in August 1995. Officers found part of Lucy's
10 driver's license in Duke's wallet.
11        Dukes told Sobczak he knew nothing
12 about the murders, and he had not gone to
13 Marilyn's house on the night of the murders.
14 Police released Dukes without charging him.
15        Do you believe these statements to be
16 true and correct?
17   A. Yeah. They arrested me on August 6th, '95
18 pursuant to a August 7th warrant.
19   Q. Okay, identify what police arrested you in
20 August of 1995?
21   A. Yeah, Sobczak and her partner. I can't
22 remember his name, Bazaro (phonetic) Bizerik.
23   Q. Robert Bizerik?
24   A. Bizerik, yeah.

Page 106

1    Q. And where did these events occur?
2    A. In Indiana. I didn't know at the time.
3  They said they had a warrant for my arrest, but
4  the warrant wasn't issued until the day after
5  they arrested me.
6    Q. Did they, in fact, find part of Lucy's
7  driver's license in your wallet?
8    A. Yeah. It was the photo portion that Lucy
9  had given to me while I was still living at the
10 house. We were looking for screws or something
11 in the junk drawer.
12        There was a piece of driver's license.
13 Oh, that's my old ID. Here, do you want a
14 picture? And she handed me a picture, her
15 picture.
16   Q. So this was not from the event on July 23rd
17 when Marilyn handed you a stack of
18 identifications?
19   A. No, that -- Lucy got her ID back, her
20 driver's license. I think she had both. If I
21 remember right, she had an ID and a license, and
22 I gave them both back to her.
23        I didn't touch them. I didn't damage
24 any of the paperwork Marilyn had given me. Lucy

Page 107

1  got them back exactly how Marilyn handed them to
2  me.
3         That picture I had in my wallet,
4  according to this number 33, Lucy had given to me
5  from an old license that was in a junk drawer in
6  the kitchen.
7    Q. Did you make statements to Sobczak that you
8  knew nothing about the murders?
9    A. Yes, I did.
10   Q. Was your statement true and correct?
11   A. Yes, it was.
12   Q. Who was present at that time?
13   A. Her partner Bizerik.
14   Q. Anybody else?
15   A. Not that I recall.
16   Q. Did you make a statement to Sobczak that
17 you had not gone to Marilyn's house on the night
18 of the murders?
19   A. Yes, I did.
20   Q. Was that statement true and correct?
21   A. Yes, it was.
22   Q. Paragraph 34: Police arrested Tomazovich
23 again in 1998. Again police asked him about the
24 murders. This time Tomazovich said that he held

Page 108

1  Marilyn's legs while Dukes choked her.
2  Prosecutors charged Tomazovich with the murders
3  of Marilyn and Bridget.
4         Do you believe these allegations are
5  true and correct?
6    A. That's what came up at trial, yes.
7    Q. So, again, I don't mean to trick you.
8  These are statements that Marko made.
9         Do you believe that he made those
10 statements?
11   A. Yeah. I think he testified at trial that
12 he did --
13   Q. Okay.
14   A. -- after they paid him.
15   Q. How much -- How do you believe that he was
16 paid?
17   A. Pretrial discovery showed he was paid over
18 $12,000 by the prosecutor's office in free
19 commissary. They were giving him pizza parties
20 on the weekends. They were giving him catered
21 holiday meals.
22        He was running a business with the
23 State's Attorney's Office investigator, stuff
24 like that. That came up in pretrial.

27 (Pages 105 to 108)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 109

1        They tried to give him an air
2   compressor so he can do custom designed air brush
3   t-shirts out of his cell in the witness
4   protection unit ran by the Cook County State's
5   Attorney's Office.  That all came up in pretrial
6   discovery and pretrial -- I think it even came up
7   in the trial.
8        Q.  Paragraph 35:  Five years later, in October
9   of 2003, Tomazovich agreed to plead guilty to
10  home invasion and to testify against Dukes in
11  exchange for the dismissal of charges against him
12  for the murders of Marilyn and Bridget.
13       Do you believe this allegation is true
14  and correct?
15       A.  Yeah.  I don't know exactly when he agreed
16  to it, but I know he did do that because he was
17  released the day after he testified against me.
18       Q.  Paragraph 37:  William Dukes was arrested
19  on January 9, 2004 and questioned for
20  approximately 36 hours.
21       A.  What question is that?
22       Q.  This is paragraph 37.
23       A.  Oh, you skipped one, 36.  Yeah, 36 hours or
24  more.

Page 110

1        Q.  36 hours or more?
2        A.  Yeah, that's about right.
3        MR. RICHARDS:  Let me just point out one
4   fact.  Mr. Dukes was making -- In answer to that
5   question, Mr. Dukes was making calculations on a
6   piece of paper.  So just so the record is clear
7   that he was doing that.
8        THE WITNESS:  Yeah, I wasn't trying -- I
9   was just adding the time.  So midnight to
10  midnight on July 10th (sic) and yeah, it was
11  about 36 hours.
12  BY MR. ACKER:
13       Q.  So let me back up for a minute here before
14  we get into this.
15       So do you recall the events occurring
16  on January 9th, 2004?
17       A.  Yeah.
18       Q.  What happened that day?
19       A.  I didn't know him as Investigator Killacky
20  then from the Cook County State's Attorney's
21  Office.  I just thought he was a guy from the
22  neighborhood.
23       He had told me he had robbed a bunch of
24  guns out of his brother-in-law's garage, and he

Page 111

1   wanted me to go look at them to see if I wanted
2   to buy any.
3        I was gonna go look.  I thought he was
4   full of crap; and then when we got out there, he
5   did show me a gun in a toolbox.
6        And once I opened the metal toolbox and
7   seen it was actually a gun in there, I handed it
8   back to him and said -- I told him I'd buy it
9   later cuz I don't have any money right now, and
10  then I was arrested.
11       Q.  So let me ask you this:  Between -- We had
12  left off in approximately September of 1993 with
13  our prior examination.
14       A.  Okay.
15       Q.  Between September of 1993 and January of
16  2004, had you been arrested or convicted of any
17  crimes?
18       A.  Yeah.
19       Q.  Tell me about them.
20       A.  2004 I had -- I was in possession of a
21  stolen motor vehicle.  I ended up with that.
22       There were a couple others.  I ended up
23  getting a burglary.  The boss I worked for at
24  National Salad Oil, I didn't go in his house.

Page 112

1   They charged me with residential burglary anyway
2   because I went into his garage and got a couple
3   boxes of chewing tobacco from India out of it
4   without his permission or knowledge.
5        Q.  So we have a car theft and a burglary.
6        Anything else?
7        A.  There were some arrests but -- violation of
8   probation arrests, and I ultimately got nine
9   years.  I did four years in the IDOC, and that
10  was done.
11       Q.  What years were those, sir?
12       A.  August '99 to August '03.
13       Q.  Okay, so between September of 1993 and
14  September -- I'm sorry, 1999 where you just told
15  me that you went in the DOC, any other time that
16  you've spent during that six-year period?
17       A.  Not -- No, I don't think so.  It might have
18  been a minor traffic here and there overnight.
19       Q.  Okay, so you spent approximately six years
20  between -- No, it's not six years.
21       From '99 until 2003, right?
22       A.  Yeah, four years.
23       Q.  Four years.
24       A.  Three days shy.

28  (Pages 109 to 112)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 113

1    Q. Okay, four years?
2    A. August 18th, '99 to August 15th, '03.
3    Q. Okay, so when you got out, where were you
4    living in 19 -- I'm sorry, 2003 after you got out
5    of jail?
6    A. 22 or 23 North Kostner Avenue. I can't
7    remember the exact address. It was on the corner
8    of Belden and Kostner.
9    Q. And who did you live there with?
10   A. Friends, Carol -- Well, Carol passed away a
11   couple months before I got out, but her husband
12   Jack and her son and I can't even remember her
13   son's name. He was 45 years old at the time.
14   Q. Okay, and what did you do for employment?
15   A. Well, I got out on Friday the 15th of
16   August. I went to Harold Washington and enrolled
17   in college, and I worked as a dishwasher and then
18   I worked at Jiffy Lube changing oil on cars after
19   the dishwashing job.
20   Q. Okay, so getting back to this paragraph 37,
21   you were arrested on January 9th.
22   A. Yeah.
23   Q. What did you understand you were arrested
24   for?

Page 114

1    A. The gun that Killacky had tried to give me.
2    Q. Anything else?
3    A. No, not at the time. It was after I got to
4    the station they started trying -- Two detectives
5    that are mentioned in the next one, Washburn and
6    Rodriguez, started asking me about oh, what's
7    this about the murders and what's going on with
8    that? Your name is popping up.
9        I told them I didn't wanna talk to them
10   without a lawyer about that case.
11   Q. Did you -- Was there any charges involved
12   with drugs?
13   A. At the time? No. On the 9th? No. No
14   mention of drugs; or if they asked about drugs, I
15   told them I didn't know anything about it.
16   Q. Where were you when you were arrested on
17   January 9th?
18   A. North Avenue by the car dealer out there,
19   Melrose Park.
20   Q. Melrose Park?
21   A. Al Piemonte.
22   Q. Okay, do you recall what time of day it was
23   when you were arrested?
24   A. 2:45 p.m.

Page 115

1    Q. And then where were you taken after that?
2    A. I tried telling Washburn and Rodriguez in
3    the car about Killacky saying he had other guns,
4    some of them possibly automatic weapons, at a
5    building a couple blocks over. They acted like
6    they didn't care.
7        But they were arresting me for a gun,
8    so I guess they had second thoughts about it and
9    drove me over there, and I pointed out the
10   building, and they took me to their -- what is
11   referred to as their black site, Homan and
12   Fillmore.
13   Q. And what time did you get to Homan and
14   Fillmore?
15   A. 3:00 p.m.
16   Q. So within 15 minutes you were at the police
17   station?
18   A. Yeah.
19   Q. What happened when you got there?
20   A. They don't stop at red lights. They took
21   me inside of the garage. They drove inside the
22   garage. It was filled with large police vehicles
23   like paddy wagons but bigger and video gaming
24   machines. They took me upstairs and stuck me in

Page 116

1    a little room and handcuffed me to a wall.
2    Q. How long did that last?
3    A. 36 hours or more. It seemed like more.
4    Q. So let's talk about the first couple hours
5    that you were in a room.
6        Did anybody come in and talk to you?
7    A. Washburn and Rodriguez.
8    Q. And what did they say to you?
9    A. They started asking me about Killacky and
10   guns and how long I knew him and where I met him
11   and stuff like that. Then they'd leave and then
12   they came back saying, well, your name is popping
13   up in a murder investigation, and they asked
14   about that.
15       And I told them -- Again, I told them I
16   don't wanna talk to you without a lawyer present.
17   I don't wanna talk about that, and they kept back
18   and forth between the gun with Killacky and the
19   murder case.
20   Q. Who else was present at that time?
21   A. Just them two.
22   Q. How long did that go on?
23   A. Until 3:00 o'clock in the morning.
24   Q. What happened then?

29 (Pages 113 to 116)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 117

1    A. Well, 3:30 in the morning. They took me to
2  Harrison and Kedzie Police Station. They had me
3  fingerprinted and photographed.
4    Q. Did they let you sleep then?
5    A. Nope.
6    Q. What happened then?
7    A. Like I said, I got there about 3:30, maybe
8  15, 20 minutes for them to print me and
9  photograph me. They took my jacket and my shoes,
10 stuck me in my sock feet, pants, and a t-shirt in
11 a cell with no bedding, no blanket, no mattress,
12 no nothing. It was ice cold in there. It was
13 January, and I was there maybe five or ten
14 minutes.
15    Then they -- a Jailer came and got me.
16 I don't think they're Chicago Police because
17 their patches on their uniforms are different and
18 they don't wear a badge. They're just lockup
19 personnel.
20    He came and got me out, took me back to
21 the front where they photographed me and did the
22 paperwork at the desk, and Rodriguez was there.
23 He cuffed me behind my back and walked me out of
24 the thing and took me upstairs at Harrison and

Page 118

1  Kedzie, and he started questioning me again.
2    Q. And who was present then?
3    A. It was just Rodriguez then. That was it.
4  I remember looking at the clock because they had
5  one of them great big clocks, like, round clocks
6  like you have in a school, and it was 4:05 I
7  think, 4:04, 4:05 as I walked out of the holding
8  cell -- I mean, the holding area, the lockup.
9    He took me upstairs, handcuffed me --
10 in another small room, handcuffed me to a wall,
11 and started questioning me again. Then about
12 10:00 o'clock in the morning roughly, again, it's
13 hard to see. I'm tired. Washburn shows up.
14    They uncuffed me from the wall, cuffed
15 me behind my back, take me back outside, and put
16 me in a car and take me back to Homan and
17 Fillmore where there were a bunch more cops from
18 Cicero.
19    They put me at a table like this, maybe
20 two of these tables wide and -- with a tape
21 recorder on there with dual cassette capability.
22 I could see the back of it. It had phone --
23 where you could plug in a phone, the old fashion
24 house phones into it, wires, and a box full of

Page 119

1  tapes, and they left me in there.
2    They had two detectives in there at the
3  time. One looked familiar, but I didn't know him
4  at the time. And they introduced him as Cicero
5  detectives.
6    Q. All right, I'm going to stop you right
7  there. I want to back up to your 4:00 o'clock in
8  the morning in the one facility with Rodriguez.
9    What did he ask you about?
10    A. Murders specifically, nothing about the gun
11 and Killacky.
12    Q. What kind of murders?
13    A. Marilyn and Bridget.
14    Q. What did he say to you?
15    A. He just asked me where I was, who I was
16 with, all kinds of stuff. I said, look, I just
17 want a lawyer, leave me alone, and he kept going
18 on and on. He wouldn't stop. He would leave to
19 go take a leak, go get a drink of coffee or
20 something, and that was it.
21    Q. What did he talk to you about when he came
22 back?
23    A. Same thing. I said, Look, just let me have
24 a lawyer and leave me alone, and he'd keep going

Page 120

1  and going and going.
2    Q. How long did this go on for?
3    A. Until 10:00 o'clock in the morning when
4  Washburn showed up, and they both took me to the
5  Homan and Fillmore -- back to Homan and Fillmore.
6    Q. So you're telling me that you were in your
7  cell for ten minutes before they took you out?
8    A. In the lockup, yeah.
9    Q. And that the facility that you had didn't
10 have any bedding or blankets or anything?
11    A. Nope.
12    Q. Did it have a bed?
13    A. It had a steel shelf sticking off the wall.
14    Q. Was --
15    A. No mattress, nothing, bare steel, and the
16 temperature had to be in the 50's.
17    Q. Do you believe that you could have laid
18 down on that steel shelf and gotten some sleep?
19    A. Nope. I would have been like the kid on
20 Christmas Story when he stuck his tongue to the
21 metal pole outside. That's how cold it was in
22 there or seemed to be.
23    Q. Okay, I'm asking you whether you could
24 have, not whether you wanted to.

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich (001-221-339-3972)                85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 121

1     A.  No.  It was too cold to lay down and sleep
2  like that.
3     Q.  Moving forward to 10:00 o'clock, so --
4     A.  In the morning.
5     Q.  I'm sorry, before I get to that.
6          During your evening or early morning
7  session with Rodriguez, was anyone else present?
8     A.  No.  I recall people walking past the
9  interrogation room when he'd leave the door open,
10  but some of them would stop and look in.  I don't
11  recall who else it was.
12     Q.  Okay, so --
13     A.  It was just him that was doing the
14  questioning.
15     Q.  I just want to clarify that on January 9th,
16  2004, the only people that you recall questioning
17  you or being present when you were questioned
18  were who?
19     A.  Washburn, Rodriguez, and then they put
20  Killacky in the cell with me earlier that night
21  before they took -- I'd say it was around 10:00
22  o'clock at night.  They stuck me in a holding
23  cell, a large holding cell at Homan and Fillmore.
24          And a few minutes later -- They cuffed

Page 122

1  me to a small narrow metal bench, and a few
2  minutes later they brought Killacky in still
3  unbeknownst to me he was an officer.
4          They put him farther down the bench and
5  cuffed him.  Two uniformed officers, Chicago
6  police officers, handcuffed him farther away, and
7  he started asking me, man, what's this?  They're
8  asking me about you and murders.  What's going
9  on?
10          I said, look, I told them like I'm
11  gonna tell you.  I don't wanna talk about -- I
12  told Killacky I don't wanna talk about that, and
13  I told them I don't wanna talk without a lawyer,
14  leave me alone.  I told the cops that I didn't
15  wanna talk to them without a lawyer.
16     Q.  So during the entirety of January 9th,
17  those are the only people that you recall
18  speaking with?
19     A.  Yes.  They might have had somebody stuck
20  their head in the room or something.  I don't
21  recall.
22     Q.  Okay.
23     A.  They did everything they could.  Washburn
24  and Rodriguez interviewed me together.  Then

Page 123

1  they'd leave.  One would come back.  He'd leave.
2  The other one would come in.  It was just like
3  tag team back and forth.
4          They did everything they could to keep
5  a person discombobulated.  They'd give you
6  something to drink but then they wouldn't let you
7  go to the bathroom.
8          They'd give you three or four sodas to
9  drink and wouldn't let you go to the bathroom,
10  just stuff to keep you -- anything they could do
11  to keep you, what I'd call, discombobulated.
12     Q.  Okay, moving on to the next paragraph,
13  paragraph 38:  On January 10, 2004, Defendant
14  Washburn questioned Dukes.  According to
15  Washburn, he asked what type of sentence Dukes
16  thought he could get for a double homicide, and
17  Dukes said replied, the needle.
18          Do you believe those statements are
19  true and correct?
20     A.  Yeah.
21     Q.  So you recall an event on January 10th,
22  2004 where Washburn asked you that question and
23  you gave that response?
24     A.  Yeah.  Like I said, there was a tape

Page 124

1  recorder that showed dual cassette capabilities
2  that you could plug into the phone and the tapes.
3  They played one of those tapes for me, all right,
4  and that's when the drugs first came up.
5          And I put my head on the table, and I
6  asked Washburn what type of sentence I could get
7  for the drug thing knowing that the gun didn't
8  matter because I hadn't touched the gun, but I
9  asked him about the drugs.  How much time does
10  that carry or what's the sentence on that?
11          And I put my head on the table, and he
12  said what -- that's when he asked about what did
13  I think I could get for a double murder, and
14  that's when I said the needle.
15     Q.  So moving forward, Washburn -- Paragraph
16  39:  Washburn claimed that Dukes then said he
17  wanted to tell Washburn about his participation
18  in the murders of Marilyn and Bridget.  First
19  Dukes wanted to make some phone calls.
20          Were those statements true and correct?
21     A.  About the phone calls?  Yes.  I didn't tell
22  him I wanted to tell him about my participation
23  in the murders.  He asked me what I could tell
24  him.

31 (Pages 121 to 124)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 125

1    I said, yeah, I can tell you about my
2    participation in the murders. It was
3    non-existent. I didn't do anything. I had
4    nothing to do with the murders. I wasn't there.
5          That's specifically what I told him,
6    and I said I didn't wanna talk unless I can make
7    some phone calls to let people know where I was
8    at.
9    Q. Paragraph 40: Washburn claimed that after
10   the calls, Dukes said he would make a statement
11   about his participation in the murders if the
12   State promised not to seek the death penalty.
13   Washburn said he needed to speak to his
14   supervisor.
15         When he returned, Washburn said, the
16   State's Attorney's Office wants to know exactly
17   what you're going to say in your statement
18   regarding the murders. Washburn claimed that
19   Dukes said, well, I'm gonna tell them about my
20   participation in the murders of Marilyn and
21   Bridget.
22         Washburn asked, what are you gonna say,
23   that you killed Marilyn and Bridget? Dukes
24   answered, yes, yes, I am.

Page 126

1    Are those statements true and correct?
2    A. No, they're not. They're outright lies.
3    Q. And was there an event where you asked
4    him -- you asked Washburn to talk to the
5    supervisor or that Washburn said he needed to
6    speak to the supervisor?
7    A. Nope. It was right after they played the
8    tapes. They played them again, a few more of
9    them, and Washburn said that all this could go
10   away, just tell us about the murders.
11         I said -- Please, you guys, forgive me
12   for what I'm gonna say; but when Washburn said
13   all of this can go away meaning the drugs and the
14   gun case charges, I said, you think I'm fucking
15   stupid? I'm gonna plead guilty to a fucking
16   death penalty murder if you get rid of a simple
17   stupid ass drug case, a murder I had nothing to
18   do with?
19         And he goes, I'll talk to my
20   supervisor. Maybe the death penalty can go away.
21   He volunteered that. I didn't ask him to take it
22   away. I just told him I wasn't gonna plead
23   guilty to something that I didn't -- a death
24   penalty case I had nothing to do with in order

Page 127

1    for them to remove a drug case and a gun case
2    that I didn't touch. I never touched the gun.
3    Q. All right, so I'm going to pull back here.
4    You just discussed paragraph 38, 39 and 40.
5    A. Okay.
6    Q. And these are all events that you believe
7    occurred on January 10th, 2004 or this is the
8    timeframe of when these events occurred?
9    A. The timeframes of what he claims occurred,
10   Washburn, yeah.
11   Q. Okay, who else was present during the times
12   that these events were occurring?
13   A. Now, I don't know cuz they -- Like musical
14   chairs, they were in and out of the room,
15   Washburn and Rodriguez.
16         At one point there was a State's
17   Attorney, Papa, and there were two Cicero
18   detectives in there they introduced. So that's
19   at least five. Then they brought in Killacky, so
20   six in and out all over the place.
21   Q. Okay.
22   A. So I don't know who was in here when he
23   specifically claimed this happened which it
24   didn't.

Page 128

1    Q. Describe for me what Washburn looks like.
2    How tall?
3    A. I was sitting down. So I couldn't really
4    judge height. I was constantly handcuffed and
5    bent over, 5'8 to 6' maybe.
6          Appearance wise, looked like hair style
7    of -- I'm trying to think. My only reference is
8    TV, between Sergeant Carter and Gomer Pyle, black
9    hair, brown hair, short, neat cut.
10   Q. How much did he weigh?
11   A. 200 give or take.
12   Q. What was he wearing?
13   A. A sport coat, button shirt, and dress pants
14   I guess.
15   Q. So he was --
16   A. It could have been jeans. I don't know.
17   Q. Was he in plain clothes or was he --
18   A. Plain.
19   Q. Tell me about Rodriguez.
20         What did he look like?
21   A. A little bit more muscular built, same
22   general height, I wanna say more military-type
23   haircut, and that's about it.
24   Q. How much did he weigh?

32 (Pages 125 to 128)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 129

1     A.  Well, if Washburn was 200, I'd say he
2  weighed around 210, 220 give or take.  I'm no
3  expert on weight.
4     Q.  What was he wearing?
5     A.  Same type of clothes, dress pants or jeans,
6  button-up shirt, like a dress shirt, and a sports
7  coat.
8     Q.  Was there anybody wearing a uniform?
9     A.  Only the guys that brought Killacky into
10  the holding cell around 10:00 o'clock that night
11  under the guise that he was still a suspect in a
12  gun case and not as an officer.
13     Q.  What's Donegan look like?
14     A.  A little shorter, more heavyset, grayer
15  hair.  Pineda, I don't know how to describe
16  Pineda.
17         Like I said, they're sitting down.  I
18  can't tell you how much he weighs or he weighs.
19  They look about the same to me.  One is heavier
20  than the other.  I know that, but I don't know
21  which is which.
22     Q.  What color hair?
23     A.  Donegan was brownish gray that I remember;
24  and the other one you said, he was Hispanic

Page 130

1  looking, black hair.
2     Q.  Any of them wear glasses?
3     A.  Not that I can recall.  I think Donegan
4  might have; and Washburn, yeah, Washburn I think
5  kept putting on readers or prescription.  I don't
6  know.  It just appeared to be readers by the way
7  he was taking them on and off whenever he looked
8  at paper.
9     Q.  I'm going to move forward here to the next
10  couple paragraphs talking about a motion to
11  suppress in paragraph 41; paragraph 42 talking
12  about an expert on hair comparisons; paragraph 43
13  talking about hairs on the comforter; paragraph
14  44, expert admitted Marilyn or anyone else who
15  came to the home could have picked up the
16  unidentified hairs anywhere outside the house.
17  I'm going to move on from that.
18         Paragraph 45, expert DNA comparison,
19  I'm going to move on from that; paragraph 46 we
20  have Defendant Washburn testified about the
21  January 6th, 2004 (sic) interview with Dukes.
22         After the prosecution elicited all of
23  the statements the trial court permitted, defense
24  counsel, on cross-examination, elicited

Page 131

1  Washburn's testimony that Dukes sought a sentence
2  of 20 years, and a sentence of 40 years in
3  exchange for his statement.
4         Do you believe that that statement is
5  true and correct?
6     A.  No, I didn't ask for a sentence.
7  They offered what if we can get you 20 years or
8  40 years?  No, I'm not pleading guilty to
9  something I didn't do.
10     Q.  Okay, what I'm asking you is are these
11  statements true and correct -- This is
12  attributable to what happened at trial.
13         Did Washburn testify to these matters
14  in paragraph 46?
15     A.  I believe Washburn did, but it could have
16  been a State's Attorney that testified to it.  I
17  don't remember which one testified to what.
18     Q.  Okay.
19     A.  But I think it was Washburn.
20     Q.  Would you agree that there was testimony
21  presented at trial, in substance, that attributed
22  your statements that you sought a sentence of 20
23  years and a sentence of 40 years in exchange for
24  a statement?

Page 132

1     A.  Could you repeat that?
2     Q.  Yes.
3         Would you agree that there was
4  testimony provided at trial that they elicited
5  statements from you, not to say that they are
6  true, but they said that you said this, right,
7  that you sought a sentence of 20 years and a
8  sentence of 40 years?
9     A.  Yes.  They said that I said that --
10     Q.  Okay.
11     A.  -- when I didn't.
12     Q.  Okay, I just want to make sure.  Paragraph
13  47:  Defendant Sobczak testified that when she
14  questioned Dukes in '95, she asked him about his
15  relationship with Lucy.
16         According to Sobczak, Dukes kept on and
17  on about how she liked rough sex and that they
18  wanted each other, and he would give -- he would
19  have sex with her, and he wanted him and little
20  detail like about roughness and stuff of sex.
21         Do you believe that that statement is
22  true and correct?
23     A.  She stated -- This is what Sobczak stated.
24  That's not what I told her.  I didn't keep on and

33 (Pages 129 to 132)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

---

Page 133

1    on about anything like that.
2            I told her me and Lucy had sex in the
3    car one time, and it got a little painful being
4    in the car just because we don't fit.
5        Q. Did that result in bruising?
6        A. Not that I recall. It kind of hurts your
7    butt hitting the steering wheel or the gear
8    shift.
9        Q. Did you tell Sobczak that you had a sexual
10   relationship with Lucy in the summer of 1993?
11       A. Yeah, I told her we were friends with
12   benefits.
13       Q. Did you tell Sobczak that Lucy's sexual
14   relationship with you was consensual?
15       A. Yeah, because she was insinuating that we
16   were having -- that I was forcing myself on Lucy,
17   and we weren't. We just wanted each other, and
18   that was it. I didn't tell it this way. I
19   just -- We were both consenting adults.
20       Q. Did you tell Sobczak that Lucy liked having
21   sex with you?
22       A. She kept doing it. So I assume she did. I
23   didn't tell Sobczak that.
24       Q. Did you tell Sobczak that you liked having

---

Page 134

1    sex with Lucy?
2        A. Well, it's kind of stating the obvious when
3    two people keep having sex. Evidently they like
4    it. It was between me and Lucy. It was none of
5    her business.
6        Q. Do you believe that Sobczak's testimony
7    about your relationship with Lucy was false?
8        A. Yes. I don't believe it. I know it.
9        Q. What part of it is false?
10       A. She kept on and on about how Lucy liked
11   rough sex. I never said anything about that. I
12   never said Lucy liked rough sex. I never said I
13   liked rough sex. I never said stuff about little
14   details about roughness of sex and that kind of
15   stuff, nothing.
16       Q. Putting aside the -- your objection about
17   inclusion of roughness or rough sex, what else do
18   you believe is false about Sobczak's testimony?
19       A. Just this part here on 47?
20       Q. Yes.
21       A. I didn't keep on and on. I said we were
22   consenting adults. I never said anything about
23   the rough sex.
24       Q. Is it true that you talked with Sobczak in

---

Page 135

1    1995 about having sex with Lucy?
2        A. Yeah, I told her we had sex.
3        Q. So she's not making that up?
4        A. No. She just added stuff to it.
5        Q. Is there any -- Do you have any reason to
6    believe that the statements that she
7    characterized as having -- that she wanted you
8    and that she liked having sex with you, do you
9    believe that that's an embellishment?
10       A. I think it's an inference. She inferred --
11   I mean, we had sex repeatedly and maybe she
12   just -- That's how she phrased it, but there was
13   nothing about rough sex.
14       Q. Paragraph 49: Sobczak testified that she
15   asked Dukes why he had Lucy's picture -- Hold on
16   a second before I get to that one.
17           So as far as your statements about Lucy
18   and rough sex and all that and claiming that
19   Sobczak's testimony is false, who are you going
20   to call to testify as to those facts?
21           MR. RICHARDS: Objection, I'm not sure I
22   understand.
23           THE WITNESS: I'm not either.
24

---

Page 136

1    BY MR. ACKER:
2        Q. Who's going to testify that Sobczak was
3    lying?
4            What facts do you have?
5        A. Well, I'm sure if I get on the witness
6    stand you're going to bring up my past criminal
7    history prior to all this to infer that I'm
8    probably lying.
9            So I would probably call her criminal
10   history too. She's a dirty -- She was a dirty
11   cop, plain and simple. She went to prison for
12   lying and stuff, but who would I call?
13       Q. Yes, sir.
14       A. Lucy cuz why am I gonna lie on Lucy about
15   she liked rough sex? I know she didn't. We
16   never had rough sex. So...
17       Q. What other evidence do you have other than
18   your testimony?
19           Do you have any documentary evidence to
20   show that these statements are false?
21       A. No. You could consider the lack of.
22   Nobody ever went to the doctor as evidence that
23   this stuff didn't happen.
24       Q. So it's your word against Ms. Sobczak's?

---

34 (Pages 133 to 136)

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 137

1       A. Yeah.
2           MR. RICHARDS: Objection, argumentative.
3   You can answer.
4           THE WITNESS: Yes.
5   BY MR. ACKER:
6       Q. Paragraph 49: Sobczak testified that she
7   asked Dukes why he had Lucy's picture from her
8   driver's license in his wallet.
9           She claimed Dukes said Marilyn asked
10  him to stop Lucy from marrying Kevin. After
11  Dukes had sex with Lucy the night before her
12  wedding, Dukes took all of Lucy's identification
13  cards thinking that she could not complete the
14  civil ceremony without any identification.
15          Do you believe these allegations are
16  true and correct?
17      A. No, they are not.
18      Q. Why not?
19      A. Up until the column at wedding, she claimed
20  Dukes said Marilyn asked him to stop Lucy from
21  marrying Kevin.
22          After Dukes had sex with Lucy the night
23  before her wedding, Marilyn gave Dukes all of
24  Lucy's identification cards and asked me to take

Page 138

1   them with me thinking that -- Marilyn thinking
2   that Lucy couldn't get married if she didn't have
3   identification. That's exactly what I told
4   Sobczak.
5       Q. So this conversation did, in fact, occur?
6       A. Yeah.
7       Q. You did, in fact, tell Sobczak about how
8   you came into possession of Lucy's
9   identifications?
10      A. Yeah, and I gave them back to her that same
11  day. I told Sobczak that.
12          And as far as the driver's license
13  picture, I told Sobczak that I think we were
14  looking for something in a junk drawer, screws or
15  something, to fix something in the house, one of
16  the cabinets or whatever, and one of Lucy's old
17  ID's was in there cut in half; and Lucy said,
18  here, do you want a picture? And she gave me the
19  picture from the ID. That was it.
20          I didn't cut up Lucy's IDs that Marilyn
21  gave me. I gave them back to Lucy intact --
22      Q. Did you --
23      A. -- and I told that to Sobczak. Sorry. I'm
24  sorry.

Page 139

1       Q. Did you tell Sobczak that Marilyn asked you
2   to stop Lucy from marrying Kevin?
3       A. Yeah, by taking her IDs that Marilyn handed
4   me. Marilyn took her IDs. That's how she asked
5   me to stop the wedding when she handed them to
6   me. Here, take these with you so she can't get
7   married.
8       Q. Do you believe that Sobczak's testimony
9   about you taking Lucy's identification before her
10  wedding was false?
11      A. Yeah, because I told her I didn't take it.
12  It was given to me by Marilyn.
13      Q. The fact of the matter is that you walked
14  away from the house with it that day; is that
15  correct?
16      A. That I did, yes.
17      Q. Okay, so isn't that you taking it?
18          MR. RICHARDS: Objection, argumentative.
19  You can answer.
20          THE WITNESS: Yeah, I guess technically
21  that could be. I was part of the taking. I
22  didn't take it. I participated in it after the
23  fact.
24

Page 140

1   BY MR. ACKER:
2       Q. You received it, and you intended to
3   deprive Lucy of having it for her ceremony; is
4   that correct?
5       A. Yeah, under the -- at the request of
6   Marilyn.
7       Q. Who do you intend to call as witnesses to
8   show that Sobczak's testimony for this allegation
9   is false?
10      A. I don't know. It's going to be my word
11  against hers. The driver's license picture, I
12  guess you can check with the DMV and see when she
13  got pictures -- or replaced her license. If I
14  supposedly cut it like Sobczak claimed, she would
15  have had to get a new one.
16          And it would show if she did it or not.
17  If she didn't then that means I gave her back --
18  What I received from Marilyn, I gave her back her
19  IDs and driver's license intact.
20      Q. Turning to paragraph 50: Dukes told
21  Sobczak that on August 28th, 1993, he spent the
22  afternoon with a friend. Then he went to another
23  friend's house. Then he stayed at a crack house
24  for the night.

35 (Pages 137 to 140)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                        WILLIAM DUKES

Page 141

1         Do you believe these allegations are
2   true and correct?
3         A.  No.
4         Q.  Tell me what you believe is false?
5         A.  I went to a friend's house about 11:00
6   o'clock that -- I left my house about 11:00,
7   10:30, somewhere around there, and went to a
8   friend's house that I worked with.  We were
9   supposed to work on a car at his house.
10        Westmont, it's off Interstate 55 and it
11  was near -- not too far from where Lucy worked as
12  a cocktail waitress at the time.  I went to his
13  house that morning, and he wasn't there.
14        Around noon he comes home.  15, 20
15  minutes I sat there and let my truck cool down.
16  It was an old truck, '67 Chevy.  It was almost 30
17  years old at the time.
18        Anyway, he shows up with his wife and
19  kids in the car and tells me that the customer
20  cancelled the job on the car.  Okay, talked for a
21  few minutes and I came home.
22        I get home around 12:30, 1:00
23  o'clock -- No, around 1:00, 1:30 I guess; and
24  then after four or five hours or so, 4:30, 5:00

Page 142

1   o'clock, I leave and go to another friend's
2   house.
3         The guy I was with I went to first was
4   Mark Bowling.  I remember the name because his
5   brother was one of John Wayne Gacy's victims,
6   Tommy Bowling, and I told that to Sobczak.
7         Then another friend I went to was a guy
8   I went to school with at Lincoln Tech.  His name
9   was Brussels.  I remember the name because word
10  association, brussel sprout.  His name is Russell
11  Farmer.
12        He lived near 78th on the east side,
13  78th Street south on the east side because he
14  lived near that -- It's a CTA train that goes to
15  Indiana, but it's got overhead electric lines.
16  He lived in that area.
17        I get to his house, knock on the door.
18  He's not there.  Nobody answers.  So I leave a
19  note with the time and the date, and I see him
20  Monday morning or Monday evening at school.  He
21  said, yeah, I got your note.  I got home ten
22  minutes after you left.
23        Anyway, I left his house 7:30, 8:00
24  o'clock, somewhere around there, and stopped at a

Page 143

1   liquor store in that area, got a six-pack, jumped
2   back on Lake Shore Drive, and I stopped somewhere
3   around 63rd Street.
4         They got those little indentations on
5   the side where you can park a car if you break
6   down.  I parked there, popped the hood on the old
7   truck, put the hazards on, jumped the fence and
8   sat by the lake and drank a six-pack.
9         And then I jumped the fence and went
10  home or started to go home and changed my mind
11  half way there and got off around Fullerton and
12  went to a friend's house that lived near Kedzie
13  and Armitage, a Puerto Rican guy I knew over
14  there named Angelo.  We all called him Angel, had
15  a few beers.
16        Me and him went to a place that sold
17  crack on the street, bought $10 a piece, so $20,
18  came back to his house to smoke it and found out
19  it was soap and drywall.
20        I had a couple more beers, and I went
21  home.  I got home right at midnight, and the
22  doors were locked.  So I knocked on the door --
23  well, not the door.  I went around and knocked on
24  the bedroom window so I wouldn't wake everybody

Page 144

1   up, and the person that was sleeping in the room
2   came out to the front door and let me in.  I went
3   in, went downstairs and went to sleep.
4         Q.  You told Sobczak all that?
5         A.  Yep.
6         Q.  Every word of it, huh?
7         A.  Pretty much.
8         Q.  All those identities?
9         A.  Yep, and a couple others.
10        Q.  Yep.
11        A.  There was Aaron, Lupe, Efrain, Peter -- or
12  his name was Pedro, but it was Aaron's brother
13  Peter which was Efrain's father, Alicia, Irma,
14  the two adult women.  I think it was -- Yeah, it
15  was Irma's friend Laura was the one that let me
16  in.  Who else.
17        Carla was the daughter, Aaron's
18  daughter and Norvix, N-o-r-v-i-x, was his son.
19  Angelo was the Puerto Rican guy.  I went to his
20  house on Armitage -- by Armitage and Kedzie.
21        It was actually the 1900 block of
22  Sawyer.  He lived on the east side of the street,
23  Sawyer, three houses south of the alley behind
24  Armitage in a graystone building on the first

36 (Pages 141 to 144)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 145

1    floor apartment.
2          Russell Farmer, I gave her that name
3    and approximate address, that I went to school
4    with him. So she could have went to Lincoln Tech
5    and found him and Mark Bowling, so 12, 13 names.
6          Q. Did you ever see Russell Farmer that day?
7          A. That night? No. I left a note on his door
8    when I -- I was here, time and date, see you
9    tomorrow night or Monday night in school.
10         And then when I did see him Monday
11   night, he said, yeah, I got home about 10 minutes
12   after you left. You should have stuck around for
13   a few minutes. It's kind of -- A white boy with
14   Tennessee plates in that neighborhood, not a good
15   idea.
16         Q. So you're telling me that you do not
17   believe that Ms. Sobczak's testimony is correct
18   as alleged in paragraph 50?
19         A. Nope. She left a lot of it out, and I
20   never said I stayed at a crack house. I told her
21   I went to Angelo's house on the 1900 block of
22   Sawyer.
23         I told her it was a graystone three
24   blocks -- on the south side of Armitage off that

Page 146

1    alley three houses on the east side of Sawyer.
2          I didn't know the exact street, but I
3    gave her the exact description of the building,
4    and it was the only one there because the house
5    next to it was a vacant lot south. There was no
6    house next to it.
7          Q. Paragraph 52: Lucy testified -- Before I
8    get to that.
9          So who do you intend to call to testify
10   that Sobczak's testimony is false?
11         A. Well, if you read paragraph 51, it says she
12   found the crack house where I said I stayed. She
13   said I stayed at 2758 North Richmond was where
14   the crack house was. That's BS. It was never a
15   crack house.
16         I lived there and been friends with
17   those people for years, since they moved in; and
18   I don't recall once the police ever being called
19   to that building, and it's a multi-unit building.
20   There was no crack house there period. So she's
21   lying about that.
22         The police reports will show -- If it's
23   a crack house, and she knew it was a crack house,
24   why don't the Chicago Police who patrol that area

Page 147

1    know it's a crack house? Because it's Logan
2    Square. They didn't have crack houses.
3          Q. So you're telling me that you were not at
4    Marilyn's house that night?
5          A. No, I was not at Marilyn's house on
6    August 28th when the murders happened.
7          Q. Were you there on August 27th?
8          A. 27th?
9          Q. The day before.
10         A. That Friday? Possibly. I think I was. I
11   would go there once in a while for lunch. If I
12   owed her 20 bucks or whatever and it was a
13   Friday, I'd stop and pay her the money I owed
14   her.
15         Q. Do you recall that event?
16         A. No.
17         Q. Do you recall who was there?
18         A. I don't recall the event. So how can I
19   recall who was there on the 27th?
20         Q. You just told me you were there.
21         Were you there or not?
22         A. I didn't say I was there. I said I would
23   go there. If it was a Friday, I might have
24   stopped by. I just don't remember if I did or

Page 148

1    not. I think I could have because it was common
2    for me to go there.
3          I'd stopped there for lunch. I worked
4    right over the bridge even though I couldn't
5    drive over the bridge. I'd have to take the side
6    -- go a roundabout way to get there.
7          Q. So let's talk about August of 1993.
8          How many times do you think you visited
9    Marilyn at her house?
10         A. A couple times a week.
11         Q. And why would you go there?
12         A. Either early in the week to borrow a few
13   dollars or later in the week to pay it back, or
14   she'd call and ask if I could do something for
15   her, she needed some work done or needed my truck
16   to haul something.
17         Q. You don't have any specific recollection of
18   being at her house on August 27th, 1993?
19         A. No.
20         Q. When was the next time you were at the
21   house?
22         A. I don't recall exactly when I was at the
23   house before -- the last time I was at the house
24   before the murders. It could have been that

37 (Pages 145 to 148)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

---

Page 149

1    Friday.
2          I remember going there one time.  One
3    of Lucy's brothers, I can't remember his name,
4    they were fixing the siding on the back.  They
5    covered the back enclosed porch, putting new
6    siding.  I don't remember what exactly.  It was
7    something to do with the siding.
8          But I was going back and forth to
9    school, and I guess September 2nd they pulled me
10   into the police station.  They stopped me in
11   Chicago and made me follow them back to Cicero so
12   they can give me a traffic ticket, and that's
13   when they started questioning me about the
14   murders of Marilyn.
15         That's when I first found out about it
16   so 28th, 29, 30, 31, 1, 2, five days after.  I
17   didn't go back to the house.  I haven't even been
18   within five blocks of that house since.
19   Q.  Paragraph 52:  Lucy testified that when she
20   arrived at the courthouse for her wedding on
21   July 24th, 1993, she found that she had no
22   identification cards.  However, she had her birth
23   certificate, and the Court accepted that as
24   sufficient identification for the ceremony.

---

Page 150

1          Do you believe these allegations to be
2    true and correct?
3    A.  Yeah, because I found out about it when I
4    went back to the house around noon and gave Lucy
5    her IDs back when she was there packing her
6    stuff.  She got married.
7    Q.  Paragraph 53:  Lucy saw Dukes a few times
8    after the wedding.  He gave her back her
9    identification cards.
10         Another time he came into the place
11   where she worked as a cocktail waitress.  She
12   told Dukes their relationship was over.  Dukes
13   remained calm, and he never seemed like he was
14   angry or any emotions, actually none.
15         Lucy testified that she did not like
16   rough sex, and she never said to Dukes that she
17   liked rough sex.  Dukes' attorney moved to strike
18   as irrelevant all references to rough sex.  The
19   trial court denied the motion.
20         Do you believe these allegations in
21   paragraph 53 are true and correct?
22   A.  This is what she testified to, and I said
23   this earlier.  I gave her back her identification
24   cards.  That was the day she got married.

---

Page 151

1          And I also stated earlier about the --
2    I came to where she worked as a cocktail
3    waitress.  I didn't come to where she worked as a
4    cocktail waitress.
5          I was in the parking lot of the strip
6    mall where her employment was, but there was also
7    an auto parts store there, either Giant Auto or
8    Trak Auto, one of them that doesn't exist
9    anymore, to get parts for another car that I was
10   working on in the area.
11         And yeah, she had told me that it was
12   over, and I understood that.  She didn't -- She
13   was afraid that her bosses would see her talking
14   to a guy in the parking lot and think there was
15   going to be problems.
16         Either she was -- They didn't want the
17   impression that there was prostitution going on
18   out of that place or they didn't want a boyfriend
19   showing up and causing problems.
20   Q.  Did, in fact, Lucy tell you that the
21   relationship was over?
22   A.  Yeah.  She was married.
23   Q.  Do you believe Lucy's testimony about Lucy
24   -- about giving Lucy back her identification

---

Page 152

1    cards after her wedding to be false?
2    A.  No, because that's what happened.  I stated
3    that earlier.
4    Q.  Do you believe Lucy's testimony that the
5    relationship was over was false?
6    A.  No.  It was over.  That's true.
7    Q.  Did you continue to have interactions with
8    Lucy after that time?
9    A.  I worked in the same area, and I was still
10   doing stuff for her mom, yeah.  We'd still run
11   into each other.
12         She lived with her husband Kevin.  It
13   was only a couple blocks away, I think if that,
14   from where Marilyn's house was where I had stayed
15   before I moved, and I worked a couple blocks away
16   at Standard Generator, and I was working at
17   National Salad Oil prior to that which was also a
18   few blocks away.  So we bumped into each other.
19   Q.  Are you finished?
20   A.  Yeah.
21   Q.  I'm going to move forward to paragraph 65.
22   This is in reference to the interrogation that
23   occurred on January 9th and 10th of 2004.  "Dukes
24   was also interrogated by Defendants Washburn and

---

38 (Pages 149 to 152)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 153

1    Rodriguez, Donegan and Pineda."
2        A.  Okay.
3        Q.  Do you believe those allegations to be true
4    and correct?
5        A.  Yeah.  This is the 9th it says, but I was
6    in -- This was on the 10th with 65, January 10th.
7        Q.  Yes.
8        A.  Yeah.
9        Q.  At what time of the interrogation did
10   Donegan and Pineda ask you questions?
11       A.  It was off and on throughout.  They brought
12   me in around 10 or so.  I can't remember the
13   exact times or if I was even aware of it at the
14   time, the exact time.
15       Q.  What questions did Donegan ask you?
16       A.  If I remembered him from somewhere before
17   and I didn't.  I guess he was with Sobczak
18   another time.  I don't remember it and basically
19   just where I was.
20           And the same thing with Washburn and
21   Rodriguez, I told them too.  I don't wanna talk
22   to you guys without an attorney.  I don't wanna
23   talk to you.
24       Q.  Yeah, I'm asking about Donegan.

Page 154

1        A.  Same thing.  I stated that in his presence.
2        Q.  Okay.
3        A.  He was in there sometimes alone and
4    sometimes with others, a combination, or
5    sometimes all four were in there together.  They
6    were in and out.
7        Q.  What about Pineda?
8        A.  Same thing.
9        Q.  What statements did Pineda ask you?
10       A.  Just general questions about where I was,
11   who I was with, did I do it, all kinds of stuff
12   about the murders.
13       Q.  What was your response?
14       A.  Did you know that they got your DNA?  They
15   got this.  They made statements about evidence
16   they supposedly had.  They wanted my reaction or
17   my response to that.
18           And I told him when he was in there by
19   himself and when he was in there with others,
20   either one, two, or all four of them, and the
21   State's Attorney that was there at the time too,
22   Papa.
23           I'd tell them all, individually,
24   singularly, and as a group or pairs, I don't want

Page 155

1    to talk to you.  Leave me alone, let me have a
2    lawyer, and they just kept going and going and
3    going.
4        Q.  So if I understand your testimony, you
5    believe Donegan and Pineda were present for how
6    long of your interrogation?
7        A.  From 10:00 o'clock till -- so 12:00, 16
8    hours.
9        Q.  You believe that Donegan and Pineda were
10   present for 16 hours on January 10th; is that
11   correct?
12       A.  They were there the whole day throughout;
13   and, like I said, it was like musical chairs.
14   They were in and out of the room.
15           It was like if you've ever watched
16   professional wrestling, the Battle Royale, where
17   they're tag teaming each other in and out of the
18   ring, that's how they were interrogating me.
19   Except I was chained to the middle of the ring.
20       Q.  Who do you intend to call to testify as to
21   these events?
22       A.  They made sure I couldn't call anybody.
23       Q.  I'm talking about today.
24           Who do you intend to call at trial to

Page 156

1    testify that Donegan and Pineda were there from
2    10:00 a.m. to midnight on January 10th?
3        A.  Washburn and Rodriguez and I'm sure they
4    probably had to sign in to get in the police
5    station into the interrogation area.
6        Q.  So have you told me the entirety of the
7    statements that you made to Donegan and Pineda?
8        A.  It was basically no statements.  They were
9    there when I put my head on the table and asked
10   how much time I could get for the drug case and
11   the gun case after they played the tape for me
12   when Washburn, well, how much time do you think
13   you can get for a double murder?  And I said, the
14   needle, meaning the death penalty.
15           And then they were there when Washburn
16   told me that all this can go away, waving his arm
17   towards the tapes and the recorder about the
18   drugs and gun case charges that they used as a
19   gimmick to get me into the police station or as a
20   pretense.  He said that could go away.
21           That's when I told him you think I'm
22   f'ing stupid.  I'm gonna plead guilty and confess
23   to a double murder I had nothing to do with, a
24   death penalty case, so you can throw away a drug

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                              85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 157

1    and gun case that I did do?
2           They said, well, all of this can go
3    away. How about 20 years or 40 years? That's
4    when they brought that up. They started with
5    that too.
6    Q. Anything else that you said at that time?
7    A. Not that I can recall.
8    Q. Turning to paragraph 66: Throughout the
9    interrogation, Dukes was not given Miranda
10   warnings.
11          Is that a true and correct statement?
12   A. They gave me some warnings on the 9th when
13   they first brought me into the police station,
14   and then after I asked for a lawyer they didn't
15   say anything else about rights.
16   Q. At numerous -- Paragraph 67: At numerous
17   points during the interrogation, Dukes asked for
18   counsel and was refused.
19          Is that --
20   A. Yep.
21   Q. Is that Statement true and correct?
22   A. Positively true and correct.
23   Q. Is it true and correct that during your
24   interrogation that you were given an opportunity

Page 158

1    to make phone calls?
2    A. Yes.
3    Q. Did you call an attorney at that time?
4    A. I was trying to find somebody that could
5    get ahold of one for me.
6    Q. So isn't it true that they, in fact,
7    allowed you to make phone calls?
8    A. The only numbers in -- It wasn't cell
9    phones. You couldn't push the handset icon and
10   call somebody. You had to remember phone
11   numbers. I didn't have an attorney's phone
12   number memorized.
13          I tried to call some friends and ask
14   them to look up attorneys for me and then that
15   was it. I couldn't call anybody else back. I
16   couldn't do anything. I got to call two or three
17   people, and that was it.
18   Q. How many instances were you allowed to use
19   the telephone that day?
20   A. Once. I was allowed to make -- I called my
21   aunt. I called a friend, and I called my
22   landlord trying to find an attorney or trying to
23   have them get ahold of somebody to help me.
24          Cuz I told them on the phone with

Page 159

1    Donegan, Pineda, Washburn, and Rodriguez in the
2    room less than eight feet away from me, I told
3    all three of them, look, I need an attorney. I
4    don't wanna talk to these people, but they won't
5    leave me alone. They keep badgering me, and then
6    after that I couldn't touch the phone again.
7    Q. So as I understand your testimony, you
8    never told anyone during that time that you were
9    involved in the murders?
10   A. Nope. I never said I was involved in any
11   way. I specifically and emphatically told them I
12   was not involved and had nothing to do with the
13   murders.
14          I wasn't there when it happened. I had
15   no prior knowledge. I didn't know they happened
16   until five days after the fact.
17   Q. I'm going to move forward to paragraph 77:
18   Defendant Darlene Sobczak authored a fabricated
19   police report in which she stated --
20   A. Which one?
21   Q. Paragraph 77.
22   A. Oh, okay, I just seen fabricated.
23   Q. Yeah, move forward.
24   A. 73 for Washburn.

Page 160

1    Q. Yep.
2    A. All right.
3    Q. Defendant Sobczak authored a fabricated
4    police report in which she stated William Dukes
5    made the following statements: (1) Lucy liked
6    rough sex; (2) After Dukes had sex with Lucy the
7    night before her wedding, Dukes took all of
8    Lucy's identification cards thinking she could
9    not complete the civil ceremony; and (3) That
10   this was an explanation as to why Dukes without
11   any identification and that they wanted each
12   other and he would have sex with her and she
13   wanted him and little detail like about roughness
14   and stuff of sex.
15   A. Sobczak fabricated that I told her that I
16   liked rough sex or Lucy liked rough sex.
17   Q. Okay.
18   A. She omitted the fact that I told her
19   Marilyn gave me the IDs to take --
20   Q. Okay.
21   A. -- thinking that Marilyn thinking that Lucy
22   couldn't get married without them. She implied
23   and added words that we wanted -- me and Lucy
24   wanted each other.

40 (Pages 157 to 160)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 161

1   Q. Was that true?
2   A. I mean, we kept having sex together. So it
3   was implied.
4   Q. So --
5   A. I never stated that specifically.
6   Q. So the point of --
7   A. And the roughness of sex and stuff, I never
8   said anything to her about we liked rough sex. I
9   just said we had sex in the car one time, and it
10  got painful.
11  Q. Okay, so the fact that you had -- Number
12  one, you had discussions with Darlene Sobczak
13  during an interview where sex was discussed,
14  correct?
15  A. Yeah.
16  Q. In fact, you had a discussion with Darlene
17  Sobczak in an interview where you told her you
18  had sex with Lucy the night before the wedding;
19  is that correct?
20  A. Yeah, on September 2nd and then again when
21  she arrested me in Indiana and pulled me out of
22  my house pursuant to a warrant that didn't exist
23  and interrogated me for hours in Indiana.
24  Q. Is it true that you had a discussion with

Page 162

1   Darlene Sobczak during an interview where you
2   told her that you took all of Lucy's
3   identification cards?
4   A. I told her Marilyn gave me and I left with
5   them, yes.
6   Q. And then is it true that you had statements
7   made to Darlene Sobczak as to that you had --
8   that -- I'm sorry.
9      It's the third one. There's an
10  explanation as to why Dukes wanted each other and
11  would have sex with each other.
12     Those statements, again, we've talked
13  about by inference, right?
14     She didn't specifically say them; but
15  by inference you believed that that was true,
16  correct?
17  A. She made the inference and said that on her
18  own. I didn't say that. I don't understand
19  three, without any identification and, what is
20  that?
21  Q. Oh, no, these are your allegations that
22  your counsel created. So I'm just making sure I
23  understand.
24  A. Okay, I see it now. Okay, I know what it

Page 163

1   is. I understand.
2   Q. Okay, so I guess the part of this is --
3   What part of these three things do you believe
4   that Darlene Sobczak fabricated?
5   A. Rough sex, and then she lied through
6   omission by not putting in the part about Marilyn
7   giving me the ID. So it looks like I did this on
8   my own to take her identification. It was
9   something Marilyn asked me to do.
10  Q. But you did, in fact, take the
11  identification?
12  A. I did leave the house -- I did what Marilyn
13  asked, and I took the IDs with me, but I brought
14  them back a few hours later and gave them to
15  Lucy.
16  Q. What other fabrications are contained in
17  here?
18  A. The rough sex.
19  Q. Okay, we've talked about the rough sex.
20     Anything else?
21  A. No.
22  Q. And what witnesses do you intend to call to
23  testify as to these fabrications?
24  A. Bazaro.

Page 164

1   Q. What's that, sir?
2   A. I use that for word association. I call
3   him Bazaro. Bizerik.
4   Q. Former Detective Bizerik?
5   A. Yeah, the other crooked cop working with
6   Sobczak.
7   Q. So I have to ask you right now, sir.
8   You've made references to crooked cops.
9      Do you believe that Darlene Sobczak
10  acted in an improper fashion in this case?
11  A. Yes, I do.
12  Q. Describe that for me.
13  A. The crack house, they didn't investigate
14  where I told them I was. She falsely stated she
15  disproved the alibi. She never even checked the
16  alibi. I didn't know this until years later when
17  the discovery came in. I told them September 2nd
18  everywhere I was at that night.
19     They didn't go talk to anybody except
20  for a couple people, and then they didn't go talk
21  to them until -- Sobczak didn't go talk to them
22  until February of '95 I think it was. There was
23  several thousand pages of discovery. So I can't
24  remember the exact one.

41 (Pages 161 to 164)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 165

1    What were you doing a year-and-a-half
2    ago on a non-eventful Saturday night and who were
3    you with?
4        Q. So the question --
5        A. She lied, and she omitted facts by not
6    doing her job.
7        Q. The question that I have for you is: Do
8    you believe that she had some type of intended
9    purpose to deprive you?
10       A. Yeah. She was under investigation for
11   being a crooked cop. So she wanted to close a
12   case any way she could.
13       Q. What date do you believe that was, sir?
14       A. What do you mean?
15       Q. When do you believe she was under
16   investigation?
17       A. Well, I know they sent an Illinois State
18   Police into all the surrounding towns bordering
19   Chicago in '95.
20       She was arrested and charged with this
21   stuff -- with her criminal activities that they
22   claimed dated back 14 years of her employment.
23   She was arrested and charged in '98 and convicted
24   in '99. So '95 is when she started to do this.

Page 166

1        Q. So did she ever offer to you that she could
2    make this go away if you paid her money?
3        A. No. I didn't have any money and she knew
4    that. I had no family with money. I had no
5    political ties. I had nothing.
6        Q. So how was --
7        A. And she knew I couldn't get on the witness
8    stand because I had a minor criminal history.
9        Q. So how was Sobczak being a crooked cop
10   affecting you?
11       A. She was just trying to close a case so they
12   wouldn't go so hard on her. Oh, look, I did this
13   and I did this. I did some good. I closed that
14   case. She was trying to make herself look good.
15       Q. She was trying to do her job; is that
16   correct?
17       A. No. She was trying to make it look like
18   she was doing her job. I've never said she tried
19   to do her job. She was trying to make it look
20   like she was doing her job, and she didn't care
21   who took the fall for it.
22       Q. Going forward, paragraph 78: Sobczak
23   authored a fabricated police report in which she
24   claimed that William Dukes gave her the address

Page 167

1    of a crack house as an alibi and falsely stated
2    that she had disproved this alibi.
3        A. Yep, that's a lie.
4        Q. Tell me why that's a lie?
5        A. Because I never told her I went to a crack
6    house. I told her I went home to the
7    2758 Richmond address. I was let in by Laura,
8    and I went to bed.
9        Q. Did you ever -- During your statements with
10   Darlene Sobczak, did you ever tell her that you
11   went to do crack cocaine?
12       A. Yeah. I told her I went to Angelo's house
13   on Armitage and Sawyer -- Armitage and Kedzie on
14   the block of Sawyer.
15       Q. So the topic of you doing crack cocaine on
16   the night of August 28th did occur; is that
17   correct?
18       A. Well, the topic of me going to get crack or
19   getting what they called dummy bags, fake crack,
20   which turned out to be soap and drywall. So I
21   never actually did any drugs that night. It was
22   fake.
23       Q. The fact of the matter is, sir, that you
24   made a statement to Darlene Sobczak as part of an

Page 168

1    alibi of your events occurring on August 28th,
2    1993 that you went with your friend to do crack
3    cocaine; is that correct?
4        A. We went to buy it and then went back to his
5    house; and then after we found out it was fake, I
6    went to my house.
7        That's exactly what I told her, and she
8    omitted facts so it would make it look worse than
9    it -- so it would look like I stayed in a crack
10   house the whole night.
11       Q. So the statement that she falsely stated
12   that she disproved this alibi, what facts do you
13   have to support that?
14       A. Well, her own police report says she didn't
15   go to that house until January or February of
16   '95, a year-and-a-half after I told her where I
17   was that night. She had a history of doing this.
18       Q. So those events occurred before her
19   testimony occurred in 2011; is that correct?
20       A. Darlene Sobczak's events of going to
21   the crack house or going to the address, those
22   events occurred before she testified in 2011; is
23   that correct?
24       A. She claimed...

42 (Pages 165 to 168)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                            WILLIAM DUKES

Page 169

1    Q. She claimed that she did, right? She went
2    and checked it out.
3    A. She made it sound like she did it in 2004.
4    Q. Okay, well, the fact of the matter is that
5    she, in fact, testified at trial that she had
6    gone and --
7    A. Yes, she did. She testified to that at
8    trial, but she lied.
9    Q. Okay, were you personally with Darlene
10   Sobczak when she went to check it out?
11   A. No.
12   Q. Do you have knowledge of people who were
13   there that told you that she did or did not check
14   it out?
15   A. I just got knowledge of the police report
16   that I read from January and February of '95 in
17   the discovery as part of this case, the murder
18   case.
19   Q. So it's true that there could have been an
20   event that she did not memorialize in a police
21   report; is that correct?
22   A. It's possible.
23   Q. Okay, so you don't have any personal
24   knowledge of whether or not Darlene Sobczak went

Page 170

1    to confirm the existence of this crack house or
2    talked to anybody at this crack house?
3    A. No. She testified though like she did it
4    in 2004, and she wasn't even a police officer
5    then. She had been a convicted felon after that.
6        I think it was even in -- The way that
7    she implied this was she did it, like, in '04;
8    and even the Appellate Court, how did she prove
9    it or disprove it in '04, years after the fact?
10   Q. Are you finished?
11   A. Yeah.
12   Q. Paragraph 83. Defendants --
13   A. Okay, hang on.
14   Q. I'm sorry. Take your time.
15   A. Okay.
16   Q. Defendants Washburn, Rodriguez, Donegan,
17   Pineda and Killacky, acting individually and in
18   concert, denied William Dukes his Fourteenth
19   Amendment due process rights by conducting the
20   interrogation in this manner as well as by
21   denying him his right to counsel and failing to
22   give him Miranda warnings.
23       Do you believe this allegation is true
24   and correct?

Page 171

1    A. One hundred percent.
2    Q. So tell me how Rodriguez, Donegan, Pineda,
3    and Killacky acted in concert?
4    A. Well, I told Washburn and Rodriguez started
5    to read the Miranda warnings, but then they said,
6    oh, you know all this. We checked your
7    background, and they continued questioning me
8    about the gun case at first.
9        And then they left the room and came
10   back a little while -- a few minutes -- 20
11   minutes later asking me about a murder case
12   because my name is popping up on the computer
13   about murder.
14       And I told them I didn't wanna talk to
15   them about -- I wasn't worried about that case
16   because I didn't do it, and I don't wanna talk to
17   them without a lawyer present about that case.
18   Q. Do you believe --
19   A. And they kept going on and on back and
20   forth between the gun case first and then the
21   next day they started with the drugs and gun once
22   they played the Killacky tape.
23   Q. Do you believe that there's some type of
24   agreement between Donegan, Pineda, Washburn,

Page 172

1    Rodriguez, and Killacky?
2    A. All right, we're all sitting here in this
3    room, and say you're them. All you guys are
4    attorneys. If I do something illegal, it's not
5    only my attorney's duty to point that out or if I
6    perjure myself, it's your duty to do that also.
7        Well, isn't it a police officer's duty
8    to stop an interrogation once I tell them I need
9    an attorney? I don't wanna talk. If I tell it
10   to one or all of them all at once, and I told it
11   to all of them at once, they were acting in
12   concert.
13   Q. Do you think they had a plan to do that for
14   you?
15   A. Yes.
16   Q. Describe that plan.
17   A. Homan and Fillmore, their black site,
18   that's where they take everybody. Killacky, I
19   found out since then, has been doing this to
20   other people for years.
21   Q. Articulate what you believe that plan was.
22   A. Do whatever they could to discombobulate
23   somebody to get them so mentally confused and
24   tired that they do or say anything that they

43 (Pages 169 to 172)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                        85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 173

1    could fabricate or get them to sign. I refused
2    to sign anything for them.
3        Q. So can you tell me who -- what conduct
4    Pineda had that deprived you of your Fifth
5    Amendment rights?
6        A. He allowed the other officers to do it
7    without saying anything. Knowing that I
8    requested an attorney and requested to be left
9    alone and remain silent, he allowed them to
10   continue the interrogation.
11       Q. And what statements did Pineda obtain from
12   you at that time?
13       A. He asked questions. I don't recall exactly
14   what they were or what he wrote down. I don't
15   know.
16       Q. So, sir, if I understand your testimony,
17   you basically told them nothing, that you didn't
18   believe that you were involved, you weren't
19   there, and to stop questioning me.
20           What else did you give them that was so
21   offensive?
22       A. It's contained in these. We've already
23   went over it.
24       Q. Well, not quite. Everything you've told

Page 174

1    me, sir, about what happened during the interview
2    of the 9th and 10th of January, 2004 was that you
3    told them that you didn't want to talk about it.
4    You weren't there and that you had nothing to do
5    with it.
6           So if that's all you said to them, what
7    was so offensive about what they got out of you
8    that violated your Fifth Amendment rights?
9           What was it?
10       A. They sat there and lied in court, Washburn,
11   Killacky, telling them I said this and I said
12   that. Well, Sobczak wasn't there for this part
13   of it, this question.
14           But Killacky, Washburn, Rodriguez, they
15   all testified in court to stuff they said I said
16   that I didn't say, and they all knew they were
17   lying about it.
18       Q. Donegan didn't testify.
19           What did he say?
20       A. He was there. He let it go on.
21       Q. Pineda, did Pineda testify?
22       A. I don't recall. It was five days of
23   questioning. I don't remember.
24       Q. Okay, well, I'm going to submit that Pineda

Page 175

1    did not testify, and Donegan did not testify.
2           So I guess my question is: If they
3    didn't testify and there's no statements that are
4    attributable to Donegan or Pineda eliciting from
5    you that were used at your trial, then how did
6    they violate your Fifth Amendment rights?
7        MR. RICHARDS: Objection, argumentative.
8    You can answer if you know.
9        THE WITNESS: They allowed it to continue
10   happening. They allowed it. That's how they
11   violated my rights by allowing it to happen in
12   their presence repeatedly.
13   BY MR. ACKER:
14       Q. What witnesses do you intend to call to
15   testify that Donegan violated your due process
16   rights?
17       A. I think it can be inferred in my testimony.
18       Q. What witnesses do you intend to testify
19   that Pineda violated your due process rights?
20       A. The same thing. I believe it will be
21   inferred from the record and my testimony.
22       Q. Okay, I'm going to put this complaint aside
23   for a minute. I'm going to give you another
24   exhibit I've marked as deposition Exhibit No. 2.

Page 176

1           (Whereupon, Dukes Deposition
2           Exhibit No. 2 was marked for
3           identification.)
4        MR. ACKER: So I'm going to mark this as
5    William Dukes' Responses to Cicero Detective
6    Darlene Sobczak's First Set of Interrogatories.
7    I'm going to tender that to the witness. It's
8    been marked as deposition Exhibit No. 2.
9           (Document tendered.)
10       THE WITNESS: This is my interrogatory, my
11   answers to them.
12       MR. RICHARDS: Yes.
13       THE WITNESS: I don't have it because it
14   was in my cell phone, and they wouldn't let me
15   bring my cell phone.
16       MR. RICHARDS: We can talk about this
17   after. I'll send you copies of all your
18   documents.
19       THE WITNESS: Okay, thank you.
20   BY MR. ACKER:
21       Q. Sir, I've just tendered to you a document
22   marked as Exhibit 2, Plaintiff's answers to
23   Sobczak's interrogatories.
24           Have you ever seen this document

44 (Pages 173 to 176)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 177

1    before?
2        A.  Yeah, when I answered it.
3        Q.  So at the very last page there's a
4    signature under verification.
5        A.  Yep, that's mine.
6        Q.  That's your signature?
7        A.  Yep, I remember this one now.  I took the
8    bus.  I didn't bring all the paperwork.  I just
9    brought my copy of it and the signature page.
10       Q.  Okay, did you review this document before
11   you signed it?
12       A.  Yeah.
13       Q.  Do you believe the answers are true and
14   correct?
15       A.  Yes.
16       Q.  Who drafted the answers to interrogatories?
17       A.  I think I wrote them by hand, and my lawyer
18   typed them.  I don't recall.
19       MR. RICHARDS:  I would object just in the
20   interfering with -- on attorney/client privilege,
21   but I think the answer can stand.
22   BY MR. ACKER:
23       Q.  Did your attorney sign this document, sir?
24       A.  I don't know, probably electronically.

Page 178

1        MR. RICHARDS:  I'll stipulate I didn't sign
2    the document.  The document does not contain my
3    signature.
4    BY MR. ACKER:
5        Q.  Okay, did you rely upon any other documents
6    to answer these questions?
7        A.  No, not that I recall.
8        Q.  Turning your attention to interrogatory
9    number five, it says:  For each and every event
10   identified in the answer to interrogatory number
11   four.  So I guess we should take a look at four,
12   right.
13       So number four was:  Please -- I'm
14   sorry.  Identify each date, the location and the
15   duration of time for each and every time
16   Plaintiff was in the presence of Defendant
17   Sobczak.
18       Do you see that, sir?
19       A.  Yeah.
20       Q.  And there's three dates underneath:
21   September 2nd, 1993, August 6th -- I'm sorry,
22   September 2nd, 1993, August 6th, 1995, and summer
23   of 1997.
24       Do you see that, sir?

Page 179

1        A.  Yes.
2        Q.  Then for each paragraph -- I'm sorry.
3    Question number five, for each and every event
4    identified in answer to interrogatory number
5    four, please state the subject matter of topics
6    discussed and what statements you made to
7    Defendant Sobczak at each event.  Then underneath
8    that you have your answer.
9        There is -- The first topic is
10   September 2nd, 1993, you had the following
11   topics:  The murders of Bridget Cannady and
12   Marilyn Williams; my whereabouts at the time of
13   the murders; my relationship with Lucy Cannady;
14   my relationship with Marilyn and the kids; my
15   willingness to give DNA.
16       Those are the general topics you
17   discussed; is that correct?
18       A.  Yes.
19       Q.  And then underneath that you have some
20   specific statements about those matters.  The
21   first thing you say is I made most of the
22   statements which are contained in Sobczak's
23   report.
24       So is it a true statement, sir, that

Page 180

1    the topics that are discussed in -- I'm sorry.
2        Is it a true statement, sir, that the
3    topics that you discussed that were contained in
4    her reports that you -- that most of them you
5    gave to her, right?
6        A.  Yeah, except for the ones I told you about
7    earlier.
8        Q.  And we're going to have some repeat on
9    this.  So just bear with me.
10       So the -- At this point, sir, I'm going
11   to switch gears, and I'm going to give you
12   another exhibit.
13       This is Exhibit No. 3 marked as
14   deposition Exhibit No. 3, and this is a copy of
15   the Cicero Police Department report from
16   September 2nd, 1993 I'm going to tender this to
17   you, sir.
18       (Whereupon, Dukes Deposition
19       Exhibit No. 3 was marked for
20       identification.)
21       (Document tendered.)
22   BY MR. ACKER:
23       Q.  Please take a look at that.
24       A.  September 2nd, okay.

45 (Pages 177 to 180)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 181

1   Q. Have you ever seen this document before?
2   A. Yeah. Now that I see it, I think I did
3   review this as I was doing this (indicating).
4   Q. So you believe that this was -- that the
5   document --
6   A. I'm not positive but yeah, I think this is
7   one of the documents I looked at when I was
8   making my answers.
9   MR. RICHARDS: Can I just compare quickly
10  just so I can make sure I have the same thing?
11  MR. ACKER: Sure.
12  MR. RICHARDS: All right, we're looking at
13  the same thing. Thank you. We're good.
14  MR. ACKER: It's Bated on the bottom
15  TOC406 and 407.
16  MR. RICHARDS: I got it. Thanks.
17  MR. ACKER: Okay.
18  THE WITNESS: It's a little off on the --
19  Lucy needed help fixing her car which she brought
20  to Standard Generator. Marilyn's car was at the
21  shop on Ogden.
22  MR. ACKER: Yeah, we're going to cover all
23  of this very thoroughly. So just hold tight.
24  THE WITNESS: I never told her Marilyn gave

Page 182

1   me money. All right, go ahead.
2   BY MR. ACKER:
3   Q. Okay, so have you ever seen this document
4   before?
5   A. Yes.
6   Q. When was the first time you saw it?
7   A. 2005.
8   Q. When was the most recent time?
9   A. There's -- What was the date on this? What
10  was the date of this deposition?
11  Q. I think some time in August.
12  Do you mean the answers to
13  interrogatories?
14  A. Yes.
15  Q. I think it's August of --
16  A. July '22 or --
17  Q. '22, this past summer.
18  A. Yeah, so almost a year or --
19  Q. About six months.
20  A. -- six months.
21  Q. Okay, turning your attention to the event
22  of September 2nd, 1993, do you remember that
23  event?
24  A. Yeah. I left work to go to school, and the

Page 183

1   Cicero detectives pulled me over and made me
2   follow them back to the station saying I didn't
3   use a turn signal.
4   Q. Did you ever make notes of the statements
5   that you made at that time?
6   A. No. It's pretty well fixed in your mind
7   when somebody keeps -- It is pretty well fixed in
8   my mind when somebody was accusing me of murder,
9   and then I found out -- I just found out that two
10  people that I was close to were murdered and one
11  of them being a kid. So it stuck in my mind.
12  Q. So it's true and correct that you did not
13  make any notes of this meeting after that event?
14  A. No.
15  Q. Were you given your Miranda warning before
16  the interview?
17  A. I believe I had been.
18  Q. Did you agree to waive your Miranda rights?
19  A. Then? Yes.
20  Q. Did you voluntarily give statements at that
21  time?
22  A. Yeah.
23  Q. Who was present during the interview?
24  A. Sobczak and Bizerik.

Page 184

1   Q. So based upon the interrogatory answer, are
2   you admitting that you made most of the
3   statements contained in Sobczak's report?
4   A. Okay, I didn't tell her that I started
5   dating. I told her we became friends with
6   benefits, and we stopped when she married Kevin,
7   and it was about a month ago at that time, not
8   two months.
9   I didn't still live at Marilyn's. Oh,
10  I did for a day-and-a-half, two days or a
11  day-and-a-half actually. The next day I was
12  gone.
13  Q. Are you claiming that there's any false or
14  fabricated statements contained in the
15  September 2, 1993 report?
16  A. I never told her I wasn't able to pay rent.
17  Q. Anything else?
18  A. Indiana with the kids, yeah, for the
19  fireworks, which I got arrested in Cicero for. I
20  took the blame for selling them so Lucy wouldn't
21  go to jail. Dustin, got along, yeah, I didn't
22  have any problems with Bridget. I got along with
23  Marilyn. Okay, most of this is, yeah.
24  Q. Other than what you've testified to, is

46 (Pages 181 to 184)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                           WILLIAM DUKES

---

Page 185

1   there anything else that you believe is false or
2   fabricated?
3       A. I don't know their full names. That's a
4   lie. I told them all, Pedro, Efrain, or Peter
5   and Efrain, same, Spanish translates to English,
6   and someone else, Aaron, Irma, Lupe, Alicia,
7   husbands and wives, Efrain, Carla, Norvix, and I
8   don't know if I said Laura or not, but I gave her
9   those names. I gave her the name of Russell
10  Farmer, and I gave her the name of Mark Bowling.
11  She doesn't have any of that in here.
12      Q. Who is Aaron Jaramillo?
13      A. A friend of mine. He was the gentleman
14  that was the delivery driver at Indian Groceries
15  and Spices out of Skokie, and I worked as a
16  delivery driver for -- He actually got me started
17  there.
18      Q. What knowledge do you believe Aaron has
19  related to your alibi?
20      A. Basically the timeframes of where I was at
21  and left the house that day.
22      Q. Do you believe Aaron was present at that
23  time?
24      A. When I left the first time, yeah.

---

Page 186

1   Everybody was in and out throughout the day that
2   day. I know Laura let me in at midnight. Some
3   were there and some were -- They were just in and
4   out.
5       Q. When was the last time you spoke with
6   Aaron?
7       A. '93, '94.
8       Q. And who was present at that time?
9       A. I can't recall.
10      Q. Do you recall what was said?
11      A. No. I think I picked up a car, and I was
12  offering it to him if he wanted it. I was gonna
13  give him the title and let him have it.
14      Q. Do you know where Aaron lives now?
15      A. No.
16      Q. Who is Irma Jaramillo?
17      A. Aaron's wife.
18      Q. That's Aaron's wife?
19      A. Yeah.
20      Q. What knowledge do you believe she has
21  related to your alibi?
22      A. At the time they could have verified what
23  times I was in and out of the house if they were
24  home -- They were home when I left at the

---

Page 187

1   beginning at about 10:30, 11:00 o'clock in the
2   morning, whatever time I left.
3           I don't know if they were there -- I
4   don't remember if they were there when I got
5   back, but whoever was there -- There's always
6   somebody there. Somebody would have been able to
7   verify when I came and left.
8       Q. When was the last time you spoke to Irma?
9       A. A couple years.
10      Q. Say that again.
11      A. It's been a few years.
12      Q. Was it in the 2010's? Was it --
13      A. No, when they called her into the police
14  station.
15      Q. When was that?
16      A. They pulled her into the police station and
17  interrogated her in '04.
18      Q. 2004?
19      A. Yeah. I seen it in the police reports.
20      Q. Did you talk to her after that?
21      A. They don't want nothing to do with me.
22      Q. Do you know where she is now?
23      A. No, somewhere in Chicago.
24      Q. So who is Mark Bowling?

---

Page 188

1       A. Mark Bowling was a gentleman that I worked
2   with at Standard Generator, a fellow mechanic.
3       Q. What knowledge do you believe he has
4   related to your alibi?
5       A. That I came to his house that day around
6   11:30, 12:00. He came home, and I was there and
7   then I left.
8       Q. When was the last time you spoke with Mark?
9       A. August 2nd -- No, I'm sorry, September 2nd,
10  '93 at work the day I left to go to school, and
11  Cicero made me follow them to the police station.
12      Q. And what did you say to him at that time?
13      A. We just worked together. That's all.
14      Q. Do you know where Mark is now?
15      A. Nope.
16      Q. Who is Mark's wife?
17      A. I can't remember her name. It was his
18  wife.
19      Q. What knowledge do you believe she has
20  related to your alibi?
21      A. She was with him when she came home -- when
22  they came home together and I was parked in their
23  parking lot at their apartment complex. I was
24  waiting for him to do a job.

---

47 (Pages 185 to 188)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

---

Page 189

1    Q. When was the last time you spoke with the
2  wife?
3    A. It would have been the 28th of August.
4    Q. And have you spoken -- You haven't spoken
5  with her since?
6    A. Nope.
7    Q. So isn't it true that the duration of time
8  that you were with Mark Bowling and Mark's wife
9  on August 28th, 1993 was less than half an hour?
10   A. Yeah.
11   Q. So beyond that, they only have knowledge of
12 where you were that day for half an hour?
13   A. It was my timeline. That's what
14 they wanted -- what Sobczak was asking for that
15 day.
16   Q. I'm asking you what --
17   A. She asked me from the time I got up until
18 you got home and went to sleep, who were you
19 with, what were you doing. That's what I told
20 her.
21   Q. Okay, I think you're misunderstanding my
22 question, sir.
23        I'm asking you whether on August 28th,
24 1993 that the entire duration of time that you

---

Page 190

1  spent with Mark Bowling was less than half an
2  hour.
3    A. Yeah.
4    Q. Okay, and his wife?
5    A. Right.
6    Q. Okay.
7        Who is Russell Farmer?
8    A. He's a gentleman I went to school with at
9  Lincoln Tech. He's a fellow student.
10   Q. What knowledge do you believe he has
11 related to your alibi?
12   A. About 7:30, 8:00 o'clock, 7:30, 8:30 I had
13 left a note on his door. He came home, he said,
14 ten minutes later because I stated -- timed and
15 dated the note.
16       And he said he come -- When I seen him
17 Monday in school, he said he got there about ten
18 minutes after I left the note. So that would
19 have verified my alibi up until then or where I
20 was up until then.
21   Q. When was the last time you spoke with
22 Russell?
23   A. September 1st, '93, school, cuz I didn't
24 make it to school after that.

---

Page 191

1    Q. Do you know where Russell Farmer is today?
2    A. No. Hopefully he's doing mechanic work.
3    Q. So is it a true statement that on
4  August 28th, 1993 that Russell Farmer never saw
5  you?
6    A. No, but he could verify that I was at his
7  house.
8    Q. Well, he could verify that there was a note
9  left at his house; is that correct?
10   A. Yeah. He told me that he got home ten
11 minutes after I left it, and he had only been
12 gone for about 20 or 30 minutes, and I told her
13 it was a liquor store not a bar.
14   Q. Who is Pedro Jaramillo?
15   A. Efrain's father.
16   Q. What knowledge do you believe he has
17 related to your alibi?
18   A. That I was in and out of the house
19 throughout that day.
20   Q. When was the last time you spoke with
21 Pedro?
22   A. 29th of August --
23   Q. And --
24   A. -- because he had to go back to Wisconsin

---

Page 192

1  to go to work Monday.
2    Q. So you never spoke to him since?
3    A. No. I think he's passed away since then.
4  I've heard through mutual friends. I'm not sure
5  if it's him or somebody else.
6    Q. Okay, how about Efrain Jaramillo?
7    A. I haven't seen him since then either.
8    Q. What knowledge do you believe he has
9  related to your alibi?
10   A. Just in and out of the house. I don't
11 remember if he remembers me coming downstairs
12 that night at midnight once I got home, but they
13 would have been there. They could verify what
14 time I got home that night too.
15   Q. When was the last time you spoke with
16 Efrain?
17   A. Around September 2nd, probably no more than
18 September 7th or 8th. It's been a while.
19   Q. Okay, and do you know where he lives now?
20   A. No.
21   Q. Who is Angelo?
22   A. He was a friend of mine from the
23 neighborhood where my parents -- My dad and my
24 aunt and uncle grew up over near Armitage and

---

48 (Pages 189 to 192)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                                              85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 193

1   Kedzie. We're about the same age and drinking
2   buddies.
3       Q. So describe for me where you believe
4   Angelo's residence was at that time?
5       A. All right, Armitage Avenue runs east and
6   west. So on the south side of Armitage there's
7   an alley. One block west of Kedzie Avenue is
8   Sawyer Avenue. It runs north and south.
9           So between 2000 block of Armitage and
10  Cortland which is 1900, so the 1900 block of
11  Sawyer on the east side, the lake side of Sawyer,
12  the odd number addresses is where Angelo lived.
13          He was three houses off of the south
14  Armitage Avenue alley, three buildings. It was a
15  brick graystone building or not a brick graystone
16  but a graystone building.
17          And next to it was an empty lot. You'd
18  walk up the stone steps and his apartment was the
19  first one there. He had other people staying
20  with him, wife, mother, whatever.
21          So once we got there and left or went
22  and got our stuff or what we thought was drugs,
23  we came back and went in his basement through the
24  alley and found out it was garbage. We drank a

Page 194

1   couple more beers, and I left. I went home. I
2   got home about 12:00 o'clock.
3       Q. What time do you believe you got to
4   Angelo's house on August 28th, 1993?
5       A. 9:30 or so, maybe 10:00. No, about 9:00,
6   9:30 roughly. It's -- Like I said, it's been 30
7   years.
8       Q. So other than Mark Bowling and his wife,
9   the only other person to -- that you spent any
10  time with that evening was Angelo; is that
11  correct?
12      A. Yes, up until, like I said, about 11:30,
13  maybe a little closer to -- 11:30 quarter to
14  12:00 I left. I only lived a few blocks away,
15  jumped in my truck, went home, found parking,
16  walked home and knocked on the window, and Laura
17  let me in.
18      Q. And who's Laura?
19      A. She was a friend of the Jaramillo -- Aaron
20  and the Jaramillos.
21      Q. And what knowledge do you believe she has
22  related to your alibi?
23      A. She let me in at 12:00 o'clock at night
24  into the house.

Page 195

1       Q. When was the last time you spoke with
2   Laura?
3       A. Then.
4       Q. Have you ever seen her since?
5       A. No.
6       Q. Do you know where she lives now?
7       A. No.
8       Q. I'm going to return back to your narrative
9   in your answer to interrogatory number five,
10  right, which is this (indicating) document, this
11  (indicating) thing.
12      A. This one?
13      Q. Yep.
14      A. All right.
15      Q. Okay, so you said that you left your house
16  at 10:00 or 11:00 to go to Mark Bowling's house
17  in Westmont.
18      A. Yeah.
19      Q. You got there around noon?
20      A. Right.
21      Q. Waited for Bowling, showed up with kids,
22  showed up about 15 minutes later, supposed to do
23  work on car, but wife with kids, couldn't do
24  work.

Page 196

1       A. Right.
2       Q. That's true and correct, right?
3       A. Right.
4       Q. So got back to -- Went back to North
5   Richmond, got there at 12:30, 1:30, hung around
6   the house until 4:00, decided to visit friend
7   from Lincoln Tech, Russell Farmer, on 78th
8   Street.
9           Is this east or west 78th Street?
10      A. Southeast side so east. It's by the
11  electric train. I don't know what it's called,
12  but it's a CTA train I guess. It goes to
13  Indiana, but it's got the overhead power lines.
14      Q. So you got there about 7:30 p.m.?
15      A. Roughly, yes.
16      Q. So as I understand your testimony, it took
17  you three-and-a-half hours to get there?
18      A. I'm driving through downtown. I've got a
19  '67 Chevy pickup truck. It's cutting in and out
20  sometimes.
21          It had a stuck float, and I also had a
22  stick shift on the steering wheel. I had to
23  shift gears on that. It would jam up. I'd have
24  to stop and straighten it out.

49 (Pages 193 to 196)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 197

1      I'd have to stop.  It was a stick shift
2  on the steering column.  You had to shift gears
3  -- use the clutch and manual transmission on the
4  steering column.
5      I had to stop, open the hood, and mess
6  around with stuff on the steering column for the
7  linkage to get it straightened out without
8  getting myself run over too.
9      Q.  So you didn't go anywhere else in that
10 timeframe?
11     A.  No.
12     Q.  Three-and-a-half hours of travel; is that
13 correct?
14     A.  Three hours, three, three-and-a-half,
15 something like that.
16     Q.  After you left Russell Wilson's house, you
17 stopped at a liquor store?
18         MR. RICHARDS:  Objection, Russell Farmer.
19 BY MR. ACKER:
20     Q.  I'm sorry.  Russell Farmer.  That's
21 correct.
22         After you stopped at Russell Farmer's
23 house and left a note, you stopped at a liquor
24 store near Russell Farmer's house; is that

Page 198

1  correct?
2      A.  Yes.
3      Q.  About 8:00 p.m.?
4      A.  Roughly, yes.
5      Q.  Okay, and then headed down Lake Shore
6  Drive, stopped in a breakdown parking space,
7  jumped fence, and went to lake and drank some
8  beer?
9      A.  Yeah, I popped the hood and then jumped the
10 fence.
11     Q.  Okay, so --
12     A.  I went over and sat at one of the benches
13 -- hopped the fence and sat at one of the benches
14 on the walkway in front of the lake and drank my
15 six-pack.
16     Q.  So you bought a six-pack and you drank all
17 six?
18     A.  Yes.  I tried to drink one in the car, but
19 shifting gears on the steering column trying to
20 steer and holding the clutch and everything else,
21 I had to stop and dry off.
22     Q.  Did you talk to anyone?
23     A.  No.  There wasn't many people out.
24     Q.  How long were you there?

Page 199

1      A.  Maybe an hour.
2      Q.  Then you go on.  I decided to go to the
3  house of a friend, Angel, 1900 block of Sawyer.
4         Is this correct?
5      A.  Yes.
6      Q.  All right, is this north or south Sawyer?
7      A.  North.
8      Q.  What is Angel's last name?
9      A.  I don't know.  I just call him Angel.  His
10 name was Angelo but I called him Angel.
11     Q.  How did you know Angel from before?
12     A.  From the neighborhood.
13     Q.  Who was present at Angel's house?
14     A.  We never went in his house.  So I don't
15 know.  I'm assuming his wife and kids, maybe his
16 mom.
17     Q.  What time did you arrive at Angel's house?
18     A.  I got here at 9:00 o'clock, but it could
19 have been later like 9:30 or so.
20     Q.  What did you do while at Angel's house?
21     A.  Drink beer out on the front porch and
22 standing by the car or my truck.
23     Q.  And did you go to buy crack cocaine?
24     A.  Yes, we did, $10 a piece.

Page 200

1      Q.  Where did you go?
2      A.  Central Park and Ohio.
3      Q.  Who paid for the crack?
4      A.  We both did.  We bought $10 a piece.
5      Q.  Who did you buy it from?
6      A.  Some people standing on the street selling
7  it.  It was an open-air drug market.
8      Q.  What did you do after you did that?
9      A.  Went back to his house, went in his
10 basement, tried to smoke it, found out it was
11 fake.
12     Q.  Then you drank a few beers and then you
13 went home; is that correct?
14     A.  I drank a few more beers and then went
15 home.
16     Q.  Okay, how many beers did you drink with
17 Angel?
18     A.  Six-pack so three a piece.  No, it would
19 have been four a piece because he drank the
20 little Millers, the seven ounce Millers.  They
21 came in eight-packs.
22     Q.  Next you say I arrived at north Richmond at
23 around 12:00 midnight.  A woman named Laura, a
24 friend of Aaron's wife, let me in.

50 (Pages 197 to 200)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                              WILLIAM DUKES

Page 201

1    A. Yes.
2    Q. So describe Laura for me.
3    A. I can't even remember the color of her
4    hair. It was brownish colored hair. She's kind
5    of -- I'm not trying to be mean by saying this,
6    but she reminded me of a cat lady, like somebody
7    who might have four or five cats at her house.
8    Kind of frumpy I guess is a word for it. She's a
9    nice person but...
10   Q. Did you know her from before?
11   A. I met her a few times before, yeah.
12   Q. How did you get her attention?
13   A. I tapped on the Diversey side bedroom
14   window.
15   Q. Which entrance did you use to get in?
16   A. The front door off of Richmond.
17   Q. Did you talk to Laura at that time?
18   A. No, just hi, how you doing? Thanks for
19   letting me in. I hope I didn't wake anybody else
20   up. Sorry for waking her. She said, oh, I
21   wasn't asleep yet.
22   Q. Who other than Laura knew about your
23   arrival at the north Richmond residence at around
24   12:00 midnight?

Page 202

1    A. I had to go down through the access panel
2    to the basement. Lupe and Alicia, his wife,
3    would have been off in their room with the door
4    closed.
5        Efrain would have been downstairs.
6    Norvix would have been downstairs; and I don't
7    know if Pedro, who I called Peter at the time
8    because that's the Spanish, Pedro might have been
9    on the sofa in the dining room sleeping because
10   he was just visiting from out of town.
11       But Efrain, Norvix would have been
12   downstairs in the rooms downstairs. They would
13   have seen me or possibly heard me come in at
14   about that time and Laura.
15       I don't know about Pedro seeing me come
16   in because you came in from the front. You
17   entered the small foyer then into the dining room
18   which opened in both ways to the main house, and
19   I had to go to the living room to go into the
20   access panel to go to the basement.
21   Q. So did you physically acknowledge them or
22   have any communication, hi, how are you doing?
23   A. I was trying to be as quiet as possible
24   because it was midnight. Laura, I apologized if

Page 203

1    I woke her, and she said, you didn't wake me. I
2    wasn't asleep yet, and I went downstairs.
3    Q. You didn't talk to anybody else?
4    A. I remember specifically trying to be as
5    quiet as possible.
6    Q. So other than Laura, is there anybody else
7    that was in the house at that time who you
8    believe could testify that they observed you
9    coming in at midnight?
10   A. Not that I'm aware of unless Laura told
11   them about it. She probably didn't wanna wake
12   anybody else up either, maybe Carla, one of the
13   kids.
14   Q. So I'm going to go back to this Exhibit No.
15   3 which is the police report, all right, this
16   (indicating) thing. Go back to this.
17       I want to review the narrative of
18   events that you claimed that happened on
19   August 28th by way of the statements contained in
20   Darlene Sobczak's report.
21       I left house at 10:00 or 11:00 a.m. to
22   go to Mark Bowling's house in Westmont, got there
23   around noon, waited on Bowling --
24   A. Where does that start at?

Page 204

1    Q. I'm sorry. So it's on the second page.
2    A. Oh, okay.
3    Q. It's this (indicating) paragraph. Dukes
4    stated he was at home.
5    A. All right, I got it.
6    Q. I'm sorry. Wait. Wait. Wait. No. Got
7    there around noon, waited for Bowling, showed up
8    about 15 minutes --
9        MR. RICHARDS: No, I think you're reading
10   the wrong thing.
11       MR. ACKER: I think I'm on the wrong one.
12   Hold on a second. I'm sorry.
13       THE WITNESS: No, you're reading Sobczak's
14   -- She made it from memory or something.
15       MR. ACKER: Hold on a second. Whoa, whoa,
16   whoa, whoa. Okay, I'm sorry. I'm going to go
17   back to -- All right. At home Saturday the 28th
18   until around 1:00 p.m.
19       THE WITNESS: Yeah, she got the times all
20   wrong.
21   BY MR. ACKER:
22   Q. Do you see that?
23   A. Yeah. She got the times all wrong. That's
24   when I got home.

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 205

1   Q. Okay, he went to friend's house in either
2   Westmont or Downer's Grove, right?
3       That's what she says?
4   A. Yeah, that's what she's saying in the
5   report.
6   Q. Okay, he is not sure of the guy's last name
7   but met him at work, and his first name is Mark;
8   is that correct?
9   A. Yeah. His first name was Mark, and I knew
10  his last name because he told me his brother's
11  name was Bowling, and I looked it up. His
12  brother was Tommy Bowling, one of Gacy's victims.
13  Q. All right, okay, so the difference between
14  the interrogatory answer and the statement of the
15  police report, you left the house around 10:00,
16  11:00 and got there around noon and at home
17  between around 1:00 p.m.
18      The difference between this is you
19  didn't know Mark's last name and you went to
20  house in Downers Grove or Westmont.
21      In comparison, your answer to your
22  interrogatories has specifically Mark Bowling in
23  Westmont and that Mark Bowling showed up with his
24  wife and the kids and couldn't do work on the

Page 206

1   car, right?
2   A. Right.
3   Q. So what Sobczak's statements are, those are
4   generally true, correct?
5       You told her those statements at that
6   time?
7   A. I told her what I'm putting in my
8   interrogatories. I gave her the approximate
9   times I left the house, when I got to where I was
10  going, when I left where I went, when I left
11  there, when I got back home, when I left the
12  house again, where I went, what time I got there,
13  how long I stayed, when I left, what I did after
14  that until I got to Angel's house, how long I was
15  there approximately, what we did, and then until
16  I got home and Laura let me in.
17  Q. Okay, what I'm trying to establish, sir, is
18  that the topics that are contained in your
19  interrogatory answers are also generally
20  discussed in Detective Sobczak's police report
21  from September 2nd, 1993?
22  A. Yes, whether intentionally or inadvertently
23  she omitted facts, I don't know; but this is how
24  good she keeps records. I didn't catch that.

Page 207

1   Q. It's a true statement though that in her
2   police report she --
3   A. If that's what it says in her police
4   report, that's what she says; and we talked about
5   this in general, but she didn't put the correct
6   times and stuff of when I told her or the names.
7   Q. Yeah, the point I'm trying to make is that
8   these topics were not fabricated in their
9   entirety.
10      You had a conversation with her, and
11  you covered certain topics of where you were that
12  day; is that correct?
13  A. Right.
14  Q. And all of those topics are generally
15  reflected in Defendant Sobczak's statements,
16  right?
17  A. Yeah. They're generally, but I gave her
18  specific, not general answers.
19  Q. So the fact that you had a conversation
20  with Sobczak on September 2nd, 1993, you did, in
21  fact, talk about these topics?
22  A. Yeah.
23  Q. I'm going to move on to --
24  A. She switched the times and everything.

Page 208

1   Q. Again, I get back to did you make any notes
2   after you had this meeting with Detective Sobczak
3   on September 2nd, 1993?
4   A. Say that again.
5   Q. Did you make any notes of your conversation
6   after your conversation with Detective Sobczak on
7   September 2nd, 1993?
8   A. No, I did not.
9   Q. Okay, so you're relying on your memory as
10  to exactly what you told her; is that correct?
11  A. Yep.
12  Q. So to the --
13  A. It's indelibly imprinted because of the
14  topic of the -- the circumstances leading to her
15  asking me them questions. Somebody getting
16  killed -- Somebody that I was close to ended up
17  getting killed, and they were basically accusing
18  me of it.
19      It's in -- It's branded into my mind
20  about that. I remember getting pubic hairs
21  plucked. I remember getting hairs plucked, nose
22  hairs.
23  MR. GAINER: It's probably best if you just
24  wait until he asks you a question. That way we

52 (Pages 205 to 208)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 209

1   can move this thing along.
2        THE WITNESS: I'm sorry.  I'm just getting
3   frustrated with this too.  It's not a very good
4   memory of a thing to live through; and then once
5   you find out that these cops have done it to
6   other people, then it makes it even more
7   frustrating.
8   BY MR. ACKER:
9        Q.  I'm going to turn to another exhibit that
10  is marked as deposition Exhibit No. 4.  Give me a
11  minute.  I'll hand it to you.
12       A.  I've got 1, 2, and 3.
13       MR. ACKER:  Yeah, that's 2.  The complaint
14  is 1.  The interrogatory answers are 2.  The
15  police report is 3.  I'm about to give you 4.
16  I'm going to hand you a document that I've marked
17  as deposition Exhibit No. 4.  I'll hand this to
18  you.
19       (Whereupon, Dukes Deposition
20        Exhibit No. 4 was marked for
21        identification.)
22       (Document tendered.)
23       MR. ACKER:  Counsel, would you like to
24  compare?

Page 210

1        MR. RICHARDS:  Yeah, I got this one but
2   this one printed out.
3        MR. ACKER:  It's Bated TOC0470 through
4   0473.
5        MR. RICHARDS:  So, yeah, the first page is
6   the Miranda warning.  Let me see if I -- Okay,
7   here it goes.  So it's the first page Miranda
8   warning and then it's TOC470 to 473.  Yeah, I got
9   it.
10       MR. ACKER:  You got it?
11       MR. RICHARDS:  Yeah.
12  BY MR. ACKER:
13       Q.  Sir, I'm going to ask you to please review
14  this.
15       A.  Okay.
16       Q.  Have you had a chance to review deposition
17  Exhibit No. 4?
18       A.  Yes.
19       Q.  Have you ever seen this document before?
20       A.  I believe I have during, what do you call
21  it, discovery when my case went to trial.
22       Q.  For the purposes of the deposition, could
23  you please identify what this document is?
24       A.  There's two separate -- One is --

Page 211

1        Q.  The first page, TOC470, that's a custodial
2   interrogation Miranda warning; is that correct?
3        A.  Yeah.
4        Q.  It's dated August 6th, 1995?
5        A.  Yes.
6        Q.  And that's your signature?
7        A.  Yes.
8        Q.  Turning forward to TOC471, this is a
9   supplemental Cicero Police Department report?
10       A.  71, yeah, I see it.
11       Q.  471 through 473.
12       A.  Yeah.
13       Q.  Do you recall this August 6th, 1995 event?
14       A.  Yeah.
15       Q.  Did you make notes of the statements made
16  at that time?
17       A.  No, I did not.
18       Q.  Were you given -- I'm sorry.
19       Does the August 6th, 1995 police report
20  state that you were read your Miranda warning and
21  you stated that you understood and you were
22  willing to give it?
23       A.  Yeah, it does say that.
24       Q.  Where did the interview occur?

Page 212

1        A.  Plymouth Police Department after I was
2   arrested and pulled out of my house by Cicero
3   Police detectives.
4        Q.  Where did the interview occur?
5        A.  In the Plymouth, Indiana Police Department.
6        Q.  Who was present during the interview?
7        A.  Sobczak, Detective Sobczak and Detective
8   Bizerik.
9        Q.  Are you claiming that there are false or
10  fabricated statements contained in the
11  August 6th, 1995 police report?
12       A.  False or misstated.  I don't know how she
13  put them down when she put them down.  I don't
14  know how she intended them to be, but the
15  timeframes are off.
16       Q.  So flipping back for a minute to your
17  answers to interrogatories, right, this is on
18  answer to number -- under five, right, you
19  have -- This (indicating) document, right?  So
20  then --
21       A.  I have four to six.
22       Q.  Right, yeah, four, five, it's actually top.
23  Top is five and then you have all -- Yeah, five
24  and then your answer.

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                          WILLIAM DUKES

| Page 213 |
| --- |

1    A. I got a page missing somewhere.
2    Q. You got it. It's right there.
3    A. Am I missing a page or it got cut off?
4    Q. No, here's five. The top of the next page
5  begins with to sleep. You got it right there, to
6  sleep.
7    A. Where does it say five at?
8    Q. It doesn't. So this is number five, answer
9  to --
10   A. That's what I'm saying. Yours says -- Mine
11 goes from four skip to sleep, and it doesn't have
12 five on there anywhere.
13   Q. That's (indicating) the one.
14   A. Oh, I'm sorry.
15   Q. That's okay. That's all right. No, that's
16 why we've got to keep it all straight. So on the
17 top of -- This is under answer to interrogatory
18 number five.
19   A. Okay.
20   Q. Right, then you have September 2nd, 1993
21 and then you have your narrative underneath of
22 all the things you said to Sobczak?
23   A. Okay.
24   Q. Right. The top of the next page, I never

| Page 214 |
| --- |

1  said rough sex to Lucy. I never said I tore up
2  Lucy's IDs to prevent her from getting married.
3  I told her Lucy gave me the picture from an old
4  ID, right?
5        Those are all the statements that you
6  had attributable to the first interview, right?
7    A. On August 6th, '95.
8    Q. This is all under September 2nd, 1993,
9  right? All these statements, right?
10       Then you go to the next interview,
11 August 2nd -- Yeah, August 6th, 1995.
12       Do you see that?
13   A. I see it but I misquoted. I got the times
14 mixed up.
15   Q. No. No. No. No. No.
16   A. I don't know if I -- I think I misquoted or
17 misstated the date and got the date mixed up when
18 I was doing this because that sentence there
19 should be under this August 6th, '95.
20   Q. Okay.
21   A. Because that's when they seen
22 whatcha-call-it.
23   Q. The ID.
24   A. The ID and the rough sex, same thing.

| Page 215 |
| --- |

1    Q. Okay.
2    A. I got it mixed up like I just did with the
3  paperwork here.
4    Q. That's fine. So I just want to make sure
5  that -- So under August 6th, 1995 you have the
6  line below it, same.
7        What do you mean by same?
8    A. The answers above.
9    Q. Okay, so --
10   A. Cuz I thought I told them -- Where's the
11 police report? Yeah, maybe I got it -- the times
12 inverted or something.
13   Q. Okay, I just want to make sure I understand
14 it.
15   A. It's a very stressful topic, but the IDs
16 came in in '95 when they arrested me on
17 August 6th and then went and got a warrant on
18 August 7th to justify the arrest.
19   Q. Okay, so is there anything different in
20 your answer as to what happened on August 6th,
21 1995?
22       You just identified one, right, that
23 you talked about the ID?
24   A. I eventually told them the same thing

| Page 216 |
| --- |

1  again, my whereabouts at the time of the murders,
2  my relationship with Lucy and the kids and
3  Marilyn, my willingness to give DNA which I
4  already done by that time. Yeah, they're talking
5  about the murders.
6    Q. Okay, so --
7    A. It's basically the same answer to the one
8  above.
9    Q. Okay, so if I understand your interrogatory
10 answer, you're basically saying the same topics
11 that you were questioned about in September of
12 1993 were also the same topics you were
13 questioned about in 1995; is that correct?
14   A. With the exception of the rough sex and the
15 ID. I believe I did tell them in September
16 '02 -- I mean, September of '93 that I did take
17 her IDs.
18       I did tell them that. At Marilyn's
19 request, I left with the IDs that morning that
20 Marilyn gave me, but I didn't have -- I forgot I
21 had the ID in my wallet.
22   Q. Okay, so --
23   A. Not the ID. I forgot I had the picture
24 from the ID in my wallet. Let me clarify that.

54 (Pages 213 to 216)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 217

1    And at that time in '93, I never said
2  anything about rough sex with Lucy. I might have
3  said -- Then I might have said something about
4  having sex in the car and it got painful, but I
5  know I restated that again in '06 -- I mean,
6  August 6th of '95.
7    Q.  Okay, so let's talk about August 6th, 1995.
8       Whose house were you at?
9    A.  I was living with my brother.
10   Q.  And where were you at the time?
11   A.  I was living in the basement.
12   Q.  You were living in the basement?
13   A.  Yes.
14   Q.  And where did the officers find you?
15   A.  In the basement.
16   Q.  Okay, so the police report goes here, Dukes
17  stated that he met Marilyn through a friend.
18  This is in your --
19   A.  Yeah, I did.  It was my boss.
20   Q.  Yeah, this is in this (indicating) thing,
21  right?
22   A.  Right, yeah, right, my boss.
23   Q.  Marilyn worked at the flea market, right?
24       That's what you told them?

Page 218

1    A.  That's where I met her when he introduced
2  us, yes.
3    Q.  Dukes had offered to fix her car; is that
4  correct?
5    A.  I was looking at her car for Sharma, the
6  Hindu guy I was working for.  He was gonna buy
7  her Chevy Blazer.
8    Q.  Dukes was then able to stay at the
9  apartment because it was closer to his job.
10   A.  That was after Lucy came and got her car
11  fixed at Standard -- not Standard.  She came to
12  National Salad Oil, and Sharma had me fix her
13  car.
14       And then the next day she called me and
15  said her mom knew a guy that needed help at a
16  garage, and I could make more money working
17  there.
18   Q.  Okay, Dukes also would help Marilyn at both
19  flea markets on the weekends.
20       Is this a true and correct statement?
21   A.  Yes.  She had the one on Cicero and 31st or
22  in that general area across from the drive-in
23  movie theater, and then she'd sell the fireworks
24  at an outdoor flea market that was a drive-in.

Page 219

1    I wanna say it was -- It was Columbus
2  Drive I believe is where it was.  I said it was a
3  different name earlier I think, but it was
4  Columbus now that I think about it.
5    Q.  Okay, Balboa or something?
6    A.  Balboa.  That's Rocky.
7    Q.  Okay, did you have an arrangement with
8  Marilyn where she would credit you for your rent
9  for working at the flea markets?
10   A.  No.  It was just something when I tried to
11  hand her money for the rent, I'd say here.
12  She'd, oh, don't worry about it.
13   Q.  Then there's a statement in this police
14  report:  Dukes was going to school at Lincoln
15  Tech.  Marilyn had given him money to start.
16   A.  I was in school at Lincoln Tech, but
17  Marilyn did not give me money to start the
18  school.
19   Q.  Then you believe that's a false statement?
20   A.  Yes.  Now I can't remember if I gave her
21  money and she gave me a check cuz they didn't
22  take cash.  That could have happened, but she
23  never actually gave me anything.  I can't
24  remember if I had to make a deposit and she gave

Page 220

1  me the check because they wouldn't take cash.
2    Q.  Okay.
3    A.  Okay, but she never gave me money --
4    Q.  All right.
5    A.  -- to start school, and I don't think I had
6  to pay any money that I remember cuz it was all
7  handled through grants and loans or grants mostly
8  and scholarship things that they had set up
9  already.  They were pretty adept at getting money
10  out of the government.
11   Q.  So then the statement goes on:  Dukes can't
12  recall exactly when they started being together.
13       Do you believe that was a true
14  statement?
15   A.  Yeah, I couldn't -- This was '95, over two
16  years after the murders; and even two or three
17  months after we started having sex I couldn't
18  remember exactly when it had started.  It just
19  happened one night.
20   Q.  Then you go on here:  One of them started
21  playing with his hair and then one thing led to
22  another.
23       Is that a true and correct statement?
24   A.  One of them?  Lucy started playing with my

55 (Pages 217 to 220)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 221

1   hair while I was leaning up against the sofa
2   watching TV with her.
3       Q. Okay, so that's a statement that you
4   believe you made to Ms. Sobczak?
5       A. Yeah.
6       A. Dukes had sex with Lucy several times.
7           Is that a true statement?
8       A. This is from the police report?
9       Q. Yeah.
10      A. On the 2nd?
11      Q. Yeah.
12      A. Yeah, it was more than several times but,
13  yeah.
14      Q. He states he received bruises from the
15  sexual contact.
16          Is that a true statement?
17      A. I don't think so unless I said in relation
18  to when we had sex in the car and it got painful.
19      Q. Okay.
20      A. The gear shifter and the steering wheel.
21      Q. But you did relate that --
22      A. I might have. I don't recall it.
23      Q. Okay, Lucy wanted him.
24          Do you believe that that's a true

Page 222

1   statement?
2       A. I said we both wanted it. We were mutual.
3   It was mutual.
4       Q. Okay, he never forced himself on her.
5           Is that a true statement?
6       A. Cuz she was insinuating that I had.
7       Q. Okay, but you communicated to her that both
8   of you guys -- It was consensual, right?
9       A. Two consenting adults, yes.
10      Q. Okay, all right, let's see here. Then it
11  talks here about Lucy and the kids would take
12  trips and do all kinds of things together.
13          That's something that you told her, to
14  Sobczak?
15      A. Say that again.
16      Q. That Lucy and the kids would take trips and
17  do all kinds of things together.
18      A. And Marilyn, yeah, we'd go to Indiana and
19  buy fireworks.
20      Q. Okay, that's something that you believe you
21  told Detective Sobczak?
22      A. Yeah. They knew about the fireworks cuz I
23  was driving the van, and Lucy was asking people
24  on the porch steps out front of their houses

Page 223

1   saying ¿Quieres cohetes which in Spanish means do
2   you want fireworks.
3       Q. Okay, so next statement, they were going
4   out for a couple months when Lucy started seeing
5   Kevin.
6           Is that a true statement?
7       A. She had been seeing him the whole time. He
8   had been coming around off and on. I didn't know
9   if she was dating him or not, but I knew he had
10  been coming around. So she was definitely seeing
11  him. The kids knew him.
12      Q. Is this a statement that you made to
13  Detective Sobczak?
14      A. That she started a couple months after me
15  and her started?
16      Q. Yeah.
17      A. No, because I told her we were already
18  doing that.
19      Q. Next statement: Marilyn didn't want Lucy
20  seeing Kevin, but he had money.
21          Is that a statement that you believe
22  you made to Detective Sobczak?
23      A. Yes.
24      Q. Next statement: On the Friday before Lucy

Page 224

1   got married, she came home and showed him a ring.
2           Is that a true statement?
3       A. Yes.
4       Q. Next statement: She said she was getting
5   married the next day.
6           Is that a true statement?
7       A. Yeah.
8       Q. Okay, that's a true statement, you told
9   that to Detective Sobczak?
10      A. Yes.
11      Q. And then Marilyn was very upset and had
12  asked Bill if he could stop the marriage.
13      A. By taking her IDs that she handed me, yes.
14  I told her that specifically.
15      Q. That's a statement you made to Detective
16  Sobczak?
17      A. Yeah, but she omitted the fact that Marilyn
18  gave me the IDs. Marilyn already had them in her
19  hand.
20      Q. All right, and then Dukes states he took
21  all of Lucy's identification, birth certificate,
22  driver's license, et cetera, that he can find and
23  destroyed them.
24          Is that a true statement?

56 (Pages 221 to 224)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 225

1    A.  No, it is not.
2    Q.  You did, in fact, take her identification;
3  is that correct?
4    A.  I took the identifications Marilyn handed
5  me, and I gave them right back to Lucy.  I gave
6  them to Lucy herself in the exact condition they
7  were given to me, undamaged.
8    Q.  Okay, thinking she couldn't get married if
9  she didn't have the papers, was that your
10  thought?
11   A.  Yeah, that was Marilyn's --
12   Q.  Plan?
13   A.  -- plan for giving me the IDs.
14   Q.  Lucy and Dukes had sex for the last time
15  the night before she got married.  There was a
16  couple times after she got married they'd be
17  kissing and things at the apartment when Lucy
18  came over.  Let's start with this first
19  statement.
20       You had sex for the last time the night
21  before they got married; is that correct?
22   A.  Up until the morning she got married, yeah.
23   Q.  Right.  There were a couple times after she
24  was married that they would be kissing and things

Page 226

1  at the apartment when Lucy came over.
2       Is that a true statement?
3    A.  I hugged her once or twice when I bumped
4  into her at the house or something, and that was
5  it.  She hugged me back and we parted, no sexual,
6  no kissing.
7    Q.  Right.  So that's a statement you made to
8  Detective Sobczak?
9    A.  That we hugged a couple times after that
10  when we bumped into each other at the apartment,
11  but I never told Sobczak that I kissed her and
12  things at the apartment.  I never said that part.
13   Q.  This next statement:  They were always
14  stopped from continuing because the kids or
15  Marilyn would come in the room.
16       Did you make that statement?
17   A.  There was nothing to stop.  I said Lucy was
18  there with the kids either dropping them off or
19  picking them up.
20       So the only thing we ever did was hug.
21  We didn't do anything else.  There was nothing --
22  She was married by then.
23   Q.  Okay, then we turn to the events on the
24  second paragraph, the first full paragraph on

Page 227

1  472.
2    A.  Okay, the second paragraph?
3    Q.  Yeah, states that remembers Saturday,
4  28 August 93, the night they were murdered.  Then
5  there's -- you go through the various events.
6  I'm not going to go through all of this again,
7  but you did, in fact, tell her that you went to a
8  friend's house on the south side.
9       Is that correct?
10   A.  Yes.  We've done went over all of this, but
11  the timeframes she's got are totally different
12  than what I actually told her.
13   Q.  Okay, so this one she says:  He had been
14  home most of the day; and around 2:00, you left
15  to go to your friend's on the south side,
16  correct?
17   A.  That's what she says in her report.
18   Q.  Okay, moving forward:  He doesn't know
19  exactly where it is, but there's some guy Mark that he
20  worked with.
21       This is referring to Mark Benning; is
22  that correct?
23       MR. RICHARDS:  Objection, Mark Bowling.
24       MR. ACKER:  Mark Bowling.  Thank you,

Page 228

1  Counsel.
2       THE WITNESS:  Tommy Bowling's brother, a
3  Gacy victim, Tommy Bowling.  I knew Mark's last
4  name.
5  BY MR. ACKER:
6    Q.  He doesn't know exactly where it is.
7       Did you tell her that?
8       I'm sorry.  No, I skipped something.
9       He returned home and later that evening
10  around 7:00 he went to Russell's house.
11   A.  Most of the day, around 2:00 he left and
12  went to a friend's house on the south side.  No,
13  I didn't tell her it was the south side.
14       He doesn't know exactly where, but it
15  was some guy Mark that I worked with.  He didn't
16  live on the south side.  He lived west down
17  Interstate 55, off of there, Westmont or
18  whatever.
19       I returned home later that evening.
20  No.  I went to Russell's house.  I got to
21  Russell's house around 7:30, 8:00 o'clock.
22       I already went over all the timeframes.
23  Her timeframes are completely off.
24   Q.  Okay, so it says that you decided to go

57 (Pages 225 to 228)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

---

Page 229

1    back home.  You went to a friend's house around
2    the corner on Honore north.
3         What's that?
4         A.  I went to my friend's house around here
5    where I lived.  I lived at 2758 Richmond which is
6    west of California.  Honore is north of Damen.
7    That's where my aunt lives, 2951 North Honore.
8    My aunt lives there.  I didn't go nowhere near
9    her house that day.
10        Q.  Okay, did you tell Darlene Sobczak that
11   that's where you went?
12        A.  Nope.
13        Q.  Keep going here.  This is a crack house
14   where you go around the back into the basement,
15   and the guy is there.
16        Did you tell Darlene Sobczak that?
17        A.  She's talking about 2951 North Honore.  Why
18   would I tell her that?  There is no -- You go
19   around the back -- Because there is no way to go
20   around the back at Honore because there's a
21   railroad track there with a 12-foot wall behind
22   it.  There is no alley.
23        I went home around midnight not 2:00.
24   Aaron's wife didn't let me in.  That was Irma

---

Page 230

1    and that -- Laura was a friend of hers and his.
2    I went to sleep in the basement, 2951 Honore.
3    That was 2758 Richmond.
4         Q.  What's the telephone number there?
5         A.  That was my aunt's old phone number.
6         Q.  That was your aunt's old phone number?
7         A.  I believe so.
8         Q.  Why would you give her that?
9         A.  Maybe she had it in her notes from
10   somewhere else, my aunt's address.  Again, this
11   is '95.  This is two years after the fact.
12        She showed up at my aunt's job and my
13   aunt's house numerous times.  She showed up at my
14   job numerous times, showed up at jobs, apartments
15   where I was working for my rent getting me kicked
16   out.  She did a lot of things.
17        Q.  Okay, moving forward down --
18        A.  So if she got her notes all discombobulated
19   and just made this report off a bunch of stuff
20   all shuffled up, I don't know.
21        Q.  So are you telling me that you didn't have
22   a discussion with Darlene Sobczak about what you
23   did that night?
24        A.  Yeah.  This was the second go-around, and

---

Page 231

1    she screwed up the dates and times all again.
2         Q.  But these are -- essentially covered in the
3    main points.  You went to Mark's house.  You went
4    to Russell's house --
5         A.  Yeah.
6         Q.  -- you went to the lake, had some beers.
7         A.  Then went to Angel's house, tried to -- had
8    some beers.  Before and after we tried to get
9    some crack.  We found out it was fake, and then I
10   went home.
11        I got home around midnight, 2758
12   Richmond, first floor, and I went in the
13   basement.  There is no basement at 2951 Honore.
14        Q.  So moving forward there's a statement:  He
15   knows of the incident at the hotel where his
16   sister-in-law states he tried to rape her.
17        What's that all about?
18        A.  What?
19        Q.  He knows of the incident at the hotel when
20   his sister-in-law states he tried to rape her.
21        A.  Where's that at?
22        Q.  This paragraph right here (indicating),
23   down here.
24        A.  She was drunk and came on to me, and I

---

Page 232

1    pushed her away.  My sister-in-law, me and her
2    went out drinking.  She was drunk.
3         I was staying at a hotel then, and I
4    went to change clothes, and she started coming on
5    to me, and I pushed her away.  You're my
6    brother's wife.  Leave me the F alone.
7         And we went and got back in the car and
8    went to a bar, and from the bar she called her
9    brother thinking I was gonna tell him what she
10   did and made that story up.
11        The next day at work, my brother, he
12   was mad that night when he came to the bar to get
13   her; but the next day at work, he was, I know
14   what happened.  I already found out.  She don't
15   remember shit except you guys went out drinking
16   last night.  She said everything except for the
17   last part.
18        Q.  So the next statement here:  He states --
19   Bill has had sex since 14 years of age.
20        Is that a true statement?
21        A.  Yeah, 14 or 15.
22        Q.  Okay, he hasn't had a steady girlfriend.
23        Is that a true statement?
24        A.  Not a serious girlfriend but I've had a

---

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                                    WILLIAM DUKES

Page 233

1    couple steady girlfriends.  I lived with a couple
2    women.
3        Q.  Next statement:  Only girl he really has
4    had feelings for was Lucy.
5            Is that a true statement?
6        A.  No.  She was a friend.  We just -- friends
7    with benefits.  We called it something else back
8    then.  It was called fuck buddies.  Excuse my
9    language but that's what it was referred to back
10   then.
11       Q.  Next statement:  All of his other girls
12   have been one-night stands, usually someone he
13   picks up in a bar -- picked up in a bar.
14           Is that a true statement?
15       A.  No, I lived with people, girls.
16       Q.  Talking as of 1995?
17       A.  Yeah.  Prior to that I've lived with girls.
18   I had steady relationships.  We had our own
19   apartments.
20       Q.  Did you have discussions with Darlene
21   Sobczak about these topics?
22       A.  Yeah.  I never said all of them have been
23   one-night stands or that I picked up in a bar.  I
24   try to stay away from them because you pick up

Page 234

1    some other stuff there where you gotta go to the
2    Health Department.
3        Q.  Okay, I'm going to turn to another set of
4    documents here.  This is deposition Exhibit No.
5    5.
6            (Whereupon, Dukes Deposition
7            Exhibit No. 5 was marked for
8            identification.)
9            (Document tendered.)
10   BY MR. ACKER:
11       Q.  I'm tendering to you a document I've marked
12   as deposition Exhibit No. 5.  This is entitled
13   Dukes' Responses to Cicero Detective Donegan's
14   First Set of Interrogatories Directed to William
15   Dukes.  Please take a moment and review this
16   document.
17       A.  All right, I'm ready.
18       Q.  Okay, are you ready?
19           Have you reviewed deposition Exhibit
20   No. 5?
21       A.  Most of it.
22       Q.  Have you ever seen this document before?
23       A.  I think when I signed it, yep.
24       Q.  There's a document -- There's a

Page 235

1    verification page at the very end.  It has your
2    signature.
3            Is that you?
4        A.  Yes.
5        Q.  There's a page number below that, 23.
6            Is that part of this document or
7    something else?
8        A.  It's this (indicating), right?
9        Q.  Yeah.  I mean, it was part of what I
10   received but it has --
11       A.  It says 23.
12       Q.  -- a page number at the bottom, 23.
13           Who prepared this document, sir?
14       A.  My attorney.
15       Q.  Attorney, okay.
16           MR. RICHARDS:  Does anyone have another
17   copy of that document?
18           MR. ACKER:  I have one.  Do you want one?
19           MR. RICHARDS:  Yeah.
20           (Document tendered.)
21   BY MR. ACKER:
22       Q.  Do you believe the answers contained in
23   here to be true and correct?
24           MR. SULLIVAN:  That's No. 5, right?

Page 236

1            MR. ACKER:  5 is Donegan.
2    BY MR. ACKER:
3        Q.  Do you believe these answers to be true and
4    correct, sir?
5        A.  So far, yes.
6        Q.  I'm turning your attention to the answer to
7    interrogatory number five.
8        A.  Okay.
9        Q.  There's no page numbers on this.  I think
10   it's the third page.
11       A.  I've got it.
12       Q.  He's talking about in paragraph --
13   interrogatory question number five is in regards
14   the interrogation alleged in paragraphs 63
15   through 67 of the first amended complaint.  State
16   the questions asked to Plaintiff by Donegan and
17   Plaintiff's answers to those questions.
18           Do you see that, sir?
19       A.  Yes.
20       Q.  Okay, and then below that it's your answer:
21   "Donegan asked me a number of questions
22   suggesting that Marko was more responsible and
23   that Marko killed Bridget and I killed Marilyn.
24   Donegan suggested that Lucy needed closure and

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 237

1   that I should not make her sit through a trial."
2          Are those the statements that you
3   believe that Detective Donegan asked you at that
4   time?
5      A.  Yes.
6      Q.  Is there anything else you believe he said
7   at that time -- asked you during your
8   interrogation?
9      A.  Offhand, no.
10     Q.  Then below that is your response: "I
11  repeatedly told him I did not know anything and
12  wanted to be left alone, that I wanted a lawyer,
13  that he should just charge me with this so that I
14  could get a lawyer and get this settled in
15  court."
16         Is that your belief of what you said to
17  Detective Donegan at that time?
18     A.  Yeah, but you gotta multiply that sentence
19  ten times or more, repeated over and over again
20  by me.
21     Q.  Do you recall who was present at the time
22  that this interrogation occurred with
23  Mr. Donegan?
24     A.  Like I said, this was a 36-hour marathon,

Page 238

1   and they were floating in and out like tag team
2   wrestlers on me, and I can't remember if this was
3   one of the incidents where he was in there by
4   himself or with just Pineda or with all of them
5   combined.
6          But I said this to him.  I remember
7   that, and he said that to me.  Donegan asked me
8   another question suggesting that Marko was more
9   responsible and that Marko killed Bridget and
10  that I killed Marilyn.
11         Yeah, that's exactly one of the things
12  he said to me, and that's what I told him.  I
13  didn't know anything.  I want a lawyer.  Leave me
14  alone.
15     Q.  Okay, I'm going to move on to another
16  document that's been marked as deposition Exhibit
17  No. 6.  It's a one-page document.  It is P --
18     A.  Are we done with this one?
19     Q.  Yes, for now.  It is PFP00566.
20         (Whereupon, Dukes Deposition
21          Exhibit No. 6 was marked for
22          identification.)
23         (Document tendered.)
24     MR. SULLIVAN:  What's the Bates number on

Page 239

1   that?
2      MR. ACKER:  PFP566.  Take a moment and look
3   at that one page.
4      THE WITNESS:  Oh, here (indicating).
5      MR. ACKER:  At the bottom, right.
6      THE WITNESS:  I got a question.  Isn't
7   there another one of these?  Cuz what we're
8   talking about now, I'm not sure if that was the
9   April 12th or if this was the January 10th.
10     MR. ACKER:  This is a different report from
11  a different date.
12     THE WITNESS:  Okay, he had two different
13  reports.  I wasn't sure.
14  BY MR. ACKER:
15     Q.  Are you aware of any other reports that
16  Mr. Donegan authored for January 9th or 10th,
17  2004?
18     A.  If he was there on January 10th, shouldn't
19  he have had a report?
20     Q.  I'm asking you, sir.
21     A.  I don't know if he did or not.  I don't
22  recall ever seeing one.  If there's not, there
23  should have been.
24     Q.  I do not believe Detective Donegan prepared

Page 240

1   a report for that date, sir.
2          Moving on, have you had a chance to
3   review deposition Exhibit No. 6?
4      A.  Now?  Yes.
5      Q.  Okay, have you ever seen this document
6   before?
7      A.  I believe I have but I can't state when.
8      Q.  This is a report related to an event on
9   April 12th, 2004?
10     A.  Yes.
11     Q.  Do you recall that event?
12     A.  Yeah.
13     Q.  And where did this event occur?
14     A.  Homan and Fillmore police station.
15     Q.  And who was present at that time?
16     A.  Pineda, Donegan, Washburn and Rodriguez
17  brought me out of the Cook County Jail.  Killacky
18  was there.  Fernando, one of Killacky's
19  supervisors, I think was the name of him was
20  there.
21         There was Dan Weiss was there off and
22  on.  He never came in the room, but he walked
23  past the doorway and looked in just as an
24  intimidation factor to let me know he was there,

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 241

1    state prosecutor.
2        Q. Okay, so the second paragraph it indicates,
3    the narrative:  On this date of April 12th, 2004
4    at 1430 hours, responding officer had the
5    opportunity to interview William Dukes, date of
6    birth, blah, blah, blah.
7            At this time Dukes was asked if he
8    wanted to make any statements to me regarding
9    this investigation in that both myself and
10   William Dukes had met in the past referring to
11   this case.
12           William Dukes replied that he would
13   like to tell responding officer what he knows in
14   the case but stated he will take his chances in
15   court.  Interview ended at this time.
16           Do you recall this event, sir?
17       A. Yeah, but that's not what I said to him.
18       Q. What happened?  Tell me what you said to
19   him.
20       A. I pretty much told him just leave me the F
21   alone.  I used the full four-letter word at the
22   time.  I want a lawyer, and I'll take my chances
23   in court.
24       Q. Is it a true statement, sir, that you did

Page 242

1    not make any statements to him related to the
2    merits of the event?
3        A. If I remember correctly, that's all I said
4    to him the whole day.
5        Q. So you did not discuss any specifics as to
6    what happened on August 28th, 1993; is that
7    correct?
8        A. To the best of my knowledge now and memory,
9    no.
10       Q. Okay, did Mr. Donegan honor your request to
11   terminate the interview?
12       A. No, cuz he continued all the way to
13   midnight.
14       Q. This was on April 12th, 2004, sir, not
15   January 10th.
16       A. I know.  They took me out of the jail
17   April 12th at 8:00 o'clock in the morning.  This
18   particular happened at 2:30 in the afternoon
19   according to this, and they didn't take me back
20   to the jail until the 13th, bring me back there
21   'til the 13th of April.
22       Q. So as I understand your testimony,
23   Mr. Donegan interrogated you from 1430 to 1200?
24       A. He was in and out with them the whole time,

Page 243

1    this whole period.  I don't know exactly what
2    time he ceased to be present, but I know it was
3    after 2:30.
4        Q. Did you make any notes following this
5    incident of what happened?
6        A. No.
7        Q. So this is all based upon your recollection
8    and memory; is that correct?
9        A. Yes, and was contained in the County
10   signing me out on April 12th about 8:00, 9:00 in
11   the morning and my being signed back in the next
12   day.
13           They said there was nobody at the
14   County to receive me to bring me back.  So I had
15   to sit at Harrison and Kedzie over night.
16       Q. Do you recall whether any statements that
17   you made to Donegan were used at trial?
18       A. No, but he was there for part of the fake
19   statements that were made when I was begging for
20   an attorney and to be left alone, and he let them
21   keep interrogating me.
22       Q. I have one more exhibit for you.  This is
23   Deposition Exhibit No. 7.
24

Page 244

1            (Whereupon, Dukes Deposition
2            Exhibit No. 7 was marked for
3            identification.)
4            (Document tendered.)
5    BY MR. ACKER:
6        Q. This is Plaintiff's Response to Cicero
7    Detective Allan Pineda's First Set of
8    Interrogatories.  That's 7.
9            Please take a moment to review that.
10       A. Okay.
11       Q. Have you ever seen this document before?
12       A. Yes.
13       Q. On the last page there's a signature under
14   verification.
15           Is that your signature?
16       A. Yes, it is.
17       Q. Again, it has the pagination number 23 at
18   the bottom.
19           Do you see that, sir?
20       A. Yes.
21       Q. Did you review this document before you
22   signed it?
23       A. Yes.
24       Q. Do you believe the answers are true and

                              61 (Pages 241 to 244)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 245

1  correct?
2      A. I believe so, yes.
3      Q. Who drafted these answers, sir?
4      A. My attorney.
5      Q. I don't see the attorney's signature on it;
6  is that correct?
7      A. I didn't see one, no.
8      Q. What documents did you rely on to prepare
9  these answers?
10     A. My memory and I think I had these
11  (indicating), memory and that's about it.
12     Q. Okay, so turning your attention to --
13     A. I might have had some paperwork. I can't
14  remember but... I did have a few police reports
15  at the house. I just don't remember which ones.
16     Q. Okay, so at the bottom of page two is the
17  beginning of question five.
18         Question five states: In regards the
19  interrogation alleged in paragraph 63 through 67
20  of the first amended complaint, state the
21  questions asked to Plaintiff by Defendant Pineda
22  and Plaintiff's answers to those questions.
23         Do you see that, sir?
24     A. Yes.

Page 246

1      Q. And then beneath that is your answer:
2  "Pineda asked many of the same questions as
3  Detective Donegan. He continually suggested that
4  Marko was more involved.
5         I repeatedly told him that I didn't
6  know anything, that I wanted to be left alone,
7  that I wanted a lawyer and if he could just
8  charge me with this so that I could get a lawyer
9  and get this settled in court."
10        Was that your answer, sir?
11     A. Yes, it is.
12     MR. RICHARDS: A Correction. You said he
13  could just charge me. I think it reads he should
14  just charge me.
15     MR. ACKER: Should just charge me. I'm
16  sorry, Counsel. Thank you for the correction.
17     THE WITNESS: Yeah, because there was no --
18  I said that he should just charge me because
19  there's no way I can get an attorney unless I was
20  charged so I could get the public defender
21  appointed.
22  BY MR. ACKER:
23     Q. Okay, so when did the events occur where
24  Mr. Pineda made these statements to you?

Page 247

1      A. I can't remember if it was specifically
2  only on April 12th.
3      Q. Did -- Were these statements made to you on
4  January 10th, 2004?
5      A. It's possible they were made then too. I
6  can't remember specifically if they were, but I
7  know they were made on the August 12th, the same
8  time when Donegan did it.
9      Q. Do you mean April 12th, 2004?
10     A. April 12th, yeah, April. I'm sorry.
11     Q. And who was present at that time?
12     A. Again, it's the tag team interrogation
13  tactics. They were in and out of the room
14  together, in pairs, and triplets, all of them at
15  once, in and out.
16         I'm assuming -- Pineda and Donegan I'm
17  pretty sure were in there at the same time most
18  of the time. Occasionally they were separated.
19         But most of the time the two Cicero
20  detectives, Donegan and Pineda, were in the room
21  together. So this could have been at the same
22  time.
23     Q. Again, we established that you did not take
24  any notes after this event; is that correct?

Page 248

1      A. That's correct.
2      Q. And --
3      A. I was handcuffed to a wall.
4      Q. Did Pineda ask you any other questions
5  other than what you reflected in your
6  interrogatory?
7      A. Not that I can recall.
8      Q. Did you make any other statements to Pineda
9  other than what's reflected in your answer to
10  interrogatory number five?
11     A. Other than repeating this exact statement
12  to him a dozen times, telling him I wanted a
13  lawyer, leave me alone, I can't recall, no.
14     Q. Were any of these statements used at trial?
15     A. No, but statements that they alleged that I
16  made at times when I was --
17     Q. Statements that you made to Mr. Pineda,
18  were they used at trial?
19     A. No. I didn't make any statements to
20  Pineda, but statements that they alleged I made
21  in his presence were used at trial, fabricated
22  statements.
23     Q. How has Pineda violated your civil rights?
24     A. By not doing his duty and stopping them

62 (Pages 245 to 248)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO

WILLIAM DUKES

---

Page 249

1   from the interrogation when I told them I wanted
2   a lawyer.  He allowed it to continue not just
3   over the January 10th but on April 12th.
4        MR. ACKER:  I may be done.  I'm going to
5   take a short break.
6        (Whereupon a recess was taken.)
7        MS. KUNZER:  Back on the record.
8           DIRECT EXAMINATION
9              BY MS. KUNZER:
10   Q.  You're still sworn in.
11   A.  Right.
12   Q.  I represent Mr. Killacky.
13   A.  Okay.
14   Q.  And I'm going to be a lot shorter than he
15   was, okay?  I'll try to keep it brief, and I'm
16   going to be bouncing around.  So the same rules
17   apply.  If I ask a question you don't understand,
18   just let me know and I'll rephrase it, okay?
19        You had mentioned that you had lived
20   with a couple of girlfriends, you know, over the
21   years.
22   A.  Yeah.
23   Q.  Do you remember any of their names, first
24   and last name?

---

Page 250

1   A.  Anna Villacorta, V-i-l-l-a-c-o-r-t-a.
2   Q.  And where did you live with her?
3   A.  1414 North Tripp.
4   Q.  In Chicago?
5   A.  Yes.
6   Q.  And when was this?
7   A.  '87, '88, '89, somewhere in that vicinity.
8   Q.  Okay, anyone else?
9   A.  Dina Noble.
10   Q.  N-o-b-e-l?
11   A.  E-l or l-e.  I can't remember.
12   Q.  Okay, and where did you live with her?
13   A.  That one was -- That was near Keeler and
14   Armitage so 2100 North Keeler or Kedvale,
15   Kedvale.
16   Q.  Kedvale, 2100 North Kedvale or Keeler?
17   A.  Kedvale.
18   Q.  Kedvale, and when did you live with her?
19   A.  Between '89 and '90.
20   Q.  Okay, so right after Anna?
21   A.  Yeah.
22   Q.  Okay, anyone else?
23   A.  No, not live-in roommates.
24   Q.  Do you talk to Anna or Dina anymore?

---

Page 251

1   A.  Nope.
2   Q.  When is the last time you spoke with either
3   one of them?
4   A.  Around the same time.
5   Q.  Okay, we had talked about the first time
6   you were picked up.  I think it was five days
7   after this murder happened.
8   A.  Yeah.  They told me on September 2nd that
9   they were murdered on the 28th.
10   Q.  And I think you testified that that was the
11   first time you learned about the murders?
12   A.  Yeah.
13   Q.  And at any time between, you know,
14   August 28th and September 2nd had Lucy tried to
15   reach you at all?
16   A.  Not that I know of.  Nobody told me anybody
17   called at the house, and she knew where I worked
18   so, no.
19   Q.  And after you were picked up on the 2nd,
20   did you reach -- you know, reach out Lucy?
21   A.  I wanted to but I was told not to.
22   Q.  Who told you not to?
23   A.  Sobczak.
24   Q.  Okay, and did she say why you shouldn't

---

Page 252

1   reach out to Lucy?
2   A.  They weren't sure who did it, and they
3   might think I did it.  I said no, that's not the
4   case, but they still said don't contact them.  I
5   was told not to specifically.
6   Q.  Okay, so Sobczak told you that you
7   shouldn't contact Lucy because then Lucy might
8   think you're guilty?
9   A.  Right.  She didn't -- I don't know what the
10   purpose was, but that's what she implied.
11   Q.  Okay, at any -- When was the last time you
12   talked to Lucy?
13   A.  Probably within a week of them pulling me
14   into the station so not too long, maybe a week
15   before the murders happened if it was on the
16   28th.
17   Q.  Okay, so since the murders, you haven't
18   spoken with her at all?
19   A.  No.  The only time I seen her was in court.
20   Q.  And you haven't spoken with Lucy since your
21   trial at all?
22   A.  I didn't speak to her at trial.  I seen her
23   at trial.  She was in the courtroom, the
24   audience.  That was it.

---

63 (Pages 249 to 252)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 253

1    Q.  Okay, I'm going to go back to January 9th
2  of 2004 when you were arrested on weapons
3  charges.
4    A.  Okay.
5    Q.  Can you tell me -- I think you said you
6  were on North Avenue in Melrose Park.
7         Was anyone with you when you were
8  arrested?
9    A.  Brian Killacky.
10    Q.  And was he arrested as well at that time?
11    A.  It appeared to be, yes.
12    Q.  Okay, and I want to go back and talk to you
13  about your relationship with Killacky.
14         Do you remember when you first met him?
15    A.  Early to mid October of '93.
16    Q.  Okay, and how did you guys come to meet?
17    A.  I was leaving for school and he -- I lived
18  on the corner of Kostner and Belden north -- No,
19  I'm sorry, southeast corner, and coming out the
20  rear door onto the sidewalk.  He was parked
21  outside by the parking slab with his hood open
22  like his car was broke down.
23         And being knowledgeable of cars, I
24  asked if he needed some help thinking I could

Page 254

1  make some money, and that's where it started.
2    Q.  Okay, about how many times did you see
3  Killacky before you were arrested together?  It
4  doesn't have to be exact.
5         More than ten times?
6         Less than ten times?
7    A.  Oh, yeah, more than ten.  It was almost
8  daily at some point or twice daily.
9         His whole gimmick was he was living at
10  his sister's house -- living on the back porch of
11  his sister's house a couple blocks over, a block
12  over and a block down.
13    Q.  Okay, did you and Killacky ever do any
14  drugs together?
15    A.  He asked me to buy some drugs for his
16  friends in Melrose Park after he got me to quit
17  my job and knew I needed some money, to work; and
18  his whole gimmick was his brother-in-law where he
19  was staying with his sister had basically a day
20  labor type deal with some jobs he had, and he
21  would pay me.
22         And he talked me into quitting my job
23  at Jiffy Lube, and then all of a sudden Fernando
24  didn't have any jobs available, and it was right

Page 255

1  near Christmastime when this happened, and I
2  needed money.
3         Well, I got some friends out in the
4  suburbs.  I think he said Melrose Park.  He did
5  say Melrose Park.  They buy cocaine out there.
6  It's like 2 or $300 dollars.  Can you find it in
7  the city cheaper?
8         By that time he had already left
9  cocaine for me to find in the car that he had me
10  working on which was supposedly his sister's car
11  that she allowed his nephew, her son, to use.
12         And he come to me, the tire blew.  Can
13  you change the tire?  I got it fixed.  I'm not
14  thinking.  So I opened the trunk; and when I
15  moved the spare tire, there was an 8-ball of
16  cocaine or a 16th of cocaine laying there.
17         And he already said his nephew was a
18  gang banger, and he thought he was selling drugs
19  and stuff like that.  So I figured he dropped it
20  in the car.  So I grabbed it and put it in my
21  pocket and used it.
22    Q.  Okay.
23    A.  He did the same thing another time with the
24  fuses.  Something was wrong with the electrical

Page 256

1  system, and he asked me to check the fuses, and
2  it was in one of the fuse panels under the
3  dashboard, not under the hood.
4    Q.  Okay, I'm going to ask you to try to just
5  answer the question asked just because I'm --
6    A.  Okay, I'm sorry.
7    Q.  -- in the interest of time today.  That's
8  all.  I want you to tell everything that's
9  relevant of course, but we're trying to get out
10  of here.
11         Now you had mentioned that you had
12  listened to some tapes after you were arrested.
13    A.  Yes, January 10th.
14    Q.  Okay, and what did you hear on the tapes?
15         Do you remember?
16    A.  Brian Killacky asking me if I can call my
17  friend.  He was coming over with some money.  So
18  I can call my friend and have him bring over some
19  cocaine for Killacky to pick up and take to his
20  friends in the suburbs.
21    Q.  Okay.
22    A.  And then he was talking about the guns and
23  stuff too.
24    Q.  Okay, and I think you testified earlier

64  (Pages 253 to 256)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 257

1    today that you told Killacky that you'd buy the
2    gun later because you didn't have any money right
3    then?
4        A. Yes.
5        Q. Okay, and for what purpose were you going
6    to be buying a gun?
7        A. I wasn't really. I just -- I thought he
8    was full of shit, honestly. That's the short
9    version of it. I thought he was full of crap.
10           He said he stole some guns out his
11   sister's garage or from her brother-in-law. He
12   had -- He was describing all types of weapons.
13   I'm thinking he's full of crap. So I just played
14   along with it.
15           He takes me to Melrose Park, and it's
16   just an almost empty parking lot of a warehouse
17   out there, and he goes to another vehicle and
18   grabs a toolbox, a metal toolbox, and comes back
19   and hands it to me.
20           And I opened the toolbox, and there was
21   a grocery bag inside, like a Jewel shopping bag.
22   I picked it up and let it roll down. At first I
23   thought it was a cigarette lighter, a toy
24   cigarette lighter.

Page 258

1        Wait a minute, they don't have serial
2    numbers. I dropped the bag and closed it up and
3    said, yeah, I ain't got the money for it right
4    now, and he got out and put it in the other truck
5    that he got it from. I told him I'd have to buy
6    it later cuz I didn't have any money.
7        Q. In January when you guys were arrested
8    together, what were the resulting charges?
9        They were just regarding drugs and
10   weapons, right?
11       A. Yes.
12       Q. And you pled guilty, correct?
13       A. I had to plead guilty to the drug cases
14   because of the way the Judge was gonna let them
15   try them separately and manipulate the entrapment
16   defense.
17       Q. Try what separately?
18       A. They were gonna try each separate drug
19   charge, three separate deliveries, the same
20   officer, same investigators, all that. They were
21   gonna try each one separate, use one as
22   evidence -- try three first, use one and two as
23   evidence to negate the entrapment defense.
24           Then they were gonna try one. Then

Page 259

1    they were gonna try two. So the entrapment
2    defense, I could've proved on the first one
3    whichever one they chose first to try.
4           But they would have had a preview of my
5    defense and would've been able to circumvent it
6    after that. So the lawyer I had said I had no
7    choice but to plead guilty, and I knew Killacky
8    by then was a police officer, and he was gonna
9    lie.
10       Q. So when did you first learn that Killacky
11   was wearing a wire?
12       A. When they played the tapes on January 10th.
13       Q. Okay, and you testified that you listened
14   to those tapes on January 10th.
15       A. Just a portion of one.
16       Q. Okay, did you ever read any of the
17   transcripts from those recordings?
18       A. Years later.
19       Q. Okay, and did you read all the transcripts
20   of those recordings?
21       A. I believe what I was given. I wasn't given
22   everything.
23       Q. And was there anything regarding the
24   murders on either of the recordings or the

Page 260

1    transcripts?
2        A. Other than the day they brought Tomazovich
3    out of the jail and had him confront me at my
4    house? No.
5        Q. Okay, and --
6        A. And that wasn't specifically about the
7    murders. It was just who was that guy, and the
8    cab he was in hit me. Killacky was saying the
9    taxi that the guy got out of hit him when he was
10   crossing the street.
11       Q. And was that recording with Tomazovich ever
12   introduced at your murder trial for the jury to
13   consider?
14       A. I think it was brought up, but it wasn't
15   introduced.
16       Q. Okay, so the jury never heard any of the
17   wire recordings at your murder trial?
18       A. I can't recall if they did or not. I don't
19   know. They were used in pretrial.
20       Q. That's not my question.
21       A. I know but they were used --
22       Q. Try to just answer the question being
23   asked.
24       A. To me it's all part of the same thing.

65 (Pages 257 to 260)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 261

1    Q. There was no testimony from Killacky about
2  your involvement in the murders at your murder
3  trial, correct?
4    A. At the trial I don't think -- I don't
5  remember if Killacky testified or not. I don't
6  think he did, but he might have. It's getting
7  mixed up with -- My memory of that right there is
8  getting mixed up with the pretrial stuff he
9  testified to.
10    Q. Okay, so I'll submit to you that Killacky
11  never testified at your murder trial.
12    A. If he didn't, he didn't.
13    Q. Okay, you had answered some interrogatories
14  under oath that we served upon you on behalf of
15  Brian Killacky.
16    A. Okay.
17    Q. Do you recall that?
18    A. Yeah.
19    Q. Okay, and they were --
20    A. It was that (indicating) thick all the
21  different paperwork, briefly.
22    Q. Similar to, you know, the interrogatories
23  that counsel here for Pineda and Donegan had
24  submitted, and I assume you're represented by

Page 262

1  counsel.
2       I assume that you looked over your
3  answers to your interrogatories and made sure
4  that when you signed them under oath that they
5  were correct?
6    A. Yeah.
7    Q. Okay, and the same thing for requests to
8  admit that we propounded on you, you signed them
9  under oath --
10    A. Okay.
11    Q. -- believing all your answers to be true.
12    A. Okay.
13    Q. Is that fair for me to assume that?
14    A. Yeah.
15    Q. Okay, I just want to save some time and not
16  go through each answer, okay?
17    A. Okay.
18    Q. All right.
19      MR. RICHARDS: We'll stipulate that he
20  signed both of them. They're both under oath,
21  and you have copies of each.
22      MS. KUNZER: Perfect. Perfect.
23  BY MS. KUNZER:
24    Q. All right, you had talked about the time

Page 263

1  that you got arrested on January 9th with
2  Killacky, that they took you to a room, and
3  eventually Killacky also showed up at that time.
4       And on January 9th when you saw
5  Killacky be brought in, did you have any
6  conversations with him?
7    A. When he was brought -- They took me to a
8  holding cell, a large room or a large cell,
9  handcuffed me to a bench, a long narrow bench,
10  and then a few minutes later uniformed officers
11  brought in Killacky, set him farther down the
12  bench where we couldn't reach each other, and he
13  started talking about the guns.
14       What are you telling them? I said, I
15  didn't tell them nothing. I didn't touch the
16  gun. I don't know what -- Oh, I ain't worried
17  about the gun cuz it's my uncle -- my nephew --
18  I'm sorry.
19       He said, I'm not worried about the guns
20  because it's Fernando. He's not gonna press
21  charges on me. Okay, I didn't touch it. So I
22  ain't got nothing to worry about.
23       What's this about the murders though?
24  What are you talking about? Well, they're

Page 264

1  talking to me what I know about murders. You
2  committed some murders.
3       Look, I don't know what they're talking
4  about. I had nothing to do with it. I asked
5  them to leave me alone. I want a lawyer and that
6  was it. I told him that.
7    Q. Okay, when Killacky was in the room with
8  you at that point, at that point you didn't know
9  if he was working undercover as an investigator,
10  did you?
11    A. No.
12    Q. Okay, so you wouldn't have any reason to
13  think that he could give you a lawyer at that
14  point, did you?
15    A. No. I just stated to him specifically what
16  I told the police officers.
17    Q. Okay.
18    A. I said, I don't wanna talk to them. I want
19  a lawyer --
20    Q. Okay.
21    A. -- and they won't quit questioning me.
22  This is the first time they stopped since we got
23  pulled in.
24    Q. And then I think you had testified that

66 (Pages 261 to 264)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 265

1    they took you to a different location, right?
2       A.  Yeah.  About 3:30 in the morning they took
3    me to Harrison and Kedzie.
4       Q.  Okay, and was Killacky with you at that
5    time?
6       A.  No, I didn't see him then.  It was
7    Rodriguez and Washburn.
8       Q.  Okay, when is the next time, if ever, you
9    saw Killacky?
10      A.  The next morning, January 10th, after they
11   played the tapes he came in.
12      Q.  Okay.
13      A.  Because then it was out of the bag because
14   they played the tapes, and he's an officer.
15      Q.  Okay, and I think in your answers to
16   interrogatories or request to admit responses you
17   indicated that Killacky was present for about 30
18   minutes during the interrogation.
19      A.  During the 10th?  Yeah, maybe.  Like I
20   said, it was a continuous tag team, and I don't
21   think Killacky was there that long at all.
22      Q.  Okay.
23      A.  30 minutes, yeah, but I don't think he was
24   there for the whole 30 something hours.

Page 266

1       Q.  Okay, and when he showed up the next day,
2    did you make any sort of statement to him?
3       A.  No.  I said, take me to jail, charge me,
4    and let me get this -- so I can go to court and
5    get a lawyer.  I just want a lawyer and get this
6    over with.  Leave me alone.
7       Q.  Okay, and as far as you know, you never
8    made any incriminating statements to him
9    regarding the murders?
10      A.  No.
11      Q.  Okay, when was the last time you spoke to
12   Killacky?
13      A.  April 12th.
14      Q.  And tell me when you saw him on April 12th?
15      A.  When they brought me from here, the jail,
16   to Homan and Fillmore again.  He showed up right
17   after I got there.
18      Q.  Okay, and --
19      A.  He had brought food.
20      Q.  And how long did he stay there on
21   April 12th?
22      A.  It was a few hours in.  It was in and out.
23      Q.  Okay, did you make any statements to him
24   about the murders on April 12th?

Page 267

1       A.  No.  I kept telling him to tell these guys
2    to leave me alone, just give me a lawyer.  I
3    don't wanna talk to you.
4       Q.  Okay, and so you didn't talk to him on
5    April 12th about the murders?
6       A.  No, but he let them keep doing it.
7       Q.  Killacky never created any sort of report
8    about any statements you made to him that was
9    introduced at trial, right?
10      A.  I don't know.
11      Q.  You don't remember seeing any reports that
12   were authored by Killacky that -- We went through
13   several reports today by different people.
14      A.  I haven't seen any here today, no.
15      Q.  Okay, but at any time during your murder
16   trial do you remember any reports being authored
17   by Killacky?
18      A.  I'm not sure if he signed off on any of
19   them or not or if he wrote them and then the
20   other people signed off on them.  I don't know.
21   I don't remember.  I don't recall, no.
22      Q.  In any event, he never testified at your
23   murder trial about any reports that he wrote
24   regarding any comments you made to him?

Page 268

1       A.  Not that I recall.
2       Q.  Okay, what evidence was used at your murder
3    trial that you think led to your conviction?
4       A.  Stuff they made up in the interrogation
5    that Killacky was a part of.  Their false --
6    Sobczak, Washburn, Rodriguez, all of them, they
7    signed off on reports that said I said stuff I
8    never said.
9           Killacky was there for parts of it.  So
10   he basically went along with it.  Whether he
11   signed it or not, he let it happen, and he knew I
12   was coming down off of drugs during the first
13   interrogation or withdrawing from them because he
14   was the one that helped get me to relapse onto
15   the drugs by leaving them for me to find.
16      Q.  Your drugs and weapons charges are not part
17   of this litigation, right?
18      A.  No, but that's what he used to set me up on
19   so they can use it as a ruse to get me into the
20   station so they can interrogate me about the
21   murders that I'd already asked for an attorney
22   for several years prior in front of the State's
23   Attorneys.
24      Q.  As far as in April of 2004, do you remember

67 (Pages 265 to 268)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                                WILLIAM DUKES

Page 269

1  anything that Killacky said to you or that you
2  said to him specifically?
3        A. If I said anything, I'd be making it up if
4  I said what he said because I can't recall
5  everything that was said by him.
6        I believe he did say some things about
7  -- similar to Donegan and Pineda about Lucy
8  doesn't need to go through this, just tell them
9  what happened and don't put her through a trial,
10 not verbatim but close to that effect.
11       I was just leave me alone and let me go
12 to court or leave me alone and let me have a
13 lawyer.
14       Q. I want to ask you a little bit about your
15 damages claim. It looks like, according to your
16 answers to interrogatories, that you're claiming
17 $6,000 a day for damages.
18       Does that seem right to you?
19       A. Okay, mmm-hmm.
20       Q. Can I ask you -- You're not claiming lost
21 wages, right?
22       A. No, mental anguish, health problems caused
23 by the stress, medical surgeries, heart attacks,
24 a lot of stuff.

Page 270

1        Q. What's the most you've ever made in a day?
2  Do you know?
3        A. 12, 1,400 labor.
4        Q. 12, $1,400 in a day?
5        A. Yeah, and that's a partial day.
6        Q. Where was this?
7        A. You get paid for book time. You don't get
8  paid working as a mechanic. You get book time.
9  I can rebuild two transmissions in a day and get
10 paid 16 hours at $35 an hour, stuff like that.
11       Q. And where did you get paid this amount?
12       A. I did a lot of side jobs. I did work for
13 companies or garages that weren't totally on the
14 books.
15       Q. And when was this?
16       A. My whole life. I've redone,
17 whatcha-call-it, crane motors that pull the
18 cables that move window washing platforms up and
19 down the side of the building with people
20 standing on them. I've regeared them.
21       That's $1,000 right there for one.
22 It's either that or you've gotta wait 90 days to
23 get them repaired.
24       Q. Okay, and, again, do you remember any of

Page 271

1  the names of the employers that you worked for?
2        A. No. It was just construction companies.
3  People either knew me or of me and then called on
4  me and had me do the work.
5        Q. And did you ever file tax returns?
6        A. Yes, some, some are no, just back and
7  forth. It wasn't permanent steady work; but if I
8  would have stuck with it, it would have been.
9        Q. You were incarcerated from 1999 to 2000?
10       A. August 18th, 1999 to August 15th, 2003, and
11 I was on my way to becoming a drug counselor when
12 I met Killacky and he caused me to relapse.
13       Q. Prior to 1999 to 2003 had you been
14 incarcerated previously?
15       A. Yeah, back in '92.
16       Q. And how long were you incarcerated in '92?
17       A. 14 months total, so '91 through '92,
18 January 4th, '93 I got out. So 15 months say,
19 approximately September '91 through January 4,
20 '93.
21       Q. Okay, so the basis for your damages claim
22 is the medical bills or medical problems that
23 you've --
24       A. The emotional and physical pain and

Page 272

1  suffering.
2        Q. And how did you come up with $6,000 a day
3  for that?
4        A. I talked with my attorney and just whatever
5  -- It's just how it came out. I'm sure they paid
6  6,000, $7,000 a day to make it look like I did
7  this. So they can afford it; and since being
8  out, I found out they've done it to other people
9  too.
10       Q. All right, who is Karen Perez?
11       Do you know that name?
12       A. Who.
13       Q. Karen Perez?
14       A. Perez?
15       Q. Lives on Harding in Chicago?
16       A. Harding. That doesn't sound familiar.
17 Perez is a common name. I've known a couple
18 Perezes. What's it in reference to?
19       Q. Do you recall any female accusing you of
20 sexual assault back in June of 1991?
21       A. Yeah, I think so.
22       Q. You do?
23       A. Yeah, it was dismissed.
24       Q. Do you recall any --

68 (Pages 269 to 272)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 273

1    A. I don't remember.
2    Q. You don't recall any details about it?
3    A. No.
4    Q. You don't recall the accusations being made
5    specifically?
6    A. I remember going to court and then they
7    dismissed it if I'm not mistaken. They let her
8    out of the car. She got on the bus stop. We
9    left and turned around and come back. She's
10   passed out at the bus stop.
11       So we tried to put her back in the car
12   so we can take her to her house or something, and
13   that was it. She was freaking out, and people
14   working next door said call the cops. Let them
15   take her home.
16       I guess she made some shit up by the
17   time they got there. When we tried to put her
18   back in the car, she started yelling. She was
19   coming to. She was combative and drunk. She was
20   passed out at the bus stop after we dropped her
21   off.
22       So people come out of the factory right
23   there at the bus stop, just call the police, let
24   them take the girl home; and I guess she told the

Page 274

1    police some stuff. The next thing I know I was
2    being put in handcuffs cuz they separated
3    everybody, and that was it.
4    Q. So you gave her a ride home to her house?
5    A. My friend did. We gave her a ride home,
6    and she said just let me out here, and we did; we
7    went down the street to turn around to go back
8    the other way and she passed out at the bus stop.
9    Q. Do you remember your friend's name?
10   A. Jose -- Shit, I can't remember his last
11   name. It's not -- No, it's not Guadalupe. I
12   can't remember his last name. What year did you
13   say that was?
14   Q. 1991.
15   A. 30 something years ago, no, I can't
16   remember.
17   Q. Did you ever talk to Marcy Dukes?
18   A. Marcy?
19   Q. Mmm-hmm.
20   A. We call her Marcy. That was my aunt. She
21   was married to my Uncle Ron, my dad's brother.
22   Q. Is she still around?
23   A. I haven't talked to her in 30 years. I
24   think she's passed away. I seen my cousin,

Page 275

1    Willie, her oldest son's Facebook. He had put a
2    post on there about we miss you, mom. So I'm
3    assuming she's dead. My uncle died in '95. He
4    had a massive heart attack.
5    Q. What about Melissa Buck?
6    A. Who?
7    Q. Melissa Buck, does that name sound
8    familiar?
9    A. Buck, like dollar?
10   Q. Yeah.
11   A. Yeah, I know a couple Melissas. I just
12   don't know a Buck.
13   Q. All right, has anyone ever told you that
14   you have schizoaffective disorder?
15   A. I had what?
16   Q. Schizoaffective disorder.
17   A. I don't even know what that is so, no.
18   Q. Antisocial personality?
19   A. Once or twice somebody said that.
20   Q. Somebody did?
21   A. I don't know if it -- They said I was
22   antisocial. I don't know if they said
23   personality disorder or not.
24   Q. Have you ever been prescribed with

Page 276

1    medications for agitation and aggressiveness like
2    Depakote?
3    A. Depakote I can't remember. I know what the
4    medication is, and I can't recall ever having
5    been prescribed that.
6        Maybe after I've been locked up. I've
7    had a lot of problems after getting out on
8    July 11th of 2019. I've had anxiety disorders.
9    I've had PTSD, depression, anxiety issues.
10       I've had a lot of different issues
11   since I been released trying to get used to
12   society again because of all this, and I have had
13   some medications. I don't know what they were.
14       And I was involved in a motor scooter
15   accident in 2020, and they had me down as
16   paranoid because I was supposedly telling them
17   the police are after me. They're out to get me.
18   I cracked my skull in two places.
19   Q. This was in 2020?
20   A. That was in 2020. I had a fractured skull
21   in my right eye and my right temple along with a
22   brain hemorrhage. So I was a little out of it.
23   Q. And you said this was a motorcycle
24   accident?

69 (Pages 273 to 276)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 277

1      A.  Scooter, I was only doing 30 miles an hour,
2    and a guy turned in front of me, but that was
3    just because of the medications they had me on.
4    They made me do a five-day psych evaluation.
5           Because of the medication I was on in
6    the hospital for the brain and brain bleeding and
7    skull fractures, they -- I had to do a mandatory
8    five-day psych evaluation, and that's where they
9    said something about paranoia.
10          But then once I got there and the
11   doctors seen I was normal, I told them just
12   Google my name, and you'll see what I'm talking
13   about.  We've gotta hold you for five days, but
14   he let me go.  They released me.
15     Q.  Was this at Jackson Park Hospital?
16     A.  Yes.  The one on 79th and Stony Island.
17     Q.  I don't know the exact address, but I
18   think...
19     A.  Yeah, it's way south.
20     Q.  And that was in August of 2020?
21     A.  August 25th to August 30th.  I spent 23
22   days in a coma or a medically induced stupor.
23     Q.  Did you have any other procedures done
24   other than the coma, the medically induced coma?

Page 278

1      A.  MRIs, CAT scans, stuff like that, that's
2    all I know of.  They did one after.  I don't know
3    what happened during.  Like I said, I don't have
4    any memory for three weeks and two days.
5      Q.  Back at that time when you were
6    hospitalized, were you homeless at the time?
7      A.  No.
8      Q.  Where were you living then?
9      A.  6234 North Washtenaw, third floor.
10     Q.  And who were you living there with?
11     A.  I was renting a room.  The landlord
12   subleted the apartments out as single room
13   occupancy.  He'd rent out a bedroom, a bedroom.
14   He converted a living room to a bedroom, and
15   three people would share the rest of the
16   apartment.
17     Q.  And who was the landlord?
18     A.  Greg Krabanka (phonetic).  I don't know how
19   to spell it.
20     Q.  Do you remember how you found this place?
21     A.  Yeah.  The plumber I was working with owned
22   the building next door and when I was in there
23   gutting --
24     Q.  And who's the plumber?

Page 279

1      A.  Mike's Plumbing.
2      Q.  Okay, do you know Mike's last name?
3      A.  Nope.  It's foreign, and I'd butcher it if
4    I tried to pronounce it.
5           MR. RICHARDS:  I believe we can produce
6    that in discovery.  That's Mike I've talked to,
7    right?
8           THE WITNESS:  Yeah, yeah, I forgot about
9    that.
10          MR. RICHARDS:  If that's necessary, we can
11   produce that in discovery, his name and his phone
12   number.
13   BY MS. KUNZER:
14     Q.  Who is Walter Boggess?
15     A.  Huh?  Can you give me a timeframe?
16     Q.  He's got an address in Kentucky, and he's
17   listed as a possible alternative suspect?
18     A.  What's the name?
19     Q.  Walter Boggess, B-o-g-g-e-s-s.
20     A.  I have no idea.  I didn't list him.  What
21   about David Martin?
22     Q.  We'll get there.
23     A.  Okay.
24     Q.  I'm trying to go through the list here.

Page 280

1      A.  That was the police officer's nephew.  I
2    don't know if that got omitted or not.
3      Q.  Who is Ricky Earl Camper?
4      A.  I don't know.  Where did that come from?
5      Q.  Well, he's listed on your answers to
6    interrogatories as a circumstantial witness as to
7    the possible involvement of Walter Glen Boggess.
8      A.  Okay, there was a lot of names in the
9    police reports and stuff.  I can't remember which
10   one.  Walter O'Campo, is it O'Campo one of the
11   names?
12     Q.  No, Camper, C-a-m-p-e-r.
13          Who is Carrie Sandburg?
14     A.  Sandburg?
15     Q.  Mmm-hmm.
16     A.  The name rings a bell, but I can't tell
17   you.
18     Q.  What about Rodney Anderson?
19     A.  Same thing.  I'm unsure.
20     Q.  William Frank?
21     A.  Frank, he's something about the flea market
22   I believe, an older guy.
23     Q.  Do you know what he knows?
24     A.  No, I don't know offhand.

70 (Pages 277 to 280)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

---

Page 281

1    Q. Mark Burkhart, did I already ask that?
2        Do you know him?
3    A. Without seeing the faces, I can't associate
4  the names with a face.
5    Q. Okay, you have listed Dustin Rhynes here.
6    A. Okay.
7    Q. Is he someone you intend to call at trial?
8    A. I'd hope that we wouldn't have to do
9  something like that but -- cuz the kid's gotta be
10  screwed up. I know he's not a kid any longer,
11  but he was only two years old when this happened.
12       And the main suspect that Sobczak
13  pushed off the radar, he's got family that are in
14  law enforcement and Illinois Department of
15  Corrections.
16       He's a main suspect -- was a main
17  suspect, but for some reason, during the
18  investigation of the corruption of the Cicero
19  cops, he gets pushed off the radar by them. He's
20  no longer a suspect.
21    Q. And who is this?
22    A. Dustin Rhynes' father.
23    Q. What's his name?
24    A. David Martin.

---

Page 282

1    Q. I take it you're not aware that Dustin has
2  passed away?
3    A. No. Can I ask how it happened? Accident
4  or --
5    Q. I don't know.
6    A. Poor kid.
7    Q. All right, how about Jamie O'Campo?
8    A. That's Lucy's brother.
9    Q. Whose brother?
10    A. Lucy Cannady.
11    Q. Do you talk to Jamie?
12    A. I had up until before this happened.
13    Q. Who is Christine VanDeventer?
14    A. Who?
15    Q. Christine VanDeventer, you list her as a
16  witness to possible suspect.
17    A. I know the name. I just can't -- Maybe
18  she's a witness to something Lucy had said in one
19  of her reports. I can't -- One of Lucy's
20  statements. I can't remember.
21    Q. You testified earlier that you intend to
22  call Lucy in to testify at trial.
23    A. Who?
24    Q. Lucy.

---

Page 283

1    A. I don't know if I said that earlier or not,
2  but it's quite possible she'd have to be called
3  to verify some of the things of what I'm saying
4  actually happened in order to show some of the
5  Defendants in this case hiding stuff.
6    Q. Carla Mejia, M-e-j-i-a, you list her as a
7  witness to your alibi.
8    A. She would have been at the house that
9  night. I don't know if she would have seen me
10  come in or not that night when I came home and
11  Laura let me in because Laura was sleeping in her
12  bedroom.
13       Carla was a teenager at the time. She
14  might have been sleeping in the living room where
15  I had to go through and go downstairs. She might
16  have seen me come in. I don't know.
17    Q. Her address is listed as 1710 North
18  Richmond.
19    A. I don't know what the exact address is now.
20  I haven't seen Carla since '93, September of --
21  beginning of September '93.
22       MS. KUNZER: All right, that's all I have.
23
24

---

Page 284

1            DIRECT EXAMINATION
2            BY MR. GAINER:
3    Q. Okay, I'm going to go next. I represent
4  Washburn and Rodriguez and the City of Chicago.
5  I don't know that I said my name to you when I
6  came in, but my name is Brian Gainer.
7       How long have you been here at the Cook
8  County Jail this most recent time?
9    A. Today is the 17th? 65 days.
10    Q. What are you charged with?
11    A. Attempt murder.
12    Q. Is that it?
13    A. There's other charges. I haven't been
14  given the full thing. I think one of them is
15  assault, sex assault. It's attempt murder and a
16  sex assault is the charges.
17    Q. Okay, kidnapping?
18    A. Not that I know of.
19    Q. All right, how many times have you been
20  charged with a sex crime in your life?
21    A. I think three.
22    Q. When was the first time?
23    A. It would have been the one she read from
24  '91 or '90.

---

71 (Pages 281 to 284)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                                     85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                        WILLIAM DUKES

Page 285

1    Q. The one about the bus stop?
2    A. Yeah.
3    Q. Okay, and then you have the sex crime that
4  you were charged with in this case that we're
5  here talking about today, right?
6    A. Yeah.
7    Q. And then you've got this sex crime that you
8  were just arrested for, right?
9    A. Yes.
10   Q. Any other jurisdictions outside of Illinois
11 where you've been charged with a sex crime?
12   A. Not in my entire adult life that -- No, in
13 Chicago there was one, but they dropped it. It
14 was dismissed. It was a misdemeanor case.
15      I was -- Me and a girl had been fooling
16 around, and her mom and dad found out about it.
17 And when she told her dad she was pregnant, dad
18 dropped the charges and basically had a shotgun
19 in my back until she told him she wasn't
20 pregnant.
21   Q. When was that?
22   A. That would have been the same general time
23 I guess. What time was that bus stop?
24      MS. KUNZER: '91.

Page 286

1      THE WITNESS: Somewhere in there.
2  BY MR. GAINER:
3    Q. So early 90's?
4    A. Yeah.
5    Q. You were an adult when you were charged
6  with that crime?
7    A. Yeah.
8    Q. And you said that was dismissed?
9    A. Yeah.
10   Q. Were you ever charged with any sex crimes
11 as a juvenile anywhere?
12   A. Yeah, Florida. They were dismissed too,
13 not guilty.
14   Q. And when was that?
15   A. In the 80's. I can't remember the exact
16 times. They tried to say when I was 12, I raped
17 a 30 something year old woman. I didn't even
18 know what an erection was then.
19   Q. Okay, and you said that you were found not
20 guilty?
21   A. Yeah. No, I think that one was outright
22 dismissed.
23   Q. All right, so that's, what, four or five
24 times you've been charged with a sex crime in

Page 287

1  your life?
2    A. Yeah.
3    Q. Which one, is it four or five?
4    A. This would be five.
5    Q. Okay, do you have a bond right now?
6      Like, can you put up a bond and get out
7  of here or are you being held on no bail?
8    A. Being held on no bail.
9    Q. When is your next court date?
10   A. 17th -- No, 14th I think, February 14th.
11   Q. Is Mr. Richards representing you in that
12 case?
13   A. Yes.
14      MR. RICHARDS: I am.
15 BY MR. GAINER:
16   Q. What is the status of that case? And I'm
17 not asking about the details. I'm just asking
18 about the status in court.
19      Do you know?
20      Is it set for trial?
21      Is it just a status hearing coming up?
22      Do you have any idea?
23   A. Status.
24   Q. Okay, what's the name of the victim?

Page 288

1      MR. RICHARDS: At this time point,
2  objection. I think this -- This is verging on --
3  We're objecting, and he's asserting his right not
4  to incriminate himself.
5  BY MR. GAINER:
6    Q. Okay, are you asserting your right not to
7  incriminate yourself?
8    A. Yes.
9    Q. Okay, did you know the victim?
10      MR. RICHARDS: Same objection.
11 BY MR. GAINER:
12   Q. Okay, are you following that advice?
13   A. Yes.
14   Q. I'm going to have to ask you that every
15 time.
16      Is the victim a woman?
17   A. Fifth.
18      MR. RICHARDS: Objection.
19 BY MR. GAINER:
20   Q. So you're asserting your Fifth.
21      When you say Fifth, do you mean you're
22 asserting your Fifth Amendment rights?
23   A. Yes.
24   Q. Okay, is the victim a child or an adult?

72 (Pages 285 to 288)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 289

1     MR. RICHARDS: Objection.
2     THE WITNESS: Fifth.
3  BY MR. GAINER:
4     Q. Do you remember the date on which you were
5  arrested?
6     MR. RICHARDS: Objection.
7     THE WITNESS: Fifth.
8  BY MR. GAINER:
9     Q. After you were arrested, did you give any
10 statements to the police about what happened?
11    MR. RICHARDS: Objection.
12    THE WITNESS: Fifth.
13 BY MR. GAINER:
14    Q. After you were arrested, were you
15 Mirandized?
16    MR. RICHARDS: Objection.
17    THE WITNESS: Fifth.
18 BY MR. GAINER:
19    Q. After you were arrested, did you give any
20 statements to a State's Attorney?
21    MR. RICHARDS: Objection.
22    THE WITNESS: Fifth.
23 BY MR. GAINER:
24    Q. After you were arrested, and I'm still

Page 290

1  talking about this most recent arrest, were you
2  taken to a Chicago Police Station?
3     MR. RICHARDS: Objection.
4     THE WITNESS: Fifth.
5  BY MR. GAINER:
6     Q. After you were arrested, were you taken to
7  any City of Chicago facility?
8     And I'll just tell you the reason I'm
9  asking you that question is because I want to
10 know if you were taken to a place that is the
11 same as you were taken to in January of 2004 when
12 you were arrested for this case. So that's why
13 I'm asking.
14    MR. RICHARDS: Objection.
15    THE WITNESS: Fifth.
16 BY MR. GAINER:
17    Q. Okay, all right, I want to ask you a couple
18 questions about the various things that you've
19 been talking about throughout the course of the
20 day today.
21    First, before I do that, am I correct
22 that you are -- you filed a petition for a
23 certificate of innocence in this underlying case
24 in these murders?

Page 291

1     A. Yes, I have.
2     Q. And what's the status of that proceeding?
3     A. Pending.
4     Q. Okay, do you know when the next hearing is?
5     A. No.
6     Q. Is the hearing, wherever it is, it's at
7  26th Street, the courthouse across the street,
8  right?
9     A. It's 26th or downtown. I can't remember.
10    Q. He can't answer. Why don't you tell me
11 what you know.
12    A. I don't remember if it was 26th Street or
13 downtown at the courthouse. I can't remember.
14    Q. Do you remember the name of the Judge?
15    A. No.
16    Q. Have you ever listened to all of the
17 recordings that were made of you in either
18 Killacky or Marko during the course of the
19 investigation of these murders?
20    A. No.
21    Q. Have you ever listened to any of them?
22    A. Bits and pieces that the public defender
23 let me hear on her, whatcha-call-it, laptop.
24    Q. Right, and some of them --

Page 292

1     A. Other than that it was just bits and
2  pieces.
3     Q. Some of those recordings were played to you
4  when you were in custody at Homan Square in
5  January of '04, right?
6     A. I don't even think they changed the tape.
7  It was just one tape. They hit play and stop,
8  play and stop and that was it.
9     Q. When is the last time you think you
10 listened to any of those recordings?
11    A. '05, '06.
12    Q. So not since then?
13    A. No.
14    Q. Okay, do you have copies of those
15 recordings?
16    A. No, I had transcripts at one time or some
17 of them. A lot of them they were saying were
18 unavailable or inaudible.
19    Q. Do you have copies of those transcripts
20 now?
21    A. No.
22    Q. You walked in here today with a couple
23 files and a book.
24    What do you have with you?

73 (Pages 289 to 292)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 293

1      A. That was a Bible and some case law that I
2   had that I didn't want -- If they shake down the
3   tier or they do something -- People go through
4   your paperwork while you're not there.  I'm in a
5   dormitory.
6      Q. Okay.
7      A. So I didn't want it to be gone through.  I
8   got my addresses and my ID number.  They can use
9   that to get on your phone and pirate your
10  account.
11     Q. All right, so you brought that stuff with
12  you here today just to kind of protect it?
13     A. Right.
14     Q. Does any of the stuff that you brought here
15  today with you have anything to do with this
16  case?
17     A. No.
18     Q. Okay, you were represented by an attorney
19  during both criminal trials that you had as a
20  result of these murders.
21        Am I correct about that?
22     A. The first trial was a public defender.  The
23  second trial was the law firm of Erickson and
24  Oppenheimer.

Page 294

1      Q. Okay, so let's talk about the first trial
2   first?
3      A. Okay.
4      Q. What was the name of your lawyer in that
5   case?
6      A. Ann Collins.  It was eight-and-a-half
7   years.  The last two years -- the last three
8   years, years six and seven, she didn't do
9   anything.  She was campaigning and running to be
10  a Judge.
11     Q. Okay, what was the name of the attorneys
12  who represented you in that case?  Just tell me
13  the names.
14     A. Ann Collins, John Conniff, and Brendan Max,
15  M-a-x.
16     Q. And did any of those three attorneys who
17  were representing you leading up to and during
18  that first trial, did any of them put any of your
19  alibi witnesses on the witness stand to testify
20  on your behalf?
21     A. No.
22     Q. Did you tell any of them about these alibi
23  witnesses?
24     A. Yes.

Page 295

1      Q. Did any of those alibi witnesses -- Strike
2   that.
3        Were any of those alibi witnesses that
4   you've described here today interviewed by any of
5   your lawyers in the lead up to your first trial?
6      A. The only one I know they interviewed was
7   the brother of David Martin, a man named Henry
8   Martin who was willing to come from Florida and
9   testify on my behalf who I never met that his own
10  brother admitted to killing the victims.
11     Q. Okay, when I say alibi witnesses, I'm
12  talking about the people that you testified here
13  today saw you during the course of the day of the
14  murders, right.
15        There was the guy that you referred to
16  as brussel sprouts.  There were the folks at the
17  house who let you in.  There's the guy that you
18  bought crack with.
19        I'm talking about those people, okay?
20     A. No.  They never went and did it.  Their
21  whole thing almost up to the trial was the
22  alternate suspect theory.  That was their whole
23  thing.
24        And then they changed that at the last

Page 296

1   minute, and they had an alternate defense which
2   was basically nothing because Ann Collins went to
3   become a Judge.
4        John Conniff was retiring at the end of
5   the month.  After my trial was over with, he took
6   his vacation and sick days, and he was done.  He
7   was retired.
8        Brendan Max went back to being a --
9   He's not -- He's a good man.  He's a good legal
10  strategist, but he's got no courtroom presence.
11  That's what I wanna say.  I'm not saying anything
12  bad about him.  It's just some people can't get
13  in front of others.
14     Q. Okay.
15     A. And they didn't wanna spend the money.
16  That's what Brendan told me.  They didn't wanna
17  spend the money to bring the guy in from Florida
18  and put him up for a week and bring him back and
19  forth to court.
20     Q. So just so I'm clear, there's a witness who
21  lives in Florida named Henry Martin.
22        Is that what you said?
23     A. Yes.
24     Q. And Henry Martin had information about the

                              74  (Pages 293 to 296)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 297

1   fact that someone else committed the murders
2   you'd been charged with, and your criminal
3   defense attorney decided it was too expensive to
4   bring Mr. Martin up to Cook County to testify
5   about that.
6           Is that your testimony?
7       A.  Yes.
8       Q.  Okay, and your criminal defense attorney
9   told you that.  He said, that's too expensive.
10  We can't do that, right?
11      A.  Yeah, he said they don't wanna approve it.
12      Q.  All right, did anyone else or is there
13  anyone else who testified at your trial, at your
14  first trial, who you would consider to be an
15  alibi witness?
16      A.  No.  They didn't call anybody for my
17  defense except for two people, and they were
18  doctors and drug counselors that interviewed
19  Tomazovich.  That's all they brought in.
20      Q.  So the Jaramillo family who you've
21  described a couple times today as the folks you
22  were living with when these murders happened,
23  right?
24          And you've told us a bunch of different

Page 298

1   names of people who were in the house on the
2   night that the murders happened and you came home
3   around midnight, right?
4       A.  Yeah.
5       Q.  How can I find any of those people?
6       A.  I don't know.
7       Q.  Okay, and the person who you went to school
8   with, who you went out to see in Indiana, you
9   took that electric train --
10      A.  No.  It's the train that goes out to
11  Indiana.  He lived at 78th on the east side, 78th
12  Street, somewhere east near that way.
13      Q.  Okay, I'm sorry.  I got those two things
14  mixed up.
15          So the person with whom you went to
16  school who lives near east 78th Street, is that
17  the person you left the note on his door?
18      A.  Yes.
19      Q.  Okay, so that guy, what's his name again?
20      A.  Russell Farmer.
21      Q.  How can I get in touch with Russell Farmer?
22      A.  Check with Lincoln Tech and see if they
23  have any information on him.  Maybe you can get
24  in contact, research through an investigator that

Page 299

1   way.  I don't know.
2       Q.  Do you have any contact information for
3   Mr. Farmer right now?
4       A.  No.
5       Q.  Okay, and then the individual Angelo or
6   Angel with whom you bought crack over on Sawyer.
7       A.  I haven't seen Angel in -- since '92.  I
8   might have seen him while I was driving down the
9   street or something and honked at him or waved
10  not long after that, but they changed that whole
11  area.
12      Q.  Okay, so my question to you is:  Are you
13  aware of any way I can get in touch with that
14  person who's another of your alibi witnesses?
15      A.  Angel, I don't even know his last name,
16  Angelo.
17      Q.  I'm sure I'm leaving someone out, but just
18  to make sure that we cover everybody --
19      A.  Mark Bowling.
20      Q.  Mark bowling and his wife, right?
21      A.  And his wife.  His brother was the Gacy
22  victim, Tommy Bowling.  So you can probably find
23  him.
24      Q.  Okay, do you have any contact information

Page 300

1   for Mr. Bowling or his wife?
2       A.  No.
3       Q.  And when is the last time you spoke to
4   them?
5       A.  It would have been around September 2nd or
6   3rd.
7       Q.  Okay, did you ever have a sexual
8   relationship with Marilyn?
9       A.  No.
10      Q.  Is today the first time that you've ever
11  testified about the facts and circumstances
12  surrounding the murders and the investigation and
13  all of that?
14      A.  Yeah, pretty much.
15      Q.  Have you ever given any formal statements
16  to anyone about this, aside from what you've seen
17  and heard today, either to any tribunal or any
18  other person excluding your lawyer?
19      A.  I brought it up to a couple people.  One of
20  them was a guard at a jail where they had me here
21  housed off-site during my second trial in
22  Livingston County.  He was a sergeant.
23          And I was telling him about it.  I
24  said, yeah, the guy that actually did it, they

75 (Pages 297 to 300)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                        WILLIAM DUKES

Page 301

1   pushed off the radar to appease the uncle who was
2   a State Police investigator investigating Sobczak
3   and Bizerik's corruption.
4           I don't know if I told him the name of
5   the Cicero cops, but I told him they were
6   investigating dirty Cicero cops, and they pushed
7   the nephew David Martin -- I said David Martin
8   off the radar, and he's a guard at Stateville
9   now.
10      Q.  Who's a guard at Stateville?
11      A.  David Martin.  His uncle got his record
12  cleared up.  That's what the brother Henry told
13  my attorneys.
14      Q.  I'm going to ask you all those questions,
15  okay?  Let's just try to keep it flowing
16  correctly.  So David Martin you've said a couple
17  times now.  He's the person who did it.
18          Is that what you said just now?
19      A.  Yeah, he gave two false -- What I know from
20  the police reports and testimony or statements of
21  other people that I found in the discovery, he
22  admitted -- He gave two false alibis.  They both
23  turned on him and told the police the truth.
24          And then two years later the Cicero

Page 302

1   detectives pushed him off the radar as a suspect,
2   and we couldn't figure out why they pushed him
3   off in '95 until they talked to the brother in
4   2010, and he said his uncle got his record
5   cleared up, and his mom got him a job at
6   Stateville.
7       Q.  So David Martin you think still works at
8   Stateville?
9       A.  I'm not sure where he works.
10      Q.  Do you think he's still IDOC?
11      A.  I'm positive he is.
12      Q.  Did you ever see David Martin when you were
13  in IDOC?
14      A.  Once when I was sentenced on a drug case
15  here, they sent me down to NRC for holding before
16  they brought me back for my -- and he came to the
17  cell.  He was trying to instigate some problems.
18      Q.  Did you ever talk to him about this
19  incident?
20      A.  No.  I didn't know who he was.  I never
21  seen him.
22      Q.  Have you ever talked to him about this
23  incident?
24      A.  No.

Page 303

1       Q.  And the information that you have about him
2   giving two false alibis, is that based on some
3   police report you read?
4       A.  Yeah, Sobczak's police reports.
5       Q.  And is that based on anything else?
6       A.  No, not that I know of, just Sobczak's
7   police reports and when my lawyers got with their
8   investigator when they talked to him, the
9   brother, in 2010.
10      Q.  When --
11      A.  They went to Florida.  The public defenders
12  went down there and talked to him in, say,
13  summer, August, somewhere around that area.  I
14  can't remember exactly when.
15          They went to Florida, talked to the
16  brother Henry Martin, and he told him that he
17  went and told the police he admitted to doing it
18  when they got home because they argued why he
19  needed an alibi, and he said he killed one of the
20  victims.
21          And the brother disowned him and went
22  back to the police and told them, and this was
23  within a month or so of the murders, and they
24  pushed him off the radar in '95, and we couldn't

Page 304

1   figure it out.
2       Q.  Okay, this is -- Aside from what you just
3   described to me as what you believe to be
4   evidence that he committed these murders, do you
5   have any other evidence that David Martin
6   committed these murders?
7           Are you aware of any other evidence?
8       A.  The only thing missing from the house was
9   the children's vital statistic paperwork, birth
10  certificates, medical records, stuff like that;
11  and the only person left alive was David Martin's
12  son Dustin.
13      Q.  Anything else?
14      A.  He had a history of violence toward the
15  family.
16      Q.  Anything else?
17      A.  Not that I can recall.
18      Q.  All right, now I think you told us that you
19  first learned of these murders five days
20  afterwards when you were picked up by Cicero; is
21  that right?
22      A.  When they forced me to follow them from
23  Chicago into Cicero to the police station, yes,
24  after I got off work.

76 (Pages 301 to 304)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 305

1    Q.  Was that about five days after the murders
2    happened?
3    A.  You said they happened on the 28th of
4    August so 29, 30, 31, 1, 2, yeah, five days.
5    Q.  Okay, and so between the date of the
6    murders and the date that you found out, you
7    didn't happen to wander past Marilyn's house as
8    you sometimes did to have lunch or borrow some
9    money or anything like that?
10    A.  No.  On Sunday I recall telling them I'm
11    not going anywhere.  Monday I went to work and to
12    school, the same with Tuesday, and then Wednesday
13    I had to go to, whatcha-call-it, the police
14    station with them -- or Wednesday or Thursday,
15    whatever day it was.
16    Q.  All right, well, I'm wondering when you
17    learned about this, the fact that these murders
18    had happened and that people, as you said before
19    you were close to, have been murdered, why didn't
20    you tell the police that Marko had threatened to
21    kill them?
22    A.  They knew he had problems with the guy.
23    They knew that.  I figured they'd already known
24    it.

Page 306

1    Q.  I'll ask you my question again, okay.
2        Why didn't you tell the police as soon
3    as you heard that these people were close to
4    had been murdered that Marko had threatened to
5    kill them or hurt them in your presence?
6    A.  I don't know if I did or if I didn't.  I
7    think I would have.  I told them they were
8    evicting him.  I don't know how far I got into
9    the details of it.
10        They said oh, we know about that.  I
11    know that about the eviction stuff, and he was
12    calling them bitches and stuff, but I don't
13    recall ever hearing him specifically say he was
14    gonna kill them.
15    Q.  But you did hear him say he was gonna hurt
16    them, watch your back and things like that?
17    A.  Watch your back and he's gonna get at them.
18    I'm assuming he's talking about property damage.
19    Q.  But you didn't tell the police.
20        When they picked you up five days later
21    and told you about the murders, you didn't tell
22    them that stuff?
23    A.  No.  I asked them different questions.
24    They jumped from different topics.  We need your

Page 307

1    DNA.  I said, let's go.  They took me to the
2    hospital.
3    Q.  Did you testify at your criminal trial?
4    A.  No.
5    Q.  Was there a motion to suppress filed by
6    your lawyers in the criminal trial, the first
7    one?
8    A.  Yes.
9    Q.  And what was the basis for the motion to
10    suppress?
11    A.  There was several motions for suppression,
12    and there was multiple issues that they brought
13    up.
14    Q.  Was there ever a motion filed in your
15    criminal -- for your first criminal trial in
16    which the basis was these officers made this all
17    up?
18        MR. RICHARDS:  Objection, that's not a
19    legal motion, but you can answer if you know.
20        MR. GAINER:  I don't know what that means,
21    but why don't you go ahead -- If you don't
22    understand my question, just tell me and I'll try
23    to --
24        THE WITNESS:  I don't.

Page 308

1    BY MR. GAINER:
2    Q.  Do you know what a motion to suppress is?
3    A.  Yeah, I know what that is.
4    Q.  You seem pretty knowledgeable about the
5    law.
6        You've testified here a couple times
7    today that all of the statements attributed to
8    you by Washburn and Rodriguez were made up,
9    right?
10    A.  (Witness nodded.)
11    Q.  Did you ever file a motion to suppress
12    indicating that -- Or did your lawyers on your
13    behalf ever file a motion to suppress indicating
14    that Washburn and Rodriguez fabricated everything
15    that they said you told them?
16        MR. RICHARDS:  Same objection.  You can
17    answer if you know, but legally speaking there is
18    no such thing as a motion to suppress based on
19    fabrication.
20        MR. GAINER:  Okay, just go ahead and
21    answer.
22        THE WITNESS:  All right, they filed a
23    motion to suppress based on, I think they called
24    it, negotiation, plea-related negotiations, and

77 (Pages 305 to 308)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 309

1    it's -- sentence negotiations, something like
2    that, and therefore it was all illegal anyway.
3         They couldn't admit it, and the trial
4    Judge let it go, and then the Appellate Court
5    granted me a new trial based on that. He was
6    wrong.
7         They should have never been able to
8    use -- They used a different tactic or means of
9    claiming illegal statements made by Rodriguez and
10   Washburn. One was the sentence. Plea
11   negotiations, that's what it's called.
12   BY MR. GAINER:
13   Q. Right. The basis of the Appellate Court's
14   ruling that overturned your first conviction was
15   that the conversations that you had with Washburn
16   and Papa and Rodriguez and anybody else in which
17   they said you said things like what kind of
18   sentence can I get and things like that, those
19   were determined to be plea negotiations that
20   weren't admissible, right?
21   A. Yeah, and they basically screwed themselves
22   because they're the ones that brought up the plea
23   stuff cuz I never asked for a 20-year sentence.
24   I never asked for a 40-year sentence. They

Page 310

1    offered if I'd just get it over with. So...
2    Q. And then after that you were tried again?
3    A. I never had a second trial per se, legally
4    speaking. I don't consider it a trial. We asked
5    the Judge to take the transcripts from the first
6    trial and read them and then compare them to
7    specific points of evidence because the State was
8    gonna use the same transcripts to force their
9    witnesses to say the same thing or to coach them
10   to say the same thing.
11        So just read the transcripts and
12   compare it to different points of evidence, and
13   she came back with a decision, no testimony, no
14   evidence presented, just what was already on
15   record. You're free to go, not guilty on all
16   accounts.
17   Q. My question was just did you have a second
18   trial?
19   A. That's what the second trial consisted of.
20   Q. It was a stipulated bench trial, right?
21   A. Yeah, and it was --
22   Q. That's what they called it?
23   A. Yeah, that's the legal terminology I guess
24   they called it.

Page 311

1    Q. And none of the testimony of Detective
2    Washburn that was used in the first trial was
3    used in the second trial, correct?
4    A. Didn't have to be because the Judge said it
5    was -- I think she based her stuff on
6    Tomazovich's testimony being obviously
7    fabricated.
8    Q. Okay, my question was completely different
9    than what you just said.
10        None of the testimony used -- that
11   Washburn gave in the first trial was used in the
12   second trial, correct?
13   A. With the totality of all that he testified
14   to and Rodriguez, I don't know what was cut out
15   and what was allowed. I don't know what was
16   redacted and what she did use and what she didn't
17   use.
18   Q. Okay, so you don't know if she --
19   A. I think she read it all. Nothing was
20   redacted. She read it all and then just took out
21   the parts that the Appellate Court said could not
22   be used.
23   Q. You don't know, as you sit here right now,
24   whether or not Washburn's testimony was used in

Page 312

1    that second trial.
2         Is that fair to say?
3    A. I didn't read the 12-page decision she
4    made. No, I don't know what was used, but she
5    said she reviewed all the transcripts minus what
6    was stated -- couldn't be used by the Appellate
7    Court.
8    Q. And Rodriguez did not testify at either
9    trial, right?
10   A. Not that I remember, no.
11   Q. All right, so prior to January 9th, 2004,
12   did you know who Washburn and Rodriguez were?
13   A. Nope.
14   Q. Okay, and January 9th, 2004 is the date on
15   which you were arrested with Killacky for the gun
16   charges, right?
17   A. Yes.
18   Q. And about what time of day was it that you
19   were arrested?
20   A. 2:45 according to the police report.
21   Q. And that was in Melrose Park?
22   A. Yes, 17th and North Avenue.
23   Q. Were Rodriguez and Washburn there when you
24   were arrested?

78 (Pages 309 to 312)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO

WILLIAM DUKES

Page 313

1    A.  They were the ones that took me into
2  custody.  They were the ones that pointed the
3  guns in my face and pulled me out of the van that
4  Killacky brought me in.
5    Q.  And did they then transport you to what
6  you've referred to a couple times as the black
7  site?
8    A.  Yeah.
9    Q.  Why are you calling it that?
10    A.  Homan and Fillmore.
11    Q.  Why are you calling it that?
12    A.  Because that's basically what it is.  When
13  Chicago police don't want you to be found,
14  they'll take you there and tell your lawyer or
15  whoever shows up looking for you that he's at
16  Harrison and Kedzie.  They get to Harrison and
17  Kedzie, oh, he's not here.  We sent him over to
18  Belmont and Western.
19    Q.  Did that happen in this case?
20    A.  I don't know.  I couldn't get ahold of a
21  lawyer.
22    Q.  Did you read the Guardian article about
23  black site?
24       Is that where you're getting this

Page 314

1  information from?
2    A.  I've heard it referred to as a black site
3  before.  That's why I refer to it as a black site
4  because that's exactly what it is.  It's like the
5  CIA using black sites to waterboard people.
6    Q.  Did you get waterboarded?
7    A.  No, I'm just saying it as an example.
8    Q.  Did anybody, during the course of your time
9  at Homan Square, ever tell you that they were
10  hiding you from someone or making it hard so that
11  you can't be found or anything like that?
12    A.  No.
13    Q.  Okay, and when you were taken to Homan
14  Square, since you seem to have a very good memory
15  of the times of day, what time do you think it
16  was when you arrived at Homan Square on
17  January 9th?
18    A.  About 3:00, 3:05 because it didn't take 15,
19  20 minutes to get there cuz they didn't stop at
20  red lights.  They don't stop at stop signs.
21  They're cops.  They can do whatever they want.
22    Q.  And that's when you were taken to this
23  holding cell?
24    A.  I was taken up the stairs from the garage

Page 315

1  area, up a long narrow corridor, single flight of
2  stairs, straight up, and then put in a holding
3  cell.
4    Q.  All right, and during the course of that
5  day, how many different times did you talk to
6  Washburn?
7    A.  In and out, there's no telling.  As many
8  times as I told him I wanted a lawyer, leave me
9  alone, a dozen, couple dozen.
10    Q.  Is your answer the same if I ask you how
11  many different times a day you talked to
12  Rodriguez?
13    A.  About the same, yeah.  It was either in
14  pairs or singular.  They were in and out
15  together, in and out, back and forth.
16    Q.  And is it accurate that the first times
17  that you talked to Washburn and Rodriguez they
18  were asking you about the gun charges and the
19  drug cases?
20    A.  The first 30 minutes, yeah, they were
21  asking about the gun and how I knew Killacky and
22  stuff like that, and I was throwing him under the
23  bus.
24    Q.  And by that --

Page 316

1    A.  I started that at the arrest site.
2    Q.  By that you mean that both in the car on
3  the way to the station and at the station you
4  were telling them that Killacky was the one who
5  had the gun and you didn't want it and things
6  like that, right?
7    A.  Right.  He was trying to sell me the gun.
8  He's claiming to have 5 or 10, 15 more stashed at
9  a site over here on 18th Street and North Avenue
10  in Melrose Park.
11    Q.  Prior to talking to you about the guns or
12  the gun at Homan Square, Washburn read you your
13  Miranda rights, didn't he?
14    A.  Then, yeah, and he also told me that
15  they're not really after me.  They're after
16  Killacky.
17    Q.  Right, and do you remember did he read you
18  Miranda rights out of a book?
19    A.  I can't remember if it was a book or a card
20  or what it was.
21    Q.  So he read it off something, but you're
22  just not sure what it was?
23    A.  He could have done it from memory.  I can't
24  recall.

79 (Pages 313 to 316)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 317

1    Q. Okay, and after he read you those rights,
2    did you tell him something to the effect of I
3    know those by heart?
4        A. I might have.
5        Q. Okay, because you had been read your rights
6    a number of times in the past prior to this --
7        A. Right.
8        Q. -- particular day, right?
9        A. Mmm-hmm.
10       Q. Yes?
11       A. Yes.
12       Q. Okay, thanks.
13           At some point during the course of the
14   night the conversation topic switches from the
15   gun and Killacky to the murders, correct?
16       A. 30 minutes after I got there approximately
17   it started. They left the room and came back a
18   few minutes later and said your name is coming up
19   on the computer in a murder investigation and
20   stuff. What's up with that?
21       Q. Okay.
22       A. And then it started back from the gun to
23   the murders, gun to the murders. Look, I don't
24   wanna talk about the murder case. It's been 10,

Page 318

1    15 years or whatever it was at the time.
2           You can charge me with it and I'll go
3    to court. I don't wanna talk about it. I want a
4    lawyer for that case.
5        Q. After Washburn read to you or recited to
6    you your Miranda rights the first time before
7    starting to tell you about the gun -- talking
8    about the gun, did he do that again at all on the
9    9th?
10       A. Not that I remember.
11       Q. Okay, did Rodriguez ever read you your
12   rights or recite your rights to you on the 9th?
13       A. No. He was in the room when Washburn did
14   it the first time.
15       Q. Okay, now when they first brought up the
16   murders to you saying, as you've said a couple
17   times, you know, that your name popped and
18   there's this --
19       A. Right.
20       Q. -- double homicide, whatever, did you say
21   anything to the effect of I'm not worried about
22   that shit. That happened a long time ago?
23       A. It happened a long time ago, and I had
24   nothing to do with it. I want a lawyer for that

Page 319

1    case, and that's it.
2        Q. Did you say to them I'm not worried about
3    that shit. They bring me in every couple years
4    to ask me questions about that?
5        A. Something to that effect, yes.
6        Q. Okay, and did they -- At what point on the
7    9th, if at all, did they ask you questions about
8    your whereabouts on the date of the murders and
9    things like that?
10       A. I couldn't have been there more than two
11   hours when they started going real hard core into
12   that.
13       Q. And who was doing that?
14           Who was going really hard core?
15       A. Washburn and Rodriguez.
16       Q. Was anybody with them while they were doing
17   that?
18       A. Not that I recall. They might have brought
19   a sergeant in there or something at the time with
20   them. I don't -- It was back and forth.
21       Q. Okay, so on the 9th I want to know if you
22   were either questioned by or questioned in the
23   presence of any other people you knew to be
24   Chicago police officers besides Washburn and

Page 320

1    Rodriguez?
2        A. I wanna say a sergeant, but I'm not
3    positive on that one. I know it was Washburn and
4    Rodriguez all the way up until 3:30 in the
5    morning when they took me to Harrison and Kedzie
6    and then signed me out 20 minutes later and
7    started the interrogation again.
8        Q. Okay, so on January 9th at Homan Square up
9    until 3:45 in the morning when you were taken
10   to --
11       A. Roughly, yes.
12       Q. -- Harrison and Kedzie, did you constantly
13   deny that you were involved in the murders of
14   Marilyn and Bridget?
15       A. Yes, I did.
16       Q. And they just kept asking you questions?
17       A. They kept asking me questions no matter how
18   many times I said I wanted a lawyer and to be
19   left alone.
20       Q. So that brings me to my next question.
21           So how many times during the course of
22   the night -- And I'm just talking about Washburn
23   now.
24           How many times did you tell him you

80 (Pages 317 to 320)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 321

1    wanted a lawyer on the 9th?
2       A. Okay, say 3:00 o'clock to midnight, so
3    three and three, 12 hours, 20 times.
4       Q. And --
5       A. The same with Rodriguez.
6       Q. -- did you say the same thing every time?
7       A. Just leave me alone. I want a lawyer.
8       Q. Okay, anything else?
9       A. Pretty much to the same effect every time.
10      Q. Okay, and how many times --
11      A. The words might have been different, but
12   the meaning and what I was -- the point I was
13   getting was the same thing. Leave me alone, give
14   me a lawyer.
15      Q. How many times during the course of that
16   day, the 9th, when you're at Homan square were
17   you allowed to make phone calls?
18      A. On Homan Square? None.
19      Q. The first time on the 9th.
20      A. None. I think it was on the 10th they
21   allowed me to make the calls the first time.
22      Q. Okay, so at any time on the 9th did they
23   allow you to make phone calls to anybody?
24      A. It could have been on the 9th, but I'm

Page 322

1    pretty sure it was on the 10th when they did it
2    around noon, 1:00 o'clock.
3       Q. Were you aware on the 9th that a search
4    warrant had been executed at your house?
5       A. No.
6       Q. Okay, did you find out about that later?
7       A. I found out later, yeah.
8       Q. Did you ever have any discussions with
9    Washburn or Rodriguez about that, about the
10   search warrant?
11      A. They might have said something on the 12th
12   of April, but I don't recall it.
13      Q. All right, on the 9th were you put in a
14   cell with Killacky at Homan Square?
15      A. Yes, I was.
16      Q. Okay, and is that what you were talking
17   about earlier with counsel about the
18   conversations you had regarding -- first of all
19   it was about the gun and then it kind of switched
20   to the murders?
21         Is that what you were referring to?
22      A. Yeah.
23      Q. Okay, and then at some point you said that
24   you were taken to Harrison and Kedzie?

Page 323

1       A. Yeah, about 3:30 in the morning.
2       Q. Who took you there?
3       A. Rodriguez and Washburn.
4       Q. And they brought you into the lockup and
5    then according to your earlier testimony as soon
6    as you were processed you were taken right out
7    again?
8       A. As soon as I was processed I was taken to
9    the back. They took my jacket. They took my
10   shoes and put me in a cell with a bare steel
11   shelf to lay on, and it was too cold to do that.
12         And I was in there maybe ten minutes
13   when they came and said, Dukes, now you're
14   out of here. Okay. And I go up to the front by
15   the processing desk, and Rodriguez is standing
16   there, and he took me upstairs.
17      Q. Okay, and your testimony earlier was that
18   the only person that was questioning you at
19   Harrison and Kedzie during that night or
20   overnight was Rodriguez, right?
21      A. Yes.
22      Q. Did you see Washburn at all?
23      A. I don't think I seen him until about 9:00
24   or 10:00 o'clock that morning when he came to get

Page 324

1    me. He might have questioned me for a little bit
2    before -- with Rodriguez before they took me. I
3    don't recall specifically.
4          He might have asked one or two
5    questions, and just instantaneously they cuffed
6    me and took me in the car -- unhandcuffed me from
7    the wall, cuffed me behind my back and took me in
8    the car outside and back to Homan and Fillmore.
9       Q. Okay, so the place upstairs at Harrison and
10   Kedzie is Area 4.
11         Is that your understanding?
12         Did you know that?
13      A. If you say it's Area 4, it's Area 4.
14      Q. That's all right. I just didn't know.
15      A. Harrison and Kedzie upstairs.
16      Q. Harrison and Kedzie upstairs.
17         Describe for me where you were put?
18      A. It was like a small room, a cubicle with a
19   steel metal bench up against the wall that they
20   handcuffed against the back wall. Then there was
21   a small desk, wooden desk, against the wall with
22   another eyebolt mounted in the concrete and two
23   chairs.
24      Q. Okay, and --

81 (Pages 321 to 324)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

---

Page 325

1   A. And that's where they sat while I was
2   sitting on the little bench.
3   Q. Who's they?
4   A. I mean Rodriguez sat.
5   Q. Okay, so during the course of that night or
6   overnight at Harrison and Kedzie, did you
7   continue to maintain that you were not involved
8   in the murders of Marilyn and Bridget?
9   A. Yes, I did.
10  Q. Did you ever say anything different than
11  that?
12  A. Nope.
13  Q. Did you ever provide Rodriguez with any
14  details about your days around the murder, you
15  know, how you knew these people, what your
16  relationship was, anything like that?
17  A. I might have at the beginning at Harrison
18  and Kedzie -- or Homan and Fillmore at 3:00, 3:30
19  when it first started, when they first started
20  asking me about it; but that's when I said, look,
21  I don't wanna talk about the murders because I
22  didn't have nothing to do with it.
23       I want a lawyer. Leave me alone on
24  that. I'll tell you what I know about Killacky

---

Page 326

1   and the guns, but I thought it was ski. I
2   couldn't even remember his last name. I know his
3   first name was Brian.
4   Q. When you were at Homan -- I'm sorry.
5   Strike that.
6       When you were at Area 4, Harrison and
7   Kedzie upstairs, did Rodriguez read you your
8   Miranda rights?
9   A. No. The only time I remember it being read
10  was the lockup when they first brought me up to
11  Homan and Fillmore --
12  Q. Okay, when you were --
13  A. -- on the 12th.
14  Q. -- at Harrison and Kedzie upstairs, did you
15  tell Rodriguez that you wanted a lawyer?
16  A. Repeatedly.
17  Q. And what did he say in response to that?
18  A. Nothing, like he didn't hear it.
19  Q. And you told him more than once?
20  A. A dozen times or more.
21  Q. When you were being processed in the lockup
22  at Harrison and Kedzie by the -- you said -- you
23  talked earlier about these lockup keepers you
24  thought were different --

---

Page 327

1   A. Yeah.
2   Q. -- a different agency or whatever, did you
3   tell any of them, like, this is fucked. I'm
4   here. They're not listening to me. I need to
5   get out of here. I need a lawyer.
6       Did you say anything like that to any
7   of them?
8   A. No, they just print you and picture you,
9   and that's it. They deal with that.
10  Q. But did you say anything to them?
11  A. Yes, I did.
12  Q. To whom?
13  A. The guy that was rolling my fingers across
14  the glass.
15  Q. Okay, and do you remember his name?
16  A. No.
17  Q. Can you describe him?
18  A. He was in a blue uniform. It looked like a
19  police uniform, but it had different patches.
20  Q. It was a man?
21  A. Both of them were.
22  Q. And were the white, black?
23  A. One was white. One was black.
24  Q. Okay, and did you tell them both about what

---

Page 328

1   was happening to you?
2   A. No. One stayed behind the desk and didn't
3   have nothing to do with me or he was doing
4   something else regarding my paperwork. I don't
5   know. The other guy was the one with the camera
6   and rolling my fingers.
7   Q. So you're not really answering my question.
8       Which one of those guys did you tell
9   that to?
10  A. It would have been the white guy that was
11  printing and photographing me.
12  Q. Okay, and you can't -- Can you provide any
13  more description?
14  A. No.
15  Q. Those blue uniforms that you're referring
16  to, the dark blue uniforms, right?
17  A. I thought it was light blue on the top and
18  dark blue on the bottom.
19  Q. Well, either way.
20  A. It wasn't Chicago Police. It didn't say
21  Chicago Police. It said something else.
22  Q. Did it have a nameplate on it?
23  A. Not that I recall or not that I seen at the
24  time.

82 (Pages 325 to 328)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 329

1    Q. All right, so up until the point where
2  you're taken from upstairs at Harrison and Kedzie
3  to -- back to Homan Square, so now we're on the
4  10th, right?
5        Do you know what I'm talking about?
6    A. Yeah.
7    Q. Okay, up until that point were you ever
8  given anything to eat?
9    A. They give me plenty of soda and cigarettes.
10  That was it that I remember.
11    Q. So my question is: Were you ever given
12  anything to eat?
13    A. They might have gave me a bologna sandwich.
14  They might have. I don't recall it in the
15  lockup, and those I wouldn't have ate it anyway.
16        And on the 10th Killacky brought
17  something, some food. He, here, I bought this
18  out of my pocket.
19    Q. All right, so you said you were given some
20  sodas while you were at Harrison and Kedzie?
21    A. Yeah.
22    Q. And you said you were given some cigarettes
23  while you were at Harrison and Kedzie?
24    A. Yeah -- No, not Harrison and Kedzie, Homan

Page 330

1  and Fillmore.
2    Q. So was that before you went to Harrison and
3  Kedzie or after?
4    A. Before I came back.
5    Q. Okay, I think your testimony earlier was
6  you were withdrawing at that time; is that right?
7    A. Yes.
8    Q. From cocaine?
9    A. Yes.
10    Q. When is the last time you used cocaine
11  before January 9th, 2004?
12    A. Just after midnight on January 9th.
13    Q. Were you high when you were arrested?
14    A. No, but I still felt it. It was in my
15  system.
16    Q. Okay, were you high when you were taken and
17  put into a holding cell at Homan Square?
18    A. I wasn't high, but you could feel the
19  effects of withdrawal from it. It was just -- I
20  don't know how to describe it. It's just a
21  physical and mental blah.
22    Q. You were coming down?
23    A. Yeah.
24    Q. Okay, and how regularly were you using

Page 331

1  cocaine up until January 9th, 2004?
2    A. I didn't start until after I met Killacky.
3  I hadn't done it for five years.
4    Q. Okay, my question is --
5    A. I know. I'm trying to think.
6    Q. -- let's talk about the week leading up to
7  it.
8    A. I'm trying to think. Daily pretty much.
9    Q. Okay, how many times a day?
10    A. Three to five.
11    Q. And the fact that you had not had any
12  cocaine since just after midnight on the 9th,
13  that was affecting you when you were in the
14  holding cell at Homan Square physically?
15    A. Yeah. It was just all kinds of depression,
16  anxiety, anger, frustration.
17    Q. And were you having these same feelings
18  when you were in the holding cell at Harrison and
19  Kedzie upstairs?
20    A. Yes, because they wouldn't leave me alone.
21    Q. Right, but can you distinguish between the
22  effects of the cocaine withdrawal and the effects
23  of your frustration with what was happening or
24  was that all kind of part of the same thing?

Page 332

1    A. I could distinguish the two. I mean, I
2  knew part of it was -- Part of my frustration and
3  anger and stuff was from not using drugs, but I
4  knew 99 percent of it was coming from the BS that
5  was going on with them not honoring me telling
6  them to leave me alone.
7        Leave me alone, I don't wanna talk.
8  Leave me alone. I want a lawyer. They didn't
9  give a crap.
10    Q. Did the cocaine withdrawal get worse on the
11  10th?
12    A. No, it's just more of a mental than a
13  physical.
14    Q. Okay, you mentioned earlier that somebody
15  mentioned to you at some point PTSD.
16        Have you been diagnosed with PTSD?
17    A. After this, yeah.
18    Q. After what?
19    A. July 11th, 2019 when they said I was not
20  guilty of all charges and free to go and I gotta
21  -- After 15 years and six months locked up, I
22  gotta figure out how to deal with society.
23        I don't even know what the hell a cell
24  phone is. When I got locked up in 2004, they

83 (Pages 329 to 332)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 333

1    were still briefcases or they looked like a brick
2    with a piece of wire stuck to them.
3         Q. Who diagnosed you with PTSD?
4         A. Community Health clinic.
5         Q. And what's the name of the doctor?
6         A. I can't remember what her name was, but
7    they've changed doctors a couple times. It's
8    Community, and they migrate from place to place.
9         Q. Where is Community Health clinic located?
10        A. 6201 West Roosevelt Road in Berwyn 60402.
11        Q. When were you diagnosed with PTSD?
12        A. July, August, August or September of 2019.
13        Q. Was -- Did the person who diagnosed you
14    with PTSD associate your PTSD with being in
15    prison as a result of these murders?
16        A. Yeah, I told them all about it cuz it was
17    part of the -- I was honest with the doctor about
18    everything cuz you can't not give them backstory
19    of what happened.
20        Q. Just give me a sense of when you -- You
21    told us that you were diagnosed with depression
22    some time ago.
23            When were you diagnosed with
24    depression?

Page 334

1         A. Back in '91 after my grandmother died that
2    raised me. That was my actual mom -- mother. My
3    birth mother, she -- I wasn't raised by her but
4    after -- She was the only mother I knew.
5            So when she passed away, I just lost my
6    dad's father, my grandfather, her husband a
7    couple years before that. So I was depressed.
8         Q. Did you --
9         A. They called it -- That was also it had a
10    little PTSD with it they said.
11        Q. So you were diagnosed with PTSD back in the
12    90's too?
13        A. Yeah. She had a -- organic I think she
14    called it cuz that was partially substance abuse
15    too.
16        Q. Have you been officially diagnosed with any
17    other mental health issues as a result of this
18    incident, so the murders and your arrest and your
19    imprisonment?
20        A. I was suspected antisocial personality
21    disorder and some other stuff, depression, PTSD,
22    anxiety.
23        Q. When were you diagnosed with anxiety?
24        A. Around the same time.

Page 335

1         Q. By the Community Health place?
2         A. Yeah.
3         Q. Okay.
4         A. They had mental health workers come in and
5    talk to me too.
6         Q. Right, So I wanna -- I'm sorry --
7         A. They couldn't believe the story; but being
8    right there in Berwyn next to Cicero, they knew
9    -- they believed it because of the history.
10        Q. All right, I digressed a little bit there.
11    I want to go back to January 10th, 2004.
12        A. Okay.
13        Q. You were taken over to Homan Square at what
14    time?
15        A. January 10th?
16        Q. January 10th, yeah.
17        A. They took me to Harrison and Kedzie at 3:30
18    in the morning. Rodriguez signed me out about
19    4:05. Washburn showed up about 9:30 or so. They
20    had me back at Homan and Fillmore by 10:00 or
21    10:30.
22        Q. And when you -- Were you put back in a
23    holding cell?
24        A. Yep.

Page 336

1         Q. Were you ever moved to a conference room at
2    Homan Square?
3         A. Oh, when they brought me to Homan Square on
4    the 10th, they put me in the conference room when
5    I first got there.
6         Q. And did you stay in the conference room for
7    the rest of the day?
8         A. An hour or two after they played the tapes
9    and stuff like that. Then they put me in a
10    holding -- interrogation room, not a holding
11    cell.
12            They put me in an interrogation room
13    cuffed to a wall or to the bench, and then later
14    they put me back in there around 2:00 or 3:00
15    o'clock and let me make a couple phone calls.
16        Q. All right, so when they played the tapes
17    for you, was that in the conference room?
18        A. Yes.
19        Q. And the tapes -- I think you said earlier
20    they just played a part of one tape; is that
21    right?
22        A. Yeah. They played a section of it, stopped
23    it and then a little while later they hit the
24    play button again and stopped it, and that was

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 337

1    it.
2        Q. And what was on it?
3            What was on the tape?
4        A. It was me talking with Killacky about
5    drugs.
6        Q. Is that when Killacky came into the room or
7    shortly after that Killacky came into the room?
8        A. Shortly after.
9        Q. And is that when you learned that Killacky
10   was a police officer?
11       A. When they played the tapes and I heard his
12   voice on there, I knew he was a police officer.
13       Q. At some point after playing the tapes did
14   they Mirandize you again?  You said earlier that
15   they did it again on the 10th.  I'm just trying
16   to figure out when that happened.
17       A. I think they just did it as soon as I
18   walked in, and they introduced Donegan and
19   Pineda.  They read the rights.
20       Q. Who read the rights?
21       A. Washburn would have done it.  He was the
22   leader.
23       Q. He was kind of running it?
24       A. Yeah.  That's what it seemed like.  He was

Page 338

1    the lead on the interrogation.
2        Q. And then you told us that it's around this
3    point where Washburn said to you what kind of
4    sentence do you think you could get for double
5    murders, and you responded the needle, right?
6        A. Yeah.  When they played the tapes, I knew I
7    was getting charged with the drug case then cuz I
8    thought it was just the gun and they were after
9    Killacky up until that point.
10       Q. Right.
11       A. And then when they played the tapes, I'm
12   going to jail for the drugs, and I'm on parole.
13   So I knew I was gonna go -- end up going back to
14   court and be locked up.
15           I put my head on the table, and I said,
16   what kind of sentence can I get for this drug
17   shit?  And he said, what kind of sentence do you
18   think you can get for a double murder?  And I
19   said, the needle.
20       Q. So that conversation happened?
21       A. That happened.
22       Q. Okay.
23       A. But he made it sound like I just what kind
24   of sentence can I get?  I asked or I specifically

Page 339

1    said.  He asked me what sentence I can get, and
2    he did, but he didn't put the other part about me
3    asking the sentence for the drug case.
4        Q. But you -- He did say what kind of sentence
5    do you think you can get for the double murder,
6    and you did say the needle, right?
7        A. Yeah, that part I did say.
8        Q. Okay, and then did you say I just want to
9    get this over with.  I'll tell you what you want
10   to know about the murders of Marilyn and Bridget?
11       A. I didn't know nothing about the murders.
12       Q. That's not my question.  I'll ask it again.
13           Did you say I just want to get this
14   over with.  I will tell you what you want to know
15   about the murders of Marilyn and Bridget?
16           Did you ever say that?
17       A. I just wanna get this over with.  Just
18   charge me so I can get a lawyer and get this off
19   my back.
20       Q. Okay, I'm going to ask my question --
21       A. That's what I said.  I didn't say what you
22   said.
23       Q. All right, so what you just then said, you
24   did say I just want to get this over with, but

Page 340

1    you didn't say I'll tell you what you want to
2    know about the murders of Marilyn and Bridget.
3            Is that your testimony?
4        A. Correct.
5        Q. Did you say I'll tell you about my
6    involvement in the murders and about Marko's
7    involvement in the murders?
8            Did you ever say that to Washburn or
9    Rodriguez or anybody on the 10th of January?
10       A. No.  They asked me to tell them about my
11   involvement and Marko's involvement in the
12   murders, and I said they're non-existent on my
13   part.  Marko's I don't know about.  I wasn't
14   there.
15       Q. Did you ever tell anyone on the 10th of
16   January it's not like Marko's saying it was.
17   He's much more involved or he's more involved
18   than he's saying he was?
19            Did you ever say anything like that?
20       A. No.  Somebody said that to me, Donegan.
21   Donegan says, look, I got Marko for this, not
22   you.  He's more involved.  So tell us what
23   happened.  And I said, I don't know.  I wasn't
24   there.

85 (Pages 337 to 340)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 341

1    Q. So you never said those things?
2    A. No.
3    Q. Okay, at some point you mentioned that you
4    were allowed to make some phone calls?
5    A. Yeah.
6    Q. And when you were allowed to make some
7    phone calls, where were you at Homan Square,
8    like, what kind of room?
9    A. Conference room.
10   Q. Conference room.
11        And were you handcuffed?
12   A. I'm not sure if I was or not. I think --
13   Yeah, I was handcuffed like this (indicating),
14   not to the wall.
15   Q. Was there anyone in the room with you?
16   A. Yep.
17   Q. Who?
18   A. Rodriguez, Washburn, Donegan, Pineda.
19   Q. Who did you call?
20   A. I called -- I can't remember his name now.
21   One of the girls I was going to -- an Asian girl
22   I was going to school with at Harold Washington
23   College in the addiction studies class, Adam
24   Rybarczyk.

Page 342

1    Q. How do you spell that?
2    A. I don't know.
3    Q. Okay, why did you call that person?
4    A. I called him because it was the only number
5    I could remember offhand. I'd done a lot of work
6    on his cars and stuff. So I knew his number by
7    heart. I called my aunt at 2951 North Honore in
8    Chicago, and I called Jack Ellis -- Elias, not
9    Ellis.
10   Q. Who's Jack Elias?
11   A. He was my landlord.
12   Q. All right, and did you --
13   A. I let him know where I was at.
14   Q. So is that what you told all three of those
15   people, where you were?
16   A. Yeah. I told them I'm being interrogated
17   for murders I had nothing to do with and I'm
18   trying to get a lawyer. I asked Jack Elias -- I
19   asked him to contact Larry Lesinski (phonetic) as
20   my attorney, see if you can get ahold of Larry,
21   tell him where I'm at. Larry Lesinski, Lawrence
22   Lesinski was his name. I can't spell it.
23   Q. Did you tell any of the three people you
24   called that you had been asking for a lawyer for

Page 343

1    two days and no one was letting you have one?
2    A. I know I told Jack Elias that and I told
3    Adam Rybarczyk that.
4    Q. Okay, how can I get in touch with Jack
5    Elias?
6    A. You can't. He's passed away.
7    Q. How can I get in touch with Adam Rybarczyk?
8    A. He lived on Lawndale and Fullerton. I
9    don't know how you get ahold of him now.
10   Q. What about the third person that you said,
11   the Asian girl?
12   A. Okay, the Asian girl was Adam Rybarczyk's
13   girlfriend. They lived together.
14   Q. Are you aware of any way that we can get in
15   touch with any of the three people you called?
16   A. My Aunt Patricia Lockhart, she passed away
17   seven -- four months -- I got out in July. She
18   passed away in February, so five months.
19   Q. Okay.
20   A. And her husband, Ricky, my Uncle Rick, they
21   were like mothers and fathers to me too. He
22   passed away in December, seven months.
23   Q. Did you ever have any conversations with
24   Washburn or Rodriguez about the fact that they

Page 344

1    were going to contact State's Attorneys to see if
2    they can get the death penalty off the table?
3    A. Nope. That was their offers to do. Look,
4    if we get the death penalty off the table, will
5    you talk to us? No.
6    Q. Did you respond when they said that?
7    A. Well, that's one of the times I said
8    something -- Oh, no, they said that afterwards
9    about getting the death penalty removed.
10        It was when I had told him -- I asked
11   Washburn if he thought I was fucking stupid that
12   I would plead guilty to a murder, a death penalty
13   murder, so you'd drop a petty ass drug and gun
14   case.
15   Q. And what did he say when you said that to
16   him?
17   A. Well, what if we got the death penalty
18   taken off the table. I just threw up my hands.
19   Q. Did you ever ask them to go to the State's
20   Attorney's Office to see if the death penalty
21   could be taken off the table?
22   A. No.
23   Q. Okay, did you ever say, in response to a
24   question about what you would say if you gave a

86 (Pages 341 to 344)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 345

1    statement about the murders of Marilyn and
2    Bridget, I'm going to tell them my participation
3    in the murders of Marilyn and Bridget and of
4    Marko's participation in the murders?
5         Did you ever say that?
6    A. No, I did not.
7    Q. Okay, did you or were you present in the
8    conference room or the interrogation room at
9    Homan Square when Assistant State's Attorney Jim
10   Papa arrived?
11   A. Yeah, I remember Papa.
12   Q. Okay, and did you have conversations with
13   Jim Papa about eliminating the death penalty as a
14   possible sentence so that you would give a
15   statement about what happened to Marilyn and
16   Bridget?
17   A. He asked me if he -- No, he told me he can
18   get the death penalty -- I didn't ask him to do
19   it. He told me.
20        He made a statement that he can get the
21   death penalty taken off the table -- possibly get
22   it taken off the table if I were to give him a
23   statement of remorse. I said, I got nothing to
24   be remorseful about. I didn't do anything.

Page 346

1         I'm empathetic toward the family, but
2    I'm not remorseful cuz I didn't do anything to be
3    sorry about. I feel sorry for and empathize with
4    the family.
5    Q. Did you ever say anything to Papa about
6    agreeing to give a statement about what happened
7    in exchange for some consideration from the
8    State's Attorney's Office?
9    A. No. That was stuff -- They were offering
10   considerations. I didn't ask them for it. Look,
11   just give me a lawyer and let me -- and leave me
12   alone.
13   Q. So your position is that all of the
14   discussions that were about consideration or any
15   possible consideration for a statement were the
16   idea of the police and the State's Attorneys, and
17   they were the ones offering this to you?
18   A. Right.
19   Q. As opposed to you asking for it?
20   A. Right.
21   Q. Okay, was there a conversation in that room
22   about the difference between a 20-year sentence
23   and a 40-year sentence for these murders?
24   A. What do you mean? There's 20 years

Page 347

1    difference. It's 20 and 40.
2    Q. Right, you're right about that. That is
3    one difference.
4         Was there ever a discussion in this
5    room between you and Papa and Washburn and
6    Rodriguez and anyone else who was in there about
7    you wanting a 20-year sentence for the murders of
8    Marilyn and Bridget and them saying that's not
9    enough, and then you wanting a 40-year sentence
10   for the murders of Marilyn and Bridget and them
11   saying that's not enough?
12        Did any of that ever take place?
13   A. They offered the 20 and 40 years that --
14   Q. Was that for both?
15   A. -- they will bring it to their supervisors.
16   I said, no, I didn't do shit. I ain't pleading
17   guilty to a damn thing.
18   Q. So is it your testimony that they said how
19   about we'll give you 40 years and you said, no?
20   A. Right.
21   Q. Well, we'll give you 20 years --
22   A. Exactly.
23   Q. -- and you said, no?
24        Is that how it happened?

Page 348

1    A. Pretty much.
2    Q. Okay, and did they ever discuss with you
3    about putting a statement on videotape during
4    the --
5    A. Yeah, they did. They did. I said get the
6    videographer up here and a lawyer because I won't
7    do it without a lawyer present, and then they
8    cancelled everything, and everything was done.
9    They kept trying to get me to do the statement.
10        I said, just get the videographer here,
11   wherever they come from. I'm sure they come from
12   your office, but I won't do it unless you got
13   somebody from the Public Defender's Office here
14   representing me.
15   Q. Did you ever tell Jim Papa that you were
16   sorry about what happened to Marilyn and Bridget
17   on the 10th?
18   A. No. He asked something about remorse like
19   Papa did, and I said I'm not remorseful about
20   anything because I didn't do anything.
21        I feel empathetic and sympathy toward
22   the family for suffering this loss and what
23   happened to the kid and her mother -- her
24   grandmother.

87 (Pages 345 to 348)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 349

1    Q. Did you tell them that you wanted to get
2 this off your chest and you would if you got a
3 deal in writing from the State's Attorney's
4 Office?
5    A. No. I told them -- I hate swearing like
6 this, but I told them exactly, fucking charge me
7 so I can get this shit off my back.
8    Q. Okay, did you ever talk to an Assistant
9 State's Attorney named Darren O'Brien that night?
10    A. That's a big tall guy. He's real stocky;
11 and if I remember, he's bearded like you and same
12 type of hair.
13    Q. It's the Irish probably.
14    A. O'Brien. You think?
15    Q. Yeah, right.
16       Did you -- Did you say anything to
17 him -- Strike that.
18       Did they tell you, hey, we're bringing
19 a supervisor in here to talk to you before this
20 guy O'Brien came in?
21    A. I can't remember if they told me before,
22 but he introduced himself as a supervisor.
23    Q. Okay, so now you've got the police talking
24 to you. You've got an Assistant State's Attorney

Page 350

1 talking to you, and you've got the supervisor of
2 the Assistant State's Attorneys talking to you.
3       And your position is that all these
4 guys just showed up and were just throwing offers
5 at you trying to get you to confess to these
6 murders?
7    A. Pretty much but they didn't just show up.
8 As I told you, I was in an interrogation room.
9 It's got a door. Sometimes it was closed, and
10 they've got a glass mirror.
11       When they got me in there, I can still
12 see people walking by and stopping and putting
13 their face up against the window, and you can see
14 -- I can distinguish the features.
15       Or they'd walk by with the door open
16 and look in and keep walking. They were there.
17 Papa was there long before they ever brought him
18 in.
19    Q. Yeah.
20    A. And I believe O'Brien was there at least a
21 couple hours. Dan Weiss was there. He never
22 came in the room or said anything.
23    Q. Yeah, you mentioned that before.
24       So O'Brien, when he came in, did he

Page 351

1 tell you you've got one day to tell us the truth
2 about what happened?
3    A. He said something about I'm gonna put this
4 one day and then it's gone.
5    Q. Okay.
6    A. Tell us now or it's gone.
7    Q. And did you say anything in response to
8 that?
9    A. Yeah. I don't give a fuck who you are. I
10 want a lawyer.
11    Q. Did you tell O'Brien that you were sorry
12 and you wanted to get this off your chest?
13    A. I did not. I never said I wanted to get
14 anything off my chest. I said charge me so I can
15 get it off my back. That's all I ever said about
16 that --
17    Q. Did you express --
18    A. -- and that was to Washburn.
19    Q. Okay, so you never said anything like that
20 to O'Brien?
21    A. I'm positive I didn't. He might have heard
22 it out in the hallway.
23    Q. Did you express remorse to either O'Brien
24 or Papa about what happened to Marilyn and

Page 352

1 Bridget?
2    A. No. As of today, I still have nothing to
3 be remorseful for.
4    Q. At some point around 5:00 o'clock did they
5 give you more time to kind of make some phone
6 calls and get yourself together?
7       Do you remember that on the 10th?
8    A. They stuck me in another room and cuffed me
9 to a wall and back and forth, same thing.
10    Q. Were you allowed --
11    A. They didn't give me any time.
12    Q. Were you allowed to make any other phone
13 calls --
14    A. No --
15    Q. -- other than the ones you told me about?
16    A. -- just those three phone calls. That was
17 it.
18    Q. At some point were you in a room where you
19 started to talk to these guys about what happened
20 and told them that you were despondent around the
21 time of the murders because Marilyn had kicked
22 you out of the house?
23    A. No. They were coming up with scenarios
24 that they thought happened. I said, look,

88 (Pages 349 to 352)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                      WILLIAM DUKES

---

Page 353

1   nothing happened.  I didn't do it.  Leave me
2   alone.  Let me have a lawyer, and they wouldn't
3   stop.
4       Q.  So they were the ones saying stuff --
5       A.  They were the ones that come up with the
6   despondent because me and Marilyn never ended.
7   I had a place to go to.
8           They were the ones coming up with the
9   scenario of me being despondent.  They were the
10  ones coming up with that scenario, and I wasn't.
11          I had nothing to be despondent about at
12  the time because Marilyn wasn't really putting me
13  out.  I volunteered to go.
14      Q.  How did it all end?
15      A.  I kept telling them fuck this, leave me
16  alone, charge me and let me get this shit off my
17  back, take me back -- on April 12th, take me back
18  to County.  Oh, there's nobody there to receive
19  you.
20          So they stuck me in Harrison and Kedzie
21  for the night and didn't bring me back to the
22  county jail until the next morning.  There's
23  somebody here 24 hours a day seven days a week
24  every day of the year.

---

Page 354

1       Q.  So they just gave up?
2       A.  They just put me in Harrison and Kedzie.  I
3   guess they were gonna start doing it again the
4   next day.
5       Q.  Right, but I'm saying on the 10th of
6   January --
7       A.  Yeah, around midnight they gave up and took
8   me to Harrison and Kedzie.
9       Q.  They finally just stopped --
10      A.  Yeah.
11      Q.  -- after Papa and O'Brien and Washburn and
12  Rodriguez and everyone else had talked to you --
13      A.  And you forgot Fernando or Fernandez or
14  whatever the sergeant's name was.
15      Q.  Okay.
16      A.  Felipe, Salime (phonetic).  I'm sorry.
17      Q.  Okay, so at some point that night -- What
18  time that night did they shut it down?
19      A.  Around midnight.
20      Q.  And that was after a day of Papa and
21  O'Brien and Washburn and Rodriguez and everyone
22  else asking you questions and coming up with
23  scenarios about what could have happened?
24      A.  Yes, and there was a Salime in there I

---

Page 355

1   think was the name.  It was either Salome or
2   Salime.  I can't remember the exact name, but
3   there was somebody else in there.  He was a
4   sergeant.
5       Q.  Is that the guy that you've been referring
6   to as the sergeant?
7       A.  I believe so, Fernando Salime or something.
8   I don't know.  I think that's the name that Brian
9   Killacky had used as his brother-in-law.
10      Q.  All right, and you were returned to the
11  county jail the next morning is your testimony?
12      A.  I believe, yes.
13      Q.  And then four months later, about in April,
14  you were charged with the murders, right?
15      A.  No.  April is when -- April is when I was
16  charged with the murders, yes; but April is when
17  I was brought out of the county jail and
18  questioned again about the murders and not taken
19  back until the next day.  They kept me from the
20  9th and the 10th.  I didn't get here until the
21  11th.
22      Q.  And who brought you here when you came
23  here?
24      A.  Rodriguez and Washburn.

---

Page 356

1       Q.  And that's on the 11th of January?
2       A.  Yeah.
3       Q.  Okay, and when you guys left Homan Square
4   that night on the 10th, that was it with the
5   questions about the murders?
6           No more after that?
7       A.  Yeah.
8       Q.  Okay, and then --
9       A.  Well, no, there was a few on the ride here
10  the next morning.
11      Q.  Did you continue to say I'm not talking?
12      A.  Yeah, I continued, I want a lawyer, just
13  leave me alone, take me to county.
14      Q.  And then on April 12th you were again taken
15  from the jail to Homan Square, right?
16      A.  That was the first time I was taken from
17  the jail.  I was being held in the jail from
18  January 9th or 11th all the way up until
19  April 12th when they brought me out, and they
20  didn't bring me back until the 13th.
21      Q.  Understood.  That was not the best
22  question.
23          On April 12th you were taken from the
24  jail to Homan Square again?

---

89 (Pages 353 to 356)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 357

1    A. Yes.
2    Q. Okay, and they -- You were put in a room or
3  talked to Marko that day, right?
4    A. They brought him in. I think it might have
5  been that day. I just don't -- He's saying tell
6  them this is your shit. This ain't my shit.
7  You're fucking delirious. Leave me the hell
8  alone. Get him out of here.
9    Q. How long was that discussion with Marko at
10  Homan Square?
11    A. Maybe two minutes, if that.
12    Q. There was some discussion about a letter
13  you wrote to Marko.
14       Do you remember that?
15    A. Yeah. I offered -- I had information
16  about -- I didn't know if he did it or not at the
17  time, okay, when I wrote that letter. I didn't
18  know.
19       But I did know that the Cicero
20  Detectives, Sobczak and Bizerik, had been
21  arrested and charged with Federal corruption
22  charges, RICO Act and had been convicted. I
23  thought he needed to know about it.
24    Q. So you wrote a letter to Marko explaining

Page 358

1  what happened with the Cicero police?
2    A. Yeah. He was in the jail in that time
3  period. I didn't know he had been charged with
4  the murders. I didn't know -- Or yeah, I did
5  know he had been charged with the murders, but I
6  didn't know he was saying all this shit about me.
7  I said, look, you need to know about it.
8    Q. When did you send that to him?
9    A. I'm not exactly sure when it was. It could
10  have been in '99, '03 before I got out. Yeah, I
11  think it was '99 to '03 while I was locked up in
12  jail or the prison. I'm not sure if I did it
13  after.
14    Q. Do you have a copy of that letter?
15    A. No.
16    Q. When is the last time you saw it?
17    A. If it was in discovery -- It's been years.
18    Q. When is the last time you talked to Marko?
19    A. When did you say they brought him into
20  Holman and Fillmore? When did you say I talked
21  to Tomazovich at Homan and Fillmore?
22    Q. April 12th, 2004.
23    A. That's the date.
24    Q. Okay, do you know where he is?

Page 359

1    A. Nope.
2    Q. Now you testified here earlier that you
3  didn't know Dustin passed away.
4       When is the last time you spoke to
5  Dustin?
6    A. The last time would have been at the house.
7  I know I seen Lucy's brother Jamie, and he was
8  doing something with ladders and another friend
9  of his or a worker with siding on the back of
10  Marilyn's enclosed porch.
11       I'm not sure if Marilyn was watching
12  the kids that day or not. If she was, I played
13  with him or high-fived the kid or something.
14  That would have been about it.
15    Q. So that's pre-murder?
16    A. Yeah. I haven't talked to any of them
17  after.
18    Q. All right, you mentioned earlier when you
19  were being questioned, way earlier, like, toward
20  the beginning that --
21    A. This one?
22    Q. Yeah.
23    A. Okay.
24    Q. -- that there was a couple -- at least one

Page 360

1  occasion, maybe more than one occasion, where
2  Marilyn was trying to get Dustin to call you
3  Daddy Bill?
4    A. Yeah.
5    Q. And he had done that a couple times?
6    A. Yeah. The way he did it with his little
7  lisp, he talked kind of funny. He was a two year
8  old.
9    Q. Okay, did you ever become aware of a
10  forensic interview that was done with Dustin post
11  murder where he gave a statement implicating you
12  in the murders?
13    A. Yeah. I became aware of that, yeah.
14    Q. And do you remember how he identified you
15  in that statement?
16       And by that I mean, do you remember how
17  he referred to you?
18    A. How it happened in the interview?
19    Q. How he referred to you in that interview.
20    A. Bad man, I think. I'm not sure. I know
21  they were holding -- They took -- He wouldn't pay
22  attention to him.
23       So they took his candy away and said he
24  could have it back once he talk to him. I think

90 (Pages 357 to 360)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 361

1   it was with dolls or something he showed him.
2       Q. Do you know what name he called you by?
3       A. No, I don't.
4       Q. The last question I have I think --
5       A. With respect to that, can I say one thing?
6   I do know that Lucy had been married prior to
7   Kevin and me to somebody named Bill. I don't
8   know when exactly, but I think it was after
9   Dustin was born.
10      Q. All right, so I just want to make sure I
11  understand one thing you said earlier.
12          I know you've -- We've been over ad
13  nauseam the Marilyn giving you the documents to
14  try to prevent the marriage and you giving them
15  back.
16          But it sounded to me like you said that
17  in 1995, so post murders, you still had a picture
18  of Lucy in your wallet?
19      A. Yeah, I forgot it was there. It was
20  behind -- in between the plastic accordion thing.
21  It was in there behind some other pictures of
22  cars.
23      Q. And how did you find it?
24      A. The Cicero Detectives, Bizerik and Sobczak,

Page 362

1   went through my car when they came and arrested
2   me illegally in Indiana.
3       Q. And it just --
4       A. They searched my car illegally. They
5   didn't have permission. They went through the
6   car. My wallet was in the center console. They
7   pulled it out and went through it at the police
8   station.
9       Q. And it just so happened that there was --
10      A. It was still in there.
11      Q. -- a picture of Lucy still in your wallet
12  years after the murders?
13      A. Yeah, and a girl that I was dating a couple
14  years before Lucy, before I was with Lucy,
15  Antonia. I don't know her last name either.
16          She was carrying a kid that wasn't
17  mine, but I met her when the baby was six months
18  old. I still had that in there.
19          And I probably still had an old condom
20  from high school in there. You just put stuff in
21  your wallet, and it gets lost.
22      Q. Do you still have that picture or did the
23  police take it?
24      A. They took it. They took the whole wallet,

Page 363

1   everything.
2       MR. GAINER: All right, I don't have any
3   other questions.
4       THE WITNESS: And it was just the cut off
5   of the corner of a driver's license or a state
6   ID. I think it was a state ID.
7          Can we take a two-minute break before
8   you start?
9       MR. SULLIVAN: Certainly.
10          (Whereupon a recess was taken.)
11          (Whereupon, Dukes Deposition
12          Exhibit No. 8 was marked for
13          identification.)
14          (Document tendered.)
15          DIRECT EXAMINATION
16          BY MR. SULLIVAN:
17      Q. Mr. Dukes, my name is Sean Sullivan, and
18  I'm the attorney representing the municipality of
19  the town of Cicero, and so what I've tendered to
20  you marked as Exhibit 8, and I've given a copy to
21  your lawyer, is a criminal history report.
22          The first page, if you look at the
23  bottom, it's Bates stamped PFP000789, and it
24  consists of a few pages. So what I want to do is

Page 364

1   just kind of go through this because we talked
2   off and on throughout the questioning about your
3   prior criminal history.
4       A. Okay.
5       Q. We mentioned your juvenile arrest in
6   Florida with the allegation of sexual assault
7   that you characterized as sex with an older
8   woman, and you couldn't remember whether that was
9   dismissed or whether that was --
10      A. In Florida?
11      Q. Yeah, or not guilty. That was one --
12      A. That was thrown out.
13      Q. Okay, so it was dismissed, but we're going
14  to go through this because this reflects certain
15  data and certain arrests here in the State of
16  Illinois that I want to ask you about.
17          So the first thing I wanted to draw
18  your attention to is here it reflects that you
19  have a date of birth of --
20          If you look here under the name of
21  William R. Dukes, is your middle initial R?
22      A. Yes.
23      Q. And what does it stand for?
24      A. Ray.

                                    91 (Pages 361 to 364)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 365

1    Q. And is your birth date the 16th of December
2  1967?
3    A. Yes, it is.
4    Q. All right, now for privacy purposes, I
5  won't put this on the record, but do you see next
6  to that date of birth in the top column is a
7  Social Security number listed that has the last
8  four numbers of 2472?
9    A. Yes, I do.
10   Q. Read the whole -- The whole Social Security
11 number is listed there.
12       Is that your correct Social Security
13 number?
14   A. Read it out loud?
15   Q. No, no, no, I want you to read it to
16 yourself.
17   A. Okay.
18   Q. I'm only going to mention the last four so
19 we don't have to put your whole thing into the
20 record, but is this an accurate reflection of
21 your Social Security number?
22   A. Yes, and I see the other one underneath
23 that is the same. That's mine.
24   Q. Right.

Page 366

1    A. The one on the bottom I don't --
2    Q. Yeah, I'm not going to ask you about those
3  because if you see, they --
4    A. Well, that is mine. One of those is mine.
5  I don't know how that other one -- I might have
6  been under the influence on that arrest where
7  it's all different but the 348 --
8    Q. Mr. Dukes --
9    A. -- that's not mine. It's invalid.
10   Q. Okay, let's slow down and let me ask
11 because it will be easier for the court reporter.
12 So the first two columns --
13   A. I'm gonna get hit with that thing.
14   Q. The first two columns end in 2472, the
15 first two Social Security numbers listed.
16   A. Right.
17   Q. And they're the same.
18       That is your Social Security number,
19 correct?
20   A. Yes.
21   Q. Now the third column that begins with 348,
22 you're saying that is not your Social Security
23 number?
24   A. The 348 is or was, and it looks like the

Page 367

1  042427 of that number just -- I mixed it up. I
2  don't know if I had been drinking on that arrest
3  date or not.
4    Q. Okay, well, that's what I want to ask you.
5        Are you testifying you've had two
6  separate and distinct Social Security numbers?
7    A. Yes, sir.
8    Q. Okay, can you explain how that happened?
9    A. Yes, I can. My father was killed in a car
10 accident May 19, 1972, and my mother was left a
11 widow, three boys, me the oldest, under five, and
12 she lost the baby after me.
13       She somehow got on welfare and got me
14 in the Head Start Program that was starting at
15 the time, and she had to have Social Security
16 numbers.
17       So she got that for us to get into the
18 program and the welfare and the public housing,
19 and that's where I come up with the 411 -- no,
20 the 2472 number.
21   Q. Okay, for the record, it's the third one
22 listed in the column.
23   A. No.
24   Q. Yeah, the third, 2427 is the third number

Page 368

1  listed in the column.
2    A. Not that one. The 2472, that's my current
3  number now, and it was when I was four years old;
4  but when my grandmother, my dad's parents adopted
5  us and took us away from our mother in '81, I had
6  to get a work permit to get a job after school.
7        We were living in Florida at the time.
8  So they got us a Social Security number, 348,
9  where my grandmother and grandfather got that
10 when they put us on my grandfather's Social
11 Security disability.
12   Q. Okay, and just for the record, so I
13 understand, are you talking about the third
14 number listed in the column?
15   A. The fourth number.
16   Q. Okay, the fourth number?
17   A. 5307.
18   Q. Okay, so are you saying that the fourth
19 number listed that ends in 5307 is actually a
20 Social Security number for you at some time?
21   A. That was the first one I ever knew I had,
22 and I used that up until '95. I knew about it
23 since '81.
24       That was the first number I got to get

92 (Pages 365 to 368)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                              WILLIAM DUKES

Page 369

1    my high school work permit, and I used that as a
2    valid work up until I believe it was '95.
3        Q.  Okay, and then after 1995 at some point, is
4    that when you started to use the Social Security
5    number listed in the first two?
6        A.  Yeah, the 2472.
7        Q.  Okay.
8        A.  Because I had used my brother's Social
9    Security number and birth certificate to go get a
10   driver's license with his name and my picture.
11       Q.  Well, let me ask you about a specific
12   question then since you're saying the fourth
13   Social Security number listed in the criminal
14   history report here that ends in 5307 that you
15   utilized up until 1995.  That comes back to a
16   name that is listed as Dukes, Ronald R.
17           Do you see that?
18       A.  I see that.
19       Q.  Did you ever go by the name of Dukes,
20   Ronald R.?
21       A.  No, Ronald -- I used my brother's ID or
22   birth certificate and Social Security card to get
23   a driver's license with his name and my picture.
24       Q.  Okay, what's your brother's name?

Page 370

1        A.  Ronald E. Dukes.
2        Q.  Okay.
3        A.  And I got a ticket here I never went to
4    court for, and they suspended his license -- my
5    license with his -- his license with my picture.
6        Q.  All right.
7        A.  So when he moved to Indiana, it popped up,
8    and he had to get it straightened out.  So I went
9    to court and, look, I used his IDs.  I took the
10   responsibility for it.
11       Q.  But let me ask you a specific question.
12           Have you ever got a driver's license or
13   a Social Security card or any type of official
14   identification under a different name than
15   William R. Dukes?
16       A.  Other than my driver's license -- a
17   driver's license with my brother's name on it and
18   my picture, no.
19       Q.  Okay, so you did get an identification with
20   your picture but your brother's name on it?
21       A.  Yeah, I did.
22       Q.  And what state was that issued?
23       A.  Here, Chicago.
24       Q.  When?

Page 371

1        A.  License for bribe scandal, '94.
2        Q.  Okay, and when you did that, you --
3        A.  '95.
4        Q.  And when you did that though, you knew you
5    were getting a false identification so you
6    could --
7        A.  I did, yes.
8        Q.  All right, let me just direct your
9    attention here to the bottom of the square.
10           Do you see the language at the bottom
11   of the square that says Criminal Justice Summary:
12   Total Arrests:  14 (seven felony, five
13   misdemeanors) Total Convictions:  Six?
14           Do you see that?
15       A.  Yeah.
16       Q.  Does that sound like it's an accurate
17   summary of your criminal history?
18       A.  When did it end, '03?
19       Q.  I mean, you seemed to have had a remarkable
20   memory here today.
21           Do you recall being arrested for seven
22   separate felonies?
23       A.  Yeah.
24       Q.  Okay, and --

Page 372

1        A.  And I went to prison for most of them,
2    August of '99 to August of '03.
3        Q.  Well, you have some felonies that go back
4    to '87, don't you?
5        A.  Two, three, four -- Well --
6        Q.  We're going to turn the page.  I think it
7    will be easier.
8        A.  Yeah.  Four of them were the same thing,
9    part of the same check-writing spree, four
10   forgeries, and one was a burglary.  So that's
11   five of them right there.
12       Q.  What about the possession of the stolen
13   motor vehicle?
14       A.  That's six.
15       Q.  Okay, let's go --
16       A.  Two for the motor vehicles so that's seven.
17       Q.  Okay, let's go to the second page of this
18   document which was Bates stamped 790.  We'll go
19   up here on the top, and the top lists -- If you
20   look at the left here, it looks like case number
21   04CR0345601.
22           And it says -- To the right it says
23   parole date of 2011-06-07, discharge date of
24   03-June-2014, and do you see where it says

93 (Pages 369 to 372)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 373

1    conditions of parole: Drugs abuse PGM cond?
2          Do you see that?
3    A. Yeah.
4    Q. All right, is that 04CR0345601 case that's
5    listed there, that's the --
6    A. Drug possession.
7    Q. That's the guilty pleas that you entered as
8    a result of the 9-January-2004 arrest, isn't it?
9    A. Yeah. That's the one that I had no choice
10   to plead guilty to.
11   Q. Okay, but my question is --
12   A. I did plead guilty to it, yes.
13   Q. Well, I'm going to ask that question just
14   so we have a clean record. We've had a lot of
15   questions from all the counsel about your arrest
16   on 9-January-2004.
17         And you've testified that you listened
18   to certain tapes that were -- that included your
19   voice and included Mr. Killacky who, at the time,
20   you thought was non-law enforcement civilian that
21   you were engaging with for certain drug
22   transactions; is that right?
23   A. Yes.
24   Q. And so those tapes that you listened to, I

Page 374

1    believe you testified it was on -- I could be
2    wrong, but I thought you said it was
3    10-January-2004 when you listened to them.
4          Those tapes are playing your voice
5    engaging in or agreeing to drug deals with
6    Killacky; is that correct?
7    A. Agreeing to make a phone --
8    Q. Correct.
9    A. Agreeing to make a phone call to have
10   somebody bring the drugs for Killacky that he was
11   buying.
12   Q. Yeah.
13         In other words, you were agreeing to
14   assist Killacky to buy -- to purchase cocaine,
15   correct?
16   A. So I could get high with him, yes.
17   Q. But my question was: You were agreeing to
18   purchase cocaine for Killacky, right?
19   A. In an attempt to -- Yes, in an attempt to
20   get high myself.
21   Q. Okay, but you heard yourself on the tape.
22         You heard yourself talking with
23   Killacky, and you're the one agreeing to get the
24   cocaine, to find another person to buy the

Page 375

1    cocaine, right?
2    A. He asked me to call the guy; and I said,
3    yeah, I'll give him a call.
4    Q. Okay, and when you testified earlier about
5    listening to yourself on the tape and then
6    putting your head down, what you meant by that is
7    you realized now that law enforcement had you on
8    tape agreeing to purchase narcotics with
9    Killacky, correct?
10   A. Correct.
11   Q. And you said at the time you realized you
12   were on parole when you listened to those tapes,
13   correct?
14   A. Yes.
15   Q. What were you on parole for?
16   A. That was the August '99 to August '03
17   possession of stolen motor vehicle, a burglary,
18   and some other minor stuff -- some other stuff.
19   Q. All right, and the reason why I'm asking
20   this is because this case, the 04CR345601 that
21   we're talking about, you pled guilty in front of
22   a Judge here in Cook County; is that correct?
23   A. Yeah.
24   Q. And you were represented by the Public

Page 376

1    Defender at the time?
2    A. Yes.
3    Q. So you were represented by counsel when you
4    made a decision that you were going to
5    voluntarily enter a guilty plea in court to the
6    charges that were set forth within that case,
7    correct?
8    A. Technically you're correct. I was
9    represented by counsel. I don't consider a
10   Public Defender counsel because they don't care.
11   Q. Okay, but my question was at least with
12   this guilty plea, you had had the benefit of
13   representation by a lawyer, correct?
14   A. It would have had the appearance of that,
15   yes.
16   Q. Okay, and you appeared in court in front of
17   a Judge, correct?
18   A. Yeah, a former State's Attorney -- I mean,
19   a former -- a Judge, yes, yes, yes.
20   Q. And the Judge entered into a colloquy with
21   you on the record in which she asked whether you
22   were pleading guilty because you were actually
23   guilty?
24   A. Yes.

94 (Pages 373 to 376)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 377

1    Q.  And you testified under oath in that plea
2    colloquy to the Judge that yes, you were, in
3    fact, guilty of the charges that set forth
4    relating to the drug charges and the weapons
5    charge, correct?
6    A.  There was no weapons charge.  It had been
7    dismissed because I never touched the gun.
8    Q.  Okay, so you pled to the drugs?
9    A.  One drug delivery, yes.
10   Q.  And you got 15 years confinement; is that
11   right?
12   A.  Yes.
13   Q.  And the reason why I asked that question is
14   I was getting a little confused when I looked at
15   the calculations of time that you're alleging you
16   spent in prison as a result of your allegations
17   that the murder convictions were wrongful
18   convictions.  So that's what I was getting
19   confused on.
20        Do I understand correctly that after
21   you were arrested on 9-June-2004, you were held
22   in pretrial confinement at the Cook County Jail
23   until you entered your guilty plea on the drug
24   charges?

Page 378

1        Isn't that right?
2    A.  I entered my guilty plea on the drug
3    charges in 2007.  I wasn't sentenced until 2010.
4    I didn't go to IDOC until late 2010.
5    Q.  But what I'm getting to is while you were
6    waiting for your case to be called that ended in
7    the guilty plea to the drug charges, you were
8    being held on pretrial confinement here at the
9    Cook County Jail, correct?
10   A.  By the time I went to trial on the charges
11   for the murder case, this case was done.
12   Q.  Yeah, my question is this:  Were you held
13   at Cook County Jail from 9-January-2004 through
14   the date you entered your guilty plea on the drug
15   charges?
16   A.  Yeah.  Yeah.  Yeah, I was.
17   Q.  You didn't get bond, right?
18   A.  No.
19   Q.  Okay, and then you pled guilty to the drug
20   charges?
21   A.  I had a bond on this.  I didn't have a bond
22   on -- I couldn't make bond because I had no bond
23   on the murder charges.
24   Q.  But you pled guilty to the drugs charges

Page 379

1    and got a 15-year sentence, correct?
2    A.  Right, because I was told if I didn't, I'd
3    get 45 years.
4    Q.  Okay, but my question -- Am I correct?
5        Did you plead guilty and get 15 years?
6    A.  Yes.
7    Q.  Was that a negotiated plea that your lawyer
8    advised you that the State was going to cap it at
9    15 years if you entered the guilty plea?
10   A.  The Judge said he'd give me 15 years if I
11   pled guilty to the one charge.  I was told the
12   Judge would give me 45 years if I didn't take it,
13   and all three of them would be tried separately.
14   Q.  So after you took that information, you had
15   the opportunity -- You were still represented by
16   counsel, right?
17   A.  Yeah.
18   Q.  And then you made the decision in court to
19   voluntarily plead guilty to the drug charge, and
20   you got a 15-year sentence, right?
21   A.  Yeah.
22   Q.  Okay, so my question then is:  This
23   discharge date that's reflected here at the top
24   where it says IDOC and then next to that case

Page 380

1    3-June-2014, that's the discharge date where
2    you're discharged from the sentence that you
3    received with regard to the felony drug charge
4    that you pled guilty to, isn't it?
5    A.  No.  That's the day I was released from
6    custody right there, 6-7-2011.
7    Q.  I'm looking --
8    A.  I didn't have any contact with IDOC after
9    that.
10   Q.  I'm at the top here (indicating).  I'm
11   still at this top box here (indicating).
12   A.  That's where I'm at.
13   Q.  And we see where it says parole date,
14   2011-06-07, right?
15   A.  That was my release from custody.
16   Q.  Okay, and the discharge from the actual
17   15-year sentence was 3-June-2014, correct?
18   A.  It should have been -- That's what it says,
19   yes.
20   Q.  Okay, and did you do your time at
21   Stateville?
22   A.  No.
23   Q.  You didn't do any time there?  Okay, I
24   apologize.  This says the next block down

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 381

1    Stateville.  It says a received date of
2    28-August-2010, a discharge date of 3-June-2013.
3            Did you do time at Stateville during
4    that timeframe?
5        A.  No.  There was a court order that I could
6    not be at Stateville because David Martin worked
7    there.  He was the original suspect in the
8    murder.
9            And they felt -- The Judge on the
10   murder case had it not to be at Stateville.  The
11   Public Defender got that out of the Maywood Court
12   on this murder case that I could not be housed at
13   Stateville.
14           I had to go to PC.  I stayed at
15   Pontiac.  I did not get discharged from
16   Stateville.
17       Q.  Okay, so you were at Pontiac?
18       A.  Pontiac.  I was released from Pontiac.
19       Q.  Okay, let's go down to the bottom portion.
20   It says arrest here on this page, and I'm still
21   on 790.  It has an arrest address of 2045 West
22   17th Avenue in Melrose Park.
23       A.  Where?
24       Q.  Right here (indicating), the arrest, bottom

Page 382

1    portion, 9-January-2004, arrest address 2045 West
2    17th Ave, Melrose Park, Illinois.
3        A.  Is that on the next page?
4        Q.  No, it's on this second page.  You've got
5    page two of eight.  Go down here (indicating) to
6    the bottom, the bottom block that says arrest.
7            Do you see arrest?
8        A.  Oh, okay, January 9, '04.
9        Q.  Right.
10       A.  Okay, I see it now.
11       Q.  Is that the actual address in Melrose Park
12   where you were arrested?
13       A.  I believe so.
14       Q.  Okay, and that was when you still thought
15   Mr. Killacky was a civilian that you were engaged
16   with the drug sales that you eventually pled
17   guilty to, correct?
18       A.  Correct.
19       Q.  All right, if you look at the arrest charge
20   description, you see there's a UUW weapon felon
21   possession use of firearms.  You were charged
22   with that.
23           Is it your testimony, do I understand
24   you correctly, that that charge was dismissed?

Page 383

1        A.  Yes.
2        Q.  Okay, let's go to the next page.
3            Again, top of page three where it says
4    -- Are you at the next page with me, sir?
5        A.  Yeah, three of six.
6        Q.  Okay, and where it says court charges and
7    disposition, this, again, it reflects the drug
8    charge that we were just talking about.  As you
9    look at this sentence, it says the sentencing
10   date was 25-August-2010.
11           That was the date you pled guilty and
12   were sentenced to the 15 years, correct?
13       A.  This one here?
14       Q.  Yeah, as you're looking at it, it says
15   sentence Illinois Department of Corrections, 15
16   years?
17       A.  Yeah.
18       Q.  All right, do you see to the right where it
19   says disposition date 25-August-2010, sentence
20   date 25-August-2010?
21       A.  Yeah.
22       Q.  Okay, does that ring a bell?
23       A.  Yeah.
24       Q.  All right, so that's when you pled guilty

Page 384

1    to the drug charges?
2        A.  I pled guilty in 2007.  August of 2010, on
3    this date 25th of August 2010 is when I was
4    sentenced.
5        Q.  So you pled guilty and there was a
6    three-year delay in your sentencing.
7            Is that your testimony?
8        A.  Yes, there was.  Yes, it is.
9        Q.  Okay, all right, let's look at -- Let's go
10   down to the next block here because I just want
11   to ask you about some of these arrests, okay.
12           Do you see the next arrest block?  It
13   says arrest date 3-January-2004?
14       A.  Yeah.
15       Q.  And this is -- And then it lists, like,
16   multiple driving violations.  If you can see on
17   the arrest charge description it has driver's
18   license permit, failure to carry display,
19   insurance violations, DUI alcohol, that type of
20   thing.
21           Do you remember that arrest?
22       A.  Yeah.
23       Q.  Okay, what was the result of any of those
24   charges?

96 (Pages 381 to 384)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                      WILLIAM DUKES

Page 385

1        Do you know?
2        A.  I think they were all dismissed.
3        Q.  Okay, let's go down towards the next block
4    that says arrest, and it has an arrest date of
5    October 5th, 2003.
6        Do you see that?
7        A.  Yep, dismissed I believe.
8        Q.  Let me just finish, sir.  It says the
9    arrest address was at 2257 North Kostner Avenue
10   in Chicago.
11       Were you living at 2257 North Kostner
12   Avenue on 5-October-2003?
13       A.  Yep.
14       Q.  Because the charge is battery causing
15   bodily harm, and I just want to ask you about
16   that incident.
17       What was the incident that resulted in
18   you being arrested for battery causing bodily
19   harm on 5-October-2003?
20       A.  I don't remember.  I went to court and it
21   was dismissed.
22       Q.  Do you recall who you -- Was there some
23   sort of fight in the residence that you lived in?
24       A.  It wasn't in the residence, no.  It was

Page 386

1    something out in the street.  I can't remember.
2        Q.  You have no memory whatsoever of being
3    arrested for battery in October of 2003, anything
4    about that arrest or the circumstances?
5        A.  December 31st, '03?
6        Q.  No, 5-October-2003.
7        A.  Oh, 5 of October.
8        Q.  Right.
9        A.  Oh, that's when it was dismissed.
10       Q.  The arrest date is 5-October-2003.  The
11   arrest charge and description says battery
12   causing bodily harm.
13       Do you have any memory of that arrest?
14       A.  No, I don't recall it.  I'm not saying it
15   didn't happen.  I just don't remember it.
16       Q.  Do you know how many times you've been
17   arrested for battery?
18       A.  This one?  It would probably be two.
19       Q.  Okay, well, let's go to the next page if
20   you have no memory on the October 3rd arrest.
21   Let's go to the next page.
22       The arrest at the top of page four of
23   five, if you look at it, it says this is an
24   arrest on 21-August-1999.  The arrest address is

Page 387

1    6415 North Rockwell.  It says theft control of
2    stolen property, receive possession of a stolen
3    vehicle.
4        Do you see that under the arrest
5    description?
6        A.  Yeah.
7        Q.  And those are both -- One is a Class 4
8    felony.  The other was a Class 2 felony.  All
9    right, so you were arrested on August 21st of
10   1999, and it looks for being in possession of a
11   stolen vehicle.
12       Is that accurate?
13       A.  Yes, it is.  I remember it.  I had their
14   truck.  It was Balatti Glass.  I don't know how
15   to spell it.  It's a stained glass window repair
16   company in Evanston.
17       Q.  And why were you arrested for being in
18   possession of a stolen property or vehicle?  Tell
19   me about that.
20       What's your understanding of what the
21   underlying basis for this arrest was?
22       A.  I had their truck, and I didn't have
23   permission to have it.
24       Q.  Well, how did you get their truck?

Page 388

1        A.  I had been drinking.  I had walked past and
2    seen it had keys in it, and I jumped in it and
3    drove off.
4        Q.  Did you work for the glass company at the
5    time?
6        A.  No.
7        Q.  Okay, so you stole the truck?
8        A.  Yeah.  I was gonna use it to go somewhere
9    and come back.
10       Q.  And my question was:  Did you steal the
11   truck?
12       A.  Yeah, joy riding, went to use it.  I know
13   it's the legal definition of theft.  So yeah, I
14   stole it.
15       Q.  Okay, and that resulted in case number
16   99CR20091 that is reflected below that on the
17   right?
18       A.  Yes.
19       Q.  And it says convicted.  You were sentenced
20   to the Illinois Department of Corrections.  It
21   says nine years.
22       Is that correct?
23       A.  Yes.
24       Q.  Okay, and the disposition date reflects 29

97 (Pages 385 to 388)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 389

1    June of 2000.  The sentencing date was 29 June of
2    2000.
3          So is this accurate?
4          Were you sentenced to nine years in
5    prison on 29-June-2000?
6    A.  Yes.
7    Q.  All right, if you go below that, so is this
8    the charge -- So this is the charge for which you
9    were on parole on 9-January-2004 when you were
10   arrested for the drug sales, correct?
11         If you see what I'm asking you about,
12   the stolen vehicle where you got sentenced to
13   nine years and you were sentenced --
14   A.  Yeah, yeah.
15   Q.  -- on 29-June-2000, what I'm saying is this
16   is the charge that you were on parole role for.
17   A.  Yes.
18   Q.  Okay, got it.
19   A.  One of them.
20   Q.  Right, got it.  That's right because we're
21   going to get to the next one, and the next one
22   was the charge of burglary which was the second
23   charge relating to the theft of that glass
24   company vehicle because that disposition date was

Page 390

1    also 29-June-2000, same case number, same
2    sentence, correct?
3          So you had a couple charges based upon
4    that arrest; is that accurate?
5          You can see the next charge.  You can
6    see --
7    A.  I see the numbers are the same, but the
8    burglary was National Salad Oil when I went to
9    his garage and took his chewing tobacco out of
10   the garage of his house in Skokie versus the
11   stolen motor vehicle being the Evanston
12   possession of stolen motor vehicle.
13   Q.  Well, let me ask you about that because as
14   we're looking at page four of eight under the
15   charge of burglary, it's got the same case
16   numbers, if you look, as the case number for the
17   stolen vehicle charge, and it was also -- it also
18   has the same disposition sentencing date.
19         So let me ask you this:  When did you
20   get charged with burglary for breaking into your
21   boss' house from National Salad Oil -- the
22   National Salad Oil job?
23         What year was that?
24   A.  It would have been around the same time,

Page 391

1    '99.
2    Q.  Okay, so --
3    A.  Maybe early 2000.  I don't know.
4    Disposition date 2000, it would have been -- This
5    is disposition and sentencing date.
6    Q.  That's correct.
7    A.  That isn't the arrest date.
8    Q.  No, we've already talked about that.
9    A.  I think they might have just imposed the
10   number somehow.
11   Q.  But if you go back to the top of this page
12   four of eight, the arrest date is 21-August-1999,
13   and this has an arrest location of 6415 North
14   Rockwell Street in Chicago.
15         Do you see that at the top of the page?
16   A.  Yeah.
17   Q.  What was your relationship to 6415 North
18   Rockwell Street on 21-August-1999?
19         Were you living there?
20   A.  No.  That's where they pulled me over in
21   the stolen truck.
22   Q.  Okay, where it says residence, 607 Lake
23   Street in Evanston, Illinois --
24   A.  Homeless shelter.

Page 392

1    Q.  Okay, gotcha.
2          So were you homeless in August of 1999
3    and living at that shelter in Evanston?
4    A.  August of 1999, yes.
5    Q.  Okay, how long had you been homeless by
6    August of '99?
7          Can you give me a period or timeframe
8    where you were homeless?
9    A.  A couple weeks.
10   Q.  Okay, let's go down to -- There's an arrest
11   that's listed here under the name of -- In the
12   middle of the page under the name of William R.
13   Lockhart, and it's a 9-July-1999 arrest.  The
14   arrest charge is for unauthorized -- It's theft
15   unauthorized control.
16         Did you ever go by the name of William
17   R. Lockhart?
18   A.  No, I lived with my aunt.  Her last name
19   was Lockhart, and her my Uncle Ricky, their last
20   name was Lockhart, and I lived with them.  I
21   never gave them my name as William R. Lockhart.
22   Q.  Did you ever have an identification that
23   provided a date of birth of November 16th, 1967?
24   A.  Nope.  It was always December.

98 (Pages 389 to 392)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                    WILLIAM DUKES

---

**Page 393**

1  Q. Okay, so the reason why I'm asking about
2  this is this arrest that's reflected here, do you
3  think that's just a non-accurate data entry that
4  has nothing to do with you?
5  A. The name and the birth date? Yeah. It's
6  just a typographical error, a mistake. They got
7  something superimposed on the other one when they
8  were doing it, And I did the theft and
9  unauthorized control.
10  Q. You did?
11  A. Yeah.
12  Q. That's reflected here under case number
13  1999 --
14  A. I pled guilty to it and got 20 days in
15  jail, time served.
16  Q. Okay, Mr. Dukes, tell me about that.
17  What did you take?
18  What was the theft about?
19  Where did it happen?
20  Just explain for the record what that's
21  all about.
22  A. The guy that lived in the building I lived
23  in, me and him were riding around. We were going
24  to a barbecue.

---

**Page 394**

1  They asked us to go get some charcoal
2  up on Halsted and 35th Street in that area. We
3  go and get it. He turns down a side street next
4  to a liquor store that we knew sold charcoal, and
5  there was an open spot that he got parallel park
6  in.
7  And when he backs up to park, he hits
8  the car that was in the back of him parked at the
9  street already, and the car that was behind him
10  was a Chicago police car.
11  They ended up taking him to jail. He
12  told me to take the car; and if he wasn't out by
13  Tuesday, just sell it and keep the money he owed
14  me. He owed me $150.
15  Well, I didn't know it but the car --
16  It had the title and everything in the car, and
17  it was signed off, but it was his brother's car
18  that they gave him.
19  Q. Okay, so this charge of theft relates to --
20  They charged you with the theft of a motor
21  vehicle that was really the brother's car and not
22  your friend's car?
23  A. Right.
24  Q. And you pled guilty to that theft and got

---

**Page 395**

1  25 days as a sentence?
2  A. Yeah, because I had a choice of fighting it
3  and beating the case, but that would have took
4  months or just going home that day with time
5  served.
6  Q. And that's -- Again --
7  A. It was a misdemeanor. So I took the time
8  served and got out of there.
9  Q. Okay, this arrest description and charge
10  reflects that that's a 1999 conviction.
11  Underneath that, again, there's a name listed on
12  this criminal history report that has Dukes,
13  Donald R. and a date of birth of 04-January-1970,
14  and the arrest description is defacing or
15  damaging of property on the 27th of December
16  1994.
17  Does that arrest have anything to do
18  with you, the name listed as Ronald R. Dukes?
19  A. The name listed is Ronald R. Dukes.
20  Q. I apologize. Ronald. You are correct. My
21  eyes.
22  A. And 11 East --
23  Q. Yeah, the arrest address is 11 East 11th
24  Street in Chicago. The arrest date was

---

**Page 396**

1  20-December-94.
2  Do you recall -- I mean, does this --
3  A. No.
4  Q. Okay, let's go to the next page.
5  A. Hang on. 27th of December, I went and
6  turned myself in to 11th and State Police Station
7  because I had a warrant in my brother's name for
8  not going to traffic court.
9  Q. In December of 1994 you did that?
10  A. Yes.
11  Q. Okay, let's go to the --
12  A. And I guess that's what they put down as
13  the charge, and then that was it.
14  Q. Okay, I'm not going to go through this.
15  You'll see on this next page, which is at the
16  bottom it's PFP793, there's multiple misdemeanor
17  arrests that are reflected here.
18  There is at the top -- We'll go right
19  from the top there's a traffic ticket it looks
20  like from '93.
21  A. This (indicating) one?
22  Q. If you look at the top. We'll just go
23  through it.
24  A. Okay.

---

99 (Pages 393 to 396)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 397

1    Q.  Do you recall any sort of warrant in
2  November of '93?
3    A.  It wasn't a warrant.  I had my cousin's
4  car, and we were at the races, and I used his
5  car.  We was supposed to go back in the alley
6  behind the incinerator.  I don't know if it's
7  still there, but that's what we called it, the
8  incinerator, and they had street races.
9        I used his car to pull in the alley to
10 go to the bathroom, and somebody -- When I got
11 back in the car, somebody run up to the car and
12 stuck a gun, and I took off.
13   Q.  Okay, because if you look at this -- Almost
14 everything on the next five or six entries --
15   A.  It's all the same.
16   Q.  I was just gonna -- Yeah, so you saw that,
17 all reflecting a disposition date of
18 17-November-1993.  So these are either traffic
19 offenses, it looks like, or misdemeanor offenses.
20      Do you recall what the ultimate -- Did
21 you have to plead guilty or were you sentenced to
22 anything on any of these?
23   A.  My cousin dropped the charges --
24   Q.  Okay, if you --

Page 398

1    A.  -- cuz --
2    Q.  Okay, I'm sorry.
3    A.  My cousin dropped the charges because they
4  seen -- Once they got to the car, they seen the
5  vinyl top was fluffed up because shotgun pellets
6  had went through it, and the windshield was
7  busted because shotgun pellets had barely missed
8  my head.
9    Q.  Okay, but if he dropped the charges, we can
10 move on.  Let's go down to the bottom of the page
11 where it says, again, your name, Dukes, William
12 R.
13      The event date is 8 August of '94.  The
14 arresting agency was the Evanston Police
15 Department, and then it lists 2951 North Honore
16 Ave in Evanston, Illinois.
17      And then we go to the next page and
18 it's for -- reflects that it's for receiving a
19 stolen motor vehicle.  So if you go to the next
20 page, six of eight, at the top it says the charge
21 is receiving PSMV, possession of stolen motor
22 vehicle.
23      If you look at the disposition it says
24 plead guilty, finding of guilty, and the

Page 399

1  disposition date was October 14th of 1994.  It
2  says convicted.  I'm right at the top of six of
3  eight.
4    A.  I know.  That's the --
5    Q.  And it's got a '94 case number 94C220534.
6        So do you see that?
7    A.  Yeah, I do.  That goes to the nine-year
8  possession of stolen motor vehicle.  It goes back
9  to that.  That's what this is.  I violated
10 probation and they sentenced me here.
11   Q.  This is a '94 case though.  This is an
12 arrest.  If you go back to the previous page, it
13 says the arrest was 8 August of '94 in Evanston,
14 Illinois relating to a charge of possession of a
15 stolen motor vehicle.
16      So in 1994, is this a separate stolen
17 motor vehicle case?
18   A.  I got probation, and I violated the
19 probation years later, and then they sentenced me
20 here on that violation of probation.  They went
21 ahead and sentenced me on the stolen motor
22 vehicle nine years concurrent with the other
23 stuff.
24   Q.  Okay, so this 1994 -- This arrest in '94

Page 400

1  for the possession of motor vehicle, what you're
2  saying is the 1999 case in which you got nine
3  years was when they violated you on the '94
4  probation?
5    A.  Yes.
6    Q.  All right, the next block down is an
7  October 3rd, 1993 arrest.  The arrest address is
8  22 -- excuse me, 220 West Pershing Road in
9  Chicago, Illinois, criminal trespass to vehicle,
10 case number 93363725.
11      Do you have any recollection of that?
12   A.  Nope.
13   Q.  All right, underneath that is a 1991
14 arrest, 27-August-1991 arrest.  The arrest
15 description is for false impersonations.
16   A.  Forgeries.
17   Q.  Okay, tell me about that because we can see
18 that there's a -- you pled guilty to that and you
19 got -- it says you were sentenced to two years in
20 the Illinois Department of Corrections.
21      Is that correct?
22   A.  Yes.
23   Q.  Okay, so tell me about this 27-August-1991
24 arrest that has to do with the forgeries.

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                         WILLIAM DUKES

Page 401

1     What do you mean by forgeries?
2     A. I made checks that weren't mine. They were
3  a company I worked for. I had blank checks, and
4  I filled them out and cashed them at Currency
5  Exchanges under my name trying to get money.
6     Q. Okay, so let's talk about -- What was the
7  name of the company you were working for from
8  which you took the checks from, the blank checks
9  from?
10    A. Olive Can Company when they bought out
11  another company called Wisconsin Can Company.
12    Q. Did you say olive?
13    A. Olive.
14    Q. Okay, and where was Olive Can Company
15  located?
16    Where were you working at the time?
17    A. Harwood Heights, Illinois.
18    Q. And what was your job for Olive Can Company
19  in August of '90 -- well, in 1991?
20    A. Forklift operator and anything that nobody
21  else wanted to do.
22    Q. When did you start to work for the Olive
23  Can Company?
24    A. May.

Page 402

1     Q. So would it be approximately May -- And I
2  won't hold you to it, but approximately May of
3  1991 is when you started to work for the Olive
4  Can Company as a forklift operator?
5     A. Yeah, approximately.
6     Q. How did you get access to company checks?
7     A. They bought out another company on the
8  south side, and I was over there cleaning it up,
9  and I found an empty box.
10    I thought it was an empty box. While I
11  was sweeping and when I pushed it with a broom,
12  it snapped the broom because it was so heavy, and
13  it was a box full of check stubs and checks all
14  perforated like an accordion to be fed through a
15  machine, a printer.
16    Q. And what was the name of the company that
17  you were cleaning up?
18    A. Wisconsin Can Company was owned now by
19  Olive Can Company. They were selling the
20  building. I just had to clean it up.
21    Q. Okay, so the checks were from?
22    A. Wisconsin Can Company.
23    Q. Okay, and they were blank checks?
24    A. Yes.

Page 403

1     Q. How many checks did you actually forge and
2  cash?
3     A. Approximately 10 or 12.
4     Q. And do you know what the total amount --
5  the dollar amount was for the monies that you
6  received from the 10 to 12 forged checks that you
7  cashed?
8     A. $3,400.
9     Q. Okay, and were you going to a Currency
10  Exchange and presenting these to get money?
11    A. Yes, several.
12    Q. Several Currency Exchanges?
13    A. Yeah, I was using it to get money to --
14  First my grandmother -- The woman that raised me
15  was dying. She was in a coma, and I wasn't doing
16  very good. So I started using drugs and drinking
17  a lot.
18    Then they told me she was out. She was
19  in a coma at the house, and I needed money to get
20  down there. So I cashed a few more checks. I
21  only cashed one for alcohol and drugs.
22    Q. What drugs were you using in --
23    A. Cocaine and alcohol.
24    Q. -- May to -- I guess it would be May to

Page 404

1  August?
2     A. Not May to August. This I did at the end
3  of July, the first checks.
4     Q. July 1991?
5     A. Yeah, she died July 30th, 1991.
6     Q. Were you fired from your job because of
7  this?
8     A. Yes, after.
9     Q. Okay, and so --
10    A. I didn't go back to work after she died. I
11  spent two weeks --
12    Q. Let me ask you. You said you were
13  utilizing cocaine at this time.
14    How often were you utilizing cocaine
15  during the July to early August of 1991
16  timeframe?
17    A. Daily.
18    Q. And when you say daily, can you tell us --
19  I mean --
20    A. A couple hundred dollars a day.
21    Q. Okay, and how many instances would that be?
22    Is that -- Is that a use amount of five
23  times per day, ten times per day?
24    A. Back then?

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                     WILLIAM DUKES

Page 405

1    Q. Yes, sir.
2    A. Continuous.
3    Q. You were continuously using?
4    A. I had enough to keep me going all day.
5    Q. Okay, and this is in the July/August
6    timeframe of 1991?
7    A. Late July of, yeah, '91.
8    Q. Okay, because if I remember correctly, you
9    know, how long -- I mean, from August of '91
10   through '92 through '93, how often would you be
11   using cocaine during those years?
12   A. Say that again?
13   Q. You've testified earlier to responses to
14   numerous questions that in August of 1993 -- in
15   the summer of 19 -- May, June, July, I won't
16   quote you exactly, but you admitted that you were
17   using cocaine at the time.
18   A. Yeah. That was off and on maybe once a
19   week, once every couple weeks.
20   Q. And so that's what I wanted to ask you.
21   You just testified that you were using it on a
22   daily basis in August of '91.
23       So did you continue to use cocaine
24   occasionally, weekly, through '91, '92 and '93 or

Page 406

1    was there any time --
2    A. '92 I was in prison. The August 27th of
3    '91 through January 4th of 1993 I was
4    incarcerated and no drugs, no alcohol; and when I
5    got out, I didn't.
6    Q. And so we have a clear record, you were
7    incarcerated during that period as a result of
8    the sentence that you were given because of the
9    forgeries that you just talked to us about,
10   correct?
11   A. Correct.
12   Q. Okay, what were the dates that you were in
13   prison again in '91 and '92?
14   A. August 14th, 1991 -- Looking at the next
15   arrest date, August 14th '91 through January 4th
16   '93.
17   Q. Okay, all right, and let's go down. We'll
18   go to that. So you see an arrest date of
19   August 14th of 1991, and the next page -- I'm
20   sorry.
21       This is the bottom of Bates stamped
22   PFP000794. That has an arrest date of
23   14-August-91. I gotcha, and on the top of the
24   next page is for the forgeries.

Page 407

1        So that's where you were arrested on
2    14-August-91 for the checks and the forgery that
3    we just discussed, correct?
4    A. Right. On August 14th I was arrested and
5    then taken to whatever police station.
6    Q. Gotcha.
7    A. And then they pulled me out of the County
8    and took me to, I believe it was, Harrison and
9    Kedzie and charged me with this one.
10   Q. Yeah, but let me ask you. I guess I
11   probably should just ask you this. I mean, you
12   pled guilty to the forgeries because you were
13   guilty, right?
14       You did it?
15   A. Yes.
16   Q. I mean, every guilty plea that's reflected
17   here that we're going through, you pled guilty
18   voluntarily with advice of counsel because you
19   knew you did the felonies, correct?
20   A. Pretty much, yes, or I was involved in it
21   in some way like the drug case with Killacky.
22   Q. So let's go to the next arrest date that I
23   have listed here, and the bottom of the page is
24   PFP000795. The top starts with forgery.

Page 408

1        So you see -- Do you have the page that
2    starts with forgery?
3    A. Yeah.
4    Q. All right, so let's go. It says you've got
5    an arrest date here of 5-June-91, okay?
6        And it says the arrest address is 3741
7    West Belmont, and the arrest charge is criminal
8    sexual abuse, okay?
9    A. Okay.
10   Q. Do you see that?
11   A. Yeah.
12   Q. Tell me about that.
13       What was your 5-June-1991 arrest for
14   criminal sexual abuse related to?
15   A. I thought this one got dismissed. I guess
16   it didn't.
17   Q. Well, when you say this one, you're
18   referring to, for the record --
19   A. She was discussing one earlier.
20   Q. Mr. Dukes, just let me make the record.
21       When you're saying this one, what
22   you're referring to is the arrest on 5-June-1991
23   for criminal sexual abuse that is reflected in
24   the top of Bates stamp number 795, correct?

102 (Pages 405 to 408)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 409

1    A. Yes.
2    Q. Okay, the arrest address was 3741 West
3  Belmont, and the charge is a felony. It's a
4  Class 1. It says criminal sexual abuse.
5       And before we get to the court
6  disposition, which reflects that you pled guilty
7  to it, I want to ask you what do you recall about
8  the facts and circumstances of what occurred at
9  3741 West Belmont that resulted in you being
10 arrested for criminal sexual abuse?
11   A. This is the girl we dropped off at the bus
12 stop; and when we went to turn around and came
13 back, she was passed out at the bus stop, and we
14 were gonna try to help her take her to her house,
15 all the way to her house; and the people come out
16 of the factory and just call the police.
17   Q. Okay, what was that young woman's name?
18   A. I don't know. She questioned me about this
19 earlier. I thought it was dismissed.
20   Q. Do you recall anything about the
21 allegations, anything about the charge that made
22 it come under the characterization of criminal
23 sexual abuse?
24       Were you charged with fondling this

Page 410

1  girl in the back seat?
2       Were you charged with --
3    A. I never got in the back seat with her.
4    Q. Did you ever touch her?
5    A. Other than under the arm to help her up to
6  help her to the car. I never touched her
7  inappropriately in any way sexual.
8    Q. Do you have any other memory as to what
9  happened in you being charged with
10 criminal sexual abuse on 5 June of 1991?
11   A. No.
12   Q. You don't even remember her name?
13   A. No. She said a name and I didn't remember
14 it. It was a girl we picked up we met at a bar.
15 We met a couple of them.
16       We dropped one off and then we were
17 taking the other one and gonna drop her off. She
18 said just drop her off at this bus stop, and we
19 did.
20   Q. Well, let me ask you. Under the arrest
21 name it's Dukes, William R.
22       Were you going by the name of William
23 R. Dukes on 5-June-91?
24   A. That's my name.

Page 411

1    Q. Yeah, and 16-December-67 is the date of
2  birth?
3    A. That's my birth date.
4    Q. Okay, gotcha.
5       Do you recall 3741 West Belmont,
6  Chicago, Illinois?
7       Were you at or near that area?
8    A. That's the general area where we dropped
9  that girl off at the bus stop on Belmont.
10   Q. Well, this has -- Under the court charge
11 and disposition, this has you pleading guilty and
12 a finding of guilty on 19-September-1991 and
13 getting a sentence of jail, three months, two
14 days.
15       So that tells me that's Cook County
16 Jail time and not IDOC time. I could be wrong
17 but --
18   A. No, that's what it is. It's three months
19 and two days was the sentence. It's a
20 misdemeanor offense.
21   Q. Okay, and you see the case number is
22 91290569, but you don't have any memory
23 whatsoever as to what, like, the allegation of
24 what your criminal conduct was that resulted in

Page 412

1  this charge and your guilty plea?
2    A. No.
3    Q. Okay.
4    A. Because I don't remember pleading guilty to
5  it, but it shows I did.
6    Q. That's okay. If you don't have -- If --
7    A. It was listed as a felony.
8    Q. If you don't have a memory of it then
9  that's -- You can answer that because I want to
10 go to the next question because I want to finish
11 up so I don't hold everybody here.
12   A. Okay.
13   Q. The next arrest block says 6-July-1990.
14       Do you see that?
15   A. Yes.
16   Q. The name is Dukes, William R., date of
17 birth 16 December of 1967, arrest address 2619
18 West Wellington, Chicago. All right, this arrest
19 charge reflects criminal sexual abuse.
20       So I have to ask you: Do you have any
21 recollection of being arrested on 6 July of 1990
22 at or near 2619 West Wellington for criminal
23 sexual abuse?
24   A. Yes.

103 (Pages 409 to 412)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 413

1   Q.  What is your memory of that event?
2   A.  This one is the one where I ended up with a
3   shotgun in my back basically waiting for the
4   preacher to get us married until she said she
5   wasn't pregnant anymore.
6   Q.  All right, my question to you is this,
7   Mr. Dukes.  Can you look at me for a second?
8       My question is:  I want you to
9   specifically give me your best understanding of
10  what the allegation was of your criminal
11  misconduct that related in this charge.  I don't
12  care about daddy wanting to get you married.
13      What I want to know is what is your
14  understanding?
15      What did they charge you with
16  criminally for doing on that date?
17  A.  On this, I was messing around with a girl
18  that was 17 years old.  I was 21 or so, and we
19  were in a serious relationship, and mom and dad
20  found out about it, and mom called the police so
21  dad wouldn't kill me first and then they --
22  Q.  What's your understanding of what mom
23  called the police to allege against you?
24  A.  Somebody over 18 was messing with her

Page 414

1   17-year-old daughter.
2   Q.  All right, so something having to do with
3   sex with a minor?
4   A.  Yeah, she turned 18 during this -- What was
5   it?  July 25th and July 6th, she turned 18 in
6   between then.
7   Q.  All right, and it was SOL.  You know what
8   SOL means, stricken with leave to reinstate.  So
9   this charge was dismissed.
10      All right, let's go to the next block
11  down.  It says an arrest of 8-February-1987.
12      Do you see that?
13  A.  Yep.
14  Q.  And that charge reflects a charge of
15  burglary.
16      Do you see that?
17  A.  Yes, I do.
18  Q.  The charge is a felony.  Case number
19  87CR0245101.  Again, your name is listed as
20  Dukes, William R.  It does not have a date of
21  birth, and it does not have an address or a
22  residence address listed, but it does have the
23  charge of burglary.  So I want to ask you.
24      Do you recall being arrested in

Page 415

1   February of 1987 for a charge of burglary?
2   A.  Yes.
3   Q.  Tell me about that burglary arrest.
4       What was the allegation of the nature
5   of the burglary?
6   A.  It was dismissed.  It was a building --
7   apartment building's basement storage area that
8   somebody had broke into.  I didn't do it, and the
9   person I was there with had left.
10      I was in the basement area, yes, but I
11  didn't break into anything.  I was in the
12  basement area, pool table, ping pong, just
13  goofing around.
14  Q.  Do you recall going to trial on that and
15  being found not guilty?
16  A.  No, I didn't go to trial.  It was
17  dismissed.
18  Q.  Look at page eight of eight at the top.
19      Do you see where it says disposition,
20  plea not guilty, jury waived, finding not guilty?
21  A.  I don't remember going to trial on that.
22  Q.  Okay, by the way, I guess we should have
23  told you this earlier.  If you don't have a
24  memory, if you really don't remember, you can

Page 416

1   simply say that.  You see a disposition date of
2   4-December-1987 there.
3       So you don't remember going to --
4   A.  Okay, disposition date was the day I went
5   to trial?
6   Q.  Well, that's what it says.
7   A.  Okay, and I was arrested on February 8th,
8   1987.
9   Q.  And six months or eight months, whatever
10  that is, later has a disposition --
11  A.  Ten months.
12  Q.  -- date of 4-December-1987, plea of not
13  guilty, jury waived, finding not guilty.
14      Do you see that?
15  A.  Yeah, I see it.
16  Q.  You don't have any recollection of going to
17  trial?
18  A.  Nope.
19  Q.  All right, the last one I'm going to ask
20  you about is this arrest.  It's got an arrest
21  date of 30-September-1986, Dukes, William R., but
22  it has a date of birth of 16-November-1967.
23      So it's got your name with a different
24  date of birth.  So I want to ask you about this.

104 (Pages 413 to 416)

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 417

1    It's got a charge of burglary.
2         Do you see that?
3    A.  Yeah.
4    Q.  And it says sentence was probation for 30
5    months?
6    A.  Yep.
7    Q.  Did you -- Were you convicted of a burglary
8    and did you get a sentence of probation of 30
9    months back in 1986?
10   A.  I pled guilty to it.
11   Q.  Okay, so tell me about this burglary then.
12   Again, now, for the record, I'm talking about
13   it's a felony.  The case number is 86C11627901.
14   It's the last -- It's the block just above end of
15   report on the criminal history report.  So tell
16   me about this burglary.
17        What is your memory of the charge of
18   burglary that you faced back in 1986?
19   A.  It was a warehouse near my house.  It was
20   raining out, and I seen one of the doors had
21   been -- the bottom section of one of the garage
22   doors was open, and I crawled in it.  At first it
23   was just to get out of the rain and then I
24   started looking around.

Page 418

1    Q.  Okay, where were you living at the time on
2    30 September of 1986?
3    A.  2951 North Honore.
4    Q.  Do you remember who owned the warehouse,
5    what kind of warehouse it was?
6    A.  It was a moving company.
7    Q.  Okay, and so the burglary -- Is it your
8    understanding the burglary charge related to the
9    fact that you somehow accessed the warehouse
10   without any lawful permission to do so?
11   A.  Yeah.  I was trespassing, but I didn't have
12   no -- And then I started looking around.
13   Q.  Okay, when you say you started looking
14   around, do you mean you got inside the warehouse
15   and started walking around the warehouse and
16   looking at things?
17   A.  Yeah, it was dark.  I was just trying to
18   find another way out of the place.
19   Q.  Did you take anything from the warehouse on
20   this occasion?
21   A.  No.
22   Q.  Is your answer no?
23   A.  Yeah, my answer was no.  I didn't take
24   anything.

Page 419

1    Q.  In 1986 then is this your -- You know,
2    we've gone from '86 up through --
3    A.  Now.
4    Q.  Yeah, was this your first felony
5    conviction?
6    A.  Yes.
7    Q.  And so what is your understanding as you
8    sit here today, how many times have you pled
9    guilty to felonies in the State of Illinois?
10   A.  I think it was seven, wasn't it?
11   Q.  I'm asking your memory, your independent
12   memory.
13   A.  We just went through it.  I didn't keep
14   count.  It says seven.  So I'm assuming it was
15   seven.
16   Q.  How about Kentucky?
17        Have you ever pled guilty to any
18   criminal offenses in Kentucky?
19   A.  I think that was part of this.  I think it
20   was part of these, yes.  I pled guilty to two
21   forgeries down there.  That was part of the
22   August '91 through January '93 incarceration for
23   the forged instruments.
24   Q.  So are those the forged checks that you

Page 420

1    were talking about that you got from the
2    Wisconsin Can Company?
3    A.  Yes.
4    Q.  And so I may have missed that part.
5        So you cashed checks here in Illinois,
6    forged checks at certain Currency Exchanges, but
7    you also went to Kentucky and cashed forged
8    checks there?
9    A.  Several more there, yes.
10   Q.  Okay, and the State of Kentucky charged you
11   also --
12   A.  Yes.
13   Q.  -- with a criminal charge?
14   A.  They came and got me out of Illinois and
15   took me down there.
16   Q.  Okay, is that the only time you've pled
17   guilty to a felony in Kentucky?
18   A.  Yeah.
19   Q.  You don't have any other -- How about
20   misdemeanors in Kentucky?
21   A.  Driving, traffic.
22   Q.  But no other felonies?
23   A.  Nope.
24   Q.  How about other states, are there any other

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 421

1    states in which you've pled guilty to any sort of
2    felonies?
3        A. Nope.
4        Q. And nothing in Florida as an adult?
5        A. Nope.
6        MR. SULLIVAN: That's all I have.
7            CROSS-EXAMINATION
8        BY MR. RICHARDS:
9        Q. Okay, so now I get to ask you some
10   questions.
11       A. Okay.
12       Q. I'm going to try and keep it short.
13       A. Okay.
14       Q. First of all, there was a number of
15   questions to you about how basically the effect
16   of you didn't make a statement to the officers
17   during all the interrogation. You didn't admit
18   anything and so forth.
19           Do you remember all those questions you
20   were asked by a lot of these different people?
21       A. Yes.
22       Q. Okay, however, one thing that was said by
23   or was testified to by Washburn -- Washburn
24   testified in your first trial. He said --

Page 422

1    claimed that you said, well, I'm going to tell
2    you about my participation in the murders of
3    Marilyn and Bridget.
4            And then Washburn said he asked what
5    are you going to say, that you killed Marilyn and
6    Bridget? And he claimed that you said yes, yes,
7    I am.
8            Do you remember him testifying to that
9    claim that you made those statements at your
10   first trial?
11       A. Yes, I do.
12       Q. Okay, and was it your understanding that
13   was basically -- He was claiming that you
14   admitted guilt to a double-murder, correct?
15       MR. GAINER: Objection, foundation. Go
16   ahead.
17       MR. RICHARDS: You can answer the question.
18   BY MR. RICHARDS:
19       Q. That's what Washburn was saying?
20       A. Yeah, he was saying that.
21       Q. Okay, whether it was true or not, that's
22   what he was saying, correct?
23       A. That's what he was saying, yes.
24       Q. And do you remember that statement being

Page 423

1    used by State's Attorney Linas Kelecius when he
2    gave his closing argument?
3        A. Yes.
4        Q. In fact, wasn't a lot of his closing
5    argument devoted to your alleged statements to
6    Washburn?
7        A. Yes, they were.
8        Q. And these were the same statements that
9    were later suppressed or ordered suppressed by
10   the Appellate Court, correct?
11       A. Correct.
12       Q. And after those statements were admitted at
13   the first trial, were you convicted or acquitted?
14       A. The first trial? Convicted, natural life
15   in prison.
16       Q. And those statements you've said were not
17   admitted or at least to your knowledge and
18   understanding you believe they were not admitted
19   because the trial Judge at the second trial
20   couldn't consider those statements because that's
21   what the Appellate Court said, correct?
22       A. Correct.
23       Q. And in a trial in which those statements
24   were not admitted, were you convicted or

Page 424

1    acquitted?
2        A. Acquitted, not guilty on all counts.
3    You're free to go, and she basically -- She
4    didn't say it outright -- Never mind cuz it's my
5    interpretation of her basically saying what the
6    hell took so long and how did it get this far.
7        Q. Leaving that aside, is the fact that the
8    statements were admitted and emphasized at the
9    first trial where you were convicted and the
10   statements were not admitted -- alleged
11   statements were not admitted at the second trial,
12   is that your basis of your claim that the
13   fabrication of those statements contributed to
14   your conviction?
15       MR. GAINER: Object to form and relevance
16   as to his opinion. Go ahead. You can answer.
17       MR. RICHARDS: Well, okay.
18       THE WITNESS: Yeah, it's my belief that
19   that's exactly what happened. Because of his
20   false statements, I ended up convicted of
21   something I didn't do.
22   BY MR. RICHARDS:
23       Q. All right, now another thing that was
24   brought up is the idea that since you're claiming

106 (Pages 421 to 424)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                            WILLIAM DUKES

Page 425

1  that you didn't make the statements, that your
2  claim that your statements were involuntary --
3  somehow you can't make the claim that your
4  statements are involuntarily because you're
5  saying that you didn't confess and you didn't
6  admit.
7         Do you remember those questions from
8  defense attorney?
9     A. Yeah.
10    Q. Okay, are you aware of the legal rules --
11 Are you aware of any legal rule that prevents a
12 criminal Defendant from claiming that his
13 statements were coerced at the same time claiming
14 that he didn't make a statement.
15        Do you know of any legal rule that says
16 that?
17    A. No.
18    Q. Okay, I don't either.
19        In terms of -- It was also stated that
20 you didn't -- At your first trial nobody made a
21 claim that your statements could be suppressed on
22 the grounds that police had fabricated your
23 statements?
24        Do you remember those questions?

Page 426

1     A. Say that again, please.
2     Q. Maybe you don't.  You've had a lot of
3  questions.
4         Do you remember questions along the
5  lines of why didn't your attorneys at the first
6  trial move to suppress your statements on the
7  grounds that they were fabricated, the police
8  were making it up?
9     A. Vaguely.
10    Q. Vaguely, okay.  Then I'm not going to touch
11 that one because you don't remember.  We'll deal
12 with that at another point.
13        In terms of Killacky's involvement --
14 Well, let me ask you this:  Have you ever heard
15 of the cold case unit of the State's Attorney
16 Office?
17    A. Only after my arrest and the appointment of
18 the Public Defender and stuff like that.
19    Q. Right.
20        The Public Defender told you that this
21 was a cold case prosecution?
22    A. He told me it was a special prosecution,
23 and the cold case unit of the Chicago Police
24 Department was involved in it.

Page 427

1     Q. Okay, were you aware that Linas Kelecius
2  and Darren O'Brien at that point were both
3  members of the cold case unit of the State's
4  Attorney's Office?
5     A. No, I didn't.
6     Q. Okay, now after this had all happened,
7  after you were interrogated, after your arrest
8  and so forth and charged, did you -- what was
9  your belief, if you have one, as was Killacky
10 investigating you for drugs or guns or was he
11 investigating you for another purpose?
12        MS. KUNZER:  Objection, form and
13 foundation.
14        MR. GAINER:  And relevance --
15        MS. KUNZER:  And relevance.
16        MR. GAINER:  -- as to what his belief is.
17        MR. SULLIVAN:  Join.
18        MR. RICHARDS:  Okay, you can answer the
19 question if you can.
20        THE WITNESS:  Okay, August -- I'm sorry.
21 January 10th when I found out Brian Killacky was
22 working with -- as a police -- he was a police
23 officer, I didn't know he was a State's Attorney
24 investigator.  I just thought he was Chicago

Page 428

1  Police.  That's when they had told me they were
2  investigating me about the murders specifically.
3  BY MR. RICHARDS:
4     Q. All right, and were you aware whether Brian
5  Killacky was a State's Attorney investigator
6  assigned to the cold case unit?
7         MS. KUNZER:  Same objection, form,
8  foundation, relevance.
9         THE WITNESS:  No, I wasn't aware of that
10 until later after charging and disposition and --
11 or discovery and stuff.
12 BY MR. RICHARDS:
13    Q. But after that you were informed that he
14 was, in fact, working as an investigator with the
15 State's Attorney's cold case unit?
16    A. Correct.
17    Q. By the way, have you ever heard of the cold
18 case unit investigating cold cases of drugs and
19 guns?
20    A. No.
21        MS. KUNZER:  Objection, form, foundation,
22 relevance.
23 BY MR. RICHARDS:
24    Q. The cold case unit investigates murders,

107 (Pages 425 to 428)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                           WILLIAM DUKES

Page 429

1   does it not?
2       MR. GAINER:  Objection to relevance.
3       MS. KUNZER:  Join.
4       THE WITNESS:  Yes.
5   BY MR. RICHARDS:
6       Q.  All right, now you said that one -- You've
7   said in your complaint one reason that you're
8   claiming that your statements or any statements
9   alleged to have been made would have been
10  involuntary is that you asserted right to counsel
11  on numerous occasions, correct?
12      A.  Correct.
13      Q.  You also mentioned the length of the
14  interrogation which you say is 36 hours, right?
15      A.  Yes.
16      Q.  Now during those 36 hours did you get any
17  sleep?
18      A.  No.
19      Q.  How were you feeling at the end of the 36
20  hours?
21      A.  Like a zombie, like walking dead,
22  exhausted.
23      Q.  And you said that also when you were
24  arrested -- that before you were arrested you had

Page 430

1   been doing cocaine on a daily basis?
2       A.  Yeah.  It started around the first of
3   December -- no, mid November and it got almost
4   daily by the first week of December.
5       Q.  And what you are also claiming is that
6   Killacky must have put cocaine in an area where
7   you could find it because he directed you to
8   automobiles and other places where cocaine just
9   happened to be and you could use it.
10          Is that fair?
11      A.  He directed where I could find it probably
12  assuming that I would take it which I did.  I
13  pocketed it; and after he left, I had used it or
14  he thought I'd resell it to him later.  I don't
15  know, but I ended up relapsing into cocaine
16  addiction after the first time he did it.
17      Q.  Now how often were you in contact with
18  Killacky during the period when you were having
19  dealings with him before your arrest?
20      MS. KUNZER:  Objection, asked and answered.
21      MR. GAINER:  Yeah, I'll join.  That was
22  asked about an hour-and-a-half ago.
23      MR. RICHARDS:  I just want to do it to --
24  but anyway, you can answer.

Page 431

1       THE WITNESS:  Every couple days starting in
2   mid-October and by October -- By November it
3   turned into either phone or daily in person
4   talking to him about work and stuff like that.
5           And he ended up getting me to quit my
6   job at Jiffy Lube because his brother-in-law,
7   Fernando, had work, and he'd pay me $12 an hour
8   cash.
9           He took me to a couple of job sites,
10  one out near O'Hare, one at an apartment building
11  off of Grand and Fullerton I think it was,
12  Elmwood Park or something in that general --
13  Grand and Fullerton where they crisscross.  He
14  took me there to do clean up work and stuff.
15  BY MR. RICHARDS:
16      Q.  Let me interrupt just because I want to get
17  to my point without rehashing so much material
18  that we've already gone through.
19          The times when you were with Killacky,
20  in your -- Were you visibly showing the signs of
21  cocaine addiction in your view?
22      MS. KUNZER:  Objection, form, relevance.
23      MR. SULLIVAN:  Join.
24      MR. RICHARDS:  You can answer.

Page 432

1       THE WITNESS:  Yeah.  I was always shaking
2   and, like, nervous, kind of paranoid, always
3   looking over my shoulder, stuff like that, yeah.
4   BY MR. RICHARDS:
5       Q.  Now you were saying in your complaint that
6   Detective Sobczak made up the business about
7   rough sex with Lucy.
8           Do you remember -- You know that's in
9   your complaint, correct?
10      A.  Yes.
11      Q.  And you're saying she fabricated those
12  statements.
13          You never mentioned rough sex, correct?
14      A.  Exactly.  I never said that.
15      Q.  Okay, and are you aware that the comments
16  about rough sex played a role in -- whether the
17  comments about rough sex played a role in your
18  first conviction?
19      A.  Yes, they did.  They were brought up at
20  trial by Sobczak and denied by Lucy, and it made
21  me look like some kind of sex fiend I guess in
22  the eyes of the jury.
23      Q.  And do you remember what the Appellate
24  Court said about that evidence?

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                      WILLIAM DUKES

Page 433

1      A. That should have never been allowed in
2   because there were prejudicial and not -- They
3   didn't point to guilt. They were just
4   prejudicial toward guilt. I don't know what the
5   exact terminology was.
6      Q. Now in terms of -- We've gone a lot into
7   this alibi business, right.
8         But, first of all, are you aware of the
9   approximate time the murders are supposed to have
10  been committed?
11     A. September 2nd, '93, they told me it was
12  around midnight.
13     Q. Okay, now was it around midnight that you
14  were at the crack house with Angel?
15     A. No. At midnight I was going in my house at
16  2758 North Richmond, Richmond and Diversey.
17     Q. Did you ever tell Sobczak that the house
18  you lived in was a crack house?
19     A. No, I did not.
20     Q. Did you ever provide her with a first or
21  last name of Angel so that she could check out
22  the supposed crack house alibi?
23     A. I never gave her a first name or a last
24  name. I gave her the name Angel, Angelo, and I

Page 434

1   told her the location of the building where he
2   lived, the first floor to the right of the front
3   stairs.
4      Q. And are you aware of what she actually
5   testified to at trial was that you had given as
6   an alibi that you were at a crack house and she
7   had checked that out and it didn't check out?
8      A. Yes.
9      Q. Was that the truth or a lie?
10     A. It was a lie because she went to 2758 North
11  Richmond and not to the 1900 block of North
12  Sawyer where Angel lived where I specifically
13  directed her to the house, the third house off of
14  the south side alley of Armitage, east side of
15  Sawyer, next to the vacant lot, and it was a
16  graystone building.
17        It's not a brick building. It's them
18  big gray blocks that they make buildings. You
19  know what I'm talking about, graystone.
20     MR. RICHARDS: I have no further questions.
21     MR. SULLIVAN: I got some brief follow-up
22  on that. I'll be very brief.
23
24

Page 435

1         REDIRECT EXAMINATION
2         BY MR. SULLIVAN:
3      Q. So let me ask you something.
4         Angel's house that you're talking
5   about, you purchased crack within -- nearby that
6   location, what you thought was crack, right?
7      A. He is at Kedzie which is 3200 north -- I
8   mean 3200 west, and Armitage is 2000 north. We
9   went to Central Park which is --
10     Q. You went to Central Park and Ohio to buy
11  the crack?
12     A. Right.
13     Q. What you thought was crack?
14     A. Right.
15     Q. Then you went back to Angel's house,
16  correct?
17     A. Yes.
18     Q. To smoke the crack?
19     A. Right. We went in the basement.
20     Q. All right, so would you call Angel's house
21  a crack house?
22     A. No, we went in the basement. It was a man
23  cave. It wasn't a crack house.
24     Q. So it was a house where you were going to

Page 436

1   smoke crack, but it's not a crack house.
2      A. It's not like she implied in trial where
3   that's all people do, go there and buy their
4   crack and sit there and smoke it.
5      Q. But you'll admit you purchased crack
6   cocaine -- what you thought was crack cocaine
7   with Angel at the intersection of -- at or near
8   Central Park and Ohio --
9      A. Right.
10     Q. -- and took it back to Angel's house --
11     A. We went to the basement.
12     Q. -- with the specific intention of smoking
13  crack within that house, right?
14     A. Yeah.
15     Q. Okay, gotcha. Now I forgot to ask a couple
16  questions about your drug use.
17        After you got out of prison in 2019 --
18     A. Okay.
19     Q. -- did you go back to using any sort of --
20  Like, did this trauma cause you to -- I forget
21  the term you used before.
22     A. Relapse.
23     Q. -- relapse?
24        Did you start using drugs again?

109 (Pages 433 to 436)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                          WILLIAM DUKES

Page 437

1     A. I started smoking cigarettes and I did
2  drink a little. I wasn't very abusive with the
3  alcohol. I stayed away from the drugs for a
4  while. Every now and then I did relapse, but I
5  didn't get to where I was using it daily. I'd
6  use it and --
7     Q. All right, let me stop you there.
8        So every now and then you relapsed into
9  using drugs?
10    A. Every now and then I did some drugs and
11 then stopped because I realized what the hell did
12 I do? I'd be drinking and then use a line of
13 cocaine.
14    Q. Okay, that's what I was going to ask you.
15       When you said every now and then you
16 relapsed into using drugs, now this is after you
17 got out in 2019, correct?
18    A. Yes, I was self-medicating.
19    Q. Yeah, I got it.
20       So are you using cocaine?
21    A. Occasionally, yes.
22    Q. Are you using crack?
23    A. No.
24    Q. But you're drinking alcohol?

Page 438

1     A. Yes.
2     Q. Besides cocaine, are you using any other
3  drugs?
4     A. Nope.
5     Q. Okay, November of 2022, you're in here now
6  for being arrested for --
7     A. Okay, okay, yeah, yeah, yeah. Then I did,
8  yes.
9     Q. Okay, what were the drugs you were using --
10    A. Then I started using crack by then.
11    Q. Okay, so in November of 2022 you were using
12 crack cocaine?
13    A. Yeah.
14    Q. How often were you using crack cocaine?
15    A. If somebody had it, I'd do it as much as
16 they'd give me, daily sometimes, sometimes once
17 every two or three weeks, but by the first of
18 November, no.
19    Q. What was the date you were arrested in
20 November?
21    A. November 10th.
22    Q. Okay, so on November 10th of 2022 were you
23 using crack cocaine?
24       MR. RICHARDS: Objection, privileged.

Page 439

1        THE WITNESS: Fifth Amendment.
2  BY MR. SULLIVAN:
3     Q. Okay, and let's clear that for the record.
4  I'm asking you whether the date of your arrest,
5  November 10th, 2022, you used crack cocaine.
6  Your response is the Fifth Amendment.
7        So the record is clear, what you're
8  saying is I'm going to invoke my Fifth Amendment
9  constitutional privilege and refuse to answer
10 that question because the answer may tend to
11 incriminate me.
12       Is that accurate?
13       That's why you're not answering my
14 question?
15    A. I'm not answering it because it might be
16 part of the other case. I don't know.
17       MR. RICHARDS: The answer we think is
18 privileged, and it would tend to incriminate him
19 because it's the date of arrest on the other
20 case, and that's why we're making the invocation.
21       MR. SULLIVAN: Yeah. So the record is
22 clear, my question was: On November 10th of
23 2022, prior to that arrest, were you smoking or
24 doing -- I don't know how you do crack, but were

Page 440

1  you ingesting crack cocaine.
2        And your answer is you're going to
3  refuse to answer that and invoke your Fifth
4  Amendment privilege.
5        Is that right, Counsel?
6        MR. RICHARDS: Yes.
7  BY MR. SULLIVAN:
8     Q. All right, on November 10th of 2022, did
9  you attempt to murder a female that you had been
10 smoking crack cocaine with?
11       MR. RICHARDS: Objection, same objection
12 and we invoke.
13 BY MR. SULLIVAN:
14    Q. And, Mr. Dukes, you're the deponent here.
15       My question is: Did you attempt to
16 murder a female that you were doing drugs with,
17 crack cocaine specifically, on November 10th,
18 2022?
19       And you're going to refuse to answer
20 that, again, based upon the Fifth Amendment
21 because your answer to my question may tend to
22 incriminate you.
23       Is that right?
24    A. I didn't try to kill anybody.

110 (Pages 437 to 440)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                      WILLIAM DUKES

Page 441

1    Q. Did you use a knife with her?
2    A. No.
3        MR. RICHARDS: Objection, I'm asking that
4    -- or advising my client that he should invoke
5    his Fifth Amendment privilege because this goes
6    to a charge which has not yet been proved and for
7    which he is currently being charged.
8        MR. SULLIVAN: Right, and the Fifth
9    Amendment privilege means -- The Fifth Amendment
10   privilege is a privilege. It's a constitutional
11   privilege that an individual can refrain from
12   answering questions if he truly believes that the
13   answer may tend to incriminate him.
14       That's what the Fifth Amendment
15   privilege is based upon, and I need to make that
16   record because civil cases have different rules
17   with regard to invocation of the Fifth Amendment
18   privilege.
19       MR. RICHARDS: I am aware of the rules, and
20   I'm advising my client to, as he has done
21   previously, invoke the Fifth Amendment privilege.
22   BY MR. SULLIVAN:
23   Q. And are you going to follow your lawyer's
24   advice?

Page 442

1    A. Yes, I am.
2    Q. All right, my last question is on
3    November 10th of 2022 did you attempt to sexually
4    assault the female that you were with that day?
5        MR. RICHARDS: Objection, privileged.
6        THE WITNESS: Again, I take my Fifth
7    Amendment right.
8        MR. SULLIVAN: Okay, that's all I have.
9        MR. GAINER: I just have a quick question.
10           REDIRECT EXAMINATION
11           BY MR. GAINER:
12   Q. Just to be clear, so it's clear on the
13   record, Washburn testified at your first trial,
14   right?
15   A. Yes.
16   Q. And he attributed -- He said a bunch of
17   things about what you said to him during the
18   course of those two days, January 9th and January
19   10th, right?
20   A. What he claimed I said to him, yes.
21   Q. Right, and your testimony here and your
22   complaint says and everything else says that he
23   made all of those things up, right?
24   A. Yes.

Page 443

1    Q. So you didn't say anything incriminating
2    yourself to Washburn, correct?
3    A. Not that I recall, no.
4        MR. GAINER: Okay, that's it. Nothing
5    further.
6        MR. ACKER: I have one question.
7           REDIRECT EXAMINATION
8           BY MR. ACKER:
9    Q. So, sir, you talked about the fact that --
10   Your counsel just asked you a series of questions
11   about Defendant Sobczak's investigation of the
12   crack house and that you don't believe that she
13   ever went to the crack house or followed up on
14   that.
15       Is that correct?
16   A. Yes.
17   Q. Did you ever talk to Angel as to whether or
18   not anyone ever came by his house to check up on
19   your alibi?
20   A. No, I did not.
21   Q. Okay, so how do you know that Sobczak never
22   did that?
23   A. It was never brought up at trial, and it
24   was never in any of the discovery that I seen

Page 444

1    before trial.
2    Q. And there was never any questions asked
3    about that, was there, at trial, your original
4    trial?
5    A. No. They never even asked her how she
6    verified it -- that she verified I was -- to
7    disprove my alibi. Nobody asked her that
8    question.
9    Q. Okay, so you don't know whether or not she
10   went to check it out?
11   A. She lied or told the truth in any of her
12   police reports. It looks like she made police
13   reports on everything. Why wasn't there a police
14   report in my file. That's all I -- That's the
15   basis of my assumption.
16   Q. Answer my question.
17       Did you know whether or not she went to
18   talk to Angel at Angel's house or not?
19   A. I have no proof if she did, no.
20       MR. ACKER: Okay, I have no further
21   questions.
22       MR. RICHARDS: I just have one follow-up.
23
24

111 (Pages 441 to 444)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

DUKES v. CHICAGO                                    WILLIAM DUKES

Page 445

1          RECROSS-EXAMINATION
2          BY MR. RICHARDS:
3      Q.  In the police report, she does say that she
4  went to talk to Aaron Jaramillo, correct?
5      A.  Yeah, I did see one of those.
6      Q.  Okay, Aaron Jaramillo didn't run a crack
7  house.
8      A.  No, he did not.
9          MR. RICHARDS:  Nothing further.
10         MR. SULLIVAN:  Just a brief follow-up then.
11 I forgot about that.
12         FURTHER REDIRECT EXAMINATION
13         BY MR. SULLIVAN:
14     Q.  Okay, so you did see evidence in the
15 discovery that Sobczak was going out and checking
16 out some of the things that supposedly you stated
17 about an alibi, correct?
18     A.  I said that.  She went in January of 1995
19 or February of 1995, a year-and-a-half later, and
20 asked the people that I -- some of the people I
21 was with at 2758 Richmond who were you with --
22 where was I at that day and who were you with.
23         You can't answer that because if it's a
24 non-eventful night for somebody, you're not gonna

Page 446

1  remember it.  None of us here can remember what
2  we were doing unless it was a wedding, a
3  birthday, or something like that, what we were
4  doing 18 months ago on an uneventful night.
5          MR. SULLIVAN:  That's all I have.
6          MR. RICHARDS:  Okay, if that's the last
7  question, we have another inquiry.
8          Mr. Dukes, you have a right to what's
9  called -- you can either waive or reserve
10 signature.
11         If you reserve signature, it means that
12 you want the court reporter to send you a copy of
13 the transcript which you can look at to make sure
14 that there is no mis-transcription of a word, not
15 content, but just mis-transcription, or you can
16 rely on the court reporter to record it
17 accurately and waive your signature.
18         So you can do either one, waive or
19 reserve or ask for my advice.
20         THE WITNESS:  I think I'd like to reserve.
21 What's your advice?
22         MR. RICHARDS:  My advice is to waive.
23         THE WITNESS:  Okay, I'll waive.
24     (FURTHER THE DEPONENT SAYETH NOT.)

Page 447

1          REPORTER'S CERTIFICATE
2
3          I, Cynthia A. Pavesich Good, Certified
4  Shorthand Reporter within and for the State of
5  Illinois, do hereby certify that heretofore,
6  to-wit, on Tuesday, January 17th, 2023,
7  personally appeared before me at 2602 South
8  California Avenue, Post 5, Chicago, Illinois,
9  WILLIAM DUKES, a witness in a certain cause now
10 pending and undetermined in the United States
11 District Court for the Northern District of
12 Illinois, Eastern Division, wherein William Dukes
13 is the Plaintiff and Chicago Police Sergeant
14 James Washburn, #20372; Chicago Police Detective
15 Rolando Rodriguez, #20751; Cicero Police
16 Detective Darlene Sobczak, #123; Cicero Police
17 Detective Robert Donegan, #488; Cicero Police
18 Detective Allan Pineda, #496; Cook County State's
19 Attorney Investigator Brian Killacky, #361; Cook
20 County State's Attorney Kim Foxx; City of
21 Chicago; and Town of Cicero are the Defendants.
22         I further certify that the said
23 WILLIAM DUKES was by me first duly sworn to
24 testify the truth, the whole truth, and nothing

Page 448

1  but the truth in the cause aforesaid; that the
2  testimony then given by the said witness was
3  reported stenographically by me in the presence
4  of said witness and afterwards reduced to
5  typewriting, and the foregoing is a true and
6  correct transcript of the testimony so given by
7  said witness as aforesaid.
8          I further certify that the
9  signature of the witness to the deposition was
10 waived by agreement of counsel for the respective
11 parties.
12         I further certify that the taking
13 of this deposition was in pursuance of notice,
14 and that there were present at the taking of this
15 deposition Mr. Stephen L. Richards on behalf of
16 William Dukes; and Mr. Brian P. Gainer on behalf
17 of Chicago Police Sergeant James Washburn,
18 #20372; Chicago Police Detective Rolando
19 Rodriguez, #20751; and City of Chicago; and
20 Mr. Andrew Y. Acker on behalf of Cicero Police
21 Detective Darlene Sobczak, #123; Cicero Police
22 Detective Robert Donegan, #488; and Cicero Police
23 Detective Allan Pineda, #496; and Ms. Amy M.
24 Kunzer on behalf of Cook County State's Attorney

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21

DUKES v. CHICAGO                                              WILLIAM DUKES

Page 449

```
 1    Investigator Brian Killacky, #361; and Mr. Sean
 2    M. Sullivan on behalf of Town of Cicero.
 3                IN WITNESS WHEREOF:  I hereunto
 4    affix my hand as Certified Shorthand Reporter
 5    within and for the State of Illinois on this 17th
 6    day of March, A.D., 2023.
 7
 8
       Cynthia A. Pavesich Good, CSR
 9     CSR License # 084-003483
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

113 (Page 449)

CYNTHIA A. PAVESICH & ASSOCIATES
(312) 214-1992

Electronically signed by Cynthia Pavesich  (001-221-339-3972)                    85f9d337-2c78-4d25-8597-c50addd32a21